IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC. | DOCKET NO. 03-2478C |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES OF AMERICA, | (Judge Susan G. Braden) |
| Defendant. | Hearing Date: TBD |

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . 1

II. STANDARD FOR SUMMARY JUDGMENT . . . . . 2

III. OBJECTION TO ALL EVIDENCE OFFERED BY DEFENDANT SUMMARY OF FACTS . . . . . 3

IV. SUMMARY OF FACTS. . . . . . 4

V. ARGUMENT . . . . . 16

A. DEFENDANT'S PRIOR MATERIAL BREACHES OF CONTRACT EXCUSED PLAINTIFF'S RESPONSIBILITY TO RESPOND TO THE CURE NOTICE, PLAINTIFF'S ISSUANCE OF THE CURE NOTICE WAS NOT JUSTIFIED, AND PLAINTIFF'S FAILURE TO RESPOND TO THE CURE NOTICE WAS EXCUSABLE . . . . . 17

1. Defendant's Prior Material Breaches Relieved Plaintiff of Its Duty to Respond to the Cure Notice . . . . . 18

2. Defendant's Cure Notice was Not Justified and Therefore Not Valid . . . . . 23

3. Plaintiff's Failure to Respond to the Cure Notice Was Excusable and Justified . . . . . 27

B. PLAINTIFF'S FAILURE TO MAKE PROGRESS ON THE PROJECT DID NOT JUSTIFY THE DEFAULT TERMINATION . . . . . 29

C. REMCON'S FAILURE TO MAKE PROGRESS DID NOT VIOLATE THE DISPUTE CLAUSE AND IS EXCUSED . . . . . 35

VI. CONCLUSION . . . . . 40

## TABLE OF AUTHORITIES

### *FEDERAL CASES*

*Abcon Associates, Inc. v. United States*
49 Fed. Cl. 678, 687, 690-691 (Fed. Cl. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
*Adickes v. S.H. Kress & Co.*
398 U.S. 144, 90 S. Ct. 1598, 1608 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
*Alaska Pulp Corporation, Inc. v. United States*
48 Fed. Cl. 655, 659 (Fed. Cl. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*Alliant Techsystems, Inc. Global Environmental Solutions Business Division v. United States*
178 F.3d 1260, 1264, 1276 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 2512 (1986) . . . . . . . . . . . . . . . . . . . 2, 3
*Appeal of Howell Tool and Fabricating, Inc.*
ASBCA No. 47939, 96-1 B.C.A. (CCH) 28,225 (1996) . . . . . . . . . . . . . . 36, 37, 38
*Cuyahoga Metropolitan Housing Authority v. U.S.*
60 Fed.Cl. 481, 484 (Fed. Cl. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*Celotex Corp. v. Catrett*
477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 2
*Composite Limits, Inc. v. U.S.*
27 Fed. Cl. 310, 324 (Fed. Cl. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
*Contract Maintenance, Inc.*
75-1 B.C.A. ¶ 11,207 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
*Curtis L. Holt d/b/a Advanced Maintenance Company*
76-2 B.C.A. ¶ 11,999 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
*Danzig Corp. v AEC Corp.*
224 F.3d 1333, 1337, 1338, 1339 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 23, 24
*Discount Co v. United States*
554 F.2d 435, 438, 440 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 33, 34
*Guerini Stone Co. v. P.J. Carlin Const. Co.*
248 U.S. 334, 344, 39 S. Ct. 102, 106 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*H.F. Allen Orchards v. United States*
749 F.2d 1571, 1574 (Fed. Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Hillebrand Constr., Inc.*
ASBCA No. 45853, 95-1 B.C.A. (CCH) ¶ 27,464 (1995) . . . . . . . . . . . . . . . . . . . 30
*J.D. Hedin Constr. Co. v. United States*
408 F.2d 424, 431 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25
*Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*
755 F.2d 158, 163 (Fed. Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
*Macri v. Unites States*
353 F.2d 804, 810 (9th Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*Malone v. United States*
849 F.2d 1441, 1445 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 38, 39
*Metric Systems Corporation v. McDonnell Douglas Corporation*
850 F.Supp. 1568, 1580 (N.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*Michigan Joint Sealing, Inc.*
ASBCA No. 41477, 93-3 B.C.A. (CCH) ¶ 26,011 (1993) . . . . . . . . . . . . . . . . . . . 30
*Morganti National, Inc. v. United States*
49 Fed. Cl. 110, 140, 147 (Fed. Cl. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21
*Old Stone Corp. v. U.S.*
63 Fed. Cl. 65, 83 (Fed. Cl. 2004)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*Orr v. Bank of America, NT & SA*
285 F.3d 764, 773, 774-775 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4
*Pacific Intermodal Corp.*
73-2 B.C.A. ¶ 10,151 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
*Pruess v. United States*
412 F.2d 1293 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36
*Roxco, Ltd. v. U.S.*
60 Fed. Cl. 39-41, 43-44, 147, 687, 690-691 (Fed. Cl. 2004) . . . . . . . . 18, 19, 24, 25
*Spiritual Sky Scented Products*
82-2 B.C.A. ¶ 15,948 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
*State of Florida v. United States*
81 F.3d 1093, 1095 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33, 34
*Stoeckert v. United States*
391 F.2d 639, 645 (Cl. Ct. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
*Sweats Fashion, Inc. v. Pannill Knitting Co., Inc.*
833 F.2d 1560, 1562 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Tubular Aircraft Products, Inc. v. U.S.*
213 Ct. Cl., 749, 750, 566 F.2d 1190, (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . 24
*United States v. Utah Construction and Mining Co.*
384 U.S. 394, 413, 86 S. Ct. at 1555 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

***STATUTES***

Rules of Court of Federal Claims ("RCFC") 56 (c), (e) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3
Federal Rules of Evidence Rule 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

 276563v1WP/1918.001

# I.

# INTRODUCTION

Defendant United States of America's ("Defendant") Motion for Partial Summary Judgment is an inadequate attempt to convince the court to rule, as a matter of law, that Defendant's drastic and draconian termination of Plaintiff Remediation Constructors, Inc. ("REMCON" or "Plaintiff") for default was proper. As clearly demonstrated below, Defendant's motion fails to address the context and numerous facts that led to Plaintiff's excusable decision not to return to the subject Project in 2003, fails to address the multiple prior breaches of contract by Defendant from 2001 through 2003, and baldly attempts to simplify a very complex and fact driven analysis regarding terminations for default.

Conversely, as demonstrated in this opposition, **Defendant's multiple material breaches of contract over the course of the Project was the root cause of Plaintiff's inability to progress with the Project in 2003.** Defendant's issuance of a cure notice was legally and factually unjustified. There are clear questions of fact regarding the following root causes of Plaintiff's alleged failure to adequately respond to the cure notice or to make progress on the Project. They include the following:

1) Did Defendant materially breach the contract with Plaintiff?;
2) Did Defendant delay Plaintiff's ability to timely perform on the Project?;
3) Did Defendant place Plaintiff in economic duress by not timely paying or issuing time extensions to Plaintiff or executing written modifications to the contract?;
4) Did numerous documented differing site conditions and constructive changes, belatedly admitted by the government to exist, cause the amount of work to be performed, and the critical path, to be substantially different than what Plaintiff contracted and planned to perform?;
5) Did Defendant fail to timely and adequately respond to Plaintiff's claims and request for equitable contract adjustment?; and

6) Did Defendant violate its implied duties to cooperate and not hinder performance, and to provide an adequate design?

Since there are clearly questions of fact regarding whether Plaintiff's failure to perform work in 2003 was excused based on the plethora of reasons discussed in this opposition, and because terminations for default are generally disfavored,[1] the court should deny Defendant's motion and allow the issue of Plaintiff's allegations that termination for default was improper to proceed to trial.

## II.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when no genuine issue of material fact requires trial. (Rules of Court of Federal Claims ("RCFC") 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). The moving party bears the burden to make a prima facie showing of the nonexistence of any genuine issue of material fact. *Id.* A factual dispute is genuine if any evidence on file could support a reasonable finding in favor of the opposing party. A fact is material if it could affect the outcome of the case in any way. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).[2]

The availability of summary judgment turns on whether a proper jury question is presented. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598 (1970). The moving parties' submissions must foreclose the possibility of the existence of certain facts from which "it would be open to a jury ... to infer from the circumstances" in favor of the opposing party. *Id.* at 158-159, 90 S. Ct. at 1608.

---

[1] The Court of Federal Claims has held that a "default termination is a drastic sanction, which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States,* 408 F.2d 424, 431 (Ct. Cl. 1969).

[2] Please note that because no competent evidence was provided by the moving party (no declarations establishing the competence of the evidence which the motion is allegedly based was provided) in support of its motion, the motion is properly denied. See Section III infra.

The burden upon each party depends on who would bear the burden of proof at trial. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2512. If the moving party bears the initial burden of proof at trial, the moving party must show the absence of any fact from which the jury could infer the moving party did not meet their burden. *Id.*[3] If there is any doubt about factual issues, the benefits of all favorable inferences and presumptions run to the party opposing summary judgment. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir.1984); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir.1985).

## III.

## OBJECTION TO ALL EVIDENCE OFFERED BY DEFENDANT

Defendant's motion for partial summary judgment references numerous documents in an appendix, and offers facts, to support its motion. However, "a trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). Accordingly, the federal courts have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment. *Id.* (Also see *Cuyahoga Metropolitan Housing Authority v. U.S.*, 60 Fed.Cl. 481, 484 (Fed. Cl. 2004) "Because Mr. Morton's declaration would be inadmissible as evidence under Rule 701 of the Federal Rules of Evidence, it is not properly includible under RCFC 56(e) as an exhibit to defendant's motion for summary judgment.")

Defendant primarily relies on documentary evidence, exclusive of pleading, discovery responses, or depositions, in support of its motion. Amazingly, Defendant fails to authenticate *any* of the documents, fails to provide any affidavits or declarations to support its factual contentions, and wholly fails to provide any admissible evidence to support its motion. Based on Defendant's abject failure to follow the rudimentary rules of motion work and evidence, the

---

[3] Defendant admits on page 10 of its opening brief that it has the burden of proof to establish that the default was proper.

Court should refuse to consider any inadmissible evidence (*all* of Defendant's exhibits) and thus deny Defendant's motion in its entirety.

Further, Defendant's Proposed Findings of Uncontroverted Fact is insufficient because it does not cite to evidence that has been properly introduced and authenticated. The moving party's failure to provide a sufficient statement of uncontroverted facts is ground by itself for denial of the motion. *Orr*, 285 F.3d at 774-775 – failure to cite page and line number of deposition testimony 'warrants exclusion of the evidence').

## IV.

## SUMMARY OF FACTS

### Introduction

All of the following facts are supported by concurrently filed supporting declarations. The declarations submitted are those of Stephen B. Christensen, the Owner of REMCON, cited as "SBC Dec.", Thomas W. Lloyd, an expert for REMCON, cited as "TWL Dec.", and D. Michael Schoenfeld, counsel for REMCON, cited as "DMS Dec.". The D. Michael Schoenfeld declaration authenticates attached excerpts from deposition testimony of government witnesses, whose admissions substantiate that the government breached the contract and excused REMCON from further performance in 2003, and make the cure notice invalid and lacking in justification as a matter of law.

### Project Background

This matter involves work performed by REMCON for the National Park Service ("NPS") on a Project located in the Sequoia/Kings Canyon National Park in the Sierra Nevada mountains of California known as the Sherman Tree Parking Project ("Project"). The Project had three distinct components: the Upper Sherman Access Road and Parking Area, the Sherman Tree Trail, and the Lower Sherman Parking Area. (SBC Dec., ¶2).

The contract specifications required that two of the components (the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail) be complete before any work would proceed on the Lower Sherman Parking Area. As of July, 2003, due to delays directly

attributable to the NPS, work remained to be completed on the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail, and no work had been performed on the Lower Sherman Parking Area. (SBC Dec., ¶3). The Upper Sherman Access Road and Parking Area involved the construction of approximately 3,000 linear feet of a new two lane asphalt paved roadway, a new two level parking area, installation of 3,700 linear feet of domestic waterlines and 3,800 linear feet of electrical service line, installation of a new sewer system (including approximately 750 linear feet of sewer line, a concrete septic tank, dosing siphon tank, and a sewage leach field), construction of a comfort station, a wayside kiosk, rock revetments, landscaping/erosion control measures and related improvements. The Sherman Tree Trail component required the construction of approximately 2,000 linear feet of asphalt surfaced trail, including concrete/stone stairs, drainage improvements, timber edgings, a visitor overlook, and related landscaping/erosion control measures. The Lower Sherman Parking Area component included demolition and removal of existing structures and hardscape, construction of approximately 300 linear feet of concrete retaining wall with rock facing, realignment of the General's Highway, construction of a visitor comfort station, and related landscaping/erosion control measures. (SBC Dec., ¶4).

The NPS was responsible for the entire design of this Project and the plans and specifications were a combined product of internal design efforts by NPS personnel as well as by private designers retained by the NPS. (DMS Dec., ¶¶ 5, 6). The NPS issued a Request for Proposal ("RFP") for the Project in February 2001. In late February 2001, REMCON received a set of plans and specifications for the Project. REMCON, having previously worked for the NPS in the park, based its responsive proposal to the NPS on the information contained within these documents, including geotechnical reports and quantity estimates, as well as its general familiarity with the isolated and distant locale of the park from construction resources. (SBC Dec., ¶5).

Based upon the timing of the availability of the contract documents, and the required submission of proposals, REMCON, was prevented from conducting a site investigation to

confirm the accuracy, or to uncover any observable discrepancy, between the plans and specifications and the Project site. This was because the plans and specifications were published in the heart of winter when the jobsite, located at approximately 7,000 feet above sea level, was buried under snow, and because the date for submittal of proposals was March 29, 2001. It was not possible to confirm the accuracy of the government's estimates or discover any discrepancies. (SBC Dec., ¶6; DMS Dec., ¶5).

The Project site is in an area adjacent to a heavily visited national treasure (the General Sherman Tree), and had limited construction access and a limited construction season. Further compounding the Project difficulty was its location and weather. Instead of being able to work all or most months of the year, a limited construction season, depending on the extent and duration of winter precipitation and temperature, ranging from late May /early June through October, a duration of five or six months, was anticipated. The NPS RFP allowed less than three construction seasons to perform the work. The NPS awarded the contract to REMCON on May 15, 2001 and issued a Notice to Proceed on June 11, 2001. The completion date was in August 11, 2003. (SBC Dec., ¶7).

REMCON's submitted as-planned schedule called for all work on the Upper Sherman Area to be completed in the 2001 season and the Lower Sherman Area to be completed in the 2002 season. The NPS never questioned the logic of REMCON's as-planned schedule and its construction manager praised its reasonableness, completeness and content. (SBC Dec., ¶8; TWL Dec., ¶3(b),(d) and (e)). That schedule was impacted, however, at the outset of the Project by mistakes, errors and maladministration by NPS personnel as well as what turned out to be a design plagued with errors, omissions, conflicts and inconsistencies, all of which manifested themselves as breaches of contract as REMCON's ability to perform was severely hindered.

Prior to the issuance of the Notice to Proceed, Athena Demetry of the NPS, a field biologist and forester, marked all trees in the virgin forest which were to be removed by REMCON for construction of the Upper Sherman Access Road and Parking Areas. While

REMCON personnel occasionally walked the right-of-way with Ms. Demetry, and "assisted" her by placing the paint on trees which she determined were to be removed, the determination of which trees were to be removed was, by contract, and action in the field, exclusively the government's pursuant to section 1110, Part 1.04 A-F of the specifications. (SBC Dec., ¶10; TWL Dec., ¶3(b) and (f); DMS Dec., ¶¶6,8).

Thereafter, on June 11, 2001, the date the NTP was issued, REMCON began falling and logging the trees marked by Ms. Demetry. Once logging operations were complete, REMCON's surveyor, Guiliani & Kull ("G&K"), began to lay out the Upper Sherman Access Road and Parking Areas. G&K immediately discovered that about 600 feet of the road, as shown in the NPS plans and specifications, did not match the clearing limits that had been laid out by Ms. Demetry in the field. (SBC Dec., ¶11).

By that time, however, REMCON had already cut and removed the trees that Ms. Demetry had marked for removal. This discrepancy, for which REMCON had no responsibility, initiated a series of re-designs and other problems that impacted REMCON's ability to schedule and complete its work as it had originally planned. (SBC Dec., ¶12; TWL Dec., ¶3; DMS Dec., ¶¶3, 4, 6, 7 and 8). REMCON has not been compensated in time or money for virtually any of the costs or delay impacts that flowed from those changes. The limited compensation that has been received for the resulting extra work and delays was also belatedly received over a year after the extra work occurred. (SBC Dec., ¶¶1-60; TWL Dec., ¶3-6; DMS Dec., ¶¶ 3,4, 6 and 7).

The critical path on REMCON's as-planned schedule commenced with the clearing of trees and pioneering of the Upper Sherman access road and parking lots. It then transitioned to the construction of the comfort station and related improvements for the balance of 2001. But for the myriad of design deficiencies encountered, and directed performance of extra work and construction changes, the Upper Sherman work would have been completed by the end of the 2001 construction season. Unfortunately, the as-planned schedule was not able to be followed. (SBC Dec., ¶9; TWL Dec., ¶¶ 3-5).

The following extra work, and delay impacts and events, each of which individually as well as collectively hindered, delayed and impacted REMCON, and which have not been fully compensated for in time extensions and/or money, occurred, and are asserted to be material breaches of contract excusing further performance:

- The trees, designated by Ms. Demetry to be removed along the access road right-of-way, between Stations 24 and 30, were in a location up to fifteen feet off of the right-of-way set forth in the plans. As a result, the access road needed to be re-surveyed by REMCON's surveyor (recognized belatedly 14 months later by the Contracting Officer in Modification No. 4 as extra work) and the road was relocated by the government to a location into the hill from the planned locale. The content of Modification No. 4, in its Justification section, admits that the cause of the road relocation was not due to REMCON and is fully set forth in Stephen Christensen's declaration. (SBC Dec., ¶¶ 13-17; TWL Dec., ¶3(f); DMS Dec., ¶¶3,4,6,7 and 8).

- The burn pit in the Upper Parking Area, identified as containing approximately 2000 cubic yards, actually contained over 6000 cubic yards, causing delay and over $300,000 in additional costs. These costs and delays, incurred and experienced in June and July, 2001, were not recognized by the NPS until August/September 2002 when Modifications Nos. 3 and 4 was issued. The belated issuance of time and money was and is both a constructive acceleration and breach of contract. The NPS' justification admits liability and is set forth in Stephen Christensen's declaration. (SBC Dec., ¶18; TWL Dec., ¶3(f)(ii); DMS Dec., ¶¶ 3 and 6).

- Once the road was re-surveyed and pioneered, and the burn pit extra work performed, REMCON sought to excavate the access road to subgrade. As of July 30, 2001, REMCON encountered granitic rock which could not be "ripped" with a D-8 Dozer. The soils report expressly stated that all earthen material to be encountered to construct the road could be ripped and that blasting would not be necessary except in isolated instances ("floater rocks"). What REMCON encountered as of July 30th was not a floater, but solid granitic rock which required blasting. The blasting occurred, continuously, until September 13, 2001, a duration of over six weeks, which was twice the planned earthwork duration for the entire Project. The



276563v1WP/1918.001

government, for eighteen months, disputed that REMCON encountered a differing site condition. Ultimately, by unilateral modification No. 6, dated February, 2003, the Contracting Officer recognized that a Type I DSC was encountered. However, the change order only granted REMCON $84,000 in extra compensation and no time extension. Instead of taking 21 calendar days to excavate the road and parking lots, as scheduled in the as-planned schedule, the activity took more than thirteen months. REMCON claims that the government's belated recognition of the extra work, as well as its concurrent failure to issue any time extensions and/or recognize the actual damages incurred, constituted constructive acceleration and a constructive change, both of which are a material breach of contract. These contentions, as well as others set forth in this opposition brief, were documented and substantiated in REMCON's June 28, 2003 certified claim to the Contracting Officer, a true and correct copy of which is attached as Exhibit 28 to the Christensen declaration. This voluminous document details the facts which support REMCON's breach of contract claims, and had been received by the Contracting Officer mere weeks prior to the issuance of the cure notice. Prior to issuing the cure notice, no response to the REMCON certified claim was made by the NPS. (SBC Dec., ¶¶19, 20, 21 and 56; TWL Dec., ¶3(f); DMS Dec., ¶3,4,6,7 and 9).

- The Upper Sherman Tree Trail was the subject of multiple and continuing design changes. While some work was able to be performed in 2001 and 2002, the Project record details these changes issued by the NPS to the trail points and the trail's physical features and dimensions throughout 2001 and 2002. Indeed, it was not until November 20, 2002 (after REMCON's as-planned schedule demonstrated that REMCON would be complete with the entire Project, both Upper and Lower areas) that the Contracting Officer signed and issued Modification No. 5 which officially modified the trial's design and finalized the design changes which had been going on for almost two years. The timing of the issuance of Modification No. 5 was too late for REMCON to proceed in 2002 as winter weather had commenced, and it further restrained REMCON from completing the trail until 2003's construction season, as the design changes had to be implemented before the balance of the trail

could be built. No time extension was granted by the government when it issued Modification No. 5. Recognizing that the government's conduct regarding delays to the Project was a material breach, and to protect itself, REMCON signed Modification No. 5 on October 18, 2002 and forwarded it to the Contracting Officer on October 21, 2002 along with a cover letter expressly reserving REMCON's rights to receive time extensions and delay damages resulting from government breaches of contract, constructive acceleration, directed changes, constructive changes and the additional work performed and materials handled due to defective and deficient contract documents, including the Sherman Tree Trail. (SBC Dec., ¶¶22-23; TWL Dec., ¶4; DMS Dec., ¶5).

- In 2001, REMCON's Project superintendent notified Bob Russell, the NPS designated representative, of a substantial overrun in quantity of excavated material. This resulted from the DSC as well as errors in design assumptions and calculations. As a result of the NPS' failure to timely provide direction with regard to the disposition of excess material, further delays to the earthmoving work and the Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation. As a consequence of the excess material to be removed and the lack of timely direction from the NPS, REMCON's operations were severely impacted, resulting in an inefficient use of REMCON's planned labor and equipment and Project supervision and an immediate negative impact to REMCON's schedule. (SBC Dec., ¶24; TWL Dec., ¶¶3-5; DMS Dec., ¶¶3-7; 9).

- The constant NPS design revisions, occasioned by defective plans and specifications, quantity, and the design changes severely impacted REMCON's ability to schedule or perform the Project with any semblance of efficiency or economy. From the very outset of the Project, REMCON's ability to control the construction of the Project was put in jeopardy by the acts and omissions of the NPS. In fact, within the first three weeks of work on the Project, NPS changes and deficiencies in the contract documents meant that completion of the 2001 work schedule, as planned by REMCON and accepted by the NPS, was impracticable.

(SBC Dec., ¶25; TWL Dec., ¶3-5; DMS Dec., ¶¶3-7).

- Added to the discrepancies in the road alignment and quantity estimates, the DSC and the necessity for blasting effectively prevented REMCON from completing its planned scope of work for the 2001 construction season. Moreover, the necessity for blasting doomed REMCON's ability to stay on schedule, and shifted the critical path to all earthwork activities. (SBC Dec., ¶26; TWL Dec., ¶3(f)(v); DMS Dec., ¶¶3-4).

- REMCON submitted its formal request for a change order for the DSC on August 20, 2001 to recover the added cost and time. Instead of investigating REMCON's DSC claim as required by the contract documents, the Contracting Officer's Representative, Mr. DeOcampo and the Contracting Officer, Rod Keiscome, admitted in their depositions that they failed to timely respond or investigate. Eventually both the Contracting Officer and his representative conceded through the issuance of Unilateral Modification No. 6, dated February, 2003, the validity of REMCON's DSC claim. Nevertheless, they allowed less than $85,000 of REMCON's $700,000 DSC claim, and <u>no</u> time, in the unilateral modification.[4] (SBC Dec., ¶27; TWL Dec., ¶3; DMS Dec., ¶3,4,9).

- Between the first and second construction seasons (December 2001 and April 2002), REMCON traveled to Denver to meet with NPS personnel on three different occasions to discuss: (a) extra work performed but not compensated or turned into a modification; (b) design problems; (c) quantity overruns; and (d) payment of REMCON's claims that were significantly impacting the Project. Despite NPS personnel agreeing to review the impact issues and representing they would timely respond and provide necessary design changes and/or issuing the appropriate revised drawings and modifications, little or no information was

---

[4] In his deposition, Willie DeOcampo admitted it was his duty to investigate the DSC claim and that he failed to do so. This admission is contended to be a material breach of contract. In his deposition, Rod Keiscome, the Contracting Officer, admitted that he was unaware of the REMCON DSC claim and that he was disgusted by the represented conduct of his Contracting Officer's representative, and immediate subordinate, Willie DeOcampo. This failure to perform the government's duty is and was a material breach. (DMS Dec., ¶3).

forthcoming before the second construction season began. This included what to do with the excess quantity of material encountered. As a result, REMCON was unable to publish an accurate, updated schedule as it was missing critical information to enable it to plan its work. (SBC Dec., ¶28; TWL Dec., ¶¶3-6; DMS Dec., ¶¶3-7).

- Based upon the contract documents, the Project was, in essence, planned by the designers to be a balanced job (requiring neither import of earthen materials nor their export, except for the planned 2000 cubic years of burn pit materials planned to be off-hauled as well as 6800 cubic yards to be hauled within the park to a designated locale). Unfortunately, the design was flawed. Their assumptions and calculations were materially flawed, and they have admitted this in their depositions. The result was thousands of yards of excess material was excavated, stockpiled, handled multiple times, and had to be disposed of but direction to address it took almost a year. (SBC Dec., ¶29; DMS Dec., ¶3-7).

- REMCON re-mobilized to the Project in mid May 2002. A partnering meeting was held with all Project participants in the Park. It involved a comprehensive job walk so that the problems experienced in 2001 could be actually seen by the Contracting Officer and the Contracting Officer's Representative. During the partnering meeting, REMCON requested direction on how to address all of the issues then continuing to be unresolved. When the NPS continued to fail to respond, REMCON began issuing a series of RFIs seeking direction in the deep cut area. Throughout June, 2002 the NPS failed to respond to the RFIs or to provide any direction to REMCON on how to correct the slope problems resulting from earlier design deficiencies. Concurrently, REMCON sought direction on what to do with the thousands of yards of excess material on site. While in May, 2002 a suggestion was floated that some of it could be used to raise the designated finish elevation of the parking lots, this extra work was not directed until June 28, 2002, again delaying the work, and Modification No. 4 was not issued until September, 2002 even though agreement on all terms was reached in early June, 2002. The events relating to this issue are a microcosm of all extra work and delays.

The issue of excess material was raised by government personnel as of July 2, 2001. It was not until June 28, 2002, a delay of 361 days, that the Contracting Officer dealt with the excess material when he issued a directive letter to REMCON to use some of it to raise the finish grade of the upper parking areas.

Concurrently REMCON, which claimed that the events of 2001 had materially depleted its capital to perform work, sought written assurance from the Contracting Officer that the modification for the directed extra work to raise the parking lots would be immediately processed so REMCON could get paid no later than August, 2002. The Contracting Officer gave this written assurance by letter dated July 16, 2002, but he did not honor his representation as the modification (No. 4) was not issued until September 14, 2002, and REMCON was not paid for the work until October, 2002.

In their depositions, neither Willie DeOcampo, the Contracting Officer's Representative, nor Rod Keiscome, the Contracting Officer, could explain or justify their conduct which hindered and delayed REMCON and offered no excuse other than it did not get done. This maladministration was endemic throughout the time REMCON performed work on the Project. The government's written justification for these events admits responsibility and is reprinted in Stephen Christensen's declaration.

By the end of June 2002, the NPS-caused impacts and delays effectively prevented REMCON from accomplishing any productive work on the Project. REMCON published on June 27, 2002 an updated schedule but it was a guess as much as a plan due to the problems and hindrances affecting the ability to progress the work. Concurrently, the lead inspector, Bob Russell, became abusive and lost control and was removed from the Project effective July 4, 2002. In an attempt to push forward, REMCON asked that it be allowed to begin work on the Lower Sherman Trail component. The NPS denied this request. (SBC Dec., ¶¶30-32; TWL Dec., ¶¶3-6; DMS Dec., ¶3-7).

- In the meantime, REMCON gave the Contracting Officer and his representative comprehensive notice of the multiple problems on the Project and their impacts on REMCON's

ability to continue with the Project. When no substantive response was forthcoming, REMCON notified the Contracting Officer that work would cease unless circumstances swiftly changed. On July 3, 2002, REMCON wrote the Contracting Officer requesting an emergency on-site meeting. A new Project Manager, Mike Giller of the NPS Denver Service Center, then arrived on site on July 10, 2002. As of this date, Mr. Russell was gone and Mr. Giller did not have an opportunity to discuss with Mr. Russell what had occurred over the proceeding 14 months. Mr. Giller walked the site with Stephen Christensen and his lead Project personnel and, having the problems explained to him orally directed REMCON to "field fit" the Upper Sherman Access Road to the existing natural features. This direction was confirmed in REMCON's letter to the NPS on July 11, 2002, more than 8 months after those problems had been brought to the attention of the NPS. Even then, REMCON had only oral instructions, i.e., "Just make it fit." (SBC Dec., ¶33).

- REMCON then began what it hoped would be the final construction of the deep cut area. REMCON's grading superintendent/foreman, Mark Penrose and Mike Kitchell, laid the roadway alignment out using the design staking information provided by the NPS as adjusted for field conditions. By July 25, 2002, REMCON encountered still further problems in fitting the design to field conditions. A new assistant inspector, Russell Belknap, had arrived onsite to replace Bob Russell's subordinate, Loren Mangrum, who had assumed Bob Russell's role. Mr. Belknap walked the site with Mr. Kitchell to review the field conditions and determine what could be done in order that REMCON could proceed. Mr. Belknap personally directed Mr. Kitchell to make additional changes to the roadway alignment. (SBC Dec., ¶34).

- In early August 2002 the NPS requested that REMCON provide survey data for the access road as built. REMCON had its surveyor return to the Project and survey the entire access road. The new survey data was sent to the NPS on August 14, 2002. The NPS then orally advised REMCON that it was going to issue still more new design changes (Design No. 5) to correct what it perceived were failures to properly build the road. It took that position despite REMCON following dozens of oral and written directives of NPS on-site

representatives to field fit the road as needed. At no time during the extended discussions with NPS throughout July 2002 (when REMCON was struggling to make progress) did any NPS personnel insist that REMCON follow the original (and unbuildable) design. (SBC Dec., ¶35).

- The NPS provided the new Design No. 5 requirements on September 6, 2002. REMCON had its surveyor again lay out the road. In most instances only minor extra work was required to meet the latest design requirements other than in the deep cut. Meanwhile, due to the originally deficient design and consequent re-designs, REMCON was forced to delay its paving operations. As weather became an impediment to completing paving operations (paving can only occur within certain temperature ranges), REMCON was forced to wait for the following 2003 construction season to complete paving operations. (SBC Dec., ¶35).

- Concurrently, the Sherman Tree Trail design was not revised and issued to REMCON to construct until November, 2002, after the construction season was over. This re-design delayed the Project two years. (SBC Dec., ¶36; TWL Dec., ¶4).

- The combination of the NPS caused delays, and its concurrent refusal to pay for all of the extra work its representatives had directed REMCON to perform placed REMCON in dire financial duress at the end of the 2002 construction season. The job was incomplete, REMCON was prevented from bidding and obtaining further work, and its financial condition had been severely jeopardized by NPS' refusal to timely and properly pay REMCON for extra work performed. (SBC Dec., ¶37; TWL Dec., ¶¶4-6).

Before mobilizing for the 2003 construction season, REMCON wrote a series of letters to the Contracting Officer and/or his representatives outlining the cost and schedule impacts that resulted from deficiencies in the contract documents and the numerous redesigns and other changes directly attributable to NPS. They are attached as Exhibits 8- 27 to Stephen Christensen's declaration. (SBC Dec., ¶¶38-55).

- After repeated attempts to resolve its disputes with the NPS, REMCON submitted a multi volume, certified claim to the Contracting Officer on June 28, 2003. That claim outlined in excruciating detail the cost and time impacts incurred by REMCON on the

Project. The total of that claim was $3,091,799.60. (SBC Dec., ¶56).

- The NPS' response was to issue a cure notice as a pretext for a default termination. When the Contracting Officer issued the cure notice, REMCON had already supplied him with reams of information concerning deficient plans and specifications, NPS-caused delays and impacts to REMCON. Moreover, the Contracting Officer knew that he had not authorized full payment to REMCON for work it had performed on the Project. Simply put, before the cure notice was issued, the Contracting Officer had received more than enough information from REMCON to understand that REMCON was not responsible for delays on the Project. Likewise, before the Contracting Officer issued the cure notice, he had more than sufficient information to understand the impact of nonpayment of the money REMCON claimed was due – some $3.0 million.

## V.

## ARGUMENT

Defendant asserts three separate grounds for justifying its termination for default: 1) lack of response by Plaintiff to Defendant's cure notice; 2) lack of progress by Plaintiff during the 2003 construction season; and 3) Plaintiff's failure to adhere to the disputes clause of the contract. In support of all three separate arguments, Defendant relies on the same core fact: Plaintiff did not mobilize to the job site for the 2003 season.

As articulated in the summary of facts above, Plaintiff's failure to mobilize for the 2003 construction season was justified and excusable. Plaintiff's further performance was excused based on lack of payment by Defendant, material breaches of the contract by Defendant, Plaintiff's financial hardship and economic duress caused by Defendant, numerous unresolved changes to the Project, Defendant's failure to pay for and issue written modifications for money and time due to differing site conditions and changes to the Project, impracticability of performance, deficient plans and specifications from Defendant, and Defendant's hinderance of Plaintiff's ability to complete the Project.

## A. DEFENDANT'S PRIOR MATERIAL BREACHES OF CONTRACT EXCUSED PLAINTIFF'S RESPONSIBILITY TO RESPOND TO THE CURE NOTICE, PLAINTIFF'S ISSUANCE OF THE CURE NOTICE WAS NOT JUSTIFIED, AND PLAINTIFF'S FAILURE TO RESPOND TO THE CURE NOTICE WAS EXCUSABLE.

Defendant bases its motion for partial summary judgment in part on the mistaken argument that Plaintiff's failure to respond to the July 24, 2003 Cure Notice was an independent and sufficient ground for a default termination. That simplistic argument wholly ignores the role Defendant played in putting Plaintiff into a position whereby the contract would not be completed on schedule as well as the jurisprudence on the issue of cure notices and default terminations. The summary of facts above, and Plaintiff's June 28, 2003 certified claim, describe in substantial detail the difficulties it faced as a result of Defendant's defective design of the Project, the DSC's encountered, and Defendant's inadequate responses, and other acts and omissions by Defendant through mal-administration that eventually made it impossible for Plaintiff to complete the Project as scheduled. By July 2003, as the result of the Defendant's ongoing actions and omissions, Plaintiff could not provide the Contracting Officer with the requisite assurances required by the FAR.[5] Further, as of July, 2003, Plaintiff had run

[5] On June 28, 2003, Plaintiff submitted its Request for Equitable Adjustment, outlining at length the various multiple breaches of contract by the government, as well as the defects and discrepancies in the plans and specifications and the failure of NPS personnel to provide timely direction and guidance to REMCON. In response, the NPS issued a cure notice. That cure notice required Plaintiff to provide assurances that the Project would be completed by August, 2003, an impossibility caused by documented government conduct (See Declarations of Stephen Christensen and Tom Lloyd), or to explain why experienced delays were not its responsibility. Plaintiff could not, in all honesty and good conscience, provide the NPS with an assurance that the Project would be completed on time. Project delays, occasioned by faulty plans and specifications, numerous re-designs of the Project, multiple oral directions by NPS personnel to Plaintiff, and the government's refusal to timely process time extensions and/or compensate REMCON for Project changes, had a devastating effect on the Project schedule and Plaintiff. REMCON simply was not able to give the government any assurance. Meanwhile, it had already provided the government with a long and detailed explanation, by way of its certified claim, that it was not responsible for Project delays, and felt that it could offer nothing further by way of explaining the actual cause of the delays on the Project. It had provided everything it could offer to explain the delays. A further explanation, by way of a response to the cure notice, would have been superfluous. For the government to justify a default termination on a lack of a formal

out of financial resources to complete the Project due to Defendant's actions.

Defendant's argument and motion fails to account for legal authority which states that Defendant's prior material breaches of the contract with Plaintiff excuses Plaintiff's duty to perform under the contract and thus to respond to an unjustified cure notice. Defendant's argument fails to address the fact that the cure notice was unjustified given the circumstances present in July, 2003, and the plain fact that the Defendant's Contracting Officer already had in hand Plaintiff's June 28, 2003 certified claim, and other communications, when he issued the cure notice that ostensibly provided a response to the cure notice as issued. Finally, Plaintiff did not respond to the cure notice because it simply could not provide the assurances required by Defendant, and its lack of response was excused by Defendant's failures and prior breaches.

### 1. Defendant's Prior Material Breaches Relieved Plaintiff of Its Duty to Respond to the Cure Notice

Despite Defendant's strict and overly literal application of law regarding cure notices, federal case law holds that, at the time Plaintiff received Defendant's cure notice, it had no continuing duty of performance under the contract. Logically, since Plaintiff was not required to perform under the contract, it did not have a duty as of July, 2003 to respond to the cure notice. In *Roxco, Ltd. v. U.S.*, 60 Fed. Cl. 39 (Fed. Cl. 2004), the Department of the Air Force awarded a contract to Roxco for the construction of 172 new housing units at an air force base. Within a matter of weeks disputes arose including alleged differing site conditions, constructive changes, and Government-caused delays and breaches of contract. Between April 1995 and August 1998, Roxco sent the Contracting Officer (CO) at least fourteen letters regarding these disputes. In the letters Roxco requested relief in the form of extra payment and time extensions, often noting that it was reserving its rights to an equitable adjustment under the

---

response to the cure notice elevates form over substance and demonstrates the tenuous nature of its motion.

contract. *Id.* at 40-41. The original contract completion date of August 5, 1996 passed without the Project being completed. On October 16, 1998, Roxco's President executed what the Government terms the "abandonment" letter. It stated, in relevant part,

> This is to advise you that Roxco, Ltd. as contractor on the above referenced construction Project, is financially unable to perform or complete the performance of the work or comply with its contractual obligations on the Project, and accordingly, is in default under the above contract for the Project. Roxco, Ltd. hereby irrevocably and voluntarily abandons and terminates the above construction Contract effective immediately. *Id.* at 41.

Roxco's surety took over Roxco's work on November 5, 1998. On November 23, 1998, the Air Force sent Roxco a show cause letter which mandated a response within 48 hours; Roxco did not respond. The CO issued a notice of default termination on December 21, 1998. On August 20, 1999, the Project was completed by Roxco's surety. *Id.* at 41.

On March 20, 2001, Roxco submitted a CDA claim to the Air Force in connection with the contract. The claim sought equitable adjustments in the amount of $7,840,497.40 for alleged differing site conditions and constructive changes, or in the alternative, for alleged breaches of contract by the Government. The CO returned the claim as being untimely. Roxco appealed.

On appeal, the government argued that Roxco's "abandonment letter" resulted in a complete waiver of Roxco's potential contractual claims. The court held that the letter had to be read in the context of the prior relations between the parties since Roxco had accused the Air Force of a prior material breach. The court found that "a finding of prior material breach on the part of the Government would act as an affirmative defense to the Plaintiff's alleged breach. '**Upon material breach of a contract, the nonbreaching party has the right to discontinue performance, and to seek redress in accordance with the law**'." (emphasis added) *Id.* at 43.

(Also see *Old Stone Corp. v. U.S.*, 63 Fed. Cl. 65, 83 (Fed. Cl. 2004)).

In *Guerini Stone Co. v. P.J. Carlin Const. Co.*, 248 U.S. 334, 344, 39 S. Ct. 102, 106 (1919) the United States Supreme Court held that:

> "in a building or construction contract…calling for the performance of labor and furnishing of materials covering a long period of time and involving large expenditures, a stipulation for payment on account to be made from time to time during the progress of work must be deemed so material that a substantial failure to pay would justify the contractor in declining to proceed."[6]

Further, a contract is repudiated when a party owing performance indicates by word or deed that it will commit a breach that would itself give the injured party a claim for damages for total breach. *Alaska Pulp Corporation, Inc. v. United States*, 48 Fed. Cl. 655, 659 (Fed. Cl. 2001). Upon such repudiation, "the injured party is discharged of its performance obligations." *Id.* In determining the materiality of the breach, the court reviews the totality of the circumstances. *Id.* In addition, Court of Appeal for the Federal Circuit has held that "'the extent to which the behavior of [a] party failing to perform…comports with standards of good faith and fair dealing' is a significant factor in determining whether that party's breach is material." *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988). The *Malone* court also noted that "'[s]ubterfuges and evasions violate the obligation of good faith,' as does lack of diligence and interference with or failure to cooperate in the other party's performance." *Id.*[7]

The courts have further explained the concept of material breach and held that material breach by the government relieves a contractor of a termination for default. In *Morganti*

---

[6] Also see *Macri v. Unites States*, 353 F.2d 804, 810 (9th Cir. 1965) ("[I]t is well settled that an owner's failure to make progress payments on a building contract may constitute a material breach, justifying the builder's refusal to proceed with the work on the theory that the owner has rendered his performance impossible.") citing *Guerini*, 248 U.S. at 334.

[7] The facts competently presented manifest the government's lack of good faith and fair dealing, as well as its unfortunate subterfuges, evasions, and admitted incompetence.

*National, Inc. v. United States*, 49 Fed. Cl. 110 (Fed. Cl. 2001), a contractor brought suit seeking to convert its termination for default into a termination for the convenience of the government on the grounds that the government excusably delayed the contractor's performance and materially breached the contract. The court noted that:

> "[a] contractor's failure to perform may be excused and a termination for default converted to a termination for convenience of the government if the contractor can establish that the government materially breached the contract...The Federal Circuit has held that whether a particular breach is material 'depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Id.* at 140.

In its analysis, the *Morganti* court noted that, "[w]hile we do not find that serious adverse financial impact [on the contractor] must be present in all instances for establishing a material breach due to withholding money, it is an element that will be considered in arriving at an overall judgment." *Id.* at 147

In *Abcon Associates, Inc. v. United States*, 49 Fed. Cl. 678 (Fed. Cl. 2001), the contractor brought suit challenging termination of a construction contract for default. There, the court noted that, "[i]f a contractor can show that improper government actions were the primary or controlling cause of the default and rendered the contractor financially incapable of performing, then the default will be excused." *Id.* at 687. Ultimately, the *Abcon* court held that the termination for default be converted into a termination for convenience due to the government's breach of the duty of good faith and cooperation. *Id.* at 690-691. Accordingly, the court found that the government's improper withholding of liquidated damages and delay in resolving incompatible Project drawings (inept contract administration which impeded the contractor) was a material breach of the contract, thereby excusing the contractor's failure to make progress. *Id.*

In the current matter, the facts establish that there is, at the very least, a question of fact as to whether Defendant committed one or more material breaches of contract due to its failure to negotiate and/or issue change orders, for time and/or additional compensation, resulting from the performance of extra work which was directed by Defendant due to defective and deficient plans and specifications, coupled with mal-administration of the contract, all of which resulted in extraordinary financial burden on Plaintiff (which impaired Plaintiff's ability to perform under the contract).

In the instant action, the prior material breaches by Defendant are legion, including, but not limited to the following: 1) Defendant's failure to timely issue and pay for written modifications 1-6; 2) Defendant's unilateral change order Number 6 which did not fully compensate Plaintiff for the DSC; 3) inadequate plans and specifications, which failed to properly design the Project, including the burn pit, the access road, and the Upper Sherman Tree Trail, as well as the incompetent use of an exaggerated compaction percentage for decomposed granite which resulted in excess materials to be handled; 4) Defendant's failure to provide aggregate base as identified in the contract documents; 5) Defendant's failure to fully compensate Plaintiff for excess excavation, blasting activities, and aggregate base issues (which cost Plaintiff over one million dollars in excess costs); 6) Defendant's failure to timely and fully respond to RFIs and other design related questions from Plaintiff; and 7) Defendant's failure to substantially respond to Defendant's June 28, 2003 claim.

Because of Defendant's material breach(es), Plaintiff did <u>not</u> have a duty to continue performance on the contract, and Defendant had <u>no</u> right to demand reasonable assurances of continued performance. Thus, Plaintiff's failure to respond to the cure notice should have no

effect.[8] Plaintiff's June 28, 2003 claim and multiple communications in 2001, 2002 and 2003, placed Defendant on notice that it could not continue to perform the contract unless Defendant cured its breaches of contract. Since Defendant did not cure its breaches of the contract, there is a question of fact regarding whether Plaintiff had a duty to continue to perform under the contract. Logically, the question of fact regarding whether Plaintiff had a duty to continue to perform under the contract extends to whether it needed to respond to the cure notice. Accordingly, the court must deny Defendant's motion since there is a question of fact concerning whether Plaintiff was even required to respond to the cure notice at all.

**2. Defendant's Cure Notice was Not Justified and Therefore Not Valid.**

The government's reliance on *Danzig Corp. v AEC Corp.*, 224 F.3d 1333 (Fed. Cir. 2000) is misplaced. *Danzig* speaks of the government "justifiably" issuing a Cure Notice. *Id.* at 1337. ("When the government justifiably issues a cure notice...") and that a cure notice, to be effective, must be valid ("...the Contractor [must] give reasonable assurances...in response to a validly issued cure notice.") *Id.* at 1338. *Danzig* thus expressly recognizes that to be effective, a cure notice must be justified and valid. In such case a contractor must demonstrate or give the assurances that progress is being made toward completion, or "explain that the reasons for

[8] There are dozens of cases that hold that a contractor's default was excusable because of the government's acts or omissions. See, e.g. *Spiritual Sky Scented Products*, 82-2 BCA ¶ 15,948 (1982) (contractor prevented from performing a terminated contract by financial stress caused by the government's long-delayed acceptance and payment for supplies purchased under the contract); *Curtis L. Holt d/b/a Advanced Maintenance Company*, 76-2 BCA ¶ 11,999 (1976) (government breached its contract by failure to inspect work as required and failing to make timely payments that would have been due as a result of said inspections); *Pacific Intermodal Corp.*, 73-2 BCA ¶ 10,151 (1973) (contractor encountered difficulties and performed extra work not contemplated by the contract; government's denial of additional compensation exhausted the contractor's financial resources); *Contract Maintenance, Inc.*, 75-1 BCA ¶ 11,207 (1975) (although government was entitled to deduct amounts for progress payments to reflect reduced value of services received, failure to pay actual value of services performed relieved contractor from continued performance and converted termination to one for convenience).

any prospective delay in completion of the contract are not the responsibility of the contractor." *Id.* at 1337. *See, also*, *Tubular Aircraft Products, Inc. v. U.S.*, 213 Ct. Cl., 749, 750, 566 F.2d 1190, (Ct. Cl. 1977).[9]

In *Danzig*, the court faulted the contractor for failing to provide specific instances of government-induced changes that caused delay, or to otherwise describe how much delay was the responsibility of the government. *Id.* at 1339. In this matter, REMCON had already provided to the CO a detailed description of the NPS' shortcomings in the June 28, 2003 certified claim, as well as in dozens of written communications and schedule submissions showing NPS delays. Thus, the *Danzig* court's criticism of the contractor for failing to provide specifics of the government's role in Project delays has no application to REMCON because REMCON had already provided compelling and voluminous specifics to the Contracting Officer in the certified claim well before the Contracting Officer issued his cure notice.

Likewise, the government's reliance on *Roxco*, is misplaced. If anything, *Roxco* affirms Plaintiff's right to pursue its claim for an equitable adjustment and to seek a conversion of the termination for default into a termination for convenience. In *Roxco*, the government had argued that a contractor's failure to respond to an Air Force Show Cause letter constituted a waiver of its right to pursue a claim for equitable adjustment. The court rejected the government's argument, noting that cure notices such as the Air Force Show Cause letter serve

[9] Further, in *Danzig*, it was the contractor's own surety that "strangled" the contractor by freezing its bank account preventing further performance. The government's conduct, while hinted at as being a contributing factor, was not the true culprit preventing the contractor's performance. Here, REMCON's surety did <u>not</u> freeze REMCON's accounts or "strangle" REMCON. Although in 2003 the surety directed the NPS to issue further payments into a controlled account, it was the government's conduct, in 2001 and 2002, that created the circumstances encountered in 2003. The government's responsibility for the predicament REMCON found itself in, and the rights and responsibilities of the parties as a result, is a question of fact which wholly undermines the success of the instant motion.

to provide a contractor with an opportunity to assert any excusable delay and for the government to assess whether a contractor can complete the performance. *Roxco*, 60 Fed. Cl. at 43. Because the purpose of a cure notice was not to provide a pretext for a default termination, the court held that the contractor's failure to respond was not a waiver of its right to assert a claim for equitable adjustment. *Id.* at 44.

The government's reliance on *Composite Limits, Inc. v. U.S.*, 27 Fed. Cl. 310 (Fed. Cl. 1992) adds nothing to its motion. Noting that default termination is a drastic solution that is imposed only on good grounds and solid evidence (see *J.D. Hedin Constr. Co. v. U.S.*, 408 F.2d 424, 431 (Ct. Cl. 1969)), the *Composite Limits* court observed that, in deciding whether the termination for default was appropriate, the government must consider all of the contractor's efforts to comply with the cure notice. *Id.* at 324. Therefore, in this matter, Defendant is required to, but clearly did not, consider Plaintiff's existing claim and its explanation of delays to the Project attributable to Defendant's action or inaction. Plaintiff's claim provided hundreds of pages of narrative and Project documents detailing and substantiating the Defendant's material role in causing Plaintiff's difficulty in making progress towards timely completion. The Contracting Officer simply terminated Plaintiff for failure to respond to the cure notice when he already had a wealth of information, by way of Plaintiff's claim, and by treating Plaintiff's claim as though it had never existed. The Contracting Officer failed to consider all of Plaintiff's efforts to provide it with information needed to assess Plaintiff's progress, essentially treating it as though the claim had never been made.[10]

[10] In its reply, the government may provide a declaration from Mr. Keiscome, the Contracting Officer, that states that he did consider REMCON's certified claim prior to issuing the cure notice and that he rejected the same. Such a declaration will have the legal effect of validating one of the key positions expressed herein that there are multiple questions of fact that compel the Court to deny the motion. The failure of the government, in its reply, to provide such a declaration

For Defendant to now move this court by contending that Plaintiff had not provided any explanation, after receipt of the cure notice, that difficulties were not of its making, when the Contracting Officer had more than sufficient information from the certified claim, simply ignores the facts. Indeed, the very timing of the cure notice, coming less than a month after Plaintiff had submitted its certified claim, should be viewed with suspicion. That is, instead of responding to Plaintiff's claim with assurances that Plaintiff would be compensated in time and money for Defendant's responsibilities, the Contracting Officer issued the cure notice, essentially ignoring Plaintiff's claim. Given Defendant's disregard for Plaintiff's situation, Plaintiff cannot be faulted for not providing the assurances Defendant already knew Plaintiff could not provide. The cure notice, simply stated, was neither justified nor valid due to the prior notice provided and the government's material breaches of contract that preceded its issuance.

As a clear analogy to Plaintiff's plight, Defendant, by not fully compensating Plaintiff for its extra and impacted work, essentially amputated Plaintiff's legs, and then, by issuance of the cure notice, directed Plaintiff to run a marathon, in the form of a fifty yard dash. Clearly, this type of action should not be countenanced by the court, and is not consistent with the intent and policy behind federal contracting cure notices.

At the very least, given the wealth of data Plaintiff provided to the Contracting Officer by way of its certified claim and multiple letters in 2003 from Plaintiff, and the apparent indifference of the Contracting Officer to Plaintiff's documented plight, documented to be caused by Defendant, there is a triable issue of fact whether the cure notice was itself justified in the first instance.

---

would also be grounds to deny the motion.

The burden on the government is to show that there is an absence of evidence to support Plaintiff's case. *Sweats Fashion, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987). It has failed miserably to sustain that burden.[11] In its motion, Defendant did not even address the facts detailed in the supporting declaration of Stephen Christensen or the certified claim. Rather, Defendant relies upon Plaintiff's failure to respond to the cure notice as an independent and sufficient ground for termination for default. Because the purpose of the cure notice is to afford a contractor the opportunity to explain a lack of progress to the government, there is a triable issue of fact concerning the necessity for a response to the cure notice, particularly where the response would be a simple reiteration of the information already in the Contracting Officer's hands by way of Plaintiff's certified claim. In short, since Defendant's acts or omissions were the *primary* and *controlling* cause of Plaintiff's difficulties, such that it cannot provide the required assurances in response to a cure notice, Plaintiff was not in default and the cure notice was not valid nor justified.

### 3. Plaintiff's Failure to Respond to the Cure Notice Was Excusable and Justified

Defendant relies on the simplistic argument that since Plaintiff did not technically respond to Defendant's cure notice, the termination for default was justified. Clearly, based on the volume of letters and communications from Plaintiff in 2001, 2002 and 2003, and the June 28, 2003 claim, Plaintiff was not silent, and Defendant already knew what Plaintiff's response would be in response to the cure notice. Defendant's allegation that "there was no response at all" (p. 16 of its motion) is disingenuous and misleading.

---

[11] Indeed, no competent evidence was provided by Defendant to support its motion No declaration/affidavits were provided to authenticate or validate any of the facts relied upon. As discussed above in section III of this opposition, the motion is properly denied on its face.

Further, upon receipt of the cure notice, Plaintiff immediately sought financial assistance from its surety to complete the Project. The August 11, 2003 request for extension letter confirms that Plaintiff was desperately seeking financial assistance from the surety in order to be in a position to provide assurances to Defendant that it could progress on the Project, despite the government's misconduct. Although Plaintiff could not provide the requested assurances, its pending claim was sufficient to provide notice to Defendant as to why Plaintiff was excused from further performing on the Project.

Defendant's argument that Plaintiff did not perform on the Project in 2003 because of the lack of an ADR agreement is specious and a red herring. Plaintiff requested ADR because of Defendant's failure to fully compensate Plaintiff in money and time extensions for its work during 2001 and 2002. Defendant's failure to discharge its duties to issue a competent design, to properly administer the contract, to timely grant time extensions and/or additional compensation when due, exhausted Plaintiff's contractual remedies. What was left was ADR or litigation. Plaintiff sought ADR and Defendant refused to participate in the ADR process citing that "we don't need any third party assistance". (SBC Dec., ¶ 59). This left only the litigation route and the certified claim dated June 28, 2004 was and is the condition precedent to litigation. Lacking the financial resources to pay its workers if it remobilized, REMCON took all of the steps properly required of a contractor placed in the predicament it found itself.[12]

Plaintiff respectfully requests that the court deny Defendant's motion for partial summary judgment.

---

[12] REMCON gave notice to the government on multiple occasions that it lacked the financial ability to continue due to the government's alleged improper conduct. (SBC Dec. ¶¶37-59).

## B. PLAINTIFF'S FAILURE TO MAKE PROGRESS ON THE PROJECT DID NOT JUSTIFY THE DEFAULT TERMINATION

Defendant contends that Plaintiff's failure to make progress on the Project is an additional, independent, basis for the default termination. As fully discussed above, Plaintiff's failure to make progress on the Project was excused based on Defendant's multiple prior breaches of the contract, Defendant's failure to fully and timely compensate Plaintiff for its work in 2001 and 2002, Defendant's failure to provide adequate plans and specifications for the Project, differing site conditions, and Defendant's mal-administration of the Project. Further, the fact that the Project could not be completed until the end of 2003 (at the earliest) was provided to the government via REMCON's revised schedule following the 2001 construction season.

Remember, REMCON's as-planned schedule showed work being complete on the Upper Sherman portion after 2001 and the Lower Sherman after 2002. Thus, the Lower Sherman took a full construction year. With the documented government delays in 2001, this meant that a full year's delay would occur and REMCON documented this fact to the NPS. The government failed to respond or comment. (TWL Decl. ¶¶3-6).

When the government delayed the issuance of its design changes to the Upper Sherman Trail until Modification No. 5 was issued on November 20, 2002, after the 2002 construction season was over, it impliedly and expressly agreed it had delayed the Project another whole year (through the 2004 construction season) but granted no time extension. When REMCON signed Modification No. 5 in October, 2002, it expressly reserved its rights for the subject time extension. (SBC Dec., ¶¶22-23; TWL Dec., ¶¶3-6). Thus, as of the end of 2002, the Project was delayed two years (through 2004) by government action (SBC Dec., ¶¶1-61; TWL Dec.,

¶¶3-6) but the cure notice, issued in July, 2003 ridiculously requires REMCON to provide assurances it would complete the entire Project in August, 2003. On its face, the cure notice was invalid.

It is hornbook law that a contractor will defeat a termination for default based on lack of progress it if can demonstrate that excusable delay existed that would have rendered the performance timely. *Michigan Joint Sealing, Inc.*, ASBCA No. 41477, 93-3 B.C.A. (CCH) ¶ 26,011 (1993). Further, delayed performance, standing alone, does not justify a default termination. *Hillebrand Constr., Inc.*, ASBCA No. 45853, 95-1 B.C.A. (CCH) ¶ 27,464 (1995). In looking at the "totality of the circumstances"[13] to determine whether Plaintiff's lack of progress in 2003 was excusable, there is clearly and undeniably a question of fact.

First, Plaintiff incorporates its arguments presented above regarding Defendant's material breaches of the contract absolving Plaintiff of its duty to perform under the contract during the 2003 construction season. Plaintiff's lack of progress was due to Defendant's lack of payment, lack of time extensions, lack of modifications, and failure to timely respond to Defendant's June 28, 2003 claim. Plaintiff's lack of progress in the 2001 and 2002 construction seasons was caused by government-responsible causes: differing site conditions and Defendant's actions (as admitted by Defendant's employees during depositions and the Sherman Tree Trail re-design).

Further, Defendant is incorrect in its assertion that "95% of the contract time had expired" and "that there was no possibility that REMCON would complete the work by August 28, 2003." Over the course of the Project, Plaintiff requested and documented hundreds of days

---

[13] This is the standard cited by Defendant on page 19 of its brief regarding the Contracting Officer's assessment of the contractor's progress.

worth of time extensions due to Defendant's responsibility. Plaintiff's delay analysis reveals that there were more than two years of excusable days of delay during the 2001 and 2002 construction seasons.[14] Although Defendant failed to grant Plaintiff (timely or otherwise) virtually any time extensions, there is clearly substantial evidence to support a finding that Plaintiff was not able to complete the Project by August 28, 2003 due to excusable circumstances outside of its control, and that the contract time should have been extended, as of the end of 2002, through the 2004 construction season. (SBC Dec., ¶60; TWL Dec., ¶¶3-6).

The authority offered by Defendant in support of its contention that the termination for default based on a lack of progress is unavailing. In support of this contention, Defendant cites the cases of *Discount Co v. United States*, 554 F.2d 435 (Ct. Cl. 1977), and *State of Florida v. United States*, 81 F.3d 1093 (Fed. Cir. 1996) for the proposition that a Contracting Officer may properly terminate a contractor for default where the contractor fails to mobilize to the construction site for a period of months. The facts discussed in those cases are distinguishable and inapplicable to the instant matter. Unlike the instant matter, the contractor in *Discount* and the surety in *State of Florida* had a continuing duty of performance under their contracts with the government because the government had committed no material breach of contract in those cases. Thus, the defaulting parties had no "excuse" when they failed to mobilize to the construction site and were properly terminated for default. This fact and concept is not addressed in the government's motion.

In *Discount*, the contractor encountered difficulties on the job. The government claimed that two structures (a ramp and lower lot) were nonconforming because the contractor used

[14] The Sherman Tree Trail re-design issued November 20, 2002 caused two years of delay. The balance of the Upper Sherman work was delayed over one year as well, and the damages are valued at approximately $3 million. (SBC Dec., ¶¶1-60; TWL Dec., ¶¶3-6).

unsuitable materials and methods in their construction. *Discount*, 554 F.2d at 438. Prior to resumption of work for 1969 construction season, Discount and the government twice met to decide on the best way to proceed with the removal of the nonconforming structures. Discount agreed to wait until September 1969 (when the boat ramp would not longer be under water) to work on the allegedly nonconforming structures but to begin its campground construction on June 2, 1969. *Id.* The government subsequently gave Discount a partial work resumption order for the campground construction. Discount returned the order unsigned and alleged that it could not proceed because of the government's restaking and clearing and grubbing difficulties. Restaking was completed, the work order reissued and signed. No work, however, was begun on the campground. The government subsequently ordered a full resumption of work. This full work resumption order took into account the government's anticipated "as is" acceptance of the boat ramp. Despite this order, no substantial amount of work was performed by Discount during the summer of 1969. The government issued a 10-day cure notice. When Discount neither responded nor provided a schedule, the contract was terminated for default. *Id.*

In finding that Discount's failure to make progress on the campground work was inexcusable, the court noted that the material at the initial site was not so unsuitable as to make performance impossible and the contractor "therefore had a duty to continue performance during the processing of its claim." *Id.* at 440. The court also noted that the part of Discount's work which required material from the first site (i.e., the boat ramp) was accepted "as is" by the government. *Id.* These facts demonstrate that the government in Discount had not materially breached the contract, leaving the contractor with a continuing duty of performance which it thereafter failed to perform when it failed to mobilize for the 1969 construction season.

The facts in the *Discount* case are very different from those presented in the instant matter. As detailed in the declarations of Tom Lloyd and Stephen Christensen, Plaintiff failed to mobilize because it had no continuing duty of performance under its contract with Defendant because Defendant was in material breach of the contract. Even Defendant's independent design team member testified under oath that because of multiple defects in the plans and specifications, and inaction by Defendant, extra work had to be performed, and the failure by Defendant to issue change orders and revised plans placed the Project in "limbo." (DMS Dec., ¶6). Curiously, Defendant's motion fails to identify or explain any of the facts presented by this response. Had it been candid with the court in its moving papers, this motion would be able to be seen for what it is: a waste of time and money without any viable basis for success. As a matter of law, the facts presented by this opposition respectfully compel the court to deny the motion in its entirety.

Defendant also cites *State of Florida* for the proposition that a Contracting Officer may properly terminate a contractor for default where the contractor fails to mobilize to the construction site for a period of months. However, *State of Florida* also presents a very different situation than that encountered by Plaintiff. In *State of Florida*, the original contractor was terminated for default and the performance bond surety, Southern Casualty and Indemnity Insurance Company (Southeastern), undertook to finish the Project. *State of Florida*, 81 F.3d at 1095. At the time it took over, in October 1988, Southeastern promised to provide a written strategy for finishing the work within two weeks. However, Southeastern failed to do so and for several months caused little or no work to be performed on the Project. By the end of December, Southeastern had neither provided the Government with a Project schedule nor

advanced the Project's completion. In February, 1989, Southeastern informed the government that it had chosen a general contractor to complete the Project. *Id.* This general contractor proposed a work schedule that estimated the Project would be completed by August 1989. *Id.* A March 1989 site inspection showed that no work was in progress inside the building and that the roof was still incomplete. *Id.* at 1096. In a subsequent meeting with the Government, Southeastern suggested that, because of necessary corrective work, the building might not be completed in August as promised. *Id.* In May 1989, the Government terminated Southeastern for default for its failure to make progress. *Id.* As with *Discount*, the Government was not in material breach of its contract with Southeastern and here did little, if anything, to hinder its progress on the Project.

The facts of the *State of Florida* case are virtually one hundred and eighty degrees different than those presented in this matter. The evidence presented by this opposition establish facts that Defendant materially breached the contract, thereby not only severely impeding Plaintiff's ability to proceed under the Project but relieving it of its duty to do so.

Defendant also relies on *Pruess v. United States*, 412 F.2d 1293 (Ct. Cl. 1969) for the proposition that, although, in some cases, delay caused by the Government action may be grounds for excuse, it must be the actual cause of the default. This proposition is completely valid. However, contrary to Defendant's contention, Plaintiff's failure to mobilize for the 2003 construction season was the fault of the government. Unlike in *Preuss*, where the contractor's financial difficulties were caused either by inadequate financing when it signed the contract or its using of funds for purposes other than the performance of the contract during the contract period, Plaintiff's financial difficulties were directly caused by Defendant's material breach of

the contract, namely, its failure to negotiate change orders for extra work and differing site conditions, coupled with its mal-administration of the contract. As stated in the declaration of Stephen Christensen, Plaintiff's income and costs from all other Projects, during its performance of work on this Project (from June, 2001 through July, 2003) shows a net increase in cash to Plaintiff of $1,413,523. (SBC Dec., ¶61). Thus, it was this Project, not others, that caused Plaintiff to be financially unable to perform. Defendant's material breach of the contract not only "excused" Plaintiff's failure to make progress, it completely relieved Plaintiff of any continuing duty of performance. Accordingly, Plaintiff's failure to mobilize during the 2003 construction season could not and did not justify the Defendant' termination of Plaintiff for default.

Defendant also raises the incredulous argument that Plaintiff's failure to mobilize for the 2003 construction season was a "tactic aimed at forcing the Government to agree to ADR." (pp. 24-25 of opening brief). Contrary to Defendant's unsupported assertion, Plaintiff sought ADR due to its precarious financial condition caused by Defendant's actions over the course of the 2001 and 2002 construction seasons. Plaintiff simply did not have the financial ability to mobilize for the 2003 season, and was trying desperately to obtain payments from Defendant through the ADR process. (SBC Dec., ¶59). This was the last effort to avoid litigation.

Plaintiff respectfully requests that the court deny Defendant's motion for partial summary judgment.

## C. REMCON'S FAILURE TO MAKE PROGRESS DID NOT VIOLATE THE DISPUTE CLAUSE AND IS EXCUSED

Defendant contends that the contract's dispute clause required REMCON to proceed diligently with its work "pending resolution of any request for relief, claim, appeal, or action

arising under or relating to the contract, and comply with any decision of the Contracting Officer." (p. 25 of opening brief). Defendant goes on to argue that failure to proceed under the disputes clause is an independent ground for Defendant's termination of Plaintiff for default. **However, as discussed below, Defendant fails to mention that a prior material breach of the contract by Defendant would excuse such termination for default, and that the claim submitted by Plaintiff in June 28, 2003 fell outside the scope of the disputes clause since the claim asserted multiple breaches of contract by Defendant (thus rendering Defendant's argument moot).**

In support of its contention that a contractor's failure to proceed diligently pursuant to the disputes clause is a breach of contract, justifying a termination for default, the government cites *Pruess v. United States*, 412 F.2d 1293, *Stoeckert v. United States*, 391 F.2d 639 (Cl. Ct. 1968), and *Appeal of Howell Tool and Fabricating, Inc.*, ASBCA No. 47939, 96-1 BCA (CCH) 28,225 (1996). In all of these cases, the contractor's failure to perform under the disputes clause was not excused because the government had not committed a material breach of the contract which was the actual cause of the contractor's failure to continue performance. Therefore, the holdings of the cites relied upon are not persuasive or applicable to the facts of the instant matter. Further, the cases cited by Defendant highlight the maxim that failure to continue performance under a contract dispute clause serves as a justification for default termination when the contractor chooses not to perform in the face of a dispute with the government, not when the contractor cannot perform because of a material breach of the contract by the government. See *Stoeckert v. United States*, 391 F.2d at 645 ("termination of plaintiff's contract for default was proper if for no other reason than that he refused to follow the Contracting

Officer's directive to remove and replace the tile floor. Instead, he elected to abandon the work...such an election is simply not open to a Government contractor under the standard disputes clause...")

In *Appeal of Howell Tool and Fabricating, Inc.*, ASBCA No. 47939, 96-1 BCA (CCH) 28,225 (1996), one of the cases cited by Defendant, the Board held that "the Government having established that appellant repudiated the contract, the burden shifts to appellant to prove that the anticipatory repudiation was excusable within the meaning of the Default clause or was caused by a material breach of the contract." (emphasis added). The Board then added that "if a contractor can prove that improper Government actions, or Government-caused delays, were the controlling cause of the contractor's financial hardship, then the contractor's anticipatory repudiation is excusable." *Id.* Although no such hardship was present in *Howell*, the *Howell* case substantiates and supports the legal proposition that the termination for default cannot be maintained if Plaintiff's failure to continue performance, pursuant to the contract dispute clause, was excused by Defendant's prior material breach of the contract, which caused the extreme financial hardship to Plaintiff that ultimately prevented it from continuing performance.

Defendant's characterization of Plaintiff's failure to mobilize as a "decision" stemming from REMCON's "desire" that the Government agree to ADR could not be further from reality. Plaintiff made no such "decision." Defendant's prior material breaches of the contract left Plaintiff with no choice. During the late spring/early summer of 2003, as detailed in Stephen Christensen's declaration, he made repeated requests for ADR with the NPS to see if he could avoid being unable to further perform. Given the multiple breaches to date, the only way Plaintiff could proceed was if he was paid for the million dollars of extra work and delay costs

incurred to date. When the Contracting Officer denied the request for ADR, coupled with his failure to issue any financial renumeration or time extensions, either bilaterally or unilaterally, in response to the June 28, 2003 certified claim, Plaintiff was disabled from mobilizing to the Project, as it could no longer pay employees if it did so mobilize, and would not create greater liability arising from Defendant's malfeasance. (SBC Dec., ¶59). It could not mobilize even if it wanted to. Defendant's material breaches of the contract had left Plaintiff financially crippled and unable to continue. This meets the legal requirements of *Howell*.

Similarly, the Defendant's characterization of *Alliant Techsystems, Inc. Global Environmental Solutions Business Division v. United States*, 178 F.3d 1260 (Fed. Cir. 1999) as an "extreme exemplar of a contractor's duty to perform under the disputes clause" is also unfounded. As with most of the cases cited by the NPS, the facts in *Alliant* bear no resemblance to those here. In *Alliant*, the contractor refused to continue performance because it contended that the government had not properly exercised an option requiring additional performance under the contract. *Id.* at 1264. The court found that the contractor had violated the disputes clause by failing to continue performance. However, in so finding, the court found that the government had not committed a material breach of the contract. The court noted that:

> "the government may not, through a Contracting Officer's decision, impose obligations on a contractor far exceeding any contemplated by their contract. If the government orders a 'drastic modification' in the performance required by the contract, the order is considered a 'cardinal change' that constitutes a material breach of the contract...(citations omitted) Such a material breach has the effect of freeing the contractor of its obligations under the contract, including its obligations under the disputes clause." *Id.* at 1276. (emphasis added)

Furthermore, *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1998) clearly states that "[a contractor's] failure to perform would be excused and the termination for default

would be improper if the government had materially breached the contract." In *Metric Systems Corporation v. McDonnell Douglas Corporation,* 850 F.Supp. 1568, 1580 (N.D. Fla. 1994), the Court explained that the holding in *Malone* is based on the specific wording of one version of the standard disputes clause contained in federal procurement contracts, namely, "The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, or appeal, or action arising under the contract, and comply with any decision of the Contracting Officer." In that version of the disputes clause, the *Metric Systems* Court notes, "the contractor's duty to proceed pending resolution of disputes is confined to disputes 'arising under the contract" and that "[c]ourts have held that disputes over alleged breaches by the government do not "arise under" the contract. *Id.* (citing *United States v. Utah Construction and Mining Co.*, 384 U.S. 394, 413, 86 S. Ct. at 1555 (1966) ("[t]he settled construction of the disputes clause excludes breach of contract claims from its coverage...."))

**The disputes clause discussed in *Malone*, *Metric Systems*, and *Utah Construction* is the exact same clause that is contained in the contract between Plaintiff and the National Park Service.** Thus, Plaintiff's duty to "proceed diligently with performance...pending final resolution of any request for relief, claim, appeal, or action" did not apply in the present situation because its claim did not "arise under the contract" since it was a claim for breach of contract. This is documented in Plaintiff's June 28, 2003 certified claim. Clearly, there is a question of fact regarding the nature and status of Plaintiff's claim in August, 2003, thus supporting a finding that there is a question of fact regarding whether or not the disputes clause was applicable to Plaintiff's non-performance in 2003.

## VI.

## CONCLUSION

Based on the evidence and argument set forth in this opposition, and the supporting declarations and exhibits, there is clearly a question of fact regarding whether Defendant materially breached the contract, thus excusing performance by Plaintiff, whether the cure notice issued by Defendant was justified and valid, whether Plaintiff's lack of progress in 2003 was excused, whether the disputes clause in the contract was not complied with by Plaintiff, whether the disputes clause was applicable to Plaintiff's claims and non-performance in 2003, and whether Defendant's termination of Plaintiff for default was proper. Plaintiff respectfully requests that the court deny Defendant's motion for partial summary judgment.

DATED: July 22, 2005

MURPHY AUSTIN ADAMS SCHOENFELD LLP

D. MICHAEL SCHOENFELD
Attorneys for Plaintiff
REMEDIATION CONSTRUCTORS, INC.

MURPHY AUSTIN ADAMS SCHOENFELD LLP
1000 G St., Third Floor
P. O. Box 1319
Sacramento, California 95812-1319
Telephone: (916) 446-2300
Facsimile: (916) 503-4000