IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | DOCKET NO. 03-2478C<br><br>**DECLARATION OF D. MICHAEL SCHOENFELD IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(Judge Susan G. Braden)<br><br>Hearing Date: TBD |

I, D. MICHAEL SCHOENFELD, declare:

1. I am an attorney licensed to practice in the State of California and before this Court, and am the attorney of record for Plaintiff Remediation Constructors, Inc. ("Remcon") in the above-entitled matter. I have personal knowledge of the following and if called to testify could and would competently testify thereto.

2. At all times relevant I have been the lead counsel for Remcon in this matter. I have personally taken the depositions of all government witnesses and the designers who have been deposed in this litigation. I have read the government's motion for partial summary judgment and observed that there are no declarations or affidavits providing any facts to the Court and have authorized and asserted, on behalf of our client, the objections to evidence which are set forth in Section III in the opposition points and authorities concurrently filed herewith.

3. Attached hereto as Exhibits 1A - 1H are true and correct copies of selected pages of the deposition transcript of William H. DeOcampo taken on January 5, 2005, January 10, 2005 and January 11, 2005. Mr. DeOcampo was, during the entire construction phase from 2001 into 2003, the Contracting Officer's Representative. Based in Denver, he was the lead person administering the Project for the National Park Service ("NPS"). The Project inspectors, Bob Russell and Loren Mangrum, who were stationed on-site, reported directly to Mr. DeOcampo. Mr. DeOcampo was the liaison between Mr. Keiscome, the Contracting Officer, and the Project. The pages attached hereto as exhibits from Mr. DeOcampo's deposition are organized as follows:

♦ Exhibit 1A contains excerpts from Mr. DeOcampo's deposition transcripts admitting the fact that the compaction factor (40%) used by the designers to calculate the earthwork quantities used on the Project's contract documents, as part of their assumptions in designing the Project, were mistaken, and contributed to thousands of cubic yards worth of excess material being encountered by Remcon and extra work performed. The excerpts attached are:

- Page 292, Line 22 - Page 293, Line 18
- Page 294, Lines 4-23
- Page 311, Lines 1-6
- Page 311, Line 22 - Page 312, Line 7

♦ Exhibit 1B contains excerpts from Mr. DeOcampo's deposition transcripts admitting the fact that the government caused delays to Remcon's performance of work and affected its inability to construct the Project as scheduled. The excerpts attached are:

- Page 43, Line 14 - Page 44, Line 2
- Page 47, Line 24 - Page 48, Line 7
- Page 69, Lines 1-16
- Page 71, Line 16 - Page 72, Line 14

- Page 207, Line 20 - Page 210, Line 4
- Page 411, Line 19 - Page 413, Line 19
- Page 432, Line 4 - Page 434, Line 20
- Page 481, Line 14 - Page 482, Line 18
- Page 491, Line 7 - Page 493, Line 18
- Page 503, Line 23 - Page 504, Line 15
- Page 509, Line 13 - Page 510, Line 12
- Page 515, Line 2 - Page 520, Line 12
- Page 540, Line 16 - Page 542, Line 2
- Page 544, Line 18 - Page 545, Line 14
- Page 558, Line 11 - Page 559, Line 12
- Page 560, Lines 2-6
- Page 561, Line 11 - Page 562, Line 2
- Page 567, Line 7 - Page 568, Line 7
- Page 607, Line 17 - Page 608, Line 18
- Page 637, Line 7 - Page 638, Line 2
- Page 651, Line 9 - Page 652, Line 6
- Page 655, Line 6 - Page 658, Line 15

♦ Exhibit 1C contains excerpts from Mr. DeOcampo's deposition transcripts admitting the fact that the burn pit encountered had more than 200% greater quantity than represented, that it took over a year to process the modification compensating Remcon for performing the extra work, and that the modification only compensated Remcon for excavating and disposing of the material encountered and that no modification has been issued to pay Remcon for the extra work to fill up the larger hole created by the direction to remove greater material. The excerpts attached are:

- Page 119, Line 1 - Page 120, Line 3

- Page 161, Line 4 - Page 162, Line 25
- Page 285, Line 10 - Page 288, Line 24
- Page 331, Lines 3-8

♦ Exhibit 1D contains an excerpt from Mr. DeOcampo's deposition transcript admitting the fact that the aggregate base material, called for in the contract documents to be furnished by the government to the contractor in a stockpile, was not actually provided, and that prospective bidders were unable to determine, through a pre-bid site inspection, the accuracy of the indication because the site was under winter conditions when advertised and bid. The excerpt attached is Page 629, Line 17 - Page 633, Line 24.

♦ Exhibit 1E contains excerpts from Mr. DeOcampo's deposition transcripts admitting the fact that Remcon gave notice to the government's inspector and the NPS of the fact that Remcon claimed it had encountered a differing site condition ("DSC") in the deep cut area of the Upper Sherman Access Road, that the notice was in accordance with the contract requirements, but that the government failed to investigate the claim at any material time. As a result, no analysis by or on behalf of the government was undertaken of the physical conditions encountered, even though it was the government's responsibility to do so, and the Remcon claim was denied for eighteen months. Mr. DeOcampo testified that delays did occur as a result of the DSC but no time extension has ever been granted. The excerpts attached are:

- Page 104, Line 6 - Page 108, Line 23
- Page 114, Line 12 - Page 116, Line 6
- Page 122, Line 17 - Page 125, Line 15
- Page 134, Line 6 - Page 160, Line 25
- Page 187, Line 1 - Page 199, Line 2
- Page 230, Line 8 - Page 231, Line 2

- Page 234, Line 3 - Page 248, Line 25
- Page 605, Line 3 - Page 606, Line 6
- Page 611, Line 24 - Page 614, Line 7

♦ Exhibit 1F contains an excerpt from Mr. DeOcampo's deposition transcript admitting the fact that the stones to be used for boulder revetment work were to be furnished by the government according to the specifications but they were not so furnished and extra costs, not reimbursed, were incurred. The excerpt attached is Page 660, Line 8 - Page 666, Line 14.

♦ Exhibit 1G contains excerpts from Mr. DeOcampo's deposition transcripts admitting the fact that Mr. DeOcampo, who was the person responsible for preparing and processing the contract modifications, failed to do so on a timely basis, and admits that extra work performed in July, 2001 was not put into a modification until September, 2002. Further, Mr. DeOcampo admits that the Upper Sherman Tree Trail re-design was not issued to Remcon to perform until Modification No. 5 was signed by the Contracting Officer on November 20, 2002. The excerpts attached are:

- Page 228, Lines 9-21
- Page 301, Line 4 - Page 302, Line 25
- Page 304, Line 15 - Page 308, Line 16
- Page 344, Line 14 - Page 346, Line 24
- Page 359, Line 15 - Page 362, Line 21
- Page 518, Lines 7-19
- Page 591, Line 3 - Page 593, Line 9
- Page 599, Line 2 - Page 602, Line 20

♦ Exhibit 1H contains excerpts from Mr. DeOcampo's deposition transcripts admitting the fact that there were many design problems on the Project and they affected the access road and the parking lots. Also, there was concern by the NPS as early as July, 2001 that the designers needed to be put on notice of errors and omissions, especially

with respect to quantity overruns of excavated material. Mr. DeOcampo further testified that he could not recall previously being involved with a Project that had as many design changes, and that contractors are entitled to be compensated for extra costs resulting from design errors. The excerpts attached are:

- Page 176, Line 13 - Page 178, Line 16
- Page 180, Line 3 - Page 181, Line 7
- Page 371, Line 12 - Page 397, Line 21
- Page 401, Lines 2-16
- Page 438, Line 3-19
- Page 440, Line 24 - Page 441, Line 15
- Page 455, Line 18 - Page 458, Line 7
- Page 471, Line 4 - Page 472, Line 1
- Page 483, Lines 5-20
- Page 486, Lines 3-25
- Page 511, Line 5 - Page 514, Line 1
- Page 595, Line 3 - Page 598, Line 10

4. Attached hereto as Exhibits 2A - 2H are true and correct copies of selected pages of the deposition transcript of Rodney K. Keiscome taken on February 8, 2005 and February 9, 2005. Mr. Keiscome, at all relevant times, was and is the Contracting Officer and possesses a Level IV classification, meaning his authority was the highest permitted under the government's procurement process. These pages are organized as follows:

♦ Exhibit 2A contains an excerpt from Mr. Keiscome's deposition transcript admitting the fact that the plans and specifications were defective as to quantities. The excerpt attached is Page 460, Lines 1-20.

♦ Exhibit 2B contains excerpts from Mr. Keiscome's deposition transcripts admitting the fact that Modification No. 6, unilaterally issued in February, 2003, and

relating to Remcon's encountering of a DSC along the access road, was issued because the rock encountered was a DSC and the Contracting Officer ("CO") admitted that the modification was untimely issued. Further, the CO testified that he was not properly advised or supported by this subordinates and did not timely know that his technical support personnel believed a DSC was encountered. The excerpts attached are:

- Page 77, Line 16 - Page 79, Line 3
- Page 432, Line 4-7
- Page 441, Line 14 - Page 442, Line 16
- Page 445, Lines 11-14

♦ Exhibit 2C contains an excerpt from Mr. Keiscome's deposition transcript admitting the fact that the access road in the deep cut area was relocated for government responsible reason(s). The excerpt attached is Page 368, Lines 17-25.

♦ Exhibit 2D contains excerpts from Mr. Keiscome's deposition transcripts admitting the fact that the CO admits that the government did not timely or responsibly investigate the DSC in the access road, and that the CO was aware of the issue within one week of the six plus week effort to blast the road. The excerpts attached are:

- Page 79, Line 24 - Page 81, Line 12
- Page 88, Line 3 - Page 89, Line 3
- Page 96, Lines 10-16
- Page 192, Line 22 - Page 193, Line 17
- Page 362, Lines 21-25
- Page 364, Lines 11-16
- Page 430, Lines 9-16

♦ Exhibit 2E contains an excerpt from Mr. Keiscome's deposition transcript admitting that he has come to understand that the compaction percentage used by the designers in their earthwork calculations was mistaken in that it was too high, and as a result, excess material would have to have been handled, entitling the contractor to a

modification. The excerpt attached is Page 462, Line 19 - Page 463, Line 9.

♦ Exhibit 2F contains excerpts from Mr. Keiscome's deposition transcripts admitting the fact that the CO testified that time extensions, not yet granted, may be due Remcon for issues on the Project, especially for encountering the DSCs in the access road locale, and that he simply did not address this fact despite his acknowledgment that he has a duty to do so on a timely basis. He further testified and admitted that the work on the access road, between July 30, 2001 and September, 2001, was on the critical path. The excerpts attached are:

- Page 47, Line 23 - Page 48, Line 12
- Page 101, Lines 19-23
- Page 103, Lines 9-18
- Page 104, Line 10 - Page 105, Line 16
- Page 107, Lines 3-25

♦ Exhibit 2G contains excerpts from Mr. Keiscome's deposition transcripts admitting the fact that the President of Remcon, Stephen Christensen, advised the CO on multiple occasions that the failure of the government to properly compensate Remcon for impacts experienced, including the DSC, had depleted Remcon's working capital and that Remcon lacked the funds to go back to work. The excerpts attached are:

- Page 99, Lines 6-13
- Page 100, Lines 6-12
- Page 530, Lines 14-19

♦ Exhibit 2H contains excerpts from Mr. Keiscome's deposition transcripts concerning the aggregate base claim. The CO testified and admitted that Remcon was entitled to rely on the accuracy of the representations in the contract documents that all aggregate base material needed was in a stockpile available for Remcon's use, and that this representation was not accurate. The excerpts attached are:

- Page 201, Line 6 - Page 202, Line 6

- Page 205, Lines 2-7

5. Attached hereto as Exhibits 3A - 3C are true and correct copies of selected pages of the deposition transcript of Joanne H. Cody taken on February 28, 2005. Ms. Cody was the A+E Design Manager for the NPS during the design phase, in charge of administering and reviewing for accuracy the content of the outside designers efforts, including the 100% complete contract documents. During the construction phase, she was the liaison between Mr. DeOcampo and the designers, and made several site visits to inspect, evaluate and provide direction regarding design issues. Included among the design issues she addressed and participated in was the decision and direction to relocate the access road into the hill. These pages are organized as follows:

♦ Exhibit 3A contains an excerpt from Ms. Cody's deposition transcript admitting that the design changes to the Sherman Tree Trail, as part of the Upper Sherman work, issued by Modification No. 5 effective November 20, 2002, meant that the contractor was not authorized to do the work sooner than November 20, 2002, and that as a result, no Lower Sherman work could commence until after the Upper Sherman work, including the Trail, was completed during the 2003 construction season. The excerpt is at Page 291, Line 9 - Page 293, Line 15.

♦ Exhibit 3B contains an excerpt from Ms. Cody's deposition transcript admitting that there was no pre-bid site inspection because there was snow covering the site. The excerpt is at Page 110, Lines 8-24.

♦ Exhibit 3C contains excerpts from Ms. Cody's deposition transcript admitting that the quality control for quantities to be encountered was the responsibility of DHM and Martin & Martin, the outside designers hired by NPS. The excerpts attached are:

- Page 41, Lines 11-14
- Page 43, Lines 3-12
- Page 44, Lines 9-13

- Page 47, Lines 19-25
- Page 48, Lines 1-11
- Page 83, Lines 1-13

6. Attached hereto as Exhibits 4A - 4G are true and correct copies of selected pages of the deposition transcript of Robert W. Smith taken on January 6, 2005. Mr. Smith, the lead designer from DHM, one of the two third party designers hired by the NPS, was involved in all facets of the design effort, and was involved in multiple site visits and design revisions during the construction phase. These pages are organized as follows:

♦ Exhibit 4A contains an excerpt from Mr. Smith's deposition transcript admitting the fact that the NPS, not Remcon, had the responsibility, under the contract documents prepared by Mr. Smith, to determine the number and location of the trees and boulders to be removed or remain. The excerpt attached is Page 133, Line 25 - Page 134, Line 22.

♦ Exhibit 4B contains excerpts from Mr. Smith's deposition transcript admitting the fact that the access road needed to be re-aligned and that this re-alignment caused the contractor to encounter a DSC and incur extra costs and have to handle excess quantities of material. The re-alignment was caused, in part, by conflicts with trees and signature-type boulders. The NPS performed the design changes and re-alignment without contacting the outside designers or seeking their input. The excerpts attached are:

- Page 237, Line 18 - Page 239, line 20
- Page 240, Line 22 - Page 241, Line 2
- Page 246, Line 14 - Page 247, Line 21

♦ Exhibit 4C contains an excerpt from Mr. Smith's deposition transcript admitting the fact that the estimated quantity of material which was represented to be excavated from the burn pit (2000 cubic yards) more than tripled, created a larger hole,

and required extra work to be performed. The excerpt attached is Page 250, Line 17 - Page 253, Line 5.

♦ Exhibit 4D contains excerpts from Mr. Smith's deposition transcript admitting the fact that the design team members, inconsistent with their professional expertise and judgment, used a 40% compaction factor for decomposed granite in calculating estimated quantities of earthwork to be handled. This 40% factor was directed by the NPS to be used and no objection was made. As a result, the plans were inaccurate and excess material (up to 17,000 cubic yards) was encountered and had to be handled. The excerpts attached are:

- Page 142, Line 3 - Page 143, Line 6
- Page 199, Lines 9-20
- Page 206, Line 16 - Page 207, Line 19
- Page 284, Line 24 - Page 285, Line 7

♦ Exhibit 4E contains excerpts from Mr. Smith's deposition transcript admitting the fact that the plans and specifications were adversely affected by the late receipt of the soils report, and therefore data was missing from the plans causing assumptions to be made. The design was exclusively prepared by or on behalf of the NPS and it did contain mistakes, such as the compaction factor used, the aggregate base information as to the promised stockpile, the content of the soils report, the burn pit quantity, and the fact that the contractor encountered a DSC along the access road. Further, as a result of the many changes and impacts on the job, Remcon was in "limbo". The excerpts attached are:

- Page 126, Line 3-22
- Page 128, Lines 6-15
- Page 129, Line 8 - Page 130, Line 4
- Page 172, Lines 1-5
- Page 188, Lines 14-19

- Page 206, Line 16 - Page 207, Line 11
- Page 220, Line 4 - Page 222, Line 5
- Page 265, Line 4 - Page 267, Line 1
- Page 267, Line 19 - Page 268, Line 11
- Page 291, Lines 5-19
- Page 293, Line 23 - Page 294, Line 4

♦ Exhibit 4F contains an excerpt from Mr. Smith's deposition transcript admitting the ripple effect and impact the various design problems, re-design efforts, maladministration, excess material, and DSC had on the Project as of August 2001. Mr. Smith testified that a confluence of all of the impacts placed the contractor in quite a difficult position, especially with such a limited work area. The excerpt attached is Page 209, Line 11 - Page 272, Line 25.

♦ Exhibit 4G contains excerpts from Mr. Smith's deposition transcript admitting the fact that the design team members, when advised of the access road relocation and the DSC, evaluated the facts and concluded that a DSC did exist and told this to the NPS personnel, in writing, of their conclusion/determination (during 2001) long in advance of the NPS recognizing the DSC. Mr. Smith also testified that the blasting of the access road delayed and impacted the critical path. The excerpts attached are:

- Page 231, Line 19 - Page 232, Line 4
- Page 232, Line 25 - Page 233, Line 25
- Page 265, Line 4 - Page 268, Line 20
- Page 278, Line 8 - Page 279, Line 4
- Page 282, Line 7 - Page 283, Line 22

7. Attached hereto as Exhibits 5A - 5F are true and correct copies of selected pages of the deposition transcript of Raymond Tuttle taken on January 7, 2005. Mr. Tuttle was the lead designer with Martin & Martin, the Civil Engineer for the Project.

These pages are organized as follows:

♦ Exhibit 5A contains excerpts from Mr. Tuttle's deposition transcript admitting the fact that the government directed the design team to use a 40% compaction factor for the decomposed granite to be encountered and they used it even though they knew it to be wrong and caused excess material to have to be handled. Mr. Tuttle testified that the percentage should have been 15%. The direction to use an inaccurate compaction factor made the contract quantities defective, and this was discussed among the design team members. Mr. Tuttle admitted that the NPS, when told of the designers' concerns, rejected the concerns. The excerpts attached are:

- Page 129, Line 7 - Page 131, Line 20
- Page 133, Line 4 - Page 134, Line 2
- Page 134, Line 13 - Page 135, Line 15

♦ Exhibit 5B contains excerpts from Mr. Tuttle's deposition transcript admitting the fact that Mr. Tuttle believed, when presented with the facts, that Remcon did encounter, in the access road, the DSC contended to be encountered. Mr. Tuttle testified that the soils engineer should have been contacted to investigate the DSC contention but was not. At the time the DSC was encountered, the NPS did not contact Mr. Tuttle. The excerpts attached are:

- Page 68, Line 10 - Pag 69, Line 1
- Page 70, Line 25 - Page 72, Line 11
- Page 73, Lines 10-17
- Page 90, Line 8 - Page 91, Line 24
- Page 92, Line 19 - Page 93, Line 17
- Page 126, Line 22 - Page 127, Line 23

♦ Exhibit 5C contains an excerpt from Mr. Tuttle's deposition transcript admitting the fact that Mr. Tuttle, as a civil engineer, knows that blasting a road which can be ripped is a much more expensive, inefficient, and time consuming effort, and no

contractor would voluntarily blast in lieu of using conventional equipment to rip a road if both options were available because it is cheaper to rip. The excerpt attached is Page 114, Line 15 - Page 117, Line 9.

♦ Exhibit 5D contains excerpts from Mr. Tuttle's deposition transcript admitting the fact that the road was re-aligned in the deep cut area without consultation with Mr. Tuttle. Further, he testified that in July, 2001 he was aware of the NPS' concerns that there were design errors and omissions and excess quantity concerns. The excerpts attached are:

- Page 107, Line 24 - Page 109, Line 8
- Page 122, Lines 4-18
- Page 152, Line 21 - Page 155, Line 11

♦ Exhibit 5E contains an excerpt from Mr. Tuttle's deposition transcript concerning the fact that it was the designer's intent to indicate that all aggregate base material for the Project was stockpiled in an area indicated on the plans. The excerpt attached is Page 142, Line 10 - Page 144, Line 9.

♦ Exhibit 5F contains excerpts from Mr. Tuttle's deposition transcript admitting the fact that the excess material encountered caused extra work to be performed, including filling in the burn pit hole. Further, re-aligning the road into the hill caused excess material to be encountered as well. The excess 15,000 - 17,000 cubic yards result from the burn pit, the re-alignment of the access road and the compaction factor (40%) being directed by the NPS, and that none of these causes of quantity overrun are or were caused by the contractor. The excerpts attached are:

- Page 110, Line 12 - Page 111, Line 2
- Page 138, Lines 10-21
- Page 194, Line 16 - Page 196, Line 18

8. Attached hereto as Exhibits 6A - 6B are true and correct copies of selected pages of the deposition transcript of Athena Demetry taken by me on April 8, 2005. Ms.

Demetry is an NPS employee stationed at the Park who has a degree in biology and a masters in forestry and was given the responsibility to mark the trees which the design plans indicated needed to be removed to construct the Project. These pages are organized as follows:

♦ Exhibit 6A contains an excerpt from Ms. Demetry's deposition transcript admitting that she was the person who marked the trees for removal along the access road beginning June 1, 2001. A can of paint was used to mark the trees, and she was relied upon to exercise her judgment as to which trees to paint for removal. The excerpts attached are:

- Page 62, Lines 8-23
- Page 68, Lines 7-14
- Page 69, Line 4 - Page 70, Line 4

♦ Exhibit 6B contains an excerpt from Ms. Demetry's deposition transcript admitting that Mr. Christensen requested that the trees be marked and removed prior to surveying so as to avoid harming the survey stakes, and that this was agreed to at the preconstruction meeting by the government. The excerpt is at Page 72, Line 20 - Page 74, Line 16.

9. Attached hereto as Exhibits 7A - 7C are true and correct copies of selected pages of the deposition transcript of Michael J. Giller, the Project Manager assigned by the NPS to the Project effective July 10, 2002, taken on March 1, 2005. These pages are organized as follows:

♦ Exhibit 7A contains an excerpt from Mr. Giller's deposition transcript admitting that Modification No. 6 issued unilaterally, approximately 18 months after the extra work was performed, was untimely issued. The excerpt is at Page 98, Lines 14-19.

♦ Exhibit 7B contains an excerpt from Mr. Giller's deposition transcript admitting that even though Modification No. 6 was issued untimely, payment of the $84,000 recognized therein was delayed at least six additional months and he has no

explanation for the further delay. The excerpt is at Page 402, Line 2-8.

- Exhibit 7C contains an excerpt from Mr. Giller's deposition transcript admitting that the value included in Modification No. 6 is solely based on his analysis of blasting costs incurred, even though he was not present when it occurred, and disregards any other costs (delay, handling of material, excess quantities, sorting, stockpiling, loss of efficiency/productivity) claimed by Remcon. The excerpt is at Page 164, Lines 22 - Page 165, Line 25.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed at Sacramento, California on July 21, 2005.

D. MICHAEL SCHOENFELD