# EXHIBIT 1A

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF WILLIAM H. DEOCAMPO - VOLUME I
January 5, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: RICHARD P. SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 4058
Washington, D.C. 20005

Also Present: Stephen Christensen

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF WILLIAM H. DEOCAMPO - VOLUME II
January 10, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: WILLIAM K. OLIVIER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 11066
Washington, D.C. 20005

Also Present: Stephen Christensen
Michael Giller
Colleen Dulin, Esq.

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF WILLIAM H. DEOCAMPO - VOLUME III
January 11, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: WILLIAM K. OLIVIER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 11066
Washington, D.C. 20005

Also Present: Stephen Christensen
Michael Giller

Page 289

other as to whether he got reimbursed?
A Well, I relied upon what was submitted to me as costs on that.
Q Did you ever receive specific costs for raising the parking lot or the burn pit excess that was hauled off as extra work?
A I don't remember right now.
(A discussion was held off the record.)
MR. SCHOENFELD: Just give me one second.
Q (By Mr. Schoenfeld) You recall on this job that there was a request by Remcon to get reimbursed as extra work for additional excavation independent of the rock, correct?
A I don't know.
Can you refresh my memory?
Q Yeah. I think we will try.
(Exhibit Number 99 was marked for identification.)
Q (By Mr. Schoenfeld) I show you Exhibit 98, a one-page document that's dated June 24th of 2000. So it's during the design phase. Okay?
A Yes.
Q You didn't participate in preparing this doc -- document; is that correct?
A I don't think this one. I think I ran some

Page 290

estimates on it.
Q Okay. You see that the heading is Earthwork Quantities for this project; is that correct?
A Earthwork Quantities, yes.
Q Okay. Did you play any role in determining the earthquake -- the earth -- the earthwork quantities for this project on or about June of 2000, which would have been approximately nine months before the job was bid?
A Before it was bid?
Q Yes, sir.
A No, I didn't --
Q All right.
A I don't think so.
Q You see this document came out of the government files, right?
A It's 6/24/00, yes.
Q No, no, lower. The Bates stamp number. You see that's the government Bates stamp?
A Yeah, I see that.
Q All right.
A The Bates stamp.
Q I show you the next document in order --
A Okay.
Q -- which is Number 99. This is an Earthwork

Page 291

Quantities summary with the same document we just looked at with the exception there's a series of handwritten notations all over it, and it's got the date of July 14th of 2000. You see that?
You see that, sir?
A Yes.
Q Is that your handwriting on this document at all?
A I don't know if this is my handwriting.
Q Do you recognize the handwriting?
A No, I don't.
Q Do you know what -- from discussions with anybody, what discussions occurred prior to bid regarding the quantities of earthwork to include in the contract documents?
A No, I don't.
Q Okay.
MR. SCHOENFELD: Let's mark next in order. It's number 100. Lucky 100.
(Exhibit Number 100 was marked for identification.)
Q (By Mr. Schoenfeld) Have you ever seen this document, either of the two pages, sir, before?
A I may have. I'm not sure right now.
Q This is dated October 24th of 2000. It's

Page 292

noticed as being prepared by DHM on the first page. It is a typewritten page concerning earthquake quan -- earthwork quantities. The second page is all handwritten on Martin and Martin stationery. And it notes that it's done by TS.
Do you recall interacting with an individual whose initials were TS for this project for Martin and Martin?
A TS?
Q Yes.
A I don't know of a TS. I -- I've dealt with a Ray Tuttle.
Q Right.
In the first page of this document, you will see, adjacent to the Upper Sherman Tree, there's a Cut and Fill category?
A Yes.
Q And next to the 16,100 cubic yards, under Fill, there is a notation, 40 percent factor use. Do you see that?
A Uh-huh. Yes.
Q Do you understand that to be a 40 percent compaction factor, it was going to compress?
A I would assume that's what that is. I'm not sure.

Q Who performed, if anybody performed, an evaluation of the material to be encountered by the contractor and what its compaction or compression factor was?
A I don't know the answer to that.
Q Was it ever done by anybody, or was this just a guess?
A I don't know.
Q Did you ever ask?
A I would have used something less than 40 percent.
Q What would you have used?
A Somewhere around 20 to 25.
Q On what basis?
A On what I've dug out before on other projects and recompacted.
Q In this park?
A In this park.
Q Before I showed you this just now, had you come to any understanding that a 40 percent factor was, at least at some moment in time, used as part of the design analysis of the quantities to include in the contract documents?
A I can't answer yes to that. I --
Q Okay.



A Based upon what you're showing me right here with the 40 percent factor, I would assume that's to be true, what you're saying.
Q If, in fact, a 40 percent factor was used, wouldn't that increase the excess materials that were going to be encountered if that eventuated?
A If there was -- could not compact at 40 percent, yes, there would be extra material.
Q And you thought that it was overstated by maybe 100 percent of compression, huh, based on your experience?
A Somewhere around there.
Q Mr. Keiscome was upset by the overruns as early as August of 2001 of earthwork quantities, correct, as we've seen?
A I believe in one of the documents.
Q And does this at all lead you to question as to whether or not improper assumptions were made by the designers as to the compaction factor thus exposing the National Park Service to overruns?
A I wouldn't be able to speak to what they -- they performed. But I would base -- based on this 40 percent, I would say that, yes.
Q What amount of quantity was actually in the bid documents?



A I can't recall.
Q Do you know whether the 40 percent factor actually was used?
A I don't know.
Q Does that raise some question in your mind right now?
A Well, I think I performed something later on after Steve had sent me something.
Q But what was in the bid documents was a fixed quantity and then the over, slash, underrun variation quantity clause would apply, right?
A Yes.
Q On the second page, do you recognize the handwriting at all of this exhibit?
A This very light. One that says 2.1 slope?
Q Yes.
A Two to one slope max?
Q Yes.
A It appears to be my writing right there.
Q Okay. So you did see this at some point in time?
A I've seen it at some point in time, yes.
Q Is the information, 17,292 excess, in your handwriting?
A No, that's not mine.



Q All right.
MR. SCHOENFELD: Let's mark the next in order, which is 101.
(Exhibit Number 101 was marked for identification.)
Q (By Mr. Schoenfeld) Daily report dated August 16th of 2001. Once again, has your initials at the top, correct?
A Yes.
Q Bob Russell authored this document, correct?
A Yes.
Q There's a notation in the middle of the Status of Work, excavated -- with respect to what Remcon was doing that day, excavated and hauled excess material, Station 21.8 to 25 point -- plus 20, hauled to shuttle area.
Did this refer to this excess excavation that Remcon contended that it had performed?
A Judging by what he said, excess, yes.
Q Okay. When Bob Russell wasn't -- strike that.
Bob Russell was very careful in the words he chose; he wasn't just loose in the words he used in his communications, correct?
A I've cautioned him about using words like directing --

A Okay.
Q -- and I know of none --
A Okay. Yeah, but it would have --
Q -- attached to this exhibit.
Now, look at the last page of this exhibit, sir. See if this will help refresh your recollection.
In the description justifying this extra work item, it is written, During the excavation and grading of the access road and Upper Sherman parking lots, it became apparent that excess excavated material was being generated, period.
The Contract provides for hauling 6800 cubic yards of excess excavation to Wolverton Point for disposal. It was estimated by the government that a total quantity of approximately 15,000 of excess excavation will be generated.
The Denver Service Center and the designer have determined that the upper parking lot can be raised approximately 5 feet at the easterly end and will allow 5,000 cubic yards of excavated material to be incorporated into the fill at this location.
This change will reduce some of the costs associated with hauling excess material within the park boundaries and will result in an approximate savings of $17,000 as opposed to hauling this material within the



park.
This change is necessary in order to eliminate possible construction impacts that will result in claims. Therefore, this change is in the best interest of the government, and I recommend that it be approved. You see that?
A Yes.
Q Who wrote that?
A I did.
Q Does this refresh your recollection now that the following happened: That it was determined that there was approximately 22,000 cubic yards of excess material excavated and that the government, in order to mitigate its damages, elected to raise the Upper Sherman parking lot by up to 5 feet in certain locations to spread about 5,000 of that excess cubic yardage?
A I believe I ran calculations and came up with about 17,000 yards.
Q Excess yards?
A I believe. I'm not sure. I can't --
Q Regardless of the quantities --
A Yeah.
Q -- this new item, Number 139, was to spread some of the excess material, correct?
A Yes.



Q And it was not used to fill back up the hole up to the base that had been excavated as a result of the burn pit excess, correct?
A According to this, yes.
Q Thank you.
A You're correct.
MR. SCHOENFELD: Let me just see if there's anything on this direct subject only.
(Reviewed documents.)
THE WITNESS: Are you going to overrun so that way we can reduce my invite back?
MR. SCHOENFELD: No. We're going to be done.
Q (By Mr. Schoenfeld) By the way, I'm just going to show you -- this is the conclusion that came to be 17,000 set forth in that prior exhibit, when you saw the additional 17,000 yards and then you saw handwriting on it.
A State that again now. Because I -- I'd seen this, and then I put that two to one on one of the previous ones.
Q Correct.
Let me ask this: Did -- did you ever conclude that the excess volume was a product of the compaction percentage being wrong that the designers utilized?
A Probably, yes.



Q And that's not Remcon's responsibility, correct?
A No.
Q And Remcon is entitled, in your opinion, based on your understanding of your job to be reimbursed for the excess result in costs, correct?
A I would probably recommend payment.
(A discussion was held off the record.)
MR. SCHOENFELD: We'll pause for today. I'll see you Monday morning. Have a great weekend. I hope you get to play golf.
THE WITNESS: No, I don't think I'll play golf.
MR. SCHOENFELD: Thank you, sir.
THE WITNESS: Sure thing.
MR. SCHOENFELD: Appreciate it.
(The deposition was adjourned at 5:18 p.m., on Wednesday, January 5, 2005.)

# EXHIBIT 1B

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

appointment letter.
Q (By Mr. Schoenfeld) I understand that that's going to be more specific. Tell me what you understand your job duties are, in your words.
A I -- when I'm in the office, I reviewed submittals which are recommended to me by either the designers -- I also look at --
Q By designers or anybody else?
A Designers --
Q CMs?
A CMs.
Q Anybody else?
A I believe that's it.
Q Okay. So you review submittals. Go ahead.
A And they make recommendations to me.
Q I understand.
A Okay?
Q What other job responsibilities do you perceive that you have?
A I also am responsible for review on pay estimates.
Q Anything else?
A Every once in a while, I will travel to the job site and look at, in -- I will inspect.
Q Anything else?



A I perform the final inspections with designers.
(Mr. Christensen entered the room.)
Q (By Mr. Schoenfeld) Anything else?
A I have to think on that.
Q All right. Let me suggest some categories and tell me if these fit within your responsibilities.
Do you receive correspondence from the contractor?
A Yes.
Q Do you author correspondence?
A Yes.
Q When a contention is raised, whether by correspondence or otherwise, that there is a design error that affects the job, either in time or money, is that a subject that is brought to your attention as the COR and your responsibility to evaluate and respond?
A I evaluate and I respond.
Q So that is part of your duties?
A Yes.
Q So change order requests are part of your duties?
A Change order requests are part of my duties. I also negotiate cost, perform government estimates.
Q So you negotiate extra work change orders?



A Yes.
Q And you estimate?
A I perform government estimates.
Q On extra work?
A Yes.
Q Do you perform an evaluation as to whether something is extra work?
A Yes.
Q Do you receive on some periodic basis daily reports from your construction managers?
A Yes.
Q Do you review them?
A Yes.
Q Do you receive and review schedule information from your contractors?
A Yes.
Q Do you have the responsibility to approve submittals?
A Yes.
Q Approve schedules?
A No.
Q Who has the responsibility to approve schedules?
A I accept schedules.
Q So you have the responsibility to accept or



reject?
A Yes.
Q If the contractor raises a question or refers to -- we'll refer to it as an RFI, a Request For Information --
A Yes.
Q -- does that documentation flow through you --
A Yes.
Q -- and your office?
A Yes.
Q Is it your responsibility as the COR to determine what project-related communications go to the design team during the construction administration phase for their involvement?
A Yes.
Q Am I correct in understanding, then, that if the construction manager has a question or an issue or the contractor has a question or an issue that information is filtered through you as the COR before it goes to the design team as contrasted with going directly to the design team?
THE WITNESS: Can you read back that question?
(The reporter read page 44, line 16 through line 21.)
Q (By Mr. Schoenfeld) And my question is

amended to say, if the issue that the CM or the contractor has relates to some concern or issue regarding the design.

A It would flow through me.

Q Okay. So you're the hub of information and -- that would require design-related involvement during the construction phase?

A Let me clarify something.

Q Uh-huh.

A The inspector on the job site is supposed to pick up all questions coming in from the contractor. He then passes it on to myself.

Q Correct.

And if the question concerns design, you then make the decision and have the responsibility to involve the designer to get a response?

A I involve designers when a design question arises.

Q And it's not for the contractor to communicate directly with the designer, correct?

A That's true.

Q And it's not for the inspector to go directly to the designer; it has to go through DSC and, in this instance, when you're the COR, yourself?

A Sometimes the inspector will go to the



designer.

Q But that's only with your direction? It's supposed to go to you, but you may ask them to bypass you in order to facilitate?

A I like to see all questions coming in. I ask them to funnel it through me.

Q And that would include RFIs?

A Yes.

Q Now, you're familiar with RFIs as a construction document, correct?

A Yes.

Q And on this project RFIs were used, correct?

A Yes.

MR. SCHROEDER: Your -- I'm sorry, could you define RFI.

MR. SCHOENFELD: Yeah, Request For Information. I did earlier.

MR. SCHROEDER: All right. Thanks.

Q (By Mr. Schoenfeld) And when you saw an RFI that had a design-related inquiry, would you respond to it, or would you make your design team respond to it?

A I would have my design team respond to it, but it would funnel back through me.

Q Okay. So the -- so the process would be generically as follows: Remcon would identify something



they contended to be a design-related impediment, they couldn't move here because there was, let's say, a tree in the way, can we relocate this tree or take down the tree or relocate the construction activity; they would prepare an RFI in which they would communicate certain information in writing and give it to the inspector who would review it, channel it to you, you would review it, channel it to DHM, who in turn may send it to Martin and Martin; once a response was prepared, it would go back the opposite direction through the hands I just described?

A That is the sequence, yes.

Q Okay. And that was the protocol -- and while occasionally we may have broken protocol, that was the way the main things happened, yes?

A The way --

MR. SCHROEDER: Let me object to the word "broken" as a characterization.

MR. SCHOENFELD: Okay.

Q (By Mr. Schoenfeld) You may answer. Was that yes?

A That was the sequence in which we like to see things occur.

Q Okay. With respect to -- going back to the description of duties that you performed for this project



as a COR. With respect to any issues that arose concerning delays, would you have the responsibility to evaluate them?

A Yes.

Q With respect to change orders, do you have the responsibility to negotiate them with the contractor?

A Yes.

Q Did you have the authority to conclude those negotiations on behalf of the government such that it was a done deal other than just being converted to a formal document?

A I only make recommendations to the CO.

Q Okay. So you were the CO's representative delegated with the responsibility to evaluate and negotiate, but when you sat across the table from Remcon, in this case Mr. Christensen, and negotiated a particular issue, all your role would be, I will agree to recommend this --

A Yes.

Q -- to Mr. Keiscome rather than I agree and will direct a change order will be issued?

A Only the CO has the rights to go ahead and make contract modifications to the contract.

Q Understood.

A I can make recommendations to the CO.

THE WITNESS: I -- I -- I can't recall any time, but I know that Mr. Christensen and I had talked about a lot of things, i.e., the progress schedule is one that comes to my mind where I accepted it with notations in order for Remcon, or Remediation Contractors, to get paid, because in our specification it says that unless we have an approved progress schedule, the contractor cannot get paid.

Because we had already mobilized and Remcon was doing work up there --

Q (By Mr. Schoenfeld) Uh-huh.

A -- to mitigate any financial impacts to them, I accepted this progress schedule with notations with the understanding that Mr. Christensen would give me the information that I requested on my response for his progress schedule.

Q Okay. I don't believe you answered my question, so I'm going to reask it in pieces.

Was there ever a time that extra work was directed to be performed and the contractor communicated We need written assurances that we will be able to bill for it because performing of the -- the performance of the extra work will cause a financial hardship on us?

A I would have to look and see what directives were issued.



Q Please answer the question.

MR. SCHOENFELD: Read it back to him.

(The reporter read page 69, line 19 through line 23.)

THE WITNESS: I don't recall, to the best of my knowledge.

Q (By Mr. Schoenfeld) Was there ever a time, other than with respect to hauling, that you communicated with the inspector to allow the contractor to bill for the work -- the extra work under a different line item because the mod had not yet been issued?

A There was probably an instance.

Q What documentation exists to substantiate any of those instances?

A I don't know.

Q Was it just a private conversation between you and the inspector that would permit this to happen and there'd be no paper trail behind it?

A There would be a paper trail, because we have unit prices on certain items. A lot of times what happens is when they overrun, I would go ahead and let my con -- my inspector put that cost in there with the understanding that I'm going to adjust those quantities at a later date.

Q Okay. Let me just ask you a couple more



questions and then we'll take a break.

Do you recall a gentleman by the name of Larry Walling, L-A -- W-A-L-L-I-N-G, acting as a project manager on this project?

A I think he may have come in there in the intermediate time between Ray Todd and Mike Giller.

Q How long --

A I'm not sure if -- if he was designated as PM or not.

Q Okay. But Mr. Todd was there when the contract was issued?

A Yes.

Q And at some point before Mr. Giller came on board, Mr. Walling may have been?

A I guess.

Q All right. A moment ago in response to the questioning, you said that you approved the schedules --

A I --

Q -- with notation.

A I accept them.

Q Did you mean accept?

A I accept them.

Q Okay. Because you weren't given authority to approve, correct, only accept?

A The project schedules are never approved,



because I don't know the logic behind the scheduling.

Q Have you ever received any training in -- in construction scheduling?

A No formal training.

Q So you've never taken any critical path classes?

A I've taken critical path classes.

Q Okay. Are you competent in your own mind to do Primavera or Microsoft schedule work on the computer?

A Not Primavera. I've had a class in MS projects.

Q And have you ever scheduled a project yourself?

A No.

Q Okay. Were you authorized by the change -- by the con -- were you authorized by the contracting officer to direct the inspector to allow this money substitution to go on while the modifications were pending but not yet issued?

A Never directed by the contracting officer.

Q Did you communicate to the contracting officer any time you did that?

A I would let him know that whenever we had overruns, it's coming down.

Q How would you communicate that? In writing?

Page 205

Q In August -- excuse me.
In Exhibit 84, you write, "I need your help on where and how DHM thought items would be paid." "Now we have possible over-runs in item 38 - rock excavation." "What was the intent of rock excavation and how does the Government defend/ward off these requests" . . .
Effectively an hour into the next business day you write, quote -- this is now Exhibit 86 -- "Need your input concerning definition of rock excavation - the projected over-run is too excessive & unacceptable. Provide justification as to why Remcon should not be paid under this pay item. Send response to Joanne & Ray Todd. Willie."
What was it that caused you an hour plus of business time to go from, I need information, what was your thinking, I want some information to defend and ward off, to effectively this is too excessive, this is unacceptable, give me the ammunition to beat them down?
A Did I say that?
Q Words to that effect.
A I say --
Q This is --
A -- the overrun is too excessive and unacceptable.
Q Unacceptable, provide justification as to why

Page 206

they should not be paid.
A Yeah. Why they should not be paid. In other words, the way I read it, I'm thinking of -- I'm leaning toward paying them at this point in time, right? You're saying that the other one said I would not.
Q I'm not saying anything. I'm asking you why you -- why you changed the words and were much more direct, and give me information to not pay them rather than what was your thinking. What was your design intent?
MR. SCHROEDER: Okay. I'm going to object, because I think he's not testified that that's what he meant by that.
Q (By Mr. Schoenfeld) Is it your testimony that as of August 9, 2001, when you sent the first page of Exhibit 86, you were inclined to pay Remcon what -- the cost that it was claiming or that you perceived it was going to claim?
A I think what I was doing was beginning to look at trying to negotiate this problem away.
Q Because you believe the government had culpability?
A What do you mean by "culpability"?
Q Responsibility to pay for it as an extra work item.

Page 207

A I thought that Remcon had expended some costs that was beyond what they should have.
Q Because they were encountering a differing site condition?
A Just for the rock in terms of them having to pay this blaster.
Q Okay.
A Now, I don't know if it was a differing site condition, because --
Q Of that which we've talked about already?
A Right.
Q Okay. Now, as Remcon is having to do blasting, you, having worked in the field for a number of years, know that when a contractor blasts, it's a much slower process and much more time is consumed than normal ripping activities with a D8 dozer, correct?
A That's somewhat of --
Q In the abstract; is that correct?
A What do you mean by "in the abstract"?
Q In the abstract. All things being equal, it's faster, you can move more material and be more productive with a D8 dozer than having to drill and shoot, put cover, blocks, clean up the isolated areas, go and rip -- redrill, shoot, put in cover, remove it -- shoot it, remove it? That's a much more labor-intensive and

Page 208

time-consuming process, correct? That's not as efficient on balance?
A If -- if you're looking at regular dirt, then it's easier to go in there with material -- with a piece of equipment and -- and remove it.
Q And the government expected on this job that -- that Remcon would not have to blast the road, correct?
A That's my assumption.
Q Okay. Now, that being the case, wasn't there also restrictions on when blasting could occur on this project --
A Yes.
Q -- the timing?
A Yes.
Q So if Remcon could only blast after four o'clock p.m. during the five workdays of the week, Remcon could effectively do no productive excavation work where it had to blast other than to set up the blasting effort to then set off the charges at four o'clock p.m.?
A That may be the reason why we were allowed -- we -- I allowed them to go ahead and do the bypass so that way other work could take place simultaneously.
Q Correct.
But in the area where blasting had to go, they

couldn't do any other productive work, correct?
A They're not supposed to be doing any work when the charges -- when the holes are loaded.
Q Right. And so basically, the -- the -- the planned work is shut down while the extra work is going on in that area, correct?
A In that area, yes.
Q Was the road excavation work where drilling and blasting had to go on from July until the blasting was completed on the critical path of the project based on the schedules that you were submitted?
MR. SCHROEDER: Objection. I thought he testified, and I may be wrong, that he didn't do a critical path analysis.
MR. SCHOENFELD: No. He didn't testify as to that.
Q (By Mr. Schoenfeld) You may answer.
A So restate the question now.
Q Was the drilling and blasting work from late July until it was completed on the access road, on the critical path of the project, based on the schedules that you had received from Remcon?
A I'd have to look at those schedules.
Q Did you ever evaluate that -- that question?
A I can't recall right now.



Q Did Remcon seek time as well as additional compensation from the government as a result of encountering the rock it encountered on the access road?
A I can't remember at this point.
Q Would you look at the second page, please, of Exhibit 86. This is an E -- a facsimile from Bob Russell to yourself of August 8th; is that correct?
A This is from Bob Russell.
Q To yourself, correct?
A To myself, yes.
Q And you received it on August 8th based on the fax receipt of 3:05 p.m., correct?
You see Bob Russell sent it out -- sent it to you as of 3:05 p.m. on August 8th of 2001?
A I got it 8:28 a.m. on --
Q No.
A -- 9:28 --
Q The 9:28 a.m. at the top is the next day being sent out to Andrea.
A Oh, is it?
Q Is that correct?
A I don't know.
Q Well, why don't you take a look. You'll note that your fax cover sheet, which is the first page of Exhibit 86 --



A Uh-huh.
Q -- notes that there's eight pages, correct?
A Eight pages.
Q Is this exhibit the eight-page -- the eight pages?
A There's eight.
Q So therefore -- actually, it's a total -- a total of nine, right? Eight pages to follow plus your cover sheet.
A Plus the cover sheet, yes.
Q So your best recollection, as you sit here, is that what is the second page of this exhibit had been received by you, had been read by you, and was part of the fax to Andrea the next day, correct?
A Yes.
Q And you had Bob Russell's E -- what he faxed to you, which is the second page of this exhibit, at the time you prepared Exhibit 84, which was your e-mail that we looked at earlier on August 8th at 6 p.m., correct?
A I need to look back on that.
(Reviewed documents.)
Yes, I would have to say so.
Q All right. Now, did this receipt from Mr. Russell, on the second page of Exhibit 86, provide you notice that the contractor was claiming a differing



site condition for the rock being encountered?
MR. SCHROEDER: Can I -- can he read the entire --
MR. SCHOENFELD: I'm just looking at this page right now. We're going to go through page by page.
THE WITNESS: (Reviewed documents.)
Okay. Not to have any excuses, but sometimes these faxes come in and they'll sit around. I can't say for sure if I had this in hand before I sent that e-mail.
Q (By Mr. Schoenfeld) Before you sent Number 84?
A Before I sent Number 84. I can't say for certain.
Q But you definitely had it by the next morning?
A It was -- yes.
Q Okay. Did -- when you did receive it, did you come to the conclusion that the contractor was claiming a differing site condition, to the extent you hadn't already formed that conclusion?
A I probably was borderline conclusion of that.
Q Okay. Would you look at the third page of this exhibit, please.
A (The witness complied.)
Q This is a communication from Remcon to Bob Russell about the detail of what they had encountered

(A recess was taken from 11:04 a.m. until 11:20 a.m.)

MR. SCHOENFELD: We're back on the record. Thank you. It was nice to meet you, Colleen.

Q (By Mr. Schoenfeld) The exhibit right before you is Exhibit 176. Yeah. On the back side where we were, Mr. Russell communicated to you: I explained that a quick decision is needed so as not to delay the contractor.

When did the National Park Service issue its decision regarding the road realignment between Stations 24 and 30 that was the subject of this daily report?

A I don't know.

Q To the best of your knowledge, based on your personal observations, as well as what you read and were told, was the contractor delayed in performing work in that location?

A I can't say.

Q You're familiar with the term critical path, correct?

A Yes.

Q One of your job responsibilities was to review and accept the project schedules, correct?

A Correct.

Q And in those project schedules, the



specifications required the contractor to identify the critical path, correct?

A Correct.

Q Was the access road on the critical path as of July of 2001, of this project?

A It may have. I -- I can't recall.

Q If it was and the road needed to be realigned and it took time to realign it, in -- using only that information, would it be your expectation that there would be a delay to the project?

MR. OLIVIER: Objection; calls for speculation, vague and ambiguous.

Q (By Mr. Schoenfeld) You may answer.

A I think there was sufficient other work to be done simultaneous with the -- with that work that was taking place at that point in time.

Q Okay. I understand that -- that testimony, but I want to go back to the concept of critical path. You're aware in your own definition of critical path that the critical path defines those activities that are sequenced, that must be done in order to have the project finished as soon as possible, correct?

A Correct.

Q And if there is a delay to a critical path item, while there may be other work to be performed, a



delay to the critical path, by definition, delays the overall completion of the project?

A Sometimes there's float in the -- in the contract, and I don't know if we had any float built into this project.

Q Okay. Do you know if there was any float built into any critical path activity that was so defined as of July 1 of 2001?

A I can't -- I can't state without seeing that.

Q If there was no float to any critical path activity as of that moment in time, July 1 of 2001, then using only the facts I gave you, with Counsel's objection noted for the record, you would agree that that would cause a delay to the project, correct?

MR. OLIVIER: Same objection.

THE WITNESS: Yeah.

Q (By Mr. Schoenfeld) You may answer.

A There would be, I would say, some time impacts, yes.

Q Thank you.

Okay. Let's mark as next in order --

(Exhibit Number 177 was marked for identification.)

Q (By Mr. Schoenfeld) -- Number 177. Is this a true and correct copy of the daily report -- excuse me --



of the weekly field report for the week ending June 29th, 2001, that you received from Mr. Russell?

A It appears to be so.

Q Thank you.

I'll show you Exhibit 178, sir.

(Exhibit Number 178 was marked for identification.)

Q (By Mr. Schoenfeld) We previously examined your e-mail to Joanne Cody that contained the first page of this exhibit. Okay? It was marked as Exhibit 129. You recall we went through it piece by piece by piece?

A Yes.

Q Okay. Would you turn to the second page of this exhibit.

A (The witness complied.)

Q This is also dated July 2nd, 2001. It's from Bob Russell to yourself and Joanne Cody. You see that?

A Yes.

Q Okay. The first page of this exhibit concerns the access road and the excess excavation, correct, in stations between 24 and 30? That's the first page, sir?

A The first page?

Q Yeah. The first page deals with issues between Stations 24 and 30 dealing with excess excavation, correct?

Q Was that subject discussed with you before July 9th, or did you understand it for the first time as being a possibility when you read this daily report?
A I would have to say that this is the first a possibility arose.
Q I didn't understand what you just said.
A I said I believe this is the first time that was raised.
Q So the subject matter that Joanne thought this -- you could spread some of the material to waste it rather than have the contractor haul it off, the first time that subject came to your attention was through Bob Russell's daily report?
A It may have been. I'm not sure. I can't say for sure.
Q Okay. That ultimately became a direction to the contractor, correct, spread some of that excess material to raise the upper parking lot by 5 feet?
A I can't say that was a direction.
Q Wasn't there a modification issued to the contractor to raise the upper parking lot by up to 5 feet?
A Once the modification was issued, yes, it was a direction.
Q And that modification was published on



September of 2002 in Exhibit 64, correct?
A From my recollection, the date sounds correct, yes.
Q So from July 9 of 2001 when the issue at a minimum was raised, it took until September of 2002 for direction to be given formally by the government; is that correct?
A In the way you put it, that's correct.
Q Now, am I correct, as we talked last week, this job sort of had two parts to it, the Upper Sherman area and trail and then the Generals Highway work, correct?
A Yes.
Q And the upper area need -- was the access road, the parking lot, and the trail, and then once those were finished, the contractor, by contract, could then transition its operations to the Lower Sherman area? That was the way the contract was set up, correct?
A I believe that's the way the schedule was shown, yes.
Q And the contract required it that way because the National Park Service, recognizing the contractor will be working during the summertime, which is when the peak visitation occurs, did not want to have the two key locations of the park impacted by construction



operations?
A I believe the specifications required us to have -- or contracted to provide parking spaces for RVs.
Q And until the upper parking lot was finished, which would then provide additional capacity that wasn't in existence, the National Park Service didn't want to have the contractor affecting and minimizing or reducing the available spaces that preexisted when it did work in the lower area, correct?
A Yes, because that parking lot was going to be removed that provided parking spaces for visitation to the Sherman Tree.
Q Okay. So in order to finish the upper work, the contractor had to be given direction to take care of this excess material, which ultimately included raising the parking lot, correct?
A Please restate that.
Q Yeah. In order to finish the Upper Sherman area, before they could go down below, they had to raise ultimately the parking lot, correct?
A Yes.
Q And the government controlled the timing of when that directive would be issued that would allow the contractor to do so, correct?
A Yes.



Q And it took at least one year for that directive to be issued, correct?
A I can't say positively if there was not a directive that was issued.
Q Okay.
(Exhibit Number 184 was marked for identification.)
Q (By Mr. Schoenfeld) Exhibit 184, sir, July 10, 2001, daily report from Mr. Russell. You note that Ms. Cody is identified as being on-site. You see that?
A Yes.
Q Turn to the second page, sir. This -- under the -- the bottom section, the second sentence reads: Contractor expressed concern regarding excess material on project. Joanne explained that material should balance.
Do you see that?
A We're talking about the second sentence?
Q Yeah. Starting on the second line, you saw what I just read?
A Yes.
Q Okay. Now, on Exhibit 129, which is your e-mail to -- to Joanne, on June -- excuse me -- on July 2nd --
A Yes.

elevation different from that provided by DHM, then please come to the partnering meeting in a position to address this matter, period. Any delay in starting the trail work will impact this year's construction schedule and the overall completion of the project.

Did the NPS come to the partnering meeting that occurred in May of 2002 with information that it needed the trail to be constructed at an elevation different than DHM had previously provided?

A I can't recall. We may have come with some drawings. I'm not sure.

MR. CHRISTENSEN: Is that mine?

MR. SCHOENFELD: Yeah.

MR. CHRISTENSEN: Which is this? 192?

MR. SCHOENFELD: Yes.

(Exhibit Number 192 was marked for identification.)

Q (By Mr. Schoenfeld) I show you Exhibit 192, sir. Did you receive a true and correct copy of this first page, an e-mail from Bob Smith to Joanne Cody with a cc to individuals including yourself, regarding the referenced summary chart showing the trail points?

A I probably did, seeing my name is on this.

Q What was the purpose as to why this document was created, if you know?



A I don't know the reason why. I assume that it was to check elevations.

Q Okay. If you look to the second page of the exhibit, you will see headings reading from left to right, trail points, proposed grades, subgrade, existing grades, cut, slash, fill to subgrade. Do you see that?

A Yes.

Q On the far right column before numbers, there's either a C or an F. Do you understand those to be information by the designer to the contractor as to whether something should be cut, meaning C, or fill, using an F?

A Those are the standard letters that we use for cut and fill, yes.

Q And is the information, to the best of your understanding, expressed in inches or feet?

A My understanding would be feet.

Q As of May 9th of 2002, when this document purports to have been prepared, is it correct that the design team, through DHM, was proposing modifications to the grades of the Sherman Tree Trail?

A I'm not sure what this is for. I -- I assume that someone went out there and shot and they had design proposed grades and what was shown as existing grades, so --



Q In the text of the first page, the e-mail says, Willie and Joanne, attached is a summary chart slowing the trail points. It lists coordinates proposed grades, et cetera.

Did you understand when you read this on or about May 9 of 2002 that DHM was proposing new grades at this point in time to the Sherman Tree Trail?

A I'm not sure. I probably -- I could have -- I could have interpreted it as what was shown on the contract drawings proposed.

Q Did you ever communicate what you just testified as your potential response to anybody?

A I don't know. I have no recollection.

Q Now, am I correct that the project shut down for a winter shutdown between 2001 and 2002?

A Yes, there was a shutdown.

Q Approximately six, plus or minus, months long, correct?

A Depending on what the weather conditions were. No telling. I can't recall.

Q Okay. To the extent there needed to be revisions to design that were thought that had to be accomplished after the 2001 construction season ended, what prevented the National Park Service or its designer to do the redesign during the winter months?



A I have no idea.

Q I believe we looked at last week the fact that there was a construction season that was limited for this project because of its location in the Sierra Mountains, correct?

A This is correct.

Q And that the contract was issued with an expectation that the contractor would have three construction seasons, 2001, 2002, and 2003, to build the job, correct?

A I believe that's correct.

Q Okay. At the end of 2001, had the contractor performed the amount of work that it had planned to perform pursuant to the schedule that you had accepted?

A I believe they were somewhere close to it. I'm not sure, though.

Q Isn't it true they were behind schedule?

A It could very well be.

Q Why were they behind schedule? What did you understand?

A Well, according to what you're depicting to me, it's the area of the big cut.

Q They encountered what they contended was a differing site condition, correct?

A I believe that word was used, yes.

some issues, and we are working on that, parentheses, see Willie's message below, end parentheses.

We also agree that there are issues that we've mutually identified as action plans to work out. That process continues. We are trying to do this with minimal impacts, but must work together to get it done.

What prevented Mr. Keiscome, to the best of your knowledge, from issuing a modification regarding all the design changes that came out in July of 2001 prior to him writing this e-mail on May 24th of 2002, 10 months later?

A I think it would be because I didn't draft up the modification because we hadn't worked out or come to a price on what we were sitting down over the winter months.

Q Isn't it true that you had the ability, as you understood it, to ask Mr. Keiscome to issue a directive to the contractor to build according to the revised drawings with a price to be negotiated later?

A I have that discretion, yes.

Q Did you exercise that discretion?

A Apparently not.

Q Why not?

A Because I was promised these drawings, and I would go ahead and get those out as a RFP.



Q But we're now talking in May of 2002 for something that started back in July of 2001. Why did you not take care of this in July of 2001 or August of 2001 as a directive?

A You're talking about this parking lot?

Q Any aspect. We saw all these design revisions that we've marked as exhibits here dealing with the access road, the parking lot, and the trail, correct?

A Correct.

Q Okay. Why, as to any -- a portion or all of them, didn't you cause a communication to go to Mr. Keiscome at the time the events were going on, asking him to issue a directive or to do a T and M, something in order to promote the work to move forward to give the contractor a platform to bill for the extra work?

A I can't say right now. Like I say, I -- I would have to say that because there was some work that was -- that was in question that we were trying to pin down.

Q What was it that had to be pinned down? Your designers working with Joanne Cody had issued multiple generations of revisions for the access road, for the parking lot, and for the Sherman Tree Trail, copies of which had all been communicated to you, correct?

A Yes.



Q And that all occurred in July and August of 2001, correct?

A I believe that's the dates that's shown there.

Q And you knew at the time that this was going on that you had a short construction season that limited the ability of the contractor to implement design revisions, correct?

A Correct.

Q And you knew at the same time that the process by which the funding for extra work took -- it took a long time, because you had to get lots of people to agree to it, and then it had to go back to Washington, D.C., to get approved, correct?

A Correct.

Q And so the job was being impacted by all these multiple revisions being given to the contractor without clear direction from the contracting officer, correct?

A That's correct.

Q Did you consider going to the contracting officer and saying, Hey, we've got all these things going on, we need a modification issued?

A I may have, and I don't -- I don't recall right now at this point in time.

Q Isn't it true in early August you went and spoke with Mr. Keiscome about the various different



things were going on on the project, the excess material from the burn pit, the contention there was a differing site condition, the overexcavation of material, and all these various drawing revisions, and he got upset because he didn't have the funding for it, to pay for all this extra work?

A I can't recall that, but I -- I've seen something in writing that leads you to believe that, yes.

Q And isn't it true that he communicated to you, that as a result of the myriad of issues that we've looked at, he was considering terminating the job for convenience?

A That's what that one e-mail indicated, yes.

Q But that -- and that's what you know to be true, correct?

A That's what I have to, based upon what was written there.

Q Did you advise the contractor at any time, given that you knew they were making all these changes as set forth in the various drawings that they were getting, don't do it because the contracting officer is considering terminating the job for convenience, and we don't want to end up having to pay for extra work we don't want to have done?

A I don't recall making that statement, but --

MR. SCHOENFELD: Of course. Murphy works here too. I know the dates, though.
Q (By Mr. Schoenfeld) It's Exhibit 183, sir. It's in front of you.
A Where's the --
Q 183. Would you like me to get it for you?
A It must be right around here. 182 here.
Q There it is.
A 183.
Q It's Mr. Russell's July 9, 2001, daily report. Turn to the back side, please.
A (The witness complied.)
Q It states -- I'll point you to the direction, make it easier for you to find it. The word Joanne. Mr. Russell reports: Joanne stated that the north side of the upper north side at the upper parking lot could be raised if we found it necessary. She left a revised grading plan for this area with me. The understanding is that we will not raise the area unless we find it necessary.
You see that?
A Yes.
Q So the subject of raising the -- the Upper Sherman parking area was at least identified as early as July 9, 2001, correct?



A As shown here, yes.
Q Why is it that it was not until June 3 of 2002 that action was being taken by the National Park Service to implement a plan to address the excess material involving raising the Upper Sherman parking lot area?
A I don't know. I would have to go through the records and see what happened at that point in time.
Q Based on your testimony about the discharge of your responsibility, do you believe the National Park Service acted swiftly to address the excess material and make a decision regarding raising the Upper Sherman parking area?
MR. OLIVIER: Objection; vague and ambiguous.
THE WITNESS: Based on the time right here, I would say that there was a little bit of drag here.
Q (By Mr. Schoenfeld) Eleven months was more than reasonable, in your mind?
A I should have had good drawings, and I would have to look at those drawings that were issued under that modification for a date in which they were produced.
Q The construction season for 2002 had already commenced, correct, as of June 3 of 2002 for this project?
A I would have to assume that it had started already.



Q And there were stockpiles of material that had to be addressed in some manner, shape, or form by the contractor as a result of the excavation efforts during the first construction season, correct?
A I believe Mr. Christensen -- I'm not sure if it was -- we asked him to place it up at the Wolverton, and we were going to -- to perform the cross sections --
Q Uh-huh. When were the -- I'm sorry, go ahead.
A -- to make the determination of how much excess dirt was being hauled up at that point in time.
Q And he hauled that material there in July and August of 2001, correct?
A I'm not sure. It's -- if it states it on the dailies, then that must be correct.
Q Okay. So what prevented you from cross-section evaluation of that material as of September of 2001?
A I saw it as the contractor's responsibility to make the determination of how much excess was at that point.
Q Did he give you the quantities?
A He gave me only estimates, I believe. There was nothing that was cross-sectioned or anything like that.
Q Did you then just wait until you got data and



did nothing in furtherance of the issue?
A That would seem to be the case, yes.
Q Okay. The Exhibit 23, which is the June 3rd, 2002, dated report continues on the back side: Willie stated that Loren -- that refers to Loren Mangrum, correct?
A Yes.
Q -- would have to spend full time on this portion of the problem to keep tract (sic), with a T, of Remcon's personnel and equipment, including records of hours worked for both personnel and equipment.
Does this mean you were going to issue a directive on a T and M basis?
A I think I just wanted to know what was going on with the personnel and where they were working at.
Q Well, if you were directing an inspector to work full-time --
A I didn't direct him, I don't think.
Q Well, what did you mean when you said Loren would have to spend full time on this portion of the project, if you didn't intend him to monitor this activity during the --
A I -- I expected him to monitor the activity of the personnel on-site and the equipment.
Q But you didn't mean for him to do this

100 percent of his time? He could do other things as well?

A Well, sure. I mean, when you're out there, they should be able to walk around and perform a lot more than just look at people working. They should be able to inspect also at the same time.

Q Continuing a couple lines down, it says, in the next to last sentence of this section: In effect, this work will be handled on a time and material basis, period.

You see that?

A Which line is that, now?

Q (Indicated.) In effect, this work will be handled on a time and materials basis.

Did Mr. Keiscome issue a directive along that line?

A I don't believe so.

Q Why not?

A I don't know. Now, I'm not sure if this was referring to some rock or not.

THE REPORTER: Keep your voice up for me, please.

THE WITNESS: You want me to state that again?

THE REPORTER: No. I got it.

THE WITNESS: Okay.



THE REPORTER: Just keep your voice up for me, please.

THE WITNESS: Okay.

MR. SCHOENFELD: Okay.

MR. OLIVIER: Are we done with 23?

MR. SCHOENFELD: Yes. Thank you.

Q (By Mr. Schoenfeld) I'm going to show you Exhibit 24, an e-mail from Steve Christensen to yourself on June 3rd, 2002. It reads: Willie -- this, by the way, refers to the Sherman Tree Trail design -- I was told by Luke and Mark -- those were Christian -- some Remcon employees, correct?

A Yes.

Q -- quote, that a revised set of drawings is being sent for the Sherman Tree Trail, period. We received two prints for T7 and T8, but did not receive anything for T9 and T10, period.

Is it correct that the trail drawings had the design -- letter designation letter T in front of them?

A Yes.

Q Additionally, there were numerous design corrections required. I know that Luke and Mark are preparing request for informations requesting clarification of issues with regard to the two drawings they did receive.



Please provide clarification regarding the issuance of new plans. I don't want to send in a cost estimate if we're only going to revise the drawings. Additionally, we're going to need quick responses to the RFI so we can complete our cost estimate. Steve.

Did you receive this?

A As shown by the e-mail, yes.

Q What was your response, if any?

A I believe that I told Steve that there would not be a T9 or 10, that --

Q But there was a T7 and 8 making changes?

A Yes.

Q Why were changes being made as late as June of 2002 to the Sherman Tree Trail?

A That was because that's when I got the drawings that were probably issued in the field.

(Exhibit Number 195 was marked for identification.)

Q (By Mr. Schoenfeld) But why were changes being made so late in the process?

A I don't know.

Q The design process occurred approximately the entire year of calendar year 2000 and into 2001, correct?

A Theoretically, that's when everything should be completed, yes, before the contract drawings are let



out.

Q And then we had a whole construction season, 2001, which gave the designers the opportunity to go in and clarify and make certain of their design, correct? They had the opportunity --

A 2000 --

Q -- in 2001 to clarify their design, correct?

A Well, I would hope that they were pretty concrete drawings from the very beginning.

Q But they weren't in this project based on your experience, correct?

A As shown by these revisions, they were not.

Q Okay. Have you ever received any training, sir, as part of the National Park Service employment that you've had regarding something known as the Spearin Doctrine?

A I took a class, and all I got was some bullets on it.

Q And what were those bullets, generically, that you remember?

A Just basically that -- I think we went over this last week, right?

Q I don't know if we did. We may have. I -- I apologize if we did. I, frankly, don't remember.

A I think I said there was a couple bullets that

A Could be paperwork. I don't know.
Q This work had to be performed by the contractor in order to address the excess material before he could pave the Upper Sherman parking area, correct?
A Correct.
Q And by contract, the contractor was not authorized to do the extra work until a modification was issued, correct?
A Correct.
Q And this work was restraining the finishing of the Upper Sherman parking area, correct?
A Correct.
Q Once again, do you have any understanding as to why it took three months, approximately, for the modification to be issued once the price was agreed?
A No idea, other than paperwork.
Q Okay.
MR. SCHOENFELD: Exhibit 39, Steve.
I'll take both of those back, please.
Q (By Mr. Schoenfeld) Did you receive this e-mail on June -- on or about June 22nd, 2002, from Mr. Christensen asking when he was going to get the modification, because, quote, As you're aware, this is critical to our work plan and continues to impact the overall schedule, end quote?



A Yes, I probably did.
Q Did you pass this on to Mr. Keiscome?
A I'm not sure, but I would assume that because it was -- Terry Lang was also cc'd on this that she would pass it on.
Q Okay. Did you share Mr. Christensen's sense of urgency when you received this?
A I can't -- I can't say if I did or not.
Q Did you feel that Mr. Christensen was wrong in telling you that -- or identifying that it was critical to get the modification so the extra work could be done?
A No.
MR. SCHOENFELD: Steve, what exhibit is this?
THE WITNESS: You want this back?
MR. SCHOENFELD: Yes. Thank you.
(Exhibit Number 196 was marked for identification.)
Q (By Mr. Schoenfeld) Mr. DeOcampo, did you author this e-mail dated June 26th, 2002, to Bob Russell, Terry Lang, and Larry Walling?
A It appears so, yes.
Q Okay. You write: Bob, due to time constraints, I will write draft Mod Number 3 for the hauling of -- of material outside the park, period.
This concerned the burn pit work, correct?



A True.
Q And that work was done in June and July of 2001, correct?
A Correct.
Q So approximately one year after the work was done, the government is getting around to writing the modification, correct?
A Yes.
Q And the modification was ultimately issued, correct?
A Ultimately issued, correct.
Q So at -- even though Remcon performed the work without a formal written modification, the government agreed Remcon should be reimbursed, correct?
A Correct.
Q And did, in fact, to some extent, reimburse Remcon for the effort, correct?
A I believe we came to a conclusion for the total amount.
Q In the second paragraph of this e-mail, you write to Bob Russell, quote, In addition, you need to start the draft Mod Number 4, which should include -- and then you have four separate items there.
Do you see that?
A Yes.



Q Number 1 is raising the upper parking lot with backup cited above; 2, hauling excess material to Wolverton with backup cited above; 3, sorting of materials that you and Jeff already negotiated with backup cited above; and, 4, additional surveying that you negotiated with G and K, include backup cited above.
Are those the four items that ultimately materialized into Exhibit 64?
A The last mod that you showed me?
Q Yes.
A Yes.
Q Was it the responsibility of Bob Russell, your lead inspector, to draft modifications --
A That's part --
Q -- under the arrangement with the NPS?
A That's part of his job requirement, yes.
Q Why wasn't this work for Numbers 3 and 4 done in calendar year 2001?
A I can't say.
Q And why wasn't it done, if not during the construction season of 2001, during the winter of 2001, 2002, when there was no construction operations to inspect?
A I would have to say that I never took it upon myself at this point in time, I guess.

Page 519

Q The last paragraph, you write, We need this Mod Number 4 within the next two weeks, but no later than three, period.
Why did you write that?
A To get him moving on it.
Q Did he give it to you within the time frame you asked for it?
A I don't know.
Q You continue in this e-mail: Keep in mind that Remcon's accusations and negotiating position become stronger the longer these negotiated items remain unprocessed through the modification process, period.
What did you mean by that?
A I wanted to go ahead and solidify or wrap this thing up, so to process this mod as quick as possible.
Q Well, the extra work that was encompassed by Modification Number 4 had already been done, with the exception of raising the upper parking lot, correct?
A I would think that was the sequence, yes.
Q Okay. And referencing -- and the upper parking lot had just been negotiated a couple weeks earlier, as we saw in Mr. Christensen's e-mail to you, for 43,000 and some-odd dollars, correct?
A I guess that's true.
Q Okay. So what is it of their negotiating

Page 520

position that became stronger the longer these negotiated items remained unprocessed? Their claims regarding delay?
A Could be.
Q The claims regarding disruption and loss of productivity?
A That may be.
Q The inability to get the job done?
A That might be.
Q Well, is it "might," or were all those actual concerns that you had?
A Those were probably concerns that I had.
Q Did Mr. Keiscome direct you to get these modifications issued at any time sooner than they were?
A I don't recall.
Q The hauling excess material to Wolverton, that work was done in 2001, correct?
A I think it is -- was.
Q Why wasn't that modification or that portion of the modification taken care of prior to the start of the 2002 construction season?
A I believe I was overrunning that -- that amount. I believe I overran that because it was based upon a unit price.
Q But you overran it as early as August of 2001,

Page 521

and that was the subject of some of the discussions with Mr. Keiscome, correct?
A That may have been. I don't -- I don't know.
Q Is that --
A 196.
(A discussion was held off the record between Mr. Christensen and Mr. Schoenfeld.)
MR. SCHOENFELD: Would you give me 42, please. Here's 41 back.
MR. CHRISTENSEN: Okay.
Q (By Mr. Schoenfeld) Sir, Exhibit 42 is dated June 27th of 2002. It's a contracting officer's directive, raise Upper Sherman parking lot, signed by Mr. Keiscome. Do you see that?
A Yes.
Q Given to Remcon, correct?
A Correct.
Q Am I correct that Remcon was not authorized under the specifications to perform the work reflected in Exhibit 42 until a modification had been issued or it received a letter such as this?
A That's correct.
Q Okay. Can you explain to me why the government acted in what appears to be an inconsistent manner? On some items, the contractor had to receive a

Page 522

contracting officer's directive to do the work. On other items, it just received a series of designs to perform the work, and then later the government issued a modification after the work had been done. Why did the job proceed in that manner?
A I can't say why it proceeded in that manner, but I would speculate that the people issuing those drawings were doing so on their own.
Q Well, but you told me earlier that you were aware of all those drawings being issued, and you believed the contractor should build from them, correct?
A That was a different date, because we were going over a lot of different dates, if I recall correctly.
Q In July and August of '01, with all the changes that were being made, you testified earlier -- and I don't want to mischaracterize it -- that you knew they were being -- these revisions were being issued, and it was your understanding and intent that the contractor would build from them, correct?
A That may be so, depending upon the dailies that we were looking at or whatever document in front of me at that point in time.
Q Why did Mr. Keiscome issue a contracting officer's directive on June 27, 2002, regarding the Upper

This is a letter dated August 29, 2002, from Terry Lang to Remcon, entitled Letter of Rejection. The first sentence -- the paragraph reads: In accordance with the contract clause entitled Inspection of Construction, the entire horizontal and vertical roadway alignment from Station 1 through Station 30 has been rejected. The contractor has made unilateral changes without notifying the government.

Was that a true statement, sir?

A From what you've indicated by all the previous indications --

MR. OLIVIER: From your own knowledge.

THE WITNESS: From my own knowledge.

Q (By Mr. Schoenfeld) Including that which may be refreshed from reading paper. But we just want your knowledge.

A Yes, this is conflicting with what you've indicated by other things.

Q Is it conflicting with things that you've read here today?

A That would lead me to believe that, yes. I don't know the extent of it, though. I can't say.

Q Understood.

Ms. Lang continues in this letter: These changes range from moving roadways horizontally over



5 feet in various directions east and west and raising grades up 1.5 feet, period.

Before I showed you this letter just a minute or so ago, had you ever seen this?

A I can't recall.

Q Were you consulted by Mr. Keiscome or Ms. Lang before this letter was published rejecting the work by Remcon on the access road from the stations identified for the reasons identified?

A I may have been. I don't know. I don't remember.

Q As you sit here today, based on the information that you've read, are you surprised by the existence of this letter as I've just read to you?

A From my own opinion, yes, I would be.

Q What was Remcon supposed to do in the summer of 2001, given all those changes and revisions it was given? Was it supposed to wait for a formal modification?

A In my opinion, the changes that were being told to Remcon by different folks, I -- I would say the contractor probably was trying to work diligently to complete this project.

Q Do you believe the publication of this letter, based on the facts as you understand them, was fair?



A Reflecting upon what you've indicated and showed me earlier throughout this date, I would say no.

Q Why is it, given that -- strike that.

You and other representatives, Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Jack Vance, as well as members of the design team, knew -- and Bob Russell -- knew in 2001 that Remcon was building the road in accordance with the revised drawings, correct? Everybody got copied on the various different things that were going on?

A As shown, yes.

Q Why is it that it took more than one year for the government to publish a letter indicating to the contractor that its conduct in complying with all those various changes, quote, has been rejected, end quote?

MR. OLIVIER: Objection; mischaracterizes the evidence.

THE WITNESS: I don't know.

Q (By Mr. Schoenfeld) Did you ever hear from Mr. Christensen about his reaction to receipt of this letter?

A I may have. I -- I don't recall.

Q The next sentence of this letter reads: The government requires this work to be corrected within ten business days upon receipt of this letter, period.



Was that physically possible?

A Physically, no.

Q (Reviewed documents.)

Are you aware that on August 20th of 2002 a settlement meeting occurred between Remcon and its representatives and Mr. Keiscome and other representatives of the government?

A Which date was that? August?

Q August 20th of 2002.

A In regards to?

Q Issues that were outstanding on the project to attempt to negotiate a resolution of them.

A We -- I believe we tried to negotiate. I don't know if that was the date.

Q Do you recall there being a big settlement meeting in which Mr. Keiscome was in attendance?

A Like I said, I think Mr. Keiscome was in one or two. I'm not sure how many.

Q Okay. I'm talking about in the summer 2002, do you recall there being a big meeting in which Mr. Christensen came with a consultant by the name of Dick Lewis, Mr. Keiscome was present, and you were present?

A I remember Mr. Dick Lewis showing up at a couple of negotiations.

Q And do you remember there being a resolution reached at the meeting on August 20th resolving a whole bunch of outstanding issues, including the differing site condition claim, the extra excavation, and other issues that were outstanding?

A I only remember vaguely on this -- this right here. I know that there was some issues that were probably close to resolution on. I -- I know that there were some negotiations back and forth, some figures thrown out here and there, and I don't know -- I don't think all of them were accepted.

Q Okay. Is it your memory, however, that the face-to-face negotiation advanced the matter forward in that the parties got closer to resolution rather than farther apart on the issues that were then outstanding?

A I was hoping that at that point in time we were getting closer together, yes.

Q Having that frame of mind that that meeting happened on August 20th, what do you recall, if anything, happening between August 20 and August 29th that caused Exhibit 63 to be published?

A I don't know.

Q As a result of the meeting on August 20th, did Mr. Keiscome agree to issue the various modifications?

A I don't recall. Like -- like I said, there



were some things that I thought were resolved.

Q Did anyone ever bring to your attention the perception that as a result of August 29, 2002, the government was acting in bad faith to Remcon?

A I would assume Mr. Christensen probably did.

Q Did he say that to you?

A I don't remember.

MR. SCHOENFELD: Okay. We're going to take a break in a minute.

THE WITNESS: That's what I was getting ready to ask you for.

MR. SCHOENFELD: We'll take a couple more and take a break.

THE WITNESS: Let's do one, split the difference.

(Exhibit Number 198 was marked for identification.)

Q (By Mr. Schoenfeld) I'm going to mark Exhibit 198. It's a lengthy letter from Mr. Christensen to Mr. Giller. And we will take a break, and then when we get back on the record, I will ask you if you recall seeing this letter before dated October 20, 2002.

(A recess was taken from 3:55 p.m. until 4:17 p.m.)

MR. SCHOENFELD: Go on the record.



Q (By Mr. Schoenfeld) Thank you, Mr. DeOcampo, for taking the time to read it. Quick question for you. Have you ever seen this letter before?

A I can't say for sure. I may have.

Q Okay. After reading paragraph by paragraph, item by item, do you believe Remcon is wrong in its assertions that it was not fairly treated?

A I don't think I have the expertise to say that.

Q Okay. Do you disagree with the entirety of Remcon's remarks in this letter?

A Based upon what I've seen presented here, I would say I -- I would somewhat concur with what Mr. Christensen has laid out here.

Q Thank you.

(Exhibit Number 199 was marked for identification.)

Q (By Mr. Schoenfeld) Let me show you Exhibit 1 -- is that 198? Now we're at 199.

MR. CHRISTENSEN: This is 199.

THE WITNESS: But that's only in my recollection, now, okay?

Q (By Mr. Schoenfeld) I understand.

A Based upon what he says here.

Q We fully understand that.



A Okay.

Q Number 199, sir, is this Contract Mod Number 5 on this project, sir, as noted in par -- the box marked Number 2 in the upper left-hand portion of page 1 of this exhibit?

A That is what's shown.

Q And it's issued by -- the contractor signed it on October 18 of 2002 and Mr. Keiscome in November, specifically November 20th, 2002, correct?

A Those are the dates shown, yes.

Q And the items that are set forth in this particular mod, there are three of them being compensated. Two are deletions and one is an add, correct? Two are credits and one is an add?

A Yes, there's a reduction in -- in Bid Items Number 48 and 80, and 140 is a new bid item.

Q Okay. And we saw the justification for 140 a while ago that either you or Mr. Russell prepared or someone prepared and -- but you validated at some point along the way, correct? Is that correct, sir?

A I -- I've seen some of the --

Q I don't think you heard my question. Let me try again.

A Yes, please.

Q We saw the justification for Number 140, which

we showed you as an exhibit that you either wrote yourself or you verified and validated at a later time, correct?

A Yes. But I thought that was for grades or elevation. This one is for 24-inch CMP, installing boulder revetment, and relocating boulders and dispersal of riprap.

Q Correct. So what was it that Number 140 concerned? Did it concern grades in elevations, or did it only deal with what is exactly set forth in the mod that we see before us marked as Exhibit 199?

A According to the description here, it's only for what's shown under the description of 140.

Q And at this point in time, are you aware of any other mod that affected the Sherman Tree Trail?

A I don't know if there was any modification at issue greater than this right here.

Q Would you agree as a basic premise that as of November 20th of 2002, the site was affected by winter and the contractor would not have been able to perform the extra work by Number -- as set forth in Number 140 until the following construction season?

A I'm not sure of that.

Q Well, you recall there was a requirement for winterization of the site so that improvements would not



be negatively affected by the harsh winter that it's exposed to, correct?

A I know there was a storm water pollution plan that was required by the State of California to reduce any construction debris from entering any nearby creek.

Q And isn't it true that concrete needs certain temperature in order to cure properly?

A Concrete -- you should not place it in freezing weather, yes.

Q Okay. And as of November 20th, 2002, you would expect there to be freezing weather at this project site, correct?

A I would have to refer to the dailies and so forth like that. I can't say for sure, but, you know, like, winter does move in there sometimes fast, and sometimes the temperatures go down to below freezing.

Q And riprap used on this project required concrete, correct?

A I don't think so.

Q No? Okay.

(Exhibit Number 200 was marked for identification.)

Q (By Mr. Schoenfeld) Lucky number 200, sir. Did you receive this letter dated February 28th -- excuse me -- February 26th, 2003, from Mr. Triplett of Remcon?



A I would have to say I did. It's addressed to me.

Q Did you respond at all to the request for updated Trail Plans T3A through T10A?

A I believe I did.

Q In writing?

A I believe so.

Q When? Do you recall?

A I don't recall. That's the best of my recollection, okay?

Q Did you furnish updated sheets T3A through T10A to the contractor?

A I believe there was only two sheets that were furnished, and that was 7 and 8. I'm not sure, though, if that was the correct numbers on those.

Q Okay.

MR. SCHOENFELD: The schedule?

MR. CHRISTIANSEN: I'm looking for the copies.

Q (By Mr. Schoenfeld) One of your job responsibilities, as I recall, sir, was to review the project schedules and ultimately approve them, correct?

A I -- I --

Q Accept them, pardon me.

A Accepted them.

Q I used the wrong word.



A And I don't look for logistics.

Q What do you mean by logistics?

A The method in which the contractor is making the proposal for completion.

Q All right. Do you mean you don't check it for means and methods?

A I guess that's what I'm trying to say.

Q Do you check it for the purposes of determining if there's a logical sequence identified between work activities?

A Not really, because our specifications say I'm not responsible for that. I just look at the -- like I said before, I think the resources, loading and predecessors and so forth like that.

Q Okay. I want to show you --

MR. SCHOENFELD: Counsel, I'm not trying to intimidate or threaten. I just want to -- these are all oversized. They've been previously marked. So I want to put them in front of the witness.

MR. OLIVIER: Okay.

Q (By Mr. Schoenfeld) This is Exhibit 16, sir, entitled Baseline Schedule, June of 2001. Do you see your signature on the document?

A Yes.

Q Is there some handwritten notation adjacent to

Page 555

Q (By Mr. Schoenfeld) Can you tell me if Exhibit 201 is the same as the stapled sheet to Exhibit 16?
A It appears to be.
(Exhibit Number 202 was marked for identification.)
Q (By Mr. Schoenfeld) Okay. Did you receive from Mr. Russell Exhibit 202, a letter from Remcon to Mr. Russell regarding the project schedule?
A (Reviewed documents.)
I may have. I'm not sure --
Q Okay.
A -- from my recollection right now.
Q Let's just put -- I show you now Exhibit 17, which are two oversized sheets with an 8 1/2-by-11 sheet stapled on it. Focusing your attention on the 8 1/2-by-11 sheet for a moment, you note that it shows a submittal date of June 25th 2001. Do you see that?
A Yes.
Q And if you look in the lower right-hand portion of the document, you'll see the same date on -- filled in in a stamp; is that correct?
A That's correct.
Q Okay. And this is a submittal by the contractor to the government of a schedule, correct?

Page 556

A Correct.
Q Is your signature on this sheet dated June 25th of 2001?
A That's correct.
Q And that's your signature about three-quarters of the way down in the middle of the page?
A Yes.
Q Above the heading Contracting Officer's Representative?
A That's my signature.
Q There is, again, in the same location as we found in Exhibit 16, a slash line on the right-hand portion in the middle of the document at a 45-degree angle. Above it is written the words accepted with notation. Is that your writing?
A That's correct.
Q And you then wrote underneath it resubmit revised P.S. Is that correct?
A Yes.
Q What did you mean by accepted with notation, resubmit revised P, period, S, period?
A I meant that I had attached a sheet to this asking for -- whatever was stated on that sheet attached, I wanted that information so that way --
Q Resubmit revised P.S. What does P.S. mean?

Page 557

A The project schedule.
Q Okay. And looking at the second page, sir, of this Exhibit 17 of the oversized sheets, do you see any such notation by you?
A When you say "notation," what do you mean?
Q You wrote on the 8 1/2-by-11 stapled sheet accepted with notation, resubmit revised project schedule. I'm looking for the notation.
A I made it with this attached sheet.
Q It says -- okay. Let's make sure the record is clear. On the 8 1/2-by-11 sheet that's stapled to Exhibit 17 that's part of Exhibit 17, there is the words see attached sheet. Whose handwriting is that?
A That's mine.
Q Okay. Do you see the -- the document that you refer to as see attached sheet that's been marked as Exhibit 17?
A Not on this sheet.
Q Well, let's see if I've got it separate. Let's mark Exhibit 203, sir.
(Exhibit Number 203 was marked for identification.)
Q (By Mr. Schoenfeld) For the record, Exhibit 203, the first page I want to know, sir: Is it identical to what we've marked as the 8 1/2-by-11 portion

Page 558

of Exhibit 17? The Bates stamps are the same.
A Yes, it -- it appears to be the same.
Q And is the second page of this exhibit the attached sheet that you were referring to with your signature?
A Yes, because it's talking about Transmittal Number 24.
Q Did Remcon resubmit a schedule or documentation addressing the above concerns as reflected in the attachment to Exhibit 203?
A Remcon had provided me many schedules.
Q I understand that.
A I don't know if they submitted a -- another transmittal in this format with that information. I know I got some loose-bound paper talking about resource loading.
(Exhibit Number 204 was marked for identification.)
Q (By Mr. Schoenfeld) Let me show you now -- let's take that and put it away. Put that right there. Thank you.
Let me show you Exhibit 204, sir, multiple-page exhibit on Jacobs Facilities, Inc., letterhead from Brooke Harris to Adam Schwartzman -- this document was produced from the government files --

regarding Sherman Tree Microsoft project schedule dated July 11th of 2001. Do you see that?
A Yes.
Q The first paragraph reads: The cursory review of the NPS, dash, Sherman Tree resource schedule looked well thought out and organized. The logic seemed complete and consistent throughout the schedule, period. The schedule is acceptable as is; however, there are a few areas where changes could be implemented to enhance the schedule's sorting and organizing features, period.
. Did you receive this memo from Jacobs?
A I probably did.
Q Would you look at the next page, please. It's a July 12th e-mail from yourself to Ray Todd and Terry Lang regarding schedule comments which communicates that you're forwarding an e-mail that you received from Brooke Harris of -- of Jacobs on July 11th. Do you see that?
A Yes.
Q And it says, Hello, Willie. Here is the memo from our scheduler. Please let me know if you have any questions.
Does that refresh your recollection as to whether or not you received the first page of Exhibit 204?
A I would say that if this memorandum was



attached to it as shown here, then, yeah, I received it.
Q So your construction manager inspector believed the schedule was -- contained logic that was complete and consistent and it was acceptable; is that correct?
A That's what he's stating, yes.
Q Okay. Let's mark now as next in order Exhibit 205.
(Exhibit Number 205 was marked for identification.)
Q (By Mr. Schoenfeld) Exhibit 205, sir, do you recognize as Spec Section 1230 entitled Project Schedule and Monthly Inspections for this project?
A Appears to be the same one, yes.
Q Okay. I want to draw your attention, sir, to Part 1.4, which starts on the back of the first page or the second page of the exhibit entitled Project Schedule, Subpart B, which you'll find on the third page of the exhibit. It's entitled Joint Review, comma, Revision, comma, and Acceptance. You see that, very bottom of the page?
A You lost me. Very bottom?
Q Yes, sir.
A Okay. Yes.
Q You got it?



A Yes.
Q Part B1 reads: Within seven calendar days of receipt of the contractor's proposed project schedule, the contracting officer and contractor shall meet for joint review, comma, correction, comma, or adjustment of the proposed project schedule, period. Any areas, comma, which, comma, in the opinion of the contracting officer, comma, conflict with timely completion of the project, comma, shall be subject to revision by the contractor, period.
Did Mr. Keiscome, as the contracting officer, comply with this requirement in your specifications, to the best of your knowledge?
A The contracting officer never performed this right here.
Q Did you, as the contracting officer's representative, comply in all instances with the requirements that I just read in Part B1 of 1.4 of Spec Section 1320 of this contract documents which we've marked as Exhibit 205?
A If you're asking me if I got with Mr. Christensen, no, I did not. I asked my project inspector to do that.
Q Did your project inspector do so within seven days as required by these specifications of the



submittal?
A I don't know.
Q What is your understanding, sir -- on this project, if your contract documents were not complied with, in other words, the duty that was placed on the government to perform and you didn't do it timely, what is your understanding of the result?
A I have no idea.
Q Are you aware that the con -- that the contract documents on this project required that the plans that were issued for construction be stamped by your engineer and architect?
A No. That would be part of the design.
Q Are you aware that your contract documents for the designer required that the designer stamp and wet-seal the issue for construction 100 percent construction documents?
A As I said, that would be the design facet of this contract.
Q So you don't know whether they were required to or not?
A No, I don't.
Q Okay. I'll ask you to assume such a requirement was imposed by the National Park Service by contract on its designer and that the designers did not

Q What happened in those negotiations that caused you to ask them to resubmit it?
A Depending upon which negotiations it was -- I don't know which one they were -- if it was the rock or other things like that, the dirt, then I was asking for -- show me how it's impacting you.
Q Okay. Now, we've seen throughout today's deposition a whole series of revisions in 2001 that affected the access road, the upper parking lot, and the trail. We know of the existence of the differing site condition contention and the excess quantities that had to be handled.
Did you expect the contractor every time it got a change to the drawings to issue you a new baseline schedule?
A I don't think I ever requested anything like that.
Q No, I -- I don't know that you did. But how could the contractor realistically, from your experience, build this project if all the assumptions it had in the schedule were constantly in flux?
Maybe I should ask it this way: It was tough for them to build the job when things were in flux, to move the ball forward, correct?
A As indicated by what all took place today.



Q Yes?
A Yes.
Q Okay. Now, when you received each of these schedules that I've shown you so far, they all indicated by colored information what was the critical path activity, correct?
A They were supposed to, yes.
Q And they did, didn't they?
A Well, I mean --
Q If you received a copy that didn't have color on it, it wouldn't have shown it, but you received copies that showed color, correct?
A I don't recall if I did or not.
Q Did Mr. Russell?
A He may have.
Q Okay. To the best of your knowledge, Remcon, as shown in the legend on the document on the very bottom of every page of schedule, did indicate where the critical path was located, correct?
A By texturing, yes, but when you start looking at that, my eyesight is not the greatest.
Q In black-and-white, it's very hard to discern.
A Yes.
Q You need the color, right?
A Yes.



Q Because the color printer does make it very easy to follow?
A Yes.
Q And none of your comments that we've seen so far said to Remcon, Hey, the contract documents, Spec Section 1320, requires you to show the critical path. You haven't shown the critical path. You never said that, did you?
A Not by any of my comments, no.
Q And if they did not show the critical path, you definitely would have said that, because that was extremely important?
A Yes.
Q Showing you Exhibit 20, a schedule submitted in June of 2003, on the 8 1/2-by-11 sheet that's attached to it, you sent it back to the contractor on July 2nd, 2003, correct?
A As shown in my line writing there, yes.
Q And it was unacceptable, see attached letter for comments; is that correct?
A That's what it states. Now, this one came in as 24A.
Q Spec Section -- I mean, Submittal 24A, right?
A Correct, which means it was the second submittal.



MR. SCHOENFELD: That's okay.
Q (By Mr. Schoenfeld) To the best of your knowledge, was the National Park Service and its inspector timely in responding to schedule submittals?
A I think I responded, as best I possibly could.
Q As we talked about last week, you had lots of other projects and other things to do besides this project, correct?
A That's correct.
(Exhibit Number 208 was marked for identification.)
Q (By Mr. Schoenfeld) Did you receive Exhibit 208, an e-mail from Mr. Christensen to you and Terry Lang, dated June 4, 2002, regarding project schedule?
A With my name on it, I'd have to say I probably did.
Q In here Mr. Christensen is communicating that it's been approximately three weeks since the partnering meeting and he hasn't gotten the responses to the latest generation of the schedule.
Would it have been your standard practice to have directed, in response to this, Mr. Russell to address the subject?
A I believe I asked Mr. Russell to meet with

Page 607

A No agreement was reached for 400,000 plus.
Q Okay. Now, as part of the discussions in August of 2002 and before that, not only did Remcon identify that it had encountered a differing site condition, but it also contended that the work necessitating addressing the differing site condition caused delay and disruption to its work, correct?
A That's probably correct, yes.
Q Okay. And specifically Remcon contended that the work associated with having to blast during limited hours of blasting was much slower and took longer to achieve the same amount of work than had Remcon been able to perform the work with its D8 dozer to rip the rock as originally planned, correct?
A Could you restate that, please.
Q Yeah.
Remcon planned to build the access road with a D8 dozer instead of blasting, correct?
A I would have to agree with that statement, yes.
Q And as a result of not being able to use the D8 dozer on a significant portion and having to blast instead, Remcon claimed that it took six to eight weeks to do something that was planned to be done in one to two weeks, correct?

Page 608

A That could possibly be Remcon's claim, yes.
Q Okay. Given that the government did recognize that a differing site condition was encountered in the deep cut area requiring blasting, why is it that -- what is your understanding as to why Mr. Keiscome did not grant additional time when granting this Modification Number 6? You'll note at the bottom of the fourth page of this exhibit no additional time is added by Mr. Keiscome.
A I don't know.
Q Did you believe, as a result of your interactions with Mr. Russell, other National Park Service personnel, and Mr. Christensen and Mr. Lewis, that additional time was due Remcon as a result of encountering the differing site condition?
A (Reviewed documents.)
I would have to, in my own opinion, probably say there would -- there would probably be some time.
Q Did you ever communicate that observation or conclusion to Mr. Keiscome?
A I don't recall.
Q What about to Ms. Lang --
A I don't --
Q -- or anybody else at the NPS?
A There may have been. I'm -- I'm not sure.

Page 609

Q The next page of Exhibit 214 is the start of a letter dated January 14 of 2003 on National Park Service stationery entitled Backup Material for Modification 6.
Do you see that?
A Yes.
(Mr. Giller entered the room.)
Q (By Mr. Schoenfeld) Did you prepare this?
A I'm not sure.
Q Do you have any idea looking at it who prepared it?
A I can't say specifically who prepared this.
Q On the upper right-hand portion of this page there are -- appears to be two sets of initials and dates, one dated February 10th of 2003, one dated February 18th, 2003. Do you recognize either of those initials and handwriting?
A No. One appears to be an RM, but I don't know who that would be.
Q Would you continue two pages back, sir. There's a Bates-stamped page 201 -- I can't tell if it's a 9 or a 3. But at the top, it reads "Equitable Compensation." Do you see that?
A Yes.
Q Do you recall receiving written information from Remcon purporting to justify its entitlement to a

Page 610

differing site condition and the quantification of the costs it believed it was entitled to receive in a modification?
MR. OLIVIER: Objection; vague and ambiguous.
THE WITNESS: I know Remcon submitted some costs.
Q (By Mr. Schoenfeld) We've spoken a bit on this August 2002 settlement meeting. I'm going to show you Exhibit 61, sir, which is dated August 23rd, 2002, and was prepared by Loren Mangrum, in which Mr. Mangrum wrote that the meeting resulted in a settlement.
Once you have read that, tell me if you believe Mr. Mangrum was inaccurate in his recollection recorded.
A (Reviewed document.)
MR. SCHOENFELD: Morning.
MR. GILLER: Good morning.
(A discussion was held off the record.)
THE WITNESS: I don't know where Mr. Mangrum got this information at.
Q (By Mr. Schoenfeld) Well, Mr. Mangrum, I will represent to you when we took his deposition in December, testified that, yes, there was a settlement reached on the differing site condition claim, that it was in the neighborhood of $484,000.

A I never did.
Q Do you know if anybody else did?
A I don't know.
Q Would you turn to Bates-stamped page 515880, which is also page number 8 of the revised REM.
A Uh-huh.
Q There is a cloud or a circle around a citation from a case known as Foster Construction versus United States.
A Yes.
Q Did you -- did you write that or circle that?
A That's -- that's probably my clouded area around that.
Q Okay. Is the same thing true on the following page?
A That's true, yes.
Q All right. Would you look at page 515883, which is two more pages. Keep on going, one more.
Is that your handwriting on the Weekly Minutes Number 11?
A Yes.
Q Did you write those notes on the weekly meeting, Number 11, in August of 2001, or did you only write them in -- as a result of your review of the revised Request for Equitable Adjustment?



A It was probably after the Request for Equitable Adjustment.
Q Okay. Would you turn to the next page, please. The Bates stamp is 515884.
A (The witness complied.)
Q Is that your writing as well?
A No, that's not my writing.
Q So is it correct that you made a copy of the notes of the meeting from your file when you made the comments on the first page?
A I can't say for sure.
Q All right. Did you share any opinions you had regarding the existence of the differing site condition and valuation of the damages sought by Remcon with Ms. Lang or Mr. Keiscome?
A Can you be more specific?
Q Yeah.
You went -- you went through this revised Request for Equitable Adjustment --
A Yes.
Q -- and reviewed it for content?
A Yes.
Q You came to some conclusions and observations, correct?
A Correct.



Q Did you share those conclusions and observations with Ms. Lang or Mr. Keiscome?
A I may have. I can't recall right now.
Q Did you share them with Mr. Giller?
A I don't know if Mr. Giller was project manager at this point in time.
Q Okay. Based on your understanding of the events that occurred on this project, do you believe that Remcon was delayed in its performance of work?
A I would have to look at all this stuff once again and reevaluate. I think that there could be some time involved.
Q By probably would be some time involved, do you mean that they -- you believe they were delayed, but you don't know the extent of it?
A That may be the conclusion, yes.
Q On the first day of your deposition, one of the duties you identified that was your responsibility was to evaluate time and money issues and make recommendations regarding modifications to be issued in that regard, correct?
A That's correct.
Q Did you ever review at any time the issues arising on the project concerning delay and make a recommendation regarding time that the contractor should



be granted through modification extending the project?
A I can't recall right now. I may have.
Q During the depositions of Mr. Smith from DHM and Mr. Tuttle of Martin and Martin (sic), they testified that as a result of the events that occurred in 2001 continuing unresolved through the beginning of 2002's construction season, the project was in limbo.
I'm asking you just to accept that that is in substance what they testified to and that they used that word, the project was in limbo. Do you concur with that observation?
A I -- I don't know what they mean by "limbo," so . . .
Q Did you ever at any time evaluate the critical path of the project and determine that the contractor was entitled to a time extension?
A When you say "evaluate," you mean looking at that progress schedule once again, right?
Q Yes.
A I -- I would look at that. I don't know if I did, but if it was shown on the critical path, I would evaluate for time.
Q Did you ever do so on this project?
A I -- I don't know if I did or not.
Q If you didn't, was there anybody else that was

Page 651

Q In his e-mail Mr. Walling wrote, referring to Remcon, He's jerking our chain, quote/unquote.
Did you believe Mr. Christensen on behalf of Remcon was jerking your chain based on the e-mails that he sent you regarding project delay?
A I don't consider that to be accurate. Mr. Christensen is simply trying to notify me of what he thought was the problem.
Q And that was his responsibility if he so perceived it, correct? If Mr. Christensen perceived he was being delayed, he had a duty to let you know that, correct?
A Oh, yes.
Q And you didn't disagree there were issues that had to be addressed, correct?
A No, I didn't.
Q That was a bad question by me.
A Okay.
Q Am I correct, you agreed with Mr. Christensen that there were issues that had to be addressed so as to not promote any further delay to the project, correct?
A Yeah, based upon my e-mail, I wanted to go ahead and try and resolve some issues.
Q Were the issues that were pending as of May 20th and 21st, 2002, timely resolved, in your

Page 652

opinion?
A I don't think they ever were resolved, based upon what I've seen --
Q Okay.
A -- in front of me other than that unilateral modification.
Q Okay. The last sentence of Mr. Walling's e-mail dated May 21st of 2002 that's part of Exhibit 11 says, If we are holding them up, we better be reducing our liability in a big, all caps, hurry. You see that?
A Yes.
Q What did the National Park Service do to reduce its liability to Remcon, if anything?
A I don't know.
Q Okay. Do you recall the facilitator at the partnering meeting informing the National Park Service representatives that it was their responsibility to take whatever reasonable action could be taken to cause Remcon to be timely paid for work performed?
A It may have been mentioned in there. I can't recall specifically. I know that the -- as a facilitator, her responsibility was to try and facilitate any type of resolution on whatever problems were perceived.
Q Was one of the issues addressed at the

Page 653

partnering session the contention by Remcon that not only had it not been paid timely for contract work, but that there was a whole host of extra work it had performed but had not been paid for?
A There may have been. I'm not -- I'm not sure right now.
Q Would you turn to the next page of Exhibit 11, please.
A (The witness complied.)
Q Did you receive this e-mail from Mr. Christensen that's noted as a cc to yourself and it was directed to the attention of Mr. Keiscome dated May 23rd regarding meeting for negotiation purposes?
A I would have to say, yes, seeing I was cc'd, yes.
Q Turn to the next page, please.
A (The witness complied.)
Q At the bottom of the page, this is Bates stamp 388916. Mr. Keiscome sends an e-mail to Mr. Christensen with a cc to you on May 24th scheduling the partnering meeting -- excuse me -- scheduling the settlement -- strike that -- scheduling the negotiation meeting on June 12th at 9 a.m. in the conference room. Do you see that?
A I see that, yes.

Page 654

Q Did you participate in that meeting?
A I believe I did, yes.
Q Was that meeting here in Denver?
A Based upon the conference room, I'd have to say yes.
Q Okay. Did that meeting occur on that date?
A I assume so. I don't know.
Q Was there an offer made to Remcon regarding the different site condition claim at that meeting?
A There may have been. I'm not sure on that.
Q Okay. Is the offer that you're referring to in Exhibit 217 the offer that was made during the meeting on June 12th of 2002?
A Could I see that real quick?
Q It's right in front of you. Right here (indicated).
A (Reviewed documents.)
I'm not sure, because the dates are so far apart.
Q Okay. Did you receive the e-mail that's at the very top of page 388916 from Mr. Walling? It's not noted as being cc'd to you. It's dated May 24th.
A If this is running consecutively, then I received it. It wasn't cc'd to me. It was forwarded on by other e-mails, so I would have to say if this is a

correct printout, then I see -- I saw this one.
Q Okay. Mr. Walling writes in his e-mail on May 24th with respect to schedule issues, Rod seems to agree that we will wait forever for Remcon's schedule and that doing our own would be of benefit.
Did Mr. Keiscome ever make that communication to you insomuch as you were responsible for schedule-related issues concerning this project?
A Not to me, because I am not proficient in performing scheduling.
Q. Is Mr. Walling proficient in performing construction scheduling, based on your experience and knowledge?
A I can't speak for Mr. Walling.
Q Did the government -- strike that.
Did the National Park Service at any time prepare its own schedule for the project, to the best of your knowledge?
MR. OLIVIER: Objection; vague and ambiguous.
THE WITNESS: I'm not sure. I'm sure that somewhere along the line there must have been some kind of schedule.
Q (By Mr. Schoenfeld) May I have your copy back, please.
A This one?



Q Yes.
Thank you.
MR. SCHOENFELD: Number 25, Steve.
Q (By Mr. Schoenfeld) Mr. DeOcampo, I show you Exhibit 25, which is an e-mail from Mr. Christensen to yourself on -- dated Monday, June 3rd, 2003. And in substance in this e-mail, Mr. Christensen communicates that as a result of all the various issues that were then from his point of view preventing him from productively performing work, he was proposing a modification to the contract documents to allow him to work at the Lower Sherman area.
Do you recall that subject matter being raised by Mr. Christensen?
A Based upon this e-mail --
MR. GILLER: You said 2003.
MR. SCHOENFELD: Did I say 2003?
THE WITNESS: Yes.
MR. SCHOENFELD: Thank you. June 3rd, 2002. Thank you.
MR. GILLER: I'm sorry.
MR. SCHOENFELD: If someone misspeaks, I have no issue with you clarifying, because it's not intentional. We want a clear record. Thank you.
Q (By Mr. Schoenfeld) You did recall him



raising that subject to you?
A Based upon this e-mail, yes.
Q Okay. The government declined to consent to Mr. Christensen's proposal; is that correct?
It doesn't say that you declined in this e-mail, but --
A Yeah, I don't know.
Q Was Mr. Christensen's company permitted to work the Lower Sherman area prior to finishing the Upper Sherman area?
A No work ever started down there.
Q By Mr. Christensen, correct?
A That's correct.
Q Because he was not allowed by the contract to do so until the Upper Sherman had been completed, correct?
A I believe that's what -- what was stated, yes.
Q And did the government, in your understanding, ever modify that contract provision?
A I've never seen a modification on that.
Q Okay. Did you understand Mr. E -- Christensen's e-mail, that we've marked as Exhibit 25, to be his attempt to mitigate or avoid some of the damages he perceived he was incurring as a result of the issues that he felt he was being confronted with on the Upper



Sherman?
A Could you restate that again?
Q Did you understand Exhibit 25 to be Mr. Christensen's effort to minimize or mitigate the cost in damages that he believed he was incurring as a result of the impacts on the Upper Sherman scope of work?
THE WITNESS: Read that, please.
(The reporter read page 658, line 3 through line 6.)
MR. OLIVIER: I'm going to object to that. It calls for speculation.
You can answer to the extent that you had some understanding.
THE WITNESS: That's what it appears that this e-mail was concerning, yes.
Q (By Mr. Schoenfeld) Okay. Did you forward this e-mail on to Mr. Keiscome?
A I may have. I'm not sure.
Q Did Mr. Keiscome have any response to it?
A I don't -- I don't know, because I don't even know if I forwarded it on to Mr. Keiscome.
Q May I have that one back from you, sir.
A (The witness complied.)
Q Thank you.
A Sure.