# EXHIBIT 1F

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Q I'm going to show you Exhibit 220.
(Exhibit Number 220 was marked for identification.)
Q (By Mr. Schoenfeld) One-page e-mail from Mr. Christensen to yourself dated July 1st, 2002.
Did you receive this e-mail regarding standby on grading operations?
A (Reviewed documents.)
Based upon this message being sent directly to me, I have to say yes.
Q Okay.
A I don't recall it specifically, but . . .
Q Okay. Let me show you Exhibit 221.
(Exhibit Number 221 was marked for identification.)
Q (By Mr. Schoenfeld) Did you receive a copy of this notice letter regarding delays to the access road work dated September 24th, 2002, from Remcon?
(Exhibit Number 222 was marked for identification.)
THE WITNESS: I can't say for certain, because it doesn't --
Q (By Mr. Schoenfeld) Show it was addressed to you specifically, correct?
A Yes.



Q I'm going to show you Exhibit 222, sir. One-page letter from Remcon dated September 24th, 2002, regarding delays to the upper parking lot.
Did you receive this correspondence giving you notice of delays?
A (Reviewed documents.)
I may have. I -- I can't say specifically.
Q Okay. Let me show you Exhibit 121, sir, which is the spec section for Boulder Revetment.
Whoops. Can I have it back for a moment, please.
A (The witness complied.)
Q I draw your attention, sir, to the spec section. Do you recall boulder revetment, which was the placement of rock or stone materials around certain natural features, whether they be slopes or trees, for aesthetic and protective purposes as required on this project?
A I recall revetment, yes.
Q Okay. Let's turn to the very last part of the second page of this exhibit, sir. Part 4, under Measurement and Payment, has a subpart 4.1 entitled Boulder Revetment. Do you see that?
A Yes.
Q And it reads, quote, This item includes



construction, boulder revetment, slope protection, and landscape boulders and their placement, comma, using stone from park stockpiles, period.
Did the National Park Service have present at the park for Remcon's use stone in stockpiles to be used for boulder revetment?
MR. OLIVIER: Objection; asked and answered several times.
MR. SCHOENFELD: I believe we've talked about aggregate base, not boulder revetment. It's a different type of work.
THE WITNESS: I believe there were some boulders up at Wolverton, to my recollection.
Q (By Mr. Schoenfeld) Okay. Do you know when Remcon got to the job after the snow had melted, in approximately May of 2001, whether there were stockpiles from which Remcon could access material to be used for boulder revetment or not?
A I don't know, because I wasn't on-site, so I can't say yes or no to that answer -- to that question.
Q The two designers who we've deposed, Bob Smith on the one hand and Ray Tuttle on the other hand, both testified regarding this specification section.
And Mr. Smith specifically testified that this was within the scope of work of DHM to design. And



Mr. Smith testified, I'll ask you to accept, that it was his intent in preparing this spec section that all the necessary materials for all the required boulder revetment would be accessible by the contractor in stockpiles.
Did that subject, that all that was supposed to be stockpiled for the contractor, ever come to your attention during the course of the project?
A Can you be more specific?
Q Yeah.
At any time on the project, did it come to your attention from any representative of the design team or the National Park Service personnel that all of the stone for boulder revetment work on the project was supposed to be in one or more stockpiles available for Remcon to access?
A From my recollection, the plans, like I said, indicated there was boulders at Wolverton stockpile. I believe that was in this one area where some of the dirt was deposited by Mr. Christensen's company.
Q Let me show you Exhibit 123 again, sir. We previously looked at the note that concerned the aggregate base being stockpiled at Wolverton Point.
Do you see any note on this drawing, on Exhibit 123, about the existence of stone being

Page 663

stockpiled in this location for boulder revetment?
A (Reviewed documents.)
Q Let me clarify, the Lower Wolverton is one place. There's a Wolverton Point location as well shown on Exhibit 123, correct?
A Correct.
Q And there's a note that concerns something at Wolverton Point, correct?
A There is a note, yes.
Q Could you read what you see on Exhibit 123 regarding what's at Wolverton Point?
A It says, Stockpile area for rocks, excess excavation. Native material only, as directed by CO.
Q Does that note indicate to you that that is an area where stockpiles can be created as contrasted with where stockpiles were in existence?
A This note sounds as though it's an area to be -- for deposit.
Q Okay. Do you see any note elsewhere on Exhibit 123 where the government identified, at least on this document, that there was an existing stockpile or stockpiles of rock for boulder revetment?
A (Reviewed documents.)
I do not find anywhere where it says boulder stockpiled.

Page 664

Q Are you aware that the -- Remcon contended that when it came time to create rock revetment that the reference from the contract documents, specifically spec Section 2831, marked as Exhibit 121, that there was no rock stockpile to access the stone from?
A As shown by the plans, yes.
Q You're aware that they made the contention there was no stone available, correct?
A They may have. I'm not sure.
Q Okay. To the best of your knowledge, have you seen any modification issued by the National Park Service to Remcon for furnishing the stone that was used in boulder revetment activities on this project?
A My recollection of some of the specifications -- I'm not sure if it's directed for this one right here, but I believe there is mention of stone coming from Allison or Ken Smith, so I'm not sure if that pertains to this right here.
Q Okay. You mentioned specifications and then separately Allison and Ken Smith. Let's clarify.
Allison and Ken Smith you understand were subcontractors or suppliers?
A That's what was --
Q Okay. And that's something separable that would be said in a specification, because a specification

Page 665

doesn't identify the name of a supplier or sub to Remcon, correct?
A I believe it's in the specifications.
Q Okay. Did Remcon have to scrounge around the park to find rock that was suitable for stone or rock revetment?
A I'm not sure if they had to scrounge. I mean --
Q Did they have to manufacture from rock that they encountered stone material that was acceptable for boulder revetment?
A I would perceive that it would be some boulders encountered that would be acceptable for revetment based upon what I've seen from previous projects.
Q As the COR on this project, am I correct that it -- Exhibit 121 permitted the contractor to not include in its contract price the cost to create stone, but rather expect to have it in a stockpile available to be accessed?
MR. OLIVIER: Objection; calls for speculation.
THE WITNESS: The pay item would indicate that there were stockpiles.
Q (By Mr. Schoenfeld) Do you know whether those

Page 666

stockpiles ever existed once Remcon got to the site as the contractor? From your personal observation.
A I don't know.
Q In reviewing Remcon's claims arising from its activities on this project, you're aware that Remcon contended that no such stockpiles existed, correct?
A They may have. I'm -- I don't have anything in front of me.
Q And just for the record purposes, you're not aware of any modification being issued to Remcon compensating them up to this point in time for any boulder revetment work, correct?
A I -- yeah, I haven't seen anything for that in the previous modifications you've shown.
Q Okay. Let me show you number 223, please.
(Exhibit Number 223 was marked for identification.)
Q (By Mr. Schoenfeld) It's from Joanne Cody to Bob Russell dated October 4th, 2001, concerning angular and some -- subangular rock quantities being attached.
And on the second page of this exhibit, Ms. Cody identifies that there is a quantity needed for this project of 1,000 -- can you turn to the second page, please.
A (The witness complied.)

# EXHIBIT 1G

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 225

Q Your understanding is that they all refer to Jack Vance as opposed to somebody else named Jack relating to this project on behalf of the government; is that correct?
A Yes.
Q If you go to the page that has the Bates stamp on it at the bottom right 515284.
A (The witness complied.)
Q The very top sentence reads, "The Government believes that the contractor has not managed this cramped construction site efficiently."
Was that your belief?
A Yes.
Q How many times did you visit the site during 2001?
A I can't recall.
Q More than twice?
A Maybe. I don't know. I'd have to look at records.
Q When you were there, you had a lot of other responsibilities other than watching the construction operations, correct?
A Yes.
Q In fact, watching construction operations was a very minor portion of why you would visit the site,

Page 226

right? You would observe it for an hour or so, but you had other things --
A That's --
Q -- you were doing, right?
A Yes.
Q So what is it that you personally relied upon to form the belief, quote, that the contractor has not managed this cramped construction site efficiently?
A I don't know if I wrote this one right here (indicated).
Q I know. I didn't ask you --
A Yeah.
Q -- to say that you wrote it. I asked you if you believe that was a true statement personally. You said yes.
A I --
Q I'm not asking on what basis did you form that belief.
A I was out when some asphalt was being placed. I think -- I can't recall the dates.
Q So that would have been in 2002, correct?
A I'm not sure.
Q All right. Was there any asphalt or paving work done in 2001?
A I don't recall. I don't remember.

Page 227

Q Okay. Assuming that the asphalt work was done in 2002, did you form the belief in 2001 that the contractor had not managed the cramped construction site efficiently?
A I don't -- I don't think so. I -- I don't -- like I said, I don't know who wrote this right here (indicated).
Q All right. Now, in the middle of the -- the page that I had you turn to, there is an indentation that says, "Excess fill," right in the middle of the page.
A Yes.
Q To the right there is some information and then there's three asterisks.
A Uh-huh.
Q Do you see it?
A Yes.
Q And then it refers to the name of a company by the name of Psomas, capital P-S-O-M-A-S.
A Yes.
Q Who's Psomas?
A Psomas is a surveying company.
Q Correct.
What role did they play on this job?
A I believe they came in there and did some surveying.

Page 228

Q In December of 2001?
A I'm not sure.
Q Why were they doing surveying in 2001?
A I don't know.
Q Who asked them to do it?
A I don't know that either.
Q Did you?
A No.
Q You're responsible, as the COR, to evaluate and negotiate change requests that were pending from the 2001 season during the winter of 2001, 2002, correct?
A Yes.
Q That was one of your jobs to do over the winter, correct?
A That was one of many, yes.
Q Yeah. There's no doubt you had many things to do. In fact, am I correct in perceiving that you were overworked as far as the volume of responsibility you had given the number of projects and the things you had to do on each of them?
A Somewhat, I would say.
Q You know, did you feel you were overworked and unable to attend to everything that had to be taken care of as efficiently and swiftly as they -- they otherwise would have needed to be taken care of?

Page 301

from the CO to raise the parking lot in the upper area by 5 feet?
A Yes, I believe that it did.
Q Was Remcon ultimately issued a modification for that 5-foot modification raise?
A Yes.
Q Was Remcon compensated for the additional material that excavated beyond the 6800 cubic yards that was not used in the raising of the parking lot 5 feet?
A I think that excavation was a lump sum, so I -- I believe not.
Q Well, if Remcon was told in the contract documents to bid 6800 cubic yards and for our discussion, let's say, it encountered it had to excavate 20,000 yards, it was entitled to be reimbursed for the excess excavation, correct?
A If the contract documents and the pay estimate showed it was on a unit price, then they would -- there would be some overruns on that.
MR. SCHOENFELD: Why don't you show it to me, the bid schedule with the 6800 yards.
Q (By Mr. Schoenfeld) Let me just show this to you. Does this refresh your recollection? The highlighted one, the -- the excavation was 6800 cubic yards.

Page 302

A Well, that's probably Remcon's schedule of values that they submit to us.
Q Correct.
And that's a replication of a bid form, correct?
A Yes.
Q Okay. So they didn't create something; they just duplicated it, correct?
A I don't know. I'd have to see the --
Q Okay.
A -- the one that was at issue.
MR. SCHOENFELD: Is it in these specs there? We'll get it.
Q (By Mr. Schoenfeld) Okay. Going back to the question. Assuming that it wasn't a lump sum item --
A Yes.
Q -- Remcon was entitled to be reimbursed for quantities in excess of the specified quantities, correct?
A If it was in a unit price, yes.
Q Was Remcon compensated for the excess excavation other than the raising of the 5 foot of the parking lot?
A I would have to look at the modifications and see if there was such a thing.

Page 303

Q All right.
(Exhibit Number 104 was marked for identification.)
Q (By Mr. Schoenfeld) Let me show you Exhibit 104, sir, one-page document. It's got two e-mails in it. Forget the top one. Just focus on the bottom one.
MR. SCHOENFELD: Oops. Sorry, Richard.
MR. SCHROEDER: Got it.
MR. SCHOENFELD: Good hands. You could play for the Red Sox.
Q (By Mr. Schoenfeld) The bottom e-mail is dated November 15th of 2001 from Ray Todd to yourself as well as others. Do you see that?
A Yes. The bottom one?
Q Yes. And it concerns excavation quantities for this project, correct?
A As so stated in the subject.
Q Yes. And it refers to the fact that Mr. Christensen had called, was concerned about the excess quantities for excavation and that he suggested that the NPS may want to have someone do an independent review, and Mr. Todd thought that was a good idea, correct?
A Let me read it. Hold on.

Page 304

(Reviewed documents.)
Q Go ahead.
A Okay. Your question?
Q The question is: Mr. Todd thought that Mr. Christensen's idea to have an independent review of the excess quantities was a good idea, right?
A Yes.
Q And he recommended that a survey be done, correct?
A Yes.
Q Was a survey done?
A I don't know.
(Exhibit Number 105 was marked for identification.)
Q (By Mr. Schoenfeld) Okay. Let me show you 105, sir, modification to the contract. Let's just go through this real quick.
The modification is dated September 11 of 2002, correct? In Box Number 5 at the top.
A It shows September 12th.
Q (Indicated.)
A Okay. Right there.
Q Is that correct?
A Yes.
Q Okay. It's effective September 12th of 2002,

correct?
A Yes.
Q There is writing in Box 7, obligated existing contract no FFS link, initials, and dated September 16th of 2002, correct?
A Where you looking at now?
Q Box 7, sir. Top.
A Okay.
Q Whose handwriting is that?
A I have no idea.
Q What is no FFS link mean?
A It's -- it sounds like it's the --
Q I don't want you to guess. Do you know?
A No.
Q That's all I need.
A I can't say positively.
Q This is signed by Mr. Keiscome on September 12th; is that correct?
A Yes.
Q And Mr. Christensen on September 14th; is that correct?
A It appears -- it looks like the 14th.
Q On the second page, sir, the modification is for the price of $95,120.36, correct?
A Yes.



Q At the very top, sir, there's a line item summary and it says, Total Funding 7,890,724.28. Do you see that?
A Yes.
Q That also is the adjusted contract price at that moment in time, correct, if you look on the text of that page?
A I -- let's see. Yes.
Q Do you have any understanding what the reference to canceled fund is on the document?
A I have no idea.
Q Okay. Under the heading describing this $95,000 change, it says, change in funding, unit price. You see that?
A Yes.
Q Do you know what that means?
A Not offhand, no.
Q All right. Turn to the next page.
A (The witness complied.)
Q And the page after that.
A (The witness complied.)
Q Now, am I correct in understanding that this $95,000 modification dealt with four separate items?
A Yes.
Q The last one being Item Number 139, which was



a new contract item, correct, to raise the finish grade of the upper parking lot?
A Yes.
Q And you'll see the description of the work is "Compensate the Contractor for cost associated for placing and compacting the excess excavation required to raise the upper parking lot to the revised grading elevations." You see that?
A Yes.
Q That doesn't indicate to me that it's for paying all costs associated with excess excavation on the entire project up to that time; it's just handling excess excavation to raise the parking lot for 5 feet. Do you read it as I do, sir?
A Yes.
Q Okay. So am I correct, then, that the change order or the modification that you were referring to that was referenced in the exhibits we've looked at, that this modification does not address the excess excavation that was not used to raise the upper parking lot?
A Can you --
Q You want me to try it again?
A Yeah. Let me try -- try it again. So let me listen to you slower. Okay?
Q All right. There's an excess excavation



con -- intended to exist on this project --
A Right.
Q -- correct?
A Correct.
Q Some of that material was used to raise the finish grade of the parking lot, right?
A True.
Q And that portion of the excess excavation that was used to raise the finish grade of the parking lot was set forth in Exhibit -- the modification we've marked as Exhibit 105, correct?
A Correct.
Q But it is not for all of the excess excavation necessarily, correct?
A Correct.
Q Thank you.
(A discussion was held off the record.)
Q (By Mr. Schoenfeld) And this Item Number 139 did not compensate the contractor to raise it from the lowered elevation as a result of the excess burn pit up to the original grade that it should have been, correct?
A I don't know. Is there a sketch attached to it?
Q Is there a sketch attached to it? I see none, sir --

Page 343

week ending July 28, 2001. The report is dated August 1st, 2001, and once again, the document is produced from the government.
Is this prepared by Mr. Russell, to the best of your knowledge?
A Yes.
Q Under potential contract change orders, Mr. Russell writes of two separate potential change orders. The first one is generically identical to Exhibit 169, correct?
A It -- it's concerning the same subject of the burn pit, yes.
Q Okay. The second item concerning buried material, parentheses, not shown on plans were addressed in the specifications, end parentheses, along the south side of the upper parking lot, parentheses, Stations 14 to 16, end parentheses, that's a separate additional item that you understood Mr. Russell was communicating to you; is that correct?
A Let me read this --
Q Sure.
A -- please.
(Reviewed documents.)
The question again.
Q Is the second -- second item that Mr. Russell

Page 344

reads about -- writes about in Exhibit 170 is a separate, concurrent extra work item that he's identifying as a potential item, correct?
MR. OLIVIER: Objection; it's vague and ambiguous and calls for speculation.
Q (By Mr. Schoenfeld) You may answer.
A It appears to be that way.
Q Do you know if a modification was ever issued by the government for the second bullet point item that's set forth in Exhibit 170 under the heading Potential Contract Change Orders?
A It may have been lumped with the haul materials outside the park. I'm not sure, though.
Q Okay. Do you recall Modification Number 4 being issued in September of 2002 and not earlier than that date?
A I'd have to look at that mod.
Q Okay. You were responsible for negotiating modifications on behalf of the contracting officer and then recommending that they be issued, correct?
A Correct.
Q Did you keep a log of modifications that you were tracking and ultimately negotiating with the contractor?
A I relied upon Mr. Russell to do that.

Page 345

Q And then when he was no longer there, Mr. Mangrum?
A Mangrum, yes.
Q Okay. Let me show you Exhibit Number 64, sir. We marked that previously in your deposition.
(A discussion was held off the record between Mr. Schoenfeld and Mr. Christensen.)
Q (By Mr. Schoenfeld) Do you recognize that document as Modification Number 4, sir?
A Yes.
Q Could I come around here, sir, because I can't find my copy.
In the items set forth in Modification Number 4, there are four separate --
MR. OLIVIER: I'm going to object to your standing over the witness. If you want to use my copy --
MR. SCHOENFELD: It would be my pleasure. Thank you, Counsel.
Q (By Mr. Schoenfeld) Focusing your attention on the fourth page of the exhibit which I've had you open up to, the Bates stamp at the bottom is 515314. You see that?
A Yes.
Q Okay. There is a chart which identifies four separate bid items. Do you see that?

Page 346

A Yes.
Q The first bid item is Number 39, and that was a contract bid item; is that correct?
A Yes.
Q The other three bid items, Numbers 137, 138, and 139, were added as new work bid items, correct?
A This is correct.
Q Okay. Now, the Item Bid -- Bid Item Number 39 here, haul excess excavation, ultimately an increase was entered into between the government and Remcon adding $38,400; is that correct?
A Yes.
Q When was the work that is the subject of this modification -- when was that work done?
A I'm not sure.
Q Is it true it was done in calendar year 2001 during the first construction season?
A I'm not sure.
Q Okay. As a general principle, sir, one of the duties that you identified was to negotiate the extra work items as you perceive they existed, make recommendations to the contracting officer, as well as to handle progress pay applications, correct?
A Correct.
Q Did you have an understanding that it was the

Page 359

bcc when you recognized as the COR entitlement to a modification being issued?
When you recognized a mod had to be issued, these are the people you notified. Was there anybody else other than what's listed here that you felt needed to be notified?
A Just these people.
Q Okay. Did Remcon submit the trucking receipts and weight tags from the disposal site that you asked for in this exhibit?
A Yes.
Q And, in fact, it was submitted to you within a few days of August 1 of 2001, correct?
A I can't recall the date.
Q Number 64 I showed you a few moments ago. I ask you to go back to it. The last page of the exhibit, sir, there's a detailed write-up on each of the items for which a -- extra compensation is being given to the contractor. Do you see that?
A Yes.
Q Did you author these?
A I believe I -- I did. I think I said yes last week.
Q Okay. Let's look at Number 137 for a moment, sir. You'll see that you wrote that the extra work that

Page 360

was paid for in this modification was performed on July 31 of 2001, correct?
A Correct.
Q The fourth sentence of this write-up that you wrote says, Thus, the government agreed that the center line had to be revised in order to fit all earthwork into the already cleared limits, period. Do you see that?
A Can -- let me read it, please. I'm slow.
(Reviewed documents.)
Q I don't need you to read the whole thing, though. I'm not interested in anything beyond the fourth sentence.
A I need -- like I say, I need to see what I'm building up to, because I usually write in that manner.
(Reviewed documents.)
Q Have you read it?
A No, I've not.
(Reviewed documents.)
Okay.
Q The extra work was done in July of 2001, correct?
A As shown here, yes.
Q And you recognize that it was extra work and that the contractor was entitled to be compensated for the additional work, correct?

Page 361

A I believe Mr. Christensen let me know it was additional work because the surveyors wanted payment for it.
Q And you personally, after analysis, concluded that Mr. Christensen's request was appropriate to be approved as extra work, correct?
A Yes, as shown here on this.
Q Okay. Why did it take until September of 2002 for the contractor to be contracted for the performance of this extra work?
MR. OLIVIER: Objection; calls for speculation.
MR. SCHOENFELD: I'll restate the question.
Q (By Ms. Dulin) What is your understanding as to why it took until September 2002 for the contractor to be compensated for this extra work?
A I can't remember.
Q Look at Item Number 138, sir. That is the sorting and removal of buried debris in the upper parking lot. Once again, we are on the last page of Exhibit 64. Once again, this is your writing, correct?
A To the best of my recollection, yes.
Q And you wrote this up as your justification to the contracting officer and those that needed to concur for the modification to be issued, correct?

Page 362

A Correct.
Q When did you write these four justifications? Was it in 2001 or 2002?
A I'm not sure.
Q What is your standard practice? Do you write these up at the time the modification is about to be issued or weeks and months prior?
A I try to write them up as soon as I possibly can in order to get the modification processed. And at this point in time, I don't -- I can't recall the specific date this was written up.
Q After reading Item Number 138, does it refresh your recollection that the effort undertaken by the contractor for which Item Number 138 was recognized was undertaken in July of 2001?
A Okay. Let me read it first.
(Reviewed documents.)
Okay.
Q After reading 138, is your memory refreshed that the work was done in July of 2001?
A It's so shown on the write-up.
Q Okay. Let's go back to Number 137 for a minute. A few moments ago I heard you -- and I want to make sure I heard you correctly -- state that there was no realignment of the access road in the deep cut

A Could be paperwork. I don't know.
Q This work had to be performed by the contractor in order to address the excess material before he could pave the Upper Sherman parking area, correct?
A Correct.
Q And by contract, the contractor was not authorized to do the extra work until a modification was issued, correct?
A Correct.
Q And this work was restraining the finishing of the Upper Sherman parking area, correct?
A Correct.
Q Once again, do you have any understanding as to why it took three months, approximately, for the modification to be issued once the price was agreed?
A No idea, other than paperwork.
Q Okay.
MR. SCHOENFELD: Exhibit 39, Steve.
I'll take both of those back, please.
Q (By Mr. Schoenfeld) Did you receive this e-mail on June -- on or about June 22nd, 2002, from Mr. Christensen asking when he was going to get the modification, because, quote, As you're aware, this is critical to our work plan and continues to impact the overall schedule, end quote?



A Yes, I probably did.
Q Did you pass this on to Mr. Keiscome?
A I'm not sure, but I would assume that because it was -- Terry Lang was also cc'd on this that she would pass it on.
Q Okay. Did you share Mr. Christensen's sense of urgency when you received this?
A I can't -- I can't say if I did or not.
Q Did you feel that Mr. Christensen was wrong in telling you that -- or identifying that it was critical to get the modification so the extra work could be done?
A No.
MR. SCHOENFELD: Steve, what exhibit is this?
THE WITNESS: You want this back?
MR. SCHOENFELD: Yes. Thank you.
(Exhibit Number 196 was marked for identification.)
Q (By Mr. Schoenfeld) Mr. DeOcampo, did you author this e-mail dated June 26th, 2002, to Bob Russell, Terry Lang, and Larry Walling?
A It appears so, yes.
Q Okay. You write: Bob, due to time constraints, I will write draft Mod Number 3 for the hauling of -- of material outside the park, period.
This concerned the burn pit work, correct?



A True.
Q And that work was done in June and July of 2001, correct?
A Correct.
Q So approximately one year after the work was done, the government is getting around to writing the modification, correct?
A Yes.
Q And the modification was ultimately issued, correct?
A Ultimately issued, correct.
Q So at -- even though Remcon performed the work without a formal written modification, the government agreed Remcon should be reimbursed, correct?
A Correct.
Q And did, in fact, to some extent, reimburse Remcon for the effort, correct?
A I believe we came to a conclusion for the total amount.
Q In the second paragraph of this e-mail, you write to Bob Russell, quote, In addition, you need to start the draft Mod Number 4, which should include -- and then you have four separate items there.
Do you see that?
A Yes.



Q Number 1 is raising the upper parking lot with backup cited above; 2, hauling excess material to Wolverton with backup cited above; 3, sorting of materials that you and Jeff already negotiated with backup cited above; and, 4, additional surveying that you negotiated with G and K, include backup cited above.
Are those the four items that ultimately materialized into Exhibit 64?
A The last mod that you showed me?
Q Yes.
A Yes.
Q Was it the responsibility of Bob Russell, your lead inspector, to draft modifications --
A That's part --
Q -- under the arrangement with the NPS?
A That's part of his job requirement, yes.
Q Why wasn't this work for Numbers 3 and 4 done in calendar year 2001?
A I can't say.
Q And why wasn't it done, if not during the construction season of 2001, during the winter of 2001, 2002, when there was no construction operations to inspect?
A I would have to say that I never took it upon myself at this point in time, I guess.

Page 591

that as Mr. Christensen's initials, is my question?
A I don't know.
Q Okay. Do you know what the ultimate content of Mod Number 3 is? Is it 8 calendar days, or is it working days, or is it 13 calendar days or working days?
A I would have to see the next -- next modification to see what was recognized because --
Q Okay.
A -- working days are considered different than calendar days.
Q That's correct.
Now, I'm showing you Exhibit 105, which is Mod Number 4. And on the fourth page of that document, it -- and this one is signed by both parties. It shows the -- the contract completion date will remain August 24, 2003.
Does that lead you to conclude that Modification Number 3 had 13 calendar days?
A Based upon what was shown here under --
Q "Here" being in Mod Number 3?
A In Mod Number 3. Where it talks about the change accordingly from August 11th, 2003, to August 24th, 2003, those days right there are based upon calendar days.
Q Okay. So your -- your conclusion is when Mod 3 was ultimately issued, it added 13 calendar days,

Page 592

correct?
A Correct.
Q In government speak, quote, unquote, does 8 working days equal 13 calendar?
MR. OLIVIER: Objection; vague and ambiguous.
Q (By Mr. Schoenfeld) Do you use a 7/5 ratio to convert calendar to working --
A I would --
Q -- or vice versa?
A I would usually go to a calendar, look at the dates, which the ending completion date --
Q Okay.
A -- is shown on the modification, and then count working days to arrive at the specific amount of days to be extended --
Q Okay.
A -- as a calendar date.
Q Put that over there. You can put that --
I'm going to show you Exhibit 213, sir.
(Exhibit Number 213 was marked for identification.)
Q (By Mr. Schoenfeld) Do you recognize this as Modification Number 5 entered into between the government and Remcon for this project?
A Yes.

Page 593

Q And this is dated November 20th of 2002, correct?
A I see an October with some punch holes and --
Q You see the date that Mr. Keiscome signed it was November 20th of 2002?
A I see that date as being correct, yes.
Q And it's not effective until he signs it, correct?
A Correct.
Q Could you turn to the fourth page.
A (The witness complied.)
Q In this particular mod, Bid Item Number 140 was added; is that correct?
A Correct. It's a new bid item -- or new item.
Q Okay. Why don't you turn to the fifth page of this exhibit.
A (The witness complied.)
Q You'll see that this is Mod Number 5 as originally -- appears to be originally prepared, not signed by anybody, but there's a handwritten notation in Box Number 14. You see that?
A Yes.
Q Do you recognize that as the handwriting of Terry Lang?
A I can't recognize the writing, but the name at

Page 594

the bottom would be T. Lang.
Q Do you recognize Ms. Lang's signature?
A I can't recognize hardly anybody's signature except for my own.
Q Fair enough.
Ms. Lang writes, September 19, sent September 19, 2002, Remcon would not sign. Resent October 16, 2002, with further clarifications; her signature and then the date of October 29th, 2002.
Does my reading of that language refresh your recollection as to the events that occurred in September and October regarding the proposed content of Modification Number 5?
A I can't remember. I'd have to look at this and see what the circumstances surrounding the nonsignature or acknowledgement of the modification.
Q Do you recall at all Mr. Christensen objecting to some portion or portions of Modification Number 5 as initially submitted to him? Do you -- do you at all remember anything about that?
A Well, based upon what's sent here -- I mean, stated here about it.
Q I understand what Ms. Lang wrote.
A Yes.
Q Do you understand -- do you recall anything as

MR. SCHOENFELD: We'll try it again.
Q (By Mr. Schoenfeld) Why did it take, sir, between August of 2001 and May 20th of 2002 to issue revisions to T7A and T8A? If you know.
A I don't know.
Q Okay. Why did it take until November of 2002 for a modification to be issued by the government to the contractor for revisions issued by the design team six months earlier?
MR. OLIVIER: Objection; vague and ambiguous.
Q (By Mr. Schoenfeld) Do you know?
A I would have to look at the -- the sequence of events that occurred, and so I'd have to say I don't know right now offhand.
Q Okay. Now, earlier, sir, you have said to me, I believe on numerous occasions, that in response to the contractor's request -- strike that.
You recall that the contractor said, We've got revised sheets T7A and T -- T8A, but there's notes referring to sheets T3A through T10A? Remember we talked about that a couple times yesterday?
A I recall that.
Q And you ultimately received a letter or an e-mail from Mr. Christensen saying, Hey, I need these; where are they, correct?



A I believe so, yes.
Q And I believe your testimony was that you looked into it and they were not relevant and didn't need to be issued, correct?
A I believe that may have been my response.
Q Okay. Looking at the sheet marked T8A, which is the next-to-last sheet in Exhibit 213, there is a -- a box that is in a rectangle format that has the words Note 1, and then Note 2. Do you see that?
MR. SCHOENFELD: Counsel, may I approach him and show it to him?
MR. OLIVIER: Just describe to him where it is on the paper.
Q (By Mr. Schoenfeld) (Indicated.)
A I see it.
Q Would you read Note Number 2 out loud, please. Or would you like me to do it?
A Oh, you could read it back. You probably have better eyesight than I do.
Q Note 2, colon, sheets T3A dash T10A were previously submitted as a clarification for trail step grading in August 2001 and replace sheets T3 hyphen T10, period. The revisions shown on this sheet are revisions to sheet T8A, period.
Does this at all refresh your recollection,



sir, as to whether the designer issued to the government for issuance to the contractor revisions in the form of T3A through T10A?
A I don't have that information, but I -- I believe based upon some of the writings earlier that may be the case.
Q Were sheets T3A through T10A ever actually given to the contractor?
A I don't know that.
Q When the design team looks at the entirety of the trail and issues eight separate sheets with revisions on them by noting an A next to the original sheet number, why is it the government only issued two of those eight sheets to Remcon, specifically for the Sherman Tree Trail?
MR. OLIVIER: I'll object; lack of foundation.
Q (By Mr. Schoenfeld) If you know.
A Once again, it's all speculation and belief.
Q So you don't know?
A I don't -- I can't say correctly or with any concrete --
Q Fair enough.
(Exhibit Number 214 was marked for identification.)
Q (By Mr. Schoenfeld) I'm going to show you



Exhibit 214, Modification Number 6, signed by Mr. Keiscome only on October 18 of 2003. You see that?
A Yes.
Q And in Box Number 14, it is typed, quote, this is a unilateral modification. Do you see that?
A Yes.
Q And in Box Number 3, there's the stamp February 18, 2003, showing that this is an actually issued modification, correct?
A Correct.
Q First of all, sir, to the best of your knowledge, while Remcon was still working on this project, is the last modification issued this Number 6?
A I cannot say without looking at signatures or knowing if there's another Mod 7.
Q Okay. Now, this is the first modification we've seen that was identified as being issued unilaterally, correct? None of the other ones noted that?
A None of the other ones.
Q Okay. Why did this modification get issued by the contracting officer unilaterally?
MR. OLIVIER: Objection; calls for speculation.
MR. SCHOENFELD: I'll restate.

# EXHIBIT 1H

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

show up on Tuesday, August 7th or so to evaluate the differing site condition issue, did you?
A No.
Q Very good.
You'll note in Mr. Russell's report, on the back page, sir, of Exhibit 83, Mr. Russell writes, Joanne Cody, slash, Andrea Lind reviewed blasting, slash, drilling area, cut and fill slopes in upper parking lot and leach -- that's L-E-A-C-H -- fill area. Joanne stated that slopes steeper than 2 colon 1 -- which I'll say now as 2 to 1 -- in the upper parking lot would be okay because of existing conditions.
Did you understand that Joanne Cody had the right under whatever empowerment she had to modify the design?
A I would probably concur with her, because as the designer, they make recommendations to me also.
Q Did she have the ability to modify the design by direction to the contractor in the field?
A No.
Q Who had the ability to modify the design by direction to the contractor?
A Only the CO.
Q "The CO" being Mr. Keiscome, correct?
A Mr. Keiscome.



Q Did Mr. Keiscome validate in writing to the contractor changing the slopes as Joanne Cody identified by Mr. -- in Mr. Russell's report here?
A I don't think it was ever formally mod -- modified.
Q Did the contractor comply with this direction?
A I don't know.
Q The next sentence here writes, Joanne tentatively agreed to move the leach field 30 feet northerly because of large sugar pine 5 foot in diameter not shown on the plans. She said that moving the leach field would have to be confirmed with the Denver Service Center and the designers. Was that done?
A I assume so.
Q Do you know one way or the other?
A I don't know one way or the other.
Q You --
A I --
Q Go ahead.
A I -- I'm assuming right now because there is some things that came up later on where the leach field came in question once the surety took over. And --
Q Two years beyond this or three years actually beyond that?
A Yeah, I'm not sure if it was the 30 feet, as



this says right here, tied together. I can't positively say that, but I know --
Q Okay. Let's --
A -- that question arose once again.
Q I apologize, I interrupted you.
Let's make the record clear. Remcon worked the summer of 2001 and the summer of 2002, did not return for work in the summer of 2003, and was terminated for default, correct?
A Yes.
Q And the surety hired a replacement contractor by the name of AG Construction that performed work during the summer of 2004, correct?
A Yes.
Q And is the leach field relocation that you're talking about in your prior response that which was performed by AG Construction sometime during the summer of 2004?
A I believe what we found was that we have -- I forget what they're called, but they're domes that allow the water, the effluent, to be spread over a certain area. What was found was that they was short on that material, and I don't know if that's tied back to this right here.
Q By "this right here," you mean the portion I



read out of Exhibit 83, correct?
A Yes, the 30 feet north.
Q Now, do you recall on this project that there were a series of issues that arose that caused the design to have to be modified, boulders, roots, trees, rocks, mistakes in the design that caused alignment to have to be shifted of the access road of the Sherman Tree Trail?
A I believe there was one area, and I think it's the one in question, where it came out, the designers tried to look at ways to revise that and it wouldn't work, I think, from my recollection.
Q But there were issues that arose that affected the design in which clarifications had to be issued by the design team, correct?
A I don't know if that was ever issued as a clarification. I think it was stated that it would not work because of safety-citing factors.
Q Okay. I used the word clarification. I didn't mean to be pejorative.
The design, as set forth in the original contract documents, was modified in the as-built scenario in order to make the job fit, correct?
A No.
Q That never happened?
A I think it's -- it's -- based upon what we see

on the site right now, there are some variations in that road alignment.
Q Do you know whether Mr. Giller directed Remcon to make modifications in order to move the job forward because of the multitude of issues that were then pending but unresolved when he showed up to the job on --
A I don't know --
Q Let me finish -- on about July on 10, 2002?
MR. SCHROEDER: Objection to form.
Q (By Mr. Schoenfeld) You may answer.
A I cannot speak to what transpired between Mr. Giller and Remcon.
Q Okay. Let me show you a document we'll mark as Number 84, please.
(Exhibit Number 84 was marked for identification.)
Q (By Mr. Schoenfeld) It's a one-page document. It's a printout of an e-mail. It also has some handwritten information on it. First of all, sir, this was provided to us from DHM.
A Uh-huh.
Q You'll see at the bottom --
A Yes.
Q -- by -- on their Bates stamp.
It's an e-mail from yourself on August 8th of



2001 to Andrea Gregor at DHM with a cc to Joanne Cody, Ray Todd, and Bob Russell. Do you see that?
A Yes.
Q Is Andrea Gregor someone different than Andrea Lind?
A I believe they're one and the same. One is a marriage name -- married name or something like that.
Q Okay. Did you author this e-mail?
A This is mine.
Q Why did you author it?
A Let me read it first, okay?
Q Please do.
A (Reviewed documents.)
Okay.
Q Why did you author this and send it to the people you did?
A Because I was questioning the designers in terms of how they came up with quantities. When I start getting occurring overruns that are questionable like this, I have to find out what they were thinking when they designed this project.
Q What do you mean "questionable"?
A Well, whenever you have 350 percent overrun on an estimated quantity.
Q Well, did it mean that the contractor was



stating something that was wrong or just the -- the amount by which it exceeded was so high, it gave you pause as to whether the design was accurate?
A I have to see what -- what was faxed to them. Do you have that?
Q This is what I got from the government -- from DHM's files.
A Uh-huh.
Q All right. I don't know what you faxed to them.
A And I don't recall right now either.
Q What leads you to conclude that you faxed them something?
A Because I think it says I need your fax number so I can send you this request.
Q Okay. Let's look at the text of what you wrote. The 200Q project -- that's this project, right?
A Yes.
Q -- is beginning to questionable -- to questionable overruns and quantities.
A Well, I miss words.
Q That's okay. That happens all the time.
Quote, I need your help on where and how DHM thought items would be paid. The CO -- that refers to Mr. Keiscome?



A Yes.
Q -- is already questioning why Pay Item 26 is almost 350 percent over the estimated quantities.
Do you remember what Pay Item 26 was?
A No, I don't.
Q Is that the hauling out of the --
A It may be. I'm not sure.
Q Okay. What -- what did he communicate to you? Something in writing or was it oral?
A It was probably oral. I know that whenever we have large pay items like this -- because that's when I had to go out and negotiate, because I don't go out and negotiate unless I talk with the CO first --
Q Okay.
A -- you know, and -- and I don't have access to him 100 percent of the time.
Q Do you recall Mr. Keiscome in August of 2001 commenting to you that he was considering terminating this project for the convenience of the government because of the quantity overruns that you were referring to in this e-mail?
A I don't recall anything like that.
Q Did he ever communicate anything to you on that subject at any time?
A I think just before termination, he was -- he

Page 347

intent of the government with respect to this project to pay the -- the contractor timely for the performance of work?

A Yes.

Q Indeed, are you aware of certain responsibilities that you've been trained that the government has the duty to pay the contractor timely for work performed?

A Yes.

Q On this project, do you believe that the government paid the contractor timely for work performed?

A Yes.

Q Does that include the extra work that the contractor performed that the government recognized as extra work?

A Mr. Christensen notified me of certain items that he felt was increases. At that point in time, I looked at them and tried to determine if they were true.

Q I will ask you to assume that the excess excavation, which is set forth in this Modification Number 4, was performed in the summer of 2001. Okay? I ask you to make that assumption. And that this Modification Number 4 is not issued until September of 2002 compensating the contractor for the extra work performed in 2001.

Page 348

Based on your understanding of your responsibilities as the COR, is it your perception that the contractor was paid timely for that extra work --

MR. OLIVIER: I'm going to object.

MR. SCHOENFELD: Let me finish.

Q (By Mr. Schoenfeld) -- with the assumption the work was done in the summer of 2001?

MR. OLIVIER: I'm going to object on several grounds; one is it's a compound question and also vague, ambiguous, and calls for speculation.

Q (By Mr. Schoenfeld) You may answer, sir.

A My recollection is that we were to run cross sections on the material, Number 39. I believe this was to haul the material up to Wolverton. At that point in time, I believe it was the contractor's responsibility to establish original ground or cross section through the area that we were going to deposit this material. I asked for finished cross sections through those same areas so that I might be able to run in average end sections to determine the amount of material placed at this burial site or this dump site.

I don't believe I ever got any of those. It made it very difficult for me to make a determination as to how much material was deposited at this location. That's my recollection.

Page 349

Q Okay. Why did it take until September of 2002 to issue the modification for this Item Number 39?

A Once again, I would have to rely upon Mr. Russell at that point in time to provide me information as to the quantity that was deposited.

Q Okay. You recall during July of 2001 that there was a determination made to relocate portions of the access road in the deep cut section?

A I seem to recall, as I stated last week, I believe that there was an alignment that the designers looked at as a proposal from Remcon. We tried to make an adjustment. I don't think we could make that adjustment with the safety -- the siting distances required.

Q So it's your perception that a realignment was not done?

A It -- it was not supposed to be done.

Q Do you recall during the summer of 2001 a series of revised drawings being issued by DHM and Martin and Martin (sic) realigning the road, the access road?

A That may have been the drawings that I was referring to. I don't think that was issued out of our office, though.

Q Did you or anyone, to the best of your knowledge, on behalf of the National Park Service give direction to your designers to issue revised drawings to

Page 350

the contractor to build any portions of the project during the summer of 2001?

A I never gave them directions.

Q It's your testimony that -- strike that.

Item Number 137, which is the second item on the fourth page of Exhibit 64, compensated the contractor for restaking the access road between Stations 25 and 30. Do you see that?

A Yes.

Q And that was basically surveying work that was being compensated here, correct?

A I was reading this up here. Could you restate it, please.

Q That's for surveying efforts, correct?

A Yes, that's what it says up here.

Q Where was that work done?

A I'm not sure. I can't recall.

Q Isn't it true that work was done in July of 2001?

A That may have been.

Q If it's true that was done in July of 2001, why was it not until September of 2002 that a modification was issued to compensate the contractor for that extra work?

MR. OLIVIER: Objection; calls for

center line adjusted and -- I -- I can't read whatever the next designation is -- max of 11 1/2 feet right from staked location.

Do you recall being on-site on June 26th and communicating with Mr. Christensen as reflected in what Mr. Russell wrote?

A I believe this is the tree next to the pull-off, and Mr. Christensen and I did agree upon an adjustment there. And verbally he gave me his word that it was a no cost, so I assumed that we were good on that to make the -- to try and save that tree.

Q Okay. Just so that the record is clear, one of the goals of the National Park Service in causing this improvement to be done was to minimize the impact or effect on trees and rocks and rock outcroppings that were perceived to be aesthetically desirable to maintain, correct?

A We tried to preserve as much as the natural setting as possible to enhance the visitors' experience.

Q Correct. And in that regard, if a tree was in the way that was perceived desirable to maintain, an effort was undertaken to avoid impacting the tree if it was reasonably possible, correct?

A At that location, it appeared as though it would not be any big problem.



Q Okay. And the relocation was up to 11 1/2 feet in that specific location; is that right?

A I'm not sure of that.

Q Do you have any reason to believe what Mr. Russell wrote here was not true and correct?

A I have no reason to believe that.

Q Okay. And independent of your actually physically being there and making the decision that's reflected here, as part of your standard business practice, you received these daily reports from Mr. Russell, correct?

A Yes.

Q And you reviewed them before sending them off to be filed, correct?

A Yes.

Q And if you noted something that was inaccurate, it was your standard practice to communicate that, correct?

A Correct. But in this case right here, I wouldn't know if it was 11 1/2 feet or whatever.

Q But at the time, that being in late June of 2001, you were intimate with the facts and you knew what you had agreed with Mr. Christensen in the field, correct?

A I knew what he and I had agreed upon, yes.



Q As a result of this issue arising on June 26th, did -- was it necessary for the access road in this location to be restaked?

A I can't recall. I think it was already re -- I think it was already staked.

Q It was staked, but it needed to be restaked as a result of that tree being in the way, correct?

A I'm not sure. I'm -- I -- I think that we may have looked at it, and we just kind of verbally agreed. I can't recall right now.

Q You wouldn't have expected the contractor to have staked the road different than what was set up in the drawings until there was an agreement to relocate it, correct?

A You lost me on that one.

Q Okay. The contractor had a responsibility to build the road as designed, correct?

A Correct.

Q And to the best of your knowledge, the contractor hired a surveyor to stake the road in accordance with the design, correct?

A Correct.

Q And when you got out there and saw that this tree was in the way, the staking that was in place was the design staking, not revised realignment staking;



isn't that correct?

A That's what I would have to assume.

Q Okay. We'll mark as the next exhibit, sir, Number 173 --

(Exhibit Number 173 was marked for identification.)

Q (By Mr. Schoenfeld) -- two-page exhibit dated July 2nd -- pardon me -- 2001.

Did you receive the first page, which is the -- an e-mail from Bob Russell to yourself, regarding the offsets and relocation as a result of the tree that we just saw discussed in the June 26th, 2001, daily report?

A (Reviewed documents.)

I would have to assume they're correct.

Q Okay. Was it your intent when you walked the site with Mr. Christensen on June 26th that he relocate the road in accordance with the discussions that you had?

A In that location, yes.

Q And when you received Exhibit 173, did you agree that the offsets that were set forth in this document were the appropriate offsets that Mr. Christensen should undertake to achieve that, which you communicated on June 26th?

A I would assume that seeing that Bob Russell

Page 375

was out there and he looked at it, yes.
Q Okay. Did you respond to Exhibit 173 in any manner, shape, or form?
A I can't recall right now.
Q Turning to the second page of Exhibit 173, sir, do you recognize the handwriting?
A No.
Q You see that these documents -- these two pages, Exhibit 173, were produced by the government, and they are consecutively Bates-stamped? Did these come out of your file, sir?
A I don't know. I can't recall.
Q Am I correct, sir, that the distance within which these offsets had to be undertaken to avoid the impact to the tree was approximately 330 feet in length, lineal foot?
A As shown here, yes.
Q Now, there was a movement of this access road between Station 10 plus 39 and 10 plus 98 of between 10 and 11 1/2 feet; is that correct?
A Between 10.30 -- 39 you're saying and --
Q 10 plus 98. You see that was the -- that was the largest area of relocation, correct?
A Right. Correct.
Q Are you more comfortable with me saying

Page 376

realignment rather than relocation? I'm using the terms interchangeably. I don't mean to convey a different meaning, and I want to use a meaning that you're most comfortable with.
A Either way, as long as it's consistent.
Q All right. I'll try to be consistent.
A So you're going to use what word?
Q I'll try to use realignment. Okay?
When this road was realigned, recognizing we're building on a side of the hill, was the road realigned into the hill or away from the hill?
A Away from the hill.
Q Did that require the contractor, in building the access road, to use more fill to -- to build up the road?
A It would require, I would assume, more fill.
Q Okay. Was there any modification issued to compensate the contractor for bringing in that fill and installing it as required by the contract in order to build the road as it was realigned?
MR. OLIVIER: Objection; incomplete predicate and vague and ambiguous.
Q (By Mr. Schoenfeld) You may answer.
A My recollection is that Mr. Christensen and I agreed upon that it would be a no cost, and based upon

Page 377

that, I took him for his word on that.
Q Do you know if there's ever been any request for additional compensation for the realignment reflected in Exhibits 172 and 173?
A I don't recall anything specific.
Q Okay.
(A discussion was held off the record between Mr. Schoenfeld and Mr. Christensen.)
MR. SCHOENFELD: Let me show you Exhibit 174, sir.
(Exhibit Number 174 was marked for identification.)
Q (By Mr. Schoenfeld) Exhibit 174 is a one-page document, oversized, entitled Access Road Cross Sections. And it has the subsheet number of US19 on it. Do you see that, sir?
A Yes.
Q What do you recognize Exhibit 174 to be?
A I would have to say this is a -- part of the contract documents.
Q Is this part of the original issued-for-construction set that Remcon bid upon? Is that your understanding?
A It appears to be.
Q Okay. Just looking at the document for

Page 378

identification purposes, on the left-hand -- there are three sets of cross sections on this document at the top and the bottom for a total of six total, right?
A Yes.
Q Okay. And to the left of each cross section, there is numbers in -- in different stages of five apart from each other. Do you see that? The left-hand side of each (indicated). And the same numbers appear on the right side of each cross section, correct, the columns?
A Yes.
Q Are those the elevation above sea level, as you understood them -- understand them, I should say?
A Yes.
Q Okay. And then there are different stations identified on the cross section where it shows the actual elevation of a particular portion of the access road at 50-foot increments starting at Station 10 plus 50 all the way to Station 13; is that correct?
A Correct.
Q Now, when I look at Exhibit 173, sir, which you still have in front of you, you'll see that it's Station 10 plus 60, the road was realigned 11 1/2 feet, correct?
A So shown, yes.
Q Okay. For purposes of description, sir, was

the road realigned, as I'm looking at Station 10 plus 50, assuming that read 10 plus 60; was it located 10 feet to the right -- excuse me -- 11 1/2 feet to the right or 11 1/2 feet to the left, as indicated on Exhibit 174?
A If the stationing is increasing in increments of 50 going into the project site, then the road would have shifted to the right.
Q Okay. So for the purposes of me describing this for the record, if I was going to ask you to draw an arrow on Exhibit 174 under the heading 10 plus 50, looking at the document, you would write an arrow that would be pointing to the right as to the location of where the road would be shifting 11 1/2 feet, correct?
MR. OLIVIER: Objection; mischaracterizes the exhibit and the testimony.
MR. SCHOENFELD: I'll substitute the word realignment for the word shifted.
MR. OLIVIER: Same objection.
Q (By Mr. Schoenfeld) Go ahead.
A Restate, please.
Q The arrow -- if you were going to draw an arrow on Exhibit 174, you would draw it pointing to the right side of the page as to the location of where the road was being realigned 11 1/2 feet in that locale, correct?



A Correct.
Q Okay. Let me show you Exhibit 175, sir.
(Exhibit Number 175 was marked for identification.)
Q (By Mr. Schoenfeld) Before we actually look at Exhibit 175, can you answer me this: Were revised cross sections taken on behalf of anyone of the National Park Service or its design team in light of the road realignment that we just discussed in Exhibits 172, 173, and 174?
A I don't believe so.
Q Why not?
A Based upon my conversation with Mr. Christensen, I believe that we agreed that it would not be necessary since it would be a no cost.
Q I understand. Independent of whether there was additional costs associated with it, am I correct it's the policy of the National Park Service and it's a duty of you, as the COR, to have the contractor build the project according to the contract documents?
A Yes.
Q Okay. And in this instance, there was a realignment to the contract document right-of-way for the access road to be built, correct?
A Correct.



Q And if someone that hadn't touched the project or seen the exhibits we've just examined were to go out and evaluate did Remcon build the job in accordance with the issued-for-construction documents, they would conclude that Remcon didn't, because the road is in a different location than the design required, correct, in this instance?
A In this instance, yes.
Q Do you recall that there was a contention asserted by the National Park Service after Remcon stopped work on the project that Remcon did not build the road as required by the contract documents?
A Restate, please.
MR. SCHOENFELD: Read it back, please.
(The reporter read page 381, line 9 through line 12.)
THE WITNESS: Yes.
Q (By Mr. Schoenfeld) Were you involved in any discussions with anybody to evaluate the question, did Remcon build the project in accordance with the contract documents?
A Could you be more specific, please.
Q Yeah. When that subject matter came up, did you have any discussions with anybody on the subject?
A I believe I may have -- may have raised this



right here, this location right here.
Q Okay. You may have. Do you know specifically you did?
A I can't recall.
Q You recall a survey was commissioned by the National Park Service after Remcon last performed work on the project to survey where the road was built?
A It was not commissioned by me.
Q I didn't ask that. Do you recall that a survey was commissioned by the National Park Service to determine where Remcon had built the access road?
A I seem to have heard -- heard that, yes.
Q And who do you understand asked for that survey to be performed?
A I'm not sure.
Q Did the contracting officer?
A I don't know.
Q Did Mr. Giller?
A I don't know that either.
Q Did you, once you became aware of that survey was being done, indicate to anyone that you had -- had a discussion with Mr. Christensen as reflected in Exhibits 172, 173, and 174 to realign the road in a certain location?
A I may have. I'm not -- I'm not sure. I -- I

believe I did.
Q Do you know whether the surveyor was given the information that you, as the COR, had communicated to the contractor it was okay to realign the road in the locations reflected on Exhibits 172, 173, and 174?
A I've never talked to the surveyors.
Q Did you furnish anything in writing to Mr. Giller or to Ms. Cody or to Mr. Keiscome that gave them the written information reflected in Exhibits 172, 173, and 174 so that they could understand what you had communicated with the contractor in June and July of 2001 regarding the road realignment?
A I can't say for sure, but the dailies would -- would have shown that.
Q What dailies?
A The dailies that you showed from me, Exhibit --
Q The various exhibits?
A Yes.
Q Okay. So the dailies you're referring to are Mr. Russell's dailies, correct?
A Yes.
Q But how -- how was it Mr. Russell would know if you had communicated something to Mr. Keiscome or Ms. Cody, inasmuch as you were all in Denver, not on the



job site?
A He would not know.
Q Okay. So if it's not reflected in Mr. Russell's dailies, where would it be reflected if you had such a communication with Ms. Cody, Mr. Giller, or Mr. Keiscome on that subject?
A I can't recall if I made any statement to them in writing or not.
Q Okay. And you don't know that you made any oral communication; you may have, but you just don't remember?
A I don't recall.
Q Okay.
A I can't say specifically.
Q Other than the issue we're looking at between Station 8 and Station 13 regarding the road realignment, was there any other portions of the access road in which you were involved in some discussions about realignment?
A As I stated previously, I believe, like you said, through the big deep cut, we looked at that as a realignment, and the designers looked at -- at a design on that and determined that it could not be achieved.
Q What could not be achieved?
A The realignment based upon the siting safety factors.



Q So it's your recollection that there was one or more issues that arose regarding whether the road should be realigned in the deep cut section?
A There may have been, yes.
Q And your recollection is that when those issues arose, for whatever reason or reasons, the designers examined the subject matter and concluded, no, the road should not be realigned?
A I believe that's the case.
Q What were the reasons or reason why that subject was even considered?
A I believe Mr. Christensen brought it to our attention.
Q What is it he brought to your attention?
A That the road right there was a problem.
Q What was the problem or problems?
A I can't recall.
Q Were those problems or problem communicated in writing?
A I'm not sure.
Q Did you participate in any meeting or meetings regarding the subject matter with Mr. Christensen?
A I can't recall.
Q Did you participate in any discussions with Mr. Russell on the subject?



A I can't recall that either.
Q Did you participate in any discussions with -- internal only to the National Park Service, such as, at that point in time, with Mr. Todd, Ms. Cody, Mr. Keiscome, Mr. Vance, or anybody else affiliated with the project on behalf of the National Park Service?
A I may have with Mr. Todd and Ms. Cody.
Q Did you ever author any communications on the subject?
A I may have. I'm not sure.
Q Did you ever receive any communications on the subject?
A I may have, and I'm not sure about that either.
Q Did you ever receive any communications whereby Ms. Cody directed the designers to issue revised drawings indicating realignment of the road between Stations 24 and 30?
A I'm not sure of that.
Q I ask you to look at Exhibit 129.
I'm done with those, sir.
Did you author this e-mail, sir? For the record, it's an e-mail from Willie DeOcampo to Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Scott Ruesch, and Jack Vance with a cc also to Bob Russell dated

July 2nd of 2001.
A (Reviewed documents.)
Q My first question is, sir: Did you -- did you write this e-mail?
A It appears so, yes.
Q Okay. You're starting to read it. I want to break it down in parts with you, so we'll read it together. Okay?
A Okay.
Q The e-mail reads: Joanne, while at Sequoia last week, some problems surfaced concerning alignment. They are:
I'll pause for a moment. Is the reference to last week the reference to the -- in part, what we saw in Exhibit 172, your site visit? Exhibit 172, Mr. Russell records that you're on-site on June 26th.
A Right.
Q I've shown you now Exhibit 175, which shows that you were also on-site on June 22nd; is that correct?
A Correct.
Q Let's just do this right now. I'm going to show you Exhibit 176.
(Exhibit Number 176 was marked for identification.)
Q (By Mr. Schoenfeld) Mr. Russell's daily



report for June 28th. Were you also on-site on that date?
A Yes.
Q Going back to Exhibit 129, sir, is the reference to while at Sequoia last week in the first line of your e-mail in reference to your visit on June 26th through at least June 28th of 2001?
MR. OLIVIER: I object to the reading of the document.
Q (By Mr. Schoenfeld) You may answer.
MR. OLIVIER: I ask Counsel to read it accurately, please.
MR. SCHOENFELD: While Sequoia Kings Canyon last week.
Q (By Mr. Schoenfeld) Did you mean while at the project site?
A Yes.
Q Thank you.
So is the reference to "last week" reference to at least your presence on June 26th, 27th, and 28th?
A I have to assume so, yes.
Q Okay. Let's go back to Exhibit 175 for a moment, sir. Exhibit 175 is your visit on June 27th. You see Mr. Russell in his daily report reflects you were present?



A Yes.
Q Turn to the back side, sir.
A (The witness complied.)
Q Under the Status of Work at the top of the page, Mr. Russell writes: Surveyors continued laying out access road center line and profile. Surveyors expressed concern regarding center line location between Station 24 plus 46 and 30 plus 18. Center line was approaching right edge of cleared area.
Do you recall, based on your presence that date, sir, that that is a correct reflection of what was communicated by the surveyors?
A That may have been.
Q Do you have any reason to believe that's not a correct reflection of what was communicated on that date by the surveyors?
A I'd have to say Mr. Russell documented this the way he recalled it, so, yes.
Q Okay. Under the heading Unforeseen Developments on Job Continued, Mr. Russell wrote --
MR. OLIVIER: I -- okay.
MR. SCHOENFELD: Are you missing an exhibit?
MR. OLIVIER: No. I just put it away, I think.
MR. SCHOENFELD: Okay.



Q (By Mr. Schoenfeld) Mr. Russell wrote: Work with surveyors to realign center line of access road within. So that the road would be located within the cleared area, surveyors recalculated suggested -- suggested center line location to fit the site and will restake tomorrow so that Willie can review.
You see that?
A Yes.
Q Okay. Do you recall being involved in communications whereby the subject matter that I just read was discussed?
A That was probably the case, yes.
Q Okay. Let's look at Exhibit 176 now, which is Mr. Russell's daily report for the next day, June 28th of 2001. Noted that you are present on the site, correct?
A Yes.
Q Under the Status of Work, the second line reads, Restake suggested center line of access road between Station 24 plus 46 --
A Are we on the front?
Q Yes, sir. Second line of the front.
Restake suggested center line of access road between Station 24 plus 46 And Station 30 plus 18 for review by Willie.
Do you see that?

A Yes.
Q Do you recall that's what happened that date?
A I would have to assume that's correct.
Q Okay. Would you turn to the second page -- back side, I should say. Under the heading Other Comments or Pertinent Facts Regarding Job, I want to focus your attention on the third line.
It says, quote, Willie reviewed suggested realignment for access road, parentheses, Station 24 plus 46 to Station 30 plus 18, and said that he would review it with Joanne Cody in Denver next week. I explained that a quick decision is needed so as not to delay the contractor. He agreed that if the alignment is not adjusted, additional trees and boulders will have to be removed, period.
Does this refresh your recollection as to what actually transpired on the date referenced and your communications concerning it?
A That sounds to be correct.
Q I'm done with those exhibits right now.
Go back to 129, which you have before you. Perfect. Is Exhibit 129 your attempt to deal with the issue as reflected in Exhibit 176?
A Based upon the first sentences, yes.
Q Okay. Reading the text now of your e-mail in



129, we're going to break it down into pieces. I will read it. Upper Sherman Road, surveyors laid out center line and found two places that conflict with existing conditions, period. One area is located near --
MR. OLIVIER: Objection. Field condition.
MR. SCHOENFELD: Did I miss the word -- did I miss the word "field"?
MR. OLIVIER: Yes.
MR. SCHOENFELD: I'm sorry. Existing field conditions. Thanks. I guess I'm blind in one eye and can't see out of the other.
Q (By Mr. Schoenfeld) Continuing: One area is located near Station 28 to 29. The center line appears to swing further out than our drawings indicate, period. The clearing has been performed per the drawing; however the center line as staked will make it necessary to clear additional trees and remove signature-type boulders, period.
Was it your intent in writing this that I just read, in part, to communicate that the surveyors had staked the road as per the design at the time you viewed it?
A My recollection of this is that it showed that the -- just like it says here, the center line was further to the right.



Q But was it your understanding and perception, when you were at the job in late June, that the surveyors had staked the road properly; in other words, where the design indicated it was to be staked?
A I would have to assume so. I -- I -- I can't state for -- say for sure, because you'd have to have a transit and so forth, and I didn't do that.
Q Did you have any perception that it was improperly staked when you were there in late June of 2001?
A I would have no reason to assume it was.
Q Did anyone on behalf of the National Park Service or your inspection team indicate to you that they believed it had not been properly staked?
A I can't say for sure.
Q Well, if you had come to the conclusion or at least received information that the staking by the contractor's surveyors was improper, isn't that important information to you?
A Yes.
Q And you would have -- in the ordinary course of your performance and duties, have noted that in writing, correct?
A Yes.
Q And you would have expected Mr. Russell to



have done so, as well, correct?
A Correct.
Q Are you aware of any such written record, either by Mr. Russell or yourself on that subject?
A I assume that these dailies right here kind of reflect that.
Q That it was staked properly?
A Yes.
Q Okay.
A I would assume that.
Q Continuing in Exhibit 129, the e-mail reads: Bob and figure the -- the road center line can be shifted in order to make this work and prevent delays, period.
Can you tell me what you were trying to write there? I don't understand.
A Neither do I. I assume that what we're trying to say -- or what I'm trying to say here is that Bob --
Q Meaning Bob Russell?
A Bob Russell, yes -- told me he could -- it would work to move the road.
Q Okay. Why are you communicating this information to Joanne on this date, July 2nd?
A I believe I was trying to look for concurrence or whatever.
Q Because of her involvement with the design, if

Page 395

the design had to be modified, she needed to be notified about it?
A She needed to figure out if it could be corrected --
Q Okay.
A -- without any problems.
Q And the other people you identified in the e-mail were all people who were important to receive this communication, from your perspective; is that correct?
A Yes.
Q All right. Let's continue, then, in the e-mail, Number 129. The surveyors will send you a revised layout. The contractor believes our cut and fills will not balance, period.
Was your visit on July -- excuse me -- on June 26th to 28th the first time you became aware of a perception by the contractor that the balance job, other than the 6800 extra yards and the 2,000 -- that had to be hauled to Wolverton and the 2,000 yards that come out of the burn pit was no longer going to be balanced?
A I would have to say yes.
Q Was one of the purposes of this e-mail your intent to communicate to the contracting officer that additional quantities would need to be compensated to the contractor if this road realignment occurred, because

Page 396

there will be excess material to be handled?
A This would be my attempt to go ahead and notify people of the possibility of this.
Q And this included Mr. Todd, the project manager; Ms. Cody, the person most responsible for the design; and Mr. Keiscome, the contracting officer, correct?
A So shown on the document.
Q And that's why you listed them, correct?
A Correct.
Q Did you receive a revised layout from the surveyors that you reflected in this e-mail of July 2nd?
A From which surveyors?
Q Any surveyors. You write: The surveyors will send you a revised layout. Did you receive the revised layout from the surveyors?
A It may have went to Joanne, see, and I wrote --
Q Is Exhibit 173 the revised layout that you referred to in Exhibit 129?
A No.
Q You note that Exhibit 173 is dated July 2nd of 2001, which gives you the offsets for the various different stations where this issue -- strike that. This is not the same issue. My mistake.

Page 397

Did you, on behalf of the National Park Service, retain one or more surveyors to go out to the project site to prepare a revised layout as a result of this issue arising?
A I had no surveyors, no.
Q Did the contractor have a surveyor available to use on this issue in the summer of 2001?
A The contractor had surveyors, yes.
Q Is Item Number 137, restaking access road center line, that is set forth in Exhibit 164 the resurveying effort that is the subject of this issue? On the fourth page, he identifies the station, once again, between 25 and 30.
A I would have to assume this is it, yes.
Q Okay. So is your memory now refreshed that the restaking effort occurred in July of 2001, but it was not compensated to the contractor until sometime after September of 2002 for this issue?
A So shown right here.
Q Is the answer yes?
A Yes.
Q Okay. Do you recall that one of the features that the National Park Service wanted to occur on this project was to make it as balanced a project as possible, to have the cut and fills be roughly equal?

Page 398

A That's the ultimate goal of any design, yes.
Q Okay. Do you recall becoming aware that, in fact, that was a directed responsibility of the design team to attempt to achieve, to achieve a balanced site as much as possible?
A Any design is trying to balance your cut and fills.
Q Okay. I recall your testimony was that you were not the person most responsible on behalf of the National Park Service during the design phase for this project, correct?
A Be more --
Q You were not the person most responsible during the design phase for this project on behalf of the National Park Service, correct?
A I was not responsible for that responsibility.
Q Your understanding is that Joanne Cody served in that capacity?
A Yes.
Q Okay. Let's go back to Exhibit 129, sir. They believe -- in reference to "They" -- let -- let me just read it. They believe there may be 13,000 cubic yards of excess material that will have to be transported somewhere in the park at $15 per cubic yard, period.
To whom are you referring when you use the

Page 403

A Could you be more specific? Because you're -- I'm getting confused on the dates here.
Q Okay.
A The time sequences.
Q All right. As a result of what you wrote here, are you aware of any communication, whether oral or in writing, being given to the -- any member of the design team regarding a perceived error or omission in their conduct leading to the issue arising?
A There may have. I'm not sure.
Q Did you participate in any such communication directly to any design team member?
A I recall meeting with designers. I don't know what transpired. I know that I talked about balances and so forth like that, cut and fills.
Q Did you participate in any meeting in which it was raised by anybody that the National Park Service perceived that the design team had in the design made a mistake between Stations 24 and 30 concerning the center line location of the access road?
A Could you restate that? I didn't quite understand your --
Q I'll try to.
A -- your --
Q Did you sit in any meeting or participate in

Page 404

any conversation in which someone on behalf of the National Park Service said, in substance, to a member of the design team, We believe you've made an error or omission, a mistake, concerning the location of the center line of the access road between Stations 24 and 30?
A I don't think it was -- I may have said something to that effect, not concerning the center line. It may have been in terms of balancing the quantities.
Q Has there ever, to the best of your knowledge, been a claim asserted by the National Park Service against any member of the design team for the issue that's expressed in this e-mail?
A I don't know of any.
Q Okay. Were you -- did you participate in any meeting regarding whether the National Park Service should make a claim for the issue that's reflected in this e -- in this e-mail?
A Your --
Q In other words, did you sit in a room or have an e-mail exchange or conversation with anybody on behalf of -- on behalf of the National Park Service in which one of the subjects discussed was, should we make a claim against the design team for the quantity overrun that's reflected in this e-mail?

Page 405

A I may have stated that. I'm not sure. I'm not sure if anybody listened to me.
Q Okay. To whom did you make such a communication?
A I may have made that statement to Mr. Smith of DHM.
Q Okay. Did you ever make it to a project manager or the contracting officer for NPS?
A They may have been present when I made that statement.
Q Mr. Keiscome ever communicate to you any perception he had regarding whether such a claim should be made?
A I don't think Mr. Keiscome and I discussed that.
Q Mr. Todd ever communicate any observation on that subject?
A I don't think.
Q Did Ms. Cody ever communicate with you her observations regarding that subject?
A No.
Q What about Mr. Giller?
A No. I don't think so.
Q Okay. You then write in Exhibit 129, Martin and Martin need to recheck their calculations.

Page 406

Why is it you're referring to Martin and Martin here regarding checking their calculations as contrasted with DHM?
A Because Martin and Martin (sic) was the road designers.
Q So to the extent that there was a mistake made by the design team, you thought at least of July 2nd of 2001 it was a Martin and Martin mistake as contrasted with BRS or DHM, correct?
A Based upon -- excuse me. Based upon the fact that Martin and Martin was responsible for, in my eyes, the quantities of balancing for the road, yes.
Q What did Martin and Martin do, if anything, in response to this e-mail?
A I believe they sent me some -- their figures for cut and balance --
Q The original --
A -- the fills.
Q -- design data or some revised data?
A I'm not sure.
Q Did you study what you got?
A I've looked at it, yes.
Q What did you do with it?
A I may have ran some calculations my own self.
Q I'm not asking what you might have done. I

Page 435

Q -- you told her about this additional excess material of up to 13,000 yards, correct?
A As shown here, yes.
Q Okay. So that's one week before Mr. Russell records -- or eight days before Mr. Russell records that Joanne told the contractor the material should balance. You see that?
What was the state of the affairs as of July 10? Had something happened whereby that 13,000 cubic yards had no longer been perceived to come into existence?
A I cannot say what Joanne had on her mind at that point in time.
Q You didn't send your e-mail of July 2nd to the contractor, did you, that we've marked as Exhibit 129?
A No.
Q You didn't tell the contractor on or about that time that you thought there was up to 13,000 cubic yards of excess excavation to be handled, did you?
MR. OLIVIER: Objection; mischaracterizes his testimony.
Q (By Mr. Schoenfeld) You may answer.
A No. The contractor is not listed here.
Q Okay. Why not?
A The contractor was telling me there was

Page 436

excess.
Q Did you inform the contractor that you had a perception that there may be a design error or omission as of July 2nd of 2001 with respect to the existence of the excess material?
A I don't think so.
Q Why not?
A I had to look at this stuff and make a determination.
Q Did you make a determination at some point in time as to whether you thought there was a design error or omission on the subject of excess excavation?
A I believe you showed me something about errors and omission once before, so --
Q Did you make a determination?
A No, I didn't make a determination. I just used that word.
Q Okay.
A Or those words.
Q Let me show you Exhibit --
THE WITNESS: So why don't we take lunch?
MR. SCHOENFELD: In a couple moments. We'll finish this subject matter, and then we'll break for lunch, sir.
THE WITNESS: Okay.

Page 437

Q (By Mr. Schoenfeld) Staying on this exhibit on the very bottom portion of it, on the back page, Joanne said -- quote, Joanne said that the adjusted alignment, parentheses, horizontal Station 25 to 30 --
A Where we at now?
Q The very, very last two lines of this --
A Okay.
Q -- Exhibit 184.
Quote, Joanne said that the adjusted alignment, parentheses, horizontal Station 25 to 30, would be faxed to Remcon, surveyors, and to me today.
You see that?
A Yes.
Q Does this refresh your recollection as to whether or not the government did, in fact, issue a revised alignment of the access road between those two referenced stations?
A I don't know who faxed that. Who she was referring to was going to do the faxing.
Q Okay. Does this refresh your recollection that there was a revised realignment issued to the -- Remcon and the surveyors on or about July 10 of 2001?
A I had stated once before that I believe that there was a drawing indicating that. I don't think it worked.

Page 438

Q After I show you this, we'll take a break for lunch.
Is Exhibit 131 the revised realignment that was issued by the government on July 10 of 2001?
A (Reviewed documents.)
Well, it appears to be the contract drawings, but I don't know who issued this.
Q You'll see the cover note to this document issued by Joanne Cody. Do you see that? That's what it reads to you?
A Yes. But I don't know who it was sent to.
Q Okay. Whose handwriting do you recognize as being on the first page of Exhibit 131? Is that Joanne Cody's?
A I don't know what Joanne writes like.
Q Okay. The -- the text, does it read to you: Access road and upper parking lot realignment by Joanne Cody? Is that how you read it?
A That's what it states, yes.
MR. SCHOENFELD: Okay. Let's take a break.
(A recess was taken from 12:01 p.m. until 12:54 p.m.)
MR. SCHOENFELD: Good afternoon. Thank you for being so prompt with the lunch break.
Q (By Mr. Schoenfeld) I'm going to show you

what document I've marked as 185, sir.

(Exhibit Number 185 was marked for identification.)

Q (By Mr. Schoenfeld) A one-page exhibit, Mr. Russell's daily report for July 16, 2001, a fantastic day in the history of the world, by the way. It's my birthday. But I wasn't on-site that day.

A So noted. Fantastic day.

Q Yeah. I want to -- I want to focus your attention on the back side, please.

A (The witness complied.)

Q The very top under the heading Status of Work, it's written by Mr. Russell: Surveyors working on access road spent four hours staking center line revisions between Stations 25 and 30.

Why was Remcon's surveyor, on July 16, 2001, staking center line revisions between Stations 25 and 30, if you know?

A I have no idea.

Q Was Remcon, on or before July 16, 2001, directed by the National Park Service to realign the access road between those stations?

A I don't know that either.

Q Let me show you Exhibit 186.

//



(Exhibit Number 186 was marked for identification.)

Q (By Mr. Schoenfeld) It's a fax transmittal confirmation at the top dated July 19 of 2001. The fax is from Bob Russell to yourself. Do you see that?

A Yes.

Q And the text reads: Willie, the attached drawing is a field revision made to date by Joanne to save a tree. Per Joanne's request, a copy has been issued to Remcon.

Did I read it as you read it?

A Yes.

Q If you will look at the attached pages, do they indicate to you the location of that tree?

A I see a tree, yes.

Q Okay. Is that in the access road location?

A You're talking about the main access road coming in?

Q Yeah.

A Between 25 and 30?

Q Yes, sir.

A I would assume so. I don't see a station down here anywhere, though.

Q Okay. Was Remcon directed, to the best of your recollection, by the National Park Service to make a



field revision, according to this exhibit, to avoid a tree?

A I can't use that word "directed." I note that according to this, they received the drawing, it -- it looks like.

Q Okay. As the contracting officer's representative, when you got notice that someone on behalf of the National Park Service had issued a drawing that was identified as a field revision and had given it to the contractor, what did you expect the contractor to do upon receipt?

A I would have to say complied with what this drawing showed.

Q Comply with what the drawing showed?

A Yes.

Q When the National Park Service at any time during this project issued a drawing showing a revision to what was then existing as the contract drawings, would you expect Remcon to comply?

A Whenever it was issued with a modification, there was always a NPS sketch number attached to it.

Q Okay. What if it was issued without a formal modification from the contracting officer? What was the contractor supposed to do?

A Well, according to our specifications, he was



not supposed to do anything --

Q Okay.

A -- unless the CO --

Q Fair enough.

In the summer, specifically July, of 2001, we've seen a series of documents that talk about the access road needing to be realigned. You saw that material?

A Yes.

Q At the time this information comes up, the contractor is aware that horizontal and vertical realignment is being considered, correct?

A As stated by this one daily, yes.

Q Okay. Is the contractor supposed to do nothing while the evaluative process is being undertaken by the National Park Service with respect to that portion of the road that is under consideration?

Specifically, is he to build it per plan and just keep on going, or when he knows something is being considered, should he -- is he supposed to pause and wait to be told what is going to happen?

A We usually issue a written directive informing the contractor to make that revision.

Q Say that again. I didn't hear you.

A We usually issue a written directive by the CO

Page 455

Q By "these," what are you focusing on? Identify them.
A I'm looking at the contours and these points, 36, 34, and so on, these reference points.
Q Every number that has an X to it you sensed was a changed information?
A I would have assumed that, yes.
Q So every number, actually, that's along the parking area, both on the perimeter and the interior, has an X by it, which means there was some change associated with it; is that correct?
A That could be both -- that could be vertical. I don't know if it is horizontally.
Q Some change?
A When I say vertically, I mean raising in elevation.
Q Understood.
Okay. Let me show you Exhibit 134, which is an e-mail from Andrea Gregor at DHM to Bill Morris, the surveyor, with a copy to Joanne Cody dated Friday, July 27th, 2001, regarding the Sherman Tree Trail. We're no longer talking about the access road or the parking lot. We're talking about the trail. Okay?
A Yes.
Q It says, Hi, Bill, I am sending the trail

Page 456

layout sheets, parentheses, T3, hyphen, T6, end parentheses, the design base, comma, the base, comma -- I'm leaving out some detailed text regarding the drawing itself -- and a trail text file, period. Please let me know if you haven't received all these files, period. I will have to send them in more than one e-mail due to the size of the design files, period.
Do you know if through this e-mail the designer at DHM was communicating additional revisions to the Sherman Tree Trail points to the surveyor so as to permit the surveyor to resurvey that portion of the project?
A I don't know. They may be clarifications. I don't know what these drawings entail.
MR. SCHOENFELD: 135.
Q (By Mr. Schoenfeld) Let me now show you, while you have that in front of you, Exhibit 135, an e-mail dated the next day, which is Monday -- next business day, Monday, July 30, from Andrea at DHM to Bill Morris. This time the cc is not only to Joanne but to Bob Smith at DHM.
It says, Bill, attached is the finished grades for all TP points along Sherman Tree Trail.
What does TP refer to, sir?
A I would have to assume turning points.

Page 457

Q Were there changes made to the Sherman Tree Trail at the end of July that were then communicated to the contractor's surveyor to be built according to?
A According to this, it appears that way.
Q You recall in Exhibit 64, sir, the modification -- can I have those two?
A (The witness complied.)
Q -- that you paid by change -- it's not in there -- to the contractor for resurveying work done by Giuliani & Kull; is that correct?
A Along the access road, yes.
Q Okay. Was there any modification issued to the contractor for that extra work done in July of 2001 before the extra work was done?
A You're stating that was -- was there any modification --
Q Was there modification done -- let me step back.
A Okay.
Q We've seen here a series of realignments, adjustments, changes, revisions, however you want to characterize it, to various portions of the access road, the parking lot, and the trail, correct, through the exhibits, all occurring in the month of July of 2001, correct?

Page 458

A Yeah. Could I see that one about the trail once again?
Q Yeah.
A Make sure that's correct.
Q Absolutely, yeah. Here's 134 dated July 27. Here's 135 dated July 30th.
A Okay. I agree.
Q Go ahead.
Okay. We saw in Exhibit 64 -- Exhibit 64 was the change order, Mod Number 4, that's dated September of '02 -- that the National Park Service compensated Remcon for additional staking in Bid Item 137, correct?
A Correct.
Q And that work was done in July of 2001. Remember we looked at that?
A I believe that was the date, yes.
Q Okay. Am I correct that the work was done before the modification was issued?
A You're talking about the work along the access road, right?
Q Yes.
A Yes.
Q And the work was done because the government had issued revised design documents to the contractor, correct?

Page 471

to these revised drawings?
A To remain consistent, I would say, yes.
Q Thank you.
Let me show you a document we'll mark as Exhibit 191 --
(Exhibit Number 191 was marked for identification.)
Q (By Mr. Schoenfeld) -- produced from the government files. It is dated August 20th of 2001. It's from Andrea to Bob Russell, and it says, Attached are full-sized revision drawings, the follow-up to my fax. Please pass along one copy to Jeff Northrop. The dark clouded areas are the latest changes. The light clouded area is the same as the first addendum I sent you on August 10.
And then there's a second page from Bob Russell to Jeff Northrop at Remcon dated two days later, August 22nd, with a cc to you and others showing a transmittal of the referenced drawings that are on the first page.
Did you expect the contractor, upon receipt of these latest revised drawings through the transmittal of August 22nd, 2001, to build according to the revised drawings?
A Since they were recommendations by the

Page 472

designer, yes.
(A discussion was held off the record between Mr. Schoenfeld and Mr. Christensen.)
MR. SCHOENFELD: I made a mistake. I did not use 190. So we'll keep this as 191. If Steve wasn't here, we'd be in trouble. I will mark, when I get to it, next in order as 190.
Q (By Mr. Schoenfeld) Let me show you Exhibit 145, sir. This is an e-mail from Ray Todd to Andrea and Joanne. I want you to look at the bottom e-mail first. You'll note that the bottom e-mail is identical to the exhibit we marked as Number 144 (indicated).
A (Reviewed documents.)
Let me see that.
(Reviewed documents.)
Q You see that?
A They appear to be, yes, sir.
Q Okay. And in response to that e-mail, Mr. Todd, at the top of the page, writes to Andrea and Joanne Cody on August 15th, quote, Rod would like to issue these changes as a contracting officer's directive letter. Attached is a blank CODL for 200Q, period.
Do you see that?
A Yes.

Page 473

Q Is CODL an acronym for contracting officer's directive letter?
A It's not a standard. I use the COD as a contracting officer's directive.
Q Okay.
A I use it. I don't know what other people use.
Q Were you made aware on or before August 15th of 2001 that Mr. Keiscome, as the contracting officer, wished to incorporate the changes to the trail, the access road, and the upper parking lot as a modification?
A I would have to assume so, based upon this -- this letter. I -- I -- I can't recall if I was aware of it or not.
Q Mr. Todd writes in his e-mail, following what I read, The contracting officer's directive letter should describe the changes, in this case, the minor field adjustments described below and/or in the field notes, the control point changes, the drawings that were issued, et cetera, period.
Maybe you should use an addendum format, parentheses, delete some sheets, add other sheets, et cetera, end parentheses, period. In this case, since the sheets have already been sent to Bob and Remcon, note that they were sent under separate cover. It should also note that we understand Remcon agrees to complete these

Page 474

changes at contract unit prices and list them -- excuse -- and list contract item and quantity adjustments, period.
Is that consistent with how the National Park Service issued contracting officer's directives for revised changes as you understood it in August of 2001?
A No. A CO directive would have been written from Rod informing the contractor to perform certain works, and it would be described. We -- we can make field adjustments on contract unit prices, so the adjustments on the unit prices does not surprise me.
Q Okay. Continuing, it says, E-mail a copy back to me, and I would be happy to review. In your e-mail, you need to determine the cost of the changes, parentheses, unit price, asterisk, quantity --
I think it means times quantity. Is that how you read it?
A I -- I can't -- I don't know what it means.
Q -- end parentheses, period. If it increases the price of the contract, we need to tell the CO what we would cut from the contract if contingency funds are not approved. Pick something down at LS, period.
Does LS, to your understanding, refer to Lower Sherman?
A It may be. I would have guessed it to be lump

Q And I believe you testified last week that you were aware of it in the month of August of 2001, of that contention, correct?
A If you -- if you state so, yes.
Q Okay. Independent of the differing site condition issue, there were a whole series of revisions to the drawings that we've seen during the months of July and August of 2001, correct?
A As shown here, yes.
Q Okay. Did you ever come to an understanding that the design that was issued to the contractor was not able to be built as designed without modifications?
A As I stated before, I think last week, that I've never had any construction drawings that have never had any change orders to them or modifications.
Q Have you ever been associated while a contracting officer's representative for a project that had as many design changes issued as this one along the same station?
A I would say maybe not. I'm -- I can't say for sure.
Q At the end of 2001, did you take a moment in time and say, this job has got, in essence, a bunch of problems; we need to get it straightened out so when the contractor comes out -- comes back in 2002, he can really



get it going?
A I believe we had some meetings with Steve. I'm not sure if that was 2001 and then into early part of 2002. I'm not -- I'm not sure which dates those were.
Q You recall Steve came back three times in December of 2001 to meet with you and your team for this project in an effort to not only discuss the issues that had occurred in 2001, including his claims for additional compensation, but also to attempt to work with you so that he would be able to get all the design issues resolved during the winter so he could jump back to work --
A We sat down --
Q -- efficiently?
A We sat down and -- and discussed some of the problems that were taking place, and I believe there were some offers made, refused, and back and forth, so forth like that.
Q And, actually, maybe I misstated. These meetings occurred over -- over the winter period; they didn't all happen in, like, a two-week period, correct?
A Yeah, I think they occurred over a three-month period. I'm not sure.
Q Okay. Was it clear to you, as a result of those meetings, that Mr. Christensen was interested in



having this project get its design all finalized so that it could just -- he could just go out and build the job?
A I think what it was, we were trying to resolve issues that were presented in 2001, and that's what we sat down and discussed.
Q Were those issues fully resolved, to the best of your knowledge, by the design team and NPS prior to the 2002 construction season starting?
A I can't say yes to that. But I know that when we sat down, we were trying to resolve the issues of the cut area and --
Q You're talking about the negotiation for the --
A Yes.
Q -- differing site condition?
A Right.
Q I'm talking about the still pending design issues and revisions that may need to be done. Were they finalized by the design team in conjunction with the National Park Service before Remcon got out to the site to start working in 2002?
A I'm not sure. I -- I would have to look at a modification and see what we did on these.
Q Let me show you Exhibit --
A Do you -- are these to be read or what?



Q What number is that? I've got all these in there. Exhibit 193.
(Exhibit Number 193 was marked for identification.)
Q (By Mr. Schoenfeld) This is an e-mail from Robert Smith to yourself on May 22nd. And in the e-mail -- excuse me. Let's go to the middle of the first page. There's an e-mail from yourself to Robert Smith on May 22nd, at 10 in the morning. The 10 in the morning importance was identified as high. Bob, I spoke with Remcon today concerning possible costs associated with the dirt impact.
You recall that reference to volume of extra excavated material?
A That's what that would indicate to me.
Q Continuing: I need those drawings with quantity takeoffs for the parking area. I also need the trail revision indicating where changes are required. Can you provide -- can you also provide cost estimates later, but no later than a week? Thank you.
And Bob responded two hours later, correct, the upper e-mail?
A Yes, it looks like it.
Q And he wrote: Willie, Andrea is working on the revised parking lot and trail plans, period.

stated that the -- the Spearin Doctrine, from what I understood on these bullets, were that the contract drawings were supposed to be issued at 100 percent complete.

Q Okay. And if he -- were you -- were you ever trained to understand that if the contract documents were not 100 percent complete insofar as changes had to be made that caused additional costs that the contractor may be entitled to a modification?

A That's my understanding, yes.

Q Let me show you Exhibit 195, sir. It's a one-page e-mail from Mr. Christensen to yourself, as well as to Terry Lang and Rod Keiscome on June 19th of 2002. After commenting that RFIs have been given regarding the revised trail design, and to which they are still waiting a response, Steve made a couple additional comments.

Item number 1 says: Note 2 on Sheets T7A and T8A references contract drawings Sheets T3A through T10A. As previously discussed, Remcon has never been issued these plans. It was made very clear at the partnering meeting that any plans not issued by the contracting officer did not exist.

What did you expect Remcon to do in light of the content of paragraph 1 of this e-mail?

A I expected -- expected them to comply with T7A



and T8A, which were issued.

Q Was there a mod that incorporated them on or before their issuance?

A I know there was a mod probably issued for this work right here, but I don't know when.

Q Okay. Are you guessing?

A I'm guessing.

Q Okay. I don't want you to guess.

Item Number 3, Paragraph Number 3 says, Each of the plan sheets references a date of August 2001.

Assuming that is true, sir, why is it that the government waited from August of 2001 until June of 2002 to provide revised drawings regarding the Sherman Tree Trail redesign to Remcon?

A I read this right here as these plan dates were not changed on those drawings, and then I go on to say that this can't be correct as a decision to revise these plans --

Q I'm sorry. This is Mr. Christensen writing to you.

A Oh, is it?

Q Yes.

A Oh.

Q He's telling you that the latest plans they've got --



A I'm sorry. I'm sorry.

Q -- are dated August of 2001. What's going on here?

A I don't know.

Q Why is it that changes in 2001 were not given to the contractor until June of 2002?

A There were -- seems to have been plans that were provided out in the field.

Q Did you talk about the problems with the design with Mr. Keiscome at any time?

A I may have. I -- I can't recall.

Q Did you ever tell Mr. Keiscome words to the effect, Listen, this contractor just can't -- can't get this job built because we haven't got our act together on this design, and we keep on changing things?

A I don't think I would use any words like that.

Q Did you ever tell Mr. Keiscome words to the effect, We need to incorporate all these changes into a modification?

A I would have probably recommended seeing that these were coming from the designers.

Q Did Mr. Keiscome ever disagree with you insofar as communicating a disagreement?

A If we had talked, I don't think he would have disagreed.



Q Okay.

THE WITNESS: How much time before a break?

MR. SCHOENFELD: Now.

THE WITNESS: That sounds like a winner.

(A recess was taken from 2:57 p.m. until 3:10 p.m.)

(Mr. Giller is not present.)

Q (By Mr. Schoenfeld) Okay. I have handed you Exhibit 37, which is an e-mail from Mr. Christensen to yourself and a cc to Rod Keiscome and Terry Lang dated Wednesday, June 19th, in which Mr. Christensen confirms a settlement of the negotiation for the price of raising the upper parking lot to $43,816. Do you see that?

A Yes.

Q Did that get ultimately communicated in writing in a formal modification by the contracting officer?

A This modification right here.

Q Exhibit 64?

A Yes.

Q What prevented the contracting officer -- strike that.

Why did it take from June 19th, 2002, until September of 2002, approximately three months, for the formal modification to be issued?

to what Mr. Christensen said and why?
A Not -- not offhand, no.
Q Okay. Would you turn to the last two pages of this exhibit, Number 213, please.
A (The witness complied.)
Q Are these 8 1/2-by-11 copies of the revised T7A and T8A drawings for the Sherman Tree Trail?
THE WITNESS: Can you read that?
MR. SCHOENFELD: Okay. Let me just restate it.
Do you recognize that by virtue of them having a revision block on them that these sheets entitled T7A and T8A are revised drawings?
A Yes, based upon the A associated with the T8 and T7.
Q All right. Now, if you were to look both on T7A and T8A.
MR. SCHOENFELD: And, Counsel, may I approach the witness? I just want to point it to him so that he can --
MR. OLIVIER: Yes.
MR. SCHOENFELD: Thank you.
Q (By Mr. Schoenfeld) You'll see on both sheets there is a triangle with the Number 1 in them, adjacent to the triangle it says Revision 1, and there's a date of



May 20th, 2002.
MR. OLIVIER: Can you describe for the record where on the page you're talking?
MR. SCHOENFELD: They're both located on the lower right-hand portion but above the block of the -- what the document is.
MR. OLIVIER: Title block?
MR. SCHOENFELD: Yes. Thank you.
Q (By Mr. Schoenfeld) Do you see that information, sir?
A I see it. I can barely make it out, though.
Q Right. It's -- the print is very small.
Does this indicate to you that these drawings looking at the title block were originally issued in August of 2001 and were revised on May 20th, 2002?
A I -- I can barely make out this, but it -- it appears to be that whatever those notes are, I would have to say they are -- they're indicative.
Q Okay. I don't know that you listened to my question, so try it again.
A Okay.
Q Look at the title block on each T7A and T8A. It shows that they were originally issued on August of 2001; is that correct?
A It -- it appears to. I can't -- I can't



hardly make it out. My -- I -- I see this right here (indicated).
Q Okay. You're pointing to the place where it says date, but you're having trouble reading it --
A Right.
Q -- because this is a photocopy?
A Yes.
Q Okay. Thank you.
In the -- on each sheet there is a revision noted with a triangle with a Number 1 inside of it; is that correct?
A Yes.
Q Once again, it's difficult for you to see because it's a photocopy, correct?
A The writing is small; and because of my age, my eyesight is not what it used to be.
Q Gotcha.
And am I correct you just can't discern the date of the revision that's noted as Revision Number 1; is that correct, on either document?
A I can just barely make it out.
Q Okay.
A They -- they look like 5/20/02.
Q All right.
A But I can't --



Q We'll assume for the purposes of this discussion that they were issued, each of them, on August -- in August of 2001 originally and they were revised in -- on May 20th of 2002. Okay? We'll just make the assumption.
Am I correct that the original contract documents issued had sheets T7 and T8 and that they were initially revised in the form of being called T7A and T8A?
A This would be correct.
Q And that the Revision Number 1, as noted on each of these documents which are the last two sheets of Exhibit 213, are actually revisions to revised drawings?
A Based upon the -- the date shown here, it would appear to be so.
Q And further, sir, assuming the dates are correct, do you know why it took from August of 2001 for revisions to be made to these drawings until May 20th of 2002?
A No, I don't.
MR. OLIVIER: Objection; vague and ambiguous.
MR. SCHOENFELD: You know, that sounded funny in my head. So strike it as being unintelligible. How's that?
MR. OLIVIER: That's fine.