# EXHIBIT 2A

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Docket No. 03-2478C

---

DEPOSITION OF RODNEY KEITH KEISCOME - VOLUME I
February 8, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: RICHARD P. SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 4058
Washington, D.C. 20005

COLLEEN M. DULIN, ESQ.
Office of the Solicitor
Department of the Interior
755 Parfet Street
Suite 151
Lakewood, Colorado 80215

Also Present: Stephen Christensen
Mike Giller

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF RODNEY KEITH KEISCOME - VOLUME II
February 9, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: RICHARD P. SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 4058
Washington, D.C. 20005

COLLEEN M. DULIN, ESQ.
Office of the Solicitor
Department of the Interior
755 Parfet Street
Suite 151
Lakewood, Colorado 80215

Also Present: Stephen Christensen
Mike Giller

from Mr. DeOcampo to Mr. Giller and Mr. Vance regarding rock ripping requirement.
Text reads: Mike, I looked for the section in the specs that required demonstration or refusal by the D8 Cat, period. I cannot find it either, period.
Are you aware of any such requirement in the contract documents?
(Exhibit Number 258 was marked for identification.)
THE WITNESS: The D8 Cat with the soils report being part of the contract, I would rely on that.
Q (By Mr. Schoenfeld) Does that --
A But I don't know without looking at it what it might say.
Q Okay. Other than the soils report, are you aware of any requirement elsewhere in the contract documents that requires the contractor, in order to substantiate the existence of a differing site condition, to demonstrate refusal of the D8 Cat?
A I would say the differing site condition clause would be the natural clause that you would utilize to -- and communicate to the owner what the problem might be.
Q Okay. And we've seen that the contractor did communicate in writing and fulfill -- I believe your



testimony was they did comply with the requirement to give notice to the -- to the government that it had encountered a differing site condition. And then the differing site condition clause, the government then had the responsibility -- I believe it says the contracting officer shall promptly investigate.
A Yes.
Q And would that prompt investigation include, among other things, requesting the contractor to demonstrate refusal through the D8 dozer of not being able to rip the rock?
A That would be logical.
Q Do you know whether that request was ever made by anyone on behalf of your construction manager or the National Park Service?
A I don't recall.
Q Okay. Let's mark as Exhibit 259, sir --
(Exhibit Number 259 was marked for identification.)
THE WITNESS: Thank you.
Q (By Mr. Schoenfeld) -- a multiple-page exhibit. Documents are produced from the government's records. The first page is dated June 24th of 2000. I'll represent to you that I believe the designers that were deposed testified that this is part of their work



product in evaluating quantities during the midst of the design effort.
A Okay.
Q During the course of the design effort, did you at any time receive any briefing or advice regarding the quantities that were anticipated to be encountered in any aspect of the project?
A I don't recall.
Q Did you understand at the time you issued the contract documents for proposals that this project was, more closely than not, a balance job in that there was no import required to build it and very little export to other portions of the park?
A I believe that's accurate.
Q Is that what actually happened?
A I don't believe so.
Q And why is it that that did not happen?
A I think we've discussed that some quantities were not available there.
Q Well, is it because there were errors in the drawings?
A I don't recall.
Q Is it because there were omissions, conflicts, inconsistencies, and/or ambiguities in the drawings?
A I don't believe so.



Q Do you believe the quantities, as represented in the contract documents, were accurate or inaccurate with respect to earthwork?
A I believe that as a contracting officer you're not going to sign a document that you believe has inaccuracies, errors, omissions.
Q I'm not talking about at the time you signed them. I am talking about now, as you sit here looking backwards. Do you believe they were accurate as to quantities or inaccurate?
A I believe there's some inefficiencies in it.
Q What do you mean by "inefficiencies"?
A Deficiencies, I should say.
Q I'm sorry?
A Deficiencies.
Q And by "deficiencies," that means that the quantities were not sufficiently correct so as to avoid you having to issue one or more modifications; is that correct?
A That appears to be accurate.
Q Okay. Now, in this document, sir, there is a -- let me step back.
Are you familiar with the concept of compaction?
A Generally, yes.

# EXHIBIT 2B

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

A Okay.
(Reviewed documents.)
That appears correct.
Q And included among the four items set forth in Modification Number 4 is Bid Item Number 139, which is raising the finished grade of the Upper Sherman parking lot for total increase of $43,816 for the actual physical work, correct?
A Correct.
Q And that is what Mr. Giller is referring to in Item 1 of Exhibit 239; is that correct?
A It appears that way.
Q Okay. Now, the second item in Mr. Giller's e-mail refers to Modification Number 5 of 200Q regarding the trail for $27,000; is that correct?
A That's what his e-mail says.
Q I show you Modification Number 5, which is Exhibit 213, bearing Mr. Christensen's signature and your signature. Do you see that?
A Yes.
I can turn it. Yeah.
Q One more page.
Do you see the item that Mr. Giller refers to in his e-mail, Number -- Exhibit Number 239, referenced on the fourth page of Exhibit 213, sir? Is it, in fact,



Bid Item Number 140, adjust General Sherman Tree Trail?
A On Modification Number 5, yes.
Q Okay. It's a different value in that the change order is for $35,872 as contrasted with the 27,000, but it's the same generic category that you believe?
A It appears that.
Q Okay. Thank you.
Now, Mr. Giller's third item in his e-mail on August 29th of 2002 contained in Exhibit 239 regards Modification Number 6, entitled differing site for rock for $485,000. Do you see that?
A Yes.
Q Had you, as of August 29th, 2002, made a determination that you were going to issue a modification to the contractor for having encountered a differing site condition on this project dealing with rock?
A I question whether it really was a differing site condition.
MR. SCHOENFELD: Would you read him back the question.
And please listen carefully when answering that question.
(The reporter read page 75, line 14 through line 17.)



THE WITNESS: That was part of the settlement negotiations that we had with Mr. Christensen. I believe it was Mr. Lewis in attempt to put all these things behind us, and that was the intent of Modification Number -- Number 6.
Q (By Mr. Schoenfeld) My question was: Had you as of August 29th, 2002, made a determination that you would issue a modification to the contractor for encountering a differing site condition dealing with rock? Yes or no.
A I can't answer that with a yes or no.
Q Did you determine there was not a differing site condition as of August 29th, 2002, encountered by the contractor dealing with rock?
A I didn't have advance notice to look at the site on the differing site condition to see whether it was, in fact, a differing site condition, so when you reference a differing site condition, that could be Remcon's -- obviously Remcon is saying it's a differing site condition.
Q Did you issue Modification Number 6, sir?
A This particular modification? Let's look at it.
Q Sir, did you issue Modification Number 6? Yes or no.



A This particular modification for 485? There's a Modification Number 6 was issued right here, 84,170.
Q Did you issue Modification Number 6? Yes or no.
A Unilateral Modification Number 6, yes.
Q And in that modification, did you determine that the contractor had encountered a differing site condition dealing with rock on this project? Yes or no.
A Let's look at the modification.
Q Do you remember?
A I don't recall.
Q Okay. I place before you Exhibit 214.
Do you recognize this as the unilateral modification you've issued?
A Yes.
Q And in that unilateral modification, did you issue it based on your determination that the contractor had encountered a differing site condition concerning rock on this project?
A Yes.
Q And, in fact, was the rock that was the subject of that differing site condition encountered between nominally Stations 24 and 30 in the area otherwise known as the access road?
A I don't have the specific stations, but it is

Page 429

material, correct?
A Yes to both.
Q Let me show you Exhibit 84, sir. It's an e-mail from Mr. DeOcampo to Andrea Gregor at DHM and Joanne Cody with a cc to Ray Todd and Bob Russell dated August 8th of 2001.
It reads: Andrea, the 200Q project is beginning to questionable overruns and quantities. I need your help on where and how DHM thought items would be paid. The contracting officer is already questioning why Pay Item 26 is almost 350 percent over the estimated quantities, period.
Did you have that discussion with Mr. DeOcampo?
A Oh, yes.
Q And is Mr. DeOcampo accurately communicating that you had concern regarding Pay Item 26 being almost 30 -- 350 percent over the estimated quantities at that point in time?
A Yes.
Q Mr. DeOcampo continues: Now we have possible overruns in Item 38, dash, rock excavation.
This is the item ultimately for which Mod 6 was issued as a differing site condition, correct?
A Yes.

Page 430

Q Remcon is citing this item for payment for blasting rocks, period.
Had Mr. DeOcampo talked to you about the overruns in Item 38 as of August 8th of 2001, sir?
A I would have to refer to the pay estimate. And whenever you see large amounts of overruns, that's when the logical conclusion would happen where you'd have conversation about those items.
Q So even though Mr. DeOcampo may not have furnished you the actual notice of a differing site condition, which was dated August 20th until June of -- August 20th of 2001 until June of 2002, he nevertheless discussed the subject with you as of August 8th, 2001, which is within ten days of Remcon encountering rock; isn't that correct?
A That's correct.
Q Continues, quote: What was the intent of rock excavation and how does the government defend, slash, ward off these requests for payment under this pay item?
Why is it the government was looking to defend or ward off these requests?
MR. SCHROEDER: Objection to characterization.
THE WITNESS: I don't know.
Q (By Mr. Schoenfeld) Did you ask Mr. DeOcampo, based on his informing you of the subject matter of

Page 431

Remcon encountering rock and that they contended it was a differing site condition, that you wanted to know what the design team's position was so you could defend against the contention?
A I wouldn't put it in those words.
Q Put it in your words. What did you direct him or ask him to do?
A My words would be that if you have an overrun, we need to take care of that, and we did by making payment to the contractor. And then we also need to get it so we have a meeting of the minds down the road.
Q You just said so we could pay the contractor. Have you ever paid the contractor for the differing site condition encountered?
A I would have to rely on the -- the pay estimates in question.
Q Okay. As you sit here today, you know you didn't pay anything for the differing site condition --
A We have already discussed that.
Q Let me finish. You know you didn't pay any sooner than sometime in 2003, if you did pay, correct? Because Mod 6 isn't dated until February 2003; isn't that correct?
A I would have to look at the pay estimate. And what I think you're saying is that it was not paid to

Page 432

Remcon.
Q Not paid at all.
A Okay.
Q If Mod 6 isn't issued until February 2003, no payment for differing site condition work was issued any sooner than that, to the best of your knowledge, correct?
A Correct.
Q Do you have any understanding as to why Mr. DeOcampo wrote: How does the government defend, slash, ward off these requests?
MR. SCHROEDER: Objection; asked and answered.
THE WITNESS: I don't.
Q (By Mr. Schoenfeld) You ever see this e-mail before?
A I don't recall seeing it.
Q Whose writing is on this page, if you know? Is that your handwriting, sir?
A I don't recognize this writing.
Q Okay. Do you know if there was a conflict in the contract documents between the specification sections that addressed rock and rock excavation?
MR. SCHROEDER: Objection; calls for legal conclusion. He doesn't have the contract in front of him.
THE WITNESS: I don't recall.

the access road.
Q Okay. Did you personally make the determination that a differing site condition was encountered, or did you accept the recommendation of others in that regard?
A I have to put a caveat on that again. I was -- I was not informed of the differing site condition until well after it had happened.
Q In issuing Modification Number 6, in which you determined a differing site condition had been encountered by the contractor, did you make that determination yourself, or did you rely upon the recommendation of others?
A I definitely rely on the expertise of technical people, so definitely I made that based on judgment with input from technical people.
Q Who -- what technical people did you rely upon in reaching the conclusion you did?
A That would be project manager, Mike Giller.
Q Mr. DeOcampo?
A I believe we had conversation -- conversation with him as well, yes.
Q Bob Smith of DHM?
A Me directly, no.
Q Are you aware that Mr. DeOcampo received



communications from Mr. Smith in that regard?
A I believe I -- I understand that now.
Q And Mr. Tuttle on behalf of his company as well gave information to both Mr. Smith and to Mr. DeOcampo?
A I don't recall.
Q What about Andrea Lind? You recall receiving any information by or through others of her perception of whether a differing site condition had been encountered?
A I don't recall.
Q What about Bob Russell, the construction manager?
A I do not recall that.
Q What about information from the contractor that had been received by your representatives? Do you recall relying on that information?
A I saw it much later at a meeting in Denver.
Q Okay. Now, do you recall that Mr. Christensen and his personnel communicated the encountering of rock that they perceived to be a differing site condition to your representatives much earlier than you personally became aware of the issue?
A It's my understanding, yes.
Q Okay. And you're aware as part of the education you've received and your exercise of



responsibilities as a contracting officer that there is a FAR clause that deals with what is to happen when and if a differing site condition is perceived to be encountered by a contractor, correct?
A Correct.
Q And, in fact, it was included in the solicitation for this project, correct?
A Correct.
Q And, in fact, that clause provides in substance that the contractor needs to give notice when it encounters something it contends is a Type 1 differing site condition, which is generically and something different than what they perceive is indicated in the contract documents in a subsurface condition, right?
A That's correct.
Q And once that notice is given to the government's representatives, the government then has certain responsibilities to promptly investigate and make a determination one way or the other as to whether it concurs or not to that contention, correct?
A That's correct.
Q What did the government do once notice was given by Remcon of its encountering of a differing site condition to investigate the accuracy of the representation and contention?



A I was not informed of that, but --
Q By whom were you not informed? By anybody, correct?
A Wherever -- there is a document that I've seen, and Steve did bring it with him, and I think it was in -- within the remediation binder that he had brought to Denver sometime long after this, and that's where I saw it for the first time.
Q "Sometime long after this" meaning, long after approximately July and August of 2001?
A Long after basically the -- where the differing site condition was alleged by the contractor.
Q I'm going to ask you to assume that the Remcon encountered what it contended to be a differing site condition starting in late July of 2001 and there's written record of notifying Bob Russell and Willie DeOcampo of that subject within the first week of encountering it. I'm asking you to make that assumption.
Did you have a standing communication to Mr. DeOcampo as your COR that if such information came to his attention, he was to bring it to your attention?
MR. SCHROEDER: Objection to form.
Q (By Mr. Schoenfeld) Go ahead.
A I can answer?
Q Yeah. Unless he tells you not to, just go

Page 441

A Okay.
Q And it's been affirmed by others to be the final versions of the spec sections included within it.
A Okay.
Q Would you turn to the -- approximately the -- I believe it's the fourth page of the exhibit. It's entitled Specification Section 02310, Site Excavation and Grading.
Is this the specification section for Bid Item 37 which dealt with excavation and the lump sum basis on this project?
A If you go to two pages back beyond that, it has haul excess -- repeat that question, please.
Q Is this the specification section that related to Bid Item Number 37, the lump sum item for excavation on the project?
A It appears to be.
Q If you would turn to the page that you're on -- which is the fifth page of the spec section, correct?
A Yes.
Q -- there is Item 4.2, Rock Excavation. You see that?
A Yes.
Q And it's for utility excavation only, correct?

Page 442

A Yes.
Q So the contractor was going to be paid for rock encountered for utility excavation only?
A Yes.
Q All other rock was unclassified, as you understood it on this project, which means it was included within the lump sum?
A Yes.
Q And was that conditioned upon the content of the soils report which we've marked as Exhibit 74?
A I believe that's correct.
Q Okay. And because it was determined that the material encountered in excavation, other than utility trenches, was rock which was different than set forth in the soils report, you then issued Mod 6; is that correct?
A I believe that is correct.
Q Would you turn now to the next page of this exhibit, Spec Section 2316, Roadway Excavation and Embankment. Is this the spec section for the construction of the access road?
A It appears to be.
Q Was the scope of work set forth in this spec section also to be included in the contractor's bid price for the lump sum in Bid Item 37, excavation?
A It refers back to Section 2310 for roadway

Page 443

excavation.
Q And where is that reference that you're relying on?
A Relying on the very last page of Section -- it's Bates stamp 015232.
Q And you're referring to part 4.1, Roadway Excavation?
A Yes.
Q Under Classification, which is on the first page of Spec Section 2316, Item 1.4, Part A, it says: Rock excavation consists of material that cannot be excavated without blasting or using rippers, including boulders having a volume of 2 cubic yards or more.
Do you see that?
A Yes.
Q Did the contractor encounter such material in constructing the roadway excavation and embankment?
A Yes.
Q Item C of 1.4 of Spec Section 2316 says: No rock excavation will be permitted unless approved by the contracting officer.
Did you approve rock excavation on this project for Remcon's construction of the roadway excavation and embankment?
A The documents will reflect what the documents

Page 444

reflect.
Q I'm not asking you what documents say; I'm saying you. Did you approve -- permit rock excavation?
A As the contracting officer who signed the contract, the plans and specifications are what were going to be governing on how it's going to be happening. So approved? I've -- I have awarded the contract to Remcon, so we go by the contract documents.
Q So you did not understand at any time that 1.4C requires any conduct by you other than authorizing Remcon to proceed with the contract with respect to rock excavation?
A This is -- this is part of the contract.
Q So nothing more needed to be done by you? Is that your understanding?
A I don't recall.
Q Going back to Exhibit 255, sir, I've now placed before you Spec Sections 2310 and 2316.
A Yes.
Q Did you read them for the meetings that were referred to?
A I don't recall.
Q The -- the referenced contractor's request for equitable adjustment, that dealt with the differing site condition claim in Exhibit 76 I just showed you, correct?

Page 445

A Yes.
Q So you knew earlier than June of 2002 that not only a claim was in existence, but also that the government needed to analyze the claim, correct?
A Yes.
Q Why is it that you did not issue a formal modification for approximately one year later than the exchange set forth in Exhibit 255 for the differing site condition?
A I don't recall.
Q Do you consider the modification that you issued for the differing site condition compensation to the contractor to have been issued timely?
A No.
Q May I have both of those back, please.
A Sure.
Q Thank you.
(A discussion was held off the record.)
(Exhibit Number 256 was marked for identification.)
Q (By Mr. Schoenfeld) Let me show you Exhibit 256, sir. Actually, let me just take a quick look at that.
(Reviewed documents.)
Did you cause Exhibit 256 to be prepared on

Page 446

your behalf?
A That would appear likely, but I don't recall.
Q Who prepared it?
A I don't see a name.
Q Okay. When quantity overruns occurred on this project, am I correct that under the contract Remcon was to be paid the contract unit price for the item up to a certain percentage of overrun or underrun?
A Up to 15 percent over at that unit price.
Q And then it was subject to negotiation?
A By -- by the request of either party.
Q Okay. Do you recall what the price per cubic yard was for roadway excavation on the project?
A Off the top of my head, no.
Q Let's assume it was 110 -- $112 per cubic yard. Okay?
A Okay.
Q Pardon me. I said "roadway"; I meant rock excavation.
A Okay.
MR. SCHOENFELD: Can you show me, Steve, Exhibit 87, please.
Q (By Mr. Schoenfeld) I'm going to show you Exhibit 87, sir. This is an e-mail from Jack Vance to Ray Todd, Willie DeOcampo, Joanne Cody, and Bob Russell

Page 447

dated September 19 of 2001 regarding rock.
It says: When Bob and I were walking the project yesterday, Remcon's grade checkers told us they had quantified the rock from the roadway excavation at 6,000 cubic yards so far.
Have you ever seen this e-mail before, to the best of your knowledge?
A I don't recall --
Q To the best -- okay. I'm sorry.
A -- from looking at the document right here. However, it's forwarded on to me. That might be something else.
Q All right. I'm not aware that it was; otherwise, I would have showed you that it was.
A Okay.
Q To the best of your knowledge, sir, is the 6,000 cubic yard reference of rock for roadway excavation the subject of the differing site condition modification that you issued?
A I believe it is.
Q Okay. What was the cubic yard price for rock excavation that you used in Mod Number 6 to calculate the compensation you found to be due Remcon?
A (Reviewed documents.)
It's Bates-stamped 002018 of the Modification

Page 448

Number 6.
Q Which is Exhibit 214, correct?
A Yes.
Q All right. What is the price per cubic yard that was utilized in the calculations?
A Oh, you did ask that, didn't you? It was not -- it was in a lump sum.
Q What was the price per cubic yard that the government used, if they did use such?
A I don't see it here.
Q What was the price per cubic yard for rock that your designers estimated would be a reasonable price for a contractor to incur?
A I would have to refer to the documents.
Q Let me show you Exhibit 158, sir. Would you turn to the second page of the document. I'll represent to you this is one of the cost estimates prepared by the design team.
Would you look at item 21, Boulder Excavation Blasting. You see that?
A Did you say page 2?
Q Two of the exhibit.
A And number 21?
Q Yes, sir?
A It says, Light grading at Wolverton Point.

# EXHIBIT 2C

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 365

is not known why the contractor overblasted and blasted in the wrong location, period.
Did you ever ask Mr. Christensen that?
A I believe if I didn't that technical people did ask that.
Q What was Mr. Christensen's response to that inquiry, if he was asked?
A I don't recall.
Q Was that important information to you in determining what the value of this mod should be?
A Yes.
Q Do you know whether any such inquiry was actually made to Mr. Christensen?
A I don't recall.
Q Okay. Did you ever ask what Mr. Christensen's response was when you reviewed the January 14th, 2003, letter from Mr. Giller, included as part of Mod 6 backup?
A We may have had some discussions at the meeting at Ash Mountain and when we tried to settle through stipulation of settlement.
Q Okay. In 2D, it is continued: However, it is known that this contractor has made numerous mistakes in layout of the project. Do you know what Mr. Giller is referring to?
A Location of the road.

Page 366

Q Anything else?
A Parking area -- parking lot, upper parking.
Q Anything else?
A The dry-laid stone wall.
Q Anything else?
A Resulting in cutting down some trees.
Q Were any of those items that you just described a result of --
A I also want to add the entry road.
Q Okay. I didn't mean to cut you off.
Were any of the mistakes in layout that you understand were made by the contractor a result of directions given by either the construction manager or the contracting officer's representative to relocate any of those improvements?
A Not to my knowledge.
Q Okay. Did you issue any modifications granting Remcon additional compensation for resurveying on this project?
A I don't recall.
Q Isn't it true that you, in one of the modifications, granted costs for resurveying as a result of errors in layout by the government?
A In a modification?
Q Yes.

Page 367

A I'd like to see that.
Q I'll show it to you.
MR. SCHOENFELD: I think it's Number 64, Steve.
MS. DULIN: 64.
MR. SCHOENFELD: Yeah. Let me see if it's here.
(Reviewed documents.)
Yeah.
Q (By Mr. Schoenfeld) I show you Exhibit 64. Did you add Item Number 137 to compensate the contractor for restaking the access road?
A Yes.
Q Why was the contractor compensated for restaking the access road?
A Exhibit 64, the last page that we have here, new Item Number 137 describes the justification, but it does not describe the record negotiation.
Q Is it correct that after the initial staking done, which was acknowledged in this justification -- strike that.
Isn't it correct that Giuliani & Kull, the surveyors hired by Remcon, staked out the center line of the road and it was found to interfere with the areas within which construction could be performed?

Page 368

A (Reviewed documents.)
Could you repeat that question, please.
MR. SCHOENFELD: Go ahead.
(The reporter read page 367, line 22 through line 25.)
MR. SCHROEDER: Objection as to form.
THE WITNESS: Thank you for reading that back. I believe the justification stands on its own.
Q (By Mr. Schoenfeld) Okay. I want your words, not just saying that the justification stands on its own. Why did you issue it? Solely because of the justification that's written and is placed before you that's the last page of Exhibit 64?
A You've asked "solely." That's part of the justification. The record negotiation may reveal more information.
Q Is it your understanding, reading the justification here this morning, that the staking of the road by Remcon's surveyor would have caused the construction to go into an area the National Park Service did not want to have disturbed?
A If the center line had to be moved? That would be a good assumption.
Q Okay. Is that a Remcon mistake?
A It does not appear to be.

# EXHIBIT 2D

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

the access road.
Q Okay. Did you personally make the determination that a differing site condition was encountered, or did you accept the recommendation of others in that regard?
A I have to put a caveat on that again. I was -- I was not informed of the differing site condition until well after it had happened.
Q In issuing Modification Number 6, in which you determined a differing site condition had been encountered by the contractor, did you make that determination yourself, or did you rely upon the recommendation of others?
A I definitely rely on the expertise of technical people, so definitely I made that based on judgment with input from technical people.
Q Who -- what technical people did you rely upon in reaching the conclusion you did?
A That would be project manager, Mike Giller.
Q Mr. DeOcampo?
A I believe we had conversation -- conversation with him as well, yes.
Q Bob Smith of DHM?
A Me directly, no.
Q Are you aware that Mr. DeOcampo received



communications from Mr. Smith in that regard?
A I believe I -- I understand that now.
Q And Mr. Tuttle on behalf of his company as well gave information to both Mr. Smith and to Mr. DeOcampo?
A I don't recall.
Q What about Andrea Lind? You recall receiving any information by or through others of her perception of whether a differing site condition had been encountered?
A I don't recall.
Q What about Bob Russell, the construction manager?
A I do not recall that.
Q What about information from the contractor that had been received by your representatives? Do you recall relying on that information?
A I saw it much later at a meeting in Denver.
Q Okay. Now, do you recall that Mr. Christensen and his personnel communicated the encountering of rock that they perceived to be a differing site condition to your representatives much earlier than you personally became aware of the issue?
A It's my understanding, yes.
Q Okay. And you're aware as part of the education you've received and your exercise of



responsibilities as a contracting officer that there is a FAR clause that deals with what is to happen when and if a differing site condition is perceived to be encountered by a contractor, correct?
A Correct.
Q And, in fact, it was included in the solicitation for this project, correct?
A Correct.
Q And, in fact, that clause provides in substance that the contractor needs to give notice when it encounters something it contends is a Type 1 differing site condition, which is generically and something different than what they perceive is indicated in the contract documents in a subsurface condition, right?
A That's correct.
Q And once that notice is given to the government's representatives, the government then has certain responsibilities to promptly investigate and make a determination one way or the other as to whether it concurs or not to that contention, correct?
A That's correct.
Q What did the government do once notice was given by Remcon of its encountering of a differing site condition to investigate the accuracy of the representation and contention?



A I was not informed of that, but --
Q By whom were you not informed? By anybody, correct?
A Wherever -- there is a document that I've seen, and Steve did bring it with him, and I think it was in -- within the remediation binder that he had brought to Denver sometime long after this, and that's where I saw it for the first time.
Q "Sometime long after this" meaning, long after approximately July and August of 2001?
A Long after basically the -- where the differing site condition was alleged by the contractor.
Q I'm going to ask you to assume that the Remcon encountered what it contended to be a differing site condition starting in late July of 2001 and there's written record of notifying Bob Russell and Willie DeOcampo of that subject within the first week of encountering it. I'm asking you to make that assumption.
Did you have a standing communication to Mr. DeOcampo as your COR that if such information came to his attention, he was to bring it to your attention?
MR. SCHROEDER: Objection to form.
Q (By Mr. Schoenfeld) Go ahead.
A I can answer?
Q Yeah. Unless he tells you not to, just go

Page 82

ahead.
A Understood.
It's -- Willie DeOcampo is aware when he has a differing site condition to notify the contracting officer.
Q Okay. Did you read in Mr. DeOcampo's transcript that Mr. DeOcampo acknowledged that he did receive notice from the contractor in either late July or the first week of August of 2001 of the contractor's contention that it had encountered a differing site condition?
A If that is the notice that he's referring to on the -- on the document about halfway down that Steve had brought to Denver, that's the notice I'm thinking of.
Q Did you read in his transcript that he acknowledged that he had received such information?
A I don't recall.
Q Do you recall Mr. DeOcampo testifying in his deposition transcript that he failed to investigate timely the differing site condition contention that Remcon claimed?
MR. SCHROEDER: Objection; calls for speculation.
THE WITNESS: I remember seeing something to that -- in that regard. What he -- his deposition said

Page 83

is what his deposition says, so . . .
Q (By Mr. Schoenfeld) Okay. As you sit here today, sir, do you believe Remcon failed to comply with its requirements under the differing site condition clause to give timely notice of the differing site condition to the government representatives?
A It appears timely, but it also appears fine print.
Q Okay. What investigation was undertaken by the government once the notice was given?
MR. SCHROEDER: Objection; asked and answered.
MR. SCHOENFELD: I don't believe it has been asked, and I don't believe it's been answered.
THE WITNESS: The fine-print notice that the government received, I think it took many months after that to investigate or -- or maybe not many months, but it took some time to investigate.
Q (By Mr. Schoenfeld) Okay. I will ask you to assume that whatever you're referring to as fine print was ultimately made in neon on August 20th of 2001 in a document that said notice of differing site condition. Do you recall seeing that document?
MR. SCHROEDER: Objection to characterization.
You may answer.
THE WITNESS: I -- I don't recall anything in

Page 84

neon.
(A discussion was held off the record between Mr. Christensen and Mike Schoenfeld.)
Q (By Mr. Schoenfeld) Is the government's contention in this dispute regarding the entitlement that Remcon was to receive for encountering the differing site condition as to the dollar value that Remcon is entitled to at all based on the timeliness of the notice?
MR. SCHROEDER: Objection.
THE WITNESS: The differing --
MR. SCHOENFELD: What's your objection?
MR. SCHROEDER: My objection is I don't know this witness is competent to testify what the government's contention is regarding this lawsuit.
MR. SCHOENFELD: That's fine.
Q (By Mr. Schoenfeld) Okay. Go ahead.
A Repeat the question, please.
Q Yeah.
Is your position as to what Remcon's entitled to receive for encountering the differing site condition in unilateral Change Order Number 6, which we've marked as Exhibit 214, at all based on the timing of the notice?
A It's based on what we feel is a fair and reasonable amount, the government's unilateral, yes.
Q So it's based on the timing of the notice?

Page 85

Had the notice been given earlier and in other than in fine print, would Remcon be entitled to more money in your mind?
A The government would have a real good chance at at least seeing what the reality was out there rather than speculating on what we're talking about now.
Q Okay. Was the differing site condition that you understand Remcon encountered was, in essence, rock that could not be ripped with a D8 dozer?
A That's my understanding.
Q Okay. And as a result of that, Remcon had to blast the rock; is that correct?
A It is my understanding that there was already blasting for the trench and so Remcon was allowed to blast on the road.
Q Okay. I realize that there's blasting that Remcon was authorized to perform on this project. I also realize that blasting of rock or rock being encountered in a utility trench was not compensable as a differing site condition because that was identified. We're not talking about utility trenches.
A Understood.
Q We're just talking about the road itself.
Am I correct that Remcon blasted the road in lieu of ripping it with a D8 dozer because it contended

that the material it encountered was not susceptible to be ripped?

A It is my understanding that Remcon has stated that it could not be ripped.

Q Okay. As a result of it could not be ripped, are you aware that it was about a ten-week period of time, plus or minus, that Remcon in lieu of using conventional construction equipment, such as a D8 dozer to rip the rock, had to blast approximately 600 lineal foot of roadway in order to create the road in the location where this rock was encountered?

MR. SCHROEDER: Objection. He -- I don't believe he just testified that it couldn't be ripped. I think that's your characterization.

THE WITNESS: Could I -- could I hear that back.

Q (By Mr. Schoenfeld) I'll restate the question. Am I correct that it took about ten weeks to blast the rock in the road?

A I recall it took quite a bit of time. I can't say if it was ten weeks, but the record will show what it took.

Q What time extension did you granted (sic), if any, the contractor for having encountered this differing site condition?



A Whatever is in the modification here before us.

Q Is there any time extension that you've granted in Modification Number 6 for having -- the contractor having encountered a differing site condition?

A No time on Mod 6.

Q Why not?

A I believe it was a means and methods. Remcon -- obviously, we feel that they could have used a larger CAT than a D8.

Q Under the contract, sir, that you caused to be put out, was there information provided as to what methodology a contractor would use to determine whether or not rock would be rippable?

A I believe the soils report would be what you would be referring to.

Q And isn't it true the soils report that was procured by the government and made a part of the solicitation identified that all rock to be encountered along the access road would be rippable by a D8 dozer or a lesser-sized piece of equipment?

MR. SCHROEDER: Objection; calls for speculation.

THE WITNESS: It is what it says in there.

Q (By Mr. Schoenfeld) And isn't that true,



that's your understanding?

A It's my understanding.

Q Okay. And is it also your understanding, sir, based on the technical information you've received that the rock encountered by the contractor was not able to be ripped by a D8 dozer or smaller-size piece of equipment along the access road?

A I would say that I don't believe our field personnel really checked on -- on -- at that particular time when this all was occurring and even observed whether that could happen or not.

Q The National Park Service had daily inspection on this project by and through its construction manager, correct?

A Correct.

Q There certainly was opportunity for the National Park Service to inspect and evaluate whether any of the material encountered along the road that was contended to be a differing site condition was or was not rippable; isn't that correct?

A That's correct.

Q And they failed to do so is your understanding; is that correct?

MR. SCHROEDER: Objection; characterization.

THE WITNESS: The record will show that it



didn't happen as it should have.

Q (By Mr. Schoenfeld) Okay.

A I'm going --

Q Did Remcon do anything --

A Could I finish?

Q I apologize. I didn't know that you hadn't.

A I still go back to the fine print of the notice for the differing site condition.

Q Did Remcon do anything to prevent any representative from the National Park Service, whether it be inspector or otherwise, from evaluating whether a differing site condition had been encountered?

A The fact that I don't believe anybody knew about the differing site condition until well after. I -- I don't think they -- there was nobody out there, I guess is what it comes down to.

Q Your inspector wasn't there even though he was supposed to be?

A Wasn't out there inspecting. Inspectors don't have to be out there watching all the work that's happening.

Q Let me show you Exhibit 75, sir, which is Mr. Russell's daily report for July 30, 2001. It's previously been marked as an exhibit.

MS. DULIN: Number?

Page 94

of the week ending August 4, 2001; isn't that correct?
A That would be his contention.
Q Okay. That was his understanding and testimony under oath, correct?
A I wasn't here, but I don't recall necessarily reading all that, but I -- the record is the record.
Q Okay. And I just show you for record purposes page -- Exhibit 78, which is a page 68 of 125 of the solicitation which includes the FAR regulation for the differing site condition that was applicable to this contract, correct?
A Correct.
Q And as you testified that once the contractor gives written notice of either a Type 1 or Type 2 differing site condition, it requires you in Subpart B to investigate the site conditions promptly after receiving the notice, correct?
A Among other things, yes.
Q And you expected the notice to come from, at a minimum, the contracting officer's representative and/or the construction manager had they received such information, correct?
A I would have thought that the contractor would have provided that directly to me by fax if it was so important, but, yes.

Page 95

Q Okay. Let me show you Exhibit 76, sir.
Exhibit 76 is a multiple-page document. The first page is dated August 20th of 2001. Specification reference is 1.62 -- or I.62, I should say, differing site condition, signed by Jeff Northrop, the superintendent on behalf of Remcon with an estimated dollar and an estimated time extension, identifying in the description of the perception that they encountered a Type 1 differing site condition. Have you ever seen this document before?
A I believe this is the document that I was referring to maybe in the meeting that we had in Denver.
Q Okay. You testified a moment ago that it was your expectation that the contractor would send a letter to you along the lines that you described had they encountered a differing site condition, correct?
A I would expect it to be important enough to maybe fax this to me.
Q Isn't it true there was a preconstruction conference on this project?
A Yes.
Q And isn't it true at that preconstruction conference there was direction given by or on your behalf -- by you on your behalf, I should have said, that written communications were to go from the contractor to

Page 96

Jacobs as the construction manager?
A Yes.
Q Okay.
A I want to note on this exhibit, if I may --
Q Yes, sir.
A -- cost estimate, 100,000; time extension, 21 days.
Q It is what it is.
A It is what it is.
Q Isn't it true that as a result of encountering the differing site condition, it was communicated to you by the technical personnel you relied upon that the project was delayed?
A I believe somewhat delayed, I recall that.
Q The answer is yes?
A I believe somewhat delayed is my answer.
Q Okay. Why is it in unilateral Change Order Number 6, wherein you granted some compensation to the contractor, you did not grant a time even though you had been advised the project had been delayed to some extent?
A I will -- excuse me. I'll refer back to what you said earlier -- actually, you had asked me questions regarding are there any other changes, errors, and omissions. This is probably in that category.
And I want to now make a correction to my

Page 97

testimony that I don't believe that there was anything that was major that was remaining along those lines, so what I'm doing is correcting the previous testimony that I had. And with this, it is what it is.
Q Modification Number 6 granted the contractor unilaterally the sum of 84,000 and some odd dollars, correct?
A Right. Correct.
Q Did you ever cause that to be paid to the contractor?
A Let's look at the timing.
Q It's -- it's in February of '03, sir.
A Okay.
Q So it's during the winter shutdown after the second construction season.
A I would have to refer back to the pay estimates to figure out when it was actually paid for, and it may not have been to Remcon.
Q Isn't it true it's never been paid to Remcon?
A Well, since they've been terminated, it may have been paid to the surety.
Q Are you certain it's -- whether it's ever been paid to anybody?
A I'm pretty sure it has been.
Q Remcon was terminated in August of 2003,

Q (By Mr. Schoenfeld) Please answer the question.
A Review of the documents that had been issued.
Q Well, did you -- did you fulfill the responsibilities that I just read for ensuring performance of all necessary actions by tasking Mr. DeOcampo to be your contracting officer's representative? Is that one of the aspects that you did?
A That's one of the aspects.
Q Do you believe in your review of his performance during the job that he did discharge his responsibilities consistent with your tasking of those responsibilities to him?
A I believe he's a very competent COR, and yes.
Q Okay. You don't believe he made any mistakes?
A I think we all make mistakes.
Q Do you believe that Mr. DeOcampo made mistakes with respect to giving you information with respect to the encountering of the differing site condition regarding rock on the access road in August of 2001?
A I can't answer that.
Q Do you believe Mr. DeOcampo discharged his responsibilities in accordance with that which you would have performed concerning the timing of giving you notice of potential mods that the contractor claimed it was



entitled to?
A I think Willie DeOcampo is a very competent COR and he has that duty to do that and that he's doing it -- or he has done it to the best of his ability.
MR. SCHOENFELD: Move to strike.
Can you read him back the question.
And I'd like you to answer it again, please, but this time the question that I asked.
(The reporter read page 190, line 22 through page 191, line 1.)
MR. SCHROEDER: Objection to form.
THE WITNESS: Yes, to the best of his ability.
Q (By Mr. Schoenfeld) Okay. You, sir -- continuing in 1.602-2, in the last sentence of the preamble paragraph, it says, Contracting officer shall. Do you see that?
A I'm looking.
Q (Indicated.)
A I see that.
Q Do you understand the word "shall" to be -- to mean mandatory, that means you must do something?
A Shall means something different than must, but yes.
Q Okay. Do -- do you consider it to be something other than must?



A It's something you're supposed to be doing.
Q Okay. It's -- it's not discretionary --
A Right.
Q -- it's something you're required to do, correct?
A Oh, yes.
Q Okay. Item A, Ensure that the requirements of 1.602-1(b) have been met, and then it continues, quote, and that sufficient funds are available for obligation, end quote.
What did you do, given that you were not involved with the money side of this equation, to, quote, ensure that sufficient funds are available for the obligation?
MR. SCHROEDER: Objection to form regarding the characterization that he was not involved in the money side.
You may answer.
THE WITNESS: All DSC line item construction projects have a 10 percent contingency.
Q (By Mr. Schoenfeld) I understand.
A moment ago you said Willie did properly discharge his responsibilities, but you've also told me earlier that you were unaware of the notice of differing site condition until at least June 2002 even though it



came in in August 2001. You remember that?
A Yes.
Q Do you believe that was the proper performance by Mr. DeOcampo of his responsibilities?
A I'd have to refer you to Willie DeOcampo's testimony, not my own.
Q I'm asking you what your opinion is.
A My opinion is that he -- he has performed to the best of his --
Q I'm asking on this specific issue.
A -- ability.
I'm saying --
Q Do you believe that he performed it properly in accordance with the responsibilities that you were granted and you delegated to him to perform on your behalf?
A I'm not sure.
Q Okay. As a Level IV contracting officer is there a limit of your authority?
A It's unlimited and states so on the warrant itself.
Q So there -- there's no dollar maximum value that limits your ability to exercise your authorities as a contracting officer, correct?
A With -- within what is shown on the warrant

Page 361

July 30th, July 31st, the meeting minutes for the week of August 4th, and the notice of differing site condition dated August 20th, correct?

A I recall that from yesterday, yes.

Q So Mr. Russell and Mr. DeOcampo certainly were aware of the encountering of rock, the contention it was a differing site condition, and, in fact, published documentation on behalf of your construction manager indicating potential change order would be a result of this encounter, correct?

A The daily logs say what they say.

Q And the meeting minutes and the summary of weekly performance, correct?

A Yes.

Q What prevented Mr. Russell or Mr. DeOcampo from seeking assistance to evaluate the contention the contractor had advanced while they were still encountering the rock in constructing the access road in August of 2001?

MR. SCHROEDER: Objection; calls for speculation.

THE WITNESS: I don't know.

Q (By Mr. Schoenfeld) Okay. We'll use the word "our" in describing that the entire National Park Service was prevented from investigating it. And I understand

Page 362

your testimony that you were unaware of it. But as we've seen, other representatives on your behalf were aware. And I'm trying to distinguish, when you use the word "our," are you including them or not? "Them" being Bob Russell and Mr. DeOcampo.

MR. SCHROEDER: Objection; argumentative. Object to form.

MR. SCHOENFELD: It's not being argumentative. I'm just trying to, perhaps, seek clarification of what he intends by his testimony.

THE WITNESS: It would be my understanding.

Q (By Mr. Schoenfeld) Okay. Now, I showed you the boring -- a calendar showing when blasting was done that was prepared by Mr. Russell, we marked as an exhibit.

A Yes.

Q And you saw that blasting occurred all the way into September of 2001, correct, for the road? And thereafter it was the utility blasting, right?

A Whatever they say, yes, those dates are there.

Q Okay. What prevented the National Park Service from having Kleinfelder visit the site on or after August 20th while rock was still being encountered and blasted in the access road?

A I don't know.

Page 363

Q Did you ever receive written communication, either directly from Mr. Christensen or by way of your construction manager or COR, that Mr. Christensen had had the rock that it encountered on the access road tested for seismic velocity?

A Where I sit right now, I don't recall. It may have been, but I don't recall.

Q I'll ask you to assume that that did occur and he delivered it to the National Park Service showing seismic velocities encountered were much greater than that found by Kleinfelder in its report, meaning that a D8 could not rip the rock. Does that refresh your recollection at all?

A From the deposition? I recall that.

Q Okay. You saw that in the deposition testimony that you've read prior to attending this deposition, correct?

A Mr. Tuttle's, yes.

Q Yes. Did that assist you in yielding the conclusion that a differing site condition was encountered by virtue of your publication of Modification Number 6?

A My knowledge came from meetings with Remcon of their alleged differing site condition, and the response is the modification itself.

Page 364

Q When we looked at the FAR regulation that was included in the contract documents for differing site condition, is it the government or the contractor that has the duty to investigate the contractor's contention of a differing site condition?

A Once the contractor has been advised, it's the government's responsibility.

Q Not -- you said "Once the contractor has been advised." Once the contractor advises, then --

A That -- that's what I meant. I'm sorry. Yes.

Q Okay. Did the government timely investigate, based on your recollection, the alleged encounter of a differing site condition by Remcon?

A Based on the exhibit that we looked at -- it was a one-page exhibit advising us of the differing site condition -- no.

Q Okay. Going back to Exhibit 214, the January 14th, 2003, letter or memo from Mr. Giller, in Item 2D, as in dog -- you've got it in your hand --

A This is what number? Did you say 214?

Q It's in Exhibit 214.

A Part of --

Q Yes.

A -- Mod 6. Okay.

Q Mr. Giller writes in 2D, as in dog, quote: It

material, correct?
A Yes to both.
Q Let me show you Exhibit 84, sir. It's an e-mail from Mr. DeOcampo to Andrea Gregor at DHM and Joanne Cody with a cc to Ray Todd and Bob Russell dated August 8th of 2001.
It reads: Andrea, the 200Q project is beginning to questionable overruns and quantities. I need your help on where and how DHM thought items would be paid. The contracting officer is already questioning why Pay Item 26 is almost 350 percent over the estimated quantities, period.
Did you have that discussion with Mr. DeOcampo?
A Oh, yes.
Q And is Mr. DeOcampo accurately communicating that you had concern regarding Pay Item 26 being almost 30 -- 350 percent over the estimated quantities at that point in time?
A Yes.
Q Mr. DeOcampo continues: Now we have possible overruns in Item 38, dash, rock excavation.
This is the item ultimately for which Mod 6 was issued as a differing site condition, correct?
A Yes.



Q Remcon is citing this item for payment for blasting rocks, period.
Had Mr. DeOcampo talked to you about the overruns in Item 38 as of August 8th of 2001, sir?
A I would have to refer to the pay estimate. And whenever you see large amounts of overruns, that's when the logical conclusion would happen where you'd have conversation about those items.
Q So even though Mr. DeOcampo may not have furnished you the actual notice of a differing site condition, which was dated August 20th until June of -- August 20th of 2001 until June of 2002, he nevertheless discussed the subject with you as of August 8th, 2001, which is within ten days of Remcon encountering rock; isn't that correct?
A That's correct.
Q Continues, quote: What was the intent of rock excavation and how does the government defend, slash, ward off these requests for payment under this pay item?
Why is it the government was looking to defend or ward off these requests?
MR. SCHROEDER: Objection to characterization.
THE WITNESS: I don't know.
Q (By Mr. Schoenfeld) Did you ask Mr. DeOcampo, based on his informing you of the subject matter of



Remcon encountering rock and that they contended it was a differing site condition, that you wanted to know what the design team's position was so you could defend against the contention?
A I wouldn't put it in those words.
Q Put it in your words. What did you direct him or ask him to do?
A My words would be that if you have an overrun, we need to take care of that, and we did by making payment to the contractor. And then we also need to get it so we have a meeting of the minds down the road.
Q You just said so we could pay the contractor. Have you ever paid the contractor for the differing site condition encountered?
A I would have to rely on the -- the pay estimates in question.
Q Okay. As you sit here today, you know you didn't pay anything for the differing site condition --
A We have already discussed that.
Q Let me finish. You know you didn't pay any sooner than sometime in 2003, if you did pay, correct? Because Mod 6 isn't dated until February 2003; isn't that correct?
A I would have to look at the pay estimate. And what I think you're saying is that it was not paid to



Remcon.
Q Not paid at all.
A Okay.
Q If Mod 6 isn't issued until February 2003, no payment for differing site condition work was issued any sooner than that, to the best of your knowledge, correct?
A Correct.
Q Do you have any understanding as to why Mr. DeOcampo wrote: How does the government defend, slash, ward off these requests?
MR. SCHROEDER: Objection; asked and answered.
THE WITNESS: I don't.
Q (By Mr. Schoenfeld) You ever see this e-mail before?
A I don't recall seeing it.
Q Whose writing is on this page, if you know? Is that your handwriting, sir?
A I don't recognize this writing.
Q Okay. Do you know if there was a conflict in the contract documents between the specification sections that addressed rock and rock excavation?
MR. SCHROEDER: Objection; calls for legal conclusion. He doesn't have the contract in front of him.
THE WITNESS: I don't recall.

# EXHIBIT 2E

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 461

Q Okay. Do you understand compaction to be a construction term that concerns the compression of earthen material or some type of material?
A Yes.
Q In a natural -- in its natural state various different types of material have different relative compactions, correct?
A Yes.
Q And by applying some force, mechanical or otherwise, there is a compression that occurs to material; some compress greater than others, correct?
A Correct.
Q With respect to the earthen material on this project, did you understand, at any time -- during the design phase, during construction phase, or after Remcon stopped performing its work -- that the design team used a compaction factor of 40 percent of the excavated material to be compressed?
A I seem to recall that.
Q You recall reading about that in Mr. Tuttle's deposition?
A Yes.
Q And do you recall that Mr. Tuttle testified that, in hindsight, the use of a 40 percent compaction factor was an error, that this material could not

Page 462

compress 40 percent?
A His deposition, what he said, will be the -- the record, so I'm going to say that what you said is accurate.
Q I'm asking what you remember him testifying to, if you have any memory.
A I -- I remember -- I don't recall.
Q Do you recall, sir, that the quantification of quantities used in the contract documents by the designer, as testified to by Mr. Tuttle, included the assumption of a 40 percent compaction factor?
A I believe I read that.
Q Could the material, sir, be compacted, that was used on this project, by 40 percent?
MR. SCHROEDER: Objection; calls for speculation.
THE WITNESS: I might not have read -- I'm not an expert in this regard, so . . .
Q (By Mr. Schoenfeld) What have you come to learn, other than through consulting or communications with counsel, as to the ability of the on-site material to compact? What percentage?
A I think it was a lower percentage.
Q And what do you understand to be the consequence of that?

Page 463

A More material.
Q That has to be handled by the contractor, correct?
A Yes.
Q And that means the contractor would be eligible to receive a modification because he's having to handle more material than the contract documents contemplated, correct?
A I believe that's correct.
Q Did you issue any modifications to the contractor for having to handle more material than that which was anticipated?
A I believe there's some hauling mod -- modifications, yes.
Q Was the hauling that you're referring to other than for hauling unacceptable material because of the burn pit being too big or bigger than thought?
A I don't recall.
Q Okay. What time was involved in the contractor having to handle more material than was contemplated at the time that it was issued the contract?
A I don't recall.
Q Do you know of any analysis undertaken by anyone on behalf of the government, other than by counsel, that evaluated whether the handling of

Page 464

additional material caused any delay to the project?
A I don't recall.
Q Have there been any time extensions granted by you, as the contracting officer, in any of the modifications as a result of the contractor having to handle material in excess of that originally contemplated as a result of the material not compressing to the 40 percent anticipated?
A I'd have to refer to the documents, and I don't recall.
Q Okay. In your soils classes or class that you took at school, did you ever learn about any material that could compress up to 40 percent?
A I don't recall.
Q What happened to the excess material that Remcon had to handle? Where did it go?
A I think there was 4 feet that was added on the parking lot.
Q Five foot was added to waste on the parking lot; that was one modification you granted?
A Yes.
Q So they didn't have to haul it somewhere?
A Right.
Q Or minimize the hauling, right?
A Exactly.

# EXHIBIT 2F

Declaration of D. Michael Schoenfeld in Opposition to Defendant's Motion for Partial Summary Judgment

Page 46

Q (By Mr. Schoenfeld) Go ahead.
A No.
Q Why not?
A Remcon was terminated.
Q Irrespective of Remcon's -- the termination of Remcon for default -- strike that.
Do you believe that the fact that Remcon was terminated for default relieves you of the obligations as the contracting officer to issue modification for those additional costs that were incurred by Remcon while it was performing work prior to termination?
MR. SCHROEDER: Objection; calls for legal conclusion.
You may answer.
THE WITNESS: No.
Q (By Mr. Schoenfeld) Therefore, why have you not issued modifications for those errors, omissions, conflicts, inconsistencies, and/or ambiguities that you perceive were encountered by Remcon but for which are not the subject of one or more modifications already to Remcon?
A I think we hit upon the major ones within those modifications, 1 through 6. Through the course, that's what we try to focus on. Undoubtedly, there are some out there that have not been covered, and I can't

Page 47

recall exactly what those are right now.
Q Is there any material that you're aware of that exists in writing that the National Park Service by and through its personnel has determined there are one or more errors, omissions, conflicts, inconsistencies, or ambiguities that are still unaddressed in a modification to Remcon?
MR. SCHROEDER: Objection; compound.
THE WITNESS: I believe that's probably the case.
Q (By Mr. Schoenfeld) Is --
A I don't recall exactly, but I --
Q What is the value of those that remain unaddressed in a modification?
A I don't know.
Q What is the amount of time that Remcon is due that is the subject of those unaddressed or unissued modifications?
MR. SCHROEDER: Objection; calls for legal conclusion and assumes facts not in evidence.
Q (By Mr. Schoenfeld) You may answer.
A I don't recall.
Q Is there any time that the National Park Service, by and through its personnel, determined was due as a change order or modification -- when I say "time," I

Page 48

mean time extension to Remcon -- that has not yet been issued?
A Undoubtedly, there's some.
Q I'm sorry. I didn't hear you.
A Undoubtedly, there's some.
Q Okay. Are you familiar, as a part of your training and experience as a contracting officer, with the concept of constructive change?
A Yes.
Q What do you understand constructive change means?
A Constructive change is when the contractor is directed or the -- the contractor might believe that he's been directed to perform something that the contracting officer has not directed him to do.
Q And what do you understand the significance of that term to mean?
A I believe it would be a contractor that's not paying attention to the requirements of the contract.
Q Did you receive, as part of your training, information regarding the legal doctrine of constructive change?
A Yes.
Q Did you learn, as part of that training, that the doctrine of constructive change is a doctrine whereby

Page 49

a contractor who receives information and perceives it's responsible to perform pursuant to it may be entitled to receive a modification compensating it for the time and/or money associated with performance of that constructive change?
A I've had that training, and it would be on a case-by-case basis --
Q Okay.
A -- depending -- depending on what it is.
Q You received such information that that doctrine exists and contractors are entitled when something is found to be a constructive change to receive a modification for the performance of it; is that correct?
A I would say the contractor may be entitled, not entitled necessarily.
Q As the contracting officer on this project, was there ever a time where you became aware of one or more issues that occurred whereby you perceived a constructive changed occurred?
A I'd say some overruns, earthwork.
Q Anything else?
A I'd have to refer back to the modifications themselves.
Q Okay. Is there any item that you became aware

correct?
A That -- yes.
Q So six months after Mod Number 6 was issued, correct?
A Sure. Yes.
Q What restrained the government, to the best of your knowledge, from issuing the payment for Mod Number 6 prior to the time Remcon was terminated?
A I think it was probably an administrative oversight.
Q Isn't it true that during the winter and spring and summer of 2003, prior to the time Remcon was terminated, Remcon was claiming in multiple communications to you personally that the failure of the government to timely issue modifications, including that which is reflected in Mod Number 6, had depleted its revenues such that until it received money it couldn't go back to the job site?
A The records will show when they were paid for Mods 1 through 5. The records will show that they weren't paid necessarily for Mod Number 6.
Q Isn't it true --
THE REPORTER: I'm sorry. I didn't -- I didn't catch the end of the answer.
MR. SCHROEDER: I'm sorry.



THE REPORTER: That's okay. I'm sorry.
MR. SCHOENFELD: The record will reflect they were paid for Mod -- when they were paid for Mods 1 through 5, and that they weren't paid for Mod Number 6.
THE WITNESS: Very good. Thank you.
Q (By Mr. Schoenfeld) Isn't it true that as of February of 2003 Mr. Christensen had communicated to you on multiple occasions that his working capital had been depleted and they lacked the funds to go back to work, until he got compensated for the differing site condition issue at a minimum?
A I remember a letter specifically that said something about ruination of the business. I --
I need to take a drink of water here.
Q Had you finished your response?
A Not yet.
Q Okay.
A -- I do not recall.
Q Okay. Is it your testimony, sir, that other than that letter dealing with ruination of business, you do not recall written or oral communications at any time for Mr. Remcon -- Mr. Christensen on behalf of Remcon prior to the date you issued the letter terminating his ability to proceed that he lacked the working capital to go back to work because of his failure to get timely paid



for contract and/or extra work?
A The government does not want to put a contractor out of business. That's one of the big reasons that we had a -- that we were -- both parties were diligently pursuing a stipulation for settlement.
Q That wasn't my question. My question was: Is it your testimony that you do not recall, other than maybe one letter, Mr. Christensen communicating to you orally or in writing that because he had not been timely paid for contract and/or extra work, he lacked the working capital to get back on the project?
A I believe he probably did.
Q Okay. Let me show you Exhibit 88, sir.
Do you recall Mr. DeOcampo testifying that Exhibit 88 is the calendar prepared by Mr. Russell of the actual blasting work that was undertaken by a subcontractor of Remcon in blasting the differing site condition location in the access road?
A This looks familiar.
Q Isn't it true that it totals approximately seven weeks of blasting?
A But included in that is also utilities.
Q Yes.
A Yes.
Q Are you familiar with the term critical path?



A Yes.
Q Have you received some training regarding what the concept of critical path scheduling is?
A Not specifically as course title, but it's been discussed in some training.
Q That's my point.
A Yes.
Q Not a specific course just on critical path methodology, but you've received scheduling training?
A Right.
Q Is that correct?
A Some.
Q Are you familiar, as a result of your experience, whether it be through training or just from the daily interactions you've had, that delays to the critical path of a project are by definition a delay to the completion of the project?
A That's accurate.
Q Between July 30th of 2001 and the completion of the blasting of the access road in September of 2001 isn't it true that the access road construction was the critical path of this project?
A That was part of the critical path.
Q Thank you.
A But that did not delay the contractor from

working in other areas.
Q It's your understanding that because the contractor could work in other areas that he's not entitled to time expense when critical path activities are concurrently delayed? Is that your testimony?
A That's what you're saying. I didn't say that.
Q That's what I'm asking you. Is that what your testimony is?
A My testimony is that if there is a critical path that impacts, the parties typically sit down, negotiate, and work those things through.
Q And if the parties cannot reach an agreement, is it your understanding that the government nevertheless has the duty to unilaterally issue a modification for that portion of time and money that it believes it inexcusably owes the contractor?
A Yes.
Q And that modification is required, as you understand your responsibilities, to be issued as promptly as it can be?
A Yes.
Q Because if you don't, you've created what you understand from your training to be a constructive acceleration?
MR. SCHROEDER: Objection; calls for legal



conclusion.
Q (By Mr. Schoenfeld) Is that correct?
A I understand that it is what it is.
Q All right. Well, let me make sure I understand your testimony.
Delays to the critical path are the subject of potentiality for time extensions, correct?
A Undoubtedly that's where they come from.
Q Okay. And if there is a delay to the critical path, such as blasting on this project of the access road, it's incumbent upon you, as the contracting officer, to promptly evaluate it, seek a resolution with the contractor, if you can; but if you can't reach a prompt resolution, to timely issue a time extension modification so as to avoid a claim that you failed to timely issue time extension, correct?
MR. SCHROEDER: Objection to form.
THE WITNESS: I'd say that's a yes.
Q (By Mr. Schoenfeld) Okay. Did you issue any time extension for the contractor encountering the differing site condition on this project?
A I believe Modification Number 6 is the modification and I -- and there was no time on that one.
Q Okay. Has there been any time granted at any time by you, as the contracting officer, for the



contractor having encountered the differing site condition in the access road?
A I don't recall.
Q Okay. Now, you mentioned a few moments ago with respect to the blasting that there was blasting for utilities, trenches, as well as blasting for the roadway, correct?
A There was a specification for blasting the utilities, yes.
Q But when I showed you Exhibit Number 88, I believe you said looking at the calendar, Well, some of it was for blasting utilities and some of it was for roadway, correct?
A Correct.
Q Isn't it true that the blasting for utilities is specifically identified by Mr. Russell in this exhibit as being separate and distinct from the blasting for the roadway?
A That's what I saw, yes.
Q And that the blasting for the roadway was seven consecutive weeks before transition to be blasting for the utilities; isn't that correct?
A Exhibit 88 is what it is.
Q But that's what you read from that document, is that correct, seven consecutive weeks of blasting for



the access road and only then blasting for the utilities occurred?
MR. SCHROEDER: I object. There -- I mean, they're not showing seven consecutive weeks. It's showing a couple days on some weeks, more days on others.
THE WITNESS: I will acknowledge what it shows.
Q (By Mr. Schoenfeld) That -- that the blasting that is shown on Exhibit 88 for utilities follows the road blasting?
A (Reviewed documents.)
In this particular -- in this particular case, it appears that the road precedes the road (sic), not follows.
Q Road precedes the utilities?
A That's what it indicates here.
Q Okay. Now, on this project, sir, are you aware of limitations in the contract documents as to the time as to when blasting could occur if it became required?
A I know that there is some time frames within the contract.
Q Okay. You recall the national park that we're dealing with was open for the public, correct?
A Correct.

Q And the primary mission is to allow the park to be used by the population and that this project was to enhance, ultimately, the public's ability to use the park, correct?
A To enhance the experience, you bet.
Q And, therefore, are you aware, sir, as a result of the materials that you became aware of during the contract and subsequently that blasting could only occur within limited time frame on a day -- working day so as to minimize the potential disruption to the use of the park?
A I will answer that you have an upper and you have a lower, so if you're blasting in the upper, you don't want to mess up the experience on the lower, so yes.
Q Okay. And as a result, sir, isn't it true that because the blasting could only occur in the limited period of time and that was the critical path activity, there was, in fact, a multiple-week delay to the progress of the project as a result of the differing site condition encountered?
A There is other work that can be done.
Q But the other work was not critical path?
A Everything becomes critical path sometimes when you have something that's holding you up. There's



other work to be done. You just don't focus in on one particular piece of the project.
Q So is it your testimony, sir, that the reason why you haven't granted a time extension up to this point is because the contractor had the ability to resequence to do noncritical path work while it was doing the blasting work on the road?
A Mod Number 6 was issued unilaterally, so it was not signed by the contractor. What it comes down to is that that is one of those situations where I -- I indicated that there might -- may have been some things that we have not covered and that is one of them. I've already said that.
Q Have you covered them yet? We're now in February of 2005 and this conduct occurred in the summer of 2001.
A We will get there.
Q Okay. What is restraining you from doing so at any time sooner than today?
A Well, you may be privy to the takeover agreement. You may not. I don't know. But the takeover agreement, we're not assessing the liquidated damages, so we are making payment. But it is something that is coming in front of us. That's something, obviously, we'll consider.



Q Let's make sure the record is clear.
The takeover agreement that you refer to is, as a matter of record, after you terminated Remcon's ability to continue on the project in August of 2003, you entered into negotiations with its performance bond surety posted by the Miller Act to have the surety cause the project to be completed, correct?
A Due to Remcon's lack of response to cure letters, yes.
Q Okay. Remcon's terminated for default. Thereafter, there's a discussion and an agreement entered into between the government, on the one hand, and General America, the surety, on the other hand, whereby General America agreed under certain terms and conditions to -- I'm sorry, I meant Great American -- to perform -- cause the balance of the work contracted by Remcon to be completed?
A By a takeover contractor.
Q And the takeover agreement doesn't provide anything whatsoever with respect to time extensions, does it?
A I would have to look at the takeover agreement. We will, undoubtedly, get there on -- on issues that we have not covered.
Q The takeover agreement was entered into



between the government and the surety during the winter of 2003/2004, correct?
A It took a long period of time, yes.
Q Up to the time the takeover agreement was entered into, what prevented you, as the contracting officer, from issuing whatever time extension you felt was promptly due the contractor for having encountered the differing site condition in calendar year 2001?
A I think I've already covered that.
Q I don't think you have. You said --
A I said --
Q -- that you will address it now because there is a takeover agreement. What prevented you from addressing it before the takeover agreement was entered into?
A If we can go back on maybe doing a search on administrative oversight, I think that answer has been -- it's been answered.
MR. SCHROEDER: Can we have a break here?
MR. SCHOENFELD: Absolutely.
MR. SCHROEDER: Thanks.
(A recess was taken from 11:22 a.m. until 11:31 a.m.)
(Ms. Dulin is not present.)
MR. SCHOENFELD: Okay. Let's go back on the

# EXHIBIT 2G

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

correct?
A That -- yes.
Q So six months after Mod Number 6 was issued, correct?
A Sure. Yes.
Q What restrained the government, to the best of your knowledge, from issuing the payment for Mod Number 6 prior to the time Remcon was terminated?
A I think it was probably an administrative oversight.
Q Isn't it true that during the winter and spring and summer of 2003, prior to the time Remcon was terminated, Remcon was claiming in multiple communications to you personally that the failure of the government to timely issue modifications, including that which is reflected in Mod Number 6, had depleted its revenues such that until it received money it couldn't go back to the job site?
A The records will show when they were paid for Mods 1 through 5. The records will show that they weren't paid necessarily for Mod Number 6.
Q Isn't it true --
THE REPORTER: I'm sorry. I didn't -- I didn't catch the end of the answer.
MR. SCHROEDER: I'm sorry.



THE REPORTER: That's okay. I'm sorry.
MR. SCHOENFELD: The record will reflect they were paid for Mod -- when they were paid for Mods 1 through 5, and that they weren't paid for Mod Number 6.
THE WITNESS: Very good. Thank you.
Q (By Mr. Schoenfeld) Isn't it true that as of February of 2003 Mr. Christensen had communicated to you on multiple occasions that his working capital had been depleted and they lacked the funds to go back to work, until he got compensated for the differing site condition issue at a minimum?
A I remember a letter specifically that said something about ruination of the business. I --
I need to take a drink of water here.
Q Had you finished your response?
A Not yet.
Q Okay.
A -- I do not recall.
Q Okay. Is it your testimony, sir, that other than that letter dealing with ruination of business, you do not recall written or oral communications at any time for Mr. Remcon -- Mr. Christensen on behalf of Remcon prior to the date you issued the letter terminating his ability to proceed that he lacked the working capital to go back to work because of his failure to get timely paid



for contract and/or extra work?
A The government does not want to put a contractor out of business. That's one of the big reasons that we had a -- that we were -- both parties were diligently pursuing a stipulation for settlement.
Q That wasn't my question. My question was: Is it your testimony that you do not recall, other than maybe one letter, Mr. Christensen communicating to you orally or in writing that because he had not been timely paid for contract and/or extra work, he lacked the working capital to get back on the project?
A I believe he probably did.
Q Okay. Let me show you Exhibit 88, sir.
Do you recall Mr. DeOcampo testifying that Exhibit 88 is the calendar prepared by Mr. Russell of the actual blasting work that was undertaken by a subcontractor of Remcon in blasting the differing site condition location in the access road?
A This looks familiar.
Q Isn't it true that it totals approximately seven weeks of blasting?
A But included in that is also utilities.
Q Yes.
A Yes.
Q Are you familiar with the term critical path?



A Yes.
Q Have you received some training regarding what the concept of critical path scheduling is?
A Not specifically as course title, but it's been discussed in some training.
Q That's my point.
A Yes.
Q Not a specific course just on critical path methodology, but you've received scheduling training?
A Right.
Q Is that correct?
A Some.
Q Are you familiar, as a result of your experience, whether it be through training or just from the daily interactions you've had, that delays to the critical path of a project are by definition a delay to the completion of the project?
A That's accurate.
Q Between July 30th of 2001 and the completion of the blasting of the access road in September of 2001 isn't it true that the access road construction was the critical path of this project?
A That was part of the critical path.
Q Thank you.
A But that did not delay the contractor from

MR. SCHOENFELD: Let me see if I have my copy.
MR. CHRISTENSEN: We don't.
MR. SCHOENFELD: It's not over here.
MR. CHRISTENSEN: What number is it?
MR. SCHOENFELD: Seventy-one. Off the record.
(A discussion was held off the record.)
Q (By Mr. Schoenfeld) I apologize, sir.
A That's okay.
MR. SCHROEDER: You want to borrow that?
MR. SCHOENFELD: Thank you.
Q (By Mr. Schoenfeld) Would you look at page number 16, sir. You on it?
A Yes.
Q At the bottom there's a heading regarding contract modifications. You recall that subject discussed at the partnering session?
A Yes.
Q And was it correct that when modifications were deemed appropriate Mr. Russell was to write them up as preliminary modifications and negotiate them with Remcon?
A Yes.
Q And Mr. DeOcampo was then to support decisions made in the field?
A I see where it says that. I'm formulating an



answer. He wouldn't necessarily support the decisions in the field. That may be a -- a decision that he didn't agree with.
Q Understood.
But if he did, he was then to support them and pass them on to you, correct?
A It would have been supported from the field up to Willie, and he would make sure that it's a complete, documented-supported modification.
Q On the next page, item -- page 17, it says: If needed, we have the ability to do unilateral change to get Remcon paid. You see that?
A Yes.
Q Do you recall at the partnering session Remcon made it crystal-clear that the failure to get timely paid had significantly affected its financial ability to perform the job? Correct?
A I recall that he had some concerns with some cash flow.
Q Yes.
So part of the response on behalf of the government, we would issue unilaterally, if it's taking too long to get a modification through the process, correct?
A Correct.



Q Did you ever issue any unilaterals earlier than Number 6, which occurred in February of 2003?
A It would have been by directive. The only unilateral modification, as we are all aware of, was Number 6.
Q A directive only says you go ahead and do the work; it doesn't get them paid, correct?
A That is -- can be correct with a caveat. As we have discussed earlier today, maybe even yesterday, where the contractor could conceivably have gotten paid through another line item.
Q Okay. Looking at page 18, it deals with outstanding issues on the project. With respect to Item Number 2, excess haul outside of park, paperwork needs to get caught up, the commitment by the government was to have the contract modification completed by Bob Russell as of May 31, 2002. Do you see that?
A Yes.
Q Did that happen?
A Not on that date.
Q Why not?
A I'd have to go to the modification that was issued on whatever date it was issued on.
Q Isn't it true the modification wasn't issued until September, sir, as we've seen?



A Whatever date is on the modification.
Q Okay.
A I would say yes.
Q Under the heading of Sherman Tree Trail, towards the top of the page, there's a reference that Bob S. to meet with Joanne on Monday. Is that Bob Svoboda?
A Bob S. I don't know. That's --
Q Is it Bob Smith of DHM? It should be Bob Smith?
A I think that would be a logical conclusion.
Q And that two types of issues were going to be resolved: Minor issues and major issues. How many issues were there pending regarding the Sherman Tree Trail as of the date of the partnering meeting?
A I recall -- I believe there were something to do with the -- the steps, three or four.
Q Are you sure that's all there was?
A I'm not sure.
Q Okay. Under the heading Earthwork, slash, Excess Material, the issues that were to be addressed was the redesign of the parking lot and that the drawings were going to be put out to Remcon for pricing within two days. Did that happen?
A I don't believe it did.
Q Why not?

# EXHIBIT 2H

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 202

or representatives of the National Park Service that the volume that was available for the contractor in the location indicated on the plans was less than represented?
A I have to say that I recall something to that effect.
Q Okay. Did you, therefore, issue a modification to the contractor to -- to compensate it for that portion that you felt was diminished over what was supposed to have been there as represented in the contract documents?
A It's been a while since I looked at the modifications, but they -- it may be in there.
Q Please look at modifications which I've -- we've marked and tell me if you can see any modification granting compensation for aggregate base --
A Okay.
Q -- materials.
A (Reviewed documents.)
Q That's the differing site condition?
A No.
Q Okay. Why not?
A I don't recall.
Q Is that one of the items that's yet to be addressed?

Page 203

A I believe that's in a final decision.
Q Did the final decision acknowledge entitlement?
A I have to look at the final decision.
Q Okay.
A I don't recall.
Q What information did you rely upon to issue that final decision other than -- strike that.
In issuing your final decision, did you utilize Exhibits 123 and 124?
A I don't recall.
Q Were you the contracting officer for 200P performed by Buddy's Contracting Service?
A Yes.
Q Did Buddy's Contracting Service access the material that was identified in the picture marked Exhibit 124 and deplete such that it was not available to Mr. Christensen and his company?
A I don't recall.
Q Who do you believe is most knowledgeable on that subject that's in the employment of the National Park Service, sir?
A Willie DeOcampo.
Q Do you remember what Mr. DeOcampo testified on the subject?

Page 204

A I don't -- I don't recall.
Q Isn't it true Mr. DeOcampo testified that the National Park -- that the aggregate base was not there and that Remcon was entitled to a modification compensating it for having to create or procure the materials?
A I don't recall.
Q On Exhibit 123, sir, what's the quantity that's indicated of the base rock that's available? Isn't it true it's the entire aggregate base quantity by virtue of the words "The aggregate base course for this project is stockpiled in the general area"?
A (Reviewed documents.)
That's what the note appears to say.
Q So, therefore, you would expect a reasonably prudent bidder when bidding this job not to include the cost of procurement of the aggregate base material but just the cost to take it from the location stockpiled to use in the project, correct?
A I would expect the contractor to look at the conditions and take it from there and what the documents say.
Q But if the conditions were buried under snow, they could not do a takeoff on the volume that was there, correct?

Page 205

A Correct.
Q Was the contractor entitled to rely upon the accuracy in the representation in the note on Exhibit 123 that all the aggregate base material anticipated to be used on this job was, in fact, in a stockpile at the location indicated?
A I believe so.
MR. SCHROEDER: Objection; calls for a legal conclusion.
Q (By Mr. Schoenfeld) Okay. Has Remcon been compensated for any of the aggregate base materials that it did use on this project?
A I have to look through the pay estimate.
Q Okay. May I have that back?
A You bet.
Q Thank you.
(Exhibit Number 247 was marked for identification.)
Q (By Mr. Schoenfeld) We'll mark as Exhibit 247, sir, a document, it's entitled Office of Acquisition and Property Management, Department of the Interior, Contracting Officers Warrant Manual dated February 11th, 1997.
Is this a document you keep on your desk, sir?
A We have available from -- on-line. I don't