# EXHIBIT 3A

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF JOANNE HARTMAN CODY
February 28, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: RICHARD P. SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 4058
Washington, D.C. 20005

Also Present: Stephen Christensen
Rodney Keiscome

A I'm not sure.

Q Well, the redesign had to be done before he would be allowed to transition to the Lower Sherman, correct?

A I'm not sure. I thought that he could build from the exist -- from the contractor set of drawings, that the changes were very minor. So I'm not following that.

Q Well, before the contractor could transition to the Lower Sherman efforts, the Upper Sherman efforts had to be completed, correct?

A Correct.

Q And the Upper Sherman efforts included a redesigned scope of work that was not issued as a modification until sometime in the latter half of 2002, correct?

A Again, I'm not sure.

Q All right. If the government was made aware by the contractor in the first part of the first year's construction season -- in other words, the first half of 2001 -- that there was a problem with the Sherman Tree Trail design, we've seen a whole series of revisions done -- not official revisions, but revisions done during 2001, am I correct, you don't know exactly when the modification was issued formally authorizing the



contractor to perform the revised work on the Sherman Tree Trail?

A Your question is, do I know when that modification was --

Q Issued.

A Issued?

No, I do not know that.

MR. SCHOENFELD: Steve, can I have the mod, please.

MR. SCHROEDER: Which modification number?

Q (By Mr. Schoenfeld) It's Exhibit 213. I'm going to walk around to you.

A All right. I'm going to stretch.

Q That's all right. I'm going to show you Modification Number 5.

A Okay.

Q It's signed by Mr. Keiscome no sooner than November 20th of 2002. All things being equal, you would expect the site to be quite cold, if not under snow, by that point in time, generally speaking, correct?

A Cold at that point, yes.

Q Maybe under snow depending on how early the winter came, correct?

A It may be, yes.

Q And in Modification Number 5, we see: Adjust



the Sherman Tree Trail as New Bid Item Number 140, correct?

A Yes.

Q And -- pardon me.

(Reviewed documents.)

The description is compensate the contractor for the following adjustments to the trail: Install two corrugated metal pipe locations, order revetment, relocating a boulder, adding riprap, adding modified head walls, and adjusting riprap. Do you see that?

A Yes.

Q Was the contractor authorized to do this work sooner than, to the best of your knowledge, November 20th of 2002?

A No.

Q Okay. Was the work done sooner than November 20th of 2002?

A I don't know.

MR. SCHROEDER: Read into the record on page 51, 5385, that Exhibit -- Exhibit 213 says that it's sent 9/19/02. Remcon would not sign. Resent 10/16/02 with further clarifications.

MR. SCHOENFELD: Correct. And the record will reflect why and you can ask Mr. Christensen why.

Q (By Mr. Schoenfeld) Ms. Cody, let me show



you --

MR. SCHOENFELD: Steve, have we marked this?

MR. CHRISTENSEN: No. They're all there.

Q (By Mr. Schoenfeld) Excuse me.

MR. CHRISTENSEN: There's four sheets there.

MR. SCHOENFELD: Okay. I'm going to take the top sheet off and mark this as 269.

(Exhibit Number 269 was marked for identification.)

Q (By Mr. Schoenfeld) Why don't you take one and you guys can share it, and give it back to Steve.

MR. SCHROEDER: Are all these the same?

MR. SCHOENFELD: Yes. Take that back to Steve. Yes.

MR. SCHROEDER: Okay.

Q (By Mr. Schoenfeld) Okay. I've marked Exhibit 269 and placed it before you. Can you describe what this document is? And it's got several documents on it.

A (Reviewed documents.)

Q Let's take it in order. The base document underneath, it is page number US9 from the contract documents; is that correct?

A That's correct.

Q On the upper right-hand portion, there is

# EXHIBIT 3B

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 107

been A&E's that have not produced what you consider to be sufficient quality construction documents?
A Yes.
Q What about on this project?
A No.
Q Do you believe the construction documents were sufficiently quality-free from errors, omissions, conflicts, and inconsistencies?
A Yes, to the standard that you will never get a document free of errors.
Q And once again, having listened to your testimony earlier, you're not aware of any errors, omissions, conflicts, or inconsistencies in the drawings, correct?
A I don't believe I said that. Can you recall?
Q So were there errors, omissions, conflicts, and inconsistencies in the plans that were put out to build by Remcon on this job?
A There were small errors, yes.
Q Small errors. Small and how in degree? In the value, the cost it took to fix them? What do you mean by small errors?
A Or relevance, such as typos or some missing spot elevations or things that -- that do not affect the construction on a typical project.

Page 108

Q Okay. Let's talk about aggregate base for a moment. You're familiar with the content of the contract documents on the plans themselves, it says the government is going to furnish the aggregate base for the project?
A I don't remember.
Q Okay. Assume that there is a designation and note on a drawing that says the government is going to furnish all the AB necessary to build the road, okay?
MR. SCHROEDER: Objection; hypothetical.
MR. SCHOENFELD: It's okay. I don't know why you object to a hypothetical. It's a perfectly legitimate question.
Q (By Mr. Schoenfeld) Assume that that's the case and there was no AB in existence for the contractor to use. Was that an error, omission, conflict, or inconsistency?
A I don't know that there was an AB there to be used.
Q Okay. I asked you to assume that there wasn't. Assume that the government said it was going do furnish it all in one or more stockpiles on the plans.
A Okay.
Q And assume that it wasn't there when the contractor went to get it. Was that an error, omission, conflict, or inconsistency, as you understand those

Page 109

terms?
A Yes.
Q Okay. Was that the circumstance that happened on this project?
A Not to my knowledge.
Q Was there actually the AB that was designated in the contract documents to be stockpiled accessible and available to Remcon to use?
A I don't know.
Q So you don't know one way or the other whether it -- it actually occurred, correct?
A Correct.
Q Okay. Anybody ever bring that to your attention that the contractor so contended?
A Willie has said that.
Q And what did Willie say about it? The material was there? That Remcon couldn't find it?
A I don't know. I don't remember.
Q Okay. Have you ever been asked to evaluate the accuracy of the representation in the contract documents that the material was present while the job was being bid?
A Not to -- not to that extent. We did take photographs and the photographs are in the drawings of what existed.

Page 110

Q Okay. At the time this job was bid, it was during the winter, correct?
A Correct.
Q And to the extent the material existed it was under snow and could not be observed had someone tried to find it, correct?
A I don't know.
Q Well, was there a site inspection -- a prebid site inspection while the documents were out for bidding?
A No.
Q Why not?
A Because there's typically snow there.
Q Okay. It was winter and the site was inaccessible, correct?
A I don't know if the site was inaccessible.
Q There was a perception by the Denver Service Center that the site was inaccessible, so no such prebid site inspection was scheduled, correct?
A Correct.
Q Okay. So it's your expectation that the material would not have been observable because of the time of the year and the location where the project was located, correct?
A Correct.
Q So you don't know whether the materials, at

# EXHIBIT 3C

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

change.
Q That's correct?
A I'm sorry.
Q So you were still in charge of QC and QA for in-house efforts for any particular project that you were involved with, correct?
A Correct.
Q What was added was QA/QC for third-party efforts?
A Just QA for third-party.
Q Okay. What distinction do you draw between quality assurance, or QA, and quality control, QC, because you're drawing a distinction in your testimony? So please put in your words what you mean.
A Quality control, I look at as the calculations, the items that are placed on a sheet, the spot elevations, the accuracy of -- of the work that is being done there.
Q Accuracy of what work?
A Of the calculations, of the dimensions that are shown, of -- I can't think of other things at this point.
Q Let me see if I can articulate and see if this is correct. If, for instance, there's information depicted on a sheet of plan or plans where it designates



control points, trail points, elevations, certain physical features, quality control effort would involve confirming that what is shown is accurate?
A Correct.
Q And that was not your responsibility of third-party designers as a COR; is that correct?
A Correct.
MR. SCHROEDER: Objection to the form.
Q (By Mr. Schoenfeld) Am I correct in understanding that your understanding of your job responsibilities as a COR did not involve the QC efforts as I just designed -- defined it?
A I need to hear the definition again. I am sorry.
Q Confirming that what is on the drawing as shown as control points or elevations or natural features, that was not your responsibility to confirm that they were accurate as shown on a drawing?
A Correct.
Q Okay. Whose responsibility was it, as you understood it, when you were COR-managing a third-party design efforts? Was it the third-party designer's responsibility to do quality control?
A Not on those points. On those points it's the -- for what you specifically said, the control



points, those it would be the survey A&E firm, that we expect them to handle their own quality control.
Q All right. Okay. Quality control of the accuracy of information that is shown on a drawing was, while you were on COR such as this project, 200Q, was allocated to the third-party designer?
A No.
Q As contrasted with the National Park Service itself?
A No.
Q Who had the responsibility for quality control of information on drawings? The National Park Service or third-party --
A Third party. Sorry.
Q And the surveyor you don't consider to be a designer; is that correct?
A I think there may be designer surveyors; I'm not sure.
Q All right. On this project, who hired the surveyor to identify the -- the national -- the existing natural topography that is shown on the drawings? Was it the National Park Service or was it the A/E team?
A I -- I'm trying to remember. I -- I believe it was the Park Service.
Q Okay.



A To the best of my knowledge.
Q Was that Kleinfelder?
A I don't remember. I -- it was --
MR. SCHROEDER: Don't guess.
Q (By Mr. Schoenfeld) If you don't remember. I'm looking for your best information.
A I don't remember.
Q Okay. So let me just follow along. Assuming that the National Park Service hired the surveyor, when I look at a set of drawings and I say, there's a control point, an elevation, a natural feature, it would be your expectation, all things being equal and assuming I didn't show you anything different, that the surveyor would have the quality control responsibilities as to the accuracy of the location depicted on the drawing?
MR. SCHROEDER: Objection to form and hypothetical -- you're giving a hypothetical. But you may answer.
THE WITNESS: I'm -- I'm trying to understand it. That was convoluted.
Q (By Mr. Schoenfeld) All right. I'm just trying to understand what your perception of what your job responsibilities were. You've defined for me quality control of information on drawings, lines and data and information depicted on a drawing, calculations, those

sorts of things.
A Yes.
Q You told me that the surveyor had the responsibility to do the quality control thing, correct?
A I'm -- you talk about lines and things on the drawing for the survey. The surveyor had quality control.
Q All right. As far as hyp -- hypothetically, if a road was to be constructed such as in this project, who had the responsibility to quality-control the location where the road is depicted?
A That would be the A&E design firm.
Q Okay. Did the National Park Service personnel, from yourself on down, while you were COR for this project, have responsibility for quality control of any content of the drawings for the Upper Sherman portion of the project?
A At the predesign phase, yes.
Q Okay. Once it transitioned to the design team, DHM and -- et cetera, thereafter drawings that are prepared, the content, other than survey, was their responsibility for quality control; is that correct?
A That's correct.
Q Did you do any quality control work to affirm the content was accurate, or was that delegated



exclusively to them?
A That is delegated to them.
Q Exclusively?
A We have -- because of the relationship between Lower Sherman and the Upper Sherman project, we had some integration.
Q Okay. I'm going to focus on calculations.
A Okay.
Q The calculations that were done by the design team for the Upper Sherman area, that quality control responsibility was the design team's, correct? Not the National Park Service; is that correct?
A That's correct.
Q As you understood your responsibility for this project as the COR, were you aware, at any time during the design phase, of any mistakes or errors in the design that dealt with calculations?
A Not to my memory.
Q Okay. If you became aware, either from direct communication, from, let's say, Bob Smith -- oh, we found a mistake -- or your own perception, having looked at the drawings that there appears to be an omission, an error, something that was needed to be corrected, what did you understand, while you were working as the COR on this project, that was your responsibility to do, if anything?



MR. SCHROEDER: Objection to form.
THE WITNESS: If I found anything, I would make a comment on the drawings or would -- and it's their responsibility to -- to -- because as I'm looking at it as a quality assurance, there are times when -- when I do notice --
Q (By Mr. Schoenfeld) All right.
A -- items.
Q Let's transition to QA, or quality assurance, for a minute, and then we'll come back. As a senior landscape architect, I understand your job responsibilities include, over your own subordinates' design efforts, not third-party, QA and QC. But when you hire a third-party designer, they have the QC and you preserve the QA, correct?
A Correct.
Q What do you call or define QA to be?
A Quality assurance is to assure that projects meet the National Park Service design ethic, that --
Q You said ethic, E-T-H-I-C?
A Yes.
Q Okay. What else?
A That I am looking out for the natural and the cultural resources to assure that those are -- are protected. I look to --



Q Nobody said it was going to be easy today.
A I know. I assure that projects meet accessibility standards, the design of the projects meet that.
Q Assure that they're designed to be performed within identified budgets?
A I look at the estimate to make sure that it's within the budget of the project. I make sure that the scope of the project from the PMIS statement, which is the Project Management Information System where projects go in -- come into the Park Service, I assure that that scope is met in the scope that we're getting in design.
Q So let me see if I can understand it. You make sure that the scope design meets the mission identified?
A Meets the scope identified.
Q Okay. Anything else for quality assurance?
A Can I ask a --
Q Yeah. Let me ask you --
A -- a question?
Q Let me ask you a follow-up, and then I'll let you speak with counsel.
As part of your quality assurance role, is one of them to observe that the drawings are free from error or omission?

A No.
Q Conflict or inconsistency?
A No.
Q Are complete?
A No.
Q Are constructable?
A Yes.
Q How do you determine, during the quality assurance phase, that drawings are -- or plans are constructable?
A I'm sorry. I -- we -- look for completeness of disciplines to make sure that the scope of the project is covered within the -- the drawings and the specifications.
Q What do you mean by completeness of disciplines?
A If there are buildings shown, that there are architectural drawings for that building.
Q Do you study the architectural drawings themselves to determine if all the expected components and features are there so that someone could construct the building free from change order, RFI?
A No.
Q Who has that responsibility?
A The A&E firm.



Q Okay. That would be under the quality control component?
A Yes.
Q I asked you a question a moment ago regarding errors, omissions, conflicts, and inconsistencies to determine or discern whether drawings are free from, or plans, I should -- start again.
Design is free from errors, omissions, conflicts and inconsistencies. Do you consider that to be a QC responsibility of the design team?
A Yes.
Q I want to focus on constructability. Tell me exactly what you do as part of your quality assurance responsibilities as COR for third parties' design efforts to confirm or assure that the design is constructable. I'm not sure I understood your response.
A We have a constructability reviewer in the QA group that looks at projects for constructability.
Q Is this someone that is assigned to you --
A No.
Q -- to oversee?
A No.
Q Okay. Someone that is available to you for your COR responsibilities who takes third-party design as well as design done by your personnel, who independently



reviews it for constructability?
A Yes.
Q Okay. And what is it that is undertaken? What do you understand a constructability review to be?
A I'm not sure.
Q Have you ever asked?
A I -- it's to make sure that the project is constructable as it's shown on the drawings and specs.
Q Without change orders or design modifications?
A No. No. No.
Q Okay. So I still don't understand. A constructability review reviews to see if the project is constructable?
A Correct.
Q But what does that mean? That it can be built at all, whether with difficulty or not? I'm just trying to get a sense of what it means.
A I don't know. I'm not a constructability expert.
Q Okay. On this project was a constructability review done for the A/E firm's design?
A Yes.
Q Who did the constructability review?
A I believe it was Brian Lippert.
Q Spell the last name.



A L-I-P-P-E-R-T.
MR. SCHOENFELD: Counsel, we've had, throughout this litigation, a running series of outstanding requests for documents, some of which still remain unfulfilled. I make a representation to you that we received no documents demonstrating a constructability review was actually undertaken for this project, and I am not aware of the name Brian Lippert on any pieces of paper that I have seen.
I would ask that during the break today you discuss with your clients who are present the identity of this gentleman's work and whether he's still with the NPS and please let me know, perhaps by the lunch break, whether such documents are in the possession of the NPS, to the extent you can discern it.
MR. SCHROEDER: What type of documents?
MR. SCHOENFELD: Everything he touched.
MR. SCHROEDER: Constructability review documents?
MR. SCHOENFELD: Everything he touched, prepared, published, reviewed, anything with respect to this project.
Q (By Mr. Schoenfeld) One more -- a couple more questions and then we'll take a break and let you ask Mr. Schroeder whatever questions you wish to ask him.

A If the topo were wrong, it would be.
Q An error, omission, conflict, or inconsistency? It would be a mistake?
A Yes.
Q But that never happened to the best of your knowledge; is that correct?
A It was suggested that it happened.
Q What do you believe happened? Was there any such instance that came to your attention that you confirmed was accurate, that there was a mistake in that type of an instance?
A I believe we found two trees that were in the wrong place.
Q Okay. Where were those two trees in the wrong place?
A Parallel to the entry road outside of the limits of construction.
Q And anything in the Upper Sherman parking area?
A Not to my knowledge.
Q Okay. Trees or other natural features were identified by National Park Service as either able to be affected or to be kept free from effect by construction operations, correct? In other words, trees were marked, you can remove this tree or you can't touch this tree?



A Correct.
Q And same thing with natural features such as, you know, boulders or outcroppings or things that were felt of significance to the National Park Service as a cultural or natural resource to be protected, correct?
A Only trees that are identified that needed to be saved, critical trees.
Q No natural outcroppings or rocks were identified?
A There were rock outcroppings that were outside of the road prism, but they weren't identified as don't -- don't touch the rock.
Q Okay. All right.
A It wasn't --
Q Okay. Earlier this morning you identified that you've never been involved in a claim situation, correct?
A That I don't remember ever having a claim.
Q Okay. Were you involved in the construction project known as 200P?
A Yes.
Q Both -- as the COR for design, correct?
A As the COR for design.
Q And was there a claim asserted by Buddy's Contracting Service arising off that project once it was



finished?
A I'm not sure. There were issues that came up. There's a lot of talk of claims but whether they actually go to claim I don't know.
Q What do you understand go to claims to mean? You just used that phrase.
A It mean --
Q I'm not talking necessarily that a lawsuit was filed, but a request after the job is done for time and/or money is what I'm using to be a claim.
A I don't know. That's a construction COR issue. That is not a design issue.
Q You were not involved in any claims, as you understand it, on any project other than this one; is that correct?
A Correct.
Q Okay. Now, I believe you also testified that you believe that responses to RFIs that concern design that came to your attention were, to the best of your knowledge, timely addressed, correct?
A Correct.
Q What -- what do you understand to be the average turnaround time for RFI response that dealt with design issues on this project? From the date it left the contractor's hand until he received a response.



A There is no average. It's case by case.
Q What do you understand to be the average of all those that came to your attention? When you add them all up?
A I don't know. I don't know.
Q Okay. You're aware that on this project it was done at a certain location where there was a limited construction season, correct?
A Correct.
Q And so, therefore, you understood while you were performing work on this project during the construction phase that the -- the importance of responding swiftly to inquiries in order to not affect or impede the ability of the contractor to timely perform its work, correct?
MR. SCHROEDER: Objection to form.
Q (By Mr. Schoenfeld) You may answer.
A That was too long. I'm sorry.
Q You were aware that on this project, because of the shortened construction season, that if a question came to your attention it was important to timely provide a response?
A Correct.
MR. SCHROEDER: Objection to form.
Q (By Mr. Schoenfeld) Because if the contractor