# EXHIBIT 4A

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF ROBERT WAYNE SMITH
January 6, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: RICHARD P. SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 11066
Washington, D.C. 20005

For DHM: PAUL F. LEWIS, ESQ.
Moye|Giles, LLP
16 Market Square
1400 16th Street
6th Floor
Denver, Colorado 80202

Also Present: Stephen Christensen

A We could have gotten an oral interpretation from Kleinfelder.
Q You're speculating?
A I'm speculating.
Q Okay. Whose role was it to determine whether rock excavation was going to be a necessary element of the job to be included in the line item of work to be bid by a contractor? Was that DHM's? Barker Rinker? Or Martin and Martin? Or some combination of them?
A Probably it would be a combination of DHM and Martin and Martin.
Q Okay. Did Martin and Martin have prior experience working on National Park Service projects in Sequoia Kings Canyon?
A They could have been in -- I'm not sure. It could have been in earlier phases.
Q I don't want you to guess. Do you know? If you don't know, that's fine.
A I don't know for sure.
Q Okay. They hadn't worked for you on 200P, correct?
A No, it was a different engineering firm.
Q Prior to this project commencing, 200Q, what experience did you personally have in working with National Park Service people that you worked with on this



project? In other words, did you work with Joanne Cody before?
A Yes.
Q Had you worked with her on 200P?
A Yes.
Q Had you worked with Jack Vance before?
A Yes.
Q Had you worked with Ray Todd before?
A Yes.
Q Those are the key people you worked with on this project, correct?
A Correct.
Q What is the physical locale of Martin and Martin in relationship to your office?
A They're in a suburb at that time. They've moved recently. They were in a suburb called Wheat Ridge, and that's probably 10 miles by how the crow flies.
Q And what about Barker Rinker to you?
A It would have been less. Probably a mile or so.
Q Okay. Were tree and boulder preservation a project design objective?
A Yes.
Q That's a significant thing that NPS-10 talks



about, right, preserving natural features that deem to be of significance and importance?
A Correct. And the survey of what was that -- what was deemed resource was by the park.
Q Say that again.
A Okay. The quality and level of the -- those natural features was determined by --
Q The park --
A -- the park.
Q The park identified what should be preserved?
A Correct. Yes, you said it correctly.
Q All right. And the key person on the ground once the job started who was tasked to affirm that was a Athena Demetry; is that correct?
A There was also -- yes, but there was also another person on tree quality, which I don't remember his name.
Q Okay. Who determined the number and location of the trees and boulders to remain?
A That would have been the park.
Q The Park Service?
A Park -- National Park Service.
Q Okay. Were the trees and boulders that were identified that needed to stay and not be adversely affected shown as such on the plans that you produced?



A I'm trying to remember how they were labeled within the limits of work.
Q So is that a yes, they were shown within the limits of the work, anything that couldn't be disturbed?
A I'd have to go back and look at the construction plans to be accurate.
Q So you don't remember?
A Correct.
Q Regardless of who indicated on the plans, whether it was DHM or the National Park Service, what had to stay in place, were there changes made as to what had to stay in place as a result of construction processes occurring?
A There were, but I didn't -- we weren't parties to those discussions.
Q So it's your recollection that certain trees identified in the drawings not to be disturbed ultimately were allowed to be disturbed in -- in various locations?
A I -- I don't know the specifics of those.
Q Were there trees identified in the drawings that could be removed that ultimately directive was issued to the contrary?
A I do not know.
Q Were there rocks or boulders that were identified to be removed that ultimately was changed,

# EXHIBIT 4B

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 236

e-mail June 25th of 2001 that he needed more information for the parking lot grades and trail grades.
He wrote that the improvement plans shows grades at the corners of the parking lot, as well as catch basin and the stone steps. But some slopes are provided, but certain grade break locations are unknown, and the finish contour shown on the improvement plans were not on the drawings downloaded from the ftp site. What does ftp mean?
A That's a place where you post your drawings, and then other people can come in and download those drawings.
Q It's an electronic site?
A Electronic site, yes.
Q Accessed by those who have authorization to access?
A Correct.
Q And, in this instance, construction documents were posted electronically, because they were in CAD format that would allow the surveyor to access them for precision and accuracy, correct?
A Correct.
Q That's why we do that, correct?
A Correct.
Q And he was saying that certain information was

Page 237

missing, correct?
A Correct.
Q And he wanted to get the information so he could perform his work competently and ably, correct?
A Correct.
Q He also was saying in this e-mail that he was requesting further information for construction staking. They have horizontal information, but they needed the vertical data at certain identified categories of information, correct?
A Correct.
Q Is that something he was entitled to receive and that should have been available to him?
A I don't know the extent of what he was asking for.
Q Okay. Let me show you what's going to be marked next in order Number 129.
(Exhibit Number 129 was marked for identification.)
Q (By Mr. Schoenfeld) Multiple-page document. This particular document is an e-mail -- I'm looking at the lower portion -- from Willie DeOcampo to Joanne Cody, with a cc to several people, and it's on July 2nd of 2001. Do you see that?
A Yes.

Page 238

Q It came out of your files, this whole set of documents. Okay?
A Okay.
Q And then there is an e-mail --
(Mr. Schroeder entered the room.)
MR. SCHOENFELD: Just started.
Q (By Mr. Schoenfeld) -- from Willie DeOcampo to your office, with the communication, Sorry I forgot to include you. You see that on the same day?
A Yes.
Q All right. The text of the initial e-mail says, on the first page of Exhibit 129, Joanne, while at Sequoia Kings Canyon last week, some problems surfaced concerning alignment, and then it goes on to describe it in some great detail.
Do you remember receiving information in early July of 2001, which is during the first construction season, of problems with respect to the alignment of the project? Your memory is not necessarily refreshed by me?
A It's not clear.
Q Let me read it out loud, portions of it. It reads, Upper Sherman Road surveyors laid out center line and found two places that conflict with existing field conditions.
Stop there for a moment. That's what you

Page 239

strove, as part of the standards, to avoid doing, having conflicts in your drawings, correct?
A Correct.
Q Continuing: One area is located near Station 28 to 29. The center line appears to swing further out than our drawings indicate. The clearing has been performed per the drawing. However, the center line as staked will make it necessary to clear additional trees and remove signature-type boulders.
That's not good, is it, having to remove additional trees and signature-type boulders? That's like a cardinal sin as far as the National Park Service is concerned. They want to preserve that, right?
A Yes. And this relates to the roadway, Martin and Martin drawings.
Q Okay. Continuing: Bob and figure the center line can be shifted in order to make this work and prevent delays. The surveyors will send you a revised layout. The contractor believes our cut and fills will not balance.
They believe there may be 13,000 cubic yards of excess material that will have to be transported somewhere in the park at $15 a cubic yard. If this is true, we are looking at a $195,000 change. The park says there is a shortage in funds and wants to pursue the

error and omission clause of the contract. Martin and Martin need to recheck their calculations.

Does this refresh your recollection of this issue arising in early July of 2001?

A July 2001, I was on vacation. I was out of the country.

Q How convenient. Just kidding. That was tongue-in-cheek, left cheek.

When you got back from vacation, do you recall being advised on this subject?

A No, because it would have been through -- Martin and Martin would have been the ones focused on this.

Q In a nutshell or summary, sir, is what I just read a Martin and Martin problem, not a DHM problem, if there is a problem at all?

A You'd have to ask Ray what --

Q His perspective is?

A Yeah, what his perspective is.

Q And do you know what happened as a result of what I just read out loud?

A My knowledge is that the -- Ray was never fully informed about this issue, and Willie and Bob Russell made the decision to shift the road.

Q Without consultation to the designer?



A And -- from information I received verbally from Joanne Cody, that's correct.

Q In any of the discussions regarding this realignment of the road, did it ever arise that the contractor made any mistake or its surveyors made any mistake?

A I never heard any issues.

Q All right. Following the first page there are a series of documents attached here. Are any of them in your handwriting?

MR. SCHOENFELD: Let the record reflect they are sketches and drawings and sections, some of which have some handwritten notes.

THE WITNESS: They would have -- like this on page --

Q (By Mr. Schoenfeld) Give me the Bates stamp page number. 2290?

A 2290.

Q Is that your --

A Would have been Andrea Gregor.

Q Okay. Can you read me what it says? 4-inch WF, what's that?

A White fir.

Q And it's deleted, correct? You can't read the balance --



A Correct.

Q -- of the first or any line, but each line is cut off?

A Yeah. I cannot read the whole sentence.

Q All right. Anything else on any other pages have Andrea's writing? Is that 2292?

A That would be Andrea's writing.

Q And Andrea is saying there's going to have to be some cut, which was probably not anticipated. So that would be extra, correct, if the contractor so inclined?

A Correct. And she would have been stating this for others to review the quality of the fir too.

Q All right. The last page, 2293, whose handwriting is that, if you know?

A Andrea's.

Q Okay. So there's additional tree work that has to be removed, at least on this page?

A From that note, correct.

Q Okay. Let's move on to Exhibit 130, sir.

(Exhibit Number 130 was marked for identification.)

Q (By Mr. Schoenfeld) I'm correct, in all of these questions that I'm asking you, to the extent the contractor made a claim and to the extent the government negotiated and issued a modification, granted additional



time or money, you have no knowledge of whatsoever; is that correct?

A Yes.

MR. SCHOENFELD: That was pretty definitive, wasn't it? That's a man who likes to shortcut a deposition, doesn't he?

Q (By Mr. Schoenfeld) Exhibit 130, series of e-mails. Look at the lower one first on the first page. It is an e-mail from Bill Morris to Joanne Cody dated July 2nd of 2001 regarding realignment of the access road.

It says, Here's our drawing in AutoCAD R14. If you need us to convert it to Microstation, please let us know. I sent an early -- I sent an early response requesting further information for the parking lots. Need grades at all curve points and grade breaks to stake out properly. Thank you. Signed Bill Morris.

When was the information requested furnished to Mr. Morris, if at all?

A This is extremely difficult text to understand.

Q Okay. I'm not asking you to read the lower text. That's computer jargon.

A Okay.

Q I read you the text in English, the message

WORD INDEX

Page 244

saying, Here's -- Here's our drawing. I need information. When was the requested information provided, if it was?
A I do not know.
Q You'll note that Joanne did not forward this to your office for four days, or to Martin and Martin for four days. It's noted on the very top of the page, correct?
A Correct.
Q Did you guys respond?
A Martin and Martin would have responded because it's the access road.
Q As a general rule, sir, if plans are prepared completely and accurately, it is normal, then, that a surveyor, using the monuments and benchmarks identified, is able to survey the project without questions, correct?
A Correct.
Q In this instance, was that the situation?
A I can only surmise from the information that you have presented to me that that would be correct.
Q That he couldn't on this job?
A Based on what you're telling me, that's correct.
Q You don't have any independent recall?
A Independent recall?

Page 245

Q On the subject. You don't remember whether there were problems with the surveying detail of the job?
A No, I don't.
(Exhibit Number 131 was marked for identification.)
MR. SCHOENFELD: Okay. Let's mark as 131 documents produced by -- I think we've already marked this, but it doesn't matter -- Jacobs and Associates, which was the construction manager on the project. Came out of their files, a handwritten note dated July 10 of 2001 and a series of documents.
Look at the handwritten note. You'll see it says, Access road and upper parking lot realignment by Joanne Cody. You see that?
A Correct. Yes.
Q (By Mr. Schoenfeld) And attached to it are a series of drawings, correct?
A Yes.
Q And they have -- they bear a fax transmittal of July 10 of 2001 on each page, correct, the upper portion, not on each page, but --
A Well, I -- I cannot see a fax stamp.
Q The first page you see --
A It's not --
Q It's not there?

Page 246

A Not there.
Q Why don't you give that back to me, sir --
A Okay.
Q -- for a sec. You might be missing --
MR. SCHOENFELD: Let's go off the record for a minute.
(A discussion was held off the record.)
MR. SCHOENFELD: Back on the record.
Q (By Mr. Schoenfeld) The documentation that we've marked as the official Exhibit 131 and its attached documents, all the drawings are in the reverse order that I have marked in mine and that's what caused the confusion. So back on the record.
Q (By Mr. Schoenfeld) Look at the very last page of Exhibit 131. You'll see it has a fax transmittal date of July 10 of 2001, correct?
A Correct.
Q And the preceding page, correct? And while not every single page here does have it --
A 7/10.
Q Correct?
A Correct.
Q All right. Are the documents that are attached to this -- and I'm asking you to flip through them relatively quickly -- indicate to you that the

Page 247

design team members or a single member produced revised alignment for the access road and upper parking lot on July 10, 2001?
A My recollection is the Park Service did prepare these.
Q Without the design team participating?
A Correct.
Q Do you see on any of these documents an indication that the design team did the work as contrasted with the Park Service?
A You'd have to ask Ray Tuttle tomorrow. I can't read the string of titles.
Q All right. Is it your expectation that the design team was frozen out of this change and that the National Park Service just assumed the responsibility to do this themselves?
A Yes.
Q Is that customary in your experience in the construction industry that the owner usurps the role of the designer?
A No.
Q Is it customary in your experience with the National Park Service that they do this?
A They take a greater role than most agencies I work for.

# EXHIBIT 4C

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Q They have the right to do this, correct?
A Correct.
Q But they have the consequential responsibility that goes with the exercising of that right; is that correct?
A Correct. And I don't even recognize the handwriting on some of these sheets.
Q All right. Let me ask you this: As a result of the road realignment that is reflected in these drawings, did the access road get pushed into the mountain as contrasted with away from the mountain?
A Into the mountain is what Joanne told me.
Q And into the mountain would, in your expectation --
A The hillside.
Q I'm sorry?
A The hillside.
Q The hillside. Into the hillside.
And as a result, it would be your expectation that it would move into more dense or bedrock material as contrasted with weathered material, correct?
A No, because you would be cutting the slope further. My understanding, the bedrock was down lower in the cross section, so the material is looser on the part where it --



Q It may be looser?
A It may be looser.
Q Okay. But also you'd be moving the road into an area where Kleinfelder did not take test pit and boring data, correct?
A I can only -- yeah, I would assume that.
Q Well, Kleinfelder was given the access road alignment that had been determined during the design that preexisted your company's involvement and Martin and Martin's involvement, correct?
A I'm sorry. I was flipping the pages, and I'm getting tired.
Q Kleinfelder was given the access road information that the National Park Service had determined where it was going to go. You guys didn't determine where it was going to go. The National Park Service said, Here's where it's going to go.
A Here's the alignment.
Q And when we saw in the exhibits in January and February of 2000 Martin and Martin seeks information as a proposal from Kleinfelder to perform its work, the information that Martin and Martin had to give Kleinfelder to do its work was the information that came from the National Park Service as to the alignment and location, correct?



A Correct.
Q And so you would expect a reasonably prudent geotechnical engineer to perform its test pit and boring along the access road in the reach that the access road is actually going to go as contrasted with 5, 10, 15 feet, because that's not going to give them data they can rely upon for a design, correct?
A Correct.
Q Such that if the access road is then aligned off the profile that the design -- geotechnical engineer utilized, the geotechnical data may not have the same or accurate application, correct?
A Correct.
Q Thank you.
(Exhibit Number 132 was marked for identification.)
Q (By Mr. Schoenfeld) I'll show you 132, sir. I'm not going to dwell a lot on this, I don't believe. First of all, the top of the first page is from Andrea Gregor, an e-mail to a whole series of people at the National Park Service. And enclosed is her trip report of July 16th 19 -- 2002; is that correct? 2001. Excuse me.
A Correct.
Q This would be consistent with your standard



practice to identify what you see when you go to a job site, correct?
A Correct.
Q Would you turn to the next to -- actually, three pages from the back. It's Bates-stamped page number 514066. You see there's a heading for this project at the bottom of the page?
A Correct.
Q 200Q?
A Yes.
Q Item Number 3, Quantity for hauling off debris is not accurate. Plan total and bid item do not match. Plans show 3,000 cubic yards and bid item shows 2,000 cubic yards -- yards. The total haul-off is closer to 6,000 cubic yards.
Do you recall the issue being that there was a burn pit location identified in the Upper Sherman parking area --
A Yes.
Q -- that the design team identified to be excavated before the pavement section could be properly placed?
A Correct.
Q And the estimated quantities was 2,000 yards, correct?

A Correct. Based on input.
Q Do you recall the contractor excavated, at least at the moment in time this was prepared, up to 6,000 cubic yards, such that the hole was three times larger or 200 percent larger, I should say?
A Yes, the hole would have been larger, but you have to take into context what that grade was for the finished parking lots.
Q And as a result, that hole had to be filled back in, correct?
A Not necessarily. You'd have to look at the plan profile sheets to see how far they went down, and I do not know that.
Q Okay. In this instance, sir, are you aware that because there was so much excess material actually generated in the construction operations that not only did that hole have to be filled in and the quantity was actually 7,000 yards that was actually excavated, but the National Park Service paid the contractor an additional $43,000 to raise the parking lot above the design finish grade 5 additional feet?
A I'm aware of that.
Q So not only did the contractor have to perform the extra work to excavate out the burn pit of approximately 5,000 additional cubic yards, it had to



perform the extra work to place material back in it, correct?
A Yes. The -- the parking lot raising was a result of the partner meeting as a request of the contractor.
Q Okay. And the partner meeting you're referring to was in May of 2000, correct, approximately?
A Approximately.
Q All right. Item Number 4 on this page of Exhibit 132 says, Joanne Cody has adjusted grading and rock revetment at Station 11 plus 75 north side to accommodate new entry road alignment. Is this an indication to you that the National Park Service is determining the road realignment?
A Yes. I need to restate that. Strictly it doesn't indicate who realigned it in this sentence.
Q Okay.
(Exhibit Number 133 was marked for identification.)
Q (By Mr. Schoenfeld) Let me show you Exhibit 133, sir. It's dated January 25 of -- July 25th of 2001, one-page e-mail from Dan Savage to Bill Morris. Once again, Bill Morris is the surveyor hired by Remcon?
A Uh-huh.
Q Regarding the Upper Sherman grade parking



area, right?
A Correct.
Q It says, Bill, attached are files for the revised upper lot grading. Thanks, Dan.
Does this indicate to you that as of July 25th, there were a road -- excuse me -- there were changes being made by the National Park Service regarding the grading for the upper parking area?
A Can I ask a clarification?
Q Sure.
A When was the partner meeting, the date?
Q July of -- May of 2002.
A Okay.
Q This is the first construction season we're in, sir.
A I don't remember us revising the upper parking lot, but you'd have to go to -- I'd have to look at the plans.
Q The National Park Service may have, correct?
A They may have. I don't know.
Q Does this e-mail indicate to you, whether you were aware of the cause of it or not, that there was some change being undertaken and communicated to the surveyor as of July 25th of 2001?
A When I look at "revised," yes.



Q Thank you.
The word "revised" is being communicated by the National Park Service, correct?
A Correct.
(Exhibit Number 134 was marked for identification.)
Q (By Mr. Schoenfeld) I show you 134, sir. 134 is an e-mail from Andrea Gregor of your office to Bill Morris with a cc to Joanne Cody on Friday July 27th, 2001, regarding the Sherman Tree Trail.
In it it says, Hi, Bill. I'm sending the lay -- the trail layout sheets T3-T6, the design base, the base, and a trail file -- excuse me, a trail text file. Please let me know if you haven't received all these files. I will have to send them in more than one e-mail due to the size of the design files. Thank you, Andrea Lind.
Question: Were changes being made to the Sherman Tree Trail that were being communicated to Bill Morris, the surveyor for Remcon on this project, as of July 27, 2001?
A No.
Q What was being communicated?
A They requested additional spot elevations to help -- help them with their work.

# EXHIBIT 4D

Declaration of D. Michael Schoenfeld in Opposition to Defendant's Motion for Partial Summary Judgment

Page 140

Q Were you given, as part of the estimate of construction cost, identification of what the contingency budget would be for changes if they arose during construction?
A No.
Q Did you have an understanding as to any National Park Service policy or guidelines along that issue? In other words, they always have a 5 percent contingency or 10 percent, or whatever the case may be?
A My recollection is 25, but that's only memory.
Q During the time that you were designing this project, it was your perception that the National Park Service had a 25 -- a policy of a 25 percent design contingency for all projects -- I mean, construction cost contingency for all projects; is that correct?
A My recollection was that this one project was tighter in total funds, but what that number is, I don't know.
Q By "tighter," you mean a smaller percentage?
A Smaller percentage, yeah.
Q Am I correct that all aspects as to the scope of what Kleinfelder was supposed to do was controlled by the National Park Service and that the design team didn't say, Hey, we need A, B, C, Q, whatever?
A Oh, I'm sure there would have been some

Page 141

interface with Martin and Martin, but I don't know what that was.
Q Are you speculating that there should have been, but you don't know whether that occurred?
A I do not know if it occurred.
Q Okay. It would be a prudent thing to do to consult with the civil engineer as to what information the civil engineer would like to acquire before an owner issues a geotechnical engineer contract to obtain data to be used by the civil engineer, correct?
A Yeah. That's normal practice.
Q But you don't know if that happened?
A I don't -- I do not know.
Q Okay. Was there ever any discussion as to the volume of test pits, borings, and other subsurface inquiries done by Kleinfelder?
A Not that I'm aware of.
Q Okay. Was your company involved in determining the earthwork volumes to be encountered by a contractor?
A We were part of it. We didn't prepare the actual cut-and-fill calculation.
Q What about the compaction rate that you would expect the material to condense to? Were you involved in that process?

Page 142

A Only that that was furnished to us by the National Park Service.
Q Are you familiar with the fact that the construction estimates prepared during the design phase included the compaction rate of 40 percent?
A Yes.
Q And where did that number come from?
A National Park Service.
Q Who?
A It would either have been Jack Vance or Scott Ruesch.
Q In your experience, is a 40 percent compaction factor reasonable in granitic material?
A From what they -- their -- their input and direction was, that's what they have encountered.
Q Did you have any personal experience that led you to conclude that that percentage was high?
A I can only go by what -- input from Martin and Martin and the Park Service on that part of it.
Q That was given to you as something you had to rely upon and that was it?
A Correct.
Q But from your personal experience, have you ever seen a 40 percent compaction of granitic material?
A No.

Page 143

Q Have you ever seen 20 percent compaction of granitic material?
A I don't know.
Q Isn't it true that it's far less than 40 percent is the norm?
A Less. How far, I don't know.
Q Okay. And if granitic material is blasted or has to be blasted, what impact does that have? If you know.
A Yeah, I do not know.
Q If the material to be encountered by the contractor could not become compacted up to 40 percent, that would then mean the contractor would have excess material to handle, correct, if the calculations used by the design team was that 40 percent compaction would be the standard?
A Correct.
Q Do you know --
A Based on my knowledge of earthwork.
Q Do you recall during the job that there were contentions raised by the contractor that it had to handle substantial volumes in the thousands of additional cubic yards?
A I was aware of that contention.
Q Is the use of a 40 percent compaction factor,

A -- on June 15th.
Q I haven't noted that, so we'll make the assumption that the 14th and the 15th you were where? Denver? Or in -- at the park itself?
A We could have been in another location at the park versus headquarters.
Q Okay. But -- but this influences you to indicate the meeting occurred in California, not Colorado; is that correct?
A Hold on one second.
(Reviewed documents.)
On Item Number 7 on the first page --
Q Yes.
A -- it talks about the work session of DSC to be held on -- that's July -- that's June.
Q It's not really that important, so let's just move on.
A I can't say.
Q Item Number 2 on the first page of the minutes talk about construction sequencing in two options. Ultimately, who made the decision as to when -- what the sequence and duration of this contract was going to be?
A Park Service.
Q Okay. Item Number 10 on the first page of the minutes says that M and M needs the additional Generals



Highway topo ASAP. Does that mean the Denver Service Center was required to provide some information that was missing at that point in time?
A I -- I would assume so.
Q Okay. Second page of the exhibit -- excuse me -- second page of the minutes, which is the third page of the exhibit, Item Number 43, A and E to quantify fill requirements and how to handle it. Direction is to balance with the material on-site and from other projects, also review fill section where appropriate. What does that mean?
A The engineers first cut low -- cut it --
Q Cut at --
A First preparation of grading for the roadway had the road in a fill conditioned, meaning you would have to import fill.
Q Had to import fill into the park?
A Right.
Q Is that correct?
A Correct. And then the -- at the -- at that meeting, the direction was to lower the road and place it in cut so we didn't have to import fill material.
Q Let's talk about some construction terms. A bald job means that the cut-and-fill quantities are approximately even, such that no material is perceived



needed to be imported to the job and none would be exported, correct?
A We were requested to provide extra material for future jobs.
Q Okay. Sir, I gave you a definition of the word -- of the words bald job. Was my definition correct?
A Correct.
Q Okay. Was the -- was the direction from the National Park Service on this project to create a bald job for the contractor with certain volume that the -- that the client wanted to be deposited and stockpiled in the park?
A Yes.
Q And what was the additional quantity that the Park Service wanted stockpiled that made it an unbalanced job?
A I'm going by recollection. Five, six, 7,000 yards.
Q Approximately?
A Approximately.
Q Do you recall the number being 6800 cubic yards to be deposited at the Wolverton Point?
A That could be the number.
Q Okay. And so the direction was given at this



June 14th and 15th meeting that the design team was to design the elevation of the road in such a manner that it would yield an estimated 6800 cubic yards' excess to be deposited at Wolverton Point. That's your best recollection as you sit here?
A Best recollection.
Q Yes?
A Yes.
Q In doing so, the design team was also, according to your testimony, directed to use a certain compaction factor for the material that was to be excavated, correct?
A Correct.
Q And that was 40 percent?
A Correct.
Q And if it turned out that the 40 percent compaction factor was inaccurate as to the ability to compact the material, there would be excess material to be handled, correct?
A Correct.
(Exhibit Number 115 was marked for identification.)
Q (By Mr. Schoenfeld) Okay. Let's mark a one-page document Number 115. It's an e-mail from Andrea Gregor to Joanne Cody, C-O-D-Y, on July 31st of 2000.

Page 204

your reference that he was there only during --
A He was there for the partnering session --
Q Let me finish.
A Oh.
Q -- only there during the design phase or the partnering session that occurred prior to the commencement of the 2002 construction season?
A Yes.
Q Are you aware of him ever visiting the site during active construction operation being underway?
A I do not have that knowledge.
Q Okay. Turning to the next page of this exhibit. When rock was encountered under Section 2310 the contractor was directed in Part 3.4A to excavate it to a minimum depth of 6 inches and a maximum depth of 12 inches below subgrade, correct?
A Correct.
Q And when the contractor encountered rock that it needed to excavate under Section 2310, Subpart 4.2A was the governing section, correct?
A For this 75 percent submittal, correct.
Q Okay. Did that change at a later time?
A For the 100 percent, yes.
Q Okay. What happened? What changed?
A The soils report came into play.

Page 205

Q And what then happened?
A This language was revised.
Q In what respect?
A The rock excavation was deleted.
Q And no more rock excavation existed under 2310, correct?
A Correct.
Q Let's turn to Section 2316. In the -- which is part of this Exhibit 116. Subpart 1.1A specifically describes that this deals with the roadway and embankment construction, correct?
A Correct.
Q And Part 1.3A is the same as 1.3A, the preceding section, we just looked at, correct?
A Correct.
Q And 1.3C, No rock excavation will be permitted unless approved by the contracting officer, is the same as the last sentence of Part 1.3B that you have in 2310?
A Yeah.
Q You took the two sentences in 2310 in Part B and made them two separate parts, B and C, in 2316?
A Correct.
Q Correct?
A Correct.
Q But they said the same thing?

Page 206

A Same thing.
Q Okay. Did that change in the seven -- from the 75 percent construction drawings?
A It changed by -- I could not tell you without looking at that final spec.
Q Why did it change?
A It would have been based on the soils report.
Q And if the soils report turned out to be inaccurate, then the contractor was given, based on that assumption, information that was not correct?
A Based on that assumption, correct.
Q Okay. Okay. Bob -- pardon me, Mr. Smith, let's go to 117.
(Exhibit Number 117 was marked for identification.)
Q (By Mr. Schoenfeld) Mr. Smith, 117 was an e-mail from you to Ray Tuttle dated October 24, 2000, in which you enclose a document to Mr. Tuttle to review and comment back to you.
Did you prepare what's marked as the second page of Exhibit 117 or cause it to be prepared under your direction?
A I prepared it with input from others.
Q You prepared it with input from others?
A Correct.

Page 207

Q Let's look at the first item that may have been input from others, 40 percent factor use. Was that input from the National Park Service, indeed, a direction?
A Correct.
Q And that direction came initially from Jack Vance, correct?
A Best of my knowledge.
Q But you didn't agree with it, correct? The prudence of the direction you didn't agree with?
A We -- we questioned it.
Q Did you question it to -- by bringing it to the attention of anybody at the National Park Service, or was it just --
A Ray Tuttle would have, but I don't know when and how.
Q But you're certain that he did, or you're hoping he did?
A No. I'm not hoping. I believe he did.
Q Okay. I can ask him that tomorrow. He's going to be sitting in the parallel chair that you're in today.
A Okay.
Q Where did the data come from for the cubic yards quantity that are listed in this document?

A Okay.
Q Item Number 3, Earthwork/Excess Mod., The contractor has hauled the bid quantity of 6800 cubic yards to Wolverton, plus an additional 3,000 yards. Cross-sectioning will determine the actual amount. They currently have four piles of excess to place for transport to open up the site for work this year.
One pile was about 2,000 cubic yards at Station 11. The second pile is from Wuksachi, 50 cubic yards, question mark, and needs to be placed as deep fill. Third pile station is about 1500 cubic yards plus and could be partially used to sweeten the leach field --
MR. SCHOENFELD: Off the record.
(A discussion was held off the record.)
Q (By Mr. Schoenfeld) -- material. Remcon wants to save this material.
The fourth pile is the leach field material and does not count, I was told, against the excess total. The future shuttle bus area could have 2,000 cubic yards stored in it. The quantities are a guess, but we need a beginning point to discuss this. The total excess has been quantified to be between 15,000 and 17,000 cubic yards from the meeting in December.
Sir, what caused there to be fifteen to 17,000 cubic yards of excess material?



A I can only speculate that the -- in Exhibit 149, that not all the elements listed under Cut came to those totals.
Q Did it also come as a result of the compaction factor not being able to be achieved?
A It would have been a -- a compaction, plus the road shifting too.
Q Did you attend the meeting referenced in December with Remcon here in Denver?
A I -- I attended a portion of that meeting, not the whole thing.
Q Do you recall that at that meeting, Mr. Christensen, who sits next to me, came in with substantial data on both entitlement to additional costs, plus substantiation of the backup regarding the quantum of the additional costs he claimed, as a result of encountering both the differing site condition as well as the additional excavation costs?
A I'm not sure I was presented with that -- that material.
Q But do you recall him having with him at the meeting a substantial volume of data to present?
A I just don't remember.
Q Would you turn to the third page and last page of this exhibit, please.



A Okay.
Q Item C under the heading General. It says, "Overview: Remcon is in the drivers (sic) seat on this project." What did you mean by that reference?
A I would have meant that they were in control of the project versus the Park Service.
Q Is that a negative communication or a positive communication? Why did you say it?
Maybe I should ask the question this way: Did you say it because Remcon had experienced a series of extra work items and was in a position to be entitled to receive modifications from the government for performance of a lot of extra work?
A Correct.
Q Do you know whether those modifications were ever issued?
A No idea.
Q Has anybody ever brought to your attention that Remcon filed this litigation in part because it wasn't paid for the extra work it performed?
A No.
Q Are you aware, sir, that Remcon failed to start work during the third construction season, specifically calendar year 2003?
A Have I been informed they did not start work?



Yes.
Q There was still work to do; the job wasn't done at the end of 2002, correct?
A Correct.
Q Were you further informed that the reason why Remcon did not show up was because they were terminated for default? Did you ever hear that Remcon was terminated for default?
A I don't remember the exact words, but it would have been in that vein.
Q You heard Remcon was terminated, correct?
A Correct.
Q And you assumed it wasn't for the government's convenience, but for default; is that correct? Did you make that assumption?
A I don't know if it was default.
Q You don't know? Who told you?
A Probably either Joanne Cody or Mike Giller.
Q Okay.
A I don't know which. I'm not sure of the word "default" in relationship to their --
Q Remcon's conduct?
A -- Remcon's conduct.
Q Okay. You write in this memo after Remcon is in the driver's seat in this project, quote, Our approach

# EXHIBIT 4E

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 124

Lower Sherman Tree --
Q Okay.
A -- layout and grading and detailing.
Q As a landscape architecture firm, does your company have an internal standard of care that you published to your personnel as to the expectations you have as to the content of what is to be produced as design documents?
A The level and quality is my standards, personal standards. They're not written.
Q How would you describe them? The best engineering standard -- or architectural standards possible?
A Accurate and complete, buildable.
Q Accurate, complete, buildable?
A Easy to read.
Q Internally coordinated?
A Sure. Yes.
Q Containing conflicts or free from conflicts?
A Free from conflicts.
Q Free from errors?
A To the best of our ability.
Q Free from omissions?
A To the best of our ability.
Q Free from inconsistencies?

Page 125

A Best of our ability.
Q Constructable?
A Yes.
Q Okay. Was the budget constraints that you were given under which this project was to be designed a significant or material limitation in your ability to deliver to the NPS what it communicated it wanted?
A It was a -- a factor, but not the ultimate driving force. It was -- we -- we produced a set based on that budget that they gave us.
Q That was for probable construction costs, right?
A Correct.
Q But you also had a budget on the design that could be charged, correct?
A Yes. We had a top set fee amount.
Q Was that a limitation on what work you could do in order to prepare the design?
A No. It was sufficient design fees that do what our tasks were.
Q Was there ever a time that you or any members of the design team communicated internally among yourself that, Boy, I wish we had some more money, we should do this, or we would like to do that in order to confirm X, Y, or Z; but there was an insufficient budget to allow

Page 126

that to happen?
A That never came up.
Q Was the delivery of the construction documents delayed by any event or events? February 2001 is what you have in your mind.
A Yeah. I -- I -- delay -- I don't know if you call it a delay. The soils report came in towards the end of the project.
Q After the construction document phase. It's September 11 of 2000.
A Yeah, so we were --
Q Isn't that particularly late for a soils report in relationship to the generation of --
A Generally -- generally, it is. I would have liked it a little earlier.
Q In fact, you had already gone through 30 and 50 and 75 percent drawings by the time it came in?
A Correct.
Q And I would assume in your experience that's the latest you've ever seen a soils report, if one is to be prepared, correct?
A Correct.
Q Why was it so late?
A I can only assume that it's the -- the contracting delay with the Park Service.

Page 127

Q The Park Service contracted for the soils report, correct?
A Correct.
Q Was there any communications that you were -- either made directly or were made in your presence about, Hey, we need a soils report; you need to get this going here, because you're affecting our ability to design this project?
A I'm sure we raised that question.
Q And to whom would it -- was that question raised? Joanne?
A Joanne and the whole project team of the Park Service, the park, and the Denver Service Center.
Q Was there a budget limitation that restrained them from issuing an authorization to Kleinfelder to get the soils report done sooner that you're aware of?
A I'm not aware of it. I don't have any knowledge.
Q Are you aware, as a result of the experience you have in working with the National Park Service that they've got very strict controls on funding and funding mechanisms, and they can't necessarily do things as easily or as efficiently as the private sector?
A They have restrictions, yes.
Q And things take longer in working with the

National Park Service than would happen in the private sector frequently?
A Sometimes, but I can't pinpoint specifics where they were one way or the other.
Q Well, the soils report --
A The soils report is late, that's correct.
Q It was late, right?
A Correct.
Q And it did have a negative effect on the ability of the design team to perform their work as swiftly as they otherwise would have been able to, correct?
A Correct.
Q Because you were missing data?
A Correct.
Q Now, during the design phase that you were involved in, were there cost estimates prepared?
A Yes.
Q Did you participate in that effort?
A Yes.
Q In fact, that was a significant component of the effort the design team was contracted to provide, correct? Regular updates --
A Updates, yeah --
Q Regular updates --



A -- followed by submittals --
THE REPORTER: I'm sorry.
Q (By Mr. Schoenfeld) I'm going to start again.
You had a responsibility to prepare regular updates of estimates of probable construction cost broken down into very, very detailed line items, correct?
A Correct.
Q And the absence of a soils report giving you indication as to what the soils conditions were going to be encountered had a very substantial effect on what those estimates were, because you were guessing until you got the soils report, right?
A We had to make assumptions.
Q And those assumptions were, in part, that there was going to be a lot of rock that would have to be blasted by the contractor, was the preliminary assumptions, all the way up until the time the soils report was received, correct?
A Correct.
Q And then when the soils report was received, the conclusion reached by the design team was, We're not going to have to blast, or, If we have to blast, it's going to be very, very little, correct?
A The design team and the Park Service.
Q Combined?



A Combined.
Q But it's correct, it went from a significant amount of blasting to very little, if any, correct?
A Correct.
Q Do you recall what happened on the project when Remcon was performing in the calendar year 2001 as to the issue of blasting?
A I was not on-site to know.
Q I understand that. I -- I didn't ask you whether you were on-site to observe.
Did you become aware that a substantial amount of blasting had to be done on the project that was inconsistent with that which was identified in the soils report?
A Yes.
Q Did you form any conclusions as to the accuracy of the soils report as a result of the fact that all that blasting had to occur?
A Normally, in the sense that I could respond based on the input I was getting from the Park Service.
Q Which was?
A That they encountered rock.
Q So the representatives of the National Park Service, you recall, communicated to you that the contractor encountered rock that required blasting; is



that correct?
A Correct.
Q Who was it? How many people told you that?
A Would have been Joanne Cody and Willie DeOcampo.
Q Did you ever communicate with Bob Russell, the -- the lead inspector for the project hired by Jacobs Facilities?
A We had contact with him.
Q Did he, in fact, also communicate that rock was encountered that required blasting?
A I don't know if -- if he communicated to us or if it was only through Joanne and Willie. I don't remember.
Q Do you remember there being in the construction cost estimates prepared by the design team a line item referred to as rock excavation?
A Yes.
Q Isn't it, in fact, true that the design team removed the category of rock excavation as an item of work before the soils report was even produced?
A I wouldn't have remembered that.
Q If that was, in fact, a true statement, I'm asking you to assume that to be true, why did that happen?

Q Which means that the plans and specifications are prepared by the design team, issued by the owner for contractors to bid upon, and the contractors have no design responsibility, correct?
A Correct.
Q Are you familiar with this document, sir, that I'm showing you here?
A The work flows is a new element that you as part of the Park Service work.
Q Was it applicable to 200R?
A Q.
Q Q. I meant Q. I'm sorry.
A Q, I don't think it was available at that time.
Q Okay. Would you turn to the next tab. Have you ever seen this chart before, which is the Design-Bid-Build Workflow Diagram?
A As it pertains to current work, not 200Q time.
Q Okay. With respect to 200Q, staying on this page --
A Okay.
Q -- am I correct the Scope of Services that you understood the design team was hired under Exhibit 107 to perform is that set forth under the heading 4.0 Construction Documents?



A Correct.
Q And that has not changed? What's set forth here is generically the same work you were contracted to provide?
A Generically, correct.
Q Okay. Turn to the next tab, sir, NPS Management Policies. Have you ever seen this document before?
A Not that I'm aware of.
Q So you didn't design pursuant to any NPS management policies dated 2001 NPS Management Policies, correct? Correct?
A Whether our design work met this -- met the guidelines of this, I haven't reviewed it in that context.
Q Understood.
Next three tabs are Class A, Class B, and Class C estimates. Had you ever seen examples of what the NPS considered to be sufficient for the various types of construction cost estimates designers were to prepare for the NPS?
A This is their new format for Class A estimates. It's not what was in effect on 200Q.
Q All right. Would you turn, then, continuing to the tab entitled Presolicitation Drawing Checklist.



You recognize this document, sir?
A I've seen some form of this, but this was always handled internally with the Park Service.
Q When you say "internally," the Park Service itself took care of it and not its outside designer?
A Correct.
Q Okay. Let's turn to the next heading. This is the Division of Design and Construction Quality Assurance Guideline. You ever seen this document before?
A I'm aware of FAR regulations.
Q My question to you is this: Are you aware that the National Park Services Denver Service Center Division of Design and Construction had issued written quality assurance guidelines with respect to the Scope of Services it expected its designers to perform to?
A Yes. I knew there would be standards.
Q And these are standards that you knew were applicable to your scope of work on this project, correct?
A Correct.
Q Looking at page 1 of these standards under the heading Procedures, the second paragraph reads, The DSC Quality Assurance Process will confirm that the project, the first bullet point is, quote, complies with NPS policies and guidelines. And the last bullet point is



construction documents are adequate to construct the intended facility.
Were those goals applicable to your effort during the design phase of this project?
A My answer would be yes.
Q The next sentence of this document on the start -- starting on this first page reads, The architect-engineer -- that refers to the scope of work that you were doing, right?
A Correct.
Q And DHM's effort, correct?
A Correct.
Q -- is responsible for quality control, which includes insuring the technical accuracy, completeness, and correctness of the design, cost estimate and all engineering aspects and details, including coordination of all disciplines with each other and with the specifications.
Is that a guideline that you knew was applicable to your work at the time you performed it on this project during the design phase?
A During our time, that general statement would be correct. Whether it was these guidelines, I'm not sure.
Q Understood.

A The rock symbols were still on the final set.
Q The rock symbols meant what in relationship to excavation efforts?
A The -- it would have still appeared on the roadway print plan and profile drawings.
Q Which meant that the contractor could expect that area to have rock, but it said nothing about the density of the rock or whether it was considered to be roadway access contrasted with rock excavation, correct?
(Exhibit Number 113 was marked for identification.)
THE WITNESS: You're going to have to do that one again.
Q (By Mr. Schoenfeld) The issued-for-construction set of documents had no line item of work known as rock excavation, did they? It was merely roadway excavation, correct?
A Correct, because it was based on the soils report.
Q But prior to the soils report, there was a -- specific identified areas of the job that had rock excavation as a scope of work, correct, that was anticipated to be performed?
A In earlier estimates and designations here, correct.



Q Up through the first submittal of the 50 percent drawings, correct?
A Correct.
Q But in the final version of the drawings and in the specifications and in the unit price schedule for contractors to bid, there was no activity known as road -- rock excavation, correct?
A Those -- the symbols on there indicate rocks and also boulders, which were part of the --
Q Okay. Rocks and boulders are one thing; solid granitic rock that could not be ripped is another, correct?
A Correct. What was labeled could have been boulders.
Q It could have been, but you don't know that to be true, do you?
A I do not, not sitting here today.
Q And you understand the contractor, during the performance of work in calendar year 2001, contended that it encountered rock excavation as solid, dense, consolidated material as contrasted with merely individual rocks and boulders, correct?
A I'm sorry. One more time.
Q Isn't it correct that during calendar year 2001, you are aware the contractor contended that it



encountered solid, consolidated rock that could not be ripped with conventional construction equipment and required blasting as contrasted with individual rocks and boulders being encountered in those locations that you had previously identified rock excavation on your drawings?
A The -- the information we -- not being on-site and part of the review -- construction review process, I'm not sure the terms that were used to determine if they hit rock or boulders or what the material was.
Q You subsequently came to be -- to become aware that was the contention, though, right?
A That they hit rock?
Q Yeah, sure. Not just individual rocks and boulders, correct?
A Was never described to me whether it was individual boulders or bedrock or --
Q Okay. Let's show you the next exhibit, and then we'll take a break.
A Okay.
Q Number 113, sir.
MR. SCHOENFELD: Off the record.
(A discussion was held off the record.)
Q (By Mr. Schoenfeld) I'm going to describe Exhibit 113. Two pages, first page being the cover sheet



of the 75% Construction Drawings for this project dated August 18 of 2000.
(Mr. Schroeder entered the room.)
Q (By Mr. Schoenfeld) The second page being US5, once again, a duplication of what was marked as the second page of Exhibit 112; is that correct?
A Correct.
Q Both prepared by your company?
A Correct.
Q And once again, the second page does not contain the words rock excavation or partial rock excavation that we saw on those same locations in prior exhibits, correct?
A I need to add that there was a certain amount of coordination between Martin and Martin on the existing conditions plans for the roadway corridor.
Q And when did that coordination occur?
A It would have occurred throughout the production of construction drawings.
Q Okay. What's the designation DBH mean?
A Diameter breast-high.
Q Okay. And that would be the breast of an individual height, correct? Not -- that's -- ground level. Like approximately 5 feet or 4 foot off the ground?

Page 204

your reference that he was there only during --
A He was there for the partnering session --
Q Let me finish.
A Oh.
Q -- only there during the design phase or the partnering session that occurred prior to the commencement of the 2002 construction season?
A Yes.
Q Are you aware of him ever visiting the site during active construction operation being underway?
A I do not have that knowledge.
Q Okay. Turning to the next page of this exhibit. When rock was encountered under Section 2310 the contractor was directed in Part 3.4A to excavate it to a minimum depth of 6 inches and a maximum depth of 12 inches below subgrade, correct?
A Correct.
Q And when the contractor encountered rock that it needed to excavate under Section 2310, Subpart 4.2A was the governing section, correct?
A For this 75 percent submittal, correct.
Q Okay. Did that change at a later time?
A For the 100 percent, yes.
Q Okay. What happened? What changed?
A The soils report came into play.

Page 205

Q And what then happened?
A This language was revised.
Q In what respect?
A The rock excavation was deleted.
Q And no more rock excavation existed under 2310, correct?
A Correct.
Q Let's turn to Section 2316. In the -- which is part of this Exhibit 116. Subpart 1.1A specifically describes that this deals with the roadway and embankment construction, correct?
A Correct.
Q And Part 1.3A is the same as 1.3A, the preceding section, we just looked at, correct?
A Correct.
Q And 1.3C, No rock excavation will be permitted unless approved by the contracting officer, is the same as the last sentence of Part 1.3B that you have in 2310?
A Yeah.
Q You took the two sentences in 2310 in Part B and made them two separate parts, B and C, in 2316?
A Correct.
Q Correct?
A Correct.
Q But they said the same thing?

Page 206

A Same thing.
Q Okay. Did that change in the seven -- from the 75 percent construction drawings?
A It changed by -- I could not tell you without looking at that final spec.
Q Why did it change?
A It would have been based on the soils report.
Q And if the soils report turned out to be inaccurate, then the contractor was given, based on that assumption, information that was not correct?
A Based on that assumption, correct.
Q Okay. Okay. Bob -- pardon me, Mr. Smith, let's go to 117.
(Exhibit Number 117 was marked for identification.)
Q (By Mr. Schoenfeld) Mr. Smith, 117 was an e-mail from you to Ray Tuttle dated October 24, 2000, in which you enclose a document to Mr. Tuttle to review and comment back to you.
Did you prepare what's marked as the second page of Exhibit 117 or cause it to be prepared under your direction?
A I prepared it with input from others.
Q You prepared it with input from others?
A Correct.

Page 207

Q Let's look at the first item that may have been input from others, 40 percent factor use. Was that input from the National Park Service, indeed, a direction?
A Correct.
Q And that direction came initially from Jack Vance, correct?
A Best of my knowledge.
Q But you didn't agree with it, correct? The prudence of the direction you didn't agree with?
A We -- we questioned it.
Q Did you question it to -- by bringing it to the attention of anybody at the National Park Service, or was it just --
A Ray Tuttle would have, but I don't know when and how.
Q But you're certain that he did, or you're hoping he did?
A No. I'm not hoping. I believe he did.
Q Okay. I can ask him that tomorrow. He's going to be sitting in the parallel chair that you're in today.
A Okay.
Q Where did the data come from for the cubic yards quantity that are listed in this document?

Page 220

Q Did anybody at any time ever indicate to you that the soils report was inaccurate?
A No.
Q Based on the information you've seen today, do you now question the accuracy of the soils report?
A I would question it, but I am not an expert in that area to determine if it's accurate or not.
Q Okay.
(Exhibit Number 123 was marked for identification.)
Q (By Mr. Schoenfeld) I'm going to show you Exhibit 123. Exhibit 123 is a one-page document. It's a Sheet G3 of the plans for this project, and it's a portion of the Upper and Lower Sherman Tree Improvement Projects area. You see that?
A Yes.
Q There is a note on this drawing with an arrow to a designated section that is shaded. Do you see that?
A This section here (indicated)?
Q Yes, sir. And the note is on the left-hand portion of the document and it concerns aggregate base course. Do you see that?
A Yes.
Q The note reads, "The aggregate base course for this project is stockpiled in this general area. The

Page 221

contractor will be responsible for moving this material to accommodate construction sequencing. This work shall be included in the general site excavation and grading task."
By this note, was it the intent of the design team to indicate to the contractor that the government had in the location identified sufficient material stockpiled that the contractor could use to create the AB necessary for the access road and parking areas to under -- that would be the underlayment of the pavement section?
A You'd also have to take into account the specification section on aggregate base course.
Q Okay. But from this note --
A From this note.
Q -- from this note itself, without looking just at the separate spec section, was the contractor informed that there was a quantity of material available for AB --
A Correct.
Q -- creation?
A Correct.
Q Was that material actually present when the contractor commenced operations?
A I do not know.
Q If it was not present, was the contractor

Page 222

entitled to some reimbursement for the cost associated with sourcing the volume of AB that was anticipated and represented to exist in that section?
A You'd have to -- yes, if the spec section backed that up.
Q Okay. Do you recall there being an addendum issue on this project which included photographs of certain stockpiles on the project?
(Exhibit Number 124 was marked for identification.)
Q (By Mr. Schoenfeld) Do you recall that?
A Yes.
Q I'm showing you Exhibit 124, which is a two-sided exhibit. The cover page, the first page, is Photo Number 7 entitled Aggregate Base. Was this produced by the design team?
MR. LEWIS: I'm sorry. What number are we on?
MR. SCHOENFELD: 124.
Q (By Mr. Schoenfeld) Was this produced by the design team?
A I don't know.
Q Do you recognize it as being part of the contract documents that was issued as part of Addendum 1?
A I don't remember the details of Addendum 1.
Q Does this look like material stockpiled for

Page 223

use as aggregate base? Recognizing it's not the best copy; it's a photocopy.
A Photocopy. It appears to be.
Q Do you know whether this material was in existence?
A No.
Q You can see it's not an insubstantial quantity of material, correct?
A Correct.
Q And would it be reasonable, in your experience in the construction industry, that a contractor receiving this photograph as part of an addendum for this bid document would reasonably anticipate that at least the volume represented by this picture was in existence that it could count on being used as aggregate base for this project?
A Based on my knowledge, I don't know if there is sufficient material to do that job.
Q I'm not suggesting that it was the volume sufficient to do the entire job, but the contractor could rely upon this volume being available?
A This volume, correct.
(A discussion was held off the record.)
(Exhibit Number 125 was marked for identification.)

government defend and ward off these requests?
Did you respond in writing? "You" meaning DHM.
A I responded to Joanne Cody, my contact, about my --
Q Opinion?
A -- opinion based on the landscape architect's view.
Q Did you respond in writing?
A Yes.
Q And how close in time did you respond in writing?
A I don't know the particular date of when I -- when I did.
(A discussion was held off the record.)
Q (By Mr. Schoenfeld) Was it in a letter form? A memo form? An e-mail?
A Probably a memo form.
Q Do you recall that document being in existence in your file?
A I'm sure I would have kept a copy of it, so, yeah.
MR. SCHOENFELD: Would you do me a favor, Counsel, and see if you can find or have your client find for you what he considers to be his response?



We may mark something that triggers his memory, but I don't recall seeing anything contemporaneous with the event set forth in this e-mail.
Q (By Mr. Schoenfeld) We've already talked earlier today about your intent; and your intent was you didn't expect the contractor to include -- to encounter, I should say, rock that would be required to be blasted in the roadway excavation, correct?
A Correct.
Q So in response to this e-mail, is it correct that your response said, We didn't expect rock to be encountered that needed to be blasted?
A Correct.
Q And, therefore, this would be extra work?
A I'm not sure I used the word "extra work." But I would have said your first part.
Q We didn't expect them to encounter rock?
A Correct.
Q Would the natural conclusion one would draw from that statement or opinion be that it would be extra work, therefore?
A Based on the landscape architect's view without -- you need further analysis from geotechnical and the engineer.
Q The answer is yes, it would be extra work?



A Yes.
Q If you were sitting as a DRB or as an independent party judging this, one of the facts that you're aware of, as well as those that I presented to you today, it would be extra work, correct?
A Yes, but --
Q Just based on what you've been given and the limitation of your professional --
A The limitation of my professional --
Q Okay. Next.
(Exhibit Number 141 was marked for identification.)
Q (By Mr. Schoenfeld) 141, produced from your files, multiple-page exhibit. It's from Andrea to Ray on August 9th -- to Ray from Andrea saying, "Attached is the RFI I got from Willie. Bob wants to discuss this & write something to indicate how we got our numbers. We based them on the geotech report etc. etc. Look over this and give us a call."
The second page is from Willie DeOcampo to Andrea dated August 9th of eight pages, and it says, "Need your input concerning definition of rock excavation - the projected over-run is too excessive & unacceptable. Provide justification as to why Remcon should not be paid under this pay item. Send response to



Joanne & Ray Todd. Willie."
And then behind it is the memo from Bob Russell to Willie of August 8th regarding the fact that they're blasting; the August 8th memo from Jeff Northrop of Remcon to Bob Russell regarding the fact that they've had to blast and they're going to overrun big-time and need some direction on how this is to be quantified; and then blasting records and logs; the last page of this exhibit being the same e-mail we marked as Exhibit 140.
Did you direct Andrea to send this to Ray Tuttle?
A Yes.
Q Are all these documents true and correct copies of what came out of your file that got furnished to you from Willie and you furnished to Ray?
A Andrea indicated 11 sheets. So if that's the total, that would match.
Q Okay. What was Ray's opinion in response to this issue being brought to his attention?
A Ray's opinion, from my recollection, was a change in condition.
Q It was a differing site condition was encountered?
A Correct. That was what I remember from Ray.

Q And as the civil engineer member of the design team, of the three members of the design team, Ray, in your opinion and experience, was the most knowledgeable person involved in the subject matter, correct?
A Ray and Kleinfelder.
Q But Kleinfelder was a subcategory to Martin and Martin, correct?
A Correct.
Q Of the three members of the design team, Martin and Martin, as the civil engineer, was the most knowledgeable?
A Correct.
Q So that would make two of the three members, at least the two that we know who commented on the subject, both believe this was a differing site condition which entitled the contractor to some reimbursement?
A Based on our --
Q Understanding?
A -- understanding and limited knowledge.
Q Okay.
(Exhibit Number 142 was marked for identification.)
Q (By Mr. Schoenfeld) 142, multiple-page document. The first page is on your company's letterhead. It's sent from Andrea to Bob Russell, the



lead inspector.
It encloses information regarding addendum sheets for the 200Q parking and trail and dealing with modifications to the design; is that correct? And it's dated August 10 of 2001, the first page, correct?
A (Reviewed documents.)
Q Just focus on the first page right now.
A Okay.
Q You want me to ask the question again?
A Yeah, please.
Q All right. The bottom of the page Andrea communicates to Bob Russell, in essence, We're sending you full-size addendum drawings that have been promised, and then she goes in to describe a whole series of things that have been encountered that have caused changes to be made and the drawings to be revised, correct?
A Correct.
Q Including the -- several trail points have changed since the staking of the trail, correct?
A Correct.
Q And a whole bunch of new parking coordinates have changed since the 100 percent drawings were issued, correct?
A Correct. I believe they would have been based on the road --



Q Being realigned?
A Realigned. That's my -- that's my recollection.
Q Okay. We're clicking real well, because you went exactly where I'm going to go.
When something changes from the design, as a general rule, it has a reaction in some other aspect of the project, correct?
A Correct.
Q Things don't just happen in a vacuum, correct?
A Correct.
Q Unless you're at the very end of a job, of a road job, correct?
A Correct.
Q So we have sort of a ripple effect going on in the project in August of 2001, or the end of July and early August of 2001. We have a series of changes to the road realignment that rippled to cause parking and trail changes, correct?
A Correct.
Q We have the contractor encountering -- yes?
A The trail might be separate because of the location of the parking distance.
Q Okay. All right. But we had trail realignment -- changes as well?



A The trail did not realign.
Q All right. But we have changes along the trail?
A Correct.
Q Okay. But as to the road and the parking lot at the minimum, the following events were going on at the same time: We have realignment changes, which ripple into coordinate changes, which means it can't be really done by the contractor until all those ripples are figured out and disclosed?
A Correct.
Q We have the burn pit excavation that goes from 2,000 to 7,000 yards, plus the replenishment of that hole --
A Yeah.
Q -- that has to be done, correct?
A Correct. And that was based on information provided by the park.
Q From the park.
I'm talking generically, not the causation. I'm just talking about the various things going on.
A Okay.
Q We have a series of trees and rocks and boulders that can or can't be touched that have to be reevaluated each step of the way by the National Park

needs to be that we did not -- that we do not vary from the awarded plan set, period. What does that mean?
A It would have meant that if you could have built -- built it based on the plans, we should not change for the convenience --
Q Of the contractor?
A -- of the contractor.
Q Okay.
A That was the tone.
Q In continuation it says, "Clarifications and plans submitted last year are not valid since they were not submitted as a modification." What does that mean?
A I probably would have been informed that they did not process a modification.
Q The government didn't?
A Correct.
Q We saw in one of the prior exhibits a few moments ago that Rod Keiscome wanted to issue it all as a modification, right? Ray Todd communicated that to your organization, right? All the plan changes that were --
A I can only assume that he did.
Q Right. But we saw -- listen to my question, please.
A Okay.
Q We saw in an earlier exhibit that Rod



Keiscome, according to Ray Todd, was planning on issuing in the contracting officer's directive, which you understood to be a modification, all of the plan changes that had occurred up to that moment in time in 2001, correct?
A Correct.
Q Yet you wrote here, "Clarifications and plans submitted last year are not valid since they were not submitted as a modification." Does that mean the contractor was required to build the job according to the plans even though it was not constructable?
A Let's go over that one again one more time.
Q If the changes that the design team had made and clarifications that the design team determined needed to be done were reflected in written plan amendments issued to the contractor and its surveyor to stake and build the job to, and they went ahead and proceeded as a contractor is supposed to, and, in fact, it's being inspected and being observed, You're doing a great job --
A Yeah.
Q -- but the contracting officer does not formalize those plan changes into modification, does that mean that they're not valid? And what happens to the job at that point?
MR. SCHROEDER: Objection; form.



MR. LEWIS: Same objection.
Q (By Mr. Schoenfeld) Go ahead. What was the contractor to do as of May 18 of 2002 if the government was not ratifying a modification, the plan changes, and clarifications that the design team had issued to the contractor?
MR. LEWIS: Same --
Q (By Mr. Schoenfeld) If you know.
MR. LEWIS: Same objection.
THE WITNESS: I do not know.
Q (By Mr. Schoenfeld) Had the contractor during 2001 acted in response to those plan modifications and changes and commenced to stake and build the job according to them?
A It's too long. It's a long day.
Q Had the contractor acted in response to those changes that you issued and started to stake and build the job according to the changes?
A I would have assumed that they were -- processed the directive.
Q Okay. I didn't ask whether they got a directive.
A Okay.
Q Had they -- had they started their construction operations to build it as -- according to



the changes that were issued by the design team?
A I'm sorry. You'll have to do that again.
Q Okay.
A It's --
Q If the design team issues changes to the drawings and they're given to the contractor by Bob Russell, the lead inspector, as we saw, and the design team sends changes to the surveyor to stake --
A Uh-huh.
Q -- you would expect the contractor to do that?
A Correct.
Q To make those changes and to stake according to the design -- most recent updated design?
A Yes.
Q If the contracting officer does not ratify those changes in a modification, what is your understanding of what the contractor is supposed to do at that point?
A He would be in limbo.
Q Exactly. Was the contractor in limbo as of May 18 of 2002?
A I don't -- I can only assume he would be, based on that information.
Q And every day he's in limbo, than he could otherwise perform work in the field because the site

would be available, would be effectively a delay if it affected a critical path activity, correct?

A Correct.

Q Did you participate during the partnering session and discussions along these lines where Mr. Christensen said words to the effect, We've got all these changes and clarifications we got in 2001, but we haven't received a modification; in good faith, we've gone ahead and staked it and built to it, but we have no modification; what are we supposed to do?

MR. LEWIS: Object to form.

Q (By Mr. Schoenfeld) Wasn't that the subject of part of the partnering session in 2002?

A Yes. But I don't know the details of the wording.

Q Okay. But words to that effect is what he communicated, right?

A Correct.

Q In your presence?

A Correct.

Q And in the presence of all the other people present in that partnering session, correct?

A Correct.

Q What was the -- Mr. Keiscome's response?

A I don't remember his response to that past



work.

Q What was Mr. DeOcampo's response?

A I'm sorry, I don't have --

Q What was Mr. Russell's response? Or Mr. Todd? Or Ms. Cody? Or any of the other NPS people associated with this project? Did anybody say, Yeah, we've got to issue a mod -- or words to that effect -- to take care of and clean this up?

A Larry Walling was there, and he said we needed to get this resolved and move forward.

Q Larry Walling was the replacement PM because Ray Todd had moved on to other work; he had been promoted, and Mike Giller had not yet appeared, correct?

A Correct.

Q And he proactively made a communication saying, Yeah, words to the effect, Yeah, we need to have a modification issued to clean this up; is that your recall?

A I don't remember he used the words We need a modification to clean this up, only that it needs to get taken care of so -- the project needs to move forward and things resolved.

Q Did anybody contend on behalf of the National Park Service at the partnering meeting in May of 2002, or whenever it happened in 2002, that the contractor should



not have made those clarifications and modifications as issued in the revised design sheets that they received during 2001?

A Not that I'm aware of.

Q So the -- on the one hand, the government can -- did not communicate that it -- they didn't like the fact that those changes were made, but they hadn't affirmed that the contractor should make them in a modification; is that correct?

A That would be correct.

Q So the contractor was, from your perspective, in limbo?

A Correct.

Q Okay.

(A discussion was held off the record.)

(Exhibit Number 151 was marked for identification.)

Q (By Mr. Schoenfeld) Here's Exhibit 151, sir, from your files. It's an e-mail from Joanne to you regarding project delay, which forwarded Larry Walling's e-mail of May 21st.

Your e-mail -- Joanne's e-mail is also May 21st of 2002. And Larry Walling's e-mail, which was being forwarded, was sent to Willy DeOcampo, Jack Vance, Joanne Cody, Ray Todd, Rod Keiscome, and Terry Lang



regarding project delay.

Larry Walling wrote, "Willie, What happened to Partnering? Do we agree that we are holding up REMCON? Respond to this message immediately! He's jerking our chain. If we are holding them up, we better be reducing our liability in a Big hurry."

What was your reaction when you saw this?

MR. SCHOENFELD: It's classic.

THE WITNESS: Yeah, I would have thought the -- only responding to what's here.

Q (By Mr. Schoenfeld) The partnering meeting had already happened, right?

A Correct.

Q Based on the text?

A Yeah.

Q And Mr. Walling at the partnering meeting, your recall was, Look, we got to take care of this and move this job forward, right? Words to that effect?

A That's what I meant by Larry wanting to move it forward.

Q And now he's saying something a little bit different. Is that how you read this e-mail?

A No. It's still the same to me.

Q Okay.

//



WORD INDEX

# EXHIBIT 4F

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Q And as the civil engineer member of the design team, of the three members of the design team, Ray, in your opinion and experience, was the most knowledgeable person involved in the subject matter, correct?
A Ray and Kleinfelder.
Q But Kleinfelder was a subcategory to Martin and Martin, correct?
A Correct.
Q Of the three members of the design team, Martin and Martin, as the civil engineer, was the most knowledgeable?
A Correct.
Q So that would make two of the three members, at least the two that we know who commented on the subject, both believe this was a differing site condition which entitled the contractor to some reimbursement?
A Based on our --
Q Understanding?
A -- understanding and limited knowledge.
Q Okay.
(Exhibit Number 142 was marked for identification.)
Q (By Mr. Schoenfeld) 142, multiple-page document. The first page is on your company's letterhead. It's sent from Andrea to Bob Russell, the



lead inspector.
It encloses information regarding addendum sheets for the 200Q parking and trail and dealing with modifications to the design; is that correct? And it's dated August 10 of 2001, the first page, correct?
A (Reviewed documents.)
Q Just focus on the first page right now.
A Okay.
Q You want me to ask the question again?
A Yeah, please.
Q All right. The bottom of the page Andrea communicates to Bob Russell, in essence, We're sending you full-size addendum drawings that have been promised, and then she goes in to describe a whole series of things that have been encountered that have caused changes to be made and the drawings to be revised, correct?
A Correct.
Q Including the -- several trail points have changed since the staking of the trail, correct?
A Correct.
Q And a whole bunch of new parking coordinates have changed since the 100 percent drawings were issued, correct?
A Correct. I believe they would have been based on the road --



Q Being realigned?
A Realigned. That's my -- that's my recollection.
Q Okay. We're clicking real well, because you went exactly where I'm going to go.
When something changes from the design, as a general rule, it has a reaction in some other aspect of the project, correct?
A Correct.
Q Things don't just happen in a vacuum, correct?
A Correct.
Q Unless you're at the very end of a job, of a road job, correct?
A Correct.
Q So we have sort of a ripple effect going on in the project in August of 2001, or the end of July and early August of 2001. We have a series of changes to the road realignment that rippled to cause parking and trail changes, correct?
A Correct.
Q We have the contractor encountering -- yes?
A The trail might be separate because of the location of the parking distance.
Q Okay. All right. But we had trail realignment -- changes as well?



A The trail did not realign.
Q All right. But we have changes along the trail?
A Correct.
Q Okay. But as to the road and the parking lot at the minimum, the following events were going on at the same time: We have realignment changes, which ripple into coordinate changes, which means it can't be really done by the contractor until all those ripples are figured out and disclosed?
A Correct.
Q We have the burn pit excavation that goes from 2,000 to 7,000 yards, plus the replenishment of that hole --
A Yeah.
Q -- that has to be done, correct?
A Correct. And that was based on information provided by the park.
Q From the park.
I'm talking generically, not the causation. I'm just talking about the various things going on.
A Okay.
Q We have a series of trees and rocks and boulders that can or can't be touched that have to be reevaluated each step of the way by the National Park

Page 272

Service personnel?
A Correct.
Q We have the Park Service making changes to the alignment that are not even being disclosed timely, or at all, to the design team, correct?
A Correct.
Q And then we have the contractor encountering what DHM, based on its knowledge and experience, and Martin and Martin, based on its civil engineering knowledge and experience, believing there are differing site conditions in the same location where all these other things are happening, correct?
A Correct.
Q In essence, we've got a -- a pig in the middle of a python, right? We've got a huge gum-up to the works?
MR. LEWIS: I'm going to object to the form on that one.
Q (By Mr. Schoenfeld) One of the better expressions, the pig was in the middle of a python. The contractor was boxed up and had all these things going on that prevented it from efficiently attacking the job, correct?
A I'd have to still state that I wasn't present to know what other activities could occur.

Page 273

Q Absolutely correct. But on the general assumption of all these things were going on on a limited work site with limitations on where you could work versus not work, you couldn't work the Lower Sherman until the Upper was done?
A Uh-huh.
Q The contractor was in quite a pickle with all these issues going on, correct?
A It would seem that way.
Q And you could appreciate the contractor contending that it was being substantially impaired in its ability to productively perform work on this project during the summer of 2001?
A I can't speak to their work force and ability to continue with other items.
Q But based on your general knowledge of the layout and the region, you could understand the contention being asserted, right?
A It would be -- it would be an issue --
Q And the issue would be limited work area to productively perform work while these series of design changes and differing site condition and excess quantities were being addressed?
A Yes.
Q All right. Thank you.

Page 274

(Exhibit Number 143 was marked for identification.)
Q (By Mr. Schoenfeld) Next is 143.
MR. LEWIS: Is this whole stack for Bob?
MR. SCHOENFELD: Yeah. But we're not going to get it all.
Q (By Mr. Schoenfeld) This is an e-mail from Andrea to Bill and Joanne, August 12th of 2001 regarding AutoCAD files. "You should receive:" and it refers to Sheets T-3 to T-10, parentheses, "Trail sheets that have changed," end parentheses. And then certain parking sheets which have changed.
Is this the formalization of transmittal to the surveyor who needed this information to stake it so the contractor could build it, of design changes?
A Design clarifications to the surveyor.
Q Are being formally communicated so that he can stake so the contractor can build?
A Correct. And --
Q And before this date, this data was not in the possession of Mr. Morris, correct, the revisions regarding --
A I don't -- I'm unaware if these were resending or if it was the same information over again, because I'm seeing the same sheet numbers. That wouldn't have been

Page 275

redone all those times.
Q There's nothing to indicate, then, on Exhibit 143 that this is an accommodation to resend it, correct?
A Correct.
(Exhibit Number 144 was marked for identification.)
Q (By Mr. Schoenfeld) I'm going to show you Exhibit 144, sir. E-mail from Andrea to a whole series of people, including a cc to yourself and to Ray Tuttle, on Sunday August 12th. And it says, Update, Sequoia 200Q: On our site visit, we adjusted the Upper Sherman Tree Parking design and made changes to the Sherman Tree Trail due to site conditions. These are outlined in the Field Report August 5 to August 7. They have been adjusted in AutoCAD and sent out as an addendum.
With just that information that I just read, does that reinforce the fact that what is reflected as being transmitted in Exhibit 143 was new data?
A My -- my sense tells me it's all associated with the same issue of past sheets that we have been going through.
Q That it was new data being furnished to the surveyor to stake for the contractor?
A Based on those other issues.

# EXHIBIT 4G

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

which is a cover sheet, Project Specifications for this project. At the top somebody has written 100 percent February 27, 2001, correct?

A Correct. That would have been Andrea Gregor's --

Q Writing?

A -- writing.

Q Does that lead you to conclude as of February 27, 2001, when the specs were done, subject to addendum?

A That's when we would have gotten copies.

Q Okay. That's when you would have gotten copies from whom?

A I'm not sure if we printed the last set or the Park Service.

Q Okay. What's --

A This is 100 percent submittal.

Q Okay. What is set forth in the balance of this exhibit are three spec sections: 2305, 2310, and 2316. Take a moment, flip through them, and tell me if you believe these are the final versions of those three spec sections.

A (Reviewed documents.)

Can I answer as I page?

Q Absolutely. Whatever is easiest for you.



A To be honest with you, I'm not -- I don't -- I don't even remember --

Q There being a spec session?

A Right.

Q So that's a don't know?

A It's a don't know.

Q Okay. 2310.

A Can I add another comment? This would have been furnished by the Park Service.

Q Blasting?

A Blasting.

Q Okay.

(A discussion was held off the record.)

THE WITNESS: When I look at Section 2310, 4.2, Rock Excavation, I don't remember if that was in there, in the final bid documents.

Q (By Mr. Schoenfeld) Okay. That -- just for the record, that is on Bates stamp page 015227, or the fifth page of Spec Section 2310, correct?

A Correct.

Q Okay. Now, turn to Spec Section 2316. Is this what you believe is the final version?

A It appears to be.

(A discussion was held off the record.)



Q (By Mr. Schoenfeld) Okay. I note in Part 4 of 2316, specifically 4.1B that we saw in the prior exhibit entitled Rock Excavation is no longer there, correct? There is no 4.1B, correct?

A Correct.

Q Was it relocated somewhere else in 2316, or was it simply deleted?

A It was deleted, but I couldn't tell you the rationale behind why it was not --

Q Well, you recommended and concurred that it should be deleted when we looked at Exhibit 126, the last page of that exhibit, correct? You wrote delete, right?

A Ray Tuttle and I would have had conversations about how it's placed, so I don't have --

Q I would not expect that this would have occurred in a vacuum.

A Okay.

Q DHM and Martin and Martin concurred to delete the reference to rock excavation from the roadway excavation and embankment specification section, correct?

A Correct.

Q In the final version, it was deleted, correct?

A Correct.

Q Which did not give information to the contractor that he should expect to encounter the rock



that would be separately paid for, correct?

A Well, it depends on how the soils report was written.

Q The soils report was done, as we got to -- in fact, it had been done for six months. February 27th of 2001 is six months after -- five months after the soils report was prepared in September 11th of 2000, correct?

A Correct.

Q So the soils report said, Contractor shouldn't expect to encounter rock, right? That wasn't going to be able to be ripped with conventional construction equipment?

A Correct.

Q And as a result of that, the references to rock were removed because you didn't expect them to encounter rock that needed to be paid for as a separate item, correct?

A Right.

Q You didn't expect he was going to have to blast the roadway, did you?

A Correct.

Q But, as you understand, the contractor claimed it did have to blast the roadway, right?

A Correct.

Q A lot of blasting, right?

A I don't know the extent.
Q But it took a long time, right?
A I knew it was a long period, but I couldn't tell you how long.
Q Are you aware that the National Park Service limited the time when blasting could be done on a daily basis so as to minimize the effect on visitors to the park?
A No.
Q Is that consistent with what your understanding is how the National Park Service runs its park?
A Wouldn't surprise me.
Q And based on your construction experience and observation of operations in the field, normal construction days run from about seven in the morning until three or 3:30 in the afternoon, right?
A Correct.
Q And if the National Park Service did not allow blasting until 4 p.m. on a normal construction day, that would severely limit the amount of work that a contractor could do during a construction workday if blasting was required, right?
A That would be my assumption.
Q And as a result of that, you would expect



there to be extended periods of time where limited work would be done to the activity for which blasting was necessary, correct, based on your general experience and knowledge?
A My general experience, yeah.
Q And if -- are you familiar with the term critical path as that relates to construction?
A Yes. Yes.
Q Do you understand critical path to be those series of activities in an uninterrupted pattern that is the longest, continuous series of activities that control the time frame within which a project could be constructed?
A Yes.
Q And if in this instance the very access road was on the critical path and instead of being able to be ripped with conventional construction equipment, as anticipated by the soils report, and it had to be blasted, would you expect as a general rule, without studying the subject, that the critical path of the project was impacted and delayed, thus delaying the overall ability of the contractor to complete the project?
A Based on those broad parameters you stated, that would be correct.



Q Okay.
MR. SCHOENFELD: Let's take a break.
(A recess was taken from 3:21 p.m. until 3:21 p.m.)
(Mr. Schroeder is not present.)
(Exhibit Number 128 was marked for identification.)
Q (By Mr. Schoenfeld) Number 128, sir, one-page document from Bill Morris to Dan Savage. Do you recall -- do you recall meeting a gentleman by the name of Bill Morris on this project? He was with Giuliani & Kull engineers which was --
A Yes, yes, yes. He -- he was the --
Q Surveyor on behalf of Remcon?
A Yes. Yes.
Q Okay. Did you meet him personally?
A Yes.
Q Experienced, knowledgeable, able fellow --
A Seemed to be, yes.
Q No reason to believe that he wasn't competent in what he did and how he did it; is that correct?
A No.
Q Is that correct?
A Yes. He was knowledgeable.
Q You've met a lot of people in the surveying



business in your profession, correct?
A Correct.
Q And by and large, there are a lots of people that don't know what they're doing, correct? Or don't -- aren't experts at what they do?
A Correct.
Q Did you consider Mr. Morris among the people to be expert in knowing what they're doing?
A I only met him for a few hours, so I -- I couldn't form a --
Q Definitive conclusion?
A Correct.
Q But of the conclusion you did draw, you concluded that he was a solid guy who knew what he was doing?
A Correct.
Q Thank you.
And Dan Savage is with the National Park Service on the design side, correct?
A Correct.
Q And you've worked with him with respect to this project to some extent?
A He was preparing -- he was an associate of Joanne Cody's, so we would have contact with him.
Q Okay. You know Mr. Morris writes in the

Page 264

government defend and ward off these requests?
Did you respond in writing? "You" meaning DHM.
A I responded to Joanne Cody, my contact, about my --
Q Opinion?
A -- opinion based on the landscape architect's view.
Q Did you respond in writing?
A Yes.
Q And how close in time did you respond in writing?
A I don't know the particular date of when I -- when I did.
(A discussion was held off the record.)
Q (By Mr. Schoenfeld) Was it in a letter form? A memo form? An e-mail?
A Probably a memo form.
Q Do you recall that document being in existence in your file?
A I'm sure I would have kept a copy of it, so, yeah.
MR. SCHOENFELD: Would you do me a favor, Counsel, and see if you can find or have your client find for you what he considers to be his response?

Page 265

We may mark something that triggers his memory, but I don't recall seeing anything contemporaneous with the event set forth in this e-mail.
Q (By Mr. Schoenfeld) We've already talked earlier today about your intent; and your intent was you didn't expect the contractor to include -- to encounter, I should say, rock that would be required to be blasted in the roadway excavation, correct?
A Correct.
Q So in response to this e-mail, is it correct that your response said, We didn't expect rock to be encountered that needed to be blasted?
A Correct.
Q And, therefore, this would be extra work?
A I'm not sure I used the word "extra work." But I would have said your first part.
Q We didn't expect them to encounter rock?
A Correct.
Q Would the natural conclusion one would draw from that statement or opinion be that it would be extra work, therefore?
A Based on the landscape architect's view without -- you need further analysis from geotechnical and the engineer.
Q The answer is yes, it would be extra work?

Page 266

A Yes.
Q If you were sitting as a DRB or as an independent party judging this, one of the facts that you're aware of, as well as those that I presented to you today, it would be extra work, correct?
A Yes, but --
Q Just based on what you've been given and the limitation of your professional --
A The limitation of my professional --
Q Okay. Next.
(Exhibit Number 141 was marked for identification.)
Q (By Mr. Schoenfeld) 141, produced from your files, multiple-page exhibit. It's from Andrea to Ray on August 9th -- to Ray from Andrea saying, "Attached is the RFI I got from Willie. Bob wants to discuss this & write something to indicate how we got our numbers. We based them on the geotech report etc. etc. Look over this and give us a call."
The second page is from Willie DeOcampo to Andrea dated August 9th of eight pages, and it says, "Need your input concerning definition of rock excavation - the projected over-run is too excessive & unacceptable. Provide justification as to why Remcon should not be paid under this pay item. Send response to

Page 267

Joanne & Ray Todd. Willie."
And then behind it is the memo from Bob Russell to Willie of August 8th regarding the fact that they're blasting; the August 8th memo from Jeff Northrop of Remcon to Bob Russell regarding the fact that they've had to blast and they're going to overrun big-time and need some direction on how this is to be quantified; and then blasting records and logs; the last page of this exhibit being the same e-mail we marked as Exhibit 140.
Did you direct Andrea to send this to Ray Tuttle?
A Yes.
Q Are all these documents true and correct copies of what came out of your file that got furnished to you from Willie and you furnished to Ray?
A Andrea indicated 11 sheets. So if that's the total, that would match.
Q Okay. What was Ray's opinion in response to this issue being brought to his attention?
A Ray's opinion, from my recollection, was a change in condition.
Q It was a differing site condition was encountered?
A Correct. That was what I remember from Ray.

Q And as the civil engineer member of the design team, of the three members of the design team, Ray, in your opinion and experience, was the most knowledgeable person involved in the subject matter, correct?
A Ray and Kleinfelder.
Q But Kleinfelder was a subcategory to Martin and Martin, correct?
A Correct.
Q Of the three members of the design team, Martin and Martin, as the civil engineer, was the most knowledgeable?
A Correct.
Q So that would make two of the three members, at least the two that we know who commented on the subject, both believe this was a differing site condition which entitled the contractor to some reimbursement?
A Based on our --
Q Understanding?
A -- understanding and limited knowledge.
Q Okay.
(Exhibit Number 142 was marked for identification.)
Q (By Mr. Schoenfeld) 142, multiple-page document. The first page is on your company's letterhead. It's sent from Andrea to Bob Russell, the



lead inspector.
It encloses information regarding addendum sheets for the 200Q parking and trail and dealing with modifications to the design; is that correct? And it's dated August 10 of 2001, the first page, correct?
A (Reviewed documents.)
Q Just focus on the first page right now.
A Okay.
Q You want me to ask the question again?
A Yeah, please.
Q All right. The bottom of the page Andrea communicates to Bob Russell, in essence, We're sending you full-size addendum drawings that have been promised, and then she goes in to describe a whole series of things that have been encountered that have caused changes to be made and the drawings to be revised, correct?
A Correct.
Q Including the -- several trail points have changed since the staking of the trail, correct?
A Correct.
Q And a whole bunch of new parking coordinates have changed since the 100 percent drawings were issued, correct?
A Correct. I believe they would have been based on the road --



Q Being realigned?
A Realigned. That's my -- that's my recollection.
Q Okay. We're clicking real well, because you went exactly where I'm going to go.
When something changes from the design, as a general rule, it has a reaction in some other aspect of the project, correct?
A Correct.
Q Things don't just happen in a vacuum, correct?
A Correct.
Q Unless you're at the very end of a job, of a road job, correct?
A Correct.
Q So we have sort of a ripple effect going on in the project in August of 2001, or the end of July and early August of 2001. We have a series of changes to the road realignment that rippled to cause parking and trail changes, correct?
A Correct.
Q We have the contractor encountering -- yes?
A The trail might be separate because of the location of the parking distance.
Q Okay. All right. But we had trail realignment -- changes as well?



A The trail did not realign.
Q All right. But we have changes along the trail?
A Correct.
Q Okay. But as to the road and the parking lot at the minimum, the following events were going on at the same time: We have realignment changes, which ripple into coordinate changes, which means it can't be really done by the contractor until all those ripples are figured out and disclosed?
A Correct.
Q We have the burn pit excavation that goes from 2,000 to 7,000 yards, plus the replenishment of that hole --
A Yeah.
Q -- that has to be done, correct?
A Correct. And that was based on information provided by the park.
Q From the park.
I'm talking generically, not the causation. I'm just talking about the various things going on.
A Okay.
Q We have a series of trees and rocks and boulders that can or can't be touched that have to be reevaluated each step of the way by the National Park

Q Okay.
MR. SCHROEDER: What's that last exhibit, please?
MR. SCHOENFELD: 144.
(Exhibit Number 145 was marked for identification.)
Q (By Mr. Schoenfeld) I'm going to show you Exhibit 145, sir. Make a representation as to what this document is to limit your need to have to review it all.
What we just marked as Exhibit 144 makes up the -- the bulk of the document. I'm only interested in the very top of the first page. Okay? You'll see that Andrea's e-mail of August 12th is reprinted in its entirety. It comes out as August 13th on this one. Do you see that? The text is identical?
A From 144?
Q To 145.
A Yes.
Q Now, at the top of 145 on the first page, there's an e-mail from Ray Todd to Andrea and to Joanne Cody. It's dated August 15th. Do you see that?
A Yes.
Q And it says, "Rod would like to issue these changes as a contracting officer's directive letter." What's a contracting officer's directive letter, to your



knowledge?
A To me, that means a change order.
Q Directing the contractor to make these changes, correct?
A Correct.
Q Do you know if the contracting officer did so?
A No idea.
Q Well, it would be normal in your experience that would be done, because all these were changes, correct, that we've just been looking at?
A Or clarification.
Q But things that were different from the issue of construction set, correct?
A Correct.
(Exhibit Number 146 was marked for identification.)
Q (By Mr. Schoenfeld) Did the changes that we've seen so far in the project or clarification stop as of August 15th, or did they continue periodically?
A It would have been periodic, because there's always clarifications and RFIs through a course of a job.
Q Okay. Did you ever receive personally written notification that the contractor claimed that it had encountered a differing site condition on the project?
A You have to repeat that question, please.



Q Did you ever receive personally something that indicated to you that the contractor in writing had claimed that it had encountered a differing site condition on the project? In other words, the rock that had to be blasted.
A When there was a claim produced by Remcon, but I'm not sure that they --
Q Okay. Exhibit 146 I've just marked. First page is a fax from Bob Russell to Andrea, correct?
A Correct.
Q Okay. Encloses ten pages. You'll see that this exhibit is all DHM Bates-stamped documents. Okay?
A Uh-huh.
Q On the second page of this exhibit is Remcon's, I'll represent to you, written notice to Mr. Russell on August 20th of 2001 that it encountered a differing site condition. It uses the words specifically in the text. Did you see this? Did Andrea bring it to your attention on August 20 or the 21st?
A I can only assume that she did.
Q Okay. When did you form the conclusion that you felt, based on your knowledge and experience, that what Remcon had encountered what was a differing site condition?
A Sometime in that same period, but I couldn't



give you a date.
Q Did you tell representatives of the National Park Service that you had reached that conclusion?
A I sent a memo to Joanne Cody.
Q The one that I haven't shown you yet, correct?
A Correct.
(Exhibit Number 147 was marked for identification.)
Q (By Mr. Schoenfeld) And do you have a copy of that in your file, your -- you very strongly believe, that memo?
A I would assume so.
Q Okay. Let me show you 147. It's a transmittal from Bob Russell to Jeff Northrop of Remcon dated August 24th of 2001 enclosing a series of revised drawings from Andrea that he had received on August 23rd and that these are to replace a whole set of drawings -- revised drawings that were issued on August 14th and August 22nd. You see that?
A Yes.
Q What was going on? Why were there so many revisions to the drawings being issued?
A What I'm not sure of is if they consolidated them all into one set.
Q Is there anything here that suggests that this



WORD INDEX

was just a consolidation?
A Without looking at those sheets, I can't tell.
Q Now, is in part your representation that you believe Bill Morris was a competent, able surveyor based on communications you received from Andrea as to her observations to the quality of his staking work?
A That's what I remember.
(Exhibit Number 148 was marked for identification.)
Q (By Mr. Schoenfeld) So that's a yes?
A That's a yes.
Q Is Exhibit 148 an example of what -- some type of information you received from Andrea on that subject?
A Yeah. She's stating that they did a good job.
Q We previously marked certain documents. I believe one was dated June 24th of 2000 with Andrea's handwritten notation of July 14th, and then it was dated October 24th, the final estimate on Earthwork Quantities. Remember that?
A Correct.
(Exhibit Number 149 was marked for identification.)
Q (By Mr. Schoenfeld) Let me show you another document we got from the government on that subject. This one is actually dated on the cover sheet October 11



of 2001 as being prepared by your company. Do you recall doing it again about a year later?
A Yes, they would have asked me to resummarize it.
Q Why? What was the reason for redoing something you had already done? Is it because the construction operations during the 2001 construction season disclosed inaccuracies in the estimate?
A I'm not sure of the reason.
Q Is it because the road realignment changed and excess quantities were now being generated because of the additional cut that had to be done?
A To be honest with you, I don't remember.
Q Is it because in part the 40 percent factor that was identified to be used and directed to be used was, in fact, not being achieved in the field?
A What I could -- I would say this is to reflect the bid quantities.
Q I don't understand what you mean. What do you mean "reflect the bid quantities"?
A Stockpile for use at the shuttle bus area, future use 6800, that correlated to the bid --.
Q The bid quantity of sixty --
A Right. That's how.
Q Okay.



MR. SCHOENFELD: Let's go off the record for a moment.
(A recess was taken from 4:32 p.m. until 4:39 p.m.)
(Exhibit Number 150 was marked for identification.)
Q (By Mr. Schoenfeld) I've handed you a document we've marked as Exhibit 150. And it's my assumption that this is the document, perhaps, you were referring to earlier that you responded to the different site condition question; is that correct?
A Correct.
Q Did you -- I'm drawing your attention -- because this is authored by you to Joanne, correct?
A Correct.
Q And it's dated May 18 of 2002, correct?
A Correct.
Q It's entitled, Draft for Review. Did it ever get actually published?
A I do not know.
Q All right. Let's look at Item 5 on the lower part of the second page.
A It was prepared because she was not present.
Q Okay. Lower part of the second page, please.
A Yes.



Q Item 5, Earthwork. I'm going to read it, "drilling and shooting rock, you should brief Terry and Rod" -- Terry meaning Terry Lang?
A Correct.
Q And Rod meaning Rod Keiscome, correct?
A Correct.
Q -- "prior to their negotiations with the Contractor in early June. Comments included that the soundings provided by the soils report indicate that the rock in question was rip-able (sic). Remcon had the stone tested and the density is beyond the limits for ripping. The only issue is that Remcon cannot say if the stone piece tested was from" blast -- "from the blasted material. Seems like a change in condition and the work is justified."
Is this your written confirmation of that which you testified to earlier, that it was your opinion that what Remcon encountered was a differing site condition?
A Yes, based on my knowledge as a landscape architect.
Q Okay.
A Not as a geotechnical engineer.
Q Understood.
Look at the -- stay on the same page.