# EXHIBIT 5A

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF RAYMOND TUTTLE
January 7, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: RICHARD P. SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 11066
Washington, D.C. 20005

For DHM: PAUL F. LEWIS, ESQ.
Moye|Giles, LLP
16 Market Square
1400 16th Street
6th Floor
Denver, Colorado 80202

Also Present: Stephen Christensen
Michael Giller

entitlement as to why he felt he was entitled to an additional compensation as well as substantiation of the additional compensation he sought?
MR. SCHROEDER: Objection; form.
Q (By Mr. Schoenfeld) Go ahead.
A I do recall seeing Mr. Christensen with some documentation in front of him, yes, sir; I don't know what that documentation was.
Q Was one of the subjects that was discussed the contention by Mr. Christensen that he encountered a differing site condition in the access road construction?
A Yes, sir.
Q And is the information that we've talked about here today consistent with his contentions?
A Yes, sir.
Q And in that meeting that -- which Mr. Christensen raised that subject, did you communicate, along with Mr. Smith, the communication that you said you did in the meeting with the National Park Service that, on balance, you felt there was a differing site condition encountered, you just didn't know the extent of it?
A It would have been that same time frame. I don't know if it was that exact time frame.
Q And Mr. DeOcampo was present at that meeting, correct, or those meetings because he was the COR?



A I don't recall. I -- he probably was.
Q Do you recall anybody that was in attendance on behalf of the National Park Service disagreeing with you or Mr. Smith as to your observations?
A No, I don't remember that. I don't recall that.
Q Let me show you Exhibit 115, sir. It's a one-page e-mail from Andrea at DHM to yourself, Tod Bunker, and Joanne Cody regarding Psomas's performance of topography at the Generals Highway. Does this refresh your recollection as to the time when Psomas was asked to do its work during the design phase?
A (Reviewed documents.)
Okay.
Q Did -- is your memory refreshed that during July of 2000 that's when Psomas was being requested to do that work?
A That sounds right.
Q Okay. I'm going to show you a document we've marked as Exhibit 117. It is an e-mail communication from Bob Smith to yourself dated October 24, 2000. On the second page bearing the same date it's entitled Earthwork Quantities. Do you recall this spreadsheet summary?
A Yes, sir.



Q All right. Did you participate in creating this document?
A We supplied the quantities in the upper line.
Q By "the upper line," you mean the 33,400 cubic yards of cut; 16,100 cubic yards of fill?
A Yes, sir.
Q Did you also supply the determination that the material to be encountered by the contractor on this project would be -- be able to be compacted at 40 percent of volume?
A That number was supplied by the park, the personnel at the park, based on previous projects out there.
Q Jack Vance provided that information?
A I don't recall the person.
Q Was there a directive issued by the design -- pardon me -- by the National Park Service to the design team to use a 40 percent compaction factor for materials to be encountered on this project?
A A written directive?
Q Any type of directive.
A Oral.
Q Did the design team use a 40 percent compaction factor in the calculations that it ultimately used to include in the bid quantity schedule?



A Cut and fill quantities were not included in the bid schedule.
Q But net quantities were, correct? Net quantities of --
A I don't believe so.
Q Are you sure about that, or you don't remember?
A It was lump sum, if I remember correctly.
Q For excavation?
A Yes, sir.
Q Okay. Were the calculations that led you to conclude the quantity that you listed as material to be encountered, did it include a calculation of a 40 percent compaction factor?
A Yes, sir.
Q Did you personally agree that 40 percent was a reasonable, prudent compaction factor to use, given the type of material described in the soils report which we've marked as Exhibit 74?
A It's on the high side of numbers that we would use.
Q Mr. Smith testified yesterday that it was at least 100 percent high, that he would have used nothing greater than 20 percent. Was your perception in the fall of 2000 consistent with that that Mr. Smith just -- I

just communicated to you he testified to?
MR. LEWIS: Raise the same objection as I did previously.
Q (By Mr. Schoenfeld) You may testify, sir.
A We would -- we would normally use about 15 percent.
Q Okay. Did you communicate to whomever you could at the National Park Service that you felt the direction to use 40 percent compaction factor was out of line with your perception of the compaction capacity of the material to be encountered?
A Yes, sir. But they had previous projects out there that they said they had encountered the 40 percent compaction factor.
Q Okay. Would you agree, as a general principle, that if the material could not be compacted to the extent of 40 percent and it was in the range of, let's say, 15 percent, that that would generate excess material that would have to be handled?
A Yes, sir.
Q Do you recall reading in the Remcon claim that Remcon contended it encountered substantially -- substantial volumes of excess material beyond the 6800 cubic yards specified in the contract documents?
A Yes, sir.



Q Do you recall reading that Remcon encountered approximately 17,000 additional cubic yards of material?
A I don't recall the number.
Q Do you recall performing some calculations while the job was ongoing at the request of the National Park Service to determine what the actual quantities were that Remcon encountered in excess of the 6800 that were deposited at Wolverton Point?
A We were asked to verify some of our original numbers.
Q Did you verify at all the excess quantity of material Remcon had to handle as a result of the 40 percent compaction factor not being accurate?
A You need to restate your question.
Q Was the 40 percent compaction factor accurate that you were directed to use?
A I don't know.
Q Did Kleinfelder perform any evaluation or determination as to whether the granitic material could be compacted 40 percent?
A Not that I'm aware of.
Q Why not? Isn't that something that a geotechnical engineer is poised and able to do?
A That is in their purview to do, yes, sir.
Q Were they requested to do that?



A Not that I am aware of.
Q Why not?
A I don't know.
Q Is that ordinarily something that you would ask to do because it's important to evaluate the cut and fill and the swell potential as well as the compaction potential of the material when you have cut and fill on the job?
A The geotechnical engineer can provide that type of information, yes, sir.
Q I understand they can, but isn't that important information for a design professional working with a road job that has cut and fills to know what the swell potential of the material would be and the compaction capacity would be?
A Yes, that is important.
Q Why was it not requested?
A The Park Service wanted us to use that 40 percent number.
Q And this was the given, no negotiation, use it? That's, in essence, the message you received, correct?
A That's correct.
Q And you complied, correct?
A That's correct.



Q Even though you didn't agree with it, correct?
A That's correct.
Q And do you believe a by-product of the direction to use the 40 percent compaction factor is the occurrence of excess material that had to be hauled in the park?
A I don't know that because I don't know what the actual compaction factor ended up being on the job site.
Q But your expectation would be that there would be excess material generated, correct?
A If it was less than 40 percent, yes, sir.
Q In the Remcon claim, you read that Remcon contended it had encountered and had to handle excess material, correct?
A Yes, sir.
Q At the time you read that, did you connect the 40 percent compaction factor as being unreasonable and unlikely to the excess material occurring?
MR. SCHROEDER: Objection; characterization.
THE WITNESS: That was one possibility, yes, sir.
Q (By Mr. Schoenfeld) Did you ever communicate that possibility to anybody on behalf of the design team, such as your discussions with Bob Smith that you

testified to?
A Yes, sir.
Q Yes?
A Yes.
Q Did he agree with you?
A Yes, sir.
Q Did either of you, to the best of your knowledge, ever communicate those perceptions to the National Park Service?
A Yes, sir.
Q To whom?
A I don't recall exactly who was in the meeting. It was probably with Joanne and Ray Todd.
Q And Willie DeOcampo?
A I don't recall if Willie was there as well.
Q Willie DeOcampo, as I said, was -- the first day of his deposition was this past Wednesday, and we discussed the subject matter as well. And I will represent to you that he testified that he believed that number was high.
A Okay.
Q Did he ever communicate that to you in person?
A I don't -- I don't remember.
Q By "that number," I meant the 40 percent compaction factor. You understood that?



A Yes.
Q In the meetings that you just described, was there any reaction by Mr. Todd and Ms. Cody, who you do recall being in the room, or anybody else, as to your perception that -- that the swell -- the 40 percent compaction factor not being able to be achieved was a cause of the excess excavation material existing?
A Not that it was a cause, but they acknowledged that it's a possibility.
Q Do you know whether Remcon has ever received a modification from the federal government compensating it in whole or in part for any portion of the excess material that it contended it had to encounter?
A I don't know.
Q Would you agree that having to encounter the excess material involved, not just transporting it to a particular location, but having to address it in various different locations along the job -- it doesn't just happen in one big bunch, correct, as this job was designed?
A That's not necessarily true. The majority of the cut was in one location.
Q In about 700 linear feet, plus or minus?
A Plus or minus.
Q What impact does blasting have of this



granitic material on quantities that you estimated in the bid documents?
Let me restate it.
Isn't it true that blasting renders consolidated material to be less consolidated?
A You better restate that one too.
Q Blasting causes dense material to be less dense?
A There you go. Yes. I agree with that.
Q And as a result, it has -- it's prone to be less able to be compacted because there's more components to it rather than its in-situ consolidated or dense form?
A Yes, sir.
Q So that would also contribute to additional material, correct?
A Could possibly, yes, sir.
Q Were those items or possibilities discussed by you and Mr. Smith with Joanne and Ray Todd in a memo?
A Yes, sir.
Q What was their reaction?
A The same.
Q It's a possibility?
A Yes, sir.
Q Did you ever sit in any meetings with Mr. Christensen on behalf of Remcon in which the subject



of excess excavation, quantity material was discussed?
A There was one meeting where he came out to Denver.
Q "He" being Mr. Christensen?
A Yes, sir.
Q Okay.
A I believe it was talked about at that meeting.
Q Is this in that December 2001 time period?
A That's the one meeting, yes, sir.
Q Well, let's also talk about another cause that was likely to cause additional material, and that was the realignment of the road into the hillside, correct? That would have caused additional material to be generated, correct?
A Yes, sir.
Q And if that realignment caused the contractor to have to excavate more material, that, in your opinion, all other things being equal, would be extra work as well, that additional material, correct?
A If it did generate extra work -- extra material, yes, sir.
Q You've never studied that subject, yet, on this project, correct?
A No, sir.
Q And nobody has asked you to do this so --

# EXHIBIT 5B

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 67

Q Soliciting a proposal from them for the purposes of procuring what ultimately became Exhibit 74, correct? The geotechnical report for the project.
A (Reviewed documents.)
Yes, sir.
Q In fact, based on your review, because you did spend a lot of time reviewing the geotechnical report from Kleinfelder once you got it, Kleinfelder gave you the information that was requested in the RFP set forth in Mr. Haynes's letter dated February 4th of 2000, which we've marked as Exhibit 108, correct?
A I didn't read the letter in entirety, but I would believe that to be correct.
MR. SCHOENFELD: Okay. Why don't we take a break.
(A recess was taken from 9:23 a.m. until 9:32 a.m.)
Q (By Mr. Schoenfeld) You're still under oath. Focusing your attention, again, on Exhibit 107. I want you to look at page 3, Item 8 -- excuse me, Item 5. I apologize. No. Item 6.
The soils report that was procured was required as part of the task by the National Park Service to the design team to, quote, adequately document subsurface conditions for the total project. Do you see

Page 68

that?
A I do see that, yes, sir.
Q Based on your knowledge of what transpired during the first two years of construction on the project, that would be the years of 2001 and 2002, do you believe the soils report adequately reflected the subsurface conditions encountered by the contractor?
A That would be hard for me to render an opinion since I was not out on the job site.
Q Are you aware, sir, of contentions that were raised by the contractor during the summer of 2001 that it encountered material that was not rippable by a Cat D8 dozer?
A Yes, sir.
Q And the soils report stated clearly that all material expected to be encountered by the contractor in constructing the access road was expected to be rippable by a Cat D8 dozer, correct?
A That would be my interpretation of the geotech report, yes, sir.
Q And not only was that your interpretation of the geotechnical report, but you developed the design in accordance with that interpretation and understanding, correct?
A Yes, sir, with one exception. The utility

Page 69

trenching, correct.
Q Okay. I was -- my -- my question, I believe, used the words "access road." If it did not, I'll clarify it. The access road portion of the design was based upon the information you received and your understanding and interpretation that the soils report concluded that rock to be encountered during the excavation effort of the road would all be rippable with a Cat D8 dozer?
A That the material that was encountered would be rippable.
Q Thank you.
Whether rock or otherwise, correct?
A Correct.
Q In fact, sir, did you come to learn that the expectation and interpretation that you had from your reading of the soils report ultimately became inaccurate as a result of the subsurface conditions actually encountered by the contractor in constructing the access road between approximately Stations 24 and 30 in the area known as the deep cut?
A Again, I was not out on the job site, so I don't have a firsthand knowledge of that, no.
Q Okay. Independent of whether you have firsthand knowledge, you received a lot of paper and/or

Page 70

communications regarding the topic, correct?
A I was -- I was privy -- I heard a lot of discussion in that regard, yes, sir.
Q And the discussion was, in substance, the contractor was unable to rip, so it contended the material encountered on the access road and had to blast --
A That's correct.
Q -- correct?
Did you -- strike that.
Were you asked by anyone, whether it be a member of the design team or the National Park Service, to investigate the merits of the contractor's contention?
A I believe that I was in meetings where -- where that was discussed. I don't believe that we were asked to independently investigate that.
Q As the civil engineer for the project on this specific scope of work, weren't you the person of -- on behalf of the design team most knowledgeable of the intent and interpretation of the soils report with respect to this issue?
A I believe the geotechnical engineer would have been that.
THE WITNESS: Sorry.
Q (By Mr. Schoenfeld) Was the geotechnical

engineer consulted by anybody on behalf of the design team or the National Park Service in calendar year 2001 on or after the time the date -- the time the issue arose?

A I'm not aware of that. Not that I know.

Q You're not aware one way or the other?

A Not that I know of.

Q Okay. Let me make sure. You're not aware that they were contacted?

A I don't know.

Q Nobody contacted them?

A I don't know if they were contacted.

Q In Exhibit 74, which is the soils report, there's a page number 31 entitled Limitations. You see that?

A Yes, sir.

Q And in the third sentence of that page, under the heading Limitations, Kleinfelder wrote, "If soil conditions are encountered during construction that differ from those described herein, comma, Kleinfelder should be notified immediately in order that a review may be made and any supplemental recommendations provided, period."

That information was in your possession at the time this issue came to your attention in the summer of



2001, correct?

A Yes.

Q You didn't contact Kleinfelder, correct?

A On this particular issue, no.

Q You're not aware of anybody else on behalf of the design team contacting Kleinfelder, correct?

A I don't know of any.

Q You're not aware of anybody on behalf of the National Park Service contacting Kleinfelder either on this issue, are you?

A I don't know of any, no.

Q I'm going to make a representation to you that Willie DeOcampo -- you know Willie?

A Yes, sir.

Q You understand he was the contracting officer's representative during this time, summer of 2001, correct?

A Yes, sir.

Q He testified on Wednesday this week that he didn't contact Kleinfelder during this time period, and now, in hindsight, he believes it to be a mistake that he did not. I'm asking you to assume that that's what he said in substance, okay?

A Okay.

Q Would you agree with that perception that



Kleinfelder should have been contacted at the time the issue arose so that the National Park Service and design team could investigate the contention raised by the contractor that it had encountered a differing site condition in constructing the access road?

A That's a difficult question, because I was not involved in the day-to-day activities that were happening out there to know the ins and outs, specifically what was happening with that issue.

Q If Kleinfelder was the most knowledgeable individual or entity on behalf of the design team as to whether or not what the contractor was encountering was different than Kleinfelder anticipated, weren't they the most important entity or individual to be called out to evaluate this issue, in your opinion?

A I guess I would state that they would be the most likely to render an opinion in that regard.

Q Are you familiar with the federal acquisition regulation that concerns a differing site condition?

A I have seen that, yes.

Q Okay. Are you familiar with the concept of a differing site condition in that it is -- there are two different types, and that the Type 1 is what we are dealing with here, which is a subsurface condition allegedly encountered by a contractor that is different



than what was indicated in the contract documents?

A Yes, sir, I'm aware of a differing site condition.

Q Okay. And you're aware that the contractor, from the conversations and communications that you received in the summer of 2001, contended that it had encountered a differing site condition, correct?

A Yes, sir.

Q Are you also aware that once the contractor notifies the owner that it contends that it encountered a differing site condition, that pursuant to the literal requirements of the differing site condition clause, the owner has the responsibility to promptly investigate and evaluate that contention to determine whether it agrees or not?

A I -- I don't know that for fact.

Q Isn't it true the differing site condition clause says that the contractor, upon notice, should not disturb the conditions so that the owner can investigate and evaluate?

A I -- I don't know for fact if that's what that says.

Q That would be consistent with common sense?

A That would be consistent, yes, sir.

Q Okay. Have you ever worked on a project where

Page 87

Q Is that a document that you copied as part of the production of records in this matter?
A No, sir.
Q Why not?
A That's in a -- a separate file that is labeled Remcon Claim.
Q Would you place that as something I would like to get a copy of --
A Sure.
Q . -- potentially? And we'll talk about that at the end of the deposition today.
After you read the document, sir, did you comment upon it to anybody orally?
A Probably, yes.
Q To whom in your organization did you communicate an observation?
A Primarily Bruce Haynes.
Q What did you say to him?
A I don't remember.
Q Did you say to him, Oh, wow, this is ugly?
A I --
Q Or words to that effect?
A I don't remember.
Q Did you express any concern as to the perception that there may be some deficiencies found in

Page 88

the work that your company performed that caused the claim?
A We did talk about that since that was in the claim, yes, sir.
Q Did you put your insurance carrier on notice of the potential that a claim against the design was being made?
A I don't know if that was done or not.
Q Who had the responsibility to make such a notice to your insurance carrier?
A Gary Thomas, our civil department manager.
Q Gary Thomas is your risk manager portion of the -- of the business; that's part of his daily work?
A Yes, sir.
Q And who was your insurance broker for the company? Do you know?
A I believe it's DPIC.
Q Have you had any communications with any representatives of DPIC regarding the content of the Remcon claim?
A No, sir.
Q In your professional experience, has anyone ever made a claim against Martin and Martin for design work that you were the principal in charge of prior to your receipt of this claim?

Page 89

A No, sir.
Q To the best of your knowledge, has anyone from DPIC or on their behalf done any evaluation of the Remcon claim?
A No, sir.
Q Outside of Martin and Martin, was anybody notified that was a member of the design team that Martin and Martin believed it may be prudent to put its carrier on notice of the Remcon contentions?
A Not that I know of.
Q Did you talk to Bob Smith at all regarding your observations regarding the claim?
A I believe so, yes.
Q What did you tell him?
A I don't recall.
Q Did you communicate at all any perception that Remcon's claim or any portion of it had merit as to entitlement to damages?
A We probably did, but I -- I don't recall the specifics.
Q With respect to the differing site condition claim regarding rock in constructing the access road, isn't it true you and Mr. Smith both came to the same conclusion that the contention by Remcon was valid and entitled them to reimbursement from the National Park

Page 90

Service as extra work performed?
A I don't know what Mr. Smith's conclusion was.
Q What was your conclusion?
A It was hard to -- to make a conclusion or render an opinion not being out on-site to know -- to know whether what they were encountering was rock that was not rippable or not. It --
Q Mr. Lewis is here and he will comment on what I'm about to say if he feels it necessary. I'm going to attempt to generically summarize what I understand Mr. Smith's testimony was yesterday.
That on balance, reading the materials like that which you have seen so far today and others, that he, given the limitation of his professional expertise, which is not a civil engineer or geotechnical engineer, is of the conclusion that a differing site condition was, in fact, encountered by Remcon and they were entitled -- or are entitled to reimbursement for some amount. The -- the precise amount he's unaware of.
Is that generically what he communicated to you during the time that you communicated with him after you read the Remcon claim sometime after June of 2003?
A Yes, sir, I would say that's generically true -- accurate, yes, sir.
Q So you both were of the opinion that Remcon

Page 91

had encountered a differing site condition, correct, and some compensation was due?
A Based on what we had seen, I would say that's an accurate statement. However, the amount of rock that was encountered that was not rippable, can't say.
Q You have no idea about, correct?
A That is correct.
Q And you have no idea about because, first, you weren't contacted by the National Park Service or its inspector to come out and evaluate that question, correct?
A That would be correct.
Q And you weren't contacted by the National Park Service or its inspector to have Kleinfelder come out and do that on your behalf, correct?
A We were not contacted, no.
Q So you lack the information because you weren't asked to participate yourself in it, not because there's some lack of information you're able to discern, correct?
A That would be correct.
Q You were available, had you been asked, and you would have responded, correct?
A That is correct.
Q All right. That power of construction

Page 92

administration services is something your firm was set up to do?
A We -- we have the capability.
Q Now, we've just talked about your discussions with Bob Smith. Did you talk to anybody at BRS about your conclusions and observation after you read the report, if you remember?
A I don't remember speaking to anybody at BRS about that, no, sir.
Q What about anybody at the National Park Service? Did you talk to anybody in -- regarding your observations and conclusions after reading the Remcon claim that we've already discussed?
A I don't recall speaking to anybody at the National Park Service directly after reading the Remcon claim. We have had discussions in regard to the Remcon claim -- excuse me -- in regard to the Remcon claim over time.
Q Before you read the certified claim of Remcon, am I correct in understanding that you participated in one or more meetings with representatives of the National Park Service evaluating the contentions that Remcon made that it had -- that it had encountered a differing site condition, correct?
A That is true.

Page 93

Q Did you ever communicate, during any of those meetings, that Remcon did not encounter a differing site condition?
A No, sir.
Q Did you ever communicate your perception that it's very likely Remcon did encounter a differing site condition, the extent of which, however, you were unaware?
A I believe so, yes, sir.
Q And to whom did you make that communication?
A I don't remember who would have been in that meeting.
Q Joanne Cody was definitely part of it, correct?
A Possibly.
Q Ray Todd?
A Possibly.
Q Larry Walling? Is that a name you don't remember?
A I don't recall Larry's name.
Q Bob Smith present?
A Quite possibly.
Q Andrea Lind or Andrea Gregor, whatever her name was at the time?
A Possibly.

Page 94

Q Was Mike Giller present at any such meetings?
A I don't remember when --
Q Mr. Giller's first arrival on the job was approximately July 10th of 2002.
A I don't recall the time frame in there.
Q Willie DeOcampo, was he present?
A He might have been.
Q Jack Vance?
A Probably not.
Q Scott Ruesch?
A Probably not.
Q Terry Lang?
A No, sir.
Q Rod Keiscome?
A Probably not.
Q Have you ever participated in a meeting in which Mr. Keiscome was present?
A I have met Mr. Keiscome, yes, sir. I don't recall what the -- I don't recall what the meeting or encounter was about.
Q During any meetings in which Mr. Keiscome was present, did the subject of the differing site condition issue get discussed?
A I don't remember.
Q Okay. During the conversations that you have

some time rather than the direct communication that you were directed to do on that one occasion, bypassing the intermediaries where you were to go directly to the surveyor, correct?
A Takes a longer period of time, yes, sir.
Q You are aware, independent of Martin and Martin's design changes, that other design changes occurred?
A Yes, sir.
Q Do you know how those design changes were communicated? For instance, were they communicated directly to the surveyor or to the contractor, whether at the request of the National Park Service or otherwise, or did they go through the normal chain of command?
A I don't know.
Q Would you agree in the abstract that when design changes are made that it does cause some loss of time on a project? It may not be material, but it causes some loss of time, because you can't build the element until the design change is received and processed?
A Depends on the magnitude of the design change.
Q It's a general principle that is a significant possibility?
A It is a possibility, yes.
Q Okay. Did you participate in a partnering



meeting in the spring of 2002 at the job site or in Denver?
A I went out to the job site once.
Q During construction?
A During construction. I don't recall if that was the partnering meeting or not.
Q Okay.
A I don't believe so.
Q As a result of the issues that arose during the 2001 construction season, there was then a winter shutdown?
A Uh-huh.
Q And then the job was going to restart up once the site was accessible in 2002, correct?
A That is correct.
Q You recall that this job was -- had limited construction season to build given its location and the winter effects on the project, correct?
A Yes, sir.
Q And you knew that during the design phase, correct?
A Yes, sir.
Q I want to show you Exhibit 71, and I'm just going to show you the first page of it. It's identified as a project charter. And I represent to you that this



is the sign-in sheet of those that were in attendance at the partnering meeting that occurred on this project in 2002, May 14, 15. Do you see that?
A Okay. Yes.
Q Do you see your signature on the page?
A (Reviewed documents.)
Q As being in attendance?
A (Reviewed documents.)
No, sir.
Q So you don't think you were there, do you?
A Was not.
Q Do you -- do you know what Mr. Smith's signature looks like? You've seen it before?
A I probably have seen it, yes, sir.
Q Do you see his signature on this page?
A No, sir.
Q Do you recognize any of the signatures on that page as being any representative of the design team for this project?
A I cannot read part of them, but I don't recognize any of them as being part of the design team.
Q Now, is it correct that it's your recall that during the calendar year of 2001 there were a series of issues that were raised by the contractor, some of which we've talked about, which contended that there were some



limitations to the design that were affecting their ability to build the job, correct?
A I don't know what you mean by limitations of the design.
Q There were the realignments that were needed, changes that needed to be done, plus it encountered differing site conditions and additional quantities over that estimate in the contract documents, correct?
A I did hear contentions of that, yes, sir.
Q Were you aware in December of 2001 that Mr. Christensen, on behalf of Remcon, came back to Denver to meet with representatives of the design team and the National Park Service to attempt to sort out some of, if not all of, the issues that were still unresolved so as to -- for want of a better description -- clear the path so they could attack the job once the construction season in 2002 commenced?
A Yes, sir. And I believe I participated in a portion of that.
Q Did Mr. Keiscome attend any of those meetings?
A I don't recall.
Q Do you recall that at those meeting -- or meetings that you were in attendance with that Mr. Christensen came armed with data and documentation both substantiating from his point of view the

Page 127

entitlement as to why he felt he was entitled to an additional compensation as well as substantiation of the additional compensation he sought?

MR. SCHROEDER: Objection; form.

Q (By Mr. Schoenfeld) Go ahead.

A I do recall seeing Mr. Christensen with some documentation in front of him, yes, sir; I don't know what that documentation was.

Q Was one of the subjects that was discussed the contention by Mr. Christensen that he encountered a differing site condition in the access road construction?

A Yes, sir.

Q And is the information that we've talked about here today consistent with his contentions?

A Yes, sir.

Q And in that meeting that -- which Mr. Christensen raised that subject, did you communicate, along with Mr. Smith, the communication that you said you did in the meeting with the National Park Service that, on balance, you felt there was a differing site condition encountered, you just didn't know the extent of it?

A It would have been that same time frame. I don't know if it was that exact time frame.

Q And Mr. DeOcampo was present at that meeting, correct, or those meetings because he was the COR?

Page 128

A I don't recall. I -- he probably was.

Q Do you recall anybody that was in attendance on behalf of the National Park Service disagreeing with you or Mr. Smith as to your observations?

A No, I don't remember that. I don't recall that.

Q Let me show you Exhibit 115, sir. It's a one-page e-mail from Andrea at DHM to yourself, Tod Bunker, and Joanne Cody regarding Psomas's performance of topography at the Generals Highway. Does this refresh your recollection as to the time when Psomas was asked to do its work during the design phase?

A (Reviewed documents.)

Okay.

Q Did -- is your memory refreshed that during July of 2000 that's when Psomas was being requested to do that work?

A That sounds right.

Q Okay. I'm going to show you a document we've marked as Exhibit 117. It is an e-mail communication from Bob Smith to yourself dated October 24, 2000. On the second page bearing the same date it's entitled Earthwork Quantities. Do you recall this spreadsheet summary?

A Yes, sir.

Page 129

Q All right. Did you participate in creating this document?

A We supplied the quantities in the upper line.

Q By "the upper line," you mean the 33,400 cubic yards of cut; 16,100 cubic yards of fill?

A Yes, sir.

Q Did you also supply the determination that the material to be encountered by the contractor on this project would be -- be able to be compacted at 40 percent of volume?

A That number was supplied by the park, the personnel at the park, based on previous projects out there.

Q Jack Vance provided that information?

A I don't recall the person.

Q Was there a directive issued by the design -- pardon me -- by the National Park Service to the design team to use a 40 percent compaction factor for materials to be encountered on this project?

A A written directive?

Q Any type of directive.

A Oral.

Q Did the design team use a 40 percent compaction factor in the calculations that it ultimately used to include in the bid quantity schedule?

Page 130

A Cut and fill quantities were not included in the bid schedule.

Q But net quantities were, correct? Net quantities of --

A I don't believe so.

Q Are you sure about that, or you don't remember?

A It was lump sum, if I remember correctly.

Q For excavation?

A Yes, sir.

Q Okay. Were the calculations that led you to conclude the quantity that you listed as material to be encountered, did it include a calculation of a 40 percent compaction factor?

A Yes, sir.

Q Did you personally agree that 40 percent was a reasonable, prudent compaction factor to use, given the type of material described in the soils report which we've marked as Exhibit 74?

A It's on the high side of numbers that we would use.

Q Mr. Smith testified yesterday that it was at least 100 percent high, that he would have used nothing greater than 20 percent. Was your perception in the fall of 2000 consistent with that that Mr. Smith just -- I

# EXHIBIT 5C

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

If the material was brought in and was above, then that would not be the case.

Q And do you know which is true?

A I do not know.

Q Okay. Are you aware, as a result of reading the Remcon claim, that while it received compensation in the form of a modification from the National Park Service for excavating that excess material, it has never been compensated for bringing back material to fill the hole because it wasn't above the contour of the design elevation and actually created a bigger hole? Is that an element that you recall reading in the Remcon claim?

A Yes, I recall that's an element in the claim, yes, sir.

Q Without knowing anything more than what I've just communicated to you and what you read in the claim, if, in fact, it was extra work to remove the material and it was below the elevation of the design, wouldn't it be, in your experience, extra work to get compensated to put material back to bring it back to where it should be?

A If it was below, yes, sir.

Q Okay. Now, that's one element that was going on in the summer of 2001, correct?

A Correct.

Q A second element that was going on in the



summer of 2001 is this differing site condition issue that Remcon raised that arose towards the end of July of 2001 and continued into August, correct?

A I don't know the time frame, but --

Q Generically that recall is correct?

A That sounds correct.

Q I can show you the blasting logs, if you would like. Accept my representation to you that that is a --

A I accept it.

Q -- blasting occurred into September.

A Okay.

Q It was about a six-plus or seven-week period of blasting.

A Okay.

Q Okay. So we have the upper parking lot area having excess material to be excavated and then material needed to be brought in to fill it back up. We have the access road being constructed but blasting had to happen, correct?

A Okay.

Q Now, are you aware of the limitations the National Park Service put on blasting on the access road as to the timing of when that could happen?

A No, sir.

Q Are you generally familiar that construction



activities occur on most projects between approximately 7:00 a.m. and 3:30 p.m. on a normal business day? Sometimes people work ten-hour shifts or whatever, but that's a generic construction day, right?

A Generic, yes, sir.

Q Okay. Are you familiar with the fact that this National Park was frequented mostly by visitors during the summer months when the construction activities were ongoing?

A Yes, sir.

Q And you're also familiar, as a result of NPS-10 and just your general familiarity, that the National Park Service, recognizing it needs to keep the parks open, wanted to limit the impact construction activities would have on the ability of visitors to enjoy the park?

A Yes, sir.

Q You're also familiar with the National Park Service's mission, which is to preserve the natural environment as much as possible, which would be trees, rocks, and to limit any negative consequences which construction operations may have on existing features in the park, correct?

A Yes, sir.

Q Is your memory refreshed that the National



Park Service actually limited the time within which blasting could be performed to 4 p.m. of each day; blasting occurred so as to not impair the utility of the visitors' use of the park?

A No, I did not know that.

Q If that were fact, which I'm now asking you to assume, given what is the normal construction day, would that, in your experience, cause some lost productivity in the ability of a contractor to productively perform work because blasting; you have to drill a hole, you have to fill the hole, you have to cover it to prevent materials from flying out and damaging features around, and it's a very labor-intensive and time-consuming process, correct?

A I would agree with that, yes.

Q And blasting of rock is a much slower process than excavating the material you anticipated being encountered that would be ripped with a D8 dozer, correct?

A Yes, sir.

Q So therefore, if Remcon had to blast material and could only do so at 4 p.m. every workday that it was entitled to blast or allowed to blast, that effort would be much slower and take up much more time in performing than if it was not eight -- required to blast and could just rip it with a D8 dozer?

MR. SCHROEDER: Objection to form.
THE WITNESS: In relationship to normal excavation, blasting would be slower, yes, sir.
Q (By Mr. Schoenfeld) Do you know whether or not blasting of the access road during the summer of 2001 when it occurred was the critical path activity to be performed?
A No, sir, I don't know that.
Q You never saw any construction schedules, correct?
A No, sir.
Q You've never been asked to review them or analyze them, correct?
A No, sir.
Q But when you read the Remcon claim, you noted that Remcon contended that this activity, building the access road, was the critical path activity, correct, and that the blasting caused delay to the critical path activity?
A I don't recall seeing that that was a critical path, no.
Q Have you come to learn at any time other than my communication to you here today that this was a critical path activity?
A I don't recall that, no, sir.



Q Okay. Are you familiar with the fact that the way the contract documents were set up that Remcon had to finish the Upper Sherman work, the access road, parking lot, and trail before it could transition to the Generals Highway?
A Yes, I'm aware of that.
Q Because the Park Service did not want construction operations all over the place that would impede or impair the use of others by the park, correct?
A I am aware of that, yes, sir.
Q So it could transition people to the Upper Sherman area while the Lower Sherman area was going to be worked on and vice versa?
A That's correct.
Q Is it your experience, sir, as a civil engineer that a contractor would blast rock or rip rock if both options were available to it? All things being equal.
A Can I restate your question?
Q Give me your best response. However you're -- you're best able to communicate a response.
A If the contractor can rip as opposed to blast, he will rip.
Q And why is that?
A It's cheaper.



Q It's more efficient?
A More efficient.
Q It's faster?
A Yes.
Q Did anyone at any time ever communicate to you that the contractor blasted on this project for its own expediency as contrasted with the project requiring it because of what it encountered?
A No, sir.
Q And that would include National Park Service people, nobody ever said that to you; is that correct?
A I don't recall that, no, sir.
Q And you saw nothing in writing from the National Park Service so communicating, that you recall?
A I don't recall, no, sir.
MR. SCHOENFELD: Let's take a break.
(A recess was taken from 10:34 a.m. until 10:45 a.m.)
Q (By Mr. Schoenfeld) We were talking about things that were going on at the same time during the summer of 2001. We talked about the burn pit issue in the upper parking lot that had some impacts there. We're talking about the blasting issue affecting the access road.
Do you recall there were a series of



communications that came to your attention -- or your company's attention during the summer of 2001 in which the road, independent of the blasting, was being realigned in certain features and aspects?
A Through the big cut area?
Q Yes.
A Yes, sir.
Q In addition, did you come to learn, at any time, that the Sherman Tree Trail that there were miss -- was missing information regarding control points and trail points that had to be supplied by the design team as well during the summer of 2001 in order for the surveyor to stake it for the contractor to build it?
A I wasn't aware of that at that time, no.
Q Okay. Generically, the work that Remcon had to perform during the summer of 2001 was the access road, the Upper Sherman parking lot, the trail, and then trenching work associated with that ultimately leading to a leach field, correct?
A And the comfort station.
Q And the comfort stations associated up above, correct?
A Yes, sir.
Q Do you have any idea what was on the critical path at any particular point in time?

# EXHIBIT 5D

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 107

Q (By Mr. Schoenfeld) Ultimately, that portion I just showed you that said rock excavation was removed by you and DHM, correct?
A Correct.
Q And that's because the soils report that we marked as Exhibit 74 indicated that rock that would be required to be blasted to construct the roadway was not anticipated to be encountered by the contractor, correct?
A That is correct.
Q Isn't it also true during calendar year 2001 that there were certain natural features such as trees, boulders, rock outcroppings, and such that was determined by the on-site people that interfered with the roadway alignment, such that the roadway needed to be moved so as to not disturb those features?
A During the walk-through with the park personnel, there were some trees and natural features that were identified that they wanted to save, yes, sir.
Q Okay. That was during the design phase you're talking about?
A Yes, sir.
Q I'm talking now during the construction phase.
A I don't know.
Q Are you aware of there being a series of changes modifying the alignment of the road such that the

Page 108

road was, in the area between Spec Station 24 and 30, the so-called deep cut, realigned into the hillside as contrasted with away from the hillside?
A Yes, sir.
Q And is it, in fact, true that Kleinfelder did not perform its test pit or borings in locations off of the roadway as to determine what was going to be encountered off the roadway if the road were to be realigned into the hillside of that location?
A I don't know if they did or not.
Q Your expectation is that they would not have tested outside of the right-of-way, correct?
A That would be correct.
Q There would be no reason. They're looking for informations what the contractor is going to encounter in the planned right-of-way and alignment, not, hypothetically, if it got changed, you know, 6 feet over here or 2 feet over here off the road -- right-of-way, correct?
A That is correct.
Q Were you consulted about each of the realignments that were directed in writing by the design team to Remcon as to the road -- access road realignment during the summer of 2001?
A I don't believe so, no.

Page 109

Q Is that unusual in your experience that the civil engineer in charge of the road alignment was not being consulted during construction by the owner as to modifications to your design?
A Unusual, yes; not unheard of, no.
Q The -- the National Park Service had a right not to consult you, right?
A Yes, sir.
Q And it was at their choice if they choose to change things or direct you to do things to -- that cause changes, you comply, but it comes at a certain risk associated with them, correct? That you're not intimate with the facts and can't necessarily give them the benefit of the wisdom that you may have that might influence what is ultimately done, correct?
A That is correct.
Q And is that what happened here?
A Yes, sir.
Q Now, Mr. Smith yesterday testified that during the summer of 2001, the following group of events all sort of happened in the same approximate month period from July to August of 2001, and I want to see if your memory is the same. Okay?
A Okay.
Q That's the first year of construction. He

Page 110

testified that there was a burn pit location in the upper parking area that was identified to have approximately 2,000 cubic yards and that's the quantity that was set forth in the bid documents. Okay?
A I know there was a burn pit area. I don't have any idea of the quantity or how that was arrived at.
Q As to that burn pit, the contractor was required to haul off much more than the estimated quantity set forth in the bid documents. Did you come to learn that to be true?
A Yes, sir.
Q Okay. So in one area of the Upper Sherman project, a lot more material had to be removed from an area that had to be built up to be ultimately paved, correct?
A Yes, sir.
Q So that would mean there was extra work removing excess material that had to be hauled out of the park, and then there had been backfill or some type of fill into the greater hole that had been created, correct? Because you had removed stuff from the designed elevations, unless a change was made to the design to -- to modify the design?
A I would say that was accurate if the material was below the contour shown in the existing base mapping.

A No. I did not see their schedule.
Q Would you agree with a statement that I will attempt to summarize -- Mr. Lewis will correct me if I missummarize from his point of view -- that as a result of these design-related and differing site condition impacts, additional excavation, the burn pit, rock having to be blasted in the roadway, that the contractor was sort of in limbo as to what they could do effectively and efficiently until they all got sorted out?
MR. LEWIS: Object to the characterization.
You can go ahead and answer.
THE WITNESS: I don't know that.
Q (By Mr. Schoenfeld) Okay. Are you familiar with the federal government processes that require a contractor to only make changes and do extra work if the contracting officer issues such a directive in writing?
A Not specifically, but, yes, I've heard that.
Q Are you aware of any directive issued by the contracting officer directing the contractor to make the road realignment changes or take out the additional burn pit material or make any changes that the design team was issuing to them in revised drawings?
A I was not issued any of those, no.
Q So you haven't seen any such directives --
A No, sir.



Q -- correct?
A No, sir.
Q When changes were made by your company to design elements during the job in the summer of 2001, did you submit them solely to the National Park Service to submit to the contractor, or did you bypass that process and submit it to either the lead inspector or Jacobs on the job site, Bob Russell, or to the contractor or to his surveyor who were waiting for that information in order to bill the job?
MR. OLIVIER: Objection to form.
THE WITNESS: We had communication with Joanne Cody, who would have had communication with Bob Russell on-site; and I believe that there was one time where we were asked by the Park Service to send information to the surveyor for Remcon.
Q (By Mr. Schoenfeld) Bill Morris or Jeff Stanley of Giuliani & Kull? Is that the name of the surveying company and the individuals?
A I don't remember the individual's name, but that is the name of the company, yes, sir.
Q So the National Park Service, at least on one occasion, said to expedite this, get the information directly to the person that needs it most, the surveyor?
A Specifically on the one alignment through the



deep cut, yes, sir.
Q Okay. So to make it clear, in the construction operations themselves, the way it worked was Remcon hired a surveyor to stake the limits of what it had to excavate in order to excavate it prudently, correct? That's the way it works?
A I don't know that for a fact, but I would assume that, yes.
Q Okay. And the surveyor needed the data in order to stake it so it could be built, whether it be cut or fill, and there's a certain construction -- I can't think of the word -- understanding -- it's not the appropriate word, but I think it conveys it -- that stakes have certain information on them to indicate to the builder cut and fill and certain station and noted information on the stakes themselves, correct?
A That is correct.
Q And in order to be precise and accurate, which is what the owner requires of the contractor, there has to be information given to the surveyor to properly stake, correct?
A Correct.
Q And at least on one occasion, information that was needed by the surveyor and the deep cut was directed by the NPS to go directly through from the design team to



the surveyor?
A From our office to the surveyor, yes, sir.
Q Right.
On the other occasions that you're aware of where realignments and additional information as to design changes or clarifications were made, it went through the normal channel, which would be from the design team to the National Park Service to its lead inspector, Bob Russell, to the contractor, correct?
A I don't believe there are any other design changes that our office was involved with.
Q So you're not aware of the others that may have occurred, just the one you spoke of where you were directed to go directly and furnish it directly to the surveyor?
A I'm aware of other design changes, but I -- I don't think our office participated in those design changes.
Q Okay. In the chain of communications that I described was the normal path, that's consistent with how you understood the National Park Service normally operated, correct? It goes through the chain of command and the -- from contracting party to contracting party?
A Yes, sir.
Q And that's time-consuming, correct? It takes

A Yes.
Q And 2310 allowed for rock excavation, correct? At least as it existed in Exhibit 125.
A (Reviewed documents.)
Yes, sir.
Q Is Exhibit 125 and all of the information that we see on Spec Section 2310 and 2316 a joint effort of DHM and Martin and Martin?
A Yes, sir.
Q Okay.
A As well as the Park Service.
Q Okay. And Exhibit 126 is a further example of that, although this one, 126, concerns Spec Section 2316, correct?
A That is 2316, yes, sir.
Q Now, do you recall that the hundred percent specification was completed by the design team in February of 2001?
I'm showing you, for the record, Exhibit 127. You're looking at the first page that has the -- the handwritten words "100% 2/27/01."
A That is a handwritten date, yes, sir.
Q Do you recall that date as being the date when they were published as being filed?
A No, sir, I don't recall.



Q Okay. In here, I will represent to you, is the final version of 2316. And am I correct --
MR. OLIVIER: What exhibit?
MR. SCHOENFELD: 127.
Q (By Mr. Schoenfeld) And am I correct under Part 4 under Roadway Excavation there is no separate allowance for rock?
A That is correct.
Q And that's because of what Kleinfelder published in Exhibit 74, correct?
A That is correct.
Q And roadway excavation was a separate classification of work from the general excavation work to be performed, correct?
A There was a separate specification.
Q That's what I'm talking about. Yes?
A Yes.
Q I'm going to ask you to read to yourself about three quarters of the e-mail that's on the first page of Exhibit 129 and let me know when you've done so.
MR. SCHOENFELD: For the record, Exhibit 129 is an e-mail from Willie DeOcampo to Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Scott Ruesch, which is R-U-E-S-C-H, Jack Vance, and Bob Russell.
Q (By Mr. Schoenfeld) Okay. Have you had a



chance to do so?
A Yes, sir.
Q All right. This e-mail is dated July 2nd, 2001, which is in the first construction season, correct?
A Yes, sir.
Q Okay. I'm going to read the portion I want to focus your attention on.
First of all, before -- before I show you this, had you ever seen this before?
A Yes, I have.
Q Were you forwarded this by DHM?
A I don't know how I had seen it or who forwarded it.
Q If you look at the bottom, you'll see the Bates stamp is from DHM --
A Uh-huh.
Q -- which means they produced it in this litigation.
A Okay.
Q Joanne, while at Sequoia last week, some problems surfaced concerning alignment. They are Upper Sherman road, surveyors laid out center line and found two places that conflict with existing conditions. One area is located near Station 28 to 29, period.
Pause for a moment and ask you if that's a --



in a deep cut section, right?
A Yes, sir.
Q Continuing. The center line appears to swing further out than our drawings indicate. The clearing has been performed per the drawing.
Pause there for a moment. Does that mean the work done by the contractor was done correct per the drawing?
A I don't know what his intent in that statement was.
Q All right. I'll continue. However, the center line is staked, will make it necessary to clear additional trees and remove signature-type boulders.
Stopping again. Removing additional trees and signature-type boulders is a no-no if it can be avoided in the National Park Service way of doing business, right? It's to be avoided, correct? You saw that in NPS-10, right?
A Yes, sir.
Q Okay. Trying to just move it along.
Quote, continuing, Bob and figure the center -- the road center line can be shifted in order to make this work and prevent delays. The surveyors will send you a revised layout. The contractor believes our cut and fills will not balance. They believe there may be

Page 155

13,000 cubic yards of excess material that will have to be transported somewhere in the park at $15 a yard. If this is true, we are looking at a $195,000 change.

The park says there's a shortage in funds and wants to pursue the error and omission clause of the contract. Martin and Martin need to recheck their calculations.

When was the first time you became aware of the substance of what I just read?

A Probably in the same time frame that this was written.

Q Why is it that we did not get a copy of this from your files, if you received it?

A I think it's in there.

Q You do?

A I think it's in there.

Q So it's just because I don't have it before me, so . . .

Did the park ever assert a claim for design error, to the best of your knowledge, against your company?

A No, sir.

Q For any reason; is that correct?

A No, sir.

Q Let's make the record clear. No claim for

Page 156

design error, to the best of your knowledge, has ever been asserted by the NPS against your firm for this project; is that correct?

A No, sir. That is correct. Sorry.

Q Did you agree, after reading this for the first time, that the causation for the road to be realigned here was a Martin and Martin error?

A Restate your question, please.

MR. SCHOENFELD: Read it back.

(The reporter read page 156, line 5 through line 7.)

THE WITNESS: No, sir, it was not a Martin and Martin error.

Q (By Mr. Schoenfeld) Whose error was it, if anyone's?

A I don't know. The -- we were asked to realign the road, and I'm not sure that we were given a reason.

Q By whom were you asked to realign the road?

A The Park Service.

Q Who specifically? Joanne Cody? Willie DeOcampo? Ray Todd? Jack Vance?

A It most likely would have been Joanne. I don't know specifically.

Q I don't want you to guess.

A I don't remember specifically.

Page 157

Q I'm sorry?

A I don't remember specifically.

Q Once you were asked to perform a realignment of the road, whether you were given a reason or not, did your company prepare revised drawings showing a revised alignment?

A Yes, sir.

Q Are those the drawings that you testified earlier were sent directly to the surveyor at the NPS's request?

A Yes, sir.

Q Is it your expectation that the reason why you did -- were asked to do so is because the National Park Service felt the road had to be realigned, for whatever reason or reasons?

A For whatever reason, they wanted us to realign the road.

Q Okay. Was it your expectation, once you received the direction and issued the revised alignment drawings to the contractor's surveyor, that it was the intent of the National Park Service that the contractor have its surveyor stake the realignment and the contractor build it in the realigned manner?

A Yes, sir.

Q Was that subject ever communicated

Page 158

definitively, we want you to re -- redesign it, send your redesign to the contractor's surveyor so they could stake it and build it in the realigned format?

A That was the intent, yes.

Q Is what we have attached here realignment drawings prepared by your company in the balance of Exhibit 129?

A No, sir.

Q Do you recognize what those sheets are?

A No, sir.

Q Okay. How long did it take you to produce the realignment drawings? Was it done, like, within a week?

A Yes. I don't recall specifically, but, yes, within a week.

Q Let me show you Exhibit 130. It's an e-mail from Bill Morris to Joanne Cody on July 2nd of 2001, the same date as the prior exhibit. And in it, he says, Here is our drawing in AutoCAD R14. If you need us to convert it to Microstation, please let us know.

I sent an -- I sent a, meaning an, early response requesting further information for the parking lots. Need grades at all curve points and grade breaks to stake out properly. Thank you.

Am I correct that the subject matter that I just read is different than the subject matter of

# EXHIBIT 5E

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

A No, sir.
Q -- correct?
Now, I'm going to make a giant leap that, as you sit here right now, you don't know when that direction specifically was given to you to use the 40 percent compaction, correct?
A No, I don't know.
Q Well, what we showed you as Exhibit 117 was dated October 24th. Okay?
A Okay.
Q I'm going to show you the prior version marked as Exhibit 118, which is -- was printed on June 24th and then was edited by Andrea on July 14th.
You'll notice that Earthwork Quantities, while the numbers are different, there's no 40 percent compaction factor.
A I see that.
Q Does that lead you to conclude that the direction from the Park Service occurred sometime between June and October of 2000?
A Could possibly be. I don't remember.
Q You wouldn't expect it to be earlier than June, otherwise you'd expect it to have shown up on Exhibit 118, correct?
A I don't know that.



Q Well, if you were directed to do something, you generally complied, didn't you?
A Yes, sir.
Q Okay. Now, do you recall being made aware that the Park Service had certain material from other projects stockpiled in the park that could be used on this project?
A Yes, I was aware of that.
Q Did you go out or cause someone to go out and measure the volume of that material?
A No, sir.
Q Why not?
Let me ask it this way: You ultimately included in the bid documents that the contractor had certain materials available it could use for certain components of the projects to build, right?
A That didn't come out of our office, so I'm not aware of the actual quantities and the stockpiles and that kind of thing.
Q Okay. So you guys had nothing to do with the pavement section of the access road? Wasn't that your design?
A Pavement section was Kleinfelder, geotechnical.
Q Okay. Did you incorporate that recommendation



from Kleinfelder in the design work that your company did?
A Yes, sir.
Q And that you specifically were in charge of, right?
A Yes, sir.
Q And included within there was the identity of AB as a constituent component of the pavement section, correct?
A Yes, sir.
Q And AB is a material that was identified by the National Park Service that was in certain volume stockpiled and available to be used by the contractor on this project, correct?
A We were told that, yes, sir.
Q You didn't validate or verify what you were told; is that correct?
A No, sir.
Q It's correct you didn't validate or verify it?
A That is correct. We did not validate --
Q Did you ever observe it by eyeballing it yourself?
A No, sir.
Q Did you ask anybody else to do so on your behalf?



A No, sir.
Q Why not?
A Because the Park Service told us that's why it was out there.
Q Did they tell you there was sufficient quantity in place that would take care of the entire project, AB?
A I don't recall them specifically saying that, no, sir.
Q Let me show you Exhibit 123, sir. I'd ask you to look at the note on the left-hand side of the middle of the page. You will see there's a note and then there's an arrow drawing to the Lower Wolverton section that is hatched?
A Uh-huh.
Q Yes?
A Yes, sir.
Q The note reads "The aggregate base course for this project is stockpiled in this general area." You note it doesn't say some aggregate base course for this project is stockpiled. It says "The aggregate base," correct?
A Correct.
Q Did you prepare that note?
A No, sir.

Q Did DHM prepare that note?
A Yes, sir.
Q Is -- from your understanding, as you sit here, reasonable understanding of this is that sufficient volumes of AB was stockpiled at the project for use by the contractor?
A I don't know the intent of that note.
Q Okay. As you sit here today, would you believe it would be a reasonable interpretation by the contractor that by reading that note the contractor would perceive that sufficient quantities of AB was stockpiled in that location based on the language I just showed you?
A Not knowing that there are other notes within the specs or the drawings that would relate to that, I guess I can't --
Q Okay. I'm going to ask you to assume there's no other notes anywhere in the drawings that would indicate anything that would affect that.
A Okay.
Q Looking at that note solely, is it a reasonable interpretation by a contractor that adequate quantities of AB was stockpiled in that location for use by the contractor and that all he had to do was access it and take it to where he needed it?
A I would believe that note to say that the



aggregate for the project was there.
Q In the quantities sufficient to build the job without having the contractor to include within its bid a contingency item or a certain volume that he had to just guess at? All of it was there, if necessary, correct? That's a reasonable interpretation, assuming there's no other notes or indications elsewhere?
A Assuming what you said, yes, that's reasonable.
Q That is reasonable. Okay.
Are you familiar with the term boulder revetment as it relates to this project?
A On the periphery, yes.
Q Okay. That was design work done by the Park Service as contrasted with Martin and Martin or DHM?
A I don't recall if that was under DHM or under the Park Service.
Q Okay. But nothing to do with Martin and Martin?
A No, sir.
Q Do you know whether there was a representation in the contract documents that all of the materials available for boulder revetment work were stockpiled at the site so the contractor didn't have to plan on making it or importing it?



A I don't -- I don't know if I have any information on that or not. I don't recall any of that.
Q I'm going to show you Spec Section 2831 entitled Boulder Revetment. This was marked as Exhibit 121. I'm going to show you the last page of it, which is the second page of the exhibit. It's Item 4.1. It reads, "BOULDER REVETMENT: This item includes constructing boulder revetment slope protection and landscape boulders and their placement, using stone from park stockpiles. Payment will be made at the contract lump sum price."
Based on your reading of this portion that I just brought to your attention, do you believe it was reasonable for a contractor to assume at the time it bid the job that the National Park Service had stockpiled all of the stone necessary for the required boulder revetment on this project?
A Again, not knowing --
Q Assuming there's nothing else anywhere. I'm asking just to focus on this language.
A There's nothing else anywhere, I would agree that the stockpiles are from stockpiles within the park.
Q And that if the stockpiles either didn't exist or were inadequate and the contractor, based on direction to put in revetment or slope protection, had to create or



import stone for rock revetment, all other things being equal, having no other information, you would agree that would be extra work?
A Well, I don't know. I don't know.
Q Okay. We spoke earlier about the existence of rock excavation as an element of Spec Section 2316 and ultimately was removed, correct?
A Yes, sir.
Q And you were personally involved in that decision process, correct?
A Yes, sir.
Q Is Exhibit 122, the fax from Bob Smith to you dated November 1st, 2000, consistent with that process whereby that section was removed from 2316?
A Yes, sir.
Q Is that your scribbling on it, or is it Bob Smith's?
A It is not mine. I don't know whose it is.
Q Is the writing on the last page of the exhibit yours?
A No, sir.
Q Okay. I'm going to show you Exhibit 124. It is part of the Addendum 1 for the project entitled Photo 7, colon, Aggregate Base. We call it Mount Aggregate in my office. Have you ever seen this document before?

# EXHIBIT 5F

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 107

Q (By Mr. Schoenfeld) Ultimately, that portion I just showed you that said rock excavation was removed by you and DHM, correct?
A Correct.
Q And that's because the soils report that we marked as Exhibit 74 indicated that rock that would be required to be blasted to construct the roadway was not anticipated to be encountered by the contractor, correct?
A That is correct.
Q Isn't it also true during calendar year 2001 that there were certain natural features such as trees, boulders, rock outcroppings, and such that was determined by the on-site people that interfered with the roadway alignment, such that the roadway needed to be moved so as to not disturb those features?
A During the walk-through with the park personnel, there were some trees and natural features that were identified that they wanted to save, yes, sir.
Q Okay. That was during the design phase you're talking about?
A Yes, sir.
Q I'm talking now during the construction phase.
A I don't know.
Q Are you aware of there being a series of changes modifying the alignment of the road such that the

Page 108

road was, in the area between Spec Station 24 and 30, the so-called deep cut, realigned into the hillside as contrasted with away from the hillside?
A Yes, sir.
Q And is it, in fact, true that Kleinfelder did not perform its test pit or borings in locations off of the roadway as to determine what was going to be encountered off the roadway if the road were to be realigned into the hillside of that location?
A I don't know if they did or not.
Q Your expectation is that they would not have tested outside of the right-of-way, correct?
A That would be correct.
Q There would be no reason. They're looking for informations what the contractor is going to encounter in the planned right-of-way and alignment, not, hypothetically, if it got changed, you know, 6 feet over here or 2 feet over here off the road -- right-of-way, correct?
A That is correct.
Q Were you consulted about each of the realignments that were directed in writing by the design team to Remcon as to the road -- access road realignment during the summer of 2001?
A I don't believe so, no.

Page 109

Q Is that unusual in your experience that the civil engineer in charge of the road alignment was not being consulted during construction by the owner as to modifications to your design?
A Unusual, yes; not unheard of, no.
Q The -- the National Park Service had a right not to consult you, right?
A Yes, sir.
Q And it was at their choice if they choose to change things or direct you to do things to -- that cause changes, you comply, but it comes at a certain risk associated with them, correct? That you're not intimate with the facts and can't necessarily give them the benefit of the wisdom that you may have that might influence what is ultimately done, correct?
A That is correct.
Q And is that what happened here?
A Yes, sir.
Q Now, Mr. Smith yesterday testified that during the summer of 2001, the following group of events all sort of happened in the same approximate month period from July to August of 2001, and I want to see if your memory is the same. Okay?
A Okay.
Q That's the first year of construction. He

Page 110

testified that there was a burn pit location in the upper parking area that was identified to have approximately 2,000 cubic yards and that's the quantity that was set forth in the bid documents. Okay?
A I know there was a burn pit area. I don't have any idea of the quantity or how that was arrived at.
Q As to that burn pit, the contractor was required to haul off much more than the estimated quantity set forth in the bid documents. Did you come to learn that to be true?
A Yes, sir.
Q Okay. So in one area of the Upper Sherman project, a lot more material had to be removed from an area that had to be built up to be ultimately paved, correct?
A Yes, sir.
Q So that would mean there was extra work removing excess material that had to be hauled out of the park, and then there had been backfill or some type of fill into the greater hole that had been created, correct? Because you had removed stuff from the designed elevations, unless a change was made to the design to -- to modify the design?
A I would say that was accurate if the material was below the contour shown in the existing base mapping.

If the material was brought in and was above, then that would not be the case.
Q And do you know which is true?
A I do not know.
Q Okay. Are you aware, as a result of reading the Remcon claim, that while it received compensation in the form of a modification from the National Park Service for excavating that excess material, it has never been compensated for bringing back material to fill the hole because it wasn't above the contour of the design elevation and actually created a bigger hole? Is that an element that you recall reading in the Remcon claim?
A Yes, I recall that's an element in the claim, yes, sir.
Q Without knowing anything more than what I've just communicated to you and what you read in the claim, if, in fact, it was extra work to remove the material and it was below the elevation of the design, wouldn't it be, in your experience, extra work to get compensated to put material back to bring it back to where it should be?
A If it was below, yes, sir.
Q Okay. Now, that's one element that was going on in the summer of 2001, correct?
A Correct.
Q A second element that was going on in the



summer of 2001 is this differing site condition issue that Remcon raised that arose towards the end of July of 2001 and continued into August, correct?
A I don't know the time frame, but --
Q Generically that recall is correct?
A That sounds correct.
Q I can show you the blasting logs, if you would like. Accept my representation to you that that is a --
A I accept it.
Q -- blasting occurred into September.
A Okay.
Q It was about a six-plus or seven-week period of blasting.
A Okay.
Q Okay. So we have the upper parking lot area having excess material to be excavated and then material needed to be brought in to fill it back up. We have the access road being constructed but blasting had to happen, correct?
A Okay.
Q Now, are you aware of the limitations the National Park Service put on blasting on the access road as to the timing of when that could happen?
A No, sir.
Q Are you generally familiar that construction



activities occur on most projects between approximately 7:00 a.m. and 3:30 p.m. on a normal business day? Sometimes people work ten-hour shifts or whatever, but that's a generic construction day, right?
A Generic, yes, sir.
Q Okay. Are you familiar with the fact that this National Park was frequented mostly by visitors during the summer months when the construction activities were ongoing?
A Yes, sir.
Q And you're also familiar, as a result of NPS-10 and just your general familiarity, that the National Park Service, recognizing it needs to keep the parks open, wanted to limit the impact construction activities would have on the ability of visitors to enjoy the park?
A Yes, sir.
Q You're also familiar with the National Park Service's mission, which is to preserve the natural environment as much as possible, which would be trees, rocks, and to limit any negative consequences which construction operations may have on existing features in the park, correct?
A Yes, sir.
Q Is your memory refreshed that the National



Park Service actually limited the time within which blasting could be performed to 4 p.m. of each day; blasting occurred so as to not impair the utility of the visitors' use of the park?
A No, I did not know that.
Q If that were fact, which I'm now asking you to assume, given what is the normal construction day, would that, in your experience, cause some lost productivity in the ability of a contractor to productively perform work because blasting; you have to drill a hole, you have to fill the hole, you have to cover it to prevent materials from flying out and damaging features around, and it's a very labor-intensive and time-consuming process, correct?
A I would agree with that, yes.
Q And blasting of rock is a much slower process than excavating the material you anticipated being encountered that would be ripped with a D8 dozer, correct?
A Yes, sir.
Q So therefore, if Remcon had to blast material and could only do so at 4 p.m. every workday that it was entitled to blast or allowed to blast, that effort would be much slower and take up much more time in performing than if it was not eight -- required to blast and could just rip it with a D8 dozer?

testified to?
A Yes, sir.
Q Yes?
A Yes.
Q Did he agree with you?
A Yes, sir.
Q Did either of you, to the best of your knowledge, ever communicate those perceptions to the National Park Service?
A Yes, sir.
Q To whom?
A I don't recall exactly who was in the meeting. It was probably with Joanne and Ray Todd.
Q And Willie DeOcampo?
A I don't recall if Willie was there as well.
Q Willie DeOcampo, as I said, was -- the first day of his deposition was this past Wednesday, and we discussed the subject matter as well. And I will represent to you that he testified that he believed that number was high.
A Okay.
Q Did he ever communicate that to you in person?
A I don't -- I don't remember.
Q By "that number," I meant the 40 percent compaction factor. You understood that?



A Yes.
Q In the meetings that you just described, was there any reaction by Mr. Todd and Ms. Cody, who you do recall being in the room, or anybody else, as to your perception that -- that the swell -- the 40 percent compaction factor not being able to be achieved was a cause of the excess excavation material existing?
A Not that it was a cause, but they acknowledged that it's a possibility.
Q Do you know whether Remcon has ever received a modification from the federal government compensating it in whole or in part for any portion of the excess material that it contended it had to encounter?
A I don't know.
Q Would you agree that having to encounter the excess material involved, not just transporting it to a particular location, but having to address it in various different locations along the job -- it doesn't just happen in one big bunch, correct, as this job was designed?
A That's not necessarily true. The majority of the cut was in one location.
Q In about 700 linear feet, plus or minus?
A Plus or minus.
Q What impact does blasting have of this



granitic material on quantities that you estimated in the bid documents?
Let me restate it.
Isn't it true that blasting renders consolidated material to be less consolidated?
A You better restate that one too.
Q Blasting causes dense material to be less dense?
A There you go. Yes. I agree with that.
Q And as a result, it has -- it's prone to be less able to be compacted because there's more components to it rather than its in-situ consolidated or dense form?
A Yes, sir.
Q So that would also contribute to additional material, correct?
A Could possibly, yes, sir.
Q Were those items or possibilities discussed by you and Mr. Smith with Joanne and Ray Todd in a memo?
A Yes, sir.
Q What was their reaction?
A The same.
Q It's a possibility?
A Yes, sir.
Q Did you ever sit in any meetings with Mr. Christensen on behalf of Remcon in which the subject



of excess excavation, quantity material was discussed?
A There was one meeting where he came out to Denver.
Q "He" being Mr. Christensen?
A Yes, sir.
Q Okay.
A I believe it was talked about at that meeting.
Q Is this in that December 2001 time period?
A That's the one meeting, yes, sir.
Q Well, let's also talk about another cause that was likely to cause additional material, and that was the realignment of the road into the hillside, correct? That would have caused additional material to be generated, correct?
A Yes, sir.
Q And if that realignment caused the contractor to have to excavate more material, that, in your opinion, all other things being equal, would be extra work as well, that additional material, correct?
A If it did generate extra work -- extra material, yes, sir.
Q You've never studied that subject, yet, on this project, correct?
A No, sir.
Q And nobody has asked you to do this so --

Q Continuing: Remcon had the stone tested and the density is beyond the limits for ripping, period.

Do you recall that circumstance where it came to your attention that Remcon had had the site sample and produced a document substantiating that the seismic velocity of feet per second was much greater than that which was set forth in the soils report as to the material encountered?

A Yes, I do remember seeing that.

THE REPORTER: I'm sorry. Can we go off the record a second?

MR. SCHOENFELD: Sure.

(A recess was taken from 12:58 p.m. until 1:03 p.m.)

Q (By Mr. Schoenfeld) All right. You recall that the material that Remcon had sampled tested out to be denser and nonrippable according to the tables produced by Kleinfelder in its report, correct?

A Yes, sir.

Q Did you ever comment to anybody your observation and conclusions regarding the Remcon-furnished testing data?

A No, I don't, sir.

Q You recall when we looked at the differing site condition clause earlier, it required the contractor



upon encountering what it believed to be a differing site condition to notify the contracting officer, correct?

A Yes, sir.

Q And then placed, in Part B, the responsibility on the contracting officer to investigate and evaluate, correct?

A Second part I don't remember, but okay.

Q You remember we -- it said, after the contractor gives notice, the contracting officer shall -- or whatever the words were -- determine, investigate, verify, whatever it is, it is.

A Yes, sir.

Q Okay. Do you recall reading in any of the material that I showed you there that the contractor had the responsibility to provide test results to substantiate its contention?

A Not in that verbiage, no.

Q Do you recall seeing anything in writing with respect to the contract documents and the referenced FARs that required the contractor to provide test data to substantiate a differing site condition being encountered?

A Not that I know of, no.

Q Okay. Going back to the text, it says, The only issue is that Remcon cannot say if the stone piece



tested was from the blasted material, period. Seems like a change in condition and the work is justified. You see that?

A Yes, sir.

Q Is that, in a snapshot, consistent with the opinion that you held as of May of 2002?

A Generally, yes, sir.

Q Okay. Let's go towards Item 3 at the top of the page. Regarding Earthwork, slash, Excess Mod, period. Do you see that?

A Yes.

Q The text reads, The contractor has hauled the bid quantity of 6800 cubic yards to Wolverton, plus an additional 3,000 cubic yards, period. Cross-sectioning will determine the actual amount. They currently have four piles of excess to place or transport to open up the site for work this year.

One pile was about 2,000 yards at Station 11. The second pile is from Wuksachi, 50 cubic yards, question mark, and needs to be placed as deep fill. The third pile at Station 46 is about 1500 yards plus and could be partially used to sweeten the leach field material. Remcon wants to save some of this material. The fourth pile is in -- is the leach field material and does not count, I was told, against the excess total.



The future shuttle bus area could have 2,000 yards stored in it. The quantities are a guess, but we need a beginning point to discuss this. The total excess has been quantified to be between 15,000 and 17,000 cubic yards from the meeting in December.

Do you recall that meeting in December where that quantity was discussed, sir?

A Yes. This is the meeting where Mr. Christensen was out in the service center, I believe.

Q And you were in attendance and --

A Partially, yes.

Q -- at the time you were there, the discussion that Mr. Smith relates here accurately portrays that discussion, correct?

A As far as I know, yes.

Q What was the cause of the fifteen- to 17,000-cubic-yard excess excavation material? If you know.

A I don't know.

Q Have you ever investigated that issue?

A We have discussed that issue.

Q And are the discussions those that we talked about earlier of the various possible causes?

A That's right. Yes, sir.

Q Did you ever form an opinion as to what you

believe the cause or causes were of that excess material?
A Not -- no, not a formal opinion, no, sir.
Q What's your informal opinion?
A I think there's probably a number of causes.
Q Identify them for me.
A I guess, first of all, I'm not sure that it is the total fifteen to 17,000 yards. I'm not sure that that was ever identified as the total amount.
Q Okay. Whatever the amount was, what were the causes of the excess material that you would formally conclude? Name them all, please.
A We -- we previously discussed the compaction factor.
Q The unreasonable or overzealous compaction factor?
MR. SCHROEDER: Objection.
THE WITNESS: The 40 percent compaction factor.
Q (By Mr. Schoenfeld) The 40 percent compaction factor, okay.
A We --
MR. SCHOENFELD: I like that overzealous. That's good.
Q (By Mr. Schoenfeld) Go ahead.
A There was discussion about the -- if -- if it



was rock material and that was blasted, if that would generate more fill. There was discussion if the -- if the existing base mapping was off by a little bit, that can generate some extra fill.
Q Was the road realignment another cause?
A Could potentially be a cause.
Q You just identified four potential causes. Are any of those four potential causes contractor-caused, such that the contractor bore that risk of loss to incur the cost of handling that extra material without reimbursement?
MR. SCHROEDER: Objection. Calls for legal conclusion.
MR. SCHOENFELD: I'm asking for his conclusion and opinion that he formally reached that he testified to a moment ago.
THE WITNESS: No, I don't think those would be.
Q (By Mr. Schoenfeld) Thank you.
Would you turn to the last page of the document under the heading General. I want you to look at Part C, as in Charlie. It reads, Overview, colon, Remcon is in the driver's seat on this project. Did Mr. Smith ever communicate that perception to you?
A No.



Q Continues: Our approach needs to be that we do not vary from the awarded plan set, period. You've seen that DHM issued multiple changes, realignments, variations, clarifications to the design, correct?
A Yes, sir.
Q Was there ever an attempt by anyone on behalf of the design team, to the best of your knowledge, to deny that changes or clarifications or realignments were made to the original design set that was issued for the contractor to build this job?
A Not that I know of, no.
Q Do you know if the National Park Service ever directed the design team to take the position that no changes were ever made or authorized?
A No, sir.
Q Mr. Smith goes on to write, quote, Clarifications and plans submitted last year are not valid since they were not submitted as modification. As I read that language to you, what do you understand it to mean?
A I'm not sure I know the intent, but if you read -- read it straight out, the clarifications that were submitted last year were not valid because they were not part of a modification submit to the contractor is what I would read out of that.



Q So that means if the contracting officer didn't formalize those changes in some written manner to the contractor, it's as though they never existed? Is that how you read that language?
A That's how I read that language, yes, sir.
Q So what would you understand the contractor was supposed to do in that circumstance?
A Again, I said earlier, I'm not sure that I know what the communication was out in the field.
Q Assume that the communication -- there was no communication. These plans got into the contractor's hand. They went ahead and built according to the revised drawings they got. In your mind and understanding, based on the communications you had with the MPS personnel who were actively working on this project, both in design and construction side, is that what you believe that the -- they intended?
A That the intent was for the contractor to build them per the revised plans?
Q Yes.
A I believe that would be the intent, yes.
Q Were you ever aware of the circumstances we've just discussed being in existence on this project, that there were revisions issued for the contractor to build that was consistent with what you understood to be the