# EXHIBIT 6A

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

DEPOSITION OF ATHENA DEMETRY
April 8, 2005

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: WILLIAM K. OLIVIER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 11066
Washington, D.C. 20005

Also Present: Stephen Christensen
Rodney Keiscome

or assistance to your effort?
A That's probably true.
Q Okay. On the project drawings that you used, am I correct the access road was not indicated?
A No. That the access road was indicated.
Q When you were in the field, didn't you use drawings US1 through US8 only to perform the tree-marking exercise?
A I used chiefly those drawings, but if necessary, I would flip to other drawings.
Q What other drawings did you refer to in performing your tree marking exercise other than US1 through US8 for this project?
A I may have looked at the drawing that showed the road grading, the extent of grading.
Q Is your most immediate response one of speculation as contrasted with actual recall?
A As relates to?
Q That you may have, you said, but you don't know that you actually did. I'm trying to discern if you actually used anything other than US1 through US8.
MR. OLIVIER: Objection; compound. There was, like, four or five questions there --
MR. SCHOENFELD: I'll restate the question.
MR. OLIVIER: -- some of them obtuse.



MR. SCHOENFELD: Maybe so.
Q (By Mr. Schoenfeld) Do you specifically recall using any of the contract plans other than US1 through US8 to mark trees in June of 2001 for this project?
MR. OLIVIER: Objection; asked and answered.
Q (By Mr. Schoenfeld) You may answer it.
A A specific recollection is when a tree appeared to be well outside the road alignment, but it was marked for removal. In that situation, I would go to the grading sheet and confirm that there was a major change in grade that caused that tree to need to be removed.
Q How many times did you refer to the grading plans while marking trees on the 3,000, approximate, lineal foot of the access road?
A I don't recall how many times. It would have been one or two times.
Q Do you recall in what location for stationing purposes or was it at the beginning of the road or towards the parking lot, the upper end of the road? Can you give me any information about where you did this checking with the grading plans?
A I don't recall along the access road. I recall a location in the parking lot.



Q Okay. So am I correct in understanding that while you may have had the grading plans with you when you were marking trees for removal, and you recall referring to them once or twice, at least you don't recall doing so while marking trees for removal on the access road?
A That's right.
Q Okay. Let me make sure I understand the process. The original effort was a survey was done of the natural features in the forest, trees, rocks, and associated things that were mapped by surveyors, and that information was put into an AutoCAD format and transmitted to the designers for the design of this project. Is that your understanding?
A That's my understanding. I don't know if it was transmitted to them or, you know . . .
Q How they got it?
A Yeah.
Q Okay. Then the designers did their effort to design the improvements that a contractor was to construct, including an access road and a parking lot, correct?
A Yes.
(Mr. Keiscome entered the room.)
Q (By Mr. Schoenfeld) And at some point during



the design phase -- and the design phase being while the plans were being finalized -- there was some review undertaken by the National Park Service; is that correct?
A Sorry. My attention wandered.
Q All right. During the design phase, the surveying had been done with mapping; however it got to the designers, they got it. They then designed their improvements. Their improvements were imposed, overlaid, whatever the appropriate characterization is, onto the survey map.
A Uh-huh.
Q There was some review undertaken, you testified to, of the design effort and the survey map looking at them in combination, correct?
A Correct.
Q Were you part of that review process?
A Yes.
Q Okay. Do you recall specifically doing so at a time the design drawings for this project were identified as being 50 percent construction documents?
A I remember several review fate -- trips onto the site. I don't know if they were 30 percent or 50 percent or 75 percent or 90 percent.
Q During any of those efforts, do you recall looking at some documentation that indicated the level of

removal in June of 2001?
MR. OLIVIER: Objection; I don't think we've established that.
Q (By Mr. Schoenfeld) Did you mark --
MR. SCHOENFELD: Yeah, I think we did multiple times.
Q (By Mr. Schoenfeld) Did you mark the trees for removal along the access road in June of 2001?
A I marked the trees with two contractor's representatives beginning on June 1st. We began in the parking lot.
Q June of 2001?
A Yes.
Q Okay.
A We began in the parking lot, and we proceeded to go around the parking lot and then go towards the entrance of the entrance road.
Q "Entrance road" meaning?
A The access road.
Q And you walked the entire length of the access road identifying trees for removal, correct?
A Yes. That wasn't all done on June 1st, 2001.
Q I didn't say June 1st. Was that effort undertaken during the month of June of 2001 in its entirety?



A Yes.
Q Thank you.
Now, at all times when you were --
MR. OLIVIER: Did you personally mark all the trees for removal on this project?
THE WITNESS: I marked them working with the contractor's representative. Sometimes they held the can of paint; sometimes I held the can of paint.
Q (By Mr. Schoenfeld) Did you indicate which tress -- were you the individual in charge of the responsibility, as you understood it, to identify which trees would be removed during the month of June of 2001?
A I understood it to be a cooperative responsibility. However, I did have the most detailed knowledge of the site from having many past walk-throughs of the site, and they did rely on me to make most of the judgment.
Q If Remcon's representative, walking along with you, said I want to remove a particular tree, did they have the right to determine that they could remove a tree, as you understood?
A If that was shown on the drawings as a tree to be removed, it could be removed.
Q Okay. But they had no ability to designate trees that were not shown on the drawings to be removed;



that was your responsibility, correct?
A If they felt that they needed to remove an additional tree, they would propose it to the project inspectors, and then I would consult on that.
Q Okay. Do you know when the notice to proceed was issued to Remcon to start work on this project?
A I don't know exactly when. I recall from looking at my dailies that on June -- that there was a comment in my dailies that they wanted to proceed with logging; however, it was delayed because they had not received the notice to proceed.
Q Is -- did you have your memory refreshed looking at your dailies that the notice to proceed was not issued by Mr. Keiscome or his representative until June 11th of 2001?
A I don't recall having that exact date.
Q What do you understand a notice to proceed means?
A My understanding is that the contracting officers have everything in place. They've received the necessary submittals or whatever a contract requires that -- to be completed before the start of work.
Q Is it your understanding that the notice to -- that the notice to proceed is the official authorization to the contractor that they may start physical operations



on the project?
A I don't have detailed technical knowledge of what a notice to proceed technically means.
Q Okay. At the preconstruction conference, is it true that it was identified that the first order of work in the field on this project would be the marking of trees for removal by Remcon?
A Yes. And we discussed things that needed to happen before that.
Q Okay. And am I correct that you did not start marking the trees for removal until June 1, 2001?
A That's correct. That was a meeting date that was arranged for both government representatives and contractor representatives to meet to start marking trees.
Q And isn't it true that the contractor accompanied you on the tree-marking walk-through of the project?
MR. OLIVIER: Objection; vague and ambiguous.
Q (By Mr. Schoenfeld) You may answer.
Accompanied you that -- there was one or more representative of Remcon with you as the trees were being marked for removal?
A That was correct for part of the first day. We marked trees for the morning. We broke for lunch. We

# EXHIBIT 6B

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

agreed to meet back after lunch, and the contractor's representatives did not show up again after lunch, so I continued marking.

Q Was there a provision in the contract documents, that you are aware of, that provided that the contractor shall accompany a representative of the National Park Service when the trees identified for removal would be marked for removal?

A No, not that I'm aware of.

Q Okay. Was it your understanding at the preconstruction conference Remcon agreed to accompany the National Park Service tree removal marking effort?

A I don't recall that we talked specifically about the process for marking trees at the precon.

Q Okay. Do you recall at the preconstruction conference there was discussion -- we'll get to it -- discussion concerning the order in which activities would occur?

A Yes.

Q Do you recall that Mr. Christensen communicated that until the trees were marked for removal and logged he would not be able to have his surveyors efficiently lay out from -- by surveying techniques the access road?

A I recall that he preferred the survey -- his



survey to be done after tree removal so that falling trees would not damage his survey stakes.

Q And that was agreed to by the National Park Service representatives at the preconstruction meeting as the order in which things would proceed, correct?

A Correct.

Q And as we see on -- on the first page of Exhibit 310, the preconstruction conference was apparently held on May 22nd. Was, to the best of your recall, the first order of physical activity in the field the marking of trees for removal?

A Can you repeat your question?

MR. SCHOENFELD: Please read it back.

(The reporter read page 73, line 7 through line 11.)

THE WITNESS: I recall that that was my first activity in the field. I don't know if there was previous activity in the field.

Q (By Mr. Schoenfeld) During the tree-marking process, did Mr. Christensen accompany you on any of your walks through the project site?

A He did not accompany us on our tree marking for removal. He accompanied us on tree marking for protection.

Q Did -- do you remember Mr. Christensen helping



you mark some of the trees for removal at all?

A No, I don't.

Q Isn't it true that the time that you were marking the trees for removal Remcon had not yet received a notice to proceed on this project?

A That's correct.

Q At the preconstruction conference, is it true that Mr. Christensen stated that the survey crew will set the cut-and-slope stakes after the logging operations were completed?

A I recall that he said the survey would be done after the logging operations. I don't know specifically.

Q Is that the sequence in which you recall events occurring?

A Yes. I recall that no survey was done prior to logging.

Q Okay. So when you did your marking of the trees, there was no survey that had been undertaken during calendar year 2001 indicated by stakes on the ground, correct?

A That's correct. No survey done by the contractor.

Q And no survey done by anybody else, to the best of your knowledge, during calendar year 2001?

A To the best of my knowledge.



Q And to the best of your knowledge, there was no survey done in calendar year 2000 along the area you were marking the trees for removal?

A There very well may have been a survey done in calendar year 2000.

MR. SCHOENFELD: Can I have Exhibit 111 again?

Q (By Mr. Schoenfeld) I'm showing you the 50% Construction Drawing that we --

A Uh-huh.

Q -- cover sheet. If I recall your testimony on this document, this appears to be one of the documents you likely accessed during the design review process for this process that you were involved in to some extent, correct?

A Correct.

Q Given the fact that the date is June 2nd of 2000, and your understanding is that the survey was done before the designers could overlay the road, does that help refresh your recollection that the survey that was done to do the mapping was done earlier than calendar year 2000?

A The survey that was done to do the mapping was probably done before that, but they would also do a survey of interim designs for each review phase. So there would have been survey stakes associated with that