# EXHIBIT 7A

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF MICHAEL JOSEPH GILLER - VOLUME I
March 1, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: RICHARD P. SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 4058
Washington, D.C. 20005

COLLEEN M. DULIN, ESQ.
Office of the Solicitor
Department of the Interior
755 Parfet Street
Suite 151
Lakewood, Colorado 80215

Also Present: Stephen Christensen
Rodney Keiscome
Cori Brown

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Docket No. 03-2478C

---

DEPOSITION OF MICHAEL JOSEPH GILLER - VOLUME II
March 2, 2005

---

REMEDIATION CONSTRUCTORS, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

---

A P P E A R A N C E S

For the Plaintiff: D. MICHAEL SCHOENFELD, ESQ.
Murphy Austin Adams Schoenfeld, LLP
1000 G Street
Third Floor
Sacramento, California 95812-1319

For the Defendant: RICHARD P. SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 4058
Washington, D.C. 20005

COLLEEN M. DULIN, ESQ.
Office of the Solicitor
Department of the Interior
755 Parfet Street
Suite 151
Lakewood, Colorado 80215

Also Present: Stephen Christensen
Rodney Keiscome

Page 98

were on-site through October, and I don't know when in that period they worked.

Q Okay. There was blasting done for the trenches for utilities, correct? But that was not perceived to be a differing site condition by the government, right?

A It's in his claim.

Q Please answer my question.

A Okay.

Q There was blasting for rock in trenches for utilities, but that was not perceived to be a differing site condition by the government, correct?

A Correct.

Q Okay. Do you consider the -- the issuance of the unilateral Modification Number 6 in February of 2003 approximately 18 months after the work was performed to be a timely issuance of a modification for recognized extra work on this project?

A No.

MR. SCHOENFELD: Let's take a break.

(A recess was taken from 11:08 a.m. until 11:20 a.m.)

(Mr. Keiscome is not present.)

MR. SCHOENFELD: Let's go back on the record.

Q (By Mr. Schoenfeld) Mr. Giller, in performing

Page 99

the analytical effort you did perform evaluating what damages Mr. Keiscome should consider granting Remcon in Modification Number 6 for the differing site condition, you reviewed a lot of paper, correct?

MR. SCHROEDER: Objection to the word "damages."

Q (By Mr. Schoenfeld) Compensation, I'll substitute in place. Go ahead.

A I -- I reviewed paper.

Q Okay. And you talked to those that you felt had some knowledge that might assist you in performing whatever analytical exercise you were undertaking, correct?

A Yes.

Q Okay. As part of your evaluation, did you consider what time that was critical in the project was utilized in the encountering and addressing the differing site condition between Stations 26 and 30?

A Yes.

Q Okay. Do you believe that there was any delay to the project which occurred as a result of the encountering of the differing site condition in that locale?

A Not to the critical path.

Q Okay. What was the critical path of the

Page 100

project between July 30th of 2001 and September -- the end of September 2001?

A I don't know.

Q Are you familiar with the concept of the critical path analysis?

A Yes.

Q Are you -- have you examined the as-planned schedule that Remcon had in place as of July 30, 2001?

A No.

Q Have you examined any as-built schedule showing what work was actually undertaken on the project between July 30, 2001, and the end of September,2001?

A I don't know.

Q Well, how is it that you don't believe that the work encountering the differing site condition between those dates and Stations 26 to 30 was on the critical path?

A Discussions with others.

Q Whom?

A Bob Russell, possibly others, but I can't say.

Q Willie DeOcampo?

A I don't know.

Q Did you believe Mr. DeOcampo was knowledgeable about facts associated with the encountering of the differing site condition?

Page 101

A In general, yes.

Q Mr. Keiscome, did you talk to him about whether or not the work that Remcon was performing between August -- excuse me -- between July 30th and the end of September of 2001 was on the critical path?

A I don't remember.

Q You said you performed an analysis and determined it was not on the critical path. What did you use to make determination, other than talking to Bob Russell and, perhaps, speaking with others?

A I didn't say I performed an analysis. I said I didn't believe it was on the critical path and I spoke to colleagues who knew more about it than I.

Q What colleagues?

A Bob Russell.

Q Anybody else that you can recall?

A Not that I recall.

Q Did you speak with Bob Smith of DHM?

A I don't think so.

Q Did you speak with Ray Tuttle of Martin and Martin?

A I don't know.

Q Did you speak with anybody on behalf of the contractor to evaluate their perspective?

A On behalf -- you mean like Steve?

# EXHIBIT 7B

Declaration of D. Michael Schoenfeld in Opposition to
Defendant's Motion for Partial Summary Judgment

Q Did you discuss it with Mr. Mangrum or anybody else on behalf of working on behalf of the government?
A (Reviewed documents.)
I don't recall.
Q Okay. You note in the second paragraph Mr. Christensen writes about the differing site condition work that had been performed approximately one year earlier, including the blasting effort done by its subcontractor, California Drilling & Blasting. Do you see that?
A Yes.
Q Had Remcon received any payment as of August 1st of 2002 for the blasting work done by California Drilling & Blasting in the differing site condition locale?
A I don't know.
Q Isn't it true that no such payment had been made up to the time Modification Number 6 was issued by Mr. Keiscome in February of 2003 for that effort?
A I don't know.
Q And has any payment actually been made to Remcon in accordance with the -- the content of Modification Number 6?
A I don't believe so.
Q You were responsible as part of your job



duties as the project manager to solicit funds for modifications, correct?
A I am.
Q Did you ever solicit funds for Modification Number 6?
A Yes.
Q Did -- did you receive -- "you" being the National Park Service personnel for this project -- receive the authorization to fund Modification Number 6?
A I believe so.
Q Why, then, did the payment not get made if the authorization was received?
A Well, there was a letter from the surety in 2003 saying release no further funds to Remcon.
Q Why weren't the funds then released to the surety?
A They were.
Q The 84,000 was paid to the surety?
A Yes.
Q You're certain of that?
A Yes.
Q Okay. When was it released to the surety?
A I don't recall.
Q Was notice given to Remcon that the $84,000 was paid to the surety?



A I don't know.
Q Was the -- was the surety paid the $84,000 before the notice of termination was given?
A I don't believe so.
Q Why did the government hold the money from February of 2003 when the mod was issued until sometime after mid-August of 2003?
A I don't know.
Q Is that -- is the holding of that money and nonpayment of it in accordance of your understanding of the government's responsibility under the prompt payment act that was incorporated in the document?
A I need to back up a bit. I'm sorry.
It was not paid to Remcon for two reasons: One, the surety said release no further funds to Remcon and, two, there were retainages greater than the amount of the mod.
Q And what retainages were in existence as of February of 2003?
A I'm not sure.
Q Was there anything published in writing to Remcon disclosing that the government was withholding progress payments otherwise due?
A Probably.
Q Probably? Yes or no.



A Probably yes.
Q Who authored such communications?
A Likely Rod, Willie, or -- or me.
Q You don't know for certain, though?
A If you showed it to me.
Q I showed it to you?
A If you show me a document.
Q Okay. Are you specifically aware, as you sit here now, the end of February 2003, any written communications given to Remcon that money otherwise due it was being withheld for any reason?
A I'm aware of a document. I'm not certain about the date with respect to the date you said.
Q When is it that the National Park Service received notice from the surety not to make payment -- further payments to Remcon without contacting the surety?
A I don't know.
Q Isn't it true it was more than a month after --
A I don't know.
Q -- modification Number 6 was issued?
A I don't know.
Q Why is it that the NPS did not pay Remcon the $84,000 in Mod Number 6 between the time Mr. Keiscome issued it and the date the notice was received from the

# EXHIBIT 7C

Declaration of D. Michael Schoenfeld in Opposition to Defendant's Motion for Partial Summary Judgment

A Possibly.
Q But you don't know?
A I don't know.
Q Okay. Going back to Mod Number 6, what amount of time did it take to blast through the differing site condition that was encountered?
A Mod 6. You said earlier August and September.
Q Looking at the blasting records. You concluded as part of your analysis that not all of the blasting was necessary that was performed, correct?
A I didn't say that.
Q I'm saying in your analysis, you concluded that, didn't you?
A No.
Q Well, let's look at unilateral Mod Number 6, sir. Here's Exhibit 214. Would you go through there and find your analysis.
A (Reviewed documents.)
Q I can help you, if you like.
A (Reviewed documents.)
Q Look at Bates-stamped page 2016, 2017, and 2018. Are those authored by you?
A In part.
Q Are you the author of the memo dated January 14th, 2003, that's part of Exhibit 214 that are



Bates-stamped pages 2016 and 2017?
A I signed the memo.
Q Someone else wrote it?
A Well --
Q I see no notation that somebody else wrote it.
A Right. But many -- much of the information most likely came from earlier analysis done by my colleagues.
Q Your colleagues being the one that you recall was Bob Russell and you're not sure if anybody else did, correct?
A Correct.
Q Okay. You use the word "colleagues" as though it is a plural. You're not sure there's anybody else other than Mr. Russell, correct?
A Correct.
Q Okay. And you relied on a notebook which was assembled by Mr. Russell preparing this memo and the subsequent spreadsheet on Bates stamp page 2018; is that correct?
A Yes.
Q Did you write the text that is printed as Bates-stamped page 2016?
A I just answered that. That I signed the letter, but that much of that information came from



colleagues' work.
Q For whose benefit was this letter written?
A Backup, modification backup.
Q For the contracting officer?
A Yes.
Q You had no personal knowledge of the facts set forth in this document insofar as you did not observe any of the activity you referenced, correct?
A I wasn't on-site in 2001.
Q So you didn't observe any of the facts that you were -- you were accounting here; you were relying on somebody else's document or memory, correct?
A I wasn't relying on documentation.
Q Okay. And you concluded, sir, in the spreadsheet the information set forth therein is your calculation, correct?
A A lot of that came out of Bob Russell's work.
Q On what basis did you determine the dollar value of $848,170?
(A discussion was held off the record between Mr. Schoenfeld and Mr. Christensen.)
THE WITNESS: In general what we did is, Steve's claim backup showed all of the blasting cost as cost basis for his claim. The government believed that much of the blasting was for contract-required rock



excavation, and so we took -- based upon Bob Russell's analysis, we took a percentage of the blasting that was associated with differing site and came up with the 84,170.
Q (By Mr. Schoenfeld) Am I correct that the 84,170 is for reimbursing the contractor for blasting costs?
A Yes.
Q It has nothing to do with roadway excavation of handling the material other than the actual cost of blasting, correct?
A I don't know.
Q Where in -- where in this analysis on page 2018 do you believe there's any compensation that you found due the contractor for handling the by-product of blasting?
A I'd have to go back and do a backup.
Q Are you aware of any communication that you indicated to the contracting officer that you found there was any money due the contractor in Mod Number 6 for handling the by-product of blasting?
A I'm not sure.
Q Isn't it true that what is set forth on page 2018 is just the cost of blasting that you felt were compensable to the contractor?