IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | DOCKET NO. 03-2478C<br><br>**DECLARATION OF STEPHEN B. CHRISTENSEN IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(Judge Susan G. Braden)<br><br>Hearing Date: TBD |

I, STEPHEN B. CHRISTENSEN, declare:

1. I am the president of Remediation Constructors, Inc. ("Remcon" or "Plaintiff"), plaintiff in this action. I make this declaration in opposition to Defendant's Motion for Partial Summary Judgment. I have personal knowledge of all matters stated herein and, if called upon to do so, I could and would competently testify thereto.

2. Remcon performed work for the National Park Service ("NPS") on a Project located in the Sequoia/Kings Canyon National Park in the Sierra Nevada mountains of California known as the Sherman Tree Parking Project ("Project"). The Project had three distinct components: the Upper Sherman Access Road and Parking Area, the Sherman Tree Trail, and the Lower Sherman Parking Area. Claims resulting from the Project are the subject of the instant lawsuit.

3. The contract specifications for the Project required that two of the components (the Upper Sherman Access Road and Parking Area and the Sherman Tree

Trail) be complete before any work would proceed on the Lower Sherman Parking Area. As of July, 2003, due to delays directly attributable to the NPS, work remained to be completed on the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail, and no work had been performed by Remcon on the Lower Sherman Parking Area. My written request, on June 3, 2002, to be permitted to mitigate Project delays caused by the government, and experienced up to that time by working on the Lower Sherman portion of the Project was denied by the NPS.

4. The Upper Sherman Access Road and Parking Area involved, in substance, the construction of approximately 3,000 linear feet of a new two lane asphalt paved roadway, a new two level parking area, installation of 3,700 linear feet of domestic waterlines and 3,800 linear feet of electrical service line, installation of a new sewer system (including approximately 750 linear feet of sewer line, a concrete septic tank, dosing siphon tank, and a sewage leach field), construction of a comfort station, a wayside kiosk, rock revetments, landscaping/erosion control measures and related improvements. The Sherman Tree Trail component required the construction of approximately 2,000 linear feet of asphalt surfaced trail, including concrete/stone stairs, drainage improvements, timber edgings, a visitor overlook, and related landscaping/erosion control measures. The Lower Sherman Parking Area component included demolition and removal of existing structures and landscape, construction of approximately 300 linear feet of concrete retaining wall with rock facing, realignment of the General's Highway, construction of a visitor comfort station, and related landscaping/erosion control measures.

5. The NPS issued a Request for Proposal ("RFP") for the Project in February, 2001. In late February, 2001, Remcon received a set of plans and specifications for the Project. Remcon, having previously worked for the NPS in the park as a subcontractor, based its responsive proposal to the NPS on the information contained

within these documents, including geotechnical reports and quantity estimates for removal and hauling of material, as well as our general familiarity with the isolated and distant locale of the park from construction resources.

6. Based upon the timing of the availability of the contract documents, and the required submission of proposals, Remcon, and all other prospective bidders, were prevented from conducting a site investigation to confirm the accuracy, or to uncover any observable discrepancy, between the plans and specifications and the Project site. This was because the plans and specifications were published in the heart of winter when the jobsite, located at approximately 7,000 feet above sea level, was buried under snow, and because the date for submittal of proposals was March 29, 2001, it was not possible to confirm the accuracy of the government's estimates or discover any discrepancies.

7. The Project site is in an area adjacent to a heavily visited national treasure (the General Sherman Tree), and had limited construction access and a limited construction season. Further compounding the Project difficulty was its location and weather. Instead of being able to work all or most months of the year, Remcon had to anticipate a limited construction season depending on the extent and duration of winter precipitation and temperature. Realistically, the construction season ranged from late May/early June through October, a duration of five or six months. The NPS' RFP allowed less than three construction seasons to perform the work. The NPS awarded the contract to Remcon on May 15, 2001 and issued a Notice to Proceed on June 11, 2001. The completion date was August 11, 2003.

8. Remcon submitted an as-planned schedule to the NPS in 2001 which called for all work on the Upper Sherman Area to be completed in the 2001 season and the Lower Sherman Area to be completed in the 2002 season. The NPS never questioned the logic of Remcon's as-planned schedule, and its construction manager by letter dated July 11, 2201, praised its reasonableness, completeness and content.

9. The critical path on Remcon's as-planned schedule commenced with the clearing of trees and pioneering of the Upper Sherman Access Road and Parking areas. It then transitioned to the construction of the comfort station and related improvements for the balance of 2001. But for the myriad of design deficiencies encountered, and directed performance of extra work and construction changes, the Upper Sherman work would have been completed by the end of the 2001 construction season. Unfortunately, the as-planned schedule was not able to be followed.

10. Prior to the issuance of the Notice to Proceed, Athena Demetry of the NPS, a field biologist and forester, marked all trees in the virgin forest which were to be removed by Remcon during its clearing and grubbing operation (including logging) for construction of the Upper Sherman Access Road and Parking Areas. While Remcon personnel occasionally walked the right-of-way with Ms. Demetry, and "assisted" her by placing the paint on trees which she determined were to be removed, the determination of which trees were to be removed was, by contract, and action in the field, exclusively the governments' pursuant to section 1110, Part 1.04 A-F of the specifications.

11. Thereafter, on June 11, 2001, the date the NTP was issued, Remcon began falling and logging the trees marked by Ms. Demetry. Once the logging operations were complete, Remcon's surveyor, Guiliani & Kull ("G&K"), began to lay out the Upper Sherman Access Road and Parking Areas. G&K immediately discovered that about 600 feet of the road, as shown in the NPS plans and specifications, did not match the clearing limits that had been laid out by Ms. Demetry in the field.

12. By that time, however, Remcon had already cut and removed the trees that Ms. Demetry had marked for removal. There was a significant discrepancy, between Stations 24 and 30 (approximately 600 lineal feet) between the area Remcon had cleared per Ms. Demetry's direction and where the NPS plans and specifications called for the access road to be constructed. This discrepancy initiated a series of re-designs and other

problems that impacted Remcon's ability to schedule and complete its work as it had originally planned. Remcon has not been compensated in time extensions or additional money for virtually any of the costs or delay impacts that flowed from those changes. The limited compensation that has been received for the resulting extra work and delays was also belatedly received, in most cases over a year after the extra work was performed.

13. The trees, designated by Ms. Demetry to be removed along the access road right-of-way, between Stations 24 and 30, were in a location up to fifteen feet off of the right-of-way set forth in the plans. As a result, the access road needed to be re-surveyed by Remcon's surveyor (recognized belatedly 14 months after the events by the Contracting Officer in Modification No. 4 as extra work) and the road was relocated by the government to a location into the hill from the planned locale. The content of Modification No. 4, in its Justification section, admits that the cause of the road relocation was not due to Remcon. It states:

> On July 31, 2001, the Contractor's submitted a change order request for "Additional Survey Work" for their Surveying Subcontractor (Giuliani & Kull). This request was based upon the initial Access Road centerline staking per the contract drawings. After the initial staking it was discovered that the centerline with all required cut boundaries did not fall within the earlier cleared limited as delineated by Park staff. Thus the Government agreed that the centerline had to be revised in order to fit all earthwork into the already cleared limits. Therefore the surveyor had to re-staked this revised centerline and are entitle to be compensated for their additional work. In addition, this work had to be completed at this time to prevent additional construction costs associated with equipment stoppage and delays. The revised road layout and re-staking reduced construction costs since additional clearing and tree removal was not required. Therefore, this work is necessary in order to construct the roadway alignment in the location shown on the construction drawings. This change is in the best interest of the Government and I recommend it be approved.

A true and correct copy of Modification Number 4 is attached hereto as Exhibit 1 to my declaration.

14. Once Remcon had removed the trees marked to be logged in the area known as the "deep cut" of the Upper Sherman access road (nominally Stations 24 through 30, a distance of 600 lineal feet) and then had its surveyor stake the access road

per the plans, the surveyor's stakes were among many trees which had not been marked to be removed. Therefore, either the road had to be relocated into the hill, or more trees had to be removed and a big scar of cleared area would be seen by park visitors.

15. Remcon orally notified the NPS's on-site representative, in late June, 2001, of the conflict between the clearing limits and the surveyed location of the road per the plans. Multiple visits by the Contracting Officer's Representative (Willie DeOcampo) and A&E Manager (Joanne Cody) in late June and early July, 2001 occurred and ultimately resulted in an NPS direction to relocate the road further into the hill where the trees had been logged. To do so, Remcon was directed to survey the new road alignment. This extra work was performed in July, 2001 and recognition of the fact that it was extra work, and that this was solely caused by the government, was belatedly set forth by the government in Modification No. 4 in September, 2002.

16. Remcon's surveyor, G&K, taking direction from the NPS on-site representative, Bob Russell, provided new alignment data that was forwarded to the NPS designers who issued the actual design change to fit the road into the cleared area. While the road realignment issue was ongoing, Remcon ceased operations in the deep cut area pending new design data from NPS, and relocated its equipment and began work in the Upper Sherman parking area to address the burn pit.

17. Once the NPS issued its new design (Design No. 2) for the Upper Sherman Access Road, Remcon's surveyor returned to the Project and re- surveyed the area with the revised design information. This new design affected some 600 feet, or 20%, of the access road.

18. Remcon's relocated grading operations were then impacted by an error in the NPS quantity calculation (Item 26 - Haul Misc. Materials from Park) in the contract documents for material to be removed from the Project site. The contract documents called for Remcon to excavate an existing NPS burn pit filled with discarded material that was to be hauled off from the park and disposed of in a recycle/dump site. The plans and

specifications estimated 2,000 cubic yards (or 67 truckloads) of material. Remcon was required to remove and dispose of some 8,200 cubic yards (394 truckloads) of material. Remcon had originally scheduled 5 days for this work based on the NPS quantity estimate. It took 27 workdays (from June 11, 2001 to July 18, 2001) for Remcon to remove all of the burn pit material from the park and the extra costs exceeded $300,000. These extra costs and delays, incurred and experienced in July, 2001, were not recognized by the government until August/September 2002 when Modification's No. 3 and 4 were issued. The government's justification, for this extra work set forth in Exhibit 1 hereto, states:

> On July 12, 2001 while grading the Upper Parking Lot the Contractor encountered unknown miscellaneous buried debris in the easterly end of the upper parking lot. The buried debris consisted of logs, stumps, tires and miscellaneous material that had been buried in this area over the years. The Denver Service Center Project Manager and Lead Designer inspected this area on July 16, 2001 and determined that the buried material would be detrimental to the construction of the parking lot. All agreed that a parking lot constructed upon structurally unsound material would eventually fail causing future maintenance problems for the Park. Therefore, the upper 5-feet of the existing grade, which contained unsuitable debris had to be removed. This removal included the sorting and screening of the material cited above. This work is necessary at this time so that the parking lot construction can be continued without delay to the project. This change is in the best interest of the Government and I recommend it be approved.

19. Once the road was re-surveyed and pioneered, and the burn pit extra work performed, Remcon sought to excavate the relocated access road to subgrade. As of July 30, 2001, Remcon encountered granitic rock which could not be "ripped" with a D-8 Dozer. The soils report made a part of the contract documents expressly stated that all earthen material to be encountered to construct the road could be ripped and that blasting would not be necessary except in isolated instances ("floater rocks"). However, the soils report did not test the material to be encountered in the realigned roadway locale. Remcon had on site a new D8 Dozer/Ripper which meant it had the equipment on site which should have been able to excavate the entire planned roadway locale to subgrade. Remcon encountered, between Stations 24 and 30, where the road was relocated into the

hill, solid granitic rock which required blasting. This solid rock necessitated drilling and blasting and Remcon swiftly asserted orally and in writing that it had encountered a differing site condition. Subsequent independent testing paid for by Remcon, the results of which were furnished to the NPS, concluded that the density of the granitic rock encountered, measured in terms of its seismic velocity, greatly exceeded the highest velocity which the soils report represented would be encountered and which exceeded the capacity of a Cat D8 Dozer to rip. The result was that blasting, which is much more expensive, inefficient and time consuming, was required.

20. The drilling, blasting and material handling operations occurred, continuously, until September 13, 2001, a duration of over six weeks, which was twice the planned earthwork duration for the entire Project. The NPS, for eighteen months thereafter, disputed that Remcon encountered a differing site condition. Ultimately, by unilateral modification No. 6, dated February, 2003, the Contracting Officer recognized that a Type I differing site condition was encountered. However, the change order only granted Remcon $84,000 in extra compensation and no time extension. Instead of taking 21 calendar days to excavate the road and parking lots, as scheduled in the as-planned schedule, the activity took more than thirteen months and the costs for excavation exceeded $700,000. A true and correct copy of Modification No. 6 is attached hereto as Exhibit 2 to my declaration.

21. The unsuccessful efforts to rip the granitic rock was documented in both Remcon's daily reports as well as the daily reports prepared by NPS representatives. Remcon gave timely notice of the differing site condition to the NPS so that the NPS could investigate Remcon's claim before conditions were disturbed. Notice of drilling and blasting operations was given on July 30, 2001 and the effort to blast the road (as contrasted with the subsequently blasted utility trenches under the road) was not completed until September 13, 2001, a total of 44 calendar days. Even then, additional boulder and incidental rock also had to be drilled and blasted throughout the entire

earthmoving period. As a result, Remcon experienced additional increased costs and time impacts in excavating, loading, hauling, stockpiling, sorting and re-handling of the shot material.

22. While the Access Road and Parking Areas were greatly impacted by documented extra work and design problems, the Upper Sherman Tree Trail, the last piece of the Upper Sherman work, was also the subject of multiple and continuing design changes, and the last design change was not issued to me until August, 2002. While some work was able to be performed in 2001 and 2002, there were multiple and continuing changes issued by the NPS to the trail points and the trail's physical components and dimensions throughout 2001 and 2002. It was not until November 20, 2002 (after Remcon's as-planned schedule demonstrated that Remcon would be complete with the entire Project, both Upper and Lower areas) that the Contracting Officer signed and issued Modification No. 5, which officially modified the trail's design and finalized the design changes which had been going on for almost two years. A true and correct copy of Modification No. 5 is attached hereto as Exhibit 3 to my declaration. The timing of the issuance of Modification No. 5 was too late for Remcon to proceed in 2002 as winter weather had commenced, and it further restrained Remcon from completing the trail until 2003's construction season, as the design changes had to be implemented before the balance of the trail could be built. No time extension was granted by the government when it issued Modification No. 5.

23. Recognizing that the government's conduct regarding delays to the Project was a material breach, and to protect my company, I signed Modification No. 5 on October 18, 2002 on behalf of Remcon and forwarded it to the Contracting Officer on October 21, 2002 along with a cover letter expressly reserving Remcon's rights to receive time extensions and delay damages resulting from government breaches of contract, constructive acceleration, directed changes, constructive changes and the additional work performed and materials handled due to defective and deficient contract documents,

including the Sherman Tree Trail. A true and correct copy of my October 20, 2002 letter to Rodney Keiscome, the Contracting Officer, is attached hereto as Exhibit 4 to my declaration.

24. In 2001, Remcon's Project superintendent notified Bob Russell, the NPS designated representative, of a substantial overrun in quantity of excavated material. This resulted from the differing site condition as well as errors in design assumptions. The NPS did not provide Remcon with direction to mitigate this problem until mid-season 2002. As a consequence of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and the Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation. As a consequence of the excess material to be removed and the lack of timely direction from the NPS, Remcon's operations were severely impacted, resulting in an inefficient use of Remcon's planned labor and equipment and Project supervision and an immediate negative impact to Remcon's schedule. I have subsequently come to learn that, as early as July 2, 2001, the NPS was aware that earthwork quantities would overrun, up to 13,000 cubic yards, and that the NPS considered in writing notifying the design team that its conduct was professionally negligent. Despite this awareness, no action was taken for up to one year regarding what I was to do to address the quantity overruns.

25. The constant NPS design revisions, occasioned by defective plans and specifications, and the belated timing of them, severely impacted Remcon's ability to schedule or perform the Project with any semblance of efficiency or economy. From the very outset of the Project, Remcon's ability to control the construction of the Project was put in jeopardy by the acts and omissions of the NPS. In fact, within the first three weeks of work on the Project, NPS changes and deficiencies in the contract documents meant that completion of the 2001 work schedule, as-planned by Remcon and accepted by the NPS, was impracticable.

26. Added to the discrepancies in the road alignment and quantity estimates, the differing site condition and the necessity for blasting effectively prevented Remcon from completing its planned scope of work for the 2001 construction season. Moreover, the necessity for blasting adversely impacted Remcon's ability to stay on schedule, and shifted the critical path to all earthwork activities. Not only did the road require blasting, but the NPS would not let us blast until 4 p.m. daily, thus limiting our ability to efficiently perform critical path work.

27. Remcon submitted its formal request for a change order for the differing site condition on August 20, 2001 to recover the added cost and time of the differing site condition. A true and correct copy of Remcon's August 20, 2001 letter is attached hereto as Exhibit 5 to my declaration.

28. Between the first and second construction seasons (December 2001 and April 2002), I traveled to Denver to meet with NPS personnel on three different occasions to discuss extra work performed but not compensated or turned into a modification; design problems; quantity overruns; and payment of Remcon's claims that were significantly impacting the Project. During that time, I notified the NPS that final slope grades had not been completed and additional earthwork would be needed to meet the designed slope minimums. Despite NPS personnel agreeing to review the impact issues and representing they would timely respond and provide necessary design changes and/or issuing the appropriate revised drawings and modifications, little or no information was forthcoming before the second construction season began. As a result, Remcon was unable to publish an accurate, updated schedule as it was missing critical information to enable it to plan its work.

29. Based upon the contract documents, the Project was, in essence, planned by the designers to be a balanced job (requiring neither import of earthen materials nor their export, except for the planned 2000 cubic years of burn pit materials planned to be off-hauled as well as 6800 cubic yards to be hauled within the park to a designated

locale). The Project was not balanced and thousands of yards of excess material were excavated, stockpiled, handled multiple times, and had to be disposed of but direction to address it took almost a year.

30. Remcon re-mobilized to the Project in mid May 2002. A partnering meeting in the Park was held with all Project participants in the Park. It involved a comprehensive job walk so that the problems experienced in 2001 could be actually seen by the Contracting Officer and the Contracting Officer's Representative, who traveled to the Park from Denver. Also present were the outside designers, the inspectors and Park personnel. During the partnering meeting, Remcon requested to all attendees prompt direction on how to address all of the issues then continuing to be unresolved, including how to proceed through the deep cut area, including how to address slope problems. When the NPS continued to fail to respond, Remcon began issuing a series of requests for information ("RFIs"). Throughout June, 2002 the NPS failed to respond to the RFIs or to provide any direction to Remcon on how to correct the slope problems resulting from earlier design deficiencies. Concurrently, Remcon sought direction on what to do with the thousands of yards of excess material on site. While in May, 2002 a suggestion was floated that some of it could be used to raise the designated finish elevation of the parking lots, this extra work was not directed until June 28, 2002, again delaying the work, and Modification No. 4 was not issued until September, 2002 even though agreement on all terms was reached in early June, 2002. The justification written by the government, set forth in Exhibit 1 hereto states:

> During the Excavating and Grading of the Access Road and the upper Sherman Parking lots, it became apparent that excess excavated material was being generated. The Contract provides for hauling 6,800 CY of Excess Excavation to Wolverton Point for disposal. It was estimated by the Government that the total quantity of approximately 15,000 CY of Excess Excavation will be generated. The Denver Service Center and the Designer have determined that the Upper Parking Lot can be raised approximately 5-feet at the easterly end and will allow 5,000 CY of Excavated Material to be incorporated into the fill at this location. This change will reduce some of the costs associated with hauling excess material within the Park boundaries and will result in an approximate

> savings of $17,000.00 as opposed to hauling this material within the Park. This change is necessary in order to eliminate possible construction impacts that will result in claims. Therefore, this change is in the best interest of the Government and I recommend it be approved.

31. The issue of excess material was noted in writing by government personnel in internal email memorandum as of July 2, 2001. It was not until June 28, 2002, a delay of 361 days, that the Contracting Officer partially dealt with the excess material issue when he issued a directive letter to Remcon to use some of it to raise the finish grade of the upper parking areas. Concurrently Remcon, which claimed that the events of 2001 had materially depleted its capital to perform work, sought written assurance from the Contracting Officer that the modification for the directed extra work to raise the parking lots would be immediately processed so Remcon could bill for the work and get paid no later than August, 2002. The Contracting Officer gave this written assurance by letter dated July 16, 2002, but he did not honor his representation as the modification (No. 4) was not issued until September 14, 2002, and Remcon could not receive payment for the work until October, 2002.

32. By the end of June 2002, the NPS-caused impacts and delays effectively prevented Remcon from accomplishing any productive work on the Project. Remcon published on June 27, 2002 an updated schedule which attempted to address the volume of problems and hinderances affecting the ability to progress the work. It showed a completion date of November, 2003. No response was received even though: (a) the specifications required the Contracting Officer to meet with me within seven days of the submittal; and (b) this completion date was more than three months beyond the contractual completion date. In an attempt to push forward, Remcon asked that it be allowed to begin work on the Lower Sherman Trail component. A true and correct copy of my June 3, 2002 email to Willie DeOcampo of the NPS is attached hereto as Exhibit 6 to my declaration. The NPS denied this request.

33. In June, 2002, Remcon gave the Contracting Officer and his representative

comprehensive notice of the multiple problems on the Project and their impacts on Remcon's ability to continue with the Project. When no substantive response was forthcoming, Remcon notified the Contracting Officer that work would cease unless circumstances swiftly changed. On July 3, 2002, Remcon wrote the Contracting Officer requesting an emergency on-site meeting. A new Project Manager, Mike Giller of the NPS Denver Service Center, then arrived on site on July 10, 2002. As of this date, Mr. Russell, who had become abusive and non-responsive, had been removed from the Project and Mr. Giller did not have an opportunity to discuss with Mr. Russell what had occurred over the proceeding 14 months. Mr. Giller walked the site with myself and my lead Project personnel and, having the problems explained to him orally, directed Remcon to "field fit" the Upper Sherman Access Road to the existing natural features. This direction was confirmed in Remcon's letter to the NPS on July 11, 2002, more than eight months after those problems had been brought to the attention of the NPS. A true and correct copy of my July 11, 2002 letter is attached hereto as Exhibit 7 to my declaration.

34. Remcon then began what it hoped would be the final construction of the deep cut area. Remcon's grading superintendent/foreman, both Mark Penrose and Mike Kitchell, laid the roadway alignment out using the design staking information provided by the NPS as adjusted for field conditions. By July 25, 2002, Remcon encountered still further problems in fitting the design to field conditions. A new assistant inspector, Russell Belknap, arrived onsite to replace Bob Russell's subordinate, Loren Mangrum, who had assumed Bob Russell's role. Mr. Belknap walked the site with Mr. Kitchell to review the field conditions and determine what could be done in order that Remcon could proceed. Mr. Belknap personally directed Mr. Kitchell to make additional changes to the roadway alignment as this was recorded in Remcon's project records.

35. In early August 2002 the NPS requested that Remcon provide survey data for the access road as built. Remcon had its surveyor return to the Project and survey the

entire access road. The new survey data was sent to the NPS in Denver on August 14, 2002. The NPS then orally advised Remcon that it was going to issue still more new design changes (Design No. 5) to correct what it perceived were failures to properly build the road. It took that position despite Remcon following dozens of oral and written directives of NPS on-site representatives to field fit the road as needed . At no time during the extended discussions with NPS throughout July 2002 (when Remcon was struggling to make progress) did any NPS personnel insist that Remcon follow the original (and unbuildable) design. The NPS provided the new Design No. 5 requirements on September 6, 2002. Remcon had its surveyor again lay out the road. In most instances only minor extra work was required to meet the latest (the fifth design) requirements other than in the deep cut. Meanwhile, due to the originally deficient design and consequent re-designs, Remcon was forced to delay its paving operations. As weather became an impediment to completing paving operations (paving can only occur within certain temperature ranges), Remcon was forced to wait for the following 2003 construction season to complete paving operations.

36. Concurrently, throughout 2001 and 2002, the Sherman Tree Trail design was undergoing multiple revisions, and was not definitively revised and issued to Remcon to construct until November, 2002, after the 2002 construction season was over. This re-design delayed the completion of the Upper Sherman work, and thus the Project, two years. None of the design changes to the Trail were completed by Remcon.

37. The combination of the NPS caused delays, and its concurrent refusal to pay for all of the extra work its representatives had directed Remcon to perform placed Remcon in dire financial duress at the end of the 2002 construction season. The job was incomplete, Remcon was financially prevented from bidding and obtaining further work, and its financial condition had been severely jeopardized by NPS' refusal to timely and properly pay Remcon for extra work performed.

38. Before mobilizing for the 2003 construction season, I wrote a series of

letters to the Contracting Officer and/or his representatives outlining the cost and schedule impacts that resulted from deficiencies in the contract documents and the numerous redesigns and other changes directly attributable to NPS. These letters clearly placed the NPS on notice of the financial duress Remcon was under due to the lack of payments by the NPS, and detailed the delays to project completion caused by the NPS. I have attended all depositions taken in this matter and was personally present when Rodney Keiscome, the Contracting Officer, testified that he received my communications that I lacked the financial therewithal to continue due to the claimed government caused issues.

39. On October 20, 2002, I wrote a lengthy letter to the NPS outlining the impacts of the redesign of the Upper Sherman Tree Access Road and Parking Area. A true and correct copy of my October 20, 2002 letter is attached hereto as Exhibit 8 to my declaration.

40. On November 16, 2002, I wrote a letter to the NPS outlining a potential claim due to NPS caused delays. A true and correct copy of my November 16, 2002 letter is attached hereto as Exhibit 9 to my declaration.

41. On November 19, 2002, I wrote to the Contracting Officer concerning NPS' failure to issue prompt payment to Remcon for work performed. A true and correct copy of my November 19, 2002 letter is attached hereto as Exhibit 10 to my declaration. I wrote again on November 25, 2002. A true and correct copy of my November 25, 2002 letter is attached hereto as Exhibit 11 to my declaration.

42. On November 25, 2002, I sent a formal request for Alternative Dispute Resolution to the Contracting Officer A true and correct copy of my November 25, 2002 letter is attached hereto as Exhibit 12 to my declaration.

43. On December 3, 2002, I submitted a notice of claim against the NPS for nonpayment for work performed (aggregate base and asphalt concrete pavement). A true and correct copy of my December 3, 2002 letter is attached hereto as Exhibit 13 to my

declaration.

44. On December 4, 2002, I submitted a notice of claim for failure to pay concerning the dry-laid stonewall. A true and correct copy of my December 4, 2002 letter is attached hereto as Exhibit 14 to my declaration. On the same day, I wrote to the Contracting Officer concerning NPS' failure to make progress payments to Remcon. A true and correct copy of my November 25, 2002 letter is attached hereto as Exhibit 15 to my declaration.

45. On December 7, 2002, I wrote to the Contracting Officer concerning NPS' failure to pay in full for concrete drop inlets. A true and correct copy of my December 7, 2002 letter is attached hereto as Exhibit 16 to my declaration. The same day, I gave notice of a claim for NPS' failure to pay in full for boulder revetment work. A true and correct copy of my December 7, 2002 letter is attached hereto as Exhibit 17 to my declaration.

46. On February 13, 2003, I wrote to the Contracting Officer reiterating NPS' failure to process Remcon's progress payments. In that letter, I noted that the failure "has severely impacted Remcon." A true and correct copy of my February 13, 2003 letter is attached hereto as Exhibit 18 to my declaration.

47. On February 26, 2003, I wrote to Mr. DeOcampo requesting updated design drawings for the project. A true and correct copy of my February 26, 2003 letter is attached hereto as Exhibit 19 to my declaration.

48. On March 4, 2003, I wrote the Contracting Officer protesting the NPS reduction of its differing site condition claim from an agreed (per negotiations) $485,214 to $84,170. In his letter, I noted that Remcon's submitted costs for the differing site condition exceeded $700,000. A true and correct copy of my March 4, 2003 letter is attached hereto as Exhibit 20 to my declaration.

49. On March 10, 2003, I again wrote to the Contracting Officer concerning NPS' failure to pay in full for concrete base and concrete asphalt placement. A true and

correct copy of my March 10, 2003 letter is attached hereto as Exhibit 21 to my declaration.

50. On March 21, 2003, I gave notice of a claim for the NPS' failure to timely issue Modification Number 7. A true and correct copy of my March 21, 2003 letter is attached hereto as Exhibit 22 to my declaration.

51. On March 25, 2003, I gave notice of a claim for the NPS' failure to provide aggregate base. A true and correct copy of my March 25, 2003 letter is attached hereto as Exhibit 23 to my declaration.

52. On March 27, 2003, Luke Triplett from Remcon forwarded to Willie DeOcampo a list of unresolved RFIs. A true and correct copy of Mr. Triplett's March 27, 2003 letter is attached hereto as Exhibit 24 to my declaration.

53. On April 9, 2003, I wrote to the Contracting Officer concerning NPS' failure to make proper progress payments. A true and correct copy of my April 9, 2003 letter is attached hereto as Exhibit 25 to my declaration.

54. On April 15, 2003, I sent a letter to the Contracting Officer which fully detailed the NPS' failures and breaches of contract. A true and correct copy of my April 15, 2003 letter is attached hereto as Exhibit 26 to my declaration.

55. On June 8, 2003, I sent a letter to Willie DeOcampo which stated "...the revised completion date is now October 7, 2004." My letter detailed how NPS caused delays had pushed the anticipated completion date well past August, 2003. A true and correct copy of my June 8, 2003 letter is attached hereto as Exhibit 27 to my declaration.

56. After repeated attempts to resolve its disputes with the NPS, Remcon finally submitted a multi volume, comprehensive certified claim to the Contracting Officer on June 28, 2003. That claim outlined in substantial detail the cost and time impacts incurred by Remcon on the Project. This voluminous document details the facts which support Remcon's breach of contract claims, and had been received by the Contracting Officer mere weeks prior to the issuance of the cure notice. The total of that

claim was $3,091,799.60. Prior to issuing the cure notice, no response to the Remcon certified claim was made by the government. A true and correct copy of the narrative section of the June 28, 2003 certified claim is attached hereto as Exhibit 28 to my declaration.

57. On June 30, 2003, I sent to the Contracting Officer another detailed letter which again protested and communicated the impact on Remcon resulting from the NPS' lack of payment. A true and correct copy of my June 30, 2003 letter is attached hereto as Exhibit 29 to my declaration.

58. On July 17, 2003, I sent to the Contracting Officer a letter which stated that Remcon was prepared to proceed once the NPS met its contractual requirements. A true and correct copy of my July 17, 2003 letter is attached hereto as Exhibit 30 to my declaration.

59. Remcon sought ADR and the NPS refused to participate in the ADR process. Mr. Keiscome told me that "we don't need any third party assistance." When the Contracting Officer denied the request for ADR, coupled with his failure to issue any financial renumeration or time extensions, either bilaterally or unilaterally, in response to the June 28, 2003 certified claim, Remcon was disabled from mobilizing to the Project, as it could no longer pay employees if it did so mobilize. Remcon sought ADR due to its precarious financial condition caused by NPS's actions over the course of the 2001 and 2002 construction seasons. Remcon simply did not have the financial ability to mobilize for the 2003 season unless NPS issued payments for existing work performed and time extensions due, and Remcon was trying desperately to obtain payments from Defendant through the ADR process. This left only the litigation route and the certified claim dated June 28, 2003 was and is the condition precedent to litigation. When the Contracting Officer issued the cure notice, Remcon had already supplied him with reams of information concerning deficient plans and specifications, NPS-caused delays and impacts to Remcon.

60. Although the NPS failed to grant Remcon virtually any time extensions, the contract time should have been extended, as of the end of 2002, through the 2004 construction season.

61. Remcon's income and costs from all other Projects, during its performance of work on this Project (from June, 2001, when the NTP was issued, through July, 2003) shows a net increase in cash to Plaintiff of $1,413,523. It is my belief that our company, but for this Project, was very successful, and our financial inability to continue was exclusively caused by this Project.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed at Sacramento, California on July 21, 2005.

STEPHEN B. CHRISTENSEN