# EXHIBIT 3

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

RECEIVED COPY

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

OCT 2[redacted]

1. CONTRACT ID CODE: J

Page 1 of 3

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| 0005 | | DSC Contracting Services | SEKI-200Q |

6. ISSUED BY CODE 2081

DSC - CS - Contracting Services Group
National Park Service, P.O. Box 25287,12795 W. Alameda Parkway, Attn: Terry Lang
Denver, CO 80225

7. ADMINISTERED BY *(If other than Item 6)* CODE

OBLIGATED IN IDEAS/PA (existing contract - no FFS LINK) 11/20/02

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and Zip Code)*

M 8, LINE 003

Remcon Inc.

751 Wakefield Court

Oakdale, CA 95361

CODE FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

(X) 10A. MODIFICATION OF CONTRACT/ORDER NO. C8000010903

(X) 10B. DATED *(SEE ITEM 13)* 05/09/2001

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

See Line Item Detail

13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| ☐ | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| ☐ | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| ☑ | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: Changes, FAR Clause 52.243 |
| ☐ | D. OTHER *(Specify type of modification and authority)* |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 3 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

Sequoia and Kings Canyon National Parks, California
Giant Forest, Sherman Tree Parking
SEKI-200Q

SEE ATTACHED CHANGES

DEPOSITION EXHIBIT 213
PENGAD-Bayonne, N. J.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
|---|---|---|---|
| STEPHEN B. CHRISTENSEN, PRESIDENT | | Rodney K. Keiscome | |
| 15B. CONTRACTOR/OFFEROR [signature] *(Signature of person authorized to sign)* | 15C. DATE SIGNED 10/18/02 | 16B. United States of America BY [signature] *(Signature of Contracting Officer)* | 16C. DATE SIGNED 11/20/02 |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243

515331

| Line Item Summary | Document Number | Title | Page |
|---|---|---|---|
| | C800[redacted]0[redacted]05 | SEKI-200Q [redacted] | 2 of 3 |

Total Funding: $7,917,604.28

FYs Fund Budget Org Sub Object Class Sub Program Cost Org Sub Proj/Job No. Sub Reporting Category

See Line Item(s)

Division Closed FYs Cancelled Fund

| Line Item Number | Description | Delivery Date (Start date to End date) | Quantity | Unit of Issue | Unit Price | Total Cost |
|---|---|---|---|---|---|---|
| 0001 | Sequoia and Kings Canyon National Parks, California, Sherman Tree Parking Area, SEKI-200Q<br>Change in Funding, Unit Price | | 0.00 | ls | $26,880.00 | $26,880.00 |

Funding Information:
2002 - - - 8550 - - 252z - - 477 - - - 0197 - - - - - -
26,880.00

| | |
|---|---|
| Previous Total: | $7,890,724.28 |
| Modification Total: | $26,880.00 |
| Grand Total: (Includes Discounts) | $7,917,604.28 |

| Address Detail | Title | Document Number | Page |
|---|---|---|---|
| | SEK[redacted]Q[redacted] | C800001[redacted] | 3 of 3 |

## Shipping Addresses

| Code | Detail |
|---|---|
| 0001 | Org: DSC-PM<br>Addr: NPS DSC-PM<br>12795 W. ALAMEDA PKWY<br><br>LAKEWOOD CO 80228<br>Attn: Michael Giller, Project Manager<br>Phone: (303) 969-2007 ext.<br>Fax: (303) 969-2238 ext. |

## Invoice Addresses

| Code | Detail |
|---|---|
| 0001 | Org: DSC - CS - Contracting Services Group<br>Addr: National Park Service, P.O. Box 25287<br>12795 W. Alameda Parkway<br><br>Denver CO 80225<br>Attn: Martie Savarie, Procurement Tech<br>Phone: (303) 969-2166 ext.<br>Fax: (303) 969-2040 ext. |

**No. 48: Riprap**
Delete 4 SY of Riprap at Sherman Tree Trail. Deletion price is equivalent to 3.38± SY at contract unit price of $109/SY.

**DEDUCT:** **($368.00)**

**No. 80: Stone Trench**
Delete 96 LF of stone trench at Sherman Tree Trail. Deletion price is equivalent to 18.47± LF at contract unit price of $467/LF.

**DEDUCT:** **($8,624.00)**

**No. 140: Adjust General Sherman Tree Trail**
Compensate the contractor for the following adjustments to the Sherman Tree Trail. Details include: install 2 quantity 24" CMP, install boulder revetment, relocate boulder, add dispersal riprap, add modified headwalls, adjust riprap.

**ADD:** **$35,872.00**

Except as modified above, all work shall be performed in accordance with the provisions of the contract where applicable as determined by the Contracting Officer or as otherwise directed by the Contracting Officer.

You will be compensated for the changed work by modifying the Contract Bid Schedule as follows:

| Item No. | Original Est. Quantity | Revised Estimated Quantity | Item Description | Unit Price | Original Amount | Amount of (Decrease) or Increase | Revised Amount |
|---|---|---|---|---|---|---|---|
| 48 | 28 | 24.62 | Riprap | $109/SY | $3,052.00 | ($368.00) | $2,684.00 |
| 80 | 96 | 77.533 | Stone Trench | $467/LF | $44,832.00 | ($8,624.00) | $36,208.00 |
| *140 | 0 | LS | Adjust General Sherman Tree Trail | LS | $0.00 | $35,872.00 | $35,872.00 |

* Indicates New Bid Item

This Modification Number 5 results in an increased amount of $ 26,880.00 in the contract amount. The revised amount is accordingly established as follows:

| | |
|---|---|
| Original Contract Amount | $ 7,121,636.00 |
| Modification No. 1, Increase | $ 317,850.00 |
| Modification No. 2, Increase | $ 10,908.00 |
| Modification No. 3, Increase | $ 345,209.92 |
| Modification No. 4, Increase | $ 95,120.36 |
| Modification No. 5, Increase | $ 26,880.00 |
| Revised Contract Amount | $ 7,917,604.28 |

In addition, a four (4) day contract extension shall be granted for this work due to the impact on asphalt placement. The contract completion date is accordingly changed from August 24, 2003 to August 28, 2003.

## CONTRACTOR'S STATEMENT OF RELEASE

The contractor agrees that, in consideration of receiving the benefits of Modification 5, all claims or obligations which now exist or which may hereafter arise, whether known or unknown, or which have or could have been asserted against the National Park Service or the Government as well as its officers and employees, in any form or forum, whether in law or equity, arising out of or resulting from this modification are hereby released, waived, and forever discharged.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | | |
|---|---|---|---|
| 1. CONTRACT ID CODE J | | | Page 1 of 3 |
| 2. AMENDMENT/MODIFICATION NO. 0005 | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* SEKI-200Q |
| 6. ISSUED BY CODE 2081<br>DSC - CS - Contracting Services Group<br>National Park Service, P.O. Box 25287,12795 W. Alameda Parkway, Attn: Terry Lang<br>Denver, CO 80225 | | 7. ADMINISTERED BY *(If other than Item 6)* CODE<br>Dan 9/19/02 | |

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and Zip Code)*

Remcon Inc.

751 Wakefield Court

Oakdale, CA 95361

CODE FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

(X) 10A. MODIFICATION OF CONTRACT/ORDER NO. C8000010903

(X) 10B. DATED *(SEE ITEM 13)* 05/09/2001

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

See Line Item Detail

## 13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| ☐ | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| ☐ | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| ☑ | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: Changes, FAR Clause 52.243 |
| ☐ | D. OTHER *(Specify type of modification and authority)* |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 3 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

Sequoia and Kings Canyon National Parks, California
Giant Forest, Sherman Tree Parking
SEKI-200Q

SEE ATTACHED CHANGES

SENT 09.19.02
REMCON WOULD NOT SIGN.
RE-SENT 10.16.02 WITH
FURTHER CLARIFICATIONS
T. Lang
10.29.02

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| | | | |
|---|---|---|---|
| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* Rodney K. Keiscome | |
| 15B. CONTRACTOR/OFFEROR<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. United States of America<br>BY ________<br>*(Signature of Contracting Officer)* | 16C. DATE SIGNED |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243

515335

| Line Item Summary | Document Number | Title | Page |
|---|---|---|---|
| | C800[redacted]0005 | SEKI-200Q [redacted] | 2 of 3 |

Total Funding: $7,917,604.28

FYs Fund Budget Org Sub Object Class Sub Program Cost Org Sub Proj/Job No. Sub Reporting Category

See Line Item(s)

Division Closed FYs Cancelled Fund

| Line Item Number | Description | Delivery Date (Start date to End date) | Quantity | Unit of Issue | Unit Price | Total Cost |
|---|---|---|---|---|---|---|
| 0001 | Sequoia and Kings Canyon National Parks, California, Sherman Tree Parking Area, SEKI-200Q<br>Change in Funding, Unit Price | | 0.00 | ls | $26,880.00 | $26,880.00 |

Funding information:
2002 - - - 8550 - - 252z - - 477 - - - 0197 - - - - - - -
26,880.00

| | |
|---|---|
| Previous Total: | $7,890,724.28 |
| Modification Total: | $26,880.00 |
| Grand Total: (Includes Discounts) | $7,917,604.28 |

No. 140: Adjust General Sherman Tree Trail
Compensate the contractor for the following adjustments to the Sherman Tree Trail. Details include: install 2 quantity 24" CMP, install boulder revetment, relocate boulder, add dispersal riprap, add modified headwalls, adjust riprap, and delete stone trench and riprap.

**ADD: $26,880.00**

Except as modified above, all work shall be performed in accordance with the provisions of the contract where applicable as determined by the Contracting Officer or as otherwise directed by the Contracting Officer.

You will be compensated for the changed work by modifying the Contract Bid Schedule as follows:

| Item No. | Original Est. Quantity | Revised Estimated Quantity | Item Description | Unit Price | Original Amount | Amount of (Decrease) or Increase | Revised Amount |
|---|---|---|---|---|---|---|---|
| *140 | 0 | LS | Adjust General Sherman Tree Trail | LS | $0.00 | $26,880.00 | $26,880.00 |
| | | | | | | | |
| | | | | | | | |

* Indicates New Bid Item

This Modification Number 5 results in an increased amount of $ 26,880.00 in the contract amount. The revised amount is accordingly established as follows:

| | |
|---|---|
| Original Contract Amount | $ 7,121,636.00 |
| Modification No. 1, Increase | $ 317,850.00 |
| Modification No. 2, Increase | $ 10,908.00 |
| Modification No. 3, Increase | $ 345,209.92 |
| Modification No. 4, Increase | $ 95,120.36 |
| Modification No. 5, Increase | $ 26,880.00 |
| Revised Contract Amount | $ 7,917,604.28 |

An allowance of four (4) additional calendar days shall be granted for this work due to the impact on asphalt placement. The contract completion date is accordingly changed from August 24, 2003 to August 28, 2003.

## CONTRACTOR'S STATEMENT OF RELEASE

The contractor agrees that, in consideration of receiving the benefits of Modification 5, all claims or obligations which now exist or which may hereafter arise, whether known or unknown, or which have or could have been asserted against the National Park Service or the Government as well as its officers and employees, in any form or forum, whether in law or equity, arising out of or resulting from this modification are hereby released, waived, and forever discharged.




## LEGEND

- WORK LIMIT LINE
- EXISTING GRADE
- PROPOSED GRADE
- SILT PROTECTION
- PLACE SOIL RETENTION BLANKET
- PLACE LITTER AND DUFF
- PLACE CHANNEL BLANKET

(QUANTITIES FOR SHERMAN TREE TRAIL GRADING AND RESTORATION SHOWN ON SHEET T7)

### TRAIL POINT TABLE

| TRAIL PT. | NORTHING | EASTING |
|---|---|---|
| ST9 | OMIT | |
| ST10 | OMIT | |
| C3 | 102094.2 | 101423.2 |
| C4 | 102105.6 | 101421.5 |

*C–CULVERT POINTS

REFER TO SHEETS T3A–T8A, LAYOUT PLANS FOR ALL OTHER TRAIL COORDINATE POINT INFORMATION.

NOTE 1: ALL SETS OF TRAIL STAIRS ARE FOUR STEPS TYPICAL. THE FIFTH LINE SHOWN ON PLANS IS THE BACK OF TOP TREAD.

NOTE 2: SHEETS T3A – T10A WERE PREVIOUSLY SUBMITTED AS A CLARIFICATION FOR TRAIL STEP GRADING IN AUGUST 2001 AND REPLACE SHEETS T3 – T10. THE REVISIONS SHOWN ON THIS SHEET ARE REVISIONS TO SHEET T8A.

REVISION 1 – 5/20/02
ADD 17 LF OF 24" CMP.
ADD 28 SY OF DISPERSAL RIPRAP.
ADD 4 SY OF RIPRAP.
ADD 2 MODIFIED HEADWALLS.
DELETE ONE STONE TRENCH.

20 0 20 40
SCALE OF FEET

| DESIGNED: DHM | SUB SHEET NO. | TITLE OF SHEET | DRAWING NO. |
|---|---|---|---|
| DRAWN: ZHKE | T8A | GRADING AND RESTORATION PLAN | 102 41,163 |
| TECH REVIEW: GREGOR | | | PKG. NO. 200 Q |
| DATE: 8/01 | | SEQUOIA AND KINGS CANYON NATIONAL PARKS | SHEET 1084 of 178 |

515338




NOTE: SEE E/L4 FOR FULL DETAILS.

A/T7A MODIFIED HEADWALL FOR TRAIL

SCALE OF INCHES

TRAIL POINT TABLE

| TRAIL PT. | NORTHING | EASTING |
|---|---|---|
| ST1 | OMIT | |
| ST2 | OMIT | |
| C1 | 102429.4 | 101567.1 |
| C2 | 102441.6 | 101566.2 |

*C–CULVERT POINTS

REFER TO SHEETS T3A–T6A. LAYOUT PLANS FOR ALL OTHER TRAIL COORDINATE POINT INFORMATION.

NOTE 1: ALL SETS OF TRAIL STAIRS ARE FOUR STEPS TYPICAL. THE FIFTH LINE SHOWN ON PLANS IS THE BACK OF TOP TREAD.

NOTE 2: SHEETS T3A – T10A WERE PREVIOUSLY SUBMITTED AS A CLARIFICATION FOR TRAIL STEP GRADING IN AUGUST 2001 AND REPLACE SHEETS T3 – T10. THE REVISIONS SHOWN ON THIS SHEET ARE REVISIONS TO SHEET T7A.




REVISION 1 – 5/20/02
ADD 130 LF OF BOULDER REVETMENT AS SHOWN.
ADD 18 LF OF 24" CMP.
ADD 14 SY OF DISPERSAL RIPRAP.
ADD 4 SY OF DISPERSAL RIPRAP.
ADD 2 MODIFIED HEADWALLS.
RELOCATE TRAIL AND MOVE BOULDER.
DELETE ONE STONE TRENCH.

DESIGNED: DHM
ZINKE
TECH. REVIEW: GREGOR
DATE: 6/01

SUB SHEET NO. T7A

TITLE OF SHEET: GRADING AND RESTORATION PLAN

SEQUOIA AND KINGS CANYON NATIONAL PARKS

DRAWING NO. 102 41,163
PKG. NO. 200 Q
SHEET 107A OF 178

# EXHIBIT 4

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

COPY

REM CON

Oakdale Office
P.O. Box 758
751 Wakefield Ct.
Oakdale, CA 95361
Phone: 209/847-9186
Fax: 209/847-9189

Sequioa Office
P.O. Box
Wolverton Rec. Area
Lodgepole, CA
Phone: 559/565-3086
Fax: 559/565-3203

---

October 20, 2002

Mr. Michael Giller
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Reservation of Contractor's Rights

Dear Mike:

This letter is being provided to the National Park Service (NPS) to serve as a reservation of REMCON's rights, and as stipulated within the contract documents providing formal notification to the NPS.

Pursuant to Section 52.236-02 Differing Site Conditions and Section 52.243-04 Changes, REMCON is formally notifying the National Park Service and reserving its rights to seek additional monetary compensation and/or contract extension time related to the following issues, which have occurred since August 22, 2002.

- Cost and delay impacts as they relate to defective plans and specifications;
- Rejection of contractor work without following proper testing protocol;
- Untimely response to contractor's request for information;
- Owner caused delays, which have impacted Contractor's schedule.

If you wish to further discuss this matter you can contact me at (209) 847-9186.

Sincerely,

Stephen B. Christensen
President

cc: Rod Keiscome, NPS Contracting Officer
Richard A. Lewis, REMCON Board Member
Luke Triplett, REMCON Project Manager

REM000014491

# EXHIBIT 5

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

RECEIVED
AUG 21 2001

ompany Name: REMCON, Project Number 01-12

ontract Description: Sherman Tree Parking Project SEKI-200Q

ontract No.: 1443N8000010903

# CHANGE ORDER REQUEST

ate: 08/20/01

COR NO.: 4

scription of Change: Rock Excavation, Drilling and Shooting

wing Reference:

ecification Reference: I.62 Differing Site Condition

thorization and/or RFI Reference: None

| | *Potential Impact* |
|---|---|
| *Labor* | (X) |
| *Material* | ( ) |
| *Equip* | (X) |
| *Schedule* | (X) |
| *Other* | (X) |

tailed Description of Change:

rsuant to Section I.62 of the Contract Specifications, REMCON is formally notifying the National Park Service (NPS) that a Differing Site ondition exists on the Sherman Tree Parking Project. The Geotechnical Investigation Report prepared by Kleinfelder on September 11, 2000, clearly ates that all granitic rock encountered on the Sherman Tree Parking Project, excluding the septic leachfield, is ripable with a Catapillar D8 Dozer.

uring excavation operations it became apparent this information was not correct and blasting was required to remove this granitic rock. Pursuant the Contract Specifications, the Contracting Officer's On-site Representative was notifyied and blasting proceeded.

EMCON is due full compensation for the cost of performing drilling and shooting operations on this project. See attached detailed write up.

EMCON will maintain detailed daily cost reports per the terms and conditions of the Contract Specifications.

| | | | |
|---|---|---|---|
| vner: | | Cost Estimate: | Est. $100,000.00 |
| thorized Rep: | | Time Extension: | 21 Days |
| gned By: | | Organization: | REMCON, Inc. |
| tle: | | Signed By: | [signature] |
| | | Title: | Project Superintendent |

PENGAD-Bayonne, N. J.
DEPOSITION EXHIBIT
76

500120

RECEIVED
AUG 21 2001

**REMCON, Inc.**

P.O. Box 788
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

August 20, 2001

Mr. Wm. H. DeOcampo
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Rock Excavation, Differing Site Condition

Dear Willie:

During the excavation of the Upper Sherman Parking Area, REMCON has encountered granitic rock, which can not be ripped with a D8 Dozer/Ripper as indicated in the Contract Documents geotechnical report. I have taken the time to prepare a brief write up detailing why I believe REMCON is due additional compensation as it relates to the need for drilling, blasting and rock handling.

Please review the information provided and contact me if you require any additional information. Additionally, I want to make sure that no one finds this letter or its contents inflammatory, for it still remains REMCON's goal to maintain our great working relationship.

Sincerely,

Stephen B. Christensen
President

Enclosure

cc: Bob Russell, Jacobs Engineering

RECEIVED
AUG 2 1 2001

SEQUOIA AND KINGS CANYON NATIONAL PARKS
SHERMAN TREE PARKING PROJECT
SEKI-200Q

## Facts of the Case

The Contract Documents clearly state that the Contractor will be able to rip all the granitic rock on the Sherman Tree Parking Project with a Caterpillar D8 Dozer. REMCON based its cost estimate on the information provided by the National Park Service being correct and truthful. REMCON provided a Caterpillar D8 Dozer/Ripper (built in 1999) for all rock excavation on the Sherman Tree Parking Project. During excavation for the Upper Sherman Parking Area, REMCON encountered granitic rock which clearly exceeds the seismic velocities reported in the Geotechnical Report. REMCON spent numerous hours attempting to rip this material with little to no results. As a result REMCON has been forced to utilize drilling and shooting for the handling of the granitic rock.

Pursuant to Section I.62 of the Contract Specifications, REMCON is formally notifying the National Park Service (NPS) that a Differing Site Condition exists on the Sherman Tree Parking Project. The Contract Specifications provided a Geotechnical Investigation Report prepared by Kleinfelder, Inc., dated September 11, 2000. Section 5.2-Rippability of the Geotechnical Report clearly indicates that the granitic rock material will be rippable with a Caterpillar D8 Dozer.

Section 5.2.2 Conclusions of the Geotechnical Report state; "The upper silty sand and weathered granitic rock material at the site appear to be conducive to ripping". The report references charts developed by the Caterpillar Tractor Company (August 1996) which define the size of equipment needed to rip rock at specific velocities (see attached Geotechnical Report sections). Table 5.2-1 provides the contractor with three seismic lines showing velocities ranging from 4947 to 5747. Table 5.2-2 Caterpillar Ripper Performance, shows the nominal threshold for ripping and the marginal threshold for ripping based on seismic velocity. The nominal threshold for a Cat D8 Dozer is 6400 and the marginal is 7,500, 653 velocities above the highest rating shown in Table 5.2-1 for nominal ripping and 1,753 above the marginal threshold.

## Legal Discussion

There are several independent legal theories, which all result in the same payment of damages to REMCON.

### A. The NPS's geotechnical report creates a differing site condition.

Section I.62 of the Contract Specifications entitled Differing Site Condition provides that the contractor will be issued a change order compensating him if he encounters subsurface or latent physical conditions at the site differing from those indicated in the Contract Documents.

RECEIVED
AUG 2 1 2001

1. **Purpose of differing site condition clause.**

The purpose of the differing site condition clause is to alleviate from the contractor's bid any contingencies for unforeseen adverse conditions. *J.F. Shea Co. v. United States,(1983), (Fed. Cir. 1985).* In *Foster Construction C.A. v. United States, (1970)* the court explained:

> [T]he presence of the changed condition clause works to reassure bidders that they may confidentially rely on the logs and need not include a contingency element in their bids. Reliance is affirmatively desired by the Government, for if the bidders feel they cannot rely, they will revert to the practice of increasing their bids. *Foster Construction.*

The purpose of the differing site condition clause is to induce contractors to submit bids based on conditions reasonably to be anticipated from the available data without contingencies to cover the unexpected or unusual. *Kaiser Industries Corp. v. United States (1965); Foster Construction C.A. v. United State.* In return, bidders are provided assurance that if conditions prove more onerous or difficult than anticipated or indicated, an adjustment will be made in the contract price or time.

2. **Contract "indications" under the differing site condition clause.**

The "indications" in the contract need not be explicit, but rather, they may be inferences and implications. *J.F. Shea Co. v. United States, (citing Foster Construction C.A. v. United States).* Contract indications "need not be explicit or specific, but only enough to impress or lull a reasonable bidder." *Stock & Grove, Inc. v. United States, (1974).*

Bidding schedule estimates in a contract are considered indications. *J.F. Shea Co. v. United States.* Estimates as to quantity are also indications. *Continental Drilling Co.*

In *Foster Construction C.A. v. United States, supra,* the Court disregarded explicit indications, relying wholly on the indications drawn from inferences from the contract. The court stated:

> . . . it is not necessary that the "indications" in the contract be explicit or specific; all that is required is that there be enough of an indication on the face of the contract document for a bidder reasonably not to expect "subsurface or latent physical conditions at the site differing materially from those indicated in this contract." *Foster.*

RECEIVED
AUG 2 1 2001

3. Attempted exculpatory clauses are unavailing.

Broad warning and exculpatory clauses will not shift liability under the differing site condition clause. *United Contractors v. United States (1960); Fehlaber Corp. v. United States (1957); Foster Construction C.A. v. United States.*

In *United Contractors v. United States* the court, in rejecting the government's attempted shift of responsibility, held:

> . . . broad exculpatory clauses . . . cannot be given their full literal reach, and do not relieve the defendant of liability for changed conditions as the broad language thereof would indicate. *United Contractors.*

The bidders reliance on the contract documents alleviates the necessity for extensive site investigations to verify the accuracy of the contract information. The court in *Foster Construction C.A. v. United States,* stated:

> Faithful execution of the policy requires that the promise in the changed conditions clause not be frustrated by an expansive concept of the duty of bidders to investigate the site. That duty, if not carefully limited, could force bidders to rely on their own investigations, lessen their reliance on logs in the contract and reintroduce the practice sought to be eradicated-the computation of bids on the basis of the bidders' own investigations, with contingency elements often substituting for investigation. The changed conditions clause "makes it clear that bidders are to compute their bids, not upon the basis of their own preaward surveys or investigations, but upon the basis of what is indicated and shown in the specifications and on the drawings." *Foster*

4. **What the contract indicated.**

Here the contract indicated that the granitic rock which was to be encountered in the excavation of the Upper Sherman Tree Parking area was rippable with a Caterpillar D8 Dozer/Ripper. The NPS provided the geotechnical report, and bidders were to rely on and bid on the representation that these reports accurately depicted the work required. REMCON based its bid on the plans and specifications provided by the NPS and those plans and specifications provide detailed description of the work required.

B. **The NPS is liable for breach of the implied warranty of plans and specifications.**

An owner of a construction project which furnishes a set of detailed plans and specifications to be bid on by the contractor is deemed by law to impliedly warrant that those plans and specifications are accurate and suitable for their intended use. *United Sates v. Spearin (1918).*

Aug 21 01 07:34a R con

RECEIVED
AUG 2 1 2001

The California Supreme Court articulated the same rule for contractor recovery for the public owner's breach of this implied warranty in *Souza & McCue Constr. Co. v Superior Court (1962)*:

> A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented.

In this case, REMCON is led to believe by the NPS's incorrect plans and specifications and submitted a bid far lower than it would have, if it had known that the geotechnical report incorrectly misrepresented the rippability of the granitic rock. REMCON acted reasonably throughout the bid process. REMCON is entitled to recover for all the extra work and expenses it has incurred in having drill, shoot and handle the granitic rock.

## Damages

At this time REMCON has not been able to accurately access the total cost and time impacts related to this matter. REMCON is tracking all the costs and will submit these costs to the owner pursuant to the terms and conditions of the contract.

KLEINFELDER

RECEIVED
AUG 21 2001

# 5 EARTHWORK

## 5.1 GENERAL

Based on available laboratory data and the field investigation, and geotechnical analyses conducted by Kleinfelder for this study, we believe it is geotechnically feasible to construct the Sequoia 200Q project as planned, provided the recommendations presented in this report are incorporated into the project design and construction.

General comments and specific recommendations regarding the geotechnical aspects of project design and construction, are presented in subsequent sections. All reference to compaction, maximum density and optimum moisture are based on American Society of Testing and Materials (ASTM) Test Method D-1557, unless otherwise noted.

## 5.2 RIPPABILITY

### 5.2.1 General Data

The apparent depth and rippability of the underlying soils along the access road can be evaluated from seismic refraction surveys. The data obtained during our investigation were plotted on time verses distance graphs with velocity lines drawn on a "best fit" basis. Velocity, critical distance, and intercept time, were used to calculate the depth to each major velocity interval. A summary of the data is presented in Table 5.2-1.


Copyright 2000, Kleinfelder, Inc.

KLEINFELDER

RECEIVED
AUG 2 1 2001

TABLE 5.2-1
SUMMARY SEISMIC LINE DATA

| Seismic Traverse Lines | Apparent Velocities (ft/sec) | | Approximate Depth (ft) | |
|---|---|---|---|---|
| | Layer No. 1 | Layer No. 2 | Layer No. 1 | Layer No. 2 (see note) |
| A-A' | 1115 | 5747 | 0-13 | >13 |
| B-B' | 1122 | 4947 | 0-11 | >11 |
| C-C' | 1160 | 5422 | 0-9 | >9 |

NOTE: The seismic refraction equipment typically measures to a depth 1/4 to 1/3 of the horizontal length of the traverse. The horizontal traverse distance was 100 feet, therefore, the second layer likely extends to a minimum depth of approximately 25 feet.

A subsurface weathered granitic rock will produce a unique travel-time graph. However, different soil structures can produce travel-time graphs with a similar appearance. Information from the travel-time graphs and test borings along with observations made in the field were used to derive the subsurface interpretations in the conclusions of this report. Breaks in the travel-time graphs were encountered in several profiles. These probably represent subsurface steps in the geology or other discontinuities.

### 5.2.2 Conclusions

The upper silty sand and weathered granitic rock material at the site appear to be conducive to ripping. We anticipate that some areas of weathered granite may be ripped with larger equipment. Some oversized materials may be generated during ripping/excavation. If this oversized material is unable to be broken down, it must be removed from the project site.

Charts developed by the Caterpillar Tractor Company (August 1996) were used in evaluating potential rippability at the site. These charts correlate rippability with the seismic velocity for various geologic materials. The reported nominal and marginal seismic velocity thresholds for rippability in granite are shown in Table 5.2-2.


Copyright 2000, Kleinfelder, Inc.

KLEINFELDER

RECEIVED
AUG 2 1 2001

TABLE 5.2-2
CATERPILLAR RIPPER PERFORMANCE

| Tractor Model Single Shank Ripper | Nominal[1] Seismic Velocity Threshold (ft/sec) | Marginal [2] Seismic Velocity Threshold (ft/sec) |
|---|---|---|
| D7G | 4,200 | 4,850 |
| D8L | 6,400 | 7,500 |
| D9R | 6,800 | 8,000 |
| D10R | 7,300 | 8,400 |

(1) The nominal seismic velocity threshold is the upper limit at which ripping becomes difficult and possibly more costly. Well maintained equipment should be productive up to this limit.

(2) The seismic velocity range for granite between the nominal seismic velocity threshold and the marginal seismic velocity threshold will likely be difficult to rip.

The apparent seismic compressional velocities within the upper soil horizon are 1115 to 1160 fps. The velocity of the weathered granitic rock ranged from approximately 4947 to 5,747 fps. These apparent velocities indicate the weathered granitic rock should be rippable in large excavations with the appropriate equipment in good working condition.

Our field exploration utilized a backhoe with a 24-inch bucket. We met refusal at various depths atop weathered granitic rock. The contractor should consider the seismic velocity range listed in Table 5.2-1 and test pit refusal depths in developing the approach to confined excavations (e.g. utility trenches).

## 5.3 REMOVALS

### 5.3.1 General Highway Retaining Wall

The fill soils that make up the slope downhill of General Highway have a low relative density. These fill soils are underlain by slope wash. The General Highway retaining wall should bear upon weathered granitic rock. As such, the fill soils and slope wash should be removed in areas of future foundation support. Due to the consistency of the fill soils, attention should be given to a setback and/or shoring to support the upslope during excavation and footing construction.


Copyright 2000, Kleinfelder, Inc.

# EXHIBIT 6

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**Steve Christensen**

**From:** "Steve Christensen" <remconsc@fire2wire.com>
**To:** "Willie DeOcampo" <Willie_DeOcampo@NPS.gov>
**Cc:** "Terry Lang" <Terry_Lang@NPS.gov>
**Sent:** Monday, June 03, 2002 2:51 PM
**Subject:** Generals Highway Work

Willie,

Discussions have taken place between all parties regarding the starting of work at the Generals Highway. REMCON has proposed doing this work out of sequence in an effort to mitigate the costs to the NPS as a result of quantity overruns, changes in the project plans, differing site conditions which will ultimately result in increased costs and time to the project. As your aware, the contract specifications prevent work on the Generals Highway until the Upper Sherman Access Road, Upper Sherman Parking Area and Sherman Tree Trail had been completed.

I believe it would be in the best interest of all parties if a modification to the contract documents could be issued to allow work to begin along the highway. This will help in shortening the additional time required to complete the project as a result of the above impacts. I know that Luke and Mark are preparing a cost estimate for constructing the detour which would allow two way traffic along the highway while under construction. I believe this will be submitted to you on Tuesday, June 4, 2002. I will assume that we can come to a mutual agreement on the additional work to be performed.

From our partnering meeting it was clear that the proper paperwork was required before we proceed with work. As this request is a change in the specifications I think we should get the proper authorization for this change. Please advise.

Steve

REM000014642

# EXHIBIT 7

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**COPY**

July 11, 2002

**SENT VIA FAX AND U.S. MAIL**

Mr. Willie DeOcampo
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Confirmation of Direction by NPS for Roadway Alignment.

Dear Willie:

Reference is made to our job walk of July 10, 2002, with the NPS's new Project Manager – Mike Giller.

This letter confirms the direction given by Mike Giller, concerning the alignment of the access road and parking areas. In attempt to provide REMCON with answers to our numerous unanswered RFI's, Mr. Giller verbally directed REMCON to field fit the alignment of the access road and parking areas around existing natural features. This field direction was provided to REMCON, so that work could resume along the roadway and parking areas.

We look forward to this continued improved working relationship.

Sincerely,

Stephen B. Christensen
President

REM000014574

# EXHIBIT 8

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

COPY

01-12

REM CON

Oakdale Office
P.O. Box 758
751 Wakefield Ct.
Oakdale, CA 95361
Phone: 209/847-9186
Fax: 209/847-9189

Sequioa Office
P.O. Box
Wolverton Rec. Area
Lodgepole, CA
Phone: 559/565-3086
Fax: 559/565-3203

October 20, 2002

Mr. Michael Giller
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Impacts of Redesign of Access Road, Station 23+00 to Station 30+00

Dear Mike:

Reference is made to the numerous NPS design changes and discussion which have taken place concerning the Access Road between Station 23+00 and 30+00.

It is now October 2002, and REMCON's work on the Sherman Tree Parking Project is being severely impacted by yet another redesign of the Sherman Tree Access Road. The referenced subject, that portion of the Access Road between Station 23+00 and 30+00, known as the **deep cut**, continues to impact the project.

Before I proceed with my concerns over the new design I feel it is important to address the issues that have created this problem. I have repeatedly heard NPS personnel state they are only trying to correct what REMCON built incorrectly, this a false statement and NPS personnel are fully aware that this is not true. The following are the events, which transpired to bring us to this precipitous which we now find ourselves.

Prior to the start of any work on this project, including surveying, the NPS marked each and every tree, which was to be removed during the clearing phase of the contract. In the pre-construction conference it was made very clear that under no circumstance was REMCON to remove any trees that were not flagged for removal even if those trees impacted the design. If natural feature impacts were found, REMCON was to bring those design deficiencies to the attention of the NPS's onsite representative (Jacobs Engineering).

Once clearing and tree removal operations had been completed, REMCON's surveyor, Giuliani and Kull, surveyed the centerline of the project and provided off sets for REMCON's grading operation (early to mid July 2001). REMCON's grading operations began at the intersection of Wolverton Road and proceed up station towards the parking area. Once we reached the area of the deep cut and began initial pioneering of the area it became apparent that a defective design existed, as the trees removed under the clearing operation did not correspond to the limits required for road construction. REMCON immediately brought this to the attention of NPS onsite personnel. REMCON was directed by NPS personnel to provide survey alignment data to the NPS, which took into account the NPS's desire to not remove any additional trees. Giuliani and Kull's survey crew chief, Jess Stanley, taking direction from Bob Russell, provided new alignment data, which was forwarded to the NPS's designers. A contract change order was issued to REMCON for this work. REMCON ceased grading operations in this area pending new design data from the NPS, and began work in the Upper Sherman Parking Area.

Once new design data (Design 2) was provided to Giuliani and Kull, Jess Stanley came back to the project and re-surveyed the new design information, which was to correct the previously defective design, this included both vertical and horizontal grade changes (mid to late July 2001). Once new survey data was provided REMCON again began grading operations within the deep cut area. Within days REMCON encountered rock velocities, which exceeded those limits provided within the NPS's geotechnical report. REMCON was forced to change their method of excavation from dozing and ripping, to a much more expensive method of drilling and blasting and rock handling, for which REMCON filed a claim and a settlement for this expense is pending between the NPS and REMCON.

As REMCON's excavation proceeded within the deep cut area (August/September 2001) further design deficiencies began to develop. The deficiencies were brought to the attention of the NPS's on-site representative. Once REMCON's excavation neared the required depth it became apparent that the side slopes of the excavation for Design 2 also encroached upon the trees and natural rock features, which per NPS direction, could not be removed.

REMCON continued excavating the deep cut area to the new design elevations, which were provided in Design 2. **Once subgrade elevation was reached**, REMCON began the installation of the electrical conduit and the domestic waterline through the deep cut area. Both of these utilities were installed to provide the minimum cover requirements. The trench excavation for these utilities was largely rock excavation and the NPS monitored the trench depth to insure additional rock excavation was not being performed at the expense of the NPS.

It was now October 2001 and winter was approaching, grading operations were halted and the site winterized. REMCON's grading operation had been severely impacted, throughout the 2001 work season, by the development of a differing site condition – rock excavation, differing site condition – excavation quantities exceeding those indicated in the contract documents, and numerous design deficiencies which included those in the deep cut area.

REMCON remobilized to the project in mid May 2002. At that time REMCON requested direction on how to proceed through the deep cut area, primarily addressing the problems with the slopes. The NPS provided no response to REMCON's initial request for direction. REMCON began issuing a series of Requests for Information (RFI's) to the NPS seeking direction in the deep cut area. Throughout the month of June the NPS failed to respond to the RFI's or to provide any direction on how REMCON was to correct these design deficiencies. It was not until you arrived on the project the week of July 9, 2002 did we receive any direction on how to proceed with this work.

During a job walk with you, Jack Vance (NPS), Loren Mangrum (Jacobs), Luke Triplett (REMCON), Mark Penrose (REMCON), and myself, these design deficiencies were pointed out. It had been over eight (8) months since these problems were brought to the attention of the NPS and REMCON still had no new design information. At that time a discussion took place on what needed to be done. It is important to note that REMCON was seeking direction on the slopes, utilities had been installed and a rough subgrade had been reached, per Design 2. Options were discussed and REMCON was asked if we felt we could field fit the road to take into account that no additional slope was needed. We responded that we felt this could be done, agreement was reached and direction was given by NPS personnel to proceed taking into account the current slopes and natural features. Direction was then given to Mike Kitchell, REMCON's grading foreman, to field fit the road through the deep cut area (Design 3).

Over the course of the next week REMCON began, what was believed to be the final construction of the deep cut area. Mr. Kitchell laid the roadway alignment out using the design staking information provided under Design 2 and adjusting to fit field conditions (Design 3, field fit without new design data from NPS, per NPS direction). A final subgrade was constructed incorporating a crown in the roadway. It is now mid July 2002 nearly two months since REMCON remobilized to the project. The use of a crown (as originally designed) created a large vertical cut along the westerly portion of the roadway through the deep cut, and became quite pronounced along an area of two large boulders. At this time, Russell Belknap, a consultant to the NPS, arrived on-site to assist Jacobs Engineering as the NPS's on-site representative.

Mr. Belknap and Mr. Kitchell, discussed the problems with the large vertical slope and a decision was made to change the roadway design from a "crown" to "super" which sloped from the east side of the road upwards to the west (Design 4, field fit without new design data from NPS). By utilizing a "super", the large vertical slope area was reduced. The change to a "super" required REMCON to import additional fill over what was already a completed subgrade and nearly ready for the import and placement of aggregate base. Work proceeded and the roadway through the deep cut was built under the direction of Mr. Belknap, who daily worked on the new design (Design 4). Subgrade was completed and REMCON began placement of aggregate base along the access road.

At this time, and not until this time, the NPS requested that REMCON provided survey data on the access road. REMCON contacted Giuliani and Kull, and requested Jess Stanley return to the project and survey the entire access road. The new survey data was sent to the NPS in Denver, August 14, 2002. The NPS responded that they were now going to make new design changes (Design 5) to correct what was perceived as failures on REMCON's part to properly build the road, even though REMCON was given direction to field fit the road as needed to account for natural features. Never during the discussions, which took place in July 2002 did any NPS personnel tell REMCON that design criteria was to be followed. REMCON is not an engineering design company, Mr. Kitchell simply fit the road to the existing conditions and natural features utilizing the original survey control wherever possible.

It was not until September 6, 2002, did the NPS provide REMCON's surveyor with the new Design 5 requirements, 23 days after REMCON provided the survey data to the NPS. Jess Stanley came back to the project and provided new survey control for the entire access road. In most cases only minor work was required to meet the Design 5 requirements, other than in the deep cut. REMCON has been forced to delay paving operations while waiting for this design information. As a result weather is becoming an increasing impact to the paving operations and project completion.

As confirmation of REMCON's contention that this roadway had been previously constructed as shown on the plans and that any change was a result of decisions on the part of the NPS, REMCON at the request of the NPS performed pothole testing within this deep cut area. Those pothole tests confirmed that the waterline and electrical conduit were installed to the actual elevations shown on the plans. This could have only been done had REMCON constructed the subgrade to the elevations shown on the plans. It was the NPS and not REMCON that directed changes to the roadway from Station 23+00 to 30+00.

As a result of the five (5) designs, which have taken place in the deep cut, REMCON has been forced to incur a tremendous loss of revenue as well as delays to the overall project. REMCON has agreed in negotiation with the NPS, to accept a settlement sum, which would encompass the work performed in the deep cut area through Design 4. To date the NPS has made no offer to REMCON of a change order for the additional work now being performed. Initially, REMCON was told that only a minor adjustment was needed in the deep cut. This minor adjustment is now estimated to cost REMCON $20,000.

It is hard for me to accept a position that REMCON is responsible for correcting what clearly developed as a result of defective designs on the part of the NPS. I believe REMCON is due additional compensation and time extensions as they relate to this work. I remain available to meet with you and further discuss this matter.

Sincerely,

Stephen B. Christensen
President

cc: Rod Keiscome, NPS Contracting Officer
Richard A. Lewis, REMCON Board Member
Luke Triplett, REMCON Project Manager