# EXHIBIT 9

Declaration of Stephen B. Christensen in Opposition to Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

FILE

**SENT VIA FAX AND U.S. MAIL**

November 16, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Notice of Potential Claim-Related to Owner Caused Delays

Dear Mr. Keiscome:

Pursuant to Section 52-236-02 of the Contract Specifications, REMCON is providing formal notification of its intent to file a claim for damages incurred as it relates to NPS caused delays.

On August 22, 2002, the NPS met with representatives of REMCON in an attempt to negotiate a settlement on all outstanding claims, which had occurred prior to the August 22, 2002. A tentative settlement was reached in that meeting, but has not been finalized at this time. The primary reason this agreement has not been finalized is because the NPS has repeatedly attempted to include language that was not agreed to in the meeting.

One of the conditions of the agreement, was that REMCON complete work on the Upper Sherman Access Road and Parking Areas and the Sherman Tree Trail by November 5, 2002. To meet the agreed upon completion date the NPS was to provide REMCON with a redesign of the access road no later than August 30, 2002, one week after the negotiation meeting. Additionally, the NPS was to provide REMCON with a Contract Modification for the Sherman Tree Trail, for an amount agreed upon in a meeting in mid August 2002. Any delay in receiving these critical items, would delay and increase project costs, and most likely prevent REMCON from completing the project as agreed. Additionally, it would force the project into a winter suspension, which would add additional costs.

It took the NPS four weeks to provide REMCON with a design for the Access Road and over 2 months for the issuance of Contract Modification No. 5, which allowed work to proceed on the trail. Additional, delays occurred on the Access Road, as the new design, again did not match the natural features of the project. As a result of the Owner caused delays, REMCON has been forced to incur additional costs and/or will incur additional costs, which the NPS must compensate REMCON. These additional costs include the following:

- Costs associated with the remobilization to the project in the spring of 2003.
- Costs associated with the demobilization from the project in the summer of 2003.
- Installation of extensive storm water pollution measures, which would not have been required, had the work not been delayed.
- Costs incurred in repairing damaged areas of the project that resulted from an usually severe storm which hit the project on November 7, 2002.
- Increased labor costs related to increases in the Davis-Bacon wage scale in June of 2003.
- Extended project overhead costs.

- Extended corporate overhead costs.

Had REMCON not been delayed by the NPS, REMCON would not have incurred any of the above referenced costs. REMCON is clearly due an equitable adjustment for these undisputed, Owner caused delays.

Under separate cover REMCON will provide the NPS with an estimate of our claim amount.

Sincerely,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member

# EXHIBIT 10

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

FILE

**SENT VIA FAX AND U.S. MAIL**

November 19, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Failure to Issue Prompt Payment

Dear Mr. Keiscome:

Pursuant to the Federal Acquisition Regulations and the Contract Specifications, the NPS is to issue prompt payment to small business contractors. Once again the NPS has failed to meet this obligation. Last week I left messages at your office in hopes of discussing this matter. I received no call back, as a result I feel compelled to issue this formal letter.

On October 31, 2002, REMCON's Project Manager, Luke Triplett, met with the NPS's on-site representative, Loren Mangrum, to review the monthly pay request. After extensive discussions each agreed on the quantities due and payable. Agreed upon quantities were then faxed to REMCON's office where the NPS required invoice was prepared and then faxed back to the project for signature. On November 1, 2002, both Mr. Triplett and Mr. Mangrum signed the pay estimate request. A copy of this signed monthly progress payment request was then faxed to your office. Copies of which were sent to Terry Lang and Michael Giller. Additionally, we also sent the actual signed copy over-night delivery to the NPS office in Denver. A record of such delivery was recorded by the UPS delivery company, date of delivery being November 4, 2002.

During the Partnering Meeting for this project, REMCON was informed that the NPS's on-site representative was acting for the Contracting Officer in the approval process of the monthly progress payment invoice. As such once the monthly pay request has been approved and signed by the Contracting Officer's designated representative, the contract pay period begins. In this specific case the pay estimate was signed on November 1, 2002. Based on the Contract Documents, REMCON should have received its pay estimate no later than November 15, 2002, if not REMCON is due interest.

On Wednesday, November 13, 2002, REMCON's controller, Tina Erickson, called Mike Giller to confirm that our monthly payment had been properly processed and payment was forthcoming in the next few days. Mr. Giller responded that our payment had not been processed and he could not confirm when REMCON would receive the contractual funds due. Mr. Giller told Ms. Erickson that he would call her back before the end of the day and let her know when she could expect payment. No call was ever received.

On Thursday morning, November 14, 2002, having not received a call, Ms. Erickson called Mr. Giller to again request REMCON's payment date. Mr. Giller responded that REMCON should receive its payment by November 25, 2002, but made no formal commitment to that date. Additionally, Mr. Giller responded that he was making adjustments to the pay request, but was unwilling to provide Ms. Erickson with information concerning these changes.

It appears that it serves little to no purpose for REMCON's Project Manager and the NPS's on-site representative to prepare and agree on a monthly pay request only to have the Denver office repeatedly make changes without ever discussing those changes with the contractor. This is in direct conflict to the information and direction given to REMCON by the NPS at the Partnering Meeting and the Pre-construction Meeting.

Additionally, it is unconscionable that REMCON's pay estimate sat in the Denver office for 19 days without anyone ever contacting REMCON to even say there was an issue with the already agreed monthly pay request. It was only after REMCON contacted the NPS that we even found out about this matter. In fact, it appears that no one in the Denver office even began processing REMCON's invoice until the week of November 11, 2002. Both REMCON and its subcontractors rely on the NPS to make proper monthly progress payments as stipulated in the contract documents.

It has been quite apparent that ever since REMCON began issuing Notices of Potential Claim against the NPS, as a reservation of REMCON's rights and as stipulated in the contract documents, the NPS has adopted an adversarial position against REMCON. REMCON has done everything possible to expedite construction of the Sherman Tree Project once we had the cooperation of the NPS in July 2002. It's a credit to all of those involved that so much work was able to be completed considering the number of obstacles that needed to be over come.

By failing to properly process payments to REMCON you are threatening the financial viability of both REMCON and its subcontractors, who so diligently processed the work referenced above. It is imperative that the NPS meet the contractual payment requirements of the contract, in the time period specified in the Contract Documents.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Ken Smith, Ken Smith Masonry
Joe Borgess, WSC
Garcia Paving Inc.
Clay Miranda, Clay Miranda Trucking

# EXHIBIT 11

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

COPY

FILE

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**SENT VIA FAX AND U.S. MAIL**

November 25, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Failure to Follow Prompt Payment Statute, 2nd Notice

Dear Mr. Keiscome:

It is now November 25, 2002, and REMCON has yet to receive the monthly progress payment as stipulated in the Federal Acquisition Regulations and the Contract Specifications. I enclosed a copy of Section DS52.232-27 (Prompt Payment for Construction Contracts), for your review. REMCON demands a full explanation on why the NPS feels it is not required to comply with the Contract Specifications.

Section DS52.232-27 (a) (1) (i) (A) clearly states the following:

> "The due date for making such payments shall be 14 days after receipt of the payment request by the designated billing office. "Receipt of the payment request by the designated billing office" is defined as the day the Contracting Officer's Representative and the Contractor reach agreement of the requested progress payments."

REMCON's Project Manager, Luke Triplett, and the Contracting Officer's Representative, Loren Mangrum, signed the monthly progress payment on October 31, 2002, and that payment request was faxed to the designated billing office on November 1, 2002. Pursuant to the contract specifications, REMCON should have received the progress payment no later than November 15, 2002. If the billing office has a disagreement with the executed progress payment, the billing office was required under the Prompt Payment Clause to notify REMCON within 7 days after receipt of the payment request.

Section DS52.232-27 (a) (2) clearly states the following:

> "If the invoice does not comply with these requirements, it shall be returned within 7 days after the date the designated billing office received the invoice, with a statement of the reasons why it is not a proper invoice. "

REMCON's invoice was never returned and no explanation has been received why the NPS has failed to make the timely monthly progress payment. It becomes apparent that the NPS's failure to properly adhere to the F.A.R. regulations is done so with the purpose of creating financial ruin to REMCON.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Robert L. Leslie, McInerney & Dillon
Ken Smith, Ken Smith Masonry

# EXHIBIT 12

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

FILE

**SENT VIA FAX AND U.S. MAIL**

November 25, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Formal Request for Alternative Dispute Resolution

Dear Mr. Keiscome:

Reference is made to the Contract Specifications, Part I.59 Disputes and the Federal Acquisition Regulations Title 41, Chapter 9, Section 605.

Pursuant to the Federal Acquisition Regulations and the Contract Specifications, REMCON is formally requesting immediate establishment and use of Alternative Dispute Resolution for resolution of REMCON's claims against the NPS. REMCON is clearly within its rights to make this formal request.

Title 41, Chapter 9, Section 605 (d) "Alternative means of dispute resolution" states:

> "Notwithstanding any other provision of this chapter, a contractor and a contracting officer may use any alternative means of dispute resolution under subchapter IV of chapter 5 of title 5, or other mutually agreeable procedures, for resolving claims. The contractor shall certify the claim when required to do so as provided under subsection ©(1) of this section or as otherwise required by law. All provisions of subchapter IV of chapter 5 of title 5 shall apply to such alternative means of dispute resolution."

In addition, Title 41, Chapter 9, Section 605 (e) "Termination of authority to engage in alternative means of dispute resolution; savings provision" states:

> "In any case in which the contracting officer rejects a contractor's request for alternative dispute resolution proceedings, the contracting officer shall provide the contractor with a written explanation, citing one or more of the conditions in section 572(b) of title 5 or such other specific reasons that alternative dispute resolution procedures are inappropriate for the resolution of the dispute."

Section 572 of title 5 is very explicit with regards to the rejection of a request by a contractor for alternative dispute resolution. We trust that the NPS will adhere to these requirements, and comply with REMCON's immediate request. It has been over five (5) months since REMCON provided its claim to the NPS. It is time this matter commands the attention of the NPS and resolution to this matter put on the highest priority. The NPS continues to place REMCON in a position of financial crisis by their continued lack of action.

I look forward to your immediate response.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Robert L. Leslie, McInerney & Dillon
Congressman George P. Radanovich, U.S. House of Representatives

LII
legal information institute
collection home

US CODE COLLECTION

search



## Sec. 605. - Decision by contracting officer

**(a)** Contractor claims

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim. The preceding sentence does not apply to a claim by the government against a contractor that is based on a claim by the contractor involving fraud. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter. Specific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding. The authority of this subsection shall not extend to a claim or dispute for penalties or forfeitures prescribed by statute or regulation which another Federal agency is specifically authorized to administer, settle, or determine. This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.

**(b)** Review; performance of contract pending appeal

The contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter. Nothing in this chapter shall prohibit executive agencies from including a clause in government contracts requiring that pending final decision of an appeal, action, or final settlement, a contractor shall proceed diligently with performance of the contract in accordance with the contracting officer's decision.

Search this title:

Search Title 41

Notes
Updates
Parallel authorities (CFR)
Topical references

REM000014451

**(c)** Amount of claim; certification; notification; time of issuance; presumption

**(1)**

A contracting officer shall issue a decision on any submitted claim of $100,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. For claims of more than $100,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

**(2)**

A contracting officer shall, within sixty days of receipt of a submitted certified claim over $100,000 -

**(A)**

issue a decision; or

**(B)**

notify the contractor of the time within which a decision will be issued.

**(3)**

The decision of a contracting officer on submitted claims shall be issued within a reasonable time, in accordance with regulations promulgated by the agency, taking into account such factors as the size and complexity of the claim and the adequacy of the information in support of the claim provided by the contractor.

**(4)**

A contractor may request the tribunal concerned to direct a contracting officer to issue a decision in a specified period of time, as determined by the tribunal concerned, in the event of undue delay on the part of the contracting officer.

**(5)**

Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer

REM000014452

denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter. However, in the event an appeal or suit is so commenced in the absence of a prior decision by the contracting officer, the tribunal concerned may, at its option, stay the proceedings to obtain a decision on the claim by the contracting officer.

**(6)**

The contracting officer shall have no obligation to render a final decision on any claim of more than $100,000 that is not certified in accordance with paragraph (1) if, within 60 days after receipt of the claim, the contracting officer notifies the contractor in writing of the reasons why any attempted certification was found to be defective. A defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim. Prior to the entry of a final judgment by a court or a decision by an agency board of contract appeals, the court or agency board shall require a defective certification to be corrected.

**(7)**

The certification required by paragraph (1) may be executed by any person duly authorized to bind the contractor with respect to the claim.

**(d)** Alternative means of dispute resolution

Notwithstanding any other provision of this chapter, a contractor and a contracting officer may use any alternative means of dispute resolution under subchapter IV of chapter 5 of title 5, or other mutually agreeable procedures, for resolving claims. The contractor shall certify the claim when required to do so as provided under subsection (c)(1) of this section or as otherwise required by law. All provisions of subchapter IV of chapter 5 of title 5 shall apply to such alternative means of dispute resolution.

**(e)** Termination of authority to engage in alternative means of dispute resolution; savings provision

In any case in which the contracting officer rejects a contractor's request for alternative dispute resolution proceedings, the contracting officer shall provide the contractor with a written explanation, citing one or more of the conditions in section 572(b) of title 5 or such other specific reasons that alternative dispute resolution procedures are inappropriate for the resolution of the dispute. In any case in which a contractor rejects a request of an agency for alternative dispute resolution proceedings,

REM000014453

the contractor shall inform the agency in writing of the contractor's specific reasons for rejecting the request

Prev | Next

© copyright about us send email

REM000014454

## Sec. 572. - General authority

**(a)**

An agency may use a dispute resolution proceeding for the resolution of an issue in controversy that relates to an administrative program, if the parties agree to such proceeding.

**(b)**

An agency shall consider not using a dispute resolution proceeding if -

**(1)**

a definitive or authoritative resolution of the matter is required for precedential value, and such a proceeding is not likely to be accepted generally as an authoritative precedent;

**(2)**

the matter involves or may bear upon significant questions of Government policy that require additional procedures before a final resolution may be made, and such a proceeding would not likely serve to develop a recommended policy for the agency;

**(3)**

maintaining established policies is of special importance, so that variations among individual decisions are not increased and such a proceeding would not likely reach consistent results among individual decisions;

**(4)**

the matter significantly affects persons or organizations who are not parties to the proceeding;

REM000014455

**(5)**

a full public record of the proceeding is important, and a dispute resolution proceeding cannot provide such a record; and

**(6)**

the agency must maintain continuing jurisdiction over the matter with authority to alter the disposition of the matter in the light of changed circumstances, and a dispute resolution proceeding would interfere with the agency's fulfilling that requirement.

**(c)**

Alternative means of dispute resolution authorized under this subchapter are voluntary procedures which supplement rather than limit other available agency dispute resolution techniques



© copyright about us send email

# EXHIBIT 13

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

FILE 0.2

**SENT VIA FAX AND U.S. MAIL**

December 3, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Notice of Claim, Failure to Follow Payment Terms of the Contract
Specifications for Aggregate Base and Asphalt Concrete Pavement

Dear Mr. Keiscome:

Pursuant to Section 52.233-01 Disputes of the Contract Specifications, REMCON is hereby notifying and certifying its claim against the National Park Service as it relates to non-payment for work performed.

> "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

Reference is made to the NPS's letter of November 19, 2002, entitled "Pay Estimate Quantity Corrections" and the Contract Specifications. The terms and conditions of payment for both Bid Item No. 71 and 72, are well defined. Mr. Giller's letter has, with total disregard of the Contract Specifications, established a completely new set of payment rules that are not even addressed in the specifications. The NPS is bound by the Contract Specifications and the F.A.R.'s, and is required by law to uphold the conditions contained within the Contract Specifications. You are not allowed to establish a new set of rules on a project and then arbitrarily take a credit from the Contractor.

Through October 2002, REMCON has placed 9,292.4 tons of Aggregate Base on the Sherman Tree Access Road, Parking Area and Trail, for which proper documentation and invoicing was prepared and submitted by REMCON to the NPS. The total amount due and payable to REMCON for Bid Item No. 71 – Aggregate Base Course is $399,571.91. The NPS has now reduced REMCON's payment for Bid Item No. 71 to 6,640 tons or $285,520.00, a reduction in payment of $114,051.91. The NPS provides no backup to this reduction other than some calculation of theoretical area, which does not comply with the Contract Specifications. The Contract Specifications, Section 02725 – Aggregate Base Course, Part 4 Measurement and Payment clearly states the following conditions:

> "Measurement for aggregate base course under bituminous concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Deduction will be made for moisture content exceeding 5 percent by weight. Payment will be made at the contract unit price."

The NPS's own contract language clearly states that payment for Aggregate Base, will be made on verified weight tickets. REMCON provided the NPS with verified weights, and the tonnage billed was verified by the Contracting Officer's On-site Representative. Additionally, prior to REMCON being allowed to begin paving over the Aggregate Base, the Aggregate Base was checked for thickness as well as straight edged for tolerance compliance. In one case where REMCON contaminated a portion of the Aggregate Base a reduction in tonnage was given to the NPS.

The NPS does not have the right to arbitrarily determine a tonnage. If the NPS had concerns over Aggregate Base usage they should of addressed those concerns long before this stage of the contract. The NPS is required to make proper payment based on the terms and conditions of the contract. REMCON is due an immediate payment of $114,051.91 not including interest.

With regard to Bid Item No. 72 – Asphalt Concrete Pavement, the NPS has adopted the same position as they did in Bid Item No. 71 – Aggregate Base Course. The NPS has utilized some theoretical calculation for asphalt concrete, which is not provided for in the Contract Specifications. Section 02743 – Asphalt Concrete Pavement, Part 4.2 clearly defines the terms of payment. The specifications state:

> "Measurement for asphalt concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Payment will be at the contract unit price."

Through the October billing REMCON had placed a total of 5,441.7 tons of asphalt concrete, as verified by certified weight tags, previously submitted to the NPS. Payment for this work is to be paid under two separate bid items, Bid Item No. 72 – Asphalt Concrete Pavement, and Bid Item No. 129 AC Pavement Overlay, Upper Sherman. At the conclusion of October, REMCON had completed approximately two lifts of paving over the entire Upper Sherman Access Road and Upper Sherman Parking Area. The two lifts of paving accounted for a paving depth of four (4) inches, three (3) inches or 75 percent, pays under Bid Item No. 72, and one (1) inch or 25 percent, pays under Bid Item No. 129. The following is a summary of accounts for Bid Items 72 and 129.

Total Amount Contractual Due REMCON:

| | | |
|---|---|---|
| Bid Item 72 | 4,081.0 Tons x $104.00 per ton = | $ 424,424.00 |
| Bid Item 129 | 1,360.7 Tons x $75.00 per ton = | $ 102,052.50 |
| Total Payment for AC Paving | | $ 526,476.50 |

Total Amount Paid by NPS through October Billing:

| | | |
|---|---|---|
| Bid Item 72 | 3,533.0 Tons x $104.00 per ton = | $ 367,432.00 |
| Bid Item 129 | 1,444.0 Tons x $75.00 per ton = | $ 108,300.00 |
| Total Payment for AC Paving | | $ 475,732.00 |

The NPS has failed to meet their contractual obligation to make payment to REMCON for the actual tonnage placed by REMCON. The October payment made by the NPS short pays REMCON the sum total of $50,744.50. REMCON is due immediate payment of these funds including interest, interest to be calculated from the date REMCON was due payment or November 15, 2002.

REMCON is formally issuing this Notice of Claim, as a reservation of our rights, and as required by the Contract Specifications. If you have any questions concerning this formal notification, you can contact me at (209) 847-9186.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Robert L. Leslie, McInerney & Dillon
Congressman George P. Radanovich, U.S. House of Representatives

# EXHIBIT 14

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**SENT VIA FAX AND U.S. MAIL**

December 4, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Notice of Claim, Failure to Follow Payment Terms of the Contract
Specifications for Dry-Laid Stone Wall

Dear Mr. Keiscome:

Pursuant to Section 52.233-01 Disputes of the Contract Specifications, REMCON is hereby notifying and certifying its claim against the National Park Service as it relates to non-payment for work performed.

> "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

Reference is made to the NPS's letter of November 19, 2002, entitled "Pay Estimate Quantity Corrections" and the Contract Specifications. The terms and conditions of payment for Bid Item No. 119, are well defined. The NPS's letter disregards the Contract Specifications, fails to even address the numerous project discussions and documentation concerning this work, and establishes a completely new set of payment rules that are not even addressed in the specifications. The NPS is bound by the Contract Specifications and the F.A.R.'s, and is required by law to uphold the conditions contained within the Contract Specifications. You are not allowed to establish a new set of rules on a project and then arbitrarily take a credit from the Contractor.

The Contract Specifications clearly define the terms of payment for the Dry-Laid Stone Wall, Section 04403 Part 4: Measurement and Payment states:

> "This item includes furnishing stone from park sources and constructing dry laid stone walls. Measurement for payment will be the number of square feet on the face of the wall, measured on the battered face from the toe of the wall at the base of the foundation to the top of the wall. Measurements shall be taken at 10-foot intervals where applicable, and at ends, corners and major breaks in top or bottom of wall elevations. The measurements will be averaged appropriately to accurately compute the face footage. Aggregate base and surface treatment shall be included in the contract unit price and shall not be paid for separately. Payment will be made at the contract unit price."

Not only does the NPS totally disregard this payment clause, it fails to even address the issues that took place with regard to the wall construction. REMCON fully acknowledges that the wall was relocated, it was done so at the direction of the NPS's Jack Vance and Russell Belknap.

At the start of wall construction it became apparent that the wall did not appear to be placed as the plan showed. REMCON suspended work on the wall (approximately 10% was complete), placed the subcontractor on stand-by, and asked for an immediate meeting with NPS project personnel. Numerous measurements were made collectively by NPS and REMCON personnel to try and determine what direction should be taken. It became apparent from the measurements that the tree shown directly across from the wall was not located as shown on the plan. REMCON was directed to adjust the wall by NPS personnel so as to allow for the proper depth of the designed parking area. Had the wall not been relocated, then the parking stalls would have been shortened or a new design developed. NPS personnel could have had the wall constructed further towards the parking stalls but chose to adjust the wall to fit the natural features.

Through out the issues regarding the defective plans and specifications for the Dry-Laid Stone Wall, REMCON worked with NPS personnel to correct the deficiencies with minimal impact. Agreement was reached and work proceeded. It is unconscionable to now notify REMCON that the NPS is not going to pay for the additional wall footage, even though it was the NPS that directed the relocation of the wall.

The NPS had previously made the proper payment and now arbitrarily and without discussion with REMCON makes a change. The NPS has failed to meet their contractual obligation to make payment to REMCON for the actual facial square footage installed. The October Progress Payment arbitrarily reduces REMCON's payment for Dry-Laid Stone Wall by $39,560.00. REMCON is due immediate payment of these funds including interest, interest to be calculated from the date REMCON was due payment or November 15, 2002.

REMCON is formally issuing this Notice of Claim, as a reservation of our rights, and as required by the Contract Specifications. If you have any questions concerning this formal notification, you can contact me at (209) 847-9186.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Robert L. Leslie, McInerney & Dillon
Congressman George P. Radanovich, U.S. House of Representatives

# EXHIBIT 15

Declaration of Stephen B. Christensen in Opposition to Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

FILE

SENT VIA FAX AND U.S. MAIL

December 4, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Failure to Make Proper Progress Payments to Contractor

Dear Mr. Keiscome:

Reference is made to Section I.87 of the Request for Proposal, Prompt Payment for Construction Contracts (attached) and Contract Pay Estimate No. 12 (attached).

REMCON has received Contract Pay Estimate No. 12, and is shocked to find that the NPS modified the estimate from that which was agreed between the Contracting Officer's Representative, Loren Mangrum, and REMCON's Project Manager, Luke Triplett. It appears that your office has arbitrarily made changes, which were not agreed to by the Contractor. Section I.87 of the Request for Proposal, contains sections of the F.A.R. regulations DS52.232-27 Prompt Payment for Construction Contracts, which clearly states that a monthly progress payment must be agreed upon by both the Owner and the Contractor. And, once the Contracting Officer's Representative and the Contractor agree and sign the pay request, payment is to be made within 14 days, unless objections are raised within 7 days by the billing office, in this case NPS's Denver Service Center. Section DS52.232.27 (a) (1) (i) (a) clearly states the following:

> "The due date for making such payments shall be 14 days after receipt of the payment request by the designated billing office. "Receipt of the payment request by the designated billing office" is defined as the day the Contracting Officer's Representative and the Contractor reach agreement on the requested progress payments. If the designated billing office fails to annotate the payment request with the actual date of receipt at the time of receipt, the payment due date shall be the 14th day after the date of the Contractor's payment request, provided a proper request is received and there is no disagreement over quantity, quality, or Contractor compliance with contract requirements."

If the designated billing office has issue with the progress payment request, **they are required by the F.A.R.'s,** to return the invoice to the Contractor within 7 days, with a statement explaining why the invoice is not proper. Section DS52.232.27 (a) (2) clearly states the following:

> "Contractor's Invoice. The Contractor shall prepare and submit invoices to the designated billing office specified in the contract. A proper invoice must include the items listed in paragraphs (a)(2)(i) through (a)(2)(ix) of this clause. If the invoice does not comply with these requirements, it shall be returned within 7 days after the date the designated billing office received the invoice, with a statement of the reasons why it is not a proper invoice. ..."

REMCON's October monthly Progress Payment request was properly agreed to and signed by the NPS's Contracting Officer On-site Representative, Loren Mangrum and REMCON's Project Manager, Luke Triplett, on October 31, 2002. A proper invoice was faxed to the NPS's Denver Service Center, the designated billing office, on November 1, 2002 with a copy delivered to that office on November 4, 2002 by UPS. REMCON was never notified in writing, or even a phone call, within the mandated seven (7) day time frame of a problem with the invoice as stipulated in the Regulations and Contract. **Based on the Contract requirements, REMCON was to receive payment within 14 days of November 1, 2002, or no later than November 15, 2002.**

The Contract Specifications clearly state that if the Contractor does not receive payment within the 14 day time period, interest will be automatically paid. Throughout the course of this contract, REMCON's payments have been repeatedly late without receipt of proper interest payments. Section DS52.232.27 (a) (3) clearly states the following:

> "Interest penalty. An interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in paragraphs (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable. ..."

Your office as disregarded the conditions of the Contract Specifications and the F.A.R.'s by improperly modifying an invoice, which had been properly agreed to and signed by the Contracting Officer's On-site Representative and the Contractor. In fact, Monthly Progress Payment No. 12, fraudulently states, that agreement for this pay estimate was reached on November 14, 2002. REMCON was never notified of any changes, did not agree to the changes made, and takes exception to these changes. REMCON expects full payment including interest, in the agreed amount, which was properly submitted, on November 1, 2002.

REMCON finds this action to be arbitrary and capricious on the part of you and your staff, and it is meant to cause economic duress to REMCON, REMCON's employees, subcontractors and material suppliers. REMCON will seek what ever means available to seek compensation for the action of the NPS, its employees and contractors.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Robert L. Leslie, McInerney & Dillon
Congressman George P. Radanovich, U.S. House of Representatives
Ken Smith, Ken Smith Masonry
Joe Borgess, WSC Contracting

United States Department of the Interior
National Park Service
**PAYMENTS**

14-Day Prompt Payment X
30-Day Final Payment ___

Sequoia and Kings Canyon National Parks
SEKI-200Q

| | | | |
|---|---|---|---|
| ESTIMATE NO. 12 | For Period September 31, 2002 through October 31, 2002 | DATE: | |
| CONTRACT NO.: 1443C8000010903 | COMPLETION DATE: 8/11/2003 | EXTENDED DATE: | 8/28/2003 |
| CONTRACTOR: Remcon Inc., P O Box 758, 751 Wakefield Court, Oakdale, CA 95361 | | ORIG CONTRACT: | $ 7,121,636.00 |
| PROJECT: Sherman Tree Parking Area | | TTL CHG ORDERS: 5 | $ 795,968.28 |
| LOCATION: Tulare County, California | | TOTAL CONTR AMT | $ 7,917,604.28 |

| ITEM NO. | CONTRACT QUANTITY | | DESCRIPTION | QUANTITY TO DATE | UNIT PRICE | AMOUNT TO DATE |
|---|---|---|---|---|---|---|
| 1 | LS | | Upper & Lower Sherman Tree Comfort Stations & Wayside Kiosk | 47.46% | $830,000.00 | $393,900.00 |
| 2 | 4987 | LF | Construction Fencing | 3,816 | $5.00 | $19,080.00 |
| 3 | 182 | EA | Tree Trunk Protection | 144 | $100.00 | $14,400.00 |
| 4 | 493 | LF | Tree Barricade | 0 | $25.00 | $0.00 |
| 5 | LS | | Removal of Restroom Building | 0.00% | $15,000.00 | $0.00 |
| 6 | LS | | Removal of Powder House | 100.00% | $1,060.00 | $1,060.00 |
| 7 | 155627 | SF | Remove Asphalt Paving | 58,108 | $0.50 | $29,054.00 |
| 8 | 180 | SF | Remove Concrete Paving | 0 | $1.50 | $0.00 |
| 9 | 213 | LF | Remove Concrete Curb & Pan | 0 | $2.50 | $0.00 |
| 10 | 2575 | LF | Remove Asphalt Curb - Single | 0 | $1.64 | $0.00 |
| 11 | 426 | LF | Remove Asphalt Curb - Double | 0 | $1.00 | $0.00 |
| 12 | 144 | SF | Remove Wooden Steps and Landing | 0 | $3.00 | $0.00 |
| 13 | 116 | LF | Saw Cutting Asphalt | 48 | $6.00 | $288.00 |
| 14 | 34 | EA | Remove Signs | 0 | $85.00 | $0.00 |
| 15 | 1136 | LF | Remove & Salvage Split Rail Fence | 0 | $10.00 | $0.00 |
| 16 | 8 | EA | Remove & Salvage Trash Receptacles | 0 | $85.00 | $0.00 |
| 17 | 53 | EA | Remove & Salvage Boulders | 0 | $60.00 | $0.00 |

Recommended (COR) [signature] for T. Lang

Wm. H. DeOcampo

DATE: (Agreement reached between Contractor & Proj Supr) 14 Nov '02

APPROVAL: (Contracting Officer) [signature] Rod Heinrich

DATE: 11/20/02

| SUMMARY | | |
|---|---|---|
| TOTAL TO DATE | | $4,243,461.94 |
| LESS RETAINED AMOUNT | $ | 4,052.47 |
| NET | $ | 4,239,409.47 |
| LESS PREVIOUS PAYMENTS | $ | 3,660,580.24 |
| LESS LIQUIDATED DAMAGES | $ | - |
| DUE THIS ESTIMATE | $ | 578,829.23 |
| % COMPLETE TO DATE: | | 50.6% |
| % TIME ELAPSED: | | 64.1% |

ACCOUNT NO.: 8550-0197-477 TIN NO: 77-0410135 TFCS REC'D: Yes or No TO AOC:

If th[...]re any questions about this payment, call Tony Abeyta @ 303/987-6746

Receive

REM000014431

Receiver Prepared in IDEAS-PD

Receiver Number: Z80001904 12

I.86 DS52.228-05 INSURANCE - WORK ON A GOVERNMENT INSTALLATION (PARAGRAPH (D) ADDED BY DSC) JANUARY 1997

(a) The Contractor shall, at its own expense, provide and maintain during the entire performance of this contract, at least the kinds and minimum amounts of insurance required in the Schedule or elsewhere in the contract.

(b) Before commencing work under this contract, the Contractor shall notify to the Contracting Officer in writing that the required insurance has been obtained. The policies evidencing required insurance shall contain an endorsement to the effect that any cancellation or any material change adversely affecting the Government's interest shall not be effective (1) for such period as the laws of the State in which this contract is to be performed prescribe or (2) until 30 days after the insurer or the Contractor gives written notice to the Contracting Officer, whichever period is longer.

(c) The Contractor shall insert the substance of this clause, including this paragraph (c), in subcontracts under this contract that require work on a Government installation and shall require subcontractors to provide and maintain the insurance required in the Schedule or elsewhere in the contract. The Contractor shall maintain a copy of all subcontractors' proofs of required insurance, and shall make copies available to the Contracting Officer upon request.

(d) The Contractor shall maintain compensation insurance, for employees engaged in the work, complying with the workmen's compensation laws of the State in which the work is to be performed and shall maintain liability insurance protecting him from claims because of bodily injury (including death) and property damage arising under this Contract.

I.87 DS52.232-27 PROMPT PAYMENT FOR CONSTRUCTION CONTRACTS (PARA (A)(1)(I)(A) 2ND SENTENCE ADDED BY DSC, 4/89) JUNE 1997

Notwithstanding any other payment terms in this contract, the Government will make invoice payments and contract financing payments under the terms and conditions specified in this clause. Payment shall be considered as being made on the day a check is dated or the date of an electronic funds transfer. Definitions of pertinent terms are set forth in section 32.902 of the Federal Acquisition Regulation. All days referred to in this clause are calendar days, unless otherwise specified. (However, see subparagraph (a)(3) concerning payments due on Saturdays, Sundays, and legal holidays.)

(a) Invoice payments--

(1) Types of invoice payments. For purposes of this clause, there are several types of invoice payments that may occur under this contract, as follows:

(i) Progress payments, if provided for elsewhere in this contract, based on Contracting Officer approval of the estimated amount and value of work or services performed, including payments for reaching milestones in any project:

(A) The due date for making such payments shall be 14 days after receipt of the payment request by the designated billing office. "Receipt of the payment request by the designated billing office" is defined as the day the Contracting Officer's Representative and the Contractor reach agreement on the requested progress payments. If the designated billing office fails to annotate the payment request with the actual date of receipt at the time of receipt; the payment due date shall be the 14th day after the date of the Contractor's payment request, provided a proper payment request is received and there is no disagreement over quantity, quality, or Contractor compliance with contract requirements.

(B) The due date for payment of any amounts retained by the Contracting Officer in accordance with the clause at 52.232-5, Payments Under Fixed-Price Construction Contracts, shall be as specified in the contract or, if not specified, 30 days after approval for release to the Contractor by the Contracting Officer.

(ii) Final payments based on completion and acceptance of all work and presentation of release of all claims against the Government arising by virtue of the contract, and payments for partial deliveries that have been accepted by the Government (e.g., each separate building, public work, or other division of the contract for which the price is stated separately in the contract):

(A) The due date for making such payments shall be either the 30th day after receipt by the designated billing office of a proper invoice from the Contractor, or the 30th day after Government acceptance of the work or services completed by the Contractor, whichever is later. If the designated billing office fails to annotate the invoice with the date of actual receipt

at the time of receipt, the invoice payment due date shall be the 30th day after the date of the Contractor's invoice, provided a proper invoice is received and there is no disagreement over quantity, quality, or Contractor compliance with contract requirements.

(B) On a final invoice where the payment amount is subject to contract settlement actions (e.g., release of claims), acceptance shall be deemed to have occurred on the effective date of the contract settlement.

(2) Contractor's invoice. The Contractor shall prepare and submit invoices to the designated billing office specified in the contract. A proper invoice must include the items listed in paragraphs (a)(2)(i) through (a)(2)(ix) of this clause. If the invoice does not comply with these requirements, it shall be returned within 7 days after the date the designated billing office received the invoice, with a statement of the reasons why it is not a proper invoice. Untimely notification will be taken into account in computing any interest penalty owed the Contractor in the manner described in subparagraph (a)(4) of this clause.

(i) Name and address of the Contractor.

(ii) Invoice date. (The Contractor is encouraged to date invoices as close as possible to the date of mailing or transmission.)

(iii) Contract number or other authorization for work or services performed (including order number and contract line item number).

(iv) Description of work or services performed.

(v) Delivery and payment terms (e.g., prompt payment discount terms).

(vi) Name and address of Contractor official to whom payment is to be sent (must be the same as that in the contract or in a proper notice of assignment).

(vii) Name (where practicable), title, phone number, and mailing address of person to be notified in the event of a defective invoice.

(viii) For payments described in paragraph (a)(1)(i) of this clause, substantiation of the amounts requested and certification in accordance with the requirements of the clause at 52.232-5, Payments Under Fixed-Price Construction Contracts.

(ix) Any other information or documentation required by the contract.

(x) While not required, the Contractor is strongly encouraged to assign an identification number to each invoice.

(3) Interest penalty. An interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in paragraphs (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable. However, when the due date falls on a Saturday, Sunday, or legal holiday when Federal Government offices are closed and Government business is not expected to be conducted, payment may be made on the following business day without incurring a late payment interest penalty.

(i) A proper invoice was received by the designated billing office.

(ii) A receiving report or other Government documentation authorizing payment was processed and there was no disagreement over quantity, quality, Contractor compliance with any contract term or condition, or requested progress payment amount.

(iii) In the case of a final invoice for any balance of funds due the Contractor for work or services performed, the amount was not subject to further contract settlement actions between the Government and the Contractor.

(4) Computing penalty amount. The interest penalty shall be at the rate established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) that is in effect on the day after the due date, except where the interest penalty is prescribed by other governmental authority (e.g., tariffs). This rate is referred to as the "Renegotiation Board Interest Rate," and it is published in the Federal Register semiannually on or about January 1 and July 1. The interest penalty shall accrue daily on th invoice principal payment amount approved by the Government until the payment date of such approved principal amount; and will b compounded in 30-day increments inclusive from the first day after the due date through the payment date. That is, interest accrued at the end of any 30-day period will be added to the approved invoice principal payment amount and will be subject to interest penalties if not paid in the succeeding 30-day period. If the designated billing office failed to notify the Contractor of a defective invoice within

# EXHIBIT 16

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**SENT VIA FAX AND U.S. MAIL**

December 7, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Notice of Claim, Failure to Follow Payment Terms of the Contract Specifications for Concrete Drop Inlets Type A.

Dear Mr. Keiscome:

Pursuant to Section 52.233-01 Disputes of the Contract Specifications, REMCON is hereby notifying and certifying its claim against the National Park Service as it relates to non-payment for work performed.

> "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

Reference is made to the NPS's letter of November 19, 2002, entitled "Pay Estimate Quantity Corrections" and the Contract Specifications. The NPS's letter states that two concrete drop inlets, Bid Item 68, are not in the proper location as shown on the plans. REMCON has had to relocate these two drop inlets twice to adjust to continuing roadway changes made by the NPS. The concrete drop inlets are in the correct location and are at the proper elevation to match the concrete asphalt v-ditch. The lids for these drop inlets have been set to final grade.

The Contract Specifications clearly define the terms of payment for Concrete Drop Inlets, Section 02632, Part 4: Measurement and Payment states:

> "Payment will be made at the contract unit price per each, excluding pipe, for each size and type drop inlet."

The two Type A concrete drop inlets are in place and two the final elevation. The only item lacking is the placement of the final asphalt concrete around the inlet. REMCON is due full compensation for this work.

The NPS has failed to meet their contractual obligation to make payment to REMCON for the actual drop inlets installed. The October Progress Payment arbitrarily reduces REMCON's payment for Concrete Drop Inlet – Type A by $2,000.00. REMCON is due immediate payment of these funds including interest, interest to be calculated from the date REMCON was due payment or November 15, 2002.

REMCON is formally issuing this Notice of Claim, as a reservation of our rights, and as required by the Contract Specifications. If you have any questions concerning this formal notification, you can contact me at (209) 847-9186.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Robert L. Leslie, McInerney & Dillon
Congressman George P. Radanovich, U.S. House of Representatives

# EXHIBIT 17

Declaration of Stephen B. Christensen in Opposition to Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**SENT VIA FAX AND U.S. MAIL**

December 7, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Notice of Claim, Failure to Follow Payment Terms of the Contract
Specifications for Boulder Revetment

Dear Mr. Keiscome:

Pursuant to Section 52.233-01 Disputes of the Contract Specifications, REMCON is hereby notifying and certifying its claim against the National Park Service as it relates to non-payment for work performed.

> "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

Reference is made to the NPS's letter of November 19, 2002, entitled "Pay Estimate Quantity Corrections" and the Contract Specifications. The terms and conditions of payment for Bid Item No. 102, are well defined. The NPS's letter disregards the Contract Specifications, fails to address the signed speed letters, which accept revetment work installed, and establishes a completely new set of payment rules that are not even addressed in the specifications. The NPS is bound by the Contract Specifications and the F.A.R.'s, and is required by law to uphold the conditions contained within the Contract Specifications. You are not allowed to establish a new set of rules on a project and then arbitrarily take a credit from the Contractor.

The Contract Specifications clearly define the terms of payment for Boulder Revetment, Section 02831 Part 4: Measurement and Payment states:

> "This item includes constructing boulder revetment slope protection and landscape boulders and their placement, using stone from park stockpiles. Payment will be made at the contract lump sump price."

Every month REMCON's Project Manager, Luke Triplett meets with the NPS's Contracting Officer's On-site Representative to review and agree on the monthly billing quantities. REMCON has only submitted billings for those quantities, which have been agreed on by both parties, as specified in the Contract Specifications. The NPS's designated billing office has disregarded the conditions of the Contract and arbitrarily assumed a quantity for payment.

The NPS has failed to meet their contractual obligation to make payment to REMCON for the actual footage of boulder placement. The October Progress Payment arbitrarily reduces REMCON's payment for Boulder Revetment by $15,114.50. REMCON is due immediate payment of these funds including interest, interest to be calculated from the date REMCON was due payment or November 15, 2002.

REMCON is formally issuing this Notice of Claim, as a reservation of our rights, and as required by the Contract Specifications. If you have any questions concerning this formal notification, you can contact me at (209) 847-9186.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Robert L. Leslie, McInerney & Dillon
Congressman George P. Radanovich, U.S. House of Representatives

# EXHIBIT 18

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

COPY

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

February 13, 2003

**SENT VIA FAX AND U.S. MAIL**

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** **Failure to Properly Process Monthly Progress Payments**

Dear Mr. Keiscome:

Reference is made to the NSP's letter of January 16, 2003 as well as Contract Pay Estimate 13.

On January 2, 2003, REMCON submitted a "Certification for Construction Contract Progress Payment", in the amount of $611,023.74. Under separate cover REMCON provided the NPS with the requirements for payment, as the NPS had failed to properly pay REMCON in Pay Estimate 12. Again the NPS has chosen a completely disregard the requirements of the Contract Specifications and the Federal Acquisition Regulations (F.A.R.'s) and has again fraudulently represented that the Contractor and NPS have agreed on the pay estimate value.

It is quite apparent that the NPS, and employees of the NPS have taken this action in an attempt to force REMCON into financial ruin. This action by the NPS, NPS employees and NPS subcontractors is a violation of not only the Contract Specification, the F.A.R.'s, but also the civil rights of both REMCON and REMCON employees. The NPS, NPS employees and NPS subcontractors continue to operate in complete contempt for the requirements of this contract.

The NPS continues to improperly process REMCON's progress payments, which has severely impacted REMCON. It is imperative that the NPS adhere to the contractual requirements and properly compensate REMCON for work performed.

Cordially,

Stephen B. Christensen
President

cc: Michael Giller, NPS Project Manager
Richard A. Lewis, REMCON Board Member
Robert L. Leslie, McInerney & Dillon
Congressman George P. Radanovich, U.S. House of Representatives

SequoiaLetter088-sbc

# EXHIBIT 19

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

February 26, 2003

**SENT VIA FAX AND U.S. MAIL**

Mr. Willie DeOcampo
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** **Updated Trail Plans T3A – T10A, Second Request**

Dear Mr. DeOcampo:

Reference is made to Sheet T7A of the contract drawings, Note 2 for the Sherman Tree Parking Project.

As a result of the numerous design changes associated with the NPS's defective plans for the Sherman Tree Trail, REMCON is requesting updated and verified plans so we can complete our construction schedule for the upcoming season. REMCON references sheet T7A, note 2 which states the following:

> "Sheets T3A – T10A were previously submitted as a clarification for trail step grading in August 2001 and replace sheets T3 – T10."

To date the NPS has only provided REMCON with updated sheets T7A and T8A. Please provide REMCON with a complete set of revised trail drawings, sheets T3A – T10A. We are attempting to complete our construction schedule for the upcoming season, without updated plans detailing all of the changes made by the NPS during the 2002 work season, REMCON can not complete the schedule. Numerous, field changes were made by NPS personnel, work being directed by speed letter, which need to be incorporated in these drawings so REMCON can provide the NPS with the cost increases.

Your immediate attention to this matter is imperative so as not to further delay the project once weather conditions allow work to begin.

Cordially,

Luke Triplett
Project Manager

cc: Stephen B. Christensen, REMCON
Rodney Keiscome, NPS Contracting Officer
Richard A. Lewis, REMCON Board Member

SequoiaLetter091-lt

REM000014410

# EXHIBIT 20

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

COPY

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

March 4, 2003

**SENT VIA FAX AND U.S. MAIL**

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Contract Modification No. 6

Dear Mr. Keiscome:

Reference is made to the National Park Service's (NPS) Contract Modification No. 6.

On February 24, 2003, REMCON received via U.S. Mail, the NPS's Contract Modification No. 6, which is being issued unilaterally. The NPS's contention that $84,170.00 fairly compensates REMCON for a Differing Site Condition as it relates to Rock Blasting and Excavation is ludicrous. REMCON has repeatedly provided the NPS with detailed backup regarding the actual costs associated with REMCON's Differing Site Condition, Rock Blasting and Excavation. This information was provided to the NPS in December of 2001, again in March, June and August of 2002. REMCON's submitted costs for this work exceed $700,000.00.

REMCON has estimated that over 5,000 cubic yards of rock excavation was required to construct the Sherman Tree Access Road and Parking Areas. The contract provided a bid item for rock excavation, which is analogous to this work. REMCON's price for performing this work is $112.00 per cubic yard. This alone would constitute a price adjustment of $560,000.00, and that does not take into account the additional handling costs, and allowable overhead and profit as it relates to delay costs.

To further compound the NPS's failure to properly address this matter, the Modification No. 6 states that **no** contract time extension will be allowed. As the NPS knows, REMCON spent nearly two (2) months in 2001 trying to blast and excavate rock. This extra work was the sole critical path activity during August/September, 2001. REMCON's differing site condition claim documented the actual delay period, and a time extension was requested. To unilaterally issue this Contract Modification, 18 months after the events occurred, demonstrates the untimely nature of your conduct, and to grant us no time extensions whatsoever is not only manifestly unfair, but demonstrates that you are acting in an unjust manner trying to harm REMCON, its owners and employees. As detailed in our prior correspondence, such punitive conduct is in bad faith and inconsistent with your legal obligations.

Additionally, your modification states that the NPS is "definitizing" this modification and issuing a lump sum payment. Yet the modification provides no backup "definitizing" any calculation for the amount of the contract adjustment ($84,170.00). At this time REMCON is formally demanding the NPS provide REMCON with all cost data, quantity calculations, and cost estimates related to Contract Modification No. 6, that justifies, explains or otherwise validates the determination that only $84,170.00 is due our company. I remind you that the NPS is bound by the Freedom of Information Act and must make this information available.

The issuance, by the NPS, of Contract Modification No. 6 in the amount of $84,170.00, fails to fairly compensate REMCON for the costs associated to rock blasting, rock excavation, and rock handling. REMCON's claim, which seeks fair and equitable compensation for the costs incurred in performing this work, will remain in place and REMCON will seek a judicial ruling to this matter.

The issuance of Contract Modification No. 6 by the NPS, again reinforces REMCON's assertion that the NPS as well as employees of the NPS have engaged in deliberate acts to cause financial ruin to REMCON and its principal owners. By doing so, the NPS and some of its employees are violating the civil rights granted the principals of REMCON.

Please recall that in our August 22, 2002, meeting to address and negotiate compensation for these impacts, you, as the Contracting Officer, along with your Project Manager, as well as other NPS employees, agreed to resolve our differing site condition claim for $485,214.00, as well as a time extension. We agreed to substantially reduce our claim amount and to accept this resolution to get paid for work completed over a year earlier even though we felt we were entitled to more. We have waited in good faith for you to issue Modification No. 6 to fulfill the obligations of the NPS. Now, having received the unilateral modification, we see you have reneged on your agreement and, in combination with the recently received Modification No. 7 (March 3, 2003), have tried to penalize us for acting in good faith, asserting our rights and pointing out the errors and mistakes in the Contract Documents. This matter (and your conduct) will be the object of judicial action and, hopefully, Inspector General investigation. You are in government service, which we respect. To abuse your position and power to harm others is unconscionable. We would prefer to work things out but unfortunately must seek assistance from others to ensure that equity prevails.

Cordially,

Stephen B. Christensen
President

cc: Congressman George P. Radanovich, U.S. House of Representatives
John Wm. McCamman, Chief of Staff, Congressman G. P. Radanovich
Richard A. Lewis, Richard A. Lewis P.E., Consultant
Michael W. Flak, Great American Insurance Company

# EXHIBIT 21

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

COPY

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

March 10, 2003

**SENT VIA FAX AND U.S. MAIL**

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Claim for Non-Payment by NPS for Aggregate Base and Asphalt Concrete.

Dear Mr. Keiscome:

Reference is made to the National Park Service's (NPS) letter of March 3, 2003, regarding the above subject.

What's unclear is why you responded to REMCON's letter in the manner that you did. On December 3, 2002, REMCON certified its claim against the NPS for failure to follow the payment terms of the contract for aggregate base and asphalt concrete pavement. REMCON's certification was done in complete conformance with section I.59 52.233-01 Disputes of the Contract Specifications.

Section I.59 52.233-01( c ) clearly states; " . . . However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph (d)(2) of this clause." Additionally, part (e) of this same section states the following:

> "For Contractor-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made."

What is clear from your letter is the NPS is again attempting to circumvent the NPS's own Contract Specifications. REMCON's claim was certified, the amount of the claim was provided, and the NPS had all related back-up documentation. By the NPS's own Contract Specification **you must** respond within 60 days, which you failed to do.

Your letter further attempts to misrepresent the terms of the conditions of the contract by requesting supporting documentation, which is not part of the contract requirements. REMCON's claim is for non-payment for Aggregate Base and Asphalt Concrete, which are covered by Section 02725 and Section 02743 respectively. In both cases the Contract Specifications clearly state that "payment will be made by verified weight tickets", which REMCON provided to the NPS. Nowhere does it state that surveys are required or that contractor quality control reports are needed prior to making payment. At all times during this work the NPS had on-site representatives who never question the work being performed.

What is in evidence here, is that the NPS has failed to properly pay REMCON for work performed in accordance with the Contract Specifications, the NPS is attempting to contrive a new set of rules for payment other than that specified in the Contract Specifications, and the NPS has failed to respond to REMCON's claim in the time frame specified in the Contract Specifications. By failing to respond within the sixty day requirement, the NPS has lost their right to reject REMCON's claim and must make payment. REMCON has provided the NPS with a "Certified Claim" and interest is now being accrued on all unpaid sums due.

Cordially,

Stephen B. Christensen
President

cc: Congressman George P. Radanovich, U.S. House of Representatives
Richard A. Lewis, REMCON Board Member
D. Michael Schoenfeld, Murphy Austin Adams Schoendfeld LLP

# EXHIBIT 22

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

March 21, 2003

**SENT VIA FAX AND U.S. MAIL**

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No: 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Notice of Potential Claim, Contract Modification No. 7

Dear Mr. Keiscome:

Reference is made to the National Park Service's (NPS) Contract Modification No. 7. At this time and in compliance with the Contract Specifications, REMCON is formally providing the NPS with a Notice of Potential Claim as it relates to Contract Modification No. 7.

As a result, of the NPS's untimely issuance of Contract Modification No. 7, REMCON will incur additional damages as they relate to; loss of indirect job costs, loss of equipment revenue, and the loss of profit associated to the deletion of work on hand. At this time REMCON is calculating the actual damages and will provide those figures to the NPS in the future. REMCON estimates these damages to exceed $500,000.00.

At this time, REMCON reserves it right to seek damages which may have occurred or may occur in the future as a result of the issuance of Contract Modification No. 7.

Cordially,

Stephen B. Christensen
President

cc: Richard A. Lewis, P.E., Consultant
D. Michael Schoenfeld, Murphy Austin Adams Schoenfeld, LLP

# EXHIBIT 23

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

March 25, 2003

**SENT VIA FAX AND U.S. MAIL**

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Notice of Claim, Failure to Provide Aggregate Base

Dear Mr. Keiscome:

Reference is made to the REMCON's letter of March 17, 2003, which provided the NPS a Notice of Potential Claim as it relates to the failure to provide aggregate base material for the project.

At this time and in compliance with the Contract Specifications, REMCON is formally providing the NPS with a Notice of Claim as it relates to aggregate base course. And provides the following statement as required by the Contract Specifications.

> "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor."

Sheet G-3 of the Contract Specifications clearly states that the aggregate base course for this project is stockpiled in the area of the Upper Sherman Parking Areas. The drawings state:

> "Note: The aggregate base course for this project is stockpiled in this general area. The contractor will be responsible for moving this material to accommodate construction sequencing. This work shall be included in the general site excavation task."

Additionally, Addendum No. 1, Photo 7 showed a pile of aggregate base. It's clear that the contract drawings as well as Addendum No. 1, provided information to the contractor that the NPS was to provide the contractor with the aggregate base course for the Sherman Tree Parking Project. To date the NPS has failed to live up to its agreement to provide REMCON with the aggregate base for this project. REMCON is due full compensation associated to the purchase and hauling of aggregate base to the Sherman Tree Parking Project, as provided in the following calculations:

| | |
|---|---|
| Aggregate Base Course (10,183.50 Tons x $6.25 per ton) | $ 63,646.88 |
| Haul Aggregate Base (10,183.50 Tons x $18.25 per ton) | 185,848.88 |
| Subtotal | $249,495.76 |
| Allowable Mark-up (17.4%) | 43,412.26 |
| Total Amount Due REMCON | $292,908.02 |

In a previous letter, REMCON provided the NPS with all related backup concerning the amount of aggregate base course provided to the project. If you require additional backup please contact our office so this information can be provided.

Additionally, the NPS needs to provide REMCON with assurances that all remaining aggregate base course material will be provided by the NPS or issue the appropriate change order to REMCON assuring REMCON of compensation.

Cordially,

Stephen B. Christensen
President

cc: Richard A. Lewis, P.E., Consultant
D. Michael Schoenfeld, Murphy Austin Adams Schoenfeld, LLP

# EXHIBIT 24

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

REM CON

Oakdale Office
P.O. Box 758
751 Wakefield Ct.
Oakdale, CA 95361
Phone: 209/847-9186
Fax: 209/847-9189

**Sequioa Office**

**Phone: 559/565-3086**
**Fax: 559/565-3203**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Willy DeOcampo | **From:** | Luke Triplett |
| **Fax:** | 303-969-2736 | **Pages:** | 3 |
| **Phone:** | 303-969-2419 | **Date:** | 3/27/2003 |
| **Re:** | | **CC:** | |

☐ **Urgent** ✓ **For Review** ☐ **Please Comment** X **Please Reply** ☐ **Please Recycle**

• **Comments:** WILLIE PLEASE GIVE WRITTEN RESPONSE TO THIS LIST OF R.F.I.'S

# REQUEST FOR CLARIFICATION LOG

JOB NAME: *Sequioa National Park- General Sherman Tree Parking*
REMCON JOB NO: *0112*

| RFI | DESCRIPTION | DATE SUBMITTED TO OWNER | DATE RECEIVED FROM OWNER | COMMENTS |
|---|---|---|---|---|
| 1 | Tree marking | 06/07/01 | | No answer |
| 2 | Wood chips | 06/07/01 | | No answer |
| 3 | Haul from park | 06/08/01 | | No answer |
| 4 | Surveuy cad files | 06/13/01 | | No answer |
| 6 | Sewage disposal pipe | 06/01/01 | | No answer |
| 26 | Slurry section | 09/25/01 | | No answer |
| 28 | 4" gate valves | 10/17//01 | | No answer |
| 29 | 4" pipe over run | 10/17/01 | | No answer |
| 34 | Fire retardent | 10/18/01 | | No answer |
| 35 | Heavy timber connectors | 02/20/01 | | No answer |
| 36 | Night time work | 4//17/02 | | No answer |
| 37 | Landscape boulders | 04/17/02 | | No answer |
| 38 | Trail elevation | 04/17/02 | | No answer |
| 39 | Mod lower sherman parking lot | 04/22/02 | | No answer |
| 40 | Daily eart work disc. | 04/22/02 | | No answer |
| 41 | Stone steps | 05/29/02 | | No answer |
| 42 | Boulder at staion 28+00 | 05/29/02 | | No answer |
| 43 | Down tree on trail | 05/30/02 | | No answer |
| 44 | Tree removal on trail | 05/30/02 | | No answer |
| 45 | Electrical vault | 5/30//02 | | No answer |
| 46 | Aggregate foundation for sone wall | 06/12/02 | | No answer |
| 47 | Embedded plate | 06/13/02 | | No answer |
| 48 | Clean-up on access road | 06/13/02 | | No answer |
| 49 | Elevation at Kiosh | 06/13/02 | | No answer |
| 50 | Revised trail prints | 06/13/02 | | No answer |
| 51 | Compaction testing on the ditch line | 06/14/02 | | No answer |
| 52 | Anchor ties on comfort station | 06/17/02 | | No answer |
| 53 | Boulder removal at the trail | 06/17/02 | | No answer |
| 54 | Plan revision on trail | 06/17/02 | | No answer |
| 55 | Submittals | 06/18/02 | | No answer |
| 56 | Dossen tank | 06/18/02 | | No answer |
| 57 | Stone foundation | 06/18/02 | | No answer |
| 58 | Elecrical to dosing | 06/19/02 | | No answer |
| 59 | Fill slope | 06/20/02 | | No answer |
| 60 | Wood trim | 06/25/02 | | No answer |
| 61 | Slopes | 06/27/02 | | No answer |
| 62 | Slopes | 06/27/02 | | No answer |
| 63 | Sewer line to leach field | 06/27/02 | | No answer |
| 64 | Leach field system details | 06/27/02 | | No answer |
| 65 | Toe of slope on access road | 06/27/02 | | No answer |
| 66 | D/O/ Exsostmg s;p[e | 06/27/02 | | No answer |
| 67 | Access road (seeding) | 09/22/02 | | No answer |
| 68 | Speed letters from N.P.S. | 10//17//02 | | No answer |
| 69 | Added curbing | 10/17/02 | | No answer |

# REQUEST FOR CLARIFICATION LOG

JOB NAME: *Sequioa National Park- General Sherman Tree Parking*
REMCON JOB NO: *0112*

| RFI | DESCRIPTION | DATE SUBMITTED TO OWNER | DATE RECEIVED FROM OWNER | COMMENTS |
|---|---|---|---|---|
| 70 | Comfort station | 10/17/02 | | No answer |
| 71 | Signature boulders | 10//17/02 | | No answer |

# EXHIBIT 25

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**COPY**

**SENT VIA FAX AND U.S. MAIL**

April 9, 2003

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Failure to Make Proper Progress Payments, Pay Estimate 14

Dear Mr. Keiscome:

Reference is made to Section I.87 of the Request for Proposal, the Federal Acquisition Regulations, Prompt Payment for Construction Contracts and Contract Pay Estimate No. 14.

On March 14, 2003, REMCON submitted to the National Park Service (NPS), mailed return receipt and signed by NPS, Progress Pay Estimate No. 14, for proper processing and payment. It is now April 9, 2003, and REMCON has yet to receive payment, as required by the Contract Specifications and the Federal Acquisition Regulations (FAR's). REMCON has repeatedly notified the NPS of their violations regarding payment. The Contract Specifications and the FAR's leave no room for interpretation, the NPS is once again violating the rules.

The regulations clearly state that if the designated billing office has issue with the progress payment request, **they are required by the F.A.R.'s,** to return the invoice to the Contractor within 7 days, with a statement explaining why the invoice is not proper. Section DS52.232.27 (a) (2) clearly states the following:

> "Contractor's Invoice. The Contractor shall prepare and submit invoices to the designated billing office specified in the contract. A proper invoice must include the items listed in paragraphs (a)(2)(i) through (a)(2)(ix) of this clause. If the invoice does not comply with these requirements, it shall be returned within 7 days after the date the designated billing office received the invoice, with a statement of the reasons why it is not a proper invoice. ..."

The NPS received REMCON's invoice on March 14, 2003, if you had any issues with the billing, you were required to return the invoice to REMCON within 7 days. Had the NPS had an issue with the invoice, you were required to return the invoice within the mandated time period. Having made no objection, the NPS is then required to make payment to REMCON within 14 days from the date of receipt of the invoice. Once again, the NPS has failed to abide by the Contract Specifications. Section I.87 of the Request for Proposal, contains sections of the F.A.R. regulations DS52.232-27 Prompt Payment for Construction Contracts, which clearly states that payment is to be made within 14 days, unless objections are raised within 7 days by the billing office, in this case NPS's Denver Service Center. Section DS52.232.27 (a) (1) (i) (a) clearly states the following:

> "The due date for making such payments shall be 14 days after receipt of the payment request by the designated billing office. "Receipt of the payment request by the designated billing office" is defined as the day the Contracting Officer's Representative and the Contractor reach agreement on the requested progress payments. If the designated billing office fails to annotate the payment request with the actual date of receipt at the time of receipt, the payment due date shall be the 14th day after the date of the Contractor's payment request, provided a proper request is received and there is no disagreement over quantity, quality, or Contractor compliance with contract requirements."

Additionally, the Contract Specifications clearly state that if the Contractor does not receive payment within the 14 day time period, interest will be automatically paid. Throughout the course of this contract, REMCON's payments have been repeatedly late without receipt of proper interest payments. Section DS52.232.27 (a) (3) clearly states the following:

> "Interest penalty. An interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in paragraphs (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable. ..."

REMCON continues to find your action to be arbitrary and capricious, and it is meant to cause economic duress to REMCON, REMCON's employees, subcontractors and material suppliers. REMCON will seek what ever means available to seek compensation for the action of the NPS, its employees and contractors.

Cordially,

Stephen B. Christensen
President

cc: D. Michael Schoenfeld, Murphy Austin Adams Schoenfeld, LLP
Richard A. Lewis, REMCON Board Member
Ken Smith, Ken Smith Masonry

# EXHIBIT 26

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**COPY**

**Sent Via Fax and U.S. Mail**

April 15, 2003

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Response to April 4, 2003 Letter

Dear Mr. Keiscome:

This letter responds to the April 4, 2003, letter you sent to me regarding the NPS position concerning Contract Modification No. 7, Alternative Dispute Resolution (ADR), and Contract Modification No. 6.

Although you requested additional time to respond to my March 12, 2003 letter so as to provide me with a "comprehensive" response, I find your letter to be less than comprehensive and full of factual inaccuracies and omissions. Given the importance of the issues under discussion, and the fact that you have been put on notice that REMCON finds the NPS conduct to date to be in repeated breach of contract, it is indeed unfortunate that you would publish the content of your letter. To ensure that the factual record is accurate, and that you possess all relevant data to assist you in making whatever decisions you elect to make, the following point-by-point response to each substantive paragraph of your letter is provided. I request that you immediately review each factual assertion made in this letter and advise me if you dispute it. If you do dispute any factual assertion, you are requested to identify the bases of such dispute, and the document(s) you rely upon to support your position. Your response is requested to be received within one week.

The NPS withdrawal of Contract Modification No. 7 is unconscionable and without merit. On February 24, 2003, the NPS issued a letter, along with Contract Modification No. 7, which deleted $2,743,771.14 from the Sherman Tree Parking Area Project. The letter stated that if the signed modification, was not received within 10 days from receipt, the NPS would issue Contract Modification No. 7 unilaterally. REMCON received your letter on March 3, 2003; and refused to sign the Modification. By virtue of your letter, Contract Modification No. 7 took effect unilaterally on March 13, 2003. Subsequently under separate cover, the NPS was notified, by REMCON's attorney, D. Michael Schoenfeld), that by issuing Contract Modification No. 7 the NPS had effectively activated a "Termination for Convenience for the Government". Now, in a clear attempt to counter the termination for convenience, the NPS is attempting to delete/rescind Contract Modification No. 7. This action was clearly taken in an effort to avoid the Federal Acquisition Regulations and the related cost impacts as a result of the NPS "Termination for Convenience of the Government". Contract Modification No. 7 took effect March 13, 2003. The NPS can't arbitrarily and unilaterally now add back work which it deleted just weeks prior. If the NPS now chooses to have additional work performed under REMCON's contract, it will need to provide REMCON with a request for proposal, clearly defining what work the NPS would like performed along with detailed plans and specifications. After receipt of said information and request, REMCON will provide the NPS with a cost proposal for performing the work. In lieu of this process REMCON can perform the work on a time and materials basis.

Your continued approach to REMCON's request for Alternative Dispute Resolution (ADR), only provides credence to REMCON's position regarding the NPS unwillingness to comply with the Contract Specifications. Repeatedly, REMCON has issued letters to the NPS requesting the use of ADR (letters of November 25, 2002; December 8, 2002; March 26, 2003). To date, you have refused to adhere to the Contract Specifications and the FAR, which grants REMCON the right to utilize ADR. Again, your recent correspondence fails to address previous requests to invoke ADR procedures pursuant to the Contract Specifications and 48 C.F.R. 33.214 (nor have you responded in writing objecting to ADR as stipulated in the FAR provision). REMCON's position remains unchanged: the contract specifications and FAR grant REMCON the right to a third party review in the ADR process. Your continued stalling tactic is tantamount to a breach of contract.

Paragraph 3 of your letter is blatantly untruthful. You make a statement that REMCON has never submitted a schedule that meets the contract requirements. Again, you must be getting either poor information from your staff or no information as the NPS approved REMCON's original baseline project schedule, June 2001 and a revised construction scheduled submitted in spring 2002. In both cases these schedules were submitted by REMCON and approved by the NPS. The fact that your letter asserts the opposite underscores the tragic lack o f communication and proper business procedures being used by the NPS, which has plagued this project from the very beginning. The primary reason for REMCON not being able to maintain an ongoing work plan is a direct result of the NPS defective plans and specifications, differing site conditions, delays caused by the NPS by failing to timely respond to REMCON Requests for Information, and numerous overruns in quantities. Before you make such blatantly false statements again, I ask that you research them yourself rather than rely on the very people who have (and continue) to cause problems.

Your statement in Par. 4, referencing a conversation with Mr. Dick Lewis is factually untrue. REMCON has repeatedly provided the NPS with settlement figures in hopes of resolving outstanding claims. I can assure you that in the event this matter goes to litigation REMCON's claim figures will be far higher than previously provided the NPS in an effort to reach a reasonable settlement. REMCON's claims continue to increase as a result of continued problems on the project created by the NPS. As you are aware, REMCON negotiated a settlement of claims through August 22, 2002, which the NPS failed to honor and the NPS has now reneged on the agreement.

With regard to Modification No. 6, your attempt to explain your unilateral issuance of Modification No. 6, clearly shows the NPS lack of knowledge with regard to drilling and blasting and the associated costs. The contract specifications clearly provided the Contractor with a differing site condition clause. Additionally, the NPS own geotechincal information stated that the materials to be encountered by the Contractor were all rippable with a Cat D8 Dozer. As you are fully aware this was not the case. REMCON encountered over 6,000 cubic yards of <u>rock</u>, which could <u>not</u> be removed by ripping. Not only is the NPS responsible for the cost of drilling and blasting but you are also responsible for all associated costs which would include: exposing the rock surface, developing a drilling platform, covering the blast to prevent fly rock, removal of the cover material, drilling and shooting of any large boulders which failed to break in the initial shot, and all costs associated with the delays and disruption due to the change in character of the work as a result of the shot rock. In a <u>subsequent</u> letter you stated that the rock was overshot. In any normal blasting operation, rock is typically over drilled so the floor can be excavated without additional drilling. Your analysis fails to even address these issues. Additionally, as a result of this need to drill and blast in the first season of work, REMCON lost over 10 weeks of critical path work. Your letter and position again fails to even address these issues. The NPS has attempted to simplify the entire drilling and blasting costs and in doing so, fails to address, most of the costs associated with the need for drilling and blasting. This failure on your part, coupled with your clear lack of knowledge provides even more credence to the need for a knowledgeable third-party arbitrator to address all of the project's outstanding issues.

Your statement that the NPS plans and specifications are clear and concise clearly shows how out of touch you are with this project. The NPS plans are so poorly prepared and riddled with ambiguities and inconsistencies that it makes it nearly impossible (as shown in the contract documents) for any contractor to build this project. Specially, in light of your staff's failure to provided timely responses to REMCON's requests for clarification of the numerous problems identified, the project has been unduly further delayed. If the NPS plans were so perfect then please provide an explanation for Contract Modifications 2, 3, 4, 5, and 6, as well as the numerous plan changes, RFI's, and outstanding claims. The bottom line is that the content of the plans fell way below any standard of care and the government bears the economic burden to compensate us for the resulting damages.

We understand that you don't agree with REMCON's position that the access road required numerous changes. If you agreed then there would be no issues and REMCON would have its money. There is no doubt that the road required numerous changes. The fact that you don't agree is unbelievable considering the fact that numerous directed changes in alignment were required as a result of defective plans and specifications for which the NPS has provided both Contract Modifications as well as field modifications directing such changes.

REMCON fully acknowledges that the access road is not constructed as provided on the original plans. The sole reason for the changes in alignment, were the requirements from the NPS to not disturb natural features along the roadway alignment. On July 10, 2002, REMCON personnel met with Mike Giller (NPS) and walked the access road and pointed out the numerous problems. REMCON had remobilized to the project in the middle of May 2002, issued numerous RFI's to the NPS, and had failed to receive <u>any</u> direction to that point. In an attempt to get the project moving, and to avoid additional delay impact costs to the NPS, Mr. Giller directed REMCON's field personnel to build the road to fit existing natural features. This was confirmed in a letter of July 11, 2002. Through Mr. Giller's direction REMCON was finally able to begin construction of the access road, 1 ½ months after remobilization.

Subsequently, on July 25, 2002, a meeting was held between REMCON and NPS personnel to discuss alignment problems between Station 24+00 and 29+75. At that time Russell Belknap (NPS), who was new to the project, asked Mike Kitchell (REMCON Superintendent/Foreman) to show him how REMCON was adjusting the roadway alignment to account for natural features in conflict with the contract plans. Mr. Belknap and Mr. Kitchell performed a job walk from Station 1+00 to 24+00. Along the way Mr. Kitchell pointed out the numerous design defects and the alignment changes required, to avoid the natural features, which the NPS did not want disturbed. Mr. Russell responded that he felt Mr. Kitchell's changes from Station 1+00 to 24+00 were well done and wanted to know why REMCON had not continued to Station 29+75. Mr. Kitchell responded, that Mr. Giller's direction was for work only through Station 24+00. Further discuss transpired between Mr. Kitchell and Mr. Belknap, who then directed REMCON to continue roadway modifications from Station 24+00 to 29+75. It was further agreed that REMCON would track their costs for this work on a time and materials basis. On July 31, 2002, another meeting was held between NPS and REMCON personnel to discuss design problems with the intersection of the access road and Wolverton Road. After much discuss, REMCON was directed by the NPS to move the tangent of the curve. NPS personnel felt the design radius was incorrect on the project plans.

REMCON fully acknowledges that the access road is not constructed as provided on the original plans. These corrective changes were required as a result of the NPS defective plans and specifications and these changes were directed by the NPS. Subsequently, the NPS then redesigned the access road in late September of 2002, further delaying the project, as REMCON was forced to wait for alignment changes and finish grades. Remember REMCON was provided plans and specifications prepared by the NPS, REMCON had/has <u>no</u> design responsibility.

It is beyond dispute that the NPS failed to provide REMCON with a detailed and concise set of project plans and specifications. The NPS fully admits this by its own issuance of Contract Modifications, quantity overruns and NPS responses to REMCON's Requests for Information. As a result REMCON is due a fair and equitable adjustment to the Contract as provided for in the contract specifications.

Referencing your final paragraph, REMCON has never indicated that all the issues are one-sided. Rather, all REMCON seeks is to be treated fairly, to be afforded due process, and to have both parties honor the contract, including the right to implement ADR and that a third party neutral be utilized to resolve outstanding issues, which can not be resolved by the parties. Your documented reluctance to use a neutral third-party mediator, leads us to believe that the NPS is further attempting to stall this process and prolong settlement of these outstanding issues. The history of this project is well documented, and there clearly has been unwillingness on the part of the NPS to meet the contractual requirements granted REMCON by both the contract specifications and the Federal Acquisition Regulations. We demand the initiation of ADR as specified or that the NPS terminate our right to proceed with the project.

Cordially,

Stephen B. Christensen
President

Enclosures

cc: D. Michael Shoefeld, Murphy Austin Adams Schoenfeld LLP
Michael Flak, Great American Insurance Company
Richard A. Lewis, P.E.

# EXHIBIT 27

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

**SENT VIA FAX AND U.S. MAIL**

June 8, 2003

Mr. William H. DeOcampo
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Project Schedule Review Comments

Dear Mr. DeOcampo:

Reference is made to you letter of May 22, 2003 referencing the project schedule.

First off I'd like to thank you for your letter and schedule review, though I believe clarification is needed. REMCON never submitted a formal schedule to the National Park Service (NPS) in April. REMCON, at the request of the NPS, simply provided a schedule, which provided the NPS with an approximate timeline for project start up for the 2003 work season. If you reference the weekly meeting minutes you will note that the issuance of the formal project schedule was being withheld pending verification of suitable site conditions. Now that this information is available REMCON is submitting our revised construction schedule for the remaining work. As noted this is Revision 2, to the two previously approved schedules, dated July 11, 2001 (baseline) and August 12, 2002 (Revision 1). I believe no further response is needed regarding the April schedule, as it appears there was a miscommunication internally within the NPS. It is important to note that REMCON's construction schedule, revision 2, has been prepared in the same method and format as the two previously approved construction schedules. The NPS, by approving and accepting the two previous schedules has established the criteria for which all construction schedules for this project must follow.

REMCON's construction schedule, Revision 2, has been prepared to reflect the current work activities remaining on the project. REMCON's as-built construction schedule for the 2001 and 2002 work season is protected by Attorney/Client privilege and is not available to the NPS, until such time, that an agreed upon exchange of documents has been worked out between legal counsel.

With regard to notification to the NPS of REMCON's "Contractor's Schedule Representative", REMCON previously submitted this data in the spring of 2001, by transmittal with the first submitted schedule. As previously submitted, REMCON's schedule representative is Stephen Christensen, President of REMCON. Mr. Christensen's resume was previously submitted to the NPS in the bid proposal packet.

Your reference to what I believe is meant to be Section 01320, Part 1.4 A.1, the established contract completion date, fails to address the delay impacts caused by the NPS. As you will note from REMCON's submitted schedule, Revision 2, the revised completion date is now October 7, 2004. As I am sure your aware, the NPS has failed to acknowledge their numerous impacts to the project completion date as a result of differing site conditions (rock excavation), changes in the character of the work, overrun in contract item quantities, failure of the NPS to timely respond to RFI's, and, but not limited to, the failure of the NPS to properly issue contract change orders. REMCON cannot provide

the NPS with a construction schedule, which fails to address these impacts and the resultant revised completion date associated to the Owner caused delays.

In addition, REMCON's construction schedule, revision 2, addresses many of the issues raised in your letter, even though your review was made on a preliminary mobilization schedule and a formally submitted schedule. The issues are as follows:

- The submitted schedule utilizes an incremental number system by 10 digits.
- The submitted schedule contains no activity longer than 15 days.
- The submitted schedule shows the predecessors and successors, utilizing a critical path. Should the NPS desire additional reports not submitted with this letter then can be extracted from the enclosed computer disk.
- The submitted schedule is resource loaded in the same method as was utilized in the two previously approved contract schedules. If for any reason you have misplaced the resource legend provided previously, one can be provided on request.
- The submitted schedule does show the estimated time required for each activity, reference submitted reports.
- The submitted schedule does take into account weather conditions at the project. In addition the schedule reflects the impacts of Owner caused delays as they impact weather related items.

REMCON disagrees with your position that REMCON has not met the requirements of the contract specifications as it relates to the schedule. If you refer to the weekly meeting minutes, there is even reference to the schedules being approved.

In closing please find two copies and one electronic copy of contract schedule revision 2 as stipulated in the contract specifications. If you have any questions feel free to contact me.

Cordially,

Stephen B. Christensen
President

enclosures

cc: D. Michael Schoenfeld, Murphy Austin Adams Schoenfeld, LLP
Richard A. Lewis, REMCON Board Member