# EXHIBIT 28

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**Sent Via Overnight Mail**

June 28, 2003

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Certified Claim of REMCON Arising from Work Performed to Date

Dear Mr. Keiscome:

As the Contracting Officer, this certified claim is submitted to you in accordance with the requirements of the Contract Disputes Act of 1978, 41 U.S.C. §§601, et seq. While some of the individual claims noted herein have been the subject of previous claims to you, there are additional facts and/or revised damage claims submitted herewith. Therefore, for purposes of being comprehensive, and to state the known, pending claims in one omnibus package, the certified claim of REMCON is submitted as an attachment to this letter.

The claim consists of a narrative and exhibits.

A timely, formal Contracting Officer's final decision, on each claim, is requested.

I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Pursuant to applicable law, we strongly urge the Contracting Officer to adopt alternative means of dispute resolution, whether binding arbitration or mediation. I am amendable to utilizing such a process to resolve this claim

Cordially,

Stephen B. Christensen
President

Enclosures:

cc: D. Michael Schoenfeld, Murphy Austin Adams Schoenfeld, LLP
Richard A. Lewis, REMCON Board Member

SequoiaLetter117-sbc

# CERTIFIED CLAIM OF REMCON

## SEQUOIA & KINGS CANYON NATIONAL PARK
## SHERMAN TREE PARKING PROJECT

## I.

## INTRODUCTION

This certified claim has been prepared so as to provide a detailed description of REMCON's claims, justification for them, and a breakdown of the amounts being claimed and due REMCON relating to the above-referenced project.

The total value of the claims asserted in this document is $3,091,799.60. They are identified immediately below, and discussed in detail in the body of this document. The identification of the claims, and their individual amount, in the order addressed below, are as follows:

| | | |
|---|---|---|
| • Excavation: | $ | 887,508.46 |
| • Boulder Revetment: | $ | 47,039.61 |
| • SWPPP Operations: | $ | 90,182.12 |
| • Failure to Supply AB: | $ | 298,792.33 |
| • Re-Grading AB: | $ | 117,510.11 |
| • Winter 2002/2003 Repair: | $ | 50,000.00 *(Estimated)* |
| • Additional Survey Costs: | $ | 49,052.66 |
| • Extended Field Overheads: | $ | 767,356.28 |
| • Extended Home Office Overhead: | $ | 352,235.21 |
| • Unallocated Equipment Costs | $ | 150,197.94 |
| • Improper Credits: | | |
| (i) AB | $ | 140,407.90 |
| (ii) AC | $ | 50,322.48 |
| (iii) Dry-Laid Stone | $ | 39,560.00 |
| (iv) Boulder Revetment | $ | 15,114.50 |



REM000017654

| | | | |
|---|---|---|---|
| (v) | Drop Inlets Type A | $ | 2,000.00 |
| (vi) | Erosion Control Logs | $ | 34,520.00 |
| (viii) | Interest | | TBD |
| (ix) | Attorney Fees | | TBD |

**A. Project Description**

The Sherman Tree Parking Project ("Project") was divided into three distinctly separate construction areas. These three areas are referred to as the Upper Sherman Access Road and Parking Area, the Sherman Tree Trail, and the Lower Sherman Parking Area. The contract specifications required that the Upper Sherman Access Road and Parking Area, and the Sherman Tree Trail, be complete before any work could proceed on the Lower Sherman Parking Area. As of May, 2003, since work remains to be completed on the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail, no work has been performed on the Lower Sherman Parking Area.

The Upper Sherman Access Road and Parking Area involved the construction of approximately 3,000 linear feet of two lane asphalt paved roadway, a two level parking area, installation of approximately 3,700 linear feet of domestic waterline, installation of approximately 3,800 linear feet of electrical service line, installation of a sewer system (which included approximately 750 linear feet of sewer line, a concrete septic tank, dosing siphon tank, and a sewage leach field), construction of a comfort station, wayside kiosk, rock revetment, and landscaping/erosion control measures. The Sherman Tree Trail component involved the construction of approximately 2,000 linear feet of asphalt surfaced trail (including concrete/stone stairs, timber edging, a visitor overlook, and related landscaping/erosion control measures). The planned work for the Lower Sherman Parking Area includes demolition and removal of existing man-made features,

construction of approximately 300 linear feet of concrete retaining wall with rock facing, realignment of the General's Highway, construction of a visitor comfort station, and related landscaping/erosion control measures.

**B. Bidding and Selection Process**

It's important to note that the selection process for this project was an RFP (Request for Proposal), and REMCON was the contractor of choice for the National Park Service ("NPS"). In late February 2001, REMCON received a set of plans and specifications for the Sherman Tree Parking Project. REMCON based its "Proposal" on the information contained within these documents. REMCON's proposal contained a line item cost breakdown, previous job experience as well as numerous other factors, which were requested within the "Request for Proposal". REMCON had performed previous work for the NPS, and had just completed a project within the Sequoia National Park – Giant Forest area. As a result of REMCON's work on the Giant Forest project REMCON received a "Letter of Recommendation", issued from Sequoia National Park's own construction manager, Jack Vance.

Based on all of the information provided in REMCON's "Proposal", the NPS selected REMCON as the contractor. The NPS was under no set criteria to award REMCON the Sherman Tree Parking Project. The NPS had the opportunity to review REMCON's price proposal and compare the NPS' estimated project value against the price proposal provided by REMCON. The NPS did review these figures and contacted REMCON concerning certain price items, with which the NPS did not agree. The NPS was fully aware of REMCON's price proposal and the work required as it confirmed the prices provided by REMCON.

## C. Summary of Impacts to Earthwork Activity

The contract documents provided by the NPS to the prospective bidders (who submitted proposals to the government) for the Sherman Tree Parking Project were design specifications which included the NPS estimated quantities of work and a geotechnical report. In the preparation of REMCON's estimate and subsequent proposal, REMCON justifiably and reasonably relied on the information contained within said documents to be truthful and accurate. This is consistent with the legal authorities cited at the conclusion of this claim (e.g. United States v. Spearin and its progeny). The contractors proposing on the Sherman Tree Parking Project were prevented from making a site investigation to confirm the accuracy (or observe/perceive any inaccuracy) of the contract documents as the NPS did not make the contract documents available to bidders until February 27, 2001. The timing of the issuance of the contract documents is extremely important as they were published in the heart of winter when the jobsite, located at approximately 7,000 feet above sea level, was completely buried under snow. Given that the requested bid date was March 29, 2001, when the site was still completely buried, there was no way to confirm the accuracy of the government's estimates or observe their inaccuracy.[1]

---

[1] As but one example of the numerous errors in the contract documents which could not be discovered through a pre-bid site inspection is the issue regarding the NPS furnishing of aggregate base material. On sheet G-3 of the plans, the NPS identified it had stockpiled aggregate base material, which was available to prospective contractors. This area was buried under snow and the accuracy of the NPS representation could not be evaluated. In fact, there was no aggregate base stockpile as represented, and the NPS bears liability for all resulting time and cost impacts for this misrepresentation. This problem is addressed in greater detail below, but suffice it to say, such conduct violates multiple legal principles, including, but not limited to, breach of the implied warranty of

This project, located in the Sierra Nevada mountains at over 7,000 feet in elevation, in an area adjacent to a heavily visited national treasure (the General Sherman Tree), had limited construction access and a limited annual construction season. The site conditions, and work required to be performed, were of such a nature that multiple concurrent activities realistically could not be planned to be performed. By analogy, this project was akin to building three separate jobs, and one job (due to limited access, time to perform and mobility of equipment) had to be effectively (if not actually) completed before the next commenced. Much of the work by its nature has to be performed sequentially. Thus any delay in one operation also effects all the operations that must follow in sequence.

Further compounding the project is its location and weather. Instead of being able to work twelve months, or even nine months, the construction season was dictated by the extent and duration of winter precipitation (snow) and cold temperature. Realistically, the construction season was from sometime in May or June through October, a duration of five or six months.

Thus, any construction delays or impacts would have significant detrimental impacts on the ability of the contractor to work on the project. The NPS knew this as it allowed for three years' worth of construction seasons to perform the work.

REMCON was awarded the project on May 15, 2001 and was issued a "Notice to Proceed" on June 11, 2001. Prior to the issuance of the "Notice to Proceed", a representative of the NPS made a field investigation and marked all trees which could be

---

the correctness and accuracy of plans, failure to disclose superior material information, and misrepresentation of material facts. Entitlement to damages is automatic, and detailed below the damages are identified. Citations to legal authorities establishing these principles are set forth in the concluding portions of this omnibus claim.

removed during the clearing and grubbing operation (including logging). On June 11, REMCON began operations with the falling and logging of all marked trees. Once clearing operations had been completed, the NPS representative made another site visit to review REMCON's natural feature protection measures, which were required by the contract specifications and drawings. In addition to the measures noted on the plans, additional measures and restrictions were directed by the NPS. These natural feature protection measures established the limits of REMCON's work area. The NPS directed REMCON not to encroach, damage or remove any trees, shrubs or natural features which had not been marked for removal by the NPS. REMCON substantially completed its clearing operations on June 27, 2001. Upon completion of the clearing operations, REMCON's surveyor, Guiliani & Kull (G&K), began layout of the Upper Sherman Access Road and Parking Areas.

The commencement of the surveying efforts to lay out the road and parking areas per the NPS mandated alignment and elevations immediately disclosed significant and devastating design errors in that the access road and other improvements, as shown on the plans, did not match the clearing limits that had been laid out by the NPS in the field. This initiated a series of re-designs and problems that have continued to impact and ripple through the project. A total of five significant re-design efforts have already been performed by the NPS. These are detailed herein below.

Per its original, approved schedule, REMCON had originally planned to begin earthwork activity once survey layout had been completed and the disposal of unsuitable material had been removed from the park as required in Bid Item 26. As a result of the quantity overrun in Bid Item 26, and the delays resulting from it, REMCON, in an

attempt to mitigate the delays and resulting impacts was forced to try and begin earthwork activities along the access road while it was still being concurrently utilized as the truck route for the significant increase in material being off-hauled from the park. This constant truck traffic, as a result of the NPS defective plans, negatively impacted REMCON's earthwork productivity and further delayed the project.

## II.

## SPECIFIC EARTHWORK CLAIMS

### A. Impact of Item 26 – Increased Quantity of Misc. Material Hauled from the Park

Earthwork operations were immediately impacted as a result of an error in the NPS quantity calculation for Item 26 – Haul Misc. Materials from the Park. Included within the scope of work for Item 26 was the excavation of an existing NPS burn pit which contained unsuitable material that was stipulated within the contract specifications to be off hauled from the park and disposed. Bid Item 26 called for the removal of 2,000 cubic yards or 67 truckloads (Ex. 1) of material, which was to be disposed of outside the park, at a recycle/dump facility. Instead of the estimated 67 truckloads, REMCON was required to remove 394 loads (Ex. 2) or an estimated 8,200 cubic yards, an increase of 6,200 cubic yards over the NPS stated quantity. REMCON had reasonably originally planned for this work activity to take 5 workdays (based on the NPS estimated quantity). In fact it took 27 workdays (from June 11, 2001 to July 18, 2001) to remove all of the NPS designated material from the park due to the significant increase in quantity.

REMCON was also forced to search for this additional disposal material, wait on NPS direction, and was having to start-stop-start this work activity, which resulted in both an inefficient use of REMCON's planned labor and equipment, and project



REM000017660

supervision, as well as a huge and immediate negative impact to REMCON's schedule. As a result of this significant overrun in quantity and change in the character of the work, REMCON's schedule was immediately impacted by the NPS defective plans related to this work item. The fact is, within the first three weeks of work on the project, NPS directions and deficiencies in the contract documents (e.g. plan errors) impacted the schedule to such an extent that completion of the 2001 work schedule, as planned by REMCON and accepted by the NPS, was undermined. Damages for this effort are detailed below.

**B. Redesign Impact Due to Defective Plans and Clearing Limitations (2001 Season)**

Once REMCON began initial pioneering of Stations 24+00 to 30+00, the area known as the "deep cut", it became apparent that a defective design existed, as the trees removed (as directed by NPS), during the clearing operation, did not correspond to the limits set forth in the project plans for construction. REMCON immediately notified the NPS on-site representative (verbally) of the apparent conflict between the clearing limits and the plans. The NPS on-site representative initiated conversations between REMCON's surveyor and the NPS Denver design office to try and determine a resolution to this design problem. REMCON was directed verbally by NPS personnel to provide new survey alignment data to the NPS, which took into account the NPS's desire not to remove additional trees. Giuliani and Kull's survey crew chief, Jess Stanley, taking direction from the NPS on-site representative, Bob Russell, provided new alignment data, which was forwarded to the NPS designers. (A contract modification was issued by NPS in September 2002 to REMCON for the additional survey work, thus validating REMCON's contention that the plans were in conflict with the designated tree clearing

limits. Ex. 3.) REMCON ceased grading operations between Stations 24+00 and 30+00 pending new design data from NPS and relocated its equipment and began work in the Upper Sherman Parking Area.

On Wednesday, July 11, 2001 the NPS issued a memo (Ex. 4) to REMCON stating the new plans were being sent directly to Giuliani & Kull for the alignment change on the access road between Stations 24+38 and 30+20, a distance of approximately 600 linear feet or 20 percent of the entire access road. Once the new design data (Design No. 2) was provided to Giuliani and Kull, Jess Stanley returned to the project and resurveyed the area with the revised design information. This new design changed both vertical and horizontal grades. It was not until Monday, July 16, 2001 that Giuliani & Kull was able to return to the project site and re-survey the new road alignment. As further verification of this alignment change the NPS issued a contract modification (Ex. 5) for G&K's additional survey work. It is very important to note that the reason REMCON commenced its access road work in this area was because the work was a combination of cuts and fills, and the significant source of the fill material for other portions of the road was from this reach of the access road. The majority of the deep or major excavation material needed to complete earthwork fills elsewhere on the project was to be generated within this excavation area between Stations 24+00 to 30+00.[2]

[2] This project, as designed, had excess material, which needed to be hauled and stockpiled at Wolverton Point. The NPS specified this as bid item 38 – Excess Excavation Material, which required the export of 6,800 cubic yards. Given the bid item showing the project had excess material, which needed to be off hauled/exported, REMCON had to wait for the re-design to reasonably and efficiently start its work in the deep cut location. Otherwise, REMCON would have created greater off-haul, thus increasing the NPS' costs.

REMCON's earthwork operations were further impacted by the NPS revising and clarifying the grading plans for the Upper Sherman parking lots. This is verified in an e-mail (July 25, 2001) sent from Dan Savage (NPS) to Bill Morris (G&K) which states: "Bill, Attached are the files for the revised upper lot grading. Thanks, Dan" (Ex. 6). The files being referenced in this and subsequent e-mails contained all the design points which the surveyors needed to layout the project. Further design problems were encountered in the lower parking area as noted in an e-mail (July 30, 2001) sent from Bill Morris (G&K) to Dan Savage (NPS) which stated: "Dan, please check the points you sent me for the lower parking lot, I believe they are off by a hundred feet" (Ex. 7). Mr. Savage responded to Mr. Morris' e-mail on July 31 and stated: "Bill, I just saw the lower parking elevations are off 100' as you had noticed. I will correct and send you a new .txt file along with the centerline points Wed am" [August 1, 2001] (Ex. 8). Mr. Savage followed with another e-mail on Wednesday, August 1, 2001 to Mr. Morris stating; "Bill, Attached is the updated drawing and text files of upper and lower parking with the addition of centerline pt coordinates and elevations. (also the 100 ft. correction in elevation of the lower parking is reflected in the text file)" (Ex. 9). These e-mails confirm that the design was, at least as of August 1, 2001, horribly inaccurate, and it substantially restrained REMCON's work. As of July, 2001, REMCON has been required to haul off substantially greater quantities than represented (a 300% increase), and the two key areas available to work (parking lots and access road) were both being re-designed, thus stalling, preventing, hindering and impacting REMCON's work during the height of the construction season.

In addition to the previously identified design changes, another design change was required, per a verbal direction (confirmed in writing on July 15, 2002) along the access road between Stations 9+00 and 13+00 (Ex. 10). This issue concerned a conflict between the road design and a tree REMCON could not disturb. As a result of this design problem, the following design changes and impacts occurred: the traffic turn out had to be adjusted to the other side of a large tree designated not to be removed, the road had to be moved to accommodate the tree location which was improperly shown on the plans, and REMCON was required to construct additional fills to accommodate the new road alignment. All of this was directed extra work which caused time and monetary damages. Despite this fact, no compensation (in time or money) for this impact (or indeed for any of the earthwork impacts detailed in this certified claim) has been issued by the NPS. Such conduct is a gross abuse of the NPS obligation and magnifies its improper conduct.

It only took seven weeks into the project for the NPS, due to its multiple directions, plus errors and clarifications to completely undermine and negatively impact REMCON's operation and schedule. The NPS revisions due to defective plans and specifications, quantity overruns, improper survey data, and design changes, which were experienced in June and July, 2001, usurped REMCON's ability to schedule the project or meaningfully and economically control its means, methods, sequences or operations. There were so many areas where REMCON could not work, or work with any efficiency. Not since completion of the clearing and grubbing had scheduled work been able to proceed without an impact to productivity or schedule as a consequence of these problems. Following these impacts in June and July 2001 were the subsequent impacts

of increased material required to be hauled from the park and a Differing Site Condition – Rock Excavation which required drilling and blasting, which further impacted and delayed the project through the remainder of the 2001 work season (detailed in Differing Site Condition – Unrippable Rock below).

**C. Differing Site Condition – Unrippable Rock**

Following receipt of the design revisions for Stations 24+00 to 30+00, and the re-survey, excavation proceeded within the deep cut area in the Upper Sherman Access Road and Upper Sherman Parking Area. Unfortunately, further problems began to become apparent. REMCON encountered granitic rock in late July 2001, starting at Stations 21+50, which according to the geotechnical report, made a part of the contract documents, was supposed to be rippable with a Cat D8 Dozer/Ripper. While actual efforts at ripping were able to remove only a small portion of the more weathered granitic rock, the remainder of the rock formation quickly proved too hard for ripping using the specified Cat D8 Dozer/Ripper. REMCON even attempted the use of a single shank ripper tooth, but still could not dislodge or break up this rock formation. As work progressed, these formations of solid rock were encountered in many locales along the Upper Sherman Access Road and the Upper Sherman Upper Parking Area and required drilling and blasting. Drilling and blasting is extra work and reimbursable.

In the preparation of REMCON's cost estimate for earthwork, REMCON reviewed and relied on the NPS's Geotechnical Report to accurately depict the field conditions, which would be encountered by REMCON during earthwork. Due in large part to the time of year that this project was advertised and bid, REMCON was prevented from performing an on-site investigation as a consequence of a large accumulation of

snowpack. The NPS was fully aware that the site was not accessible to contractors bidding on the project and intended that contractor's preparing proposals on the project rely on the information contained in the NPS's plans, specifications, and geotechical report. REMCON's estimate and proposal was reasonably based on that information.

After careful review of the contract documents, REMCON concluded that the soils represented to be encountered, during excavation, could all be ripped with a Cat D8 Dozer/Ripper. This is the representation made in the NPS Geotechnical Report, Section 5.2 Rippability (Ex. 11), which is made a part of the contract documents. This report, in Table 5.2-1, on page 11, indicates that the granitic rock, which would be encountered, was all rippable with a Cat D8 Dozer/Ripper. Table 5.2-1 Summary Seismic Line Data shows a velocity range of from 4,947 to 5,747 ft/sec in Layer 2. In further confirmation of REMCON's reasonable belief that all granitic rock represented to be encountered and excavated was rippable, Section 5.2.2 Conclusion of the Geotechnical Report states: "Charts developed by the Caterpillar Tractor Company (August 1996) were used in evaluating potential rippability at the site. These charts correlate rippability with the seismic velocity for various geologic materials. The report includes nominal and marginal seismic velocity thresholds for rippability in granite are shown in Table 5.2-2.

Table 5.2-2 Caterpillar Ripper Performance shows that for a Cat D8 Dozer/Ripper the Nominal Seismic Velocity Threshold (ft/sec) was 6,400 and the Marginal Seismic Velocity Threshold (ft/sec) was 7,500. A footnote to the chart defined "The nominal seismic velocity threshold is the upper limit at which ripping becomes difficult and possibly more costly. Well maintained equipment should be productive up to this limit." Even using the highest Velocity line of 5,747 (A-A'), significantly below a Cat D8L's

Velocity Threshold for ripping of 6,400, REMCON could clearly expect that all granitic rock represented that would be encountered could be productively ripped with a Cat D8 Dozer/Ripper. The contract documents in this regard proved to be defective and the use of the specified equipment, even with a single shank ripper tooth, could not rip the rock encountered.

After repeated efforts to rip the granitic rock in this area, documented in daily reports and observed by NPS representatives, which included represented discussions with NPS project personnel, and which notice was promptly given, it became quite apparent that REMCON could not remove the existing granitic rock with a Cat D8 Dozer/Ripper without drilling and blasting.

Drilling and blasting resulted from encountering a Type I Differing Site Condition and clearly caused the claimed increased costs discussed below. REMCON subcontracted with California Drilling and Blasting to perform the necessary drilling and blasting to loosen and break up the granitic rock sufficiently to allow the necessary excavation to proceed. Along with the drilling and blasting costs, REMCON incurred additional, unreimbursed costs for the following extra work activities: building of drilling pads, covering the blast area with clean soil so as to prevent flying rock, removal of the cover soil, excavation and hauling of shot rock to stockpile area, sorting of the shot rock from the fines, breaking of oversized material as well as all costs associated with delay impacts to the earthwork operations. Mass drilling and blasting operations began on July 30, 2001 and were completed on September 13, 2001 (Ex. 12), a total of 34 working days, though additional boulder and incidental rock required drilling and blasting or rock hammering throughout the entire earthmoving period. REMCON experienced additional

increased cost and time in excavating, loading, hauling, stockpiling, sorting and re-handling of the shot material.

In weekly meeting No. 11 (Ex. 13) on August 7, 2002, a discussion took place among meeting participants to discuss blasting operations. All meeting participants agreed that blasting would be required and that Bob Russell, the NPS on-site representative at that time, would approve and evaluate blasting plans on a case-by-case basis.

On August 8, 2001, REMCON issued a letter (Ex. 14) to Bob Russell as well as blasting reports from California Drilling and Blasting. The letter notified the NPS that REMCON believed rock excavation was to be paid for under Bid Item 38-Rock Excavation and that the quantity could overrun by 500 percent. The letter also stated that REMCON would track the cost on a daily basis (which REMCON actually did). Those costs are included with REMCON's Request for Additional Compensation discussed below.

In weekly meeting No. 12 (Ex. 15) further discussion took place amongst all participants regarding rock excavation and blasting as well as REMCON's letter of August 8, 2001.[3] Joanne Cody of NPS expressed her position that Bid Item 38-Rock Excavation was for incidental rock blasting and rock excavation for utility trenches and not mass excavation. Jeff Northrup, REMCON's Project Manager, stated he did not agree with this position and believed mass rock excavation by blasting was an extra and should be covered under Bid Item 38-Rock Excavation.

---

[3]Per direction on the NPS, all correspondence by REMCON was required to be given to the Contracting Officer's on-site representative who was to forward all correspondence to the Contracting Officer.

At weekly meeting No 13 on August 20, 2001 REMCON issued to the NPS Change Order Request No. 4 (Ex. 16), citing a Differing Site Condition (DSC) with regard to the rippability of the granitic rock being encountered in the access road and the parking areas. At no time during this meeting did anyone from the NPS ever voice disagreement with REMCON's position that this granitic rock formation needed to be drilled and blasted, in order to be excavated.

Over the next month and half, REMCON continued with blasting operations along the Upper Sherman Access Road and Parking Areas. REMCON continued to track daily costs for rock drilling, blasting, covering blast areas, rock excavation, rock handling and related earthwork impacts. At no time during this span of over two months did anyone from the NPS, including the Contracting Officer, question whether blasting was necessary or whether the rock blasted could have been ripped. Never did anyone from NPS request that REMCON perform additional test ripping, even after REMCON had issued a formal notice of a differing site condition.

In addition to REMCON now being required to drill and blast granitic rock which exceeded the seismic velocities indicated in the geotechnical report (subsequent tests by an independent laboratory indicate seismic velocities of individual rock from this excavation to be between 9,000 and 10,000 feet per second, far above the 5,747 feet per second indicated in the geotechnical report). REMCON was now forced to handle shot rock instead of rippable materials as reasonably estimated. REMCON's actual costs for earthwork greatly exceeded the costs estimated at bid time for this work, as a result of the change in character of the work due to this differing site condition. Historical construction data has long proved that the costs associated with rock excavation are far

more expensive than general earth excavation. This includes the need for larger and more expensive equipment, additional labor and increased manhours. The work becomes far less efficient, and overall production is slowed, which significantly delays excavation operations and the overall project. This is what occurred on this project.

In addition to submitting REMCON's Change Order Request No. 4 on August 20, 2001, REMCON prepared and delivered to the NPS, in Denver, a detailed cost analysis along with a second request for adjustment in compensation in December, 2001. REMCON requested a meeting with the NPS to discuss all outstanding issues including REMCON's request for additional compensation. The meeting was held in December, 2001 in Denver, excluding the Contracting Officer who was not present (other than a cursory hello). The NPS provided no response to REMCON's request. It was not until March 28, 2002, seven months after REMCON first notified the NPS of its DSC claim that the NPS responded to REMCON's repeated requests (Ex. 17). However, the NPS letter of response simply requested that REMCON submit the same written information, which REMCON had previously provided.[4] The NPS did not dispute the existence of the Type 1 differing site conditions.

In addition to the impacts of rock excavation throughout the 2001 work season, REMCON's grading operations during the 2002 work season also were impacted as a result of rock removal requirements. Throughout the 2002 season, REMCON's work was repeatedly delayed (almost daily), as a result of rock formations throughout the Upper Sherman Parking Area. These rock formations required REMCON to utilize a large excavator with a rock hammer to pound away on the rock in order to remove it from

[4] This conduct by the NPS is a serious breach of its duties, including its duty to timely review and respond to letters and change order requests.



REM000017670

the proposed roadway or pathway alignment. The same type of difficulties, unplanned extra costs, and reduced productivity, resulted.

**D. Excess Excavated Materials and Design Changes**

To further complicate matters, excavation quantities of the earthwork required the excess materials generated were greatly exceeding those which were represented by the NPS in the contract plans and specifications. In RFI #31 dated October 18, 2001 (Ex. 18), REMCON's project superintendent notified Bob Russell, the NPS designated representative, as follows: "Over the past three weeks there have been several discussions, and I have provided several spread sheets, regarding excess excavation. At this point in time there is approximately 1,978 cubic yards of dirt at Wolverton Point in excess of the contract yardage. There is so many piles of dirt on the site we cannot finish-grade the parking lots. The general consensus of our people onsite is that there is approximately 15,000 cubic yards of excess in various piles on the site." The NPS, notified of this condition on October 24, 2001, did not provide REMCON direction to mitigate this problem until mid-season 2002. Rather, the NPS response to the RFI stated that the improvements REMCON was building were maybe a foot below designed grade and that the NPS needed to determine whether errors occurred and if the grades used were wrong. In the meantime REMCON was told not to haul anymore waste to Wolverton Point without further authorization. REMCON was told the NPS could not guarantee payment without the issuance of the proper contract modification by the NPS. As a consequence of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and the project

resulted as stockpiles of excess excavated material remained in place preventing finishing the excavation work and utility installation.

In preparing its bid prices for this project, REMCON relied on the information provided in the contract documents: the specifications, plans, and the geotechnical report. REMCON prepared a detailed take-off from the plans provided by the NPS. REMCON's take-off indicated approximately 14,436 cubic yards of embankment for the access road and upper parking areas. The NPS provided a bid item for the handling, hauling and disposal of excess excavated material, Bid Item 39-Haul Excess Excavation, with an engineer's estimated quantity of 6,800 cubic yards. As a result of this information, REMCON calculated the NPS total excavation quantity, for Bid Item 37, to be approximately 21,236 cubic yards (14,436 cubic being used in the embankment and 6,800 cubic yards of excess material). The NPS received a bid proposal from REMCON based on these facts being true and accurate. Subsequent take-off's by NPS' Bob Russell and Willie DeOcampo in the 2001/2002 winter (2 separate take-off's) resulted in confirming quantity calculations between 14,000 cubic yards and 16,000 cubic yards of excess material over and above the bid quantity of 6,800 cubic yards. However, these figures also fail to account for an additional 6,200 cubic yards necessary to replace the additional material, which was removed from the burn pit and off hauled from the park under Bid Item 26.

As REMCON proceeded with earthwork operations in the late summer and fall of 2001 it was clear that there would be a large overrun in the excess quantity of excavation. The NPS had originally estimated a total of 6,800 cubic yards of excess material but field conditions were now indicating this quantity to be in excess of 20,000 cubic yards.

Based on the contract specifications, Section 02310 – Site Excavation and Grading, REMCON was required to haul excess material from earthwork operations to the Wolverton Point Stockpile Area. At the completion of the 2001 work season REMCON estimated, from truck count, that 9,778 cubic yards had been hauled to the stockpile area, for which the NPS had only paid REMCON for 6,800 cubic yards. As a result of being told that it will not be paid unless and until a modification was issued by the NPS authorizing payment over the 6,800 cubic yard bid quantity, for all the hauling of excess material, REMCON suspended its hauling operations and stockpiled the material within the project site. As stated previously, this resulted in earthwork operations being severely hampered by stockpiles of excess material being located throughout the project, which prevented completion of the excavation work, subgrade operations and other work. It was not until July 18, 2002 that the NPS provide direction to REMCON on what to do with the excess material. The direction (by issuing a revised design) was to raise the upper parking lot to use the excess material. To date, REMCON has hauled and been paid for 13,936 cubic yards of material to the Wolverton stockpile area, an increase of more than 100% the contract bid quantity. Additional stockpiles of excess material still remain today, and this overrun is expected to increase the bid quantity well over 200%. Once again, the NPS' inaction, and delayed conduct, delayed the project for no good reason.

**E. Design Changes Due to Defective Plans (2002 Season)**

Between December 2001 and April 2002, REMCON met with NPS personnel on three different occasions to discuss both design problems as well as the quantity overruns and REMCON's claims, which were significantly impacting the project. REMCON

notified the NPS that final slope grades had not been completed and additional earthwork would be needed to meet the designed slope minimums. NPS personnel stated they would review these impact issues and timely respond (by making the necessary design changes and/or issuing the appropriate revised drawings). Little to no information was thereafter provided by the NPS to REMCON thru the winter and essentially all of the issues that impacted the work at the conclusion of the 2001 work season remained unresolved when REMCON remobilized to the site in May 2002.

REMCON remobilized to the project in mid May 2002. At that time REMCON requested direction on how to proceed through the deep cut area, primarily addressing the problems with the slopes (Ex. 19). The NPS provided no response to REMCON's initial request for direction. REMCON began issuing a series of Requests for Information (RFI's) to the NPS seeking direction in the deep cut area (Ex. 20). Throughout the month of June, 2002 the NPS failed to respond to any of the critical RFI's or to provide any direction on how REMCON was to correct these design deficiencies.

At the end of June, 2002 NPS-caused impacts and delays were preventing REMCON from doing any productive work on the entire project. The NPS had chosen to deny REMCON's request to begin work on the Lower Sherman portion of the project (this request was an attempt to mitigate the delays and potential damages). The access road was unable to be constructed as we were waiting for new design and responses to the multiple RFI's, and the Sherman Tree Trail was also awaiting new design information. The critical path work was at a stand still. Comprehensive notice of these multiple problems, and their impacts on the project, was given to the Contracting Officer, Rod Keiscome, and his designees, in multiple written communications. Finally, on June

28, 2002, REMCON issued yet another letter (Ex. 21) notifying the NPS of the numerous impacts that were occurring to REMCON's grading operations notifying the Contracting Officer that work would cease unless circumstances swiftly changed. These problems were not swiftly addressed, and on July 3, 2002, REMCON wrote Mr. Keiscome, the Contracting Officer, a letter requesting an emergency on-site meeting. It's importance is so overwhelming as an insight to the problems being experienced that it is reprinted below. It may also be found in Exhibit 22.

REMCON, Inc.

P.O. Box 756
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

FILE

SENT VIA FAX AND U.S. MAIL

July 3, 2002

Mr. Rodney K. Kaiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

Reference: Sequoia and Kings Canyon National Park. Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

Subject: Emergency On-Site Meeting

Dear Rod:

Over the past couple of weeks the atmosphere of cooperation at the project level has deteriorated to such a level that effective relations no longer exist. I believe as the two respective leaders of our team, the project would be best served if you and I set an emergency meeting next week at the project, to address many of these issues.

The following are a list of issues, which need to be addressed:

- Removal of Bob Russell as a NPS representative.
- No or slow response to submitted RFI's.
- Grade impacts which are currently delaying the project.
- Errors and omissions within the contract documents.
- Prompt issuance of contractors pay estimates.

As a result of these issues and others, REMCON's ability to construct this project is being severely impacted. Every impact to REMCON is another delay to the overall completion of the project.

Please provide me with a date, which your available and I will adjust my schedule accordingly. I believe it is imperative that you and I take control of this situation immediately.

Sincerely,

Stephen B. Christensen
President

cc: Terry Lang, NPS Contract Specialist
Richard A. Lewis, Advisory Member & Consultant
Luke Triplet, Asst. Project Manager

SequoiaLetter015.doc

It was not until Mike Giller, the new Project Manager from the NPS Denver Service Center, arrived on site on July 10, 2002 and investigated the facts that REMCON receive any direction on how to proceed with the numerous impacts that were identified starting 50 days earlier (See Exhibits 19, 20, 21 and 22). Mr. Giller verbally directed REMCON to field fit the access road to fit the existing natural features. This direction ("Design 3") was confirmed in REMCON's letter to the NPS on July 11, 2002 (Ex. 23). It had been over eight (8) months since these problems were brought to the attention of the NPS and REMCON still had no definitive design information, other than a verbal direction from the NPS to "just make it fit".

Over the course of the next week REMCON began what was believed ("hoped") to be the final construction of the deep cut area. REMCON's grading superintendent/ foreman, Mike Kitchell laid the roadway alignment out using the design staking information provided under Design 2 and adjusting to fit field conditions (Design 3, field fit without new design data from NPS, per NPS direction). The work performed by Mr. Kitchell and his efforts to adjust the roadway to fit field conditions is detailed in his daily diaries from July 12 through July 30, 2002 (Ex. 24). On July 25, 2002, Mr. Kitchell's diary reflects the additional problems he was having in trying to adjust the roadway between Stations 24+00 and 29+75. Eventually work had to be suspended pending further direction from the NPS to address the fact that the design could not be built in the field due to the natural conditions encountered. It was on July 25, 2002 that Russell Belknap of the NPS arrived onsite to assist the NPS and replace Bob Russell. Mr. Belknap walked the site with Mr. Kitchell to review the field conditions and determine what could be done to permit REMCON to proceed. Mr. Belknap personally directed

Mr. Kitchell to make additional changes to the roadway alignment between Stations 24+00 and 29+75 in order for the work to proceed. These concerned multiple grade and alignment changes. Work continued, with additional grade and alignment changes being directed between Stations 21+50 and 23+16. The use of a crown in the road (as originally designed) created a large vertical cut along the westerly portion of the roadway through the deep cut, and became quite pronounced along an area of two large boulders, which were designated by the NPS as natural features not to be disturbed (Ex. 25).

In late July, 2002, Mr. Belknap and Mr. Kitchell discussed the problems with the large vertical slope and a decision was made by the NPS to change the roadway design from a "crown" to "super" which sloped from the east side of the road upwards to the west (Design 4, field fit without new design data from NPS). By utilizing a "super", the large vertical slope area was reduced. The change to a "super" required REMCON to import additional fill over what was already a completed subgrade and nearly ready for the import and placement of aggregate base. These impacts were discussed in detail with Mr. Belknap and direction to proceed was given. Work proceeded and the roadway through the deep cut was built under the direction of Mr. Belknap, who daily worked on the new design (Design 4). Subgrade was completed and REMCON began placement of aggregate base along the access road.

On July 31, 2002 Mr. Kitchell met with the NPS's Russell Belknap and Joann Cody to discuss design problems at the intersection of Wolverton Road and the access road. Conflicts existed along the radius to the entrance road. Additional field changes were thereafter directed by the NPS to fit field conditions (Ex. 26).

It was not until early August, 2002 that the NPS requested that REMCON provide survey data on the access road. REMCON contacted Giuliani and Kull, and requested Jess Stanley return to the project and survey the entire access road. The new survey data was sent to the NPS in Denver on August 14, 2002. Unbelievably, the NPS responded on August 22, 2002 that it was now going to make new design changes (Design 5) to correct what was perceived as failures on REMCON's part to properly build the road, even though REMCON had been given multiple and daily direction's to field fit the road as needed to account for natural features. Never during any of the discussions, which took place in July 2002, did any NPS personnel tell REMCON that the original (or amended) design criteria was to be followed, even though the natural features were in the way. This was (and remains) a classic Catch-22 with the Contracting Officer located over a thousand miles away. REMCON is <u>not</u> the engineer or designer of this project. This was not and is not a design-build project. Rather this was and is a plan and specification project. REMCON had the right to wait for detailed new plans to be issued, price them, quote changed work, and wait until a change order was issued before working on changes. Instead of doing so, REMCON relied upon NPS issued directives, confirmed in writing, modifying the design. The project's construction season was too short, and the need for the project represented to be too acute, to have REMCON wait for the formal process to occur. The NPS, well aware of REMCON's hesitance to perform changed work without written direction, provided REMCON with numerous oral and written assurances that it must comply and would be fairly compensated. REMCON complied and relied upon these representations. The NPS has failed to honor them.

The NPS did not provide REMCON's surveyor with the new Design 5 requirements until September 6, 2002, 23 days after REMCON provided the survey data to the NPS. Jess Stanley again came back to the project and provided new survey control for the entire access road. In most cases only minor work was required to meet the latest (Design 5) requirements, other than in the deep cut. Due to the constant re-design, and resulting delays, REMCON had been forced to delay paving operations while waiting for this latest design information. As a result, weather became an increasing factor in completing paving operations, significantly impacting it (paving can only occur within certain temperature ranges) and once again forced the project into another winter season (2002 – 2003) (Ex.27).

**F. Increased Excavation Quantities**

Additional impacts occurred to the access road and parking area costs and schedule due to the increased quantity of excavation that occurred in Bid Item 37, from that represented by the NPS and originally anticipated by REMCON. Utilizing the existing remaining excess stockpile quantities along with the NPS's adjusted quantities provided at our April 2002 meeting, the embankment and waste quantities confirm in fact that approximately 48,000 cubic yards of excavation was performed under Bid Item 37. This calculation reflects the 13,936 cubic yards hauled to Wolverton Point, for which the NPS has made payment, the approximately 3,000 cubic yards remaining in a stockpile in the bus parking area, the 6,200 cubic yards used in the Upper Parking lot to replace the excess quantity removed from the burn pit (no payment was ever made to REMCON for this work which was performed in 2001), the 4,257 cubic yards that was used to raise the Upper Parking lot based on revised grades issued by the NPS in July 2002, the 2,625

cubic yards that was used to produce aggregate base material at the project site, and 1,000 cubic yards that was estimated to have been used to develop stone revetment for which the NPS was to have provided to REMCON from an already produced stockpile (See summary of these calculations in Ex. 28).

As a result of the significant quantity increases and increased excess material, the NPS decided, during the winter shutdown of 2001-2002, to revise the upper parking area plans by raising its elevation (another design change). Even though the NPS had decided to revise the plans in 2001 – 2002 winter, to make this change, it was not until the end of May, 2002 that the NPS provided REMCON with revised grading plans. Once again, NPS' untimely conduct, for which there is no excuse (the job was shut down for six months due to weather), occurred and negatively impacted the project. Once REMCON received the revised plans, a cost estimate was prepared and negotiations took place between the NPS and REMCON to effect a Contract Modification. It was not until July 16, 2002 that the Contracting Officer provided REMCON with a directive and guarantee to make payment in August for work performed in July, 2002 (Ex. 29). Even though the Contracting Officer assured REMCON that it would be paid in August, 2002 for this work, the NPS once again failed to honor its commitment and make payment as promised. This conduct speaks for itself.

The NPS onsite representative, Bob Russell, became increasingly difficult to work with and unresponsive to REMCON's RFI's and letters from the start of work in the spring 2002. Many of REMCON's inquiries were critical to the completion of the earthwork (see RFI's 38, 59, 61, 62, 65 for example). REMCON, in addition, was waiting for further redesign of the access road and parking area, and trail, during this

same period. The access road and parking area inquiries from REMCON remained unresolved until July 16, 2002, and the Sherman Tree Trail re-design was not ultimately resolved until October 18, 2002 (when it was too late to do productive work until the next construction season).

In addition to having to wait on revised grading plans, REMCON issued numerous Requests for Information (RFI) to the NPS between mid May and the end of June 2002 concerning conflicts with the planned road alignment and existing natural features, which were designated not to be disturbed. Repeatedly, REMCON issued a series of letters to the Contracting Officer notifying the NPS of the project impacts and putting the NPS on notice of delay (Ex. 20). After nearly a month and half of delay REMCON's project manager requested a meeting on July 3, 2002 with the NPS on-site representative, Bob Russell, to review and get signatures on REMCON's stand-by extra work reports. The NPS representative disregarded the extra work reports and refused to sign them. After refusing to sign the reports, Bob Russell, the NPS representative, then verbally assaulted REMCON's project manager with a statement of "Luke, F—k you and your RFI's". He then threatened REMCON's project manager by saying "I'll kill you, you son of a bitch" (Ex. 30). Following this verbal abuse, and assualt, the NPS removed Bob Russell from the project and subsequently replaced him with a new NPS onsite representative (Russell Belknap).

On July 10, 2002, REMCON personnel met with Mike Giller, the new NPS project manager, who was sent to the site as the Contracting Officer's representative. In discussions with REMCON personnel Mr. Giller expressed concerns over the lack of work being performed. At that time Mr. Giller was notified by REMCON personnel that

REMCON was being repeatedly delayed by a lack of pertinent information, defective plans, and untimely direction and contract modifications. Mr. Giller had just joined the NPS and had little time to review what had occurred on the project before his arrival. It was agreed that a site walk would take place with NPS and REMCON personnel so the NPS could provide REMCON with verbal direction on how to proceed. The entire Upper Sherman Access Road and Parking Area was walked, with REMCON personnel pointing out the numerous impediments to building the access road as shown on the plans. Mr. Giller verbally directed REMCON to proceed with the work, adjusting the roadway and slopes as needed to avoid existing natural features which had been marked to remain on the site and not to be disturbed. A confirmation of this meeting was provided to the NPS on July 11, 2002 (Ex. 23). At that point REMCON was able to proceed with grading operations, even though a significant quantity overrun of excavated material was still being encountered and it's disposition remained unresolved.

Based on the direction provided by the NPS, REMCON began construction of the access road, providing realignment and revised slopes as needed to avoid existing natural features. This required additional grading and embankment operations, further impacting the overall project schedule. Subsequently, the NPS then issued, on July 16, 2002, a written directive (Ex. 29) raising the grade of the upper parking area to absorb some of the excess material by issuing revised plans, and REMCON was able to commence work in this area.

REMCON attempted to proceed with the work as directed throughout the remainder of July and early August 2002. On August 22, 2002, REMCON met with NPS personnel in an attempt to negotiate a settlement to outstanding claims for damages

through that time period. At that meeting, REMCON was orally informed of yet another design change (Design #6) to the access road. The NPS claimed that REMCON's modifications were not in compliance with road design requirements. REMCON reminded the NPS that we were not design engineers and we simply made the changes which were directed and authorized by the NPS. At that time, Russell Belknap, of the NPS, told REMCON that new design grade information would be provided by August 30, 2002. In fact, it was not until September 6, 2002 that REMCON received the lastest revisions to the Sherman Tree Access Road and Parking Area. It then took REMCON's surveyor ten days to calculate the staking changes, mobilize to the project and provide REMCON with new construction stakes. In many cases the revised grade changes impacted sections of the road on which REMCON had already placed aggregate base material. Thus, some grade changes then had to be made using additional aggregate base material (see Aggregate Base claim).

**G. Sherman Tree Trail**

Based on REMCON's take-off information, and subsequent NPS take-off's, the earthwork quantities on the Sherman Tree Trail nearly balanced, requiring only a net 300 cubic yards of import fill as indicated from the contract drawings. REMCON's surveyor's, Giuliani & Kull, relying on survey points provided by the NPS, began construction survey layout of the trail in the summer of 2001. Once actual construction began it became apparent that there was, not surprisingly, a problem with the design. Instead of the trail requiring any import of additional fill, it now required the export of excess material. REMCON brought this information to the attention of Bob Russell, the

NPS representative in October 2001. REMCON completed rough grading of the trail at the end of October 2001.

During a site investigation by the NPS of the Sherman Tree Trail in the fall of 2001, NPS stated that REMCON had not constructed the trail to the grades indicated in the project drawings. NPS stated the trail was designed to sheet water and not act as a canal, which was clearly going to happen under its current layout. REMCON requested that its surveyors come back to the project and check the trail layout. The surveyors did so and confirmed the trail was built to the grades provided by the NPS. Subsequently, the NPS confirmed to REMCON that REMCON had properly graded the trail, though the confirmation was not received until May of 2002. REMCON had suspended work on the trail in the fall of 2001 pending resolution of this matter. REMCON issued to the NPS numerous RFI's and letters in May and June 2002 requesting direction on how to proceed with work on the trail (Ex. 31).

It was not until mid July 2002 that the Sherman Tree Trail redesign by the NPS was issued to REMCON. The new design provided additional drainage features as well as grade revisions. REMCON met with the NPS on August 14, 2002 and negotiated a price change for this work. It was not until October 18, 2002 that the NPS provided REMCON with a contract modification and directed REMCON to proceed with this work (Ex. 32). It therefore took an entire year, including the entire 2002 work season, for the NPS to determine that it, not REMCON, was in error, to issue REMCON with revised plans, negotiate price revisions, and then issue a contract modification directing this work. This conduct is unconscionable, but unfortunately just one of a series of improper actions plaguing this contract. To say that the Contracting Officer and NPS personnel

have abdicated and avoided responsibilities is a monumental understatement. By failing to timely issue this contract modification, the NPS prevented REMCON of having any chance in timely completing the Sherman Tree Trail work in 2002 and further delayed the project into another season of work, and exposing the trail to additional erosion damage as a result of winter storms and runoff.[5]

**H. Summary of Earthwork Claims**

It is clear from the foregoing why REMCON's schedule and costs were so drastically impacted as a result of the numerous conflicts/problems encountered on the project. The project had been impacted by the differing site condition, that is rock which could not be ripped by a Cat D8 Dozer/Ripper, repeated design changes to the upper parking area, design changes to the lower parking area, repeated design changes to the access road between Stations 24+38 and 30+20, design changes to the access road between Stations 9+00 and 13+00, significant overruns in quantities of excess excavated material, as well as the increased embankments required to be built over that known at bid time, as well as a significant overrun of material which was required to be off hauled from the park. Approximately 1,300 linear feet of the access road (43 percent) required design modifications, and in some cases multiple modifications. The evidence is clear that the quantities and conditions encountered were not as indicated in the contract documents. As a result, REMCON was forced to change it's construction methods, hire a subcontractor for drilling and blasting, perform additional survey work, perform

[5] REMCON's as-planned schedule, submitted to and approved by the NPS, provided that REMCON would complete the entire project before the end of the construction season in 2002. "But for" the dozens of NPS caused delays and redesigns, this would not have occurred. The NPS is 100% responsible for all resulting delays, and the extended field and home office overhead costs that have resulted and will result from these delays.

additional storm water pollution measures as a result of the construction delays incurred as a result of the additional work requirements and after virtually all of its planned methodologies were unable to be implemented, all of which were caused by and/or are the responsibility of the NPS, and which have collectively resulted in substantial loss of productivity, delays and resulting damages. As a result of the NPS defective plans and specifications, delays in response to extensive letters and RFI's, overruns in quantities, and other documented impacts and the slow and unresponsive administration of the changes to the contract by the NPS, REMCON's ability to construct the Sherman Tree Parking Project as originally planned and estimated has been severely undermined. REMCON is seeking a fair and equitable adjustment to the contract as a result of these impacts.

**I. Equitable Compensation for Earthwork Activities**

In analyzing REMCON's cost impacts as they relate to earthwork on the Sherman Tree Parking Project, REMCON has utilized a modified total cost approach. The volumes of problems, their concurrent nature, and the inability to discretely track each of them by time and material studies, makes this methodology appropriate. The general goal of contract damages is to place the injured party in the financial position it would have occupied had the other party fully performed under the contract. It is well established that a claimant need not prove his damages with absolute certainty. It is sufficient if he furnishes a reasonable basis for competition even though the result is only approximate. In this instance, REMCON has strived to do the best it can, as detailed below.

REMCON has prepared and provided a total cost breakdown for the earthwork excavation, building of embankment, drill and blasting, handling, hauling, stockpiling and rehandling of excavated materials, additional grading work for the Upper Sherman Access Road, Upper Sherman Parking Areas, and the Sherman Tree Trail. This provides a breakdown of the costs for all labor, equipment, materials and subcontractors. Mark-ups are applied within REMCON's daily rates for corporate overhead, profit, and bond premium. This provides a total cost to date, analyzed in the same exact method and format used by REMCON in preparation of its cost proposal. REMCON then provides a credit to the NPS based on REMCON's estimated cost for each task item as identified in REMCON's estimate for work completed to date. The difference between REMCON's actual cost to-date versus REMCON's estimated costs for the same scope of work is the amount REMCON seeks as an equitable adjustment.

REMCON's Direct Cost to Date:

Upper Sherman Access Road & Parking:

| | |
|---|---|
| Earthwork 2001: | |
| Labor Cost w/Mark-up | $ 145,658.02 |
| Equipment Cost w/Mark-up | 78,677.27 |
| Matl's & Subs Cost w/Mark-up | 8,886.01 |
| Earthwork 2002: | |
| Labor Cost w/Mark-up | $ 144,624.06 |
| Equipment Cost w/Mark-up | 58,416.41 |
| Matl's & Subs Cost w/Mark-up | 2,424.10 |
| Rock Excavation: | |

| | |
|---|---|
| Labor Cost w/Mark-up | $ 123,152.41 |
| Equipment Cost w/Mark-up | 86,563.02 |
| Matl's & Subs Cost w/Mark-up | 260,263.45 |
| Sherman Tree Trail: | |
| Labor Cost w/Mark-up | $ 89,118.86 |
| Equipment Cost w/Mark-up | 15,355.49 |
| Matl's & Subs Cost w/Mark-up | 15,792.92 |
| Total Costs w/Mark-up | $ 1,028,932.02 |

Credit Due NPS for Grading Work Performed to Date:

| | |
|---|---|
| REMCON's Estimated Direct Cost: | |
| US-Pioneer Access Road | $ 7,831.00 |
| US-Cut to Fill | 26,043.00 |
| US-Cut to Stockpile | 31,759.00 |
| STT-Pioneer Access Road | 4,711.00 |
| STT-Cut to Fill | 20,119.00 |
| Blasting Allowance | 30,000.00 |
| Sub-total | $ 120,463.00 |
| Mark-up for Overhead & Profit (17.4%) | 20,960.56 |
| Total Credit Due NPS | $ 141,423.56 |
| Total Compensation Due REMCON | $ 887,508.46 |
| (for work performed to date) | |

The total compensation amount of $ 887,508.46 due REMCON for excavation, grading, rock excavation, and material handling does not include the amount paid and/or