due REMCON under Item 39 – Haul Excess Excavation. The cost for this work has not been included in the above calculations.

## III.

## OTHER CLAIMS

### A. Summary Boulder Revetment Impacts

REMCON issued a letter to the NPS, notifying it of REMCON's intent to file a claim for the failure of the NPS to provide boulder revetment as stated in the Contract Specifications. The contract specifications state clearly in Section 02831 – Boulder Revetment, Part 4; Measurement and Payment, that boulder revetment stone will be available from park stockpiles. The specifications state:

> "This item includes constructing boulder revetment slope protection and landscape boulders and their placement, **using stone from park stockpiles** (emphasis added). Payment will be made at the contract lump sum price."

The specification clearly states that boulder revetment stone will be in park stockpiles. It also states that the item includes constructing boulder revetment slope protection and landscape boulder placement. It does not state that the contractor is required to rummage through excavated material for rock, scrounge material over the project site and develop suitable material from rock blasted from project excavation, which by the way was not suppose to occur per the NPS plans and specifications.

Over the course of constructing boulder revetment slope protection and installing landscape boulders, REMCON's revetment crew was required to develop their own source of boulder revetment, instead of suitable boulders being provided by the NPS, as stated in the contract specifications. The undisputed facts are that the represented stockpile(s) did not exist, could not be confirmed during bid time, and this false

representation was unable to be discovered prior to bid submission. The NPS had a duty to publish plans and specifications that were true, accurate and constructible. This law is almost 100 years old. To make such a false representation not only is a breach of warranty, but is an actual misrepresentation. REMCON had to spend time and money locating, sorting and developing boulders. REMCON's best estimate is that 50% of time and money spent on this item of work as recorded in REMCON's records, was used in developing suitable material, which is the bases of REMCON's claimed damages for this issue. (Backup documentation contained in Ex. 33)

**Equitable Compensation:**

REMCON estimates that half the time and money spent on this item of work, involved locating and sorting of boulder revetment, which was to be provided by the NPS. The following is a summary of costs:

| | |
|---|---|
| Total Cost to Date | $ 94,079.21 |
| Amount Due REMCON (50%) For Locating and Sorting | $ 47,039.61 |

In addition to agreeing to compensate REMCON for the work performed to date, REMCON reserves its right to be paid for all additional future costs which it may incur in developing and procuring boulder revetment rock and landscape boulders. This work is not complete.

**B. Additional SWPPP Operations Due to Delays**

As a result of the NPS project impacts, which include defective plans and specifications, project redesign, multiple redesign of already redesigned work, overruns in quantities, slow or no response to contractor "requests for information", differing site

conditions, and changes in the character of the work, REMCON's construction schedule was severely impacted, forcing additional storm water pollution prevention protection (SWPPP), which would not have been required had these delays not occurred. As previously noted in this position paper, REMCON incurred numerous delays, which resulted in REMCON not being able to complete construction as planned. The result of these impacts was that REMCON was required to install SWPPP measures beyond those specified in the project plans to protect the site during two winter suspension periods. Had the work not been delayed REMCON would have installed the contract required SWPPP measures as required and this work would of been paid for in pay items. (Backup documentation contained in Ex. 34)

**Equitable Compensation:**

As a result of the NPS impacts REMCON is due the following equitable compensation:

| | |
|---|---|
| Addl. SWPPP Operations Due to Delay 2001 | $ 55,921.99 |
| Addl. SWPPP Operations Due to Delay 2002 | $ 34,260.13 |
| Total SWPPP Compensation Due | $ 90,182.12 |

These costs do not reflect the additional costs, which will be incurred by REMCON in 2003 removing SWPPP measures and repairing damage which may have occurred to the project site. REMCON will be due additional compensation for performing this work.

**C. Government Failure to Supply REMCON Aggregate Base**

The contract plans and specifications state that the NPS is to provide the aggregate base course material for the Sherman Tree Parking Project. Sheet G-3 of the

contract plans clearly states that the aggregate base course for this project is stockpiled in the area of the Upper Sherman Parking Areas. The drawings state:

> "Note: The aggregate base course for this project is stockpiled in this general area. The contractor will be responsible for moving this material to accommodate construction sequencing. This work shall be included in the general site excavation task."

Additionally, Addendum No. 1, Photo 7 showed a pile of aggregate base. It is clear that the contract drawings as well as Addendum No. 1, provided information to the contractor that the NPS was to provide the contractor with the aggregate base course for the Sherman Tree Parking Project. Unfortunately, the aggregate base shown in the picture was not present at the site when the snow melted, nor did the NPS import the aggregate base and stockpile it, and the representation in the note quoted above, that "the aggregate base course for this project is stockpiled…" was not true. To date the NPS has failed to live up to its agreement to provide REMCON with the aggregate base for this project.

To date REMCON has crushed and/or purchased a total of 10,183.5 tons of aggregate base material. A total of 4,757.0 tons of aggregate base was produced on site while an additional 5,426.5 tons was purchased and hauled to the project site. All of this material was supposed to be provided by the NPS. (Backup documentation contained in Ex. 35)

**Equitable Compensation:**

REMCON is due full compensation associated to the purchase and hauling of aggregate base to the Sherman Tree Parking Project, as provided in the following calculations:

| | |
|---|---|
| Purchase Aggregate Base Course (10,183.50 Tons x $6.25 per ton) | $ 63,646.88 |
| Tax on Material Purchase ($63,646.88 x 7.875%) | 5,012.19 |
| Haul Aggregate Base to Site (10,183.50 Tons x $18.25 per ton) | 185,848.88 |
| Subtotal | $ 254,507.95 |
| Allowable Mark-up (17.4%) | 44,284.38 |
| Total Amount Due REMCON | $ 298,792.33 |

For pricing purposes, and the fact that as a result of not having enough on-site material to produce aggregate base economically, the price for crushing on site was higher than the import price.

Additionally, the NPS needs to provide REMCON with assurances that all remaining aggregate base course material will be provided by the NPS or issue the appropriate change order assuring REMCON of compensation to complete the project. Given NPS' conduct, REMCON will not perform any further extra work without a change order issued by the Contracting Officer.

**D. Re-grading of Aggregate Base Material**

As previously noted within this document, REMCON reasonably began the placement of aggregate base material in late July, 2002. The initial material placed was the aggregate base material that REMCON produced on-site in the summer of 2001 and stockpiled in the upper parking area. This stockpile of aggregate base material had to be removed to allow the upper parking area to be adjusted per the subsequent design change issued by the NPS. This adjustment change was required because of the significant overrun in excess excavation quantity. Throughout the months of August and September 2002, REMCON continued to adjust grades to the access road and parking areas, per NPS

direction. This continued adjustment required REMCON to perform additional finegrading activities to already placed and finished aggregate base.

**Equitable Compensation**

As a result of the numerous design changes, REMCON incurred additional cost in performing the finegrading of aggregate base, which would not have been incurred had the NPS not redesigned the access road and parking lot areas.

| | |
|---|---|
| Total Cost for Aggregate Base Finegrading | $ 199,169.68 |
| Total Amount Allocated to Re-grading | 59% |
| Total Amount Due REMCON | $ 117,510.11 |

The percentage of compensation due is based on REMCON's estimated cost for performing this work divided by the actual cost to date. The allocation is made against a total of 10,183 tons.

**E. Storm Damage and Winter 2002/2003 Repair**

REMCON, but for NPS caused delays and re-design efforts, would have completed the work in the fall of 2002. As a result of NPS caused delays and impacts, REMCON will be forced, prior to re-starting work on the Upper Sherman Access Road, Upper Sherman Parking Areas and the Sherman Tree Trail, to perform extensive repair work. The actual extent of the repair costs will not be known until the snow melts from the site and REMCON has had an opportunity to visually inspect the project site. In any event, the NPS is fully responsible for compensating REMCON for all costs associated to these repairs. (Backup documentation contained in Ex. 34)

**Equitable Compensation**

For the purpose of this brief REMCON has estimated the costs of repairing the damage, based on field inspections performed after the severe floods of November 7 –9, 2002.

| | |
|---|---|
| Estimated Cost to Repair Damage | $ 50,000.00 (actual costs to be determined) |

**F. Additional Survey Costs**

As a result of the numerous design changes and corrective actions initiated by the NPS, REMCON incurred additional costs for its surveyor, Giuliani and Kull. Those costs include additional office engineering time (time spent communicating with NPS and calculating design changes for field crew), office time for party chief (time spent uploading new design information into data collectors), and field survey crew performing additional surveying and re-surveying. (Backup documentation contained in Ex. 36)

**Equitable Compensation**

As a result of the above action, Giuliani & Kull incurred additional costs, which they are due equitable compensation. In addition, REMCON is due the allowable mark-up for this subcontracted work.

| | |
|---|---|
| Total Amount Due Surveyors | $ 41,782.50 |
| REMCON Allowable Mark-up (17.4%) | 7,270.16 |
| Total Amount Due REMCON | $ 49,052.66 |

**G. Delay Analysis**

It is beyond dispute that the NPS has delayed the project. The full extent of the delay is not known as the work is incomplete. What is also beyond dispute is that both

field and home office overhead costs are compensable. See Laburnum Construction v. U.S. 325 F.2d 451 (Ct. Cl. 1963)

There were 220 workdays in the combined 2001 and 2002 construction seasons. REMCON reasonably planned on performing 100% of the work in these workdays. The NPS reviewed REMCON's original schedule and approved it without comment on the completion time. When the extra work performed is removed from the project accounting, the NPS has acknowledged through progress payments that REMCON has completed 48.5% of the base contract work (base contract paid to date $3,450,446/original contract $7,121,636).

This means, if the NPS percentage is correct, that REMCON's contract work was delayed 113 workdays. Although the contract work was done in a manner less efficient than planned, a conservative allocation of extra work time as contrasted to contract work time yields this conclusion. For instance, the drilling and blasting in 2001 was all extra work, but it had the practical effect of addressing contract work ("excavation") albeit in a less timely and significantly more expensive manner. Precisely allocating what percentage was contract versus extra work is not possible. Workdays need to be converted to calendar days by multiplying them by 7/5. REMCON is, through 2002, entitled to 158 days of time extension due to NPS caused delay. Said delay is fully compensable.[6]

---

[6] The calculation is as follows: If there were 220 total workdays in 2001 and 2002, and only 48.5% of the work is done, then 51.5% of the days were used for extra/delayed work, assuming REMCON is not responsible for any such delays, REMCON's delay analysis discloses exactly that. See Exhibit 38.

**1. Extended On-site Project Overhead**

REMCON's construction schedule has been severely impacted by NPS delays. REMCON's original schedule showed REMCON substantially completing work on the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail on November 8, 2001. As a result of the numerous NPS impacts, REMCON was unable to complete the work as planned. In analyzing REMCON's impact schedule, REMCON is able to determine that REMCON's 2001 work season was impacted by 53 days, and the 2002 season by another 60 days.

REMCON has calculated the projects daily overhead rate based on actual labor rates as well as the actual costs for project support costs through April 2003. REMCON calculated daily project overhead rate for work performed in 2001 is \$6,215.56, and \$7,298.86 for the 2002 work season. (Backup documentation contained in Ex. 37)

| | |
|---|---|
| Total Extended Onsite Project Overhead 2001 | \$ 329,424.68 |
| (53 days at \$6,215.56) | |
| (103 days x 51.5% = 53 days) | |
| Total Extended Onsite Project Overhead 2002 | <u>\$ 437,931.60</u> |
| (60 days at \$7,298.86) | |
| (117 days x 51.5% = 60 days) | |
| Total Extended Project Overhead Due REMCON | \$ 767,356.28 |

**2. Extended (Unallocated) Home Office Overhead**

Home office overhead deals with "those costs" which are expended for the benefit of business as a whole and which usually accrue over time. Project changes and delays

extend the duration of activities at the project site and force administrative costs and general overhead expense associated with the project to continue longer than expected.

When a particular project is delayed or suspended, a contractor continues to incur G&A expenses. The delay or suspension prevents the contractor from collecting revenue under the contract and therefore prevents it from recouping the home office overhead costs allocated to that contract. As a result, the corporate or home office overhead rate increases due to these revenue shortfalls attributable to the delays to the particular project. If a contractor cannot generate additional revenue to compensate for the reduction of revenue caused by the delay, or conversely eliminate some of its overhead expenses, a contractor's overall revenue will continue to underabsorb the fixed overhead costs.

In most instances of suspension or delay, the contractor's workforce must remain on standby and be prepared to resume work on the suspended or delayed project activity. As a result, the contractor often cannot take on additional work to mitigate the effects of the suspension or delay on home office expenses. Furthermore, a contractor may have reached the limits of its bonding capacity, further exacerbating its ability to take on additional work to mitigate the effects of the delay on home office expenses. Moreover, while billing to the delayed project may have essentially ceased, home office expenses will continue to accrue. As a result, the delayed or suspended contract cannot absorb its anticipated share of the home office expenses. A contractor is therefore entitled to recover as damages the amount of overhead on a daily basis allocable to the period of overrun for which the Government is responsible. This is the circumstances which confronted REMCON.

Estimating the amount of home office overhead attributable to any single project and its delay or disruption becomes an intricate task. Essentially, a contractor must reallocate the amount of indirect costs that it would have otherwise theoretically recouped from a delayed or disrupted contract.

Courts primarily use formulas to evaluate home office overhead in delay damage claims. However, courts and boards have, on occasion, used percentage factors or rates to estimate home office overhead. These percentage rates calculate the value of extended home office overhead as a fraction of the direct costs the contractor incurred during the delay or disruption period. The U.S. Claims Court in *C.B.C. Enterprises v. United States* stated a preference for percentage rates over other formulas in situations involving simple contract extensions, saying, "When a contract period is extended for additional work, rather than a suspension of work, home office overhead generally can be calculated more accurately by applying a percentage overhead markup to direct costs rather than by use of the *Eichleay* formula. As a general rule, however, the plain arithmetic of a percentage markup may fail to capture home office overhead costs and tends to undercompensate a contractor for these extended costs due to delay. Carried to the extremes, delay may reduce a contractor's direct costs to zero, causing a percentage rate likewise to eliminate a home office overhead at zero despite the actual continuation of home office expenses.

The formula most widely employed by courts and boards to evaluate extended or unabsorbed home office overhead arose before the Armed Services Board of Contract Appeals ("ASBCA") in *Eichleay Corp*. In *Eichleay*, the ASBCA held:

> Overhead costs, including the main office expenses involved in this case, cannot ordinarily be charged to a particular contract. They represent the cost of general facilities and administration necessary to the performance of all contracts. It is therefore necessary to allocate them to specific contracts on some fair basis of proration.

The ASBCA also held that, once a contractor had demonstrated delay, the government must bear the burden of showing that no damage arose as a result.

In 1997, in *Wickham Contracting Co. v. Fischer*, the Federal Circuit confirmed the Eicheay formula as "the exclusive means for compensating a contractor for unabsorbed overhead." There, the contractor argued that the *Eicheay* formula applied only when no other better method could estimate the unabsorbed overhead. In *Wickham*, the contractor argued that it devoted eighty percent of its home office activities to the delayed contract, and should be reimbursed accordingly. The court rejected this argument and justified the *Eichleay* approach, saying, "Allocation based on a pro-rata share is necessary because overhead cannot be traced to any particular contract since overhead consists of expenses which benefit and are necessary to every contract.

As a small business, REMCON could not bid any other substantial work until this project was completed, or at least substantially completed. However, REMCON was performing other work concurrently. This limitation on volume of work was imposed by its bonding capacity and its capital limitations.

REMCON bid this work to achieve completion with two seasons, and be completed by fall, 2002. This would have freed REMCON to bid and contract for other work thereafter. It included in its bid home office time and attention and therefore costs which would be applicable to this project. In reality, based on the company's workflow and disproportionate devotion of effort to this project, the percentage of time and

attention, and therefore costs of the home office, devoted to this project actually increased.

The combination of the NPS delays, and concurrent refusal to pay for all of the extra work directed to be performed, has placed REMCON in a financial duress vice. The job is incomplete, this prevents REMCON from bidding and obtaining further work, and concurrently its financial ability has been virtually destroyed due to the NPS' refusal to pay REMCON, timely or untimely, for these disputes or even for the work performed.

As a result of the NPS' actions, REMCON has been forced to borrow funds to its limit to maintain its business operations and even involved its surety to fund project creditors, including California Drilling and Blasting, because the NPS has failed to pay for the extra work cost of drilling and blasting.[7]

While there has been no directed suspension of the work during the working season, it is undisputed that the time needed to perform this work has been extended. The measure of damages to be used to compensate REMCON is not absolutely clear as a matter of law, but REMCON has calculated its damages using a modified *Eichley* formula method as an effort to personally approximate its damages due.

[7] Although the drilling and blasting was performed in Summer, 2001, the NPS did not negotiate the undisputed extra work until the Summer of 2002. This conduct was unconscionable. Adding insult to injury was the attempt by NPS to take advantage of REMCON by refusing to recognize many of the directed and necessary extra costs incurred in the drilling and blasting as NPS knew, through discussions, that REMCON was in financial peril due to NPS' conduct (e.g. failure to timely and properly pay for contract work and extra work and delays.) Acting out of economic duress, REMCON agreed to a change order of $485,214.00 for this extra work. The NPS issued a change order for the agreed sum but improperly conditioned it by requiring REMCON to waive its right to other pending claims. Such a condition was <u>not</u> negotiated, and was and is tantamount to bad faith conduct. As a result, REMCON refused to sign the change order. NPS, once again, reneged on a promise, and this extra work, almost two years later, remains unpaid. REMCON cannot afford to work without payment.

**Equitable Compensation:**

Between June 2001 and November 2002, REMCON had total revenue of $20,416,829.00. This figure includes those revenue funds paid by the NPS. REMCON's total corporate overhead for this period of time was $1,959,093.00 or 9.595% of total revenue. REMCON's bid and approved schedule was based on completing all the work by November 2002. This would have increased REMCON's total revenue by $3,671,190.00 (REMCON has been paid $3,450,446 against the base bid) or $24,088,019.00. Dividing REMCON's corporate overhead of $1,959,093.00 against total revenue of $24,088,019, REMCON's percentage of overhead against revenue reduces to 8.133%, or a reduction of 1.462%. To calculate the total amount of corporate overhead unallocated as a result of the numerous NPS delays and impact, 1.462% is divided by 8.133% or an allocation percentage of 17.98% of total overhead costs, or ($1,959,093 x 17.98%) $352,235.21.

Total Amount Due REMCON for Corporate Overhead $ 352,235.21

**3. Unallocated Equipment Costs**

As a result of the NPS' numerous impacts, such as; defective plans and specifications, changes in the character of the work, failure to provide timely responses to Requests for Information, failure to properly comply with the terms and conditions of the contract specifications, overrun's in contract quantities, and a failure to properly issue contract change orders, REMCON was unable to obtain or maintain efficient operations on the Sherman Tree Project. REMCON bases equipment utilization on 130 hours per month, as a result of these NPS impacts REMCON was unable to attain these utilization hours. REMCON is due compensation for the loss of revenue on these units. (Ex. 48)

Total Compensation Due REMCON $ 150,197.94

**H. Attorney Fee's & Claim Preparation Fee's**

These are not asserted per FAR authority but notice is given that the documented position of the NPS lacks substantial justification entitling REMCON to EAJA fees as it qualifies as a small business.

**I. Failure to Follow Payment Terms of the Contract Amounts Due for Work Performed and Not Paid by NPS**

The NPS, throughout the administration of the Sherman Tree Parking Project, has repeatedly failed to abide by the payment terms of the contract specifications and the law, including the prompt payment requirements and F.A.R.'s (Ex. 38), made misrepresentations with regard to contract pay estimates (Ex. 39), and arbitrarily withheld and/or adjusted payments which had been agreed upon by the Contracting Officer's Representative and the Contractor (Ex. 40). REMCON has repeatedly notified the Contracting Officer of these violations. These notifications have had little effect in getting the NPS to comply with the contract specifications and the F.A.R.'s. The following summary's provide a breakdown of the additional funds currently due REMCON, with a reservation of interest due, which will be based on the date of payment.

**1. Aggregate Base**

On December 3, 2002, with follow up on March 10, 2003 REMCON submitted a certified claim to the Contracting Officer as a result of the NPS failing to abide by the payment terms of the contract for aggregate base material supplied by REMCON. On July 3, 2003 REMCON received the Contracting Officer's notice of final decision rejecting REMCON's claim (it is important to note that the contract specifications

**require the Contracting Officer to render a decision within 60 days**, a requirement that the Contracting Officer failed to adhere too). The Contracting Officer's final decision (Ex. 41) fails to comprehensively address facts regarding payment requirements for Bid Item 71- Aggregate Base Course, and as a result, the claim is submitted herein for reconsideration.

The terms and conditions of payment for Bid Item No. 71 are well defined. The NPS, with total disregard for the Contract Specifications, unilaterally and it is asserted improperly established a completely new set of payment practices that are not even addressed in the specifications. The NPS is bound by the Contract Specifications and the F.A.R.'s, and is required by law to uphold the conditions contained within the Contract Specifications. The Government is not allowed to establish a new set of rules on a project and then arbitrarily take a credit from the Contractor.

Through 2002, REMCON has placed 10,183.50 tons of aggregate base on the Sherman Tree Access Road, Parking Area and Trail, for which proper documentation (certified weight tags) and invoicing was prepared and submitted by REMCON to the NPS. The total amount due and payable to REMCON for Bid Item No. 71 – Aggregate Base Course is $437,890.50. The NPS has only made payment to REMCON for 6,918.2 tons or $297,482.60, a payment difference of $140,407.90. Previously, the NPS had paid REMCON for a total of 7,115 tons but then subsequently in a later pay estimate unilaterally reduced that amount, even though the NPS on-site representative had agreed with REMCON that full payment for 10,183.5 tons was due.

In their letter of July 3, 2003, the NPS alleges that REMCON placed the aggregate base material in other locations other than those specified in the contract, yet

provides no evidence of such act. In addition the NPS fails to acknowledge that the Contract Officer's On-site Representative, physically verified the subgrade prior to placement of aggregate base course as well as verifying and approving the aggregate base course, for both thickness and tolerance, prior to asphalt concrete paving.

Additionally, the NPS' letter repeatedly states that the requirement for payment by certified weight tags does not apply, and that quantity surveys were required and that survey data is the basis for payment. If this statement were true then there would have been no need for a specific specification for payment by certified weights. The NPS letter also deliberately leaves out a very important requirement of the contract specifications, which the NPS never complied. The NPS letter states for Specification Section 01720.1.2, Field Engineering, Part B the following:

> "The Contractor shall conduct the original and final surveys and surveys for the periods for which progress payments are requested..."

The specification factually states:

> "The Contractor shall conduct the original and final surveys and surveys for the periods for which progress payments are requested. All these surveys shall be conducted in the presents of the **Contacting Officer**, unless the Contracting Officer waives this requirement in a specific instance..." (emphasis added).

Not once during the coarse of construction has the Contracting Officer made himself available or been on-site when REMCON was performing site surveys. Nor do the specification state that such a survey be anything more than a review of the certified weight tags provided by REMCON.

The NPS has provided no backup for this unilateral reduction other than some calculation of theoretical area, which does not comply with the Contract Specifications.

REM000017706

The Contract Specifications, Section 02725 – Aggregate Base Course, Part 4 Measurement and Payment clearly states the following conditions:

> "Measurement for aggregate base course under bituminous concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Deduction will be made for moisture content exceeding 5 percent by weight. Payment will be made at the contract unit price."

The NPS's own contract language clearly states that payment for aggregate base will be made on verified weight tickets. REMCON provided the NPS with verified weights, and the tonnage billed was verified by the Contracting Officer's On-site Representative. Additionally, prior to REMCON being allowed to begin paving over the aggregate base, the aggregate base was checked by the NPS representatives for thickness as well as straight edged for compliance. In one case where REMCON contaminated a portion of the aggregate base and an appropriate reduction in tonnage has been made by REMCON and agreed to by the NPS representative in the field and has not been included in the tonnage claimed for payment below.

If the NPS had intended that the aggregate base pay item to be based on theoretical volume rather than weight it was obligated to provide that basis and information within the contract specifications for that item of work by providing the bid quantity using a volume unit (i.e. cubic feet, cubic yard). Had it done so, REMCON would have provided for overrun allowances, normally at 2.25 tons per cubic yard. By failing to provide this information and payment basis, the NPS cannot, in midstream, unilaterally change the rules. The NPS is bound by the language of the contract and must make payment based on actual tonnage placed in accordance with the plans and

specifications. The NPS has provided no evidence and statement to indicate this work is not in compliance.

In addition, the NPS directed design changes to the access road and parking areas after REMCON had previously placed aggregate base in some of these areas. These grade adjustments were not provided until mid September, 2002. Additional aggregate base was used to make these grade adjustments where aggregate base was already placed. The costs of removing already placed aggregate base, adding additional subgrade material, re-making final subgrade, and then replacing the aggregate base would have been far more expensive and caused greater delay than simply adding additional base material in these areas. (Backup contained in Ex. 41)

**Equitable Compensation**

The NPS does not have the right to arbitrarily determine a tonnage payment quantity. If the NPS had concerns over aggregate base usage they should of addressed those concerns long before this stage of the contract. The NPS is required to make proper payment based on the terms and conditions of the contract, plus interest for this late payment.

Total Compensation Due REMCON $140,407.90

**2. Asphalt Concrete Pavement**

The NPS has adopted the same position as it did in Bid Item No. 71 – Aggregate Base Course. The NPS has utilized some theoretical calculation for asphalt concrete, which is not provided for in the Contract Specifications. Section 02743 – Asphalt Concrete Pavement, Part 4.2 clearly defines the terms of payment. The specification states:

> "Measurement for asphalt concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Payment will be at the contract unit price."

REMCON has placed a total of 6,179.80 tons of asphalt concrete, as verified by certified weight tags, previously submitted to the NPS. Payment for this work is to be paid under two separate bid items, Bid Item No. 72 – Asphalt Concrete Pavement, and Bid Item No. 129 AC Pavement Overlay, Upper Sherman. REMCON has completed approximately two lifts of the ultimate 5.5 inches of paving over the entire Upper Sherman Access Road and Upper Sherman Parking Area. The two lifts of paving that have been placed accounts for a paving depth of approximately four (4) inches, three (3) inches or 75 percent, pays under Bid Item No. 72, and one (1) inch or 25 percent, pays under Bid Item No. 129. The following is a summary of accounts for Bid Items 72 and 129. (Backup contained in Ex. 42)

Total Amount Contractually Due REMCON:

| | | |
|---|---|---|
| Bid Item 72 | 4,016.87 Tons x $104.00 per ton = | $ 417,754.48 |
| Bid Item 129 | 2,162.93 Tons x $75.00 per ton = | $ 162,219.75 |
| Total Payment for AC Paving | | $ 579,974.23 |

Total Amount Paid by NPS through October Billing:

| | | |
|---|---|---|
| Bid Item 72 | 3,533.0 Tons x $104.00 per ton = | $ 367,432.00 |
| Bid Item 129 | 2,163.0 Tons x $75.00 per ton = | $ 162,219.75 |
| Total Payment for AC Paving | | $ 529,651.75 |
| Total Compensation Remaining Due REMCON | | $ 50,322.48 |

If the NPS had intended that the asphalt concrete pavement item to be paid based on the theoretical volume rather than weight, it was obligated to provide that information

in the contract specifications for that item of work by providing a bid quantity using a volume unit (i.e. cubic feet, cubic yard). Had it done so, REMCON would have provided for allowances for overruns and loss in its price, normally by utilizing a conversion factor of 2.25 tons per cubic yard in its cost estimate.

**Equitable Compensation**

The NPS has failed its meet their contractual obligation to make payment to REMCON for the actual tonnage placed by REMCON. REMCON is due immediate payment of these funds, including interest.

| | |
|---|---|
| Total due REMCON | $ 50,322.48 |

**3. Dry-Laid Stone Wall**

On December 4, 2002, with follow up on March 12, 2003 REMCON submitted a certified claim to the Contracting Officer as a result of the NPS failing to abide by the payment terms of the contract for construction of a dry laid stone wall. On July 3, 2003 REMCON received the Contracting Officer's notice of final decision rejecting REMCON's claim (it is important to note that the contract specifications require the Contracting Officer to render a decision within 60 days, a requirement that the Contracting Officer failed to adhere too). The Contracting Officer's final decision (Ex. 43) fails to comprehensively address all relevant facts regarding payment for work performed, and as a result the claim is submitted herein for reconsideration. (Ex.43).

The contract specifications clearly define the terms of payment for the Dry-Laid Stone Wall. Section 04403 Part 4: Measurement and Payment states:

> "This item includes furnishing stone from park sources and constructing dry laid stone walls. Measurement for payment will be the number of square feet on the face of the wall, measured on the battered face from the toe of the

> wall at the base of the foundation to the top of the wall. Measurements shall be taken at 10-foot intervals where applicable, and at ends, corners and major breaks in top or bottom of wall elevations. The measurements will be averaged appropriately to accurately compute the face footage. Aggregate base and surface treatment shall be included in the contract unit price and shall not be paid for separately. Payment will be made at the contract unit price."

Not only has the NPS totally disregarded this payment clause, it has failed to even address the issues that took place with regard to the wall construction. REMCON fully acknowledges that the wall, as originally designed, has been changed and adjusted, at the direction of the NPS's Jack Vance and Russell Belknap.

At the start of wall construction it became apparent that the wall did not appear to be placed as the plan showed. REMCON suspended work on the wall (approximately 10% was complete), placed the subcontractor on stand-by, and asked for an immediate meeting with NPS project personnel. Numerous measurements were made collectively by NPS and REMCON personnel to try and determine what direction should be taken. It became apparent to all from the measurements that the tree shown directly across from the wall was not located as shown on the plan. REMCON was directed by the NPS' Russell Belknap and Jack Vance to adjust the wall so as to allow for the proper width of the designed parking area so the buses could be accommodated. Had the wall not been relocated, then the parking stalls would have been shortened or a new design required. NPS personnel directed the adjustment of the wall fit the natural features and maintain the width of parking area. In addition to REMCON's letter, refer to Ken Smith Masonry's letter of April 23, 2003 (Ex. 44), which confirms the same position held by REMCON.

Throughout the issues regarding the problems concerning the Dry-Laid Stone Wall, REMCON worked with NPS personnel to correct the plan deficiencies to minimize the impact. Agreement was reached and work proceeded. It is unconscionable to now notify REMCON that the NPS is not going to pay for the additional wall footage, even though it was the NPS that directed the relocation of the wall in the field.

The NPS had previously made the proper payment to REMCON (including payment for the extra work necessitated by natural features as directed by NPS personnel) and now has arbitrarily, and without discussion with REMCON, reduced that payment. The NPS has failed to meet its contractual obligation to make payment to REMCON for the actual facial square footage installed as required by the cited provision. The October, 2002 Progress Payment arbitrarily reduces REMCON's payment for Dry-Laid Stone Wall by $39,560.00. REMCON is due immediate payment of these funds, including interest, with interest to be calculated from the date REMCON was due payment or November 15, 2002.

**Equitable Compensation:**

The NPS is bound by the contract specifications and the F.A.R.'s and is required by law to uphold the conditions contained within those specifications. The NPS is not allowed to establish a new set of rules on a project and then arbitrarily take a credit from the Contractor.

Total Amount Due REMCON $ 39,560.00

**4. Boulder Revetment**

On November 19, 2002, the NPS issued a letter entitled "Pay Estimate Quantity Corrections", which reduced payments to REMCON. One of those items being reduced

was Boulder Revetment. The terms and conditions of payment for Bid Item No. 102 – Boulder Revetment, are well defined. The NPS letter disregards the Contract Specifications, fails to address the signed speed letters, which accepts revetment work installed, and unilaterally and improperly purports to implement a completely new set of payment rules that are not even addressed in the specifications. The NPS is bound by the Contract Specifications and the F.A.R.'s, and is required by law to uphold the conditions contained within the Contract Specifications. The Government is not allowed to establish a new set of rules on a project and then arbitrarily take a credit from the Contractor.

The Contract Specifications clearly define the terms of payment for Boulder Revetment. Section 02831 Part 4: Measurement and Payment states:

> "This item includes constructing boulder revetment slope protection and landscape boulders and their placement, using stone from park stockpiles. Payment will be made at the contract lump sump price."

Every month REMCON's Project Manager, Luke Triplett, met with the NPS' Contracting Officer's On-site Representative to review and agree on the monthly billing quantities. REMCON has only submitted billings for those quantities, which have been agreed on by both parties on-site, as specified in the Contract Specifications. The NPS's designated billing office has unilaterally disregarded the conditions of the Contract and arbitrarily assumed a quantity for payment.

The NPS has failed to meet its contractual obligation to make payment to REMCON for the actual footage of boulder placement. The October Progress Payment arbitrarily reduces REMCON's payment for Boulder Revetment by $15,114.50. REMCON is due immediate payment of these funds including interest, interest to be

calculated from the date REMCON was due payment or November 15, 2002. (Backup contained in Ex. 45)

**Equitable Compensation:**

The NPS is bound by the contract specifications and the F.A.R.'s and is required by law to uphold the conditions contained within those specifications. The NPS is not allowed to establish a new set of rules on a project and then arbitrarily take a credit from the Contractor.

Total Amount Due REMCON $ 15,114.50

**5. Concrete Drop Inlets Type A**

The NPS issued a letter on November 19, 2002, entitled "Pay Estimate Quantity Corrections", which inappropriately reduced payment to REMCON for work previously performed and paid for by the NPS. The NPS letter states that two concrete drop inlets, Bid Item 68, are not in the proper location as shown on the plans. REMCON has had to relocate these two drop inlets twice to adjust to continuing roadway changes made by the NPS. The concrete drop inlets are in the correct location and are at the proper elevation to match the concrete asphalt v-ditch. The lids for these drop inlets have been set to final grade.

The Contract Specifications clearly define the terms of payment for Concrete Drop Inlets. Section 02632, Part 4: Measurement and Payment states:

> "Payment will be made at the contract unit price per each, excluding pipe, for each size and type drop inlet."

The two Type A concrete drop inlets are in place and at final elevation. The only item lacking is the placement of the final asphalt concrete around the inlet. REMCON is due full compensation for this work. (Backup contained in Ex. 46)

**Equitable Compensation**

The NPS has failed to meet its contractual obligation to make payment to REMCON for the actual drop inlets installed. The October Progress Payment arbitrarily reduces REMCON's payment for Concrete Drop Inlet – Type A by $2,000.00. REMCON is due immediate payment of these funds including interest, interest to be calculated from the date REMCON was due payment or November 15, 2002.

Total Amount Due REMCON $ 2,000.00

**6. Erosion Control Logs**

Prior to the start of any construction on the project site, REMCON was directed by NPS personnel to install all of the "excelsior logs" as stated in Section 02370 of the Contract Specifications. REMCON installed the "logs" as directed by NPS, the work was inspected, and payment was approved to be made and made in Pay Estimates No. 4 and 5 under Bid Item 41. Subsequently, in a capricious act, the NPS rescinded payment in Pay Estimate 12. REMCON has objected to this unilateral payment reduction.

The Contract Specification, Section 02370 – Silt Protection, Part 1.1 Description states:

> "A. The work of this section consists of furnishing, installing, repairing and maintaining wood fiber drainage filters as indicated on the contract drawings for silt protection and channel blanket."

Additionally, Part 3.4 Removal and/or Replacement states:

> "A. The drainage filter shall be left in place after the contract is complete. Contractor will service drainage filters throughout the contract period including removal all soil sediment and/or foreign debris and removal and replacement of clogged, damaged or malfunctioning drainage filters."

Simply put, REMCON was directed by the NPS to install the "excelsior logs" prior to beginning work. REMCON has continued throughout the course of construction to maintain these "excelsior logs", and has replaced those which were damaged, as stipulated in the Contract Specifications.

Part 4, of Section 02370, Measurement and Payment, 4.1 Silt Protection, states:

> "A. Measurement will be the number of linear feet of drainage filter placed at project completion. Payment will be made at the contract unit price. Payment shall also include repair, relocation and maintenance throughout the course of the project."

This payment section of the contract does not state that the NPS is not required to make progress payments to REMCON for this work when it is provided and installed. It simply states that at completion of the project, a final accounting of the actual linear feet installed and maintained, will be made and the quantity adjusted to that figure. The NPS action in this matter is a clear violation of the contract payment requirements and is done so in a further attempt by the NPS to cause financial harm to REMCON. (Backup contained in Ex. 47)

**Equitable Compensation**

The October Progress Payment arbitrarily reduces REMCON's payment for Silt Protection by $34,520.00. REMCON is due immediate payment of these funds including interest.

Total Amount Due REMCON $ 34,520.00

**The total amount claimed by REMCON, for the claims presented, is $3,091,799.60.**

**LEGAL ISSUES RELEVANT TO REMCON'S CLAIMS AGAINST THE NPS**

There are several independent legal theories, which all result in the same compensation payment to REMCON, for increases in earthwork quantities, drilling and blasting, rock excavation, excavation and disposal of excess material and subsequent project delays as they relate to extended project overhead.

**Differing Site Condition**

The actually encountered site conditions, when constructed and compared with the NPS's geotechnical report, is a Type 1 differing site condition. Section I.62 of the Contract Specifications, Differing Site Condition, provides that the contractor will be issued a change order compensating him if he encounters subsurface or latent physical conditions at the site differing from those indicated in the contract documents.

1. **Purpose of differing site condition clause.**

The purpose of the differing site condition clause is to alleviate from the contractor's bid any contingencies for unforeseen adverse conditions. *J.F. Shea Co. v. United States,(1983), (Fed. Cir. 1985).* In *Foster Construction C.A. v. United States, (1970)* the court explained this rational :

> [T]he presence of the changed condition clause works to reassure bidders that they may confidentially rely on the logs and need not include a contingency element in their bids. Reliance is affirmatively desired by the Government, for if the bidders feel they cannot rely, they will revert to the practice of increasing their bids. *Foster Construction, supra. 435 F.2d 873 (Ct.Cl.1970).*

The purpose of the differing site condition clause is to induce contractors to submit bids based on conditions reasonably to be anticipated from the available data without contingencies to cover the unexpected or unusual. *Kaiser Industries Corp. v. United States (1965); Foster Construction C.A. v. United States.* In return, bidders are provided assurance that if conditions prove more onerous or difficult than anticipated or indicated, an adjustment will be made in the contract price or time.

**2. Contract "indications" under the differing site condition clause.**

The "indications" in the contract need not be explicit, but rather, they may be inferences and implications. *J.F. Shea Co. v. United States, (citing Foster Construction C.A. v. United States).* Contract indications "need not be explicit or specific, but only enough to impress or lull a reasonable bidder." *Stock & Grove, Inc. v. United States, (1974).*

Indications may be implicit and need only "induce . . . reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered", quoting *Pacific Alaska Contractors v. United States (1972)* "[A] bidder has a right to reasonably rely on the contract indication as to the material to be encountered, both as to quality and quantity, and such indications need not be specific or explicit."

For example, the design features of the project are considered to be indications of the characteristics of the soil to be encountered. *Foster Construction C.A. v. United States, Fairbanks Builders, Inc.*. In Fairbanks Builders the board stated:

> [C]ases have established the rule that design features can be an indication as that word is used in the Differing Site Condition Clause.

What is included in the "contract" is interpreted with considerable breadth to include not only bidding documents (invitation for bids, drawings, specifications and other documents physically furnished to bidders) but also documents and materials mentioned in the bidding documents. *Dawco Constr., Inc. v. United States (1989).*

In *Foster Construction C.A. v. United States, supra,* the Court disregarded explicit indications, relying wholly on the indications drawn from inferences from the contract. The court stated:

> [T]he court finds it unnecessary to consider whether the particular boring logs in this case indicated conditions other than those actually encountered. . . . [t]he court is of the view that the other indications in the contract . . . are sufficient in themselves, without the log to sustain the determination that a changed condition was encountered. While the commissioner characterizes these indications as "confirmatory" (In view of his reliance on the logs), the court believes that these features, taken together, supply an independent basis to sustain plaintiff's claim. The first category of changed conditions in the Changed Conditions Clause refers to conditions materially different from those indicated in this contract, and the design features to which we have referred reasonable "indicate" the type of subsurface conditions expected to be encountered. For this part of the Changed Conditions Clause to apply, it is not necessary that the "indications" in the contract be explicit or specific; all that is required is that there be enough of an indication on the face of the contract document for a bidder reasonably not to expect "subsurface or latent physical conditions at the site differing materially from those indicated in this contract." *Foster.*

In this case, the contract indicated that the granitic rock which was to be encountered in the excavation of the Upper Sherman Tree Access Road and Parking Area was rippable with a Caterpillar D8 Dozer/Ripper. The NPS provided the geotechnical

report, and bidders were entitled to rely on and bid on the factual representation in this report that it accurately depicted/commented upon the work required. REMCON based its bid on the soils report and plans and specifications provided by the NPS and they provide a detailed description of the work required and the conditions to be encountered.

**A Contractor is Entitled to Recover Damages for Defective**

**Plans and Specifications Supplied by the Owner**

In the landmark case of United States v. Spearin, 248 U.S. 132, 137 (1918), the United States Supreme Court found an implied warranty by the owner that the plans and specifications which it supplies will be adequate for the performance of the work by the contractor. In Spearin, supra, the government prepared and supplied the plans and specifications for the construction of a dry dock. The contractor relied upon these plans and specifications in submitting its bid. During the construction, the contractor encountered substantial difficulties due to defects in the plans and specifications. The government ultimately terminated the contract, and the contractor sued for damages. Id. At 133-135. The United States Supreme Court held the government unjustifiable breached the contract and was liable for all damages. The court stated:

> ...[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. (Citations.) This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work ... (Citations.) Id. At 136.

The Supreme Court concluded that the government implicitly warranted the plans and specifications it supplied were adequate for the performance required. Id. At 137.

Where the owner's faulty specifications cause a delay in the contractor's performance, the owner is responsible for the resulting damages. J.D. Hedin

Construction Co. v. United States, 347 F.2d 235, 241 (Ct. Cl. 1965); Wunderlich Contracting Company v. United States, 240 F.2d 201, 205 (10th Cir. 1957). In J.D. Hedin, supra, the court stated the rule is based on "the presumed expertise of the government when it sees fit to prescribe detailed specifications. (Citations.)" 347 F.2d at 241. The court held that:

> If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover delay damages for (the owner's) breach of its implied warranty, and this breach cannot be cured by the simple expedient of extending the time of performance.
> (Citation.) Id.

In Wunderlich Contracting Company, supra, 240 F.2d at 205, the court held:

> A contractor who bids for work has the right to rely on the plans and specifications submitted to him for bidding purposes. The rights of the parties are to measured by them. It is only through the plans and specifications that he can make an intelligent bid. (Citation.) Burdens other than those contemplated by the contract, may not be placed upon the contractor without additional compensation. Id.

**Any Ambiguities in a Construction Contract Drafted by the Owner are Construed Against the Owner**

Any uncertainties or ambiguities in the language of a contract are to be interpreted most strongly against the party who caused the uncertainty to exist, i.e., the drafter. This rule comports with fairness and common sense in that it prevents the party with the primary opportunity to avoid misunderstanding, from capitalizing theron.

The 1971 decision by the Court of Claims in Bromley Contracting Company, 72-1 BCA 9252 states at P. 42902:

> "Contractors are business men usually pressed for time and consciously seeking to underbid competitors. Consequently they estimate only those costs which they feel the contract terms will permit the Government to insist upon in the way of performance. They are not expected to ferret out hidden ambiguities or errors in the bid documents and are protected if they innocently construe in their own favor

an ambiguity equally susceptible to another construction or overlook an error. Cf. Blount Bros. Construction Co. v. United States (10 CCF 73,058), 171 Ct. Cl. 478, 496 (1965). In the case before us the ambiguity was subtle, not blatant; the appellant genuinely misled and not deliberately seeking to profit from a recognized error by the Government. Under these circumstances the contractor falls within the scope of the recognized formula."

**An Owner is Responsible for Damages Caused by the Breach**

**Of His Duty Not to Prevent, Hinder or Delay Performance, or to Increase**

**The Cost of Performance by the Contractor**

A. The Implied Covenant Not to Hinder or Interfere With the Contractor's Performance.

The courts expressly recognize a theory of constructive cooperation. In essence, every contract contains an implied condition that neither party will prevent performance by the other party, will otherwise hinder or delay such performance, or will increase the cost of performance of the contract. See e.q., Petrofsky v. United States; Northeast Clackamas C. E. Co-op v. Continental Cas.; Volentine and Littleton v. United States (covenant breached by owner permitting flooding of contractor's work area without adequate warning). Where a contractor is delayed in performance of the contract work and suffers a loss that would not have been sustained except for the other party's delay and failure to observe the implied duty of cooperation, the contractor is entitled to recover those damages. Chalender v. United States (1954); Fuller v. United States (1947).

In Chalender, supra, 119 F. Supp. 186, the contractor sued the United States for loss sustained as a result of delay in completion due to the owner's delay in furnishing parts required by the contract. Holding the government liable, the court stated:

> "There is present, in a contract such as this one, an implied obligation on the defendant that it will not do that which will hinder the contractor in the performance of the contract. When the contractor is delayed by a negligent act chargeable to the Government, it is a breach of this clearly implied obligation, and the Government is liable for the damages sustained by the contractor because of the delay."

In Fuller v. United States, supra, 69 F. Supp. 409, the contractor sued the government for damages due to delays caused by the government. Relying upon the implied covenant, the court held the government liable for those damages. Moreover, the court stated that conduct hindering performance by the other party to **an immediate breach of the contract.**

Finally, one court compared the construction of a large complex project to the conditions encountered in a battlefield. In Blake Construction Co. v. C.J. Coakly, (1981), the court said:

> "We note parenthetically and at the outset that, except in the middle of a battlefield, nowhere must men coordinate the movement of other men and all materials in the midst of such chaos and with such limited certainty of present facts and future occurrences as in a huge construction project such as the building of this 100 million dollar hospital. Even the most painstaking planning frequently turns out to be mere conjecture and accommodation to changes must necessarily be of the rough, quick and ad hoc sort, analogous to ever-changing commands on the battlefield."

There can be no doubt that the NPS' documented conduct breached this warranty.

**An Owner's Failure to Timely Pay All Sums Due as Progress Payments is a Material Breach of the Contract**

The law is well settled that the owner's failure to pay timely all sums due as progress payments is a material breach of the contract.

In Northern Helex Co. v. United States, the government failed to make payments due under a contract for the supply of helium. The court of appeal held, "We have, in

short, not the slightest doubt that the prolonged failure to pay large amounts was a material breach of the contract."

**The Owner Has a Duty to Grant Extensions of Time**

In Continental Consolidated Corp (1967), the contractor was delayed due to an obstruction encountered during the construction of an underground duct bank. The court found a partial suspension of the contractor's work due to the government's unreasonable delay in approving the shop drawings for the relocation of the duct bank. Liability for the contractor's additional costs resulting from the excusable delay was imposed upon the government since the contracting officer had failed to grant proper time extensions.

In *Natkin & Co. v. George A. Fuller Co*. (1972) the contractor was delayed in its performance by substantial design changes in contract drawings, the inadequacy of equipment drawings, substantial change orders, inclement weather and delays, the owner refused to grant time extensions needed to update the schedule. The owner was held liable for all additional costs experienced by a contractor where the owner delayed the contractor's progress and then failed to grant time extensions under the critical path method schedule agreed to in the contract.

The Owner's failure to issue time extensions, to which the Contractor was contractually entitled (due to design changes, changed conditions, unexpected obstacles, disruptions, and inclement weather) was a **fundamental breach of contract**.

**An Owner Can By Its Conduct Waive the**

**Requirement Of Written Change Order**

An Owner who authorizes extra work has a duty to pay for any additional expenses. Typical construction contracts contain provisions that require a written change order for any changes in the contract price of completion date.

The provisions are waived and do not bar claims for additional costs where the owner has actual knowledge of the changed condition or reasons for delay. Central Mechanical Construction (1985) (notice requirement waived where owner has actual or constructive notice of the changes and is thus not prejudiced by the lack of written notice); Clark F. Cass & Walt Alloway, a Joint Venture, (1970) (Owner may not "take advantage of technical noncompliance with [notice] requirements if no injury has resulted therefrom"; contractor's failure to give notice does not waive consideration of claim for additional costs where Owner has actual knowledge of changed conditions); Lockheed Aircraft Corp., (1965) These government contract decisions are based on the unarguable logic that where the owner knows of the conditions creating the need for the change, a writing or notice requirement is superfluous; in such cases, the contractor's claim will not be barred by its lack of compliance with the writing or notice requirements. **An even stronger argument for waiver can be made when the Owner's design and coordination errors caused extra costs and delays to the work.**

**When An Owner Delays The Work,**

**The Contractor May Be Entitled to an Extension of Time for Every Day He Could Not Work Due to Inclement Weather**

When an owner delays the contractor's performance during good weather and compels that performance during the winter (bad weather), the contractor is entitled to a time extension for each day of delay experienced during the good weather and all time

lost while working in inclement weather. This point is well illustrated in R. L. Spencer Construction Co., Inc., (1975).

In R. L. Spencer, the contractor was initially delayed some 84 days due to unsuitable soil conditions and compaction difficulties. The Board described subsequent additional delays of 111 days due to the government's failure to timely authorize a change in compaction specifications:

> . . . [A]ppellant's delay in completing the project, from 2 November 1972 to 15 May 1973, was due to government-caused delay in the period April – August 1972 which threw the project completion into the winter period and, due to winder conditions, appellant was unable to complete the outside project work until 15 May 1973, the government's acceptance date for project completion. Appellant is entitled to a 194 day extension in time for project completion to 15 May 1973."

The Board thereafter awarded the contractor damages for the delay:

> When a government caused delay throws project completion into a winter period, the contractor is entitled to his extra costs of performance due to schedule disruption of winter conditions.

Similarly in J.D. Hedin Construction Co. v. United States, and Urban Plumbing & Heating Co. v. United States (Ct. Cl. 1969), the government was held accountable when its delays caused the contractors to be further delayed by inclement weather. In J.D. Hedin, the court initially determined the government breached its implied warranty regarding the adequacy of plans and specifications:

> It is well settled that where delays are occasioned by factors beyond the control of the contractor or government, a contractor cannot recover damages from the government for the delays, nor can the government properly assess liquidated damages against the contractor. However, where government caused delays force the contractor into a more costly operations, the government will have to respond in damages for the resulting additional delays.

The court went on to assess the effects of the weather like this:

> The unusually severe weather encountered after April of 1950 seriously impeded the foundation work on the buildings as well as work on outside utility lines, roadways and grading. The records support the conclusion that this work would have been entirely completed prior to April 1, 1950, had it not been for prior difficulties with respect to foundation and sewers. If these difficulties had not occurred, the abnormal weather subsequent to April 1, 1950, would have had little, if any, delaying effect on the items of construction work which would have been in progress after that date. By that date, the foundation work would have completed and the interior work could have been performed during the inclement weather. For these reasons, we conclude that the defendant is responsible for the 62 days in delays which plaintiff experienced as the result of inclement weather.

The foregoing is not intended to be a complete synopsis of all legal authorities substantiating REMCON's entitlement. Rather, it is presented to make clear that comprehensive legal support exists to validate REMCON's claims.