# EXHIBIT 29

Declaration of Stephen B. Christensen in Opposition to
Defendant's Motion for Partial Summary Judgment

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

COPY

**SENT VIA FAX AND U.S. MAIL**

June 30, 2003

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Response to NPS' Pay Estimate 14 Quantity Corrections Letter

Dear Mr. Keiscome:

Reference is made to your letter of April 15, 2003, entitled subject "Pay Estimate No. 14 Quantity Corrections". This letter addresses each of the issues brought forth in your letter.

**NPS Failure to Abide by Payment Requirements**

First and foremost your untimely letter was a clear violation of the prompt payment requirements of the Contract Specifications and the Federal Acquisition Regulations. REMCON has repeatedly notified you of these violations and you continue to disregard the requirements. The Contract Specifications and the FAR's leave no room for interpretation, and are as stated. The regulations clearly state that if the designated billing office has issue with the progress payment request, **they are required by the F.A.R.'s,** to return the invoice to the Contractor within 7 days, with a statement explaining why the invoice is not proper. Section DS52.232.27 (a) (2) clearly states the following:

> "Contractor's Invoice. The Contractor shall prepare and submit invoices to the designated billing office specified in the contract. A proper invoice must include the items listed in paragraphs (a)(2)(i) through (a)(2)(ix) of this clause. If the invoice does not comply with these requirements, it shall be returned **within 7 days** after the date the designated billing office received the invoice, with a statement of the reasons why it is not a proper invoice. ..."

The NPS received REMCON's invoice on March 14, 2003, if you had any issues with the billing, you were required to return the invoice to REMCON within 7 days. Having made no objection, the NPS was then required to make payment to REMCON within 14 days from the date of receipt of

the invoice. Section I.87 of the Request for Proposal, contains sections of the F.A.R. regulations DS52.232-27 Prompt Payment for Construction Contracts, which clearly states that payment is to be made within 14 days, unless objections are raised within 7 days by the billing office, in this case NPS's Denver Service Center.

Additionally, the Contract Specifications clearly state that if the Contractor does not receive payment within the 14 day time period, interest will be automatically paid. Throughout the course of this contract, REMCON's payments have been repeatedly late without receipt of proper interest payments. Section DS52.232.27 (a) (3) clearly states the following:

> "Interest penalty. An interest penalty shall be paid automatically by the designated payment office, without request from the Contractor, if payment is not made by the due date and the conditions listed in paragraphs (a)(3)(i) through (a)(3)(iii) of this clause are met, if applicable. ..."

By failing to respond within the seven day time period the NPS lost their right to object to REMCON's billing. Proper payment was due 14 days after receipt of REMCON's invoice and interest is now accruing on the total billed amount. Please provide a detailed explanation why you, as the Contracting Officer, are not bound by the Contract Specifications and the F.A.R., and believe you have the right to arbitrarily develop your own set of rules for this project.

**Contract Requirements**

Your letter makes arbitrary deductions, makes no reference to how these deductions are calculated nor does it provide any reference to the contract specifications or the F.A.R., which allows such a capricious act. Your letter references eight items, six of which you claim not to have received. Each of these six items are addressed below:

**Project Schedule -**

Once again the NPS alleges that REMCON has not complied with the contract requirements but cites no specific contract specification where REMCON has not met its obligation. What is fact, is once again the NPS has willfully disregarded their own Contract Specifications and attempted to modify the requirements of the contract. This type of behavior will not be tolerated nor accepted.

Prior to the start of work for both the 2001 and 2002 work season, REMCON provided you, the Contracting Officer, with a detailed schedule defining REMCON's anticipated work plan. The Contract Specifications clearly set forth the requirements that you, the Contracting Officer, are to follow if the

schedule is not acceptable. The Contract Specification clearly defines the requirements, which are to be followed if the Contractor's schedule is not acceptable to the Contracting Officer. Section 01320 – Project Schedule and Monthly Inspections, Part 1.4 B states:

> "Within seven calendar days of receipt of the Contractor's proposed project schedule, the Contracting Officer and Contractor shall meet for joint review, correction, or adjustment of the proposed project schedule. Any areas, which, in the opinion of the Contracting Officer, conflict with timely completion of the project, shall be subject to revision by the Contractor."

Additionally, the contract specification goes on to say:

> "Within seven calendar days after the joint review between the Contractor and Contracting Officer, the Contractor shall revise and resubmit the project schedule in accordance with agreements reached during the joint review."

REMCON provided the NPS with a contract schedule at the start of work for each respective work season. At **no time did you, the Contracting Officer**, ever meet with REMCON to review the schedule as required by the NPS' own Contract Specification. By failing to request the required schedule review meeting, the NPS accepted REMCON's contract schedules as submitted.

Additionally, REMCON continues to maintain an as-built schedule, which are updated monthly. This as-built schedule is now protected under attorney-client privilege but will be made available once the NPS complies with Activity 20, of REMCON's approved 2003 work schedule.

Please provide a detailed explanation of why the NPS and you, the Contracting Officer, are not required to comply with the NPS' Contract Specifications.

**Submittals -**

Please provide the section of the specifications, which states the NPS is allowed to withhold funds for submittals, which are not impacting the current project work. The project specifications make no reference to a time period, which the contractor is bound to provide submittals other than it must be done prior to installation of that product on the project. To the best of REMCON's knowledge, there are only a couple outstanding submittals, and that work is not scheduled for sometime.

**Quantity Surveys, Notes & Records –**

All survey information, other than that which is protected by attorney-client privilege, was provided to the NPS on April 7, 2003. Please provide the referenced section of the specifications, which allows the NPS to arbitrarily withhold these funds.

**Project Record Drawings –**

The NPS has reviewed REMCON's as-built drawings at a meeting in May at Sequoia National Park. As I'm sure your aware, as-built drawings are a work in progress and will not be completed until the project is complete. At that time REMCON will transfer all data to one single drawing set, which will be the requirements of the Contract Specifications.

**Operation & Maintenance Binders -**

Operation and maintenance (O&M) binders are an on-going process and will be provided to the NPS at the completion of the project. Representatives of the NPS have review the current O& M binders, which are maintained by REMCON's QA/QC representative.

**Outstanding Utility Bills –**

REMCON does not dispute this utility billing, but is unwilling to make payment until such time as the NPS properly makes payment to REMCON, an amount that now exceeds over $2,000,000.

In addition to your improper actions in the withholding of funds for the above listed items, the NPS has failed to comply with the Contract Specifications for the following listed items of work and payment is currently due REMCON for this work, including interest.

**Item No. 38 – Rock Excavation**

REMCON provided the NPS with a "tentative daily work agreement" on September 10, 2002, for rock excavation. Both, REMCON's Project Manager, Luke Triplett and the NPS On-site Representative, Loren Mangrum, agreed that the total rock excavation was 258.4 cubic yards. In all previous "tentative daily work agreements" the quantity referenced was by the cubic yard. Your assumption that this method of reporting would change for only one report is not reasonable. In discussions with Mr. Triplett, it is his recollection that this quantity agreement was correct.

In review of the attached "tentative daily work agreement" it is clear that someone has altered the report after it was signed by both individuals. The NPS owes REMCON based on the agreed quantity.

Total amount due REMCON, not including interest, is $ 28,940.80.

**Item No 45 – Silt Protection**

REMCON is not confusing the two items of work. REMCON has installed both log drainage filters as well as SWPPP measures at the project site. REMCON is not requesting payment for SWPPP measures installed, other than those, which were required as a result of NPS caused delays. REMCON fully understands that SWPPP measures are included in the work items. We are simply asking to be paid for work, which the NPS is contractually bound to compensate REMCON.

Prior to the start of any construction on the project site, REMCON was directed by NPS personnel to install all of the "excelsior logs" as stated in Section 02370 of the Contract Specifications. REMCON installed the "logs" as directed by NPS, the work was accepted, and payment was made in Pay Estimates No. 4 and 5 under Bid Item 41. Subsequently, in a capricious act, the NPS rescinded payment in Pay Estimate 12. REMCON objected to this payment reduction.

The Contract Specification, Section 02370 – Silt Protection, Part 1.1 Description states:

> "A. The work of this section consists of furnishing, installing, repairing and maintaining wood fiber drainage filters as indicated on the contract drawings for silt protection and channel blanket."

Additionally, Part 3.4 Removal and/or Replacement states:

> "A. The drainage filter shall be left in place after the contract is complete. Contractor will service drainage filters throughout the contract period including removal all soil sediment and/or foreign debris and removal and replacement of clogged, damaged or malfunctioning drainage filters."

Simply put, REMCON was directed by the NPS to install the "excelsior logs" prior to beginning work. REMCON has continued throughout the course of construction to maintain these "excelsior logs", and has replaced those which were damaged, as stipulated in the Contract Specifications. Part 4, of Section 02370, Measurement and Payment, 4.1 Silt Protection, states:

> "A. Measurement will be the number of linear feet of drainage filter placed at project completion. Payment will be made at the contract unit price. Payment shall also include repair, relocation and maintenance throughout the course of the project."

This statement does not require the Contractor to install all the "excelsior logs", at the direction of the NPS, and the NPS is not required to make progress payments for the work performed. It simply states that at completion of the project, a final accounting of the actual linear feet installed and maintained, will be made and the quantity adjusted to that number.

In response to your footnote 1, this is factually untrue. Mr. Triplet, in a job walk with Mr. Giller, notified the NPS that he felt additional SWPPP measures were needed at the site, and as a result of NPS caused delays, the NPS was solely responsible for the costs associated to installation of these measures. The purpose of the site walk was to provide the NPS with the opportunity to direct what SWPPP measures they wanted, as they will ultimately be responsible for the costs for the installation. Mr. Triplet provided Mr. Giller a cost for performing the additional work. Additionally, REMCON has provided the NPS with a "Notice of Potential Claim" as a result of the flooding that occurred November 8 and 9, 2002, and the failure by the NPS to prevent storm water from entering REMCON's work zone.

The total amount of funds currently due REMCON is $34,520.00

**Item No. 71 – Aggregate Base Course**

Once again your statement is untrue regarding the tonnage calculation provided. REMCON provide the NPS with detailed backup for a total of 10,183.52 tons of aggregate base material (see attached spreadsheet). Your letter is misleading as you fail to acknowledge 4,757 tons of aggregate base material, which REMCON produced on site. The 4,757 tons was a quantity calculated by both belt scale and survey calculations prepared by the NPS, and the NPS paid for this quantity as materials on hand. It has subsequently been removed as a payment for materials on hand, and included in REMCON's payment in Bid Item 71, even though the NPS has failed to properly compensate REMCON for this work.

Your letter once again completely disregards the contractual requirements of Section 02725 – Aggregate Base Course, Part 4 Measurement and Payment, which clearly states the following payment requirements:

> "Measurement for aggregate base course under bituminous concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Deduction will be made for moisture content exceeding 5 percent by weight. Payment will be made at the contract unit price."

The NPS contract language clearly states that payment for Aggregate Base will be made on verified weight tickets. REMCON provided the NPS with verified weights, and the tonnage billed was verified by the Contracting Officer's On-site Representative. Additionally, prior to REMCON being allowed to begin paving over the Aggregate Base, the Aggregate Base was checked for thickness as

well as straight edged for tolerance compliance. In one case where REMCON contaminated a portion of the Aggregate Base a reduction in tonnage was given to the NPS.

Additionally, the NPS was required by the contract plans, specifications and addendum to provide REMCON with all the aggregate base material for this project. Sheet G-3 of the Contract Specifications clearly states that the aggregate base course for this project is stockpiled in the area of the Upper Sherman Parking Areas. The drawings state:

> "Note: The aggregate base course for this project is stockpiled in this general area. The contractor will be responsible for moving this material to accommodate construction sequencing. This work shall be included in the general site excavation task."

Additionally, Addendum No. 1, Photo 7 showed a pile of aggregate base. It's clear that the contract drawings as well as Addendum No. 1, provided information to the contractor that the NPS was to provide the contractor with the aggregate base course for the Sherman Tree Parking Project. To date the NPS has failed to live up to its agreement to provide REMCON with the aggregate base for this project. To date the NPS has failed to provide this material and has not compensated REMCON for having to purchase and deliver this material to the jobsite.

Please provide a detailed explanation why the NPS, now believes they can arbitrarily disregard their own payment requirements and utilize a theoretical calculation, why the NPS failed to provide the aggregate base as required, and why REMCON has not been compensated for having to purchase and haul the aggregate base material to the project.

Total amount currently due REMCON, not including interest is as follows:

| | |
|---|---|
| Unpaid Amount Due Bid Item 71 | $140,407.90 |
| Failure of NPS to Supply Agg. Base | $298,792.33 |

**Item No. 72 – Asphalt Concrete Pavement**

The NPS has adopted the same position as it did in Bid Item No. 71 – Aggregate Base Course. The NPS has utilized some theoretical calculation for asphalt concrete, which is not provided for in the Contract Specifications. Section 02743 – Asphalt Concrete Pavement, Part 4.2 clearly defines the terms of payment. The specification states:

> "Measurement for asphalt concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Payment will be at the contract unit price."

REMCON has placed a total of 6,179.80 tons of asphalt concrete, as verified by certified weight tags, previously submitted to the NPS. Payment for this work is to be paid under two separate bid items, Bid Item No. 72 – Asphalt Concrete Pavement, and Bid Item No. 129 AC Pavement Overlay, Upper Sherman. REMCON has completed approximately two lifts of the ultimate 5.5 inches of paving over the entire Upper Sherman Access Road and Upper Sherman Parking Area. The two lifts of paving that have been placed accounts for a paving depth of approximately four (4) inches, three (3) inches or 75 percent, pays under Bid Item No. 72, and one (1) inch or 25 percent, pays under Bid Item No. 129. The following is a summary of accounts for Bid Items 72 and 129. (Backup contained in Ex. 44)

Total Amount Contractually Due REMCON:

| | | |
|---|---|---|
| Bid Item 72 | 4,016.87 Tons x $104.00 per ton = | $ 417,754.48 |
| Bid Item 129 | 2,162.93 Tons x $75.00 per ton = | <u>$ 162,219.75</u> |
| Total Payment for AC Paving | | $ 579,974.23 |

Total Amount Paid by NPS through October Billing:

| | | |
|---|---|---|
| Bid Item 72 | 3,533.0 Tons x $104.00 per ton = | $ 367,432.00 |
| Bid Item 129 | 2,163.0 Tons x $75.00 per ton = | <u>$ 162,219.75</u> |
| Total Payment for AC Paving | | $ 529,651.75 |
| Total Compensation Remaining Due REMCON | | $ 50,322.48 |

If the NPS had intended that the asphalt concrete pavement item to be paid based on the theoretical volume rather than weight, it was obligated to provide that information in the contract specifications for that item of work by providing a bid quantity using a volume unit (i.e. cubic feet, cubic yard). Had it done so, REMCON would have provided for allowances for overruns and loss in its price, normally by utilizing a conversion factor of 2.25 tons per cubic yard in its cost estimate.

Please provide REMCON with a detailed explanation why the Contract Specification requirements for payment are being willfully disregarded by the NPS.

**Item No. 119 – Dry Laid Stone Wall**

On December 4, 2002, REMCON issued a Notice of Claim to the NPS, the subject of said claim being the failure of the NPS to follow the payment terms of the contract specifications for the Dry-Laid Stone Wall (Ex.45).

The contract specifications clearly define the terms of payment for the Dry-Laid Stone Wall. Section 04403 Part 4: Measurement and Payment states:

> "This item includes furnishing stone from park sources and constructing dry laid stone walls. Measurement for payment will be the number of square feet on the face of the wall, measured on the battered face from the toe of the wall at the base of the foundation to the top of the wall. Measurements shall be taken at 10-foot intervals where applicable, and at ends, corners and major breaks in top or bottom of wall elevations. The measurements will be averaged appropriately to accurately compute the face footage. Aggregate base and surface treatment shall be included in the contract unit price and shall not be paid for separately. Payment will be made at the contract unit price."

Not only has the NPS totally disregarded this payment clause it has failed to even address the issues that took place with regard to the wall construction. REMCON fully acknowledges that the wall, as originally designed, has been changed and adjusted, at the direction of the NPS's Jack Vance and Russell Belknap.

At the start of wall construction it became apparent that the wall did not appear to be placed as the plan showed. REMCON suspended work on the wall (approximately 10% was complete), placed the subcontractor on stand-by, and asked for an immediate meeting with NPS project personnel. Numerous measurements were made collectively by NPS and REMCON personnel to try and determine what direction should be taken. It became apparent to all from the measurements that the tree shown directly across from the wall was not located as shown on the plan. REMCON was directed by the NPS' Russell Belknap and Jack Vance to adjust the wall so as to allow for the proper width of the designed parking area so the buses could be accommodated. Had the wall not been relocated, then the parking stalls would have been shortened or a new design required. NPS personnel directed the adjustment of the wall fit the natural features and maintain the width of parking area. In addition to REMCON's letter, refer to Ken Smith Masonry's letter of April 23, 2003 (Ex. 46), which confirms the same position held by REMCON.

Throughout the issues regarding the problems concerning the Dry-Laid Stone Wall, REMCON worked with NPS personnel to correct the plan deficiencies to minimize the impact. Agreement was reached and work proceeded. It is unconscionable to now notify REMCON that the NPS is not going to pay for the additional wall footage, even though it was the NPS that directed the relocation of the wall in the field.

The NPS had previously made the proper payment to REMCON (including payment for the extra work necessitated by natural features as directed by NPS personnel) and now has arbitrarily, and without discussion with REMCON, reduced that payment. The NPS has failed to meet its contractual obligation to make payment to REMCON for the actual facial square footage installed as required by the cited provision. The October, 2002 Progress Payment arbitrarily reduces REMCON's payment for Dry-Laid Stone Wall by $39,560.00. REMCON is due immediate payment of these funds, including interest, with interest to be calculated from the date REMCON was due payment or November 15, 2002.

The NPS is bound by the contract specifications and the F.A.R.'s and is required by law to uphold the conditions contained within those specifications. The NPS is not allowed to establish a new set of rules on a project and then arbitrarily take a credit from the Contractor.

Total Amount Due REMCON $ 39,560.00

REMCON is due immediate payment for the amounts reflected above. Failure to provide immediate payment, including interests, provides further evidence that the NPS actions are based more on causing economic harm to REMCON, than complying with the Contract Specifications. By failing to comply with the Contract Specifications the NPS is in breach of contract with REMCON. Clearly the NPS action is arbitrary and capricious, and is meant to cause economic duress to REMCON, REMCON's employees, subcontractors and material suppliers.

Cordially,

Stephen B. Christensen
President

cc: D. Michael Schoenfeld, Murphy Austin Adams Schoenfeld, LLP
Richard A. Lewis, REMCON Board Member

# EXHIBIT 30

Declaration of Stephen B. Christensen in Opposition to Defendant's Motion for Partial Summary Judgment

COPY

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-9186
Fax: 209/847-9189

**Sent Via Fax & U.S. Mail**

July 17, 2003

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Contract Delay by the NPS

Dear Mr. Keiscome:

Reference is made to REMCON's submitted and accepted contract schedule as well as numerous letters issued by REMCON concerning NPS impacts to the 2003 work season.

REMCON has repeatedly notified the NPS that by failing to address contractual matters within the NPS contract specifications, that the NPS is continuing to impact and delay work on the project. It is now mid July and nearly a 1/3rd of the construction season has been lost as a result of the NPS failing to address issues, which impact the project. REMCON has provided the NPS with a construction schedule, which was accepted by the NPS. This schedule clearly defines issues, which must be addressed by the NPS. I will once again state that REMCON is prepared to proceed with work once the NPS meets their contractual requirements.

I urge the NPS to immediately address these issues so as to prevent further delays and cost increases to the project. Your immediate attention to this matter is required.

Cordially,

Stephen B. Christensen
President

cc: D. Michael Schoenfeld, Murphy Austin Adams Schoenfeld, LLP
Richard A. Lewis, REMCON Board Member

SequoiaLetter122-sbc