IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | DOCKET NO. 03-2478C<br><br>**DECLARATION OF THOMAS W. LLOYD IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(Judge Susan G. Braden)<br><br>Hearing Date: TBD |

I, THOMAS W. LLOYD, declare:

1. I am a construction claims consultant and disclosed expert for Plaintiff in this action. At the time I am signing this declaration I am finishing up my report as an expert for Remcon in the action which is going to trial in October this year. It is my understanding that my expert report is due to be exchanged with the defendant by the end of this month. In preparing to issue my report I have reviewed hundreds and hundreds of deposition exhibits and other project records, including the project schedules, modifications, daily reports and many emails and written correspondence, as well as Remcon's certified claim, and read several of the deposition transcripts taken in this case. I have also spent many hours meeting with and discussing the events of the project with Mr. Stephen B. Christensen, the owner of Remcon, to enable me to evaluate and comprehend the various issues and impacts which occurred on the project and their effect on the planned contract work. Based upon my professional experience, which is detailed below, as well as the review and understanding I have gained from the effort I have

undertaken as part of my engagement over the last several months, I have personal knowledge of the following and if called to testify could and would competently testify thereto.

2. Attached hereto as Exhibit 1 and by this reference made a part hereof is a true and correct copy of my resume.

3. I am of the opinion that the government, in multiple instances, breached its obligations to Remcon and that these breaches caused delay and disruption to Remcon denying it the ability to perform the work as planned. My opinions are based upon the following facts:

a. The contract specifications, set forth in section 1320 Part 1.4.B.1, which deals with scheduling, provides that the Contracting Officer will, within seven (7) days of submission, meet with the contractor to discuss any issues or comments relating to the schedule. I find that at no time did the government ever perform this duty despite multiple requests from the contractor to do so. Further, I have read the transcript of Willie DeOcampo, the Contracting Officer's Representative, in which he states, under oath, that while he was delegated the responsibility from Mr. Keiscome, the Contracting Officer, to review Remcon's schedule submissions, that he did not do so within the seven day period required and that he did not believe himself to be competent to review schedules. True and correct copies of the scheduling specification and excerpts of Mr. DeOcampo's declaration are attached hereto, respectively, as Exhibits 2 and 3 and by this reference made a part hereof.

b. Remcon made multiple schedule submissions, dated 6/11/01, 6/25/01, 6/27/02, 8/6/02 and 6/9/03. The baseline or as-planned schedule relevant to my analysis is the one dated 6/11/01. This schedule provides that Remcon proposed to perform all of the contract required work within two construction seasons (by November, 2002). Given that the work was divided into two principal phases, known as Upper Sherman and Lower

Sherman, there was a practical restraint imposed by the contract as follows: the contractor had to keep a specified number of parking spots for cars, RV's and buses open year round. In order to perform the project the contractor had to construct the new spaces in the Upper Sherman parking lots (which meant all of the lots, along with the new access road and the new comfort station and the new trail to the Sherman Tree) before he could relocate his efforts to the Lower Sherman portion and demo and rebuild the parking lot, highway and other improvements there. These requirements are found in various locations of the contract documents but include Specification section 01110 1.4 A-F. A true and correct copy of this section is attached hereto as Ex. 4 and by this reference made a part hereof.

c. In order to comply with the contract requirements the Upper Sherman work needed to be completed before transitioning to the Lower Sherman work. Because the Lower Sherman work would take a full construction season (given the elevation of the project (over 7000 feet in the Sierra Nevada mountains) and the limited site access), the work season could only commence when the snow had melted and the prior to it re-commencing. In general, this means the construction season runs from June 1 to October 31 or so every year.

d. Remcon's as-planned schedule planned to perform all of the Upper Sherman work in one construction season (during 2001) and then perform all of the Lower Sherman work in the next season (during 2002). The contract issued to Remcon in the spring of 2001 gave Remcon 792 calendar days to construct from the issuance of a notice to proceed. The notice to proceed was issued effective June 11, 2001, and the original contract completion date was therefore August 11, 2003. A true and correct copy of the Notice to Proceed is attached hereto as Ex 5 and by this reference made a part hereof.

e. I have reviewed Remcon's as-planned schedule both as to durations of planned activities and logic and find them to be reasonable. My opinion in this regard is

assisted by the fact that not only did the government not object to the logic or durations shown by Remcon (whether timely or otherwise), but in fact the government's retained construction manager, Jacobs Facilities, had its scheduler, Adam Schwartzman review the schedule. His opinion and commentary on Remcon's as-planned schedule is as follows:

> "The cursory review of the NPS - Sherman Tree Resource schedule looked well thought out and organized. The logic seemed complete and consistent throughout the schedule. The schedule is acceptable as is, however, there are a few areas where changes could be implemented to enhance the schedule's sorting and organizing features."

A true and correct copy of Mr. Schwartzman's letter dated July 11, 2001 is attached hereto as Ex 6 and by this reference made a part hereof.

f. In Remcon's as-planned schedule, the critical path of the work in the Upper Sherman commenced with the clearing of trees and pioneering of the access road and parking lots and then transitioned into the construction of the comfort station and related improvements. This critical path was closely followed by the excavation and earthwork effort, and given what happened on the project, due to delays admitted to have occurred by the government, the critical path of the as-built project promptly shifted from the comfort station to the earthwork and excavation activities. The following is a list of events that impacted the critical path and caused Remcon to not be able to complete the Upper Sherman portion of the project as-planned:

i. The trees were marked to be removed by the government, between stations 24 and 30 on the access road, in a location into the hill from where the designers intended. This was discovered after Remcon had removed the trees. Between June 26 and July 2, 2001 the government evaluated this issue and ultimately directed Remcon to relocate the road into the hill where the trees had been removed. The government admitted it was responsible for this mistake by agreeing to pay Remcon for re-surveying the road into the cleared area. (Prior to June 26th, the trees had been

cleared and Remcon's surveyors had come out to stake the road. Between stations 24 and 30, the stakes were in a location up to 10 to 15 feet from the area where the trees had been marked to be cleared and the clearing had been undertaken. The government, faced with this issue, brought personnel out from the Denver Service Center to evaluate the issue and made the decision to relocate the road into the hill. As described below, this was a decision that had serious financial and time extension ramifications.) The government's admission that it was responsible for relocation of the road and that it was not the result of Remcon's error is set forth in writing as part of Modification No. 4, issued by the government on September 14, 2002 (over 1 year after the fact which is one example of the government's maladministration and failure to timely perform its responsibilities). In the modification the government included new bid item number 137, which reads as follows:

> **<u>New Item No. 137: Restaking Access Road Centerline.</u>**
>
> On July 31, 2001, the Contractor's submitted a change order request for "Additional Survey Work" for their Surveying Subcontractor (Giuliani & Kull). This request was based upon the initial Access Road centerline staking per the contract drawings. After this initial staking it was discovered that the centerline with all required cut boundaries did not fall within the earlier cleared limits as delineated by Park staff. Thus the Government agreed that the centerline had to be revised in order to fit all earthwork into the already cleared limits. Therefore the surveyor had to re-staked this revised centerline and are entitle to be compensated for their additional work. In addition, this work had to be completed at this time to prevent additional construction costs associated with equipment stoppage and delays. The revised road layout and re-staking reduced construction costs since additional clearing and tree removal was not required. Therefore, this work is necessary in order to construct the roadway alignment in the location shown on the construction drawings. This change is in the best interest of the Government and I recommend it be approved.

Additionally, as part of the Modification the Contracting Officer included the following express justification, authored by government personnel, supporting the issuance of the Modification:

A true and correct copy of Modification No. 3 is attached hereto as Ex 7 and by this reference made a part hereof.

ii. Concurrent with the problem with the access road location, and continuing into the month of July, 2001, Remcon encountered a differing site condition in the Upper Sherman parking area. Specifically, the contract documents identified that a portion of the area to be constructed into a parking lot was previously used as a burn pit and was estimated to contain approximately 2000 cubic yards of material to be excavated and hauled out of the park. Remcon bid the work as indicated. Unfortunately, the volume of material which was encountered and deemed unacceptable, based upon directions from the project's inspector working for the NPS, exceeded 6000 cubic yards. Remcon excavated and hauled this material out of the park at the direction of the government in June and July of 2001 but the government, again untimely, did not issue Modification No. 3 until August, 2002. As part of Mod. No.3, Remcon was given a time extension of 13 working days. See Ex. 7. This belated granting of a time extension is not consistent with the government's duty to timely issue time extensions. Instead of being granted in July, 2001 when it was experienced, it was issued 13 months later.

iii. Following the hauling out of the burn pit materials Remcon planned to perform its mass excavation work which principally consisted of excavation and grading of the access road and the parking lots in the Upper Sherman portion of the project. This effort was planned to be a duration of 21 calendar days. Instead, it took over a year to perform due to

the road relocation identified above and the failure of the government, until September, 2002, to issue its final design changes to Remcon so that Remcon could complete the earthwork portions of the project and commence paving. As a result of the multiple problems with the design, which are documented in dozens of written communications between the contractor, the inspector, the NPS park and Denver Service Center personnel, and the outside design team members hired by the NPS, and which are admitted by the government to have been its responsibility in the modifications it issued as well as in the testimony of multiple government witnesses, including Willie DeOcampo (COR), Rod Keiscome (CO), Joanne Cody (A+ E Manager), as well as the independent designers (Bob Smith and Ray Tuttle), the project was unable to be constructed as-planned.

iv. One of the worst and most far-reaching design problems stemmed from the road relocation issue. As a result of being placed into the hill, the road profile, which was already in a "cut" location between stations 24 and 30, now had more excess material to be handled. Further, the subsurface material to be encountered between these stations was no longer "earth and rippable rock" which could be "ripped" by conventional construction equipment as disclosed in the contract's soils report made available to bidders and upon which the bid of Remcon was based, but rather had to be blasted.

The consequences of blasting, rather than ripping, are enormous. They include the fact that it is much slower to blast than rip and thus a huge overrun in labor, material and equipment costs were incurred. Blasting, in substance, involves drilling holes to place charges, covering the holes, clearing the site, and blasting. The material then needs to be removed. It

cannot be used as backfill or fill as planned without special processing. The time it took to blast this 600 foot area was 6 or so weeks alone, twice the planned duration of the entire excavation and earthwork in the Upper Sherman Access Road and Parking Areas included in the as-planned schedule and which was found by the government's consultant to be reasonable.

Remcon gave notice orally and in writing concerning encountering the rock which it characterized as a differing site condition.

The contract required the government, upon receipt of such notice, to investigate the validity of Remcon's contention. This requirement is found in the Differing site condition clause of the contract found at FAR 52.236-02. A true and correct copy of this clause is attached hereto as Ex 8 and by this reference made a part hereof.

The government has now belatedly admitted that it failed to investigate the claimed type one differing site condition. This admission is found in the testimony of Willie DeOcampo and Rod Keiscome and true and correct copies of excerpts from their depositions are attached hereto as Ex 9.

Further still, the government steadfastly denied Remcon's multiple written and oral requests for compensation in time and money for encountering the differing site condition. Remcon sought many weeks of delay damages and over $700,000 in additional costs as a result of the issue.

More than 18 months after Remcon encountered the issue, after the entire 2002 construction season was over, the Contracting Officer issued, on a unilateral basis, Modification No. 6 which expressly recognized the fact that the contractor did in fact encounter a differing site condition between stations 24 and 30 in constructing the access road. This admission granted Remcon only $84,000 worth of compensation based upon an analysis

which is flawed in many respects and which ignores multiple items and issues. However, not only was the modification improperly issued with respect to when it was issued, it also failed to address the issue of time extensions and delay. Indeed, it is wholly silent on that point.

Because Remcon was apparently in such a dire financial situation due to the impacts on this project as of February, 2003 when Modification No. 6 was unilaterally issued, it appears to me that the issuance was akin to "too little too late" and the failure to include any time extension cannot be justified as my analysis shows that the encountering of the differing site condition was a material delay to the project and the government has never addressed it.

v. The combination of the road relocation, the burn pit material and the differing site condition on the access road collectively caused the critical path of the project to shift from going through the comfort station and put it entirely on the excavation activities. This continued into 2002.

g. Concurrent with all of the excavation issues identified above are multiple instances of design problems with the parking lots and access road not being able to be constructed as designed due to many different impacts. These include rock outcroppings, trees which were not marked to be removed but which had to be removed, the government's identification that a stockpile of aggregate base was on site to access and use which turned out to be false and a myriad of other documented problems. The fact that there were design problems is not of concern to me. Design problems are to be expected. However, the government failed to promptly address them in a timely or efficient or fair manner (whether they were huge issues such as the differing site conditions or relatively minor issues which one could expect to be encountered and addressed), and this maladministration plagued the project and contributed to the delays and extra costs incurred by Remcon.

One such example is the burn pit issue. Once Remcon was directed to excavate the hole from 2000 cubic yards over 6000 cubic yards it did so in July, 2001. The design planned for the 2000 yards to be excavated to be filled in from other locations along the access road and parking lots that were "cut" because their existing elevation was higher than required. However, the material to fill in the 2000 yards was, in part, from the deep cut area which was blasted and therefore rock and other material not able to be used, but also no direction was given by the government to fill in the extra 4000 yards excavated and recognized through Modification No. 3. In fact, to this day no modification reimbursing Remcon to fill in the hole has been issued, whether for time or money.

h. Additionally, in the spring of 2002 Remcon repeatedly asked for direction from the government regarding what to do with the thousands of extra cubic yards it had excavated and for which there was no provision in the contract to handle. This issue arose as early as July 2, 2001 when the NPS realized in internal communications that up to 13,000 cubic yards of excess material may be excavated and that if the contractor was directed to haul it out of the park at the contract rate of $15/cy the cost would be almost $200,000. The internal written materials from the NPS perceive this to be a result of a design error and discuss putting the designer on notice of a professional negligence claim. Based on the records reviewed and deposition testimony they did not do so and the Contracting Officer testified that he was not informed of these issues or events.

This issue stems from the fact that the designers used a compaction rate of 40% for the decomposed granite to be excavated. This percentage appears in the record and was acknowledged in their testimony. It is my experience that this percentage was extremely flawed and the designers have testified that they were dubious of it as well but were directed by the NPS to use it. In my experience decomposed granite will compact no greater than 15% and likely much less, and this explains, in part, for the reason for such a large volume of overrun in material.

i. The bottom line is that there were a myriad of design and other issues which arose during the first year of the project and which continued unresolved into the second year (2002). When Remcon remobilized in the second year it had no direction what to do with the excess material and ultimately was given direction in late June, 2002 to raise portions of the upper parking lot by up to 5 feet. This, unfortunately, did not address bringing the lot back to its intended grade. The modification for this effort was also delayed by the government until September 2002.

4. Adding to all of these issues is the fact that the design of the third prong of the Upper Sherman work, concerning the construction of the new trail to the Sherman Tree, was found to be substantially deficient throughout 2001 and again into 2002. The record is filled with multiple instances where the designers acknowledged that trail points and other items, including the planned drainage, needed to be modified and multiple design revisions were issued by the NPS to Remcon and/or Remcon's subcontractors, including its surveyors. The design changes issued by the NPS did not stop until the issuance of Modification Number 5, signed by Remcon on October 18, 2002 but not signed and issued by the Contracting Officer until November 20, 2002. This one modification, alone, prevented Remcon from completing the Upper Sherman Tree Trail work for over two construction seasons. Stated otherwise, even if all of the other problems on the Upper Sherman Tree Trail work had not occurred, the delay by the government from issuing the redesign to the Upper Sherman Tree Trail, and the modification to Remcon to construct the changes, until November 20, 2002, prevented Remcon from finishing the Upper Sherman Tree Trail work in 2001 or 2002, as it was already snowing as of November 20, 2002, and there was much work to perform on the trail that was restrained by the redesign effort maturing into Modification No. 5. This meant, as a practical consequence, that had Remcon remobilized during the 2003 construction season it would have still had to work on the trail even if it had finished all other Upper Sherman work (which it hadn't for a multitude of reasons). This meant that

the Lower Sherman work could not have started until 2004 at the earliest without relief from the contract standards and the NPS indicated to Remcon in 2002 that it would not provide such relief. Thus, by the government's own conduct, the Project was delayed at least two years but a time extension recognizing this delay has not been issued.

5. Collectively, all of these issues compelled Remcon to be unable to construct the project as-planned. Because of this fact Remcon issued a revised, updated schedule to the NPS early in the 2002 construction season. It showed that the earthwork, not the comfort station, was on the critical path and that the government was responsible for the delays to date. It also showed that completion would occur, at the earliest, in November, 2003.

No response to the schedule, as to its material content, has been found by me in the project records. In fact, had the government objected to Remcon's contention it was the government's responsibility, by the rules promulgated by the government in the project specifications, to sit down with Remcon within seven days of receipt of the schedule. I am not aware that any such meeting or response which occurred within this time frame or at all. No evidence exists to support that it did. As a result, I conclude that the government failed to perform as required which I understand to be a breach.

6. The failure to issue time extensions, on a timely basis, in most instances has dire financial and performance effects on a contractor. My opinion is that the government failed to timely issue modifications for time or money, and its belated issuance of modifications, combined with the volume of the design problems and failure to timely address most of them, whether big or small, but especially the big ones, had a devastating effect on the contractor and was unfair and was a breach of the duties I read the government had under the contract.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed at Rancho Cordova, California on July 20, 2005.

Thomas W. Lloyd

THOMAS W. LLOYD