# EXHIBIT 1

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

# THOMAS W. LLOYD, P.E.

**Position:** Executive Consultant

**Education:** B.S. Civil Engineering, Rensselaer Polytechnic Institute, 1964

**Experience:** PCCI, Sacramento, Los Angeles, San Francisco Bay Area, Las Vegas

Responsible for preparing and managing contract dispute analyses for law firms, owners, contractors, architects, engineers and insurance companies. Includes extensive involvement in disputes on various construction projects, including buildings, educational facilities, hydroelectric and nuclear power projects, prisons, art and cultural facilities, water treatment plants, hospitals, parking garages, shopping centers and other commercial facilities. Active in preparing and giving seminars for owners and contractors. Provides expert witness testimony for depositions, arbitrations, mediations and litigation. (1987-present)

Duncan & Weber, Inc., Littleton, Colorado

Prepared and managed contract disputes for contractors, owners, and law firms. Projects included power plants, buildings, dams, industrial facilities, mining facilities, mass transit systems, sewage treatment plants and hotels. Provided expert witness testimony for depositions, arbitrations, and litigation. (1980-1987)

Kellogg Corporation, Littleton, Colorado

Prepared claims for industrial, nuclear and fossil power, sewage treatment, utility and commercial projects. Clients included contractors, owners and insurance firms. (1978-1980)

Dravo Corporation, Pittsburgh, Pennsylvania

Contract Administrator and Cost Engineer Supervisor – Responsible for the contract administration for many projects. Prepared and assisted in negotiation of claims and change orders. Responsible for setting up effective cost keeping systems as well as accumulating and monitoring project costs from the field for all projects. Provided estimators and division management with cost analyses and production data for active and completed projects. (1977-1978)

Project Engineer – Responsible for all required field engineering, including project planning and scheduling, design and selection of forming and support systems for the civil construction of the Shoreham Nuclear Power Station, built for Long Island Lighting Company. Supervised over 50 engineering personnel. (1972-1977)

Engineer/Estimator – Performed engineering design work and estimating for several projects. Prepared a licensing manual for nuclear piping work complying with ASME Section III requirements. Also, served as Dravo's home office engineer for the Wallace Dam pumped storage project. (1971-1972)

Chief Field Office Engineer – Responsible for coordinating and directing all office engineering work for civil work at the Shoreham Nuclear Power Station. Supervised engineers and draftsmen engaged in design work and in the preparation of feasibility studies. (1970-1971)

Field Cost Engineer/Project Engineer – Prepared cost comparisons, design of forming systems, preparation and monitoring of schedule, installation of machinery, and field engineering responsibilities for the removal and installation of a cofferdam. Work performed on the Jones Bluff Lock and Dam on the Alabama River. (1968-1970)

Office Engineer – Performed design work for forming systems and cofferdams for several projects. Worked with estimating department. (1968)

Field Engineer – Responsible for engineering, surveying, coordination and inspection for the construction of a flyash retention dike for the American Electric Power Company at Lawrenceburg, Indiana. (1967)

Office/Field Engineer – Worked as office engineer and field engineer on Lock and Dam No. 13 on the Arkansas River. (1967)

Office Engineer – Worked with the estimating department on many projects. (1964 and 1966)

## Military Service:

Second/First Lieutenant – Served in the U.S. Army Corps of Engineers in Vietnam and the United States. (1964-1966)

## Professional Certifications and Activities:

Registered Professional Engineer
Listed in ABA Register of Expert Witnesses
Commercial Panels of Arbitrators (AAA)

## Publications:

*Substructure and Structural Concrete Work for Nuclear Power Plants*, Pennsylvania State University, August 1976. T.W. Lloyd and J.J. Smith, co-authors. Later published by John Wiley & Sons in *Planning, Engineering and Construction of Electric Power Generation Facilities.*

# EXHIBIT 2

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

SECTION 01320

PROJECT SCHEDULE AND MONTHLY INSPECTIONS

PART 1 GENERAL

1.1 DESCRIPTION

A. Summary: The work of this section consists of project schedule requirements including preparation of a project schedule, schedule updates, schedule revisions and time impact analysis. The project schedule shall be based upon the Critical Path Method (CPM) for planning, scheduling and reporting progress of the Work. The project schedule shall be developed by the Contractor and shall be in accordance with this section. The monthly inspection of project record drawings and operation and maintenance data binders is also included in this section.

B. Purpose: The purpose of the project schedule is to ensure adequate planning, coordination, scheduling, and reporting during execution of the work by the Contractor. The project schedule will assist the Contractor and Contracting Officer in monitoring the progress of the work, evaluating proposed changes, and processing the Contractor's monthly progress payment.

C. Software:

1. The software shall be the latest version of Primavera Project Planner (P3) by Primavera Systems, Inc., Bala Cynwyd, PA, or approved equal. The CPM software program shall be capable of processing 5,000 activities per project using Precedence Diagramming Method (PDM). Other software features shall include original/remaining activity durations (in days), multiple activity code information, multiple activity calendars, cost analysis, and the use of identification numbers or float for selection, sorting, grouping, summarizing, and reporting schedule information in tabular or graphic formats. The software program shall be capable of calculating finish-to-start, start-to-start, and finish-to-finish relationships and free, total, and negative float calculations. The software shall track original activity cost, actual cost to date, percent complete, earned value, cost to complete, and cost at completion. The software shall be capable of preparing all tabular and graphic reports required by this section.

2. The Contractor shall provide to the Contracting Officer a licensed copy of the software used for the project schedule and a software reference manual. The software and reference manual will be returned to the Contractor at completion of the Contract.

D. Submittals: (See Section 01330 Part1.3H-4d)

1. Project Schedule: Within five calendar days after Notice to Proceed, the Contractor shall submit for the Contracting Officer's review one electronic copy on PC compatible CD-ROM, and four paper copies of its proposed Project Schedule Network Diagram or (CPM-produced) Bar Chart graphic with logic links indicated, which shall be time scaled from left to right on 22-inch by 34-inch sheets. The Contractor shall also submit accompanying CPM Schedule Reports.

2. Project Schedule Updates: On or before the 10th day preceding the progress payment request date, the Contractor shall submit estimates of the percent completion of each schedule activity and necessary supporting data. The submittal shall include two copies and

one electronic copy of the previous month's Schedule Update indicating actual activity start and/or complete dates, revised (current) remaining durations, and percent complete information. The Contractor shall also indicate in writing those activities the Contractor plans to work on during the following update month, any anticipated conditions, which may delay the work, or any additional information necessary to support the above.

3. Project Schedule Update Reports: Within seven days after the schedule update meeting, the Contractor shall revise and submit two papers and one electronic copy of the project schedule update reflecting progress as of the status date of the schedule update and any agreed-to revisions to the project schedule. The Contractor shall also use the percentage completions as required for preparation of its monthly request for progress payment.

4. Project Schedule Revisions and Time Impact Analysis: For Contractor-requested schedule revisions, contract modifications, changes, and delays, the Contractor shall submit a time impact analysis which shall include a fragmentary project schedule analysis demonstrating how the Contractor proposes to incorporate the modification, change, delay, or Contractor request into the project schedule.

5. In addition to each of the above-specified number of hard copies of network diagrams and reports, the Contractor shall provide a PC compatible CD-ROM of all required project schedule submissions and updates. Provide complete project name and schedule information status date on an external label. For all submissions, the computer disc shall contain files of all the required data, including all graphic files.

1 .2 REFERENCES

A. Associated General Contractors of America, Construction Planning and Scheduling (AGC's Manual), January 1994, also referred to as AGC Publication No. 1107.

B. The general principles stated in the AGC's Manual shall be used in preparing and updating the project schedule, except that the requirements of this section shall govern.

1 .3 PRELIMINARY REQUIREMENTS

A. Meeting: The Contractor shall meet with the Contracting Officer on the day of the preconstruction conference to conduct a joint review of the project schedule requirements of the contract to assure the Contracting Officer of the Contractor's and subcontractors' understanding of the requirements of this section.

B. Contractor's Schedule Representative: Before or at the preconstruction conference, the Contractor shall designate in writing and provide the qualifications of an authorized representative in the Contractor's organization who shall be responsible for coordinating with the Contracting Officer during the preparation and maintenance of the project schedule.

1 .4 PROJECT SCHEDULE

A. Schedule Development:

1. The project schedule shall cover the entire contract period. The late finish of the project schedule shall be the same sate as the established completion date of the contract.

2. The Contractor shall use the Precedence Diagram Method (PDM) with limited use of lead or lag durations between schedule activities. The Contractor's project schedule shall consist of procurement activities (including mobilization, submittal, and the fabrication and delivery of key and long-lead procurement items) and construction activities.

3. The Contractor's project schedule shall consist of, but not be limited to, the following for each activity:

   a. The Contractor shall utilize numerical designations (maximum 5-digit) to identify each and every activity number. Numbering of activities shall be in increments of 10 digits.

   b. Concise description of the work represented by the activity (maximum 48 characters). Avoid the use of non-standard abbreviations.

   c. Activity duration in whole working days with a maximum duration of 15 work days each, unless otherwise approved by the Contracting Officer, except for non-construction activities including mobilization, shop drawing and sample submittals, fabrication of materials, delivery of materials and equipment, and concrete curing.

4. In developing the project schedule, the Contractor shall be responsible for ensuring that subcontractor work at all tiers, as well as its own work, is included in the project schedule.

5. The project schedule as developed shall show the sequence and interdependence of activities required for complete performance of the work. The Contractor shall be responsible for ensuring all work sequences are logical and the project schedule shows a coordinated plan of the work.

6. Proposed duration assigned to each activity shall be the Contractor's best estimate of time required to complete the activity considering the scope and resources planned for the activity.

7. Resource loading of each activity shall list all personnel by labor category and equipment type and capacity proposed to complete the activity in the duration shown.

8. Seasonal weather conditions shall be considered and included in the planning and scheduling of all work influenced by high or low ambient temperatures, wind and/or precipitation to ensure completion of all work within the contract time. Modify project calendar to reflect weather conditions.

B. Joint Review, Revision, and Acceptance: (see Specification Section 01330, Part 1.3H-4d)

1. Within seven calendar days of receipt of the Contractor's proposed project schedule, the Contracting Officer and Contractor shall meet for joint review, correction, or adjustment of the proposed project schedule. Any areas, which, in the opinion of the Contracting Officer, conflict with timely completion of the project, shall be subject to revision by the Contractor.

2. In the event the Contractor fails to define any element of work, activity, or logic, and the Contracting Officer review does not detect this omission or error, such omission or error, when discovered by the Contractor or Contracting Officer, shall be corrected by the Contractor at the next monthly project schedule update and shall not affect the contract time.

3. Within seven calendar days after the joint review between the Contractor and Contracting Officer, the Contractor shall revise and resubmit the project schedule in accordance with agreements reached during the joint review.

4. Upon acceptance of the project schedule by the Contracting Officer, the project schedule will be used to evaluate the Contractor's monthly applications for payment based upon information developed at the monthly project schedule update meeting.

1.5 PROJECT SCHEDULE UPDATES

A. General: The project schedule shall be updated on a monthly basis throughout the entire contract time and until project substantial completion. The status date of each schedule update shall be the 10th day preceding the progress payment request date.

B. Procedure: The Contractor shall meet with the Contracting Officer each month at a project schedule update meeting to review actual progress made through the data date of the project schedule update (hereinafter referred to as the schedule update), including dates activities were started and/or completed and the percentage of work completed on each activity started and/or completed. In case of disagreements at the schedule update meeting concerning actual progress to date, the Contracting Officer's determination shall govern. The schedule update meeting shall occur on the seventh day prior to the progress payment request date.

C. Progress Payments: The monthly updating of the project schedule will be an integral part of the process upon which progress payments will be made under this contract. If, in the judgment of the Contracting Officer, the Contractor fails or refuses to provide a complete schedule update or revision as specified, the Contractor will be deemed to have not provided the required information upon which the progress payment may be made, and shall be subject to retainage of a portion of the payment.

1.6 PROJECT SCHEDULE REVISIONS

A. Required Revisions: If, as a result of the monthly schedule update, it appears the project schedule no longer represents the actual prosecution and progress of the work, the Contracting Officer will request, and the Contractor shall submit, a revision to the project schedule. The Contractor may also request reasonable revisions to the project schedule in the event the Contractor's planning for the work is revised. If the Contractor desires to make changes in the project schedule, the Contractor shall notify the Contracting Officer in writing, stating the reason for the proposed revision. Accepted revisions will be incorporated into the project schedule at the next monthly schedule update.

B. Procedure: If revision to the project schedule is contemplated, the Contractor or Contracting Officer shall so advise the other in writing at least seven calendar days prior to the next schedule update meeting, describing the revision and setting forth the reasons therefore. Government-requested revisions to the project schedule will be presented in writing to the Contractor, who shall respond in writing within seven calendar days.

1.7 TIME IMPACT ANALYSIS FOR CONTRACT MODIFICATIONS, CHANGES, DELAYS, AND CONTRACTOR REQUESTS

A. Requirements: When contract modifications or changes are initiated, delays are experienced, or the Contractor desires to revise the project schedule, the Contractor shall submit to the Contracting

Officer a written time impact analysis illustrating the influence of each modification, change, delay, or Contractor request on the contract time.

B. Time Extensions: Activity delays shall not automatically mean that an extension of the contract time is warranted or due the Contractor. It is possible that a modification, change, or delay will not affect existing critical activities or cause non-critical activities to become critical. A modification, change, or delay may result in only absorbing a part of the available total float that may exist within an activity chain of the project schedule, thereby not causing any effect on the contract time. Time extensions will be granted in accordance with the terms of the contract.

C. Float: Float is not for the exclusive use or benefit of either the Government or the Contractor. Extension of the contract time will be granted only to the extent the equitable time adjustments to the activity or activities affected by the modification, change, or delay exceeds the total (positive or zero) float of a critical activity (or path) and extends the contract completion date.

D. Procedure: Each time impact analysis shall be submitted within the time period stated in a request for proposal, or the time period designated under the clauses entitled Changes or Default. In cases where the Contractor does not submit a written request for extension of time and a time impact analysis within the designated time, it is mutually agreed that the particular modification, change, delay, or Contractor request does not require an extension of the contract time. Upon acceptance, the time impact analysis shall be incorporated into the project schedule at the next monthly schedule update.

1.8 SCHEDULE OF VALUES: (See Specification Section 01330, Part 1.3H-4d)

a. Submit a schedule of dollar values based on the Contract Bid Schedule. Include bond costs, mobilization, general condition costs, overhead, and profit in the total dollar value of unit price items and in the component parts of work for each lump-sum item, as described below. Do not include bond premiums, mobilization, general condition costs, overhead, or profit as separate items; however, payment for bond premiums can be made based upon evidence of payment to the surety. Bond premiums may be shown as a separate item.

b. Break down each lump sum bid item into component parts of work for which progress payments may be requested. The total costs for the component parts of work shall equal the bid amount for that lump-sum item. The Contracting Officer may request data to verify accuracy of dollar values.

c. Do not break down unit price bid items. Use only the bid amount for unit price items.

d. The total cost of all items shall equal the contract sum. The Schedule of Values will form the basis for progress payments as provided for in the terms of the contract.

1.9 MONTHLY INSPECTIONS

A. Project record drawings as specified in Section 01770.

B. Operation and maintenance data binders as specified in Section 01785.

PART 2 PRODUCTS NOT USED.

PART 3 EXECUTION NOT USED.

PART 4 MEASUREMENT AND PAYMENT

4 .1 PROJECT SCHEDULE AND MONTHLY INSPECTIONS

A. Payment will be included in the bid item to which this work relates.

END OF SECTION

# EXHIBIT 3

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

appointment letter.
Q (By Mr. Schoenfeld) I understand that that's going to be more specific. Tell me what you understand your job duties are, in your words.
A I -- when I'm in the office, I reviewed submittals which are recommended to me by either the designers -- I also look at --
Q By designers or anybody else?
A Designers --
Q CMs?
A CMs.
Q Anybody else?
A I believe that's it.
Q Okay. So you review submittals. Go ahead.
A And they make recommendations to me.
Q I understand.
A Okay?
Q What other job responsibilities do you perceive that you have?
A I also am responsible for review on pay estimates.
Q Anything else?
A Every once in a while, I will travel to the job site and look at, in -- I will inspect.
Q Anything else?



A I perform the final inspections with designers.
(Mr. Christensen entered the room.)
Q (By Mr. Schoenfeld) Anything else?
A I have to think on that.
Q All right. Let me suggest some categories and tell me if these fit within your responsibilities.
Do you receive correspondence from the contractor?
A Yes.
Q Do you author correspondence?
A Yes.
Q When a contention is raised, whether by correspondence or otherwise, that there is a design error that affects the job, either in time or money, is that a subject that is brought to your attention as the COR and your responsibility to evaluate and respond?
A I evaluate and I respond.
Q So that is part of your duties?
A Yes.
Q So change order requests are part of your duties?
A Change order requests are part of my duties. I also negotiate cost, perform government estimates.
Q So you negotiate extra work change orders?



A Yes.
Q And you estimate?
A I perform government estimates.
Q On extra work?
A Yes.
Q Do you perform an evaluation as to whether something is extra work?
A Yes.
Q Do you receive on some periodic basis daily reports from your construction managers?
A Yes.
Q Do you review them?
A Yes.
Q Do you receive and review schedule information from your contractors?
A Yes.
Q Do you have the responsibility to approve submittals?
A Yes.
Q Approve schedules?
A No.
Q Who has the responsibility to approve schedules?
A I accept schedules.
Q So you have the responsibility to accept or



reject?
A Yes.
Q If the contractor raises a question or refers to -- we'll refer to it as an RFI, a Request For Information --
A Yes.
Q -- does that documentation flow through you --
A Yes.
Q -- and your office?
A Yes.
Q Is it your responsibility as the COR to determine what project-related communications go to the design team during the construction administration phase for their involvement?
A Yes.
Q Am I correct in understanding, then, that if the construction manager has a question or an issue or the contractor has a question or an issue that information is filtered through you as the COR before it goes to the design team as contrasted with going directly to the design team?
THE WITNESS: Can you read back that question?
(The reporter read page 44, line 16 through line 21.)
Q (By Mr. Schoenfeld) And my question is

Page 69

THE WITNESS: I -- I -- I can't recall any time, but I know that Mr. Christensen and I had talked about a lot of things, i.e., the progress schedule is one that comes to my mind where I accepted it with notations in order for Remcon, or Remediation Contractors, to get paid, because in our specification it says that unless we have an approved progress schedule, the contractor cannot get paid.

Because we had already mobilized and Remcon was doing work up there --

Q (By Mr. Schoenfeld) Uh-huh.

A -- to mitigate any financial impacts to them, I accepted this progress schedule with notations with the understanding that Mr. Christensen would give me the information that I requested on my response for his progress schedule.

Q Okay. I don't believe you answered my question, so I'm going to reask it in pieces.

Was there ever a time that extra work was directed to be performed and the contractor communicated We need written assurances that we will be able to bill for it because performing of the -- the performance of the extra work will cause a financial hardship on us?

A I would have to look and see what directives were issued.

Page 70

Q Please answer the question.

MR. SCHOENFELD: Read it back to him.

(The reporter read page 69, line 19 through line 23.)

THE WITNESS: I don't recall, to the best of my knowledge.

Q (By Mr. Schoenfeld) Was there ever a time, other than with respect to hauling, that you communicated with the inspector to allow the contractor to bill for the work -- the extra work under a different line item because the mod had not yet been issued?

A There was probably an instance.

Q What documentation exists to substantiate any of those instances?

A I don't know.

Q Was it just a private conversation between you and the inspector that would permit this to happen and there'd be no paper trail behind it?

A There would be a paper trail, because we have unit prices on certain items. A lot of times what happens is when they overrun, I would go ahead and let my con -- my inspector put that cost in there with the understanding that I'm going to adjust those quantities at a later date.

Q Okay. Let me just ask you a couple more

Page 71

questions and then we'll take a break.

Do you recall a gentleman by the name of Larry Walling, L-A -- W-A-L-L-I-N-G, acting as a project manager on this project?

A I think he may have come in there in the intermediate time between Ray Todd and Mike Giller.

Q How long --

A I'm not sure if -- if he was designated as PM or not.

Q Okay. But Mr. Todd was there when the contract was issued?

A Yes.

Q And at some point before Mr. Giller came on board, Mr. Walling may have been?

A I guess.

Q All right. A moment ago in response to the questioning, you said that you approved the schedules --

A I --

Q -- with notation.

A I accept them.

Q Did you mean accept?

A I accept them.

Q Okay. Because you weren't given authority to approve, correct, only accept?

A The project schedules are never approved,

Page 72

because I don't know the logic behind the scheduling.

Q Have you ever received any training in -- in construction scheduling?

A No formal training.

Q So you've never taken any critical path classes?

A I've taken critical path classes.

Q Okay. Are you competent in your own mind to do Primavera or Microsoft schedule work on the computer?

A Not Primavera. I've had a class in MS projects.

Q And have you ever scheduled a project yourself?

A No.

Q Okay. Were you authorized by the change -- by the con -- were you authorized by the contracting officer to direct the inspector to allow this money substitution to go on while the modifications were pending but not yet issued?

A Never directed by the contracting officer.

Q Did you communicate to the contracting officer any time you did that?

A I would let him know that whenever we had overruns, it's coming down.

Q How would you communicate that? In writing?

Q (By Mr. Schoenfeld) Can you tell me if Exhibit 201 is the same as the stapled sheet to Exhibit 16?
A It appears to be.
(Exhibit Number 202 was marked for identification.)
Q (By Mr. Schoenfeld) Okay. Did you receive from Mr. Russell Exhibit 202, a letter from Remcon to Mr. Russell regarding the project schedule?
A (Reviewed documents.)
I may have. I'm not sure --
Q Okay.
A -- from my recollection right now.
Q Let's just put -- I show you now Exhibit 17, which are two oversized sheets with an 8 1/2-by-11 sheet stapled on it. Focusing your attention on the 8 1/2-by-11 sheet for a moment, you note that it shows a submittal date of June 25th 2001. Do you see that?
A Yes.
Q And if you look in the lower right-hand portion of the document, you'll see the same date on -- filled in in a stamp; is that correct?
A That's correct.
Q Okay. And this is a submittal by the contractor to the government of a schedule, correct?



A Correct.
Q Is your signature on this sheet dated June 25th of 2001?
A That's correct.
Q And that's your signature about three-quarters of the way down in the middle of the page?
A Yes.
Q Above the heading Contracting Officer's Representative?
A That's my signature.
Q There is, again, in the same location as we found in Exhibit 16, a slash line on the right-hand portion in the middle of the document at a 45-degree angle. Above it is written the words accepted with notation. Is that your writing?
A That's correct.
Q And you then wrote underneath it resubmit revised P.S. Is that correct?
A Yes.
Q What did you mean by accepted with notation, resubmit revised P, period, S, period?
A I meant that I had attached a sheet to this asking for -- whatever was stated on that sheet attached, I wanted that information so that way --
Q Resubmit revised P.S. What does P.S. mean?



A The project schedule.
Q Okay. And looking at the second page, sir, of this Exhibit 17 of the oversized sheets, do you see any such notation by you?
A When you say "notation," what do you mean?
Q You wrote on the 8 1/2-by-11 stapled sheet accepted with notation, resubmit revised project schedule. I'm looking for the notation.
A I made it with this attached sheet.
Q It says -- okay. Let's make sure the record is clear. On the 8 1/2-by-11 sheet that's stapled to Exhibit 17 that's part of Exhibit 17, there is the words see attached sheet. Whose handwriting is that?
A That's mine.
Q Okay. Do you see the -- the document that you refer to as see attached sheet that's been marked as Exhibit 17?
A Not on this sheet.
Q Well, let's see if I've got it separate. Let's mark Exhibit 203, sir.
(Exhibit Number 203 was marked for identification.)
Q (By Mr. Schoenfeld) For the record, Exhibit 203, the first page I want to know, sir: Is it identical to what we've marked as the 8 1/2-by-11 portion



of Exhibit 17? The Bates stamps are the same.
A Yes, it -- it appears to be the same.
Q And is the second page of this exhibit the attached sheet that you were referring to with your signature?
A Yes, because it's talking about Transmittal Number 24.
Q Did Remcon resubmit a schedule or documentation addressing the above concerns as reflected in the attachment to Exhibit 203?
A Remcon had provided me many schedules.
Q I understand that.
A I don't know if they submitted a -- another transmittal in this format with that information. I know I got some loose-bound paper talking about resource loading.
(Exhibit Number 204 was marked for identification.)
Q (By Mr. Schoenfeld) Let me show you now -- let's take that and put it away. Put that right there. Thank you.
Let me show you Exhibit 204, sir, multiple-page exhibit on Jacobs Facilities, Inc., letterhead from Brooke Harris to Adam Schwartzman -- this document was produced from the government files --

regarding Sherman Tree Microsoft project schedule dated July 11th of 2001. Do you see that?
A Yes.
Q The first paragraph reads: The cursory review of the NPS, dash, Sherman Tree resource schedule looked well thought out and organized. The logic seemed complete and consistent throughout the schedule, period. The schedule is acceptable as is; however, there are a few areas where changes could be implemented to enhance the schedule's sorting and organizing features, period.
Did you receive this memo from Jacobs?
A I probably did.
Q Would you look at the next page, please. It's a July 12th e-mail from yourself to Ray Todd and Terry Lang regarding schedule comments which communicates that you're forwarding an e-mail that you received from Brooke Harris of -- of Jacobs on July 11th. Do you see that?
A Yes.
Q And it says, Hello, Willie. Here is the memo from our scheduler. Please let me know if you have any questions.
Does that refresh your recollection as to whether or not you received the first page of Exhibit 204?
A I would say that if this memorandum was



attached to it as shown here, then, yeah, I received it.
Q So your construction manager inspector believed the schedule was -- contained logic that was complete and consistent and it was acceptable; is that correct?
A That's what he's stating, yes.
Q Okay. Let's mark now as next in order Exhibit 205.
(Exhibit Number 205 was marked for identification.)
Q (By Mr. Schoenfeld) Exhibit 205, sir, do you recognize as Spec Section 1230 entitled Project Schedule and Monthly Inspections for this project?
A Appears to be the same one, yes.
Q Okay. I want to draw your attention, sir, to Part 1.4, which starts on the back of the first page or the second page of the exhibit entitled Project Schedule, Subpart B, which you'll find on the third page of the exhibit. It's entitled Joint Review, comma, Revision, comma, and Acceptance. You see that, very bottom of the page?
A You lost me. Very bottom?
Q Yes, sir.
A Okay. Yes.
Q You got it?



A Yes.
Q Part B1 reads: Within seven calendar days of receipt of the contractor's proposed project schedule, the contracting officer and contractor shall meet for joint review, comma, correction, comma, or adjustment of the proposed project schedule, period. Any areas, comma, which, comma, in the opinion of the contracting officer, comma, conflict with timely completion of the project, comma, shall be subject to revision by the contractor, period.
Did Mr. Keiscome, as the contracting officer, comply with this requirement in your specifications, to the best of your knowledge?
A The contracting officer never performed this right here.
Q Did you, as the contracting officer's representative, comply in all instances with the requirements that I just read in Part B1 of 1.4 of Spec Section 1320 of this contract documents which we've marked as Exhibit 205?
A If you're asking me if I got with Mr. Christensen, no, I did not. I asked my project inspector to do that.
Q Did your project inspector do so within seven days as required by these specifications of the



submittal?
A I don't know.
Q What is your understanding, sir -- on this project, if your contract documents were not complied with, in other words, the duty that was placed on the government to perform and you didn't do it timely, what is your understanding of the result?
A I have no idea.
Q Are you aware that the con -- that the contract documents on this project required that the plans that were issued for construction be stamped by your engineer and architect?
A No. That would be part of the design.
Q Are you aware that your contract documents for the designer required that the designer stamp and wet-seal the issue for construction 100 percent construction documents?
A As I said, that would be the design facet of this contract.
Q So you don't know whether they were required to or not?
A No, I don't.
Q Okay. I'll ask you to assume such a requirement was imposed by the National Park Service by contract on its designer and that the designers did not

# EXHIBIT 4

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

SECTION 01110

SUMMARY OF WORK

PART 1 GENERAL

1.1 DESCRIPTION

A. The work of this contract consists of the demolition of an existing comfort station, and the demolition of existing road and parking, and site restoration all at the Sherman Tree area. New construction will include a new vaulted comfort station at the Sherman Tree Area, two parking areas at Wolverton with sewered comfort station and leach field, re-alignment of the Generals Highway with parking, new asphalt pedestrian trail with associated wood bridges from Wolverton parking to the Sherman Tree area.

B. All work as identified and described in the drawings and specifications.

C. All work will be performed under a single contract.

1.2 LOCATION

A. The general location of all demolition and new construction sites are in Giant Forest of Sequoia National Park, accessed from the Generals Highway near elevation 6,400. The areas included in this project are part of the Giant Forest and are known as Sherman Tree and Lower Wolverton.

1.3 CONTRACTOR'S USE OF PREMISES

A. Separate contracts identified as package 200 O and 200 P will be ongoing in Lower Wolverton, Wolverton Point, Wolverton and in the Giant Forest. The Contractor shall coordinate his work and schedule with the other contractors. In addition, for spring and summer 2001, the Contractor shall provide the 200 O contractor four camp sites at the RV terrace, and provide the 200 P contractor ten camp sites for their workers at the Wolverton Parking Lot. Provide Government two camp sites at the RV terrace for the contract duration.

B. Construction Camp: Establishment of a camp will be permitted in the RV Terrace area at Wuksachi. Confine camp to paved areas. Adhere to all park regulations including food storage, provide bear-proof trash receptacles. Provide temporary water, sewer, garbage removal, and electric utilities for all sites including government spaces at RV terrace as specified in Section 01510. Water is available from the park at the RV Terrace during the summer construction season only. Water lines at RV Terrace are winterized and shut off during fall, winter and spring. Keep camp neat and clean at all times and completely clean at completion of work.

C. Construction Office, Staging, and Stockpile Area: As shown on the plans or as directed by the Contracting Officer.

D. Contractor shall at all times conduct his operations to ensure the least inconvenience to the public. Road closures of maximum twenty minutes will be permitted, when required, upon specific approval of Contracting Officer.

E. Confine storage of materials to pre-approved areas in identified staging areas and other adjacent salvage storage areas as directed by Contracting Officer.

F. Preservation of Natural Features: See Section 01351. The Giant Forest, in which this demolition and construction project is located, is part of the prime resource for which Sequoia National Park was created. This prime resource must be protected. Any damage to natural features which occurs will result in an immediate stoppage of operations, so that any appropriate penalties can be assessed, (Section 01351-3.8), restoration or repair can be prescribed, and procedures for preventing any similar occurrences can be implemented. Delays and additional work that occur as a result of any damage to any natural features will be at no additional expense to the Government.

1. Confine all operations to work limits of the project.

2. Prevent damage to natural surroundings.

3. Provide temporary barriers to protect existing trees and plants and root zones.

4. Do not remove, injure, or destroy trees or other plants without prior approval. Consult with Contracting Officer and remove agreed-on roots and branches that interfere with construction.

5. Do not fasten ropes, cables, or guys to existing trees.

6. Carefully supervise excavating, grading, filling, and other construction operations near trees to prevent damage.

G. Existing Utilities: Notify Contracting Officer and utility companies of proposed locations and times for excavation and/or demolition.

1. Contractor shall be responsible for locating and preventing damage to known utilities. If damage occurs, repair utilities designated to remain at no additional expense to the Government.

2. If damage occurs to an unknown utility, repair utility. An equitable adjustment will be made in accordance with the Changes clause of the Request for Proposals (RFP).

H. Hauling Restrictions:

1. The Contractor shall use Highway 180 for hauling and mobilization of equipment.

2. The Contractor shall comply with all legal load restrictions in the hauling of materials and assume all liability for damage which may result from moving of materials or equipment.

3. Special vehicle size restrictions exist on Highway 198 from Potwisha to Giant Forest Village due to steep, narrow, and winding road conditions.

4. Construction activities on Highway 198 in the vicinity of Hospital Rock may result in road closures affecting access between Ash Mountain to Giant Forest for the duration of this project.

5. Highway Information regarding closures and rules and regulations for general vehicular traffic on park roads may be obtained from the Office of the Park Superintendent (559) 565-3341.

1.4 SPECIAL CONSTRUCTION REQUIREMENTS

A. Construction Season: The construction season varies in Sequoia and Kings Canyon National Parks. Snow may occur as early as September, but in general, larger amounts of snow impeding demolition and construction would not normally be expected until late October or November.

B. Traffic Management: Section 01570.

C. The Contractor shall maintain a minimum of 85 passenger vehicle spaces (4 handicap accessible spaces) and 12 oversized RV/bus parking spaces for public use at either Upper or Lower Sherman Tree from May 15 through October 15.

D. The Contractor shall maintain a minimum of 12 oversized RV/bus parking spaces for public use at the Lower Sherman Tree from October 16 through May 14. The Government will provide snow removal for paved public parking spaces adjacent to Generals Highway. The Government will remove snow only from paved areas. The Contractor shall provide all other snow removal required to provide access to parking spaces.

E. The Contractor shall provide four men's and four women's fixtures for public restroom facilities in either existing, new, or temporary facilities at all times. Contractor shall maintain all temporary restroom facilities as specified in Section 01510.

F. The Contractor shall maintain public pedestrian access to the Sherman Tree at all times. Access is defined as hardened surface trail within 40 feet of the base and encompassing one-half of the circumference of the Sherman Tree. Access can be from either Upper or Lower Sherman Tree parking areas by existing or newly constructed trail within designated work limits.

1.5 FIELD VERIFICATION

A. Field verify all new and existing dimensions affecting the work of this contract before ordering products.

1.6 CONSTRUCTION MATERIALS

A. The Government will furnish signs, benches, some of the required granite boulders, recycled crushed aggregate, crushed asphalt and wood chips as identified on plans.

B. All other materials, including borrow and additional materials (aggregates, additional granite boulders including signature and landscape boulders, fill material, etc.) shall be Contractor-furnished from outside the park. Imported material sources must be approved prior to delivery of materials to the park.

C.

1.7 GEOTECHNICAL REPORT

A. Geotechnical Investigation Report Proposed Sherman Tree Parking and Restoration, Sequoia 200Q, September 11, 2000, 97 pages, by Kleinfelder, Inc; and Geotechnical Investigation Report Proposed Retaining Wall and Leach Field, Sherman Tree - SEKI 200Q, February 8, 2001, 39 pages, by Kleinfelder, Inc, are included under separate cover.

B. Two previous preliminary geotechnical reports are filed in the Denver Service Center - Technical Information Center (TIC) 303-969-2959. These are superceded by the 9/11/00 report. The reports: "Preliminary Site Characterization Report Proposed General Sherman Tree Parking

Area", 01/13/00, 42 pages, by Kleinfelder, Inc, - document number 102/D406; and "Geotechnical Investigation-Two Disposal Areas (Sherman Tree Area)" 10/4/96, 24 pages, by Harding Lawson; Associates - document number 102/D327 are available by contacting TIC.

If conflicts occur between the report and drawings or specifications, the drawings and specifications govern.

1.8 HAZARDOUS MATERIAL REPORT

A. Hazardous Material Survey Report for Comfort Station at Sherman, Sequoia National Park, October 29, 2000, 36 pages is included under separate cover.

If conflicts occur between the report and drawings or specifications, the drawings and specifications govern.

PART 2 PRODUCTS NOT USED.

PART 3 EXECUTION NOT USED.

PART 4 MEASUREMENT AND PAYMENT

4.1 SUMMARY OF WORK

A. Payment will be included in the bid item to which this work relates.

END OF SECTION

# EXHIBIT 5

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

RECEIVED JUN 1 2 2001

United States Department of the Interior

NATIONAL PARK SERVICE
DENVER SERVICE CENTER
12795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287

IN REPLY REFER TO:
D5217 (DSC-CS)
SEKI-200Q
1443C8000010903

NOTICE TO PROCEED AND CONTRACT TIME

Remcon, Inc.
Attention: Mr. Stephen Christensen
P O Box 758
751 Wakefield Court
Oakfield, California 95361

JUN 06 2001

Dear Sir:

Reference: Sequoia and Kings Canyon National Park, Tulare County, California, Giant Forest, Sherman Tree Parking Area, Contract No. 1443C8000010903, Project No. SEKI-200Q

Subject: Notice to Proceed and Contract Time

Confirming mutual agreement, you are notified to proceed with the work on June 11, 2001. That date will then become the first calendar day of the contract period of 792 days and, unless extensions are granted, the contract period will expire on August 11, 2003.

Please acknowledge your agreement to this completion date by signing, dating, and returning the original to this office, in the envelope provided, retaining one copy for your files.

Sincerely,

Edward L. Tafoya 6/6/2001

Edward L. Tafoya
Contracting Officer

In Duplicate

*****************************************************************************************

Received and concurred:

By: ______________________

Title: President

Date: June 14, 2001

# EXHIBIT 6

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

PROGRESS SCHEDULE

JACOBS FACILITIES INC.
Engineers, Architects, and Constructors

# Memorandum

**To:** Brooke Harris, Project Manager
**From:** Adam Schwartzman, Scheduler III
**CC:**
**Date:** 07.11.01
**Re:** Sherman Tree MS Project Schedule

---

The cursory review of the NPS – Sherman Tree Resource schedule looked well thought out and organized. The logic seemed complete and consistent throughout the schedule. The schedule is acceptable as is, however, there are a few areas where changes could be implemented to enhance the schedule's sorting and organizing features.

Suggestions:

1) Use the grouping features in MS Project to combine activities by area or type of work. Although this feature is not required, it helps reviewers quickly locate and sort only the activities they are concerned with at the time.

2) Change the "Initials" of each resource to a unique identifier and use the "Group" field for common items such as L – Labor, M – Material, E – Equipment, etc. This will allow for better sorting and filtering of activity resources in the future. Currently the same resource initial is used on multiple resources.

PENGAD-Bayonne, N. J.
DEPOSITION EXHIBIT
204

Willie DeOcampo
07/12/01 07:15 AM MDT

To: Ray Todd/DENVER/NPS@NPS, Jack Vance@NPS
cc: Terry Lang/DENVER/NPS@NPS, bob.russell@jacobs.com
Subject: Schedule comments

----- Forwarded by Willie DeOcampo/DENVER/NPS on 07/12/2001 07:35 AM -----

"Harris; Brooke" <Brooke.Harris@jacobs.com>
07/11/2001 07:24 PM MDT

To: Willie DeOcampo/DENVER/NPS
cc:
Subject: Schedule comments

---

Hello Willie -
Here is the memo from our scheduler. Please let me know if you have any questions or if you'd like him to elaborate on any points.
Thanks -
Brooke

<<Sequoia Schedule A-E Comments.doc>>

Brooke Harris
Project Manager
Jacobs Facilities Inc.
1527 Cole Boulevard, Suite 100
Golden, CO 80401-3403
tel: (303) 462-7637
fax: (303) 462-7003
Brooke.Harris@Jacobs.com

==========================================================================================
NOTICE - This communication may contain confidential and privileged information that is for the sole use of the intended recipient. Any viewing, copying or distribution of, or reliance on this message by unintended recipients is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.
==========================================================================================

- Sequoia Schedule A~E Comments.doc

Received: from outside2.jacobs.com ([66.20.250.194]) by ccmail.itd.nps.gov with
SMTP
(IMA Internet Exchange 3.13) id 00C26D3A; Wed, 11 Jul 2001 17:04:56 -0400
Received: from no.name.available by outside2.jacobs.com
via smtpd (for bluto.itd.nps.gov [165.83.216.134]) with SMTP; 11 Jul
2001 21:07:56 UT
Received: from 10.54.64.40 by oaknccnt05.jacobs.com with ESMTP (Jacobs Engineering SMTP Relay (MMS v4.7)); Wed, 11 Jul 2001 17:00:16 -0400
X-Server-Uuid: 2bcdaa02-5029-11d3-8638-0008c7dfb9a3
Received: by OAKNCCW2K11.jacobs.com with Internet Mail Service (
5.5.2653.19) id <3T3QAZXY>; Wed, 11 Jul 2001 17:00:40 -0400

# EXHIBIT 7

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE: J
Page 1 of 3

2. AMENDMENT/MODIFICATION NO.: 0003
3. EFFECTIVE DATE:
4. REQUISITION/PURCHASE REQ. NO.:
5. PROJECT NO. *(If applicable)*: SEKI-200Q

6. ISSUED BY — CODE 2081
C - CS - Contracting Services Group
National Park Service, P.O. Box 25287,12795 W. Alameda Parkway, Attn:
Terry Lang
Denver, CO 80225

7. ADMINISTERED BY *(If other than Item 6)* — CODE

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and Zip Code)*

Remcon Inc.
751 Wakefield Court
Oakdale, CA 95361

CODE *
FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED *(SEE ITEM 11)*
(X) 10A. MODIFICATION OF CONTRACT/ORDER NO. C8000010903
(X) 10B. DATED *(SEE ITEM 13)* 05/09/2001

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*
See Line Item Detail

13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| ☐ | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| ☐ | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| ☑ | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: Changes, FAR Clause 52.243 |
| ☐ | D. OTHER *(Specify type of modification and authority)* |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 3 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

Sequoia and Kings Canyon National Parks, California
SEKI-200Q

SEE ATTACHED CHANGES

**COPY**

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER *(Type or print)*: STEPHEN B. CHRISTENSEN, PRESIDENT
16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*: Rodney K. Keiscome

15B. CONTRACTOR/OFFEROR [signature]
(Signature of person authorized to sign)
15C DATE SIGNED: 8/20/02

16B. United States of America
BY ________________
(Signature of Contracting Officer)
16C DATE SIGNED:

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243

| Line Item Summary | Document Number | Title | Page |
|---|---|---|---|
| | C8000010903/0003 | SEKI-200Q | 2 of 3 |

Total Funding: $7,795,603.92

FYs Fund Budget Org Sub Object Class Sub Program Cost Org Sub Proj/Job No. Sub Reporting Category

See Line Item(s)

Division Closed FYs Cancelled Fund

| Line Item Number | Description | Delivery Date (Start date to End date) | Quantity | Unit of Issue | Unit Price | Total Cost |
|---|---|---|---|---|---|---|
| 0001 | Sequoia and Kings Canyon National Parks, California, Sherman Tree Parking Area, SEKI-200Q<br>Change in Funding, Unit Price | | 0.00 | ls | $345,209.92 | $345,209.92 |

Funding Information:
2001 - - - 8550 - - - - 477 - - - 0197 - - - - - -
345,209.92

Previous Total: $7,450,394.00
Modification Total: $345,209.92
Grand Total: $7,795,603.92
(Includes Discounts)

| Address Detail | Title | Document Number | Page |
|---|---|---|---|
| | SEKI-200Q | C8000010903/0003 | 3 of 3 |

## ıipping Addresses

| Code | Detail |
|---|---|
| 0001 | Org: DSC-PM<br>Addr: NPS DSC-PM<br>12795 W. ALAMEDA PKWY<br><br>LAKEWOOD CO 80228<br>Attn: MICHAEL GILLER<br>Phone: (303) 969-2007<br>Fax: ( ) - ext. |

## Invoice Addresses

| Code | Detail |
|---|---|
| 0001 | Org: DSC - CS - Contracting Services Group<br>Addr: National Park Service, P.O. Box 25287<br>12795 W. Alameda Parkway<br><br>Denver CO 80225<br>Attn: Martie Savarie, Procurement Tech<br>Phone: (303) 969-2166 ext.<br>Fax: (303) 969-2040 ext. |

**Item No. 26: Haul Miscellaneous Material from the Park**
Delete this item in its entirety.

**DEDUCT: $124,000.00**

**New Item No. 134: General Condition Costs Associated with the Deletion of Item 26**
Reimburse the Contractor's General Condition costs for deleting pay item #26. Payment will be made at a Lump sum price.

**ADD: $ 20,720.40**

**New Item No. 135: Haul Excess Miscellaneous Material from the Park**
Reimburse the Contractor for costs associated for hauling and disposing 4,624 Tons of deleterious material outside the park. Payment will be made at the newly negotiated unit price of $93.86/ton for 4,624 Tons.

**ADD: $434,008.64**

**New Item No. 136: Extended Field Overhead (EFO)**
Compensate the contractor for an eight- (8) calendar day time extension in this Modification No. 3. The EFO cost of $1,810.11/day shall be paid for additional costs associated with the contractor remaining on site longer than expected. Payment will be based on the number of days extended.

**ADD: $ 14,480.88**

Except as modified above, all work shall be performed in accordance with the provisions of the contract where applicable as determined by the Contracting Officer or as otherwise directed by the Contracting Officer.

You will be compensated for the changed work by modifying the Contract Bid Schedule as follows:

| Item No. | Original Est. Quantity | Revised Estimated Quantity | Item Description | Unit Price | Original Amount | Amount of (Decrease) or Increase | Revised Amount |
|---|---|---|---|---|---|---|---|
| **26 | 2,000 CY | 0 CY | Haul Miscellaneous Material From the Park | $62.00/CY | $124,000.00 | $124,000.00 | $ 0.00 |
| *134 | 0 | LS | Gen. Condition Costs associated with the deletion of Item # 26 | LS | $0.00 | $ 20,720.40 | $ 20,720.40 |
| *135 | 0 | 4,624 Ton | Haul Excess Miscellaneous Material From the Park | $93.86/Tn | $0.00 | $434,008.64 | $434,008.64 |
| *136 | 0 | 8 Days | Extended Field Overhead | $1,810.11/ Day | $0.00 | $14,480.88 | $14,480.88 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

* Indicates New Bid Item

This Modification Number 3 results in an increased amount of $345,209.68 in the contract amount. The revised amount is accordingly established as follows:

| | |
|---|---|
| Original Contract Amount | $ 7,121,636.00 |
| Modification No. 1, Increase | $ 317,850.00 |
| Modification No. 2, Increase | $ 10,908.00 |
| Modification No. 3, Increase | $ 345,209.92 |
| **Revised Contract Amount** | **$ 7,795,603.92** |

JBe 8/20/02

An allowance of thirteen (13) additional ~~calendar~~ WORKING days will be made on account of the additional work involved under this modification and the contract completion date is accordingly changed from August 11, 2003 to August 24, 2003.

## CONTRACTOR'S STATEMENT OF RELEASE

The contractor agrees that, in consideration of receiving the benefits of Modification 3, all claims or obligations which now exist or which may hereafter arise, whether known or unknown, or which have or could have been asserted against the National Park Service or the Government as well as its officers and employees, in any form or forum, whether in law or equity, arising out of or resulting from this modification are hereby released, waived, and forever discharged.

# EXHIBIT 8

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

(2) The Contractor asserts its right to an adjustment within 30 days after the end of the period of work stoppage; provided, that if the Contracting Officer decides the facts justify the action, the Contracting Officer may receive and act upon a proposal at any time before final payment under this contract.

(c) If a stop-work order is not canceled and the work covered by the order is terminated for the convenience of the Government, the Contracting Officer shall allow reasonable costs resulting from the stop-work order in arriving at the termination settlement.

(d) If a stop-work order is not canceled and the work covered by the order is terminated for default, the Contracting Officer shall allow, by equitable adjustment or otherwise, reasonable costs resulting from the stop-work order.

(e) The Government's rights to terminate this contract at any time are not affected by action taken under this clause.

(f) If, as the result of the Contractor's intentional or negligent misstatement, misrepresentation, or miscertification, a protest related to this contract is sustained, and the Government pays costs, as provided in FAR 33.102(b)(2) or 33.104(h)(1), the Government may require the Contractor to reimburse the Government the amount of such costs. In addition to any other remedy available, and pursuant to the requirements of Subpart 32.6, the Government may collect this debt by offsetting the amount against any payment due the Contractor under any contract between the Contractor and the Government.

## I.61 52.236-01 PERFORMANCE OF WORK BY THE CONTRACTOR APRIL 1984

The Contractor shall perform on the site, and with its own organization, work equivalent to at least fifteen (15) percent of the total amount of work to be performed under the contract. This percentage may be reduced by a supplemental agreement to this contract if, during performing the work, the Contractor requests a reduction and the Contracting Officer determines that the reduction would be to the advantage of the Government.

## I.62 52.236-02 DIFFERING SITE CONDITIONS APRIL 1984

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of --

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

## I.63 52.236-03 SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK APRIL 1984

(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to--

(1) conditions bearing upon transportation, disposal, handling, and storage of materials;