# EXHIBIT 9A

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

A I probably skimmed through that, yes.
Q Okay. Are you familiar with the term used in construction soils report?
A Probably only by my own standards.
Q Okay.
A And I don't -- just basically reading it.
Q Okay. Let me -- let me make sure that the record is clear. The term construction -- excuse me. The term contract documents refers generically, and I'm looking for your understanding, to a series of written communications that are given to a contractor upon which to form a bid, correct?
A Yes.
Q And that would include, generically speaking, plans, correct?
A Yes.
Q Specifications?
A Yes.
Q Soils or geotechnical report, if it exists, is identified?
A If it exists, yes.
Q And other written data that the owner decides it wishes to give the contractor, correct?
A When you say other written documents --
Q That the owner decides is going to be made



part of the contract documents, what may be instructions to bidders, it may be --
A It would be instructions, yes. It wouldn't be that Class A estimate.
Q No. I understand that. Exactly.
A Okay.
Q On this project, did the contract document -- do contract documents include at a minimum the plans, the specifications, and the geotechnical report?
A I believe they do.
Q Okay.
MR. SCHOENFELD: Let me mark, then, as next in order -- and I believe next in order -- next in order is Number 73 -- correction -- Number 74.
MR. SCHOENFELD: Let's go off the record.
(Exhibit Number 74 was marked for identification.)
Q (By Mr. Schoenfeld) I've handed you what I've marked as Exhibit Number 74. And let me describe it for the record. It is a multipage document dated September 11 of 2000. It's entitled Geotechnical Investigation Report, Proposed Sherman Tree Parking and Restoration, Sequoia 200Q and is purported to have been prepared by Kleinfelder, K-L-E-I-N-F-E-L-D-E-R.
And it bears -- the first page bears a Bates



stamp of REM -- meaning Remcon produced this record -- 11634. The last page of the exhibit is Remcon, or REM, 11707.
Generically speaking, sir, do you recognize this document as the geotechnical report made part of the contract documents for this project?
A It looks like it. I don't know if it's complete.
Q Okay. And did you participate, sir, in causing this report to be prepared?
A No.
Q Do you recognize this, however, as the report that you understand was used by the design team in completing the design for this project?
A I would have to assume so.
Q Okay. Let's turn to page number 1 of the document, sir.
Before you get into the actual text, at any time, sir, have you read this document cover to cover?
A I believe I probably skimmed through it, because, like, there was some questions about rock.
Q Okay.
A And also --
Q And rippability, correct?
A Yes.



Q And once the issues regarding rock and rippability arose on this project, did you consult this report to find out what information had been provided to the contractor to rely upon in forming its bid?
A I looked at portions of it.
Q Okay. Did you ever participate in any meeting or meetings with anybody other than counsel to evaluate the contentions by the contractor regarding rippability of rock?
A I met with Remcon about the rippability and so forth.
Q Other than Remcon, did you ever participate in any meeting or meetings with others concerning the subject of --
A I believe I gave a call to Kleinfelder asking them what was going on in the soundings. The soundings being, I asked him how do you perform the soundings, and they told me that it was performed with a shotgun method.
I'm not familiar with how they perform these things. But basically, they informed me that they drill holes, I believe it was, they put a shotgun shell in there, shoot it, and by the sound waves carrying through it, they can determine what the underlying structure is.
Q What the frequency through which the sound waves move through the underlying subsurface material and

for them to determine then how dense the rock is?
A Yes, I believe that's -- that's the case.
Q And based on the analysis they do with respect to how fast those shock waves go through, they come up with some type of a standard as to whether they believe the rock should be rippable with conventional construction equipment; is that correct, or is that your understanding?
A That's my understanding. I believe that whenever your -- your -- your sound is moving through it faster, your rock is denser or something like that. I believe that --
Q Whatever the standard is.
A Yes. Yes.
Q All right. And in those discussions that you had with Kleinfelder once the subject matter of density of rock and its inability to be ripped was -- with conventional equipment was raised, did you come to a conclusion that Kleinfelder had performed whatever effort it did, so-called shotgun method, in the generally accepted process?
A I assume because they were licensed that that was the standard method for performing this operation.
Q To the best of your knowledge, did the National Park Service at any time make any determination



as to whether or not the actual rock encounter between Station 24 and Station 30 on this project was denser than the rock identified by Kleinfelder in this Exhibit 74?
A When you say Station 24 to 30 --
Q Correct.
A -- I'm assuming that we're talking about --
Q The deep cut area --
A -- the deep cut area.
Q -- on the access road.
A No. Because I asked Kleinfelder if we could go ahead and take rock samples to verify what Remcon was stating to myself that it was unrippable. At that point in time, they told me that you could not take a relatively small sample to make a determination of the overall burden that was in there. Okay? That -- that's -- that's -- that was the explain -- explanation to me.
When I went on the job site and walked it, I looked at some of the cut areas -- and I -- I believe you were there, Steve -- I asked why some of the stuff looked to be decomposing. Decomposing granite to me is rippable.
Q Correct. I understand that point.
And you're familiar with the differing site condition clauses, a standard clause in government



contracts --
A Yes.
Q -- correct?
A Yes.
Q And generically speaking, I'm not trying to be overly legalistic; I'm just trying to get a common understanding with you.
But if a contractor encounters a subsurface condition which it contends is different than that which is indicated in the contract documents, the contractor has the duty to disclose that promptly to the on-site government representative, in this case the inspector, correct?
A Yes.
Q And then once that notice is given, the government then makes a determination as to whether it agrees or disagrees a differing site condition exists?
A This is what is described in that FAR clause, yes.
Q Okay. By FAR clause you mean Federal Acquisition Regulations?
A Yes.
Q Okay. And -- but in the actual working mechanisms, the contractor encounters something that was not able to be observed because it's subsurface, if he



contends it is different than what he anticipated, he's got a duty to say, Hey, I've encountered something that's different, it's going to cause me extra time or extra money?
A He has the responsibility to bring it to our attention so we have the opportunity to investigate his claims on that.
Q Okay. On this project, isn't it true that on July 30th of 2001, during the first construction season, the contractor contended that it had encountered rock that was not rippable in the deep cut section and notified the inspector?
A I don't know. I don't know about that.
Q Okay.
A I'm not privy to that.
Q If it was recorded as such in Mr. Russell's daily report, then that would have been something that Mr. Russell would have been told by the contractor, correct?
MR. SCHROEDER: Objection; calls for speculation.
Q (By Mr. Schoenfeld) You may answer.
A I would have to assume that.
Q And Mr. Russell had the responsibility to give his daily reports to you --

Q One of the comments that I failed to you give earlier is I don't want you to guess or speculate. I only want what you know. And if you're speculating, I want you to tell me that. In this instance you're speculating, correct?
A Yes.
Q All right. Now, if you turn to the second page of the report, Exhibit 74, under the heading Scope of Services, you will see that Kleinfeld (sic) identifies the various things that it was tasked to do. I know you didn't participate in identifying those tasks, correct?
A This is correct.
Q Okay. You'll note that the fifth box that is checked under the Scope of Services reads that they are to provide recommendations for site preparation and earthwork grading, comma, including a discussion concerning rippability, comma, stripping and grubbing, comma, scarification, and compaction and the use of on-site soils for engineered fill. Do you see that?
A Yes.
Q When you scanned this report for the first time --
A Uh-huh.
Q -- and at all times since, was it your understanding that this Kleinfelder report did, in fact,



make those recommendations identified here as one of their tasks?
A When I scanned this, I was looking for what was stated by Remcon in terms of rippability, and so I basically was turning toward center, somewhere back in here, talking about --
Q We're going to get there.
A Okay.
Q You were focusing on the rippability issue, correct?
A Yes.
Q Okay. Did you -- do you recall that Kleinfelder determined that based on the use of a Caterpillar D8 piece of equipment that the rock that was to be encountered, based on its testing -- "its testing" being Kleinfelder's -- was rippable?
A I heard all this stuff going around to that effect. I don't recall what it says in this report.
Q Do you recall finding out that this report communicates to a reader knowledgeable about the subject that the rock expected to be encountered was all lower in a threshold of density such that it met the standards for rippability of a D8 dozer as published by Caterpillar?
A That was the interpretation that I kind of summarized out of this. If -- if I can refresh my



memory.
Q We're going to get there.
A Okay.
Q We're going to get there.
Just to make sure the record is clear: After reviewing the report, you came to the conclusion that Kleinfelder communicated that the rock to be encountered by the contractor on this project was all able to be ripped by conventional construction equipment using the standard of a Caterpillar D8 dozer, correct?
A That was my interpretation, yes.
Q Did Remcon contend in the summer of 2001 when it encountered what it contended to be hard rock that it had attempted to rip it with a Caterpillar D8 dozer and it was unable to be ripped, thus necessitating blasting?
A You need to rephrase that in singular type of questions, because I can't answer that question with a yes or no.
Q Did Remcon contend in the summer of 2001 that it had used a D8 dozer and was unable to rip some of the rock it was encountering?
A They had made that -- that statement.
Q And as a result of that statement, Remcon identified to Mr. Russell and to yourself that they needed to blast?



A In a -- in a construction meeting, it was raised that they wanted to blast. I don't -- I don't recall ever hearing before then from my inspector that they had went out there -- when I say "they," I say Remcon -- and actually used a D8 Cat to try and rip that --
Q Okay.
A -- portion of the work.
Q That's fair.
Now, did you ever review the soils report and the boring logs and the test pit logs attached to it that we've marked as Exhibit 74 to determine whether or not rock was encountered by Kleinfelder during its tests that was not rippable?
A When I went through this and looked at it, I believe they had mentioned a backhoe.
Q That they had used to dig a test pit?
A Yes. I don't see them talking about them actually using a dozer, a D8 Cat dozer.
Q I believe you are correct.
A I believe that's what I interpreted from my recollection on this thing.
Q Okay.
A However, they were basing a lot of their conclusions upon sounding.

determine what transitions between slightly versus highly weathered?

A I have never done anything to that effect, because I have never tried to distinguish between slightly and highly.

Q It's not been your professional expertise or devotion of time to do any evaluation in that regard, correct?

A No.

Q And you don't know what piece of Caterpillar equipment can excavate or rip slightly weathered rock as contrasted with highly weathered rock, correct, and where the line is in their abilities to perform, correct?

A I think I can determine when something can -- is rippable --

Q Generically speaking --

A -- if I'm -- if I'm there on-site. I have to be there present to be able to identify certain things.

Q Uh-huh. Would you turn to page number 10 of this report. The top of the page is entitled Earthwork.

A (The witness complied.)

Q Nope. You're one page too far.

A Oh.

Q There you go.

The first sentence reads under heading 5.1,



"Based on available laboratory data and the field investigation, and geotechnical analyses conducted by Kleinfelder for this study, we believe it is geotechnically feasible to construct the Sequoia 200Q project as planned, provided the recommendations presented in this report are incorporated into the project design and construction." You see that?

A Yes.

Q Have you ever performed any analysis to determine whether or not the recommendations presented in this Exhibit Number 74 were, in fact, incorporated into the project design?

A No.

Q Do you know of anybody else on behalf of the National Park Service doing so?

A I don't have any knowledge.

Q Let's go down to the section on the same page entitled Rippability. It says, "The apparent depth and rippability of the underlying soils along the access road can be evaluated from seismic refraction surveys."

Do you know from a professional expertise point of view if that is an actual statement of fact or not?

A Well, I would have to go with whatever Kleinfeld --



Q I'm not asking you to tell me that Kleinfelder says it, so --

A Yes.

Q -- it must be true.

A Yes.

Q I'm asking: Do you have independent knowledge as to whether that's a true statement or not?

A I have no independent knowledge.

Q Thank you.

Do you know who determined how many seismic refraction surveys should be taken during the Kleinfelder effort to prepare this report?

A No, I don't.

Q Do you know who determined where those surveys should be done?

A No, I don't.

Q Do you -- do you have any understanding as to the volume of data collected with respect to those survey efforts?

A I don't.

Q Do you know whether they were done properly or not?

A I don't know that either.

Q Do you know whether they were done in accordance with certain published testing protocols?



A I don't know that either.

Q Would you look at the table at the top of page 11 on this report.

A (The witness complied.)

Q You'll see that there is a -- the table is entitled Summary Seismic Line Data.

And with respect to the second layer, the Layer Number 2, you'll see that there are certain numbers expressed in the column.

A Yes.

Q And the highest as far as number is 5,747. You see that?

A That's on the A-A?

Q Yes.

A Very first line?

Q Correct. And that's the highest of the A-A, B-B, and C-C lines. Do you see that?

A Yes.

Q And you note that the heading above that is the apparent velocities of sound transmitted in feet per second. Do you see that?

A Yes.

Q Okay. And is it your understanding that the higher the number means the denser or less weathered the granitic rock encountered is?

A I -- that was my assumption at the time, the higher the velocity, the fast -- I mean, the denser the material, the higher the velocity travels through.
Q The faster it went through?
A Yes.
Q Okay. So the higher the number, the denser the rock?
A Yes.
Q The less likely it is to be able to be ripped. The harder it is to rip. How's that?
A Make that statement again.
Q Okay. The higher the number equals the conclusion that the rock is hard -- is denser, which means it will take more effort to rip, correct?
A This is true. Yes.
Q All right.
A Or that's my understanding.
Q Under the heading on page 11, 5.2.2 Conclusions, the second sentence reads, We anticipate that some areas of weather granite -- weathered granite may be ripped with larger equipment. The next sentence reads, Some oversized materials may be generated during ripping, slash, excavation.
Is it your understanding, reading this report, that the phrase some oversized materials refers to



boulders encountered?
A I would have to assume that, because I've encountered what we call floaters out there on -- in other projects. Floater being --
Q An isolated boulder, in other words?
A An isolated boulder that has been carried down by I think it would probably be glacial action and buried over time.
Q And that -- your understanding that some oversized materials refers to that floater-type concept that the contractor may encounter in performing the work?
A Yes.
Q As contrasted with the host of the material it encountered?
A I believe that's why, when I contacted Kleinfelder about doing a partial examination of some of the rock that was removed -- extracted from this location, they told me they could not do it based upon such a small quantity.
Q Okay. When the contractor in 2001 contended that it encountered a differing site condition because it couldn't rip this rock, was it identified to you that it couldn't rip rock because it was a floater or two that was encountering, or was it the predominance of the material being encountered?



A I don't recall any statement like that. Now, it may be on Bob Russell's records. I don't know.
Q You don't remember one way or the other?
A. I don't remember one way or the other.
Q All right.
A Like I said, the only thing I remember is the construction meeting that we have.
Q Okay.
A And at that point in time, I believe it was Jeff Northrop -- I'm not sure, but it was someone out there that said they would like to blast.
Q Okay.
A Nowhere was it mentioned that it was because of a differing site condition.
Q I understand.
The second paragraph under Conclusions reads, quote, Charts developed by the Caterpillar Tractor Company, parenthesis, August 1996, end parentheses, were used in evaluating potential rippability at the site, period. These charts correlate rippability with the seismic velocity for various geologic materials, period. The reported nominal and marginal seismic velocity thresholds for rippability in granite are shown in Table 5.2-2, period.
And you'll see that table is immediately on



the next page, page number 12; is that correct?
A Yes.
Q Did you read the information I just read when you first went to this report to look up this subject?
A Yes.
Q And did you see here, sir, in the Caterpillar ripper performance, which is reflected in Table 5.2-2, that the -- that the threshold for a D8 Caterpillar model piece of equipment, that it could rip under normal circumstances rock having a seismic velocity up to 6400 feet per second and then that it was marginal, but it still could do such work when the rock was as dense as 7500 feet per second?
A Yeah, I think I probably focused in on the 7500 feet per second.
Q But both of those are along the same line for that same piece of equipment, correct?
A Yes. And based upon review of what was stated earlier on the seismic hardness, these numbers right here are what -- are above what was stated there.
Q And when you look back to the table on the prior page, at 5.2-1 --
A Uh-huh.
Q -- you'll see that the highest threshold of feet per second of seismic velocity was 5,747 found by

Page 133

work and all the problems that we may encounter.
Q So -- so the bottom line was, you gave direction to Jacobs that you needed to be informed contemporaneous with events happening, and one of the processes for you to get such information was Exhibit 75, via that form?
A Yes. However, any other problems that needed immediate attention, I also wanted red flags on that, and that was my inspector's expectation.
Q By red flag, what do you mean?
A Well, this would be a red flag.
Q All right. But is there some type of -- something that you directed them to put on it that was in red?
A No.
Q Was there a Post-it Note --
A It was basically a telephone conversation.
Q Okay. Alert you to it?
A Alerting me to that.
Q Something out of the ordinary?
A Yes.
Q All right. And in that regard, how did these get transmitted to you? "These" being these daily logs. Were they faxed? Were they mailed? What was the process?

Page 134

A They were -- are usually mailed.
Q Okay.
A Because we want a wet signature.
Q So you got the original?
A Yes.
Q All right. Now, are you aware that on this matter that Remcon contends that during the last week of July of 2001 it encountered rock in -- between Stations 24 and 30, generically speaking, that it was unable to rip with a D8? You know that that's their contention, right?
A Yes.
Q Okay. And you know they made that communication to Mr. Russell. That's their contention, right?
A That's their contention, yes.
Q Did you ever consult with Mr. Russell as to when he was advised by Remcon as to whether or not they did, in fact, encounter refusal based on their inability to get the D8 through the material?
A He informed me that he never witnessed anything to that effect.
Q Okay. Once he became aware that that was the contention made by Remcon --
A Yes.

Page 135

Q -- as I believe you testified earlier under the FARs and your understanding of the differing site condition clause, once you became aware of the contention, it's the responsibility of the government to evaluate whether it's true or not?
A True.
Q Did Mr. Russell have the ability to communicate to the Remcon people, Bring your D8, show me that it's not rippable? Did he have the ability to do that?
A He should have had the ability to go ahead and do that.
Q Do you know whether he ever did so?
A According to what he -- he never said to me, no, he never asked.
Q Did you ever ask him to?
A No.
Q Why not?
A I probably didn't read this one as thorough as I would have liked to.
Q In hindsight you should have?
A Yes. Yes.
Q Okay. The contractor has fulfilled, from your understanding of the FARs, its obligation once it encounters what it believes is a differing site

Page 136

condition, it gives notice; then the burden, as you understand it, goes on the government to then investigate, correct?
A No.
MR. SCHROEDER: I'm going to object because it calls for a legal conclusion, but he may answer.
Q (By Mr. Schoenfeld) Go ahead.
A No, because I would assume that Steve had always alerted me to a lot of things too. I've never heard from him other than what was stated at the construction weekly meeting.
Q Okay.
A And that was basically just they wanted to shoot.
Q All right. Let's go back now to Exhibit 74. Remember a moment ago I had asked you about Mr. Russell?
A Uh-huh.
Q And you said, He never told me. And now I've showed you Exhibit 75 --
A Yeah.
Q -- so clearly this information got to you, correct?
A Yes.
Q All right. Back to Exhibit 74. Under table 5.2-2 --

A Uh-huh. Yes.
Q -- the Kleinfelder report reads -- (indicated) -- the velocity of the weathered granitic rock ranged from approximately 4,947 to 5,747 feet per second. Do you see that?
A Yes.
Q And that is the same as what is reflected in Table 5.2.1 under Layer Number 2, correct?
A (Reviewed documents.)
Yeah, those -- those two numbers --
Q They all correlate?
A -- Layer Number 2.
Q They correlate, correct?
A Correlate with A to A and B to B on Layer Number 2.
Q All right. That's in Table 5.2-1, correct?
A Yes.
Q On page 12 it continues now, "These apparent velocities indicate the weathered granitic rock should be rippable in large excavations with the appropriate equipment in good working condition."
At any time did you form the conclusion that Remcon lacked on-site the appropriate equipment in good working condition to perform the excavation?
A My inspector never told me that they had bad



equipment. Now, he did say some of the equipment was leaving the job site and coming back on, different equipment.
Q Okay. I'm not talking about whether it was there at all times that you felt it should be --
A Uh-huh.
Q -- or anything like that. That --
My question is: When Remcon had on-site equipment to perform the excavation, did it have the appropriate equipment in good working condition?
A I have to assume it is.
Q Okay. You never --
A I'm not -- not -- not being there on-site, I could not make that --
Q Okay. Let me -- let me ask the question. You never formed the conclusion that it -- that Remcon lacked the appropriate equipment in good working condition; is that correct?
A This is true.
Q Okay. Did any of your inspectors at any time ever inform you that Remcon lacked the appropriate equipment --
A They never --
Q -- on-site in good working equipment?
A They never informed me.



Q Did any representative of the National Park Service who was on-site, whether permanently during the job or occasionally, ever inform you that Remcon lacked with respect to the excavation effort the appropriate equipment in good working condition on-site?
A Well, when we talk about in good working condition, I never was informed that there was any equipment out there not capable of doing its intended job. However, like I said, I was informed that the equipment was being shuttled in and out of there. Now --
Q Do you know why?
A I don't know why.
Q Did you ever ask? I'm talking about calendar year 2000 --
A It's not --
Q Let me finish. I'm talking about calendar year 2001. Did you ever ask why equipment that you understood was being shuttled in and out was, in fact, being shuttled in and out?
A Well, they -- it was only hearsay, but, you know, it was -- I think what my inspector told me was the equipment owned by Remcon was being moved out and some rental equipment being moved in. This is what I was told verbally.
Q Okay. Would you turn to page 31 of the



report, please.
A (The witness complied.)
Q On page 31 it's entitled Limitations. You see that? That's the heading?
A Yes.
Q Did you ever read this page before?
A You know, I probably skimmed through it again.
Q Okay.
A I do a lot of skimming.
Q Now, the third sentence of the first paragraph reads, "If soil conditions are encountered during construction that differ from those described herein, Kleinfelder should be notified immediately in order that a review may be made and any supplemental recommendations provided."
A Yes.
Q I've shown you Exhibit 75, which shows that this issue arose, at the latest, as of July 30th of 2001, correct?
A Yes.
Q During the 2001 construction season, was Kleinfelder notified and asked --
A No.
Q -- to come in?
A No.

Page 141

Q Why not?
A This was because I was under the assumption, based upon what I was informed at a construction meeting, that it was just going to -- the rock was going to be shot. Okay? Nowhere was it stated that it was a differing site condition.
Q Was this throughout the entire 2001 construction season?
A By the time --
Q Yes or no?
A -- that --
Q Was this, what you've just said, your understanding throughout the entire 2001 construction season, that there was no differing site condition being claimed? Yes or no.
A No. I wasn't --
Q You were informed in August of 2000 --
A I was --
THE REPORTER: Wait. One at a time.
Q (By Mr. Schoenfeld) Let me finish.
A Okay.
Q Isn't it true that you were informed of -- August of 2001 that -- in writing that Remcon contended it had encountered a differing site condition? Yes or no.

Page 142

A I'm not sure of that.
Q Well, let's -- let's confirm it.
A Okay.
Q Okay?
I'm going to show you what we'll mark as Exhibit 76.
MR. SCHROEDER: 75? Oh, no, 76. Okay.
(Exhibit Number 76 was marked for identification.)
Q (By Mr. Schoenfeld) What we've marked as Exhibit 76, you'll note, has Bates stamp starting with the number 500120, which shows it came from the government. It continues through page 500126. Do you see that? That's the Bates stamp.
A I see that.
Q Okay. And you see that this first page is a Change Order Request signed by Jeff Northrop, the project superintendent of Remcon, and it references the description of the change, rock excavation, drilling, and shooting, and the specification reference is I.62, differing site conditions. You see that?
A Yes.
Q It has a received stamp of August 2001. Do you see that?
A Yes.

Page 143

Q Whose received stamp is that?
A That probably went up to contracts, I would have to say. I don't know for sure.
Q Contracts within the National Park Service --
A Right.
Q -- correct?
A Yes.
Q So isn't it true that in August of 2001, Remcon gave notice in writing that it contended it had encountered a differing site condition regarding the subject matter we've been discussing?
A According to this, yes.
Q Okay. Go back to the question.
A Okay.
Q Assuming now that your memory has been refreshed that Remcon did give notice in writing in August of 2001 that it had encountered a differing site condition regarding the volume of rock it was encountering that could not be ripped --
A Okay.
Q -- why was Kleinfelder not requested to come back to the site in accordance with the limitation set forth in the soils report, which we've marked as Exhibit 74?
A (Reviewed documents.)

Page 144

I -- I would have to think --
Q I don't want you to guess.
A Okay.
Q I'm asking why, if you know.
A I can't say why.
Q You don't know?
A I don't know.
Q Okay. Do you have a perception as to why?
A I probably missed that.
Q Okay. It was your responsibility to have contacted Kleinfelder?
A It was my responsibility, yes.
Q Okay. After 2001, Kleinfelder was contacted by you, correct?
A I -- I believe so, yes.
Q When?
A I don't have the specific date.
Q Why were you -- did you contact them when you did?
A Because at that point in time, we were trying to make a determination if -- when I say "we," I say the government, myself -- if the accusation or the claim that Remcon was stating was actually true.
Q Okay. So let me just put this in context of time. After the 2001 construction season, the blasting

effort had been performed, Remcon quantified what it contended to be the additional cost and submitted it to you for modification of the issue, correct?
A Yes.
Q And only after that occurred did you reach out to Kleinfelder; is that correct?
A I sat down -- I think I tried to go over some of the costs with Steve to negotiate a modification on this.
Q Okay. But as a result of being unable to reach initial resolution, you then contacted Kleinfelder?
A I believe that was the case.
Q Okay. At the time you initially sat down with Steve -- meaning Mr. Christensen; is that correct?
A Yes.
Q -- were you of the perception that the assertion by Remcon was correct, they had encountered a differing site condition?
A My -- my assertion was to go ahead and make sure that the contractor was not going to be harmed. Okay? I --
Q That wasn't my question. My question is: Had you come to your own personal conclusion that they had encountered a differing site condition? Yes or no.
A I couldn't make that determination at that



point in time.
Q You didn't know?
A I didn't know.
Q You were willing to negotiate something with Mr. Christensen if the money wasn't too much to not hurt them; is that correct?
A Yes. He had encountered the costs.
Q And the costs were substantial, correct?
A They were, I think, somewhere around 200,000, I believe.
Q Okay. They were -- they were healthy six figures?
A Yes.
Q And how were you going to justify in your write-up of this modification to Mr. Keiscome paying additional costs if you had not determined that there was a differing site condition encountered?
A That would be the clause I used, yes.
Q So you -- it was your intent when you sat down with Mr. Christensen, once you received his quantification, to justify the amount you would recommend paying under the differing site condition clause --
A Yes.
Q -- without any technical data to substantiate it other than Remcon's assertions that it had encountered



rock using a D8 in good working order that was not rippable?
A It would be based upon the blasting that was expended on that portion of work.
Q And the blasting was necessitated because Remcon contended it could not rip the rock with a D8 in good working order, correct?
A That was what the contention was at that point in time, yes.
Q And you were going to write up your modification recommendation based on that contention, correct?
A Yes.
Q Okay. Could you look now at Exhibit 75, sir. You can close 74. Put 76 aside. Here's 75.
In the Status of Work, we know that there is an asterisk next to the word blasting.
A Yes.
Q And then to the right there is another asterisk written down below, it says, "Contractor said that." Do you see that?
A Yes.
Q Do you recognize the writing "Contractor said that" as being in the same handwriting as Mr. Russell, or is it somebody else's writing, sir?



A It looks to be different. I don't know whose it is.
Q Is it yours?
A No, it's not.
Q Okay. And do you see that there is something missing after the word that? It's not complete.
A I can't tell.
Q Well, it said, "Contractor said that" and then it just stops, correct?
A Yes.
Q It's an incomplete communication, correct?
A Yes, it looks like it.
Q Do you know whether anybody erased or altered any documents, sir?
A I don't have any knowledge.
MR. SCHROEDER: Yeah. Just for the record, I don't see that this looks like different handwriting, whatever that's worth.
MR. SCHOENFELD: We'll put you under oath later.
All right. Let me mark next in order, sir, as Exhibit 77, Mr. Russell's daily report for the very next day.
(Exhibit Number 77 was marked for identification.)

MR. SCHOENFELD: Richard.
Q (By Mr. Schoenfeld) This is the daily report for July 31 of 2001. Number 77. Now, in this report, you'll see Mr. Russell identified that a Cat D8 was being used that day, correct?
A Up in the equipment on job site, yes.
Q And it was working, correct?
A It says so, yes.
Q And that the status of the work describes cutting grade on access road, Station 25 to 31, encountering rock, parentheses, boulders, end parentheses, will require blasting, and then it goes on, correct?
A Yes.
Q Did you receive this report from Mr. Russell?
A I received it, yes.
Q Now, under the differing site condition clause, as you understand it, does the contractor have a duty to give notice to the government that it encountered a differing site condition prior to the time the contractor perceives that it had encountered a differing site condition?
MR. SCHROEDER: I'll object because, again, it calls for a legal conclusion. Also, he does not have that clause in front of him, but he can answer.



MR. SCHOENFELD: Okay.
Q (By Mr. Schoenfeld) You may answer.
A I perceive it as the contractor should notify me in writing that there is a differing site condition.
Q Once they become aware of that subject?
A Once they become aware of that.
Q They're not clairvoyant in that they can't anticipate it; it's only when they encounter it, correct?
A Yes.
Q All right.
MR. SCHOENFELD: Let's mark as 78 a one-page document.
(Exhibit Number 78 was marked for identification.)
Q (By Mr. Schoenfeld) I'll ask your attention -- draw your attention to the middle of the page, sir. Is that the differing site condition clause that was in effect at the time this job was issued to Remcon, identified to the -- as the heading I, that's capital I, .62, Differing Site Conditions, April 1984?
A Yes. And I would say as a document titled under Sequoia 200.
Q Okay. You see at the very top that this is a copy of page 68 of this project specifications, correct?
A Correct.



Q So this is the instruction the government gave Remcon that it was going to be performed to, right?
A Yes.
Q And it states that, The Contractor shall promptly, before the conditions are disturbed, give a written notice to the contracting officer of a subsurface or latent condition at the site which differ materially from those indicated in this contract. Do you see that? That's a Type 1 differing site condition, right?
A You're talking about the --
Q A-1?
A A-1, yes.
Q All right. In Part B, it says, The contracting officer shall investigate the conditions promptly after receiving the notice. Am I correct that that responsibility was delegated to you by Mr. Keiscome in his letter of authorization and it was your responsibility to cause an investigation of the site conditions promptly after receiving the differing site condition notice?
A That would be a correct assumption, yes.
Q And at this point, based on the information I've provided to you and your recollection, it's your conclusion that you did not do so?
A I did not contact Kleinfelder at the time of



this right here.
Q Did you contact any other geotechnical expertise to evaluate the contention as to whether or not a differing site condition had been encountered as contended by the contractor?
A No.
Q Let's now look at Exhibit 79.
(Exhibit Number 79 was marked for identification.)
MR. SCHOENFELD: And then we will take a lunch break.
Q (By Mr. Schoenfeld) Number 79, sir, is a two-page exhibit. It is Mr. Russell's daily report also for July 31st, 2001. And I'd like you to put Exhibit 77 right next to it.
A (The witness complied.)
Q You'll note on Exhibit 79 there are asterisks placed on the document, but on Exhibit 77 they do not exist. Can you explain to me why there are two different versions of the same document? And for the record, it's under the -- the asterisks are under the heading Status of Work.
A (Reviewed documents.)
I don't know.
Q Did you ever notice that before today?

A This is the first I've seen it.
Q Okay. Are the asterisks or the X's that are noted on 79 in your writing?
A I don't think so.
Q Okay.
MR. SCHROEDER: I note, just for the record, that it looks like one is dated Monday, one says Tuesday, you know, one says -- M is circled, the other is T is circled.
MR. SCHOENFELD: You're looking at the wrong document, sir.
MR. SCHROEDER: This is not --
MR. SCHOENFELD: They were not --
MR. SCHROEDER: Which numbers did say?
MR. SCHOENFELD: (Indicated.)
MR. SCHROEDER: Oh, 77. Sorry. Let me take a look at that.
MR. SCHOENFELD: Okay.
We're off the record for lunch.
(A recess was taken from 12:10 p.m. until 1:29 p.m.)
Q (By Mr. Schoenfeld) Okay. We're back on the record, Mr. DeOcampo. Remind you, you are still under oath.
A Yes.



Q We're going to transition to a series of other documents. I'm going to get these out of your way here.
MR. SCHOENFELD: The next number I believe is Number 80; is that correct? Yeah.
Let me show you -- oh, I put the sticker on mine.
(Exhibit Number 80 was marked for identification.)
Q (By Mr. Schoenfeld) Exhibit Number 80, sir, is a one-page exhibit. It is a Daily Log by Mr. Russell for August 2nd, 2001. This is a true and correct copy of the document we got from the government. You'll see its Bates stamp is on it.
Once again, you'll see in the document, sir, that the D8 dozer is noted as being on-site and operational by Remcon, correct?
A Yes.
Q And you see that the status of work, Mr. Russell wrote, cutting grade on access road, Station 25 to 31, encountering large boulders, will require blasting. Do you see that?
A Yes.
Q Okay. This is information that was furnished to your office; is that correct?
A That's correct.



Q On the back side of the form, the continuation of the Status of Work, Mr. Russell writes, Blasting crew completed drilling rock between Station 29 and 31.
A Is that up on the top or the bottom?
Q Yes. It's -- (indicated).
A Right here (indicated). Okay.
Q Blasting crew completed drilling rock between Station 29 and 31 and started loading holes for blasting between 2 p.m. and 4 p.m. Blast occurred at 4 p.m. No fly rock or other problems.
A Uh-huh. Yes.
Q Let me ask you a few other questions, sir.
Am I correct in your recollection that there was not, for the road excavation portion of the work, a line item for blasting?
A For road, yes.
Q Okay. And while blasting was anticipated for some portion of the utility trench --
A Yes.
Q -- there was no such anticipated blasting required for the road, correct?
A In our -- in our bid documents and line item or line construction pay estimate form, no, there wasn't.
Q Okay. So as a result, if the contractor encountered material that required blasting in the road X



portion of the work, the contractor would be reasonably likely to claim an additional cost and that a modification be prepared and issued for that work, correct?
A Yes, based under the differing site condition clause, yes.
Q And Remcon did, in fact, do so, correct?
A Yeah. Based upon this -- this request, which was dated --
Q August 20th of 2001?
A -- received August 21st, yes.
Q And the request is August 20th?
A Yes.
Q And this request in writing followed the communications to the inspector, correct? That we're going through, starting on July 30, July 31st, and now August 2nd, that they're doing blasting.
A According to the previous document daily stated.
Q Yes.
Okay.
MR. SCHOENFELD: Let's move on now to a document we're going to mark as Number 81.
(Exhibit Number 81 was marked for identification.)

Page 157

Q (By Mr. Schoenfeld.) It, once again, is a one-page exhibit. It's a weekly field report. It is dated August 8th of 2001 for the week ending August 5th, 2001. You see that document, sir?
A Yes.
Q Do you recall receiving, on approximately a weekly basis, weekly field reports?
A Yes, that's what I required.
Q And who prepared this Weekly Field Report which was produced by the government and has Bates stamp 6519?
A I have to assume that was Mr. Russell.
Q Okay. You're making the assumption. You don't know, do you?
A I don't know.
Q You don't know whether it was done by Mr. Russell or the contractor, do you?
A Not by the contractor.
Q It was done by Jacobs as the inspector for you?
A Yes.
Q All right. That was part of the requirements you imposed?
A Yes.
Q All right. Now, under the heading

Page 158

Construction Activities, you will see that there's a series of tasks that are identified that the contractor did on a generic basis throughout that week.
A Yes.
Q Okay. And includes beginning blasting operations on the access road; is that correct?
A This is correct.
Q So you received this on or about August 8th, 2001, correct?
A On or about, yes.
Q Okay. And under the heading of Subcontractors, there's notice that a subcontractor of Remcon by the name of California Drilling & Blasting came on-site and started the blasting at various locales, correct?
A Yes, drilling and blasting alone.
Q Okay. Now, under the heading Potential Change Orders -- do you see that?
A Yes.
Q -- was Mr. Russell tasked to identify for you as part of his red flag process information regarding things that he felt may be extra work so he could alert you as the contracting officer's representative?
A Yes.
Q Was this one of those red flag communication

Page 159

devices that was in place?
A This could be considered, but, you know, hopefully I would get verbal and then that way it would be more pressing.
Q By "verbal," you mean communication --
A Communication.
Q -- by voice?
A By voice.
Q All right. And by the way, communication by voice, do you recall, as you sit here today, did Mr. Russell pick up the phone and call you or send you an e-mail about the differing site condition perception that he had?
A I can't recall right now.
Q Okay. You would have expected him to, given his level of experience and ability, correct?
A I would expect him to, yes.
Q Okay.
MR. SCHOENFELD: Off the record for a minute.
(A discussion was held off the record.)
MR. SCHOENFELD: Let's go back on the record.
Q (By Mr. Schoenfeld) The first item under potential change orders on this Exhibit 81 is, quote, blasting for roadway excavation may be a potential extra cost, end quote. Did you understand this information

Page 160

when communicated by Mr. Russell to you to be his perception that what Remcon was encountering was a differing site condition?
MR. SCHROEDER: Objection. I -- it says potential --
MR. SCHOENFELD: Okay.
MR. SCHROEDER: -- extra cost.
MR. SCHOENFELD: Okay. If you would listen to the question, I had asked him what his -- was it his understanding as I expressed it.
Q (By Mr. Schoenfeld) You may answer the question, sir. If you'd like it read back, I will have it read back.
A I can -- I can read it right here.
Q No, no. Do you have my question specifically in mind?
MR. SCHOENFELD: Why don't you read him back the question.
(The reporter read page 159, line 22 through page 160, line 3.)
THE WITNESS: Based upon him stating the extra costs, I would have to agree with that.
Q (By Mr. Schoenfeld) That you thought that he was perceiving it to be a differing site condition?
A I would have to assume that.

was talking to me about terminating. I believe something to the effect that, I'm not asking -- I think Remcon had made mention of termination for convenience and that's when that subject came up.
Q Do you know, were you involved with -- withdraw this.
Were you made aware at any time by anybody, during the late winter or early spring of 2003 that Remcon contended that actions by Mr. Keiscome legally converted the contract into a termination for convenience?
A I don't recall anything like that.
Q Okay. Are you aware that in the late winter or early spring of 2003 Mr. Keiscome issued a directive to the contractor deleting the Lower Sherman work?
A I believe. I -- I can -- I recall that. I think I do.
Q Okay. Do you know what, if any, response the contractor had to that written communication from the contracting officer?
A No, I don't.
Q Okay. Continuing back on Exhibit 84. Now we have possible over-runs in item 38 - rock excavation. Remcon is citing this item for payment for blasting rocks. What was the intent of rock excavation and how



does the Government defend/ward off these requests for payment under this pay item?
Were you asking for justification so that you could say no?
A I was asking for justification so that way I can go in there and negotiate with Mr. Christensen.
Q Why didn't you ask them, do you think this is an extra or not, given they were the ones that designed the job and either they contemplated or not? Why were you asking them just for information to defend and rebut the contention that there was extra work being done?
A I can't remember why right now.
Q All right. I mean, you weren't involved in the design, right?
A No.
Q So you don't know whether the designers anticipated that the contractor was going to encounter this level of material, correct?
A This is correct.
Q And the information that you had at your disposal before getting a response to this e-mail was the daily report saying that the contractor's encountering this material and that your inspector felt it was extra work under the differing site condition clause, correct?
A It was probably --



Q Listen to my question. That information you had gotten from your inspector --
A Yes.
Q -- and you had at your disposal and had taken the time to at least cursorily review --
A Yes.
Q -- the geotechnical report, which we marked as Exhibit 74, which indicated that blasting shouldn't be required because all the rock was going to be rippable, correct?
A This is correct.
Q So what you had in your hands was the conclusion by your geotechnical engineer saying the rock should be rippable and your on-site eyes and ears, Mr. Russell, who indicated that it was a differing site condition.
So my question to you: Why were you looking for just answers as to why we shouldn't have to pay for it rather than saying, What were you thinking?
A I always look for why we're making overruns on certain things. I didn't --
Q But that's not what you asked for here. You said, Give me the information as to how I can defend or ward off these requests.
A Yes.



Q Weren't you just looking for neutral information -- or, excuse me.
Why weren't you just looking for neutral information, what the facts were?
A I don't know at this time.
Q Okay.
A I don't know how I was thinking at that point in time.
Q Okay. Fair enough.
A Yeah.
Q Fair enough.
Whose handwriting is on this document that we marked as Number 84?
A I have no idea.
Q Okay. It did come from DHM's file, so I'm not suggesting that you should know. I just don't know if you know.
A Yes.
Q Did you get a response from --
A I can't --
Q -- Andrea, Joanne, Ray, and/or Bob on your request here?
A I can't say right now definitely.
Q Okay. By the fact that you sent this to Ray Todd, does that indicate to you that at that moment

Page 189

in time, August 9th of -- August 8th of 2001, that he was the project manager?
A Yes.
Q Okay. Why did you send this to Bob Russell if he had already given you his opinion that it was a differing site condition?
A I would try to keep him informed on what was occurring.
Q Okay. Fair enough.
MR. SCHOENFELD: Let's mark this next in order then, Number 85.
(Exhibit Number 85 was marked for identification.)
Q (By Mr. Schoenfeld) This came from the government's files.
You can just stack those over here (indicated).
It's a one page e-mail. Don't focus on the top. That's a later printout. We'll get back to that.
But the original e-mail is from yourself on August 9th, the next day, of 2001 to Ray Todd referring to problems at Sequoia Kings Canyon. You see that?
A Well, this one is dated -- I got one that says 4/23/03 (sic).

Page 190

Q No. Okay. Let -- I want you to listen to what I'm saying. I'm focusing on the original e-mail.
A Okay. Okay.
Q I want to make sure the record is clear. We're looking at an e-mail from Willie DeOcampo on August 3rd of 2001 to Ray Todd regarding problems at Sequoia Kings Canyon, correct?
A Yes.
Q The document we've marked has a later printout whereby Ray Todd, on April 28th, 2003, forwarded it to Mike Giller, correct?
A Uh-huh. Yes.
Q But there's no text, correct?
A Yes.
Q It's -- it's just a forwarding of the same document that you forwarded a year and three quarters earlier, right?
A Yes.
Q All right. So let's focus now on your e-mail.
Why don't you read it to yourself, please.
A (Reviewed documents.)
Q Have you had a chance to read the document?
A No. I'm a slow reader.
MR. SCHOENFELD: Off the record.
(A discussion was held off the record.)

Page 191

Q (By Mr. Schoenfeld) Okay.
A Okay. I guess my memory is not as good as it should be.
Q Let's go back to it.
A Okay.
Q Why did you write this e-mail one day after you sent Exhibit 84 that we've just examined to Mr. Todd on August 9th?
A I guess maybe I had contact with Rod, I guess, sometime talking about possible termination.
Q Okay. So this -- the reading of Exhibit 85 dated August 9th of 2001 refreshes your recollection that Rod Keiscome had communicated to you that he was considering terminating this contract for the convenience of the government, correct?
A It could -- may -- it may be. I don't know for sure.
Q And it -- but the communication that you had with Rod that he was considering termination was as a result of the overruns that had then been identified, correct?
A In the way this is written, that's correct.
Q Okay. Were you involved in any subsequent discussions during the year 2001 with Mr. Keiscome as to whether and to what extent he decided not to terminate

Page 192

for convenience?
A I don't remember now.
Q All right.
A I mean, seeing that I can't remember talking about it.
Q All right. Let's go through this e-mail.
A Okay.
Q The first sentence says, "Ray: Sorry to drop a load of problems on you, but I have asked Bob Russell and Andrea to write up some rebuttals to the over-run on rock excavation. Hopefully they can come up with some good explanations as why Remcon is not entitled to adjustments."
Let me ask a question. Why were you asking Mr. Russell to write a rebuttal to thé overrun on rock excavation when he had already communicated to you in writing, as reflected in each of the exhibits we've marked as his daily reports, as well as Exhibit 81, that this was a differing site condition, having already staked his flag in the ground saying, Willie, the contractor's inquired -- encountered a differing site condition?
A It doesn't say encountered a differing site condition.
Q No, it doesn't use those words --

Page 193

A Right.
Q -- but your testimony was that when you received this Exhibit 81, you understood Mr. Russell as saying the contractor had encountered a differing site condition. Why were you asking him to write up something that was different than what he communicated he perceived?
A I think that's my personality. I always ask for ways in which I can go ahead and defend. Now, I think the fact that I've sat down with Steve and tried to negotiate this thing is in effect my showing -- or demonstrates that my -- I did try to resolve this issue.
Q Okay. You sat down with Steve because you had a job duty to negotiate the modification?
A Yes.
Q Okay. Mr. Russell, your eyes and ears, said there was a differing site condition, correct?
A In --
Q In so many words.
MR. SCHROEDER: I'm going to object.
MR. SCHOENFELD: Let me restate the question.
THE WITNESS: That's obvious.
MR. SCHOENFELD: Fair objection.
Q (By Mr. Schoenfeld) Mr. Russell, your eyes and ears on the ground at the time the material was

Page 194

encountered communicated to you in writing words that you understood to be his perception that there was a differing site condition being encountered, correct?
A I can't answer that one. I -- I see it as him describing that there was some large boulders --
Q All right.
A -- encountered.
Q All right. And on behalf of the government, it was your responsibility to treat the contractor fairly, correct?
A I think I always have.
Q I'm not in any way insinuating that you did not. Okay? I don't want you to perceive that.
But it was your job duty as the contracting officer's representative to do your job, which included treating the contractor fairly within the contract obligations of the government?
A Yes.
Q Okay. And in performing that task, one of them was negotiating claims that the contractor made?
A Yes.
Q And that would include the claim associated with the rock excavation, correct?
A Yes.
Q And with respect to the claim regarding the --

Page 195

the rock excavation, when you sat down and negotiated with Remcon, you lacked information with respect to whether a differing site condition was actually encountered, correct?
A Correct.
Q And the reason you lacked that information is that you, on behalf of the government in combination with other people, did not avail yourselves of the opportunity to investigate the subsurface conditions when they were exposed but before they were disturbed, correct?
A I think there was some bad timing in there, and, yeah, I failed to go ahead and contact Kleinfelder to get him out there on a timely basis based upon what your previous --
Q Exhibit showed?
A -- exhibit showed.
Q And not just failing to have Kleinfelder out there, you failed to have Russell go out and direct the contractor to use the D8 in his presence and demonstrate that they couldn't rip the material, correct?
A Bob Russell was indicating to me he never witnessed that.
Q Right.
But you didn't direct him to say, Contractor, you've said there's a differing site condition, move your

Page 196

D8 up here and demonstrate to us that it can't be ripped.
A I would assume that a man who has a P.E. would be able to go ahead and think on his own, and that's one of the reasons why we hired him.
Q And I appreciate that.
And the contractor was there, as we've seen, every day with the D8 in active working condition?
A As the dailies show, yes.
Q And Mr. Russell clearly had before him the contract documents which included the geotechnical report, correct?
A Correct.
Q And he also had before -- with him the specifications, which include page 68, the differing site condition clause?
A Correct.
Q And he also worked, based on his history, on other government construction projects, so the existence of a differing site condition clause and its meaning was not a novel or new idea to him, correct?
MR. SCHROEDER: Objection; speculation.
Q (By Mr. Schoenfeld) You may answer it, if you can.
A I don't know if he -- I don't recall him having anything listed for other federal jobs. I know it

Page 197

was, like I said, city, the state.
Q All right. Let me restate that, then.
He had the responsibility to administer the job as the inspector on your behalf, correct?
A Yes.
Q Which included the responsibilities under the differing site conditions clause, correct?
A True.
Q So he had at his disposal all the pieces of the puzzle plus his knowledge from his years of experience to know that when the contractor makes a claim that it can't rip something with the identified piece of equipment, go out there and look at it and see if it's true or not, right?
A Yes.
MR. SCHROEDER: I'm going to object.
MR. SCHOENFELD: Okay.
Q (By Mr. Schoenfeld) And once the contractor gave notice that it had encountered what it contended to be a differing site condition, the contractor had done what it was supposed to do, as you understood it, and then the response, if any, was on the government, correct, to evaluate and investigate?
A According to the FAR clause, yes.
Q Okay.

Page 198

Okay, back to Exhibit 85.
A Can I answer --
Q Please. If you have something further to say, go ahead.
A Yeah, I would assume that Steve would have called me up and said there was a differing site condition so that way I could go ahead and send out somebody for -- in that case.
Q We'll get to that.
A Okay. Okay.
Q Okay?
Let's -- let me just ask this. I don't think I've established this. I know this to be true. Mr. Russell was stationed at the site and he was there daily during every workday, correct?
A Correct.
Q So he had the opportunity, as part of his job duties, to physically observe the contractor meeting refusal with the D8 not being able to rip the rock, correct?
A That would be my idea -- idea of what he was doing out there, yes --
Q And --
A -- being on-site.
Q And you would have expected him, as part of

Page 199

his job, to evaluate that and observe that, correct?
A Yes.
Q Okay. In the second paragraph of this e-mail to Mr. Todd you wrote with respect to the relocation of the leach field, I would -- I think the word was intended to be -- tend to agree with Steve, meaning Steve Bainbridge?
A Yes.
Q We don't want to continue making construction field revisions since it would make -- since it would look like our plans are worthless, period.
Up to August 9th, have there been a series of field revisions made that showed that the plans were not accurate up to that point?
A I would have to look at what modifications took place before then.
Q You would not have written this if you didn't believe it to be true, correct?
A Yes, more than likely.
Q Okay.
A That could be --
Q Did you -- did you think the plans were going to be worthless by all these modifications that had to happen?
A I think I used those words to try and light

Page 200

fires under who I -- who I write them to so that way I can get quick responses.
Q Okay.
A I --
Q But, you know, you -- in stuff that I've seen that you've written so far and the other things we'll get to, you're not a person to just cavalierly write things; is that correct? You don't use words carelessly --
A No.
Q -- intentionally?
A Not really.
Q I mean, you're an educated person who's worked within the government system for a great number of years, correct?
A Correct.
Q When I read something that says, "we don't want to continue making construction field revisions since it would look like our plans are worthless," it's a pretty significant statement, isn't it?
A Looking back at it, yes, it is.
Q Okay. And it struck me, when I was reading this, that you were not the kind of person that just used offhand flippant remarks, correct?
A Like I say, at the time, I'm -- I'm trying to get responses, timely responses, and I'll use whatever

A I probably couldn't put in as much time as I would prefer to -- on each project.

Q Okay. And that includes this project during 2001 and 2002?

A Any project.

Q All of them, right?

A Yes.

Q Okay. And this is among them, right?

A Yes.

Q All right. During the winter of 2001, 2002, did you put into place the necessary resources, whether it be from third parties or internal to the government, including the design team, to get the data you needed to form some judgments so that you could put yourself in a position to negotiate the outstanding claims?

A I would have to think so.

Q Do you know --

A Based upon --

Q Do you know if you did?

A I'm not sure.

Q Okay. Turn to the next page, which is -- finishes with Bates stamp number 285.

A (The witness complied.)

Q The first sentence under the heading Rock Excavation says, quote, The NPS does not agree with



Remcon that blasting in the roadway is a differing site condition or that it is extra work because -- and then it goes on to a technical discussion.

Is that statement that I read a position that you ever agreed with?

MR. SCHROEDER: I ask to let him read the whole section.

MR. SCHOENFELD: No. I just want him to --

Q (By Mr. Schoenfeld) Did you come to the conclusion that blasting in the roadway was not a differing site condition or extra work?

A I could not state yes or no to that, because, like you said, I didn't have Kleinfelder out there to make that determination.

Q Okay. At the very bottom of that same page, it says, quote, In addition, the lead inspector has stated that he has never witnessed any attempts to rip the material in question with a ripper mounted on a D8 dozer.

Was there anything that prevented him from asking to do so, to the best of your knowledge --

A No.

Q -- during the time frame in which -- July, August of 2001?

Your answer is no?



A No.

Q Okay.

Okay. That's it on that exhibit.

MR. SCHOENFELD: Number 90.

(Exhibit Number 90 was marked for identification.)

Q (By Mr. Schoenfeld) I give you Number 90 dated March 28th, 2001, from Remcon's files -- excuse me -- 2002 from Remcon's files. It's a two-page letter addressed by you and signed by you to Remcon. Did you author this letter, sir?

A I probably did. That's my signature on it.

Q Is that your signature?

A Yes.

Q Were you directed by the CO to issue this letter to Remcon?

A May I read it, please.

(Reviewed documents.)

MR. SCHROEDER: 90?

MR. SCHOENFELD: Yeah.

THE WITNESS: What was the question now?

Q (By Mr. Schoenfeld) Were you directed by the contracting officer to send this letter to Remcon?

A I don't think I was.

Q You initiated it yourself without the



contracting officer's involvement?

A I -- I have to try and collect information, and that's what I think I was trying to do.

Q Is the document we marked as Exhibit 89 -- was that in existence before you prepared and published Exhibit -- Exhibit 90?

A I don't know. Because, like you said, there's no date on that, and we can't speak to that.

Q Did Mr. Christensen respond to Exhibit 28 -- 90?

A I would hope so.

Q Do you remember him responding to Exhibit 90?

A I can't recall right now.

(Exhibit Number 91 was marked for identification.)

Q (By Mr. Schoenfeld) Is Exhibit 91 dated April 3, 2002, addressed to you, Mr. Christensen's response to Exhibit 90.

A (Reviewed documents.)

Q Sir, my question is: Did you receive this letter in response to yours?

A I probably did.

Q Okay. Did you consider the response contained in this exhibit to be a satisfactory response to your letter?

A I felt that they had expended that amount of money in and through there.
Q As a result of encountering a differing site condition?
A As a result of encountering what they said were rock.
Q Did you justify, in your mind, that offer of $59,500.47 because it had encountered a differing site condition?
A That would have been what I would have justified.
Q That was the basis for the offer, correct?
A That would have been my best -- my -- mine, yes.
Q I want to make sure the record's clear because you mumbled a few words.
The basis of the offer, under the contract, was that the contractor had encountered a differing site condition, correct?
A At that point in time, that's correct.
Q Thank you.
(Exhibit Number 93 was marked for identification.)
Q (By Mr. Schoenfeld) I'm going to show you now Exhibit 93. Is this page Bob Russell's analysis that was



referenced in Exhibit 92 -- excuse me -- in Exhibit 8? I'm sorry.
A I would assume so.
Q Well, I don't want you to assume. Look in the upper right-hand portion.
A Yes, that's what the figures show.
Q And is that Bob Russell's analysis and you adopted it, 59,500.47?
A Yes.
Q And it's based on it being a 50 percent share?
A Yes.
Q Who made the determination that only 50 percent of the recognized costs would be reimbursed by the government, in your offer?
A Well, if this is Bob Russell's, then Bob Russell made his recommendations to me.
Q Why did you agree with those recommendations?
A Because he was on-site.
Q You had the right to disagree with him, though, correct?
A Yes.
Q Did you believe only 50 percent of the blasting costs that he found were legitimate were the government's responsibilities?
A I don't know. I wasn't on-site, so I have to



assume that Bob was telling the truth.
Q You didn't listen to my question. Did you come to a conclusion that only 50 percent of the blasting costs were compensable as extra costs under the differing site condition clause?
A At this point in time, I would say yes.
Q What is the basis for such a determination? Were you just deferring to what Mr. Russell concluded and not doing an independent review yourself?
A I rely heavily upon inspectors.
Q Okay. Now, we saw in Exhibit 92 that Mr. Christensen in May gave the government information regarding seismic velocities, correct?
A Yes.
(Exhibit Number 94 was marked for identification.)
Q (By Mr. Schoenfeld) I show you Exhibit 94. It's an e-mail from Steve Christensen to yourself dated June 3rd, 2002, concerning a rock sample from the cut. It says, Last week I requested that Mark Penrose get with Bob Russell or his designated representative to take a rock sample from the cut area of the Upper Sherman access road. That's the area where the blasting was done, right?
A Yes.



Q Quote, The NPS had previously questioned the rocks sample results Remcon had taken regarding seismic velocity. Is that in reference to Exhibit 92, sir?
A I would have to assume so, seeing this was afterwards.
Q Continuing: I felt that by taking a new sample, witnessed by your representative, that this would eliminate any concern.
Continues: On Thursday, Mark requested that either Bob or his representative make time to witness a sample being taken. In other words, this is taking material out of the undisturbed area, correct?
A I don't know.
Q Did you ask?
A Obviously not.
Q Why not?
A I don't know.
Q Mark was told by Bob -- continuing in the text -- that he was not interested in the sampling of rock from the cut area and that neither Bob or Jerry were available.
Who was Jerry? You remember somebody by the name of Jerry on this job?
A Let me think.
Q We have Loren Mangrum.

Page 233

A I can't recall.
Did I write another letter to this?
Q Let me see here.
(Reviewed documents.)
MR. SCHROEDER: This is two pages.
MR. SCHOENFELD: All right. Let me express to you -- I just noted this. The exhibit that was marked is only two pages. There's actually a third page that apparently just didn't get copied, so I'm going to put my copy attached to it. At the break, we'll copy the third page. Because I saw he was only looking at two pages.
MR. SCHROEDER: Take a look at the -- oh, okay. I thought maybe you'd want to look at the third page.
MR. SCHOENFELD: It's just a signature.
MR. SCHROEDER: Okay.
Q (By Mr. Schoenfeld) Did you write a response to Mr. Christensen's response?
A I may have. I'm not sure.
Q Did you solicit information from others in order to do so?
A I can't recall right now.
Q All right. We assume that you did not retain anybody, Kleinfeld or otherwise, to evaluate the seismic velocities per foot that -- the rock encountered by

Page 234

Remcon, right? Correct?
A Yes.
Q Didn't Remcon submit to you data from a certified testing laboratory that they had procured regarding the seismic velocities?
A I believe they did.
(Exhibit Number 92 was marked for identification.)
Q (By Mr. Schoenfeld) And that's submitted in substantiation of the fact that they had encountered a differing site condition, correct?
A Well, let me see it, the thing.
Q That was the purpose they submitted it to you, correct?
A I would assume so.
Q Let me show you Exhibit 92, sir. One-page document addressed to Remcon dated May 13 of 2002 from Central Valley Testing regarding the velocities of foot per second of three samples related to this project. Did you receive this?
A Yes. I think this was based upon a small relative sample.
Q But nevertheless, it was a sample that was provided to you, correct?
A Yes, and -- and my -- my person because I

Page 235

wanted them to do the same thing. They told me that a small quantity would not be representative of the actual conditions.
Q Under the contract documents, did the contractor have an obligation to have seismic velocities per foot per second delivered to you in substantiation of a differing site condition? That wasn't their job responsibility; they were just to notify you that they perceived and encountered one, correct?
A You lost me on that one.
Q All right. Under the contract documents, the contractor was not required to contract with a third party to come in and perform the seismic velocity testing?
A No.
Q All right. It's correct, they weren't, right?
A I don't think so.
Q All right. In fact, that was the responsibility of the government to do in its investigation, if it disagreed that there was a differing site condition encountered after being notified of the contention, right?
A Yes.
Q Okay. And the government didn't do that, did it?

Page 236

A We didn't do it at the time, yes.
Q All right. And as a result of not doing it at the time, you lost the opportunity to do it with the in-situ nondisturbed material, correct?
A I would have to, once again, go back through and try and figure out.
Q Well, let's -- let's talk it out, because I think you know the answer to this and you're just not willing to give it to me.
A No.
Q I can tell --
A I'm -- I'm -- I'm being perfectly honest with you as best as I can.
Q I have no -- you are, and I have no doubt about that. I don't want to suggest otherwise. But I think you may not have listened to my question, so I --
A That's why sometimes I don't understand your question.
Q That's right.
The time to evaluate whether what the contractor was encountering was, in fact, a differing site condition was at the time it encountered it before it got disturbed?
A Yes.
Q And once the -- and the reason for the

differing site condition clause, the way it's set up is, contractor, we don't want you to include artificial contingencies in your bid upon what you might encounter. Bid the job based on what we tell you. If you encounter something subsurface that you think is different than what was indicated, let us know and --

A Let us know.

Q -- don't disturb it, which will then give you, the government, the opportunity to go in and look and see whether you agree or disagree. That's the process --

A Yes.

Q -- generically speaking, correct?

A Yes.

Q All right. Once Remcon gave you the notice, there was portions of the site, major portions, that were undisturbed so you had the opportunity to investigate, and that didn't happen at that point in time, correct?

A Yes.

Q So, therefore, when you wrote your March 28th letter of 2002 saying We want this information, you basically said to the contractors, Prove to me that it was a differing site condition. That was what you were asking for. You were saying, Demonstrate to me that the material you encountered was different than what was indicated.



A Yes.

Q And you placed the burden on the contractor, that was the government's, but which the government had failed to do in August of 2001, correct?

A That's the scenario you're painting, yes.

Q And so, therefore, in an effort to try to respond, Remcon procured Exhibit 92, correct?

A Yes.

Q Thank you.

Let's look at some other exhibits that we've previously marked as exhibits to earlier depositions. Let me start with Exhibit Number 7.

I want you to keep -- keep those just where they are. Keep this in a separate pile. Okay? Because you see, these have blue stickers, we don't want to mix them up.

Exhibit Number 7 is Mr. Russell's daily report of May 13 of 2002. You see that?

A Yes.

Q Okay. And it shows that you were on-site, correct?

A Yes.

Q In the middle of the Status of Work section, on page 1, it says, Met in office and reviewed last year's blasting and earthwork operations with Terry,



Willie, and Steve.

Based on the visitors to the site section -- that's Terry Lang, Willie DeOcampo, and Steve Christensen, correct?

A Yes.

Q It continues to say, Visited project site at 4 p.m. with Terry, Willie, Mark Penrose, and Steve to review areas that were blasted, parenthesis, roadway, comma --

A Where is that at now?

Q It was just where I was -- it's a continuation of where I was reading.

MR. SCHOENFELD: Can you help him, Richard, please.

THE WITNESS: No. Okay.

Q (By Mr. Schoenfeld) But it talks about, to review areas that were blasted.

A Yes.

Q Roadway, parking lots, and boulders. Do you see that?

A Yes.

Q So the roadway excavation is different than the boulder excavation of blasting, correct?

A Yes.

Q All righty. Look at Exhibit 8, sir. This is



the daily report for May 14th. Once again, you were still on-site, correct?

A Yes. That's correct.

Q It says in the bottom portion of the first page that you were reviewing Remcon's Request for Equitable Adjustment. You see that?

A Yes.

Q And it says that you made Remcon an offer for the access road blasting cost, and it was based on Bob Russell's estimate, and it was for $59,500.47, right?

A Well, I see where it says 59,506. Where does it say --

Q 500.47.

MR. SCHROEDER: (Indicated.)

THE WITNESS: Yeah.

Q (By Mr. Schoenfeld) Is that correct? That's the offer you made?

A Yeah. You said it was based upon --

Q Offer was based on my estimate, meaning Bob Russell's estimate --

A Okay.

Q -- is that correct? That's what it reads.

A Yes, if that's what it says here.

Q Did -- did you agree that Remcon was due $59,000 plus for encountering a differing site condition?

A Right.
Q And Mr. Christensen wrote on, quote, I find this quite disturbing as I am unclear why we would not want a confirming sample of this material.
A Yes. I don't -- right now my mind is confused on who Jerry is.
Q Okay. Forget Jerry now.
A Yeah.
Q Okay. Did you direct Bob Russell to say no on taking a sample?
A No.
Q As -- as a government representative, you've already told me that you wanted to be fair, pay the contractor what he was due, not try to rip them off or artificially defeat them in any way. That was your way of doing business, correct?
A Yes.
Q You relied on your inspectors, you delegated responsibilities to them and expected them to perform their work, right?
A Yes.
Q And you expected them to perform in a manner consistent with what you just said to be fair and honorable and to do the right thing, correct?
A Yes.



Q Why, before the road is placed with subgrade -- subgrade and base rock when the undisturbed material still exists, wouldn't you, as the contracting officer's representative, or your lead inspector want to find out what's there given the fact that we've now had a differing site condition claim that's been priced and there's a dispute over how much is due?
Isn't a fundamental key issue, was a differing site condition actually encountered? Right? That was still unknown to you, right?
A That was an unknown, yes.
Q And still unknown to you today, right?
A That's true.
Q You had an opportunity even as far as June of 2002 to have a sample taken by somebody in the presence of your inspector of undisturbed material that still existed on the site adjacent to the areas that were blasted, correct?
A Yes.
Q And, yet, neither your lead inspector nor you followed through to say, yeah, let's do it; isn't that correct?
A I -- like I said, I talked to Kleinfelder, and they had told me that a small sample would not be representative.



Q Were you talking about a rock from a stockpile as contrasted with touching undisturbed material?
A I believe that's --
Q A rock from a stockpile, right?
A I don't know where these samples came from.
Q I don't either personally, sir.
A Yeah.
Q I don't know. I wasn't there.
A Yeah.
Q Regardless of where the samples that Remcon referenced in Exhibit 92 came from, the site still existed, it wasn't yet paved, right? As of June of 2002, there was no paving yet done until the end of the second season, right?
A I would have to assume so. I can't remember.
Q So you had base rock still exposed for which you could have called Kleinfelder or whomever to come out and investigate because what was still at issue was, was a differing site condition encountered, correct?
A I'm not sure if that -- I may have contacted Kleinfelder. I'm not positively sure what their responses were.
Q Did you respond to Mr. Christensen's e-mail that we've marked as Exhibit Number 94?
A I would hope so.



Q How did you --
A I can't recall.
Q How did you respond?
A I don't know. I can't remember.
Q Do you recall meeting in December of 2001 after the first construction season was over here in Denver with Steve Christensen where you received a complete cost breakdown regarding this differing site condition claim?
A I recall getting a large volume of material from Steve.
Q On the differing site condition claim?
A On the rock excavation.
Q Okay. And the contracting officer was present, correct, at that meeting?
A I can't recall if he was present or not. I know Terry was present.
Q In the large volume of material that you did receive on the rock excavation claim from Remcon there was a whole section devoted to the costs that were claimed with backup documentation showing the actual labor, material, and equipment costs incurred, right?
A Yes.
Q Okay. Did you ever respond to that detail?
A I think that's what the meeting was all about.

Q (By Mr. Schoenfeld) What is your understanding as to why this Modification Number 6 was issued unilaterally?
A Unilaterals are usually without concurrence --
Q By the contractor?
A -- or bilateral agreement by the contractor.
Q Okay. Do you recall in August of 2002 there was a meeting in which Mr. Keiscome was in attendance, you were in attendance, Mr. Christensen and I believe Mr. Lewis on behalf of Remcon were in attendance in which there were negotiations on various items?
A I recall meeting Mr. Lewis and Mr. Christensen trying to resolve some issues, yes.
Q And during those negotiations in August of 2002, one of the subjects that was discussed was the contention that there was a differing site condition encountered by Remcon in the area of the deep cut that necessitated blasting, correct?
A Correct.
Q And am I correct that as part of that negotiation, there was an agreement reached in principal that the government comp -- would compensate Remcon approximately $484,000 for that effort?
A There may have been some agreement reached. I can't really remember the exact amount, if -- if any.



Q But it was in several hundreds of thousands of dollars, is that your memory, with respect to the differing site condition?
A I'd have to look through whatever records I have or -- just to refresh my memory in terms of amount.
Q What records would those be?
A Whatever -- whatever you have.
Q Whatever -- well, you would have to look at your records was your testimony. What records?
A That would be whatever -- I would assume Terry Lang was in that meeting, too, so she would have probably kept some records.
Q Okay. You're not certain, but you'd hope there would be something?
A I'm not certain. I'm not certain.
Q All right. Now, I note in this document, sir, which is issued in February of 2003, approximately six months after that settlement meeting, that the contracting officer issued unilaterally a new Bid Item Number 141 recognizing there was a differing site condition encountered by Remcon in the area of the deep cut because of Remcon encountering rock that was not rippable.
Do you see that write-up on the fourth page, which is the page you're looking at?



A It -- it appears to be that. I -- it doesn't specifically state the stations or anything like that.
Q Okay. It states that this Item Number 141 was to compensate Remcon for blasting and excavation where the material was classified as rock not rippable in accordance with the contract requirements in the Upper Sherman access road and parking area locations. Do you see that?
A Yes.
Q But it doesn't include trenching work, which was covered under a separate bid item, correct?
A Trenching and sewer disposal system.
Q Okay.
A Structural excavation and backfill --
Q So --
A -- and blasting of boulders.
Q Okay. So is it your understanding from reading this description on the fourth page of Exhibit 214 that Mr. Keiscome and the National Park Service was compensating Remcon for encountering nonrippable rock in the deep cut area of the access road in the amount he identified?
A It appears so, yes.
Q And that was identified as the justification as a result of the contractor encountering a differing



site condition; is that correct?
A As stated in the description in 141, yes, differing site condition.
Q Did you draft this description for the contracting officer?
A I may have. I don't -- I don't recall.
Q The top of this page, the second sentence reads, "The National Park Service and Remcon have been unable to reach a bilateral agreement" --
A Where -- where are we located?
Q The second sentence.
A Okay.
Q The National Park Service and Remcon have been unable to reach a bilateral agreement on the costs related to this work, period.
Based on your presence at the meeting that occurred in August of 2002, is that an accurate statement?
A Yes, no -- no bilateral agreement was reached.
Q Is it your testimony from your attendance at the meeting in August of 2002 that Mr. Keiscome and Mr. Christensen, on behalf of the National Park Service and Remcon respectively, did not agree that Remcon would receive $484,000 for this scope of work that's set forth in this Modification Number 6?

MR. OLIVIER: I'm going to object to your telling the witness what some other witness testified to.
MR. SCHOENFELD: Okay.
Q (By Mr. Schoenfeld) Do you believe Mr. Mangrum, assuming what I just said was true, was inaccurate in his recollection?
A There is no settlement from what I -- I can see based upon this unilateral modification.
Q Okay. I don't want you to focus on the unilateral Modification Number 6. I want you to focus on what happened in August of 2002.
Was there an agreement reached at the settlement meeting between Mr. Keiscome and Mr. Christensen concerning the differing site condition claim that Remcon had made?
A I don't recall.
Q Okay. Do you have any notes of that meeting that would lead you to be able to give us a more definitive response that you are aware or are in existence?
A Whatever notes I had were in my -- in my documents that I gave to Terry Lang and the people to go ahead and copy for you.
Q Okay. On the bottom of the page that I had asked you to look at, which is Bates-stamped either 2019



or 2013, it's part of Exhibit 214, there is handwriting that says SEKI 200Q Mod 7 hyphen differing site condition -- differing site backup. Do you see that?
A Yes.
Q Do you recognize the handwriting?
A No, I don't.
Q Two pages back, sir, there are a series of pages that have handwriting on them showing what appear to be blasting locations and information, approximately 13 pages' worth.
Do you recognize what those pages are?
A (Reviewed documents.)
They appear to be blasters' records.
Q Did you ever study them to analyze any aspect of entitlement or damage recovery that the contractor should be entitled to for encountering the differing site condition?
A I may have, but I'm -- I'm not a blaster, so I don't know what it takes to go ahead and move rock.
MR. SCHOENFELD: Okay. We'll go off the record now.
(A recess was taken from 8:51 a.m. until 9:23 a.m.)
Q (By Mr. Schoenfeld) We were examining Exhibit 214 when we broke. I'd like you to turn to the



back portion of the exhibit now, the next-to-last page, please.
A (The witness complied.)
Q The document that you're looking at has the first word justification. You see that?
A Yes.
Q Did you author this justification for this new Bid Item Number 141?
A I'm not sure. I can't say positively.
Q Okay. In the second paragraph, the second sentence reads, The work was performed in August and September of 2001. Do you see that?
A In the -- oh, second paragraph?
Q Yes.
A Second sentence?
Q Yes.
A Yes, I see that.
Q Is that consistent with your recollection of when Remcon had its blasting work done in the access road location?
A I believe those are dates that keep on coming up, August and September.
Q Of 2 --
A I recall some July, too, but that may be confusing my memory on other things.



Q No, you're right. Because they started, I believe, on July 30th. But for purposes here, we'll assume August and September of 2001.
Assuming that is true, why was it not until February of 2003 that the government was agreeing to compensate Remcon any amount of money for the differing site condition work that had been done approximately 18 months earlier?
MR. OLIVIER: I'm going to object. It mischaracterizes the evidence.
THE WITNESS: I don't know.
Q (By Mr. Schoenfeld) Are you aware of any compensation given to Remcon prior to February of 2003 for the blasting and associated work referenced in this justification?
A I can't say positive.
Q Given that you were the -- the person given responsibility to handle progress payments on this project, was Remcon ever paid the $84,000 in this unilateral modification agreed to pay Remcon?
MR. OLIVIER: I'm not sure that was a sentence, but that's all right.
Q (By Mr. Schoenfeld) Let me ask you -- let me do it this way: Was Remcon ever paid the amount of money that Modification Number 6 agreed to pay?

# EXHIBIT 9B

Declaration of Thomas W. Lloyd in Opposition to
Defendant's Motion for Partial Summary Judgment

Page 78

the access road.
Q Okay. Did you personally make the determination that a differing site condition was encountered, or did you accept the recommendation of others in that regard?
A I have to put a caveat on that again. I was -- I was not informed of the differing site condition until well after it had happened.
Q In issuing Modification Number 6, in which you determined a differing site condition had been encountered by the contractor, did you make that determination yourself, or did you rely upon the recommendation of others?
A I definitely rely on the expertise of technical people, so definitely I made that based on judgment with input from technical people.
Q Who -- what technical people did you rely upon in reaching the conclusion you did?
A That would be project manager, Mike Giller.
Q Mr. DeOcampo?
A I believe we had conversation -- conversation with him as well, yes.
Q Bob Smith of DHM?
A Me directly, no.
Q Are you aware that Mr. DeOcampo received

Page 79

communications from Mr. Smith in that regard?
A I believe I -- I understand that now.
Q And Mr. Tuttle on behalf of his company as well gave information to both Mr. Smith and to Mr. DeOcampo?
A I don't recall.
Q What about Andrea Lind? You recall receiving any information by or through others of her perception of whether a differing site condition had been encountered?
A I don't recall.
Q What about Bob Russell, the construction manager?
A I do not recall that.
Q What about information from the contractor that had been received by your representatives? Do you recall relying on that information?
A I saw it much later at a meeting in Denver.
Q Okay. Now, do you recall that Mr. Christensen and his personnel communicated the encountering of rock that they perceived to be a differing site condition to your representatives much earlier than you personally became aware of the issue?
A It's my understanding, yes.
Q Okay. And you're aware as part of the education you've received and your exercise of

Page 80

responsibilities as a contracting officer that there is a FAR clause that deals with what is to happen when and if a differing site condition is perceived to be encountered by a contractor, correct?
A Correct.
Q And, in fact, it was included in the solicitation for this project, correct?
A Correct.
Q And, in fact, that clause provides in substance that the contractor needs to give notice when it encounters something it contends is a Type 1 differing site condition, which is generically and something different than what they perceive is indicated in the contract documents in a subsurface condition, right?
A That's correct.
Q And once that notice is given to the government's representatives, the government then has certain responsibilities to promptly investigate and make a determination one way or the other as to whether it concurs or not to that contention, correct?
A That's correct.
Q What did the government do once notice was given by Remcon of its encountering of a differing site condition to investigate the accuracy of the representation and contention?

Page 81

A I was not informed of that, but --
Q By whom were you not informed? By anybody, correct?
A Wherever -- there is a document that I've seen, and Steve did bring it with him, and I think it was in -- within the remediation binder that he had brought to Denver sometime long after this, and that's where I saw it for the first time.
Q "Sometime long after this" meaning, long after approximately July and August of 2001?
A Long after basically the -- where the differing site condition was alleged by the contractor.
Q I'm going to ask you to assume that the Remcon encountered what it contended to be a differing site condition starting in late July of 2001 and there's written record of notifying Bob Russell and Willie DeOcampo of that subject within the first week of encountering it. I'm asking you to make that assumption.
Did you have a standing communication to Mr. DeOcampo as your COR that if such information came to his attention, he was to bring it to your attention?
MR. SCHROEDER: Objection to form.
Q (By Mr. Schoenfeld) Go ahead.
A I can answer?
Q Yeah. Unless he tells you not to, just go

ahead.

A Understood.

It's -- Willie DeOcampo is aware when he has a differing site condition to notify the contracting officer.

Q Okay. Did you read in Mr. DeOcampo's transcript that Mr. DeOcampo acknowledged that he did receive notice from the contractor in either late July or the first week of August of 2001 of the contractor's contention that it had encountered a differing site condition?

A If that is the notice that he's referring to on the -- on the document about halfway down that Steve had brought to Denver, that's the notice I'm thinking of.

Q Did you read in his transcript that he acknowledged that he had received such information?

A I don't recall.

Q Do you recall Mr. DeOcampo testifying in his deposition transcript that he failed to investigate timely the differing site condition contention that Remcon claimed?

MR. SCHROEDER: Objection; calls for speculation.

THE WITNESS: I remember seeing something to that -- in that regard. What he -- his deposition said



is what his deposition says, so . . .

Q (By Mr. Schoenfeld) Okay. As you sit here today, sir, do you believe Remcon failed to comply with its requirements under the differing site condition clause to give timely notice of the differing site condition to the government representatives?

A It appears timely, but it also appears fine print.

Q Okay. What investigation was undertaken by the government once the notice was given?

MR. SCHROEDER: Objection; asked and answered.

MR. SCHOENFELD: I don't believe it has been asked, and I don't believe it's been answered.

THE WITNESS: The fine-print notice that the government received, I think it took many months after that to investigate or -- or maybe not many months, but it took some time to investigate.

Q (By Mr. Schoenfeld) Okay. I will ask you to assume that whatever you're referring to as fine print was ultimately made in neon on August 20th of 2001 in a document that said notice of differing site condition. Do you recall seeing that document?

MR. SCHROEDER: Objection to characterization.

You may answer.

THE WITNESS: I -- I don't recall anything in



neon.

(A discussion was held off the record between Mr. Christensen and Mike Schoenfeld.)

Q (By Mr. Schoenfeld) Is the government's contention in this dispute regarding the entitlement that Remcon was to receive for encountering the differing site condition as to the dollar value that Remcon is entitled to at all based on the timeliness of the notice?

MR. SCHROEDER: Objection.

THE WITNESS: The differing --

MR. SCHOENFELD: What's your objection?

MR. SCHROEDER: My objection is I don't know this witness is competent to testify what the government's contention is regarding this lawsuit.

MR. SCHOENFELD: That's fine.

Q (By Mr. Schoenfeld) Okay. Go ahead.

A Repeat the question, please.

Q Yeah.

Is your position as to what Remcon's entitled to receive for encountering the differing site condition in unilateral Change Order Number 6, which we've marked as Exhibit 214, at all based on the timing of the notice?

A It's based on what we feel is a fair and reasonable amount, the government's unilateral, yes.

Q So it's based on the timing of the notice?



Had the notice been given earlier and in other than in fine print, would Remcon be entitled to more money in your mind?

A The government would have a real good chance at at least seeing what the reality was out there rather than speculating on what we're talking about now.

Q Okay. Was the differing site condition that you understand Remcon encountered was, in essence, rock that could not be ripped with a D8 dozer?

A That's my understanding.

Q Okay. And as a result of that, Remcon had to blast the rock; is that correct?

A It is my understanding that there was already blasting for the trench and so Remcon was allowed to blast on the road.

Q Okay. I realize that there's blasting that Remcon was authorized to perform on this project. I also realize that blasting of rock or rock being encountered in a utility trench was not compensable as a differing site condition because that was identified. We're not talking about utility trenches.

A Understood.

Q We're just talking about the road itself.

Am I correct that Remcon blasted the road in lieu of ripping it with a D8 dozer because it contended

that the material it encountered was not susceptible to be ripped?
A It is my understanding that Remcon has stated that it could not be ripped.
Q Okay. As a result of it could not be ripped, are you aware that it was about a ten-week period of time, plus or minus, that Remcon in lieu of using conventional construction equipment, such as a D8 dozer to rip the rock, had to blast approximately 600 lineal foot of roadway in order to create the road in the location where this rock was encountered?
MR. SCHROEDER: Objection. He -- I don't believe he just testified that it couldn't be ripped. I think that's your characterization.
THE WITNESS: Could I -- could I hear that back.
Q (By Mr. Schoenfeld) I'll restate the question. Am I correct that it took about ten weeks to blast the rock in the road?
A I recall it took quite a bit of time. I can't say if it was ten weeks, but the record will show what it took.
Q What time extension did you granted (sic), if any, the contractor for having encountered this differing site condition?



A Whatever is in the modification here before us.
Q Is there any time extension that you've granted in Modification Number 6 for having -- the contractor having encountered a differing site condition?
A No time on Mod 6.
Q Why not?
A I believe it was a means and methods. Remcon -- obviously, we feel that they could have used a larger CAT than a D8.
Q Under the contract, sir, that you caused to be put out, was there information provided as to what methodology a contractor would use to determine whether or not rock would be rippable?
A I believe the soils report would be what you would be referring to.
Q And isn't it true the soils report that was procured by the government and made a part of the solicitation identified that all rock to be encountered along the access road would be rippable by a D8 dozer or a lesser-sized piece of equipment?
MR. SCHROEDER: Objection; calls for speculation.
THE WITNESS: It is what it says in there.
Q (By Mr. Schoenfeld) And isn't that true,



that's your understanding?
A It's my understanding.
Q Okay. And is it also your understanding, sir, based on the technical information you've received that the rock encountered by the contractor was not able to be ripped by a D8 dozer or smaller-size piece of equipment along the access road?
A I would say that I don't believe our field personnel really checked on -- on -- at that particular time when this all was occurring and even observed whether that could happen or not.
Q The National Park Service had daily inspection on this project by and through its construction manager, correct?
A Correct.
Q There certainly was opportunity for the National Park Service to inspect and evaluate whether any of the material encountered along the road that was contended to be a differing site condition was or was not rippable; isn't that correct?
A That's correct.
Q And they failed to do so is your understanding; is that correct?
MR. SCHROEDER: Objection; characterization.
THE WITNESS: The record will show that it



didn't happen as it should have.
Q (By Mr. Schoenfeld) Okay.
A I'm going --
Q Did Remcon do anything --
A Could I finish?
Q I apologize. I didn't know that you hadn't.
A I still go back to the fine print of the notice for the differing site condition.
Q Did Remcon do anything to prevent any representative from the National Park Service, whether it be inspector or otherwise, from evaluating whether a differing site condition had been encountered?
A The fact that I don't believe anybody knew about the differing site condition until well after. I -- I don't think they -- there was nobody out there, I guess is what it comes down to.
Q Your inspector wasn't there even though he was supposed to be?
A Wasn't out there inspecting. Inspectors don't have to be out there watching all the work that's happening.
Q Let me show you Exhibit 75, sir, which is Mr. Russell's daily report for July 30, 2001. It's previously been marked as an exhibit.
MS. DULIN: Number?

of the week ending August 4, 2001; isn't that correct?
A That would be his contention.
Q Okay. That was his understanding and testimony under oath, correct?
A I wasn't here, but I don't recall necessarily reading all that, but I -- the record is the record.
Q Okay. And I just show you for record purposes page -- Exhibit 78, which is a page 68 of 125 of the solicitation which includes the FAR regulation for the differing site condition that was applicable to this contract, correct?
A Correct.
Q And as you testified that once the contractor gives written notice of either a Type 1 or Type 2 differing site condition, it requires you in Subpart B to investigate the site conditions promptly after receiving the notice, correct?
A Among other things, yes.
Q And you expected the notice to come from, at a minimum, the contracting officer's representative and/or the construction manager had they received such information, correct?
A I would have thought that the contractor would have provided that directly to me by fax if it was so important, but, yes.



Q Okay. Let me show you Exhibit 76, sir.
Exhibit 76 is a multiple-page document. The first page is dated August 20th of 2001. Specification reference is 1.62 -- or I.62, I should say, differing site condition, signed by Jeff Northrop, the superintendent on behalf of Remcon with an estimated dollar and an estimated time extension, identifying in the description of the perception that they encountered a Type 1 differing site condition. Have you ever seen this document before?
A I believe this is the document that I was referring to maybe in the meeting that we had in Denver.
Q Okay. You testified a moment ago that it was your expectation that the contractor would send a letter to you along the lines that you described had they encountered a differing site condition, correct?
A I would expect it to be important enough to maybe fax this to me.
Q Isn't it true there was a preconstruction conference on this project?
A Yes.
Q And isn't it true at that preconstruction conference there was direction given by or on your behalf -- by you on your behalf, I should have said, that written communications were to go from the contractor to



Jacobs as the construction manager?
A Yes.
Q Okay.
A I want to note on this exhibit, if I may --
Q Yes, sir.
A -- cost estimate, 100,000; time extension, 21 days.
Q It is what it is.
A It is what it is.
Q Isn't it true that as a result of encountering the differing site condition, it was communicated to you by the technical personnel you relied upon that the project was delayed?
A I believe somewhat delayed, I recall that.
Q The answer is yes?
A I believe somewhat delayed is my answer.
Q Okay. Why is it in unilateral Change Order Number 6, wherein you granted some compensation to the contractor, you did not grant a time even though you had been advised the project had been delayed to some extent?
A I will -- excuse me. I'll refer back to what you said earlier -- actually, you had asked me questions regarding are there any other changes, errors, and omissions. This is probably in that category.
And I want to now make a correction to my



testimony that I don't believe that there was anything that was major that was remaining along those lines, so what I'm doing is correcting the previous testimony that I had. And with this, it is what it is.
Q Modification Number 6 granted the contractor unilaterally the sum of 84,000 and some odd dollars, correct?
A Right. Correct.
Q Did you ever cause that to be paid to the contractor?
A Let's look at the timing.
Q It's -- it's in February of '03, sir.
A Okay.
Q So it's during the winter shutdown after the second construction season.
A I would have to refer back to the pay estimates to figure out when it was actually paid for, and it may not have been to Remcon.
Q Isn't it true it's never been paid to Remcon?
A Well, since they've been terminated, it may have been paid to the surety.
Q Are you certain it's -- whether it's ever been paid to anybody?
A I'm pretty sure it has been.
Q Remcon was terminated in August of 2003,

Page 190

Q (By Mr. Schoenfeld) Please answer the question.
A Review of the documents that had been issued.
Q Well, did you -- did you fulfill the responsibilities that I just read for ensuring performance of all necessary actions by tasking Mr. DeOcampo to be your contracting officer's representative? Is that one of the aspects that you did?
A That's one of the aspects.
Q Do you believe in your review of his performance during the job that he did discharge his responsibilities consistent with your tasking of those responsibilities to him?
A I believe he's a very competent COR, and yes.
Q Okay. You don't believe he made any mistakes?
A I think we all make mistakes.
Q Do you believe that Mr. DeOcampo made mistakes with respect to giving you information with respect to the encountering of the differing site condition regarding rock on the access road in August of 2001?
A I can't answer that.
Q Do you believe Mr. DeOcampo discharged his responsibilities in accordance with that which you would have performed concerning the timing of giving you notice of potential mods that the contractor claimed it was

Page 191

entitled to?
A I think Willie DeOcampo is a very competent COR and he has that duty to do that and that he's doing it -- or he has done it to the best of his ability.
MR. SCHOENFELD: Move to strike.
Can you read him back the question.
And I'd like you to answer it again, please, but this time the question that I asked.
(The reporter read page 190, line 22 through page 191, line 1.)
MR. SCHROEDER: Objection to form.
THE WITNESS: Yes, to the best of his ability.
Q (By Mr. Schoenfeld) Okay. You, sir -- continuing in 1.602-2, in the last sentence of the preamble paragraph, it says, Contracting officer shall. Do you see that?
A I'm looking.
Q (Indicated.)
A I see that.
Q Do you understand the word "shall" to be -- to mean mandatory, that means you must do something?
A Shall means something different than must, but yes.
Q Okay. Do -- do you consider it to be something other than must?

Page 192

A It's something you're supposed to be doing.
Q Okay. It's -- it's not discretionary --
A Right.
Q -- it's something you're required to do, correct?
A Oh, yes.
Q Okay. Item A, Ensure that the requirements of 1.602-1(b) have been met, and then it continues, quote, and that sufficient funds are available for obligation, end quote.
What did you do, given that you were not involved with the money side of this equation, to, quote, ensure that sufficient funds are available for the obligation?
MR. SCHROEDER: Objection to form regarding the characterization that he was not involved in the money side.
You may answer.
THE WITNESS: All DSC line item construction projects have a 10 percent contingency.
Q (By Mr. Schoenfeld) I understand.
A moment ago you said Willie did properly discharge his responsibilities, but you've also told me earlier that you were unaware of the notice of differing site condition until at least June 2002 even though it

Page 193

came in in August 2001. You remember that?
A Yes.
Q Do you believe that was the proper performance by Mr. DeOcampo of his responsibilities?
A I'd have to refer you to Willie DeOcampo's testimony, not my own.
Q I'm asking you what your opinion is.
A My opinion is that he -- he has performed to the best of his --
Q I'm asking on this specific issue.
A -- ability.
I'm saying --
Q Do you believe that he performed it properly in accordance with the responsibilities that you were granted and you delegated to him to perform on your behalf?
A I'm not sure.
Q Okay. As a Level IV contracting officer is there a limit of your authority?
A It's unlimited and states so on the warrant itself.
Q So there -- there's no dollar maximum value that limits your ability to exercise your authorities as a contracting officer, correct?
A With -- within what is shown on the warrant

July 30th, July 31st, the meeting minutes for the week of August 4th, and the notice of differing site condition dated August 20th, correct?
A I recall that from yesterday, yes.
Q So Mr. Russell and Mr. DeOcampo certainly were aware of the encountering of rock, the contention it was a differing site condition, and, in fact, published documentation on behalf of your construction manager indicating potential change order would be a result of this encounter, correct?
A The daily logs say what they say.
Q And the meeting minutes and the summary of weekly performance, correct?
A Yes.
Q What prevented Mr. Russell or Mr. DeOcampo from seeking assistance to evaluate the contention the contractor had advanced while they were still encountering the rock in constructing the access road in August of 2001?
MR. SCHROEDER: Objection; calls for speculation.
THE WITNESS: I don't know.
Q (By Mr. Schoenfeld) Okay. We'll use the word "our" in describing that the entire National Park Service was prevented from investigating it. And I understand



your testimony that you were unaware of it. But as we've seen, other representatives on your behalf were aware. And I'm trying to distinguish, when you use the word "our," are you including them or not? "Them" being Bob Russell and Mr. DeOcampo.
MR. SCHROEDER: Objection; argumentative. Object to form.
MR. SCHOENFELD: It's not being argumentative. I'm just trying to, perhaps, seek clarification of what he intends by his testimony.
THE WITNESS: It would be my understanding.
Q (By Mr. Schoenfeld) Okay. Now, I showed you the boring -- a calendar showing when blasting was done that was prepared by Mr. Russell, we marked as an exhibit.
A Yes.
Q And you saw that blasting occurred all the way into September of 2001, correct, for the road? And thereafter it was the utility blasting, right?
A Whatever they say, yes, those dates are there.
Q Okay. What prevented the National Park Service from having Kleinfelder visit the site on or after August 20th while rock was still being encountered and blasted in the access road?
A I don't know.



Q Did you ever receive written communication, either directly from Mr. Christensen or by way of your construction manager or COR, that Mr. Christensen had had the rock that it encountered on the access road tested for seismic velocity?
A Where I sit right now, I don't recall. It may have been, but I don't recall.
Q I'll ask you to assume that that did occur and he delivered it to the National Park Service showing seismic velocities encountered were much greater than that found by Kleinfelder in its report, meaning that a D8 could not rip the rock. Does that refresh your recollection at all?
A From the deposition? I recall that.
Q Okay. You saw that in the deposition testimony that you've read prior to attending this deposition, correct?
A Mr. Tuttle's, yes.
Q Yes. Did that assist you in yielding the conclusion that a differing site condition was encountered by virtue of your publication of Modification Number 6?
A My knowledge came from meetings with Remcon of their alleged differing site condition, and the response is the modification itself.



Q When we looked at the FAR regulation that was included in the contract documents for differing site condition, is it the government or the contractor that has the duty to investigate the contractor's contention of a differing site condition?
A Once the contractor has been advised, it's the government's responsibility.
Q Not -- you said "Once the contractor has been advised." Once the contractor advises, then --
A That -- that's what I meant. I'm sorry. Yes.
Q Okay. Did the government timely investigate, based on your recollection, the alleged encounter of a differing site condition by Remcon?
A Based on the exhibit that we looked at -- it was a one-page exhibit advising us of the differing site condition -- no.
Q Okay. Going back to Exhibit 214, the January 14th, 2003, letter or memo from Mr. Giller, in Item 2D, as in dog -- you've got it in your hand --
A This is what number? Did you say 214?
Q It's in Exhibit 214.
A Part of --
Q Yes.
A -- Mod 6. Okay.
Q Mr. Giller writes in 2D, as in dog, quote: It

material, correct?
A Yes to both.
Q Let me show you Exhibit 84, sir. It's an e-mail from Mr. DeOcampo to Andrea Gregor at DHM and Joanne Cody with a cc to Ray Todd and Bob Russell dated August 8th of 2001.
It reads: Andrea, the 200Q project is beginning to questionable overruns and quantities. I need your help on where and how DHM thought items would be paid. The contracting officer is already questioning why Pay Item 26 is almost 350 percent over the estimated quantities, period.
Did you have that discussion with Mr. DeOcampo?
A Oh, yes.
Q And is Mr. DeOcampo accurately communicating that you had concern regarding Pay Item 26 being almost 30 -- 350 percent over the estimated quantities at that point in time?
A Yes.
Q Mr. DeOcampo continues: Now we have possible overruns in Item 38, dash, rock excavation.
This is the item ultimately for which Mod 6 was issued as a differing site condition, correct?
A Yes.



Q Remcon is citing this item for payment for blasting rocks, period.
Had Mr. DeOcampo talked to you about the overruns in Item 38 as of August 8th of 2001, sir?
A I would have to refer to the pay estimate. And whenever you see large amounts of overruns, that's when the logical conclusion would happen where you'd have conversation about those items.
Q So even though Mr. DeOcampo may not have furnished you the actual notice of a differing site condition, which was dated August 20th until June of -- August 20th of 2001 until June of 2002, he nevertheless discussed the subject with you as of August 8th, 2001, which is within ten days of Remcon encountering rock; isn't that correct?
A That's correct.
Q Continues, quote: What was the intent of rock excavation and how does the government defend, slash, ward off these requests for payment under this pay item?
Why is it the government was looking to defend or ward off these requests?
MR. SCHROEDER: Objection to characterization.
THE WITNESS: I don't know.
Q (By Mr. Schoenfeld) Did you ask Mr. DeOcampo, based on his informing you of the subject matter of



Remcon encountering rock and that they contended it was a differing site condition, that you wanted to know what the design team's position was so you could defend against the contention?
A I wouldn't put it in those words.
Q Put it in your words. What did you direct him or ask him to do?
A My words would be that if you have an overrun, we need to take care of that, and we did by making payment to the contractor. And then we also need to get it so we have a meeting of the minds down the road.
Q You just said so we could pay the contractor. Have you ever paid the contractor for the differing site condition encountered?
A I would have to rely on the -- the pay estimates in question.
Q Okay. As you sit here today, you know you didn't pay anything for the differing site condition --
A We have already discussed that.
Q Let me finish. You know you didn't pay any sooner than sometime in 2003, if you did pay, correct? Because Mod 6 isn't dated until February 2003; isn't that correct?
A I would have to look at the pay estimate. And what I think you're saying is that it was not paid to



Remcon.
Q Not paid at all.
A Okay.
Q If Mod 6 isn't issued until February 2003, no payment for differing site condition work was issued any sooner than that, to the best of your knowledge, correct?
A Correct.
Q Do you have any understanding as to why Mr. DeOcampo wrote: How does the government defend, slash, ward off these requests?
MR. SCHROEDER: Objection; asked and answered.
THE WITNESS: I don't.
Q (By Mr. Schoenfeld) You ever see this e-mail before?
A I don't recall seeing it.
Q Whose writing is on this page, if you know? Is that your handwriting, sir?
A I don't recognize this writing.
Q Okay. Do you know if there was a conflict in the contract documents between the specification sections that addressed rock and rock excavation?
MR. SCHROEDER: Objection; calls for legal conclusion. He doesn't have the contract in front of him.
THE WITNESS: I don't recall.