IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | DOCKET NO. 03-2478C<br><br>**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**<br><br>(Judge Susan G. Braden)<br><br>Hearing Date: TBD |

1. The contract specifications for the Project required that two of the components (the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail) be complete before any work would proceed on the Lower Sherman Parking Area. (Declaration of Steven B. Christensen (hereinafter "SBC Dec."), ¶ 3).

2. As of July, 2003, due to delays directly attributable to the NPS, work remained to be completed on the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail, and no work had been performed on the Lower Sherman Parking Area. (SBC Dec., ¶ 3; Declaration of Thomas W. Lloyd (hereinafter "TWL Dec."), ¶¶ 3-4; Declaration of D. Michael Schoenfeld ("DMS Dec., ¶¶ 3-5).

3. The Upper Sherman Access Road and Parking Area involved the construction of approximately 3,000 linear feet of a new two lane asphalt paved roadway, a new two level parking area, installation of 3,700 linear feet of domestic waterlines and 3,800 linear feet of electrical service line, installation of a new sewer system (including approximately 750 linear feet of sewer line, a concrete septic tank, dosing siphon tank, and a sewage leach field), construction of a comfort station, a wayside kiosk, rock

revetments, landscaping/erosion control measures and related improvements. (SBC Dec., ¶ 4).

4. The Sherman Tree Trail component required the construction of approximately 2,000 linear feet of asphalt surfaced trail, including concrete/stone stairs, drainage improvements, timber edgings, a visitor overlook, and related landscaping/erosion control measures. (SBC Dec., ¶ 4).

5. The Lower Sherman Parking Area component included demolition and removal of existing structures and hardscape, construction of approximately 300 linear feet of concrete retaining wall with rock facing, realignment of the General's Highway, construction of a visitor comfort station, and related landscaping/erosion control measures. (SBC Dec., ¶ 4).

6. The NPS was responsible for the entire design of this Project and the Project plans and specifications were a combined product of internal design efforts by NPS personnel as well as by private designers retained by the NPS. (DMS Dec., ¶¶ 5-6).

7. The NPS issued a Request for Proposal ("RFP") for the Project in February 2001. (SBC Dec., ¶ 5).

8. In late February 2001, Remcon received a set of plans and specifications for the Project. (SBC Dec., ¶ 5).

9. Remcon, having previously worked for the NPS in the park as a subcontractor, based its responsive proposal to the NPS on the information contained within these documents, including geotechnical reports and quantity estimates for removal and hauling of material, as well as its general familiarity with the isolated and distant locale of the park from construction resources. (SBC Dec., ¶ 5).

10. Based upon the timing of the availability of the contract documents, and the required submission of proposals, Remcon, and all other prospective bidders, were prevented from conducting a site investigation to confirm the accuracy, or to uncover any

observable discrepancy, between the plans and specifications and the Project site. (SBC Dec., ¶ 6; DMS Dec., ¶ 6).

11. The Project site is in an area adjacent to a heavily visited national treasure (the General Sherman Tree), and had limited construction access and a limited construction season. (SBC Dec., ¶ 7).

12. Instead of being able to work all or most months of the year, Remcon anticipated a limited construction season depending on the extent and duration of winter precipitation and temperature. (SBC Dec., ¶ 7).

13. Realistically, the construction season ranged from late May/early June through October, a duration of five or six months. (SBC Dec., ¶ 7).

14. The NPS RFP allowed less than three construction seasons to perform the work. (SBC Dec., ¶ 7).

15. The NPS awarded the contract to Remcon on May 15, 2001 and issued a Notice to Proceed on June 11, 2001. The completion date was in August, 2003. (SBC Dec., ¶ 7).

16. Remcon's submitted as-planned schedule called for all work on the Upper Sherman Area to be completed in the 2001 season and the Lower Sherman Area to be completed in the 2002 season. (SBC Dec., ¶ 8; TWL Dec., ¶ 3(b)(d) and (e)).

17. The NPS never questioned the logic of Remcon's as-planned schedule and its construction manager praised its reasonableness and content. (SBC Dec., ¶ 8; TWL Dec., ¶ 3(b)(d) and (e)).

18. Prior to the issuance of the Notice to Proceed, Athena Demetry of the NPS, a field biologist, marked all trees in the virgin forest which were to be removed by Remcon during its clearing and grubbing operation (including logging) for construction of the Upper Sherman Access Road and Parking Areas. (SBC Dec., ¶ 10; TWL Dec., ¶ 3(b) and (f); DMS Dec., ¶¶ 6, 8).

19. While Remcon personnel occasionally walked the right-of-way with Ms. Demetry, and "assisted" her by placing the blue ribbons on trees which she determined were to be removed, the determination of which trees were to be removed was, by contract, and action in the field, exclusively the government's pursuant to section 1110, Part 1.04 A-F of the specifications. (SBC Dec., ¶ 10; TWL Dec., ¶3(b) and (f); DMS Dec., ¶¶ 6, 8).

20. On June 11, 2001, the date the NTP was issued, Remcon began falling and logging the trees marked by Ms. Demetry. (SBC Dec., ¶ 11).

21. As the clearing operations proceeded, Remcon's surveyor, Guiliani & Kull ("G&K"), began to lay out the Upper Sherman Access Road and Parking Areas. G&K immediately discovered that about 600 feet of the road, as shown in the NPS plans and specifications, did not match the clearing limits that had been laid out by Ms. Demetry in the field. (SBC Dec., ¶ 11).

22. By June, 2001, Remcon had already cut and removed the trees that Ms. Demetry had marked for removal. (SBC Dec., ¶12; TWL Dec., ¶3; DMS Dec., ¶¶ 3, 4, 6, 7, and 8).

23. At the very beginning of the Project, there was a significant discrepancy, between Stations 24 and 30 (approximately 600 lineal feet) between the area Remcon had cleared per Ms. Demetry's direction and where the NPS plans and specifications called for the access road to be constructed. (SBC Dec., ¶12; TWL Dec., ¶3; DMS Dec., ¶¶ 3-8).

24. This discrepancy, for which Remcon had no responsibility, initiated a series of re-designs and other problems that impacted Remcon's ability to schedule and complete its work as it had originally planned. (SBC Dec., ¶12; TWL Dec., ¶3; DMS Dec., ¶¶ 3-8).

25. Remcon has not been compensated in time or money for virtually any of

the costs or delay impacts that flowed from those changes between Stations 24 and 30. (SBC Dec., ¶¶ 1-61; TWL Dec., ¶3-6; DMS Dec., ¶¶ 3-7).

26. The limited compensation that has been received for the resulting extra work and delays was also belatedly received over a year after the extra work occurred. (SBC Dec., ¶¶ 1-61; TWL Dec., ¶3-6; DMS Dec., ¶¶ 3-7).

27. The critical path on Remcon's as-planned schedule commenced with the clearing of trees and pioneering of the Upper Sherman access road and parking lots. It then transitioned to the construction of the comfort station and related improvements for the balance of 2001. (SBC Dec., ¶9; TWL Dec., ¶3-5).

28. But for the myriad of design deficiencies encountered, and directed performance of extra work and construction changes, the Upper Sherman work would have been completed by the end of the 2001 construction season. (SBC Dec., ¶ 9; TWL Dec., ¶¶ 3-5).

29. The trees, designated by Ms. Demetry to be removed along the access road right-of-way, between Stations 24 and 30, were in a location up to fifteen feet off of the right-of-way set forth in the plans. (SBC Dec., ¶ 13; TWL Dec., ¶3(f); DMS Dec., ¶ 3, 4, 6, 7, and 8).

30. As a result of the trees being in a location up to fifteen feet off the right of way set forth in the plans, the access road needed to be re-surveyed by Remcon's surveyor, and the road was relocated by the government to a location into the hill from the planned locale. (SBC Dec., ¶ 13-17; TWL Dec., ¶3(f); DMS Dec., ¶ 3, 4, 6, 7, and 8).

31. The content of Modification No. 4, in its Justification section, admits that the cause of the road relocation was not due to Remcon. The government wrote:

> On July 31, 2001, the Contractor's submitted a change order request for "Additional Survey Work" for their Surveying Subcontractor (Giuliani & Kull). This request was based upon the initial Access Road centerline staking per the contract drawings. After the initial staking it was discovered that the centerline with all required cut boundaries did not fall within the earlier cleared limited as delineated by Park staff. Thus the

> Government agreed that the centerline had to be revised in order to fit all earthwork into the already cleared limits. Therefore the surveyor had to re-staked this revised centerline and are entitle to be compensated for their additional work. In addition, this work had to be completed at this time to prevent additional construction costs associated with equipment stoppage and delays. The revised road layout and re-staking reduced construction costs since additional clearing and tree removal was not required. Therefore, this work is necessary in order to construct the roadway alignment in the location shown on the construction drawings. This change is in the best interest of the Government and I recommend it be approved.

(SBC Dec., ¶ 13; TWL Dec., ¶3(f); DMS Dec., ¶ 3, 4, 6, 7, and 8).

32. The burn pit in the Upper Parking Area, identified in the contract documents as containing approximately 2000 cubic yards, actually contained over 6000 cubic yards, causing delay and over $300,000 in additional costs. (SBC Dec., ¶ 18; TWL Dec., ¶ 3(f)); DMS Dec., ¶¶ 3 and 6)

33. The extra costs and delays, incurred and experienced in July, 2001, regarding the burn pit in the Upper Parking Area were not recognized by the government until September 2002 when Modification No. 4 was issued. (SBC Dec., ¶ 18, TWL ¶3(f); DMS Dec., ¶¶ 3 and 6).

34. In Modification No. 4, the government's justification states:

> On July 12, 2001 while grading the Upper Parking Lot the Contractor encountered unknown miscellaneous buried debris in the easterly end of the upper parking lot. The buried debris consisted of logs, stumps, tires and miscellaneous material that had been buried in this area over the years. The Denver Service Center Project Manager and Lead Designer inspected this area on July 16, 2001 and determined that the buried material would be detrimental to the construction of the parking lot. All agreed that a parking lot constructed upon structurally unsound material would eventually fail causing future maintenance problems for the Park. Therefore, the upper 5-feet of the existing grade, which contained unsuitable debris had to be removed. This removal included the sorting and screening of the material cited above. This work is necessary at this time so that the parking lot construction can be continued without delay to the project. This change is in the best interest of the Government and I recommend it be approved.

(SBC Dec., ¶ 18).

35. Once the road was re-surveyed and pioneered, and the burn pit extra work

performed, Remcon sought to excavate the access road to subgrade. (SBC Dec., ¶ 19).

36. As of July 30, 2001, Remcon encountered granitic rock which could not be "ripped" with a D-8 Dozer. (SBC Dec., ¶ 19; TWL Dec., ¶3(f); DMS Dec., ¶¶ 3, 4, 6, and 7).

37. The soils report for the Project prepared by Kleinfelder expressly stated that all earthen material to be encountered to construct the road could be ripped and that blasting would not be necessary except in isolated instances ("floater rocks"). (SBC Dec., ¶ 19).

38. Remcon encountered material as of July 30, 2001 that was not a floater. (SBC Dec., ¶ 19).

39. Remcon encountered, between Stations 24 and 30 (a distance of 600 lineal feet) solid granitic rock which required blasting. (SBC Dec., ¶ 19; TWL Dec., ¶3(f); DMS Dec., ¶¶ 3, 4, 6 and 7).

40. The blasting occurred, continuously, until September 13, 2001, a duration of over six weeks, which was twice the planned earthwork duration for the entire Project. (SBC Dec., ¶ 20; TWL Dec., ¶3(f))

41. The NPS, for eighteen months, disputed that Remcon encountered a differing site condition relating to the granitic rock which required blasting. (SBC Dec., ¶ 20; TWL Dec., ¶3(f)).

42. Ultimately, by unilateral modification No. 6, dated February, 2003, the Contracting Officer recognized that a Type I differing site condition (DSC) was encountered regarding the granitic rock. (SBC Dec., ¶ 20; TWL Dec., ¶3(f); DMS Dec., ¶¶ 3, 4, and 9).

43. Modification No. 6 only granted Remcon $84,000 in extra compensation and <u>no</u> time extension. SBC Dec., ¶ 20; (SBC Dec., ¶ 20; TWL Dec., ¶3(f); DMS Dec., ¶¶ 3, 4, and 9).

44. Instead of taking 21 calendar days to excavate the road and parking lots, as

scheduled in the as-planned schedule, the activity took more than thirteen months, and the costs for excavation exceeded $700,000. (SBC Dec., ¶ 20-21; TWL Dec., ¶3(f)).

45. The government's belated recognition of the extra work in the deep cut area, as well as its concurrent failure to issue any time extensions and/or recognize the actual damages incurred, constituted constructive acceleration and a constructive change, both of which are a material breach of contract. (SBC Dec., ¶ 19-21; TWL Dec., ¶ 3-6).

46. Remcon's submitted on June 28, 2003 a certified claim to the Contracting Officer. (SBC Dec., ¶ 56)

47. Remcon's June 28, 2003 claim detailed the facts which support Remcon's breach of contract claims, and had been received by the Contracting Officer mere weeks prior to the issuance of the cure notice. (SBC Dec., ¶ 56).

48. Prior to issuing the cure notice, no response to the Remcon certified claim was made by the government. (SBC Dec., ¶ 56).

49. The Upper Sherman Tree Trail was the subject of multiple and continuing design changes. (SBC Dec., ¶ 22; TWL Dec., ¶4; DMS Dec., ¶ 5).

50. While some work was able to be performed in 2001 and 2002, the Project record details the multiple and continuing changes issued by the NPS to the trail points and the trail's physical location and dimensions throughout 2001 and 2002. (SBC Dec., ¶ 22; TWL Dec., ¶4; DMS Dec., ¶ 5).

51. It was not until November 20, 2002 (after Remcon's as-planned schedule demonstrated that Remcon wold be complete with the <u>entire</u> Project, both Upper and Lower areas) that the Contracting Officer signed and issued Modification No. 5 which officially modified the trial's design and finalized the design changes which had been going on for almost two years. (SBC Dec., ¶ 22; TWL Dec., ¶4; DMS Dec., ¶¶ 3 and 5).

52. The timing of the issuance of Modification No. 5 was too late for Remcon to proceed in 2002 as winter weather had commenced (SBC Dec., ¶ 22; TWL Dec., ¶4).

53. The issuance of Modification No. 5 restrained Remcon from completing

the trail until 2003's construction season, as the design changes had to be implemented before the balance of the trail could be built. (SBC Dec., ¶ 22; TWL Dec., ¶4; DMS Dec., ¶ 5).

54. No time extension was granted by the government when it issued Modification No. 5. (SBC Dec., ¶ 22; TWL Dec., ¶4).

55. Recognizing that the government's conduct regarding delays to the Project was a material breach, and to protect itself, Remcon signed Modification No. 5 on October 18, 2002 and forwarded it to the Contracting Officer on October 21, 2002 along with a cover letter expressly reserving Remcon's rights to receive time extensions and delay damages resulting from government breaches of contract, constructive acceleration, directed changes, constructive changes and the additional work performed and materials handled due to defective and deficient contract documents, including the Sherman Tree Trail. (SBC Dec., ¶ 23; TWL Dec., ¶ 4).

56. In 2001, Remcon's Project superintendent notified Bob Russell, the NPS designated representative, of a substantial overrun in quantity of excavated material as result of a differing site condition and errors in design assumptions. (SBC Dec., ¶ 24; TWL Dec., ¶ 3).

57. The NPS did not provide Remcon with direction to mitigate the overrun in excavated material problem until mid-season 2002. (SBC Dec., ¶ 24; TWL Dec., ¶ 3; DMS Dec., ¶¶ 3-7).

58. As a consequence of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and the Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation. (SBC Dec., ¶ 24; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-7).

59. As a consequence of the excess material to be removed and the lack of timely direction from the NPS, Remcon's operations were severely impacted, resulting in

an inefficient use of Remcon's planned labor and equipment and Project supervision and an immediate negative impact to Remcon's schedule. (SBC Dec., ¶ 24; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-7).

60. The constant NPS design revisions, occasioned by defective plans and specifications, quantity, and the design changes severely impacted Remcon's ability to schedule or perform the Project with any semblance of efficiency or economy. (SBC Dec., ¶ 25; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-7).

61. Within the first three weeks of work on the Project, NPS changes and deficiencies in the contract documents meant that completion of the 2001 work schedule, as planned by Remcon and accepted by the NPS, was impracticable. (SBC Dec., ¶ 25; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-7).

62. The necessity for blasting in 2001 adversely impacted Remcon's ability to stay on schedule, and shifted the critical path to all earthwork activities. (SBC Dec., ¶ 26; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-4).

63. Remcon submitted its formal request for a change order for the DSC on August 20, 2001 to recover the added cost and time of the DSC. (SBC Dec., ¶ 27; TWL Dec., ¶ 3; DMS Dec., ¶ 3-4).

64. Willie DeOcampo and Rodney Keiscome admitted in their depositions that the NPS failed to timely respond and investigate Remcon's claim of a DSC in 2001, and did not respond until 2002. (DMS Decl., ¶¶ 3-4).

65. The NPS ultimately issued Unilateral Modification No. 6, dated February, 2003, which validated Remcon's DSC claim. (SBC Dec., ¶ 27; TWL Dec., ¶ 3; DMS Dec., ¶¶ 3-4).

67. Modification No. 6 only authorized payment of $85,000 of Remcon's $700,000 DSC claim, and did not grant any time extensions. (SBC Dec., ¶ 20; TWL Dec., ¶ 3; DMS Dec., ¶¶ 3,4, and 9).

68. Between the first and second construction seasons (December 2001 and

April 2002), Remcon traveled to Denver to meet with NPS personnel on three different occasions to discuss: extra work performed but not compensated or turned into a modification; design problems; quantity overruns; and payment of Remcon's claims that were significantly impacting the Project. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-4).

69. During the three visits/meetings in Denver between the first and second construction seasons, Remcon notified the NPS that final slope grades had not been completed and additional earthwork would be needed to meet the designed slope minimums. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4).

70. Despite NPS personnel agreeing to review the impact issues and representing they would timely respond and provide necessary design changes and/or issuing the appropriate revised drawings and modifications, little or no information was forthcoming before the second construction season began. (SBC Dec., ¶ 28; TWL Dec., ¶ 3-4; DMS Dec., ¶¶ 3-7).

71. The NPS's lack of information included what to do with the large hole caused by the burn pit excavation which was created in July, 2001 and for which no direction had been received as well as the excess quantity of material encountered. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

72. As a result, Remcon was unable to publish an accurate, updated schedule prior to the 2002 construction seasons as it was missing critical information to enable it to plan its work. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4).

73. Based upon the contract documents, the Project was, in essence, planned by the designers to be a balanced job (requiring neither import of earthen materials nor their export, except for the planned 2000 cubic years of burn pit materials planned to be off-hauled as well as 6800 cubic yards to be hauled within the park to a designated locale). (SBC Dec., ¶ 29; DMS Dec., ¶ 3).

74. The project design was flawed. (SBC Dec., ¶ 29; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

75. Thousands of yards of excess material was excavated, stockpiled, handled multiple times, and had to be disposed of after direction was provided almost one year after the design errors were discovered. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

76. Depositions of the designers has disclosed that a 40% compaction factor used by the designers to calculate quantities and determine that this Project was, in essence, a balanced job, even though the material to be excavated was decomposed granite. DMS Dec., ¶¶ 3-7).

77. The designers' assumptions regarding a 40% compaction factor were materially flawed, and they have admitted this in their depositions. (DMS Dec., ¶¶ 3-7).

78. The designers' flawed assumption regarding the 40% compaction factor resulted in thousands of yards of excess material to be excavated, stockpiled, handled multiple times. (DMS Dec., ¶¶ 3-7).

79. Remcon re-mobilized to the Project in mid May 2002. (SBC Dec., ¶ 30).

80. A partnering meeting was held with all Project participants in the Park in May, 2002. (SBC Dec., ¶ 30).

81. The May, 2002 partnering meeting involved a comprehensive job walk so that the problems experienced in 2001 could be actually seen by the Contracting Officer and the Contracting Officer's Representative. (SBC Dec., ¶ 30).

82. During the partnering meeting, Remcon requested direction on how to address all of the issues then continuing to be unresolved, including how to proceed through the deep cut area, including how to address slope problems. (SBC Dec., ¶ 30).

83. When the NPS continued to fail to respond, Remcon began issuing a series of requests for information seeking direction in the deep cut area. (SBC Dec., ¶ 30).

84. Throughout June, 2002 the NPS failed to respond to any of the RFIs or to provide any direction to Remcon on how to correct the slope problems resulting from earlier design deficiencies. (SBC Dec., ¶ 30; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-4).

85. In May, 2002, Remcon sought direction on what to do with the thousands of yards of excess material on site. (SBC Dec., ¶ 30; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-4).

86. Despite being raised as a potential solution in May, 2002 that some of the excess material could be used to raise the designated finish elevation of the parking lots, this extra work was not directed until June 28, 2002, again delaying the work. (SBC Dec., ¶ 30; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

87. Modification No. 4, which addressed raising the elevation of the parking lots, was not issued until September, 2002 even though agreement on all terms was reached in early June, 2002. (SBC Dec., ¶ 30; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-5).

88. The issue of excess material was raised by government personnel as of July 2, 2001. (SBC Dec., ¶ 31; TWL Dec., ¶ 3-4; DMS Dec., ¶3-5).

89. It was not until June 28, 2002, a delay of 361 days, that the Contracting Officer dealt with the excess material when he issued a directive letter to Remcon to use some of it to raise the finish grade of the upper parking areas. (SBC Dec., ¶ 31; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-5).

90. Remcon, which claimed that the events of 2001 had materially depleted its capital to perform work, sought written assurance from the Contracting Officer that the modification for the directed extra work to raise the parking lots would be immediately processed so Remcon could bill for the work and get paid no later than August, 2002. (SBC Dec., ¶ 31; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-5).

91. The Contracting Officer gave this written assurance by letter dated July 16, 2002, but he did not honor his representation as the modification (No. 4) was not issued until September 14, 2002, and Remcon could not bill for the work until October, 2002.

(SBC Dec., ¶ 31; DMS Dec., ¶ 4).

92. In their depositions, neither Willie DeOcampo, the Contracting Officer's Representative, nor Rod Keiscome, the Contracting Officer, could explain or justify their conduct which hindered and delayed Remcon and offered no excuse other than it did not get done. (DMS Dec., ¶¶ 3-4).

93. By the end of June 2002, the NPS-caused impacts and delays effectively prevented Remcon from accomplishing any productive work on the Project. (SBC Dec., ¶ 32; TWL Dec., ¶¶ 3-6; DMS Dec., ¶¶ 3-7).

94. Remcon published on June 27, 2002 an updated schedule but it was a guess as much as a plan due to the volume of problems and hindrances affecting the ability to progress the work. (SBC Dec., ¶ 32; TWL Dec., ¶¶ 3-6).

95. In June, 2002. lead inspector, Bob Russell, became abusive and lost control and was removed from the Project effective July 4, 2002. (SBC Dec., ¶ 32).

96. In an attempt to push forward, Remcon asked that it be allowed to begin work on the Lower Sherman Trail component. The NPS denied this request. (SBC Dec., ¶ 32; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-4).

97. In June, 2002,, Remcon gave the Contracting Officer and his representative comprehensive notice of the multiple problems on the Project and their impacts on Remcon's ability to continue with the Project. (SBC Dec., ¶ 33).

98. When no substantive response was forthcoming, Remcon notified the Contracting Officer that work would cease unless circumstances swiftly changed. (SBC Dec., ¶ 33).

99. On July 3, 2002, Remcon wrote the Contracting Officer requesting an emergency on-site meeting. (SBC Dec., ¶ 33).

100. A new Project Manager, Mike Giller of the NPS Denver Service Center, then arrived on site on July 10, 2002. (SBC Dec., ¶ 33).

101. As of this date, Mr. Russell was gone and Mr. Giller did not have an

opportunity to discuss with Mr. Russell what had occurred over the proceeding 14 months. (SBC Dec., ¶ 33).

102. Mr. Giller walked the site with Stephen Christensen and his lead Project personnel and, having the problems explained to him orally directed Remcon to "field fit" the Upper Sherman Access Road to the existing natural features. (SBC Dec., ¶ 33).

103. This direction was confirmed in Remcon's letter to the NPS on July 11, 2002, more than 8 months after those problems had been brought to the attention of the NPS. Even then, Remcon had only oral instructions, i.e., "Just make it fit." (SBC Dec., ¶ 33).

104. In July, 2002, Remcon's grading superintendent/foreman, Mike Kitchell and Mark Penrose, laid the roadway alignment out using the design staking information provided by the NPS as adjusted for field conditions. (SBC Dec., ¶ 34).

105. By July 25, 2002, Remcon encountered still further problems in fitting the design to field conditions. (SBC Dec., ¶ 34).

106. A new assistant inspector, Russell Belknap, had arrived onsite to replace Bob Russell's subordinate, Loren Mangrum, who had assumed Bob Russell's role. (SBC Dec., ¶ 34).

107. Mr. Belknap walked the site with Mr. Kitchell to review the field conditions and determine what could be done in order that Remcon could proceed. (SBC Dec., ¶ 34).

108. Mr. Belknap personally directed Mr. Kitchell to make additional changes to the roadway alignment. (SBC Dec., ¶ 34).

109. In early August 2002 the NPS requested that Remcon provide survey data for the access road as built. (SBC Dec., ¶ 35).

110. Remcon had its surveyor return to the Project and survey the entire access road. (SBC Dec., ¶ 35).

111. The new survey data was sent to the NPS in Denver on August 14, 2002.

(SBC Dec., ¶ 35).

112. The NPS then orally advised Remcon that it was going to issue still more new design changes (Design No. 5) to correct what it perceived were failures to properly build the road. (SBC Dec., ¶ 35).

113. The NPS took the position that it was going to issue still more new design changes despite Remcon following dozens of oral and written directives of NPS on-site representatives to field fit the road as needed. (SBC Dec., ¶ 35).

114. At no time during the extended discussions with NPS throughout July 2002 (when Remcon was struggling to make progress) did any NPS personnel insist that Remcon follow the original (and unbuildable) design. (SBC Dec., ¶ 35

115. The NPS provided the new Design No. 5 requirements on September 6, 2002. (SBC Dec., ¶ 35).

116. Remcon had its surveyor again lay out the road. (SBC Dec., ¶ 35).

117. In most instances only minor extra work was required to meet the latest (the fifth design) requirements other than in the deep cut. (SBC Dec., ¶ 35).

118. Due to the originally deficient design and consequent re-designs, Remcon was forced to delay its paving operations. (SBC Dec., ¶ 35).

119. As weather became an impediment to completing paving operations (paving can only occur within certain temperature ranges), Remcon was forced to wait for the following 2003 construction season to complete paving operations. (SBC Dec., ¶ 35).

120. The Sherman Tree Trail design was not revised and issued to Remcon to construct until November, 2002, after the 2002 construction season was over. This re-design delayed the Project two years. (SBC Dec., ¶ 36; TWL Dec., ¶ 4).

121. The combination of the NPS caused delays, and its concurrent refusal to pay for all of the extra work its representatives had directed Remcon to perform placed Remcon in dire financial duress at the end of the 2002 construction season. (SBC Dec., ¶ 37; TWL Dec., ¶¶ 4-6).

121. By the end of the 2002 construction seasons, the job was incomplete, Remcon was prevented from bidding and obtaining further work, and its financial condition had been severely jeopardized by NPS' refusal to timely and properly pay Remcon for extra work performed. (SBC Dec., ¶ 37).

121. Before mobilizing for the 2003 construction season, Remcon wrote a series of letters to the Contracting Officer and/or his representatives outlining the cost and schedule impacts that resulted from deficiencies in the contract documents and the numerous redesigns and other changes directly attributable to NPS. (SBC Dec., ¶¶ 38-55)

122. The letters sent by Remcon to the NPS from October, 2002 to July, 2003 placed the NPS on notice of claims, detailed the government's material breaches of contract, advised the government of Remcon's precarious financial status, and advised the NPS that lack of payment and government caused delays prevented Remcon from performing work in 2003. (SBC Dec., ¶¶ 38-55, and 57-58)

123. After repeated attempts to resolve its disputes with the NPS, Remcon finally submitted a multi volume, comprehensive certified claim to the Contracting Officer on June 28, 2003. That claim outlined in excruciating detail the cost and time impacts incurred by Remcon on the Project. The total of that claim was $3,091,799.60. (SBC Dec., ¶ 56).

124. The NPS' response to Remcon's certified claim was to issue a cure notice as a pretext for a default termination. (SBC Dec., ¶ 56).

125. Remcon sought ADR and the NPS refused to participate in the ADR process. (SBC Dec., ¶ 59).

126. Mr. Keiscome told Steve Christensen that "we don't need any third party assistance." (SBC Dec., ¶ 59).

127. When the Contracting Officer denied the request for ADR, coupled with his failure to issue any financial renumeration or time extensions, either bilaterally or unilaterally, in response to the June 28, 2003 certified claim, Remcon was disabled from

mobilizing to the Project, as it could no longer pay employees if it did so mobilize. (SBC Dec., ¶ 59).

128. Remcon sought ADR due to its precarious financial condition caused by NPS's actions over the course of the 2001 and 2002 construction seasons. (SBC Dec., ¶ 59).

129. Remcon simply did not have the financial ability to mobilize for the 2003 season unless NPS issued payments for existing work performed and time extensions due, and Remcon was trying desperately to obtain payments from Defendant through the ADR process. (SBC Dec., ¶ 59).

130. When the Contracting Officer issued the cure notice, Remcon had already supplied him with reams of information concerning deficient plans and specifications, NPS-caused delays and impacts to Remcon. (SBC Dec., ¶ 33-59; TWL Dec., ¶¶3-6).

131. Although the NPS failed to grant Remcon virtually any time extensions, the contract time should have been extended, as of the end of 2002, through the 2004 construction season. (SBC Dec., ¶ 60; TWL Dec., ¶¶ 3-6; DMS Dec., ¶¶ 3-4 ).

132. Remcon's income and costs from all other Projects, during its performance of work on this Project (from June, 2001, when the NTP was issued, through July, 2003) shows a net increase in cash to Plaintiff of $1,413,523. (SBC Dec., ¶ 61).

133. Remcon, but for this Project, was very successful, and its financial inability to continue was exclusively caused by this Project. (SBC Dec., ¶ 61).

134. Remcon was not able to perform work in accordance with its original as-planned schedule due to government mistakes, errors, and maladministration, design errors, government caused delays, and the government's multiple material breaches of contract. (SBC Dec., ¶¶ 1-61 and Exhibits 1-30; TWL Dec., ¶¶ 1-8 and Exhibit 1-9; and DMS Dec., ¶¶1-9 and Exhibits 1-7).

135. The NPS' multiple material breaches of contract excused Remcon's performance during the 2003 construction season. (SBC Dec., ¶¶ 1-61 and Exhibits 1-30;

 

TWL Dec., ¶¶ 1-8 and Exhibit 1-9; and DMS Dec., ¶¶ 1-9 and Exhibits 1-7).

136. The NPS' cure notice was unjustified and invalid due to the NPS' prior multiple material breaches of contract. (SBC Dec., ¶¶ 1-61 and Exhibits 1-30; TWL Dec., ¶¶ 1-8 and Exhibit 1-9; and DMS Dec., ¶¶ 1-9 and Exhibits 1-7).

137. The disputes clause did not apply to Remcon's breach of contract claims, and thus Remcon did not violate the disputes clause of the contract. (SBC Dec., ¶¶ 1-61 and Exhibits 1-30; TWL Dec., ¶¶ 1-8 and Exhibit 1-9; and DMS Dec., ¶¶ 1-9 and Exhibits 1-7).

DATED: July 21, 2005

MURPHY AUSTIN ADAMS SCHOENFELD LLP

D. MICHAEL SCHOENFELD

Attorneys for Plaintiff
REMEDIATION CONSTRUCTORS, INC.

MURPHY AUSTIN ADAMS SCHOENFELD LLP
1000 G St., Third Floor
P. O. Box 1319
Sacramento, California 95812-1319
Telephone: (916) 446-2300
Facsimile: (916) 503-4000



276563v1WP/1918.001