02/08/2005 09:16 MURPHY AUSTIN ADAMS → 17204490334 NO.913 P006
Received: 2/ 8/05 9:11AM; -> Murphy,Austin,Adams,Schoenfeld ; Page 6
02-08-05 09:12am From- T-508 P.06/07 F-201 165

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 34 | 52 EA | 43 EA | Salvage Landscape Logs | $73.00 | $3,796.00 | $657.00 | $3,139.00 |
| 36 | 63441 SF | 55282 SF | Remove, Stockpile & Place Litter & Duff | $0.30 | $19,032.30 | $2,447.70 | $16,584.60 |
| 37 | 1 LS | LS | Excavation and Grading | LS | $350,000.00 | $35,000.00 | $315,000.00 |
| 40 | 1300 CF | 0 CF | Compaction Grouting | $20.00 | $26,000.00 | $26,000.00 | $0.00 |
| 41 | 88125 SF | 4317 SF | Soil Amendment & Cultivation | $0.23 | $20,268.75 | $19,275.84 | $992.91 |
| 42 | 28438 SF | 20229 SF | Cultivate Soil (no amendments) | $0.10 | $2,843.80 | $820.90 | $2,022.90 |
| 43 | 97279 SF | 19739 SF | Wood Chip Placement | $0.20 | $19,455.80 | $15,508.00 | $3,947.80 |
| 44 | 52 EA | 43 EA | Log Moving and Placement | $210.00 | $10,920.00 | $1,890.00 | $9,030.00 |
| 45 | 6331 LF | 3964 LF | Silt Protection | $8.00 | $50,648.00 | $18,936.00 | $31,712.00 |
| 46 | 146838 SF | 124335 SF | Soil Retention Blanket | $0.40 | $58,735.20 | $9,001.20 | $49,734.00 |
| 49 | 133 SY | 110 SY | Dispersal Riprap | $90.00 | $11,970.00 | $2,070.00 | $9,900.00 |
| 52 | 252 SF | 0 SF | Low Water Crossing | $14.00 | $3,528.00 | $3,528.00 | $0.00 |
| 54 | 170 LF | 38 LF | 2" PVC Serviceline | $20.00 | $3,400.00 | $2,640.00 | $760.00 |
| 55 | 2 EA | 0 EA | 2" Gate Valve | $539.00 | $1,078.00 | $1,078.00 | $0.00 |
| 58 | 2 EA | 1 EA | 2" Curb Stop | $230.00 | $460.00 | $230.00 | $230.00 |
| 64 | 957 LF | 938 LF | 24" CMP | $64.00 | $61,248.00 | $1,216.00 | $60,032.00 |
| 65 | 2 EA | 1 EA | Stone Headwall | $6,458.00 | $12,916.00 | $6,458.00 | $6,458.00 |
| 67 | 98 LF | 0 LF | 6" Non-perforated Drain Pipe | $21.00 | $2,058.00 | $2,058.00 | $0.00 |
| 69 | 9 EA | 8 EA | Concrete Drop Inlet - Type B | $3,500.00 | $31,500.00 | $3,500.00 | $28,000.00 |
| 71 | 10376 TN | 9640 TN | Aggregate Base Course | $43.00 | $446,168.00 | $31,648.00 | $414,520.00 |
| 72 | 4635 TN | 4308 TN | Asphalt Concrete Pavement | $104.00 | $482,040.00 | $34,008.00 | $448,032.00 |
| 75 | 1 LS | 1 LS | Traffic Markings | LS | $17,500.00 | $6,125.00 | $11,375.00 |
| 76 | 4126 LF | 3345 LF | Stone Curb | $97.00 | $400,222.00 | $75,757.00 | $324,465.00 |
| 77 | 855 LF | 73 LF | Flush Stone Curb | $126.00 | $107,730.00 | $98,532.00 | $9,198.00 |
| 78 | 69 EA | 37 EA | Snow Pole Sleeves | $104.00 | $7,176.00 | $3,328.00 | $3,848.00 |
| 79 | 90 SY | 0 SY | Stone Swale | $580.00 | $52,200.00 | $52,200.00 | $0.00 |
| 81 | 1546 LF | 0 LF | Stone Edging | $56.00 | $86,576.00 | $86,576.00 | $0.00 |
| 82 | 1174 TN | 679 TN | Bituminous Walks | $122.00 | $143,228.00 | $60,390.00 | $82,838.00 |
| 83 | 9406 LF | 5964 LF | Timber Edging | $7.00 | $65,842.00 | $24,094.00 | $41,748.00 |
| 84 | 458 SY | 81 SY | Stone Paving | $393.00 | $179,994.00 | $148,161.00 | $31,833.00 |
| 85 | LS | LS | Irrigation Connection | LS | $3,480.00 | $3,480.00 | $0.00 |
| 86 | 300 LF | 0 LF | 2" Above Ground Irrigation Main | $5.00 | $1,500.00 | $1,500.00 | $0.00 |
| 87 | 100 LF | 0 LF | 2" Underground Irrigation Main | $20.00 | $2,000.00 | $2,000.00 | $0.00 |
| 88 | 1260 LF | 0 LF | 1-1/2" PVC Irrigation Main Above Ground | $4.00 | $5,040.00 | $5,040.00 | $0.00 |
| 89 | 6 EA | 0 EA | Battery operated Controller and Automatic Valve | $1,500.00 | $9,000.00 | $9,000.00 | $0.00 |
| 90 | 60 LF | 0 LF | 1-1/2" Galv. Steel Irrigation Main Underground | $24.00 | $1,440.00 | $1,440.00 | $0.00 |
| 96 | 3648 LF | 320 LF | Split Rail Fence | $42.00 | $153,216.00 | $139,776.00 | $13,440.00 |
| 97 | 1136 LF | 0 LF | Split Rail Fence-Salvaged Material | $24.00 | $27,264.00 | $27,264.00 | $0.00 |
| 98 | 1271 LF | 0 LF | Split Rail Fence-Modify Existing | $9.00 | $11,439.00 | $11,439.00 | $0.00 |
| 99 | 1434 LF | 0 LF | Temporary Rope Fence | $7.00 | $10,038.00 | $10,038.00 | $0.00 |
| 101 | 1 LS | 1 LS | Signature Boulders | LS | $30,000.00 | $27,000.00 | $3,000.00 |
| 102 | 1 LS | 1 LS | Boulder Revetment | LS | $151,145.00 | $30,229.00 | $120,916.00 |
| 105 | 3 EA | 1 EA | Kiosk | $16,640.00 | $49,920.00 | $33,280.00 | $16,640.00 |
| 107 | 1 EA | 0 EA | Boardwalk - Type One | $29,935.00 | $29,935.00 | $29,935.00 | $0.00 |
| 109 | 21 EA | 0 EA | Traffic Sign with 4x4 Post | $158.00 | $3,318.00 | $3,318.00 | $0.00 |
| 110 | 15 EA | 0 EA | Traffic and Parking Sign with 4x6 Post | $171.00 | $2,565.00 | $2,565.00 | $0.00 |

REM000016123

02/08/2005 09:16 MURPHY AUSTIN ADAMS → 17204490334 NO.913 D007
Received: 2/ 8/05 9:11AM; -> Murphy,Austin,Adams,Schoenfeld ; Page 166

02-08-05 08:12am From- T-508 P.07/07 F-281

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 111 | 14 EA | 0 EA | Traffic Sign with 4x4 Post (Government Furn Sign Panel) | $105.00 | $1,470.00 | $1,470.00 | $0.00 |
| 112 | 8 EA | 0 EA | Directional Sign | $375.00 | $3,000.00 | $3,000.00 | $0.00 |
| 113 | 8 EA | 1 EA | Wayside - Double Post | $156.00 | $1,248.00 | $1,092.00 | $156.00 |
| 115 | 3 EA | 1 EA | Wayside - Boulder or Log Mounted | $156.00 | $468.00 | $312.00 | $156.00 |
| 116 | 10 EA | 0 EA | Wayside Exhibit | $125.00 | $1,250.00 | $1,250.00 | $0.00 |
| 117 | 2800 FF | 0 FF | Concrete Wall with Mortared Stone (at General's Highway) | $309.00 | $865,200.00 | $865,200.00 | $0.00 |
| 118 | 238 FF | 0 FF | Concrete Wall with Mortared Stone (at Comfort Station) | $145.00 | $34,510.00 | $34,510.00 | $0.00 |
| 119 | 1866 FF | 1340 FF | Dry-Laid Stone Wall | $115.00 | $214,590.00 | $60,490.00 | $154,100.00 |
| 121 | 1047 LF | 851 LF | Stone Stairs | $250.00 | $261,750.00 | $49,000.00 | $212,750.00 |
| 122 | 1 LS | 0 LS | Boulder Handrails | LS | $7,035.00 | $7,035.00 | $0.00 |
| [illegible] | 1 LS | 1 LS | Small LS Gas System | LS | [illegible] | [illegible] | [illegible] |
| [illegible] | 2 EA | 1 EA | Transformer Pad | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | 1 LS | LS | Electrical Distribution to Lower Sherman Site | LS | $31,800.00 | $31,800.00 | $0.00 |
| 128 | 1 LS | LS | Pay Telephone for Lower Sherman Tree Site | LS | $2,110.00 | $2,110.00 | $0.00 |
| 130 | 1 LS | 0 LS | General's Highway Stone Headwall | LS | $87,000.00 | $87,000.00 | $0.00 |

$2,743,771.14

This modification Number 7 results in a decrease of ($2,743,771.14) in the contract amount. The revised contract amount is accordingly established as follows:

| | |
|---|---|
| Original Contract Amount: | $7,121,636.00 |
| Modification 1, Increase: | 317,850.00 |
| Modification 2, Increase: | 10,908.00 |
| Modification 3, Increase: | 345,209.92 |
| Modification 4, Increase: | 95,120.36 |
| Modification 5, Increase: | 26,880.00 |
| Modification 6, Increase: | 84,170.00 |
| Modification 7, Decrease: | (2,743,771.14) |
| | $5,258,003.14 |

Due to the deletion of work associated with this modification, the contract completion date is accordingly changed from August 28, 2003 to May 30, 2003.

## CONTRACTOR'S STATEMENT OF RELEASE

[illegible] all claims or obligations which now exist or which may hereafter arise, whether known or unknown, or which have or could have been asserted against the National Park Service or the Government as well as its officers and employees, in any form or forum, whether in law or equity, arising out of or resulting from this modification are hereby released, waived, and forever discharged.

SECTION 02230

LOGGING, CLEARING AND GRUBBING

## PART 1 GENERAL

### 1.1 DESCRIPTION

A. The work of this section consists of logging, clearing, grubbing, and removing and disposing of trees, vegetation, stumps and debris. The work also includes the removal, stockpiling and placement of litter and duff.

### 1.2 RELATED WORK

A. Log Placement, Soil Amendment, Cultivation and Wood Chips – Section 02363.

B. Silt Protection – Section 02370.

## PART 2 PRODUCTS

### 2.1 BACKFILL MATERIAL

A. Site excavation and grading as specified in Section 02310.

### 2.2 BORAX

1. Sporax (technical grade sodium tetraborate decahydrate) by Wilbur Ellis Co., Manteca, California, 209-982-4337, or approved equal.

## PART 3 EXECUTION

### 3.1 PROTECTION OF TREES AND PLANTS TO REMAIN

A. Section 01110 and Section 01351.

B. Notify the Contracting Officer three weeks before clearing any vegetation so the park can conduct plant salvage.

### 3.2 REMOVE, STOCKPILE AND PLACE LITTER AND DUFF

– EARTHWORK

A. Remove all litter and duff within the limits of disturbance. Windrow where possible for reuse at the completion of grading operations. Areas of the site not appropriate for windrow operations shall be stockpiled for later reuse. Collect any additional litter and duff required to cover all graded or disturbance areas within the construction limits. If sufficient material is not available from windrow or stockpiled material to cover all disturbed or graded area (except those areas specified for soil retention blanket or wood chips), collect from surrounding areas without removing all the litter/duff from the borrow sites. The Contracting Officer shall direct or identify locations for litter and duff collection. Place litter and duff upon completion of grading operations, in areas directed by the Contracting Officer. Areas regraded or disturbed surfaces shall be covered with a ½" to 1" depth of litter and duff except those areas specified for soil retention blanket or wood chips.

3 .3 CLEARING

A. After installing silt and tree protection, remove all trees, brush, and vegetation from areas designated and approved by the Contracting Officer to be cleared. As directed, trim low hanging, unsound, or unsightly branches on trees and shrubs designated to remain. Trim branches in accordance with ANSI A300 – 1995. Conifer stumps resulting from clearing operations shall be immediately treated with borax. Treat all stumps 3 inches in diameter and larger with borax at a rate of 1 pound per 50 square feet of surface area.

3 .4 GRUBBING

A. Remove all stumps, roots, and debris within areas to be paved, including stumps existing prior to this work.

B. In unpaved areas of fill, remove all debris. Where fills are less than 2 feet deep, grind or chip stump entirely to a depth of 18 inches below existing grade. Where fills exceed a depth of 2 feet, cut stump level 12 inches above original grade. After grinding, chipping or cutting, treat immediately with Borax as specified above.

C. In areas of no grade change, remove all debris, and grind or chip stump entirely to a depth of 18 inches below existing grade, and cover with Borax as specified above.

D. Stumps within the critical root zones of remaining trees shall be flush-cut and ground down to a minimum of 6 inches below original ground, as directed by Contracting Officer. Reapply borax to stumps immediately following cutting and grading.

E. Fill stump and root holes with suitable material with placement and compaction requirements as specified in Section 02310.

3 .5 SALVAGE

A. The Contractor is to salvage all merchantable logs plus those to be used for check dams, landscape logs, wood chips and other features.

3 .6 DISPOSAL

A. Dispose of debris and excess material as specified in Section 01570. All excess debris/material is the property of the Contractor and shall be properly disposed of outside the park.

3 .7 LOGS

A. Merchantable Logs:

1. Logs are to be selected and approved by the Contracting Officer. Stockpile at locations approved by the Contracting Officer.

2. Those logs resulting from the removal of trees marked and numbered with blue paint by the Contracting Officer.

3. These logs shall be included in the credit item for logging.

B. Unmerchantable Logs:

1. Unmerchantable logs are defined as all other logs from tree removal.

2. Unmerchantable logs are the property of the Contractor and are to be disposed of outside the park.

3. Stockpile sufficient quantities for placement as landscape logs at a location approved by the Contracting Officer.

PAYMENT WILL BE INCLUDED IN THE BID ITEM TO WHICH IT RELATES

PART 4 MEASUREMENT AND PAYMENT

4.1 TREE CUTTING, REMOVAL, AND CLEARING AND GRUBBING

A. This work item includes the cutting and removal of trees, clearing, grubbing, stump removal, and the removal of vegetative debris and excess material from the park. Payment will be made at the contract lump sum price.

4.2 LOGGING

A. The unit of measurement will be the 1,000-board-foot (M.B.F.) unit, as measured to the nearest 100 board feet and estimated in the field using standard forestry methods for standing timber. The standing timber shall be that merchantable timber previously marked in the field. Payment for merchantable timber will be based on mill scale and deducted from the contract amount as a credit.

4.3 SALVAGE LANDSCAPE LOGS

A. Payment will be made at the contract unit price, including hauling and stockpiling logs.

4.4 REMOVE, STOCKPILE AND PLACE LITTER AND DUFF

A. Measurement will be the number of square feet of removing, stockpiling and placement of litter and duff. Payment will be made at the contract unit price.

END OF SECTION

SECTION 01351

NATURAL FEATURES PROTECTION

PART 1 GENERAL

1.1 DESCRIPTION

A. The work of this section consists of protection of vegetation and native soils to be retained within and adjacent to the perimeter work limits of demolition/restoration and new construction. The work shall also include maintaining existing fencing, barricades, etc. This section also consists of evaluation processes and mitigation measures in the event of tree damage, casualty, or removal and unauthorized passage outside authorized work limits. Supplemental tree watering is included in the work of this section.

1.2 PLANT CONDITION INVENTORY

A. Prior to the placement of all fencing, barricades and tree wrap, the Contractor and Contracting Officer/Park Ecologist together shall perform an on-site inventory of trees and other natural features in the entire project site. A print of the contract document site plan will be used to note placement and condition of existing trees. Previous damage to trees and vegetation shall be noted. This site plan print shall be retained by the Contracting Officer for use during the final walk-through tree assessment scheduled during the project closeout, see Section 01770.

1.3 SUBMITTALS

A. As specified in Section 01330.

B. Shop drawings or manufacturers literature for fencing.

C. Supplemental tree watering device.

PART 2 PRODUCTS

2.1 WORK LIMITS – CONSTRUCTION ZONE WARNING TAPE

A. Banner Guard construction zone warning tape, imprinted with "CAUTION: CONSTRUCTION AREA", manufactured by Reef Industries, Inc., Houston, Texas, or approved equal.

2.2 CONSTRUCTION FENCING

A. Four foot high orange plastic mesh construction fencing.

B. 6 foot steel posts.

2.3 TREE TRUNK PROTECTION

A. Four foot high orange plastic mesh construction fencing

2.4 TREE BARRICADE

A. Individual Tree Protection: 8-foot wide by 8-foot high sections of 2x4 lumber with diagonal braces at all corners. The use of recycled lumber to construct fencing is encouraged.

2.5 SUPPLEMENTAL TREE WATERING: See components listed under execution.

PART 3 EXECUTION

3.1 WORK LIMITS - CONSTRUCTION ZONE WARNING TAPE

A. Install where necessary to maintain work limits as shown, and as requested by the Contracting Officer. Keep a minimum of two rolls on site at all times. Tape shall not be substituted for fencing.

3.2 PROTECTION INSTALLATION

A. Provide temporary work limit fencing, tree trunk wrap, and tree barricades to protect existing trees, plants and critical root zones. Protections shall be in place before any demolition work or heavy equipment is allowed on site.

3.3 CONSTRUCTION FENCING

A. Four-foot high orange plastic mesh construction fencing shall be supported securely to steel posts, 5 feet on center, and driven into the ground, installed where shown on plans.

B. Within the perimeter work limits, protect groups of shrubs and small trees and undisturbed soils as shown on plan with 4-foot-high construction fencing. Firmly anchor fences to the ground a minimum of 2 feet from the nearest plant. Completely and continuously enclose areas of trees and shrubs to be protected with fencing.

3.4 TREE TRUNK PROTECTION

A. For isolated trees up to 4 feet dbh (diameter breast height) within the work limits, provide tree trunk protection.

B. Wrap orange plastic mesh construction fencing continuously around the circumference of the trunk from the base to a height of not less than 8 feet. Fence wrap shall be secured around the trunk by three strands of jute or other natural fiber rope around top, middle and bottom of the tree trunk protection. No anchoring or nailing in trees will be allowed.

3.5 TREE BARRICADE

A. Provide tree barricade for trees larger than 4 feet dbh or groups of trees as shown on plans. The barricade shall include the limits of the critical root zone surrounding the tree(s) to a radius of not less than 15 feet from the edge of the nearest tree trunk. In cases where demolition/deconstruction is to take place within the critical root zone, tree barricade shall be placed two feet beyond the actual feature being demolished / deconstructed. Additional adjustments to barricade location for equipment accessibility within the work area will be subject to approval of the Contracting Officer.

B. Ensure that the tree barricade alignment provides maximum protection to trees and root zones. Flag alignment clearly before barricade installation and review alignment with Contracting Officer for approval.

C. Tree barricade shall be constructed to withstand winter snow loading and possible contact with mechanical equipment without shifting or overturning.

3.6 PROTECTION MAINTENANCE

A. Only after all tree and plant protection has been installed, and the Contracting Officer has inspected and given written approval of the tree and plant protection, will the Contractor be allowed to begin demolition, restoration and new construction. All tree and plant protection shall be maintained throughout the duration of this project.

B. If any fencing, barriers, staking or marking, which designates protected areas, limits of demolition or work limits, is knocked down, moved or destroyed by the Contractor, the Contractor will immediately move the work operation to another area, wholly or in part, or suspend work operations, until the fence or other protection is repaired to the Contracting Officer's satisfaction at the Contractor's expense. Time lost due to such stoppage will not be considered basis for adjustment of completion date nor additional payment.

C. Parking vehicles and storing materials or supplies shall be confined to areas designated as staging areas on the plans or as specifically approved by Contracting Officer. Vehicle and material storage activities are strictly prohibited from protected and fenced sensitive soil and vegetation areas.

D. Fastening ropes, cables, or guys to existing trees and disposing of materials including, but not limited to paint, paint thinner, fiberglass materials, fiberglass thinners, concrete or cement residue, washings from cement or concrete mixers or any other material considered harmful by the Contracting Officer is prohibited anywhere in the project area.

E. Do not remove, injure, or destroy trees or other plants without prior approval of the Contracting Officer. Consult with the Contracting Officer and remove agreed upon roots and branches that interfere with demolition / deconstruction. All pruning of canopy or cutting of roots will be done under the supervision of the Contracting Officer, and shall be done as set forth by the National Arborist Association or the International Society of Arboriculture.

F. Major roots (greater than 6" diameter) that are encountered during excavation and trenching shall be covered with wet burlap to prevent sun scald. Protect roots that have been exposed by demolition of foundations or utilities and immediately cover with backfill. If within the critical root zone, excavate structures with hand tools.

G. At project completion, the Contractor shall leave in place vegetation protections designated on the contract drawings to remain; all other protections shall be completely removed (disposed or recycled).

3.7 PLANT APPRAISAL

A. If the Contractor destroys or injures trees and shrubs not designated for removal or outside of the perimeter work limits, the Contractor will be assessed damages prior to final progress payment.

B. Replacement costs for damaged vegetation will be computed according to the method described in the International Society of Arboriculture's 1992 Guide For Plant Appraisal. This method is based on the cost of the largest commonly available tree or shrub, with modifications based on species value, condition and location. A trained arborist or professional plant appraiser from the California region will be hired by the Contractor to make the damage appraisal. The arborist's fees will be included in the damage assessment. The damage assessment will be done as the damage occurs.

C. The damage appraisal process will be triggered by any of the following types of damage to vegetation outside of the perimeter work limits or fenced or otherwise protected areas of soil or vegetation within the perimeter work limits:

1. Removal of any tree or shrub.
2. Pruning or removal of more than 30% of a tree or shrub canopy.
3. Removal or fracture of a limb or trunk that is one of the major structural entities of the plant.
4. Removal or fracture of any limb greater than 12 inches in diameter..
5. Bark damage or removal around more than 20% of the trunk circumference.
6. Trenching or soil disturbance within the critical root zone that is deeper than 6 inches.
7. If the damaged vegetation is protected under the Endangered Species Act or other special legislation, additional penalties may be assessed.
8. Pruning or removal of vegetation when authorized and supervised by the Contracting Officer is excepted from these penalties.
9. Removal of any root 6" diameter or larger.
10. Bark damage or removal around more than 20% of the circumference of a root 6" diameter or larger.

D. Minor cuts and damaged areas shall be treated in accordance with tree and plant repair practices specified by the National Arborist Association, the International Society of Arboriculture, or a qualified arborist.

3.8 PLANT APPRAISAL METHOD (TRUNK FORMULA METHOD)

A. The following sample appraisal is based on the Trunk Formula Method, established by the International Society of Arboriculture, in 1992. This formula can be applied to trees and very large shrubs, or multi-stemmed trees. It is based on the size, species, condition and location of the plant that was injured or destroyed.

1. Size: For the purposes of appraisal, size is determined by the area of trunk, usually at breast height (or 4.5 feet), calculated by diameter or circumference measurement. Example for a 24" diameter trunk: 24" divided by 2 = 12" radius, X = 3.14, $Xr^2$= area of a circle, $3.14(12^2) = 452$"
2. Modifications to measuring technique will occur in the case of multi-stemmed trees, trees with major branches lower than breast height, etc.
3. Species: A rating is given for each species, depending on the region in which it is living. The International Society of Arboriculture has a number of regional chapters that have generated species rating lists. Ratings are based on some of the following factors: climate

adaptability, growth characteristics, soil adaptability, resistance to disease and insects, maintenance requirements, aesthetic and general functional values, and rarity.

4. Condition: A rating is given for the general condition of the plant which involves health and structural integrity. See the "Guide to Judging Plant Condition", following.

5. Location: A rating is given for the location of the plant and includes site, placement, and functional and aesthetic contributions.

B. The Trunk Formula Method is based on the following equation:

Appraised Value = Basic Value x Condition x Location
Basic Value = Replacement Cost + (Basic Price x [$TA^A$ - $TA^R$]) x Species

1. Replacement Cost = maximum size commonly available from local or regional nurseries, usually around 4" diameter. The cost includes the average cost (from 3 nurseries, min.), transportation and installation, guarantee and profit.

2. Basic Price = cost per unit of trunk area of replacement tree (cost may be wholesale, retail, or installed).

3. $TA^A$ = Trunk area at breast height of tree being appraised.

4. $TA^R$ = Trunk area at 12" from base of largest commonly available tree.

5. Species, Condition and Location = ratings of the appraised tree.

3.9 SUPPLEMENTAL TREE WATERING

A. Provide deep watering to trees from June 1 to November 15 for each year of the project. Deep watering device shall consist of a 3-foot long, ¾" diameter galvanized pipe, crimped at one end, with 18 to 24 1/8-inch holes randomly drilled along the length. The open end of the pipe shall be connected to a 5-gallon bucket with a rigid, water-tight connection. Place the device at the dripline (edge of canopy) of specified trees with the pipe pushed fully into the soil. Fill each bucket with 5 gallons of water three times per week. The number of devices per tree shall be 1 pipe/bucket for every 1 foot of tree diameter (at breast height). A submittal sample and demonstration shall take place before fabrication is begun.

PART 4 MEASUREMENT AND PAYMENT

4.1 CONSTRUCTION FENCING

A. Measurement will be the number of linear feet of 4-foot-high construction fence placed as indicated. Payment will be made at the contract unit price and includes the removal of fencing at the end of the contract.

4.2 TREE TRUNK PROTECTION

A. Measurement will be the number of trees treated with protective trunk wraps. Payment will be made at the contract unit price and includes the removal of protection at the end of the contract.

4.3 TREE BARRICADE

A. Measurement will be the number of linear feet of 8-foot-high wood frame tree barricades placed around trees indicated. Payment will be made at the contract unit price and includes the removal of protection fencing at the end of the contract..

4.4 WORK LIMITS - CONSTRUCTION ZONE WARNING TAPE

A. Payment will be included in the bid item to which this work relates.

4.5 SUPPLEMENTAL TREE WATERING

A. Payment will be made at the contract lump sum price.

END OF SECTION

KLEINFELDER



# GEOTECHNICAL INVESTIGATION REPORT
# PROPOSED SHERMAN TREE PARKING AND RESTORATION
# SEQUOIA 200Q
# SEQUOIA NATIONAL PARK, CALIFORNIA

Prepared For:
Barker Rinker Seacat Architects
2300 Fifteenth Street, Suite 100
Denver, Colorado 80202

September 11, 2000

This document was prepared for use only by the client, only for the purposes stated, and within a reasonable time from issuance. Non-commercial, educational and scientific use of this report by regulatory agencies is regarded as a "fair use" and not a violation of copyright. Regulatory agencies may make additional copies of this document for internal use. Copies may also be made available to the public as required by law. The reprint must acknowledge the copyright and indicate that permission to reprint has been received.

# 1. INTRODUCTION

## 1.1. PURPOSE

In this report we present the results of our geotechnical investigation for the Sequoia 200Q project located in Sequoia National Park, California. The purpose of our investigation was to explore and evaluate the subsurface conditions at the sites in order to develop geotechnical engineering recommendations to aid in project design and construction.

The Sequoia 200Q project is located south of Lodge Pole, west of General's Highway and south of Wolverton Road in Sequoia National Park, California. The location of the project site is illustrated on Plate 1, "Vicinity Map".

This report includes our recommendations related to the geotechnical aspects of project design and construction. Conclusions and recommendations presented in this report are based on the subsurface conditions encountered at the locations of our exploration and the provisions and requirements outlined in the "Additional Services" and "Limitations" sections of this report. Recommendations presented herein should not be extrapolated to other areas or used for other projects without our prior review.

## 1.2. PROPOSED CONSTRUCTION

Our understanding of the project is based upon conversations with Bruce Haynes with Martin/Martin Consulting Engineers, a site meeting with representative of Martin/Martin and Barker Rinker Seacat Architects, and a review of the following documents that were included with Martin/Martin's Request for Proposal, dated February 4, 2000:

- ☑ Revised Preliminary Design – June 1999
- ☑ Access Road Plan and Profiles February 2000
- ☑ Leach Field Location Plan – February 2000
- ☑ General's Highway Proposed Plan – February 2000
- ☑ Access Road Typical Section
- ☑ Retaining wall alternatives for relocation of General's Highway

REM000011638


Copyright 2000, Kleinfelder, Inc.

We understand the proposed project will consist of:

- ☑ Construction of a new asphalt concrete parking area north of the existing General Sherman Tree Visitor facility, and an overflow gravel surfaced RV parking north of the new parking area;
- ☑ Construction of 3000 feet of asphalt concrete access road leading from Wolverton Road to the new parking area. This alignment will require up to 8.5-foot cuts and 12-foot fills, with dry stack walls to 6 feet in height;
- ☑ Realignment of the General's Highway to accommodate relocation of the existing overflow parking to the north side of the highway. The relocated parking area will become handicap parking and shuttle drop-off. The realignment will require an engineered retaining wall to 22 feet in height;
- ☑ Construction of new comfort stations near the location of the existing station and at the new parking area. The lower comfort station will have a septic unit directly below the structure. There will be a leach field constructed near the upper comfort station at the new parking area;

We understand the two comfort station structures will be of masonry and timber construction with concrete slabs-on-grade floors. Maximum column and wall loads are not expected to exceed 15 kips and 3 kips per foot, respectively.

## 1.3. SCOPE OF SERVICES

Our scope of services consisted of a field exploration program, field and laboratory testing, design analysis, and preparation of this written report, as described in the proposals for geotechnical investigation services, dated March 3, 2000 (reference Kleinfelder File No. 21-YP4-248). General issues addressed consisted of:

- ☑ A description of the proposed project including a vicinity map showing the location of the site and a site plan showing the locations of the exploration points for this study;.
- ☑ A description of the site surface and subsurface conditions encountered during our field investigation, including boring logs and test pit logs;
- ☑ A summary of the field exploration and laboratory testing programs;
- ☑ Discussion of the regional geology and site seismicity, including the potential for liquefaction and seismically induced settlement.
- ☑ Recommendations for site preparation and earthwork grading, including a discussion concerning rippability, stripping and grubbing, scarification and compaction and the use of on-site soils for engineered fill;
- ☑ Comments on the use of the pavement section from the existing parking area as recycled aggregate subbase;
- ☑ Comments for temporary excavations, and trenches;
- ☑ Recommendations for permanent slopes;


Copyright 2000. Kleinfelder, Inc.

- ☑ Recommendations for foundation design including bearing capacity of foundation soil for sustained loading and total combined loading, including minimum embedment depths and anticipated settlements;
- ☑ Recommendations for resistance of lateral loads including frictional coefficients, passive pressures and lateral translation needed to develop passive pressures;
- ☑ Recommendations for lateral earth pressures on retaining walls;
- ☑ Recommended subgrade preparation for concrete slabs-on-grade;
- ☑ Recommendations for asphalt concrete paving. In the absence of anticipated traffic conditions, recommendations are provided for a range of traffic.
- ☑ Comments on percolation rates to aid in design of the on-site leach field;
- ☑ Comments to aid in the design of comfort station and retaining wall drainage, and;
- ☑ Comments on the general corrosion characteristics of the site soils.


Copyright 2000, Kleinfelder, Inc.

# 2. FIELD AND LABORATORY EXPLORATION

## 2.1. FIELD EXPLORATION

Our field exploration, conducted on July 5, 6 and 13, 2000, consisted of drilling four (4) test borings, performing nineteen (19) test pits, three (3) asphalt cores and three (3) hand auger borings within the project area. Two (2) of the test borings were drilled along the area of the General's Highway retaining wall. One test boring was drilled at each comfort station, to identify the soil conditions. Eight (8) of the test pits were performed along the alignment of the access road to the new parking area. Two (2) of the test pits were performed within the area of the overflow RV parking area. Seven (7) of the test pits were performed within the new parking area. The remaining two (2) test pits were performed within the area of the proposed leach field. The three (3) cores were performed within the existing pavement in the area of the realignment of General's Highway. Two (2) of the hand auger borings were performed on the downhill side of General's Highway. The remaining hand auger boring was performed on the upslope side of the access road to the new parking area, where a retaining wall was planned. The test borings were drilled with a CME 45 truck-mounted drill rig using 6-inch diameter hollow stem auger to a depth ranging from 4.5 to 16.5 feet below existing ground surface. The test pits were performed with a rubber-tired backhoe, equipped with a 24-inch bucket to depths ranging from 3 to 15.3 feet. The approximate locations of the points of exploration are indicated on the "Site Plan", Plates 2, 3, 4 and 5.

The soils encountered at the points of exploration were visually classified in the field and a continuous log was recorded. Plates A-1 through A-27 graphically illustrate the materials encountered at the exploration locations.


Copyright 2000, Kleinfelder, Inc.

## 2.2. FIELD AND LABORATORY TESTS

Three (3) in-situ percolation tests were performed in the two (2) test pits within the proposed leach field area, at depths from 2.5 to 4.0 feet below ground surface.

Our field testing also included performing three (3) seismic refraction surveys along portions of the proposed access road alignment that are in cut areas. This study was conducted to determine the depth and velocity of the weathered granitic rock material. The approximate locations of the surveys are indicated on the "Site Plan", Plates 2, 3, 4 and 5. Results of the refraction surveys are presented on Plates A-28 through A-30.

Laboratory tests were performed on selected samples to evaluate their physical characteristics and engineering properties. The laboratory testing program was designed with emphasis on the geotechnical properties of soils to assist in the evaluation of foundation design recommendations. Our laboratory testing program included performing the following tests:

- ☐ Unit weight (ASTM D-2937)
- ☐ Moisture content (ASTM D-2216)
- ☐ Direct Shear (ASTM D-3080)
- ☐ Resistance Value (California Test Method No. 301)
- ☐ Consolidation (ASTM D-2435)
- ☐ Minimum Resistivity (California Test Method 532)
- ☐ Soluble Sulfate Content (California Test Method No. 417)
- ☐ Soluble Chloride Content (California Test Method No. 422)

Unit weight and moisture content test results are shown on the boring and test pit logs in Appendix A. The results of other laboratory tests are in Appendix B.


Copyright 2000, Kleinfelder, Inc.

# 3. SITE CONDITIONS

## 3.1. GENERAL

The Sequoia 200Q project is located south of Lodge Pole, west of General's Highway and south of Wolverton Road. The proposed bus parking, turn out, lower comfort station and General's Highway retaining wall are to be constructed southwest of the General Sherman Tree. The new parking, upper comfort station, overflow RV parking and access road are to be constructed north of the General Sherman Tree. The existing access road to the Park Service wood pile and burn dump closely follows the proposed roadway alignment from Wolverton Road. There is an existing burn dump within the area of the upper lot of the new parking area. Construction debris has been dumped within the area of the overflow RV parking. The proposed improvements are indicated on the "Site Plan", Plates 2, 3, 4 and 5.

## 3.2. EARTH MATERIALS

The near surface earth materials encountered at our points of exploration consisted of fill, residual soil and weathered granitic rock. The following sections provide a brief description of the materials encountered at the various project components. A more detailed description of the earth materials encountered at the points of exploration is noted on the logs in Appendix A of this report.

### 3.2.1 General's Highway Realignment

The upper 5.5 to 11.5 feet of soil along the proposed realignment consisted of fill soil consisting of silty sand. The fill soil was underlain by a thin layer of moderately organic native soil (slope wash). The slope wash was underlain by highly weathered granitic rock.

### 3.2.2 Lower Comfort Station

The upper 2 feet of soil within the area of the lower comfort station consisted of residual soil. The underlying soils at the points of exploration generally consisted of weathered granitic rock to the maximum depth explored, 11.5 feet below existing grade. The weathered granitic rock ranged from slightly to highly weathered.

### 3.2.3 Access Road

The surficial fill soils along the proposed access road alignment consisted of silty sand to depths ranging from 3.5 to 8 feet below ground surface. The upper 4 feet of the fill soil along the access road typically contained roots. The underlying soils at the points of exploration generally consisted of a thin layer of native soil (slope wash) that was moderately organic. There was weathered granitic rock underlying the slope wash, to the maximum depth explored, 12.0 feet below ground surface. The weathered granitic rock ranged from slightly to highly weathered.

### 3.2.4 Overflow RV Parking

We understand the overflow RV parking area was previously used as a borrow source for fill material. Subsequently it was utilized as a debris dump. At the time of our study, nearly half of the overflow RV parking area was filled with piles of soil and construction debris approximately 40 feet high. At our test pit locations, silty sand and construction debris was encountered to a depth of 14 feet below surrounding grade. The construction debris included, structural steel, concrete, large tree roots, and steel pipes. This subsurface construction debris is underlain by weathered granitic rock.

### 3.2.5 New Parking

The south and west border of the new upper parking area was covered with debris (stumps, concrete, etc) piles up to 45 feet in height. In addition to the debris piles, the upper parking area had approximately 5.5 feet of intermixed silty sand and burn material, underlain by weathered granitic rock.


Copyright 2000, Kleinfelder, Inc.

### 3.2.6 Upper Comfort Station

The upper 3 feet of soil within the area of the upper comfort station consisted of residual soil. The underlying soils at the points of exploration generally consisted of weathered granitic rock to the maximum depth explored, 16.5 feet below existing grade. The weathered granitic rock ranged from slightly to highly weathered.

### 3.2.7 Leach Field

The area of the proposed leach field was predominantly residual soil consisting of silty sand to a depth of 3.5 to 4 feet. This soil was underlain by moderately weathered granitic rock.

## 3.3. GROUNDWATER CONDITIONS

In general, groundwater was not encountered within the depths explored (15.5 feet) during our field exploration. Zones of perched water that travel on the bedrock surface and within the fractures in the granitic rock may exist, particularly in the Spring. It is possible that groundwater conditions at the site could change at some time in the future due to variations in rainfall, construction activities, or other factors not apparent at the time our test borings and test pits were made.

REM000011645


Copyright 2000, Kleinfelder, Inc.

# 4. GEOLOGIC CONDITIONS

## 4.1 FAULTS LOCAL TO THE PROPOSED FACILITY

The project site and its vicinity are located in an area traditionally characterized by relatively low seismic activity. There are no known faults which traverse through or near the site, and the site is not located in an Alquist-Priolo Earthquake Fault Zone as established by the Alquist-Priolo Fault Zoning Act (Section 2622 of Chapter 7.5, Division 2 of the California Public Resources Code). Based on our current understanding of the geologic framework and tectonic setting of the proposed facility, the primary source of seismic shaking is anticipated to be the Owens Valley Fault and Independence Fault.

## 4.2 SEISMIC DESIGN CRITERIA

Use of the 1997 UBC design criteria would be appropriate, unless the structural engineer deem more site specific data is necessary. Based on the 1997 UBC. the general Soil Profile Type is $S_B$, the Seismic Source Type would be B, and the Seismic Zone Factor (Z) would be 0.3.

## 4.3 LIQUEFACTION

Based on the consistency and relative density of the soil depth to bedrock and general absence of groundwater, liquefaction and dynamically induced settlement is unlikely.

REM000011646


Copyright 2000, Kleinfelder, Inc.

# 5 EARTHWORK

## 5.1 GENERAL

Based on available laboratory data and the field investigation, and geotechnical analyses conducted by Kleinfelder for this study, we believe it is geotechnically feasible to construct the Sequoia 200Q project as planned, provided the recommendations presented in this report are incorporated into the project design and construction.

General comments and specific recommendations regarding the geotechnical aspects of project design and construction, are presented in subsequent sections. All reference to compaction, maximum density and optimum moisture are based on American Society of Testing and Materials (ASTM) Test Method D-1557, unless otherwise noted.

## 5.2 RIPPABILITY

### 5.2.1 General Data

The apparent depth and rippability of the underlying soils along the access road can be evaluated from seismic refraction surveys. The data obtained during our investigation were plotted on time verses distance graphs with velocity lines drawn on a "best fit" basis. Velocity, critical distance, and intercept time, were used to calculate the depth to each major velocity interval. A summary of the data is presented in Table 5.2-1.

REM000011647


Copyright 2000, Kleinfelder, Inc.

TABLE 5.2-1
SUMMARY SEISMIC LINE DATA

| Seismic Traverse Lines | Apparent Velocities (ft/sec) | | Approximate Depth (ft) | |
|---|---|---|---|---|
| | Layer No. 1 | Layer No. 2 | Layer No. 1 | Layer No. 2 (see note) |
| A-A' | 1115 | 5747 | 0-13 | >13 |
| B-B' | 1122 | 4947 | 0-11 | >11 |
| C-C' | 1160 | 5422 | 0-9 | >9 |

NOTE: The seismic refraction equipment typically measures to a depth 1/4 to 1/3 of the horizontal length of the traverse. The horizontal traverse distance was 100 feet, therefore, the second layer likely extends to a minimum depth of approximately 25 feet.

A subsurface weathered granitic rock will produce a unique travel-time graph. However, different soil structures can produce travel-time graphs with a similar appearance. Information from the travel-time graphs and test borings along with observations made in the field were used to derive the subsurface interpretations in the conclusions of this report. Breaks in the travel-time graphs were encountered in several profiles. These probably represent subsurface steps in the geology or other discontinuities.

### 5.2.2 Conclusions

The upper silty sand and weathered granitic rock material at the site appear to be conducive to ripping. We anticipate that some areas of weathered granite may be ripped with larger equipment. Some oversized materials may be generated during ripping/excavation. If this oversized material is unable to be broken down, it must be removed from the project site.

Charts developed by the Caterpillar Tractor Company (August 1996) were used in evaluating potential rippability at the site. These charts correlate rippability with the seismic velocity for various geologic materials. The reported nominal and marginal seismic velocity thresholds for rippability in granite are shown in Table 5.2-2.


Copyright 2000, Kleinfelder, Inc.

TABLE 5.2-2
CATERPILLAR RIPPER PERFORMANCE

| Tractor Model Single Shank Ripper | Nominal[1] Seismic Velocity Threshold (ft/sec) | Marginal [2] Seismic Velocity Threshold (ft/sec) |
|---|---|---|
| D7G | 4,200 | 4,850 |
| D8L | 6,400 | 7,500 |
| D9R | 6,800 | 8,000 |
| D10R | 7,300 | 8,400 |

(1) The nominal seismic velocity threshold is the upper limit at which ripping becomes difficult and possibly more costly. Well maintained equipment should be productive up to this limit.

(2) The seismic velocity range for granite between the nominal seismic velocity threshold and the marginal seismic velocity threshold will likely be difficult to rip.

The apparent seismic compressional velocities within the upper soil horizon are 1115 to 1160 fps. The velocity of the weathered granitic rock ranged from approximately 4947 to 5,747 fps. These apparent velocities indicate the weathered granitic rock should be rippable in large excavations with the appropriate equipment in good working condition.

Our field exploration utilized a backhoe with a 24-inch bucket. We met refusal at various depths atop weathered granitic rock. The contractor should consider the seismic velocity range listed in Table 5.2-1 and test pit refusal depths in developing the approach to confined excavations (e.g. utility trenches).

## 5.3 REMOVALS

### 5.3.1 General Highway Retaining Wall

The fill soils that make up the slope downhill of General Highway have a low relative density. These fill soils are underlain by slope wash. The General Highway retaining wall should bear upon weathered granitic rock. As such, the fill soils and slope wash should be removed in areas of future foundation support. Due to the consistency of the fill soils, attention should be given to a setback and/or shoring to support the upslope during excavation and footing construction.


Copyright 2000, Kleinfelder, Inc.

5.3.2 Access Road/New Parking

Typically we would recommend overexcavation of all the roots and fill soils beneath the areas to receive structures or engineered fill, which would require from 4 to 8 feet of overexcavation along the access road and within the upper and lower new parking areas. However, we understand that the National Park Service may not allow removal of tree root systems, as it would be detrimental to the survival of the associated trees. Therefore, the root systems and fill soils beneath the final elevation of the proposed roadway may have to remain. The root systems should not cause settlement as long as the tree is alive. However, if the tree were to die or be removed, the root systems that remain have the potential to cause an undetermined amount of settlement when they decompose. Likewise, the fill soils that remain have the potential to cause an undetermined amount of settlement, which may increase paving maintenance.

We understand the above ground stumps and miscellaneous debris are to be removed from the project site; however, we also understand that two options were provided for treatment of the burn material in our Preliminary Site Characterization Report, dated November 30, 1999 (File No. 21-5102-08 AOO). The two options provided in the referenced report were "In-place Closure" and "Off-site Disposal". We recommend that the burn material be overexcavated to a depth of 5 feet below ground surface and disposed of off-site in areas planned for asphalt parking, or areas where future structures may be supported. If the National Park Service decides to not overexcavate the burn material, it is likely that the asphalt pavement will require increased periodic maintenance, include crack sealing.

5.3.3 Overflow RV Parking

After stripping and grubbing, no deep removal of the underlying debris is planned for support of the graveled parking surface. Due to the presence of near surface debris, the debris should be overexcavated to a depth of 12 inches and backfilled with "Engineered Fill", Section 5.5.

If any structures or hardscape sensitive to an undetermined amount of settlement are planned, the debris should be removed full depth beneath the structure, and to a distance beyond the structure


Copyright 2000, Kleinfelder, Inc.

# SEQUOIA NATIONAL PARK

Project 200Q Quantities Summary

10/24/00

Prepared By:
DHM

## Earthwork Quantities

| Upper Sherman Tree | Cut | Fill | | |
|---|---|---|---|---|
| | 33,400 | 16,100 | CY | 40% Factor Used |
| | | | CY | |
| Excess Cut | 17,300 | | CY | |
| Landfill Haul Off From Upper Sherman Tree | -3,400 | | CY | *Unknown Amount At This Time* |
| Misc. Site & Landscape Fill ( General Site Blending Fill ) | -3,500 | | CY | |
| Lower Sherman Misc. Landscape Fill | -2,000 | | CY | |
| Stockpile Fill For Use At The Shuttle Bus Area - future use | -5,000 | | CY | |
| Trail Fill | -600 | | CY | |
| Rocks Salvaged From Excavation | -1,000 | | CY | |
| Net Excess | 1,800 | | CY | |

Notes

| | | | |
|---|---|---|---|
| Embankment Material From Wuksachi Village | 2,200 | CY | Don't need it now. Leave as stockpile for the future. |
| *Material On-site at Upper* Sherman Tree for use as Deep Fill | 1,000 | CY | Misc. concrete, rocks, etc could be stockpile at the Shuttle Bus Area for future use in that area. |
| Fill required to raise the end of the north parking lot Upper Sherman Tree *400' x 50' x 3' ave.* | 1,800 | CY | *We would revise the grading plan* and profile. The access road would not be changed. This would reduce the cross slope for the parking lot to less then 5%. |

Note: Earthwork totals are based on the topographic survey provided to the Design Team *and alterations since that date are not quantified.*

517521