279

RECEIVED

SEP 20 2002

**REMCON, Inc.**

P.O. Box 758
751 Wakefield Court
Oakdale, CA 95361
Telephone: 209/847-8186
Fax: 209/847-9189

<u>SENT VIA FAX AND U.S. MAIL</u>

September 11, 2002

Mr. Rodney K. Keiscome
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Letter of Rejection, Asphalt Debris

Dear Mr. Keiscome:

Reference is made to the NPS's letter of August 30, 2002, concerning the above subject.

Though REMCON's position regarding this matter has been well documented in previous letters, REMCON did agree to remove the asphalt debris in question. At this time it is my understanding that all the asphalt debris has been removed and Jack Vance has inspected the site and given final approval. Currently, REMCON's crews are placing final backfill along the access road. Again, my understanding is that Jack Vance is very happy with the work that is being performed. I hope this matter has been fully resolved to everyone's satisfaction and no further discussion is required concerning this issue.

If you have any questions concerning this letter please contact me at (209) 847-9186.

Sincerely,

Stephen B. Christensen
President

cc: Wm. H. DeOcampo, NPS Contracting Officer's Representative
Michael Giller, NPS Project Manager
Luke Triplett, REMCON Project Manager

SequoiaLetter040-sbc

REM CON

Oakdale Office
P.O. Box 758
751 Wakefield Ct.
Oakdale, CA 95361
Phone: 209/847-9186
Fax: 209/847-9189

Sequioa Office
P.O. Box
Wolverton Rec. Area
Lodgepole, CA
Phone: 559/565-3086
Fax: 559/565-3203

---

October 20, 2002

Mr. Michael Giller
National Park Service
P.O. Box 25287
Denver, CO 80225-0287

**Reference:** Sequoia and Kings Canyon National Park, Contract No. 1443C8000010903
Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

**Subject:** Reservation of Contractor's Rights

Dear Mike:

This letter is being provided to the National Park Service (NPS) to serve as a reservation of REMCON's rights, and as stipulated within the contract documents providing formal notification to the NPS.

Pursuant to Section 52.236-02 Differing Site Conditions and Section 52.243-04 Changes, REMCON is formally notifying the National Park Service and reserving its rights to seek additional monetary compensation and/or contract extension time related to the following issues, which have occurred since August 22, 2002.

- Cost and delay impacts as they relate to defective plans and specifications;
- Rejection of contractor work without following proper testing protocol;
- Untimely response to contractor's request for information;
- Owner caused delays, which have impacted Contractor's schedule.

If you wish to further discuss this matter you can contact me at (209) 847-9186.

Sincerely,

Stephen B. Christensen
President

cc: Rod Keiscome, NPS Contracting Officer
Richard A. Lewis, REMCON Board Member
Luke Triplett, REMCON Project Manager

United States Department of the Interior

NATIONAL PARK SERVICE
DENVER SERVICE CENTER
12795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287

IN REPLY REFER TO:

D5217 (DSC-CS)
SEKI-200Q
1443C8000010903

September 18,2002

Mr. Stephen B. Christensen
Remcon, Inc.
P O Box 758
751 Wakefield Court
Oakdale, California 95361

Dear Mr. Christensen

VIA FACSIMILE (209) 847-9189

Reference: Sequoia and Kings Canyon National Parks, Tulare County, California, Contract No. 1443C8000010903, Giant Forest, Sherman Tree Parking Area, Package No. SEKI-200Q

Subject: Letter dated September 11, 2002 concerning Asphalt Rejection

This will acknowledge receipt of your letter dated September 11, 2002, concerning Asphalt Rejection. I have spoken with Loren Mangrum concerning your letter and he acknowledges some on the work in question as being completed to dated (E-mail attached). Remcon should have your on-site Assistant Project Manager get with the NPS Field Inspector to review and sign off attesting that all work in question has been inspected and is acceptable. By receipt of this letter, Remcon still has work required to make this acceptable.

If you have any questions, please contact our field staff (Loren Mangrum) at 559-565-4477.

Sincerely,

Wm. H. DeOcampo
Contracting Officer's Representative

282

# United States Department of the Interior

NATIONAL PARK SERVICE
Denver Service Center
12795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287

IN REPLY REFER TO:
1/14/03
D52

SEKI 200 Q
1443C8000010903

Reference: Sequoia and Kings Canyon National Parks, Tulare County, California, Contract No. 1443C8000010903, Giant Forest, Sherman Tree Parking Area, SEKI 200Q

Subject:: Backup Material for Modification 6

Review of Remcon, Inc. (KTR) and the A\E Construction Management firm documentation of additional costs for blasting is the basis for the unilateral modification payment. Through late 2001 and until August 2002, there was extensive discussion between the National Park Service(NPS) and the KTR on the amount due.

The review shows the following documentation:

1. The blast reports from August and September, 2001. REMCON blasted 13 times for road excavation (see attached logs). The source was notebook entitled "SEKI 200Q Calif. Drilling & Blast. – Blasting Records/Backup, Year 2001", which was assembled by field engineer Bob Russell.

2. Review of these blast reports and the blast locations and depths indicates over-blasting and blasting done for purposes other than road excavation. This is summarized in the NPS spreadsheet entitled "Estimate for Unilateral Roadway Blasting Modification SEKI-200Q" For example:

    a. The very first blast (08/02/01) states that "holes are deeper for utilities – OK'd by REMCON". Utility rock excavation was paid for in BI # 38 – Rock Excavation.
    b. The blast of (08/13/01) was in the wrong location by 5 feet. Due to REMCON's mistake here, much more blasting was necessary and material generated. This is consistent with survey and layout errors throughout the project.
    c. Depths of drilling and blasting were consistently deeper than necessary – typically by 5'. This is indicated by analysis of the blast reports with the contract documents. Depth of cut necessary is shown on the contract documents. Actual depth of blasting is shown on the blast report.
    d. It is not known why the contractor overblasted and blasted in the wrong location. However it is known that this contractor has made numerous mistakes in layout of the project.

3. The REMCON certified request for equitable adjustment indicates that the subcontractor cost for blasting was $133,659.45. Over blasting is estimated to be at least 37% for the road.

4. Therefore, the total direct costs for blasting based upon information provided by REMCON is $84,170.

Michael Giller
Project Manager

PART OF
X 214

# Estimate for Unilateral Roadway Blasting Modification SEKI-200Q

| Date | Linear Feet Drilling | Number of Holes | Average Hole Depth | Pay Factor | Adjusted Linear Feet Drilling | Comments |
|---|---|---|---|---|---|---|
| 8/2/2001 | 1,189.00 | 132 | 9.01 | 0.50 | 595 | "Holes are deeper for Utilities" |
| 8/7/2001 | 704.00 | 90 | 7.82 | 0.50 | 352 | SS-C-4.3 |
| 8/13/2001 | 1,296.00 | 162 | 8.00 | 0.50 | 648 | Roadway Offset 5 feet & SS-C-5.5 |
| 8/14/2001 | 434.00 | 56 | 7.75 | 0.75 | 326 | Co-mingled bolders and road |
| 8/15/2001 | 720.00 | 90 | 8.00 | 0.75 | 540 | |
| 8/22/2001 | 1,456.00 | 182 | 8.00 | 0.50 | 728 | SS-C-4.9 |
| 8/23/2001 | 572.00 | 52 | 11.00 | 1.00 | 572 | |
| 8/29/2001 | 356.00 | 89 | 4.00 | 0.50 | 178 | SS-C- 2.6 Co-mingled bolders and road |
| 8/30/2001 | 1,263.00 | 115 | 10.98 | 0.50 | 632 | Blasted 75ft wide area |
| 9/5/2001 | 824.00 | 111 | 7.42 | 0.75 | 618 | SS-C-3.3 |
| 9/6/2001 | 744.00 | 93 | 8.00 | 0.50 | 372 | SS-C-1.3 |
| 9/10/2001 | 776.00 | 97 | 8.00 | 0.67 | 519 | SS-C-3.4 |
| 9/13/2001 | 1,160.00 | 145 | 8.00 | 1.00 | 1,160 | |
| Sum | 11,494.00 | 1,414 | 8.13 | | 7,238 | |

**Total Cost for Road Blasting** **$133,659.45**

| | |
|---|---|
| **Total Linear Feet Drilled** | **11,494.00** |
| **Adjusted Linear Feet for Overbl** | **7,238.18** |
| **Adjusted Payfactor for Overblas** | **0.62974** |
| **Total Adjusted Cost** | **$84,170** |

**Pay factor** is an estimate of the amount of each blast necessary for road excavation only



002013
284

Ex 232

MURPHY AUSTIN
ADAMS SCHOENFELD LLP

D. MICHAEL SCHOENFELD
DIRECT (916) 503-4005 Ext 261
mschoenfeld@murphyaustin.com

March 12, 2003

*Sent Via Facsimile & U.S. Mail*

Rodney K. Keiscome
Contracting Officer
DCS - CS - Contracting Services Group
P.O. Box 25287
Denver, CO 80225

Re: Sequoia and Kings Canyon National Parks, California
Giant Forest, Sherman Tree Parking, SEKI - 200Q
**Remediation Constructors, Inc.**
Our File No: 1918.001

Dear Mr. Keiscome:

This office has been retained by Remediation Constructors, Inc. ("RemCon") to assist it in closing out its contract with the National Park Service ("NPS") for the project known as the Sequoia and Kings Canyon National Parks (California) Giant Forest, Sherman Tree Parking Project ("Project"). A copy of this letter is being concurrently sent to Sharon Brenna, the Solicitor who we understand has been assigned to this contract/matter.

Our client has provided us with a copy of Contract Modification No. 7, which, in substance, reduces the scope of the Project by over 33% (based on scheduled activity). Contract Modification No. 7 was not received by our client until Monday, March 3, 2003. Accompanying this Modification was correspondence from Theresia C. Lang of the NPS, bearing a date stamp of February 24, 2003, advising that RemCon has 10 days to respond to Modification No. 7, and that if no response was received, Modification No. 7 would be deemed approved and accepted by RemCon. Given the fact that the Government delayed

POST OFFICE BOX 1319
SACRAMENTO, CALIFORNIA 95812-1319
1000 G STREET, THIRD FLOOR
SACRAMENTO, CALIFORNIA 95814
916/446-2300 FAX 916/503-4000
MURPHYAUSTIN.COM

Rodney K. Keiscome
Contracting Officer
DCS - CS - Contracting Services Group
March 12, 2003
Page 2

delivery of this proposed unilateral modification by at least one week[1], the "deemed approval and acceptance" language is unenforceable. This response is timely made on our client's behalf based upon its receipt of the document.

RemCon is not in agreement with Contract Modification No. 7 and believes that this deductive change order is tantamount to a termination for convenience and/or a breach of contract. Given the impact and far-reaching ramifications of the unilateral decision of NPS to delete (on an untimely basis) a significant scope of Project work through the issuance of Contract Modification No. 7, RemCon requests a sixty (60) day extension of time within which to provide a formal written objection to Contract Modification No. 7. In the interim, our client demands that the parties immediately enter into formal ADR procedures and proceedings, which were formally requested by RemCon on November 27, 2002 (a copy of RemCon's request is enclosed), as permitted by our client's contract. We advise that RemCon may insist that you, as the Contracting Officer, issue a formal decision recognizing that the unilateral deduction arising under Contract Modification No. 7 has resulted in a

[1] We are informed that your office, last summer, indicated to our client the fact that you were considering deleting the bulk of the remaining work. Our client has advised us that in response it communicated to you that if you were so inclined to please do so promptly, but in no event later than the Fall of 2002, so as to permit our client to mitigate any resulting damages. You were further advised by our client of the need to provide a written modification so RemCon's bonding company (Great American Insurance Company) would provide our client with additional bonding capacity to procure work for the upcoming 2003 work season if you anticipated terminating the Lower Sherman portion of the contract. You disregarded this request and failed to issue a timely modification, which has prevented RemCon from actively bidding on projects to fill RemCon's work backlog that has been removed by your untimely termination. To further exacerbate this matter, Mick Flak, Great American Insurance Company's representative, contacted Theresia C. Lang on February 20, 2003 regarding any proposed or contemplated contract deletion and was specifically told that no contract deletions were anticipated, even though a letter was issued by her on February 24, 2003 (four days later!) terminating the work. It is beyond belief that the NPS decided to terminate this portion of work in the three days that transpired between Mr. Flak's conversation with Ms. Lang and Ms. Lang's letter of February 24, 2003. Our client relied on your conduct, and your late notice of this proposed deletion of work is challenged on multiple grounds, as detailed herein, and notice is given that it has and will cause significant substantial damages to our client, including lost business opportunities.

Rodney K. Keiscome
Contracting Officer
DCS - CS - Contracting Services Group
March 12, 2003
Page 3

termination for convenience/breach of contract should these processes not yield an acceptable resolution.

As evidence of the gravity of the impacts experienced by RemCon as a result of the conduct of NPS during this Project, we offer some preliminary comments and observations on behalf of our client. We advise that the following comments and observations are in no way intended to serve as an all-inclusive list of issues or impacts arising upon the Project for which RemCon may be entitled to additional compensation or other damages. These preliminary comments are simply provided to ensure that you, as the Contracting Officer, and your counsel (Ms. Brenna, per my telephone conversation with her) are aware of the significant ramifications flowing from Contract Modification No. 7 (upon both RemCon and the Project) as well as the unjust treatment to which RemCon has been subjected throughout the course of its performance of Project work. RemCon reserves all rights pursuant to its contract with NPS (and as otherwise afforded under Federal law) to assert any claims for additional compensation or damages arising from its contract with NPS or the Project.

While Contract Modification No. 7 purports to be a deductive "change" pursuant to FAR 52.243-04, our client interprets the conduct of the NPS in reducing the scope of the Project by over 33% as, effectively, a termination for convenience. This interpretation finds significant support in federal case law. *See J.W. Bateson Company v. United States*, 308 F.2d 510, 513 (5th Cir.1962)(when "major" portions of the work are deleted, the termination clause should be invoked); *see also Appeal of Kahaluu Construction Co., Inc.*, ASBCA 33248, 90-2 BCA 22663 (1990)(government's use of deductive change order held to be improper). Upon the invocation of the termination for convenience provision under the contract, RemCon is entitled to recover all outstanding and unpaid costs for work performed on the Project (including, without limitation, costs for extra work and related labor impacts), as well as its reasonable profit upon the work performed (as measured by the reasonable overhead and profit margins set forth in RemCon's Project bid and accepted by the NPS).

In addition to drastically reducing the scope of the Project, Contract Modification No. 7 concurrently accelerates the Project completion date from August 28, 2003 to May 30, 2003. This is unacceptable. We are advised that there presently remains at least six to eight weeks of work to be performed at the Project site that was not subject to deletion under Contract Modification No. 7 (assuming an absence of weather related and/or other delays attributable to the NPS). To the extent that RemCon will be unable to commence work at the Project because of the existing inclement weather conditions until, at the earliest, May 1,





287

2003, it will be impossible for RemCon to complete the remaining scope of its Project work before mid-to late June of 2003.[2] (It is, of course, quite possible that this completion date may be considerably <u>later</u> if weather conditions preclude RemCon from cost effectively commencing Project work on or about May 1.) By unilaterally compressing the Project completion date, the NPS is forcing an unreasonable time constraint upon RemCon which will both compel acceleration (at an increased cost to the Government which we suspect you do not wish to incur but are exposing yourself to incur) and, we perceive, has been undertaken for the purpose of attempting to generate potential liquidated damages as a "bargaining chip" to partially offset RemCon's Project related claims.[3] Our client perceives the conduct of NPS detailed above, in prior correspondence, and herein below to be intended to cause our client greater damage as part of a Project close-out negotiating strategy. Our client will not stand idly by and "accept" the actions of the NPS in this regard.[4]

Nor is the questionable conduct of the NPS upon this Project limited to its present handling of Contract Modification No. 7. The facts relating to your recent unilateral issuance of Contract Modification No. 6 illustrates and exemplifies the actionable conduct of

---

[2] As you are undoubtedly aware, the project is at an elevation greater than 7000 feet and is inaccessible due to snow. Given the vagaries of weather, it is uncertain when access will be able to be made.

[3] Given the fractious relationship between RemCon and NPS personnel, our client perceives the timing of the issuance of Contract Modification No. 7, concurrent with the receipt of Contract Modification No. 6 (discussed below) along with the compression of time, yields the inescapable conclusion that the Government's conduct is punitive and improper.

[4] We further call your attention to the fact that the defective design documents provided by the NPS resulted in several months of delay to RemCon during the summers of 2001 and 2002. Specifically, the failure of the NPS to provide timely responses to multiple outstanding RFIs (and related revisions to Project plans) precluded RemCon from commencing critical path construction activities until July 2002 even though it had mobilized at the site and was ready to commence work in May 2002. The effects of such <u>owner</u> caused delay have apparently been "overlooked" in the recent revision of the contract completion date in Contract Modification No. 7. The history of year 2001 design problems have also been fully documented to the NPS and are not addressed nor accounted for in Contract Modification No. 7.





288

Rodney K. Keiscome
Contracting Officer
DCS - CS - Contracting Services Group
March 12, 2003
Page 5

which our client complains. In 2001, due to different site conditions encountered (massive rock) our client was forced to drill and blast the road right-of-way and parking areas. It is undisputed that this was extra work. Daily tickets validating such extra costs exist and were provided to the government representatives. It took your office over a year to seriously address this matter.

Please note that while this work was undisputably on the critical path and delayed the project you have refused to grant any time extensions. The value of the drilling, blasting, and rock handling extra work was greatly in excess of $600,000.00. Despite these facts your negotiating strategy was to deny our client any time extension and reduce the money claimed. Due to the passage of time (more than one year after the work was done) you ultimately agreed to pay $480,000.00. Our client, due to economic duress, reluctantly had no choice but to agree as it had third parties to pay. We are informed that you issued documents in furtherance of this agreement but compelled, as part of them, that our client waive its right to pursue additional claims against the NPS for further delays caused by defective plans and specifications. Our client declined to do so. Therefore, as further evidence of your overall strategy, you waited until late February, 2003 (6 months after the negotiations and 18 months after the performance of the extra work) to issue Contract Modification No. 6, but did so unilaterally, and in the outrageous sum of $84,000.00, a reduction of $396,000.00 from what you already agreed to. Our client, by letter dated March 4, 2003, has advised you of RemCon's specific objections to Contract Modification No. 6. Such conduct unequivocally demonstrates the improper treatment to which RemCon has been subjected throughout the course of this Project.

We call your attention to the fact that RemCon has incurred significant and quantifiable additional costs, impacts and damages that are solely attributable to the conduct of NPS on the Project, and, in particular, to its maladministration of the Project.[5] With

---

[5] In addition to the extra costs and/or impacts that RemCon is entitled to recover as a result of the recent termination for convenience issued by the NPS through Contract Modification No. 7, RemCon has incurred significant additional costs, labor impacts and related damages throughout its performance of Project work. As you are aware, RemCon has previously provided the NPS with written notification, on multiple occasions, with respect to the defective contract documents provided by NPS that were the basis of RemCon's Project bid. The contract

123915v1 WP/1918.001



289

Rodney K. Keiscome
Contracting Officer
DCS - CS - Contracting Services Group
March 12, 2003
Page 6

respect to cost and impact issues pertaining directly to Contract Modification No. 7, there are obvious factors and cost issues that the NPS has failed to consider. On its face, Contract Modification No. 7 deducts various line items that (we assume) the NPS attributes to portions of the Project work deducted from the contract. However, no explanation is provided as to why or how the NPS arrived at its specific deductions (as to dollars and line items). The quantification of its deductions is necessary to demonstrate that the NPS is not deducting line items properly attributable to work that was already performed by RemCon.

Contract Modification No. 7 is woefully inadequate on several other grounds. The NPS fails to recognize that this Project was not designed as a "balanced" Project, and that many of the early Project activities undertaken by RemCon (such as construction of the road and the performance of related activities) required that it incur a disproportionately large amount of costs (as compared to the entire Project) during the initial phases of the Project. The performance of the remaining contract work involves, generally speaking, activities that are less cost-intensive than those performed during the initial phases of the Project. As a result, the deletion of a significant portion of the remaining scope of the Project does not

---

documents contain material misrepresentations regarding the quantity and type of stone stockpiles that were to be available to RemCon at the Project. The actual quantity of stone contained in the stockpiles was considerably less than the quantity represented in the contract documents. (RemCon could not independently verify the size of the stockpiles at the time of its bid because the stockpiles were covered with snow.)

RemCon has also incurred appreciable additional costs (and related impacts) associated with the construction of the new road. This road could not be constructed as shown on the plans and drawings because of the presence of natural features (which, by order of the federal government, could not be removed) in direct conflict with the placement of the road as indicated in plans and drawings. RemCon's constant relocation of the road during construction as a result of the deficient plans and drawings, and the related quantity variances and grade issues arising therefrom, has resulted in our client's incurrence of additional unreimbursed costs. NPS has the ultimate responsibility for these additional costs.

While RemCon's total damages (including extra costs and impacts) have not yet been quantified (since RemCon's scope of Project work has not yet been completed), they are believed to significantly exceed $1,000,000.

123915v1 WP/1918.001



290

Rodney K. Keiscome
Contracting Officer
DCS - CS - Contracting Services Group
March 12, 2003
Page 7

necessarily mean that the NPS is entitled to reduce the contract balance by a like percentage, *i.e.*, the deletion of the final 33% of the work (based upon activity) does not equate to a concomitant reduction in contract balance by 33%. (In other words, the deletion of the final 33% of the actual Project work, as measured by the scheduled time to complete these activities, results in the reduction of the contact balance in an amount less than 33% of the total contract balance.) The NPS therefore must adequately demonstrate that the contract dollars (and units/materials) deleted pursuant to Contract Modification No. 7 are related and attributable to the actual scope of work deleted. Contract Modification No. 7 does not purport to undertake any such analysis or evaluation.

Moreover, many of the quantity deductions set forth in Contract Modification No. 7 (including, without limitation, asphalt paving, stone and timber) result in a quantity variance in excess of 15% of initial estimated quantities of unit-priced items. *See* 48 C.F.R. 11.702. Specifically, the significant reduction in quantities has resulted in an increase in the per unit-prices incurred by RemCon. RemCon is entitled to an equitable adjustment with respect to all of these line items, but again, Contract Modification No. 7 is silent on this issue.

We request that you immediately confirm with us, in writing, that the NPS is amenable to providing RemCon an additional 60 days to respond to Contract Modification No. 7. Please also advise when the NPS is willing to meet and initiate ADR procedures and proceedings. Although our client remains amenable to exploring a negotiated resolution, RemCon is prepared to pursue and exercise all of its legal remedies, including litigation, if a resolution cannot be reached in short order.

We anticipate your prompt response.

Very truly yours,

D. MICHAEL SCHOENFELD

DMS:mjb
Encl.
cc: Stephen B. Christensen (w/encl.) *(Sent Via Fax and Mail)*
Sharon Brenna (w/encl.) *(Sent Via Fax and Mail)*
J. Scott Alexander (w/encl.)

123915v1WP/1918.001



291