## Section III. ANALYSIS AND EVALUATION

### A. Background of Dispute

Remcon has alleged that NPS compelled it to (a) incur additional costs in performing extra work and changes, (b) perform its contract work in a more costly manner, and (c) experience delays and loss of productivity in the performance of its contract work. In June 2003, Remcon submitted a certified claim for an equitable adjustment to the contract price in the amount of $3,091,799.60 and requested the Contracting Officer's final decision regarding its claim. A substantial portion of additional costs asserted in Remcon's claim are for additional excess excavation, differing site condition ("unrippable rock"), the purchase of aggregate base material from commercial sources, and extended duration costs for both job site and home office overheads.

In July 2003, the Contracting Officer issued a final decision denying the differing site, excavation, grading and storm water pollution prevention portions of Remcon's claim. Remcon has asserted that this denial of its claim constituted a breach of the contract. Furthermore, Remcon has asserted that it was wrongfully terminated by NPS in retaliation for the submission of its certified claim and Remcon's represented inability to finance further work due to NPS' non-payment for all work performed.

In October 2003, Remcon filed its "Complaint for Breach of Contract and Damages" seeking damages of at least $3,115,096.89 and conversion of the termination for default to termination for convenience.

### B. Contract Considerations

The following contract provisions were found to be relevant to our analysis, evaluations, findings and conclusions for the Sherman Tree Parking Project.

In the Solicitation, Section A – Solicitation/Contract Form, it provides the following:

> *"The Contractor shall begin performance within 15 calendar days and complete it within 792 calendar days after receiving notice to proceed."*

In the Solicitation, in Section C – Descriptions and Specifications, Division 1, Section 01320 Project Schedule and Monthly Inspections, it states in part the following:

> *"1.4.A.1 The project schedule shall cover the entire contract period. The late finish date of the project schedule shall be the same date as the established completion date of the contract.*
>
> *1.4.A.2 The Contractor shall use the Precedence Diagram Method (PDM) with limited use of lead or lag durations between schedule activities. The Contractor's project schedule shall consist of procurement activities (including mobilization, submittal, and the fabrication and delivery of key and long-lead procurement items) and construction activities.*
>
> *1.4.A.4 In developing the project schedule, the Contractor shall be responsible for ensuring that subcontractor work at all tiers, as well as its own work, is included in the project schedule.*
>
> *1.4.A.5 The project schedule as developed shall show the sequence and interdependence of activities required for complete performance of the work. The Contractor shall be responsible for ensuring all work sequences are logical and the project schedule shows a coordinated plan of the work.*
>
> *1.5.A. General: The project schedule shall be updated on a monthly basis throughout the entire contract time and until project substantial completion. The status date of each schedule update shall be the 10th day preceding the progress payment request date.*
>
> *1.7.A. Requirements: When contract modifications or changes are initiated, delays are experienced, or the Contractor desires to revise the project schedule, the Contractor shall submit to the Contracting Officer a written time impact analysis illustrating the influence of each modifications, change, delay, or Contractor request on the contract time."*

In the Solicitation, in Section E – Inspection and Acceptance, subparagraph E.1 – Inspection of Construction, it states in part the following:

> *"(b) The Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements. The Contractor shall maintain complete inspection records and make them available to the Government, All work shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract.*
>
> *(d) The presence or absence of a Government inspector does not relieve the Contractor from any contract requirement, nor is the inspector authorized to change any term or condition of the specification without the Contracting Officer's written authorization." (emphasis added)*

In the Solicitation, in Section F – Deliveries or Performance, subparagraph F.1 – Liquidated Damages Construction, it states the following:

> *"(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $550.00 for each calendar day of delay until the work is completed or accepted.*
>
> *(b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause."*

In the Solicitation, in Section I – Contract Clauses, subparagraph I.7 – Definitions Alternate I, it states in part the following:

> *"(f) "Contracting Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer."*

In the Solicitation, in Section I, subparagraph I.17 – Variation in Estimated Quantity, it states the following:

> *"If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity. If the quantity variation is such as to cause an increase in the time necessary for completion, the Contractor may request, in writing, an extension of time, to be received by the Contracting Officer within 10 days from the beginning of the delay, or within such further period as may be granted by the Contracting Officer before the date of final settlement of the contract. Upon the receipt of a written request for an extension, the Contracting Officer shall ascertain the facts and make an adjustment for extending the completion date as, in the judgement of the Contracting Officer, is justified."*

In the Solicitation, in Section I, subparagraph I.18 – Audit and Records Negotiation, it states in part the following:

> *"(f) Availability. The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Record Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statute or by other clauses of this contract. In addition –*
>
> *(1) If this contract is completely or partially terminated, the Contractor shall make available the records relating to the work terminated until 3 years after any resulting final termination settlement; and*
>
> *(2) The Contractor shall make available records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract until such appeals, litigation, or claims are finally resolved."*

In the Solicitation, in Section I, subparagraph I.62 – Differing Site Conditions, it states in part the following:

*"(a) The Contracting shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of–*

*(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract: or*

*(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract."*

In the Solicitation, in Section I, subparagraph I.77 - Changes, it states in part the following:

*"(a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes--*

*(1) In the specifications (including drawings and designs);*

*(2) In the method or manner of performance of the work;"*

In the Solicitation, in Section I, subparagraph I.81 - Default, it states in part the following:

*"(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Government in completing the work."*

In the Solicitation, in Section I, subparagraph I.91 – Seasonal Shutdown, it states the following:

> *"(a) It is recognized that seasonal climatic conditions regularly occur in some of the National Park Service areas that restrict and in some cases prohibit normal construction activities. The actual timing of a seasonal shutdown will be determined by mutual agreement between the Contractor and the Contracting Officer. The Contractor shall give the Contracting Officer at least two weeks notice prior to the anticipated resumption of work. The actual date that work is resumed is subject to the approval of the Contracting Officer. The amount of time during a seasonal shutdown is taken into consideration when the completion time as stated in the Contract is determined. Therefore, the contract time will not be extended due to seasonal shutdowns."*

In the Solicitation, in Section C – Descriptions and Specifications, Division 1, Section 01430 Contractor Quality Control, it states in part the following:

> "*1.4.A.1 The quality of all work shall be the responsibility of the Contractor. Testing shall be the responsibility of an independent testing laboratory.*"

In the Solicitation, in Section C – Descriptions and Specifications, Division 1, Section 01720 Field Engineering, it states in part the following:

> *"1.1.A Contractor shall use monuments shown on the plans. Contractor shall layout the work by accurately measuring from these controls. <u>All work improperly located due to Contractor's errors or omissions shall be corrected at no additional expense to the Government</u>.*
>
> *1.1.B Contractor shall preserve controls thus established. Controls originally set by Contracting Officer that are destroyed by Contractor will be replaced by Contracting Officer, with the cost of replacement deducted from Contractor's final payment.*
>
> *1.1.C Locations and elevations shown on the drawings are subject to final field adjustment by the Contracting Officer before construction. Contractor shall immediately notify the Contracting Officer of apparent errors discovered on the drawings or in the initial stakeout. If changes in stakeout are required, the Contractor shall cooperate with Contracting Officer in prompt establishment of the field control for altered or adjusted work. All construction layout shall be completed a minim of seven (7) working days ahead of actual construct start for that particular work to allow time for the Contracting Officer to inspect the layout and perform any necessary field adjustments to the design.*

> *1.1.E General Earthwork: Original cross sections for earthwork shall be performed on all contractor work. Cross sections shall be performed at station intervals not to exceed 25 feet, at all PC, PT and angle points, at all design template transition stations, terrain breaks, and at all design center line profiles grade breaks, points of vertical curvature and tangency.*
>
> *1.2.A Quantity surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed in place.*
>
> *1.2.B The Contractor shall conduct the original and final surveys and surveys for the periods for which progress payments are requested. All these surveys shall be conducted in the presence of the Contracting Officer, unless the Contracting Officer waives this requirement in a specific instance. The Government shall make such computations as are necessary to determine the quantities of work performed or finally in place. The Contractor shall make computations based on the surveys for any period for which progress payments are requested. All surveys and computations shall be subject to review and approval by the Contracting Officer." (emphasis added)*

In the Solicitation, in Section C – Descriptions and Specifications, Division 2, Section 02310 Site Excavation and Grading, it states in part the following:

> *"1.3.A Use of rippers will be considered as unclassified excavation.*
>
> *1.3.B All excavation under this section will be considered unclassified regardless of the nature of material encountered. No rock excavation will be permitted unless approved by Contracting Officer.*
>
> *3.7.A Deep Fill Areas: The drawings and specifications indicate several sources of material to be placed in the deep fill areas of the Upper Sherman Tree Parking area. The geotechnical report outlines the placement procedures and compaction requirements. The deep fill material can be crushed asphalt or concrete, soil, boulders and other material not suitable for fill within the upper embankment layer requiring compaction levels of 95% or maximum density as outlined in Paragraph 3.9 Compaction. The Contractor must use the soil from Wukasachi as deep fill material.*
>
> *3.12.A Dispose of all surplus and unsuitable material outside the park and as specified in Section 01570.*

> *4.1 EXCAVATION AND GRADING*
>
> *4.1.A Payment will be included in the contact lump sum price for all excavation, embankment (including deep fill material), transporting of cut and fill material within the project area, stripping, staging, stockpiling, handling, and placement of topsoil and finish grading.*
>
> *4.3 HAUL EXCESS EXCAVATION*
>
> *4.3.A This work involves the hauling and disposal of excess excavation to Wolverton Point. Measurement will be by final cross sections of the finished stockpile. Volumes will be computed from cross sections by the average end area method. Payment will be made at the contract unit price per cubic yard." (emphasis added)*

In the Solicitation, in Section C – Descriptions and Specifications, Division 2, Section 02316 Roadway Excavation and Embankment, it states in part the following:

> *"1.1.A The work of this section consists of roadway and embankment construction, including excavation and grading for roadways and parking areas, ditch construction, and slope finishing.*
>
> *3.15.A Dispose of all surplus material and unsuitable materials outside the park and as specified in Section 01570.*
>
> *4.2.A This work involves the hauling and disposal of excess excavation outside the park. Payment will be made under the bid items for site excavation and grading (Section 02310) at the contract unit price per cubic yard."*

In the Solicitation, in Section C – Descriptions and Specifications, Division 2, Section 02725 Aggregate Base Course, it states in part the following:

> *"1.1.A The work of this section consists of furnishing and placing aggregate, including recycled crushed asphalt and concrete, on a prepared subgrade.*
>
> *1.2.C If materials are obtained from a commercial source, submit certification from the supplier certifying that aggregate base course meets the requirements of this section.*

> *1.2.D If recycled crushed concrete or asphalt is used, testing as specified in Section 02726.*
>
> *3.4.B Width: Plan dimension, plus or minus 2 inches.*
>
> *3.4.C Thickness: Plan dimension, plus or minus ½ inch.*
>
> *4.1.A Measurement for aggregate base course under bituminous concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Deduction will be made for moisture content exceeding 5 percent by weight. Payment will be made at the contract unit price."*

In the Solicitation, in Section C – Descriptions and Specifications, Division 2, Section 02743 Asphalt Concrete Pavement, it states in part the following:

> *"1.1.A The work of this section consists of constructing one or more surface courses composed of a mixture of aggregate and bituminous material to lines, grades, cross-sections and details, as shown on the plans and covered within these specifications.*
>
> *4.2.A Measurement for asphalt concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Payment will be at the contract unit price."*

### C. Methodology

In order to assess the delays that experienced on this project, CPMI has performed a series of Time Impact Analyses ("TIA"). TIA is an analytical scheduling technique that is utilized to determine the schedule impact of delay-causing event on overall project completion. This technique relies upon the as-planned schedule, schedule updates, and the development of an as-built schedule. These schedules are then used to facilitate determining the status of the project at specific "status dates", or points in time from which the amount of work both completed and remaining may readily be determined. The TIA's are then supplemented with the various project documents and other studies as necessary to aid in the determination of causation and liability. The critical path is then calculated, and a determination is made as to which delays, if any affected the project completion date, and which simply consumed

available float. This process is repeated in chronological order until the analysis reaches project completion.

Before delays and other impacts can be evaluated, certain fundamentals of planning and scheduling must be considered. Such considerations include assessing the "As-Planned" Schedule and developing the actual or "As-Built" Schedule. Once these operations are completed, a comparison and reconciliation of the two schedules becomes the basis for the TIA's.

### D. "As-Planned" Schedule

An "As-Planned" Schedule is defined as a document which illustrates the contractor's original work plan to perform the scope of work in accordance wit h the contract documents, and as such is usually prepared prior to or shortly after the commencement of the work. The "As-Planned" Schedule is utilized as a benchmark for measuring the contractor's actual performance. Generally, contractors will submit a construction schedule at the inception of the project, which was carefully thought out and reflects their planned approach. This schedule will then be submitted to the owner for approval.

The project specifications required that within five calendar days after Notice to Proceed the Contractor prepare and submit, for the Contracting Officer's review its proposed Project Schedule Network Diagram.[9] This submittal was to consist of both a time scaled with logic ties indicated hard copy (22" x 34" sheets) and an electronic file. The scheduling software was be the latest version of Primavera Project Planner (P3), or approved equal. At the

[9] Specification Section 01320, Project Schedule and Monthly Inspections.

Preconstruction Conference Remcon was given approval to use an approved equal, Microsoft Project, for its project scheduling.[10]

On June 11, 2001, Remcon submitted its project schedule to NPS.[11] On June 18, 2001, Jacobs returned the schedule to Remcon commenting that it did not conform to Division 1 Section 1.4.A1 and 1.4A7 and Remcon was to correct and resubmit.[12] On July 2nd, NPS advised Remcon that its project schedule was "Unacceptable – Resubmit w/Resource Loaded" and that Remcon was to provide "complete project schedule from start to completion – does not schedules for Lower Sherman."[13] On June 25th, Remcon resubmitted its Project Schedule.[14] In early July, NPS noted that it could not make payment to Remcon until there was an acceptable schedule among several other items.[15]

On July 24th, Jacobs indicated that the 2-year schedule should be accepted with notations and that the late starts should be revised.[16] On July 25th, Remcon's schedule was accepted with notations and Remcon was to resubmit revised schedule.[17] NPS indicated that it believed that Remcon's schedule was very optimistic and that current progress was behind schedule. Furthermore, NPS indicated that the completion date should be as addressed in Specification Section 01320, part 1.4A1 and 2, Schedule Development. Remcon's schedule projected an early completion; however, the specifications required that the project schedule should cover the entire contract period and that the late finish of the project schedule was to be the same date as the established completion date of the contract. In conclusion, NPS

[10] NPS letter to Remcon dated June 18, 2001, re: Preconstruction Meeting Minutes.
[11] Transmittal No. 10 – Project Schedule dated June 11, 2001.
[12] Handwritten Note dated June 18, 2001 on Transmittal No. 10.
[13] Handwritten Note dated July 2, 2001 on Transmittal No. 10.
[14] Transmittal No. 24 – Project Schedule dated June 25, 2001.
[15] NPS E-Mail dated July 3, 2001.
[16] Minutes of Weekly Meeting #8 dated July 24, 2001.
[17] Handwritten Note dated July 25, 2001 on Transmittal No. 24.

indicated that Remcon's Progress Schedule was Acceptable provided that Remcon resubmitted it addressing its concerns.

In early October 2001, Remcon noted that NPS might start withholding some funds if the schedule was not updated, as earlier requested.[18] Remcon responded to NPS that it intended to spend several weeks during the early part of the winter shutdown developing a schedule that both Remcon and NPS would believe was workable.[19] In early December 2001, Remcon submitted two schedules, one for the completion of the Upper Sherman phase and one for the completion of the first phase of Lower Sherman.[20] On December 24, 2001, Jacobs provided NPS its comments regarding Remcon's revised CPM schedule.[21] Jacobs recommended that NPS require an acceptable baseline schedule for the entire project and that Remcon be required to submit monthly updates as required by the project specifications.

In early January 2002, Jacobs notified NPS that one of the items that needed to be resolved was the acceptance of the Project Schedule.[22] In late January 2002, NPS requested that Remcon provide it with a revised schedule for the project in accordance with Specification Section 01320 in advance of a meeting to be scheduled in February.[23]

On February 6, 2002, Remcon submitted several schedules. One schedule was for the completion of Upper Sherman. A second schedule was for the all the Lower Sherman tasks to be completed in 2003. Another schedule combined the Upper Sherman work with the retaining wall on the Generals Highway and some other preliminary Lower Sherman work. The last schedule showed completion in 2003 using the combined schedule for 2002. On

---

[18] Remcon Memorandum dated October 2, 2001.
[19] JE Facsimile to NPS dated October 11, 2001 with Remcon letter to NPS undated attached.
[20] Remcon Transmittal to NPS dated December 3, 2001.
[21] JE Transmittal to NPS dated December 24, 2001.
[22] JE Transmittal to NPS dated January 2, 2002.
[23] NPS letter to Remcon dated January 29, 2002, re: February 2002 Meeting.

February 25th, Jacobs provided NPS its comments on Remcon's February schedules.[24] Jacobs' comments were virtually the same as its comments regarding Remcon's December schedules. Jacobs reiterated its previous recommendation that NPS require an acceptable baseline schedule for the entire project and that Remcon be required to submit monthly updates per the project specifications. In early March, NPS notified Remcon that it had reviewed Remcon's progress schedule dated February 6, 2002 and had found that it was still not in compliance with the contract requirements.[25]

In early April 2002, Remcon notified NPS that at their last meeting Remcon had provided NPS with two preliminary schedules.[26] One scheduled based on being able to start the retaining wall on the Generals Highway this year and the other schedule had the wall starting next year. To date we have not received any response to the retaining wall. Should we not be able to start the wall this spring we will be forced to push the wall off to next season. This is a result of delays encountered last year.

In early June, in an internal e-mail it was reiterated that NPS must receive an acceptable baseline schedule for the entire project from Remcon.[27] Until we see an honest effort by Remcon to get the Upper Sherman area back on track and under construction, we will not entertain any proposals that will impact park operations at Lower Sherman. We have spent considerable time reviewing at least 3 proposals and have met with Remcon 2 times regarding this change.

In late June 2002, Remcon submitted three schedules.[28] One was Remcon's original project schedule, which was approved with comments in 2001 with the requested revisions. The

[24] JE Transmittal to NPS dated February 25, 2002, re: Remcon's Revised CPM Schedule.
[25] NPS letter to Remcon dated March 4, 2002, re: Project Schedule Review Comments (Schedule dated 02/06/02).
[26] Remcon E-Mail to NPS dated April 2, 2002, re: Project Schedule.
[27] NPS E-mail to NPS dated June 4, 2002, re: Generals Highway Work.
[28] Remcon letter to NPS dated June 27, 2002, re: Project Baseline Schedule & As-Built/As-Planned Schedules.

second schedule shows the as-built durations for 2001 and as-planned durations for 2002 and 2003. The third schedule was a proposed schedule showing as-built durations for 2001 and as-planned activities if NPS allows work to begin on Generals Highway this year. After careful review the original project schedule submitted by Remcon in June 2002 did not include all the required revisions and did not comply with the specification requirements. This schedule did not cover the entire contract period (it was still an early finish schedule). Remcon's schedule did not include procurement activities for key and long-lead time procurement items.

CPMI carefully reviewed the "baseline schedule" submitted on June 27, 2002, and found that there were no significant durations or logic changes from the schedule submitted in June 2001. The June 2002 schedule did reflect the actual date of Notice to Proceed. In CPMI's opinion, the baseline schedule submitted in June 2002 should be considered the "As-Planned" Schedule for this project.

At Tab D of this report is a graphical illustration of the summary of the "As-Planned" Schedule.

Even though NPS did not have the schedule for more than a year after the Notice to Proceed, it remains in our opinion, the only schedule that can be considered the "As-Planned" Schedule. It is very unusual to have an "As-Planned" Schedule that was actually submitted for review more than a year after the Notice To Proceed. Additionally Remcon did not submit the monthly schedule updates required by the specifications.[9]

### E. "As-Built" Schedule

CPMI prepared an As-Built Schedule, which is an itemized chronology of the project's history, from data contained within Remcon's contemporaneous schedules and supplemented by Remcon's Daily QA/QC Reports and Daily Log of Construction prepared by Jacobs.

At Tab E of this report is a series of graphical illustrations of the "As-Built" Schedule.

### F. Project Delays

In CPMI's opinion there were five "controlling time impacts" which accounted for the extended duration of the project. The controlling time impacts are described in detail below and are illustrated graphically on the Exhibits included at the end of this Section of the report. These series of Exhibits are known as the Time Impact Analysis (TIA's), and are utilized to explain the sequence of events that translated the "As-Planned" Schedule into the "As-Built" Schedule. These TIA's were prepared by starting with the "As-Planned" Schedule and chronologically incorporating the various delays that occurred during the life of the project into this schedule. Once the critical path was identified all the original schedule dates were revised accordingly in order to project adjusted schedule dates. The adjusted schedule was then used when analyzing the next chronological time impact.

#### 1). Time Impact Analysis # 1 – July 27, 2001

The status date for our first TIA is July 27, 2001. On this date, Remcon commenced earthwork operations in the "deep cut" area of the AR, between stations 25+00 and 31+00. Prior to this date Remcon's earthwork activities consisted of excavation in the USPA upper parking lot and placing fill in the AR at stations 10+00 to 12+00, and 17+00 to 19+00.

The critical path of Remcon's "As-Planned" Schedule, was initiated by the following sequence of activities: Remove Trees, Clear and Grub, Install Erosion Control, Haul Material within Park, Place Fill from Wuksachi, Excavation and Embankment for the AR, and Excavation and Embankment for the PA. Up to this point the critical path is running through the roadwork activities. Following the earthwork activities in the USPA, the critical path then proceeds through the Comfort Station activities to Substantial Completion of the USPA. Our analysis indicates as of July 27, 2001, the project was essentially on schedule.

Immediately after the Notice to Proceed Remcon commenced tree removal, and clearing operations over the entire USPA. From June 11, 2001 to about July 2, 2001, Remcon hauled both wood chips and contaminated wood chips off the project as well as timber to the mill. Remcon commenced survey layout work on June 25, 2001, after the tree clearing/logging operations had been completed. On June 27, 2001, Remcon began to haul in material from Wuksachi for placement along the AR at stations 10+00 to 12+00, and 17+00 to 19+00. Hauling from Wuksachi was not a continuous operation and appeared to be complete by mid July.[29] The contract contained a pay item for Hauling Material within the Park, Pay Item #27.[30] This material was located at Wuksachi and was made up of soil and decomposed granite. The soil was to be used in deep fill locations and the granite was to be used as aggregate base under pavement.

Excavation and removal of the material located in the "burn/pit" of the USPA parking lot commenced on July 2, 2001 and continued until July 18, 2001.[31] The contract drawings

[29] Remcon Log of Trucking/Hauling June and July 2001.
[30] Revised Contract Price Schedule, CPS-2, from Amendment No. 1, dated March 12, 2001.
[31] Remcon QC Daily Report dated July 2, 2001.

contained a reference to "Burn Material", which was required to be hauled from the park.[32] As the excavation advanced into the "burn/pit", it became apparent the volume of material to be hauled out of the park was more extensive than anticipated. NPS issued a contract modification to compensate Remcon for this additional work.[33]

Generally during this time period, the earthwork was confined to three operations; excavation of the "burn/pit"; excavation of material from the parking lot to be hauled to Wolverton Point[34], and the placement of fill material from the stockpile at Wuksachi in the AR.

In late June after logging and clearing were complete and survey work was underway, NPS met with Remcon on-site and reviewed the layout of the AR. Two areas of the AR alignment presented concerns because of the proximity to trees which were not scheduled to be removed. Between stations 9+00 and 12+00, it appeared that a very large tree would be very close to the left edge of the AR[35]. At area between station 24+46 and 30+25 it appeared that the centerline layout of the AR was to close to the right edge of where the AR should be. Apparently, the clearing was performed according to the drawings, and if the AR was built as laid out, then additional tree removal on the west side of the AR would be required. The NPS decided it would be best to realign the access road, rather than remove any more trees. On July 11, 2001, NPS forwarded the adjusted AR alignment, between 24+38 and 30+20, to Remcon.[36] On July 16, 2001, Remcon's surveyors began re-staking

---

[32] Contract Drawings, Sheet US8, entitled Existing Conditions and Demolition.
[33] Contract Modification #3 dated August 2, 2002.
[34] JE Daily Log of Construction dated July 16, 2001.
[35] JE E-mail to NPS dated July 2, 2001.
[36] JE Speed Letter to Remcon dated July 11, 2001.

the adjusted AR alignment.[34] NPS agreed to reimburse Remcon for the additional survey work associated with the realignment work.[37]

In late June, Remcon advised NPS that it believed the "cut and fills will not balance", in fact it believed there may be 13,000 cubic yards of excess excavation.[35] At the weekly meeting of July 10, 2001, the volume of earthwork was discussed.[38] At the following weekly meeting, dated July 16, 2001, an itemized accounting of all volumes of earthwork was presented by NPS.[39] This accounting revealed that in addition to the 6,800 cubic yards that were to be hauled to Wolverton Point, an additional 5,000 cubic yards needed to be hauled out of the park.

On July 24, 2001, at the weekly field meeting, Remcon was advised they needed to address submittals regarding the Comfort Station.[16] Construction of the Comfort Station, on the project critical path activity, was planned to commence on August 16, 2001. As of that point in time, very few shop drawings for the Comfort Station had been submitted.[40]

Remcon transmitted the qualifications of CDB as well as a blasting plan to NPS on June 25, 2001. The transmittal was returned on July 25, 2001 marked qualifications approved, blasting plan disapproved resubmit.[41] On July 18, 2001 CDB was on site to review the blasting plan with NPS. The revised blasting plan was submitted and approved on July 26, 2001. On July 23, 2001 Remcon `scheduled CDB to the project.[42] The blasting plan as submitted by Remcon is entitled, Explosives Use and Blasting Plan for Sequoia National Park, Big Tree Parking. The general location of blasting as identified in this transmittal was,

[37] JE Fax to Remcon dated January 7, 2002, re; Mod #3 cost proposals.
[38] Remcon Weekly Meeting Minutes dated July 10, 2001.
[39] Remcon Weekly Meeting Minutes #7 dated July 16, 2001.
[40] MasterLog (NPS/Remcon Doc) dated April 28, 2005.
[41] Remcon transmittal #18 to NPS dated June 25, 2001.
[42] Remcon Project Manager's Report for week of July 23, 2001.

"Blasting will be performed on a new sewer line in Sequoia National Park Big Tree Parking Project." It also states that, "Blasting is required to allow a new parking area and sewer line to be constructed."[43] (emphasis added) As of this status date, there are no indications, that Remcon has encountered rock in its earthwork activities.

At Tab F of this report is a graphical illustration of TIA #1.

### 2). Time Impact Analysis # 2 – November 9, 2001

The status date for TIA #2 is November 9, 2001. On this date Remcon "shutdown" the project and made preparations for the winter.[44] The critical path of the projected schedule of TIA #1 indicated that Remcon would begin earthwork first on the AR and then complete the USPA. These activities were scheduled to be complete by August 17, 2001. After earthwork in the USPA was complete the critical path would then shift to a series of Comfort Station activities ending with Substantial Completion of the USPA. As of November 9, 2001, the USPA was not complete. During this 105 calendar day period (July 28, 2001 to November 9, 2001), the Substantial Completion of USPA (Phase I) was delayed 88 calendar days.

Our analysis indicates there were two delays to the critical path in the projected schedule of TIA #1. The first delay occurred in the earthwork operations, and the second delay occurred in construction of the Comfort Station. In addition our analysis also indicates that the Remcon "As-Planned" Schedule contained a serious flaw in logic.

---

[43] Remcon Explosives Use, and Blasting Plan, Transmittal #18.
[44] JE Daily Log of Construction dated November 9 and 12, 2001.

Earthwork operations begin in the deep cut of the AR on July 27, 2001.[45] The following work day, July 30, 2001, Remcon's blasting subcontractor, CDB, arrived on site and began to drill in the AR at station 28+00.[46] Over the next several days it is noted in the Daily Log of Construction that Remcon was cutting grade on the AR between station 25+00 and 31+00 and encountering boulders which required blasting.[47] Once the earthwork operation began on the AR in the "deep cut" area, access to the USPA would be limited. On August 1, 2001, Remcon sought permission to construct a temporary construction road to by pass the "deep cut" area due to utility work and blasting operations.[48] The temporary construction road linked the staging area at the end of the Shuttle Drive to the upper parking lot. NPS agreed to this request.[49]

On August 8, 2001, Remcon sent a fax to NPS suggesting that the quantity of rock excavation would greatly exceed the contract quantity for Pay Item #38. Pay Item #38 Rock Excavation was included in the Contract to pay for rock excavation that was required during utility trench work.[50] On August 20, 2001, Remcon submitted a formal notice to the NPS of a differing site condition, "rock that can not be ripped".[51] Remcon continued to drill and blast at various locations in the AR and USPA upper parking lot until September 11, 2001. Excavation in the USPA continued until September 24, 2001.[52] The excavated material from the "deep cut" area of the AR was hauled to the staging area and to the upper parking lot. On September 25, 2001, Remcon's subcontractor, Oasis, arrived at the site and began to crush on site material into aggregate base and sand.[53] By October 29, 2001, Oasis had made

[45] JE Daily Log of Construction dated July 27, 2001.
[46] JE Daily Log of Construction dated July 30, 2001.
[47] JE Daily Log of Construction dated July 31, 2001.
[48] NPS Transmittal to NPS dated August 2, 2001.
[49] NPS letter to Remcon dated August 7, 2001.
[50] Project Specification, Section 02310-5, Article 4.2, and CPS-3.
[51] Remcon letter to NPS dated August 20, 2001, re: Rock Excavation – Differing Site Condition.
[52] JE Daily Log of Construction dated September 25, 2001.
[53] JE Daily Log of Construction dated September 25 & 26, 2001.

4,750 tons of aggregate base, 3,940 tons of sand to be used in the leech field, and 800 tons of by product for use as utility trench backfill,[54] and left the project.[55] The stockpiled materials were still in the upper parking lot when the project was shut down for the winter.

NPS acknowledged that Remcon had encountered a differing site condition, and began negotiating to reach a bilateral agreement. However, those negotiations eventually failed and NPS issued a unilateral contract modification (Mod #6) to compensate Remcon for this differing site condition.[56]

On October 18, 2001, Remcon submitted RFI #31 –Excess Excavation to NPS.[57] Remcon informed NPS that they believed there was approximately 15,000 cubic yards of excess material in various piles on the project. Remcon wanted to know what NPS wanted done with the excess material and how they were going to be compensated for moving it. NPS responded that based on field observations it appeared that earthwork was being constructed approximately one foot below design grades.[58] NPS advised Remcon that they would have the surveyors check the field work.

Earthwork on the AR began as scheduled however, Remcon encountered "non-rippable rock", which it determined required drilling and blasting. The project records indicate earthwork in this area was substantially complete on September 24, 2001. Therefore completion of this sequence of activities was delayed a total of 38 calendar days. This is a critical path delay and as such delayed the Substantial Completion of USPA. Remcon contends it could not rip the rock that was encountered in the AR and UPSA. Our review of

---

[54] Remcon IOM dated Novmeber 13, 2001.
[55] JE Daily Log of Construction dated October 29, 2001.
[56] NPS letter to Remcon dated February 18, 2003, re: Contract Modification #6.
[57] Remcon RFI #31 to NPS dated October 18, 2001.
[58] NPS letter to Remcon dated October 29, 2001.

the project documents does not support that position, since Remcon spent only one and one half day in the deep cut area before its drilling and blasting subcontractor began working in that area. However, NPS did recognize Remcon's claim of differing site condition – rock, through the issuance of Mod #6. Therefore, it is CPMI' opinion that this delay was not within the control of Remcon and is excusable, however, the entire 38 calendar days are not compensable.

Construction activity at the Comfort Station began on August 6, 2001, somewhat earlier than scheduled. In a weekly meeting on October 2, 2001, Remcon stated that they were going to be shutting the project down November 1, 2001 for the winter, and therefore they were planning to stop work on the Comfort Station when they completed the slab on grade pour.[59] At the same meeting Remcon advised NPS that submittals for the Comfort Station windows and doors would be made that day. It was also noted that "the lead time for some of those materials was between 6 and 8 weeks", after the review and approval cycle. Our review indicated that despite earlier prompting by NPS, Remcon failed to timely submit key shop drawings for the Comfort Station. The lack of attention to these submittals caused a delay to the critical path and Substantial Completion of USPA.

Based on the projected schedule of TIA #1, the critical path included all the activities for the Comfort Station. The slab on grade was scheduled to be complete on September 4, 2001, but was not completed until October 10, 2001. Therefore completion of this sequence of activities was delayed a total of 36 calendar days. The construction of the CMU walls was to commence upon completion of the slab on grade. As of November 9, 2001, when the project was shut down for the winter by Remcon, the CMU walls had not started. It appears from the project records that the windows and door frames were not available on

[59] Remcon IOM dated October 2, 2001, and Weekly Meeting #19 dated October 2, 2001.

October 10, 2001. Therefore, the delayed start of the CMU walls caused an additional delay of 30 calendar days. Together these two critical path events contributed a delay of 66 calendar days to Substantial Completion of USPA (Phase I).

It is CPMI's opinion, with a reasonable degree of certainty that these two critical path delays, late completion of slab on grade and the delayed start of the CMU walls of the Comfort Station were within the control of Remcon and as such are non-excusable contractor caused delays.

The utility work included water, storm drainage, sewer, electric service, and telephone. In the Remcon "As-Planned" Schedule this sequence of activities was not on the critical path. All of the utility work except for the sewer was beneath the AR and USPA pavement. The water and electric service were designed to be located in the center of the AR and literally ran from one end of the AR to the Comfort Station. The water line was to be installed with a minimum cover of four feet.[60] Remcon requested and received permission to install the water line and electric conduit in a single trench. The water line was to be at the bottom and the electric conduit at least one foot above and offset one foot to the side of the water line. The storm drainage crossed the AR and USPA in several locations. Therefore, the installation of the utility work was a predecessor to Place and Finish Aggregate Base and AC Paving activities. Remcon's "As-Planned" Schedule omits this logical relationship. Instead the Aggregate Base and AC Paving activities had in some cases erroneous and enormous amounts of float.[61] Remcon eventually realized this flaw and correctly updates the logic in a future schedule submission. The absence of the correct logic in the schedule will conceal some portion of the delay.

---

[60] Contract Drawing Sheet US42, entitled Access Road Utilities Waterline.
[61] Remcon letter to NPS dated June 27, 2002, re: Project Baseline Schedule & As-Build/As-Planned Schedules.

The water line extended from the existing water service in Wolverton Road to the Comfort Station approximately 3,900 linear feet. On September 11, 2001, Remcon began work on utility trench construction.[62] On September 19, 2001, Remcon began to install the 4" ductile iron water line at Wolverton Road. Between September 17, 2001, and October 9, 2001, Remcon drilled and blasted rock within the utility trench at various locations, between stations 6+00 and 36+00, on the AR.[63] On October 2, 2001, Remcon began installation of the 4" ductile iron waterline, and reached station 39+00 by October 25, 2001.[64] Backfill material for the utility trench was hauled from Wuksachi. The contract documents provided a pay item for rock excavation during utility trench excavation.

The storm drains were 24" corrugated metal pipe, which ran beneath the AR at specific locations. At the up stream end of each storm drains were concrete drainage structures (inlets). At the lower end were stone headwalls. The storm drain lines crossed the AR as well as the waterline. When the storm drain lines were beneath the waterline they needed to be installed before waterline work. Of the seven storm drain crossings in the AR two were located beneath the waterline (approximately station 12+00 and 19+00). These were installed between September 28, 2001 and October 2, 2001.[65] Only two other storm drains were installed during this time period (station 1+50 and 2+10). Approximately two weeks after the start of waterline installation the electrical conduit work commenced and continued until November 9, 2001.

The sewer line was to be constructed from the Comfort Station out to the leach field.[66] It included sewer pipe, dosing and septic tanks, and a leach field. During this time period

[62] JE Daily Log of Construction dated September 11, 2001.
[63] JE Daily Log of Construction dated October 9, 2001.
[64] JE Daily Log of Construction dated October 25, 2001.
[65] JE Daily Log of Construction dated September 28 and October 1, 2001.
[66] Contract Drawing Sheets US46 & US47 entitled, Leach Field System Details.

Remcon excavated and constructed the septic and dosing tanks, and excavated for the leach field. At the leach field Remcon encountered rock. The contract documents provided that the lump sum price for the sewage disposal system, which included constructing the disposal (leach) field, included the cost of all earthwork, weathered granite removal and blasting as required.[67]

On the status date of this TIA, November 9, 2001, Remcon had not completed: the utility work (water, electric and sewer); the leach field construction; or the placement of aggregate base. This meant that more than 10, 000 tons of crushed material, together with other stored materials were stockpiled in the upper parking lot, prohibiting Remcon from completing its contract work in the upper parking lot. In essence the upper parking lot was a staging area.

During this time period our analysis indicates there is a period of time when two of the critical path delays overlapped or occurred concurrently. It is CPMI's opinion that for this period of the delay (September 4, 2001 to September 24, 2001), the time should be considered as excusable but non-compensable. Therefore, we conclude the critical delays for this period are:

| | | |
|---|---|---|
| Earthwork DSC | 18 cd | Excusable compensable |
| Concurrent | 20 cd | Excusable non-compensable |
| Comfort Station | 46 cd | Non-excusable |

At Tab G of this report is a graphical illustration of TIA #2.

[67] SEKI 200Q Project Specifications, Section 02745 – Sewage Disposal System.

**3). Time Impact Analysis # 3 – July 12, 2002**

The status date for TIA #3 is July 12, 2002. On this date Remcon resumed work on the AR. The projected schedule of TIA #2 indicates that there are three groups of activities all commencing with the restart of work after the winter season. The critical path has shifted to the completion of the road work. The Comfort Station sequence of activities is the second most critical path with 19 calendar days of total float. As discussed in a prior TIA, the Remcon "As-Planned" Schedule was missing key logic ties between the completion of utility work and the start of aggregate base material. In June 2002 Remcon submitted a revised schedule. Our analysis included a review of the actual work against both the projected schedule of TIA #2 and Remcon's revised schedule.

During the winter JE advised NPS that there were a number of items of work that Remcon needed to address once the winter season was over.[22] Some of the critical items were:

- Fill slopes were not placed in accordance with the plans. NPS surveyors found that some of the slopes are steeper than 2:1. This was perhaps the reason why culvert pipes appear to be too long. The skinny slopes contain less material and this would contribute to the excess material.
- Shuttle Drive roadway was apparently constructed four feet south of the plan location.
- Comfort Station has quite a few key submittals that need to be submitted and approved.
- Leach Field percolation soil needs to be tested to assure it conforms to the contract requirements.
- Water line should be pressure tested and the air relief valve assemblies installed.

Between November 9, 2001 and May 8, 2002 no contract work was performed.[68] The contract provisions clearly indicate the impact weather can have on the project. The "As-Planned" Schedule included an allowance for each winter shutdown and that time was included in the overall contract duration. Remcon returned to the project on May 8, 2002, and began to re-establish the construction yard and started a general clean up of the construction site after the winter shutdown. By May 20, 2002, due to poor weather conditions, Remcon advised NPS it was sending the staff home.[69]

On May 21, 2002, JE and Remcon had a conversation regarding the quantity of earthwork. JE advised Remcon that it had calculated 30,500 cubic yards of cut and 10,500 cubic yards of fill which was in agreement with the quantities reported by G&K (Remcon's surveyor). JE reported that Remcon appeared to agree on the excavation and fill quantities.[70]

The Comfort Station was actually the first contract work that resumed after the winter shutdown. On May 28, 2002, Remcon's subcontractor, KSM was on site to begin constructing the CMU walls. However on that same date, Remcon submits RFI #40 requesting permission to retrofit the door jams after the walls are completed.[71] On May 30, 2002, NPS approved an alternate method of anchoring the metal door frames to the CMU walls.[72] With this change the exterior walls could proceed. The roof framing started next and was completed by June 13, 2002. The stone veneer on the outside walls was the next item of work for the Comfort Station.

---

[68] JE Daily Log of Construction dated May 8, 2002.
[69] JE Daily Log of Construction dated May 20, 2002
[70] JE Daily Log of Construction dated May 21, 2002.
[71] JE Fax to NPS dated May 28, 2002, re: RFI #40 Upper Comfort Station Door Substitution.
[72] Remcon typed notes of Meeting Minutes dated May 30, 2002.

On May 30, 2002, some of Remcon's forces returned to the project and began to remove winterizing cover from the excavation. However, at a meeting held on site on May 31, 2002, Remcon advised JE that although it had quite a bit of work, it was not going to receive any additional equipment or personnel until June 10, 2002.[73]

On June 10, 2002, when Remcon forces arrived they resumed work on the storm drains and sewer line. Remcon constructed four storm drain crossing during this time period, some in the road and some in the parking lot. However, it encountered rock during storm drain construction and removed it using backhoes with a hoe-ram attachment, since the drilling and blasting subcontractor did not return after the winter. Remcon began excavation and installed the sewer line from the septic and dosing tanks to the leach field, and began installation of the 5 foot blanket of percolation material in the leach field.[74]

During this period of analysis the project was delayed an additional 66 calendar days. Based upon the projected schedule of TIA #2, Remcon should have been working on the completion of utility work in the AR and constructing the Aggregate Base and AC Pavement. Although the utility work began, there was no Aggregate Base or AC Pavement started. It is CPMI's opinion that the delayed resumption of work on the AR was within the control of Remcon, and should be considered non-excusable. The utility work was not completed sufficiently, including all required testing, to permit the commencement of fine grading and placement of Aggregate Base. Remcon failure to progress the utility work and Aggregate Base work on the AR delayed the project.

On June 27, 2002 Remcon submitted a revised schedule.[28] Our review of this schedule revealed that Remcon introduced new activities, extended activity durations, and revised

[73] JE Daily Log of Construction dated May 31, 2002.
[74] JE Daily Log of Construction dated June 10, 2002.