logic ties. Most of the changes were to revise the logic to reflect how Remcon planned to progress the work. Remcon's schedule which projects resuming work on June 28, 2002, indicates that USPA (Phase I) will be Substantially Complete on October 28, 2002. CPMI analyzed this schedule as of July 12, 2002 and obtained similar results. However, using Remcon's revised schedule, we concluded that the project was delayed an additional 9 calendar days, or a total additional delay of 75 calendar days. Because this schedule contained more activity detail and corrected logic relationships we will use TIA #3A as the adjusted schedule to measuring project progress. It is CPMI's opinion that the additional 9 calendar days were within Remcon's control and should be considered non-excusable.

At Tab H of this report is a graphical illustration of TIA #3 and 3A.

### 4). Time Impact Analysis # 4 – December 6, 2002

The status date for TIA #4 is December 6, 2002, the date Remcon "shutdown" for the winter. The projected schedule of TIA #3A indicates that the critical path began with completion of the Utility Work, followed by Fine Grading, Aggregate Base, and Stone Revetment in the AR. These activities were then followed by Utility Work and Aggregate Base in USPA, Paving in AR and USPA, Signs and Cleanup, and Substantial Completion of USPA (Phase I). The second most critical path is through the Stone Curbwork and Stairs in the USPA. This path had approximately 7 calendar days of total float.

On June 19, 2002, Remcon and NPS agreed on the cost of the work associated with using the "excess excavation" to raise the grades in the upper parking lot.[75] However, Remcon informed NPS that until they receive the MOD for the USPA work it was being delayed. On June 27, 2002, NPS directed Remcon to raise the grades in the USPA in accordance with the

[75] Remcon E-mail to NPS dated June 19, 2002.

revised drawings, and a bilateral modification would be issued as soon as practical.[76] Remcon advised NPS that it received the Contracting Officer's Directive, but without some assurance that it would be paid within 15 days after the work was complete, it could not continue to finance the project.[77] On July 16, 2002, NPS responded that it was their intent to issue a bilateral MOD and include payment in the next payment cycle in August 2002.[78]

On July 25, 2002, Remcon began to remove material from the stockpiles in the upper parking lot so it could raise the grades as directed a month earlier. At that time Remcon began to haul and place Aggregate Base from the stockpiles in the USPA to the AR between stations 21+00 and 30+00.[79] Remcon substantially completed placing the stockpiled material in the upper parking lot by the end of July.[80] It appears that this work took approximately one week to perform.

On August 7, 2002, NPS advised Remcon that the deep fill embankments, which contained asphalt chunks and/or debris, from station 6+00 to 21+50 were rejected. Asphalt materials if used were to be crushed and placed in the embankments of the upper parking lot.[81] After denying the existence of the asphalt material in the fill slopes, Remcon finally submitted a plan to remove the asphalt debris from the AR slopes.[82] This work was substantially complete by September 11, 2002, except for hand raking which was complete on September 23, 2002.[83]

---

[76] NPS letter to Remcon dated June 27, 2002.
[77] Remcon letter to NPS dated June 28, 2002.
[78] NPS letter to Remcon dated July 16, 2002.
[79] JE Daily Log of Construction dated July 25, 2002.
[80] Remcon letter to NPS dated September 16, 2002.
[81] NPS letter to Remcon dated August 9, 2002.
[82] Remcon letter to NPS dated August 21, 2002.
[83] Remcon Fax to JE dated September 23, 2002, re: Access Road cleanup and finishing fills.

On August 19, 2002, Remcon was advised by NPS that the Aggregate Base material sampled was not in compliance with the specifications and therefore rejected. Remcon reworked the Aggregate Base materials placed in the AR and new tests were performed with positive results. Some of the Aggregate Base material became contaminated as Remcon worked on the buried utilities. Remcon offered to cut out or make repairs to these areas on a case by case basis.[84] Remcon began to haul in Aggregate Base material from a commercial source on September 19, 2002.[85] This material was placed initially in the AR and then in the USPA. Asphalt paving commenced on October 7, 2002, and continued until November 4, 2002, when Remcon's subcontractor, Garcia shut down operations for the winter. Before the winter shutdown, Remcon installed the first course of AC Pavement over the entire AR and USPA, and only a porton of the second course of AC Pavement.

Utility work also continued during this period. NPS issued letters to Remcon regarding "suspect work" on the water line and electric ductwork. Corrective work to confirm that the installations were installed in accordance with the contract continued until September 18, 2002. At that time, pressure testing and chlorination commenced. Construction of the leach field continued and on July 23, 2002, Remcon began to install the infiltrators and piping. On September 13, 2002, Remcon notified NPS that the disposal system from the septic tank to the leach field had been air and water tested with no leakage and therefore was considered complete.[86]

Stone work for the dry laid stone wall and the stone face curbing was very active during this time period. The dry laid stone wall was started in mid July and completed by August 8, 2002. Construction of this wall was interrupted when it was determined that the wall was

---

[84] Remcon Fax to JE dated September 23, 2002.
[85] JE Daily Log of Construction dated September 19, 2002.
[86] Remcon letter to JE dated September 13, 2002.

laid out incorrectly. NPS provided Remcon with a revised design so that the wall construction could be modified and accepted.

The stone curb work, which is located on the perimeter of the upper and lower parking lots, commenced on August 19, 2002. Stone curb work is a combination of a formed concrete base and cut stone set into the fresh concrete to make a vertical face that eventually the pavement rests against. This work continued until October 28, 2002. Remcon's adjusted schedule projected less than a month for all of this work. It actually took more than twice the planned duration. The stone curb was an activity that was generally to be completed before the Aggregate Base was installed. In Remcon's schedule the stone curb was shown to be installed completely before any Aggregate Base was installed in the USPA. Because the upper parking lot served as a staging area, Remcon had various stored materials occupying most of the lot. Until the stockpiles of Aggregate Base, leach field backfill, and excess excavation were removed from the upper and lower parking lots, the stone curb could not begin. Aggregate Base and excess earthwork were removed by the end of July, but it was more than two weeks before the stone curb began.

At the start of this period of analysis, the work on the STT was not on the critical path. However, because Remcon did not actively pursue this work, all of the float time was consumed and the STT activities became critical. By November 15, 2003, just before the winter shutdown, the placement of the aggregate base was completed. The late completion of the aggregate base on the STT delayed substantial completion of USPA by 40 calendar days.

After November 4, 2002, Remcon was essentially preparing for the winter shutdown, however some landscape work and a limited amount of work at the Comfort Station continued into December.

During this period of analysis the project was delayed an additional 40 calendar days. Based upon the projected schedule of TIA #3A, Remcon began working on the completion of utility work in the AR and installing the Aggregate Base. However, the stone curb work in the upper parking lot did not begin as planned. In addition the duration of this activity was more than double that allowed in the schedule. The late start and extended duration of the stone curb impacted the start of the AC Pavement. The combination of these critical delays was 36 calendar days. It is CPMI's opinion that although the late start and extended duration of the stone curb activity and the subsequent extended duration of the AC Pavement delayed the project the controlling critical delay was the late completion of the aggregate base on the STT, which delayed the substantial completion of the USPA 40 calendar days. Remcon's failure to timely resume work on the project after the winter; to schedule and timely progress the stone curb work; and to timely progress the AC Pavement work delayed Substantial Completion of the USPA. These delays were all within the control of Remcon, therefore should be considered non-excusable delays.

On August 21, 2002, NPS issued contract modification #3 to the Contract. This modification added 13 calendar days to the contract completion date, making the new contract completion August 24, 2003.[33]

On September 12, 2002, NPS issued contract modification #4 to the Contract. This bilateral modification was to include four separate items of work: additional quantity (3,200 cubic yards) for Pay Item #39 Haul Excess Excavation to Wolverton Point; new Pay Item #137 Restaking Access Road Centerline; new Pay Item #138 Sorting and Removal of Buried Debris in Upper Parking Lot; and new Pay Item #139 Raising Finish Grade of upper parking lot. This modification contained the following language, "Since the above items were not

shown to be on the critical path in the Contractor's Schedule, no time extension will be granted for this modification."[87]

On November 20, 2002, NPS issued contract modification # 5 to the Contract. This modification added 4 calendar days to the contract completion date, making the adjusted contract completion date August 28, 2003.[88]

Based on the adjusted schedule of TIA #4, Substantial Completion of USPA would not occur until June 15, 2003. Assuming the LSPA work would commence immediately and break for a winter shutdown on October 21, 2003, the projected Substantial Completion of LSPA (Phase II) would be August 2, 2004.

At Tab I of this report is a graphical illustration of TIA #4.

**5). Time Impact Analysis # 5 – August 13, 2003**

The status date for TIA #5 is August 13, 2003. On this date NPS issued a Notice of Termination for Default to Remcon.[89] The projected schedule of TIA #4 indicates that work would resume after the winter on May 6, 2003. The critical path for all practical purposes was through the STT activities. At the conclusion of the 2002 construction season only the Grading and Aggregate Base of STT had been performed. The second most critical path was through the remaining activities of the AR and the USPA.

On January 23, 2003, JE prepared an itemized list of the outstanding work which needed to be completed once construction resumed after the winter. Among the more significant items

---

[87] Contract Modification # 4 dated September 12, 2002.
[88] Contract Modification # 5 dated November 20, 2002.
[89] NPS letter to Remcon Re: Notice of Termination for Default, dated August 13, 2003.

were: complete the AC paving; complete paving of swales; complete slopes per plans; correct storm drain installations; complete the upper Comfort Station – install windows, heating system, epoxy flooring; complete stone curb installation; complete irrigation system; and complete STT work.[90]

On February 18, 2003, NPS issued Contract Modification #6 to the Contract. This MOD was issued as a unilateral modification because the NPS and Remcon were unable to reach a bilateral agreement on the costs related to drilling and blasting material classified as rock not rippable. This work does not include rock drilling and blasting for utility trenching, sewage disposal system, structure excavation and blasting for boulders. No additional contract time was granted by MOD #6.[56]

On June 6, 2003, NPS contacted Remcon to inquire about the status of re-mobilizing to the site.[91] Remcon responded that it would begin mobilizing on June 9, 2003, and that the process would take two weeks.[92]

On July 3, 2003, NPS informed Remcon of its growing concern about Remcon's intention to complete the contract.[93] On July 24, 2003, NPS issued Remcon a Cure Notice, and explained that Remcon had 10 days from receipt to submit a written plan on how it intended to complete the contract by August 28, 2003.[94] Remcon requested an extension of time to formally respond to the Notice to Cure.[95] On August 4, 2003 NPS acknowledged Remcon's request and granted an extension of time to August 11, 2003.[96] On August 11, 2003,

---

[90] JE Transmittal to NPS Re: Outstanding Work Items, dated January 23, 2003.
[91] NPS letter to Remcon dated June 6, 2003.
[92] Remcon letter to NPS dated June 7, 2003.
[93] NPS letter to Remcon dated July 3, 2003.
[94] NPS letter to Remcon dated July 24, 2003.
[95] Remcon letter to NPS dated July 31, 2003.
[96] NPS letter to Remcon dated August 4, 2003.

Remcon informed NPS that were expecting a response from Great American Insurance Company, Remcon's Surety, and would forward it upon receipt.[97] On August 13, 2003, NPS advised Remcon, "to date we have received no substantive response to our cure letter and no significant work has been accomplished during this construction season", therefore, this contract is terminated for default in accordance with Contract Clause No. I.81, Default (Fixed price Construction).

During this period of the analysis the project was delayed an additional 99 calendar days. It is CPMI's opinion because Remcon failed to return to the project to complete the contract work this action caused a delay to Substantial Completion of the USPA. This delay was within the control of Remcon, and should be considered a non-excusable delay.

At Tab J of this report is a graphical illustration of TIA #5.

### 6). Findings and Conclusions

CPMI's findings and conclusions regarding the project delays are tabulated in the following chart entitled, SUMMARY OF DELAYS.

[97] Remcon letter to NPS dated August 11, 2003.

## SUMMARY OF DELAYS

| TIA No. | Status Date | Delay | Excusable Compensable | Excusable Non-Compensable | Non-Excusable |
|---|---|---|---|---|---|
| 1 | 07/27/01 | 0 | 0 | 0 | 0 |
| 2 | 11/09/01 | 84 | 18 | 20 | 46 |
| 3 | 07/12/02 | 75 | 0 | 0 | 75 |
| 4 | 12/06/02 | 40 | 0 | 0 | 40 |
| 5 | 08/13/03 | 99 | 0 | 0 | 99 |
| ***Totals*** | | ***298*** | ***18*** | ***20*** | ***260*** |

## Section IV. EVALUATION OF REMCON'S CERTIFIED CLAIM

On June 28, 2003, Remcon submitted a certified claim in the amount of $3,091,800 consisting of narrative and exhibits along the supporting damage calculations. In terms of dollar amount, the most significant elements of Remcon's claim involve earthwork, aggregate base, extended field and home office overheads, and improper credits. These four elements total $2.7 million of the $3.1 million claim.

The various elements of Remcon's damages are basically calculated on a total cost basis. During its time of performance, Remcon coded its labor and equipment to extra work codes on its time sheets that were entered into its job cost system. From the information on its daily time sheets, Remcon has calculated the labor and equipment cost to perform the work involved in the various elements of its claim and reduced its calculated claim cost by the amount included in its bid estimate for that same work. Following are CPMI's comments on each of the above elements of Remcon's claim.

### A. Earthwork

Remcon asserts that its cost to perform the earthwork portion of its contract work was impacted by rock that was not rippable (differing site condition), design changes to the upper parking lot, design changes to the lower parking area, design changes to the access road between Stations 24+38 and 30+20, design changes to the access road between Stations 9+00 and 13+00, significant overrun in volume of excess excavated material, increased embankments, and a significant increase in the volume of material to be hauled off from the park.

CPMI notes that Contract MOD # 4, which included payment for the design change raising the grade of the upper parking lot, was a bi-lateral modification that stated "the above items

were not shown to be on the critical path in the Contractor's Schedule, no time extension will be granted for this modification."[87] Another item of added work included in MOD # 4 was the Restaking Access Road Centerline (Station 25+00 to Station 30+00).

**1). Excess Excavation**

Remcon asserts in its claim that approximately 48,000 cubic yards of excavation was performed under Bid Item No. 37, Excavation and Grading (the unit of measure for Bid Item No. 37 was lump sum not cubic yards). This assertion is not supported by any credible evidence or calculations; in fact the contemporaneous documents indicate that the excavation volume was approximately 30,000 cubic yards.[70] Moreover, the excavation volume that can be determined from the bid documents was also approximately 30,000 cubic yards. In April 2002, JE advised NPS that the quantity of excavation and the rock to be removed had not changed from the bid documents; however, the quantity for hauling excess excavation in the bid documents was less than the quantity actually encountered.[98]

In its bid estimate, Remcon allowed for only 21,236 cubic yards of excavation and 14,136 cubic yards of fill leaving 7,100 cubic yards to be hauled to stockpile (Wolverton Point).[99] During discovery, Remcon indicated that it did not retain its calculations in which it determined the excavation and fill volumes used in its bid estimate.[100]

In CPMI's opinion, Remcon underestimated the volume of the excavation required by the bid documents. Furthermore, in CPMI's opinion, Remcon's earthwork damage calculation is suspect because it assumes that its original earthwork contract price was proper and

---

[98] JE E-Mail to NPS dated April 22, 2002, re: Follow up to Friday's E-mail regarding Remcon's request for extra work.
[99] Remcon's Bid Estimate dated December 7, 2001, pages 14 and 15.
[100] Deposition of Stephen B. Christensen taken on June 28, 2005, pages 605 -607.

profitable. As demonstrated above, Remcon's earthwork bid estimate was not proper and profitable in that it was based on an excavation volume significantly less than required by the bid documents.

**2). Unrippable Rock**

In July 2001, while excavating the between Station 24+00 and Station 30+00, Remcon encountered granitic rock that was anticipated to be "rippable". Remcon excavated this rock by drilling and blasting. After a lengthy negotiation, NPS determined that the rock was not rippable and constituted a differing site condition. When Remcon and NPS could not agree to the compensation due Remcon for this differing site condition, NPS issued a unilateral contract modification, MOD # 6, in the amount of $84,170.[56] In reviewing MOD # 6, CPMI found that NPS did not allow Remcon any markup for overhead and profit on the direct cost of drilling and blasting. In CPMI's opinion, Remcon should be allowed 17.4% markup on its direct cost or an additional $14,646 for overhead and profit.

Remcon alleges that since it now had to handle shot rock instead of rippable rock its costs for earthwork greatly exceeded its estimated costs. In CPMI's opinion, once Remcon drilled and blasted the rock, the effort to excavate this material was no different that if the rock had been rippable. Therefore, in CPMI's opinion, this differing site condition, other than the cost for drilling and blasting, did not materially change Remcon's excavation costs. The comparison should be shot rock versus ripped rock, not shot rock versus soil. Therefore, in CPMI's opinion, <u>Remcon is not entitled to additional compensation for excavation, except for drilling and blasting rock, due to the differing site condition.</u>

**3). Volume to Be Hauled From the Park**

In mid-July 2001, NPS informed Remcon that there was an additional 5,000 cubic yards of material to be hauled out of the park.[39] Remcon received this information around the time it was beginning excavation. When Remcon hauled 1,724 cubic yards of material from Wuksachi to the deep fill areas, this increased the material to be hauled out of the park to 6,724 cubic yards.[29] The realignment of the access road between Station 25+00 and Station 29+00 increased the cut by approximately 1,200 cubic yards, which increased the material to be hauled out of the park to 7,924 cubic yards. However, the raising of the grade in the upper parking lot utilized 4,257 cubic yards of this material, which reduced the volume to be hauled from the park to 3,667 cubic yards.[101] Based on the project records, it appears that this material was not hauled from the park, but was stockpiled within the park.

In CPMI's opinion, Remcon should be compensated for hauling 3,667 cubic yards of material from the project site as well as for the excavation of the additional 1,200 cubic yards due to the access road realignment. Based on the payment application unit price for Bid Item 39, the hauling of the 3,667 cubic yards would be valued at $44,004 (3,667 CY x $12.00 per CY).

Utilizing the payment application lump sum price for Bid Item 37 and the excavation quantity included in Remcon's bid estimate, CPMI determined a unit price of $16.48 per cubic yard ($350,000 / 21,236 CY = $16.48 per CY).[99] Based on this unit price, the additional excavation of 1,200 cubic yards would be valued at $19,776 (1,200 CY x $16.48 per CY).

[101] Remcon letter to NPS dated June 5, 2002, re: Contract Modification Price to Raise Parking Area.

In summary, in CPMI's opinion, Remcon is entitled to additional compensation for this additional hauling and excavation in the amount of $63,780 ($44,004 + $19,776).

### B. Aggregate Base

Remcon's aggregate base claim consists of two parts. The first part is for reimbursement of the cost to provide the aggregate base. Remcon alleges that the contract documents state that NPS was to provide the aggregate base as indicated on contract drawing G-3 and as shown in Photograph No. 7 in Addendum No. 1. The second part is for Remcon's cost to regrade the aggregate base during the months of August and September 2002 allegedly due to design changes in the access road and the parking lots.

#### 1). Supply of Aggregate Base

The stockpile of aggregate base indicated in the contract drawings and shown in Photograph No. 7 apparently was not on site and available for use by Remcon. Remcon crushed some on site material to make a portion of the aggregate base and purchased the remainder of the aggregate base from a commercial source. Remcon is seeking reimbursement for the purchase and hauling to the site of the aggregate base course material.

After careful review of Remcon's bid estimate for Bid Item No. 71, Aggregate Base Course, CPMI found that Remcon included the purchase and hauling of the aggregate base course in its bid estimate.[102] Remcon estimated that the aggregate base course could be purchased at $7.00 per ton plus tax and could be hauled for $15.00 per ton for a total of $22.53 per ton. Based on Remcon's claim the aggregate base material was purchased for $6.25 per ton plus tax and it was hauled to the site for $18.25 per ton for a total of $24.99 per ton. Although Remcon's claimed costs to supply the aggregate base course material was $2.46 per ton

[102] Remcon's Bid Estimate dated December 7, 2001, pages 28 and 29.

greater than it had estimated, it appears that Remcon failed to estimate the hauling cost accurately, which resulted in its increased cost.

Based on the above, it is CPMI's opinion, that Remcon is not entitled to additional compensation for the purchase and hauling of the aggregate base course since those costs were included in its bid estimate and its contract.

**2). Regrading of Aggregate Base**

Remcon alleges that it had to adjust the grades to the access road and parking areas, per NPS direction, which required it to perform additional fine grading activities to already placed and finished aggregate base. Remcon stated that the "percentage of compensation due is based on Remcon's estimated cost for performing this work divided by the actual cost to date."

During July 2002, Remcon placed approximately 2,759 tons of aggregate base course material on the access road between Station 21+00 and 30+00 (as described in TIA # 4). Remcon did not place any additional aggregate base course material until September 19, 2002, when it began supplying aggregate base course material from a commercial source. Remcon's installation of the aggregate base course continued until the first week of November 2002.

The contemporaneous documents indicate that the adjustment of grades to the access road and parking areas during August and September 2002 were necessitated by Remcon not constructing the access road and parking areas in accordance with the contract documents. In fact in October 2002, Remcon stated that the "change to a "super" required Remcon to import additional fill over what was already a completed subgrade and nearly ready for the

placement of aggregate base. … Subgrade was completed and Remcon began placement of aggregate base along the access road."[103] Remcon's own letter contradicts the assertions in its claim that it had to regrade the aggregate base course after it was placed and finished.

Additionally as detailed in TIA # 4 earlier in this report, some of the aggregate base material was not in compliance with the specifications and was re-worked by Remcon during August 2002. Remcon also agreed to cutout and/or repair aggregate base material that was contaminated when Remcon was working on the buried utilities. The costs to perform this rework potentially are included in Remcon's regrading of the aggregate base claim.

In its claim Remcon states that the stockpile of aggregate base material located in the Upper Parking Lot had to be removed to allow the Upper Parking Lot to be adjusted. This stockpile had to be removed eventually to allow the work to proceed in the Upper Parking Lot even if the grades were not revised. Furthermore, in its estimate for the extra work to raise the grades in the Upper Parking Lot, Remcon included the cost to remove this stockpile from the Upper Parking Lot.[101]

Based on the above, it is CPMI's opinion that <u>Remcon is not entitled to any additional compensation for its claimed regrading of the aggregate base course material</u>.

### C. Extended Field and Home Office Overheads

Remcon is seeking compensation for extended field office and home office overheads due to alleged NPS impacts and delays that extended Remcon's time of performance. In its claim

[103] Remcon letter to NPS dated October 20, 2002, re: Impacts of Redesign of Access Road, Station 23+00 to Station 30+00.

Remcon offers no credible delay analysis to support its extended field office and home office overhead claims.

Based on CPMI's analysis of the project delays, Remcon is entitled to only 18 calendar days of compensable time. Therefore, Remcon is entitled to extended field office and home office overheads for 18 calendar days.

**D. Improper Credits**

Remcon is seeking payment for additional quantities of Aggregate Base, Asphalt Concrete Pavement, Dry-Laid Stone Wall, Boulder Revetment, Drop Inlets Type A, and Erosion Control Logs. Remcon's claim for each of these items is the difference between the quantity that Remcon believes is due under the contract and the quantity that NPS believes is due under the contract. Remcon appears to be reading only selected portions of the contract provisions and not reading the contract as a whole.

For example, Remcon is seeking payment for each and every ton of aggregate base material delivered to site under Bid Item No. 71. Bid Item No. 71 provides for payment of aggregate base installed beneath bituminous concrete pavement only. Remcon is seeking payment for quantities far in excess of the total quantity specified in the access road and parking areas and the contract does not provide for payment beyond the contract requirements. The contract requires the installation of aggregate base course in elements of the work other than under bituminous concrete pavement. Payment for aggregate base course for these other installations is to be included in price for those installations. Therefore, payment for each and every ton of aggregate base course material provided by Remcon was not to be paid under Bid Item No. 71.

Upon review of NPS' position regarding payments for the above described items of work, it appears that it has complied with the contract provisions. Based on the foregoing, it is CPMI's opinion that <u>Remcon is not entitled to the additional compensation it is seeking for improper credits.</u>

## Section V. FINDINGS AND CONCLUSIONS

In its evaluation of the project delays, CPMI determined that of the 298 days of project delay, 18 were excusable compensable, 20 were excusable non-compensable, and 260 were non-excusable.

In its evaluation of Remcon's Certified Claim, CPMI determined that there was entitlement for only certain elements of the claim. Tabulated below is CPMI's valuation of the elements of the claim that it evaluated:

| **Element of Claim** | **Valuation** |
|---|---|
| Excess Excavation | $0 |
| Unrippable Rock | 14,646 |
| Additional Volume to Be Hauled | 44,004 |
| Additional Excavation | 19,776 |
| Supply Aggregate Base | 0 |
| Regrading Aggregate Base | 0 |
| Extended Field and Home Office Overheads | TBD |
| Improper Credits | 0 |
| ***Total*** | ***$78,426*** |

# Francis J. Brennan, P.E.
Executive Vice President

**EDUCATION**

New Jersey Institute of Technology, Post Graduate Studies in Management
New Jersey Institute of Technology, B.S., Civil Engineering, 1966

**REGISTRATION**

Professional Engineer: New Jersey, New York, Pennsylvania

**PROFESSIONAL MEMBERSHIPS**

American Society of Civil Engineers
Construction Management Association of America
National Society of Professional Engineers
Professional Engineers in Construction
Project Management Institute – College of Scheduling

**GENERAL EXPERIENCE**

Mr. Brennan has over 35 years of extensive experience in financial, engineering, project and construction management and dispute resolution for construction projects, commercial litigation and regulatory matters. He specializes in the use of advanced CPM scheduling techniques for time impact analyses on complex delay and disruption claims. Assignments have included hotels, housing projects, hospitals, educational buildings, environmental facilities, stadiums, dams, tunnels, transit systems and highway work.

**SELECTED PROJECT EXPERIENCE**

- 2004, P&W: Hunterdon Central Regional High School, Hunterdon, NJ.
- 2003-2004, DRB, Performing Arts Center of Greater Miami, Miami FL.
- 2003, EPI: American Airlines Terminal at JFK International Airport NY.
- 2002-2003, RDG, B: Slippery Rock University Multi-Use Student Recreational Facility, Slippery Rock, PA.
- 2001-2002, US Air Force: Childern Youth Center, Vandenberg, CA.
- 2001-2002, Elston T. Killam: Bayshore Regional Sewerage Authority Modification and Expansion, Bayshore, NJ.

- 2001, Parsons Chemical and Energy Group: Electrical and Instrumentation Installation, Bucksport, MA.
- 2000, Environmental Elements Corporation: Rebuild Electrostatic Precipitator, Jackson, AL.
- 1999-00, Washington Metropolitan Area Transit Authority: Indefinite Quantity Contract for Construction Management, Scheduling and Dispute Resolution Services.
- 1998-2000 Township of Mt. Olive: Budd Lake Sanitary Sewer System, Mt. Olive Township, NJ.
- 1998-99, Heery International: Federal Building and Courthouse, Concorde, NH.
- 1997-00, Federal Bureau of Prisons: Metropolitan Detention Center, Brooklyn, NY.
- 1997-99, CNA and DPIC: Lehigh Valley Tunnel No. 2, Pennsylvania Turnpike, PA.
- 1997-99, Gordon Food Services: Distribution Center No. 3 Springfield, Ohio.
- 1997, Kajema Engineering & Construction: Linden Booth Reach Tunnel, Birmingham, MI.
- 1997, Smith - Kajema E&C: Laurel Park Remediation Site, Connecticut
- 1996-01, New York City School Construction Authority: Independent Case Mediator
- 1996-99, Odebrecht Contractors of California: Seven Oaks Dam
- 1996-98, Raytheon Engineers & Constructors: Fossil Fuel Plant, Stewart County, Tennessee.
- 1996-97, M&M Contracting: 72" Watermain at 14 mile, Birmingham, MI.
- 1995-96, NJ Transit: Bus Garage, Wayne, NJ
- 1995-96, Arnold & Porter: Tenant Build-out, Washington, D.C.
- 1994-96, General Services Administration: Federal Building and Courthouse Charleston, WV

- 1993-96, General Services Administration: Indefinite Quantity Contract, New York, NY
- 1992-96, U.S. Department of Justice: Federal Office Building Jamaica, NY
- 1990-91, Tishman Construction of NY: Vertical Mall & Office Space, New York, NY
- 1989-90, Port Liberte Partners: Residential Development Program, Jersey City, NJ
- 1988-89, Research-Cottrell: Fossil Fuel Plant, Portage, WI
- 1986-87, Pacific Gas & Electric: Power Plant, Diablo Canyon, CA
- 1984-86, The County of Clark, Nevada: Advanced Wastewater Treatment Facility, Nevada
- 1984-85, Schiavone Construction Company: Wastewater Treatment, New York, NY
- 1983-84, U.S. Army Corps of Engineers: Concrete Dam & Embankment, Elberton, GA
- 1983-84, The City of New York: Wastewater Treatment, New York, NY

**TESTIMONY EXPERIENCE**

- Interstate Iron Works Corp. v. Engineered Products, Inc., American Arbitration Association, Northeast Case Management Office (Deposition and Arbitration)
- Marsico Construction v. Slippery Rock University v. RDG, PA Board of Claims Harrisburg, PA (Trial)
- RP Richards v. US Air Force, US Court of Federal Claims, (Mini - Trial)
- Bayshore Regional Sewerage Authority v. Elston T. Killam, Eric Green, Neutral Mediation, Eatontown, NJ (Mediator with / Plaintiff)
- Southern Erectors, Inc. v. Environmental Elements Corp. v. Boise Cascade Corp. United States District Court for the District of Maryland_ (Deposition)

- Morganti National Inc. v. The United States, No. 97-744C, U.S. Court of Federal Claims. (Trial and Deposition)
- Terminal Construction Corporation v. The United States, No. 333-89C & 96-689C, U.S. Court of Federal Claims. (Mini-Trials, two separate)
- A. S. McGaughan Company, Inc. v. Arnold & Porter, JAMS/ENDISPUTE, Neutral Mediation, Washington, D.C. (Mediator)
- Interlake Companies, Inc. v. Gordon Food Services, Inc., CPR Institute for Dispute Resolution, Chicago, IL. (Mediator), and United States District Court for the Western District of Michigan (Deposition)
- Tishman Construction Company of New York v. SZS 33 Associates L.P., American Arbitration Association, New York, N.Y., No. 13 110 00183 91 (Trial)
- Flemington Trade Center v. Tectonic, Superior Court of New Jersey, Union County, NJ. (Deposition)
- Frank Briscoe Company, Inc. v. The County of Clark, Nevada v. Morrison-Knudsen Company, Inc. et al., United States District Court, District of Nevada (Trial and Deposition)
- Fairfax County Water Authority v. John W. Daniel and Company v. Brock and Davis Company, Inc., Circuit Court of Fairfax County, Fairfax County, Virginia (Deposition)
- Mahoney Troast v. New Jersey Housing Finance Authority, Superior Court of New Jersey, Passaic County NJ. (Deposition)
- J. A. Cavanaugh Contractors v. Township of Hanover, Superior Court of New Jersey, Morris County, NJ. (Trial and Deposition)

**PUBLICATIONS**

"Techniques and Methods in Assessing Delay", co-author, The Millenium Construction Superconference, December 1999.

"Construction Defaults: The Need for Expert Advice", MDC Advisor, Spring 1991.

# William M. Wolf, Jr., P.E.
## Vice President

**EDUCATION**

Texas A & M University, B.S., Civil Engineering

**LICENSE**

Professional Engineer: Texas

**PROFESSIONAL MEMBERSHIPS**

National Society of Professional Engineers
American Society of Civil Engineers

**CONTINUING EDUCATION**

Fundamentals of Railway Train Control and Signaling Systems

**GENERAL EXPERIENCE**

Mr. Wolf has over 35 years of experience in construction contract administration, construction claims evaluation, and project management. He has completed assignments for construction claims with a total value in excess of $675 million, including disputes regarding: delay; acceleration; constructive acceleration; unjust termination; loss of productivity; defective plans and specifications, including professional liability of design consultant; abnormal weather; escalation and extended overheads. The value of the individual claims has varied from $50,000 to $175 million. He has prepared and reviewed CPM schedules, negotiated change orders, and prepared bid documentation and project documentation as construction contract administration and on-site representative of owners and contractors.

Project assignments have included high-rise buildings, correctional facilities, multi-use commercial developments, wastewater treatment facilities, resource recovery facilities, fossil fueled power generating facilities, electrification of railroads, high voltage electrical transmission lines and substations, hospital facilities, school renovations and multi-use single story buildings and roadways.

**SELECTED PROJECT EXPERIENCE**

- Performing an independent analysis regarding the project delays and disruption associated with the construction of a new combined Bobsled and Luge track in Lake Placid, NY. The project experienced a number of delaying events such as redesign of the track layout and location, late start of critical activities, delays in bidding the various phases, and adverse winter weather. Due to the international competition event

scheduled, the Owner could not adjust the project completion date and required the contractors to complete the project at the earliest possible date. The analysis addresses both project delays and disruption including loss of productivity claims. This matter is pending at this time.

- Performed an independent analysis regarding the increased time and the increased cost to complete the residential conversion of existing commercial space to condominiums. Substantial completion required almost 3 years versus a planned 5 months. The initial hard costs were anticipated to be $1.5 million; however, the actual hard costs exceeded $5 million. Both the owner and the surety terminated the original general contractor. This matter is pending at this time.

- Performing an independent analysis regarding the installation of the mechanical piping in a new de-mineralized water plant. The project start was delayed due to revisions to the design by the owner. Although the mechanical piping systems were installed in the planned 5 months (which was within the adjusted contract timeframe), the remainder of the contract work including punch list work required another 5 months to complete. The as-planned schedule required the piping and the remainder of the work to be installed concurrently. The analysis addresses both project delay and disruption including extended duration costs and loss of productivity damages.

- Performed an independent evaluation of the project delays and the structural steel contractor's delay and disruption claim on a $57 million new high school. The project consists of 356,000 square feet of new construction plus 50,400 square feet of renovated space. The project was constructed utilizing multiple prime contractors. There were various completion dates for each of 5 Phases. Additionally, CPMI performed an evaluation of the contractors' project schedule for the project owner to support its decision regarding potential owner directed acceleration. This matter is pending at this time.

- Performed an independent analysis in defense of the contractor for general construction's delay claim arising from the $20 million renovation and construction of a middle school utilizing multiple prime contracts. The contractor alleged that the delays experienced were due to the architect's errors and omissions on the contract drawings. The project included the conversion of an existing 102,000 SF building constructed in 1929 into a Secondary School. The project included the refurbishment of the historic exterior of the existing building and the complete gut renovation and redesign of the interior. The project was constructed in two phases, Foundations and Demolition Work utilizing a single prime contractor and the remainder of the construction using the multiple-prime contractor project delivery system. The substantial completion date was 10 months later than required by contract. The Owner sued the Architect in the belief

that design errors and omissions caused additional project costs and project delays. This matter is pending at this time.

- Performed a delay analysis for a time extension for the general contractor for a $27.6 million design-build contract for the construction of a regional rail park and ride facility. The delay analysis found that the public agency owner had instituted several changes that caused construction activities to extend past the contract completion date. The results of our delay analysis were included in a written report. This matter was settled by negotiation.

- Performed an analysis of the delay and disruption claim of the contractor for general construction for a $10 million multi-purpose recreation facility at a university located in Pennsylvania. The contractor has alleged that the delays it experienced were due to the design professional not providing adequate contract drawings and not responding to RFI's timely. The results of our analysis were included in an expert report.

- Preformed a delay analysis and provided scheduling services to the general contractor for its $35,000,000 contract to construct a new science building. The building is a 3-story steel framed masonry exterior science laboratory facility of approximately 150,000 square feet as well as a mechanical partial basement and a mechanical penthouse. The project experienced at least a 2-month delay attributed to the owner not timely obtaining the required dewatering permit. In an attempt to mitigate this delay, the building construction was progressed in a different sequence than shown on the approved Baseline Schedule. CPMI has assisted in the preparation of a formal presentation to a Hearing Officer for resolution of the dispute regarding this dewatering delay.

- Performed a delay analysis, determined the delay and disruption damages, and prepared a $3 million Request for Equitable Adjustment for the contractor on an intelligent highway project in New Jersey. The contractor experienced a delay of 1-½ years awaiting revised contract drawings for the installation of the foundations for traffic signal structures at various intersections. The contractor's REA is pending.

- Performed delay analysis and prepared expert report relating to the delays experienced by the general contractor during the construction of a replacement veterans' home. The project consisted of the phased construction of the new facility, phased demolition of the existing facility, and related site work. In addition to providing a residence for veterans, this facility provided medical and dental care. After the completion of the new facility, the residents were relocated from the existing facility to the new facility. After the existing facility was vacated, it was demolished allowing for the completion of the site work. Based on findings and conclusions, the parties reached a negotiated settlement.

- Evaluated an equipment erection subcontractor's acceleration and disruption claim against an equipment supplier of equipment for a power plant located in Texas. The project consisted of 2 gas turbines connected to a HRSG and steam turbine. The EPC contractor contracted with an equipment supplier for the design, fabrication, delivery and erection of its equipment. The supplier subcontracted the erection of its equipment. The erection subcontractor has submitted a $7.8 million claim arising from its $5.1 million subcontract. The erection subcontractor has alleged that the bid documents that it was provided did not adequately depict the work scope required for the erection of the equipment and its time of performance was reduced. This matter was settled by negotiations.

- Evaluated the EPC contractor's $2.3 million liquidated damage claim for late delivery against its equipment supplier arising from the addition of a 3rd generating unit at a power plant. The equipment supplier's $11.7 million contract required it to design, fabricate and deliver the equipment in accordance with the contract requirements. The equipment supplier's contract contained stipulated guaranteed delivery dates for various components of the equipment. During the design and construction of the project there were changes that affected the design of some of the components. These design changes impacted the delivery of the effected components. Based on findings and conclusions, the parties reached a negotiated settlement.

- Performed a delay analysis and prepared a report of the findings and conclusions for a public owner of a $56 million commuter rail project. The project, one section of a $2 billion fast-track project, required the construction of 3,750 center line feet of line (consisting of cut-and-cover box tunnel, aerial structure, and retained-cut and fill line sections), a station including administrative and maintenance space, a below-grade traction power substation, an elevated 1,980 space parking structure, and site improvements. In order to support the work of other work required to place the rail facilities in revenue service, the contract required four interim milestones as well as project completion. All of the interim milestones were not achieved, thereby requiring the delay analysis to account for the interrelationship of delay in one milestone to subsequent milestones. Based on findings and conclusions, the parties reached a negotiated settlement.

- Prepared the evaluation of the physical status of construction of a $21.7 million, 360,000 square feet tenant build out for a law firm's main office in Washington, DC after the construction manager was terminated. The construction manager, with a guaranteed maximum price contract, had failed to meet several of the tenant floor milestone turnover dates. Also provided Construction Observation Services through substantial completion of the tenant work by a replacement construction manager. Analyzed causes of delay and disruption and provided litigation support services for

defense of wrongful termination litigation. Through mediation, the owner reached a settlement in this matter.

**TESTIMONY EXPEREINCE**

During the past 5 years Mr. Wolf has testified in the following matters:

- The Board of Claims For The Commonwealth of Pennsylvania, Marsico Corporation et al v. State System of Highèr Education v. RDG Bussard Dikis, Inc. and Turner Construction Company. Prepared an expert report responding to contractor's delay and damage claims against the design professional. Provided expert testimony regarding the damages being sought from the design professional at the Board hearing. [August 2003]

- Administrative Hearing - Epic Management, Inc claim against Rowan University regarding the construction of the Science Building. Presented the contractor's delay claim at an administrative hearing as part of the contract dispute resolution process. [May 2002]

- United States Court of Federal Claims, Morganti National, Inc. v. United States of America regarding the construction of the Metropolitan Detention Center in Brooklyn, NY. Prepared an expert report responding to contractor's time extension request. Provided deposition expert testimony. The judge's ruled in favor of the Government after trial. [March 2000]