# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2478C<br>(Judge Braden) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits these responses to the proposed findings of uncontroverted fact ("proposed fact(s)") submitted by plaintiff, Remediation Constructors, Inc. ("Remcon").

## General Objections

The Government objects to plaintiff's proposed facts because they are contrary to the Rules of this Court. Specifically, RCFC 56(h)(2) permits a party opposing summary judgment to file proposed findings of uncontroverted fact only as to"relevant matters." Many of Remcon's proposed facts are not relevant to the matters at issue in the Government's partial motion for summary judgment, which relates solely to the Government default termination of Remcon's contract. Facts that

are irrelevant or immaterial to the pending motion for partial summary judgment should be disregarded by the Court, even if there is a disagreement regarding such facts.

## DEFENDANT'S RESPONSES

### PLAINTIFF'S PROPOSED FACT NO. 1

The contract specifications for the Project required that two of the components (the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail) be complete before any work would proceed on the Lower Sherman Parking Area. (Declaration of Steven B. Christensen (hereinafter "SBC Dec."), ¶ 3).

### DEFENDANT'S RESPONSE

Agrees.

### PLAINTIFF'S PROPOSED FACT NO. 2

As of July, 2003, due to delays directly attributable to the NPS, work remained to be completed on the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail, and no work had been performed on the Lower Sherman Parking Area. (SBC Dec., ¶ 3; Declaration of Thomas W. Lloyd (hereinafter "TWL Dec."), ¶¶ 3-4; Declaration of D. Michael Schoenfeld ("DMS Dec., ¶¶ 3-5).

**DEFENDANT'S RESPONSE**

Defendant agrees that, as of July 2003, work remained to be completed on the Upper Sherman Access Road and Parking Area and to the Sherman Tree Trail, and that no work had been performed on the Lower Sherman Parking Area. Defendant disagrees that the reason that this work remained to be completed was "due to delays directly attributable to the NPS." Most of the delayed work in 2002 was directly attributable to Remcon. In May 2002, Remcon was not providing adequate resources and personnel on the project. See May 29, 2002 Daily Log, SA223-224; May 29, 2002 Notes, SA225. In June and July, 2002, Remcon, had to perform considerable rework upon the utility line, which runs beneath the access road, because it did not perform the work properly the first time. See Remcon's Daily Production Reports, SA235-254. This, in turn, held up placing aggregate base upon the access road. Michael Giller Declaration ("Giller Decl.") ¶¶ 5-6. The Government was required to issue letters to Remcon regarding work that did not meet contract requirements, including work upon the electrical conduit and water line appurtenances. See letters of August 20, 2002, SA273-277. Remcon also was delayed because it had to rework slopes that it contaminated with asphalt material. See letters of

August 20, 2002, September 11, 2002, and September 18, 2002, SA278-79, 281. Also in 2002, Remcon was delayed in placing aggregate base because Remcon's aggregate base failed to meet specifications. See letter of August 19, 2002, SA270. In 2003, all delays were directly attributable to Remcon because it failed to mobilize to the site for the third construction season.

**PLAINTIFF'S PROPOSED FACT NO. 3**

The Upper Sherman Access Road and Parking Area involved the construction of approximately 3,000 linear feet of a new two lane asphalt paved roadway, a new two level parking area, installation of 3,700 linear feet of domestic waterlines and 3,800 linear feet of electrical service line) installation of a new sewer system (including approximately 750 linear feet of sewer line, a concrete septic tank, dosing siphon tank, and a sewage leach field), construction of a comfort station, a wayside kiosk, rock revetments, landscaping/erosion control measures and related improvements. (SBC Dec., ¶ 4).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 4**

4. The Sherman Tree Trail component required the construction of approximately 2,000 linear feet of asphalt surfaced trail, including concrete/stone stairs, drainage improvements, timber edgings, a visitor overlook, and related landscaping/erosion control measures. (SBC Dec., ¶ 4).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 5**

The Lower Sherman Parking Area component included demolition and removal of existing structures and landscape, construction of approximately 300 linear feet of concrete retaining wall with rock facing, realignment of the General's Highway, construction of a visitor comfort station, and related landscaping/erosion control measures. (SBC Dec., ¶ 4).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 6**

6. The NPS was responsible for the entire design of this Project and the Project plans and specifications were a combined

product of internal design efforts by NPS personnel as well as by private designers retained by the NPS. (DMS Dec., ¶¶ 5-6).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 7**

The NPS issued a Request for Proposal ("RFP") for the Project in February 2001. (SBC Dec., ¶ 5).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 8**

In late February 2001 Remcon received a set of plans and specifications for the Project. (SBC Dec., ¶ 5).

**DEFENDANT'S RESPONSE**

Defendant does not know when Remcon received the plans and specifications because that information is within Remcon's knowledge and not the Government's.

**PLAINTIFF'S PROPOSED FACT NO. 9**

Remcon, having previously worked for the NPS in the park as a subcontractor, based its responsive proposal to the NPS on the information contained within these documents, including geotechnical

reports and quantity estimates for removal and hauling of material, as well as its general familiarity with the isolated and distant locale of the park from construction resources. (SBC Dec., ¶ 5).

**DEFENDANT'S RESPONSE**

Defendant agrees that Remcon previously worked as a subcontractor for NPS in the park and that Remcon was provided the documents cited. Defendant disagrees that Remcon merely had "general familiarity with the isolated and distant locale of the park from construction resources, because the statement implies that Remcon's familiarity was limited. Steve Christensen, Remcon's president, had been to the site before and Remcon, therefore, had more than a general familiarity with its location. Christensen Deposition, 242:9 - 243:5.[1] Defendant does not know what Remcon based its proposal upon because that information is within Remcon's knowledge and not within the knowledge of the Government.

**PLAINTIFF'S PROPOSED FACT NO. 10**

Based upon the timing of the availability of the contract documents, and the required submission of proposals, Remcon, and all

---

[1] Excerpts Mr. Christensen's deposition is annexed to Ms. Dulin's declaration. Mr. Christensen's deposition is cited in the following format, e.g., 242:9, with the number at the left of the colon the page number of the transcript and the number at the right of the colon the line number.

other prospective bidders, were prevented from conducting a site investigation to confirm the accuracy, or to uncover any observable discrepancy, between the plans and specifications and the Project site. (SBC Dec., ¶ 6; DMS Dec., ¶ 6).

**DEFENDANT'S RESPONSE**

Agrees that it was impracticable for prospective bidders to conduct a site visit.

**PLAINTIFF'S PROPOSED FACT NO. 11**

The Project site is in an area adjacent to a heavily visited national treasure (the General Sherman Tree), and had limited construction access and a limited construction season. (SBC Dec., ¶ 7).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 12**

Instead of being able to work all or most months of the year, Remcon anticipated a limited construction season depending on the extent and duration of winter precipitation and temperature. (SBC Dec., ¶ 7).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 13**

13. Realistically, the construction season ranged from late May/early June through October, a duration of five or six months. (SBC Dec., ¶ 7).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 14**

14. The NPS RFP allowed less than three construction seasons to perform the work. (SBC Dec., ¶ 7).

**DEFENDANT'S RESPONSE**

Defendant disagrees with Remcon's proposed fact because the NPS RFP allowed 792 calendar days for completion of the project. See Response to Plaintiff's Proposed Finding of Fact (PPFOUF) ¶ 7, See Solicitation cover-sheet, SA152. However, defendant agrees that the 792 calendar days allowed generally would require construction work to be completed in less than three construction seasons, assuming that normal weather conditions existed.

**PLAINTIFF'S PROPOSED FACT NO. 15**

The NPS awarded the contract to Remcon on May 15, 2001 and issued a Notice to Proceed on June 11, 2001. The completion date was in August 2003. (SBC Dec., ¶ 7).

**DEFENDANT'S RESPONSE**

Agrees. The contract completion date was August 11, 2003.

**PLAINTIFF'S PROPOSED FACT NO. 16**

Remcon's submitted as-planned schedule called for all work on the Upper Sherman Area to be completed in the 2001 season and the Lower Sherman Area to be completed in the 2002 season. (SBC Dec., ¶ 8; TWL Dec., ¶ 3(b), (d) and (e)).

**DEFENDANT'S RESPONSE**

Defendant disagrees in that the schedule submitted by Remcon on June 11, 2001 only called for all work upon the Upper Sherman Area to be completed in the 2001 season. The work upon the Lower Sherman Area was not shown on this schedule. The Government also disagrees to the extent that Remcon's proposed fact implies that Remcon submitted an acceptable schedule on June 11, 2001 because, due to deficiencies in Remcon's schedule, it was returned to Remcon a number of times for correction and resubmission. See June 21, 2001

transmittal, SA196; July 25, 2001 transmittal with attached comments, SA197-198.[2] Remcon was told that the schedule needed to cover the entire contract duration and not show early completion.

**PLAINTIFF'S PROPOSED FACT NO. 17**

17. The NPS never questioned the logic of Remcon's as-planned schedule and its construction manager praised its reasonableness and content. (SBC Dec., ¶ 8; TWL Dec., ¶ 3(b)(d) and (e)).

**DEFENDANT'S RESPONSE**

Disagrees because the construction manager did not "praise" the schedule's reasonableness and content. Further, although the construction manager ("CM") stated that the schedule "looked well thought out and organized," the CM did not have the authority to either approve or disapprove the schedule. See Memorandum of July 11, 2001, SA204. As set forth in Defendant's Response to Plaintiff's Proposed Fact No. 16, above, the schedule was returned to Remcon by NPS because it was deficient.

---

[2] The Government does not have the June 11, 2001 schedule. It was returned to the Contractor.

**PLAINTIFF'S PROPOSED FACT NO. 18**

Prior to the issuance of the Notice to Proceed, Athena Demetry of the NPS, a field biologist, marked all trees in the virgin forest which were to be removed by Remcon during its clearing and grubbing operation (including logging) for construction of the Upper Sherman Access Road and Parking Areas. (SBC Dec., ¶ 10; TWL Dec., ¶ 3(b) and (f); DMS Dec., ¶¶ 6, 8).

**DEFENDANT'S RESPONSE**

The Government disagrees. The NPS was responsible for ensuring that Remcon protected the valuable natural resources and Remcon was responsible for constructing the project. To that end, both parties worked together to mark trees. Further, both parties participated in a walk-through related to inventorying trees for natural protection. See Specification Section 01351, SA170-175.

**PLAINTIFF'S PROPOSED FACT NO. 19**

While Remcon personnel occasionally walked the right-of-way with Ms. Demetry, and "assisted" her by placing the blue ribbons on trees which she determined were to be removed, the determination of which trees were to be removed was, by contract, and action in the field, exclusively the government's pursuant to section 1110, Part 1.04 A-F of

the specifications. (SBC Dec., ¶ 10; TWL Dec., ¶ 3(b) and (f); DMS Dec., ¶¶ 6, 8).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon misinterprets the specifications. Section 1110 expresses the importance of protecting the natural resources at the park. Section 01351 of the specifications requires the contractor and the contracting officer/park ecologist to perform an on-site inventory together of trees and other natural features on the project site. See specification section 01351, SA 170-175. Mr. Christensen walked the site with Ms. Demetry to perform this on-site survey. See Ms. Demetry's daily log of June 7, 2001, SA328-329. Marking trees for removal was a joint effort between the NPS and Remcon. While Remcon states that its personnel "occasionally walked the right of way" with Ms. Demetry and "assisted" her, those characterizations grossly minimize Remcon's involvement. Remcon's Superintendent, Mark Penrose, and Project Superintendent, Greg Kasparek, actually walked with Ms. Demetry and marked trees with "plans in [their] hands." Penrose Deposition, 70:17-23; 71:2-10; 71:21-72:7. Further, prior to logging Ms. Demetry along with Remcon employees, Mark Kasparek and Mark Penrose, walked the site with the

loggers. Penrose Deposition, 73:4-22. Again, the participants at the walk-through carried plans and specifications.

**PLAINTIFF'S PROPOSED FACT NO. 20**

On June 11, 2001, the date the NTP was issued, Remcon began falling and logging the trees marked by Ms. Demetry. (SBC Dec., ¶ 11).

**DEFENDANT'S RESPONSE**

The Government agrees, except that the statement is incomplete because Remcon personnel were also involved in walking the site and marking trees. See Response to Plaintiff's Proposed Fact No.19, above.

**PLAINTIFF'S PROPOSED FACT NO. 21**

As the clearing operations proceeded, Remcon's surveyor, Guiliani & Kull ("G&K"), began to lay out the Upper Sherman Access Road and Parking Areas. G&K immediately discovered that about 600 feet of the road, as shown in the NPS plans and specifications, did not match the clearing limits that had been laid out by Ms. Demetry in the field. (SBC Dec., ¶ 11).

**DEFENDANT'S RESPONSE**

The Government agrees that, as the clearing operations proceeded, Remcon's surveyor, G&K, began to lay out the Upper

Sherman Access Road and Parking Areas. The Government neither agrees nor disagrees with the statement regarding the time that G&K realized that the road was approaching the right edge of the cleared limits because that information is within G&K's knowledge and not the Government's. As stated above, the clearing limits were not solely NPS's responsibility. NPS's responsibility was to protect the resources. Remcon's responsibility was to build the project in conformance with the plans and specifications.

**PLAINTIFF'S PROPOSED FACT NO. 22**

By June, 2001, Remcon had already cut and removed the trees that Ms. Demetry had marked for removal. (SBC Dec., ¶ 12; TWL Dec., ¶ 3; DMS Dec., ¶¶ 3, 4, 6, 7, and 8).

**DEFENDANT'S RESPONSE**

The Government disagrees because the trees were cut and removed in June, beginning June 11, 2001, not "by June." See Plaintiff's Proposed Fact No. 20, above. Further, the Government disagrees that the trees were marked by Ms. Demetry because that the statement is incomplete; marking trees was a joint effort. NPS participated in marking trees to assure that the park's resources were protected and Remcon participated in marking the trees because it was

responsible for building the project according to the plans and specifications. See Response to Plaintiff's Proposed Fact No.19, above.

**PLAINTIFF'S PROPOSED FACT NO. 23**

At the very beginning of the Project, there was a significant discrepancy, between Stations 24 and 30 (approximately 600 lineal feet) between the area Remcon had cleared per Ms. Demetry's direction and where the NPS plans and specifications called for the access road to be constructed. (SBC Dec., ¶ 12; TWL Dec., ¶ 3; DMS Dec., ¶ 38).

**DEFENDANT'S RESPONSE**

The Government disagrees because there was not a discrepancy between the area Remcon was required to clear pursuant to the specifications and where the NPS plans and specification called for the access road to be constructed. After the survey was laid out, the parties noticed that the right edge of the road approached the clearing limits. See Daily report of June 27, 2001, SA207-208. Although the drawings were correct, the parties believed that the road would better fit the cleared area if it were shifted away from the right edge of the cleared limits.

**PLAINTIFF'S PROPOSED FACT NO. 24**

This discrepancy, for which Remcon had no responsibility, initiated a series of re-designs and other problems that impacted Remcon' s ability to schedule and complete its work as it had originally planned. (SBC Dec., ¶ 12; TWL Dec., ¶ 3; DMS Dec., ¶¶ 3-8).

**DEFENDANT'S RESPONSE**

The Government disagrees that there was a discrepancy and disagrees with Remcon's characterization that there were a "series of redesigns." There was one "redesign" (a field revision). On June 29, 2001, Guiliani & Kull, a Remcon subcontractor, took it upon itself to draft and stake a "realignment." See Response No. 23, above; Letter of December 19, 2001, SA216-217, Letter of January 8, 2002, SA221-222. This work was unsolicited. The Government did not approve G&K's unsolicited staked alignment and forwarded its revision. On June 16, 2001, G&K staked the Government's revision. Because the field revision benefitted the Government, the Government paid Remcon for G&K's work by Modification No. 4, which was a bilateral modification. Keiscome Declaration at ¶ 18-19, See Modification No. 4, SA154-160. On June 16, 2001, Steve Christensen said he would only ask for money for restaking. Daily Report of July 16, 2001, SA207-208. Remcon did

not otherwise ask for additional money for the alignment change. However, Remcon later contended that it encountered additional excavation upon the project, which was caused, in part, by the alignment change. The Government paid for disposal of the additional excavation in Bilateral Modification No. 4, when it paid Remcon to raise the upper parking lot. See Keiscome Declaration at ¶ 18-19, See Modification No. 4, SA154-160.

**PLAINTIFF'S PROPOSED FACT NO. 25**

Remcon has not been compensated in time or money for virtually any of the costs or delay impacts that flowed from those changes between Stations 24 and 30. (SBC Dec., ¶¶ 1-61; TWL Dec., ¶ 3-6; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. First, there only were only 18 excusable compensable days of delay upon this project. See excerpts of Expert Report of Capital Project Management, Inc. ("Expert Report"), SA351. These are more than offset by liquidated damages for which Remcon is responsible. Further, Remcon was paid through bilateral modifications for work associated with the alignment change. Keiscome Declaration at ¶¶ 18-19; Modification No. 4, SA154-160. The parties

agreed that the road would fit better if it were moved away from the right edge of the cleared area. This was a field adjustment pursuant to Specification Section 01720. Since this work required additional survey work by Guiliani & Kull, the Government agreed to pay for the additional survey work. This was paid for by Bilateral Modification 4. Keiscome Declaration at ¶¶18-19. Remcon did not otherwise ask for time or money for realignment of the road, however, Remcon contended that it encountered additional excavation when it realigned the road into the hillside. The Government paid for disposal of additional excavation in Modification No. 4, when it paid Remcon to raise the upper parking lot. See Keiscome Declaration at ¶¶ 18, 20 .

**PLAINTIFF'S PROPOSED FACT NO. 26**

The limited compensation that has been received for the resulting extra work and delays was also belatedly received over a year after the extra work occurred. (SBC Dec., ¶¶ 1-61; TWL Dec., ¶ 3-6; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

Modification No. 4 was issued on September 12, 2002. This was a bilateral modification. Keiscome Declaration at ¶ 18-19; see Modification No. 4, SA154-160. As with all modifications, much of the

time taken in issuing the modification was because the parties were negotiating the cost of the modification. See Letter of June 5, 2002, SA226-231; Daily Log of June 14, 2002, SA232-233. Further, the time taken in issuing the modification actually was of benefit to Remcon, because it gave Remcon the opportunity between the time the road was realigned and the modification was issued to assess any impacts that the realignment or excess excavation may have caused. Ultimately, the parties agreed that the work associated with Modification No. 4 was not on the critical path and no time extension was granted. Remcon signed the modification, and its release. SA154-160.

**PLAINTIFF'S PROPOSED FACT NO. 27**

The critical path on Remcon's as-planned schedule commenced with the clearing of trees and pioneering of the Upper Sherman access road and parking lots. It then transitioned to the construction of the comfort station and related improvements for the balance of 2001 (SBC Dec., ¶ 9; TWL Dec., ¶ 3-5).

**DEFENDANT'S RESPONSE**

The Government generally agrees that the above items were on the critical path. The as-planned schedule was produced to the

Government on June 27, 2002, more than one year after the notice to proceed.

**PLAINTIFF'S PROPOSED FACT NO. 28**

But for the myriad of design deficiencies encountered, and directed performance of extra work and construction changes, the Upper Sherman work would have been completed by the end of the 2001 construction season. (SBC Dec., ¶ 9; TWL Dec., ¶¶ 3-5).

**DEFENDANT'S RESPONSE**

The Government disagrees. As an initial matter, Remcon's allegations are too vague to respond to because Remcon generally refers to "design deficiencies," without citing what these deficiencies specifically were. Further, the Government's as-built survey does not support Remcon's claim that the original design was deficient. Giller Dec. at ¶ 15. With respect to "extra work," the Government again does not know to what Remcon is referring, except that it hauled more material out of the park than it expected. Remcon was paid for this work by Modification No. 3, and was given 13 working days for the work. Keiscome Declaration at ¶ 15; Modification No.3, SA3-6. Remcon had not completed the comfort station by 2001, nor had not completed the

leach field by 2001. Giller Dec. at ¶ 7. These items should have been unaffected by Remcon's claimed delays.

**PLAINTIFF'S PROPOSED FACT NO. 29**

The trees, designated by Ms. Demetry to be removed along the access road right-of-way, between Stations 24 and 30, were in a location up to fifteen feet off of the right-of-way set forth in the plans. (SBC Dec., ¶ 13; TWL Dec., ¶ 3(f); DMS Dec., ¶ 3, 4, 6, 7, and 8).

**DEFENDANT'S RESPONSE**

The Government disagrees. Ms. Demetry, along with Remcon personnel, marked trees for removal pursuant to the contract drawings. See Response to Remcon Proposed Fact No. 19, above.

**PLAINTIFF'S PROPOSED FACT NO. 30**

As a result of the trees being in a location up to fifteen feet off the right of way set forth in the plans, the access road needed to be re-surveyed by Remcon's surveyor, and the road was relocated by the government to a location into the hill from the planned locale. (SBC Dec., ¶ 3-17; TWL Dec., ¶ 3(f); DMS Dec., ¶ 3, 4, 6, 7, and 8).

**DEFENDANT'S RESPONSE**

The Government disagrees for the reasons set forth in our response to Remcon's Proposed Fact No. 24, above.

**PLAINTIFF'S PROPOSED FACT NO. 31**

The content of Modification No. 4, in its Justification section, admits that the cause of the road relocation was not due to Remcon. The government wrote:

> On July 31, 2001, the Contractor's submitted a change order request for "Additional Survey Work" for their Surveying Subcontractor (Giuliani & Kull). This request was based upon the initial Access Road centerline staking per the contract drawings. After the initial staking it was discovered that the centerline with all required cut boundaries did not fall within the earlier cleared limits as delineated by Park staff. Thus the Government agreed that the centerline had to be revised in order to fit all earthwork into the already cleared limits. Therefore the surveyor had to re-stake this revised centerline and are entitled to be compensated for their additional work. In addition, this work had to be completed at this time to prevent additional construction costs associated with equipment stoppage and delays. The revised road layout and re-staking reduced construction costs since additional clearing and tree removal was not required. Therefore, this work is necessary in order to construct the roadway alignment in the location shown on the construction drawings. This change is in the best interest of the Government and I recommend it be approved.

(SBC Dec., ¶ 13; TWL Dec., ¶ 3(f); DMS Dec., ¶ 3, 4, 6 7, and 8).

**DEFENDANT'S RESPONSE**

The Government disagrees. As for Remcon's allegation that the quoted language constitutes an admission, Remcon's assertion constitute a legal conclusion, not a factual allegation, and, in any event,

Modification No. 4 speaks for itself. We further expressly note that the quotation does not state that Remcon (or its agents) were not a cause of the road location. SA154-160.

**PLAINTIFF'S PROPOSED FACT NO. 32**

32. The burn pit in the Upper Parking Area, identified in the contract documents as containing approximately 2000 cubic yards, actually contained over 6000 cubic yards, causing delay and over $300,000 in additional costs. (SBC Dec., ¶ 18; TWL Dec., ¶ 3(f); DMS Dec., ¶¶ 3 and 6)

**DEFENDANT'S RESPONSE**

Agrees. Remcon was compensated for this work in Bilateral Modification No. 3 and given additional time under the contract. To alleviate Remcon of any financial burden, Remcon was paid for this work under progress payment No. 3, SA80-85.

**PLAINTIFF'S PROPOSED FACT NO. 33**

The extra costs and delays, incurred and experienced in July, 2001, regarding the burn pit in the Upper Parking Area were not recognized by the government until September 2002 when Modification No.4 was issued. (SBC Dec., ¶ 18, TWL ¶ 3(f); DMS Dec., ¶¶ 3 and 6).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon was paid for off-haul work in 2001. See Letter of August 1, 2001, SA203. Remcon was paid under Pay Estimate 3 for this work in the amount of $491,350. See Progress Payment No. 3, SA80-85. The change was formally recognized by Modification No. 3, which was a bilateral modification that paid Remcon and gave it additional time for the work. Modification No. 3, SA12-16.

**PLAINTIFF'S PROPOSED FACT NO. 34**

In Modification No. 4, the government's justification states:

> On July 12, 2001 while grading the Upper Parking Lot the Contractor encountered unknown miscellaneous buried debris in the easterly end of the upper parking lot. The buried debris consisted of logs, stumps, tires, and miscellaneous material that had been buried in this area over the years. The Denver Service Center Project Manager and Lead Designer inspected this area on July 16, 2001 and determined that the buried material would be detrimental to the construction of the parking lot. AU agreed that a parking lot constructed upon structurally unsound material would eventually fail causing future maintenance problems for the Park. Therefore, the upper 5-feet of the existing grade, which contained unsuitable debris had to be removed. This removal included the sorting and screening of the material cited above. This work is necessary at this time so that the parking lot construction can be continued without delay to the project. This change is in the best interest of the Government and I recommend it be approved.

(SBC Dec., ¶ 18).

**DEFENDANT'S RESPONSE**

Agrees, except refers to Modification No. 4 for the best evidence of its contents. See Modification No. 4, SA 154-160. This modification section is unrelated to the excavation of the burn pit.

**PLAINTIFF'S PROPOSED FACT NO. 35**

Once the road was re-surveyed and pioneered, and the burn pit extra work performed, Remcon sought to excavate the access road to subgrade. (SBC Dec., ¶ 19).

**DEFENDANT'S RESPONSE**

The Government generally agrees. However, the Daily Reports and Remcon's Dailies are the best evidence of how Remcon proceeded with its work.

**PLAINTIFF'S PROPOSED FACT NO. 36**

As of July 30, 2001, Remcon encountered granitic rock which could not be "ripped" with a D-8 Doser. (SBC Dec., ¶ 19; TWL Dec., ¶ 3(f); DMS Dec., ¶¶ 3, 4, 6, and 7).

**DEFENDANT'S RESPONSE**

The Government neither agrees nor disagrees with this statement for the reasons set forth immediately below. On July 30, 2001, Remcon told the Government's on-site construction manager that it was

encountering large boulders and that blasting would be necessary in the area. See daily log of July 30, 2001, SA 201-202. However, Remcon did not tell the on-site inspector that it planned to blast the road because it had encountered a differing site condition. Remcon has cited no contemporaneous evidence that Remcon ever attempted to rip the road or was having any difficulties in ripping the road. The best evidence of whether the road could have been ripped was destroyed by Remcon's blasting. See blasting calendar, SA217-220.

**PLAINTIFF'S PROPOSED FACT NO. 37**

The soils report for the Project prepared by Kleinfelder expressly stated that all earthen material to be encountered to construct the road could be ripped and that blasting would not be necessary except in isolated instances ("floater rocks"). (SBC Dec., ¶ 19).

**DEFENDANT'S RESPONSE**

The Government disagrees. The Geotechnical report stated that the "earthen material" at both the upper comfort station and on the access road was granitic rock that ranged from slightly to highly weathered. See Geotechnical Report, SA176-189. From the geotechnical report, Remcon knew it would be ripping rock. The report also stated:

> The upper silty sand and weather granitic rock material at the site appear to be conducive to ripping. We anticipate that some areas of weathered granitic rock may be ripped with larger equipment. Some oversize materials may be generated during ripping/excavation.

SA187 (emphasis added). See also Response to Remcon's Proposed No. 36.

**PLAINTIFF'S PROPOSED FACT NO. 38**

Remcon encountered material as of July 30, 2001 that was not a floater. (SBC Dec., ¶ 19).

**DEFENDANT'S RESPONSE**

The Government neither agrees nor disagrees with this statement for the reasons set forth immediately below. At the time, Remcon stated that it "encountered material as of July 30, 2001 that was not a floater." See daily report of July 30, 2001, SA201-202. It is impossible for the Government to determine the veracity of this statement because Remcon did not tell the Contracting Officer until August 20, 2001, three weeks later, that it had encountered an alleged "differing site condition." See August 20, 2001 change order, SA209, and letter of August 20, 2001, SA210. By that time, Remcon had blasted most of the road and the Government could not determine whether Remcon had encountered

unrippable rock. See blasting calendar, SA217-220. What is clear, is that up to July 30, 2001, there is no evidence that Remcon had attempted to rip the access road, and that the day Remcon apparently encountered this condition was the first day it blasted. See Response to Remcon's Proposed Fact No. 36; daily report of July 30, 2001, SA201-202. The Government finds it impossible to believe that in one half day, Remcon could have made a determination that 600 lineal feet of access road was not rippable and then called in the blasters who quickly mobilized to the site.

**PLAINTIFF'S PROPOSED FACT NO. 39**

Remcon encountered between Stations 24 and 30 (a distance of 600 lineal feet) solid granitic rock which required blasting. (SBC Dec., ¶ 19; TWL Dec., ¶ 3(f); DMS Dec., ¶¶ 3, 4, 6 and 7).

**DEFENDANT'S RESPONSE**

See Responses to Remcon's Proposed Fact Nos. 37 and 38 above.

**PLAINTIFF'S PROPOSED FACT NO. 40**

The blasting occurred, continuously, until September 13, 2001, a duration of over six weeks, which was twice the planned earthwork duration for the entire Project. (SBC Dec., ¶ 20; TWL Dec. ¶¶ 3(f))

**DEFENDANT'S RESPONSE**

Agrees. The Government agrees that drilling and blasting on the access road occurred from July 30 to September 13. See Response to Remcon's Proposed Fact No. 28, above; blasting calendar, SA 217-220. However, Remcon mistakenly planned its excavation as if it were going to excavate soil, not the rock that the geotechnical report advised prospective contractors that it would encounter. See Response to Remcon's Proposed Fact No. 37, above.

**PLAINTIFF'S PROPOSED FACT NO. 41**

The NPS, for eighteen months, disputed that Remcon encountered a differing site condition relating to the granitic rock which required blasting. (SBC Dec., ¶ 20; TWL Dec., ¶ 3(f)).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 42**

Ultimately, by unilateral modification No. 6, dated February, 2003, the Contracting Officer recognized that a Type I differing site condition (DSC) was encountered regarding the granitic rock. (SBC Dec., ¶ 20; TWL Dec., ¶ 3(f); DMS Dec., ¶¶ 3, 4, and 9).