**DEFENDANT'S RESPONSE**

Agrees. The Government further states that Modification No. 6 is the best evidence of its content. Keiscome Declaration at ¶ 28, See Modification No. 6, A26-29.

**PLAINTIFF'S PROPOSED FACT NO. 43**

Modification No.6 only granted Remcon $84,000 in extra compensation and no time extension. SBC Dec., ¶ 20; (SBC Dec., ¶ 20; TWL Dec., ¶ 3(1); DMS Dec., ¶¶ 3, 4, and 9).

**DEFENDANT'S RESPONSE**

Agrees. The Government further states that Modification No. 6 is the best evidence of its content. See Modification No. 6, A26-29.

**PLAINTIFF'S PROPOSED FACT NO. 44**

Instead of taking 21 calendar days to excavate the road and parking lots, as scheduled in the as-planned schedule, the activity took more than thirteen months, and the costs for excavation exceeded $700,000. (SBC Dec., ¶ 20-21; TWL Dec., ¶ 3(f).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon bid this project as if it were going to be excavating soil, not rock. See bid estimate, SA306. Regardless, it would have taken Remcon longer to excavate than it

scheduled for based upon its assumptions. Remcon was paid for additional excavation by Modification No. 4. SA154-160. Further, the "thirteen months" Remcon cites includes winter, a time when it wasn't working (October, 2001 – May 2002).

**PLAINTIFF'S PROPOSED FACT NO. 45**

The government's belated recognition of the extra work in the deep cut area, as well as its concurrent failure to issue any time extensions and/or recognize the actual damages incurred, constituted constructive acceleration and a constructive change, both of which are a material breach of contract. (SBC Dec., ¶ 19-21; TWL Dec., ¶ 3-6).

**DEFENDANT'S RESPONSE**

The Government disagrees. The statement constitutes an incorrect legal conclusion, not a statement of fact. The Government recognized "additional" work related to the deep cut in Modification Nos. 4 and 6. See Modification No. 4, SA154-160, Modification No. 6, SA26-29. Modification No. 4, related to excess excavation, was bilateral. Remcon negotiated the cost of this modification and did not request any time. See Responses to Remcon's Proposed Fact Nos. No. 24 and 42, and SA26-29.

**PLAINTIFF'S PROPOSED FACT NO. 46**

Remcon's submitted on June 28, 2003 a certified claim to the Contracting Officer. (SBC Dec., ¶ 56)

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 47**

Remcon's June 28, 2003 claim detailed the facts which support Remcon's breach of contract claims, and had been received by the Contracting Officer mere weeks prior to the issuance of the cure notice. (SBC Dec., ¶ 56).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon's statement is argumentative. Further, Remcon's June 28, 2003 certified claim does not contain facts that support Remcon's "breach of contract" claims. Nowhere in the claim does Remcon state that the Government was in "breach of contract." Rather, the claim asserts that Remcon is entitled to additional monies from the Government. Moreover, the June 28, 2003 claim was not received by the Government until July 15, 2003. Keiscome Declaration at ¶ 32, cover letter for June 28, 2003 claim, SA153.

**PLAINTIFF'S PROPOSED FACT NO. 48**

Prior to issuing the cure notice, no response to the Remcon certified claim was made by the government. (SBC Dec., ¶ 56).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 49**

The Upper Sherman Tree Trail was the subject of multiple and continuing design changes. (SBC Dec., ¶ 22; TWL Dec., ¶ 4; DMS Dec., ¶ 5).

**DEFENDANT'S RESPONSE**

The Government disagrees. The Upper Sherman Tree trail was not redesigned numerous times. Remcon alleged that there was a lack of survey control on the trail. It has provided no data or proof that the survey control was incorrect. Remcon requested spot elevations and consistently asked for additional information. Most contractors obtain all survey information from the plans, however, the Government agreed to help Remcon and provided this information. Giller Declaration ¶ 8. The Government eventually issued two revised drawings, T7A and T8A, which were the subject of Modification No. 5. See Modification No. 5, A22-25.

**PLAINTIFF'S PROPOSED FACT NO. 50**

While some work was able to be performed in 2001 and 2002, the Project record details the multiple and continuing changes issued by the NPS to the trail points and the trail's physical location and dimensions throughout 2001 and 2002. (SBC Dec., ¶ 22; TWL Dec., ¶ 4; DMS Dec., ¶ 5).

**DEFENDANT'S RESPONSE**

The Government disagrees. There were not "multiple and continuing" changes made to the trail. The changes that were made to the trail were negotiated through bilateral Modification No. 5. Keiscome Dec. ¶ 25, See Modification No. 5, A22-25.

**PLAINTIFF'S PROPOSED FACT NO. 51**

It was not until November 20, 2002 (after Remcon' s as-planned schedule demonstrated that Remcon would be complete with the entire Project, both Upper and Lower areas) that the Contracting Officer signed and issued Modification No. 5 which officially modified the trail's design and finalized the design changes which had been going on for almost two years. (SBC Dec., ¶ 22; TWL Dec., ¶ 4; DMS Dec., ¶¶ 3 and 5).

**DEFENDANT'S RESPONSE**

The Government agrees that the modification was signed and issued on November 20, 2002. However, the Government notes that Modification No. 5 was originally sent to Remcon for Remcon's signature on September 19, 2002. Keiscome Dec. at ¶ 21. Remcon refused to sign and it was resent to Remcon on October 16, 2002 with further clarifications. Keiscome Dec. at ¶ 23. The modification, which was bilateral, is the best evidence of its content. Keiscome Dec. at ¶ 25, Bilateral Modification No. 5, A22-25.

**PLAINTIFF'S PROPOSED FACT NO. 52**

The timing of the issuance of Modification No. 5 was too late for Remcon to proceed in 2002 as winter weather had commenced (SBC Dec., ¶ 22; TWL Dec., ¶ 4).

**DEFENDANT'S RESPONSE**

The Government disagrees. Had Remcon negotiated Modification No. 5 in good faith, which it did not, it could have begun work upon that modification prior to the end of the 2002 construction season. See Response to Remcon's Proposed Fact No. 51, above.

**PLAINTIFF'S PROPOSED FACT NO. 53**

The issuance of Modification No. 5 restrained Remcon from completing the trail until 2003's construction season, as the design changes had to be implemented before the balance of the trail could be built. (SBC Dec., ¶ 22; TWL Dec., ¶ 4; DMS Dec., ¶ 5).

**DEFENDANT'S RESPONSE**

Disagree for the reasons set forth in our responses to Remcon's Proposed Fact Nos. 51 and 52, above.

**PLAINTIFF'S PROPOSED FACT NO. 54**

No time extension was granted by the government when it issued Modification No. 5. (SBC Dec., ¶ 22; TWL Dec., ¶ 4).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 55**

Recognizing that the government's conduct regarding delays to the Project was a material breach, and to protect itself, Remcon signed Modification No. 5 on October 18, 2002 and forwarded it to the Contracting Officer on October 21, 2002 along with a cover letter expressly reserving Remcon's rights to receive time extensions and delay damages resulting from government breaches of contract,

constructive acceleration, directed changes, constructive changes and the additional work performed and materials handled due to defective and deficient contract documents, including the Sherman Tree Trail. (SBC Dec., ¶ 23; TWL Dec., ¶ 4).

**DEFENDANT'S RESPONSE**

The Government agrees that Remcon signed Modification No. 5 (we do not know the date Remcon signed it) and forwarded it to the contracting officer on or about October 21, 2002. Thereafter, Remcon accepted payment. See Response to Remcon's Proposed Fact No. 51, above. The Government neither agrees nor disagrees that Remcon executed the document Modification No. 5 with the subjective intent "to protect" itself because we have no way of knowing what the subjective intent of Remcon or Mr. Christensen was when Remcon executed the document. Remcon's allegations that the Government was in breach, material or otherwise, or that Remcon had a right to receive time extensions and delay damages resulting from alleged government breaches of contract, constructive acceleration, directed changes, constructive changes and the additional work performed and materials handled due to defective and deficient contract documents, including the Sherman Tree Trail, are argumentative, state legal conclusions, and do

not constitute a proposed finding of fact; to the extent that an answer is necessary, we disagree with Remcon's allegations. Further, although we agree that Remcon's letter to the contracting officer dated October 21, 2002, related to Modification No. 5, and advised the Government that Remcon allegedly reserved its rights to seek "additional monetary compensation" related to Modification No. 5, it did not advise the Government that it otherwise considered the Government to be in "material breach" of the contract. See letter of October 20, 2002, SA280. Finally, the Government refers to the letter and modification themselves for the best evidence of their content. Remcon did not take exception to the release language in the modification.

**PLAINTIFF'S PROPOSED FACT NO. 56**

In 2001, Remcon's Project superintendent notified Bob Russell, the NPS designated representative, of a substantial overrun in quantity of excavated material as result of a differing site condition and errors in design assumptions. (SBC Dec., ¶ 24; TWL Dec., ¶ 3).

**DEFENDANT'S RESPONSE**

The Government agrees that it was advised of a substantial overrun in quantity of excavated material. The Government disagrees that the reason Remcon encountered an overrun in quantity of

excavated materials was the result of a differing site condition or design errors. Much of the alleged overrun was due to a misperception upon the part of Remcon, because its bid was in error and it miscalculated the amount of cut on the project by roughly 10,000 CY. See October 24, 2000 quantities summary, SA190 and compare to Remcon's certified bid estimate, SA306. Regardless, the Government paid for disposal of additional excavation through Modification No. 4.

**PLAINTIFF'S PROPOSED FACT NO. 57**

The NPS did not provide Remcon with direction to mitigate the overrun in excavated material problem until mid-season 2002. (SBC Dec., ¶ 24; TWL Dec., ¶ 3; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. The Government issued Modification No. 4 in 2002 to compensate Remcon for disposal of additional excavation encountered in 2001 and 2002. SA154-160.

**PLAINTIFF'S PROPOSED FACT NO. 58**

As a consequence of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and the Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation

work and utility installation. (SBC Dec., ¶ 24; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon had the opportunity to advise the Government of any delays it perceived it was encountering in earthwork operations when it was negotiating Modification No. 4 with the Government. Modification No. 4 was a negotiated, bilateral modification that compensated Remcon for disposal of additional excavation that it encountered upon the project. See Keiscome Dec. ¶ 18-20, Modification No. 4, 154-160. Excavation work and utility installation also experienced delays due to Remcon's poor workmanship. See Response to Remcon's Proposed Fact No. 2, above.

**PLAINTIFF'S PROPOSED FACT NO. 59**

As a consequence of the excess material to be removed and the lack of timely direction from the NPS, Remcon's operations were severely impacted resulting in an inefficient use of Remcon's planned labor and equipment and Project supervision and an immediate negative impact to Remcon's schedule. (SBC Dec., ¶ 24; TWL Dec., ¶¶ 3- 5; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees for the reasons set forth in response to Remcon's Proposed Fact No. 58, above. Also, the Government notes that Remcon caused its own inefficiencies through the manner in which it administered and performed its work. For example, as of August 7, 2002, there was no project manager or project superintendent on the jobsite. See weekly meeting August 9, 2002, SA269, daily report of August 20, 2002, SA271-272. We also disagree with Remcon's assertion that Government's actions severely impacted Remcon's operations, resulting in an inefficient use of Remcon's planned labor and equipment and Project supervision and an immediate negative impact to Remcon's schedule. See Response to Remcon's Proposed Fact No. 2. We also note that Remcon's operations were impacted by its failure to include all of the earthwork contained in the contract drawings in its bid. See Response to Remcon's Proposed Fact No. 56.

**PLAINTIFF'S PROPOSED FACT NO. 60**

The constant NPS design revisions, occasioned by defective plans and specifications, quantity, and the design changes severely impacted Remcon's ability to schedule or perform the Project with any semblance

of efficiency of economy. (SBC Dec., ¶ 25; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

We agree that Remcon failed to properly schedule its work and that Remcon failed to "perform the Project with any semblance of efficiency of economy." We disagree that the cause of Remcon's inefficient and untimely performance was the fault of the Government. See Response to Remcon's Proposed Fact No. 2. We further note that, although Remcon cites to "constant NPS design revisions occasioned by defective plans and specifications, quantity and design changes," it does not cite to an instance where plans or specifications were defective. Finally, the Government met Remcon in good faith and during 2001 and 2002 it negotiated Modification Nos. 1–5 with Remcon to compensate it for additional work and time. These modifications were all bilateral.

**PLAINTIFF'S PROPOSED FACT NO 61**

Within the first three weeks of work on the Project, NPS changes and deficiencies in the contract documents meant that completion of the 2001 work schedule, as planned by Remcon and accepted by the NPS,

was impracticable. (SBC Dec., ¶ 25; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. First, the statement is argumentative, conclusory and fails to cite to any specific "changes and deficiencies." Second, the road issue is not relevant because the road was readjusted, and Remcon was paid for the readjustment by Modification No. 4. See Keiscome Dec. ¶¶ 18-19, Modification No. 4, SA154-160. Third, Remcon also claimed that it was encountering additional excavation; however, it was paid for the disposal of additional excavation pursuant to Modification No. 4. See Keiscome Dec. ¶¶ 18, 20, Modification No. 4, SA154-160. Modification 4 was bilateral and the parties agreed that no time was necessary for the work. Fourth, Remcon claimed that it encountered a differing site condition, but it was paid for this DSC by Modification No. 6. See Keiscome Dec. ¶ 26, Modification No. 6, A26-29.

**PLAINTIFF'S PROPOSED FACT NO. 62**

The necessity for blasting in 2001 adversely impacted Remcon's ability to stay on schedule, and shifted the critical path to all earthwork activities. (SBC Dec., ¶ 26; TWL Dec., ¶¶ 3-5; DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

The Government disagrees. First, Remcon's statement assumes that it had the ability to stay on schedule; however, we believe that, due to Remcon's own inability to properly manage this project, Remcon could not have stayed "on schedule." Second, Remcon has not established that blasting was necessary, for the reasons the set forth in our response to Remcon's Proposed Fact No. 38, above.

**PLAINTIFF'S PROPOSED FACT NO. 63**

Remcon submitted its formal request for a change order for the DSC on August 20, 2001 to recover the added cost and time of the DSC. (SBC Dec., ¶ 27;.TWL Dec., ¶ 3; DMS Dec., ¶ 3-4).

**DEFENDANT'S RESPONSE**

Agreed.

**PLAINTIFF'S PROPOSED FACT NO 64.**

Willie DeOcampo and Rodney Keiscome admitted in their depositions that the NPS failed to timely respond and investigate Remcon' s claim of a DSC in 2001, and did not respond until 2002. (DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

The Government agrees that Willie DeOcampo and Rod Keiscome did not investigate the site between August 20, 2001 and September 13, 2001 (which included the Labor Day holiday). The Government neither admits nor denies that the statements that Mr. DeOcampo and Mr. Keiscome "admitted" in their depositions that "NPS failed to timely respond and investigate Remcon' s claim of a DSC in 2001, and did not respond until 2002," because whether something is an admission is a legal conclusion, and because the "DMS Dec.," cited above, does not set forth their testimony but rather their counsel's characterization of their testimony. The Government further refers to the transcripts themselves as the best evidence of their content. The Government further notes that the contemporaneous records demonstrate that Remcon did not timely advise the contracting officer that it had encountered a differing site condition and that by the time Remcon advised the Government of the alleged differing site condition, it had been drilling and blasting the site for 20 days. See Response to Remcon's Proposed Fact No. 38, above; blasting calendar, SA217-220, Change Order request, SA209. Remcon never asked the Government to come out and witness attempts to rip the rock prior to blasting.

**PLAINTIFF'S PROPOSED FACT NO. 65**

The NPS ultimately issued Unilateral Modification No. 6, dated February, 2003, which validated Remcon's DSC claim. (SBC Dec., ¶ 27; TWL Dec., ¶ 3; DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

The Government agrees that NPS issued Unilateral Modification No. 6, and that the purpose for this modification was to compensate Remcon for its claim. See Modification No. 6, A26-29. However, we neither agree nor disagree with the assertion that this "validated" Remcon's DSC claim because the term is not defined, it is Remcon's characterization of what occurred, it is argumentative, and it sets forth a legal conclusion rather than a statement of fact.

**PLAINTIFF'S PROPOSED FACT NO. 66**

Omitted.

**PLAINTIFF'S PROPOSED FACT NO. 67**

Modification No. 6 only authorized payment of $85,000 of Remcon's $700,000 DSC claim, and did not grant any time extensions. (SBC Dec., ¶ 20; TWL Dec., ¶ 3; DMS Dec., ¶¶ 3, 4, and 9).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 68**

Between the first and second construction seasons (December 2001 and April 2002), Remcon traveled to Denver to meet with NPS personnel on three different occasions to discuss: extra work performed but not compensated or turned into a modification; design problems; quantity overruns; and payment of Remcon's claims that were significantly impacting the Project. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon's assertion that it discussed extra work performed but not compensated or turned into a modification; design problems; quantity overruns; and payment of Remcon's claims that were significantly impacting the Project is vague, is Remcon's characterization of its claims, which we dispute, and contains legal conclusions. Further, the assertion is vague. We agree with Remcon assertion insofar as Remcon is stating that parties met three times to discuss Remcon's claims that it was entitled to additional funds. Specifically, individuals from the DSC, Park and contractor personnel met in the park on October 23, 2001; the parties met in Denver on

December 11, 2001; and the parties met during the week of April 8, 2002. Keiscome Declaration at ¶ 16

**PLAINTIFF'S PROPOSED FACT NO. 69**

During the three visits/meetings in Denver between the first and second construction seasons, Remcon notified the NPS that final slope grades had not been completed and additional earthwork would be needed to meet the designed slope minimums. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

Agrees that Remcon notified the NPS that the final slope grades had not been completed. The Government disagrees that Remcon advised of "additional earthwork."

**PLAINTIFF'S PROPOSED FACT NO. 70**

Despite NPS personnel agreeing to review the impact issues and representing they would timely respond and provide necessary design changes and/or issuing the appropriate revised drawings and modifications, little or no information was forthcoming before the second construction season began. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. First, Remcon's Proposed Fact is vague because Remcon does not define what it means by the "impact issues." Second, to the extent that Remcon is referring to earthwork, the parties had ongoing discussions regarding earthwork. After Remcon submitted a Request for Equitable Adjustment in March 2002, the Government responded on March 28, 2002 and requested additional information. Specifically, the Government asked for Remcon's backup. SA307-309. Remcon responded without providing the requested information. SA311-313. On April 24, 2002, the Government again explained to Remcon the information that it was seeking. SA31-317. The Government paid Remcon for additional earthwork by Modification No. 4. SA154-160. The Government also paid for the alleged differing site condition by issuing Modification No. 6.

**PLAINTIFF'S PROPOSED FACT NO. 71**

The NPS's lack of information included what to do with the large hole caused by the burn pit excavation which was created in July, 2001 and for which no direction had been received as well as the excess quantity of material encountered. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon excavated the burn pit in 2001. Remcon did not ask for any direction regarding the "large hole" left by the burn pit, and cites no contemporaneous evidence demonstrating that it did. Further, it is incongruous that Remcon is claiming both that it had encountered additional excavation, which was stock-piled in the upper parking lot, and, at the same time, that it had a hole that needed filling in the upper parking lot. Regardless, Modification No. 4 compensated Remcon for raising the upper parking lot. This would include "filling a hole" that was in the parking lot. See Keiscome Dec. ¶¶ 18- 20, Modification No. 4, SA154-160

**PLAINTIFF'S PROPOSED FACT NO. 72**

As a result, Remcon was unable to publish an accurate, updated schedule prior to the 2002 construction seasons as it was missing critical information to enable it to plan its work. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

The Government disagrees for the reasons set forth in response to Remcon's Proposed Fact No. 71, above. Further, Remcon has failed to cite any contemporaneous evidence establishing that it advised the

Government that it was unable to publish an "accurate, updated schedule" for this reason.

**PLAINTIFF'S PROPOSED FACT NO. 73**

Based upon the contract documents, the Project was, in essence, planned by the designers to be a balanced job (requiring neither import of earthen materials nor their export, except for the planned 2000 cubic years of burn pit materials planned to be off-hauled as well as 6800 cubic yards to be hauled within the park to a designated locale). (SBC Dec., ¶ 29; DMS Dec., ¶ 3).

**DEFENDANT'S RESPONSE**

The Government disagrees. The contract documents do not support the contention that this was a balanced job. Further, the correct earthwork quantities could have been determined by Remcon during the bid period. See Expert Report SA398-399.

**PLAINTIFF'S PROPOSED FACT NO. 74**

The project design was flawed. (SBC Dec., ¶ 29; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. The "design" of the project was not flawed. Although there was a mistake in the assumption that the earth

would compact 40 percent, this does not render the entire project design flawed. See Response to Remcon's Proposed Fact No. 56, above. The 40 percent compaction reference resulted in having more than 6800 CY of material that needed to be hauled. The Government compensated Remcon for this under Modification No. 4. See Keiscome Dec. ¶¶ 18 - 20, Modification No. 4, SA154-160.

**PLAINTIFF'S PROPOSED FACT NO. 75**

Thousands of yards of excess material was excavated, stockpiled, handled multiple times, and had to be disposed of after direction was provided almost one year after the design errors were discovered. (SBC Dec., ¶ 28; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government agrees that thousands of yards of excess material was excavated, stockpiled, and had to be disposed of after direction was provided. This is precisely the reason that Government issued bilateral Modification No. 4 to compensate Remcon for this work. See Keiscome Dec. ¶¶ 18 - 20, Modification No. 4, SA154-160. However, the Government disagrees that Remcon was required to handle the excavated material multiple times because the assertion is

vague and because proper planning by Remcon would have minimized the handling of this material.

**PLAINTIFF'S PROPOSED FACT NO. 76**

Depositions of the designers has disclosed that a 40% compaction factor used by the designers to calculate quantities and determine that this Project was, in essence, a balanced job, even though the material to be excavated was decomposed granite. DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government agrees that depositions of the designers had disclosed that a 40% compaction factor was used by the designers to calculate quantities. However, the Government disagrees that the prject was a balanced job, for the reasons set forth in Response to Plaintiff's Proposed Fact No. 73, above, and disagrees with Remcon's implication that the material to be excavated consisted of solely decomposed granite. SA182.

**PLAINTIFF'S PROPOSED FACT NO. 77**

The designers' assumptions regarding a 40% compaction factor were materially flawed, and they have admitted this in their depositions. (DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 78**

The designers' flawed assumption regarding the 40% compaction factor resulted in thousands of yards of excess material to be excavated, stockpiled, handled multiple times. (DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. Although the 40 percent compaction reference resulted in having more than 6,800 cubic yards of material that needed to be hauled, it did not require the excavation of more material. However, the Government disagrees that Remcon was required to handle the excavated material multiple times because the assertion is vague and because proper planning by Remcon would have minimized the handling of this material.

**PLAINTIFF'S PROPOSED FACT NO. 79**

Remcon re-mobilized to the Project in mid May 2002. (SBC Dec., ¶ 30).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 80**

A partnering meeting was held with all Project participants in the Park in May 2002. (SBC Dec., ¶ 30).

**DEFENDANT'S RESPONSE**

Agrees. The partnering meeting was held May 14–15, 2002.

**PLAINTIFF'S PROPOSED FACT NO. 81**

The May, 2002 partnering meeting involved a comprehensive job walk so that the problems experienced in 2001 could be actually seen by the Contracting Officer and the Contracting Officer's Representative. (SBC Dec., ¶ 30).

**DEFENDANT'S RESPONSE**

Agrees, except that we neither agree nor disagree regarding what is meant by the term "problems" because it is not defined; to the extent that Remcon is referring to the "problems" discussed above, we refer to our prior responses.

**PLAINTIFF'S PROPOSED FACT NO. 82**

During the partnering meeting, Remcon requested direction on how to address all of the issues then continuing to be unresolved, including how to proceed through the deep cut area, including how to address slope problems. (SBC Dec., ¶ 30).

**DEFENDANT'S RESPONSE**

The Government neither agree nor disagrees with this statement because it is not supported by a citation to a contemporaneous record.

**PLAINTIFF'S PROPOSED FACT NO. 83**

When the NPS continued to fail to respond, Remcon began issuing a series of requests for information seeking direction in the deep cut area. (SBC Dec., ¶ 30).

**DEFENDANT'S RESPONSE**

The Government disagrees. The Government issued clear direction in June 2001 regarding slopes in the deep cut area in response to an Request for Information ("RFI") from Remcon. See RFI No. 9, SA199. Remcon did not issue a "series" of RFIs. On June 27, 2002, Remcon issued three RFIs and asked for direction from the Government regarding a toe slope and hinge conflicts at a few places in the deep cut. See RFI Log, SA300. The Government requested as-built information from Remcon, which was not forthcoming. The Government addressed Remcon's slope questions at its walk-through with Remcon on July 10, 2002. See letter of July15, 2002, SA259-262.

**PLAINTIFF'S PROPOSED FACT NO. 84**

Throughout June, 2002 the NPS failed to respond to any of the RFIs or to provide any direction to Remcon on how to correct the slope problems resulting from earlier design deficiencies. (SBC Dec., ¶ 30; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

The Government disagrees because Remcon's characterizations are misleading. Remcon issued the RFIs on June 27, 2002; therefore, it is not surprising that the Government did not respond to Remcon in June. The Government responded within two weeks. See Response to Remcon's Proposed Fact No. 83, above.

**PLAINTIFF'S PROPOSED FACT NO. 85**

85. In May, 2002, Remcon sought direction on what to do with the thousands of yards of excess material on site. (SBC Dec., ¶ 30; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 86**

Despite being raised as a potential solution in May, 2002 that some of the excess material could be used to raise the designated finish

elevation of the parking lots, this extra work was not directed until June 28, 2002, again delaying the work. (SBC Dec., ¶ 30; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees with Remcon's statement except that it agrees the work was directed on June 28, 2002. The parties negotiated in June 2002 regarding the work and how it would be accomplished. See letter of June 5, 2002, SA226-231, Daily Log of June 14, 2002, SA232-33. The negotiations did not cause any material or compensable delay. See Expert Report, SA385-388, SA396.

**PLAINTIFF'S PROPOSED FACT NO. 87**

Modification No.4, which addressed raising the elevation of the parking lots, was not issued until September, 2002 even though agreement on all terms was reached in early June, 2002. (SBC Dec., ¶ 30; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-5).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 88**

The issue of excess material was raised by government personnel as of July 2, 2001. (SBC Dec., ¶ 31; TWL Dec., ¶ 3-4; DMS Dec., ¶ 3-5).