**DEFENDANT'S RESPONSE**

Agrees. We point out that Remcon advised the Government that Remcon was encountering excess excavation and the Government believed Remcon. The Government did not know at that time that much of what Remcon claimed was "excess" was the result of Remcon's mistaken calculations. See Response to Proposed Fact No. 56, above.

**PLAINTIFF'S PROPOSED FACT NO. 89**

It was not until June 28, 2002, a delay of 361 days, that the Contracting Officer dealt with the excess material when he issued a directive letter to Remcon to use some of it to raise the finish grade of the upper parking areas. (SBC Dec., ¶ 31; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-5).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon signed bilateral modification No. 4 which compensated it for the disposal of excavation. If it believed that it had suffered a "delay" as it now asserts, it had time to negotiate this with the Contracting Officer. See Keiscome Dec. ¶¶ 18 - 20, Modification No. 4, SA154-160. Further, there only were only 18 excusable compensable days of delay on this project. See Expert

Report, SA396. These are more than offset by liquidated damages for which Remcon is responsible, which are still continuing to run.

**PLAINTIFF'S PROPOSED FACT NO. 90**

Remcon, which claimed that the events of 2001 had materially depleted its capital to perform work, sought written assurance from the contracting officer that the modification for the directed extra work to raise the parking lots would be immediately processed so Remcon could bill for the work and get paid no later than August, 2002. (SBC Dec., ¶ 31; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-5).

**DEFENDANT'S RESPONSE**

Agrees only to the extent that, on June 28, 2002, Remcon requested that the CO pay for the subject work in a timely manner, and refers to Remcon's request itself as the best evidence of its content. The modification was issued in September 2002. SA154-160.

**PLAINTIFF'S PROPOSED FACT NO. 91**

The Contracting Officer gave this written assurance by letter dated July 16, 2002, but he did not honor his representation as the modification (No. 4) was not issued until September 14, 2002, and Remcon could not bill for the work until October, 2002. (SBC Dec., ¶ 31; DMS Dec., ¶ 4).

**DEFENDANT'S RESPONSE**

The Government disagrees with Remcon's characterization. On July 16, 2002, the contracting officer stated its intent was to work the Sherman parking lot work into a bilateral modification. See letter of July 16, 2002, SA234. The modification was issued in September, less than two months later. See Keiscome Dec. ¶¶ 18 - 20, Modification No. 4, SA154-160.

**PLAINTIFF'S PROPOSED FACT NO. 92**

In their depositions, neither Willie DeOcampo, the Contracting Officer's Representative, nor Rod Keiscome, the Contracting Officer, could explain or justify their conduct which hindered and delayed Remcon and offered no excuse other than it did not get done. (DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

The Government disagrees with Remcon's characterizations regarding Modification No. 4 and notes that the Government's actions did not hinder or delay Remcon. Further, the Government was not unresponsive to Remcon, and does not have to explain its "conduct" in issuing the modification in September because Remcon accepted the terms of the modification. If Remcon believed that it was entitled to

additional money or time for delays, it should have requested additional funds and time before signing the bilateral modification and its release. See Keiscome Dec. ¶¶ 18 - 20, Modification No. 4, SA154-160.

**PLAINTIFF'S PROPOSED FACT NO. 93**

By the end of June 2002, the NPS-caused impacts and delays effectively prevented Remcon from accomplishing any productive work on the Project. (SBC Dec., ¶ 32; TWL Dec., ¶¶ 3-6; DMS Dec., ¶¶ 3-7).

**DEFENDANT'S RESPONSE**

The Government disagrees, except that we agree that by the end of June 2002, Remcon was failing to accomplish any productive work upon the project. Remcon had considerable work to do in 2002 that it was not prevented from doing, including completing the comfort station, wayside kiosk, leach field, and restoration of the temporary access road. Giller Declaration ¶ 7. Regardless, Remcon negotiated and signed Modification Nos. 1–5 during 2001 and 2002. If it believed it was entitled to additional money or time, it should have so stated.

**PLAINTIFF'S PROPOSED FACT NO. 94**

Remcon published on June 27, 2002 an updated schedule but it was a guess as much as a plan due to the volume of problems and

hindrances affecting the ability to progress the work. (SBC Dec., ¶ 32; TWL Dec., ¶¶ 3-6).

**DEFENDANT'S RESPONSE**

Agree that a schedule was provided to the Government. The Government also notes that one of the schedules that was produced on June 27, 2002 was the baseline schedule for this project. Expert Report, SA371. We disagree that the Government hindered Remcon's ability to perform work and note that Remcon does not support this statement with contemporaneous documentation. We neither agree nor disagree that Remcon's schedule was a "guess" because that we do not know what Mr. Christensen's subjective state of mind was during the relevant time.

**PLAINTIFF'S PROPOSED FACT NO. 95**

In June, 2002, lead inspector, Bob Russell, became abusive and lost control and was removed from the Project effective July 4, 2002. (SBC Dec., ¶ 32).

**DEFENDANT'S RESPONSE**

We neither agree nor disagree with Remcon's allegations because we do not have first hand knowledge of whether Mr. Russell engaged in abusive conduct or lost control. However, we agree that Bob Russell

was removed from the project because of Remcon's allegations that he was abusive.

**PLAINTIFF'S PROPOSED FACT NO. 96**

In an attempt to push forward, Remcon asked that it be allowed to begin work on the Lower Sherman Trail component. The NPS denied this request. (SBC Dec., ¶ 32; TWL Dec., ¶¶ 3-4; DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 97**

In June, 2002, Remcon gave the Contracting Officer and his representative comprehensive notice of the multiple problems on the Project and their impacts on Remcon's ability to continue with the Project. (SBC Dec., ¶ 33).

**DEFENDANT'S RESPONSE**

The Government neither agrees nor disagrees with Remcon's assertion. First, a copy of the notice, which would be the best evidence of its content, is not cited. Second, because Remcon does not cite the notice, its assertion is vague and requires the Government to speculate as to what Remcon is referring. Third, Remcon has not defined what it means by the term "problems"; to the extent that Remcon is referring to

the issues discussed in its previous Proposed Facts, described above, we refer to our prior responses.

**PLAINTIFF'S PROPOSED FACT NO. 98**

When no substantive response was forthcoming, Remcon notified the Contracting Officer that work would cease unless circumstances swiftly changed. (SBC Dec., ¶ 33).

**DEFENDANT'S RESPONSE**

The Government agrees that Remcon notified the contracting officer that work would cease. The Government disagree that the reasons Remcon cited for ceasing work were valid.

**PLAINTIFF'S PROPOSED FACT NO. 99**

99. On July 3, 2002, Remcon wrote the Contracting Officer requesting an emergency on-site meeting. (SBC Dec., ¶ 33).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 100**

A new Project Manager, Mike Giller of the NPS Denver Service Center, then arrived on site on July 10, 2002. (SBC Dec., ¶ 33).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 101**

As of this date, Mr. Russell was gone and Mr. Giller did not have an opportunity to discuss with Mr. Russell what had occurred over the proceeding 14 months. (SBC Dec., ¶ 33).

**DEFENDANT'S RESPONSE**

Disagrees. On or about July 9, 2002, Mr. Giller spoke to Mr. Russell at the park headquarters to discuss the project and Pay Estimate No. 9. SA343-344. Further, Loren Mangrum worked with Bob Russell, was available to speak with Mr. Giller and discuss what had occurred on the project prior to Mr. Giller's arrival. Giller Dec. ¶ 2.

**PLAINTIFF'S PROPOSED FACT NO. 102**

Mr. Giller walked the site with Stephen Christensen and his lead Project personnel and, having the problems explained to him orally directed Remcon to "field fit" the Upper Sherman Access Road to the existing natural features. (SBC Dec., ¶ 33).

**DEFENDANT'S RESPONSE**

Agrees that Mr. Giller walked the site along with Jack Vance (NPS) and Loren Mangrum (Jacobs), Steve Christensen (Remcon), Luke Triplett (Remcon), Bob Reinhardt (Remcon), and Mark Penrose (Remcon). At the site, the parties discussed areas of concern. Mr.

Giller took notes at the meeting about the specific field adjustments for which the parties agreed. Giller Declaration ¶ 3, See letter of July 15, 2002, SA259-262, Mike Giller's Notes 301-30. Mr. Giller did not tell Mr. Christensen to "field fit" the access road, they only agreed to specific changes at specific spots along the roadway. We neither agree nor disagree regarding what is meant by the term "problems" because it is not defined; to the extent that Remcon is referring to the issues discussed in its previous Proposed Facts, described above, we refer to our prior responses.

**PLAINTIFF'S PROPOSED FACT NO. 103**

This direction was confirmed in Remcon's letter to the NPS on July 11, 2002, more than 8 months after those problems had been brought to the attention of the NPS. Even then, Remcon had only oral instructions, i.e., "Just make it fit." (SBC Dec., ¶ 33).

**DEFENDANT'S RESPONSE**

The Government disagrees that it ever told Remcon to "just make it fit," regarding the alignment of the access road. Giller Declaration ¶ 3-4. With respect to the content of Remcon's letter, Remcon's July 11, 2002 letter speaks for itself. See Response to PPFOUF No. 102.

We neither agree nor disagree regarding what is meant by the term "problems" because it is not defined; to the extent that Remcon is referring to the issues discussed in its previous Proposed Facts, described above, we refer to our prior responses.

**PLAINTIFF'S PROPOSED FACT NO. 104**

In July, 2002, Remcon's grading superintendent/foreman, Mike Kitchell and Mark Penrose, laid the roadway alignment out using the design staking information provided by the NPS as adjusted for field conditions. (SBC Dec., ¶ 34).

**DEFENDANT'S RESPONSE**

The Government disagrees. Mike Kitchell realigned the access road without input from the NPS. See Belknap Dec. ¶¶ 2 - 8.

**PLAINTIFF'S PROPOSED FACT NO. 105**

By July 25, 2002, Remcon encountered still further problems in fitting the design to field conditions. (SBC Dec., ¶ 34).

**DEFENDANT'S RESPONSE**

The Government agrees that Remcon encountered problems, but disagrees that they were caused by the Government. By July 25, 2002, Remcon had "realigned" the road upon its own initiative. Belknap Declaration ¶¶ 2 - 8. We neither agree nor disagree regarding what is

meant by the term "problems" because it is not defined; to the extent that Remcon is referring to the issues discussed in its previous Proposed Facts, described above, we refer to our prior responses

**PLAINTIFF'S PROPOSED FACT NO. 106**

A new assistant inspector, Russell Belknap, had arrived onsite to replace Bob Russell's subordinate, Loren Mangrum, who had assumed Bob Russell's role. (SBC Dec., ¶ 34).

**DEFENDANT'S RESPONSE**

Disagrees. Russell Belknap did not replace Loren Mangrum. They worked on the project together.

**PLAINTIFF'S PROPOSED FACT NO. 107**

Mr. Belknap walked the site with Mr. Kitchell to review the field conditions and determine what could be done in order that Remcon could proceed. (SBC Dec., ¶ 34).

**DEFENDANT'S RESPONSE**

Agrees. When Russell Belknap walked the site with Mr. Kitchell, he found that Remcon had unilaterally realigned the road. Belknap Dec. ¶ 2 .

**PLAINTIFF'S PROPOSED FACT NO. 108**

Mr. Belknap personally directed Mr. Kitchell to make additional changes to the roadway alignment. (SBC Dec., ¶ 34).

**DEFENDANT'S RESPONSE**

The Government disagrees. Mr. Belknap requested additional information when he spoke with Mr. Kitchell. Belknap Dec. ¶¶ 3-7.

**PLAINTIFF'S PROPOSED FACT NO. 109**

In early August 2002 the NPS requested that Remcon provide survey data for the access road as built. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 110**

Remcon had its surveyor return to the Project and survey the entire access road. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 111**

The new survey data was sent to the NPS in Denver on August 14, 2002. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 112**

The NPS then orally advised Remcon that it was going to issue still more new design changes (Design No. 5) to correct what it perceived were failures to propery build the road. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

The Government disagrees. NPS was not issuing "new design changes." NPS wanted Remcon to fix the road that it unilaterally realigned. Belknap Dec. ¶¶ 4-8 .

**PLAINTIFF'S PROPOSED FACT NO. 113**

The NPS took the position that it was going to issue still more new design changes despite Remcon following dozens of oral and written directives of NPS on-site representatives to field fit the road as needed. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

The Government disagrees for the reasons set forth in the Response to Proposed Fact No. 112, above.

**PLAINTIFF'S PROPOSED FACT NO. 114**

At no time during the extended discussions with NPS throughout July 2002 (when Remcon was struggling to make progress) did any NPS personnel insist that Remcon follow the original (and unbuildable) design. (SBC Dec., ¶ 35)

**DEFENDANT'S RESPONSE**

The Government disagrees. The discussions in July 2002 regarded specific areas as identified in the July 15, 2002 memorandum, related to the road embankment, not the road. See Response to Proposed Fact No. 102. Although Remcon claims that the design was not buildable, it has not demonstrate this. Further, the design was buildable, as the as-built survey demonstrates. Giller Declaration ¶ 15.

**PLAINTIFF'S PROPOSED FACT NO. 115**

The NPS provided the new Design No. 5 requirements on September 6, 2002. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

The Government did not issue a "new design," on September 6, 2002; the Government issued direction upon how Remcon was to correct what Remcon unilaterally realigned without input from NPS designers. Belknap Decl. ¶ 7 - 8.

**PLAINTIFF'S PROPOSED FACT NO. 116**

Remcon had its surveyor again lay out the road. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

Agrees.

**PLAINTIFF'S PROPOSED FACT NO. 117**

In most instances only minor extra work was required to meet the latest (the fifth design) requirements other than in the deep cut. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

The Government disagrees that there was a "fifth design"; the Government wanted Remcon to build an engineered road according to the project plans and specifications. While the Government agrees that the parties agreed to make changes to the road embankment, there was no discussion related to changing the horizontal or vertical alignment of the road. Giller Dec. ¶ 3–4, notes of walk-through, SA301-304.

**PLAINTIFF'S PROPOSED FACT NO. 118**

Due to the originally deficient design and consequent re-designs, Remcon was forced to delay its paving operations. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon was unable to pave for the reasons cited in response to Response to Proposed Fact No. 2, above.

**PLAINTIFF'S PROPOSED FACT NO. 119**

As weather became an impediment to completing paving operations (paving can only occur within certain temperature ranges), Remcon was forced to wait for the following 2003 construction season to complete paving operations. (SBC Dec., ¶ 35).

**DEFENDANT'S RESPONSE**

The Government disagrees, except that we agree that Remcon did not complete paving in 2002. However, much of this was the result of Remcon-caused delays. See response to Response to Proposed Fact No. 2, above.

**PLAINTIFF'S PROPOSED FACT NO. 120**

The Sherman Tree Trail design was not revised and issued to Remcon to construct until November, 2002, after the 2002 construction season was over. This redesign delayed the Project two years. (SBC Dec., ¶ 36; TWL Dec., ¶ 4).

**DEFENDANT'S RESPONSE**

The Government disagree. See Response to Proposed Fact No. 51, above. The Government disagrees that this delayed the project for two years and notes that there only were only 18 excusable compensable days of delay on this project. See Expert Report, SA396. These are more than offset by liquidated damages for which Remcon is responsible, which are still continuing to run.

**PLAINTIFF'S PROPOSED FACT NO. 121 (#1)**

The combination of the NPS caused delays, and its concurrent refusal to pay for all of the extra work its representatives had directed Remcon to perform placed Remcon in dire financial duress at the end of the 2002 construction season. (SBC Dec., ¶ 37; TWL Dec., ¶¶ 4-6).

**DEFENDANT'S RESPONSE**

The Government disagrees. First, the Government disagrees that it was responsible for the lengthy delays in this project; indeed, there only were only 18 excusable compensable days of delay on this project. See Expert Report, SA396. These are more than offset by liquidated damages for which Remcon is responsible, which are still continuing to run. Second, the Government never refused to pay for extra work. It negotiated with Remcon at various meetings and it

negotiated modifications with Remcon. Keiscome Decl. ¶ 16. The Government did not place Remcon in a dire financial condition. Remcon had a $1.4 million judgment entered against it in June 2002, which placed Remcon in a dire financial position. See Remcon judgment, SA255-257. Interestingly, when asked about litigation against Remcon, Steve Christensen allegedly "forgot" about the Bank of America judgment until reminded by the Government. Christensen Deposition, 59:24 - 60:12 (annexed to Dulin Decl.). Remcon also lost money upon other contracts. See Remcon spreadsheet, SA266-268.

**PLAINTIFF'S PROPOSED FACT NO. 121 (#2)**

By the end of the 2002 construction seasons, the job was incomplete, Remcon was prevented from bidding and obtaining further work, and its financial condition had been severely jeopardized by NPS' refusal to timely and properly pay Remcon for extra work performed. (SBC Dec., ¶ 37).

**DEFENDANT'S RESPONSE**

The Government disagrees. Remcon was not prevented from bidding and obtaining other work by any action of the Government. Rather its financial condition was the result of its own conduct. See Response to Remcon's Proposed Fact No. 121 (#1), above. By the end of 2002, the Government had paid Remcon all progress payments for

work performed and the Government had paid Remcon for Modifications 1–5.

**PLAINTIFF'S PROPOSED FACT NO. 121 (#3)**

Before mobilizing for the 2003 construction season, Remcon wrote a series of letters to the Contracting Officer and/or his representatives outlining the cost and schedule impacts that resulted from deficiencies in the contract documents and the numerous redesigns and other changes directly attributable to NPS. (SBC Dec., ¶¶ 38-55)

**DEFENDANT'S RESPONSE**

The Government agrees that Remcon wrote letters containing allegations that it had incurred additional cost and schedule impacts that resulted from deficiencies in the contract documents and the numerous redesigns and other changes directly attributable to NPS. However, the Government disagrees with the substance of what Remcon alleged in those letters, and refers to the letters themselves as the best evidence of their content. The parties resolved issues regarding cost and time impacts through modifications to the contract.

**PLAINTIFF'S PROPOSED FACT NO. 122**

The letters sent by Remcon to the NPS from October, 2002 to July, 2003 placed the NPS on notice of claims, detailed the government's material breaches of contract, advised the government of

Remcon's precarious financial status) and advised the NPS that lack of payment and government caused delays prevented Remcon from performing work in 2003. (SBC Dec., ¶¶ 38-55, and 57-58)

**DEFENDANT'S RESPONSE**

The Government agrees that the letters between October 2002 and July 2003 notified the NPS of Remcon's allegations, even regarding items that the parties had negotiated upon and for which Remcon had been paid. However, the Government disagrees with the substance of what Remcon alleged in those letters. For instance, in one letter, Remcon accused the Government of "material breach" regarding Modification No. 7. See letter of March 12, 2003, SA285-291. Remcon stated that if the Government issued the modification, that the Government would be in breach. The contracting officer, under this advisement, withdrew the modification. See letter of April 1, 2003, SA294-295.

**PLAINTIFF'S PROPOSED FACT NO. 123**

After repeated attempts to resolve its disputes with the NPS, Remcon finally submitted a multi volume, comprehensive certified claim to the Contracting Officer on June 28, 2003. That claim outlined in

excruciating detail the cost and time impacts incurred by Remcon on the Project. The total of that claim was $3,091,799.60. (SBC Dec., ¶ 56).

**DEFENDANT'S RESPONSE**

The Government disagrees that Remcon attempted in good faith to resolve many of its disputes with NPS. The Government agrees that Remcon submitted a claim. The claim outlines the cost and time impacts allegedly incurred by Remcon on the Project.

**PLAINTIFF'S PROPOSED FACT NO. 124**

The NPS' response to Remcon's certified claim was to issue a cure notice as a pretext for a default termination. (SBC Dec., ¶ 56).

**DEFENDANT'S RESPONSE**

The Government disagrees. The NPS issued a cure notice because Remcon did not mobilize to the job site in 2003. The cure notice was not issued in response to the claim or as a pretext. See Keiscome Deposition ¶ 32.

**PLAINTIFF'S PROPOSED FACT NO. 125**

Remcon sought ADR and the NPS refused to participate in the ADR process. (SBC Dec., ¶ 59).

**DEFENDANT'S RESPONSE**

Agrees. We note that the Government met with Remcon to negotiate many times. Specifically, individuals from the DSC, Park and contractor personnel met in the park on October 23, 2001; the parties met in Denver on December 11, 2001; during the week of April 8, 2002; May 14 – 15, 2002, and August 22, 2002. Keiscome Declaration at ¶ 16. By letter of March 28, 2003, the Government requested that the parties meet to work out a reasonable settlement of outstanding issues. See letter of March 28, 2003, SA292-293. The Government was not required to agree to mediation.

**PLAINTIFF'S PROPOSED FACT NO. 126**

Mr. Keiscome told Steve Christensen that "we don't need any third party assistance." (SBC Dec., ¶ 59).

**DEFENDANT'S RESPONSE**

The Government disagrees. Mr. Keiscome's response to Remcon's request for ADR is expressed in a letter in which the Government stated that it preferred to enter into negotiations with the parties. See e.g., SA292-293.

**PLAINTIFF'S PROPOSED FACT NO. 127**

When the Contracting Officer denied the request for ADR, coupled with his failure to issue any financial renumeration or time extensions, either bilaterally or unilaterally, in response to the June 28, 2003 certified claim, Remcon was disabled from mobilizing to the Project, as it could no longer pay employees if it did so mobilize. (SBC Dec., ¶ 59).

**DEFENDANT'S RESPONSE**

The Government disagrees. By June 28, 2003, when Remcon submitted its claim, the Government had issued Remcon all financial remuneration due. See Modifications, A3-29, Progress payments, SA68-151. It had paid Remcon upon all of its payment requests for work done in 2001 and 2002 and it had issued all outstanding modifications; five of the six of the modifications were bilateral. See Modifications, A3-29. Moreover, Remcon's financial condition was the result of its own conduct. See Response to Remcon's Proposed Fact No. 121 (#1), Further, the parties were two months into the very short construction season and Remcon had still improperly failed to mobilized to the site.

**PLAINTIFF'S PROPOSED FACT NO. 128**

Remcon sought ADR due to its precarious financial condition caused by NPS's actions over the course of the 2001 and 2002 construction seasons. (SBC Dec., ¶ 59).

**DEFENDANT'S RESPONSE**

The Government disagrees. The Government did not cause Remcon's precarious financial condition. See Response to PPFOUF No. 121. The Government did not entertain ADR with Remcon because the Government had already paid Remcon for work done.

**PLAINTIFF'S PROPOSED FACT NO. 129**

Remcon simply did not have the financial ability to mobilize for the 2003 season unless NPS issued payments for existing work performed and time extensions due, and Remcon was trying desperately to obtain payments from Defendant through the ADR process. (SBC Dec., ¶ 59).

**DEFENDANT'S RESPONSE**

The Government disagrees. See Response to Remcon's Proposed Fact No. 128, above.

**PLAINTIFF'S PROPOSED FACT NO. 130**

When the Contracting Officer issued the cure notice, Remcon had already supplied him with reams of information (concerning deficient

plans and specifications, NPS-caused delays and impacts to Remcon. (SBC Dec., ¶ 33-59; TWL Dec., ¶¶ 3-6).

**DEFENDANT'S RESPONSE**

The Government disagrees. The Government states that, although Remcon communicated with the Government regarding allegations that the NPS had supplied deficient plans and specifications, and caused delays and impacts to Remcon, the Government disagrees with the substance of what Remcon is alleging. Further, by the time NPS issued its cure notice, it had issued Bilateral Modifications 3–5 and unilateral Modification No. 6. See Modifications, A3-29. Remcon was delaying the project by not mobilizing to the project site.

**PLAINTIFF'S PROPOSED FACT NO. 131**

Although the NPS failed to grant Remcon virtually any time extensions, the contract time should have been extended, as of the end of 2002, through the 2004 construction season. (SBC Dec., ¶ 60; TWL Dec., ¶¶ 3-6; DMS Dec., ¶¶ 3-4).

**DEFENDANT'S RESPONSE**

The Government disagrees. First, there only were only 18 excusable compensable days of delay upon this project. See Expert Report, SA396. These are more than offset by liquidated damages for

which Remcon is responsible, which are still continuing to run. Second, Modification Nos. 1 through 5 were bilateral. As a result, Remcon had the opportunity to negotiate appropriate time extensions and take appropriate exceptions. See Modifications 1–5, A3-25. Third, Remcon also is seeking additional time for a differing site condition, which was the subject of Modification No. 6. Fourth, Remcon's failure to mobilize was unexcused and Remcon was delaying itself by not mobilizing to the project site.

**PLAINTIFF'S PROPOSED FACT NO. 132**

Remcon's income and costs from all other Projects, during its performance of work on this Project (from June, 2001, when the NTP was issued, through July, 2003) shows a net increase in cash to Plaintiff of $1,413,523. (SBC Dec., ¶ 61).

**DEFENDANT'S RESPONSE**

The Government neither agrees nor disagrees because the details regarding Remcon's actual financial condition are not within the Government's knowledge.

**PLAINTIFF'S PROPOSED FACT NO. 133**

Remcon, but for this Project, was very successful, and its financial inability to continue was exclusively caused by this Project. (SBC Dec., ¶ 61).

**DEFENDANT'S RESPONSE**

The Government disagrees for the reasons set forth in Response to Remcon's Proposed Fact No. 121, above. Further, Remcon has failed to provide details or cite to contemporaneous records in support of this allegation.

**PLAINTIFF'S PROPOSED FACT NO. 134**

Remcon was not able to perform work in accordance with its original as planned schedule due to government mistakes, errors, and maladministration, design errors, government caused delays, and the government's multiple material breaches of contract. (SBC Dec., ¶¶ 1-61 and Exhibits 1-30; TWL Dec., ¶¶ 1-8 and Exhibit 1-9; and DMS Dec., ¶¶ 1-9 and Exhibits 1-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. First, Remcon's allegations are vague and call for a legal conclusion. Second, the Government did not materially breach the contract. The Government negotiated with

Remcon and paid Remcon for changes through bilateral Modifications 1–5.

**PLAINTIFF'S PROPOSED FACT NO. 135**

The NPS' multiple material breaches of contract excused Remcon's performance during the 2003 construction season. (SBC Dec., ¶¶ 1-61 and Exhibits 1-30; TWL Dec., ¶¶ 1-8 and Exhibit 1-9; and DMS Dec., ¶¶ 1-9 and Exhibits 1-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. The Government did not materially breach the contract, Remcon was not excused from performance under the contract, and the cure notice was validly issued. See Response to Remcon's Proposed Fact No. 134, above.

**PLAINTIFF'S PROPOSED FACT NO. 136**

The NPS' cure notice was unjustified and invalid due to the NPS' prior multiple material breaches of contract. (SBC Dec., ¶¶ 1-61 and Exhibits 1-30; TWL Dec., ¶¶ 1-8 and Exhibit 1-9; and DMS Dec., ¶¶ 1-9 and Exhibits 1-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. See Response to Remcon's Proposed Fact Nos. 134 and 135 above.

**PLAINTIFF'S PROPOSED FACT NO. 137**

The disputes clause did not apply to Remcon's breach of contract claims, and thus Remcon did not violate the disputes clause of the contract. (SBC Dec., ¶¶ 1-61 and Exhibits 1-30; TWL Dec., ¶¶ 1-8 and Exhibit 1-9; and DMS Dec., ¶¶ 1-9 and Exhibits 1-7).

**DEFENDANT'S RESPONSE**

The Government disagrees. The disputes clause applies to Remcon's claims. This is precisely why Remcon filed its claim under the disputes clause. See SA153.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

*s/Franklin E. White, Jr.*
FRANKLIN E. WHITE, JR.
Assistant Director

*s/Richard P. Schroeder*
RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Attorneys for Defendant

OF COUNSEL

COLLEEN DULIN
U.S. Department of Interior
Office of the General Counsel
755 Parfet Street
Lakewood, CO 80215

September 1, 2005