IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-2478C<br>(Judge Braden) |

**DECLARATION OF COLLEEN DULIN IN RESPONSE TO PLAINTIFF'PROPOSED FINDING OF UNCONTROVERTED FACTS**

1. I am an attorney for the Solicitor's Office, Rocky Mountain Region, for the Department of the Interior.

2. I am licensed to practice before the State of Colorado and before this Court.

3. I was present at the following depositions and witnessed the Deponents state that they were under oath: Stephen Christensen on March 29 – 30, 2005, and Mark Penrose on April 20, 2005.

4. On April 20, 2005 I took the deposition of Mark Penrose. He stated that he helped Ms. Demetry mark trees. P. 68 L. 25 – 4; 70 17 – 23. Specifically, he said that they had plans in their hands to designate the trees to be removed and saved. P. 71 L. 2 – 10. He also stated he did this along the upper, lower parking lot, and southern access road. P. 71, L. 4 – 6. Mr. Penrose also stated that he came back on "several occasions" to help Ms. Demetry mark trees, P. 71 L. 21 – 72 L. 7.

5. Mr. Penrose also testified that he walked the site and reviewed the marked trees with Ms. Demetry and the loggers. P. 73, L. 4 – 19. He also stated that Mr. Kasparek from Remcon attended the walk-through. P. 73, L. 20 – 22.

6. On March 29, 2005, Mr. Schroeder, the lead counsel on this case from the Department of Justice, Civil Litigation Division, deposed Mr. Christensen from Remcon. I was present at the deposition. At the deposition he was asked about claims against Remcon. When asked about the Bank of America claim he stated, "yes, there was litigation with Bank of America, I forgot all about that one." P. 59 L. 24 – P. 60 – L. 12.

7. On March 30, 2005, I deposed Mr. Christensen I asked him if he had been to the project site before he submitted a bid. He stated that he had been there before. P. 242 L. 9 - 243 L. 5. Prior to the Sherman Tree project, Mr. Christensen had worked from about three to five miles down the road from the project on the Giant Forest Project. P. 243, L. 6 – 14.

8. Mr. Christensen also testified that he understood that there would be a project in the area, and that he was told about it in Fall of 2000 and he knew that he would submit a bid. P. 244, L. 16 – 24.

9. Mr. Christensen also testified that "other contractors" used aggregate base on the Giant Forest project that was stockpiled for use on the Sequoia project. P. 425 L. 12 – 427 L. 21.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Lakewood, Colorado, on August 18, 2005.

COLLEEN M. DULIN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--ooo--

REMEDIATION CONSTRUCTORS, INC., )
Plaintiff, )
vs. ) No. 03-2478C
UNITED STATES OF AMERICA, )
Defendant. )

ORIGINAL

--ooo--

Deposition of

RICHARD MARK PENROSE

Wednesday, April 20, 2005

--o0o--

L.J. HART & ASSOCIATES
Certified Shorthand Reporters
1900 Point West Way, Suite 141
Sacramento, California 95815
Telephone (916) 922-9001

Reported by DIANA HULSEY, CSR License #6915, RPR

THE WITNESS: I can't remember.

MS. DULIN: We'll mark this as Exhibit No. 69.

(Whereupon Defendant's Exhibit No. 69 was marked for identification.)

MS. DULIN Q: And for the record, this is dated June 1st, 2001. It's a daily log of construction.

MR. SCHUMAKER: Counsel, Exhibit 69 does not have a Bates stamp number, and it's not clear whose document this is.

MS. DULIN: Thank you.

MR. SCHUMAKER: Are you going to clarify it?

MS. DULIN: I don't think I need to. It's actually in Athena Demetry's deposition. It was marked as a plaintiff's exhibit.

MR. CHRISTENSEN: Off the record a second.

MR. SCHUMAKER: Let's go off the record.

MS. DULIN: Off the record.

(Off-the-record discussion.)

MS. DULIN: Back on the record.

Q Have you reviewed the document?

A Yes.

Q And this is just one page from several pages of a daily log that I believe Athena Demetry drafted, but my question for you is, right near the bottom there's a paragraph there, it says, "Greg and Mark helped mark trees

from 1030 to 1230." And the date of this document is June 1st, 2001. Do you recall helping Ms. Demetry mark trees at or about this time?

A Yes.

Q And do you know why the trees were being marked?

MR. SCHUMAKER: Objection, calls for speculation, vague and ambiguous. Go ahead, Mark.

MS. DULIN: Certify.

THE WITNESS: Well, as the document so states, the evaluation as far as what was to be saved and what was not to be saved and possible savers.

MS. DULIN Q: Tell me what you can remember about walking with Athena and marking trees.

MR. SCHUMAKER: Objection, it calls for a narrative, it's vague and ambiguous. Are you asking about on June 1st or just over the entirety of the project?

MS. DULIN: One, we're talking about this document, and I'm asking him about the circumstances; two, calls for a narrative is a completely inappropriate objection for a deposition.

MR. SCHUMAKER: It is an unfair question.

MS. DULIN: I do want a narrative. That's what discovery is about, so we're going to certify the question.

MR. SCHUMAKER: Well, the question was not

clear whether it was on this day or other days, because obviously, there were other days, and you've clarified it to June 1st.

MS. DULIN: We're talking --

MR. SCHUMAKER: I appreciate that.

MS. DULIN: That's what we're talking about.

MR. SCHUMAKER: Thank you.

MS. DULIN: And we may have to call Mr. Penrose back again. I don't want to, but if we're going to continue on with, you know, you going on about do you want this day or that day, it's pretty clear. The judge may not think it's clear, and then I'm wrong. The judge may think it's very clear, but you're interrupting the deposition.

MR. SCHUMAKER: Well, I want to make sure the witness understands the question.

MS. DULIN: Can you read back my question?

(Whereupon the record was read as follows: "Question: Tell me what you can remember about walking with Athena and marking trees.")

THE WITNESS: I remember helping Greg and Athena.

MS. DULIN Q: Okay. Do you know where you were? Do you recall where you were?

A Yes.
Q Okay. Where were you?
A We had the plans in our hands.
Q Did you walk down the access road, the parking lot? Where were you specifically if you can recall?
A Upper, lower parking lot, southern access road.
Q You stated you had the plans in your hands. Why did you have the plans in your hands, if you recall?
A Plans so designate trees to be saved, trees to be removed.
Q It states that you didn't return after lunch. Do you know why you didn't return after lunch?
MR. SCHUMAKER: Objection, that assumes facts not in evidence. I think you need to ask him if he did or not. Just because Ms. Demetry wrote it, that doesn't necessarily mean it's true.
MS. DULIN Q: You can answer the question if you understand it.
A What's the question again?
Q Ms. Demetry states, "They did not return after lunch, so I continued on my own." Mr. Schumaker would have me ask you, do you recall not returning after lunch?
A I don't remember if we did so or did not.
Q Do you know whether after this date you continued helping Ms. Demetry mark trees?

A On several occasions.
Q You do?
A With Mr. Kasparek?
Q Yes.
A Yes.
Q And what was the purpose?
A The same per plan.
Q After the trees were marked, do you recall what was done on site regarding the trees?
MR. SCHUMAKER: The question is vague and ambiguous. Go ahead, Mark.
MS. DULIN: Certify.
Q You can answer.
A Protection was established around trees that were to be saved.
Q And then what happened, and what I'm looking for is like general chronology, we protected the trees, and then we cut down some trees, and, you know, kind of what the chronology was next?
MR. SCHUMAKER: And you're asking the project as a whole as compared to access road versus parking lot?
MS. DULIN Q: You can answer if you understand.
MR. SCHUMAKER: The question is vague and ambiguous as to locations. Go ahead.

MS. DULIN: Certify.

THE WITNESS: Generalized procedure?

MS. DULIN Q: Yes.

A Trees were marked according to line items in the contract, and also, specification from the government, also, trees that were possibly going to be saved and trees that possibly were going to be saved, trees according to per plan, these were marked and barricaded as such as so specified in the specs, and once that was done when the contractor came prior to extraction?

Q Yes.

A A walk-around was proceeded.

Q And who attended the walk-around?

A I want to say at one time Athena was there because she had to meet the man, and I wanted her to be there on site.

Q When you say the contractor, are you referring to the logging contractor?

A Yes.

Q Okay. And anybody from Remcon besides yourself there?

A I believe Mr. Kasparek was there.

Q You had mentioned before that Mr. Kasparek really didn't work on this project. Did he leave soon after this date which was June 1st, 2001 to your recollection?

RECEIVED
APR 11 2005
OFFICE OF THE REGIONAL SOLICITOR
DENVER, COLORADO

# *REMEDIATION CONDSTRUCTORS vs. UNITED STATES OF AMERICA*

## *Deposition of: STEPHEN B. CHRISTENSEN, VOL. I*

*Taken on March 29, 2005*

*Page 1 to Page 214*

Prepared For:
*RICHARD SCHROEDER*

Certified Copy

*CONDENSED TRANSCRIPT AND CONCORDANCE*
PREPARED BY:

*L.J. HART & ASSOCIATES*
*1900 Point West Way*
*Suite 141*
*Sacramento, CA 95815*

Page 57

roadway widening, Caltrans.
MR. SCHROEDER Q: Is that the same claim?
MR. SCHOENFELD: Caltrans is the owner of the I-80 widening project. Go ahead. Of course, he's going to exclude this particular claim.
THE WITNESS: Sonoma County Water Agency, Reservoir D. I think it's Reservoir D. It may be another alphabetic number, but it was a reservoir. There's a couple, you know, hundred jobs I'm trying to recall here.
MR. SCHROEDER: Can we get a list of the claims, or better yet so we can shortcut this, perhaps a copy of the claim letter for each of these?
MR. SCHOENFELD: I have no idea. I don't even know that any documents exist. These things are, you know, up to 10 years old the company existed. I have not represented him on any matter other than this one, so I can't respond to it. Steve, if you remember of anything else further, let me know, and I will let government counsel know.
THE WITNESS: I do know that all of them settled at the project level.
MR. SCHROEDER Q: Do you know about how many there were? You identified about four of them.
MR. SCHOENFELD: Plus Fresno.
THE WITNESS: I don't.

Page 58

MR. SCHROEDER Q: Okay. Has Remcon ever been involved other than what we've just spoken of, these four plus all of those litigations that we spoke about, any other specifically identified claim or court actions, has Remcon ever been involved in a mediation, an ADR or any similar proceeding?
A **No, sir.**
Q *Okay.*
A **My question to Mike was, does that include a DRB which is known as a dispute resolution board?**
Q *That would include that, yes.*
A **We had a couple of projects where we had DRB's that we set up prior to start of the project where if there was any issue that came up on the project, it couldn't be resolved by the project manager, that it went in front of a DRB, generally, one member from the agency, myself and an independent third party. In all cases they were always resolved.**
Q *And do you recall the projects?*
A **One was for the City of Ripon.**
MR. SCHOENFELD: R-i-p-o-n.
THE WITNESS: Jack Tone Road interchange.
MR. SCHOENFELD: T-o-n-e.
MR. SCHROEDER Q: Okay. Any others?
A **We actually resolved the Reservoir D issue utilizing**

Page 59

**a DRB in Sonoma County.**
Q *Any others?*
A **Not that I recall.**
Q *Okay. Now, and we're getting sort of to the end of this I hope, have any claims other than all of the ones we've previously identified been filed against Remcon as opposed to Remcon filing a claim against an owner?*
A **Rephrase. I'm unclear what you meant by that.**
Q *Well, for a claim such as somebody, some employee files a claim in the Department of Labor or, you know, a subcontractor files some kind of claim against Remcon that you haven't previously identified and not necessarily a litigation.*
A **Not that I'm aware of that I can remember.**
Q *Okay. I'm just going to say a couple names, and tell me if this rings a bell regarding any claims or litigations for or against Remcon. Oasis Crushing? That could be a litigation.*
A **I don't recall it ever having a -- they made a request for payment, but I don't believe it ever went to a litigation.**
Q *What became of that request for payment?*
A **They were not due any additional funds.**
Q *Bank of America?*
A **Yes. There was litigation with Bank of America, I**

Page 60

**forgot all about that one, on the line of credit for Remcon.**
Q *Pardon me?*
A **That was an issue on payment for the line of credit for Remcon.**
Q *Do you recall the name -- was that a litigation?*
A **Yes, it was.**
Q *Do you recall the name of the case?*
A **Bank of America versus Remediation Constructors and John Does and everybody else, and they received a judgment, and it has been satisfied.**
Q *By Remcon?*
MR. SCHOENFELD: The judgment has been satisfied. It may step across a confidentiality clause as to how the judgment was satisfied. I do not know the answer. I do not represent him in that litigation. To the extent that there is or there may be and you're concerned in that regard, then don't respond. I just don't know the answer, so I'll just give you that admonition.
MR. SCHROEDER Q: Is there a confidentiality clause in that case?
A **I believe so.**
Q *Well, is a judgment something that's publicly filed?*
MR. SCHOENFELD: Yeah, the existence of a

# REMEDIATION CONDSTRUCTORS vs. UNITED STATES OF AMERICA

## Deposition of: STEPHEN B. CHRISTENSEN, VOL. II

*Taken on March 30, 2005*

*Page 215 to Page 395*

Prepared For:
*RICHARD SCHROEDER*

Certified Copy

*CONDENSED TRANSCRIPT AND CONCORDANCE*
PREPARED BY:

*L.J. HART & ASSOCIATES*
*1900 Point West Way*
*Suite 141*
*Sacramento, CA 95815*

Page 239

we were subcontractors on. We typically did not subcontract. It would be three that we subcontracted on.
Q *Would you say you personally, Steve Christensen, were familiar generally with the roles that the government players played, like contracting officer, contract specialists? It's kind of a vague question, but you can answer --*
MR. SCHOENFELD: Stipulated.
MS. DULIN Q: -- to the best of your ability.
MR. SCHOENFELD: The objection is duly noted for the record.
MS. DULIN: I'll object to my own questions.
MR. SCHOENFELD: Sustained.
THE WITNESS: I had never heard the terminology before this as a contract specialist before. I heard contracting officer. In an organization the size of Granite, there were specialists that, you know, dealt with certain aspects of contracts of what I'll call the builders didn't deal with.
MS. DULIN Q: Was there a similar personality in Remcon that was like a contracting officer for the government in that somebody had to sign on the dotted line?
MR. SCHOENFELD: I don't understand your question. You mean that only one person could bind, is

Page 240

that your question?
MS. DULIN Q: You can answer it if you understand.
MR. SCHOENFELD: That question is hopelessly vague and ambiguous, but you can answer it if you can.
THE WITNESS: I would set up typically levels of authority for personnel on the project; for instance, Jeff Northrop had a dollar level that he could bind the company to. Spencer Boyer had another, Mark Gordine had one, and then myself.
MS. DULIN Q: You signed the contract; correct?
A **I did.**
Q *Typically, you signed subcontracts?*
A **Yes.**
Q *Okay. Do you personally understand that the contracting officer with the government was the one that had the authority to sign and obligate money for the government?*
MR. SCHOENFELD: Objection, calls for a legal conclusion. You may answer it if you can.
THE WITNESS: No.
MS. DULIN Q: What was your understanding, if you have one?
A **Well, Willie was negotiating changes with us,**

Page 241

**directing us to proceed with work. We were getting -- at the pre-construction conference, we were told that all of our correspondence was to go through Jacobs, and subsequently, all direction would come back through Jacobs, so we weren't sure who we were necessarily getting information from. It would come back through the first year Bob Russell, and he'd say, "Go do this."**
Q *That pre-construction conference was June, I don't remember, you probably remember, the 13th or somewhere?*
MR. SCHOENFELD: We got the document right here.
MS. DULIN: Okay. Great.
Q *We are going to refer to a document that's not marked as an exhibit.*
A **May 22nd.**
Q *May 22nd. I'm really off.*
MR. SCHOENFELD: It's that California thing that's causing your orientation.
MS. DULIN: It's the beautiful day that I promised you, Mr. Schoenfeld.
MR. SCHOENFELD: This is true, and you delivered.
MS. DULIN Q: You did a walk-thru on that day; correct?
A **I don't recall if we did or didn't. I'm not going**

Page 242

**to say we didn't.**
Q *Okay.*
A **We had a meeting down at Ash Mountain which is an hour or so away from the job site so --**
Q *Right at the beginning, right around the pre-construction conference time, did you take a walk-thru of the site?*
A **I believe so, yes.**
Q *Okay. And prior to the walk-thru on whatever day it was, you stated yesterday that you'd been to the site before; correct?*
A **Yes.**
Q *You weren't very clear as to why you had walked through the site, and I'm going to ask you a few questions about it. When I say the site, I mean the project site, and there was an upper Sherman and a lower Sherman, and I'm just talking generally, so you can tell me if you said, "Oh, I didn't ever walk down there," but why did you walk through the site before? Was it just to get from one place to another?*
MR. SCHOENFELD: Objection, several layers of compoundness, but to the extent you can answer the inquiry, please identify what you're responding to.
THE WITNESS: I believe I testified yesterday that I had been to the site. I did not believe that I

Page 243

testified that I had walked the site.
MS. DULIN Q: Understood. So you'd been to the site before. Why had you been to the site before?
A During the -- we were subcontractor to Atherton Construction Company for the Giant Forest Museum project.
Q *How far were the sites from one another, and when I say these sites, the Atherton site versus the Sequoia project site?*
MR. SCHOENFELD: When you say Sequoia, do you mean both upper and lower?
MS. DULIN: In general.
MR. SCHOENFELD: If you can answer it if you can, please do.
THE WITNESS: Three to five miles maybe.
MS. DULIN Q: And what should I call the other project, the Atherton project?
A Giant Forest project.
Q *Giant Forest project. On the Giant Forest project you did roadwork there; correct?*
A We did.
Q *Did you do any blasting associated with that project?*
A No.
Q *Did you do site work like grading and cutting and that kind of thing?*

Page 244

A Yes.
Q *And how did you cut? Another CQ, I'm telling you what. Did you use a dozer? Did you grade that way?*
A Yes. We did use a dozer. Typically, we use a dozer to rough grade and then use a motor grader and/or a skip loader depending on the confines of the work for fine grading.
Q *What were the circumstances if you can recall that you had been to the Sequoia project site prior to you bidding on it?*
A Whenever I would go to the Giant Forest project I would drive through the lower Sherman area.
Q *Understood. Okay.*
A I had never, at that point I'd never stopped and go to the Sherman Tree Trail, but I had driven by it.
Q *And that's what I was thinking. Did you ever come to know that there was going to be a project in that area when you were working on the Atherton project?*
A I believe we knew there was another project coming or were told about it in fall of 2000.
Q *Did you at that time in fall 2000 think you might want to bid on the project?*
A Yes. I had three previous jobs with the park service that had gone well.
Q *And my understanding on the Atherton project was*

Page 245

*that it was going well. I know that Jack Vance wrote a letter of recommendation and said that you guys did a goo job. Do you recall that?*
A Yes.
Q *And was that your feeling of the project that it had gone well?*
A It went well for Remcon. It did not go well for Atherton.
Q *Okay. In the fall of 2000, you understand that there may be a project. Did you go to the site then at all, kind of look around?*
A No. There weren't any plans available yet to know where it was going. I had been -- there was an old acce road, and there was kind of a contractor storage, they were using it as a contractor storage area back somew in the area of where the parking area is now, so I'd driven back there. The old road kind of went on parts o where the road is now, and then above the road.
Q *Did you drive that to kind of look at it or --*
A I just went in there because we had some equipmen stored in there.
Q *Real quick on equipment, you had mentioned yesterday something about a holding company that you --*
A Limited liability.
Q *With your projects, did you rent equipment from your*

Page 246

*holding company? Did you just use equipment from that holding company? You had mentioned that you used some that equipment.*
A We set up hourly rates established, and if you look in the estimate that we were reviewing at the end of yesterday, you can look through and you'll see different types of equipment and an equipment rate. Some of that equipment was held directly by Remcon, and then as the company grew, the accountant said you need to move or a separate company for your equipment company, and it used the same rental rates and just hourly rates, and it just moved the money back and forth.
Q *What equipment did you use on this project that was from the holding company?*
A The accounting system didn't even separate it, but I believe the D8R dozer was held by the equipment compa 345 excavator, I think the 14H motor grader. We had som articulating haul trucks. I don't know which number truck at this time was at the job site, but some were held by Remcon, some were held by Remcon Equipment Compan
Q *Did you use equipment from elsewhere? Did you rent equipment on this project?*
A Yes.
Q *And what equipment did you rent?*
MR. SCHOENFELD: You're speaking of Remcon as

Page 420

*understanding, but you have aggregate base, and then under quantity you have 10,376 tons, you have a unit cost of $7.00. Are you telling me now that there was something less that you were accounting for?*
A **What do you mean less?**
Q *Well, you said it wasn't 10,376 tons. How much was it then?*
MR. SCHOENFELD: Objection. It's vague and ambiguous, and it misstates his testimony. Go ahead and answer.
THE WITNESS: It accounts for 10,376 tons. When we put the initial estimate together, these were plug numbers, not the quantity, the dollars. That was prior to receiving addendum number one. Then in our bid review we discussed it. Now, I didn't correct this. I also did not correct the unit pricing to match up the proper unit prices for the job, just made a mistake.
MS. DULIN Q: So the bid was incorrect?
A **Yes -- actually, no. Let me restate that. You said the bid is incorrect. The bid is not necessarily incorrect. The estimate, this is the cost estimate for the project. It's our best guesstimate of what we think it's going to cost us to build the job.**
Q *Does the amount in the bid estimate reflect the amount that you put into the bid?*

Page 421

A **No.**
Q *So if I were to look at the number that you had in your bid estimate, it would be a totally different number in the actual bid?*
A **Yes.**
MS. DULIN: Off the record.
(Off-the-record discussion.)
MS. DULIN: I'm going to hand you an exhibit which was Plaintiff's Exhibit No. 282, and I believe Defendant's Exhibit No. 11, and if you want to write that on there, Mike, it was Exhibit No. 11, Defendant's Exhibit No. 11.
MR. SCHOENFELD: And 282 of ours?
MS. DULIN: Yes. Can we go off the record?
(Off-the-record discussion.)
MS. DULIN: Okay. Back on the record.
Q *With respect to this section, it is a section from the contract specifications. It's 02725 aggregate base course, and under part two, products, it says, "Recycled aggregate." It says, "Material for aggregate base course will come from crushing of material," and then in parens it's "(asphalt and concrete)" removed from this project and/or stored from previous projects." Now, this is going back in time, but when you read this section back when you were going to prepare the bid, what did you understand if*

Page 422

*you recall Section 2.1.A to mean?*
A **Is this prior to receiving addendum number one?**
Q *Yes, and then we can talk about when you received addendum number one.*
A **Initially, I was unclear what it meant.**
Q *Why?*
A **It's ambiguous.**
Q *Okay. So it's patently ambiguous because you knew, and that's a thing, but you knew at the time it was ambiguous?*
MR. SCHOENFELD: Objection, calls for a legal conclusion, assumes facts not in evidence. You may answer it.
MS. DULIN Q: And I will rephrase the question because it does call for a legal conclusion, but you thought at the time it was ambiguous?
A **Initially on.**
Q *Why?*
A **Because it wasn't clear. It says that material for aggregate base shall come from crushing material on this project, or it can be, the material can be already made on site. Addendum one then clarifies that by sending us a picture telling us that there was a stockpile. The contract plans state that the aggregate base course material for this project is stockpiled at this location**

Page 423

**and may need to be relocated by the contractor for construction purposes.**
Q *Now, when was that addendum issued to your recollection, if you have one?*
A **I have none.**
MR. SCHOENFELD: Colleen, the photos that you had provided to us during this deposition, what exhibit numbers were those, 124 did you say or 123?
MS. DULIN: I thought it might be 127.
MR. SCHOENFELD: Oh.
THE WITNESS: 124.
MS. DULIN: 124. 124.
MR. SCHOENFELD: Okay. Thank you.
MS. DULIN Q: We'll have this marked as Exhibit No. 84. Actually, do you want to take a break? Are you fine, or do you want to go on?
A **I'm fine.**
Q *Okay.*
A **Are you done with this?**
Q *Yes.*
(Whereupon Defendant's Exhibit No. 84 was marked for identification.)
MR. SCHOENFELD: What number is this, 84?
MS. DULIN: 84.
Q *And for the record, this is an e-mail. The top*

Page 424

*e-mail is from Terry Lang to Remcon, and the bottom e-mail is from Remcon to Terry Lang, and the date on the e-mails, the top e-mail is 3-26-01, and the bottom e-mail is 3-21-01, and the Bates stamps on those are 19644 through 19646. Did you draft the e-mail, the second e-mail down?*

A **Yes, I did.**

Q *And what prompted you to draft this e-mail?*

A **I think this was before I received addendum number one, and I was questioning, I had questions concerning the aggregate base on it. As I said, I thought it was ambiguous in the specifications, so I wrote a -- I asked a question prior to bidding.**

Q *And you were referred back to Section 2.1.A and 4.1, and I'm referring to that, that's the little, it says, "See specification section"? Did you do that?*

A **Yes.**

Q *Okay. And you're welcome to look back, and you're looking back at Defendant's Exhibit No. 11?*

A **Correct.**

Q *And when you referred back to those spec sections, what was your understanding, and I'm saying at this time probably 3-26-01?*

MR. SCHOENFELD: 3-21-01 when he prepared the e-mail?

MS. DULIN Q: 3-26-01 is when he would have

Page 425

received from Ms. Lang her response, so that's the time frame I'm looking at.

A **Correct.**

Q *Okay. So at that point in time, it could have been before the addendum or after, you can say what you think, but what did you understand that to mean when she referenced Sections 2.1.A and 4.1? I'm looking for your understanding.*

A **She provided no clarification whatsoever, but addendum number one did, or there would have been no purpose for addendum number one.**

Q *You stated in, we're going to look three down on your e-mail, you talk about bid item 71, aggregate base. You say, "Page 02725-1 of the specifications states in Section 2.1.A, 'Material for aggregate base course shall come from crushing of materials (asphalt and concrete) removed from this project and/or stored from previous projects.'" We read that in the specs. Continuing on, "I believe this statement may lead some bidders to assume that enough material exists on the project site to meet the demand for aggregate base," and you have O, but I assume you meant "on this project. Remcon is currently working on the Giant Forest project, and I believe that the use of any stockpiled base crushed during previous contracts will be used in the completion of those*

Page 426

*contracts. Other than a limited amount salvaged from this project, I do not believe any additional base material is available." What did you mean by what you stated?*

A **Well, I knew that there was other ongoing projects in the Giant Forest area, and people were using base rock up there. They had had it crushed previously.**

Q *When you said, "Remcon is currently working on the Giant Forest project, and I believe that the use of any stockpiled base crushed during previous contracts will be used in the completion of those contracts," did you, Remcon, use any of that material that was in the stockpile on the Giant Forest project?*

A **I believe we may have used some. I know we also purchased some because we were compensated by a change order from buying base rock.**

Q *So you had been to that pile before, would that be a correct statement?*

A **No.**

Q *You had never personally been there?*

A **I don't recall if I had or hadn't been.**

Q *Do you know whether --*

MR. SCHOENFELD: I'm going to object to the prior question as far as assumes facts not in evidence as to a singular pile. You may answer.

MS. DULIN Q: And I guess I'm referring to

Page 427

what you're referring to in the site, you know, the aggregate base stored on site.

MR. SCHOENFELD: But you singularized it as a single location.

MS. DULIN: I keep thinking it was a big old pile.

MR. SCHOENFELD: It may have been one. It could have been multiple. I don't know, and I just don't know that the witness has so testified. I just wanted the record clear.

MS. DULIN Q: Why did you believe that the use of the stockpile base crushed during previous projects would be used in the completion of those contracts? Why did you have that belief at that time?

A **Because other contractors were using that material.**

Q *And so you didn't believe that that pile would be there or that the aggregate base would be there for your use?*

MR. SCHOENFELD: Objection, compound. You may answer it.

THE WITNESS: I was asking for clarification. I didn't know whether they were going to issue another contract, produce more base rock, whether they wanted to buy it, haul it up and not pay for markup to a contractor to save money. I prudently asked the question prior to