IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) | DOCKET NO. 03-2478C **REMCON'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** (Judge Susan G. Braden) Hearing Date: TBD |

Plaintiff REMEDIATION CONSTRUCTORS, INC. ("REMCON" or "Plaintiff") respectfully submits the following Memorandum of Contentions of Fact and Law, in accordance with Appendix A of this Court's Local Rules.

## 1) STATEMENT OF FACTS

REMCON intends to prove and offer into evidence facts identified in the attached Exhibit A at the time of trial. REMCON reserves the right to augment or revise this statement of facts prior to and during trial. REMCON provides the comprehensive list of facts in Exhibit A in accordance with the rules, and to promote a discussion between the parties regarding stipulations of fact for trial.

While REMCON asserts that the enclosed list of facts is complete and thorough, a concise summary of the facts is provided below.

This matter involves work performed by REMCON for the National Park Service ("NPS") on a Project located in the Sequoia/Kings Canyon National Park in the Sierra

Nevada Mountains of California known as the Sherman Tree Parking Project ("Project"). The Project had three distinct components: the Upper Sherman Access Road and Parking Area, the Sherman Tree Trail, and the Lower Sherman Parking Area.

The contract specifications required that two of the components (the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail) be complete before any work would proceed on the Lower Sherman Parking Area. As of July, 2003, due to delays directly attributable to the NPS, work remained to be completed on the Upper Sherman Access Road and Parking Area and the Sherman Tree Trail, and no work had been performed on the Lower Sherman Parking Area. The Upper Sherman Access Road and Parking Area involved the construction of approximately 3,000 linear feet of a new two lane asphalt paved roadway, a new two level parking area, installation of 3,700 linear feet of domestic waterlines and 3,800 linear feet of electrical service line, installation of a new sewer system (including approximately 750 linear feet of sewer line, a concrete septic tank, dosing siphon tank, and a sewage leach field), construction of a comfort station, a wayside kiosk, rock revetments, landscaping/erosion control measures and related improvements.

The Sherman Tree Trail component required the construction of approximately 2,000 linear feet of asphalt surfaced trail, including concrete/stone stairs, drainage improvements, timber edgings, a visitor overlook, and related landscaping/erosion control measures. The Lower Sherman Parking Area component included demolition and removal of existing structures and hardscape, construction of approximately 300 linear feet of concrete retaining wall with rock facing, realignment of the General's Highway,

construction of a visitor comfort station, and related landscaping/erosion control measures.

The NPS was responsible for the entire design of this Project and the plans and specifications were a combined product of internal design efforts by NPS personnel as well as by private designers retained by the NPS. The NPS issued a Request for Proposal ("RFP") for the Project in February 2001. In late February 2001, REMCON received a set of plans and specifications for the Project. REMCON, having previously worked for the NPS in the park, based its responsive proposal to the NPS on the information contained within these documents, including geotechnical reports and quantity estimates, as well as its general familiarity with the isolated and distant locale of the park from construction resources.

Based upon the timing of the availability of the contract documents, and the required submission of proposals, REMCON, was prevented from conducting a site investigation to confirm the accuracy, or to uncover any observable discrepancy, between the plans and specifications and the Project site. This was because the plans and specifications were published in the heart of winter when the jobsite, located at approximately 7,000 feet above sea level, was buried under snow. Because the date for submittal of proposals was March 29, 2001, it was not possible to confirm the accuracy of the government's estimates or discover any discrepancies.

The Project site is in an area adjacent to a heavily visited national treasure (the General Sherman Tree), and had limited construction access and a limited construction season. Further compounding the Project difficulty was its location and weather. Instead of being able to work all or most months of the year, a limited construction season,

depending on the extent and duration of winter precipitation and temperature, ranging from late May /early June through October, a duration of five or six months, was anticipated. The NPS RFP allowed less than three construction seasons to perform the work. The NPS awarded the contract to REMCON on May 15, 2001 and issued a Notice to Proceed ("NTP") on June 11, 2001. The completion date was August 11, 2003.

REMCON's submitted as-planned schedule called for all work on the Upper Sherman Area to be completed in the 2001 season and the Lower Sherman Area to be completed in the 2002 season. The NPS never questioned the logic of REMCON's as-planned schedule and its construction manager praised its reasonableness, completeness and content. That schedule was impacted, however, at the outset of the Project by mistakes, errors and maladministration by NPS personnel as well as encountering multiple differing site conditions and a design premised upon faulty quantity calculations (admitted in testimony) and riddled with errors, omissions, conflicts and inconsistencies, all of which manifested themselves as breaches of contract as REMCON's ability to perform was severely hindered.

Prior to the issuance of the contract, Athena Demetry of the NPS, a field biologist and forester, marked all trees in the virgin forest which were to be removed by REMCON for construction of the Upper Sherman Access Road and Parking Areas. She confirmed this effort on June 1, 2001 and June 4, 2001, prior to the issuance of the NTP. While REMCON personnel walked the right-of-way with Ms. Demetry in June, 2001 for two hours, and during those two hours "assisted" her by placing the paint on trees which she alone determined were to be removed, the determination of which trees were to be

removed was, by contract, and action in the field, exclusively the government's pursuant to section 2230 of the specifications.

Thereafter, on June 11, 2001, the date the NTP was issued, REMCON began falling and logging the trees marked by Ms. Demetry. Once logging operations were complete, REMCON's surveyor, Guiliani & Kull ("G&K"), began to lay out the Upper Sherman Access Road and Parking Areas. G&K immediately discovered that about 600 feet of the road, as shown in the NPS plans and specifications, did not match the clearing limits that had been laid out by Ms. Demetry in the field.

By that time, however, REMCON had already cut and removed the trees that Ms. Demetry had marked for removal. This discrepancy, for which REMCON had no responsibility, initiated a re-alignment of the road directed by the NPS, which caused Remcon to encounter a differing site condition (non-rippable rock) which required blasting. These problems, and others, impacted REMCON's ability to schedule and complete its work as it had originally planned. REMCON has not been compensated in time or money for virtually any of the costs or delay impacts that flowed from those changes. The limited compensation that has been received for the resulting extra work was also belatedly received over one and a half years after the extra work occurred.

The critical path on REMCON's as-planned schedule commenced with the clearing of trees and pioneering of the Upper Sherman access road and parking lots. It then transitioned to the construction of the comfort station and related improvements for the balance of 2001. But for the myriad of design deficiencies encountered, and directed performance of extra work and construction changes, the Upper Sherman work would

have been completed by the end of the 2001 construction season. Unfortunately, the as-planned schedule was not able to be followed.

The following extra work, delay impacts and events, each of which individually as well as collectively hindered, delayed and impacted REMCON, have not been fully compensated in time extensions and/or money, occurred on this Project and are asserted to be material breaches of contract excusing further performance:

- The trees, designated by Ms. Demetry to be removed along the access road right-of-way, between Stations 24 and 30, were in a location up to fifteen feet off of the right-of-way set forth in the plans. As a result, the access road needed to be re-surveyed by REMCON's surveyor (recognized belatedly 14 months later by the Contracting Officer in Modification No. 4 as extra work) and the road was relocated by the government to a location into the hill from the planned locale. The content of Modification No. 4, in its Justification section, admits that the cause of the road relocation was not due to REMCON;

- The burn pit in the Upper Parking Area, identified as containing approximately 2000 cubic yards, actually contained over 7000 cubic yards, causing delay and over $300,000 in additional costs. These costs and delays, incurred and experienced in June and July, 2001, were not recognized by the NPS until August, 2002 when Modification No. 3 was issued. The belated issuance of time and money was and is both a constructive acceleration and breach of contract. The NPS' justification for this modification admits liability;

- Once the road was re-surveyed and pioneered in July, 2001, and the burn pit extra work performed in July, 2001, REMCON sought to excavate the access road to

subgrade. After commencing in mid-July, 2001, REMCON as of July 30, 2001, encountered granitic rock which could not be "ripped" with a D-8 Dozer. The location where this non-rippable rock was encountered was identical to the area where the road was directed to be realigned into the mountain;

The soils report made a part of the contract documents expressly stated that all earthen material to be encountered to construct the road could be ripped and that blasting would not be necessary except in isolated instances ("floater rocks"). What REMCON encountered as of July 30th was not a floater, but solid granitic rock which required blasting. The blasting occurred until September 13, 2001, a duration of over six weeks, which was twice the planned earthwork duration for the entire Project.

The government, for eighteen months, disputed that REMCON encountered a differing site condition ("DSC") in this locale. Indeed, through deposition testimony, the key NPS personnel admitted that they failed to investigate the claimed condition. Ultimately, by unilateral modification No. 6, dated February, 2003, the Contracting Officer recognized in writing that a Type I DSC was encountered. However, the change order only granted REMCON $84,000 in extra compensation and no time extension. Instead of taking 21 calendar days to excavate the road and parking lots, as scheduled in the as-planned schedule, the Project records detail that the activity took more than thirteen months due to a myriad of government-initiated design revisions and inaction/maladministration concerning what to do with the excess material which was excavated (and then stockpiled). This excess material was predominately caused by two significant impacts: the government moving the road into the mountain but not altering the vertical elevation, thus causing a huge wedge of unanticipated material to be

excavated (this wedge turned out to contain substantial volumes of non-rippable rock); and the fact that the quantities of material to be handled was, through deposition testimony by the designers, admitted to be based on a flawed assumption that the excavated material would compact by 40%, when it would only compact approximately 15%.

REMCON claims that the government's belated recognition of the extra work, as well as its concurrent failure to issue any time extensions and/or recognize the actual damages incurred, constituted constructive acceleration and a constructive change, both of which are a material breach of contract. These contentions were documented and substantiated in REMCON's written submissions to the government in 2001 and 2002, as well as REMCON's June 28, 2003 certified claim to the Contracting Officer. This voluminous document details the facts which support REMCON's breach of contract claims, and had been received by the Contracting Officer mere weeks prior to the issuance of the cure notice. Prior to issuing the cure notice, no response to the REMCON certified claim was made by the NPS.

- The Upper Sherman Tree Trail was the subject of multiple and continuing design changes. While some work was able to be performed in 2001 and 2002, the Project record details these changes issued by the NPS to the trail points and the trail's physical features and dimensions throughout 2001 and 2002. Indeed, it was not until November 20, 2002 (after REMCON's as-planned schedule demonstrated that REMCON would be complete with the entire Project, both Upper and Lower areas) that the Contracting Officer signed and issued Modification No. 5 which officially modified the trail's design and finalized the design changes which had been going on for almost two

years. The timing of the issuance of Modification No. 5 was too late for REMCON to proceed in 2002 as winter weather had commenced, and it further restrained REMCON from completing the trail until 2003's construction season, as the design changes had to be implemented before the balance of the trail could be built.

Recognizing that the government's conduct regarding delays to the Project was a material breach, and to protect itself, REMCON signed Modification No. 5 on October 18, 2002 and forwarded it to the Contracting Officer on October 21, 2002 along with a cover letter expressly reserving REMCON's rights to receive time extensions and delay damages resulting from government breaches of contract, constructive acceleration, directed changes, constructive changes and the additional work performed and materials handled due to defective and deficient contract documents, including the Sherman Tree Trail.

- In 2001, REMCON's Project superintendent notified Bob Russell, the NPS designated representative, of a substantial overrun in quantity of excavated material. This resulted from the DSC as well as errors in design assumptions and calculations. As a result of the NPS' failure to timely provide direction with regard to the disposition of excess material, which was stockpiled on the project site, restraining contract work (no direction what to do with the excess material was given for almost one year since notice of its existence was given), further delays to the earthmoving work and the Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation. As a consequence of the excess material to be excavated and the lack of timely direction from the NPS, REMCON's operations were severely impacted, resulting in an inefficient use of REMCON's planned

labor and equipment and Project supervision and an immediate and long-lasting negative impact to REMCON's schedule.

- The constant NPS design revisions, occasioned by defective plans and specifications, quantity, and the design changes severely impacted REMCON's ability to schedule or perform the Project with any semblance of efficiency or economy. After the first two weeks of the Project, REMCON's ability to control the construction of the Project was put in jeopardy by the acts and omissions of the NPS. In fact, within the first three weeks of work on the Project, NPS changes and deficiencies in the contract documents meant that completion of the 2001 work schedule, as planned by REMCON and accepted by the NPS, was impracticable.

- Added to the discrepancies in the road alignment and quantity estimates, the DSC and the necessity for blasting effectively prevented REMCON from completing its planned scope of work for the 2001 construction season. Moreover, the necessity for blasting doomed REMCON's ability to stay on schedule, and shifted the critical path to all earthwork activities.

- REMCON submitted its formal request for a change order for the DSC on August 20, 2001 to recover the added cost and time. Notice that the government's conduct was a breach of contract was given at that time. Instead of investigating REMCON's DSC claim as required by the contract documents, the Contracting Officer's Representative, Mr. DeOcampo and the Contracting Officer, Rod Keiscome, admitted in their depositions that the government failed to timely respond or investigate, which was and is inconsistent with the government's responsibility under the differing site condition clause. Eventually both the Contracting Officer and his representative conceded through

the issuance of Unilateral Modification No. 6, dated February, 2003, the validity of REMCON's DSC claim. Nevertheless, they allowed less than $85,000 of REMCON's $700,000 DSC claim, and no time, in the unilateral modification.

- Between the first and second construction seasons (December 2001 and May 2002), REMCON traveled to Denver to meet with NPS personnel on three different occasions to discuss: (a) extra work performed but not compensated or turned into a modification; (b) design problems; (c) quantity overruns and excess material requiring direction concerning handling; and (d) payment of REMCON's claims that were significantly impacting the Project. Despite NPS personnel agreeing to review the impact issues and representing they would timely respond and provide necessary design changes and/or issuing the appropriate revised drawings and modifications, little or no information was forthcoming before the second construction season began. This included what to do with the excess quantity of material encountered. The NPS' Park Superintendent asked the CO, in writing, to address all of the pending issues, valued at more than one million dollars, before the start of the second season. They weren't. As a result, the project further suffered and the damages incurred by Remcon increased.

As a result of government inaction, REMCON was unable to publish an accurate, updated schedule as it was missing critical information to enable it to plan its work, and was unable to productively commence or perform its work. One example is a microcosm of the problems:

From June 26, 2001 through July 9, 2001, the NPS evaluated the access road centerline relocation issue and directed that REMCON's surveyors re-survey the road and relocate it "into the hill" up to 15 feet. As of July 9, 2001, Joanne Cody, the lead NPS

designer, communicated in a writing internal to the NPS that the re-design would cause excess excavation to be handled, and that to save money, the NPS should consider raising the designed finish grade of the parking area by up to 5 feet. She went so far as to prepare plans to implement this solution and left them with the lead Project inspector.

While the subject of the fact that there would be excess excavation was raised by REMCON and communicated to the NPS no later than July 2, 2001, as well as what to do with it (raised multiple times, including RFI #31 dated 10/18/01), the NPS provided no direction until June 27, 2002, when the Contracting Officer issued a directive to REMCON to raise the parking lot by up to 5 feet. It took 360 days from REMCON's notice, and 353 from Joanne Cody's identified solution, for the government to act.

During the intervening year, REMCON could not perform as planned due to the thousands of yards (approximately 15,000) of stockpiled rock and dirt which was placed in piles all over the place awaiting direction.

- Based upon the contract documents, the Project was, in essence, planned by the designers to be a balanced job (requiring neither import of earthen materials nor their export, except for the planned 2000 cubic years of burn pit materials planned to be off-hauled as well as 6800 cubic yards to be hauled within the park to a designated locale). Unfortunately, the design was flawed. Their assumptions and calculations were materially flawed, and they have admitted this in their depositions. The result was thousands of yards of excess material was excavated, stockpiled, handled multiple times, and had to be disposed of but direction to address it took almost a year.

- REMCON re-mobilized to the Project in mid May 2002 following the 2001-2002 winter shutdown. A partnering meeting was held with all Project participants

in the Park. It involved a comprehensive job walk so that the problems experienced in 2001 could be actually seen by the Contracting Officer and the Contracting Officer's Representative. During the partnering meeting, REMCON requested direction on how to address all of the issues then continuing to be unresolved, including the excess excavated material.

When the NPS continued to fail to respond, REMCON began issuing a series of RFIs seeking direction in the deep cut area. Throughout June, 2002 the NPS failed to respond to the RFIs or to provide any direction to REMCON on how to correct the slope problems resulting from earlier design deficiencies. Concurrently, REMCON sought direction on what to do with the thousands of yards of excess material on site. While in July, 2001 a suggestion was floated that some of it could be used to raise the designated finish elevation of the parking lots, this extra work was not directed until June 27, 2002, again delaying the work, and Modification No. 4, paying for the extra work of raising the upper parking lot was not issued until September, 2002 even though agreement on all terms was reached in early June, 2002.

Concurrently REMCON, which claimed that the events of 2001 had materially depleted its capital to perform work, sought written assurance from the Contracting Officer that the modification for the directed extra work to raise the parking lots would be immediately processed so REMCON could get paid no later than August, 2002. The Contracting Officer gave this written assurance by letter dated July 16, 2002, but he did not honor his representation as the modification (No. 4) was not issued until September 14, 2002, and REMCON was not paid for the work until October, 2002.

In their depositions, neither Willie DeOcampo, the Contracting Officer's Representative, nor Rod Keiscome, the Contracting Officer, could explain or justify their conduct which hindered and delayed REMCON and offered no excuse other than it did not get done. This maladministration was endemic throughout the time REMCON performed work on the Project. The government's written justification for these events, attached to the government's file copies of the modifications (but not shared with REMCON until discovery), admits responsibility.

By the end of June 2002, the NPS-caused impacts and delays effectively prevented REMCON from accomplishing any productive work on the Project. REMCON published on June 27, 2002 an updated schedule but it was a guess as much as a plan due to the problems and hindrances affecting the ability to progress the work. Concurrently, the lead inspector, Bob Russell, became abusive and lost control and was removed from the Project effective early July, 2002. In an attempt to push forward, and mitigate the costs and time impacts, REMCON asked in writing that it be allowed to begin work on the Lower Sherman Trail component. The NPS denied this request.

- In the meantime, REMCON gave the Contracting Officer and his representative comprehensive notice of the multiple problems on the Project and their impacts on REMCON's ability to continue with the Project. When no substantive response was forthcoming, REMCON notified the Contracting Officer that work would cease unless circumstances swiftly changed. On July 3, 2002, REMCON wrote the Contracting Officer requesting an emergency on-site meeting. A new Project Manager, Mike Giller of the NPS Denver Service Center, then arrived on site on July 10, 2002. As of this date, Mr. Russell was gone. Mr. Giller walked the site with Stephen Christensen

and his lead Project personnel and, having the problems explained to him orally directed REMCON to "field fit" the Upper Sherman Access Road to the existing natural features. This direction was confirmed in REMCON's letter to the NPS on July 11, 2002, more than 8 months after those problems had been brought to the attention of the NPS. Even then, REMCON had only oral instructions, i.e., "Just make it fit."

- REMCON then began what it hoped would be the final construction of the deep cut area. REMCON's grading superintendent/foreman, Mark Penrose and Mike Kitchell, laid the roadway alignment out using the design staking information provided by the NPS as adjusted for field conditions. By July 25, 2002, REMCON encountered still further problems in fitting the design to field conditions. A new assistant inspector, Russell Belknap, had arrived onsite. Mr. Belknap walked the site with Mr. Kitchell to review the field conditions and determine what could be done in order that REMCON could proceed. Mr. Belknap personally directed Mr. Kitchell to make additional changes to the roadway alignment, including modifying the road from a crown design (raised center sloping to both sides) to a super (one side sloping to the other side). This altered the design, requiring additional cut and fill activities, and delayed the Project. All of these actions are documented in the government's daily reports.

- In early August 2002 the NPS requested that REMCON provide survey data for the access road as built. REMCON had its surveyor return to the Project and survey the entire access road. The new survey data was sent to the NPS on August 14, 2002. The NPS then orally advised REMCON that it was going to issue still more new design changes (Design No. 5) to correct what it perceived were failures to properly build the road. It took that position despite REMCON following dozens of oral and written

directives of NPS on-site representatives to field fit the road as needed. At no time during the extended discussions with NPS throughout July 2002 (when REMCON was struggling to make progress) did any NPS personnel insist that REMCON follow the original (and unbuildable) design.

- On August 29, 2002, after complying with the multiple directions, the NPS Contract Specialist, Terry Lang, at the direction of the Contracting Officer, issued a letter rejecting 100% of the access road because it was not constructed in the location required by the original plans and contained unauthorized changes. The letter gave REMCON ten days to fix the alleged imperfections. Compliance with the directive was physically impossible as to time as well as the layout of the road. The road could not be built as designed and the government directed the road to be realigned. While this letter has not been rescinded, 16 days later, on September 14, 2002, the CO signed and issued Modification No. 4. Included therein was New Bid Item 137, which compensated REMCON for the costs of re-surveying the new alignment of the access road in July, 2001. At that time Rod Keiscome issued Modification No. 4, the letter rejecting the realignment was still pending. Theresa Lang works directly for Rod Keiscome.

- The NPS provided the new Design No. 5 requirements on September 6, 2002. REMCON had its surveyor again lay out the road. In most instances only minor extra work was required to meet the latest design requirements other than in the deep cut. Meanwhile, due to the originally deficient design and consequent re-designs, REMCON was forced to delay its paving operations. As weather became an impediment to completing paving operations (paving can only occur within certain temperature ranges),

REMCON was forced to wait for the following 2003 construction season to complete paving operations.

- Concurrently, the Sherman Tree Trail design was not revised and issued to REMCON to construct until November, 2002, after the construction season was over. The CO testified that until Modification 5 was issued on November 20, 2002, REMCON was not authorized to proceed with any design changes to the trail. This re-design delayed the completion of the Upper Sherman work for two years.

- The combination of the NPS caused delays, design problems, and the NPS' concurrent refusal to pay for all of the extra work its representatives had directed REMCON to perform placed REMCON in dire financial duress at the end of the 2002 construction season. The job was incomplete, REMCON was prevented from bidding and obtaining further work, and its financial condition had been severely jeopardized by NPS' refusal to timely and properly pay REMCON for extra work performed. Remcon gave notice to its surety of its disability and the surety both denied bonding for new projects and directed the NPS, effective March, 2003, until further notice, to pay any future funds to the surety.

Before mobilizing for the 2003 construction season, REMCON wrote a series of letters to the Contracting Officer and/or his representatives outlining the cost and schedule impacts that resulted from deficiencies in the contract documents and the numerous redesigns and other changes directly attributable to NPS.

- After repeated attempts to resolve its disputes with the NPS, REMCON submitted a multi volume, certified claim to the Contracting Officer on June 28, 2003.

That claim outlined in detail the cost and time impacts incurred by REMCON on the Project. The total of that claim was $3,091,799.60.

- The NPS' response was to issue a cure notice as a pretext for a default termination. When the Contracting Officer issued the cure notice, REMCON had already supplied him with reams of information concerning deficient plans and specifications, NPS-caused delays and impacts to REMCON, and breach of contract. Moreover, the Contracting Officer knew that he had not authorized full payment to REMCON for work it had performed on the Project. Simply put, before the cure notice was issued, the Contracting Officer had received more than enough information from REMCON to understand that REMCON was not responsible for delays on the Project. Likewise, before the Contracting Officer issued the cure notice, he had more than sufficient information to understand the impact of nonpayment of the money REMCON claimed was due – some $3.0 million.

Once the termination for default was issued, a takeover agreement was entered into. No work was performed in 2003. The takeover contractor, Agee Construction, commenced work in 2004 and the work is scheduled to be completed during the trial (by 11/1/05).

Due to the government's multiple material breaches of contract, REMCON claims damages of $2,835,651 for breach of contract/direct costs issues, an order converting the termination for default into a termination for convenience, and a total of $6,540,903 when the surety's completion costs are included, plus profit pursuant to the termination for convenience jurisprudence.

## 2) STATEMENT OF THE ISSUES OF LAW AND FACT TO BE RESOLVED BY COURT

REMCON offers the following listing of issues of law and fact that it contends needs to be addressed by the court to resolve this case.

1) Did the government provide complete and suitable design documents for REMCON to bid and construct the Project?

2) Were the design documents defective?

3) Has the government compensated REMCON in time and/or money for all of extra and changed work encountered at the Project and the impacts thereof?

4) Was the government's termination for default proper?

5) Did the government hinder and interfere with REMCON's ability to complete the Project?

6) Did the government properly administer this Project?

7) Did the government cause delay to REMCON's performance of work on the Project?

8) Was REMCON the cause of delay on the Project?

9) Did the government timely respond to REMCON's claims for additional compensation?

10) Did the government timely and properly provide design changes for the Project?

11) Did the government provide correct bid quantities in its request for proposal?

12) Was there a differing site condition between stations 24+00 and 30+00 at the deep cut area in the access road?

13) Do any of the contract modifications entered into by the parties constitute an accord and satisfaction of REMCON's pending claims?

14) Should the government have supplied REMCON with the aggregate base to construct the Project in accordance with the contract documents?

15) Should the government have supplied REMCON with the stones to be used for rock revetment work?

16) Did the government's lack of payment for extra work excuse REMCON from performing work in the 2003 season?

17) Was REMCON's precarious financial position in 2003 its own fault?

18) Did REMCON have a duty to continue to perform in 2003 under the Disputes Clause of the contract?

19) Can REMCON recover excess completion costs incurred by its surety and the replacement contractor, Agee Construction, against the government?

20) Did the government withhold information of substance during the bid phase?

21) Did the government mark the trees to be removed? Did REMCON mark the trees?

22) Did the government direct REMCON to perform extra and changed work under the doctrine of constructive change?

23) Did the government direct REMCON in 2002 to "field fit" the road?

24) Was any of REMCON's work non-conforming, and thus required re-work?

25) Did the government fail to timely issue contract modifications?

26) Were persons from the government, other than the Contracting Officer, authorized to direct changed and extra work by REMCON?

27) Did REMCON incur excess excavation costs that have not been compensated by the government?

28) Did REMCON incur additional costs for drilling and blasting that have not been compensated by the government?

29) Did REMCON incur additional costs for SWPPP operations that have not been compensated by the government?

30) Did REMCON incur unpaid costs for supplying and re-grading aggregate base that have not been compensated by the government?

31) Did REMCON incur additional survey costs that have not been compensated by the government?

32) Did REMCON incur extended field and home office overhead, due to government caused delays, that have not been compensated by the government?

33) Did REMCON incur additional equipment standby costs that have not been compensated by the government?

34) Did the government take improper credits for placing aggregate base, asphalt concrete, dry-laid stone, boulder revetment, drop inlets, and erosion control logs, and does the government need to compensate REMCON for these improper credits?

35) Does the government owe REMCON interest and prompt payment interest for REMCON's claims?

36) Is the government entitled to assess liquidated damages against REMCON?

37) Did the government fail to timely pay REMCON?

38) Were all of the positions taken by the government during its administration of the Project substantially justified?

39) Did the government fail to investigate (promptly and/or otherwise) the DSC?

40) Did the government provide false information to REMCON, as of 10/29/01, as to the reason(s) for the approximate 15,000 cy of excess excavation then stockpiled on the Project?

41) Did the NPS timely issue to REMCON revised Sherman Tree Trail drawings to construct?

42) Did the COR's on the Project keep the CO timely informed of events, including constructive changes?

43) Was REMCON directed at the preconstruction meeting to send all written inquiries and communications to the NPS through the lead inspector, Bob Russell? Did REMCON comply?

44) Did the CO issue Modification No. 7 in the spring of 2003, thus terminating the Project for the convenience of the government?

45) What is the legal effect of Modification No. 7?

46) Was REMCON constructively accelerated by the government's conduct?

47) Was the government's cure notice valid?

48) Was the government's cure notice justified?

**3) CONTENTIONS OF LAW**

In its Complaint, REMCON alleges Breach of Contract against Defendant, and also seeks to convert the government's termination for default into a termination for convenience. The factual and legal arguments offered by REMCON to support its Breach of Contract claim, and to convert the termination for default, are similar and parallel since a contractor can challenge a default termination based on the government's material breaches of the contract. Therefore, the arguments discussed below under the

heading of "Breach of Contract" can also be applied to the below section entitled "Termination for Default."

**A. BREACH OF CONTRACT**

REMCON's Complaint in this matter asserts multiple breaches of contract against the NPS. These breaches are well documented in the documentary evidence to be offered at the time of trial, and which have been the subject of written discovery, oral depositions, and expert opinions/reports in this matter. Generally, the government's multiple breaches include failing to make timely and full payment, failing to provide complete and adequate plans and specifications, maladministration, encountering of differing site conditions, failing to timely reply to submittals and Requests for Information ("RFIs"), failing to grant time extensions, issuing and/or directing constructive changes and/or acceleration to the Project, suppression of superior material knowledge, concealing known and relevant information, improperly terminating REMCON for default, failing to properly administer the Project, interfering and hindering REMCON's performance of work, inadequate design clarifications, failing to mitigate its damages, and breach of the covenant of good faith and fair dealing. The multiple material breaches of contract are clearly delineated in REMCON's concurrently filed contentions of fact.

These multiple breaches, along with several independent legal theories, all result in the same compensation payment to REMCON, for increases in earthwork quantities, drilling and blasting, rock excavation, excavation and disposal of excess material, supply and re-grading of aggregate base, and Project delays as they relate to extended Project overhead, excess completion costs incurred by REMCON's surety, interest, and prompt

payment interest.[1]

"Ordinary principles of contract construction and breach that would be applicable to any contract between private parties" is also applicable to government contracts. *United States v. Peck* 102 U.S. 64 (1880). Breach recovery could include anticipated profits and other items that are not generally part of an equitable adjustment. *Embassy Moving & Storage Co. v. United States*, 424 F.2d 562 (Ct. Cl. 1970). Below is a legal discussion of specific categories of breaches by the government.

**1. DIFFERING SITE CONDITION**

A Type I differing site condition is universally defined as a condition encountered that is different than that represented in the plans and specifications. At the deep cut area between stations 24+00 to 30+00, the actually encountered site condition, when constructed and compared with the NPS's geotechnical report, is a Type 1 differing site condition. Section I.62 of the Contract Specifications, Differing Site Condition, provides that the contractor will be issued a change order compensating it if it encounters subsurface or latent physical conditions at the site differing from those indicated in the contract documents. In this matter, the government has failed to issue a change order to fully compensate REMCON for its additional costs, and to grant time extensions, relating

---

[1] Due to the government's multiple breaches of contract, REMCON is entitled to recover compensatory damages. Principles of compensatory damages require the breaching party to compensate the injured party in such an amount as is necessary to place the injured party in as good a position as it would have been in had the breaching party fulfilled its promise. *See Hadley v. Baxendale*, 156 Eng . Rep. 145 (1854).

to the Type I differing site condition.[2]

The purpose of the differing site condition clause is to alleviate from the contractor's bid any contingencies for unforeseen adverse conditions. *J.F. Shea Co. v. United States,* 754 F.2d 338 (Fed. Cir. 1985)). In *Foster Construction C.A. v. United States,* 435 F.2d 873, 887 (Ct. Cl. 1970*)* the court explained this rational:

> [T]he presence of the changed condition clause works to reassure bidders that they may confidentially rely on the logs and need not include a contingency element in their bids. Reliance is affirmatively desired by the Government, for if the bidders feel they cannot rely, they will revert to the practice of increasing their bids.

The purpose of the differing site condition clause is to induce contractors to submit bids based on conditions reasonably to be anticipated from the available data without contingencies to cover the unexpected or unusual. *Kaiser Industries Corp. v. United States* 340 F.2d 322 *(*Ct. Cl. 1965). In return, bidders are provided assurance that if conditions prove more onerous or difficult than anticipated or indicated, an adjustment will be made in the contract price or time.

In this case, the contract indicated that the earlier material which was to be encountered in the excavation of the Upper Sherman Tree Access Road and Parking Area was, with isolated exceptions referred to as "floaters" (e.g. a large rock), rippable with a Caterpillar D8 Dozer/Ripper. The NPS provided a geotechnical report, made it a part of the contract documents, and bidders were entitled to rely on and bid on the factual representation in this report that it accurately depicted/commented upon the work

---

[2] The government belatedly admitted the existence of the differing site condition in its unilateral issuance of Modification No. 6, but has failed to fully compensate REMCON for its costs incurred relating to this condition. A tortured analytical path was taken by NPS to pay Remcon $84,170 of the approximate $700,000 claimed.

required. REMCON based its bid on the soils report and plans and specifications provided by the NPS and they provide a detailed description of the work required and the conditions to be encountered.

Instead of encountering rippable rock between stations 24+00 and 30+00, REMCON encountered granitic rock that required drilling and blasting. This condition materially differed from what was represented in the contract documents. REMCON properly and promptly notified the government of the differing site condition, and has submitted its increased costs for drilling and blasting the unforeseen rock, and for additional costs due to excess excavation and handling/sorting of the blasted material. Further, the drilling and blasting severely impacted the critical path of the Project during the 2001 construction season, and REMCON has not been compensated for the delays, or given time extensions, caused by this differing site condition.

The area where the DSC was encountered was the exact locale where the access road was relocated into the hillside when the NPS directed that the road be built where the trees had been marked by the NPS to be cleared and were actually cleared. This new locale, up to 15 feet from the planned road locale, was a direction exclusively made by the NPS. It has steadfastly refused to accept, acknowledge or pay for, in time or money, the consequences of its direction. Such conduct, both belatedly and in its continuing denial, lack substantial justification.

### 2. A CONTRACTOR IS ENTITLED TO RECOVER DAMAGES FOR DEFECTIVE PLANS AND SPECIFICATIONS SUPPLIED BY THE OWNER

In the landmark case of *United States v. Spearin*, 248 U.S. 132, 137 (1918), the United States Supreme Court found an implied warranty by the owner that the plans and

specifications which it supplies will be adequate for the performance of the work by the contractor. In *Spearin, supra*, the government prepared and supplied the plans and specifications for the construction of a dry dock. The contractor relied upon these plans and specifications in submitting its bid. During the construction, the contractor encountered substantial difficulties due to defects in the plans and specifications. The government ultimately terminated the contract, and the contractor sued for damages. *Id.* at 133-135. The United States Supreme Court held the government unjustifiable breached the contract and was liable for all damages. The court stated:

> …[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. (Citations.) This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work … (Citations.) Id. At 136.

The Supreme Court concluded that the government implicitly warranted the plans and specifications it supplied were adequate for the performance required. *Id.* at 137.

Where the owner's faulty specifications cause a delay in the contractor's performance, the owner is responsible for the resulting damages. *J.D. Hedin Construction Co. v. United States*, 347 F.2d 235, 241 (Ct. Cl. 1965); *Wunderlich Contracting Company v. United States*, 240 F.2d 201, 205 (10th Cir. 1957). In *J.D. Hedin, supra*, the court stated the rule is based on "the presumed expertise of the government when it sees fit to prescribe detailed specifications. (Citations.)" 347 F.2d at

241. The court held that:

> If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover delay damages for (the owner's) breach of its implied warranty, and this breach cannot be cured by the simple expedient of extending the time of performance.
> (Citation.) Id.

In *Wunderlich Contracting Company, supra*, 240 F.2d at 205, the court held:

> A contractor who bids for work has the right to rely on the plans and specifications submitted to him for bidding purposes. The rights of the parties are to be measured by them. It is only through the plans and specifications that he can make an intelligent bid. (Citation.) Burdens other than those contemplated by the contract, may not be placed upon the contractor without additional compensation. *Id.*

Further, a contractor is entitled to receive compensation for delays cased by defective plans and specifications. *Wilner v. United States*, 26 Cl. Ct. 260 (1992).

The circumstances in which the NPS failed to provide suitable plans and specifications are too numerous to list in this section, but are identified in the concurrently filed contentions of fact. Some key examples include the multiple revisions to the Sherman Tree trail points and trail itself, the multiple design changes to the access road, the many trees that were not indicated or the plans to be removed but which had to be removed in order to permit the road and other improvements to be built, the lack of supply of AB by the government (despite the reference to an AB stockpile in Addendum 1 to the contract), the failure to provide stone revetment, and the government's issuance of revised design drawings through the 2002 construction season. REMCON is entitled to receive compensation for the multiple breaches of the government's implied warranty, including its excess excavation costs, delay damages, cost overruns, stand-by costs, and additional costs caused by the poor and incomplete design.

### 3. AN OWNER IS RESPONSIBLE FOR DAMAGES CAUSED BY THE BREACH OF HIS DUTY NOT TO PREVENT, HINDER OR DELAY PERFORMANCE, OR TO INCREASE THE COST OF PERFORMANCE BY THE CONTRACTOR

The courts expressly recognize a theory of constructive cooperation. It is elementary that "every contract has an implied condition that 'neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.' " *Petrofsky v. United States*, 222 Ct.Cl. 450, 616 F.2d 494, 497 (1980) (quoting *Petrofsky v. United States*, 203 Ct.Cl. 347, 488 F.2d 1394, 1404 (1973)). When the government is one of the parties, it "impliedly promises to act in good faith and 'invoke its great power of a sovereign act when and only when and to the extent necessary to carry out its essential governmental functions.' " *Hughes Communications Galaxy, Inc. v. United States*, 26 Cl.Ct. 123, 140 (1992) (quoting *Air Terminal Servs., Inc. v. United States,* 165 Ct.Cl. 525, 330 F.2d 974, 981 (1964). Where a contractor is delayed in performance of the contract work and suffers a loss that would not have been sustained except for the other party's delay and failure to observe the implied duty of cooperation, the contractor is entitled to recover those damages. *Chalender v. United States* 119 F. Supp. 186 (Ct. Cl. 1954); *Fuller v. United States* 108 Ct.Cl. 70, 69 F. Supp. 409 (Ct.Cl 1947).

In *Chalender, supra*, 119 F. Supp. 186, the contractor sued the United States for loss sustained as a result of delay in completion due to the owner's delay in furnishing parts required by the contract. Holding the government liable, the court stated:

> "There is present, in a contract such as this one, an implied obligation on the defendant that it will not do that which will hinder the contractor in the performance of the contract. When the contractor is delayed by a negligent act chargeable to the Government, it is a breach of this clearly

> implied obligation, and the Government is liable for the damages sustained by the contractor because of the delay."

In *Fuller v. United States*, *supra*, the contractor sued the government for damages due to delays caused by the government. Relying upon the implied covenant, the court held the government liable for those damages. Moreover, the court stated that conduct hindering performance by the other party to an immediate breach of the contract. *Id.* at 412.

There can be no doubt that the NPS' documented conduct breached this warranty by continuously hindering and interfering with REMCON's ability to complete its contract.

### 4. AN OWNER'S FAILURE TO TIMELY PAY ALL SUMS DUE AS IS A MATERIAL BREACH OF THE CONTRACT

The law is well settled that the owner's failure to pay timely all sums due under a contract is a material breach of the contract. *Lynch v. United States*, 292 U.S. 571 (1934). Similarly, a failure to make progress payments is a breach and may justify abandonment of the contract by the contractor. *Northern Helex Co. v. United States*, 455 F.2d 546 (Ct. Cl. 1972). In this case, the government had a duty not only to timely issue progress payments, but also had a duty to timely process and pay for claims and cost overruns incurred by REMCON.

In *Northern Helex Co. v. United States, supra,* the government failed to make payments due under a contract for the supply of helium. The court of appeal held, "We have, in short, not the slightest doubt that the prolonged failure to pay large amounts was a material breach of the contract."