In addition, section I.57 of this Contract Specifications provides for recovery of interest by the Contractor for the government's failure to make timely payments, and section I.87 of the same Contract Specifications provides for Prompt Payments by the government.

Further, where the government wrongfully withholds money from the contractor, an excusable delay results. The subsequent failure on the contractor's part to perform is excusable. (*Brooklyn Queens Screen Mfg. Co. v. United States*, 97 Ct. Cl. 532 (1942).

## 5. THE GOVERNMENT FAILED TO DISCLOSE ESSENTIAL INFORMATION/DOCTRINE OF SUPERIOR KNOWLEDGE

The NPS' failure to provide REMCON with the plans and specifications that marked the rock formations it knew to exist amounts to a breach of contract that allows for the recovery of breach of contract damages the termination for convenience clause notwithstanding. The government's failure to disclose all essential information falls under the doctrine of superior knowledge, which is defined as follows:

> "The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information." (*American Ship Building Company v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981).)

"This doctrine of superior knowledge is well established in law [citations] and failure to disclose crucial information can lead to a finding of contract breach by the government." (*McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1329 (1999).)

Further, as early as July, 2001, the lead NPS designer (Joanne Cody) as the Contracting Officer Representative (Willie DeOcampo) published writings

acknowledging up to 15,000 cy of excess material would be encountered by REMCON and needed to be addressed. They did not share their writings with REMCON, but Willie did with the Contracting Officer.

In October, 2001, when REMCON was frustrated with the inaction of the NPS and its inspectors due to a failure to provide REMCON with requested direction as the what to do with the then stockpiled approximately 15, 000 cy, REMCON wrote RFI #31 asking for direction. In response, Willie and Joanne authored a common response denying the excess material was caused by the government and contended that it was a result of the excavation effort being too aggressive and constructing the site a foot too low.

Survey results proved the NPS' contention to be false, and it wasn't until June 27, 2002, a year later, that some direction was given to address some of the excess material.

**6. THE OWNER HAS A DUTY TO GRANT EXTENSIONS OF TIME**

In *Natkin & Co. v. George A. Fuller Co.* 347 F.Supp. 17 (D.C.Mo., 1972), the contractor was delayed in its performance by substantial design changes in contract drawings, the inadequacy of equipment drawings, substantial change orders, inclement weather and delays, the owner refused to grant time extensions needed to update the schedule. The owner was held liable for all additional costs experienced by a contractor where the owner delayed the contractor's progress and then failed to grant time extensions under the critical path method schedule agreed to in the contract.

Courts have also held that the government's refusal to grant a time extension was a constructive acceleration for which the contractor was entitled to an equitable adjustment. *Appeal of Norair Engineering Corp.*, ENG BCA 3804, 90-1 BCA 22327

(1989). Contractors can recover for constructive acceleration when delays are excusable, the contractor was ordered to accelerate (in some manner than can reasonably be construed as an order to complete), and the contractor incurred extra costs. *Nordair Engineering Corp. v. United States,* 229 Ct. Cl. 160 (1981).

The government's failure to issue time extensions, to which REMCON was contractually entitled (due to design changes, changed conditions, unexpected obstacles, disruptions, and inclement weather) was a fundamental breach of contract, and served as constructive acceleration of REMCON.

**7. THE GOVERNMENT HAS A DUTY TO TIMELY ISSUE CHANGE ORDERS/MODIFICATIONS**

If a change order causes an increase or a decrease in the cost or time of doing the work, it is the duty of the contracting officer to make a determination with respect to the equitable adjustment, and the amount thereof, as these involve questions of fact upon which the contracting officer must render a decision. *United States v. Callahan Walker Construction Co.,* 317 U.S. 56, 59 (1942). By its own delay, the government cannot place the contractor in a position where the contractor's costs are greatly increased, and then refuse compensation, without involving the government in a breach of contract. *Ross & Co. v. United States*, 115 F.Supp. 187 (Ct.Cl. 1953). There is an obligation on the part of the United States not to cause unreasonable delay in making changes permitted by the contract. *Eisenberg v. United States*, 75 F.Supp. 1006 (Ct. Cl. 1948). Hence, the government breaches its contract when it delays unduly in issuing a change. *Ross & Co., supra*. Further, Courts have held that a contractor can recover for delay when the government delayed work by failing to issue a timely and necessary change order. *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1359-1360 (Fed. Cir. 2002). This rule can

also apply when a change is not ordered. *Severin v. United States*, 102 Ct. Cl. 74 (1943) [a six month delay in deciding not to make a change is unreasonable].

In the instant matter, the government's tardy issuance of modifications (or decision not to issue modifications) was clearly unreasonable and caused delay to the Project.

**8. THE GOVERNMENT HAS FAILED TO RECOGNIZE AND COMPENSATE REMCON FOR CONSTRUCTIVE CHANGES**

A constructive change occurs when the owner requires the contractor, either informally, or through the owner's fault, to perform additional work beyond the contract requirements without a formal change order. *American Line Builders, Inc. v. Untied States* (1992) 26 CL.CT. 1155, 1180; *Miller Elevator Company v. United States* (1994) 30 Fed. Cl. 662, 678). Constructive changes often result from owner action or inaction even though the owner might not characterize it as a change. As stated by the *Miller* court:

> A constructive change entails two base components, the change component and the order or fault component. The "change" component describes work outside of the scope of the contract, while the "order/fault" component describes the reason that the contractor performed work. Thus, if the government either expressly or impliedly ordered work outside the scope of the contract, or if the government otherwise caused the contractor to incur additional work, a constructive change arises for that work performed outside of the scope of the contract. While the constructive change doctrine provides a means for a contractor recovery, the rationale for constructive changes involves the objective of persuading a contractor to continue to work pending resolution of any dispute involving the work at issue....to demonstrate a constructive change for disputes over the contract requirements, the contractor must show the performance of work in addition to or different from that required under the contract (the change component), either by express or implied direction of the government or by government default (the order/fault component). (*Miller* at page 678).

Five types of constructive changes typically permit a contractor additional compensation: 1) disputes over contract interpretation during performance, 2) government interference or failure or cooperate, 3) defective plans and specifications, 4) non-disclosure of superior knowledge, or 5) acceleration. *Miller Elevator, supra,* at 678; *also see Wieman v. United States* (1982) 230 Ct. Cl. 563.

Courts have held that performance of work without a written change order raised an implied contract to pay for it when the government received the benefit of the work. (*Armstrong & Co. v. US* (1943) 98 Ct. Cl. 519). In *Appeal of Ryall Engineering Co.*, (1955) IBCA 1, 6 CCF 61639, the Board held that the contracting officer's refusal to reduce an oral change order to a writing was an administrative error that the board was empowered to correct.

The factual record in this matter is overloaded with example after example where the government's representatives gave clear direction to REMCON to perform changed or extra work. This direction included letters, revised design documents, oral directions, and responses to requests for information. These changes are all documented contemporaneously and the testimony of the key NPS personnel admits the bulk of the changes occurred.

REMCON anticipates that the government will argue that REMCON did not have the authority to rely on direction provided by government representatives other than the contracting officer. As discussed below, this argument is misleading.

**a. The Government's Contracting Officer's Representatives and Inspectors Had Authority to Direct Changed Work**

As a general matter, the government is bound only by the awards or actions of those possessed with authority to bind the government. *Miller Elevator vs. United States*

(Ct.Cl. 1994) 30 Fed. Cl. 662, 693; *Sipco Services in re Insurance v. United States*, *supra*, 41 Fed. Cl. at 221. A contracting officer's representative can be found to have implied authority to direct changes in the contracting officer's absence if the change is "reasonably related and consequent to the representative's official responsibilities." *Id.* at 221-222; *Design and Production, Inc. v. United States* (Ct.Cl. 1989) 18 Cl.Ct. 168205.

In *Sipco*, the contracting officer's technical representative ("COR") acted as "the onsite representative of a contracting officer ("CO") who admittedly visited rarely." 41 Fed. Cl. at 222. Thus it was reasonably obvious to the contractor from the COR's activities, that the CO had delegated to the COR broad discretion in supervising the contract. *Id.* For that reason, the COR had implied authority to bind the government. See also, *Wieman v. United States* (Ct.Cl. 1982) 678 F.2nd 207, 214, where the court sets out two factors justifying a COR's implied authority: (1) the acquiescence and acceptance by the government of benefits accruing to it from work directed by the CO's representatives, and (2) the fact that the representative was authorized *ex contractu* to direct the contractor's work, and the contractor was expected to comply with the COR's directives. The facts in this matter fit within the cited exceptions.

### b. An Owner Can By Its Conduct Waive the Requirement Of Written Change Order

An Owner who authorizes extra work has a duty to pay for any additional expenses. Typical construction contracts contain provisions that require a written change order for any changes in the contract price of completion date.

The provisions are waived and do not bar claims for additional costs where the owner has actual knowledge of the changed condition or reasons for delay. *Appeal of Karshoj Construction Co.*, IBCA 321, 63 BCA 3848 (1963) Further, performance of

work without a written change order raised an implicit contract to pay for it when the government received the benefit of the work. *Armstrong & Co. v. United States*, 98 Ct. Cl. 519 (1943).

These government contract decisions are based on the unarguable logic that where the owner knows of the conditions creating the need for the change, a writing or notice requirement is superfluous; in such cases, the contractor's claim will not be barred by its lack of compliance with the writing or notice requirements. An even stronger argument for waiver can be made when the Owner's design and coordination errors caused extra costs and delays to the work, the Owner issued revised plans for the work to the contractor and/or the directions are given to the Contractor (e.g. realign a road) by the government and he complies and the direction to do so, and the compliance, are recorded by the government's own inspector.

**9. REMCON IS ENTITLED TO BE COMPENSATED FOR GOVERNMENT CAUSED DELAYS**

It is beyond dispute that the NPS has delayed the Project. REMCON's expert analysis proves that REMCON's performance on the Project was delayed at least 371 calendar days by the government. What is also beyond dispute is that both field and home office overhead costs are compensable for government caused delays. *See Laburnum Construction v. U.S.* 325 F.2d 451 (Ct. Cl. 1963). Both types of increased overhead may be recovered with the proper type of documentation. *W.G. Cornell Co. v. Ceramic Coating Co.* 626 F.2d 990 (D.C. Cir 1980). REMCON's experts have calculated REMCON's delay damages for home and office overhead, and the proper documentation substantiating the delay claim has been presented.

## 10. THE GOVERNMENT'S ACTIONS CAUSED REMCON COMMERCIAL IMPRACTICABILITY

Commercial impractability occurs when the contractor's cost of performance is unreasonably, excessively, and unforeseeably increased so as to make performance senseless from a business standpoint. *Appeal of Southern Dredging Co., Inc.* ENG BCA 5843, 92-2 BCA 24886 (1992). The principle of practical impossibility (which is the same as impractability) consists of the theory that the object of the contract could not be accomplished without commercially unacceptable costs and time input far beyond that contemplated in the contract. *Foster Wheeler Corporation v. United States*, 206 Ct. Cl. 533 (1975). A constructive change requiring an equitable adjustment is appropriate where practical impossibility is found even when the specified performance is not literally impossible to achieve. *Tombigbee Constructors, et. al. v. United States*, 190 Ct. Cl. 615 (1970). Courts have applied a three prong test to determine whether a contractor's continued performance was excused based on commercial impractability:

> "(1) Performance must be vastly different from that which the parties contemplated at the time of contract execution. Such a change in performance must not be due to the contractor's actions;
>
> (2) The change in performance must result in significantly greater costs and/or time for contract performance;
>
> (3) The contractor must not have assumed the risk of such changed performance by virtue of a contract clause shifting the burden to the contractor or based on his superior knowledge. *Appeal of Xplo Corp.*, DOT CAB 1289, 86-3 BCA 19125 (1986).

In the instant matter, the differing site condition, Project delays, design changes, the government's failure to issue modifications, maladministration, and the government's refusal to pay REMCON for its cost overruns led to commercial impracticability in the 2003 construction season.

**11. DAMAGES FOR GOVERNMENT'S BREACHES OF CONTRACT**

Where one of the parties to a contract has breached it, the actual damages to which the injured party is entitled are the monetary losses it has suffered. Basically, this will involve two separate items: out of pocket expenditures incurred during performance, and anticipatory profits. *See generally United States v. Behan* 110 U.S. 338 (1884). The main component of a contractor's damages are its costs, and the preferred method of proving costs is the submission of actual costs. *Cen-Vi-Ro of Texas, Inc. v. United States*, 210 Ct. Cl. 684 (1976). In the instant matter, REMCON has submitted its actual costs, plus reasonable profit and mark-up, for extra and changed work relating to excess excavation, drilling and blasting, boulder revetment, SWPPP operations, costs related to supply of aggregate base, re-grading of aggregate base, and equipment stand-by costs. As discussed above, REMCON is also entitled to recover costs for extended field and home office overhead due to government caused delay.

REMCON also seeks the excess completion costs incurred by its surety for the Project. It is well established that a contractor's reimbursements to a surety for its cost of completing a Project from which the contractor was wrongfully terminated are recoverable as an element of its breach of contract damages.

For example, in *Dale Construction Co. v. United States*, 168 Ct.Cl. 692 (1964)), the contractor filed a breach of contract claim against the government for damages it sustained because of the Army's wrongfully terminating the contract for default. The Court noted that "it is settled that 'if the Government terminates a contract without justification, such termination is a breach of the contract and the Government becomes liable for all the damages resulting from the wrongful act . . . . The objective is to put the injured party in as good a position pecuniarily as he would have been in if the contract

had been completely performed." (*Dale, supra*, at p. 18 [citing G.*L. Christian and Associates v. United States*, 160 Ct.Cl. 1, 11 (1963)].)

In *Dale*, the contractor's performance bond surety completed the Project after the government terminated the contractor, but at a net loss of $31,870.38. The Court held that because the termination was "improper, the Government is liable for the completion loss inasmuch as it was the direct and foreseeable result of the breach." (*Dale, supra*, at 25.) As such, the excess completion costs in that case were recovered as an element of its damages arising from the government's contractual breach.

Similarly, in *J.D. Hedin Construction Co. v. United States*, 456 F.2d 1315 (Cl.Ct. 1972), the contractor was wrongfully terminated by the government and the surety completed the Project. As stated by the Court:

> "The return to plaintiff of the completion costs in excess of those plaintiff reasonably would have incurred had there been no termination, in the amount of $419,797.03 (which includes the amount owed to the surety in respect thereof), puts plaintiff 'in as good a position pecuniarily as [it] would have been in if the contract had been completely performed.' [citation] Such excess completion cost application of this basic breach of contract rule was also made in the similar case of Dale Construction v. United States, 168 Ct.Cl. 692 (1964). plaintiff is entitled to recover such amount." (*J.D. Hedin, supra*, at 1327.)

REMCON will also be seeking damages for interest, prompt payment interest, and attorneys' fees pursuant to the Equal Access to Justice Act.

## 12. TERMINATION FOR CONVENIENCE

Modification No. 7 was issued, cannot be rescinded, and its legal impact is a termination for convenience. The NPS sent the modification for review by REMCON with a letter dated February 24, 2003. The February 24th letter stated that the modification would be issued unilaterally if it was not received within ten days from

REMCON. REMCON did not sign the modification within ten days, the NPS should have unilaterally issued the modification. REMCON contended, as early as March 12, 2003 (in letter from Mike Schoenfeld to Rod Keiscome) that modification number 7 was tantamount to a termination for convenience since it deleted a significant portion of the Project. REMCON reaffirmed its position that the NPS was required to issue the modification unilaterally, and that the modification was a termination for convenience, in an April 15, 2003 correspondence from Steve Christensen to Rod Keiscome.

The court should affirm REMCON's contention that Modification No. 7 was issued, was not rescinded, and served as a termination for convenience. If the Court does affirm REMCON's contention, the all action subsequent to the effective date of the issuance of Modification No. 7 (which should be March 13, 2003, since Remcon did not receive the modification until then) shall be deemed null and void (including the Government's termination for default since the NPS could not issue a termination for default when the contracted had already been terminated for convenience).

**B. ASSUMING THAT MODIFICATION NO. 7 IS NOT FOUND TO BE A TERMINATION FOR CONVENIENCE, CONVERTING THE TERMINATION FOR DEFAULT INTO A TERMINATION FOR CONVENIENCE IS THE PROPER LEGAL RESULT**

REMCON also seeks a finding from the court that the termination for default was improper, and should be converted into a termination for convenience. While REMCON will address the government's anticipated arguments below concerning why the government believes the termination for default was proper, this section addresses the reasons for why the termination was wrongful, and should be converted into a termination for convenience. It is the well established rule that where it is determined that the contractor was not in default, or that the default was excusable, the rights of the

parties will be the same as if the termination had been issued for the convenience of the government. *Appeal of Troy Air, Inc.* IBCA 2238, 88-1 BCA 20,268 (1987).

The standard termination for default clause, which is contained in REMCON's contract, provides that "[i]f, after termination [for default], it is determined that the contactor was not in default, or that the default was excusable, ***the rights and the obligations of the parties are the same as if the termination had been issued for the convenience of the Government.***" *CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 386 (1999) [emphasis added]; 48 C.F.R. 52.249-10 ["a termination for default will be considered to have been a termination for the convenience of the Government, and the rights and obligations of the parties governed accordingly"].

"A termination for convenience essentially converts a fixed price contract into a ***cost reimbursement contract***. [citations] As such, the contractor is entitled to recover all allowable costs incurred in the performance of the terminated work, a reasonable profit on the work done, and certain additional costs associated with the termination" *Best Foam Fabrictors, Inc. v. United States* (1997) 38 Fed.Cl. 627, 638 [emphasis added]; 48 C.F.R. § 52.249- 2; *William Green Construction Co. v. United States*, 477 F.2d 930 (Ct.Cl.1973) ["A reasonable profit is allowable on the cost incurred by [the contractor] for work actually performed prior to the termination"].) As noted by the *Best Foam* Court, a contractor may incur "certain additional costs" beyond its costs incurred and reasonable profits on work already performed. Therefore, the Federal Acquisition Regulation contains a cost principle governing termination costs which requires special treatment for the following eight particular types of costs:

(a) Common items.

(b) **Costs continuing after termination.** Despite all reasonable efforts by the contractor, costs which cannot be discontinued immediately after the effective date of termination are generally allowable. However, any costs continuing after the effective date of the termination due to the negligent or willful failure of the contractor to discontinue the costs shall be unallowable.
(c) Initial costs.
(d) Loss of useful value. Loss of useful value of special tooling, and special machinery and equipment
(e) Rental under unexpired leases.
(f) Alterations of leased property.
(g) Settlement expenses.
(h) **Subcontractor claims.** (48 C.F.R. § 31.205-42.) (emphasis added)

As noted above, the surety's excess completion costs are recoverable as "continuing costs."

The termination for default was improper, and REMCON's default was excusable, due to the myriad of breaches of contract detailed above, including delays caused by the government, the government's failure to compensate REMCON for the differing site condition, the government's failure to issue payments to REMCON, the government's creation of commercial impracticability for REMCON, constructive changes and acceleration, caused by the government, maladministration, the government's failure to provide a suitable design, the government's failure not to hinder or interfere with REMCON's performance of its contract, and the government's failure to timely issue contract modifications.

## C. THE GOVERNMENT CANNOT CLAIM LIQUIDATED DAMAGES OR OTHER OFF-SETTING DAMAGES AGAINST REMCON

In this litigation, the government, in its answer to REMCON's complaint, did not plead any affirmative defenses, and did not assert an affirmative counter claim. The Rules of the Court of Federal Claims (RCFC) provides that a party who omits a defense or objection or counter-claim in a pleading or motion, that is then available, cannot

thereafter make such a motion. RCFC §§ 7(a), 12(g), 13(a). Because the government has omitted any affirmative defenses or counter claims in its answer, in accordance with the rules of this court, REMCON contends that the government has not asserted any such claims against REMCON. RCFC §§ 7(a), 12(g), 13(a).

In general, a failure to plead an affirmative defense results in the waiver of that defense and it is excluded as an issue in the case. *Lopez v. U.S. Fidelity & Guar. Co.*, D.C.Alaska 1955, 18 F.R.D. 59, 61, 15 Alaska 633, 637.

The complaint was filed on October 21, 2003. Two years have elapsed. Two separate counsel, from two separate agencies, have been representing the government in this matter. As such, REMCON will oppose the introduction of any evidence on causes of action or affirmative defenses that have not been plead, and would be prejudiced if any such assertion would be attempted not to be belatedly made. No good cause can be shown for the failure to make the assertion over the past 23 months. Leave of court to amend, if requested, should be denied.

## D. RESPONSE TO GOVERNMENT'S ANTICIPATED LEGAL ARGUMENTS

REMCON anticipates that the government will present the following legal arguments: 1) the termination for default was proper based on REMCON's lack of response to the cure notice; 2) termination for default was proper because REMCON failed to progress under the Project; 3) the termination for default was proper because REMCON did not perform under the Disputes clause; 4) the government is entitled to recover liquidated damages against REMCON; 5) the government is entitled to recover reprocurement costs relating to the termination; and 6) written modifications to the contract serve as an accord and satisfaction of some of REMCON's claims.

### 1. TERMINATION FOR DEFAULT WAS NOT JUSTIFIED

For items 1-3 listed above, REMCON presented substantial legal argument relating to these three legal issues in response to the government's motion for partial summary judgment. REMCON contends that the government will not be able to sustain its burden of proof that the termination for default was justified or proper.

#### a. REMCON did not need to respond to the Cure Notice

The government based its motion for partial summary judgment in part on the mistaken argument that REMCON's failure to respond to the July 24, 2003 Cure Notice was an independent and sufficient ground for a default termination. That simplistic argument wholly ignores the role the government played in putting REMCON into a position whereby the contract would not be completed on schedule as well as the jurisprudence on the issue of cure notices and default terminations. By July 2003, as the result of the government's ongoing actions and omissions, REMCON could not provide the Contracting Officer with the requisite assurances required by the FAR. Further, as of July, 2003, REMCON had run out of financial resources to complete the Project due to the government's actions.

Despite the government's strict and overly literal application of law regarding cure notices, federal case law holds that, at the time REMCON received the government's cure notice, it had no continuing duty of performance under the contract. Logically, since REMCON was not required to perform under the contract, it did not have a duty as of July, 2003 to respond to the cure notice. In *Roxco, Ltd. v. U.S.*, 60 Fed. Cl. 39 (Fed. Cl. 2004), the Department of the Air Force awarded a contract to Roxco for the construction of 172 new housing units at an air force base. Within a matter of weeks disputes arose including alleged differing site conditions, constructive changes, and

Government-caused delays and breaches of contract. Between April 1995 and August 1998, Roxco sent the Contracting Officer (CO) at least fourteen letters regarding these disputes. In the letters Roxco requested relief in the form of extra payment and time extensions, often noting that it was reserving its rights to an equitable adjustment under the contract. *Id.* at 40-41. The original contract completion date of August 5, 1996 passed without the Project being completed. On October 16, 1998, Roxco's President executed what the Government terms the "abandonment" letter. It stated, in relevant part,

> This is to advise you that Roxco, Ltd. as contractor on the above referenced construction Project, is financially unable to perform or complete the performance of the work or comply with its contractual obligations on the Project, and accordingly, is in default under the above contract for the Project. Roxco, Ltd. hereby irrevocably and voluntarily abandons and terminates the above construction Contract effective immediately. *Id.* at 41.

Roxco's surety took over Roxco's work on November 5, 1998. On November 23, 1998, the Air Force sent Roxco a show cause letter which mandated a response within 48 hours; Roxco did not respond. The CO issued a notice of default termination on December 21, 1998. On August 20, 1999, the Project was completed by Roxco's surety. *Id.* at 41.

On March 20, 2001, Roxco submitted a CDA claim to the Air Force in connection with the contract. The claim sought equitable adjustments in the amount of $7,840,497.40 for alleged differing site conditions and constructive changes, or in the alternative, for alleged breaches of contract by the Government. The CO returned the claim as being untimely. Roxco appealed.

On appeal, the government argued that Roxco's "abandonment letter" resulted in a complete waiver of Roxco's potential contractual claims. The court held that the letter had to be read in the context of the prior relations between the parties since Roxco had accused the Air Force of a prior material breach. The court found that "a finding of prior material breach on the part of the Government would act as an affirmative defense to the REMCON's alleged breach. '**Upon material breach of a contract, the nonbreaching party has the right to discontinue performance, and to seek redress in accordance with the law**'." (emphasis added) *Id.* at 43. (Also see *Old Stone Corp. v. U.S.*, 63 Fed. Cl. 65, 83 (Fed. Cl. 2004)).

In *Guerini Stone Co. v. P.J. Carlin Const. Co.*, 248 U.S. 334, 344, 39 S. Ct. 102, 106 (1919) the United States Supreme Court held that:

> "in a building or construction contract...calling for the performance of labor and furnishing of materials covering a long period of time and involving large expenditures, a stipulation for payment on account to be made from time to time during the progress of work must be deemed so material that a substantial failure to pay would justify the contractor in declining to proceed."[3]

Further, a contract is repudiated when a party owing performance indicates by word or deed that it will commit a breach that would itself give the injured party a claim for damages for total breach. *Alaska Pulp Corporation, Inc. v. United States*, 48 Fed. Cl. 655, 659 (Fed. Cl. 2001). Upon such repudiation, "the injured party is discharged of its performance obligations." *Id.* In determining the materiality of the breach, the court

---

[3] Also see *Macri v. Unites States*, 353 F.2d 804, 810 (9th Cir. 1965) ("[I]t is well settled that an owner's failure to make progress payments on a building contract may constitute a material breach, justifying the builder's refusal to proceed with the work on the theory that the owner has rendered his performance impossible.") citing *Guerini*, 248 U.S. at 334.

reviews the totality of the circumstances. *Id.* In addition, Court of Appeal for the Federal Circuit has held that "'the extent to which the behavior of [a] party failing to perform...comports with standards of good faith and fair dealing' is a significant factor in determining whether that party's breach is material." *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988). The *Malone* court also noted that "'[s]ubterfuges and evasions violate the obligation of good faith,' as does lack of diligence and interference with or failure to cooperate in the other party's performance." *Id.*[4]

The courts have further explained the concept of material breach and held that material breach by the government relieves a contractor of a termination for default. In *Morganti National, Inc. v. United States*, 49 Fed. Cl. 110 (Fed. Cl. 2001), a contractor brought suit seeking to convert its termination for default into a termination for the convenience of the government on the grounds that the government excusably delayed the contractor's performance and materially breached the contract. The court noted that:

> "[a] contractor's failure to perform may be excused and a termination for default converted to a termination for convenience of the government if the contractor can establish that the government materially breached the contract...The Federal Circuit has held that whether a particular breach is material 'depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Id.* at 140.

In its analysis, the *Morganti* court noted that, "[w]hile we do not find that serious adverse financial impact [on the contractor] must be present in all instances for establishing a material breach due to withholding money, it is an element that will be considered in arriving at an overall judgment." *Id.* at 147

[4] The facts competently presented manifest the government's lack of good faith and fair dealing, as well as its unfortunate subterfuges, evasions, and admitted incompetence.

In *Abcon Associates, Inc. v. United States*, 49 Fed. Cl. 678 (Fed. Cl. 2001), the contractor brought suit challenging termination of a construction contract for default. There, the court noted that, "[i]f a contractor can show that improper government actions were the primary or controlling cause of the default and rendered the contractor financially incapable of performing, then the default will be excused." *Id.* at 687. Ultimately, the *Abcon* court held that the termination for default be converted into a termination for convenience due to the government's breach of the duty of good faith and cooperation. *Id.* at 690-691. Accordingly, the court found that the government's improper withholding of liquidated damages and delay in resolving incompatible Project drawings (inept contract administration which impeded the contractor) was a material breach of the contract, thereby excusing the contractor's failure to make progress. *Id.*

In the current matter, the facts establish that the government committed one or more material breaches of contract due to its failure to negotiate and/or issue change orders, for time and/or additional compensation, resulting from the performance of extra work which was directed by the government due to defective and deficient plans and specifications, coupled with mal-administration of the contract, all of which resulted in extraordinary financial burden on REMCON (which impaired REMCON's ability to perform under the contract).

In the instant action, the prior material breaches by the government are legion, including, but not limited to the following: 1) the government's failure to timely issue and pay for written modification; 2) the government's unilateral change order Number 6 which did not fully compensate REMCON for the DSC; 3) inadequate plans and specifications, which failed to properly design the Project, including the burn pit, the

access road, and the Upper Sherman Tree Trail, as well as the incompetent use of an exaggerated compaction percentage for decomposed granite which resulted in excess materials to be handled; 4) the government's failure to provide aggregate base and/or store for rock revetment as identified in the contract documents; 5) the government's failure to fully compensate REMCON for excess excavation, blasting activities, and aggregate base and rock revetment issues (which cost REMCON over one million dollars in excess costs); 6) the government's failure to timely and fully and honestly respond to RFIs and other design related questions from REMCON; and 7) the government's failure to substantially respond to Defendant's June 28, 2003 claim.

Because of the government's material breach(es), REMCON did not have a duty to continue performance on the contract, and the government had no right to demand reasonable assurances of continued performance. Thus, REMCON's alleged failure to respond to the cure notice should have no effect and be considered nullity and irrelevant. REMCON's June 28, 2003 claim and multiple communications in 2001, 2002 and 2003 placed the government on notice that it could not continue to perform the contract unless the government cured its breaches of contract.

#### b. Defendant's Cure Notice was Not Justified and Therefore Not Valid

The government's reliance on *Danzig Corp. v AEC Corp.*, 224 F.3d 1333 (Fed. Cir. 2000) is misplaced. *Danzig* speaks of the government "justifiably" issuing a Cure Notice. *Id.* at 1337. ("When the government justifiably issues a cure notice...") and that a cure notice, to be effective, must be valid ("...the Contractor [must] give reasonable assurances...in response to a validly issued cure notice.") *Id.* at 1338. *Danzig* thus expressly recognizes that to be effective, a cure notice must be justified and valid. In

such case a contractor must demonstrate or give the assurances that progress is being made toward completion, or "explain that the reasons for any prospective delay in completion of the contract are not the responsibility of the contractor." *Id.* at 1337. *See, also*, *Tubular Aircraft Products, Inc. v. U.S.*, 213 Ct. Cl., 749, 750, 566 F.2d 1190, (Ct. Cl. 1977).[5]

In *Danzig*, the court faulted the contractor for failing to provide specific instances of government-induced changes that caused delay, or to otherwise describe how much delay was the responsibility of the government. *Id.* at 1339. In this matter, REMCON had already provided to the CO a detailed description of the NPS' shortcomings in the June 28, 2003 certified claim, as well as in dozens of written communications and schedule submissions showing NPS delays. Thus, the *Danzig* court's criticism of the contractor for failing to provide specifics of the government's role in Project delays has no application to REMCON because REMCON had already provided compelling and voluminous specifics to the Contracting Officer in the certified claim well before the Contracting Officer issued his cure notice.

Likewise, the government's reliance on *Roxco*, is misplaced. If anything, *Roxco* affirms REMCON's right to pursue its claim for an equitable adjustment and to seek a

---

[5] Further, in *Danzig*, it was the contractor's own surety that "strangled" the contractor by freezing its bank account preventing further performance. The government's conduct, while hinted at as being a contributing factor, was not the true culprit preventing the contractor's performance. Here, REMCON's surety did not freeze REMCON's accounts or "strangle" REMCON. Although in 2003 the surety directed the NPS to issue further payments into a controlled account, it was the government's conduct, in 2001 and 2002, that created the circumstances encountered in 2003. The government's responsibility for the predicament REMCON found itself in, and the rights and responsibilities of the parties as a result, is a question of fact which wholly undermines the success of the instant motion. Further, while Modification 6 was unilaterally issued in February, 2003, payment was not made for about 18 months later.

conversion of the termination for default into a termination for convenience. In *Roxco*, the government had argued that a contractor's failure to respond to an Air Force Show Cause letter constituted a waiver of its right to pursue a claim for equitable adjustment. The court rejected the government's argument, noting that cure notices such as the Air Force Show Cause letter serve to provide a contractor with an opportunity to assert any excusable delay and for the government to assess whether a contractor can complete the performance. *Roxco*, 60 Fed. Cl. at 43. Because the purpose of a cure notice was not to provide a pretext for a default termination, the court held that the contractor's failure to respond was not a waiver of its right to assert a claim for equitable adjustment. *Id.* at 44.

The government's reliance on *Composite Limits, Inc. v. U.S.*, 27 Fed. Cl. 310 (Fed. Cl. 1992) in its summary judgment motion adds nothing to its position. Noting that default termination is a drastic solution that is imposed only on good grounds and solid evidence (see *J.D. Hedin Constr. Co. v. U.S.*, 408 F.2d 424, 431 (Ct. Cl. 1969)), the *Composite Limits* court observed that, in deciding whether the termination for default was appropriate, the government must consider all of the contractor's efforts to comply with the cure notice. *Id.* at 324. The government is required to, but has not with any substance, considered REMCON's existing claim and its explanation of delays to the Project attributable to Defendant's action or inaction. In short, since the government's acts or omissions were the *primary* and *controlling* cause of REMCON's difficulties, such that it cannot provide the required assurances in response to a cure notice, REMCON was not in default and the cure notice was not valid nor justified. Even the government's own delay expert in this case opines that REMCON was due some time not

yet granted, and the CO testified that some time may be due but even two years after the events had occurred he had not gotten around to addressing it.

**c. REMCON's Failure to Respond to the Cure Notice was Excusable and Justified**

The government relies on the simplistic argument that since REMCON did not technically respond to the government's cure notice, the termination for default was justified. Clearly, based on the volume of letters and communications from REMCON in 2001, 2002 and 2003, and the June 28, 2003 claim, REMCON was not silent, and the government already knew what REMCON's response would be in response to the cure notice.

**d. REMCON's Failure to Make Progress on the Project Did Not Justify the Default Termination**

Defendant contends that REMCON's failure to make progress on the Project is an additional, independent, basis for the default termination. As fully discussed above, REMCON's failure to make progress on the Project was excused based on the government's multiple prior breaches of the contract, the government's failure to fully and timely compensate REMCON for its work in 2001 and 2002, the government's failure to provide adequate plans and specifications for the Project, differing site conditions, and the government's mal-administration of the Project. Further, the fact that the Project could not be completed until the end of 2003 (at the earliest) was provided to the government via REMCON's revised schedule following the 2001 construction season.

It is hornbook law that a contractor will defeat a termination for default based on lack of progress it if can demonstrate that excusable delay existed that would have

rendered the performance timely. *Michigan Joint Sealing, Inc.*, ASBCA No. 41477, 93-3 B.C.A. (CCH) ¶ 26,011 (1993). Further, delayed performance, standing alone, does not justify a default termination. *Hillebrand Constr., Inc.*, ASBCA No. 45853, 95-1 B.C.A. (CCH) ¶ 27,464 (1995). In looking at the "totality of the circumstances"[6] to determine whether REMCON's lack of progress in 2003 was excusable, there is clearly and undeniably a conclusion that Remcon's non-performance was excused.

The authority offered by the government in support of its contention that the termination for default based on a lack of progress is unavailing. In support of this contention, the government cites the cases of *Discount Co v. United States*, 554 F.2d 435 (Ct. Cl. 1977), and *State of Florida v. United States*, 81 F.3d 1093 (Fed. Cir. 1996) for the proposition that a Contracting Officer may properly terminate a contractor for default where the contractor fails to mobilize to the construction site for a period of months. The facts discussed in those cases are distinguishable and inapplicable to the instant matter. Unlike the instant matter, the contractor in *Discount* and the surety in *State of Florida* had a continuing duty of performance under their contracts with the government because the government had committed no material breach of contract in those cases. Thus, the defaulting parties had no "excuse" when they failed to mobilize to the construction site and were properly terminated for default. This fact and concept is not addressed in the government's motion.

In *Discount*, the contractor encountered difficulties on the job. The government claimed that two structures (a ramp and lower lot) were nonconforming because the

---

[6] This is the standard cited by Defendant on page 19 of its moving papers in support of its summary judgment motion regarding the Contracting Officer's assessment of the contractor's progress.

contractor used unsuitable materials and methods in their construction. *Discount*, 554 F.2d at 438. Prior to resumption of work for 1969 construction season, Discount and the government twice met to decide on the best way to proceed with the removal of the nonconforming structures. Discount agreed to wait until September 1969 (when the boat ramp would not longer be under water) to work on the allegedly nonconforming structures but to begin its campground construction on June 2, 1969. *Id.* The government subsequently gave Discount a partial work resumption order for the campground construction. Discount returned the order unsigned and alleged that it could not proceed because of the government's restaking and clearing and grubbing difficulties. Restaking was completed, the work order reissued and signed. No work, however, was begun on the campground. The government subsequently ordered a full resumption of work. This full work resumption order took into account the government's anticipated "as is" acceptance of the boat ramp. Despite this order, no substantial amount of work was performed by Discount during the summer of 1969. The government issued a 10-day cure notice. When Discount neither responded nor provided a schedule, the contract was terminated for default. *Id.*

In finding that Discount's failure to make progress on the campground work was inexcusable, the court noted that the material at the initial site was not so unsuitable as to make performance impossible and the contractor "therefore had a duty to continue performance during the processing of its claim." *Id.* at 440. The court also noted that the part of Discount's work which required material from the first site (i.e., the boat ramp) was accepted "as is" by the government. *Id.* These facts demonstrate that the government in Discount had not materially breached the contract, leaving the contractor with a

continuing duty of performance which it thereafter failed to perform when it failed to mobilize for the 1969 construction season.

The government also cites *State of Florida* for the proposition that a Contracting Officer may properly terminate a contractor for default where the contractor fails to mobilize to the construction site for a period of months. However, *State of Florida* also presents a very different situation than that encountered by REMCON. In *State of Florida*, the original contractor was terminated for default and the performance bond surety, Southern Casualty and Indemnity Insurance Company (Southeastern), undertook to finish the Project. *State of Florida*, 81 F.3d at 1095. At the time it took over, in October 1988, Southeastern promised to provide a written strategy for finishing the work within two weeks. However, Southeastern failed to do so and for several months caused little or no work to be performed on the Project. By the end of December, Southeastern had neither provided the Government with a Project schedule nor advanced the Project's completion. In February, 1989, Southeastern informed the government that it had chosen a general contractor to complete the Project. *Id.* This general contractor proposed a work schedule that estimated the Project would be completed by August 1989. *Id.* A March 1989 site inspection showed that no work was in progress inside the building and that the roof was still incomplete. *Id.* at 1096. In a subsequent meeting with the Government, Southeastern suggested that, because of necessary corrective work, the building might not be completed in August as promised. *Id.* In May 1989, the Government terminated Southeastern for default for its failure to make progress. *Id.* As with *Discount*, the Government was not in material breach of its contract with Southeastern and here did little, if anything, to hinder its progress on the Project.

The facts of the *State of Florida* case are virtually one hundred and eighty degrees different than those presented in this matter. The evidence establishes facts that Defendant materially breached the contract, thereby not only severely impeding REMCON's ability to proceed under the Project but relieving it of its duty to do so.

Defendant also relies on *Pruess v. United States*, 412 F.2d 1293 (Ct. Cl. 1969) for the proposition that, although, in some cases, delay caused by the Government action may be grounds for excuse, it must be the actual cause of the default. This proposition is completely valid. However, contrary to the government's contention, REMCON's failure to mobilize for the 2003 construction season was the fault of the government.

**e. REMCON's Failure to Make Progress Did Not Violate the Disputes Clause and is Excused**

The government contends that the contract's disputes clause required REMCON to proceed diligently with its work "pending resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer." The government goes on to argue that failure to proceed under the disputes clause is an independent ground for Defendant's termination of REMCON for default. **However, as discussed below, the government fails to mention or address that a prior material breach of the contract by the government would excuse such termination for default, and that the claim submitted by REMCON in June 28, 2003 fell outside the scope of the disputes clause since the claim asserted multiple breaches of contract by the government (thus rendering the government's argument moot).**

In support of its contention that a contractor's failure to proceed diligently pursuant to the disputes clause is a breach of contract, justifying a termination for default,

the government relies on *Pruess v. United States*, 412 F.2d 1293, *Stoeckert v. United States*, 391 F.2d 639 (Cl. Ct. 1968), and *Appeal of Howell Tool and Fabricating, Inc.*, ASBCA No. 47939, 96-1 BCA (CCH) 28,225 (1996). In all of these cases, the contractor's failure to perform under the disputes clause was not excused because the government had not committed a material breach of the contract which was the actual cause of the contractor's failure to continue performance. Therefore, the holdings of the cites relied upon are not persuasive or applicable to the facts of the instant matter. Further, the cases cited by Defendant highlight the maxim that failure to continue performance under a contract dispute clause serves as a justification for default termination when the contractor chooses not to perform in the face of a dispute with the government, not when the contractor cannot perform because of a material breach of the contract by the government. See *Stoeckert v. United States*, 391 F.2d at 645 ("termination of REMCON's contract for default was proper if for no other reason than that he refused to follow the Contracting Officer's directive to remove and replace the tile floor. Instead, he elected to abandon the work…such an election is simply not open to a Government contractor under the standard disputes clause…")

In *Appeal of Howell Tool and Fabricating, Inc.*, ASBCA No. 47939, 96-1 BCA (CCH) 28,225 (1996), one of the cases cited by the government, the Board held that "the Government having established that appellant repudiated the contract, the burden shifts to appellant to prove that the anticipatory repudiation was excusable within the meaning of the Default clause or was caused by a material breach of the contract." (emphasis added). The Board then added that "if a contractor can prove that improper Government actions, or Government-caused delays, were the controlling cause of the contractor's financial

hardship, then the contractor's anticipatory repudiation is excusable." *Id.* Although no such hardship was present in *Howell*, the *Howell* case substantiates and supports the legal proposition that the termination for default cannot be maintained if REMCON's failure to continue performance, pursuant to the contract dispute clause, was excused by Defendant's prior material breach of the contract, which caused the extreme financial hardship to REMCON that ultimately prevented it from continuing performance.

The government's characterization of REMCON's failure to mobilize as a "decision" stemming from REMCON's "desire" that the Government agree to ADR could not be further from reality. REMCON made no such "decision." The government's prior material breaches of the contract left REMCON with no choice. During the late spring/early summer of 2003, REMCON made repeated requests for ADR with the NPS to see if he could avoid being unable to further perform. Given the multiple breaches to date, the only way REMCON could proceed was if he was paid for the million dollars of extra work and delay costs incurred to date. When the Contracting Officer denied the request for ADR, coupled with his failure to issue any financial renumeration or time extensions, either bilaterally or unilaterally, in response to the June 28, 2003 certified claim, REMCON was disabled from mobilizing to the Project, as it could no longer pay employees if it did so mobilize, and would not create greater liability arising from the government's malfeasance. It could not mobilize even if it wanted to. Defendant's material breaches of the contract had left REMCON financially crippled and unable to continue. This meets the legal requirements of *Howell*.

Similarly, the government's characterization of *Alliant Techsystems, Inc. Global Environmental Solutions Business Division v. United States*, 178 F.3d 1260 (Fed. Cir.

1999) as an "extreme exemplar of a contractor's duty to perform under the disputes clause" is also unfounded. As with most of the cases cited by the NPS, the facts in *Alliant* bear no resemblance to those here. In *Alliant*, the contractor refused to continue performance because it contended that the government had not properly exercised an option requiring additional performance under the contract. *Id.* at 1264. The court found that the contractor had violated the disputes clause by failing to continue performance. However, in so finding, the court found that the government had not committed a material breach of the contract. The court noted that:

> "the government may not, through a Contracting Officer's decision, impose obligations on a contractor far exceeding any contemplated by their contract. If the government orders a 'drastic modification' in the performance required by the contract, the order is considered a 'cardinal change' that constitutes a material breach of the contract…(citations omitted) Such a material breach has the effect of freeing the contractor of its obligations under the contract, including its obligations under the disputes clause." *Id.* at 1276. (emphasis added)

Furthermore, *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1998) clearly states that "[a contractor's] failure to perform would be excused and the termination for default would be improper if the government had materially breached the contract." In *Metric Systems Corporation v. McDonnell Douglas Corporation*, 850 F.Supp. 1568, 1580 (N.D. Fla. 1994), the Court explained that the holding in *Malone* is based on the specific wording of one version of the standard disputes clause contained in federal procurement contracts, namely, "The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, or appeal, or action arising under the contract, and comply with any decision of the Contracting Officer." In that version of the disputes clause, the *Metric Systems* Court notes, "the contractor's duty to proceed pending resolution of disputes is confined to

disputes 'arising under the contract" and that "[c]ourts have held that disputes over alleged breaches by the government do not "arise under" the contract. *Id.* (citing *United States v. Utah Construction and Mining Co.*, 384 U.S. 394, 413, 86 S. Ct. at 1555 (1966) ("[t]he settled construction of the disputes clause excludes breach of contract claims from its coverage…"))

**The disputes clause discussed in *Malone*, *Metric Systems*, and *Utah Construction* is the exact same clause that is contained in the contract between REMCON and the National Park Service.** Thus, REMCON's duty to "proceed diligently with performance…pending final resolution of any request for relief, claim, appeal, or action" did not apply in the present situation because its claim did not "arise under the contract" since it was a claim for breach of contract. This is documented in REMCON's June 28, 2003 certified claim.

### 2. THE GOVERNMENT CANNOT PROVE LIQUIDATED DAMAGES

Assuming the court does allow the government to claim liquidated damages in its case in chief, despite the lack of a counter claim on file, REMCON contends that the government will not be able to prove that it is entitled to liquidated damages. Liquidated damages are collectable for unexcusable delay. *Appeal of Craig Systems, Inc.* ASBCA 9466, 65-1 BCA 4584 (1964). A contractor will not be liable for liquidated damages for delay caused by an Act of God, act of the law, or act of the government. *Hathaway Co. v. United States,* 52 Ct. Cl. 267 (1917). Delays due to defective government specifications are not subject to liquidated damages. *Appeal of Frontier Contracting Co.*, ASBCA 33658 89-2 BCA 21595 (1989). In the instant matter, REMCON's expert consultant, Tom Lloyd, will clearly demonstrate that the delay on this Project was

excusable and caused by the government, thus precluding a potential recovery for liquidated damages.

Further, a party seeking to impose liquidated damages must not have done anything to delay or prevent the other party from performing, and it has the additional obligation to mitigate damages. *Callahan Construction Co. v. United States,* 47 Ct. Cl. 229 (1912). Where delays are concurrent, the liquidated damages provision will not be enforced. *PCL Construction Services, Inc. v. United States* 53 Fed. Cl. 479 (2002).

### 3. CONTRACT MODIFICATIONS DID NOT SERVE AS AN ACCORD AND SATISFACTION OF REMCON'S CLAIMS

REMCON anticipates that the government will argue that by the parties executing Modifications and/or 4, there was an accord and satisfaction of all excess excavation claims on the Project. This argument is not supported by the facts of this case, or legal authority. Accord and satisfaction is an affirmative defense to a claim, and the government bears the burden of proving the existence of an accord and satisfaction when defending a claim brought by a contractor. *Westerhold v. United States*, 28 Fed. Cl. 172 (1993). There are three elements that must be present in order for there to be an effective accord and satisfaction: 1) a bona fide disputed claim between the government and contractor; 2) an agreement to settle the disputed claim in return for substituted performance; and 3) an acceptance of the substituted performance in full satisfaction of the disputed claim. *Tri-O, Inc. v. United States*, 28 Fed. Cl. 463 (1993). The critical element of an accord and satisfaction is the intention of the parties. *Black v. Denver United States Nat. Bank*, 362 F.2d 38 , 41 (8th. Cir. 1966). A party claiming accord and satisfaction must show "proper subject matter, competent parties, meeting of the minds of

the parties, and consideration." *Brock & Blevins Co. v. United States*, 343 F.2d 951, 955, 170 Ct. Cl. 52 (1965).

For Modification No. 4, REMCOM did not intend, and clearly there was not a meeting of the minds, to release all of its claims for excess excavation in exchange for a minor payment. This lack of intent is supported by the fact that modification no. 4 did not compensate REMCON for additional 7,000-9,000 cubic yards of excess excavation, and by admissions by Willie DeOcampo that modification number 4 was not intended to compensate REMCON for all excess excavation encountered on the Project.

Further, there is no evidence that modification number four was intended to fully compensate REMCON for all claims relating to the re-alignment of the access road. The only claim relating to the realignment that was addressed by modification no. 4 was for additional survey work, and not for the delays, impacts, excess excavation costs, and drilling and blasting costs associated with the realignment of the road. The realignment of the road led to the differing site condition. Since the government sought to compensate REMCON for the differing site condition in modification number 6, there clearly was not an intent by the government to full resolve the realignment issue in modification number 4.[7]

Accord and satisfaction requires a bilateral agreement, and there clearly was not a bilateral agreement to resolve all excess excavation claims in Modification No. 4.

---

[7] The government's conduct after the modifications can suggest that the requisite intent did not exist when the modifications were executed. *Community Heating & Plumbing Company, Inc. v. Kelso*, 987 F.2d 1575, 1581 (Fed. Cir. 1993). Continued negotiations on claims after a modification is issued can evidence the fact that a meeting of the minds did not exist so as to treat the modification as a release of further claims. *Westerhold v. United States*, 28 Fed. Cl. 172, 174-175 (1993).

REMCON had no intention of releasing other excess excavation claims that it had been requesting for over a year.

Given the extreme duration of time taken by the government to execute contract Modifications (in some instances, over 14 months), REMCON, in some instances, was forced to accept lesser amounts offered in order to obtain cash flow. If the contractor is coerced or under duress, an executed modification may not bar a previously asserted claim. *Pete Vicari, General Contractors, Inc. v, United States*, 47 Fed. Cl. 353 (2000).

REMCON also anticipates that the government will argue that REMCON waived delay claims by executing modification number 5. However, there was not an accord and satisfaction for delay claims in Modification No. 5 since REMCON contemporaneously sent a reservation of rights letter which reserved additional claims.[8]

In support of its argument that contract modifications serve as an accord and satisfaction of REMCON's claims, the government cites to the justifications penned by the government to justify the modifications. These modifications were not provided to REMCON for review prior to execution of the modifications, and thus cannot serve as a basis for any alleged agreement between the parties. Their existence and content only became known to REMCON when it received them in response to discovery requests.

Indeed, the content of the justifications hurt, not help, the government's position. The justification for modification number 4, relating to item #39, identifies that the increase for excess excavation was only from 6,800 cy to 10,000 cy. Further, there were subsequent post-modification no. 4 increases for excess excavation to 10,700 cy in

---

[8] The general rule is that acceptance under protest of a smaller sum than that claimed does not estop the contractor from pursuing its claim, and payment by the Government is not a bar. *Weehawken Dry Dock Co. v. United States*, 65 Ct. Cl. 662 (1928).

progress pay estimates. These increases clearly show that there was no accord and satisfaction of excess excavation claims in modification no. 4.

Modification no. 4 also narrowly addressed the raising of the upper parking lot by five feet, and not other issues relating to the upper parking lot. The same holds true for the staking of the centerline for the access road – no other issues relating to the realignment of the access road are specifically addressed in modification no. 4 or its justification. Modification no. 4 also does not specifically address hauling of debris from the upper parking lot. Finally, there are no modifications that address in any manner filling up the burn pit hole.

Since an accord and satisfaction assumes and requires a bilateral agreement between the parties, any extrinsic evidence created by the government which was not presented to REMCON during the negotiations for the modifications is irrelevant.

Based on the government's contention, the modifications may also be asserted to be vague and unclear as to what claims were being released. Since the government prepared the modifications, any uncertainties or ambiguities in the language of the modifications are to be interpreted most strongly against the party who caused the uncertainty to exist, i.e., the drafter under the doctrine of *contra proferentum*. This rule comports with fairness and common sense in that it prevents the party with the primary opportunity to avoid misunderstanding, from capitalizing theron.

**4. THE GOVERNMENT IS NOT ENTITLED TO RECOVER ITS REPROCUREMENT COSTS**

REMCON expects the government to claim reprocurement costs in relation to the take-over by REMCON's surety and the replacement contractor. To recover any costs, the government must prove that:

1. The reprocured items are the same as, or similar to, the terminated items,

2. The costs were actually incurred,

3. The government acted reasonably to minimize its excess costs, i.e. the government mitigated its damages. *Appeal of Etex Company*, VABCA 3415, 93-3 BCA 26,116 (1993).

In the instant action, the government failed to mitigate its damages by not contracting with REMCON's subcontractors, by not properly protecting the site from storms (thus leading to additional work by the replacement contractor), by not providing a proper design for the replacement contractor, and by failing to properly administer the Project for the replacement contractor.

DATED: September 15, 2005

MURPHY AUSTIN ADAMS SCHOENFELD LLP

D. MICHAEL SCHOENFELD
Attorneys for Plaintiff
REMEDIATION CONSTRUCTORS, INC.

MURPHY AUSTIN ADAMS SCHOENFELD LLP
1000 G St., Third Floor
P.O. Box 1319
Sacramento, California 95812-1319
Telephone: (916) 446-2300
Facsimile: (916) 503-4000