# EXHIBIT A

Remcon's Memorandum of Contentions of Fact and Law

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 1 | The name of the project was Giant Forest, Sherman Tree Parking Area, Project No. SEKI-200Q. | |
| 2 | The Project had two parts to it, the Upper Sherman area and trail and the Lower Sherman (General's Highway). | |
| 3 | The Upper Sherman area consisted of an access road, parking area, and trail, plus ancillary improvements. | |
| 4 | Once the Upper Sherman area was completed, the contractor, by contract, could then transition its operations to the Lower Sherman area. | |
| 5 | The contract specifications for the project required that the components Upper Sherman Access Road and Parking Area and the Sherman Tree Trail be complete before any work would proceed on the Lower Sherman Parking Area. | |
| 6 | As bid, the Upper Sherman Access Road and Parking Area involved, in substance, the construction of approximately 3,000 linear feet of a new two lane asphalt paved roadway, a new two level parking area, installation of 3,700 linear feet of domestic waterlines and 3,800 linear feet of electrical service line, installation of a new sewer system (including approximately 750 linear feet of sewer line, a concrete septic tank, dosing siphon tank, and sewage leach field), construction of a comfort station, a wayside kiosk, rock revetments, landscaping/erosion control measures and related improvements. | |
| 7 | As bid, the Sherman Tree Trail component required the construction of approximately 2,000 linear feet of asphalt surfaced trail, including concrete/stone stairs, drainage improvements, timber edgings, a visitor outlook, and related landscaping/erosion control measures. | |
| 8 | As bid, the Lower Sherman Parking Area component included demolition and removal of existing structures and landscape, construction of approximately 300 linear feet of concrete retaining wall with rock facing, realignment of the General's Highway, construction of a visitor comfort station, and related landscape/erosion control measures. | |
| 9 | Due to the elevation of the project and its location in the Sierra Nevada Mountains, the construction season for the Project at bid time, realistically annually ranged from late May/early June through October, a duration of five or six months. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 10 | The NPS issued a Request for Proposal for the Project in February, 2001. This was the first time the project's plans and specifications were available. | |
| 11 | Remcon received a set of plans and specifications for the Project in late February, 2001. | |
| 12 | In the construction industry, it is a standard practice for prebid site inspections to be made available so prospective bidders can familiarize themselves with the locality and the conditions under which the work will be performed. | |
| 13 | It is typical protocol, based on Rod Keiscome's experience, to advertise the project at a time that prospective contractors can access the site and walk the right-of-way in order to determine what the physical conditions are. | |
| 14 | Rod Keiscome can't recall if the design was late in being completed such that it prevented that effort from being undertaken. | |
| 15 | Athena Demetry does not know if a pre-bid site inspection occurred that allowed contractors to observe the physical conditions of the project once the plans were completed. | |
| 16 | At the time this job was bid, it was during winter and there was no prebid site inspection while the documents were out for bidding because there was a perception by the Denver Service Center that the site was inaccessible due to snow so no such prebid site inspection was scheduled. | |
| 17 | Based upon the timing and availability of the contract documents, and the required submission of proposals, Remcon, and all other prospective bidders, were prevented from conducting a site investigation to confirm the accuracy, or to uncover any observable discrepancy, between the plans and specifications and the Project site. This was because the plans and specifications were published in the heart of winter when the jobsite, located at approximately 7,000 feet above sea level, was buried under snow and because the date for submittal of proposals was March 29, 2001. | |
| 18 | There was no reason why the government could not have advertised the existence of this project and conducted a prebid walkthrough for prospective bidders the fall of 2000, before the contract documents were completed so as to enable prospective bidders to actually see the right-of-way that was being contemplated. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 19 | On or about March 21, 2001, the NPS published Amendment No. 1. Included was the picture of stockpiled aggregate base at the project site | |
| 20 | Remcon, having previously worked for the NPS in the park as a subcontractor, based its responsive proposal to the NPS on the information contained within the documents provided by the NPS, including geotechnical reports and quantity estimates for removal and hauling of material, as well as its general familiarity with the isolated and distant locale of the park from construction resources. | |
| 21 | On March 21, 2001, while preparing its bid estimate, Steve Christensen emailed the NPS asking a series of questions. | |
| 22 | In his March 21, 2001 email, Steve Christensen noted that based on his knowledge, little or no aggregate base was available on site which was inconsistent with the contract documents. | |
| 23 | Remcon's bid proposal is dated March 26, 2001 and was in the amount of $7,595,417.08. | |
| 24 | The NPS' published estimated price range for the Project was $5,000,000 to $10,000,000. | |
| 25 | The published original duration of the Project was 792 calendar days. | |
| 26 | A competitive range determination and request for final proposal revisions was sent to Steve Christensen on April 12, 2001. | |
| 27 | Remcon, Inc.'s response to the April 12, 2001 competitive range determination and request for final proposal revisions was sent to the NPS on April 16, 2001. The amount of Remcon's revised proposal was $7,121,636. | |
| 28 | By memo dated April 16, 2001, the CO determined that Remcon was a responsible prospective contractor to receive the award of the contract. | |
| 29 | By signing the April 16, 2001 memo, Rod Keiscome intended to indicate and validate, based on the investigation that he performed, that Remcon was financially responsible and had adequate working capital to perform the job. | |
| 30 | Remcon, prior to bidding this project, had performed over $30 million worth of road and engineering projects. | |
| 31 | Mr. Christensen personally performed the detailed analysis of the contract documents and prepared the estimate/bid for Remcon for the project. | |
| 32 | Mr. Christensen, using his training, had his personnel independently review and evaluate Remcon's bid. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 33 | Ultimately, it was Steve Christensen's decision to determine the amount of the proposal and the revised amount to submit. | |
| 34 | Using his experience and knowledge, as well as the historic production rates of the proposed equipment to be used, and general knowledge of the terrain the work would be performed in, Steve Christensen compiled a comprehensive estimate. | |
| 35 | Steve Christensen's analysis led him to perceive errors in the contract documents during the bid phase. | |
| 36 | Steve Christensen authored a written inquiry to the NPS seeking verification of quantities of cut/fill material (e.g. that it was essentially a balanced job after accounting for 6800 cubic yards of hauling in the park and 2000 cubic yards out of the park) and the fact that he did not believe the representation of stockpiled aggregate base was accurate. He was directed to bid the job based on the construction documents and disregard his concerns. | |
| 37 | Steve Christensen complied with that direction. | |
| 38 | Remcon did make the following bid mistake: It included an amount for supplying aggregate base when this was unnecessary based upon the specifications. | |
| 39 | Rod Keiscome was, effective October 27, 2000, appointed a Level IV contracting officer and, as such, he had the authority to award and administer the contract and task orders without limitation as to amount. | |
| 40 | Rod Keiscome, as the Contracting Officer, is the independent authority for the contract side of the project. | |
| 41 | The Director's Project Approval for this project was issued on November 6, 2000. | |
| 42 | At the time the Director's Project Approval was prepared, estimated base bid was just under $7.1 million, plus $526,620 in options and a 10% contingency reserve on top of that. | |
| 43 | Rod Keiscome doesn't know what happened to the $526,620 in options given that the options, when actually exercised in Modification No. 1, for $317,000, were removed from the contingency and not from a separate account. | |
| 44 | The written Notice of Award by Rod Keiscome to Remcon is dated May 9, 2001 for the sum of $7,121,636. | |
| 45 | The amount of the contract for the Project, as awarded, was $7,121,636.00. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 46 | Steve Christensen signed the Contract on May 15, 2001. | |
| 47 | On this Project, the contract documents included, at a minimum, the plans, the specifications, and the geotechnical report. | |
| 48 | A Notice to Proceed for the Project was issued effective June 11, 2001. | |
| 49 | A pre-construction conference for the Project was held on May 22, 2001 at the Ash Mountain Recreation Hall at Sequoia National Park. | |
| 50 | The pre-construction conference was held on May 22, 2001 and the NPS published the minutes dated June 18, 2001. | |
| 51 | During the May 22, 2001 pre-construction conference, the NPS indicated that the Contracting Officer's Representative, Willie DeOcampo, would furnish Remcon with the details of any proposed modifications including revised plans and specifications if necessary. | |
| 52 | During the May 22, 2001 pre-construction conference, the NPS agreed that labor burden percentages would be established at the time the first modification was negotiated. | |
| 53 | During the May 22, 2001 pre-construction conference, the NPS agreed that the Corps of Engineers equipment rates would be used for all modifications. | |
| 54 | During the May 22, 2001 pre-construction conference, the NPS directed that all communications from Remcon to the NPS be directed to Bob Russell, the lead inspector, who would forward it to Willie DeOcampo. | |
| 55 | The original contract completion date was August 11, 2003. | |
| 56 | Bob Russell of Jacobs Facilities was the project inspector in the first year of construction. | |
| 57 | Loren Mangrum was added to the Project inspection team in 2002. | |
| 58 | In June and July of 2002, Willie DeOcampo was informed by Steve Christensen that Mr. Russell was acting belligerent with Mark Penrose. These contentions were raised within a couple weeks of Mr. Russell being removed from the Project. | |
| 59 | Bob Russell was no longer on the project effective July 4, 2002. | |
| 60 | Rod Keiscome does not recall if Bob Russell was advised to resign before he got fired. | |
| 61 | Rod Keiscome was verbally advised by one or more Remcon employees, prior to July 4, 2002, that Mr. Russell's conduct was inappropriate. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 62 | Rod Keiscome investigated the contention that Mr. Russell's conduct was inappropriate and concluded that the two Remcon employees felt threatened. | |
| 63 | Soon thereafter, Mr. Russell was no longer on the job. | |
| 64 | Loren Mangrum became the lead project inspector upon Bob Russell's departure. | |
| 65 | Loren Mangrum was officially named Project Supervisor (aka "Lead Inspector"), by letter dated August 30, 2002. | |
| 66 | At the July 10, 2001 weekly Project meeting, Jeff Northrop of Remcon was named as Project Manager. | |
| 67 | Mark Penrose, Remcon's Project Superintendent, has over thirty years of supervisory experience on heavy civil engineering projects and mining operations. | |
| 68 | Remcon remobilized to the Project in mid May 2002, following the 2001-2002 winter shutdown. Remcon commenced field work on June 11, 2002 and continued until later October/early November. | |
| 69 | After Remcon remobilized in mid May 2002, a partnering meeting was held on May 15-16, 2002 in the Park with all Project participants. This meeting involved a comprehensive job walk so that the problems experienced in 2001 could actually be seen by the CO and COR, who traveled to the Park from Denver. Also present were the outside designers, the inspectors and Park personnel. | |
| 70 | Field work could not begin in earnest in the second year until early June, 2002 due to late snow melt. | |
| 71 | Modification No. 1 was issued bilaterally on July 24, 2001. | |
| 72 | Modification No. 1 amended the contract to add additional compensation of $317,850 for asphalt concrete pavement on the Upper Sherman roads and parking area, General's Highway stone headwall, and telephone service to Correl Stub. | |
| 73 | Modification No. 1 brought the cumulative total of the base contract, plus modifications, to $7,439,486. | |
| 74 | Modification No. 1 did not provide for any time extension for contract completion. | |
| 75 | Modification No. 2 was issued bilaterally on January 28, 2002. | |
| 76 | Modification No. 2 amended the contract to add additional compensation of $10,908.00 for a sewer force main from the dosing tank and for electrical/telephone changes on the Access Road. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 77 | Modification No. 2 brought the cumulative total of the base contract, plus modifications, to $7,450,394. | |
| 78 | Modification No. 2 did not provide for any time extension for contract completion. | |
| 79 | Modification No. 3 was issued bilaterally on August 20, 2002. | |
| 80 | Modification No. 3 amended the contract to add additional compensation of $345,209.92 for general conditions costs associated with the deletion of Pay Item 26, hauling of excess material from the park, and extended field overhead. | |
| 81 | Modification No. 3 brought the cumulative total of the base contract, plus modifications, to $7,795,603.92. | |
| 82 | Modification No. 3 provided for a time extension of 13 calendar (8 working) days. | |
| 83 | Modification No. 4 was issued bilaterally on September 12, 2002. | |
| 84 | Modification No. 4 amended the contract to add additional compensation of $95,120.36 for hauling of excess excavation, restaking the access road centerline, sorting and removing buried debris in the upper parking lot, and raising the finish grade of the upper parking lot. | |
| 85 | Modification No. 4 brought the cumulative total of the base contract, plus modifications, to $7,890,724.28. | |
| 86 | Modification No. 4 did not provide for a time extension for contract completion. | |
| 87 | Modification No. 5 was issued bilaterally on November 20, 2002. | |
| 88 | Modification No. 5 amended the contract to add additional compensation of $26,880.00 for adjustments to the Sherman Tree Trail. | |
| 89 | Modification No. 5 brought the cumulative total of the base contract, plus modifications, to $7,917,604.28. | |
| 90 | Modification No. 5 provided for a time extension of 4 calendar days but Remcon reserved its rights for delays and impacts and damages. | |
| 91 | Modification No. 6 was issued unilaterally on February 18, 2003. | |
| 92 | Modification No. 6 amended the contract to add additional compensation of $84,170.00 for the encountering of a differing site condition necessitating rock blasting and excavation. | |
| 93 | Modification No. 6 brought the cumulative total of the base contract, plus modifications, to $8,001,774.28. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 94 | Modification No. 6 did not provide for a time extension for contract completion or for the impacts the differing site condition caused. | |
| 95 | On June 28, 2003, Remcon submitted a multi-volume, comprehensive certified claim to the Contracting Officer. The claim outlined in substantial detail the cost and time impacts incurred by Remcon on the Project. It also detailed the facts which support Remcon's breach of contract claims. The total of that claim was $3,091,799.60. | |
| 96 | Rod Keiscome has taken all four federal government construction law courses necessary to become eligible to be a Level IV contracting officer. | |
| 97 | Rod Keiscome has taken specific courses on advanced contract law. | |
| 98 | Rod Keiscome can't recall if he covered it in a training course or not but he has heard of the Spearin Doctrine and understands that it means that the government warrants the contents of plans and specifications. | |
| 99 | Rod Keiscome also learned about multiple different types of entitlement that a contractor can have on federal government construction contracts for issues that it may encounter. These included acceleration, constructive acceleration, differing site conditions (both Type 1 and Type 2), and directed and constructive changes. | |
| 100 | As part of his advanced contract law training, Rod Keiscome learned the government had a responsibility to have a quick turnaround in issuing modifications for either time or money. This was supposed to occur within a reasonable period of time. | |
| 101 | In the training courses or seminars that he attended, Rod Keiscome was taught that, under federal government construction contracts ,when a contractor encounters a circumstance in the field that they can't build according to the plans they are supposed to communicate that fact to the COR and/or the construction manager who is on site. | |
| 102 | Rod Keiscome also learned about constructive changes. | |
| 103 | When Remcon encountered something in the field, they were directed to communicate it in the first instance to the construction manager, Jacobs Facilities. | |
| 104 | Rod Keiscome has been consistently with the National Park Service for approximately 22 years. | |
| 105 | Rod Keiscome has had his office in Lakewood, Colorado with the National Park Service for 22 years. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 106 | In 1996, Rod Keiscome acquired his Contracting Officer warrant. Since that time, he had had the title of Contracting Specialist and his duties are as a Contracting Officer. | |
| 107 | Rod Keiscome's job responsibilities changed once he received his Contracting Officer warrant. As a Contracting Officer, he is required to sign the documents and commit the government to contracts, modifications, pay estimates, and communications with the contractor. | |
| 108 | Prior to receiving his Contracting Officer warrant in 1996, Rod Keiscome received formal training in contract administration. He attended 24 hours of course study, some of which was in-house. | |
| 109 | Rod Keiscome did not go through a testing program in order to be qualified to become a Contracting Officer. | |
| 110 | Rod Keiscome received an interim Contracting Officer warrant in 1996. He has since been issued several warrants, limited in time, while he was completing an additional 40 hours of training. | |
| 111 | With respect to this project, Rod Keiscome was at all times for both design and construction the Contracting Officer. | |
| 112 | At the time that this project commenced, Rod Keiscome was assigned to the Pacific West Region (consisting of California, Hawaii, Guam, Idaho, Washington, Oregon and Nevada) and was responsible for administering, on behalf of the NPS, all projects in the parks in that region. | |
| 113 | There was no second Contracting Officer assisting Rod Keiscome in the Pacific West Region, except on an as-needed basis. | |
| 114 | The NPS underwent a reorganization which included the fact that the NPS, for any particular construction work that may go on in a National Park, was not permitted to actually administer the field operations. Congress directed that third-party construction managers be the means and method implemented by the NPS for administering field operations of contractors. | |
| 115 | On this project, Jacobs Facilities was the NPS' construction manager during the first two years of active construction. | |
| 116 | The construction manager was hired by the NPS to be the on-site field eyes and ears of the NPS, inspecting the work of the contractor. | |
| 117 | During the first year, Bob Russell was the lead inspector, the person in charge on behalf of Jacobs Facilities, the construction manager in the field. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 118 | It is exclusively the province of the Contracting Officer to issue a change for anything that affects time or money. | |
| 119 | On this project, neither the project manager nor the COR had the ability to issue a directive to the contractor that affected time or money. However, they do have the authority to make recommendations to the Contracting Officer. | |
| 120 | Rod Keiscome has not ever had any training on the means and methods required for earthwork and the excavation of a roadway. | |
| 121 | With respect to training with respect to compaction of earth and material, Rod Keiscome took soils in college, a long time ago. | |
| 122 | Rod Keiscome can't recall if he has any training with respect to how a contractor creates from excavated rock material that is properly sized to be used as either backfill or base rock for a road. | |
| 123 | The Contracting Officer delegated authority to administer the design and construction phases to Contracting Officer's Representatives. | |
| 124 | The initial Contracting Officer's Representative for design was Ray Todd. | |
| 125 | Joanne Cody was the A/E Manager for design and she had the direct contact with the outsourced design team. | |
| 126 | Effective February 16, 2001, Joanne Cody became the Contracting Officer's Representative for the design. | |
| 127 | Joanne Cody's Contracting Officer's Representative status for design remained unaltered through the time Remcon was terminated. | |
| 128 | Ray Todd was also the project's Project Manager. In this position, he was responsible for scope of work, schedule, and budget. | |
| 129 | Prior to Mr. Giller becoming project manager on this project, effective July 1, 2002, there were two prior Project Managers, initially Ray Todd (until spring of 2002), and then Larry Walling, in an interim role for a few months. | |
| 130 | Ray Todd left the responsibility and role as the project manager because he obtained a promotion with the NPS. | |
| 131 | Project managers do a vast amount of coordination between the Washington office, the Pacific West office, discussions with the superintendents, chiefs of maintenance, and facility managers at each park. | |
| 132 | Primarily, the project managers are involved in the means and methods of the project whereas the Contracting Officer is more responsible for the administrative side of projects. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 133 | Rod Keiscome designates Contracting Officers Representatives as he determines they are necessary for any particular solicitation. The Contracting Officer Representatives are designated as representatives or inspectors. | |
| 134 | On this project, there were at least three people who concurrently possessed the designation of Contracting Officer Representative. Ray Todd was the Contracting Officer's Representative during the bulk of the design phase and then, during the proposal solicitation phase (through today), Joanne Cody was the Contracting Officer Representative for design. Concurrently, Willie DeOcampo was the Contracting Officer Representative for construction but may have been designated while design was still ongoing. Mike Giller was made a Project Manager in July, 2002 and a Contracting Officer's Representative (concurrently with Willie DeOcampo) thereafter. When Willie DeOcampo retired on January 31, 2005, Mike Giller became the sole Contracting Officer's Representative for construction. | |
| 135 | Joanne Cody was appointed the project Contracting Officer's Representative by Rod Keiscome on February 26, 2001, replacing Ray Todd, for design. | |
| 136 | Rod Keiscome relied upon Joanne Cody to perform the responsibility to manage the third-party designers during the construction document phase (from fall, 1999 until February, 2001) so that the plans and specifications and contract documents were competently prepared and were full, complete, and accurate. | |
| 137 | Joanne Cody had not been a COR on this project prior to her receipt of the February 26, 2001 letter. | |
| 138 | Joanne Cody was doing the design effort as the A/E manager during calendar year 2000 for Mr. Todd. | |
| 139 | Joanne Cody was involved in both the design and construction phases of 200Q. | |
| 140 | Joanne Cody understands a COR to be a person to assist the Contracting Officer, provide technical guidance, to request the work of the A&E firms that she is the COR for, and to review the work of the A&E firms for quality assurance. | |
| 141 | Prior to February 26, 2001, whether she was officially COR or not, when she acted as the A/E manager, Joanne Cody managed and acted as the design team lead for the in-house design team as well as the A/E team. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 142 | Joanne Cody sometimes wore both hats such that on a particular project she may be a COR as well as a design lead. | |
| 143 | Once designated as COR, Joanne Cody may have concurrent parallel responsibilities as a design lead which is, in fact, what happened on this project. | |
| 144 | As design lead, Joanne Cody integrates the work of the A/E firms with her own design group and reviews the work of the A/E firms and her design group for quality assurance. | |
| 145 | Other than managing third-party A/E firms' efforts, there was nothing else that was new as part of Joanne Cody's responsibilities when she first became designated as COR. | |
| 146 | Joanne Cody only covered quality assurance for the A&E firm but covered both quality control and quality assurance for the in-house work. | |
| 147 | What was added when Joanne Cody became COR was quality assurance for the third-party design efforts. | |
| 148 | When performing quality control, Joanne Cody looks at the calculations, the items that are placed on a sheet, the spot elevations, the accuracy of the work that is done. | |
| 149 | As COR, this was not Joanne Cody's responsibility for third-party designers. | |
| 150 | Quality control of the accuracy of information that is shown on a drawing was, while Joanne Cody was COR such as this project, 200Q, allocated to the third-party designer. | |
| 151 | Once the project transitioned to the design team, DHM, etc., thereafter drawings that are prepared, the content, other than survey, was their responsibility for quality control. The quality control work to affirm the content was accurate was delegated to them. | |
| 152 | The calculations that were done by the design team for the Upper Sherman area, that quality control responsibility was the design team's, not the NPS. | |
| 153 | Quality assurance is to assure that projects meet the NPS design ethic that the natural and cultural resources are protected, that projects meet accessibility standards, and that they are within the budget of the project. | |
| 154 | Joanne Cody's quality assurance role does not include observing that the drawings are free from error, omission, conflict, or inconsistency. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 155 | One of Joanne Cody's responsibilities in quality assurance mode as COR was to make sure the design was complete. | |
| 156 | If Joanne Cody reviewed on this project a set of plans and saw a mistake, she could just sit and do nothing. | |
| 157 | If Joanne Cody became aware that there was a substantive error that affected the quality of the work, she perceived that she had a responsibility as the COR to communicate that to the designer. | |
| 158 | Joanne Cody cannot remember any situation on this project, while she was COR, that she became aware of a mistake in the contract documents and it wasn't changed before it was put out to bid. | |
| 159 | Part of Joanne Cody's quality assurance role is to make sure the drawings are constructable. | |
| 160 | Quality assurance dealt with plans, specifications, and cost estimates. | |
| 161 | Joanne Cody looks for completeness of disciplines to make sure that the scope of the project is covered within the drawings and specifications like if there are buildings shown, she will make sure there are architectural drawings for that building. | |
| 162 | Joanne Cody does not study the architectural drawings themselves to determine if all expected components and features are there so that someone could construct the project free from change order or RFI. The design firm has that responsibility because it would constitute quality control. | |
| 163 | The NPS has a constructability reviewer in the QA group that looks at projects for constructability. | |
| 164 | The constructability reviewer is not someone who is assigned to Joanne Cody to oversee but is someone that is available to Joanne Cody for her COR responsibilities who takes third-party design as well as design done by Joanne Cody's personnel and independently reviews them for constructability. | |
| 165 | Joanne Cody is not sure what a constructability review is. | |
| 166 | Brian Lippert did the constructability review for the A/E design firm's design. | |
| 167 | The constructability review was part of the design phase. The project was not put on the street for bids until the constructability review was done. | |
| 168 | It was the Contracting Officer who had the responsibility to make sure the bids were received from a complete set of drawings. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 169 | Rod Keiscome is not technically inclined, so he asked others to assume the responsibility to make sure that that duty got fulfilled. | |
| 170 | Joanne Cody was the person tasked with the responsibility to make sure bids were received from a complete set of drawings. | |
| 171 | Joanne Cody was, in essence, a liaison between the park, her own design subordinates, and the third-party outside design team. | |
| 172 | Joanne Cody's responsibilities as COR did not end once the project was bid and a contract was awarded to Remcon. She remained the COR for design issued. | |
| 173 | As the COR for design issues, Joanne Cody's responsibilities changed given that the project had transitioned into the construction phase. At that point, she was responsible to Willie DeOcampo, the COR for construction, not the Contracting Officer. | |
| 174 | To the extent design-related issues arose during construction, Mr. DeOcampo was the hub to receive such information and he would then channel them to Joanne Cody. She was away from the day-to-day interaction of the project unless and until Mr. DeOcampo brought something to her attention. | |
| 175 | When something came to Joanne Cody's attention, she would look at it and then would make the decision whether it was something that the NPS took care of in-house or was outsourced to the underlying design effort. | |
| 176 | If it was in-house, then Joanne Cody would attempt to address it in-house. | |
| 177 | Joanne Cody did receive RFIs on this project. | |
| 178 | When Joanne Cody read an RFI, if it dealt with the design done by DHM or Martin and Martin or BRS, she would not see if she could answer it herself without having to give to them to review. She would automatically, if it dealt with their design, solicit a response from them. | |
| 179 | While Joanne Cody was still the COR for that portion that she was responsible for, if Willie asked her to modify the design, then she gave him what he requested. | |
| 180 | At the time Joanne Cody received such a request, she did not notify Mr. Keiscome because that was Willie's responsibility. | |
| 181 | If the change involved a third party, such as the A/E firms on this project, Joanne Cody's responsibility was to get them the information, receive it back, QA it, and if found to be adequate give it to Willie. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 182 | There were situations where, if Willie requested it, Joanne Cody received the request from Willie, caused the design team to do something that modified the design, but instead of going back through her to Willie, it went directly to the contractor or the contractor's surveyor. | |
| 183 | Typically such a request from Willie DeOcampo (to deal directly with the contractor or its surveyor) would be made verbally. Joanne Cody and Willie DeOcampo have worked together for several years and they didn't need to do that. | |
| 184 | Joanne Cody didn't feel the need to make sure that Mr. Keiscome was aware of that request because it was Willie DeOcampo's responsibility and she didn't need to question him. | |
| 185 | Joanne Cody was not aware that Rod Keiscome testified in substance that he was not made aware of the changes to the design that were made during the construction by Mr. DeOcampo. | |
| 186 | Willie DeOcampo, as the COR, had the primary responsibility to be the liaison between the field construction manager and the Denver Service Center. Thus, while he may not have been formally supervising, that was the line of authority and communication. | |
| 187 | Willie DeOcampo has never been licensed as a professional, other than a driver's license, from any State. | |
| 188 | With respect to this Project, Willie DeOcampo did not perform any design related activities. | |
| 189 | In 1980, Willie DeOcampo began continuously working for the NPS. | |
| 190 | When Willie DeOcampo was transferred to Denver from field work in 1999, he was a landscape architect and was then reassigned as a COR once the NPS started construction on this project. He served as COR for construction activities only. | |
| 191 | As the COR, Willie DeOcampo was directed to communicate with the Contracting Officer ("CO"), Rod Keiscome, through the CO's contract specialist, Terry Lang, instead of communicating directly with Rod Keiscome. Terry Lang acted as an intermediary between Willie DeOcampo and Rod Keiscome on issues that arose on this Project. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 192 | As the Contracting Officer's Representative for construction, Willie DeOcampo was responsible for performing government estimates on extra work, performing evaluations as to whether something was extra work, reviewing daily reports from the construction manager, approving submittals, accepting project schedules, reviewing submittals which were recommended to him by designers or CMs, reviewing pay estimates, inspecting the job site, receiving correspondence from the contractor, authoring correspondence, monitoring the project, and was responsible for change order requests, negotiating costs, and performing government estimates. He also negotiated extra work change orders and performed government estimates on extra work. | |
| 193 | Willie DeOcampo was responsible for negotiating modifications on behalf of the CO and then recommending that they be issued. | |
| 194 | When a contention was raised, whether by correspondence or otherwise, that there was a design error that affects the job, either in time or money, this was brought to his attention as COR and it was his responsibility to evaluate and respond. | |
| 195 | Willie DeOcampo is familiar with RFIs as a construction document and is aware that they were used on this Project and that contractor RFIs flowed through him. | |
| 196 | When Willie DeOcampo saw an RFI that had a design-related inquiry, he would have his design team respond to it but it would funnel back through him. The process was generically as follows: Remcon would identify something they contended to be a design-impediment, they would prepare an RFI in which they would communicate certain information in writing and give it to the inspector who would review it, channel it to Willie, Willie would review it, channel it to DHM, who in turn may send it to Martin and Martin. Once a response was prepared, it would go back the opposite direction through the same hands just described. | |
| 197 | That was the protocol and, while occasionally they may have broken protocol, that was the way the main things happened. | |
| 198 | Willie DeOcampo received and reviewed on some periodic basis daily reports from his construction managers. | |
| 199 | Design changes, not just design questions, were funneled through Willie DeOcampo during construction. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 200 | It was Willie DeOcampo's responsibility, as COR, to determine what project-related communications went to the design team during the construction administration phase for their involvement. | |
| 201 | It was Bob Russell's responsibility based on the organization setup to communicate that information that he felt necessary to be transmitted to Willie DeOcampo as his next immediate line of communication. | |
| 202 | If Willie DeOcampo perceived it was something for which a modification might need to be published, Mr. DeOcampo had the responsibility to communicate it to Rod Keiscome, either directly or through Terry Lang. | |
| 203 | There was no standing rule of procedure for when Willie DeOcampo would communicate something to Ms. Lang as contrasted with communicating it directly with Mr. Keiscome. | |
| 204 | When Rod Keiscome was contract specialist, he basically did all the legwork for the Contracting Officer and communicated with the Contracting Officer to keep him well informed. This is also the formula and/or method that Mr. Keiscome wanted Ms. Lang to replicate while working with him. | |
| 205 | Terry Lang doesn't have the technical background of Mr. DeOcampo or Mr. Russell. She would communicate to the point of having her understanding of what the situation was that was facing her. | |
| 206 | Rod Keiscome and Terry Lang were physically located no more than probably 25 steps from each other so a fair amount of communication was happening with the project. | |
| 207 | When Rod Keiscome was a contract specialist, he doesn't recall ever waiting ten months to give notice to the Contracting Officer of a potential claim notice from the contractor. He doesn't think that anyone would do that. | |
| 208 | The inspector on the job site is supposed to pick up all questions coming from the contractor and pass them on to Willie DeOcampo. Willie, as COR, involved the designers when a design question arose. It was not for the contractor to communicate directly with the designer. | |
| 209 | Willie DeOcampo likes to see all questions coming in. He asks them to be funneled through him, including RFIs. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 210 | When Willie DeOcampo received information on any subject matter from his lead inspector that the contractor had encountered something that maybe resulted in a modification to be issued, one of his duties was to evaluate extra work issues when the issue arose and negotiate extra work orders and modifications. | |
| 211 | With respect to any issues that arose concerning delays, Willie DeOcampo had the responsibility to evaluate them. | |
| 212 | Willie DeOcampo did not travel to the project site to evaluate extra work issues. He relied on what his inspector told him. | |
| 213 | Willie DeOcampo had the responsibility to negotiate change orders with the contractor. However, he did not have the authority to conclude those negotiations on behalf of the government; he only made recommendations. Only the Contracting Officer had the rights to go ahead and make contract modifications to the contract. | |
| 214 | There was never an instance on this Project where Willie DeOcampo negotiated a change order with Mr. Christensen on behalf of Remcon, made a recommendation to Mr. Keiscome, and Mr. Keiscome did not agree with Mr. DeOcampo and would not follow through by issuing a modification until funs are cleared. | |
| 215 | There were no recommendations that Willie DeOcampo made regarding change orders that Mr. Keiscome didn't agree with. | |
| 216 | In terms of Mr. Keiscome authorizing work, when it did occur, there were substantial gaps in time between when Mr. DeOcampo would make a recommendation for something for Mr. Keiscome to issue and the paperwork for Mr. Keiscome to sign to be issued authorizing the extra work because there was a lot of paperwork that the NPS had to send off to Washington to get fund clearance. The NPS cannot issue a modification until funds are cleared. | |
| 217 | Every modification that the government recognized on this Project through Willie DeOcampo's office went through the same process: Willie needed to have the superintendent of the park approve it or concur. | |
| 218 | As a result of the training he got associated with the Spearin decision and the Spearin doctrine, Willie DeOcampo perceived that it was his role as the Contracting Officer's Representative that if the contractor encountered something that was not in the contract documents as being completely shown that they were entitled to be reimbursed. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 219 | Rod Keiscome believes that Mr. DeOcampo discharged his responsibilities to the best of his abilities with respect to the timing of giving Mr. Keiscome notice of potential modifications that the contractor claimed it was entitled to. | |
| 220 | However, with respect to giving Mr. Keiscome notice of the differing site condition issue, Mr. Keiscome is not sure if Mr. DeOcampo performed in accordance with the responsibilities that were delegated to him. | |
| 221 | The preamble, section 1.602.2 states that the Contracting Officer shall ensure that the requirements of 1.602(b) have been met, and that sufficient funds are available for obligation. | |
| 222 | Rod Keiscome understood the word "shall" to mean that it is something that a person is supposed to be doing, something that is not discretionary. | |
| 223 | Willie DeOcampo is now retired. | |
| 224 | Specification section 2230 concerns logging, clearing and grubbing. | |
| 225 | Specification section 2230, Parts 3.3 and 3.7 expressly provide that the Contracting Officer shall mark the trees to be cleared, which include both merchantable and non-merchantable logs. | |
| 226 | Specification section 2230, Part 3.3A provides: "After installing silt and tree protection, remove all trees, brush and vegetation from areas designated approved by C.O. to be cleared. | |
| 227 | Athena and her supervisor, Tom Warner, the park forester, and Rich Thiel and Gary Muerle had gone through the area to be built in 2000 or early 2001, prior to the pre-construction meeting, and marked trees with blue or yellow ribbon to indicate whether they were to be saved or to be removed trees so that they could quantify the trees to be removed to provide input on this project. Blue ribbon indicated a tree to be removed and yellow ribbon indicated a tree to be saved. This type of thing was usually done prior to a review trip so that participants could visually see the trees that would be lost. | |
| 228 | Athena Demetry testified that most of the trees identified on the drawings to be removed were marked with blue ribbon before the preconstruction conference. She thinks they generally marked with the tape the largest of the trees. They didn't always mark all of the small trees. This was just for their own information and for the information of the government personnel. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 229 | Most of the trees identified in the drawings to be removed were marked by the NPS with blue ribbon before the preconstruction conference. | |
| 230 | One of the tasks that Athena Demetry performed on this project, specifically in June of 2001, was to mark trees that Remcon could remove. | |
| 231 | During the time that Athena Demetry was in the field marking trees, she used the project drawings to discern what trees should be removed by Remcon. She also used her knowledge of the site gained from past walk-throughs and may have used a compass and measuring tape. The measuring tape may have been used to measure the distances between trees to verify that they were the trees shown on the project drawings. | |
| 232 | The pre-construction conference minutes affirm that the marking of trees would be undertaken by the NPS. | |
| 233 | Athena Demetry recalls attending the preconstruction conference on this project. During the May 22, 2001 pre-construction conference, Athena Demetry indicated that she would mark all trees to be removed prior to logging operations. | |
| 234 | At the preconstruction conference, it was identified that the first order of work in the field on this project would be the marking of trees that Remcon could remove because NPS representatives agreed that trees would be marked prior to surveying by Remcon. | |
| 235 | Mr. Christensen communicated that until the trees were marked for removal and logged he would not be able to have his surveyors efficiently use surveying techniques to lay out the access road. This was agreed to by the NPS representatives at the preconstruction meeting as the order in which things would proceed. | |
| 236 | At the preconstruction conference, Mr. Christensen stated that the survey crew would set the cut-and-slope stakes after the logging operations were completed. This is the sequence in which events actually occurred; no survey by Remcon was done prior to logging. | |
| 237 | Mr. Christensen informed the NPS that survey of the road needed to be done after tree removal so that falling trees would not damage his survey stakes. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 238 | The NPS identified what natural resources should be preserved, specifically, the number and location of the trees and boulders to remain. The key person on the ground once the job started who was tasked with this responsibility was Athena Demetry. | |
| 239 | With respect to this project, Athena Demetry had been given responsibility for restoration and natural resource protection. Her responsibilities were to be a consultant to the project inspectors to ensure that the natural resource specifications were being carried out properly. | |
| 240 | In discharging those responsibilities, she would mostly use the inspectors as a vehicle to communicate with the contractor. Sometimes, the inspector would say for her to go ahead and interact directly with the contractor. | |
| 241 | Athena Demetry of the NPS was the individual that was tasked with the responsibility, before Remcon actually started its work, to go out to the site and mark the trees that could and could not be removed. | |
| 242 | Athena Demetry marked the trees that were allowed to be removed but then Joanne Cody made some adjustments in the field walk. | |
| 243 | After the preconstruction conference, the fieldwork started on June 1, 2001 by Athena Demetry who started to mark trees. | |
| 244 | Athena Demetry marked virtually all of the trees for removal along the access road on Friday, June 1, 2001 and Monday, June 4, 2001. | |
| 245 | Mr. Russell, the project inspector, was not present in the field that first day that Athena Demetry was marking trees for removal. | |
| 246 | While Remcon personnel walked the right-of-way with Ms. Demetry for about 2 hours on June 1, 2001, and "assisted" her by placing the blue paint on trees which she determined were to be removed, the determination of which trees were to be removed was, by contract, and action in the field, exclusively the NPS' pursuant to section 2230 of the specifications. | |
| 247 | On Friday, June 1, 2001, Athena Demetry started marking trees for removal. 252 of the 270 trees noted in the plans to be removed were found. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 248 | In the second paragraph of Athena Demetry's narrative on the first page of Exhibit 342 (her Friday, June 1, 2001 daily diary), she wrote: "Only about 252 of the total of 270 trees for removal were found on the drawings, and several of the trees shown in the drawings can't be found in the field, so fewer than the total of 270 will probably be removed." The number 270 came from US1, in Exhibit 343, under the heading "Legend." | |
| 249 | Athena Demetry came up with the number 252 for the number of trees that were marked for removal because she went through and highlighted every X tree with a yellow highlighter and counted those, which added up to 252. | |
| 250 | The 18 trees that were identified on the drawings but weren't marked for removal were later found by her to be on another contract drawing sheet. | |
| 251 | What Athena Demetry is reflecting in her June 1, 2001 daily log is that on the first day she marked trees, all the trees shown on US6 and US7 were completely marked but only half those on US5 and US8 were marked. | |
| 252 | At the time that Athena Demetry was marking the trees for removal, Remcon had not yet received a notice to proceed on this project. | |
| 253 | Athena Demetry and the contractor's representatives placed blue paint on the trees that were identified as an "X" on US 1 through US8. | |
| 254 | Athena Demetry chiefly used drawings US1 through US8 to perform the tree-marking exercise. However, if necessary, she would flip to other drawings. | |
| 255 | Specifically, on one occasion a tree appeared to be well outside the road alignment but it was marked for removal. In that situation, Athena Demetry went to the grading sheet and confirmed that there was a major change in grade that caused that tree to need to be removed. | |
| 256 | Athena Demetry utilized the information in the legend contained on the first page of drawings US1 through US8 to indicate which trees the Contracting Officer by authorizing these plans to be issued were to be removed. She occasionally exercised discretion other than for trees less than 12 inches in diameter in her tree-marking effort but only rarely. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 257 | Athena Demetry referred to the grading plans while marking trees on the access road one or two times. She doesn't recall where she did this along the access road but recalls a location in the parking lot when the grading plans were consulted. | |
| 258 | Athena Demetry recalls knowing, when she was marking the trees, the stations that had been assigned along the access road at the time she was in the access road location. She knew what stations she was in when she was walking through the forest because she would look at the survey stakes if they were still in existence. | |
| 259 | When Athena Demetry did her marking of the trees, there was no survey that had been undertaken during calendar year 2001 indicated by stakes in the ground. | |
| 260 | When marking the trees, Athena Demetry did not take into consideration the width of the road and didn't try to make sure that the trees that she was marking cleared the right-of-way for Remcon to construct the road. That process had already been done in the office on AutoCAD on the drawings. The drawings identified the trees to be removed. | |
| 261 | Athena Demetry believes that, when she went out to the project in June of 2001 to mark trees for removal, the were still old survey stakes on the ground from the original survey. She doesn't know how often these survey stakes occurred but believes that they were present through the entire portion of the access road but that there had been at least one or two winter seasons since that survey was staked out so many of the stakes had fallen over or been splintered or damaged in some way. The result was intermittent staking. | |
| 262 | Athena Demetry did not use whatever stakes may have still been in the ground as part of the effort in June of 2001 to mark the trees that she did mark for removal. | |
| 263 | In doing the walk-through to mark the trees for removal, there were some areas of some length where there were no stakes at all remaining as a visual check or assistance to Athena Demetry's effort. | |
| 264 | On June 1, 2001, Mark Penrose and Greg Kasparek helped Athena Demetry mark trees from 10:30 a.m. to 12:30 p.m. Athena Demetry continued on her own thereafter. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 265 | The contractor's representatives accompanied Athena Demetry for two hours on her tree-marking walk-through of the project on the first day when she marked trees in the morning. However, after they broke for lunch, they agreed to meet back after lunch but the contractor's representatives did not show up again after lunch so she continued marking trees alone. | |
| 266 | Athena Demetry asserts that the marking of the trees was a joint responsibility but she also acknowledges that there was no contractual responsibility in the contract documents that says that the contractor shall do so with the NPS. | |
| 267 | The determination of which trees were to be removed was, by contract, and action in the field, exclusively the government's pursuant to section 2230 of the specifications. | |
| 268 | Athena Demetry marked the trees during the entire day on June 1, 2001. Two contractor's representatives accompanied her for two hours only. She began in the parking lot and proceeded to go around the parking lot and then towards the entrance of the access road. | |
| 269 | On Monday, June 4, 2001, Athena Demetry noted in her daily log that she completed marking trees for removal in the Upper Sherman site. | |
| 270 | In Athena Demetry's Monday, June 4, 2001 daily diary, she writes: "Completed marking trees for removal in Upper Sherman site as shown on US1 through US8." However, she believes that not 100 percent of the 252 trees had been marked by this day; there were a few that she did not mark that are not indicated in this daily diary. These were not marked because she wanted to consult the designers and Bob Russell. | |
| 271 | On Monday, July 4, 2001, no one from Remcon accompanied Athena Demetry on her marking of trees. | |
| 272 | Other than an isolated tree here or there, well over 98 percent of the trees that Athena Demetry understood on US1 through US8 needed to be marked for removal were, in fact, marked for removal on June 1, 2001 and June 4, 2001. | |
| 273 | Nothing occurred between June 4, 2001 and June 7, 2001 which would have caused Athena Demetry to prepare a daily diary. There are no days missing from the logs that she provided. | |
| 274 | In Athena Demetry's Thursday, June 7, 2001 daily diary, she writes: "Total trees marked on US1 through US8 252." So, by June 7, 2001, she had marked 252 trees for removal. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 275 | On Monday, June 4, 2001, Athena Demetry did not note in her daily report that she was accompanied by anyone in marking trees on that date. | |
| 276 | On Monday, June 4, 2001, Athena Demetry noted in her daily log that the existing tree damage survey would be performed on Thursday, June 7, 2001. | |
| 277 | On Thursday, June 7, 2002, Athena Demetry recorded in her daily report that she walked the site with Bob Russell and Steve Christensen to conduct the tree inventory required by Specification section 1351. | |
| 278 | Athena Demetry's June 7, 2001 daily diary also notes, "Steve also painted some additional trees less than 12 inch diameter and not shown on the drawings for removal that were obviously within the extent of new asphalt." This would have been the first time that Steve Christensen personally painted trees for removal. | |
| 279 | The next daily diary that Athena Demetry provided was for Monday, June 11, 2001. This is likely because this was the next day that she was in the field for this project. | |
| 280 | Logging commenced after the Notice to Proceed was issued on June 11, 2001. | |
| 281 | There were times during the logging itself when Athena Demetry interacted directly with the logging subcontractor on questions of how to remove logs from the site. | |
| 282 | Logging operations had likely ceased sometime between June 19, 2001 and June 26, 2001 because Athena Demetry didn't record any logging activity on June 26th and she did on June 19th. | |
| 283 | Athena Demetry doesn't know exactly when the staking was performed by Remcon's surveyors. She knows it was done after the logging but doesn't know when the logging was finished because she didn't record it precisely as a moment in time in her daily diaries. She knows that logging was finished sometime before June 26th and thinks that the logging took about two weeks. | |
| 284 | Athena Demetry does not recall a meeting with Willie DeOcampo where they walked the project site and examined the right-of-way along the access road where the trees had to be removed. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 285 | Specification section 1351, Part 1.2A provides that prior to field activities involving placing fencing, etc., the contractor and CO/Park Ecologist shall perform an onsite inventory of trees and other natural features. | |
| 286 | The purpose of the site walk/inventory was to note in writing previous damage to trees and vegetation. | |
| 287 | The inventory required under Specification section 1351 is different from the responsibility to mark trees to be removed for construction. | |
| 288 | Steve Christensen, the President of Remcon participated in the inventory process with the Park Ecologist on June 7, 2001, prior to the Notice to Proceed being issued to Remcon. | |
| 289 | Remcon had no duty to do so at this time. | |
| 290 | The inventory of trees by Remcon and the Park Ecologist was and is distinct from the duty to mark trees for removal. | |
| 291 | Mr. Christensen did not accompany Athena Demetry on any of her tree marking for removal. He accompanied her on tree marking for protection. | |
| 292 | The requirement in Specification section 1351 for the contractor to jointly inventory the trees with the C.O./Park Ecologist was required to occur prior to the logging of trees by the C.O. in Specification section 2230. | |
| 293 | On June 7, 2001, the NPS (Athena Demetry) issued a memo to Remcon publishing the plant condition inventory conducted on June 7, 2001 pursuant to Specification 1351. | |
| 294 | Athena Demetry understands a notice to proceed to mean that the Contracting Officer has everything in place, that they've received the necessary submittals or whatever a contract required to be completed before the start of work. | |
| 295 | On Monday, June 11, 2001, Athena Demetry noted in her daily log that she completed marking trees for removal based on input from Willie DeOcampo and the designers. | |
| 296 | On Tuesday, June 12, 2001, Athena Demetry noted in her daily log that she marked three additional trees to be removed based on input from Bob Russell. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 297 | On July 18, 2001, Athena Demetry noted in her daily log that a healthy, vigorous sugar pine, noted to be "saved" on the drawings, in the deep cut area of the Upper Sherman Access Road, had to be removed, after exploring and exhausting all options, because the degree of grade change in the Upper Sherman Access Road is just too drastic. | |
| 298 | Athena Demetry graduated from Wooster Polytechnic Institute in 1991 with a bachelor of science degree in biology. | |
| 299 | Athena Demetry attended graduate school at Northern Arizona University where she received a master of science degree in forestry in 1995. | |
| 300 | All of Athena Demetry's employment, whether it be by contract or as a direct employee, with the National Park Service has been posted to the Sequoia park. | |
| 301 | Prior to this Project, Athena Demetry had worked with Willie DeOcampo, Joanne Cody, Andrea Gregor, and Jack Vance. She had never worked with Mike Giller or Rod Keiscome. | |
| 302 | On this Project Athena Demetry devoted her time to developing restoration plans, being project inspector, and participating in park restoration efforts. However, she was principally involved in helping to inspect this project. | |
| 303 | Athena Demetry had worked with Remcon previously, when it was a subcontractor for 200O. | |
| 304 | During the time 200O was being performed, Athena Demetry did in some instances observe Remcon's activities. She remembers that Remcon did very good work during that time. | |
| 305 | There would have been several instances where Athena Demetry would have discussed Remcon's work on 200O with Mr. Vance. They were very pleased with Remcon's work and the NPS would have been advertising or beginning the advertising process for future contracts. She would have spoken with Mr. Vance because the NPS was looking for good contractors and Remcon was considered a good contractor. | |
| 306 | When Athena Demetry prepared her daily diaries, her process was to sit down at her computer at the end of the day, type them on her computer, print out a hard copy, and sign and date the hard copy and file the hard copy with the Jacob inspector. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 307 | In Athena Demetry's daily diaries, it was her custom and practice, if she observed some proficiencies in performance, to note them. She would only record deficiencies in performance that related to the natural resources. | |
| 308 | If Athena Demetry encountered difficulties with the contractor on any day or unforeseen developments, that information would be included in her daily diary. | |
| 309 | The original effort on this project was a survey done of the natural features in the forest of trees, rocks, and associated things that were mapped by surveyors. This information was put into an AutoCAD format and transmitted to the designers for the design of this project. | |
| 310 | During the design phase, the surveying had been done with mapping. It got to the designers and they designed their improvements which were overlaid onto the survey map. | |
| 311 | The designers overlaid the new road design onto the map of the trees and the landscape and the rocks. | |
| 312 | The map of the forest landscape had been done by the surveyors and was given to the designers. Athena Demetry was not involved in creating the map of the forest and doesn't know which surveyors prepared it or when it was prepared. | |
| 313 | Athena Demetry did not do any formal quality control to look at the map prepared by the surveyors and compare it to the landmarks in the forest and features to see if it was accurate. However, when they were doing a review of the plans in earlier phases, 50 percent review, for example, they would do a preliminary identification of the trees, and during those times they would sometimes notice they had missed a large tree, but this was generally fairly rare. It was frequent that they did not map small trees. | |
| 314 | The plans did not indicate trees, recognized to be in the right-of-way where the access road was going to be constructed, that were less than 12 inches in diameter because the surveyors who did the mapping could not mark all the trees; it would have been prohibitively time consuming so they restricted their efforts to the larger trees. | |
| 315 | Athena Demetry was aware that a geotechnical effort was undertaken as part of the design phase of the project and that Kleinfelder performed that effort. She was also aware that, in doing so, they were going to have to access and perform some testing within the natural resources. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 316 | Athena Demetry does not know how it is that Kleinfelder was made aware of where the project was supposed to occur so that they could perform whatever testing they needed to do. She did not accompany them in any way, shape or form in the Upper Sherman area. | |
| 317 | There was some review undertaken of the design effort and the survey map, looking at them in combination. Athena Demetry was part of this process. She remembers several trips to the site for this purpose but doesn't recall if, at the time, the construction documents were at 30 percent, 50 percent, 75 percent, or 90 percent. | |
| 318 | Exhibit 111 (design drawings) is the type of documents that Athena Demetry recalls seeing during the design review process, including the sheets of drawings that had been produced for review by the NPS. | |
| 319 | In the summer of 2000, there was a meeting held in the park through which comments were made to designers so they could then take those comments back to assist them in advance in the level of completion of the drawings. Jack Vance, Joanne Cody, Ray Todd and Robert Smith were part of this process. | |
| 320 | As far as Athena Demetry was aware, DHM was the lead designer. | |
| 321 | Athena Demetry does not know if a pre-bid site inspection occurred that allowed contractors to observe the physical conditions of the project once the plans were completed. | |
| 322 | When Athena Demetry came onto the job in June of 2001, the natural resources, such as trees or rocks and shrubs and stumps, that could be removed by the contractor in order to construct the project had already been identified on the project plans. Her responsibility was to ensure that the work on the plans was being constructed as shown and that the specifications were being carried out with respect to protection of natural resources. | |
| 323 | Athena Demetry was never informed by Willie DeOcampo, or someone on his behalf, in late June 2001 that the contractor claimed that the center line of the access road, as staked by its surveyors, was in a location different than where the trees had been marked for removal. Her first knowledge of this was in mid-July of 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 324 | Athena Demetry subsequently learned from Bob Russell that both Willie DeOcampo and Joanne Cody visited the project site late June 2001 and early July 2001 to examine the site between Stations, approximately, 24 and 30, along the access road. She doesn't specifically know which stations it was but assumes it was the deep cut area. | |
| 325 | Athena Demetry was made aware, in mid-July 2001, that the deep cut area was staked out to be in a location other than where the trees had been marked for removal. | |
| 326 | On July 2, 2001, Willie DeOcampo sent a fax to Bob Russell. The first page has the word Willie and then the words "Suggested realignment of access road Station 24 plus 46 to Station 30 plus 18." | |
| 327 | On July 2, 2001, in a communication from Bob Russell to Willie DeOcampo, Mr. Russell writes: "My understanding is that these alignment adjustments were made to minimize the impact on the large tree located on the left at Station 12 plus 00, plus or minus." | |
| 328 | Athena Demetry was not made aware of the large tree in mid-July when she got back from vacation or anytime subsequent until it was brought up during her deposition. | |
| 329 | On July 2, 2001, Willie DeOcampo sent an email to Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Scott Reusch, Jack Vance, and Bob Russell concerning existing field conditions and conflicts in the deep cut section. | |
| 330 | The first several sentences of the first paragraph of Willie DeOcampo's July 2, 2001 email is essentially what Mr. Russell communicated to Athena Demetry when she returned from vacation in mid-July. However, she doesn't believe that she was told that the cuts and fills would not balance; she doesn't know anything about that. | |
| 331 | What Bob Russell communicated to Athena Demetry, he did so orally. She did not have access to the July 2, 2001 fax from Willie DeOcampo. | |
| 332 | Bob Russell told Athena Demetry that they had encountered a problem. The reason he didn't tell her about it until mid-July was because she was on vacation for the first two weeks of July of 2001. | |
| 333 | Bob Russell informed Athena Demetry of the problem on or about July 18, 2001. | |