| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 334 | Athena Demetry can't remember if Bob Russell indicated to her that Joanne Cody and Willie DeOcampo had been involved in evaluating the issue reflected in Willie DeOcampo's July 2, 2001 fax. | |
| 335 | Bob Russell told Athena Demetry that the alignment of the road, as it had been surveyed by Remcon, appeared to be different than the extent of the road that was logged and he didn't know the reason for it. | |
| 336 | Bob Russell told Athena Demetry that the survey of the road was in a different location than the logged alignment and they didn't know the reason for it but that there were several possibilities. | |
| 337 | Bob Russell then recommended that Remcon place the road in the logged alignment. Athena Demetry did not make a site visit on this issue. She was very busy with other things and agreed with Bob Russell that this was probably, from the natural resource perspective, an appropriate thing to do. | |
| 338 | If the road was going to remain in the location outside of the cleared area as supposedly staked by Remcon's surveyors in the deep cut, it may have required additional logging efforts to be undertaken to some extent. Athena Demetry never made a site visit to see which trees would have needed to be logged because no one ever asked her to do that. | |
| 339 | Athena Demetry understood that the area that was cleared or logged was uphill or into the hill from where the surveyors of Remcon had identified the center line to be. | |
| 340 | Athena Demetry did have concerns if additional trees would have to be removed. | |
| 341 | Bob Russell indicated to Athena Demetry that the physical dimensions of the disparity between the staking of the center line between 24 and 30 and where the clearing had been done was more on the level of feet than inches. She doesn't recall in 2001 having a specific knowledge of the number of feet but knew it was more on the scale of several feet than on several inches. | |
| 342 | The NPS did a survey to confirm whether the trees that were marked for removal between Stations 24 and 30 were marked for removal in the correct location. Athena Demetry believes that this survey occurred sometime after 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 343 | Athena Demetry told Mr. Giller that she was highly confident that she had marked the trees as shown on the drawings and that she felt very confident in the particular issue that Remcon was raising in regards to her marking of the trees. | |
| 344 | A week before her deposition, Athena Demetry has personally gone back and evaluated whether or not the trees marked for removal between Stations 24 and 30 along the access road were indeed marked for removal in the location identified in the original contract documents. Her conclusion was that she had marked the trees as shown on the drawings in that location. She was not accompanied by anybody in doing this inspection. | |
| 345 | Athena Demetry was never asked by anyone starting in mid-July when she came back from vacation in 2001 to do that which she did a week prior to her deposition. | |
| 346 | Athena Demetry was never involved in any meeting or discussion with anybody in which the subject of her going out and field-verifying whether the trees were marked for removal in the proper location between Stations 24 and 30 should be done. | |
| 347 | Athena Demetry is aware that the road was actually built into the cleared area between Stations 24 and 30 and that the NPS moved the road in relation to what Remcon had surveyed. | |
| 348 | The NPS was responsible for the entire design of this Project and the plans and specifications were a combined product of internal design efforts by NPS personnel as well as by private designers retained by the NPS. | |
| 349 | The contractor had no design responsibilities for this project. | |
| 350 | The design phase includes that effort, from concept all the way through the time documents are put out and bids are solicited from third-party contractors to perform the work. | |
| 351 | The government discharged that responsibility on this project by Willie DeOcampo determining that an alignment change was appropriate. | |
| 352 | The process that occurred on this project was that the project was conceived, investigated, conceptual and schematic, and then transitioned to use third-party designers. | |
| 353 | While third-party designers were used on this project for the design phase of the Upper Sherman, the Lower Sherman was an in-house design piece. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 354 | Joanne Cody had worked with DHM on at least four or five other projects. | |
| 355 | DHM had worked on some of the 200 series projects in Sequoia that had preceded this one. | |
| 356 | Joanne Cody was never aware, at any time during the design phase, of any mistakes or errors in the design that deal with calculations. | |
| 357 | Based on her involvement with the project during the construction phase up through the date of her deposition, Joanne Cody believes there were some errors, omissions, conflicts or inconsistencies in the design that was issued to Remcon as part of the contract documents to construct 200Q from. | |
| 358 | At the time that Joanne Cody became aware that there was one or more errors, omissions, conflicts of inconsistencies, she did whatever the COR wanted her to do. She made no independent judgments herself. | |
| 359 | Joanne Cody recalls being on the project site during the construction phase when one or more of those mistakes was brought to her attention. | |
| 360 | Joanne Cody does not recall, as a result of one or more of those mistakes being brought to her attention while she was on site, figuring out, this is how we should correct the problem or problems. | |
| 361 | Joanne Cody is not saying that she never gave any oral or written communication to any representative of the NPS, an inspector, or the contractor, as to how to ameliorate one or more of the problems that were brought to her attention. | |
| 362 | There were issues that the contractor wanted additional information on. These were not issues that the contractor contended to be a result of a design mistake. | |
| 363 | Joanne Cody believes that they found two trees that were in the wrong place parallel to the entry road outside of the limits of construction. | |
| 364 | Joanne Cody believes that there were no mistakes with the topo with respect to the Upper Sherman parking area. | |
| 365 | During the design phase, Joanne Cody did not delegate any of her duties as a COR to Mr. Mitchell or Mr. Savage. | |
| 366 | There was never a time that Joanne Cody asked Mr. Savage to receive information from the third-party A/E and communicate it to the contractor, the contractor's surveyor, and/or the inspector because this was the COR, Willie DeOcampo's responsibility. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 367 | If it affected the design on this project, that was Joanne Cody's territory and jurisdiction. | |
| 368 | Joanne Cody's subordinates that she was working with on the design team were available to be used by Mr. DeOcampo to assist him if he felt that was necessary. | |
| 369 | The road was not built in the location originally designed. | |
| 370 | There were no changes in the location of where the road was to built that arose as a result of modifications issued by the third-party designers. | |
| 371 | There were changes to the parking lot as a result of modifications issued by the third-party designers. | |
| 372 | There were adjustments made to the Sherman Tree Trail as a result of modifications issued by the third-party designers. | |
| 373 | An adjustment is a minor field change, where a change is something that necessitates a modification. | |
| 374 | Joanne Cody wasn't concerned as to whether something was going to be perceived as a field adjustment or modification. If Willie requested, she caused it to be done. | |
| 375 | It was then Willie or somebody else's responsibility to determine or discern if it was a minor field adjustment or something that required a modification. | |
| 376 | When Joanne Cody was in the field, she actually visited the site during construction and, at that time, she was COR for design. | |
| 377 | Joanne Cody observed certain issues that were brought to her attention in the field when she was there. When that occurred she made recommendations that adjustments should be made to Willie DeOcampo. | |
| 378 | Joanne Cody was aware that Bob Russell's role on this project during the first construction season and part of the second one was a lead inspector on behalf of the government. | |
| 379 | Joanne Cody knows that there is a form in the specifications for Bob Russell to prepare, as part of his daily responsibilities, a report recording events that occurred in a particular day. | |
| 380 | There were adjustments made to the access road by Willie and Bob. | |
| 381 | Joanne Cody contends that she made no adjustments to the access road and made no recommendations for any adjustment. | |
| 382 | Joanne Cody contends that she made no recommendations for adjustments to the parking lot. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 383 | Joanne Cody contends that she made no recommendations for adjustments to the Sherman Tree Trail. | |
| 384 | Joanne Cody contends that she made no recommendations for any of the Upper Sherman work but did review adjustments that were recommended. | |
| 385 | Joanne Cody admits that there were typos and some missing spot elevations in the plans that were put out to build by Remcon on this job. | |
| 386 | The government's surveyor had the responsibility to accurately depict the trees that were in and around the access road. | |
| 387 | The government's surveyor may have been Psomas. | |
| 388 | If there were trees, as reflected in the June 26, 2001 daily log, that were in the roadway and shown differently on the survey, then there would be some mistakes between the survey and the information shown on the contract drawings. | |
| 389 | If there was a tree that was decided to be saved, it was the government's responsibility to discern what had to be done as a result. | |
| 390 | It was the responsibility of the NPS when soliciting proposals, whether by bid or proposals, to put out contract documents that were full, complete, accurate, and constructable. | |
| 391 | With respect to the accuracy of the plans, all projects have change orders (modifications). | |
| 392 | Rod Keiscome does not believe that the plans and specifications and contract documents issued for all projects that he, as Contracting Officer, has issued to a contractor to construct were free from errors, omissions, conflicts, and ambiguities. There are modifications on all projects. | |
| 393 | On this project, the contract documents that were issued to Remcon to construct were not free from errors, omissions, conflicts, inconsistencies, and ambiguities. | |
| 394 | Rod Keiscome would expect that the plans and specs that the NPS put out were good enough for a prudent contractor to build. He would expect them to be complete. | |
| 395 | Not all of the errors, omissions, conflicts, inconsistencies and ambiguities that Rod Keiscome perceived existed in the contract documents that were issued to Remcon to construct have been the subject of one or more modification issued by Mr. Keiscome, as Contracting Officer. This is because Remcon was terminated. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 396 | Rod Keiscome does not believe that the fact that Remcon was terminated for default relieves him of the obligations as the Contracting Officer to issue modifications for those additional costs that were incurred by Remcon while it was performing work prior to termination. | |
| 397 | Rod Keiscome has not issued modifications for those errors, omissions, conflicts, inconsistencies, and/or ambiguities that he perceived were encountered by Remcon but which are not the subject of one or modifications because the NPS hit upon the major ones within modifications 1 through 6. | |
| 398 | There are some errors, omissions, conflicts, inconsistencies, and/or ambiguities that Rod Keiscome has not covered in a modification. | |
| 399 | Rod Keiscome believes there is probably material that exists in writing that the NPS by and through its personnel has determined there are one or more errors, omissions, conflicts, inconsistencies, or ambiguities that are still unaddressed in a modification to Remcon. | |
| 400 | He doesn't know the value of those that remain unaddressed in a modification or the amount of time that Remcon is due that is the subject of those unaddressed or unissued modifications. | |
| 401 | Rod Keiscome has received training as to what is considered by the courts to be above and beyond that which ordinarily would be expected with respect to the volume of change orders. This training indicated to him that if there is something out of the ordinary, there are means and methods to arrive at a solution. | |
| 402 | The design of the construction documents was procured, via task order, issued by the C.O. to an outside design team consisting of BRS, DHM and Martin and Martin. | |
| 403 | All of the designers who worked on this project were located in Denver. | |
| 404 | The task order required that all architectural, engineering and landscape architecture work produced pursuant to the task order be performed under the direct supervision of a professional architect/ professional engineer/professional landscape architect and further required that all work be stamped by an architect/professional engineer/landscape architect licensed in California. | |
| 405 | Rod Keiscome doesn't know whether any of the drawings were ever stamped by anyone or whether he had the authority to waive the requirement that the drawings be stamped. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 406 | Rod Keiscome did not waive, in writing, the requirement that the contract documents be stamped. | |
| 407 | Rod Keiscome can't recall if he has made any claim against anyone for their failure to stamp the drawings. | |
| 408 | The plans were not stamped by anyone, whether licensed in California or not. | |
| 409 | Both Martin and Martin and DHM had engineers licensed in California but no one with a California license supervised the design effort. | |
| 410 | The use of modifications is not unexpected; they're a natural consequence of construction. | |
| 411 | Every project that Willie DeOcampo has worked on has had at least one modification. He expects that on every project there is going to be one or more modifications. | |
| 412 | Willie DeOcampo has never worked on a contract where there were no modifications. | |
| 413 | The government, through the COR, is set up to address modifications; it has a system in place. | |
| 414 | Item 18 of the Design Constructability Checklist requires there to be confirmation that there was an accurate survey data, BMs (benchmarks), TBMs (temporary benchmarks) and topos (topographical indications) that are shown on the plans. Topographical indications are changes in elevation, indicated by contour lines. | |
| 415 | The design team had the responsibility to confirm on this project that there was accurate survey data shown on the drawings. | |
| 416 | Rod Keiscome does not know if anybody, on behalf of the NPS, confirmed as part of a constructability review of this project that there was accurate survey data on the plans. | |
| 417 | Willie DeOcampo doesn't know who had the responsibility to confirm that this was done as part of the constructability review. He believes that Joanne Cody would know if this was done and that she would have seen the Constructability Checklist if one was done for the Project. | |
| 418 | The National Park Service typically procured design services through task orders that were written off of indefinite delivery, indefinite quantity contracts. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 419 | With respect to this Project, BRS was the party under contract with the NPS that had the indefinite deliverable responsibilities to the NPS for design. | |
| 420 | DHM was one of the consultants for BRS on the Project. | |
| 421 | Robert Smith is not licensed in the state of California. | |
| 422 | Robert Smith is the president of DHM Design Corporation. | |
| 423 | Robert Smith has been the president of DHM Design Corporation since 1998. | |
| 424 | Robert Smith is at the top of the DHM hierarchy and has a staff of five other professionals that he directs and manages. He oversees their work and prepares the scope of the work and fees. | |
| 425 | Prior to November 1999, Robert Smith had, in his professional capacity, worked on many National Park Service projects. In fact, the NPS was considered one of the significant clients of DHM for marketing and other purposes. | |
| 426 | Robert Smith has never been licensed as a landscape architect in the state of California. | |
| 427 | A licensed landscape architect in the State of California did not supervise the work of DHM on this Project. | |
| 428 | Michael Gasper is a member of DHM who is a licensed landscape architect in the state of California. He is one of the principles of DHM. | |
| 429 | Mr. Gasper was 100 percent on DHM's staff while the construction drawings were issued and stamped, but he may not have been associated with DHM at other times. | |
| 430 | There is no one else affiliated with DHM since 1990 that was a licensed landscape architect in California. | |
| 431 | Michael Gasper, as a licensed landscape architect in California, was not assigned responsibilities to manage aspects of the design of this Project because DHM believed that stamping the drawings was not a requirement of the NPS. | |
| 432 | Robert Smith contends that DHM complied with all the requirements of the federal government, which were the guiding rules and regulations regarding design professionals performing design work. | |
| 433 | As a design professional contracting with the National Park Service, Robert Smith was given certain information in the form of guidelines and directives that the NPS required DHM to comply with in performing its services. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 434 | It is Robert Smith's perception that DHM strived to comply with the NPS guidelines and directives and that this is all that DHM needed to do in order to perform its responsibilities for the NPS. | |
| 435 | Robert Smith did not inquire or evaluate whether DHM also had responsibilities to comply with, for example, California laws that may exist or regulations regarding the performance of design work by a landscape architect on projects that are within the geographic borders of California. | |
| 436 | Robert Smith does not know whether the effort he undertook and the conduct his company discharged met California law standards for design efforts by landscape architects within the jurisdiction of California. | |
| 437 | In performing its work, DHM relied on the NPS to tell it what DHM needed to do as far as guideline standards and code compliance; DHM didn't do any further research or investigations beyond what information it got from the NPS. | |
| 438 | Despite the requirement in the task order for the design phase of the Project, DHM did not stamp the plans for the Project. | |
| 439 | During the design effort for the Project, DHM considered its primary contact at the NPS, and specifically the Denver Service Center, to be Joanne Cody. | |
| 440 | With respect to this Project, Andrea Lind was the lead person at DHM that Robert Smith would consider the most knowledgeable as to the aspects of design. Her maiden name was Andrea Gregor. | |
| 441 | Andrea Lind is not a professional landscape architect and is not a principal. | |
| 442 | Andrea Lind was the main person to help Robert Smith produce the work on this Project. | |
| 443 | The responsibilities of a DHM project manager include the duty to timely produce design drawings, the responsibility to coordinate internal effort by DHM with respect to design phase activities, and the duty to coordinate third parties that DHM had subconsulted with, to the extent applicable. | |
| 444 | DHM owed its duties and loyalties to both BRS and the National Park Service. | |
| 445 | As project manager, it was Andre Lind's responsibility to coordinate the efforts of DHM's subconsultants in order for DHM to perform work. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 446 | The Project was designed by the NPS. DHM picked up the Project just to prepare construction documents, after the roads and the parking and trails had been laid out on paper. DHM did not create the layouts that were built. | |
| 447 | At the time that DHM first became involved in this Project, the Denver Service Center of the NPS had laid out the road in a conceptual manner on paper but had not done anything to the physical topography to indicate the road. | |
| 448 | The source of the topographic background in the plans was from the NPS. | |
| 449 | Robert Smith is not aware of anyone on behalf of Barker Rinker, DHM and/or Martin/Martin, Inc. confirming the accuracy of the survey data that was furnished by the NPS. Robert Smith contends that it was not a task of theirs to determine the accuracy. | |
| 450 | "Design phase" includes the construction document phase. The construction document phase is a portion of the design phase of the overall project. The design is completed when the construction documents are done. DHM's task commenced at the construction document phase. | |
| 451 | Robert Smith is aware of certain guidelines issued by the NPS that standardize or govern the work or what the NPS expects to see, otherwise know as NPS-10. | |
| 452 | Robert Smith's intent on performing his work on this project was to comply with the standard of care that others in his discipline in this jurisdiction perform, as well as NPS-10. | |
| 453 | Robert Smith coordinated the specifications from Martin/Martin, Inc., Barker Rinker, and DHM. | |
| 454 | DHM coordinated the drawings and plans from the three design team members because DHM assembled all sets as one package. | |
| 455 | Martin/Martin, Inc had certain scopes of work it was responsible for in the design of the construction document phase that included preparing technical specifications and plans for the civil engineering portions and structural engineering portions of the work. | |
| 456 | Each of the three design team members separately prepared its own set of specs relative to its scopes of work and plans or drawings to indicate the work. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 457 | Each of the three design team members had the responsibility to coordinate it with the efforts within the discipline that each of them were designing. | |
| 458 | DHM was responsible to take the three separate efforts from the design team members and put them as a combined package as to assemble it, but not to do a detailed QA/QC review to determine whether the content of the Martin/Martin's was coordinated with the contents of Barker Rinker or DHM, or any of the others ones in relationship to the other two. | |
| 459 | Robert Smith did not make sure that the documents from Martin/Martin, Barker Rinker and DHM were internally coordinated as to details and content because he didn't have the expertise to edit structural engineering. | |
| 460 | DHM was responsible for QA/QC on DHM's construction drawings and specification effort. | |
| 461 | Robert Smith, on behalf of the design team, had the responsibility to collect Martin/Martin's work, Barker Rinker's work, and DHM's work and put it together as an integrated set. | |
| 462 | No specific efforts were done during the construction document phase to verify the accuracy of the topographic survey that the NPS had furnished to the design team. | |
| 463 | The only way to actually verify the NPS' topographic survey would be to have individuals on the ground with surveying equipment. Robert Smith isn't aware of any such effort being undertaken during the construction document phase. | |
| 464 | DHM does not have an internal standard of care that is published to its personnel as to Robert Smith's expectations as to the content of what is produced as design documents. The level and quality is Mr. Smith's standards which are that the documents must be accurate, complete, buildable, easy to read, internally coordinated, free from conflicts, free from errors to the best of their ability, free from omissions to the best of their ability, free from inconsistencies to the best of their ability, and constructible. | |
| 465 | The budget constraints that DHM was given under which the Project was to be designed were a factor in DHM's ability to deliver to the NPS what it communicated it wanted. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 466 | Under the NPS Scope of Services, Task Order Number 21, on page 1 of the standards, under the heading Procedures, the second paragraph reads, "the DSC Quality Assurance Process will confirm that the project…complies with NPS policies and guidelines…the construction documents are adequate to construct the intended facility. These goals were applicable to DHM's effort during the design phase of the Project. | |
| 467 | The next sentence of the document reads, "the architect-engineer is responsible for quality control, which includes ensuring the technical accuracy, completeness, and correctness of the design, cost estimate and all engineering aspects and details, including coordination of all disciplines with each other and with the specifications." This statement also applied to DHM. | |
| 468 | Robert Smith did not possess the California Building Code in DHM's office when it preformed this work and he does not know if DHM's work complied with the California Building Code. | |
| 469 | Rod Keiscome doesn't know if the design that was produced by the design team complied with all California Building Codes. | |
| 470 | Joanne Cody should have quality-assured and quality-checked the drawings to see if they met those requirements. However, Rod Keiscome doesn't know specifically that she did that. | |
| 471 | Rod Keiscome believes that the office receiving the Task Order, Mr. Keiscome's office, and Joanne Cody would have had the responsibility to determine whether or not the drawings and specifications prepared by the design team met the requirements set forth in Items 1 through 4 of the Task Order under Roman Numeral IV. | |
| 472 | In the task order for the design phase of the Project, the largest paragraph under the heading Project Identification, says, "All architectural, engineering, and landscape architecture work produced under this task order shall be performed under the direct supervision of a professional architect/professional engineer/professional landscape architect and all work shall be stamped by an architect/engineer/landscape architect licensed in the state of California." | |
| 473 | The above identified paragraph from the task order for the design phase of the Project applied to DHM's scope of work. | |
| 474 | DHM did not comply with this requirement. | |
| 475 | Raymond Tuttle is a licensed professional engineer in Colorado. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 476 | Prior to working on this Project, Raymond Tuttle had never personally worked on any National Park Service project. | |
| 477 | Raymond Tuttle acted on behalf of Martin/Martin, Inc. as a principal with respect to the access road design phase effort that Martin/Martin, Inc performed on the Project. | |
| 478 | The upper parking area was designed by DHM. | |
| 479 | Martin/Martin, Inc. did not design the Sherman Tree Trail. | |
| 480 | Raymond Tuttle was the chief liaison on behalf of Martin/Martin, Inc. regarding the scope of work that it was tasked with the other designers being DHM and BRS. | |
| 481 | Within his office, Raymond Tuttle would direct Mr. Bunker as well as other CAD personnel as to how to put the plans together for their charge of the work. | |
| 482 | As far as Martin/Martin, Inc. was concerned, the design phase of the project essentially commenced at the very end of 1999 and continued into the very beginning of 2001. | |
| 483 | There was no stamp on the drawings that were issued as the issued-for-construction set of plans because the National Park Service did not request a stamp. | |
| 484 | During the design phase, Mike Barrett was the person at Martin/Martin, Inc. who was licensed as a registered civil engineer in the state of California. | |
| 485 | During the design phase of the Project, Raymond Tuttle kept Mike Barrett apprised of the Project and the course of design. | |
| 486 | Mike Barrett didn't do any of the actual design work for the Project. | |
| 487 | The design work for this Project was undertaken in the Denver office of Martin and Martin. | |
| 488 | None of the design work was done in any of Martin/Martin, Inc.'s California offices. | |
| 489 | Raymond Tuttle doesn't know if anyone coordinated all of the design or put it all together and made sure it was internally consistent. | |
| 490 | Raymond Tuttle would consider himself by far the person most knowledgeable on behalf of Martin/Martin, Inc. with respect to the design phase of the access road portion of the Project. | |
| 491 | Martin/Martin, Inc. did not make sure that their drawings were consistent with BRS' and DHM's drawings to ensure that they were free from error, omission, conflict and inconsistency. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 492 | In performing the design of the access road, Raymond Tuttle did not consult and/or use the California Building Code. | |
| 493 | The task order for the design phase of the Project was issued by the NPS to BRS and BRS by subconsulting agreement to both DHM and Martin/Martin, Inc. | |
| 494 | The above identified paragraph from the task order for the design phase of the Project applied to Martin/Martin, Inc.'s scope of work. | |
| 495 | Despite the requirement in the task order for the design phase of the Project, Martin/Martin, Inc. did not stamp the plans for the Project. | |
| 496 | Raymond Tuttle is not aware of anything in writing that modified the portion of the task order for the design phase of the Project that required that plans be stamped. | |
| 497 | Raymond Todd was the NPS' Project Manager for the design phase of the Project. | |
| 498 | Raymond Todd was the NPS' Contracting Officer's Representative for the design phase of the Project. | |
| 499 | In all design drawings produced prior to July, 2000, "rock excavation" and "partial rock excavation" were identified in multiple locations thereon by the designers. | |
| 500 | The draft copy of the 30% construction documents, dated January 28, 2000, refer to rock excavation in seven different instances. This information was added by Andrea Lind of DHM. | |
| 501 | In reviewing the 30% construction documents for quality assurance, Joanne Cody does not recall seeing the words "rock excavation" or "partial rock excavation" and does not know why they were there. | |
| 502 | The 30% construction documents, dated February 18, 2000, contain seven indications of rock excavation or partial rock excavation for the Upper Sherman Tree Existing Conditions. These indications were also done by DHM. | |
| 503 | DHM included rock excavation and partial rock excavation in the 30% construction drawings after reading and interpreting the existing conditions mapping that came from the NPS. | |
| 504 | Rod Keiscome can't recall if he ever had any discussions with any representatives of the NPS or the design team as to why the words "rock excavation" or "partial rock excavation" were included on any status level of design drawings. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 505 | The 50% construction documents, dated June 2, 2000, contain seven indications of rock excavation and partial rock excavation. These were placed and remained there at the direction of DHM. | |
| 506 | Rod Keiscome can't recall if he ever had any discussions with any representatives of the NPS or the design team as to why the words "rock excavation" or "partial rock excavation" were included on the 50% design drawings. | |
| 507 | Rod Keiscome does not recall ever being advised by anybody what the purpose of the words "rock excavation" or "partial rock excavation" was. | |
| 508 | The 50% construction documents, dated July 13, 2000, contain no notations for rock excavation or partial rock excavation in the areas where it had previously been noted. | |
| 509 | Joanne Cody does not know why there were two sets of 30% and two sets of 50% construction drawings. This is not customary in her experience. | |
| 510 | Joanne Cody does not know why, from June 2, 2000, which is the first set of 50% drawings, to July 13, 2000, the words "rock excavation" and "partial rock excavation" disappear from the draft construction documents. She believes that there were issues with the Kleinfelder report that was being done concurrently. | |
| 511 | Rod Keiscome does not know why the words "rock excavation" and "partial rock excavation" were deleted from the 50% construction drawings when they were in existence on the 30% and 50% construction drawings previously. | |
| 512 | Rod Keiscome cannot recall if, prior to his deposition, he had ever been involved in any discussions with anybody as to whether the words "rock excavation" or "partial rock excavation" would be removed from any design drawings that were created for this project. | |
| 513 | Rod Keiscome did not participate in any meeting between June and mid-July of 2000 whereby there was discussion regarding the inclusion or exclusion of the words "rock excavation" or "partial rock excavation" on the design drawings for this project. | |
| 514 | Rod Keiscome believes that the person most knowledgeable on behalf of the NPS on this subject matter would be Joanne Cody. | |
| 515 | Joanne Cody does not know why the August 18, 2000 75% construction documents do not contain the references to "rock excavation" or "partial rock excavation." | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 516 | Joanne Cody believes that the construction documents and the geotechnical report are usually done hand in hand and the dates on the reports are typically not the drafts that the designers are using. | |
| 517 | Commencing in July, 2000, the references to "rock excavation" and "partial rock excavation" were removed from the drawings and never reappeared. | |
| 518 | There were not any subsequent iterations of the construction documents, all the way up through the 100 percent complete set (which were issued for construction), including the words "rock excavation" or "partial rock excavation" for the same locale where they were noted in the 30% and first set of 50% construction documents. | |
| 519 | The deletion of the references to rock excavation and partial rock excavation occurred prior to the September 11, 2000 publication of the soils report. | |
| 520 | Specification Section 2310, Subpart 4.2A, of the 75% construction documents governed the contractor's required actions if rock was encountered during excavation. | |
| 521 | When the soils report was received the design team and NPS reached the conclusion that the contractor would not have to blast or, if it did have to blast, it was going to be very little, if any. | |
| 522 | The issued-for-construction set of documents had no line item of work known as rock excavation for the earthwork because they were based on the soils report. | |
| 523 | Other than isolated "floaters," the design team did not expect the contractor to encounter rock that may be required to be blasted in the roadway excavation. | |
| 524 | In the 100% construction documents, Specification Section 2310, Subpart 4.2A changed because the soils report came into play. As a result, the language was revised and the rock excavation was deleted. | |
| 525 | It was Rod Keiscome's understanding, based on his interactions with the design team, Joanne Cody and others, prior to the solicitations going out, that blasting was anticipated for utility trenches but not for other scopes of work. | |
| 526 | The topography survey for the design work was performed late in the design process. | |
| 527 | The design team did not independently review or validate the topographic survey provided to them by the NPS. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 528 | By not independently reviewing or validating the topographic survey provided to them, when combined with the use of an erroneous compaction factor, the quantities used in the design calculations were inaccurate. | |
| 529 | On September 7, 2000, which was during the design phase, the NPS concluded that the project should be able to be sequenced and completed during a two construction season time frame. The NPS further noted that delay will affect the ability to complete the project in two construction seasons. | |
| 530 | Remcon, without having knowledge of the NPS independent conclusion, bid and scheduled the project to be completed in two construction seasons. | |
| 531 | During the design phase, DHM's estimate of probable construction costs ranged from $7,803,335 to $9,032,924. | |
| 532 | The $9,032,924 Class A Cost Estimate, dated October 24, 2000, was based on the plans being 100% complete and the compaction factor of excavated material being 40%. | |
| 533 | On November 21, 2000, the designers revised their Class A Cost Estimate of construction costs based on 100% submittal drawings, to $8,989,462. | |
| 534 | On February 9, 2001, the last Class A Cost Estimate prepared by the designers, prior to proposals being solicited from contractors, estimated the probable construction cost at $8,982,049. | |
| 535 | As of March 29, 2001, the final government estimate was $7,144,723.76. | |
| 536 | Remcon's final proposal amount was $7,121,636. | |
| 537 | During the bidding phase, the designers' Class A revised construction Cost Estimate, dated April 16, 2001, was $7,669,217.95. | |
| 538 | All of the cost estimates prepared by the designers used a markup for overhead and profit of 18%. | |
| 539 | Remcon's bid used a 17.4% markup for overhead and profit. | |
| 540 | The engineer's estimate, by DHM, of the cost to construct the project was $8,480,640. | |
| 541 | The project specifications were not completed until February 27, 2001. | |
| 542 | At that time, the site was under winter weather conditions. | |
| 543 | The July 10, 2001 daily log of construction says, "Joanne said that the adjustment alignment (horizontal Station 25 to 30) would be faxed to Remcon, surveyors, and to me today. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 544 | On July 10, 2001, the NPS, without participation of the design team, produced revised alignment for the access road and upper parking lot. | |
| 545 | Raymond Tuttle was not consulted about the realignments that were directed in writing by the NPS to Remcon as to the access road realignment. | |
| 546 | The design team was frozen out of the road realignment change and the NPS just assumed responsibility to do it themselves. | |
| 547 | On July 27, 2001 the contractor's surveyor is being given some revised sheets concerning layout for the Sherman Tree Trail. | |
| 548 | The day before, the contractor was directly given revised sheets for elevations and coordinates for the upper parking lot. | |
| 549 | Earlier in July, there were changes to the access road. | |
| 550 | Each phase of the project, except for the lower parking area and comfort station, had some design revisions that had been given to the contractor during the month of July, 2001. | |
| 551 | On July 30, 2001, Bill Morris sent an email to Dan Savage saying, "Dan, please check the points you sent me for the lower parking lot. I believe they are off by 100 feet." | |
| 552 | Rod Keiscome can't recall if ultimately the points were off by 100 feet. | |
| 553 | On July 31, 2001, Dan Savage sent an email to Bill Morris, stating, "Bill, I just saw the lower parking elevations are off 100 feet as you had noticed. I will correct and send you a new text file along with centerline points Wednesday." | |
| 554 | Rod Keiscome can't recall if anybody ever advised him at any time before his deposition that the design was off by as much as 100 feet in a particular location on this project. | |
| 555 | It does concern Rod Keiscome if it was a true statement that the design was off by up to 100 feet. | |
| 556 | On July 31, 2001, Andrea Lind sent an email to Bill Morris, with copies to Bob Smith and Joanne Cody regarding spot grade adjustment. The email says, "Hi Bill. Is it too late to change trail .3 from elevation 7057.56 to elevation 7057.22?" | |
| 557 | Rod Keiscome can't recall if anybody brought to his attention that these types of changes were being made in July of 2001. | |
| 558 | Any changes that are significant should be communicated directly to the Contracting Officer. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 559 | With respect to whether, if his COR is in the field and sees a tree in the way and decides that in order to save the tree, the centerline of the road needs to be moved 5 to 11 feet, Rod Keiscome believes that this change might be significant or insignificant, depending upon the project. It is quite conceivable on any project that that could have occurred with field adjustment. | |
| 560 | Rod Keiscome doesn't know if making a "field adjustment," as just described, was within the authority of the CORs on this project, without him having issued a verbal authorization, a Contracting Officer's Directive, or a written modification. | |
| 561 | The contractor was expected to know whether they should or shouldn't follow such a communication to the COR, even though Rod Keiscome doesn't know whether the CORs had the authority to make field adjustments because "the communications from the Contracting Officer to the contractor provide the authority in the appointment letter." | |
| 562 | Rod Keiscome isn't sure if, when the contractor received a field adjustment from his COR, the contractor was supposed to make a submittal. | |
| 563 | Bob Russell reports on August 8, 2001 that Joanne Cody and Andrea Lind of DHM personally reviewed the blasting/drilling area and authorized steeper slopes to field conditions. | |
| 564 | On August 8, 2001, Willie DeOcampo sent an email to Andrea Lind, Joanne Cody, Ray Todd, and Bob Russell regarding overruns on 200Q. He sent this email because he was questioning the designers in terms of how they came up with quantities--he wanted to know what the designers were thinking when they designed the project. The overruns were questionable because the NPS was seeing a 350 percent overrun on an estimated quantity. | |
| 565 | By August 8, 2001, Willie DeOcampo had at his disposal and reviewed the information from his inspector, which said that there was a differing site condition, and the geotechnical report, which indicated that blasting wouldn't be required because all rock was going to be rippable. Nevertheless, Willie was looking for answers as to why the NPS shouldn't have to pay Remcon because he always looks for why the NPS is making overruns on certain thing. He isn't sure why he wasn't just looking for natural information. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 566 | By August 8, 2001, Rod Keiscome was already questioning why Pay Item 26 (hauling materials out of the park) was almost 350 percent over the estimated quantities. | |
| 567 | On August 8, 2001, Bob Russell sent a fax to Willie DeOcampo regarding blasting and attaching Jeff Northrop's fax with attached blasting costs. | |
| 568 | Willie DeOcampo had received and reviewed Bob Russell's August 8th fax, with the attachment from Jeff Northrop, by the morning of August 9, 2001. When he received it, he came to the borderline conclusion that Remcon was claiming a differing site condition. | |
| 569 | When Willie DeOcampo received the August 8, 2001 fax from Bob Russell, he knew that Remcon was seeking additional compensation, was proposing tracking the cost on a day-to-day basis, and perceived that the overrun could be as high as 500 percent. | |
| 570 | In response to the August 8, 2001 fax from Bob Russell, Willie DeOcampo probably would have instructed him to go ahead and keep dailies on how many men from California Drilling and Blasting was on site and what they were performing. | |
| 571 | In response to the August 8, 2001 email, Robert Smith responded that they didn't expect rock to be encountered that needed to be blasted. | |
| 572 | On August 9, 2001, Rod Keiscome communicated to Willie DeOcampo that he was considering terminating the contract for convenience of the government as a result of the overruns on the project. | |
| 573 | Independent of the differing site condition issue, there were a whole series of revisions to the drawings during the months of July and August of 2001. | |
| 574 | On August 21, 2001, Bob Russell received revised drawings for the Upper Sherman parking area from DHM with a request to forward them to Jeff Northrop of Remcon. | |
| 575 | On August 22, 2001, Bob Russell forwarded the revised drawings to Jeff Northrop of Remcon. | |
| 576 | Willie DeOcampo isn't sure if the still pending design issues and revisions were finalized by the design team in conjunction with the NPS before Remcon got out to the site to start working in 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 577 | In order to give the most complete, accurate response to an inquiry, Robert Smith wanted to make sure the baseline information he was working with was up-to-date. However, the information he was working from at all times was not up-to-date based on construction activities not having been communicated to him. | |
| 578 | On May 9, 2002, Bob Smith sent Joanne Cody, Ray Tuttle, Andrea Lind, and Willie DeOcampo revised and proposed grades for the Sherman Tree Trail. | |
| 579 | On May 22, 2002, Bob Smith emailed Willie DeOcampo advising that the stone stair quantity for the Sherman Tree Trail had to be adjusted. | |
| 580 | On May 22, 2002, Willie DeOcampo emailed Bob Smith seeking the Sherman Tree Trail revisions indicating where changes are required. | |
| 581 | On May 22, 2002, Bob Smith advised Willie DeOcampo that revised Upper Sherman parking area and Sherman Tree Trail plans were being worked on. | |
| 582 | On May 24, 2002, DHM sent Martin and Martin revised grading and parking lot plans, and Martin and Martin needed them to prepare design materials for the NPS. | |
| 583 | By email on June 4, 2002, Steve Christensen sought clarification as to what plans should be used to build the trail. | |
| 584 | On June 5, 2002, Bob Russell prepared an estimate to raise the Upper Sherman parking area. He estimated using a 20% compaction factor. | |
| 585 | On June 19, 2002, Steve Christensen wrote to Willie DeOcampo and Rod Keiscome asking when he would receive the further revised Sherman Tree Trail drawings, dated August, 2001, as the Sherman Tree Trail revised drawings he was given referenced others he was not given. | |
| 586 | On June 19, 2002, Remcon inquired what plans were to be used to construct the Sherman Tree Trail as some of the plans referenced on the revised Sherman Tree Trail drawings had not yet been received by Remcon. | |
| 587 | The plans called for a crown on the Upper Sherman Access Road. | |
| 588 | Remcon built by a crown on the Upper Sherman Access Road. | |
| 589 | As of July 25, 2002, a crown was in place on the Upper Sherman Access Road. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 590 | On July 25, 2002, NPS inspectors, along with Remcon, concluded that the Upper Sherman Access Road, between Stations 24+00 and 30+00, should be super elevated, rather than a crown, to fit the roadway into the rock shoulders and operate more successfully. | |
| 591 | The change from a crown to super resulted in extra work being performed by Remcon. | |
| 592 | No modification has been issued for the extra work performed by Remcon to change the Upper Sherman Access Road from a crown to a super. | |
| 593 | The location of this change is precisely where the differing site condition (rock blasting) was encountered. | |
| 594 | On June 28, 2002, Remcon notified the CO in writing of grading conflicts and errors on plans causing delay, disruption and extra costs and requiring immediate attention. | |
| 595 | On June 28, 2002, Remcon notified the CO that if immediate answers were not provided to clean up conflicts and errors, then it would be forced to cease work. | |
| 596 | On August 31, 2002, Steve Christensen wrote Mike Giller advising that the lack of survey control on the Sherman Tree Trail continues. | |
| 597 | On September 5, 2002, Loren Mangrum wrote Joanne Cody and Mike Giller that there was physical interference between Stations 36 and 48 in the Upper Sherman Access Road with trees affecting parking lot layout. | |
| 598 | Jack Vance and Loren Mangrum confirmed in a site walk that there was a physical interference with trees. | |
| 599 | This is the same area where the dry laid stone wall was affected by trees. | |
| 600 | On September 5, 2002, Jack Vance wrote Loren Mangrum, Joanne Cody, and Mike Giller advising of the same problem and stated that a surveyor was needed to check out if control points in the drawings were inaccurate. | |
| 601 | No surveyor was bought on site by the NPS despite problem identification. | |
| 602 | On September 10, 2002, Loren Mangrum wrote that trees and rocks are affecting the project as they are in the way. | |
| 603 | Multiple changes occurred to the Sherman Tree Trail after the contract with Remcon was entered into. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 604 | The last series of changes are set forth in Modification No. 5, dated November 20, 2002. | |
| 605 | Between the issuance of the Notice to Proceed on June 11, 2001 and November 20, 2002, when Modification No. 5 was issued, changes in trench grades, trail points, stone steps, culverts and other Sherman Tree Trail features occurred numerous times. | |
| 606 | Between the issuance of the Notice to Proceed on June 11, 2001, and the end of construction in November of 2002, multiple changes to the Upper Sherman parking area and Upper Sherman Access Road were issued. | |
| 607 | The access road, parking lot, and/or trail were relocated because of natural features that were found to be in the way. | |
| 608 | The A/E designers communicated to Joanne Cody that they wanted to use a geotechnical engineer and she told them that if that is what they needed, go ahead. | |
| 609 | Joanne Cody recalls that Kleinfelder was the geotechnical engineer who was hired by the design team and actually published a geotechnical report. | |
| 610 | The geotechnical report was made part of the contract documents. | |
| 611 | The decision to include the geotechnical report was the A/E's responsibility. However, Joanne Cody, as part of her quality assurance, allowed it to be part of the contract documents. | |
| 612 | The task order for the design of the construction documents required the outside designers to provide complete geotechnical and soils investigations and report to adequately document subsurface conditions for the total project. In compliance with Task Number 5 on page 3 of the Scope of Services of Task Order No. 21, the A/E design team procured the geotechnical report, not the NPS. | |
| 613 | Martin and Martin solicited Kleinfelder's proposal to perform the geotechnical investigation and report on February 4, 2000. | |
| 614 | Kleinfelder, a geotechnical engineering company, was hired by Martin and Martin to perform the geotechnical report. | |
| 615 | Kleinfelder was hired late and performed its work in the summer of 2000, after the design was between 50 and 75% completed. | |
| 616 | Because the geotechnical report was procured late, Martin/Martin, Inc. needed to have additional time to finalize the construction documents once it got the geotechnical report. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 617 | Rod Keiscome is aware that Raymond Tuttle testified that, because the NPS was late in procuring the geotechnical report, Martin/Martin, Inc. needed to have additional time to finalize the construction documents once it got the geotechnical report. | |
| 618 | Rod Keiscome has no reason to believe that Mr. Tuttle's deposition testimony is inaccurate in that regard. Rod Keiscome can't recall if anybody has indicated to him any information inconsistent with Mr. Tuttle's deposition testimony on that subject. | |
| 619 | The Geotechnical Investigation Report was issued particularly late on this Project, after the construction document phase was substantially in progress. Specifically, the design team had already gone through 30, 50, and 75 percent drawings by the time it was issued. This was the latest Robert Smith had ever seen a soils report be prepared for a Project. | |
| 620 | Geotechnical reports are an important feature of the contract and part of the contract documents. | |
| 621 | The Kleinfelder soils report was published in September, 2002, after the construction documents were more than 75% complete. Rod Keiscome can't recall why the soils report was not published until after the 75% construction documents were published. | |
| 622 | Kleinfelder performed its field exploration on July 5, 6, and 13 of 2000. Rod Keiscome doesn't know why it didn't happen sooner. | |
| 623 | Borings B-1, B-2, B-3 and B-4 were done in early July, 2000. | |
| 624 | As of July 5, 6, and 15 of 2000, the construction drawings were already 50% complete. | |
| 625 | The late arrival of the soils report had a negative impact on the ability of the design team to perform their work swiftly because they were missing data and had to make assumptions. | |
| 626 | Until the soils report was received, the design team had assumed that there was going to be a lot of rock that would have to be blasted by the contractor in constructing the Upper Sherman Access Road. | |
| 627 | The Geotechnical Investigation Report for the Project, prepared by Kleinfelder, Inc., was issued on September 11, 2000. | |
| 628 | Rod Keiscome can't recall if, when Kleinfelder did its soil investigation report, the access road stationing and its profile was identified as to where it was going to be. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 629 | As the Contracting Officer, it would be important for Rod Keiscome to know that the geotechnical investigation was done in the location where the work was going to be done, as contrasted with somewhere else. | |
| 630 | It would be Rod Keiscome's expectation that when Kleinfelder went out to the site to do whatever borings or test pits to try to figure out what the contractor was going to encounter in building the road, it would have taken the data from the location where the road was contemplated to be constructed. | |
| 631 | Rod Keiscome doesn't know if this was actually how Kelinfelder did its investigation. | |
| 632 | Section 1.1 of the Geotechnical Investigation Report provides: "Recommendations presented herein should not be extrapolated to other areas or used for other projects without our prior review." | |
| 633 | Section 5.2.2 of the Geotechnical Investigation Report provides: "The upper silty sand and weathered granitic rock material at the site appear to be conducive to ripping…The apparent velocities indicate the weathered granitic rock should be rippable in large excavations with the appropriate equipment in good working condition." | |
| 634 | The apparent seismic compressional velocities specified in the Geotechnical Investigation Report indicate that the material to be excavated at the Project would be rippable with a D8 dozer. | |
| 635 | In Section 7.1 of the Geotechnical Investigation Report, Kleinfelder recommended that it conduct a general review of the final plans and specifications for the Project to evaluate that its earthwork and foundation recommendations had been properly interpreted and implemented during design. | |
| 636 | In Section 7.2 of the Geotechnical Investigation Report, Kleinfelder recommended that all earthwork during construction of the Project be monitored by a representative from Kleinfelder. | |
| 637 | No one from Kleinfelder was hired by the NPS or its inspector to monitor the earthwork. | |
| 638 | Joanne Cody does not know why no one from Kleinfelder was on site to monitor the earthwork during construction. | |
| 639 | Kleinfelder did not monitor the earthwork. | |
| 640 | Section 8 of the Geotechnical Investigation Report provided that, if the scope of the proposed construction changed from that described in the report, Kleinfelder's recommendations should be reviewed. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 641 | When the DSC was encountered, no one called Kleinfelder. | |
| 642 | No one called Kleinfelder when the location of the access road, between Stations 24 and 30, was realigned by the NPS in late June and early July 2001. | |
| 643 | Kleinfelder was not ever consulted about the realignment of the Upper Sherman Access Road. | |
| 644 | The responsibility to contact Kleinfelder was Mr. DeOcampo's as the COR during the construction phase. | |
| 645 | It was not part of Joanne Cody's quality assurance responsibilities to review the recommendations to make sure they were either followed or consciously elected not to follow. No one on behalf of the NPS had this responsibility as Joanne Cody understood it. | |
| 646 | Page 11 of the report contains a table entitled Summary Seismic Line Data. This table contains the apparent velocities of sound transmitted in feet per second. The higher the number means the denser or less weathered the granitic rock encountered is. | |
| 647 | The higher the number, the denser/harder the rock and the more difficult it is to rip. | |
| 648 | The tables contained in the geotechnical report by Kleinfelder were more germane to Martin/Martin's scope of work for the design team. | |
| 649 | If the access road is then realigned off the profile of the design, the geotechnical data may not have the same or accurate application. | |
| 650 | Raymond Tuttle developed the design for the access road with the interpretation and understanding that the soils report stated clearly that, with the exception of utility trenching, all material expected to be encountered by the contractor in constructing the access road was expected to be rippable by a Cat D8 dozer. | |
| 651 | Robert Smith understood that the geotechnical engineer determined and published in the geotechnical report that the rock to be encountered, while dense, was nevertheless rippable based upon the standards published by Caterpillar for a D8 dozer, such that blasting wouldn't be required to build the access road in the location where it was planned to go. | |
| 652 | Willie DeOcampo interpreted that the report communicates to a reader knowledgeable about the subject that the rock expected to be encountered was all lower in threshold density such that it met the standards for rippability of a D8 dozer as published by Caterpillar. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 653 | After reviewing the report, Willie DeOcampo came to the conclusion that Kleinfelder communicated that the rock to be encountered by the contractor on this project was all able to be ripped by conventional construction equipment using the standard Caterpillar D8 dozer. | |
| 654 | The soils report concluded that all rock material encountered along the Upper Sherman Access Road excavation, except isolated floaters, were rippable. | |
| 655 | The Caterpillar Performance Handbook provides that granitic rock with a seismic velocity between zero and 5800 is rippable with a D8R dozer. | |
| 656 | The apparent seismic velocities reported by Kleinfelder in its soils report to be encountered were between 1115 and 5,747. | |
| 657 | Rod Keiscome had seen the geotechnical investigation report but doesn't know when he first received it because he can't recall if it is located within the specifications or is a separate document. | |
| 658 | The last sentence of the second paragraph on page 31 of the geotechnical report reads, "The recommendations provided in this report are based on the assumption that an adequate program of tests and observations will be conducted by Kleinfelder during the construction phase in order to evaluate compliance with our recommendations. | |
| 659 | Rod Keiscome does not know if this was complied with by the NPS on this project. | |
| 660 | Rod Keiscome can't recall if there was anyone with geotechnical expertise and knowledge assigned to this project to perform tests and observation during the construction phase while Remcon was on-site performing work. | |
| 661 | On June 25, 2001, Bill Morris of Giuliani & Kull sent an email to Dan Savage. | |
| 662 | In the June 25, 2001 email, Bill Morris states, "We are requesting further information to construction-stake the parking lots and trail. We have the horizontal information. We need the vertical data." | |
| 663 | Mr. Savage talked to Joanne Cody about this request because it was atypical. The NPS doesn't usually do this for contracts. The surveyor gets the documents and that is it. Joanne Cody recommended to Willie that the NPS go ahead and help the surveyors by giving them the information. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 664 | It was Joanne Cody's understanding as of June 25, 2001 that the information that was provided on the contract drawings was adequate and the information requested in the email was not necessary in order for the contractor to accurately build the project. | |
| 665 | Willie DeOcampo authorized Dan Savage to respond to the June 25, 2001 email. | |
| 666 | The information on the construction drawings was not adequate to accurately build this project. | |
| 667 | Joanne Cody does not know what the critical path on this project was as of June 25, 2001. | |
| 668 | Joanne Cody understands that the critical path is the longest chain of events, that if something delays something that is on the critical path, be definition it causes a delay to the project. | |
| 669 | Robert Smith recalls meeting with Bill Morris, one of Giuliani & Kull's engineers and a surveyor on behalf of Remcon. According to Robert Smith, Bill Morris seemed to be a experienced, knowledgeable and able fellow. There was no reason for Robert Smith to believe that Bill Morris wasn't competent in what he did and how he did it. | |
| 670 | Robert Smith concluded that Bill Morris was a solid guy who knew what he was doing. | |
| 671 | The Sherman Tree Trail, per survey, is very close to design grade. | |
| 672 | By letter dated April 17, 2002, Remcon informed Willie DeOcampo and Robert Smith that the survey on the Sherman Tree Trail confirmed that the Sherman Tree Trail, as then constructed, was per plans. | |
| 673 | On May 9, 2002 and May 10, 2002, Remcon's survey crew continued checking existing stakes in the parking area and access road. All existing stakes were confirmed to be correct. New stakes were installed as required. | |
| 674 | On May 31, 2003, Giuliani & Kull sent Remcon its statement of extra work claim for $41,782.50. | |
| 675 | Following the hauling of the burn pit materials, Remcon planned to perform its mass excavation work which principally consisted of excavation and grading of the access road and the parking lots in the Upper Sherman portion of the project. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 676 | This effort was scheduled to be a duration of 21 calendar days. Instead, it took over a year to perform due to the road relocation and the failure of the government, until September, 2002, to issue its final design changes to Remcon so that Remcon could complete the earthwork portions of the project and commence paving. | |
| 677 | DHM strove to avoid having conflicts in its drawings. | |
| 678 | A Notice to Proceed for the Project was issued effective June 11, 2001. | |
| 679 | On June 11, 2001, Remcon began falling and logging the trees marked by the NPS. | |
| 680 | As a general rule, if plans are prepared completely and accurately, it is normal that a surveyor, using the monuments and benchmarks identified, is able to survey the project without questions. | |
| 681 | Remcon's surveyor could not survey this project using solely the monument and benchmarks identified. | |
| 682 | Prior to June 26, 2001, the trees and had been cleared and Remcon's surveyors had come out to stake the road. | |
| 683 | Once the logging operations were complete, Remcon's surveyor, Giuliani & Kull, began to lay out the Upper Sherman Access Road and Parking Areas. Giuliani & Kull immediately discovered that about 600 feet of the road, as shown in the NPS plans and specifications, did not match the clearing limits that had been laid out by Ms. Demetry in the field. | |
| 684 | The trees were marked to be removed by the government, between Stations 24 and 30 on the access road, in a location into the hill from where the designers intended. | |
| 685 | This was discovered after Remcon had removed the trees. | |
| 686 | There was a significant discrepancy between Stations 24 and 30 (approximately 600 lineal feet) between the area Remcon had cleared per Ms. Demetry's direction and where the NPS plans and specifications called for the access road to be constructed. | |
| 687 | The trees, designated by Ms. Demetry to be removed along the access road right-of-way, between Stations 24 and 30, were in a location up to fifteen feet off of the right-of-way as set forth in the plans. | |
| 688 | This discrepancy, for which Remcon had no responsibility, initiated a series of re-designs and other problems that impacted Remcon's ability to schedule and complete its work as it had originally planned. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 689 | Because Giuliani & Kull's stakes were among the many trees which had not been marked to be removed, either the road had to be relocated into the hill, or more trees had to be removed and a big scar of cleared area would be seen by park visitors. | |
| 690 | Having to remove additional trees and signature-type boulders is like a cardinal sin as far as the NPS is concerned because its goal is to conserve the natural resources. | |
| 691 | On June 26, 2001, Remcon's surveyors were on site surveying and staking the Upper Sherman Access Road. | |
| 692 | On June 26, 2001, Remcon started grading the access road. | |
| 693 | On June 26, 2001, Bob Russell noted in his daily report that Remcon advised him of concerns regarding the centerline of the Upper Sherman Access Road between Stations 8 and 12. | |
| 694 | On June 26, 2001, Bob Russell noted in his daily report that Willie DeOcampo reviewed the Remcon concerns in the field between Stations 8 and 12 and Willie DeOcampo directed a realignment of up to a maximum of 11 1/2 feet right of the staked location to miss an existing tree. | |
| 695 | Joanne Cody believes that the change described in the June 26, 2001 daily log could be major or could be minor. It depends on conditions. If there is a Sequoia tree in the middle of the 11-foot, then that's a major condition because the contractor would be removing a natural feature that the NPS wants to keep. If the change does not affect the maximum grades, everything that the NPS had designed the road to the road design, then it may be minor. | |
| 696 | There are some problem trees that the NPS wants taken out. However, if it was a big sugar pine or a big Sequoia, then the NPS would want them in place. | |
| 697 | Joanne Cody does not know if moving the road up to 11 1/2 feet from the staked location was into the hillside or away from the hillside. | |
| 698 | Joanne Cody does not know if the road was moved into rock or into soil. | |
| 699 | That would have consequences because it could affect the content of the geotechnical report and its accuracy, if the road was being moved 11 1/2 foot from where it was previously identified. | |
| 700 | That could have an effect on Joanne Cody's determination as to whether it was a minor field adjustment or a significant change. | |