| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 701 | Joanne Cody was made aware that Willie DeOcampo relocated the road up to 11 1/2 feet after it was done. | |
| 702 | Willie DeOcampo was the leader of the team and Joanne Cody respected his decision to relocate the road. | |
| 703 | Joanne Cody does not know if the relocation of the road was brought to the attention of Mr. Keiscome, the Contracting Officer. | |
| 704 | Rod Keiscome can't recall if he was ever made aware, prior to his deposition, that Willie DeOcampo had made such adjustments and alignments. | |
| 705 | Willie DeOcampo was not authorized to make such adjustments and alignments on Rod Keiscome's behalf. | |
| 706 | Rod Keiscome had made it clear to Mr. DeOcampo, before June 26, 2001, that he was not to give the direction that is recorded that he gave the contractor on June 26th. | |
| 707 | Both of the contractor and Willie DeOcampo are aware or should be aware of the COR's authority. | |
| 708 | Rod Keiscome believes that Remcon should have realized that Willie does not have that authority and should have contacted the Contracting Officer directly. | |
| 709 | With respect to the activities that are referenced in Bob Russell's June 26, 2001 daily log, Remcon was supposed to cease operations and wait for direction from the Contracting Officer before proceeding on the activities referenced. | |
| 710 | Rod Keiscome won't say whether there was other work that the contractor could perform on the critical path as of June 26th had the contractor suspended his operations on the road realignment. | |
| 711 | Remcon complied with Willie DeOcampo's direction to realign the centerline of the Upper Sherman Access Road, between Stations 8 and 12, up to a maximum of 11.5 feet. | |
| 712 | Bob Russell's June 26, 2001 daily log records that Willie DeOcampo was on site on June 26, 2001. | |
| 713 | Willie DeOcampo isn't sure if the relocation was up to 11 1/2 feet in that specific location but he has no reason to believe that what Mr. Russell wrote in his June 26, 2001 daily log was not true and correct. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 714 | Independent of him actually being there and making the decision that is reflected in Bob Russell's June 26, 2001 daily log, as part of his standard business practice, Willie DeOcampo received these daily reports from Mr. Russell and reviewed them before sending them off to be filed. | |
| 715 | The contractor had a responsibility to build the road as designed. | |
| 716 | It was Willie DeOcampo's intent, when he walked the site with Steve Christensen on June 26, 2001, that Steve relocate the road in accordance with the discussions that Willie had with Steve. | |
| 717 | On June 27, 2001, the surveyors staked the centerline between Stations 24 and 30. | |
| 718 | At the time, the surveyors noted that the centerline of the Upper Sherman Access Road was not in the location where the trees were cleared. | |
| 719 | Notice of the conflict between the location of the staking of the Upper Sherman Access Road and the cleared area, between Stations 24 and 30, was provided to Bob Russell on June 27, 2001. | |
| 720 | Willie DeOcampo was on site on June 27, 2001 when the conflict was identified, and a restaking effort was undertaken so that Willie DeOcampo could personally review it on June 28, 2001 in the field. | |
| 721 | On June 27, 2001, while at the project site, Willie DeOcampo was involved in communications regarding realignment of the access road whereby the road would be relocated within the cleared area. | |
| 722 | Rod Keiscome believes that Bob Russell was also aware that they were not authorized to make changes to the design. | |
| 723 | The road, as designed between Stations 24 and 30, is approximately 22 feet wide. | |
| 724 | If stakes were approaching the edge of the cleared area, the road was eleven feet off of the cleared area. | |
| 725 | Bob Russell's June 27, 2001 daily log of construction, under the heading Unforeseen Developments on Job Continued, Mr. Russell wrote: "Work with surveyors to realign center line of access road within. So that road would be located within the cleared area, surveyors recalculated suggested center line location to fit the site and will restake tomorrow so that Willie can review." | |
| 726 | Willie DeOcampo recalls being involved in communications whereby the subject matter in Bob Russell's June 27, 2001 daily log was discussed. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 727 | Multiple visits by Willie DeOcampo and Joanne Cody in late June and early July 2001 occurred and ultimately resulted in a NPS direction to relocate the road between Stations 24 and 30 further into the hill where the trees had been logged. | |
| 728 | As a result, the access road needed to be re-surveyed by Remcon's surveyor. | |
| 729 | To do so, Remcon was directed to survey the new road alignment. | |
| 730 | This extra work was performed on July 16, 2001. | |
| 731 | On June 28, 2001, Bob Russell recorded in his daily report that Remcon's surveyors continued restaking the suggested centerline of the Upper Sherman Access Road between Stations 24 and 30, for review by Willie DeOcampo. | |
| 732 | Willie recalls this happening. | |
| 733 | On June 28, 2001, Willie DeOcampo reviewed the surveyed realignment of the Upper Sherman Access Road between Stations 24 and 30 and said he would review it with Joanne Cody next week. | |
| 734 | In response, Bob Russell told Willie DeOcampo that a quick decision was needed so as not to delay Remcon. | |
| 735 | Willie DeOcampo agreed that if the alignment was not adjusted, additional trees and boulders will have to be moved. | |
| 736 | Willie DeOcampo recalls this as being what actually transpired. | |
| 737 | The June 26, 2001 daily log dealt with Station 8 to Station 12. The June 28, 2001 daily log dealt with Station 24 to Station 30, which is another 620 lineal feet. | |
| 738 | Willie DeOcampo made Joanne Cody aware of the adjustments he felt were necessary between Stations 8 and 12 and 24 and 30 sometime in July when he got back to Denver. They discussed both of the changes at that time, but the one from Stations 24 and 30 more so than the other one. | |
| 739 | Joanne Cody doesn't know why they spent more time talking about the realignment between Stations 24 and 30. It seemed to be of more concern to Willie but she would have to see the drawings to be able to say why it was more significant. | |
| 740 | Joanne Cody thinks that Willie DeOcampo was more concerned about the realignment between Stations 24 and 30 because there was less grading on the area from 8 to 12 than the grading that was required for the change between 24 and 30, probably because 24 to 30 was in the deep cut. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 741 | Stations 24 to 30 are located on US13 and US14. | |
| 742 | The contours on US14 indicate that the access road between Stations 24 and 30 was a cut because when the existing contour cuts in, uphill on the existing contours, and back to where they connect, then it's a cut. | |
| 743 | Between Stations 8 and 12, the road was moved up to 11 1/2 feet. From looking at the grading plan, it looked like this was an area that was even in terms of cut and fill. | |
| 744 | The contractor could not walk the site in the winter of 2001 because of the location of where it is and the presumption that it was under snow. So, the contractor, having received the contract documents in late February, 2001 was physically unable to see anything and had to rely exclusively on what was shown in the drawings, specifications and documents. | |
| 745 | The specifications don't depict the actual site conditions. They may describe it in words but they don't depict it in a picture like format. | |
| 746 | Joanne Cody contends that the contractor would have the work limit line to know the extent of his work and this would indicate to the contractor that between Stations 24 and 30 the contractor was going to encounter natural conditions that would cause the center line to be relocated over what is shown on US13 and 14. | |
| 747 | Bob Russell's June 27, 2001 daily log essentially says that the contractor cleared it within the area that was marked, and thereafter it was determined that the road, because of one or more natural features, did not fit or was misdesigned. Mr. DeOcampo then showed up and said that he needed to talk to Joanne because additional trees and boulders would otherwise have to be removed. | |
| 748 | Bob Russell was responsible to make sure the contractor stayed within the limits that were marked. | |
| 749 | Willie DeOcampo does not know when the NPS issued its decision regarding the road realignment between Stations 24 and 30 that was the subject of Bob Russell's June 28, 2001 daily report. | |
| 750 | The stationing that is referenced in Bob Russell's June 28, 2001 daily log is that portion of the access road that became the subject of the differing site condition. | |
| 751 | On June 26th, June 27th and June 28th, the center line is being relocated but they are not the subject of either a Contracting Officer's Directive or a modification at that time. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 752 | With respect to whether Rod Keiscome would characterize these as constructive changes, Rod Keiscome responds, "I see that on each of these. I believe they say restaked suggested." | |
| 753 | Rod Keiscome does not know if he believes Remcon elected to move the road up to 12 feet just for its own convenience. | |
| 754 | Rod Keiscome can't recall if he ever asked that question of anybody. | |
| 755 | It is important information for Rod Keiscome to know why the road is built in a location other than what is designed. | |
| 756 | Rod Keiscome can't recall if Mike Giller, Ray Todd, Jack Vance, Bob Russell, Loren Mangrum, Joanne Cody, or Willie DeOcampo ever advised him of all the changes that occurred on the project, prior to him seeing them during his deposition. | |
| 757 | Rod Keiscome believes that it is the contractor's responsibility and the representatives of the Park Service's responsibility to communicate to the Contracting Officer. | |
| 758 | With respect to whether Rod Keiscome gave Remcon a directive at the beginning of this project when they had questions and issues to bring it to the attention of Jacobs, Rod Keiscome responds, "You'd have to look at the documentation that was issued if there was anything in writing from me in that regard." | |
| 759 | The direction given to Remcon at the preconstruction meeting by the representatives of the National Park Service that were present was that written communications and inquiries from Remcon were to go to the Project Inspector. | |
| 760 | However, Rod Keiscome believes that, if there are changes occurring out in the field that are not CO-directed, Remcon does have the task of communicating directly with the Contracting Officer. | |
| 761 | Remcon's earthwork operations on the Upper Sherman Access Road commenced during the week ending June 29, 2001. | |
| 762 | Willie DeOcampo can't say if the contractor was delayed in performing the work between Stations 24 and 30. | |
| 763 | Willie DeOcampo did not, on behalf of the NPS, retain one or more surveyors to go out to the project site and prepare a revised layout as a result of the alignment issue arising. | |
| 764 | There were a series of changes modifying the alignment of the road such that, in the area between Station 24 and 30, the so-called deep cut, realigned into the hillside. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 765 | On July 2, 2001, Bob Russell emailed to Willie DeOcampo photographs of the Upper Sherman Access Road realignment which Willie DeOcampo had reviewed with Steve Christensen the prior week, between Stations 8 and 12. | |
| 766 | On July 2, 2001, Bob Russell sent Willie DeOcampo and Joanne Cody an email entitled Access Road Suggested Realignment from Station 24+46 to Station 30+18, which included photos of the Upper Sherman Access Road realignment between Stations 24 and 30. | |
| 767 | Rod Keiscome can't recall if the July 2, 2001 email was ever brought to his attention. | |
| 768 | The July 2, 2001 email is clear documentation of Rod Keiscome's construction manager and CORs communicating regarding design changes. | |
| 769 | Rod Keiscome would have expected both the contractor and the CORs to advise him about design changes. | |
| 770 | On July 2, 2001, Bob Russell faxed to Willie DeOcampo the offset details and dimensions for the realignment between Stations 24 and 30. | |
| 771 | For almost 300 feet, the offset exceeded 8.5 feet, and was between 12.41 and 15.22 feet offset for almost 200 of those feet. | |
| 772 | On July 2, 2001, Bob Russell documented to Willie DeOcampo the actual dimensions of the offset of the centerline, between Stations 8 and 12, of the Upper Sherman Access Road, that were directed to be realigned on June 26, 2001. | |
| 773 | The maximum offset and adjustment was 11 feet between Stations 8 and 12. | |
| 774 | The relocation of the Upper Sherman Access Road centerline between Stations 8 and 12 caused additional earthwork to be performed by Remcon in constructing the Upper Sherman Access Road. | |
| 775 | On July 2, 2001, Bob Russell sent an email to Willie DeOcampo regarding offsets and relocation as a result of the tree discussed in the June 26, 2001 daily log. | |
| 776 | Willie DeOcampo received Bob Russell's July 2, 2001 email. | |
| 777 | When Willie DeOcampo received Bob Russell's July 2, 2001 email, he agreed that the offsets that were set forth therein were the appropriate offsets that Mr. Christensen should undertake to achieve that which Willie communicated to him on June 26, 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 778 | There was movement of the access road between Station 10+39 and 10+98. | |
| 779 | At Station 10+60, the road was realigned 11 1/2 feet. | |
| 780 | There was a realignment to the contract documents right-of-way for the access road to be built. | |
| 781 | Willie DeOcampo doesn't know if there has ever been any request for additional compensation for the realignment reflected in Bob Russell's June 26, 2001 daily log and Bob Russell's July 2, 2001 email. | |
| 782 | Willie DeOcampo never talked to the surveyor and communicated to them that he, as COR, had communicated to the contractor that it was okay to realign the road in the locations reflected in Deposition Exhibits 172, 173, and 174. | |
| 783 | On July 2, 2001, Remcon's surveyor, Giuliani &Kull sent Joanne Cody a drawing of the access road realigned. | |
| 784 | On July 2, 2001, Willie DeOcampo sent an email to Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Scott Ruesch, and Jack Vance, with a cc also to Bob Russell. This email says, "Upper Sherman Road, surveyors laid out centerline and found two places that conflict with existing field conditions. One area is located near Station 28 and 29. The centerline appears to swing further out than our drawings indicate. The clearing has been performed per the drawings; however the center line as staked will make it necessary to clear additional trees and remove signature-type boulders." The email also noted that Remcon had indicated that it believed that its cuts and fills would not balance that they were could be 13,000 CY of excess materials that would have to be transported elsewhere at $15.00/CY. | |
| 785 | The reference to "last week" refers to Willie's presence at the site on June 26th, 27th and 28th. | |
| 786 | Rod Keiscome can't recall if, when he read Willie DeOcampo's July 2, 2001 email, he formed the conclusion that the contractor had cleared the work as required by the plans. | |
| 787 | Joanne Cody received the email on July 2, 2001, read it, and concluded that the contractor had made a mistake. She communicated this conclusion to Willie DeOcampo. | |
| 788 | Joanne Cody can't remember if Willie DeOcampo agreed with her conclusion or disagreed with it. She thinks that he probably disagreed with her. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 789 | Willie DeOcampo is the one who was there on-site and observed the physical conditions. Joanne Cody does not think that he was incompetent to determine that a mistake existed in the drawings. | |
| 790 | In response to Willie's comment that the cut and fills might not balance and that the park wished to pursue the error and omission clause of the contract, Joanne Cody believed that she needed to get Willie the information so that he would see it from the design point of view. | |
| 791 | Joanne Cody did believe that Willie DeOcampo was communicating to her that there was a mistake in the drawings. | |
| 792 | In fact, Willie DeOcampo was communicating that it was more than one mistake to the drawings. It was a mistake regarding a conflict with existing field conditions in two places and the contractor was communicating that the volume of excess material that had been calculated by the design team was wrong. | |
| 793 | The July 2, 2001 email also says, "the surveyor will send you a revised layout." | |
| 794 | Joanne Cody does not know why the contractor's surveyor provided revised layouts. | |
| 795 | Joanne Cody believes that, by doing so, Remcon did not promote or facilitate a response so they could get on and build the job. It was detrimental because the design layout that was provided was a poor design and the NPS had to slow things down. | |
| 796 | Joanne Cody would not believe her statement was in error even if Mr. Keiscome did issue a modification authorizing payment for the effort. | |
| 797 | Joanne Cody was not consulted by Mr. Keiscome at any time as to whether or not any portion of a claim for additional surveying costs should be compensated to the contractor as a result of the centerline, as of late June and early July of 2001, not being able to be constructed in the location as identified on the drawings. | |
| 798 | Joanne Cody was not the person most knowledgeable on that point, Willie was. So, if Willie believed that it was appropriate for such a modification to be issued, then Joanne Cody would defer to his wisdom in that area. | |
| 799 | It is the mission of the NPS to minimize the removal of trees and signature type boulders where possible. | |
| 800 | Willie DeOcampo's July 2, 2001 email indicates that the surveyor laid out the centerline and found two conflicts at 28+39. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 801 | The July 2, 2001 email indicates that the road is being constructed in a location other than shown in the drawings that were issued to Remcon to build the job. | |
| 802 | Willie DeOcampo's July 2, 2001 email also noted that the NPS wanted to pursue the "error and omission" clause of the contract concerning the design team and that Martin and Martin needed to recheck their calculations. | |
| 803 | To the extent there was a design mistake made by the design team, Willie DeOcampo thought, at least as of July 2, 2001, it was a Martin and Martin mistake as contrasted with BRS or DHM. | |
| 804 | Willie DeOcampo's July 2, 2001 email ended as follows: "Joanne, I need to respond or approve the work cited above. Thus, I need answers by the 3rd." | |
| 805 | Willie DeOcampo's intent in writing the July 2, 2001 email was to communicate that, when the surveyors properly staked the road, the center line was further to the right. | |
| 806 | It was Willie DeOcampo's understanding and perception, when he was at the job in late June, 2001, that the surveyors had staked the road properly, where the design indicated it was to be staked. He had no reason to assume that the road was improperly staked when he was there in late June. | |
| 807 | If Willie DeOcampo had come to the conclusion or at least received information that the staking by the contractor's surveyor was improper, it was important information to him. He would have, in the ordinary course of his performance and duties, have noted that in writing and would have expected Mr. Russell to have done so as well. | |
| 808 | With respect to any such written record on the subject, Mr. Russell's dailies reflect that the road was staked properly. | |
| 809 | The July 2, 2001 email reads "Bob and I figure the road center line can be shifted in order to make this work and prevent delays." By writing this, Willie DeOcampo was trying to write that Bob Russell had told him that it would work to move the road." | |
| 810 | Willie DeOcampo's July 2, 2001 email also reads, "The surveyors will send you a revised layout. The contractor believes our cut and fills will not balance." | |
| 811 | On July 2, 2001, Bob Russell sent an email to Willie DeOcampo and Joanne Cody. The first page deals with issues between Stations 24 and 30 dealing with excess excavation. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 812 | On July 2, 2001, there were also some issues and questions regarding realignment between Stations 8 and 12. So, when Willie DeOcampo was there in late June, 2001, he observed two separate issues that had to be addressed regarding realignment, one between Stations 8 and 12, the other between Stations 24 and 30. | |
| 813 | On July 2, 2001, Bob Russell sent Willie DeOcampo a fax. The numbers under the heading Offset From Old Centerline were indicative of the distance in linear feet by which the center line was moved right or left in the area known as the deep cut between Stations 24 and 30. | |
| 814 | The July 2, 2001 fax shows the road offset is up to 15-plus feet. | |
| 815 | Joanne Cody does not know how the road was actually built. | |
| 816 | Joanne Cody did go back and investigate how the road was built between Station 24 and 30 in the field when she visited the site after July 2nd. | |
| 817 | When she did so, she did not use the July 2, 2001 fax or any of the other documentation shown to her during her deposition because the NPS survey was to look at the changes from the as-built survey with the as-designed drawings only, not to interpret them. That was for Willie DeOcampo. | |
| 818 | Joanne Cody also did not use Willie DeOcampo's July 2, 2001 email because there was not information in it to verify in the field. | |
| 819 | Joanne Cody did not ask Willie DeOcampo for any additional information for her to use during her investigation. | |
| 820 | Rod Keiscome does not know whether Remcon built the job in accordance with the realigned center line as reflected in the July 2, 2001 fax. | |
| 821 | Rod Keiscome doesn't know if Remcon was requested by Mr. Russell and/or Mr. DeOcampo to construct the access road in accordance with the offsets shown on the second page of the July 2, 2001 fax. | |
| 822 | Between Stations 24 and 30, when the center line moved to the left, the access road moved into the hillside as contrasted with away from the hillside. This is the area between Stations 24 and 30 that the contractor later contended it had encountered a differing site condition. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 823 | Rod Keiscome does not recall at any point in time indicating in any writing to Remcon that the government was going to withhold money that it had previously paid to Remcon because the access road was constructed in a location other than that shown on the drawings. | |
| 824 | Rod Keiscome may have withheld money from Remcon because the road in the particular location specified in Bob Russell's June 26, 2001 daily log was not in the location set forth in the original design. | |
| 825 | After Remcon left the project, the government hired Psomas to perform a survey. | |
| 826 | Psomas' survey indicated that the access road was not built in the location indicated on the original drawings issued to Remcon to build the job. | |
| 827 | Rod Keiscome does not know if Psomas was furnished Exhibit 180 in order for them to be informed that Remcon had received information telling them that the access road needed to be built in a different alignment than that shown on the contract documents issued to Remcon. | |
| 828 | Bob Russell would be the person most knowledgeable to indicate whether Remcon built the road in accordance with the dimensions indicated on the second page of Exhibit 180. | |
| 829 | Willie DeOcampo, Ray Tuttle of Martin and Martin, and the representatives of DHM who made the adjustments and issued the drawings associated with the access road would also be knowledgeable on the subject. | |
| 830 | Joanne Cody would be a person under the employ of the NPS that would be knowledgeable on this subject given that she was involved in the email communications and was tasked by Rod Keiscome as his COR for design issues on the project. | |
| 831 | Rod Keiscome did not recall ever seeing Exhibit 180 prior to his deposition. | |
| 832 | Willie DeOcampo can't recall if, a result of receipt of Bob Russell's July 2, 2001 fax, the NPS gave direction to the contractor to build the road in accordance with the information set forth therein. He thinks the designers tried to realign the road but it would not be done. | |
| 833 | The government, faced with this issue, brought personnel out from the Denver Service Center to evaluate the issue and made the decision to relocate the road into the hill. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 834 | Between June 26, 2001 and July 2, 2001, the government evaluated this alignment issue and ultimately directed Remcon to relocate the road into the hill where the trees had been moved. | |
| 835 | This was a decision that had serious financial and time ramifications. | |
| 836 | The government admitted it was responsible for this mistake by agreeing to pay Remcon for re-surveying the road into the cleared area in Modification No.4. | |
| 837 | On July 2, 2001, Bill Morris of Giuliani & Kull sent an email to Joanne Cody forwarding an AutoCAD drawing. | |
| 838 | Joanne Cody does not know why Mr. Morris was communicating directly with her on July 2, 2001. She would have expected to receive it from Willie's email. | |
| 839 | Joanne Cody recalls with Bill Morris was an employee of Giuliani & Kull, the contractor's survey group. | |
| 840 | Giuliani & Kull were sending this information to Joanne Cody on July 2, 2001 because of the realignment of the road that Willie had agreed to when he was there in June. | |
| 841 | When Joanne Cody received the July 2, 2001 email from Giuliani & Kull, she forwarded it to Andrea Lind and Martin and Martin to see if it met their needs for design, if it was okay or not. | |
| 842 | Joanne Cody doesn't recall what their response was. | |
| 843 | On July 4, 2001, Bob Russell faxed to Willie DeOcampo a sketch and memo detailing the need to remove one or two additional trees on the Upper Sherman Access Road due to the realignment. | |
| 844 | The first page of the July 4, 2001 fax reads: "Cross-section at Station 27+78 +/- that you requested. Note: Athena and Jack..." | |
| 845 | "Athena and Jack" refers to Athena Demetry and Jack Vance. | |
| 846 | The July 4, 2001 fax continues: "...Note: Athena and Jack agree to move 20-inch fir tree on right. They also agree that if we cannot grade to save 10-inch sugar pine on left that it could be removed (trees are 53 feet center to center)." | |
| 847 | The design width of the road was 22 feet. | |
| 848 | Neither Athena Demetry nor Jack Vance were authorized to make changes with respect to trees to be removed or saved on this project without a Contracting Officer's Directive or modification being issued. | |
| 849 | If a tree was within the work limit and it had been marked by Athena, Joanne Cody would expect Remcon to remove it. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 850 | Rod Keiscome can't recall if he got information from Willie DeOcampo, Athena Demetry, Jack Vance, and/or Bob Russell of this occurring on July 4, 2001. | |
| 851 | Rod Keiscome cannot recall if he issued a Contracting Officer's Directive or modification associated with the information on the first page of the July 4, 2001 fax. | |
| 852 | On July 6, 2001 Joanne Cody sent the Giuliani & Kull drawing of the realigned Upper Sherman Access Road to DHM and Martin and Martin. | |
| 853 | On July 9, 2001, Joanne Cody performed a field inspection of the Upper Sherman Access Road horizontal alignment. | |
| 854 | On July 9, 2001, Joanne Cody worked with the civil engineer, Martin and Martin, to adjust the Upper Sherman Access Road alignment between Stations 25 and 30. | |
| 855 | On July 9, 2001, Joanne Cody reviewed with Bob Russell the possibility of adjusting the vertical alignment to maximize areas for placing excess cut material. | |
| 856 | Joanne Cody does not know why she wasn't shown as a cc on this email, given that it concerns her. | |
| 857 | Joanne Cody did visit the site but she doesn't know if her purpose was exactly what was referenced in the email or something beyond that. | |
| 858 | Joanne Cody visited the site because the survey that the NPS received from Giuliani & Kull was a poorly engineered road realignment solution because it had a reversed curve which is a safety issue. | |
| 859 | Joanne Cody decided that she needed to go out and evaluate the problem herself in order to take care of it. | |
| 860 | Rod Keiscome can't recall if the changes that were apparently being made by the COR on or before July 9, 2001 were done with his authorization. | |
| 861 | Rod Keiscome can't recall if he ever rejected the changes that were made by his COR on or before July 9, 2001. | |
| 862 | Rod Keiscome would have to look at the modifications or directives in order to determine if he ever validated the changes made by his COR on or before July 9, 2001. | |
| 863 | The July 9, 2001 email continues: "Check with Joanne. We found the small sugar pine on the CD and it showed a tree wrap. However, it is in the cut section, so it can be removed." | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 864 | Rod Keiscome understands this sentence to mean that a particular sugar pine was identified to be wrapped (protected) but was in the cut section which means that area was to be removed by the contractor. | |
| 865 | Neither Joanne Cody, Willie DeOcampo, nor Bob Russell were authorized to make changes to the drawings on or before July 9, 2001 without Rod Keiscome's written consent. | |
| 866 | Rod Keiscome would have to review the plans and specifications to determine if the removal of a tree that had been designated in the contract documents to be wrapped or saved is a change in the drawing. | |
| 867 | Rod Keiscome doesn't know why his CORs were making the changes discussed if they were not authorized to do so. | |
| 868 | The removal of trees that were not marked to be removed would be a change in the contract documents. | |
| 869 | Bob Russell's July 9, 2001 daily log, under the heading "Other Comments or Pertinent Facts Regarding Job," reads "Spent afternoon reviewing access road horizontal alignment with Joanne Cody, Teddy Mitchell, and Mark Penrose. Joanne worked with Martin and Martin to adjust alignment between Station 25 and 30. | |
| 870 | Joanne Cody visited the site on July 9, 2001. | |
| 871 | Joanne Cody remembers a gentleman by the name of Mark Penrose. She understands him to be the foreman for Remcon. | |
| 872 | On July 9, 2001, Joanne Cody adjusted the poorly designed curves that the NPS was given. She designed it to make it work. The adjustment came not from problems but from the field walk between Wille DeOcampo and the contractors. | |
| 873 | Willie DeOcampo determined that the road needed to be realigned in certain locations up to 11 to 15 feet. Joanne Cody doesn't consider those to be problems. However, based on Remcon's perception, they were problems and the government representative most in charge concurred. | |
| 874 | Joanne Cody went to the site because she didn't think that Giuliani & Kull had the technical ability to make the drawing that they had made. | |
| 875 | Joanne Cody did not, in fact, make any adjustments when she was on-site on July 9, 2001. | |
| 876 | Joanne Cody believes that Martin and Martin smoothed out the curve and made it a safe road. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 877 | Joanne Cody believes that Martin and Marin issued revised drawings to reflect the adjustments made but she isn't sure. | |
| 878 | Joanne Cody does not know if Rod Keiscome issued the adjustments as a formal modification. Joanne Cody has nothing to do with the issuance of formal revisions under the authority of the Contracting Officer because that is for Willie DeOcampo to deal with. | |
| 879 | Joanne Cody merely gave the adjustment drawings from Martin and Martin to Willie DeOcampo. She has no idea what Willie did with them. | |
| 880 | Joanne Cody does not know if the contractor built the project according to Martin and Martin's revised drawings. | |
| 881 | Joanne Cody doesn't know who on behalf of the government would know. | |
| 882 | Joanne Cody's expectation of why the drawings were issued was so that the contractor could build according to them. | |
| 883 | Joanne Cody determined with Martin and Martin that a revised alignment needed to be done between Stations 25 and 30. Martin and Martin then issued some revised drawings accordingly and Joanne Cody made sure that they got to Willie. | |
| 884 | When Joanne Cody and Larry later went out to the job with the issued-for-construction set of drawings, the set of drawings that they had for the contractor included changes. They didn't really look at the area between Stations 25 and 30 because it had such a big change. Joanne and Larry just said to Willie, "here's this area. We didn't look at the big difference between them." | |
| 885 | This visit followed receipt of Willie DeOcampo's July 2, 2001 memo concerning realignments between Stations 24 to 30 and 8 to 12. | |
| 886 | Bob Russell's July 9, 2001 daily log also notes, "We reviewed the possibility of adjusting vertical alignment to maximize areas for placing excess cut material. | |
| 887 | With respect to the realignment between Stations 8 to 12 and 24 to 20, these were horizontal relocations. | |
| 888 | The July 10, 2001 daily log of construction says, "Joanne said that the adjustment alignment (horizontal Station 25 to 30) would be faxed to Remcon, surveyors, and to me today." | |
| 889 | Joanne Cody was referring to the adjusted alignment that Martin and Martin prepared and were sending out. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 890 | Revised design information for the deep cut area was being faxed to the contractor and its surveyors shortly on or after July 10, 2001. | |
| 891 | Giuliani & Kull had provided the realignment, it was a poorly designed road, and Martin and Martin repaired that design as closely as possible to what Giuliani & Kull had done. | |
| 892 | On July 10, 2001, the NPS, without participation of the design team, produced revised alignment for the access road and upper parking lot. | |
| 893 | On July 10, 2001, Joanne Cody published Upper Sherman Access Road and Upper Sherman parking area realignment drawings. | |
| 894 | Joanne Cody did leave materials with Bob Russell on the day she was there. However, she is not sure if what is attached as materials to the July 10, 2001 communication is what she left with him. | |
| 895 | Remcon's July 10, 2001 report of work activities reads: "Road alignment at Station 28 from NPS today per Joanne Cody." | |
| 896 | Joanne Cody does not know if this is a reference to the drawings referenced in Bob Russell's July 10, 2001 communication. | |
| 897 | When there is a change is design, there is a modification, Contracting Officer's Directive, or a verbal direction from the Contracting Officer that is typically issued that would change the design for the construction contractor. | |
| 898 | Rod Keiscome would have to refer back to the modification to determine if he gave a verbal, a Contracting Officer's Directive, or a written modification changing the design that was issued on or about July 10, 2001 for the access road and upper parking lot. If there is nothing in the modification, then he did not. | |
| 899 | Exhibit 131 appears to be the contract drawings but Willie DeOcampo doesn't know who issued them. Willie DeOcampo sees the cover note to this document issued by Joanne Cody but he doesn't know who it was sent to. | |
| 900 | Raymond Tuttle was not consulted about the realignments that were directed in writing by the design team to Remcon as to the access road realignment. | |
| 901 | The design team was frozen out of the road realignment change and the NPS just assumed responsibility to do it themselves. | |
| 902 | It is not customary in the construction industry that the owner usurps the role of the designer. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 903 | Ray Tuttle was never fully informed about the realignment issue and Willie DeOcampo and Bob Russell made the decision to shift the road without consultation with the designer. | |
| 904 | As a result of the road realignment that was reflected in the drawings, the access road got pushed into the hillside. | |
| 905 | Willie DeOcampo now asserts that the realignment was not supposed to be done and that the revised drawings that were issued by DHM and Martin and Martin, realigning the road, were not issued out of his office. | |
| 906 | Willie DeOcampo later asserts that the NPS tried to realign the road in the big deep cut but the designers determined that it could not fit in there due to siting safety distances. | |
| 907 | On July 11, 2001, Bob Russell recorded that the adjustments to the Upper Sherman Access road between Stations 24 and 30 had been emailed by the NPS to Remcon's surveyors. | |
| 908 | The restaking of the centerline of the Upper Sherman Access Road between Stations 25 and 30 occurred on July 16, 2001. | |
| 909 | Bob Russell's July 16, 2001 daily log, under the heading Status of Work, reads, "Surveyors working on access road spent four hours staking center line revisions between Stations 25 and 30. | |
| 910 | Bob Russell's daily report of July 16, 2001 notes the costs/effort for re-surveying the centerline that will be charged. | |
| 911 | Willie DeOcampo has no idea why Remcon's surveyor, on July 16, 2001, was staking center line revisions between Stations 25 and 30. He doesn't know if Remcon, on or before July 16, 2001, was directed by the NPS to realign the access road between those stations. | |
| 912 | On July 19, 2001, Willie DeOcampo sent a fax transmittal to Bob Russell which says, "Re the attached drawings of field revision made today by Joanne to save a tree, per Joanne's request a copy has been issued to Remcon." | |
| 913 | Before issuing revised drawings, Joanne Cody would discuss it with Bob Russell and Willie DeOcampo to determine if it needed to be a modification or if it was a minor field revision. | |
| 914 | Joanne Cody does not know what modifications were issued on this project. | |
| 915 | Rod Keiscome did not authorize this by verbal authorization, Contracting Officer's Directive, or a modification. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 916 | Rod Keiscome doesn't know why he was not advised of the changes earlier than ten months later (at the partnering session) if his CORs were making field revisions to the drawings. | |
| 917 | Rod Keiscome does not know if Remcon constructed the project in accordance with the field revision reflected in the July 19, 2001 transmittal. | |
| 918 | Remcon received many directions from Joanne Cody, Bob Russell, Willie DeOcampo, Russell Belknap, etc. and it and Giuliani & Kull complied as constructive changes. | |
| 919 | In his weekly report dated July 25, 2001, Bob Russell stated that Remcon continued earthwork operations on the Upper Sherman Access Road. | |
| 920 | On July 25, 2001, Andrea Lind of DHM sent an email to Willie DeOcampo, Joanne Cody, Jack Vance, Athena Demetry, Ray Todd, Robert Smith, and Scott Ruesch. This email indicates that the road had been realigned. | |
| 921 | Rod Keiscome can't recall if he had seen the Andrea Lind's July 25, 2001 email prior to his deposition. | |
| 922 | Rod Keiscome can't recall if DHM issued a clarification to the design reflecting Joanne Cody's adjustment as reflected in the July 25, 2001 email. | |
| 923 | No disciplinary action has been taken against either Willie DeOcampo or Joanne Cody for them acting in a manner that was different than they were authorized to act. However, Rod Keiscome doesn't know why not. | |
| 924 | Rod Keiscome doesn't know if their conduct is conduct for which disciplinary communications are made. | |
| 925 | It is possible that Rod Keiscome, as the Contracting Officer, performed performance reviews of Joanne Cody and/or Willie DeOcampo between 2001/2002 and 2003/2004. | |
| 926 | Rod Keiscome is concerned by seeing the level of realignment and changes that Joanne Cody and Willie DeOcampo participated in because he is the Contracting Officer and is the person who is supposed to direct the contractor to do the work. | |
| 927 | Rod Keiscome did not become aware of these changes until the partnering session, which occurred after the first construction season. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 928 | Rod Keiscome does not have any idea what the impact of the totality of each of these individual things had on the contractor's ability to efficiently construct the project. | |
| 929 | On July 25, 2001, Dan Savage sent Bill Morris an email regarding revised upper grade parking documents. It says, "Bill, attached are the files for the revised upper parking lot grading..." | |
| 930 | Rod Keiscome did not authorize, orally or in writing, whether by a Contracting Officer's Directive or modification, revised upper parking lot grading documents to be given from the NPS to the surveyor of Remcon for the project. | |
| 931 | Joanne Cody does not know why revised drawings for the upper parking lot were being issued on July 25, 2001. | |
| 932 | Joanne Cody does not know if these revised drawings had any time or monetary impacts or who created them. | |
| 933 | Joanne Cody would expect that the revised drawings were done by third-party designers because that wasn't part of the design work that the NPS did itself. | |
| 934 | Remcon's surveyor, Giuliani & Kull, taking direction from the NPS on-site representative, Bob Russell, provided new alignment data that was forwarded to the NPS designers who issued the actual change to fit the road into the cleared area. While the road realignment issue was ongoing, Remcon ceased operations in the deep cut area pending new design data from the NPS, and relocated its equipment and began work in the Upper Sherman Parking Area to address the burn pit. | |
| 935 | Once the NPS issued its new design (Design No. 2) for the Upper Sherman Access Road, Remcon's surveyor returned to the Project and re-surveyed the area with the revised design information. This new design information affected some 600 feet, or 20% of the access road. | |
| 936 | On July 27, 2002, Russell Belknap noted in his daily report that he "reviewed Remcon's road realignment changes with NPS and Remcon staff. Determined adjustment is o.k." | |
| 937 | On September 5, 2002, Bill Morris of Giuliani & Kull emailed Russell Belknap requesting Upper Sherman Access Road information so Giuliani & Kull could survey and stake. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 938 | On September 10, 2002 Russell Belknap emailed Bill Morris, Steve Christensen, and Mike Giller that he was giving Mike Kitchell the super elevations data so it can be surveyed and staked. | |
| 939 | Until the super elevation data was provided by the NPS, Remcon could not complete the Upper Sherman Access Road grading, and this restrained completion of placement of aggregate base and paving. | |
| 940 | On September 10, 2002, Mike Giller reported to Joanne Cody via email that the re-engineering of the Upper Sherman Access Road by the NPS was nearing completion and requested that the civil engineer review the re-engineering. | |
| 941 | On September 10, 2002, Mike Giller wrote Joanne Cody and other NPS and inspection personnel that "The road re-engineering is 'nearing completion'." | |
| 942 | On September 10, 2002, Mike Giller wrote Joanne Cody that he wanted the civil engineer to perform a review of the engineering because "...the area at Stations 29 had some real complexities, as do the transition from crown to super throughout." | |
| 943 | On September 10, 2002, Mike Giller wrote Joanne Cody requesting that she engage the project's civil engineer "to review the re-engineering." | |
| 944 | As of September 10, 2002, the NPS was still re-engineering the Upper Sherman Access Road. | |
| 945 | Remcon has not been compensated in time or money for virtually any of the costs or delay impacts that flowed from the redesign changes. | |
| 946 | The limited compensation that has been received for the resulting extra work and delays was also belatedly received over a year after the work occurred. | |
| 947 | Modification No. 4 was signed by Steve Christensen on September 11, 2002 and Rod Keiscome on September 12, 2002, | |
| 948 | Modification No. 4 only compensated Remcon for restaking the access road on July 16, 2001. | |
| 949 | The effort to restake the centerline of the Upper Sherman Access Road due to the realignment was performed on July 16, 2001. | |
| 950 | The NPS did not issue Modification No. 4 to compensate Remcon for this directed extra work until 14 months after the extra work was performed. | |
| 951 | The issuance of the Modification relating to the restaking of the Upper Sherman Access Road was untimely. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 952 | When Modification No. 4 was signed by Remcon, including when it was returned signed by the CO as well, there was no "JUSTIFICATION" page attached. The JUSTIFICATION page was received only during discovery in this matter. | |
| 953 | The JUSTIFICATION page, authored by the NPS, was never seen or agreed to by Remcon prior to signing the modification or at any time prior to litigation commencing. The JUSTIFICATION page, and its content, reflects the unilateral perception of the government. | |
| 954 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that the initial Access Road centerline staking was per the contract drawings. | |
| 955 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that after the initial staking it was discovered that the centerline did not fall within the earlier cleared limits. | |
| 956 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that the NPS park staff had delineated the trees to be cleared. | |
| 957 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that the government determined the centerline had to be revised in order to fit all earthwork into the already cleared limits. | |
| 958 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that to do so the centerline had to be re-surveyed and re-staked. | |
| 959 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that this was extra work and Remcon was entitled to be compensated for this effort. | |
| 960 | Russell Belknap's daily report for September 18, 2002 states that he made adjustments to the Upper Sherman Access Road that day. | |
| 961 | Between the issuance of the Notice to Proceed on June 11, 2001, and the end of construction in November of 2002, multiple changes to the Upper Sherman Access Road were issued. | |
| 962 | On September 18, 2002, Russell Belknap noted in his daily report that he made adjustments to the Upper Sherman Access Road with Remcon's Mike Kitchell. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 963 | Rod Keiscome doesn't know why the road was shifted, he "suspects that is possible that they moved more into the side of the hill to quite possibly remove more -- or not. Whatever." | |
| 964 | Item 2D of Exhibit 214, Mike Giller's memo regarding Modification No. 6, states: "It is known that this contractor has made numerous mistakes in layout of the project." Rod Keiscome believes that Mr. Giller was referring to the location of the road, the parking area, the dry-laid stone wall (resulting in cutting down some trees), and the entry road. | |
| 965 | None of the mistakes in layout that were made by Remcon were a result of directions given by either the construction manager or the COR to relocate any of the improvements. | |
| 966 | Rod Keiscome can't recall if, in one of the modifications, he granted costs for resurveying as result of errors in layout by the government. | |
| 967 | Modification No. 4, Item No. 137, compensated the contractor for restaking the access road. | |
| 968 | Concurrent with the problem with the access road location, and continuing into the month of July 2001, Remcon encountered a differing site condition in the Upper Sherman parking area. This involved the fact that the quantity of material to be excavated and hauled out of the park from an area known as the burn pit, specified to be 2,000 cubic yards in Bid Item 26, actually increased to more than 7,000 cubic yards. | |
| 969 | In his weekly report dated July 3, 2001 Bob Russell reported that up to 7,000 cubic yards of material will need to be excavated from the burn pit/dump area of the Upper Sherman parking lot. | |
| 970 | In his weekly field report dated July 12, 2001, Bob Russell reported that the burn pit/dump area in the Upper Sherman parking area was more extensive than shown on the plans. | |
| 971 | In his weekly field report dated July 12, 2001, Bob Russell reported that the final quantity of the burn pit/dump area "may be as much as 7,000 cy." | |
| 972 | Bob Russell's July 12, 2001 weekly field report was the first time that Willie DeOcampo became aware of the excess material from this source. | |
| 973 | If July 12, 2002 is the first date Willie DeOcampo is aware of burn pit overrun, then his July 2, 2001 memo concerns only excess excavation in the deep cut area of the access road. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 974 | On July 16, 2001, Ray Todd visited the site and inspected the debris found on the south side of the upper parking lot. This was an area separate from the burn pit and constituted another differing site condition. Mr. Todd agreed that it had to be excavated and hauled out of the park, and agreed that methods being used by Remcon were cost effective and that a contract modification was in order to cover the contractor's extra costs. | |
| 975 | The extra work excavating and hauling out this debris was performed by Remcon. | |
| 976 | The NPS did not timely process the modification for debris hauling (as contrasted with the burn pit) until 14 months later when Modification No. 4 was issued. | |
| 977 | On July 16, 2001, Andrea Gregor of DHM visited the project site. In a subsequent email to a series of people at the NPS, she noted that the quantity for hauling off burn pit materials is not accurate, that the plan total and bid item do not match because the plans show 3,000 cubic yards while the bid item shows 2,000, and that the total haul-off is closer to 6,000 cubic yards. | |
| 978 | In his weekly report dated July 25, 2001, Bob Russell stated that Remcon completed hauling burn/dump material out of the park for a total of 7,584 cubic yards (but due to some short loads that amount may need to be adjusted to about 7,000 cubic yards). | |
| 979 | In his weekly report dated July 25, 2001, Bob Russell stated that Remcon continued removing debris from the Upper Sherman parking lot and that Ray Todd and Joanne Cody reviewed site conditions and methods used by Remcon and agreed it was probably the most cost efficient. | |
| 980 | As of July, 2001, Remcon excavated up to 6,000 yards from the burn pit such that the hole was three times larger than anticipated by the designers. | |
| 981 | In his weekly report dated August 1, 2001, Bob Russell reported that "It still appears that the existing burn/dump area located in the upper parking lot may contain as much as 7000 CY." | |
| 982 | The contract bid schedule represented to bidders in Item 26 that the burn pit/dump area quantity was 2,000 cubic yards. | |
| 983 | Remcon bid the work as indicated. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 984 | In his weekly report dated August 1, 2001, Bob Russell also reported that additional buried material, not known on plans or addressed in specifications were encountered in the upper parking lot. This is the same material identified on July 16, 2001 by Ray Todd. | |
| 985 | The "buried material" referenced in Bob Russell's August 1, 2001 weekly report concerns material other than the burn pit/dump area. | |
| 986 | On August 1, 2001, Willie DeOcampo wrote Remcon advising that the NPS would pay Remcon for the extra work associated with hauling miscellaneous material (the burn pit excavation and hauling) upon submission of truck weight receipts and the re-negotiation of the unit price based on overruns in quantity. | |
| 987 | Bob Russell's August 8, 2001 weekly field report noted that the burn pit/dump area in the upper parking lot might obtain as much as 7,000 cubic yards. | |
| 988 | On August 9, 2001, Willie DeOcampo sent an email to Ray Todd. Willie wrote in this email that Mr. Keiscome had a communication with him about the overrun in quantity for Bid Item 26. | |
| 989 | Willie DeOcampo can't remember what Rod Keiscome had communicated to him other than what he mentioned in the email. He doesn't remember if Mr. Keiscome told him that the NPS didn't have sufficient money to pay for the additional work on the Project and that he was considering terminating the project for convenience. | |
| 990 | It was Willie DeOcampo's practice in 2001 that when he was quoting or summarizing a communication received from someone, he intended to do it accurately. He has no reason to believe that what he quoted in the August 9, 2001 email was not an accurate reflect of what he had heard Mr. Keiscome say. | |
| 991 | At the time that Willie DeOcampo wrote the August 9, 2001 email, another issue had arisen--the existence of hard rock that had to be blasted between Stations 24 to 30. It was his intent when he wrote the email to combine the existence of the additional excavation for Bid Item 26, which was already known, and pair it with the additional extra work that was perceived being done by the contractor with respect to rock excavation. | |
| 992 | As of August 2001, Willie DeOcampo understood that Bob Russell perceived that Remcon was encountering a differing site condition with respect to the burn pit material. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 993 | On June 26, 2002, Willie DeCampo sent Bob Russell, Terry Lang, and Larry Walling an email indicating that, due to time constraints, Willie would write draft Modification No. 3 for hauling of material from the burn pit outside the park, work which was actually done in June and July of 2001 (approximately one year earlier). Modification No. 3 was ultimately issued in August, 2002 and, to some extent, reimbursed Remcon for the extra work performed. | |
| 994 | The four items listed in the June 26, 2002 email are the same ones that ultimately materialized in Modification No. 4 | |
| 995 | Under the arrangement with the NPS, it was part of Bob Russell's job requirement to draft modifications. | |
| 996 | Willie DeOcampo can't say why this work of preparing and issuing Modification Nos. 3 and 4 was not done in calendar year 2001. | |
| 997 | Modification Nos. 3 and 4 were not prepared during the construction season of 2001, nor during the winter of 2002 (when there was no construction operations to inspect) because he never took it upon himself to prepare them at those points in time. | |
| 998 | In the last paragraph of Willie DeOcampo's June 26, 2002 email, he writes, "We need this Mod Number 4 within the next two weeks, but not later than three." | |
| 999 | He wrote this to get Bob Russell moving on it. However, he doesn't know if Bob Russell gave Modification No. 4 to him within the time frame he asked for it. | |
| 1000 | In his June 26, 2002 email, Willie also notes, "Keep in mind that Remcon's accusations and negotiating position become stronger the longer these negotiated items remain unprocessed through the modification process." | |
| 1001 | He said this because he wanted to wrap things up and the extra work that was encompassed by Modification No. 4 had already been done, with the exception of raising the upper parking lot. | |
| 1002 | He felt that Remcon's claims for delay, disruption and loss of productivity, and Remcon's inability to get the job done could become stronger the longer these negotiated items remained unprocessed. | |
| 1003 | With respect to the burn pit, Remcon was required to haul off much more than the estimated quantity set forth in the bid documents. | |
| 1004 | The amount of unsuitable material (debris) encountered in the burn pit ended up being several thousand more yards than the bid quantity. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1005 | Remcon believed it was required to remove and dispose of some 8,200 cubic yards (394 truckloads) of material. | |
| 1006 | In the area of the Upper Sherman project, a lot more material had to be removed from an area that had to be built up to be ultimately paved. | |
| 1007 | This meant that there was extra work removing excess material that had to be hauled out of the park, and then there had to be backfill or some type of fill into the greater hole that had been created. | |
| 1008 | Not only did Remcon have to perform the extra work to excavate out the burn pit of approximately 5,000 additional cubic yards, it had to perform the extra work to place material back in it. | |
| 1009 | Remcon was paid for hauling out the burn pit materials as extra costs. | |
| 1010 | However, Remcon still had to build the parking lot. | |
| 1011 | Because the quantities encountered were greater than that anticipated at the time the contract was issued, the NPS determined that a modification was appropriate to compensate Remcon for additional work associated with this excavating and hauling off the excess material encountered. | |
| 1012 | Willie DeOcampo agrees that Remcon was entitled to be paid to replace the excess burn pit material that was excavated because this was extra work. | |
| 1013 | Willie DeOcampo never analyzed whether the extra material encountered in the burn pit caused delay or disruption to Remcon's work. | |
| 1014 | Willie DeOcampo recommended and a modification was issued that reimbursed Remcon for hauling out the excess quantity. | |
| 1015 | With respect to the hauling of excess material from the burn pit, even though Remcon performed the work without a formal modification, NPS agreed that Remcon should be reimbursed. | |
| 1016 | The hole that the NPS anticipated would be created and Remcon had to plan to build, fill back in, was about 2,000 cubic yards. They had planned on 2,000 yards in their bid to haul out, and they had to fill in that 2,000 yards as part of their bid. | |
| 1017 | But the hole got bigger, because a lot more material had to be removed. | |
| 1018 | The NPS paid in Modification No. 3 for the material to go off site. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1019 | The contractor was entitled to get paid to replace the excess burn pit material because it would have been extra work to fill back in the larger hole created by the burn pit excavation. | |
| 1020 | Willie DeOcampo can't remember if Remcon was ever reimbursed for filling back in the burn pit or if he ever received specific costs for raising the parking lot or the burn pit excess that was hauled off as extra work. | |
| 1021 | No modification was ever issued to compensate Remcon for filling back the hole to the design elevation for the excess quantity that had been excavated. | |
| 1022 | Raymond Tuttle was aware, as a result of reading Remcon's claim, that while it received compensation in the form of a modification from the NPS for excavating the excess material in the burn pit, it has never been compensated for bringing back material to fill the hole because it wasn't above the contour of the design elevation and actually created a bigger hole. | |
| 1023 | In Raymond Tuttle's experience, if, in fact, it was extra work to remove the material and it was below the elevation of design, it would also be extra work, requiring additional compensation, to put material in the hole to bring it back to the elevation it should be. | |
| 1024 | Remcon had originally scheduled 5 work days for the burn pit excavation work based on the NPS quantity estimate. It took 27 workdays (from June 11, 2002 to July 18, 2001) for Remcon to remove all of the burn pit material from the park and the extra costs exceeded $300,000. | |
| 1025 | The excavation and hauling of the burn pit/dump area material, beyond 2000 cubic yards, was extra work. | |
| 1026 | This extra work was performed in June and July, 2001. | |
| 1027 | Remcon excavated and hauled this material out of the park at the direction of the government in June and July of 2001. | |
| 1028 | The Modification, No. 3, compensating Remcon for the extra work associated with the excavation and hauling of excess burn pit material was not issued until August, 2002. | |
| 1029 | Modification No. 3 was not timely issued. | |
| 1030 | The extra costs and delays, incurred and experienced in June and July, 2001, were not recognized by the NPS until August/September 2002 when Modification Nos. 3 and 4 were issued. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1031 | The excavation and hauling of the "buried material" occurred in June and July, 2001. | |
| 1032 | The excavation and hauling of the "buried material" was extra work. | |
| 1033 | Willie DeOcampo doesn't know why it took from the summer of 2001 until September of 2002 to issue these modifications. He would have to go back through his documents because he can't recall that far back in time. | |
| 1034 | Willie DeOcampo isn't sure if he wrote the justification on the fourth page of Modification No. 4 as his justification to the CO and those that needed to concur for the modification to be issued. He isn't sure when he wrote these four justifications. | |
| 1035 | The quantity in excess of 2,000 cubic yards was extra work. | |
| 1036 | In December of 2001, the extra costs for backfilling the Upper Sherman Parking Area back to grade were presented, along with the differing site conditions costs, to the NPS. | |
| 1037 | No compensation, in money or time, for any of this extra work has ever been received by Remcon from the NPS. | |
| 1038 | In order to construct the upper parking lot on this project, Remcon had to excavate out debris and material that was found to be a differing site condition. | |
| 1039 | The parking lot had a certain configuration of certain dimensions that had to be paved and it had to have certain underlay in the form of base rock and subgrade that was compacted to certain requirements. | |
| 1040 | In order to do that work, Remcon had to excavate out the material that was found not to be acceptable to support the parking lot. | |
| 1041 | The justification for Modification No. 4 states, in detail, that Remcon encountered unknown miscellaneous buried debris that it had to remove in order to do that which he was originally required to do. | |
| 1042 | Rod Keiscome can't recall if Modification No. 4 compensated Remcon for replacing that excess unsuitable buried debris. | |
| 1043 | Rod Keiscome isn't sure if he would agree that if there is no specific item in any of the modifications to pay Remcon for filling the hole back up created by Bid Item No. 138, then that has not yet been addressed. Remcon could have been paid in one of the pay estimates for these overruns. | |
| 1044 | However, if the earthwork was a lump sum, then he would not have paid it as an overrun because it was a lump sum quantity. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1045 | There was a hole that was created by the contractor due to hauling of excess material. | |
| 1046 | Joanne Cody doesn't know what material was going to be used to fill back up that hole that was created. | |
| 1047 | Joanne Cody expected that the design team would handle the issue of what material would be used to fill the hole that the burn pit unsuitable material was in. She was the COR. They were the technical. | |
| 1048 | The extra work to backfill and compact the holes created by the burn pit excavation, and the independent debris encountered, and bring the site back to the design grade, was performed by Remcon in 2001. | |
| 1049 | Joanne Cody didn't do anything as far as her QA role to make sure that they had adequately covered that subject. | |
| 1050 | The draft copy of the 30% construction documents, dated January 28, 2000, refer to rock excavation in seven different instances. This information was added by Andrea Lind of DHM. | |
| 1051 | The 30% construction documents, dated February 18, 2000, contain seven indications of rock excavation or partial rock excavation for the Upper Sherman Tree Existing Conditions. These indications were also done by DHM. | |
| 1052 | DHM included rock excavation and partial rock excavation in the 30% construction drawings after reading and interpreting the existing conditions mapping that came from the NPS. | |
| 1053 | The 50% construction documents, dated June 2, 2000, contain seven indications of rock excavation and partial rock excavation. These were placed and remained there at the direction of DHM. | |
| 1054 | The 50% construction documents, dated July 13, 2000, contain no notations for rock excavation or partial rock excavation in the areas where it had previously been noted. | |
| 1055 | There were not any subsequent iterations of the construction documents, all the way up through the 100 percent complete set (which were issued for construction) that included the words "rock excavation" or "partial rock excavation" for the same locale where they were noted in the 30% construction documents. | |
| 1056 | The deletion of the references to rock excavation and partial rock excavation occurred prior to the September 11, 2000 publication of the soils report. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1057 | Specification Section 02310, Subpart 4.2A, of the 75% construction documents, governed the contractor's required actions if rock was encountered during excavation. | |
| 1058 | In the 100% construction documents, Specification Section 02310, Subpart 4.2A changed because the soils report came into play. As a result, the language was revised and the rock excavation was deleted as part of earthwork. All earthwork was classified as common excavation. | |
| 1059 | Per Specification Section 02310, Site Excavation and Grading, the contractor was going to be paid for rock encountered for utility excavation only. | |
| 1060 | All other rock was unclassified, which means it was included within the lump sum bid item for earthwork. | |
| 1061 | This was based upon the content of the soils report. | |
| 1062 | Because it was determined that the material encountered in excavation, other than utility trenches, was rock which was different than set forth in the soils report, Rod Keiscome unilaterally issued Modification No. 6 | |
| 1063 | Specification Section 02316, Item 1.4, Part A, Classification, says: "Rock excavation consists of material that cannot be excavated without blasting or using rippers, including boulders having a volume of 2 cubic yards or more." | |
| 1064 | The contractor did encounter such material in constructing the roadway excavation and embankment. | |
| 1065 | Specification Section 02316, Item 1.4, Part C says: "No rock excavation will be permitted unless approved by the contracting officer." | |
| 1066 | When asked if he approved rock excavation on this project for Remcon's construction of the roadway, Rod Keiscome responded, "The documents will reflect what the documents reflect…I have awarded the contract to Remcon, so we go by the contract documents." | |
| 1067 | Remcon had on site a new D8 Dozer/Ripper with a single shank which meant it had the equipment on site which should have been able to excavate the entire planned roadway locale to subgrade based upon the soils report. | |
| 1068 | Remcon started grading the access road on June 26, 2001 | |
| 1069 | As of July 30, 2001, Remcon had on site a D8 Dozer with a single shank ripper which was being operated and was in good condition. | |