| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1070 | Willie DeOcampo and Rod Keiscome are familiar with the differing site condition clause, a standard clause in NPS contracts. | |
| 1071 | The project general conditions contained the differing site conditions clause. Exhibit 78 is the differing site condition clause that was in effect at the time this job was issued to Remcon. | |
| 1072 | The FAR differing site condition clause was included in the solicitation for this project. | |
| 1073 | Under the differing site conditions clause, if the contractor encounters a subsurface condition which it contends is different from that which is indicated in the contract documents, the contractor has a duty to disclose that promptly to the on-site government representative, in this case, the inspector. | |
| 1074 | Remcon complied with the requirement to give notice to the government that it had encountered a differing site condition. | |
| 1075 | Once that notice is given, the government then has a duty to make a determination as to whether it agrees or disagrees a differing site condition exists. The duty to investigate a differing site condition contention, once made, is the government's pursuant, to the differing site condition clause. | |
| 1076 | That prompt investigation would logically include, among other things, requesting the contractor to demonstrate refusal through the D8 Dozer of not being able to rip the rock. | |
| 1077 | The NPS' responsibility to investigate an alleged differing site condition promptly after receipt of notice of such condition from the contractor was delegated to Willie DeOcampo by Mr. Keiscome in his letter of authorization. Thus, it was Willie's responsibility to cause an investigation of the site conditions promptly after receiving the differing site condition notice. | |
| 1078 | Rod Keiscome would expect that Bob Russell, given his background, experience, and training, as well as his responsibility to familiarize himself with the contract documents to perform the his job, was knowledgeable as to the requirements of the differing site condition clause. | |
| 1079 | The excavation effort started on the Upper Sherman Access Road at Station 1 and proceeded towards Station 35+50. | |
| 1080 | Notice was given to the NPS, commencing on July 30, 2001, that blasting would occur. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1081 | Specification section 1110, entitled "Summary of Work," describes the project and provides: (a) in part 1.7A, that the September 11, 2000 geotechnical report prepared by Kleinfelder was part of the contract documents; and (b) in Part 1.7B, that "if conflicts occur between the [soils] report and drawings or specifications, the drawings and specifications govern." | |
| 1082 | Remcon, commencing in late July, 2001, encountered a conflict between the soils report and field conditions on the Upper Sherman Access Road. | |
| 1083 | Bob Russell's July 30, 2001 daily log indicates that Remcon encountered large boulders and that blasting would be necessary in that area. | |
| 1084 | On July 30, 2001, Remcon encountered rock that was not rippable in the deep cut section, between Stations 25 and 31, such that blasting would be necessary, and notified Bob Russell. | |
| 1085 | The subsurface material encountered between these stations was no longer "earth and rippable rock" which could be "ripped" by conventional construction equipment as disclosed in the contractor's soils report made available to bidders and upon which the bid of Remcon was based, but rather, had to be blasted. | |
| 1086 | Bob Russell's July 30, 2001 daily log has Willie DeOcampo's initials on it, which means Willie received and reviewed it. | |
| 1087 | Willie DeOcampo contends that he didn't know if on July 30, 2001, during the first construction season, Remcon contended that it had encountered rock that was not rippable in the deep cut section and notified the inspector. | |
| 1088 | However, if it was recorded as such in Mr. Russell's daily report, it would have been something that Mr. Russell would have been told by Remcon and Mr. Russell had the responsibility to give his daily reports to Mr. DeOcampo so he would have had the opportunity to receive it and see it. | |
| 1089 | Willie DeOcampo gave direction to Jacobs that he needed to be informed contemporaneously with events happening and he wanted a telephone call to alert him to anything that happened that was out of the ordinary. | |
| 1090 | The unsuccessful efforts to rip the granitic rock was documented in both Remcon's daily reports as well as the daily reports prepared by the NPS representatives. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1091 | Remcon encountered, between Stations 24 and 30, where the road was relocated into the hill, solid granitic rock which required drilling and blasting. | |
| 1092 | Remcon encountered rock that it had to blast in the same areas where rock excavation and partial rock excavation were indicated in the 30% and 50% (first version) construction documents. | |
| 1093 | Bob Russell's July 31, 2001 daily log indicates that he was on site and that, on that date, the Cat D8 dozer was active and on-site. | |
| 1094 | Bob Russell's July 31, 2001 daily log indicates that Remcon encountered boulders that required blasting from Station 25+00 to 31+00 on the access road. | |
| 1095 | Willie DeOcampo received Bob Russell's July 31, 2001 daily log. It has his initials on it, which indicates that he received and read the copy and that he gave it to Terry Lang for filing. | |
| 1096 | Bob Russell's July 31, 2001 daily report was altered. | |
| 1097 | The significance of the underline and asterisks on the altered version of Bob Russell's July 31, 2001 daily report is that the subject matter concerns what ultimately became the subject of Modification No. 6, the differing site condition. | |
| 1098 | Bob Russell is the first person who Rod Keiscome would expect to become aware of a contention by a contractor encountering a differing site condition in the field. | |
| 1099 | Exhibit 79 (the altered July 31, 2001 daily log) does not have Willie DeOcampo's initials on it. | |
| 1100 | Willie DeOcampo is aware that Remcon contends that during the last week of July 2001 it encountered rock between Stations 24 and 30 and that it was unable to rip with a D8 Dozer. | |
| 1101 | Bob Russell's August 2, 2001 daily log noted that, between Station 25 to 31, Remcon was encountering large boulders which would require blasting. The log also noted that the blasting crew completed drilling rock between Station 29 and 31 and that blasting occurred at 4:00 p.m. | |
| 1102 | Willie DeOcampo received a copy of Bob Russell's August 2, 2001 daily log and it has Willie's initials on it. | |
| 1103 | Bob Russell reports on August 6, 2001 that material blasted on August 2, 2001 was very rocky. The August 6, 2001 has Willie DeOcampo's initials on it. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1104 | Bob Russell's August 6, 2001 daily log shows the D8 dozer on-site working. | |
| 1105 | Bob Russell reports on August 7, 2001 that material blasted on August 2, 2001 was very rocky. The August 7, 2001 daily log has Willie DeOcampo's initials on it. | |
| 1106 | Bob Russell's August 7, 2001 daily log indicates that Remcon's Cat D8 dozer was on site in good working order. This means that he observed it operating. | |
| 1107 | In August, 2001, Remcon, in an effort to ameliorate the effects of the differing site condition, requested that it be permitted to construct a temporary access road between the Upper Sherman parking area and the shuttle bus/staging area. | |
| 1108 | The NPS approved the request on August 7, 2001. | |
| 1109 | The weekly meeting minutes for August 7, 2001, meeting #11, discuss blasting. | |
| 1110 | Remcon personnel tried to rip the road multiple times daily. | |
| 1111 | On days when blasting was occurring, the primary focus of Remcon's work on the Upper Sherman Access Road was to create areas to blast at 4:00 p.m. and handle material from the prior day's blasting. This included inefficiently clearing around the rock formations encountered. | |
| 1112 | Basically, as a result of having confined limits and concurrently encountering difficulty in constructing the access road that it had to blast, this was represented by the contractor to impede its ability to work in multiple areas in the same locale because it impeded its ability to go back and forth. Therefore, the bypass area was allowed to occur. | |
| 1113 | The costs to complete the bypass road are excluded from Remcon's cost claims. | |
| 1114 | The August 8, 2001 weekly field report by Bob Russell, for the week of August 5, 2001, indicates that blasting operations began on the access road by Remcon's subcontractor, California Drilling & Blasting, and that this may be an extra cost. | |
| 1115 | Mr. Russell was tasked to identify for Willie DeOcampo, as part of his red flag process, information regarding things he felt may extra work so he could alert Willie as the COR. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1116 | At the preconstruction meeting, Remcon was directed to send all written notices to Bob Russell who passed stuff through to Willie DeOcampo. This is how Willie got information. Remcon complied with this direction. | |
| 1117 | During the first week of August, 2001, Remcon gave oral notice and written notice to Bob Russell that the rock encountered was a differing site condition. | |
| 1118 | The August 8, 2001 weekly field report, under potential change orders, says "blasting for roadway excavation may be a potential extra cost." | |
| 1119 | It was part of the responsibilities of the construction manager to prepare weekly meeting minutes and summaries of what was going on. | |
| 1120 | Willie DeOcampo understood the content of the August 8, 2001 weekly field report to mean that Mr. Russell perceived the drilling and blasting to be a differing site condition. | |
| 1121 | This portion of the weekly field report was one of those red flag communication devices that was in place to keep Willie DeOcampo informed. However, he would also hopefully have gotten a verbal communication so that he would know it was more pressing. | |
| 1122 | On August 8, 2001, Willie DeOcampo sent an email to Andrea Lind, Joanne Cody, Ray Todd, and Bob Russell regarding overruns on 200Q. He sent this email because he was questioning the designers in terms of how they came up with quantities--he wanted to know what the designers were thinking when they designed the project. The overruns were questionable because the NPS was seeing a 350 percent overrun on an estimated quantity (Bid Item 26). | |
| 1123 | By August 8, 2001, Willie DeOcampo had at his disposal and reviewed the information from his inspector, which said that there was a differing site condition on the access road, and the geotechnical report, which indicated that blasting wouldn't be required on the Upper Sherman Access Road because all rock was going to be rippable. Nevertheless, Willie was looking for answers as to why the NPS shouldn't have to pay Remcon because he always looks for why the NPS is making overruns on certain thing. He isn't sure why he wasn't just looking for factual information. | |
| 1124 | By August 8, 2001, Rod Keiscome was already questioning why Pay Item 26 was almost 350 percent over the estimated quantities. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1125 | Willie DeOcampo's August 8, 2001 email also notes, "Now we have possible overruns in Item 38-rock excavation." | |
| 1126 | This is the item ultimately for which Modification No. 6 was issued as a differing site condition. | |
| 1127 | Rod Keiscome would have to refer to the pay estimate to determine if Mr. DeOcampo had talked to him about the overruns in Item 38 as of August 8, 2001. | |
| 1128 | So, even though Willie DeOcampo may not have furnished Rod Keiscome the actual notice of a differing site condition, which was dated August 20, 2001, until June of 2002, he nevertheless discussed the subject with Rod Keiscome as of August 8, 2001, which is within 10 days of Remcon encountering rock. | |
| 1129 | Willie DeOcampo's August 8, 2001 email continues, "What was the intent of rock excavation and how does the government defend/ward off these requests for payment under this pay item?" | |
| 1130 | Rod Keiscome doesn't know why the government was looking to defend or ward off these requests. | |
| 1131 | Rod Keiscome doesn't know why Willie DeOcampo wrote "how does the government defend/ward off these requests." | |
| 1132 | On August 8, 2001, Bob Russell sent a fax to Willie DeOcampo regarding blasting and attaching Jeff Northrop's fax with attached blasting costs. | |
| 1133 | Willie DeOcampo had received and reviewed Bob Russell's August 8th fax, with the attachment from Jeff Northrop, by the morning of August 9, 2001. When he received it, he came to the borderline conclusion that Remcon was claiming a differing site condition. | |
| 1134 | When Willie DeOcampo received the August 8, 2001 fax from Bob Russell, he knew that Remcon was seeking additional compensation, was proposing tracking the cost on a day-to-day basis, and perceived that the overrun could be as high as 500 percent. | |
| 1135 | In response to the August 8, 2001 fax from Bob Russell, Willie DeOcampo believed he instructed him to go ahead and keep dailies on how many men from California Drilling and Blasting was on site and what they were performing. | |
| 1136 | In response to the August 8, 2001 email, Robert Smith responded that they didn't expect rock to be encountered that needed to be blasted. | |
| 1137 | On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell enclosing drilling and blasting logs. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1138 | On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell with his quantification of 990.93 cubic yards of rock blasted through August 7, 2001, and included documentation showing his calculation. | |
| 1139 | On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell advising that he believed the overrun may be as high as 500%. | |
| 1140 | On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell requesting negotiation of quantity overruns. | |
| 1141 | As of August 9, 2001, Rod Keiscome received notice from Remcon that it had encountered rock in such an extent that it contended a differing site condition was being encountered at the project. | |
| 1142 | On August 9, 2001, Willie DeOcampo recorded that Rod Keiscome communicated to Willie DeOcampo that he was considering terminating the contract for convenience of the government as a result of the overruns on the project. | |
| 1143 | Rod Keiscome does not recall talking to anybody about terminating the contract for convenience or even considering it. | |
| 1144 | On August 9, 2001, Willie DeOcampo sent a fax to Andre Lind asking for her input concerning the definition of rock excavation because the projected over-run was too excessive and unacceptable. Willie DeOcampo also asked for justification as to why Remcon should not be paid under this pay time. | |
| 1145 | Willie DeOcampo claims he sent the August 9, 2001 fax to Andrea Lind because he thought that Remcon had experienced some costs that were beyond what it should have, in terms of what it was paying the blaster. | |
| 1146 | On August 9, 2001, Willie DeOcampo sent an email to Ray Todd, asking Bob Russell to write up a rebuttal to the over-run on rock excavation. | |
| 1147 | In response to Willie's August 9th letter, Robert Smith directed Andrea to send Ray Tuttle a letter. | |
| 1148 | Raymond Tuttle heard a lot of discussion regarding the fact that Remcon was unable to rip and as a result contended that the material encountered on the access road had to be blasted. | |
| 1149 | Robert Smith became aware that a substantial amount of blasting had to be done on the project and that was inconsistent with that which was identified in the soils report. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1150 | Neither Robert Smith nor DHM performed any investigatory and analytical effort as to the merits of the contention as to whether or not a differing site condition was encountered in the deep cut section of the Project. | |
| 1151 | Robert Smith told Raymond Tuttle that he had concluded that a differing site condition was, in fact, encountered by Remcon and that they were and/or are entitled to reimbursement for some amount. | |
| 1152 | The design team members concluded that a differing site condition had been encountered. | |
| 1153 | As the civil engineer member of the design team, of the three members of the design team, Ray Tuttle was the most knowledgeable person involved on the subject of the differing site condition. | |
| 1154 | Both Robert Smith and Raymond Tuttle were of the opinion that Remcon had encountered a differing site condition and some compensation was due. | |
| 1155 | Rod Keiscome read Raymond Tuttle's deposition in which he said, yes, a differing site condition was encountered. | |
| 1156 | The two members of the design team that commented on the subject of the differing site condition both believed there was a differing site condition which entitled the contractor to some reimbursement. | |
| 1157 | Raymond Tuttle communicated his perception that it was very likely that Remcon had encountered a differing site condition to the NPS. | |
| 1158 | On August 20, 2001, Remcon gave the NPS formal notice of the differing site condition being encountered. | |
| 1159 | The Remcon August 20, 2001 notice of encountering a differing site condition on the Upper Sherman Access Road enclosed a detailed factual and legal discussion. | |
| 1160 | The facts presented in the August 20, 2001 notice of differing site condition and accompanying documents were true. | |
| 1161 | The Contracting Officer recognized them as true when he unilaterally issued Modification No. 6, eighteen months later in February 2003. | |
| 1162 | On August 20, 2001, Steve Christensen sent Willie DeOcampo a letter indicating that, during the excavation of the Upper Sherman Access Road, Remcon had encountered a differing site condition. | |
| 1163 | Specifically, the August 20, 2001 letter indicated that Remcon had encountered granitic rock which could not be ripped with a D8 Dozer/Ripper as indicated in the contract documents' geotechnical report. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1164 | The August 20, 2001 letter included, as an enclosure, a brief write-up detailing why Steve Christensen believed that Remcon was due additional compensation for drilling, blasting and rock handling. | |
| 1165 | On August 20, 2001, Jeff Northrop submitted a change order request for rock excavation, drilling, and shooting, arising from the differing site condition. | |
| 1166 | In August of 2001, Remcon gave further notice in writing that it contended it had encountered a differing site condition. | |
| 1167 | This request in writing followed the communications to the inspector, starting on July 30, July 31st and August 2nd that they were doing blasting and the August 8, 2001 notice that the rock was a differing site condition. | |
| 1168 | In Bob Russell's weekly field report dated August 22, 2001, for the week ending August 18, 2001, he wrote: "Blasting for roadway excavation continues to be a potential extra cost." | |
| 1169 | Rod Keiscome does not know what prevented Bob Russell or Willie DeOcampo from seeking assistance to evaluate the contention the contractor, regarding the differing site condition, while Remcon was still encountering the rock in constructing the access road in August of 2001. | |
| 1170 | On September 11, 2001, Remcon's blasting crew was continuing to drill in the upper parking lot (Station 10+50 +/- to 11+00 +/-) | |
| 1171 | Jeff Northrop, on September 14, 2001, wrote to California Drilling & Blasting regarding its billing for the project. | |
| 1172 | On September 19, 2001, Jack Vance wrote to the NPS' Ray Todd, Willie DeOcampo and Joanne Cody, along with Bob Russell, that Remcon had quantified the rock blasted from the road to be 6000 cubic yards so far. | |
| 1173 | The 6,000 cubic yard reference of rock for roadway excavation was the subject of the differing site condition modification that Rod Keiscome issued seventeen months later. | |
| 1174 | Rod Keiscome doesn't know what price per cubic yard the government used, if they did use such. | |
| 1175 | Rod Keiscome would have to refer to the documents to determine what price per cubic yard for rock the designers estimated would be a reasonable price for a contractor to incur. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1176 | From looking at the cost estimate prepared by the design team, it is Rod Keiscome's understanding that, as of July 12, 2000, the government cost estimate was $45 per cubic yard of material that needed that to be blasted to create the Upper Sherman Tree Road and parking improvements. | |
| 1177 | If 6,000 cubic yards were, in fact encountered as reflected in Jack Vance's September 19, 2001 communication, then that would add up to $270,000 for excavation alone, without regards to impacts, hauling, re-handling or delays. | |
| 1178 | Rod Keiscome could be the one that asked for such a cost estimate to be put together. | |
| 1179 | NPS-10 requires the designers to prepare, in conjunction with drawings, cost estimates periodically along the way so that Rod Keiscome, as the Contracting Officer, and his staff, are advised as to the projected, anticipated costs. | |
| 1180 | Rod Keiscome expects the cost estimates to include the reasonable volume of material to be encountered in quantities. | |
| 1181 | Rod Keiscome expects the cost estimates to include what the designers believe is the market price that would be reasonable to be charged for the work. | |
| 1182 | Rod Keiscome has no reason to believe that $45 per cubic yard with respect to a quantity of 2,000 cubic yards was anything other than, as of July, 2000, to be a reasonable market price. He believes that the author of the cost estimate probably has the documentation that would support that. | |
| 1183 | Excavation work on this project was a lump sum, not a cubic yard, quantification. | |
| 1184 | Therefore, Rod Keiscome does not have a unit price that he can multiply against excess excavation on this project for the roadway excavation. | |
| 1185 | Therefore, Rod Keiscome has to resort to other means to quantify the value if he finds additional value is due. | |
| 1186 | A reasonable way to quantify additional material, because the bid item was a lump sum, was to look at the quantity that was additional, 6,000 cubic yards, as reflected in Jack Vance's September 19, 2001 communication, and multiply it by a price per cubic yard, regardless of what that price may be. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1187 | Rod Keiscome can't recall how many cubic yards of rock Remcon actually excavated in performing the differing site condition work. | |
| 1188 | Modification No. 6 does not show the quantity of rock that was encountered and had to be handled. | |
| 1189 | Rod Keiscome does not know what prevented the government from measuring the quantities in September of 2001 that had to be excavated by the contractor through blasting. | |
| 1190 | There was nothing that prevented the government from measuring the quantities. | |
| 1191 | Exhibit 88 is the calendar prepared by Bob Russell showing blasting days. | |
| 1192 | This calendar shows that blasting for the road occurred all the way into September of 2001. Thereafter, it was utility blasting. | |
| 1193 | Rod Keiscome does not know what prevented the NPS from having Kleinfelder visit the site on or after August 20th, while rock was still being encountered and blasted in the access road. | |
| 1194 | Remcon had on site, at all times relevant, in good working order, a D8 Dozer with a single shank ripper. | |
| 1195 | On every work day from July 30, 2001 through the end of blasting in mid-September 2001, Remcon used the D8 Dozer on site to rip rock or attempt to rip rock on the Upper Sherman Access Road between Stations 24 and 30. | |
| 1196 | The D8 Dozer could not rip the bulk of the rock encountered along the Upper Sherman Access Road between Stations 24 and 30. | |
| 1197 | The area where the D8 Dozer could not rip the rock is the same location where the Upper Sherman Access Road was realigned into the hill into a higher elevation. | |
| 1198 | Bob Russell never requested to observe the inability of the D8 Dozer to rip rock on the Upper Sherman Access Road between Stations 24 and 30. Bob Russell was on-site daily when ripping was unable to be accomplished and he noted the daily activities in his daily report. | |
| 1199 | No NPS employee ever requested to observe the inability of the D8 Dozer to rip rock on the Upper Sherman Access Road between Stations 24 and 30. | |
| 1200 | In 2001, when Remcon provided notice of a differing site condition to the NPS, the NPS failed to advise Remcon that they wished to review the lack of rippability of the rock encountered. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1201 | It was Remcon's goal, every day, to rip rock encountered between Stations 24 and 30 if possible as the cost to do so was far less than blasting, and it was much more productive and efficient. | |
| 1202 | Once Remcon gave notice that it had encountered what it contended to be a differing site condition, it had done what it was supposed to do under the FAR differing site conditions clause and then the response, if any, was on the NPS to evaluate and investigate. | |
| 1203 | Willie DeOcampo did not read the differing site condition notice letter as thoroughly as he should have. In hindsight, he believes he should have. | |
| 1204 | Once the issues regarding rock and lack of rippability arose on this project, Willie DeOcampo consulted the Kleinfelder report to find out what information had been provided to the contractor to rely upon in forming its bid. | |
| 1205 | Section 8 of the Geotechnical Investigation Report provided that, if soils conditions are encountered during construction that differed from those described in the report, Kleinfelder should be notified immediately in order that review could be made and any supplemental recommendations provided. | |
| 1206 | Willie DeOcampo was aware of this provision. However, he never notified Kleinfelder during the 2001 construction season and did not ask them to come back to the site. | |
| 1207 | Willie DeOcampo can't say why Kleinfelder was not requested to come back to the site in accordance with the limitation set forth in the soils report. He claims that he doesn't know and probably just missed it. | |
| 1208 | It was Willie DeOcampo's responsibility to have contacted Kleinfelder. | |
| 1209 | Section 8 of the Geotechnical Investigation Report was in the possession of Raymond Tuttle in the summer of 2001. | |
| 1210 | Neither Raymond Tuttle nor any member of the design team ever contacted Kleinfelder regarding Remcon's differing site condition claim. | |
| 1211 | At the end of 2001, Remcon was behind schedule because it had encountered what it contended was as differing site condition in the big cut. | |
| 1212 | Bob Russell had the opportunity, as part of his job duties and daily presence, to physically observe the contractor meeting refusal with the D8 and not being able to rip the rock. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1213 | In fact, Willie expected that Mr. Russell, as part of his job, would have evaluated and observed just that. | |
| 1214 | Once the contractor gave notice that it had encountered what it contended to be a differing site condition, the contractor had done what it was supposed to do, as Willie DeOcampo understood it, and then the response, if any, was on the government to evaluate and investigate. | |
| 1215 | Willie DeOcampo contends that he consulted with Mr. Russell as to when Mr. Russell was advised by Remcon as to whether or not they did, in fact, encounter refusal based on their inability to get a D8 through the material and Mr. Russell told Mr. DeOcampo that he never witnessed anything to that effect. | |
| 1216 | Mr. Russell had the ability to ask the Remcon people to use the D8 to show him that the material was not rippable. However, Mr. Russell never did so and Mr. DeOcampo never asked him to do so. | |
| 1217 | Bob Russell had the responsibility to administer the job as the inspector on Willie DeOcampo's behalf. | |
| 1218 | This included the responsibilities under the differing site conditions clause. | |
| 1219 | Mr. Russell had at his disposal all the pieces of the puzzle plus his knowledge from his years of experience to know that when the contractor makes a claim that it can't rip something with the identified piece of equipment, he should go out there and look and see if its true or not. | |
| 1220 | In 2001, Willie DeOcampo did not contact Kleinfelder or any other geotechnical expertise to evaluate the contention as to whether or not a differing site condition had been encountered as contended by Remcon. | |
| 1221 | The plans and specifications stated that a D8 Cat should be able to rip the material on the access road. | |
| 1222 | Rod Keiscome can't recall if Mr. Russell, on behalf of the construction management effort on this project, determined whether any of the material encountered by Remcon in constructing the access road was unable to be ripped with a D8 dozer. | |
| 1223 | Rod Keiscome has not spoken to Mr. Russell since he left the project in approximately July of 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1224 | Rod Keiscome believes that he did have some discussions with Mr. Russell, regarding the differing site condition contention, prior to his departure. | |
| 1225 | Mr. Russell would be one of the individuals most knowledgeable on behalf of the government as to what Remcon actually encountered because he was physically on-site daily. | |
| 1226 | Nothing prevented Bob Russell from asking to witness an attempt by Remcon to rip the material in question with a ripper mounted to a D8 dozer during the time frame from July through August 2001. | |
| 1227 | Rod Keiscome can't recall whether there was every any request, by or on behalf of Mr. Russell or the NPS, for Remcon to take a D8 dozer to any portion of the access road and demonstrate the inability to rip the material then being encountered. | |
| 1228 | Bob Russell was on-site every day and noted that the D8 was operational and that blasting, nevertheless, was going on in July and August of 2001. | |
| 1229 | Bob Russell was available to witness refusal or inability to rip of the D8 dozer had he requested it. | |
| 1230 | Raymond Tuttle is unaware of any activity by Kleinfelder following notification by Remcon in the summer of 2001 to investigate whether or not a differing site condition actually existed. | |
| 1231 | Raymond Tuttle is unaware of any specific investigatory effort that Martin/Martin, Inc was hired to perform with respect to Remcon's differing site condition claim. | |
| 1232 | Raymond Tuttle does not know if the NPS undertook any investigatory effort with respect to Remcon's differing site condition claim. | |
| 1233 | Raymond Tuttle was never aware of anyone on behalf of the NPS contacting Kleinfelder on the differing site condition issue. | |
| 1234 | If Kleinfelder was the most knowledgeable individual or entity on behalf of the design team as to whether or not what the contractor was encountering was different than Kleinfelder anticipated, then they were the most important entity or individual to be called out to evaluate the issue. | |
| 1235 | Even though Willie DeOcampo had not furnished Rod Keiscome with the actual notice of a differing site condition, which was dated August 20, 2001, until June of 2002, Willie DeOcampo had nevertheless discussed the subject with Mr. Keiscome as of August 8, 2001, within ten days of Remcon encountering rock. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1236 | Rod Keiscome knew earlier than June of 2002 that not only a claim was in existence, but also that the government needed to analyze the claim. | |
| 1237 | Rod Keiscome can't recall why he did not issue a formal modification for approximately one year later than the exchange that occurred in March, 2002. | |
| 1238 | Willie DeOcampo did not contact any other geotechnical expertise to evaluate the contention as to whether or not a differing site condition had been encountered by Remcon. | |
| 1239 | There certainly was opportunity for the NPS to inspect and evaluate whether any of the material encountered along the road that was contended to be a differing site condition was or was not rippable prior to it being fully disturbed. | |
| 1240 | The NPS failed to inspect and evaluate whether any of the material encountered along the road that was contended to be a differing site condition was or was not rippable. | |
| 1241 | The NPS did not timely investigate the alleged encounter of a differing site condition by Remcon. | |
| 1242 | Raymond Tuttle was never contacted by the NPS or its inspector to come out and evaluate the differing site condition issue and was never asked to have Kelinfelder come out and do that on their behalf. | |
| 1243 | Willie testified that only after the blasting effort had been completed and Remcon had quantified its additional costs and submitted them to Willie DeOcampo for modification did Willie call Kleinfelder and have them come out to the site. | |
| 1244 | After 2001, Willie DeOcampo contacted Kleinfelder because, at that point in time, the NPS was trying to make a determination if Remcon's claim was actually true. | |
| 1245 | At that point in time, Willie DeOcampo wanted to make sure that the contractor was not going to be harmed. He doesn't know if he had come to his own personal conclusion that Remcon had encountered a differing site condition. | |
| 1246 | It was the NPS's responsibility to do its investigation if it disagreed that there was a differing site condition encountered after being notified of the contention. However, the NPS did not do so. | |
| 1247 | The time to evaluate whether what the contractor was encountering was, in fact, a differing site condition was at the time it encountered it before it got disturbed. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1248 | The reason that Willie DeOcampo lacked information with respect to whether a differing site condition was actually encountered was that Willie, on behalf of the NPS, did not avail himself of the opportunity to investigate the subsurface conditions when they were exposed but before they were disturbed. Willie failed to go ahead and contact Kleinfelder and get them out there on a timely basis. | |
| 1249 | Once Remcon gave the NPS notice, there were portions of the site, major portions, that were undisturbed so the NPS had the opportunity to investigate, and that didn't happen at that point in time. | |
| 1250 | Rod Keiscome contends that he was not officially informed that Remcon had encountered a differing site condition until sometime well after it was encountered. | |
| 1251 | Rod Keiscome understands that Mr. Christensen and his personnel communicated the encountering of rock that they perceived to be a differing site condition to NPS representatives much earlier than he personally became aware of the issue. | |
| 1252 | Willie DeOcampo was aware that when he had a differing site condition he was to notify the Contracting Officer. | |
| 1253 | Rod Keiscome recalls Willie DeOcampo testifying in his deposition that he failed to investigate timely the differing site condition contention that Remcon claimed. | |
| 1254 | Remcon complied with the requirement under the differing site condition clause to give timely notice of the differing site condition to the government representatives. | |
| 1255 | It took some time, possibly many months, to investigate Remcon's claim of a differing site condition. | |
| 1256 | Unilateral Modification No. 6 is based on what Rod Keiscome felt was a fair and reasonable amount. If the NPS had been given notice earlier and in other than fine print, the NPS would have a real good chance to at least see what the reality was in the field, rather than speculating. | |
| 1257 | The differing site condition that Remcon encountered was, in essence, rock that could not be ripped with a D8 Dozer. As a result, Remcon had to blast the rock. | |
| 1258 | It took quite a bit of time for Remcon to blast the rock in the road. | |
| 1259 | It was communicated to Rod Keiscome, by the technical personnel that he relied on, that the project was delayed as a result of encountering the differing site condition. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1260 | Rod Keiscome did not include any time extension in Modification No. 6 because he believes that Remcon could have used a larger Caterpillar Dozer than a D8. | |
| 1261 | Willie DeOcampo never formed the conclusion that Remcon lacked the appropriate equipment, in good working condition, to perform the excavation. | |
| 1262 | On August 13, 2001, Ray Tuttle participated in a conference call with DHM and NPS personnel concerning the rock excavation on the Upper Sherman Access Road. In his minutes of the conference call, Ray Tuttle reported that the NPS personnel involved in the matter indicated that the rock was "...an unforeseen condition." | |
| 1263 | Despite the indication that the rock encountered was a differing site condition, Joanne Cody commented that the specification could be interpreted to indicate that the contractor is responsible for the costs to excavate the rock. | |
| 1264 | Sometime around August 20, 2001, Robert Smith formed his conclusion that he felt, based on his knowledge and experience, that Remcon had encountered a differing site condition. | |
| 1265 | On October 5, 2001, Jeff Northrop wrote Tina at Remcon identifying the draft billing for the September, 2001 effort. | |
| 1266 | On October 20, 2001, Jeff Northrop prepared and faxed to Steve Christensen a chronology of the differing site conditions issues. | |
| 1267 | In December 2001, Steve Christensen brought to Denver and delivered to the NPS his earthwork claim and backup, labeled as Request for Equitable Adjustment, in an amount exceeding $222,000. | |
| 1268 | Around the time of the December 2001 meeting was when Raymond Tuttle and Robert Smith informed the NPS that they felt there was a differing site condition encountered. | |
| 1269 | On December 19, 2001, Jeff Northrop wrote California Drilling and Blasting regarding billings for the project. | |
| 1270 | In the winter shutdown of 2001-2002, the NPS' negotiating strategy to offset Remcon's claims for costs and time associated with a differing site condition was to consider granting some access to the Lower Sherman portion of the work. | |
| 1271 | On March 18, 2002, Willie DeOcampo faxed Remcon's REA for rock blasting, excavation and handling to Kleinfelder. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1272 | On March 19, 2002, during the winter shutdown of 2001-2002, Willie DeOcampo phoned the project soils engineer, Kleinfelder, requesting a proposal to perform additional geotechnical assessment at the project. | |
| 1273 | On March 21, 2002, during the winter shutdown of 2001-2002, Kleinfelder sent its written proposal to Willie DeOcampo. | |
| 1274 | The purpose of the additional work was "...to observe cut areas along the new roadway that reportedly required blasting during recent construction and provide our opinion as to the quality of the rock which has been exposed in-cut." | |
| 1275 | The cost proposed to perform the additional work was $4,400. | |
| 1276 | In its March 21, 2002 proposal, Kleinfelder stated that it had concluded in its September 11, 2000 project soils report that the "...data indicated that the bedrock should be rippable with well maintained D-8 or larger dozer equipped with single tooth ripper." | |
| 1277 | Remcon had on site during 2001 and 2002 a well maintained D8 dozer equipped with a single tooth ripper. | |
| 1278 | Given the dimensions of the site, and the gross heights and width of larger dozers (they were too heavy to transport on the mountain bridges and too wide for the site), the D8 was the largest piece of equipment which could reasonably be used at the site. The width of the road was 22 feet. The width of a D8 is 14 feet. The weight of a D8 is 82,850 pounds The width of a D9 is 15 feet, 3 inches. The weight of a D9 is 106,790 pounds. The width of a D10 is 17 feet, 3 inches. The weight of a D10 is 144,190 pounds. | |
| 1279 | During the 2001 operations, Kleinfelder was not notified or advised of the apparent change in conditions nor was Kleinfelder requested to visit the site to observe the reported rock conditions, as indicated in the geotechnical report. | |
| 1280 | Willie DeOcampo is quoted by Kleinfelder as informing Kleinfelder that NPS' site representative did not observe the dozer trying to cut the rock after the overburden soils had been removed and that the granite from the rock cut reportedly failed durability testing for use as a road base. | |
| 1281 | Kleinfelder wrote in its March 21, 2002 proposal that based on Willie DeOcampo's statement, "There appears to be a discrepancy between the durability, seismic data and the need for blasting." | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 1282 | No where in the Kleinfelder proposal, dated March 21, 2002, did the author report that Willie DeOcampo advised him that the Upper Sherman Access Road had been realigned for approximately 600 feet off of the right-of-way and/or that where it was realigned is where the differing site condition was contended to be encountered requiring blasting. | |
| 1283 | Kleinfelder's proposal acknowledged that its site visit after March 21, 2002 would not be able to note the quality, fracturing or hardness of the rock and the depth encountered, when Remcon reported it could not rip in 2001. | |
| 1284 | Kleinfelder's proposal acknowledged that its site visit after March 21, 2002 could not discern or comment upon what effort Remcon actually used to rip bedrock prior to blasting, including the type, size and condition of equipment used. | |
| 1285 | Kleinfelder's proposal acknowledged that now, after the fact, it could not determine the depth where the contractor initially determined he needed to start blasting. | |
| 1286 | The Kleinfelder proposal was never accepted by the NPS. | |
| 1287 | Prior to March 28, 2002, Remcon gave written notice to the NPS of the following claims arising out of the 2001 contracting season's differing site condition: changes in the character of work, increase in quantities, increase in scope of work and design changes, and that the impacts severely impacted Remcon's work. | |
| 1288 | On March 28, 2002, Willie DeOcampo wrote Steve Christensen requesting additional information on the following claims: changes in the character of work, increase in quantities, increase in scope of work and design changes, and that the impacts severely impacted Remcon's work. | |
| 1289 | On March 28, 2002, Willie DeOcampo requested in writing certain information from Remcon to substantiate the costs incurred and quantities encountered in addressing the Upper Sherman Access Road differing site condition. | |
| 1290 | Prior to March 28, 2002, Steve Christensen had delivered to Willie DeOcampo all of the information requested in Willie DeOcampo's March 28, 2002 letter. | |
| 1291 | By sending the March 28, 2002 letter, the NPS placed the burden on Remcon, that was the government's, but which the government had failed to do in or after August 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1292 | On April 3, 2002, Steve Christensen responded to Willie DeOcampo's March 28, 2002 letter communicating both facts and that the information requested was already in the NPS' possession from Remcon. | |
| 1293 | Remcon, by letter dated April 3, 2002, responded to Willie DeOcampo's March 28, 2002 letter requesting a modification for encountering the differing site condition on the access road. | |
| 1294 | The April 3, 2002 letter explained in detail the facts ultimately found to be true by the Contracting Officer in Modification No. 6 issued in February, 2003. | |
| 1295 | On May 13, 2002, Remcon received laboratory test results confirming three tests on rock excavated from the deep cut. | |
| 1296 | The test results obtained indicate that the seismic velocities of the rock encountered in the deep cut where the differing site condition occurred greatly exceeded the maximum velocity identified in the project soil report that would be encountered. | |
| 1297 | The project soils report indicates the maximum seismic velocity of rock expected to be encountered was 5,422 ft/sec. | |
| 1298 | In an effort to comply with Willie DeOcampo's March 28, 2002 letter, Remcon submitted to Willie DeOcampo data from a certified testing laboratory that Remcon procured regarding the seismic velocities of the rock encountered. This data was submitted in substantiation of the fact that Remcon had encountered a differing site condition. | |
| 1299 | The project soils report indicates that all rock encountered, except isolated floaters, would be rippable with conventional construction equipment, namely a D8 Dozer. | |
| 1300 | The seismic velocities encountered, as detailed in the test report obtained by Remcon, exceeded the maximum ripping capacity of a D8 Dozer found in the manufacturer's (Caterpillar) specifications. | |
| 1301 | During the last week of May, 2002, Mark Penrose requested that either Bob Russell or his representative make time to witness a sample of material being taken out of the undisturbed area. | |
| 1302 | At this point in time, Willie DeOcampo testified that it was still unknown to Willie DeOcampo if a differing site condition had actually been encountered. | |
| 1303 | Remcon offered to have NPS personnel, or its inspectors, witness a sampling of rock from the Upper Sherman Access Road between Stations 24 and 30 but the NPS and its inspectors refused to do so. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1304 | Mark Penrose was told by Bob Russell that Bob was not interested in sampling of rock from the cut area and that he was not available. | |
| 1305 | On May 13, 2002, Bob Russell, Terry Lang, Willie DeOcampo, and Steve Christensen met and reviewed the previous years' blasting and earthwork operations. That afternoon, Bob Russell, Terry Lang, Willie DeOcampo, Mark Penrose and Steve Christensen visited the project site to review areas that were blasted. | |
| 1306 | On May 14, 2002, after reviewing Remcon's Request for Equitable Adjustment, Willie DeOcampo made Remcon an offer of $59,500.47 to settle the differing site conditions claim. This amount was based upon Bob Russell's estimate. | |
| 1307 | Remcon rejected the offer. | |
| 1308 | Willie DeOcampo felt that Remcon had expended that amount of money as a result of encountering what they said were rock. | |
| 1309 | The government disputed Remcon's claim for several hundred thousand dollars insofar as it would not agree to pay Remcon 100 percent of what was claimed. | |
| 1310 | Willie DeOcampo believes that in some instances, Remcon had to blast boulders, but in other instances Remcon had to blast rock. | |
| 1311 | Willie DeOcampo felt that the offer of $59,500.47 was justified because Remcon had encountered a differing site condition. | |
| 1312 | The $59,500.47 amount was based on a 50% share of the blasting costs which the NPS believed may have been incurred. | |
| 1313 | The offer to settle of $59,500.47, and analysis of the issue, did not take into account anything other than extra blasting costs. | |
| 1314 | The offer to settle of $59,500.47, and analysis of the issue, assumed expressly that the boulder blasting was for the benefit of Remcon. | |
| 1315 | Bob Russell made the determination that only 50 percent of the recognized costs would be reimbursed by the government. Willie DeOcampo agreed with this recommendation because Bob Russell was on-site. | |
| 1316 | On May 18, 2002 Robert Smith sent a memo to Joanne Cody, notifying her that he had reached the conclusion that Remcon had encountered a differing site condition. | |
| 1317 | Robert Smith communicated his opinion that Remcon had encountered a differing site condition to Raymond Tuttle. Raymond Tuttle agreed with Robert Smith's conclusion. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1318 | On May 18, 2002, Bob Smith of DHM prepared a memo and sent it to Joanne Cody reflecting his thoughts and observations. They included the fact that Remcon did encounter hard rock and that this was a differing site condition; that Rod Keiscome should be so advised and prepared to address this fact for his June, 2002 negotiations with Remcon; that the extra work reported by Remcon for encountering the differing site condition was justified; and that, due to the volume of issues, "Remcon is in the driver's seat on this project." | |
| 1319 | The blasting of rock in conjunction with the roadway excavation would be extra work. | |
| 1320 | To the best of Willie DeOcampo's knowledge, the NPS never at any time made any determination as to whether or not the actual rock encountered between Station 24 and Station 30 on this project was denser than the rock identified by Kleinfelder in its report. | |
| 1321 | Willie DeOcampo never came to a conclusion if blasting of the roadway was a differing site condition or not because he didn't have Kleinfelder out there to make that determination. | |
| 1322 | There was a partnering meeting in mid-May of 2002 at the park. | |
| 1323 | Rod Keiscome was present at the partnering meeting. | |
| 1324 | There were discussions during the partnering meeting regarding various issues that Mr. Christensen contended he had encountered and had then been unaddressed. | |
| 1325 | Included among those issues was the differing site condition contention regarding rock. | |
| 1326 | Rod Keiscome can't recall if, as a result of the oral communications at the partnering session regarding the differing site condition claim that Remcon had advanced, he requested to Willie DeOcampo that Willie contact Kleinfelder to investigate. | |
| 1327 | Under the contract documents, Remcon was not required to contract with a third party to come in and perform the seismic velocity testing. | |
| 1328 | Instead of investigating the differing site condition contention, the NPS directed Remcon to provide test results to demonstrate that a differing site condition was encountered (seismic velocities). | |
| 1329 | On June 3, 2002, Steve Christensen sent Willie DeOcampo an email regarding the sample. In the letter, Steve indicated that he found it quite disturbing as he was unclear why the NPS would not want a confirming sample of the material. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1330 | Willie DeOcampo had an opportunity even as of June of 2002 to have a sample taken by somebody in the presence of his inspector of undisturbed material that still existed on the site adjacent to the areas that were blasted. | |
| 1331 | Bob Russell, on June 4, 2002, records that Willie DeOcampo directed that NPS personnel observe Remcon's sampling of rock in areas blasted in 2001. The soils engineer is noted as being necessary for this effort. | |
| 1332 | On June 5, 2002, Bob Russell noted that because Kleinfelder was not on site, no observation of rock sampling would occur. | |
| 1333 | Willie DeOcampo's initials were on Bob Russell's June 5, 2002 daily log, indicating that Mr. DeOcampo received it and read it. | |
| 1334 | Willie DeOcampo does not know if Kleinfelder ever when out the project site to perform this sampling. | |
| 1335 | Willie DeOcampo was willing to negotiate something with Mr. Christensen if the money wasn't too much to not hurt them. | |
| 1336 | Willie DeOcampo knew that Remcon had encountered extra costs and that they were in the healthy six figures. | |
| 1337 | It was Willie DeOcampo intent when he sat down with Mr. Christensen, once he received Mr. Christensen's quantification, to justify the amount he would recommend paying under the differing site condition clause. The recommendation would be based on the blasting that was undertaken on that portion of work which was necessitated because Remcon could not rip the rock with a D8 in good working order. | |
| 1338 | During meetings held by the NPS during which the differing site condition claim was discussed, Raymond Tuttle does not recall anybody in attendance on behalf of the NPS disagreeing with his or Mr. Smith's conclusions. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1339 | On June 10, 2002, Bob Smith of DHM commented and opined on Remcon's pending differing site condition claim on the Upper Sherman Access Road (non-rippable granitic rock): (a) The plans and specs were prepared based on the soils report; (b) The soils report indicated that the rock material to be encountered was rippable; (c) The soils report was issued late in the decision process; (d) Prior to receiving the soils report the cost estimate contained a significant line item for rock excavation; (e) The significant line item for rock excavation was deleted after review of the soils report by the NPS' Denver Service Center personnel, the NPS' park personnel, and the A/E at a joint review session; (f) Unless the geotechnical engineer advises otherwise, it seems that Remcon is entitled to a change order and his contention that it is a change of condition is valid. | |
| 1340 | On June 18, 2002, Rod Keiscome emailed to Steve Christensen an offer to pay $138,699 for excess excavation on the Upper Sherman Access Road and Upper Sherman parking area, and hauling excess quantities. | |
| 1341 | In his June 18, 2002 letter, Rod Keiscome represented that there was "no evidence that quantities of excavated material are different than what was bid." | |
| 1342 | The subjects of the June 18, 2002 email offer were later the subject of Modification Nos. 3, 4 (partially) and 6. The total compensated in these modifications for the same scope of work was in excess of $520,000. | |
| 1343 | Remcon rejected the June 18, 2002 offer. | |
| 1344 | On August 1, 2002, Steve Christensen wrote Mike Giller, with copies to Willie DeOcampo and Rod Keiscome, asking for their position on the differing site condition claim and that all outstanding issues pending since the 2001 construction season be addressed in the August, 2002 progress payment. | |
| 1345 | On September 18, 2002, the inspectors directed Remcon in writing to remove additional rock and two trees in the deep cut area of the Upper Sherman Access Road. | |
| 1346 | Remcon was not allowed to remove any trees that weren't marked for removal on this project. | |
| 1347 | Any direction to remove a tree is a major direction that has to be ratified by the Contracting Officer; otherwise, the contractor is exposed to sanctions. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1348 | Part of the absolute rules for this project were: You will not remove a tree that's not marked for removal, and if one is in your way, you need to wait for written direction. | |
| 1349 | Rod Keiscome contends that the September 18, 2002 letter says, "Two adjacent trees to be removed," but it does not say "remove them." | |
| 1350 | Rod Keiscome can't recall if he ever issued a Contracting Officer's Directive or a modification directing Remcon to remove any additional trees that had not been removed or marked for removal after September 18th of 2002. | |
| 1351 | The September 18, 2002 direction was issued over 1 year after the blasting of the Upper Sherman Access Road had ceased. | |
| 1352 | On September 20, 2002, Russell Belknap noted in his report on the efficiency and expertise of Remcon that day. | |
| 1353 | Modification No. 6, concerning the differing site condition, was issued unilaterally in February, 2003. | |
| 1354 | From July 30, 2001 into December, 2002, the government never investigated in the field whether a differing site condition was encountered. | |
| 1355 | On December 16, 2002, almost 16 months after the formal differing site condition claim notice was given to the NPS, Willie DeOcampo, Mike Giller and Jack Vance were evaluating whether the contract required Remcon to prove a differing site condition was encountered via showing inability to rip rock. | |
| 1356 | On December 16, 2002, Willie DeOcampo wrote Mike Giller and Jack Vance that, pursuant to the differing site conditions clause, Remcon had to show why blasting was necessary. | |
| 1357 | On December 16, 2002, Willie DeOcampo wrote Mike Giller and Jack Vance that he could not find the requirement that Remcon demonstrate lack of rippability. | |
| 1358 | On December 17, 2002, Jack Vance wrote Willie DeOcampo, Mike Giller, and Robert Belknap that ripping refusal was not a requirement imposed on Remcon by the contract. | |
| 1359 | Mr. DeOcampo did not pass this information on to the Contracting Officer. | |
| 1360 | December 2002 was the first time that Willie DeOcampo came to the understanding that the contract did not require the contractor to demonstrate lack of rippability as Mr. Vance had written him. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1361 | Mike Giller authored a two page memo, dated January 14, 2002, which summarized his conclusions justifying the unilateral issuance of Modification No. 6 in the sum of $84,170. | |
| 1362 | Attached to Mr. Giller's memo are the documents he relied upon and the calculations he made in reaching the conclusion that $84,170 was due. | |
| 1363 | Rod Keiscome relied upon Mr. Giller's memo, and other supporting documentation, in concluding that the total adjusted cost for the differing site condition for roadway blasting was $84,170. | |
| 1364 | Rod Keiscome would have to see the documents to know if the person he asked to prepare an analysis or estimate for the unilateral roadway blasting modification was knowledgeable with respect to blasting procedures. He would have sent this issue to the construction manager. | |
| 1365 | There was nothing, as of 2002 or 2003 that restrained Rod Keiscome, as Contracting Officer, from issuing a task order soliciting the expertise to evaluate roadway blasting issues. He believes that he considered doing so but can't recall if he implemented that option. | |
| 1366 | No such expertise was retained or used. | |
| 1367 | Modification No. 6 to the Project Contract was issued unilaterally by Rod Keiscome on February 18, 2003. | |
| 1368 | Modification No. 6 was solely issued to Remcon to compensate it for blasting costs, not for the effects of blasting or having to blast. | |
| 1369 | Because the material encountered in excavation, other than utility trenches, was rock which was different than set forth in the soils report, Rod Keiscome issued Modification No. 6. | |
| 1370 | This modification was unilateral and increased the contract amount by $84,170.00 for rock blasting and excavation resulting from the differing site condition encountered by Remcon. | |
| 1371 | Willie DeOcampo doesn't know if he authored the justification for this new Bid Item Number 141 attached to Modification No. 6. | |
| 1372 | As part of the discussions in August of 2002 and before that, not only did Remcon identify that it had encountered a differing site condition, but it also contended that the work necessitating addressing the differing site condition caused delay and disruption to the work. | |
| 1373 | Modification No. 6 did not grant Remcon any additional contract time or impact costs, and only compensated for blasting costs evaluated by the NPS to be the responsibility of the NPS. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1374 | In Modification No. 6, Mr. Keiscome and the NPS compensated Remcon for blasting the nonrippable rock encountered in the deep cut area of the access road. | |
| 1375 | This fact was identified in the Justification written by the NPS as a result of the contractor encountering a differing site condition. | |
| 1376 | Modification No. 6 granted Remcon only $84,000 worth of compensation based upon an analysis which is flawed in many respects and which ignores multiple items and issues. | |
| 1377 | Modification No. 6 also failed to address the issue of time extensions and delay. | |
| 1378 | Rod Keiscome issued Modification No. 6 based on his determination that Remcon had encountered a differing site condition concerning rock on this project. | |
| 1379 | In determining that a differing site condition had been encountered by the contractor, Rod Keiscome relied on expertise, judgment and input from technical people such as Mike Giller and Willie DeOcampo. | |
| 1380 | Rod Keiscome is aware that Willie DeOcampo received communications from Bob Smith and Ray Tuttle with respect to the differing site condition. | |
| 1381 | The issuance of the unilateral Modification No. 6 in February 2003, approximately 18 months after the work was performed, was not a timely issuance of a modification for recognized extra work on the Project. | |
| 1382 | Modification No. 6 was issued approximately 6 months after a settlement meeting. | |
| 1383 | Despite the untimely issuance of Modification No. 6, the surety was not paid the $84,000 before the notice of termination was given in August, 2003. Michael Giller doesn't know why payment wasn't issued. | |
| 1384 | Willie DeOcampo believes that the NPS assumed that Remcon would not have to blast the road. | |
| 1385 | There was not, for the road excavation portion of the work, a line item for blasting. While blasting was anticipated for some portion of the utility trench under the subgrade of the constructed road, there was no such anticipated blasting required for the road itself, except for isolated "floaters." | |
| 1386 | Willie DeOcampo was responsible, as COR, to evaluate and negotiate change requests that were pending from the 2001 season during the winter of 2001-2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1387 | Modification No. 6 indicates that the work was performed in August and September of 2001. This is consistent with Willie DeOcampo's recollection of when Remcon had its blasting work done in the access road location. | |
| 1388 | Willie DeOcampo doesn't know why it was not until February of 2003 that the government was agreeing to compensate Remcon any amount of money for the differing site condition work that had been done approximately 18 months earlier. | |
| 1389 | Willie DeOcampo isn't aware of any compensation given to Remcon prior to February of 2003 for the blasting and associated work referenced in the Justification for Modification No. 6. | |
| 1390 | Instead of taking 21 calendar days to excavate the road and parking lots, as scheduled in the as-planned schedule, the activity took more than 13 months and the costs for excavation exceeded $700,000. | |
| 1391 | No time extensions or impacts to production, due to encountering the differing site condition, have ever been offered by the NPS to Remcon. | |
| 1392 | At no time from July 30, 2001, when blasting preparations commenced, until the issuance of Modification No. 6 in February, 2003, did the NPS acknowledge, in writing, that a differing site condition had been encountered in the deep cut area on the Upper Sherman Access Road. | |
| 1393 | Between July 30, 2001 and February, 2003, the NPS published multiple written communications denying the existence of the differing site condition and/or seeking a way to avoid paying for the circumstances. | |
| 1394 | The NPS took the position throughout 2001 and 2002 that the blasting of rock on the Upper Sherman Access Road was a convenience for Remcon so it could split the boulders to make crushed rock, producing revetment and stone veneer material. | |
| 1395 | The NPS took the position during the project that blasting of the Upper Sherman Access Road was done by Remcon at its election. | |
| 1396 | The position taken by the NPS regarding the differing site condition and blasting lacked substantial justification. | |
| 1397 | Modification No. 4 was signed by Steve Christensen on September 11, 2002 and Rod Keiscome on September 12, 2002, | |
| 1398 | Modification No. 4 compensated Remcon for hauling an additional 3200 cubic yards of excess excavation to Wolverton Point. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1399 | In the Justification to Modification No. 4, the government wrote that Remcon advised it during excavation operations that the cut and fill volumes did not balance, and that it took the government nine months to determine it was responsible for the hauling costs associated with this excess material. | |
| 1400 | Further, it was written: This material had to be removed from the Project site in order for the contractor to complete design subgrades. If this work is not performed this contractor (sic), the contractual work can not be completed and delay claims will follow. | |
| 1401 | The Justification page, attached to Modification No. 4, produced by the government in discovery, was not part of the modification furnished by the NPS to Remcon when Steve Christensen signed it. | |
| 1402 | The Justification page attached to Modification No. 4 admits that the NPS did not timely act in response to Remcon's claims regarding excess excavation. | |
| 1403 | The reference to "nine months" for government action in response to Remcon's notice is not accurate as Remcon gave notice to the NPS of excess material in the summer of 2001 and it wasn't until September of 2002 that the modification was issued. | |
| 1404 | The government' s belated recognition of the extra work, as well as its concurrent failure to issue any time extensions and/or recognize the actual damages incurred, constituted constructive acceleration and a constructive change, both of which are a material breach of contract. | |
| 1405 | The NPS' Exhibit 75 contains Mark Penrose's blasting data. | |
| 1406 | Remcon sought many weeks of delay damages and over $700,000 in additional costs as a result of the issue. | |
| 1407 | The differing site condition was a change, error or omission in the contract. | |
| 1408 | Rod Keiscome did not timely determine that there was a differing site condition. The contractor indicated that there was a differing site condition. | |
| 1409 | The text of Modification No. 6 admits Remcon encountered a differing site condition in constructing the access road. | |
| 1410 | Rod Keiscome authorized Modification No. 6 to be issued with the language "differing site condition" in it. | |
| 1411 | Rod Keiscome intended the language that is in Modification No. 6 to be included in it when he published it. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1412 | In the text of the backup for Modification No. 6, there are the words "differing site conditions" and "rock blasting excavation." | |
| 1413 | When he issued Modification No. 6, unilaterally, Rod Keiscome knew that that language was there in the description of the activity for which the compensation of $84,170 was being authorized. | |
| 1414 | The justification memo for Modification No. 6 was included and intended by Rod Keiscome to be included as part of Modification No. 6. | |
| 1415 | At the time Rod Keiscome placed his initials the Modification, he intended to adopt the content of it as justification substantiating the issuance of Modification No. 6. | |
| 1416 | Rod Keiscome recalls Mr. Tuttle testifying, during his deposition, that a contractor would rip because it is cheaper. Rod Keiscome notes that this is also what the documents state, that the material is rippable with a D8 Cat. | |
| 1417 | Rod Keiscome is familiar with the concept of efficiency of performance of construction work. | |
| 1418 | The concept of efficiency means that certain labor yields certain productive results which produce certain efficiency curves or evaluations. | |
| 1419 | Certain equipment can move certain quantities of earthen material at a greater rate than other equipment. | |
| 1420 | Most contractors strive to be as efficient as they can in order to reduce time that they are on a project because the less time they are on the project, that hopefully translates to less costs incurred to construct the project. | |
| 1421 | Rod Keiscome does not know what is more efficient in moving earthen material that is rippable, conventional construction equipment or blasting. He is not a technical person. | |
| 1422 | Mr. Giller came to this project no sooner than July of 2002. | |
| 1423 | The work that was done, blasting and encountering the differing site condition regarding rock occurred in July, August, and September, 2001. | |
| 1424 | Mr. Giller did not observe the blasting effort in encountering the differing site condition. | |