| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1425 | Rod Keiscome can't recall if he investigated the factual representations set forth in the analysis, authored by Mr. Giller but relied upon to issue the $84,170 amount in Modification No. 6, to determine whether they were accurate or not. | |
| 1426 | Rod Keiscome can't recall if, once he received Mr. Giller's analysis, on or after January 14, 2003, he discussed its contents with Mr. Christensen. | |
| 1427 | Rod Keiscome believes that if he didn't ask Mr. Christensen about overblasting or blasting in the wrong location, then some of the NPS technical people did. | |
| 1428 | Rod Keiscome cannot recall what Mr. Christensen's response was when allegedly asked about overblasting or blasting in the wrong location. | |
| 1429 | Mr. Christensen's explanation with respect to alleged overblasting or blasting in the wrong location was important to Mr. Keiscome. However, Rod Keiscome can't recall if any such inquiry of Mr. Christensen was ever made. | |
| 1430 | Mr. Christensen was never advised by Rod Keiscome on this issue. | |
| 1431 | Rod Keiscome recalls that Willie DeOcampo testified, during his deposition, that he believes, in hindsight, that Kleinfelder should have been consulted with respect to the differing site condition contention. | |
| 1432 | Rod Keiscome believes that it was Willie's DeOcampo's accurate recollection that no one on behalf of the NPS communicated to Kleinfelder while Remcon was in the midst of encountering the differing site condition in 2001. | |
| 1433 | Rod Keiscome's knowledge with respect to the differing site condition claim came from meeting with Remcon. | |
| 1434 | The relocation of the road, as reflected in Modification No. 4, Item No. 137, impacted Remcon's ability to construct the project as originally designed because it moved the centerline of the road which resulted in blasting. | |
| 1435 | Page 31 of the geotechnical report, under the heading "Limitations" reads, "...If soil conditions are encountered during construction that differ from those described herein, Kleinfelder should be notified immediately in order that a review may be made and any supplemental recommendations provided." | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1436 | Rod Keiscome can't recall if any representatives of the NPS followed this admonition and contacted Kleinfelder at any time earlier than calendar year 2002 regarding the differing site condition contention. | |
| 1437 | Joanne Cody understands a differing site condition to be when what is encountered on-site is different than what is shown on the documents. | |
| 1438 | Joanne Cody does not recall ever being tasked to evaluate the merits of a contractor contention that they encountered a differing site condition when building this project. | |
| 1439 | Joanne Cody does not know if she involved, at the request of anybody else, any representative of the design team, a third-party A/E, to evaluate the merits of the contractor's contention that it had encountered a differing site condition. | |
| 1440 | Rod Keiscome does not have any actual construction experience working for a construction company. | |
| 1441 | Rod Keiscome has never performed any blasting work, has never studied the process and methodology of blasting in rocky terrain, and has never consulted any experts in the subject of blasting in order to learn about it in relationship to this project. | |
| 1442 | Rod Keiscome is aware of the contention that the government made in response to Remcon's claim regarding blasting, that Remcon overblasted or overshot the volume of rock that it otherwise needed to in order to create the access road. Indeed, he included this contention in correspondence to Remcon. | |
| 1443 | Rod Keiscome does not know if he used the phrase "overshot" because the rock didn't need to be blasted as contrasted with blasted too much. | |
| 1444 | Rod Keiscome can't recall how he would know if the rock need to be blasted if no one from the NPS or its construction manager went out and inspected and evaluated it during the time frame Remcon was encountering the particular rock. | |
| 1445 | Remcon intended to build the access road using a D8 dozer instead of blasting. | |
| 1446 | Blasting of rock is a much slower process than excavating the material that the NPS anticipated being encountered that would be ripped with a D8 dozer. | |
| 1447 | If a contractor can rip as opposed to blast, he will rip because it is cheaper, more efficient and faster. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1448 | All things being equal, its faster and a contractor can move more material and be more productive with a D8 dozer than having to drill, put cover, shoot, clean up the isolated areas, go and rip, redrill, shoot, put in cover, shoot it, and remove it. With regular dirt, it is easier to go in there with a piece of equipment and remove it. | |
| 1449 | Blasting, in substance, involves drilling holes to place charges, covering the holes, clearing the site, and blasting. The material then needs to be removed. It cannot be used as backfill or fill as planned without special processing. | |
| 1450 | There were restrictions on when blasting could occur on this project. | |
| 1451 | The national park where the project was being constructed was open to the public. | |
| 1452 | Blasting could occur within a limited time frame on working day so as to minimize the potential disruption to use of the park. | |
| 1453 | Remcon was only allowed to blast after 4 p.m. daily. | |
| 1454 | If the NPS did not allow blasting until 4 p.m. on a normal construction day, that would severely limit the amount of work that a contractor could do during a construction workday if blasting was required. | |
| 1455 | While blasting was occurring, all planned work in that area had to be shut down. | |
| 1456 | The fact that blasting time was limited would have caused some lost productivity in the ability of Remcon to productively perform work because blasting is a very labor-intensive and time-consuming process because you have to drill a hole, fill the hole, cover the hole to prevent materials from flying out and damaging nearby features. Then you have to remove the blasted material and remove and sort it while performing the same process on site again. | |
| 1457 | Robert Smith would expect there to be extended periods of time where limited work would be done to the activity for which blasting was necessary. | |
| 1458 | As a result of not being able to use the D8 dozer on a significant portion and having to blast instead, Remcon possibly claimed that it took six to eight weeks to do something that was planned to be done in one or two weeks. | |
| 1459 | No one ever communicated to Raymond Tuttle that Remcon blasted on this Project for its own expediency as contrasted with the Project requiring it because of what Remcon encountered. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1460 | The financial and time consequences of blasting, rather than ripping, are enormous. | |
| 1461 | They include the fact that it is much slower to blast then rip and thus a huge overrun in labor, material and equipment costs were incurred. | |
| 1462 | The time it took to blast this 600 foot area was 6 or so weeks along, twice the planned duration of the entire excavation and earthwork in the Upper Sherman Access Road and Parking Areas included in the as-planned schedule and which was found by the government's consultant to be reasonable. | |
| 1463 | On October 30, 2000, Andrea Gregor sent a memo to Joanne Cody, attaching a copy of US30-Parking Lot Grading Plan. The memo states: "Joanne, attached are two copies of US30, one for you and one for Ray Todd. You can use them for discussions with the park for determining what to do about our excess fill. This solution will use approximately 3200 cubic yards of fill. The cross slopes of the parking area improved. The downside is that we fill at this drainage area at the lower part of the lot. If the park is interested in this, we have three options. First, we can do the adjustments to the sheets now. This would require a new profile. Second, we can do a modification during bidding. Third, we could do the adjustment during construction when we have knowledge of how much cut and fill we are doing. Any of these solutions is fine with us." | |
| 1464 | Upon receiving this information, Joanne Cody believes that they had a team meeting and she believes that Martin and Martin did something with the road as far as the grade on the road to use this material. The parking lot did not change to the best of her knowledge. | |
| 1465 | This memo alerted Joanne Cody of the recommendations from the firm. There were other ideas that were out there that are not mentioned in the memo. | |
| 1466 | Joanne Cody believes that the change that was made after October 30, 2000 was that the road was raised slightly. | |
| 1467 | The NPS was at the 75% construction documents by October 30, 2000. | |
| 1468 | Rod Keiscome was not made aware of this excess fill issue on or after October 30, 2000 during the design phase. | |
| 1469 | That project was, in essence, planned to be as close to a balanced job as possible for import and export. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1470 | Joanne Cody is aware that during construction of the project there was excess material created that had to be addressed by the NPS and that there was a modification, in fact, issued by Mr. Keiscome addressing that portion of it that was used to spread in the upper parking lot and raising it by 5 feet. | |
| 1471 | That was a lot more excess fill than the amount of excess fill addressed in the October 30, 2000 memo. | |
| 1472 | Joanne Cody does not believe that the existence of that excess material was a design error, omission, conflict or inconsistency. | |
| 1473 | Joanne Cody does not know what happened that caused the additional material to exist. She did ask Willie DeOcampo at some point but can't remember what he told her. | |
| 1474 | Joanne Cody does not believe that the excess material was a result of a design mistake. | |
| 1475 | Joanne Cody may have authored or received an e-mail from Willie DeOcampo indicating that it was a design mistake and that the designers need to be put on notice that there were mistakes in their quantity analysis. Joanne Cody hopes that she did not pass this information on to the designers, but she might have. | |
| 1476 | Rod Keiscome understood, at the time that he issued the contract documents for proposals, that this project was, more closely than not, a balanced job in that there was no import required to build it and very little export to other portions of the park. | |
| 1477 | This is not what actually happened. | |
| 1478 | He thinks it didn't happen because there were some quantities that were not available there. | |
| 1479 | Rod Keiscome can't recall if the job was not balanced because there were errors in the drawings. | |
| 1480 | Rod Keiscome does not believe that the job didn't balance because there were omissions, conflicts, inconsistencies and/or ambiguities in the drawings. | |
| 1481 | As a Contracting Officer, Rod Keiscome was not going to sign a document that he believed had inaccuracies, errors, or omissions. | |
| 1482 | Rod Keiscome now believes that there were some deficiencies in the contract documents, meaning that the quantities were not sufficiently correct so as to avoid him having to issue one or more modifications. | |
| 1483 | Rod Keiscome is familiar with the term compaction. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1484 | Rod Keiscome understands compaction to be a construction term that concerns the compression of earthen material or some type of material | |
| 1485 | In its natural state, various different types of material have different relative compactions. | |
| 1486 | By applying some force, mechanical or otherwise, there is a compression factor that occurs to material; some compress greater than others. | |
| 1487 | With respect the earthen material on this project, Rod Keiscome understood that, at some time during the project, the design team used a compaction factor of 40% for the excavated material to be compressed. | |
| 1488 | Rod Keiscome also recalls reading about this in the civil engineer, Raymond Tuttle's, deposition and recalls that Mr. Tuttle testified that, in hindsight, the use of a 40% compaction factor was an error, that this material could not compress 40%. | |
| 1489 | Rod Keiscome recalls that the quantification of quantities used in the contract documents by the designer, as testified to by Mr. Tuttle, included the assumption of a 40% compaction factor. | |
| 1490 | Rod Keiscome has come to learn that the ability of the on-site material to compress was actually a lower percentage. | |
| 1491 | The consequence of that is more material that has to be handled by the contractor. | |
| 1492 | Rod Keiscome did issue some hauling modifications to the contractor for having to handle more material than that which was anticipated. | |
| 1493 | Rod Keiscome can't recall if the hauling he is referring to is other than for hauling unacceptable material because of the burn pit being too big or bigger than thought. | |
| 1494 | Rod Keiscome cannot recall what time was involved in the contractor having to handle more material than was contemplated at the time that it was issued the contract. | |
| 1495 | Rod Keiscome does not recall if any analysis was undertaken by anyone on behalf of the government, other than by counsel, that evaluated whether the handling of additional material caused any delay to the project. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1496 | Rod Keiscome can't recall and would have to refer to the contract documents to say whether there have been any time extensions granted by him, as Contracting Officer, in any of the modifications as a result of the contractor having to handle material in excess of that originally contemplated as a result of the material not compressing to the 40% anticipated. | |
| 1497 | With respect to what happened to the excess material that Remcon had to handle, 5 feet was added to spread on the parking lot to minimize hauling. | |
| 1498 | Rod Keiscome can't recall what happened to the rest of the material. He believes that Remcon hauled it to Wolverton Point. | |
| 1499 | Rod Keiscome would have to look at the modifications to determine if 100% of the excess material that was handled by Remcon, beyond that which was placed in the upper parking lot, was compensated in one or more modifications. | |
| 1500 | The modification or modifications that have been issued for handling this excess material were primarily for hauling it. | |
| 1501 | He would have to look at the modification to see if it was for anything other than hauling or if a modification has been issued for the actual effort of excavating the excess material. | |
| 1502 | No portion of Modification No. 2 references hauling excess excavation or excavation of excess material. | |
| 1503 | Rod Keiscome would have to look at the supporting documentation for Modification No. 3 to determine if any of the three items listed, the deletion, the added general conditions, or the add for hauling miscellaneous materials out of the park, include compensation for excavation of the material to the point where it was available to be hauled. The modification itself does not indicate this. | |
| 1504 | Item No. 39 in Modification No. 4 is for hauling excess excavation for an additional 3200 cubic yards to Wolverton. | |
| 1505 | New Bid Item No. 138, in Modification No. 4, was for sorting an removal of buried debris in the upper parking. | |
| 1506 | New Item No. 139, in Modification No. 4, for raising the finish grade of the upper parking lot appears to be related to the excess excavation issue because instead of hauling it to Wolverton Point or out of the park, the government elected to minimize its cost and had the contractor raise the finish grade. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1507 | There is nothing in Modification No. 4 that pays Remcon for excavation of the excess material. | |
| 1508 | There is nothing in Modification No. 5 that pays Remcon for excavation of the excess material. | |
| 1509 | Modification No. 6 is solely related to the differing site condition claim so it does not pay Remcon for excavation of any excess material. | |
| 1510 | Contract Specification Section 02310-5, Subsection 4.1.A provides: "Payment will be included in the contract lump sum price for all excavation, embankment (including deep fill material), transporting of cut and fill material within the project area, stripping, staging, stockpiling, handling, and placement of topsoil and finish grading." | |
| 1511 | Contract Specification Section 02310-5, Subsection 4.2.A provides: "Measurement will be by original cross sections and final cross sections of the finished sub grade. Volumes will be computed from cross sections by the average area end method. This work item is for utility excavation only. Payment will be made at the contract unit price per cubic yard." | |
| 1512 | Contract Specification Section 02310-5, Subsection 4.3.A provides: "This work involves hauling and disposal of excess excavation to Wolverton Point. Measurement will be by final cross sections by the average area end method. Payment will be made at the contract unit price per cubic yard." | |
| 1513 | The first design of grading for the roadway had the road in a filled condition, meaning the contractor would have had to import fill into the park. | |
| 1514 | During the June 14 and 15 meeting of 2000 during the design phase, the NPS directed the design team to lower the road elevation and place it in cut so that the contractor wouldn't have to import fill but that it would yield an estimated 6800 yards excess to be deposited at Wolverton Point. The intent was to create a project that was, in essence, balanced. | |
| 1515 | A balanced job means that the cut-and-fill quantities are approximately even, such that no material is perceived needed to be imported to the job and none would be exported. | |
| 1516 | The direction from the NPS on this project was to create a balanced job for the contractor with a certain volume that the NPS wanted to be deposited and stockpiled in the park. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1517 | Based upon the contract documents, the Project was, in essence, planned by the designers to be a balanced job (requiring neither the import of earthen materials nor their export, except for the 2,000 cubic yards of burn pit materials planned to be hauled off as well as 6,800 cubic yards to be hauled within the park to a designated locale). | |
| 1518 | The quantities, as represented in the contract documents, were inaccurate. | |
| 1519 | The quality control for the calculations that were done by the design team for the Upper Sherman area was the design team's responsibility. | |
| 1520 | The design team was directed by the NPS to use the 40% compaction factor for the material that was to be excavated. | |
| 1521 | The 40% compaction factor means that for every 100 cubic yards of cut material, it would be compressed into 60 cubic yards of fill. | |
| 1522 | The use of a 40% compaction factor allowed the design to translate into a balanced job, with only 6800 cubic yards of excess material to be stockpiled. | |
| 1523 | The 40% compaction factor used in construction quantity estimates for the project was provided by the National Park Service. | |
| 1524 | The designers used a compaction factor of 40% to have the earthwork calculations (cut and fill), plus 6800 cubic yards of hauling, yield a balanced job. | |
| 1525 | The actual realized compaction percentage on the project was significantly lower than used in the design. This resulted in excess material to be handled by Remcon and meant that Remcon would be eligible to receive a modification. | |
| 1526 | Willie DeOcampo does not know who, if anybody, performed an evaluation of the material to be encountered by the contractor and what its compaction or compaction factor was. | |
| 1527 | Raymond Tuttle is not aware of Kleinfelder performing or being asked to perform any evaluation or determination as to whether the granitic material could be compacted 40%. | |
| 1528 | It is important for a design professional working with a road job that has cut and fills to know what the swell potential and compaction capacity of the material would be. | |
| 1529 | The design team did not request that the compaction factor of the material be tested because the NPS directed them to use a 40% compaction factor. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1530 | On June 24, 2000, during the design phase, records reflect that the quantity calculation by the NPS' designers used a 40% compaction factor for excavation material. | |
| 1531 | The designers assumed in the quantity calculations included in the bid documents and upon which bids were solicited that the excavated (cut) material would be compacted by 40%. | |
| 1532 | The same 40% calculation was used in the October 24, 2000 quantities summary for the project by DHM. As of October 24, 2000, the design was represented to be 100% complete. | |
| 1533 | The issued for construction plans and specifications, including the quantities listed in the bid schedule, were calculated by the designers using a 40% compaction factor for cut material. | |
| 1534 | The design team used the 40% compaction factor even though it didn't agree with it. | |
| 1535 | Willie DeOcampo would have used a factor somewhere around 20 to 25 percent based on what he's dug out before on other projects in the same park. | |
| 1536 | Robert Smith has never seen a 40% compaction of granitic material before. | |
| 1537 | Robert Smith doesn't know if he has ever seen a 20 percent compaction of granitic material. However, he does know that it is less than 40 percent. | |
| 1538 | Raymond Tuttle would normally use a compaction factor of approximately 15% for granitic material. He communicated this to the NPS. | |
| 1539 | Despite raising the subject that the compaction factor seemed unusually high, the NPS directed the design team to use the 40% compaction factor to calculate the quantities for the Project and that is what was actually done. | |
| 1540 | As a general principle, if the material could not be compacted to the extent of 40 percent and it was in the range of 15 percent, then that would generate excess material that would have to be handled. | |
| 1541 | If the material to be encountered by the contractor could not become compacted up to 40 percent, that would then mean the contractor would have excess material to handle. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1542 | The compaction factor (40%) used by the designers to calculate the earthwork quantities used on the Project's contract documents, as part of their assumptions in designing the Project, were mistaken, and contributed to thousands of yards worth of excess material being encountered by Remcon and extra work performed. | |
| 1543 | The 40% compaction factor used by the designers was in error as excavated decomposed granitic material does not compact greater than 20%. | |
| 1544 | The result produced by this error was excess material that could not be used as fill as planned. | |
| 1545 | The possible causes of the excess material encountered on the project were the 40% compaction factor, the rock material that was blasted, the existing base mapping being off by a little bit, and the road realignment. | |
| 1546 | Additional causes are the debris and burn pits in the Upper Sherman Parking Area. | |
| 1547 | None of these potential causes were contractor-caused such that Remcon would have borne the risk of loss to incur the cost of handling the extra material without reimbursement. | |
| 1548 | The 15,000 to 17,000 cubic yards excess material was a result of the compaction factor not being achieved, along with the shifting of the road. | |
| 1549 | The use of a 40 percent compaction factor, as directed by the National Park Service, was a contributing element to the fact that there was excess material to have to be handled by Remcon. | |
| 1550 | The use of an incorrect compaction percentage by the NPS designers was not Remcon's responsibility so Willie DeOcampo would recommended that Remcon be reimbursed for the excess result in costs. | |
| 1551 | In 2001, Remcon's Project superintendent notified Bob Russell, the NPS designated representative, of a substantial overrun in quantity of excavated material. | |
| 1552 | Willie DeOcampo's visits on June 26th to 28th was the first time he became aware of the perception by the contractor that the job, other than the 6800 extra yards that had to be hauled to Wolverton and the 2,000 yards that come out of the burn pit, was no longer going to be balanced. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1553 | As early as July 2, 2001, the NPS was advised by Remcon that earthwork quantities would overrun, up to 13,000 cubic yards, and the NPS considered in writing notifying the design team that its conduct in causing this excess material was professionally negligent. | |
| 1554 | On July 2, 2001, Willie DeOcampo sent an email to Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Scott Ruesch, and Jack Vance, with a cc also to Bob Russell. This email says, "Upper Sherman Road, surveyors laid out centerline and found two places that conflict with existing field conditions. One area is located near Station 28 and 29. The centerline appears to swing further out than our drawings indicate. The clearing has been performed per the drawings; however the center line as staked will make it necessary to clear additional trees and remove signature-type boulders." The email also noted that Remcon had indicated that it believed that its cuts and fills would not balance that they were could be 13,000 CY of excess materials that would have to be transported elsewhere at $15.00/CY. | |
| 1555 | Willie DeOcampo's July 2, 2001 email was his attempt to notify Rod Keiscome of the possibility that the job would not be balanced. | |
| 1556 | Joanne Cody does not know why the contractor perceived that there was an excess volume of material that was going to have to be handled. | |
| 1557 | Joanne Cody believes that the park told the design team the past compaction figures for all of the construction work that was going on at Sequoia. | |
| 1558 | Joanne Cody does not remember what the compaction percentage was or if she has ever worked with material, other than sand, that compacted up to 40 percent. | |
| 1559 | Joanne Cody never observed any compaction efforts on this project. | |
| 1560 | It was not reported to Joanne Cody by any source that the material would not compact up to 40% on this project. | |
| 1561 | Joanne Cody did not read in Mr. Tuttle's deposition that he thought the number 40% was "preposterous" but he was directed to use it nevertheless. | |
| 1562 | Joanne Cody doesn't know, and never asked, if the reason why there was an abundance of excess material to be handled, as reflected in the July 2, 2001 email, was because the material couldn't compact to the extent the designers calculated in coming up with the quantities. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1563 | Joanne Cody doesn't know if anyone ever questioned the 40% compaction factor. | |
| 1564 | As of October 20, 2000, the projection for excess material was 3500 cubic yards. As of July of 2001, the number is now 13,000 excess yards as identified by the contractor and communicated to Willie. | |
| 1565 | The July 2, 2001 email also states: "We also reviewed the possibility of adjusting vertical alignment to maximize areas for placing excess cut material." | |
| 1566 | This was a result of Mr. DeOcampo's email to Joanne Cody on July 2nd about the existence of the contractor's perception of up to 13,000 cubic yards of excess material. | |
| 1567 | Rod Keiscome can't recall what he did about this information on or after July 2, 2001. | |
| 1568 | Rod Keiscome can't recall if any such claim has ever been made against any representative of the design team as a result of the mistake referenced in Willie DeOcampo's July 2, 2001 email. | |
| 1569 | Rod Keiscome can't recall what restrained him from having the justification for Modification No. 4 written in the calendar year 2001. | |
| 1570 | In order to determine if Rod Keiscome, in response to Willie's July 2, 2001 email, asked whether the government had responsibility to Remcon for the additional costs that were being recognized as being potentially incurred, Mr. Keiscome would have to look at either Modification No. 3 or 4. | |
| 1571 | Modification No. 4, Item No. 39, may have compensated Remcon for having to handle additional material by virtue of exporting it as a result of centerline relocation. This item compensated the contractor for having to haul an additional 3200 cubic yards to Wolverton Point. | |
| 1572 | Willie DeOcampo's July 2, 2001 email also reads, "The surveyors will send you a revised layout. The contractor believes our cut and fills will not balance." | |
| 1573 | One of Willie DeOcampo's purposes in his July 2, 2001 email was to go ahead and notify people of the possibility that additional quantities would need to be compensated to the contractor if the road realignment occurred because there would be excess material to be handled. This included Mr. Todd, the project manager; Ms. Cody, the person most responsible for design; and Mr. Keiscome, the contracting officer. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1574 | As a result of the excess material issue arising as reflected in this email, Remcon had to perform what Willie DeOcampo understood to be extra work. | |
| 1575 | Willie DeOcampo verified the extra work performed by Remcon through Bob Russell. | |
| 1576 | Per the specifications, additional excavation, as indicated in the bid documents, had to be handled by the contractor and stockpiled at Wolverton. | |
| 1577 | As a result of the road being realigned into the hill, the road profile, which was already in a "cut" location between Stations 24 and 30, now had more excess material to be handled. | |
| 1578 | However, as a result of the Upper Sherman Access Road realignment, the contractor was going to have to handle additional excavation and performed extra work in that regard. | |
| 1579 | Remcon was directed not only to bring the excess material that they were hauling in from this access road locale to Wolverton Point, but also to stockpile some of the material at the shuttle bus location. This was done in the summer of 2001 and 2002. | |
| 1580 | Only some of the excess material encountered and using some material to raise the upper parking area have been recognized in a modification (No. 4). | |
| 1581 | The realignment of the road into the hillside caused additional material to be generated which led to extra work being performed by Remcon. | |
| 1582 | As of July 9, 2001, Bob Russell recorded that Joanne Cody recognized that excess cut material would be generated on the project. | |
| 1583 | On July 9, 2001, Joanne Cody reviewed with Bob Russell the possibility of adjusting the vertical alignment of the Upper Sherman Access Road (e.g. raising the height of the road) to maximize areas for placing excess cut material. | |
| 1584 | Joanne Cody had not done an evaluation or analysis to determine, as of July 9th, that the contractor's perceptions were correct, there were going to be more excess material to handle than had been planned. | |
| 1585 | Joanne Cody was looking at this possibility because Willie DeOcampo had requested that she do so. | |
| 1586 | Joanne Cody concluded that they could raise the north side of the parking area if they needed to. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1587 | Joanne Cody isn't sure if she told Willie DeOcampo of this possibility as of July 9, 2001. | |
| 1588 | Joanne Cody believes that sometime during July 2001 she told Willie DeOcampo that some of the material could be wasted, if there was excess , in the upper parking lot. | |
| 1589 | Joanne Cody does not know when Rod Keiscome first authorized the work to be done. | |
| 1590 | Joanne Cody has no idea why it would have taken up to one year for that information that she concluded could be possible as of July 9, 2001 to materialize into some type of communication from the contracting officer. She can't say if this was an extraordinarily lengthy period of time because she can't speak for Mr. DeOcampo or Mr. Keiscome. | |
| 1591 | Joanne Cody figured out, as of July 9, 2001, that if there was excess material then the upper parking lot could absorb it. She communicated that to the Contracting Officer's Representative for construction sometime shortly thereafter. Nevertheless, Joanne Cody doesn't know why it took almost on year for written direction to be given to the contractor to address that. | |
| 1592 | Joanne Cody does not know how much excess material was, in fact, generated on this project. | |
| 1593 | Joanne Cody has never looked at the modifications on this project. | |
| 1594 | As of July 9, 2001, Bob Russell recorded that Joanne Cody recognized that excess cut material would be generated on the project. | |
| 1595 | As of July 9, 2001, Bob Russell recorded that Joanne Cody stated that the excess material could be used to raise the upper parking lot. | |
| 1596 | As of July 9, 2001, Bob Russell recorded that Joanne Cody left with him a revised grading plan to raise the upper parking lot area if necessary. No plans to raise the height of the access road were ever prepared until 2002. | |
| 1597 | Joanne Cody contends that she made no recommendations for adjustments to the parking lot. | |
| 1598 | Joanne Cody was merely requested to look at a change, not to authorize anything. She merely provided technical assistance to Willie DeOcampo. | |
| 1599 | Joanne Cody did leave a sketch with Mr. Russell. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1600 | Joanne Cody did not intend for anything to be done with the sketch. It was for information only. It was to be taken back to Willie and she believes that she gave the sketch to Willie. | |
| 1601 | Joanne Cody does not know if the designers ever issued a revised drawing in accordance with her drawing. | |
| 1602 | Revised drawings to raise the elevation of the upper parking lot were not issued until May of 2002. However, these were different drawings. | |
| 1603 | Joanne Cody believes that revised drawings were not issued until May of 2002 to be priced by the contractor because the NPS wasn't sure that the excess material existed and they wanted to see the contractor's surveys that they were required to do. | |
| 1604 | Joanne Cody doesn't know why it took over six months after the winter shutdown to issue the revised drawings for the upper parking lot. She also doesn't know what prevented her from having it done sooner. | |
| 1605 | Remcon's July 9, 2001 crew card recorded that there was a walk-through to show Joanne Cody what the changes were that Willie DeOcampo and Bob Russell had previously agreed to. It wasn't anything that Joanne Cody had directed. This was just confirming that which was observed. | |
| 1606 | Willie DeOcampo recalls that Joanne Cody commented on July 9, 2001 that she thought the way to address the excess material that was being generated was to raise the upper parking lot. | |
| 1607 | In his July 10, 2001 daily report, Bob Russell recorded that Remcon expressed concern regarding excess material on the project. | |
| 1608 | In response to Remcon's expressed concerns on July 10, 2001, Bob Russell recorded in his daily report that Joanne Cody, who was on site, responded that the material should balance. | |
| 1609 | Joanne Cody contends that, except for the 6,800 cubic yards which was already pre-identified in the contract, she was still of the mind-set as of middle of July that this was, in essence, a balanced job. | |
| 1610 | When Joanne Cody made this representation to Remcon, it was inconsistent with Joanne Cody's own observations regarding excess material the prior day. | |
| 1611 | Excess cut material was encountered by Remcon on the project. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1612 | At the time that Raymond Tuttle read that Remcon contended that it had encountered and had to handle excess material, he connected the 40% compaction factor as a possible cause. He communicated this connection to Bob Smith, who agreed with him, and told someone at the NPS. | |
| 1613 | Robert Smith was aware that, during the job, there were contentions raised by the contractor that it had to handle substantial volumes (in the thousands) of additional cubic yards. | |
| 1614 | After Raymond Tuttle told members of the NPS that he believed that the 40% compaction factor was not being achieved and was causing the existence of the excess excavation material, he remembers that the members of the NPS acknowledged this as a possibility. | |
| 1615 | Willie DeOcampo concluded that the excess volume of material was a product of the compaction percentage that the designers utilized being wrong. | |
| 1616 | On July 26, 2001, Bob Russell sent Jeff Northop a transmittal with copies to both Willie DeOcampo and Joanne Cody. The transmittal reads, "Transmitted herewith are two copies of the coordinates and elevations for the revised grades/elevations for the upper parking lot. These revised grades/elevations are to supplement the coordinates and elevations that you received yesterday. Note, these revised grades represent the maximum changes and are to be used only if Park Service determines that it is necessary or desirable to adjust the parking lot grads to minimize excess cut material. | |
| 1617 | The July 26, 2001 submittal does not refresh Joanne Cody's recollection of what she did as a result of her determination on July 9, 2001. | |
| 1618 | Joanne Cody requested that these revised drawings be developed and she caused them to be given to Willie DeOcampo where they then went to Bob Russell and then to the contractor. | |
| 1619 | Joanne Cody does not know what the contractor was supposed to do with the July 26, 2001 revised drawings. She didn't ask, even though she was a cc on the transmittal. | |
| 1620 | Depending on the scope of the change, it was the responsibility of the Contracting Officer or Contacting Officer's Representative to give direction to the contractor what to do with the drawings that were being furnished as of July 26, 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1621 | Joanne Cody contends that there were no actual changes being made at this point. It was just ideas if the NPS needed to go there. It wasn't anyplace to be approved yet. | |
| 1622 | Until the contractor received a modification or a Contracting Officer's Directive, it was supposed to build it as originally designed if it can be done, or give the NPS notice that it had to stop because it had a problem. | |
| 1623 | Joanne Cody does not know what the contractor did on this project. | |
| 1624 | On August 1, 2001, Willie DeOcampo wrote Remcon advising that the NPS would pay Remcon for the extra work associated with hauling miscellaneous material (the burn pit excavation and hauling) upon submission of truck weight receipts and the re-negotiation of the unit price based on overruns in quantity. | |
| 1625 | Willie DeOcampo can't remember if Remcon was paid by the government for the extra work identified in the August 1, 2001 letter earlier than the issuance of Modification No. 4 by the CO. | |
| 1626 | When Willie DeOcampo wrote the August 1, 2001 letter, he was alluding to the fact that Remcon had encountered extra work on excavated excess material. | |
| 1627 | Remcon did submit the trucking receipts and weigh tags from the disposal site that Willie DeOcampo asked for in the August 1, 2001 letter. However, he can't remember when they were submitted. | |
| 1628 | On August 8, 2001, Willie DeOcampo sent an email to Andrea Lind, Joanne Cody, Ray Todd, and Bob Russell regarding earthwork quantity overruns on 200Q. He sent this email because he was questioning the designers in terms of how they came up with quantities--he wanted to know what the designers were thinking when they designed the project. The overruns were questionable because the NPS was seeing a 350 percent overrun on an estimated quantity. | |
| 1629 | By August 8, 2001, Willie DeOcampo had at his disposal and reviewed the information from his inspector, which said that there was a differing site condition on the Upper Sherman Access Road, and the geotechnical report, which indicated that blasting wouldn't be required because all rock was going to be rippable. Nevertheless, Willie was looking for answers as to why the NPS shouldn't have to pay Remcon because he always looks for why the NPS is making overruns on certain thing. He isn't sure why he wasn't just looking for information. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1630 | By August 8, 2001, Rod Keiscome was already questioning why Pay Item 26 (Hauling Miscellaneous Material from the Park) was almost 350 percent over the estimated quantities. | |
| 1631 | As of August 8, 2001, Remcon had encountered and performed the following directed extra work: (1) realignment of the Upper Sherman Access Road between Stations 8 and 12; (2) realignment of the Upper Sherman Access Road between Stations 24 and 30; (3) excavated and hauled burn pit increase from 2000 to 7000 cubic yards; (4) excavated and hauled the buried debris in the Upper Sherman Parking Area; and (5) the differing site condition on the Upper Sherman Access Road between Stations 24 and 30. Each of these items caused extra earthwork to be performed and quantities to be hauled to increase. | |
| 1632 | On August 8, 2001, Bob Russell sent a fax to Willie DeOcampo regarding blasting and attaching Jeff Northrop fax with attached blasting costs. | |
| 1633 | Willie DeOcampo had received and reviewed Bob Russell's August 8th fax, with the attachment from Jeff Northrop, by the morning of August 9, 2001. When he received it, he came to the borderline conclusion that Remcon was claiming a differing site condition. | |
| 1634 | When Willie DeOcampo received the August 8, 2001 fax from Bob Russell, he knew that Remcon was seeking additional compensation, was proposing tracking the cost on a day-to-day basis, and perceived that the overrun could be as high as 500 percent. | |
| 1635 | In response to the August 8, 2001 fax from Bob Russell, Willie instructed him to go ahead and keep dailies on how many men from California Drilling and Blasting was on site and what they were performing. | |
| 1636 | In response to the August 8, 2001 email, Robert Smith responded that they didn't expect rock to be encountered that needed to be blasted. | |
| 1637 | On August 8, 2001, Willie DeOcampo wrote Joanne Cody, Ray Todd, Bob Russell and DHM regarding overruns in quantities reporting that the CO is already questioning why Pay Item 26 (hauling excess material from in the park due to the burn pit increasing from 2000 to 7000 cubic yards) is almost 350% over the estimated quantities. | |
| 1638 | On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell enclosing drilling and blasting logs. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1639 | On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell with his quantification of 990.93 cubic yards of rock blasted through August 7, 2001, and included documentation showing his calculation. | |
| 1640 | On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell advising that he believed the overrun may be as high as 500%. | |
| 1641 | On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell requesting negotiation of quantity overruns. | |
| 1642 | On August 9, 2001, Rod Keiscome communicated to Willie DeOcampo that he was considering terminating the contract for convenience of the government as a result of the overruns on the project. | |
| 1643 | On August 9, 2001, Willie DeOcampo wrote Ray Todd that Rod Keiscome will be upset with the overruns in quantity. | |
| 1644 | On August 9, 2001, Willie DeOcampo wrote Ray Todd that Rod Keiscome, in July, 2001, when there were overruns in hauling miscellaneous material from the park, considered terminating the contract. | |
| 1645 | Rod Keiscome does recall, in August, 2001, becoming aware of quantity overruns in relationship to hauling miscellaneous materials from the park. | |
| 1646 | On August 9, 2001, Willie DeOcampo wrote DHM advising that the overrun in quantity due to rock was too excessive and unacceptable, and requested a justification to deny Remcon's claim. | |
| 1647 | In response to Remcon's notice of quantity overruns in excavation of the Upper Sherman Access Road, Willie DeOcampo asked the designers to provide written justification why Remcon should not be paid. | |
| 1648 | On September 14, 2001, Steve Christensen emailed Willie DeOcampo concerning quantity overruns advising that there would be about 16,500 cubic yards in excess material to haul. Further, he advised that as a result of the large overrun in excess material being generated in earthwork, direction needs to occur as to how to address the lump sum item adjustment. Finally, Steve Christensen advised that all of the items were seriously impacting Remcon's contract schedule. | |
| 1649 | On September 17, 2001, Willie DeOcampo, in response to Steve Christensen's September 13, 2001 email, emailed Bob Russell that it was time to start a modification for the overrun in quantities being experienced. | |
| 1650 | The modification for overruns was not processed for one year. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1651 | On September 19, 2001, Jack Vance wrote to the NPS' Ray Todd, Willie DeOcampo and Joanne Cody, along with Bob Russell, that Remcon had quantified the rock blasted from the road to be 6000 cubic yards so far. | |
| 1652 | Exhibit 88 is the calendar prepared by Bob Russell showing blasting days. | |
| 1653 | Jeff Northrop, on October 18, 2001, wrote and sent RFI No. 31 to Bob Russell reminding him that despite several discussions over the previous three weeks, Remcon had not received direction on what to do with the excess material excavated and stockpiled. | |
| 1654 | In RFI No. 31, Jeff Northrop informed Bob Russell on October 18, 2001 that there were so many piles of dirt on the site that Remcon could not finish grade the parking lot. | |
| 1655 | In RFI No. 31, Jeff Northrop, on October 18, 2001, advised Bob Russell that Remcon estimated there were 15,000 cubic yards of excess material in various piles. | |
| 1656 | The quantity of 15,000 excess yards was about the same quantity identified by Willie DeOcampo (13,000 cubic yards) to Rod Keiscome and other NPS personnel, including Bob Russell, on July 2, 2001, that may exist based on Remcon's estimate at that time. | |
| 1657 | The NPS did not share with Remcon the email, dated July 2, 2001, authored by Willie DeOcampo, which communicated to the CO the projected excavation quantity overrun of 13,000 cubic yards. | |
| 1658 | In RFI No. 31, Jeff Northrop asked Bob Russell three questions: (1) Why is there so much more yardage? (2) How are we going to be compensated for dealing with it? and (3) Where will we put the balance of the yardage once we have done everything discussed above? | |
| 1659 | In response to RFI No. 31, Joanne Cody and Willie DeOcampo communicated a reply, dated October 29, 2001. The reply did not disclose that the quantity overrun identified by Remcon in October, 2001 was recognized by Willie DeOcampo as a potential to occur sixteen weeks earlier in his July 2, 2001 email. | |
| 1660 | In response to RFI No. 31, the NPS contended that the cause of the overrun was that Remcon graded the Upper Sherman Access Road, Upper Sherman parking area, and Sherman Tree Trail approximately one foot below designed grades, and that they would determine why there was a discrepancy. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1661 | When Joanne Cody responded, on October 29, 2001, to RFI No. 31, Joanne Cody did not disclose that as of July 9, 2001, she was aware that excess material would be generated on the project. | |
| 1662 | The response to RFI No. 31 was not accurate. The Upper Sherman Access Road, Upper Sherman parking area, and Sherman Tree Trail were not built one foot below design grades. | |
| 1663 | The NPS did not disclose to Remcon, until production of Willie DeOcampo's email dated July 2, 2001 during discovery, that Willie DeOcampo reported to Rod Keiscome and other NPS individuals that Remcon projected an overrun of 13,000 cubic yards within three weeks of the issuance of the Notice to Proceed, that the NPS perceived this to be the result of a design error, and/or that on July 9 and 10, 2001, Joanne Cody communicated that excess material could be used to revise the parking area and leaving sketches behind with the inspector to achieve this need. | |
| 1664 | On November 15, 2001, Ray Todd emailed Willie DeOcampo and Joanne Cody that Steve Christensen advised that he had hired an independent firm to review the project quantities and that they estimated 12,000 to 15,000 excess cubic yards. | |
| 1665 | Ray Todd, on November 15, 2001, stated that Steve Christensen suggested that the NPS hire a firm to perform an independent review. | |
| 1666 | Ray Todd advised Willie DeOcampo and Joanne Cody on November 15, 2001 that he was seeking funds to perform a survey but needed fund clearance to do so. | |
| 1667 | The survey sought to be performed by Ray Todd as of November of 2001 was not performed until November of 2002. | |
| 1668 | During the 2001-2002 winter shutdown, Steve Christensen sent materials to Denver to address Remcon's claims and outstanding issues. These materials included binders of backup and supporting project records. Copies were given to the NPS. | |
| 1669 | On May 18, 2002, Bob Smith of DHM prepared a memo reflecting his thoughts and observations relating to the project. They included the fact that excess quantities may be between 15,000 and 17,000 cubic yards, that some of the excess material could be used to raise the Upper Sherman parking area by up to 6 feet, and that he communicated his thoughts to the NPS that there was excess material and how it should be addressed by the NPS in December, 2001 but that this "fell on deaf ears." | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1670 | On May 21, 2002, Steve Christensen called Bob Russell and asked him what quantities Bob came up with when he did his earthwork take-off the prior winter. Steve stated that all appeared to agree on the earthwork quantities and that the discrepancy was either Martin & Martin's take-off or in the quantity of excess material (earthwork not balanced). Steve also stated that he had contacted the Denver Service Center during the bid period to inform them that he was getting an excess of material and that the DSC said that they had checked their quantities and felt they were correct. | |
| 1671 | On May 22, 2002, Bob Smith sent Willie DeOcampo an email regarding the revised parking lot and trail plans. | |
| 1672 | Raymond Tuttle is not aware of anything, at the end of the 2001 construction season, that prevented anyone from doing whatever changes to the drawings for the parking lot and plan sooner than May 22, 2002. | |
| 1673 | As of May 22, 2002, the upper parking lot was a candidate to be raised to accommodate some of the excess material that was on site. | |
| 1674 | This concept worked on was to minimize the additional cost from the excess material encountered by raising the upper parking lot by up to 5 feet at a reduced cost per yard than the $15 per yard it would have cost to haul the material off site per Bid Item 26. | |
| 1675 | There was nothing that prevented the parking lot redesign effort from being done sooner given that between 15,000 to 17,000 cubic yards was known to exist in August of 2001. | |
| 1676 | As of May 22, 2002, the contractor did not have direction what to do as to those 15,000 to 17,000 cubic yards. | |
| 1677 | On May 23, 2002, Willie DeOcampo sent Steve Christensen an email indicating that he had not received the drawings to raise the upper parking lot as of that day but that he did expect to get an RFP with these drawings to Steve the following week. | |
| 1678 | He also indicated that, once the NPS received Remcon's estimate to perform this work, they would make a quick determination as to what to do with the excess dirt in question. | |
| 1679 | As of May 29, 2002, The NPS, through Willie DeOcampo, had determined that during the first construction season Remcon had hauled over 9,800 cubic yards to Wolverton Point under Item 39. This bid item was 6,800 cubic yards. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1680 | Willie DeOcampo doesn't know why it was not until June 3, 2002 that action started being taken by the NPS to implement a plan to address the excess material involving raising the Upper Sherman parking lot area. This was almost 11 months after Joanne Cody identified this conduct as a partial solution to the overrun. | |
| 1681 | Willie DeOcampo believes that there was some drag in the NPS acting to address the excess material and make a decision regarding raising the Upper Sherman parking area. | |
| 1682 | On June 5, 2002, Steve Christensen sent Terry Lang a price proposal for the proposed modification to raise the Upper Sherman Parking Lot. | |
| 1683 | On June 5, 2002, Bob Russell began working on the government estimate for using excess material for raising the Upper Parking lot grades some 4 1/2 feet. Mr. Russell noted that this would require filling a void of 4,000 cy and would require approximately 5,000 CY of loose material (using an estimated 20% loss/compaction) | |
| 1684 | On June 6, 2002, Bob Russell sent Willie DeOcampo the government estimate he prepared for raising the grade of the Upper Parking Lot. | |
| 1685 | On June 18, 2002, Rod Keiscome emailed to Steve Christensen an offer to pay $138,699 for all of the excess excavation on the Upper Sherman Access Road and Upper Sherman parking area, and hauling excess quantities. | |
| 1686 | In his June 18, 2002 letter, Rod Keiscome represented that there was "no evidence that quantities of excavated material are different than what was bid." | |
| 1687 | The subjects of the June 18, 2002 email offer were later the subject of Modification Nos. 3 and part of 4. The total compensated in these modifications for the excess excavation was $439,176.28. | |
| 1688 | Modification No. 3 raised the contract price by a net $345,209.92. | |
| 1689 | It reduced the original contract price by $124,000, which was the original bid price for hauling the 2,000 cubic yards from the park (at $62 per cubic yard) and added back the general conditions cost ($20,720.40), the actual hauling costs in tonnage ($434,008.64---4,624 tons x $93.86/ton), and general conditions cost for a time extension ($14,480.88). | |
| 1690 | One design solution for that excess volume of cubic yards that was actually encountered was to raise the parking lot by 5 feet at one corner. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1691 | Joanne Cody doesn't know how many cubic yards raising the upper parking lot wasted but she knows that it was far less than 13,000 cubic yards. | |
| 1692 | Joanne Cody does not know what happened to the balance of the excess material or how many actual cubic yards in excess the contractor encountered. She believes that Willie DeOcampo and Mike Giller know the actual number. | |
| 1693 | No claim was asserted against Martin and Martin or DHM alleging that they failed to properly design this project. | |
| 1694 | Modification No. 4 contains four separate components. | |
| 1695 | One component, concerning restaking the access road centerline (for $1,154), does not concern excess excavation, but the other three components do concern certain specific excess excavation work. They are: (1) Item 39: Haul Excess Excavation. Compensate the contractor for hauling an additional estimated quantity of 3,200 cubic yards (from 6,800 to 10,000) of excess excavation to Wolverton Point. Payment will be made at the contract unit price of $12/cubic yard. Add: $38,400.00; (2) New Item No. 138: Sorting & Removal of Buried Debris in Upper Parking Lot. Reimburse the contractor for costs associated for sorting and removal of the buried material encountered. Payment will be made at a negotiated lumb sum price. Add: $11,750.36; (3) New Item No. 139: Raise Finish Grade of Upper Parking Lot. Compensate the contractor for cost associated for placing and compacting the excess excavation required to raise the upper parking lot to the revised grading elevations. Payment will be made at a negotiated lump sum price. Add: $43,816.00. | |
| 1696 | On June 19, 2002, Steve Christensen sent Willie Deocampo an email indicating that the NPS and Remcon had agreed to a contract modification price of $43,816.00 for raising of the Upper Sherman Parking Area and requesting that Willie provide the necessary modification so that Remcon could proceed with the work. | |
| 1697 | Throughout June 2002, Remcon sought direction on what to do with the thousands of yards of excess material on site. | |
| 1698 | On June 26, 2002, Willie DeOcampo sent an email to Bob Russell, Terry Lang, and Larry Walling. In it, Willie writes, "Bob, due to time constraints, I will draft Mod Number 3 for the hauling of material outside the park." | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1699 | On June 27, 2002, Rod Keiscome sent Steve Christensen a Contracting Officer's Directive, directing Remcon to raise the Upper Sherman Parking Lot. This directive indicated that a bilateral modification to the contract would be issued in the mutually agreed negotiated contract amount of $43,816.00 as soon as possible. | |
| 1700 | Although raising the upper parking area to spread excess cut material was identified by Joanne Cody on July 9, 2001, and a revised grading plan prepared, direction to implement this plan did not get issued until June 27, 2002, 353 days later. | |
| 1701 | Remcon was not authorized under the specifications to perform the extra work until a modification had been issued or it received a letter like that sent on June 27, 2002. | |
| 1702 | Willie DeOcampo can't say why, on some items, the contractor had to receive a contracting officer's directive to do the work while, on other items, it just received a series of designs to perform the work, and then later the government issued a modification for the work that had to be done. He speculated that the people who were issuing the drawings were doing so on their own. | |
| 1703 | However, Willie DeOcampo may have intended for the contactor to build from the revisions so issued. This depends on the dailies. | |
| 1704 | On June 28, 2002, in response to the June 27, 2002 Contracting Officer's Directive to raise the Upper Sherman Parking Lot, Steve Christensen sent a letter to Rod Keiscome requesting written assurance that Remcon would be paid for this work in a timely manner and pursuant to the contract conditions for payment. | |
| 1705 | Mr. Russell left the job somewhere between the end of June and early July of 2002. | |
| 1706 | On July 16, 2002, Rod Keiscome sent Steve Christensen a letter acknowledging receipt of Steve Christensen's June 28, 2002 request for assurances that the NPS would pay for the work in a timely manner. | |
| 1707 | In Keiscome's letter, he stated that his intent was to do just that by incorporating the upper Sherman parking lot work into a bilateral modification and include payment, as appropriate, for work accomplished to date into the next payment cycle in August 2002. | |
| 1708 | Modification No. 4 was not issued until September, 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1709 | Rod Keiscome can't say for sure that Remcon wasn't paid for the work until after the modification was implemented because it could have been paid on a line item. | |
| 1710 | If Remcon was not paid on a line item, then it was not paid until after the modification was implemented. | |
| 1711 | Based upon receipt of Mr. Keiscome's June 16, 2002 letter, Remcon actually billed the government for the performance of their work, but the government struck it out of the pay estimate and wouldn't pay it in the August draw. | |
| 1712 | Mr. Keiscome did not fulfill his representation because the modification wasn't issued until September 12, 2002. | |
| 1713 | Mr. Keiscome wrote that payment could be made once a bilateral modification was issued and the bilateral modification did not occur until September. | |
| 1714 | On July 25, 2002, Remcon began raising the upper parking lot. In addition, Russell Belknap, the newly arrived inspector, allowed Remcon to install a super between Station 24 and 30+00 to reduce the cut along the access road. | |
| 1715 | On July 30, 2002, Willie DeOcampo emailed Mike Giller that a design bust along the Upper Sherman Access Road deep cut area required extra work to perform additional cut operations generating more excess fill. | |
| 1716 | Modification No. 3 to the Project Contract was issued by Rod Keiscome on August 21, 2002. This Modification increased the contract amount by $345,209.92 for general conditions costs associated with deletion of item 26, hauling of excess miscellaneous material from the park, and extended field office overhead resulting from an 8 working day (13 calendar day) time extension. | |
| 1717 | When Modification No. 3 was ultimately issued, it added 13 calendar days from August 11, 2003 to August 24, 2003. | |
| 1718 | All four of the separate items set forth In Modification No. 3 dealt with a single subject, the hauling of excess material from the park, which was associated with Bid Item Numbers 26 and 136. | |
| 1719 | Modification No. 4 was issued on September 14, 2002. This modification increased the contract amount by $95,120.36 for Remcon's hauling of excess excavation material, restaking of the access road centerline, sorting and removal of buried debris in the upper parking lot, and raising the finish grade of the upper parking lot. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 1720 | In Modification No. 4, the NPS compensated Remcon for raising the Upper Sherman parking area approximately 5 feet from the design grade. | |
| 1721 | This work was identified as something to be done in July of 2001 but direction to perform it was not received until June 27, 2002. | |
| 1722 | In the Justification page of Modification No. 4, the government states that during the excavating and grading of the Access Road and Upper Sherman parking lots, it became apparent that excess excavated material was being generated. | |
| 1723 | In the Justification page of Modification No. 4, the government states that it was estimated by the government that a total quantity of approximately 15,000 cubic yards of excess excavation will be generated. | |
| 1724 | In the Justification page of Modification No. 4, the government states that the Denver Service Center and designer determined that the Upper Sherman parking area could be raised by 5 feet to spread 5,000 cubic yards of the 15,000 cubic yard overrun. | |
| 1725 | In the Justification page of Modification No. 4, the government states that the direction to perform this work will save $17,000 in extra costs which would otherwise be incurred. | |
| 1726 | The NPS, in Modification No. 4, admitted in the Justification the facts asserted by Remcon during the summer and fall of 2001 regarding the existence of excess excavation. | |
| 1727 | The government was aware of Remcon's oral and written contentions as to the quantity of excess excavation on July 2, 2001 and in both September and October, 2001. | |
| 1728 | Even though the NPS' COR identified as of July 2, 2001 that Remcon reported that up to 13,000 cubic yards of excess quantity may be generated, and Remcon independently identified the same thing no later than October 18, 2001 and informed the NPS, the NPS provided no direction or response until June 27, 2002. | |
| 1729 | Modification No. 4 did not pay all costs associated with excess excavation on the entire project up to that time. It exclusively compensated for handling the existing excess excavation to raise the parking lot for 5 feet and for hauling some excess debris. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1730 | The NPS negotiator for Modification No. 4, Willie DeOcampo, testified that it was issued, concerning excess excavation, for that portion of the excess excavation that was used to raise the finish grade of the parking lot but was not for all of the excess excavation on the project. | |
| 1731 | On the last page of Modification No. 4, produced by the NPS during discovery, in the description justifying the work, Willie DeOcampo wrote that this change is necessary in order to eliminate possible construction impacts that will result in claims and that the change is in the best interest of the government and that Willie DeOcampo recommends that it be approved. | |
| 1732 | Willie DeOcampo believes that he ran calculations and came up with about 17,000 of excess material. Modification No. 4 was to spread only some of this excess material. | |
| 1733 | Modification No. 4 did not compensate Remcon to backfill the hole created as a result of burn pit excess excavation from 2,000 to 7,000 cubic yards. | |
| 1734 | The work to backfill that hole was performed in 2001. | |
| 1735 | There was no modification issued that compensated Remcon for filling the hole back to the design elevation for the excess quantity that had to be excavated. | |
| 1736 | Willie DeOcampo had the discretion to ask Mr. Keiscome to issue a directive to the Remcon to build according to the revised drawings with a price to be negotiated later. He did not exercise this discretion. | |
| 1737 | At the time the Upper Sherman Access Road redesign was occurring, Willie DeOcampo knew that the project had a short construction season that limited the ability of Remcon to implement design revisions. | |
| 1738 | The project was being impacted by multiple revisions to the Sherman Access Road being given to Remcon without clear direction from the Contracting Officer. | |
| 1739 | Willie DeOcampo doesn't know why it took from June 19, 2002 until September of 2002, approximately 3 months, for the formal Modification No. 4 to be issued. It could be paperwork. | |
| 1740 | All excess excavation costs as of November of 2001 were combined by Remcon and asked for reimbursement by Steve Christensen in December of 2001 in Denver. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 1741 | As a consequence of the excess material to be removed and the lack of timely direction from the NPS, Remcon's operations were severely impacted, resulting in an inefficient use of Remcon's planned labor and equipment and Project supervision and an immediate negative impact to Remcon's schedule. | |
| 1742 | With respect to why it took until September of 2002 to issue the modification for Item Number 39, Willie DeOcampo asserts that he would have to rely upon Mr. Russell at that point in time to provide him with information as to the quantity that was deposited. | |
| 1743 | Until the upper parking lot was finished, which would then provide additional parking capacity that wasn't in existence, the NPS didn't want to have the contractor affecting and minimizing or reducing the available parking spaces that preexisted when it did work in the Lower Sherman Area. | |
| 1744 | So, in order to finish the Upper Sherman area, before they could go down below, the contractor had to ultimately raise the parking lot. | |
| 1745 | The government controlled the timing of when that directive would be issued that would allow the contractor to do so. | |
| 1746 | The NPS did not timely pay Remcon for the performance of raising the grade of the Upper Sherman parking lot. | |
| 1747 | At no time from July 30, 2001, when blasting preparations commenced, until the issuance of Modification No. 6 in February, 2003, did the NPS acknowledge, in writing, that a differing site condition had been encountered in the deep cut area on the Upper Sherman Access Road. | |
| 1748 | The realignment of the Upper Sherman Access Road into the hill for 600 feet, and the encountering of the differing site condition in that locale, caused excess excavation to be hauled. | |
| 1749 | Between July 30, 2001 and February, 2003, the NPS published multiple written communications denying the existence of the differing site condition and/or seeking a way to avoid paying for the circumstances. | |
| 1750 | During 2001, Remcon excavated and hauled excess excavation in the park to Wolverton Point. | |
| 1751 | That portion of the work was compensated, at $12 per cubic yard, per bid item 39. | |