| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1752 | Modification No. 4 compensated Remcon for the hauling costs of an additional 3200 cubic yards above the estimated 6800 cubic yards for bid item 39. | |
| 1753 | Through Progress Payment No. 14, for work performed through November, 2002, Remcon was recognized by the NPS as having hauled 13,936 cubic yards within the park to the Wolverton site, at $12 per cubic yard. | |
| 1754 | While Remcon was paid for hauling all this 13,936 cubic yards of excess material, in progress payments, no modification addressing the additional quantities beyond the total of 10,000 cubic yards was ever issued by the NPS, and no modifications addressing whether any time extension was due for this extra work has ever been issued, unilaterally or bilaterally. | |
| 1755 | The NPS payments for bid item 39 are as follows: (a) Progress Payment # 1: construction quantity=6800 cubic yards, pay quantity to date=O cubic yards; (b) Progress Payment #2: construction quantity= 6800 cubic yards, pay quantity to date=0 cubic yards; (c) Progress Payment #3: construction quantity=6800 cubic yards, pay quantity to date= 5418 cubic yards; (d) Progress Payment #4: construction quantity=6800 cubic yards, pay quantity to date= 6800 cubic yards; (e) Progress Payment #5: contruction quantity=6800 cubic yards, pay quantity to date= 6800 cubic yards; (f) Progress Payment #6: contruction quantity=6800 cubic yards, pay quantity to date= 6800 cubic yards; and (g) Progress Payment #7: contruction quantity=6800 cubic yards, pay quantity to date= 6800 cubic yards. | |
| 1756 | The NPS payments for bid item 39 are as follows: (h) Progress Payment #8: contruction quantity=6800 cubic yards, pay quantity to date (June 30, 2002)= 9600 cubic yards; (i) Progress Payment #9: contruction quantity=6800 cubic yards, pay quantity to date (July 31, 2002)= 6800 cubic yards; (j) Progress Payment #10: contruction quantity=10,000 cubic yards, pay quantity to date (August 30, 2002)= 9680 cubic yards; (k) Progress Payment #11: contruction quantity=10,000 cubic yards, pay quantity to date (September 30, 2002)= 11,472 cubic yards; (l) Progress Payment #12: contruction quantity=10,000 cubic yards, pay quantity to date (October 21, 2002)= 13,446 cubic yards; and (m) Progress Payment #13: contruction quantity=10,000 cubic yards, pay quantity to date (December 31, 2002)= 13,936 cubic yards. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1757 | In Progress Payment #8, for work through June, 2002, the NPS increased the quantity paid for in Item 39 ("Haul Material Within Park") from 6800 cubic yards to 9,600 cubic yards. | |
| 1758 | In Progress Payment #9, for work performed through July, 2002, the NPS reduced the quantity paid for in Item 39 from 9,600 cubic yards to 6,800 cubic yards, thereby reducing the amount otherwise to be paid to Remcon, even though this work was confirmed in writing by the NPS to have been done as of the end of the 2001 construction season. | |
| 1759 | In Progress Payment #10, for worked performed through August, 2002, the NPS increased the quantity paid for in Item 39 to 9,680 cubic yards. | |
| 1760 | In Progress Payment #11, for work performed through September, 2002, the NPS increased the quantity paid for Item 39 to 11,472 cubic yards. | |
| 1761 | In Progress Payment #12, for work performed through October, 2002, the NPS increased the quantity paid for Item 39 to 13,446 cubic yards. | |
| 1762 | In Progress Payment #13, for work performed through November, 2002, the NPS increased the quantity paid for Item 39 to 13,936 cubic yards. | |
| 1763 | Modification No. 4 was issued in September, 2002 and adjusted the bid quantity for Item 39 from 6,800 cubic yards to 10,000 cubic yards. | |
| 1764 | Following Modification No. 4's issuance, no further modification was issued for Bid Item No. 39 work. | |
| 1765 | No modification, addressing the increase of 3,936 cubic yards from Item 39 work, or time associated therewith, has ever been issued unilaterally or bilaterally. | |
| 1766 | None of the items in Modification No. 4, prepared by the NPS and presented to Remcon to sign, indicate that Items 39, 138 and/or 139 were compensating Remcon for all excess excavation encountered to date. | |
| 1767 | At the end of 2001, there was between 15,000 and 17,000 extra cubic yards to be addressed. | |
| 1768 | Item 39 in Modification No. 4 expressly addressed only 3,200 cubic yards. | |
| 1769 | Item 138 addressed only several hundred cubic yards. | |
| 1770 | Item 139 addressed approximately 4,500 cubic yards. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1771 | This left approximately 7,000 to 9,000 cubic yards unaddressed in any modification. | |
| 1772 | The NPS did not, at the time Modification No. 4 was issued, believe that Modification No. 4 addressed all excess excavation. | |
| 1773 | In the October, November and December, 2002 progress payments, increased quantities of excess excavation were recognized for Item 39. | |
| 1774 | Item 39 only compensated Remcon, in Modification No. 4, for loading the trucks and hauling the 3200 cubic yards of excess excavation. | |
| 1775 | No modification has ever been issued to pay Remcon in time or money for the earthwork operations to excavate the excess excavation, or to haul the additional 7,000 to 9,000 cubic yards. | |
| 1776 | A by-product of relocating the center line of the access road was the creation of up to 13,000 cubic yards of excess material. | |
| 1777 | Joanne Cody does not know how many cubic yards of excess material were paid for by the government to be either spread in the upper parking lot or hauled off-site. | |
| 1778 | As of July, 2001, Remcon had encountered the differing site conditions in the Upper Sherman parking area. The first was the significant increase in the burn pit quantity from 2,000 cubic yards to over 7,000 cubic yards. The second was the debris which was encountered in the upper parking area. The loading and hauling of the excess materials encountered in the differing site conditions were addressed in Modification Nos. 3 and 4 in late summer, 2002, over a year after they were encountered. | |
| 1779 | No modification has ever been issued for backfilling the holes created by the encountering of the differing site conditions in the Upper Sherman parking area. | |
| 1780 | The differing site conditions in the Upper Sherman parking area, and that encountered on the access road, combined with the mistaken design assumption that the excavated material would compact 40%, led to the existence of thousands of yards of excess material. | |
| 1781 | Willie DeOcampo believes it is logical that in mid-July of 2001, in light of the email that he wrote to Joanne on July 2nd about here being up to 13, 000 cubic yards of excess material, that the NPS and its inspector was looking for a way to minimize the off-site handling of that excess cut material. One of the items under consideration as of July 9, 2001 was to raise the upper parking lot from the finish design elevations. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1782 | In his weekly report dated July 25, 2001, Bob Russell stated that Remcon continued earthwork operations on the Upper Sherman parking area. | |
| 1783 | On July 26, 2001, Bob Russell sent a fax to Jeff Northrop, Willie DeOcampo and Joanne Cody. Under the remarks and special instructions provision it says, "Points for revised upper parking grading." | |
| 1784 | On July 26, 2001, Bob Russell issued to Jeff Northrop, with a "cc" to Willie DeOcampo and Joanne Cody, revised grades/elevations for the parking lot. These revised grades were to supplement the coordinates and elevations sent the day before. | |
| 1785 | The revised grades represented the maximum changes and were to be used only if the NPS determined that it was necessary or desirable to raise the grades to minimize excess cut material. | |
| 1786 | On August 1, 2001, the NPS sent an email to Remcon's surveyors with a new plan for the Upper Sherman parking area. | |
| 1787 | Willie DeOcampo can't recall if, prior to his deposition, he was aware that Mr. Savage, on behalf of the NPS, was forwarding revised design drawings to the surveyor for the contractor on or about August 1 of 2001. | |
| 1788 | Willie DeOcampo's August 9, 2001 email to Ray Todd said "we don't want to continue making construction field revisions since it would look like our plans are worthless." | |
| 1789 | This was a pretty significant statement. Willie DeOcampo does not use words carelessly and would not have used those words if he didn't believe it to be true and correct. | |
| 1790 | On August 10, 2001, Andrea sent a letter to Bob Russell regarding addendum sheets for the parking and trail and dealing with modifications to the design. | |
| 1791 | On August 12, 2001, Andre Gregor sent an email to Joanne Cody, Bill Morris, Willie DeOcampo, Bob Russell, Ray Todd, Robert Smith, and Ray Tuttle. The text reads: "On our site visit, we adjusted the Upper Sherman Tree Parking design and made changes to the Sherman Tree Trail due to site conditions." | |
| 1792 | Remcon was expected to build the project in accordance with the adjustments and the changes referenced in the August 12, 2001 email. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1793 | On August 13, 2001, Andre Gregor of DHM sent an email to Joanne Cody, Willie DeOcampo, Ray Todd, Bob Russell, and others. | |
| 1794 | The first paragraph of the August 13, 2001 email reads: "On our site visit, we adjusted the Upper Sherman parking design and made changes to the Sherman Tree Trail due to site conditions. They are outlined in the field report August 5 to August 7. They have been adjusted in AutoCAD and sent out as an addendum." | |
| 1795 | Rod Keiscome can't recall if he was advised, at any time prior to his deposition, that his designers went to the site in August, 2001 and made changes in the design and then issued drawings as an addendum modifying the design for the upper parking lot and Sherman Tree Trail. | |
| 1796 | Rod Keiscome can't recall if he ever issued a Contracting Officer's Directive or a modification authorizing the contractor to make the changes reflected in the addendum that is referenced in the August 13, 2001 email. | |
| 1797 | Rod Keiscome can't recall why he didn't issue a Contracting Officer's Directive letter for the adjustments reflected in the August 13, 2001 email. | |
| 1798 | Rod Keiscome respects Raymond Todd. | |
| 1799 | Rod Keiscome wouldn't expect that Mr. Todd would publish en email to Joanne Cody and Andrea Gregor telling them that Mr. Keiscome wants to issue something as a Contracting Officer's Directive Letter unless Mr. Keiscome communicated that to Mr. Todd. | |
| 1800 | While Rod Keiscome may have authorized the designers to make changes in the task order when they deemed it necessary, it still had to be the subject of a Contracting Officer's Directive or a modification in order to be made part of the contract. | |
| 1801 | The second paragraph of the August 13, 2001 email says: "I sent Bob Russell and Jeff Northrop full-size drawings of our addendum changes for 200Q on Friday, August 10. They should be getting them on Monday morning." | |
| 1802 | Rod Keiscome was aware that his personnel on the project were aware that his designers were sending changed drawings directly to the contractor. | |
| 1803 | Rod Keiscome doesn't recall when he was advised that this was occurring. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1804 | A Contracting Officer's Directive would be needed in or for the contractor to be authorized to make the changes in design that were reflected in the addendum referenced in the August 13, 2001 email. | |
| 1805 | If the Contracting Officer's Directive or modification were not issued, then the contractor was not formally authorized by Rod Keiscome to make these changes. | |
| 1806 | The subject matter of these design changes reflected in the August 13, 2001 email and the attached addendum are what Rod Keiscome's understands to be constructive changes. | |
| 1807 | Rod Keiscome cannot speculate if these changes would be directive changes. | |
| 1808 | In order to say whether he has ever issued a modification addressing time and granting Remcon a time extension for the effort associated with constructing the project in accordance with the content of the addendum referenced in the August 13, 2001 email, Rod Keiscome would have to look at the modifications that were issued. | |
| 1809 | If the issue is not addressed in the modifications that were issued, then it has not been addressed at all. | |
| 1810 | Rod Keiscome does not have an understanding of what the actual substantive changes were to the project's design that reflected in the addendum referenced in the August 13, 2001 email. | |
| 1811 | On August 15, 2001, Ray Todd wrote to Joanne Cody and DHM that Rod Keiscome wanted all design changes to the Sherman Tree Trail and Upper Sherman parking area set forth in DHM's August 12, 2001 site visit email to be issued as a contracting officer's directive. | |
| 1812 | On May 23, 2002, Willie DeOcampo informed Steve Christensen that a Request for Proposal, with drawings to raise the Upper Sherman parking area, would be forthcoming. | |
| 1813 | On June 5, 2002, Bob Russell prepared an estimate to raise the Upper Sherman parking area. He estimated using a 20% compaction factor. | |
| 1814 | On June 5, 2002, Remcon quoted $48,217.94 to raise the Upper Sherman parking area from its designed elevation about five feet. | |
| 1815 | On June 6, 2002, Bob Russell wrote Willie DeOcampo advising him that his estimate to raise the Upper Sherman parking area was $39,475, and that this was $20,000 less than hauling the material out of the park. | |
| 1816 | Mark Penrose negotiated a final price for raising the Upper Sherman parking area with Bob Russell on June 14, 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1817 | On June 19, 2002, Steve Christensen wrote Willie DeOcampo and Rod Keiscome pleading for the modification to raise the Upper Sherman parking area. | |
| 1818 | As of June 19, 2002, an agreement on the price to raise the Upper Sherman parking area occurred. | |
| 1819 | Rod Keiscome does not know why this work wasn't put into a modification any sooner than September of 2002. There was nothing left for Remcon to do. | |
| 1820 | On June 22, 2002, Steve Christensen emailed Willie DeOcampo asking where the modification was authorizing the raising of the Upper Sherman parking area. | |
| 1821 | On June 24, 2002, Willie DeOcampo emailed Rod Keiscome asking if a modification would be issued authorizing the raising of the Upper Sherman parking area. | |
| 1822 | On June 27, 2002, Rod Keiscome issued a CO's directive letter. | |
| 1823 | On June 28, 2002, Remcon sought assurance from the CO that payment for extra work would be prompt. | |
| 1824 | On June 28, 2002, Steve Christensen again requested from Willie DeOcampo and Rod Keiscome that electronic survey data for the revised grades and alignment for the Upper Sherman parking area be emailed to Remcon's surveyors. | |
| 1825 | On July 1, 2002, Willie DeOcampo emailed Joanne Cody asking her to take care of Steve Christensen's request. | |
| 1826 | The language of Modification No. 4 was being drafted in July of 2002. | |
| 1827 | It was not finalized by the NPS until September, 2002. | |
| 1828 | On July 15, 2002, Loren Mangrum sent Remcon a summary of field adjustments to the Upper Sherman Access Road and Upper Sherman parking area made in the job walk on July 10th with Jack Vance, Loren Mangrum, Mike Giller, Steve Christensen, Luke Triplett, and Mark Penrose. | |
| 1829 | On July 16, 2002, Rod Keiscome promised Steve Christensen in writing that he would cause payment for the extra work of raising the Upper Sherman parking area to be made in the next payment cycle in August, 2002. | |
| 1830 | Rod Keiscome did not honor his promise even though Remcon performed the extra work in July, 2002. | |
| 1831 | As of July 25, 2002, Remcon was performing extra work raising the Upper Sherman parking area. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1832 | Modification No. 4 was signed by Steve Christensen on September 11, 2002 and Rod Keiscome on September 12, 2002, | |
| 1833 | Modification No. 4 compensated Remcon for hauling an additional 3200 cubic yards of excess excavation to Wolverton Point. | |
| 1834 | In the Justification to Modification No. 4, the government wrote that Remcon advised it during excavation operations that the cut and fill volumes did not balance, and that it took the government nine months to determine it was responsible for the hauling costs associated with this excess material. | |
| 1835 | Further, it was written: This material had to be removed from the Project site in order for the contractor to complete design sub grades. If this work is not performed this contractor (sic), the contractual work can not be completed and delay claims will follow. | |
| 1836 | The Justification page, attached to Modification No. 4, produced by the government in discovery, was not part of the modification furnished by the NPS to Remcon when Steve Christensen signed it. | |
| 1837 | The Justification page attached to Modification No. 4 admits that the NPS did not timely act in response to Remcon's claims regarding excess excavation. | |
| 1838 | The reference to "nine months" for government action in response to Remcon's notice is not accurate as Remcon gave notice to the NPS of excess material in the summer of 2001 and it wasn't until September of 2002 that the modification was issued. | |
| 1839 | Between the issuance of the Notice to Proceed on June 11, 2001, and the end of construction in November of 2002, multiple changes to the Upper Sherman parking area and Upper Sherman Access Road were issued. | |
| 1840 | Modification No. 4, issued in September, 2002, compensated Remcon for the excavation and hauling of the "buried material." | |
| 1841 | Modification No. 4 was issued 14 months after the extra work relating to the "buried material" was performed. | |
| 1842 | In Modification No. 4, the NPS compensated Remcon for removal of the excess quantity of buried debris in the Upper Sherman Parking Area. | |
| 1843 | While the effort to perform this extra work was performed in July, 2001, the government took 14 months to issue the modification to pay for it. | |
| 1844 | The issuance of Modification No. 4, with respect to the removal and sorting of the buried debris extra work, was untimely | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1845 | In the Justification page of Modification No. 4, relating to the extra work associated with excavating and sorting the buried debris, the government states that the differing site condition was encountered on July 12, 2001 in the Upper Sherman parking area. | |
| 1846 | In the Justification page of Modification No. 4, relating to the extra work associated with excavating and sorting the buried debris, the government states that the notice was promptly given as the NPS staff and inspector inspected the area on July 16, 2001 and determined that the buried material had to be removed before the parking lot was built. | |
| 1847 | In the Justification page of Modification No. 4, relating to the extra work associated with excavating and sorting the buried debris, the government states that direction was given to remove the upper 5 feet of the existing grade which contained unsuitable debris. This direction was not given until June 27, 2002, 350 days after the issue arose. | |
| 1848 | In June of 2001, Willie DeOcampo was made aware that Remcon's surveyor was seeking additional information regarding the parking lot grades and the trail grades. However, he can't remember if, once he became aware of that request, he authorized the appropriate people to communicate with the Remcon's surveyor in order to furnish them the requested information. | |
| 1849 | In his weekly report dated July 25, 2001, Bob Russell stated that Remcon began surveying the Sherman Tree Trail. | |
| 1850 | On July 27, 2001, Andre Gregor at DHM sent an email to Bill Morris, the surveyor, with a copy to Joanne Cody, regarding the Sherman Tree Trail. Attached to this email were trail layout sheets (T3-T6), the design base, the base, and a trail text file. | |
| 1851 | On July 30, 2001, Andrea Gregor sent an email to Bill Morris, with a cc to Joanne Cody and Bob Smith regarding the Sherman Tree Trail. Attached to this email were the finished grades for all TP points along the Sherman Tree Trail. | |
| 1852 | There were changes made to the Sherman Tree Trail at the end of July 2001 that were then communicated to the contractor's surveyor to be built according to. | |
| 1853 | On July 30, 2001, Mark Penrose told Bob Russell that additional survey control was needed on the Sherman Tree Trail for layout. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1854 | On August 12, 2001, Andrea sent an email to Bill Morris regarding AutoCAD files 200Q addendum. It describes a series of drawings that he is receiving and with respect to sheets T3-T10 (trail sheets have changed). | |
| 1855 | Willie DeOcampo expected Remcon, upon receipt of these latest revised drawings in late May, 2002, to build according to the revised drawings. | |
| 1856 | On August 15, 2001, Ray Todd wrote to Joanne Cody and DHM that Rod Keiscome wanted all design changes to the Sherman Tree Trail and Upper Sherman Parking Area set forth in DHM's August 12, 2001 site visit email to be issued as a Contracting Officer's directive. | |
| 1857 | Giuliani & Kull thereafter staked the trail pursuant to the revised grades set forth in the revised drawings. | |
| 1858 | Remcon excavated the trail in accordance with the revised drawings in 2001. | |
| 1859 | On October 24, 2001, in response to RFI #31 (concerning the existence of the excess excavation), Joanne Cody and Willie DeOcampo advised Remcon that it had constructed the trail at least one foot lower than designed. | |
| 1860 | On April 17, 2002, Steve Christensen sent Willie DeOcampo, Terry Lang, and Bob Russell a letter indicating that he had confirmed that the design elevations and layout provided by DHM prior to G &K staking the trail was correct and that the trail as currently constructed had been built to the design grades. | |
| 1861 | Steve ended by reminding the NPS that any delay in starting the trail work at the beginning of the 2002 season would impact that year's construction schedule and overall completion of the project. | |
| 1862 | As of April 17, 2002, Joanne Cody believed that the trail was constructed to an elevation lower than designed. | |
| 1863 | As of April 17, 2002, Remcon requested that the NPS, within the next month, address and resolve the elevation dispute so as to enable Remcon to perform work on the trail when weather permitted and the construction season started. | |
| 1864 | On April 17, 2002, Mike Giller emailed Rod Keiscome to please issue the modification for the Sherman Tree Trail as Remcon was claiming delays. | |
| 1865 | The April 17, 2002 email also asks Rod Keiscome to do anything he can to speed up Modification No. 5. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1866 | Rod Keiscome believes that it took a little more than two months after that to issue Modification No. 5 because he needed supporting documentation from the project manager in the field. | |
| 1867 | The delay in issuing Modification No. 5 was all on the government side; it was not the fault of the contractor. | |
| 1868 | On May 9, 2002, Bob Smith sent Joanne Cody, Ray Tuttle, Andrea Lind, and Willie DeOcampo revised and proposed grades for the Sherman Tree Trail. | |
| 1869 | On May 16, 2002 Bob Russell walked the Sherman Tree Trail with Bob Smith, Luke Triplett, Mark Penrose, Bob Reinhardt, Bill Houck and Bill Morris to review grades and drainage. Bob Smith and Bill Morris agreed that staking for the trail was substantially correct. Bob Smith agreed to review/redesign the drainage and review it with Joanne Cody the following Monday (May 21, 2002) in Denver. | |
| 1870 | As of May 24, 2002, the NPS' CO was informed that revised drawings for the Sherman Tree Trail needed to be issued. | |
| 1871 | As of May 24, 2002, the NPS' CO was informed that extra costs would be incurred to construct revised drawings for the Sherman Tree Trail. | |
| 1872 | The NPS did not negotiate with Remcon the extra costs resulting from design changes to the Sherman Tree Trail until August, 2002. | |
| 1873 | On May 31, 2002, Bob Russell, Loren Mangrum, Luke Triplett, and Mark Penrose met at Jacobs' office to discuss the plan revisions of the Sherman Trail and the Upper Parking Lot. Areas of interest were discussed and mutual understanding of the discussion was reached. | |
| 1874 | Theoretically, the design should have been completed in 2000 and 2001, before the contract drawings were let out. Willie DeOcampo would hope that the contract drawings were pretty concrete from the very beginning. However, on this project, based on the revisions, they were not. | |
| 1875 | Willie DeOcampo expected Remcon to comply with revised Sherman Tree Trail drawings T7A and T8A given to Remcon. | |
| 1876 | Rod Keiscome can't recall if he authorized Joanne Cody and Willie DeOcampo once they received such modified drawings to give them to the contractor through Bob Russell to build from them. | |
| 1877 | If Joanne Cody or Willie DeOcampo gave revised drawings to Bob Russell who them gave them to the contractor, Rod Keiscome would expect the contractor to say, "Where is the Contracting Officer's Directive? | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1878 | If Remcon was told, "build from the revised drawings, the modification is coming from the Contracting Officer's Representatives," Rod Keiscome would still not expect the contractor to follow the direction so communicated. He would expect them to follow the COR appointment letter direct because you have to have some kind of understanding on where you are going to go, rather than build it and then take your consequences, otherwise, there's a risk involved. | |
| 1879 | Rod Keiscome remembers discussing, at the partnering session before the second year commenced, the issue of when there is no such written communication and the revised drawings are handed to the contractor as described above, with respect to the trails. | |
| 1880 | The contractor, at the partnering session, indicated that it had received dozens of changes in the field as well as in revised drawings modifying the trail, the parking lot, and the access road. | |
| 1881 | The title block on each T7A and T8A show that they were originally prepared and given to the NPS in August of 2001. | |
| 1882 | Both T7A and T8A have a triangle with the Number 1 in them. Adjacent to the triangle it says Revision 1 and there is a date of May 20, 2002. This was the second revision to the trail drawings. | |
| 1883 | By virtue of T7A and T8A having a revision block on them, these sheets were revised drawings. | |
| 1884 | T7A and T8A were revised on May 20, 2002. | |
| 1885 | The original contract documents issued had sheet T7 and T8 and they were initially revised in the form of being called T7A and T8A. | |
| 1886 | Willie DeOcampo doesn't know why it took between August of 2001 and May 20, 2002 to issue revisions to T7A and T8A | |
| 1887 | On May 22, 2002, Bob Smith emailed Willie DeOcampo advising that the stone stair quantity for the Sherman Tree Trail had to be adjusted. | |
| 1888 | On May 22, 2002, Willie DeOcampo emailed Bob Smith seeking the Sherman Tree Trail revisions indicating where changes are required. | |
| 1889 | On May 22, 2002, Bob Smith advised Willie DeOcampo that revised Upper Sherman parking area and Sherman Tree Trail plans were being worked on. | |
| 1890 | On May 24, 2002, DHM sent Martin and Martin revised grading and parking lot plans, and Martin and Martin needed them to prepare design materials for the NPS. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1891 | On May 29, 2002, Willie DeOcampo emailed Steve Christensen that DHM had confirmed that the Sherman Tree Trail had been graded to the proper elevation. | |
| 1892 | The NPS' contentions, prior to May 29, 2002, that the Sherman Tree Trail had been excavated up to one foot too low, and that this was a reason explaining the excess material, were inaccurate. | |
| 1893 | On June 3, 2002, Steve Christensen sent Willie DeOcampo an email indicating that Remcon had received revised drawings for T7 and T8 but did not receive anything for T9 and T10 and that numerous design corrections were required. Mr. Christensen also noted that Luke Triplett and Mark Penrose were preparing RFIs requesting clarification of issues with regards to the two drawings they did receive. Steve ended by requesting clarification regarding the issuance of new plans and stressed that Remcon needed quick responses to its RFIs so that it could complete its cost estimate. | |
| 1894 | On June 3, 2002, Willie DeOcampo sent an email to Steve Christensen, with a copy to Bob Russell, Terry Lang, and Ray Todd. It reads, "Steve, I had given Ray Todd some drawings to take to the site last week. They were drawings sent to you by Marty S. the week before. The drawings sent with Ray were T7A, T8A, and US30. The two additional drawings were US32 (which was the centerline profile of the revised upper parking lot and a sketch profile of the new culverts for the Sherman Tree Trail). There was not T9 and T10 included in this package. | |
| 1895 | By email on June 4, 2002, Steve Christensen sought clarification as to what plans should be used to build the trail. | |
| 1896 | With respect to the difference between a field adjustment versus something that needed to be included in a Contracting Officer's Directive or a modification, if the contractor felt that it was minor and he didn't require additional funding from the NPS or if there wasn't any time, that could be considered minor and nothing would need to happen. If it was something that he believed was going to impact him, he needed to communicate. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 1897 | On June 9, 2002, Steve Christensen sent Willie DeOcampo, Terry Lang and Rod Keiscome an email indicating that Remcon was still waiting for a response to various RFIs regarding the revised trail design. Steve also indicating that it was made very clear at the partnering meeting that any plans not issued formally by the contracting officer did not exist. | |
| 1898 | On June 19, 2002, Steve Christensen wrote to Willie DeOcampo and Rod Keiscome asking when he would receive the further revised Sherman Tree Trail drawings, dated August, 2001, as the Sherman Tree Trail revised drawings he was given referenced other revised drawings he was not given. | |
| 1899 | Changes were made as late as June of 2002 to the Sherman Tree Trail because that is when Willie DeOcampo got the drawings and they were issued in the field. He doesn't know why changes were being made so late in the process. | |
| 1900 | On June 19, 2002, Remcon inquired what plans were to be used to construct the Sherman Tree Trail as some of the plans referenced on the revised Sherman Tree Trail drawings had not yet been received by Remcon. | |
| 1901 | At the partnering meeting, it was made very clear that any plans not issued by the Contracting Officer do not exist. | |
| 1902 | Rod Keiscome doesn't know when T7A and T8A were issued to Remcon or if T3A through T10A were ever issued to Remcon. | |
| 1903 | T7A and T8A are part of Modification No. 5. | |
| 1904 | The revised Sherman Tree Trail drawings are dated August, 2001, yet as of June, 2002, ten months later, Remcon still had not received all of them. | |
| 1905 | On August 31, 2002, Steve Christensen wrote Mike Giller advising that the lack of survey control on the Sherman Tree Trail continues. | |
| 1906 | The NPS' proposed modification to perform raising the Upper Sherman parking area did not get issued until September of 2002. | |
| 1907 | Willie DeOcampo doesn't know why it took until November of 2002 for a modification to actually be issued by the government to the contractor for revisions issued by the design team six months earlier. | |
| 1908 | By letter dated August 14, 2002, Remcon quoted to Mike Giller its extra costs to perform the extra work set forth on the revised Sherman Tree Trail drawings. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1909 | This quote was accepted but the modification was not issued for more than three months thereafter. | |
| 1910 | On August 14th, Luke Triplett sent a letter to Mike Giller requesting a contract modification for changes to the trail design as a result of the contents of Sheets T7A and T8A. | |
| 1911 | There were changes that had to be done by the contractor on the trail based on what it received from the NPS. | |
| 1912 | On August 21, 2002, Remcon wrote Mike Giller and Rod Keiscome providing notice that an immediate modification for the Sherman Tree Trail needed to be issued so as not to delay the Sherman Tree Trail work as the Sherman Tree Trail was "...considered critical path." The modification (No. 5) was not issued until 3 months later. | |
| 1913 | On August 21, 2002, Steve Christensen wrote Mike Giller and Rod Keiscome that the Sherman Tree Trail was continuing to be affected by lack of survey control in the design. | |
| 1914 | As of August 29, 2002, Remcon had caused staking and final grading on the Sherman Tree Trail to occur in compliance with contract drawings T7 and T8. | |
| 1915 | On August 29, 2002, Mike Giller wrote Steve Christensen advising that he could build the Sherman Tree Trail from either the original plans (T7 and T8) or revised planes (T7A and T8A). | |
| 1916 | As of August 29, 2002, the revised T7A and T8A drawings, while issued to Remcon, had not been made a part of any modification. | |
| 1917 | Revised drawings T7A and T8A, and the extra costs associated with constructing the work pursuant to them, were the subject of a modification pending as of August 29, 2002. | |
| 1918 | In response to Mike Giller's August 29, 2002 letter regarding sheets T7, T8, T7A, and T8A, which letter was faxed to Remcon on September 6, 2002, and the fact that Remcon could select which sheets to build from, Steve Christensen responded on September 17, 2002. | |
| 1919 | In his response, Steve Christensen stated that "It should not be the responsibility of the contractor to arbitrarily choose which design he wants to build." | |
| 1920 | In his response, Steve Christensen further stated that "The T7A and T8A plans have additional changes...I believe additional clarification is needed..." | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1921 | Remcon quoted additional costs to construct the Sherman Tree Trail per the content of revised drawings T7A and T8A in August, 2002, promptly following the NPS' advice that these revised drawings would be the basis of the redesign of the Sherman Tree Trail. | |
| 1922 | On September 17, 2002, in response to Steve Christensen's September 17, 2002 letter regarding the Sherman Tree Trail, and the fact that non-issuance of the modification was causing delay, Mike Giller emailed Rod Keiscome, the C.O., requesting that Modification No. 5 be issued as soon as possible. | |
| 1923 | On September 17, 2002, Rod Keiscome's assistant had the necessary paperwork signed off by the park superintendent to issue Modification No. 5. | |
| 1924 | Rod Keiscome did not cause Modification No. 5 for the Sherman Tree Trail to be entered into until November 20, 2002, more than 2 months later. | |
| 1925 | On September 20, 2002, Loren Mangrum's daily report states that the Sherman Tree Trail had a major excavation problem due to a sharp drop off in rock excavation and requested a re-routing of the trail. | |
| 1926 | Modification No. 5 was initially issued with incorrect data in September, 2002 but was rejected by Remcon and sent back unsigned. | |
| 1927 | Rod Keiscome would have to look at the initially issued Modification No. 5 in order to say if it was issued with the wrong price on one or more of the items. | |
| 1928 | It took the NPS approximately one month to re-issue Modification No. 5 with the correct information. | |
| 1929 | Upon receipt, Remcon promptly signed the corrected Modification No. 5 and returned it, with a reservation of rights, to the C.O. | |
| 1930 | The C.O. took approximately one month, until November 20, 2002, to sign and issue Modification No. 5 | |
| 1931 | Modification No. 5, issued November 20, 2002, incorporated revised drawings T7A and T8A, and the extra costs thereof. | |
| 1932 | Modification No. 5 changed the design by replacing sheets T7 and T8 with T7A and T8A. | |
| 1933 | Modification No. 5 was signed by the contractor on October 18, 2002 and was issued by Rod Keiscome on November 20, 2002. This modification increased the contract amount by $26,880.00 for adjustments to the Sherman Tree Trail. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1934 | Modification No. 5 officially modified the trail's design and finalized the design changes which had been going on for almost two years. | |
| 1935 | Modification No. 5 did not grant Remcon any time extension. | |
| 1936 | Steve Christensen signed Modification No. 5 on October 18, 2002 on behalf of Remcon and forwarded it to the Contracting Officer on October 21, 2002, along with a cover letter expressly reserving Remcon's rights to receive time extensions and delay damages resulting from the government breaches of contract, constructive acceleration, directed changes, construction changes and additional work performed and materials handled due to defective and deficient contract documents, including the Sherman Tree Trail. | |
| 1937 | Willie DeOcampo somewhat concurs with what Mr. Christensen said in the October 20, 2002 letter. | |
| 1938 | Willie DeOcampo may have written the Justification for the modifications to the Sherman Tree Trail. | |
| 1939 | If it was in the modification then Willie DeOcampo ultimately agreed with the modification of adding Item Number 140, adjust Sherman Tree Trail | |
| 1940 | Remcon was not authorized to do the work outlined in Modification No. 5 sooner than November 20, 2002. | |
| 1941 | The timing of the issuance of Modification No. 5 was too late for Remcon to proceed in 2002 as winter weather had commenced, and it further restrained Remcon from completing the trail until 2003's construction season as the design changes had to be implemented before the balance of the trail could be built. | |
| 1942 | Changes to the trail design were part of the Upper Sherman area that had to be finished before the transition to the Lower Sherman could occur. | |
| 1943 | Willie DeOcampo isn't sure if the modification that did eventually issue for this scope of work did not come out until it was too late to perform the work during the 2002 construction season. | |
| 1944 | At the time the CO signed and issued Modification No. 5, the winter shutdown had commenced. | |
| 1945 | Between the issuance of the Notice to Proceed on June 11, 2001 and November 20, 2002, when Modification No. 5 was issued, changes in trail grades, trail points, stone steps, culverts and other Sherman Tree Trail features occurred numerous times. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1946 | The primary two ways that a contractor is authorized by a Contracting Officer to perform extra work is by issuance of a modification or the issuance of a Contracting Officer's Directive. | |
| 1947 | A contractor can also be authorized to perform extra work by constructive change. | |
| 1948 | Rod Keiscome can't recall if there were any constructive changes on this project. | |
| 1949 | Rod Keiscome can't recall if, other than raising the upper parking lot by 5 feet, there was work that was performed before a modification was issued and without the issuance of a Contracting Officer's Directive. | |
| 1950 | Constructive change is when the contractor is directed or believes that he has been directed to perform something that the Contracting Officer has not directed him to do. | |
| 1951 | Rod Keiscome believes the significance of the term "constructive change" to be a contractor that is not paying attention to the requirements of the contract. | |
| 1952 | Rod Keiscome received, as part of his training, information regarding the legal doctrine of constructive change. | |
| 1953 | From his training, Rod Keiscome understands that the doctrine of constructive change is a doctrine whereby a contractor who receives information and perceives it is responsible to perform pursuant to it may be entitled to receive a modification compensating it for the time and/or money associated with performance of that constructive change. | |
| 1954 | Rod Keiscome believes that a constructive change occurred on this project with respect to some overruns and earthwork. | |
| 1955 | There are probably some items that Rod Keiscome became aware of that occurred during the project while Remcon was still the contractor that he perceived were a constructive change but have not yet materialized into one or more modifications. | |
| 1956 | On July 11, 2001, Bob Russell sent Mark Penrose what was purported to be a copy of the adjusted access road alignment between Stations 24+38 +/- and 30+20 /-. | |
| 1957 | There were a series of issues at various parts of the project that required some redesign and realignment in the summer of 2001, but they were not formally issued by the Contracting Officer as a modification. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1958 | The information regarding what was sought to be done as far as realignment of the road and redesign of the road, parking area and trail was given to the contractor. | |
| 1959 | As the contracting officer's representative, when Willie DeOcampo got notice that someone on behalf of the NPS had issued a drawing that was identified as a field revision and had given it to Remcon, he expected Remcon to comply with the drawing shown. | |
| 1960 | With respect to the realignment between Stations 24 and 30, Willie DeOcampo believes that Remcon probably was reacting or doing what it thought was in the best interest of getting this job done. | |
| 1961 | The contractor was building the road the way it was getting some sketches from people other than the Contracting Officer. | |
| 1962 | Willie DeOcampo can understand that Remcon was trying to proceed diligently to complete this project, and knowing full well that the designer was going to make recommendations to the people in Denver, and more than likely they were going to be supported because they were coming from the designer (Joanne Cody), who knew what she wanted to accomplish in terms of completing this project. | |
| 1963 | If the design team issues changes to the drawings and they are given to the contractor by Bob Russell, and the design team sends changes to the surveyor, the design team would expect the contractor to make those changes and stake according to the most recent updated design. | |
| 1964 | If the Contracting Officer does not ratify those changes in a modification, the contractor would be in limbo. | |
| 1965 | Every day the contractor is in limbo, that he could otherwise perform work in the field because the site would be available, would be effectively a delay if it affected a critical path activity. | |
| 1966 | Willie can't say if, when the design revisions were given from Mr. Russell to Remcon, it was his expectation that Remcon would build according to these revised grades and elevations. He doesn't know if this was just information or if it was to be constructed. | |
| 1967 | In the summer of 2001, it was not the NPS' standard practice to furnish design changes to the contractors just for information for them to look at and put into their files. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1968 | Willie DeOcampo can't recall if, in July of 2001, Remcon asked him what it was supposed to do with all the drawing revisions that it was receiving. | |
| 1969 | In July of 2001, Steve Christensen asked Willie DeOcampo what Remcon was supposed to do with all the drawing revisions that it was receiving. | |
| 1970 | Willie DeOcampo responded, "Proceed as we're going to issue a modification. | |
| 1971 | Willie DeOcampo believes it is probably true that Mr. Christensen specifically communicated to him on that subject. | |
| 1972 | Willie DeOcampo believes he may have responded, "Proceed as we're going to issue a modification." He's not sure though. His recollection or thought would be that because the designer was going to make a recommendation to him to implement a change, he would have concurred with it probably. | |
| 1973 | Willie DeOcampo may have told Mr. Christensen to go ahead because the NPS was going to issue a modification. | |
| 1974 | On August 20, 2001, Andrea Gregor sent Bob Russell a communication which stated, "Attached are full-sized revision drawings, the follow-up to my fax. Please pass along one copy to Jeff Northrop. The dark clouded areas are the latest changes. The light clouded area is the same as the first addendum I sent you on August 10." | |
| 1975 | On August 22, 2001 Bob Russell sent a fax to Jeff Northrop, with a cc to Willie DeOcampo and others, showing a transmittal of the referenced drawings that are in the August 20, 2001 transmittal from Andrea Gregor. | |
| 1976 | Willie DeOcampo expected Remcon, upon receipt of these latest revised drawings through the transmittal of August 22, 2001, to build according to those revised drawings because they were recommendations by the designer. | |
| 1977 | On August 24, 2001, Bob Russell sent a fax to Jeff Northrop, Willie DeOcampo, Ray Todd, and Joanne Cody, transmitting copies of revised drawings. | |
| 1978 | Rod Keiscome does not recall ever being made aware of the conduct that is referenced in the August 24, 2001 fax. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1979 | Rod Keiscome does not recall issuing any Contracting Officer's Directives or modifications with respect to the content the August 24, 2001 revised drawings. | |
| 1980 | It does concern Rod Keiscome that the email states that the drawings are to take the place of prior drawings. | |
| 1981 | Rod Keiscome was not made aware of the issuance of revised drawings on August 24, 2001 until the partnering session in May of 2002. | |
| 1982 | In the text of the next transmittal, it says "Revised drawings were issued on August 14th. Additional revised drawings were issued on August 22. And now a whole set of replacement drawings were again issued on August 24." | |
| 1983 | This is not the way that Rod Keiscome expected this project to be handled by personnel that he was working with. | |
| 1984 | Rod Keiscome would have expected the contractor's reaction to be that he was proceeding at his own risk. | |
| 1985 | The dates that these communications are occurring are August 14th, August 22nd and August 24th. That is the same time that, on the access road, the contractor was encountering a differing site condition. | |
| 1986 | The encountering of the differing site condition was not an as-planned activity. | |
| 1987 | The receipt of at least three sets of revisions to the upper parking lot and Sherman Tree Trail during August wasn't necessarily a communication to the contractor to do it, but just to communicate to the contractor. | |
| 1988 | Willie DeOcampo received Bob Russell's August 24, 2001 transmittal. He expected Remcon, upon receipt of these revised drawings, to build according to them. | |
| 1989 | Exhibit 148 indicates to Rod Keiscome that, as of August 27th, another set of revisions to some portion of the design, a potential change, was being communicated to Remcon. | |
| 1990 | Rod Keiscome sees that DHM was of the opinion that the work being done by Remcon's surveyor, at least as of August 27, 2001, was a "great job." | |
| 1991 | Independent of the differing site condition issue, there were a whole series of revisions to the drawings during the months of July and August of 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 1992 | Willie DeOcampo isn't sure if the still pending design issues and revisions were finalized by the design team in conjunction with the NPS before Remcon got out to the site to start working in 2002. | |
| 1993 | Willie DeOcampo can't remember if, in early August 2001, he went and spoke with Mr. Keiscome about the various different things that were going on the project, the excess material from the burn pit, the contention that there was a differing site condition, the over excavation of material, and all these various drawing revisions, and Mr. Keiscome got upset because he didn't have the funding to pay for all this extra work. However, Willie has seen something in writing that would lead a person to believe that this occurred. | |
| 1994 | An email in August, 2001 also indicates that Mr. Keiscome communicated to Mr. DeOcampo that, as a result of the myriad of issues that arose, he was considering terminating the job for convenience. | |
| 1995 | Willie DeOcampo doesn't recall advising the contractor at any time, given that he knew they were making all these changes as set forth in the various drawings that they were getting, to not perform the changes because the Contracting Officer was considering terminating the job for convenience and they didn't want to end up having to pay for extra work that they didn't want to have done. | |
| 1996 | Willie DeOcampo knew that Remcon was performing changed work during the summer of 2001 but didn't say anything to them in that regard because he figured the NPS would make a modification later on. | |
| 1997 | Based on what Mr. Todd has recommended, Willie DeOcampo concluded that a modification would be issued by Mr. Keiscome. Therefore, it was reasonable for a contractor to assume that he was going to get a modification for this work that he was proceeding. | |
| 1998 | Willie DeOcampo does not know why all design issues that had not been negotiated to completion were not issued as a directive in some manner, shape, or form so as to permit the contractor, as of commencement of the 2002 construction season, to proceed without impact. | |
| 1999 | On January 2, 2002, Bob Russell sent Jeff Northrop a fax requesting Remcon's cost proposal for restaking the access road centerline and Remcon's cost proposal for sorting and removing upper park lot debris so that Bob could wrap up Modification No. 3. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2000 | During the May 2002 partnering meeting, Remcon requested from all attendees direction on how to address all of the issues then continuing to be unresolved, including how to proceed through the deep cut area, including how to address slope problems. | |
| 2001 | Willie DeOcampo thinks that Mr. Christensen was first informed of the lengthy process it took for the government to get funds for modifications during the May 2002 partnering meeting. | |
| 2002 | In response to the identification of the funding mechanism process for modifications, Mr. Christensen responded that it would inevitably cause delays to the Project. | |
| 2003 | On the one hand, the government did not communicate that it didn't like the fact that the changes were made, but it hadn't affirmed that the contractor should make them in a modification, thus putting the contractor in limbo. | |
| 2004 | Remcon saw all kinds of changes and clarifications in 2001, and before it started again in 2002, after it hadn't worked for six to seven months, there were now additional changes that were going to happen based on the partnering meeting. | |
| 2005 | Although the plans went to the contractor without a modification, the intent was for the contractor to build per the revised plans. | |
| 2006 | Raymond Tuttle was aware that there were revisions issued for the contractor to build that were consistent with what he understood to be the intent of the design team and the construction branch people working on the project but that had never been formalized into a formal modification ratifying the changes. | |
| 2007 | When the NPS failed to respond, Remcon began issuing a series of requests for information ("RFIs"). | |
| 2008 | On May 22, 2002, Robert Smith sent an email to Willie DeOcampo. | |
| 2009 | In his May 22, 2002 email, Robert Smith wrote, "Willie, Andrea is working on the revised parking lot and trail plans." | |
| 2010 | This indicated to Willie DeOcampo that the adjustments hadn't been finalized yet. However, he doesn't know why this was the case. | |
| 2011 | It is distressing to Willie DeOcampo, as the Contracting Officer's Representative, that the design was still uncertain as of May 22, 2002, almost a year after Remcon had received the notice to proceed for this project. This is why Willie sent an email to them asking them to get something. However, they weren't done yet and he can't remember what he did about that. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2012 | Willie DeOcampo's understanding of the Spearin Doctrine was that the contract drawings were supposed to be issued at 100 complete. | |
| 2013 | Willie DeOcampo also understood that if the contract documents were not 100 percent complete insofar as changes had to be made that caused additional costs that the contractor may be entitled to a modification. | |
| 2014 | On May 24, 2002, Rod Keiscome sent an email to Steve Christensen. This email notes, "We also agree that there are issues that we've mutually identified as action plans to work out. That process continues..." | |
| 2015 | Rod Keiscome didn't issue a modification regarding all the design changes that came out in July of 2001 prior to him writing this email on May 24, 2002 because Willie hadn't drafted up the modification yet. Willie hadn't drafted the modification because they hadn't worked out or come to a price for the work over the winter months. | |
| 2016 | Willie DeOcampo had the discretion to ask Mr. Keiscome to issue a directive to the Remcon to build according to the revised drawings with a price to be negotiated later. | |
| 2017 | Willie DeOcampo did not exercise this discretion because he was promised these drawings and he would go ahead and get those out as a RFP. | |
| 2018 | There were many design revisions dealing with the access road, parking lot, and the trail. | |
| 2019 | Willie DeOcampo can't say why, as to any, or portion, or all of them, he didn't cause a communication to go to Mr. Keiscome at the time the events were going on, asking him to issue a directive or to do a time and materials directive, or something in order to promote the work to move forward to give the contractor a platform to bill for the extra work. | |
| 2020 | Willie DeOcampo's designers working with Joanne Cody had issued multiple generations of revisions for the access road, for the parking lot, and for the Sherman Tree Trail, copies of which had all been communicated to him. | |
| 2021 | This all occurred in July and August of 2001 and he knew at the time that this was going on that he had a short construction season that limited the ability of the contractor to implement design revisions. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2022 | He also knew at the same time that the process by which the funding for extra work took a long time because he had to get lots of people to agree to it and then it had to go back to Washington, D.C. to get approved. | |
| 2023 | The job was being impacted by all these multiple revisions being given to the contractor without clear direction from the Contracting Officer. | |
| 2024 | On June 19, 2002 Mr. Christensen sent an email to Willie DeOcampo, Terry Lang, and Rod Keiscome. After commenting that RFIs have been given regarding the revised trail design, and to which they are still waiting a response, Mr. Christensen made additional comments. Item number 1 says: "Note 2 on Sheet T7A and T8A references contract drawing sheets T3A through T10A. As previously discussed, Remcon has never been issued these plans. It was made very clear at the partnering meeting that any plans not issued by the Contracting Officer do not exist. | |
| 2025 | In light of the June 29, 2002 email, Willie DeOcampo expected Remcon to comply with T7A and T8A. He knows that there was a mod that was probably issued for this work but doesn't know when it would have been issued. | |
| 2026 | With respect to why changes in 2001 were not given to the contractor until June of 2002, Willie DeOcampo asserts that there seems to have been plans that were provided out in the field. | |
| 2027 | Willie DeOcampo would probably have recommended that Mr. Keiscome incorporate all these changes into modification, seeing as though the changes were coming from the designers. | |
| 2028 | On June 21, 2002, Remcon began restaking the access road slope. | |
| 2029 | On June 28, 2002, Steve Christensen sent Rod Keiscome a letter notifying Mr. Keiscome of delays due to unresolved grading conflicts and errors within the contract plans. This letter noted that RFIs on the issue were sent from June 20, 2002 to June 27, 2002, requesting an immediate response, and none has been received. Steve notified Mr. Keiscome that, effective July 1, 2002, Remcon would be forced to cease all grading operations on the Upper Sherman Access Road and go on stand-by pending resolution of these conflicts. | |
| 2030 | On July 3, 2002, Remcon wrote the Contracting Officer, requesting an emergency on site meeting. | |
| 2031 | A new Project Manager, Mike Giller of the NPS Denver Service Center, arrived on site on July 10, 2002. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 2032 | On, July 10, 2002, Mr. Giller walked the site with Steve Christensen and Remcon's lead Project personnel and, having the problems explained to him orally, directed Remcon to "field fit" the Upper Sherman Access Road to the existing natural features. | |
| 2033 | On July 11, 2002, Remcon confirmed the receipt of direction, in the field, from Mike Giller, on July 10, 2002, to align the access road to fit within natural features sought to be saved. | |
| 2034 | This direction was confirmed in Remcon's letter to the NPS on July 11, 2002, more than eight months after those problems had been brought to the attention of the NPS. | |
| 2035 | On July 15, 2002, Loren Mangrum, the lead inspector, wrote to Remcon confirming the job walk on July 10 with Mike Giller and identified many field changes to the Upper Sherman Access Road. | |
| 2036 | Remcon then began what it hoped would be the final construction of the deep cut area. Remcon's grading superintendent/foreman, both Mark Penrose and Mike Kitchell, laid the roadway alignment out using the design staking information provided by the NPS as adjusted for field conditions. | |
| 2037 | Because Mike Giller was the project manager and had availability of funds, if he told Willie DeOcampo about these changes, Willie probably would have concurred with whatever Mr. Giller wanted to do. | |
| 2038 | Willie DeOcampo believed that Mr. Giller would get the funds so therefore he expected Remcon to go ahead and perform the extra work. | |
| 2039 | By July 25, 2002, Remcon encountered still further problems in fitting the design to field conditions. | |
| 2040 | A new assistant inspector, Russell Belknap, arrived onsite to replace Bob Russell's subordinate, Loren Mangrum, who had assumed Bob Russell's role. | |
| 2041 | Mr. Belknap walked the site with Mr. Kitchell to review the field conditions and determine what could be done in order that Remcon could proceed. | |
| 2042 | Mr. Belknap personally directed Mr. Kitchell to make additional changes to the roadway alignment. | |
| 2043 | These changes were recorded in Remcon's Project records and in Russell Belknap's daily reports. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2044 | On July 25, 2002, Loren Mangrum noted in his daily report that himself, Russell Belknap, Steve Christensen, Mark Penrose and Mike Kitchell concluded that the Upper Sherman Access Road cross section between Stations 24 and 30 should be super elevated rather than a crown to allow the roadway to fit rock shoulders and operate more successfully. | |
| 2045 | Mike Kitchell prepared a summary of Upper Sherman Access Road crown and super locations. | |
| 2046 | On July 25, 2002, Russell Belknap noted in his daily report: "S. Christianson (sic) & Mike Kitchell talked to me re: cuts @ 24 --> 30 access road…then discussed road issue 24 --> 30+00 w/ Kitchell. Discovered that Remcon had made adjustments w/ access road from Sta 1+50 --> 24+00 w/ respect to vertical & horizontal alignments including adding super's. Prior to decision @ 24 --> 30+00, had Kitchell show me the changes. Reviewed changes. Adjustments seem to be reasonable to facilitation (sic) completion of the project. Will need survey to redesign a geometric layout. Allowed Remcon to install super between 24 --> 30+00 to reduce cut along access road." | |
| 2047 | The change from a crown to a super is a change from design requiring additional work as of July 25, 2002. | |
| 2048 | Super: Entire road is sloped to drain water to one side. Crown: Center of road highest point for water to drain to both pavement edges. | |
| 2049 | The NPS inspectors (Mr. Belknap and Mr. Mangrum) communicated in writing on July 25, 2002 that adjustments to the alignment by Remcon from Stations 1+50 to 24+00, with respect to the Upper Sherman Access Road vertical and horizontal alignments, including super, were reasonable to facilitate completion of the project. | |
| 2050 | The NPS inspectors (Mr. Belknap and Mr. Mangrum), on July 25, 2002, allowed Remcon to build from Stations 24+00 to 30+00 with a super to reduce cut work along the Upper Sherman Access Road. | |
| 2051 | On July 26, 2002, Remcon commenced building a super between Stations 24+00 and 30+00. | |
| 2052 | On July 30, 2002, Willie DeOcampo wrote to Mike Giller indicating that Remcon's work on building a super was extra and in the best interest of the NPS. | |
| 2053 | On July 31, 2002, Russell Belknap wrote that Remcon's road alignment changes are OK. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2054 | At no time during the extended discussions with the NPS throughout July 2002 (when Remcon was struggling to make progress) did any NPS personnel insist that Remcon follow the original (and unbuildable) design. | |
| 2055 | In early August 2002, the NPS requested that Remcon provide survey data for the access road as built. | |
| 2056 | Remcon had its surveyor return to the Project and survey the entire access road. The new survey data was sent to the NPS in Denver on August 14, 2002. | |
| 2057 | The NPS then orally advised Remcon that it was going to issue still more new design changes (Design No. 5) to correct what it perceived to be failures to properly build the road. | |
| 2058 | The NPS took this position despite Remcon following dozens of oral and written directives of NPS on-site representatives to field fit the road as needed. | |
| 2059 | During a meeting on August 22, 2002, Remcon notified the NPS that immediate survey design direction was needed for the Upper Sherman Access Road. The NPS responded that final control layout would be provided to Remcon's surveyor, Giuliani and Kull, no later than the first few days of the week of August 26. | |
| 2060 | Late in the afternoon on Friday, September 6, 2002, Giuliani and Kull finally received the new survey control points for the access road. | |
| 2061 | Remcon had Giuliani & Kull again lay out the road. In most instances, only minor extra work was required to meet the latest (5th) design requirements other than in the deep cut. | |
| 2062 | Meanwhile, due to the originally deficient design and consequent re-designs, Remcon was forced to delay its paving operations. | |
| 2063 | As weather became an impediment to complete paving operations (paving can only occur within certain temperature ranges), Remcon was forced to wait for the following 2002 construction season to complete paving operations. | |
| 2064 | Final horizontal and vertical control data for the Upper Sherman Access Road did not arrive at Giuliani and Kull's office until September 11, 2002, approximately 2 weeks later than agreed. The data provided failed to contain critical information relative to super-elevations locations. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2065 | On September 16, 2002, Steve Christensen sent a letter to Michael Giller outlining events that have impacted Remcon because of a lack of direction or information from the NPS. | |
| 2066 | These issues included Remcon's need for immediate survey design direction for the Upper Sherman Access Road. | |
| 2067 | By then, Remcon had been told that Russell Belknap would provide this information during the week of September 16, 2002. | |
| 2068 | In addition, Remcon informed Mike Giller that work on the Sherman Tree Trail had been placed on hold pending a written notification of the acceptance of the change order amount. | |
| 2069 | Lastly, Steve Christensen reminded Mike Giller of the impact that NPS design deficiencies and design changes were having on the Project, namely, that such events would require additional time and impact completion of the Project. | |
| 2070 | The restaking effort on the Upper Sherman Access Road that occurred in July of 2001 was not compensated to Remcon until sometime after September of 2002. | |
| 2071 | The extra work that was done on the access road was done 14 months before the modification was issued. | |
| 2072 | Willie DeOcampo has never been associated, while a Contracting Officer's Representative, with a project that had as many design changes issued as this one along the same station. | |
| 2073 | The staking of the road by Remcon's surveyor would have caused the construction to go into an area the NPS did not want to have disturbed. This was not a Remcon mistake. | |
| 2074 | The belated issuance of time and money was and is both a constructive acceleration and breach of contract. | |
| 2075 | Modification No. 4, issued in September, 2002, concerned 4 items: restaking the access road due to its directed realignment (Bid Item 137); increase in hauling excess material to Wolverton Point (Bid Item 39); compensation for hauling debris encountered in the upper parking area (Bid item 138); and compensation for raising the upper parking area by up to five feet. | |
| 2076 | Three of these items of work were performed in 2001. Only the raising of the upper parking lot occurred in 2002. | |
| 2077 | Three of these items concerned the handling of excess material. Only the restaking of the centerline of the access road did not. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2078 | In July, 2001, Joanne Cody identified that raising the finished grade of the Upper Sherman parking area was a way to use excess material and reduce extra costs. Despite knowing about the issue for 11 months, it was not until June 3, 2002 that Rod Keiscome directed Bob Russell to perform an estimate of costs to use excess material to raise the Upper Sherman parking area from revised plans. | |
| 2079 | Bob Russell records in his daily report for June 3, 2002 that Rod Keiscome was considering issuing a directive for Remcon to raise the Upper Sherman parking area. | |
| 2080 | The directive was not issued for three and a half additional weeks on June 27, 2002. | |
| 2081 | On June 28, 2002, Remcon sought assurance from the CO that payment for extra work would be prompt. | |
| 2082 | On July 16, 2002, Rod Keiscome promised to pay Remcon in the August 2002 pay cycle for the extra work in raising the Upper Sherman parking area. | |
| 2083 | In reliance upon the July 16, 2002 letter and representations by the Contracting Officer, Remcon performed the extra work. | |
| 2084 | Rod Keiscome did not honor the representation and the payment for this extra work was not made until after Modification No. 4 was issued in September, 2002. | |
| 2085 | The content of Modification No. 4, in its Justification sections, admits that the cause of the road relocation was not due to Remcon. | |
| 2086 | Modification No. 4 recognized the fact that the additional survey work by Giuliani & Kull was extra work and was solely caused by the NPS. | |
| 2087 | The fourth page of Modification No. 4 compensated the contractor for restaking the access road between Stations 25 and 30. This was surveying work that was being compensated. | |
| 2088 | The restaking effort occurred on July 16, 2001 but was not compensated to the contractor until sometime after September of 2002. Willie DeOcampo can't say why it was not until September of 2002 that the modification was issued to compensate the contractor for the extra work. | |
| 2089 | Willie DeOcampo believes that he authored the detailed write-up, contained on the last page of Modification No. 4, on each of the items for which extra compensation was being given to the contractor. | |