| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2090 | The fourth sentence of the write up that Willie DeOcampo wrote says "Thus, the government agreed that the centerline had to be revised in order to fit all earthwork into the already cleared limits." | |
| 2091 | The work along the access road was done before a modification was issued. It was done because the government had issued revised design documents to the contractor. | |
| 2092 | After the work was done, the government recognized that it was extra work and subsequently issued a modification for that item of work. | |
| 2093 | Willie DeOcampo recommended in 2002 to the Contracting Officer that he issue a modification including Bid Item 137 which concerned work that was done in 2001. He did this because it appears as though there was some additional layout that the surveyors performed. | |
| 2094 | If Willie DeOcampo felt that the contractor did extra work pursuant to revised drawings, even if they weren't subject to a modification, but it was in the best interest of the job, he would have recommended what he felt was right and appropriate based upon what the designers would have given him input on. | |
| 2095 | The way that Willie DeOcampo decided to administer his job was consistent with what he understood Mr. Keiscome wanted him to do on Mr. Keiscome's behalf. | |
| 2096 | Willie DeOcampo, after analysis, personally concluded that Mr. Christensen's request for compensation was appropriate to be approved as extra work. | |
| 2097 | It was Willie DeOcampo's intent, when writing the justification, to pay only for hauling the excess material, not for the effort to excavate it. | |
| 2098 | Modification No. 4 was signed by Steve Christensen on September 11, 2002 and Rod Keiscome on September 12, 2002, | |
| 2099 | Modification No. 4 compensated Remcon for hauling an additional 3200 cubic yards of excess excavation to Wolverton Point in Bid Item 39. | |
| 2100 | In the Justification to Modification No. 4 for Bid Item 39, the government wrote that Remcon advised it during excavation operations that the cut and fill volumes did not balance, and that it took the government nine months to determine it was responsible for the hauling costs associated with this excess material. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2101 | Further, it was written: This material had to be removed from the Project site in order for the contractor to complete design subgrades. If this work is not performed this contractor (sic), the contractual work can not be completed and delay claims will follow. | |
| 2102 | The Justification page, attached to Modification No. 4, produced by the government in discovery, was not part of the modification furnished by the NPS to Remcon when Steve Christensen signed it. | |
| 2103 | The Justification page attached to Modification No. 4 admits that the NPS did not timely act in response to Remcon's claims regarding excess excavation. | |
| 2104 | The reference to "nine months" for government action in response to Remcon's notice is not accurate as Remcon gave notice to the NPS of excess material in the summer of 2001 and it wasn't until September of 2002 that the modification was issued. | |
| 2105 | Modification No. 4 compensated Remcon for restaking the access road in July, 2001. | |
| 2106 | The effort to restake the centerline of the Upper Sherman Access Road due to the realignment was performed in July 2001. | |
| 2107 | The NPS did not issue Modification No. 4 to compensate Remcon for this directed extra work until 14 months after the extra work was performed. | |
| 2108 | The issuance of the Modification relating to the restaking of the Upper Sherman Access Road was untimely. | |
| 2109 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that the initial Access Road centerline staking was per the contract drawings. | |
| 2110 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that after the initial staking it was discovered that the centerline did not fall within the earlier cleared limits. | |
| 2111 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that the NPS park staff had delineated the trees to be cleared. | |
| 2112 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that the government determined the centerline had to be revised in order to fit all earthwork into the already cleared limits. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2113 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that to do so the centerline had to be re-surveyed and re-staked. | |
| 2114 | In the Justification section of Modification No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote that this was extra work and Remcon was entitled to be compensated for this effort. | |
| 2115 | In Modification No. 4, the NPS compensated Remcon for removal of the excess quantity of buried debris in the Upper Sherman Parking Area. | |
| 2116 | While the effort to perform this extra work was performed in July, 2001, the government took 14 months to issue the modification to pay for it. | |
| 2117 | The issuance of Modification No. 4, with respect to the removal and sorting of the buried debris extra work, was untimely | |
| 2118 | In the Justification page of Modification No. 4, relating to the extra work associated with excavating and sorting the buried debris, the government states that the differing site condition was encountered on July 12, 2001 in the Upper Sherman parking area. | |
| 2119 | In the Justification page of Modification No. 4, relating to the extra work associated with excavating and sorting the buried debris, the government states that the notice was promptly given as the NPS staff and inspector inspected the area on July 16, 2001 and determined that the buried material had to be removed before the parking lot was built. | |
| 2120 | In the Justification page of Modification No. 4, relating to the extra work associated with excavating and sorting the buried debris, the government states that direction was given to remove the upper 5 feet of the existing grade which contained unsuitable debris. | |
| 2121 | Rod Keiscome cannot recall if, when he issued Modification No. 4, he believed that there was an error in the plans that caused the additional compensation to be paid. | |
| 2122 | The justification for Modification No. 4 was prepared by the COR. | |
| 2123 | In Modification No. 4, the NPS compensated Remcon for raising the Upper Sherman parking area approximately 5 feet from the design grade. | |
| 2124 | This work was identified as something to be done in the summer and fall of 2001 but direction to perform it was not received until June 27, 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2125 | In the July 16, 2002 letter from Rod Keiscome, the CO promised to pay Remcon for performing this extra work in August, 2002. | |
| 2126 | The CO did not honor this promise as payment was not made for this extra work until Modification No. 4 was issued and signed in September, 2002. | |
| 2127 | In the Justification page of Modification No. 4, the government states that during the excavating and grading of the Access Road and Upper Sherman parking lots, it became apparent that excess excavated material was being generated. | |
| 2128 | This excavation effort primarily occurred from July through September, 2001. | |
| 2129 | In the Justification page of Modification No. 4, the government states that it was estimated by the government that a total quantity of approximately 15,000 cubic yards of excess excavation will be generated. | |
| 2130 | In the Justification page of Modification No. 4, the government states that the NPS' Denver Service Center and designers determined that the Upper Sherman parking area could be raised by 5 feet to spread 5,000 cubic yards of the 15,000 cubic yard overrun. | |
| 2131 | In the Justification page of Modification No. 4, the government states that the direction to perform this work will save $17,000 in extra costs which would otherwise be incurred. | |
| 2132 | The NPS, in Modification No. 4, admitted in the Justification the facts asserted by Remcon during the summer and fall of 2001 regarding the existence of excess excavation. | |
| 2133 | The government was aware of Remcon's contentions as to the quantity of excess excavation in July, 2001. | |
| 2134 | The NPS' COR reported Remcon's contention of 13,000 cubic yards of excess quantities as of July 2, 2001. | |
| 2135 | Even though the NPS' COR identified as of July 2, 2001 that up to 13,000 cubic yards of excess quantity was going to be generated, and Remcon independently identified the same thing via RFI #31 October 18, 2001 and informed the NPS, the NPS provided no direction or definite response until June 27, 2002. | |
| 2136 | Rod Keiscome agreed that Willie DeOcampo's write-up justifying the extra cost for Number 39 (hauling 3,200 cubic yards of excess material to Wolverton Point) was accurate when Keiscome issued Modification No. 4. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2137 | The justification for Modification No. 4 was already attached when it came to Rod Keiscome. | |
| 2138 | Rod Keiscome validated the content of the justification by going through the backup. | |
| 2139 | At the same time Rod Keiscome issued Modification No. 4, he also included with it a new item, No. 138, for handling a differing site condition in the upper parking lot. This is discussed in the justification for Modification No. 4. | |
| 2140 | The differing site condition debris was encountered in July of 2001. | |
| 2141 | Rod Keiscome can't recall what restrained him from issuing a modification for this scope of work that was extra work no sooner than September of 2002. It may have had to do with negotiations between the parties. | |
| 2142 | There was nothing that prevented Rod Keiscome, as the Contracting Officer, from issuing a modification unilaterally for a differing site condition that reflected in Bid Item 138. | |
| 2143 | From reviewing Modification No. 4, Rod Keiscome cannot tell if there is any relationship between bid Item 137 and Bid Item 39. | |
| 2144 | The only compensation Modification No. 4 provided relating to the access road was for surveying and restaking, not for excavation cost that may be contended as a result. | |
| 2145 | By contract, Remcon was granted 792 days to build the project. | |
| 2146 | The original contract completion date was August 11, 2003. | |
| 2147 | Remcon initially planned to complete the project within 2 construction seasons (by November, 2002). | |
| 2148 | The project schedule specifications are at section 1320. | |
| 2149 | Remcon's initial as-planned schedule was submitted to the NPS on June 11, 2001, the date the Notice to Proceed was issued. | |
| 2150 | It was not accepted due to the perceived absence of required resource loading. | |
| 2151 | Remcon resubmitted it on June 25, 2001 with the required resource loading clearly indicated. | |
| 2152 | The June 25, 2001 revised as-planned schedule was accepted with notations for additional edits by Willie DeOcampo. | |
| 2153 | On July 11, 2001, Jacobs Facilities, the construction manager, published its written review of Remcon's June 25, 2001 revised as-planned schedule. Jacobs stated that it was well thought out, organized and the logic was complete. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2154 | While Specification section 1320 requires the NPS to meet with Remcon within seven days of each schedule submission, the NPS never complied with this requirement. | |
| 2155 | Remcon did not strictly comply with the requirements to provide monthly updates of its schedule. | |
| 2156 | Remcon contends that the events experienced on the project, coupled with the absence of direction and/or issuance of modifications, prevented Remcon from producing an accurate or realistic schedule. | |
| 2157 | Remcon did publish, on a weekly basis, a three-week look ahead schedule which detailed the activities performed the prior week, that week's planned activities, and the forecasted activities for the subsequent week. | |
| 2158 | The three-week look ahead schedule was presented and discussed at each weekly meeting with the NPS. | |
| 2159 | The three-week look ahead schedule was used to construct the project as the full project schedule was rendered inaccurate by the absence of NPS action relating to the delay events. | |
| 2160 | Remcon submitted approximately six full project schedules but they were unable to be effectively used to manage the project. | |
| 2161 | At the end of 2001, Remcon was behind schedule because it had encountered what it contended were differing site conditions in the big cut and the Upper Sherman parking area, as well as numerous changes to the plans. | |
| 2162 | It was communicated to Rod Keiscome, by the technical personnel that he relied on, that the project was delayed as a result of encountering the differing site condition. | |
| 2163 | The critical path is those series of activities in an uninterrupted pattern that is the longest, continuous series of activities that control the time frame within which a project could be constructed. | |
| 2164 | If in this instance the access road was on the critical path and instead of being able to be ripped with conventional construction equipment, as anticipated by the soils report, it had to be blasted, as a general rule Robert Smith would expect that the critical path of the project was impacted and delayed, thus delaying the overall ability of the contractor to complete the project. | |
| 2165 | Willie DeOcampo would have to look at Remcon's schedules to know if the drilling and blasting work from late July until it was completed on the access road was on the critical path. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2166 | Willie DeOcampo doesn't know why, given that the government did recognize that a differing site condition was encountered in the deep cut area requiring blasting, Mr. Keiscome did not grant additional time when granting Modification No. 6 | |
| 2167 | Additional time was due Remcon as a result of encountering a differing site condition. | |
| 2168 | The drilling, blasting and material handling operations occurred, continuously, until September 13, 2001, a duration of over six weeks, which was twice the planned earthwork duration for the entire project. | |
| 2169 | Between July 30th of 2001 and completion of the blasting of the access road in September of 2001, the access road construction was on the critical path. | |
| 2170 | Raymond Tuttle was aware in December of 2001 that Mr. Christensen, on behalf of Remcon, came back to Denver to meet with representatives of the design team and the NPS to attempt to sort out some of, if not all of, the issues that were still unresolved so as to clear the path so that Remcon could "attack the job" once the construction season in 2002 commenced. | |
| 2171 | If there is a delay to the critical path, such as blasting on this project of the access road, it is incumbent upon Rod Keiscome, as Contracting Officer, to promptly evaluate it, seek a resolution with the contractor, if he can, and if not then to timely issue a time extension modification so as to avoid a claim that he failed to timely issue a time extension. | |
| 2172 | The NPS has still not granted any time extensions for the blasting work done by Remcon or anything related to the access road's differing site condition. | |
| 2173 | Rod Keiscome contends that this is because of the takeover agreement. | |
| 2174 | The takeover agreement was entered into between the government and the surety during the winter of 2003/2004. | |
| 2175 | Rod Keiscome did not address the time extension issue for blasting work done by Remcon because of an admitted administrative oversight on his part. | |
| 2176 | Based on Willie DeOcampo's understanding of the events that occurred on this project, he would have to look at all of the events and documentation again and reevaluate to determine if time was due. He thinks that there could be some time involved. He thinks that Remcon was delayed but just doesn't know the extent of it. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2177 | One of Willie DeOcampo's duties that were his responsibility was to evaluate time and money issues and make recommendations regarding modifications to be issued in that regard. | |
| 2178 | Willie DeOcampo doesn't know if he ever looked at the project schedule and evaluated the critical path of the project to determine if the contractor was entitled to a time extension. If he didn't, he never gave this responsibility to anyone else. | |
| 2179 | It was Willie DeOcampo's responsibility within the governmental structure set up for this project to evaluate schedule issues. If he didn't do it, it wasn't anybody else's responsibility to do it. | |
| 2180 | On September 12, 2001, Steve Christensen sent Willie DeOcampo an email. | |
| 2181 | From Mr. Christensen's September 12, 2001 email, Willie DeOcampo understood that Mr. Christensen was very concerned regarding delays and impacts to the project that were being experienced up through that date. | |
| 2182 | Willie DeOcampo had the responsibility to receive and review schedule information from the contractor. | |
| 2183 | Willie DeOcampo did not have the responsibility to approve schedules but had the responsibility to accept or reject schedules. | |
| 2184 | The Project schedules were never approved because Willie DeOcampo didn't know the logic behind the scheduling. | |
| 2185 | Willie DeOcampo did not look for logistics, the method in which the contractor was making the proposal for completion. He didn't check the schedules for means and methods. | |
| 2186 | Willie DeOcampo has never received any formal training in construction scheduling. He has taken critical path classes and has had a class in MS projects but is not competent in Primavera. | |
| 2187 | Willie DeOcampo has never scheduled a project himself. | |
| 2188 | Willie DeOcampo is not proficient in performing scheduling. | |
| 2189 | Rod Keiscome is not an expert in critical path scheduling methodology and is not technically qualified to do it. | |
| 2190 | Rod Keiscome believes that Willie DeOcampo has taken classes on reviewing and analyzing CPM schedules. | |
| 2191 | Rod Keiscome recognizes that Willie DeOcampo testified that he does not feel himself to be an expert on the subject of CPM scheduling. | |
| 2192 | Rod Keiscome can't recall if Willie DeOcampo was the one that was tasked to review the schedule information on Keiscome's behalf. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2193 | The construction season was limited for this Project because of its location in the Sierra Mountains. | |
| 2194 | During the May 22, 2001 pre-construction conference, Willie DeOcampo stated that Microsoft Project will be an acceptable scheduling program. | |
| 2195 | During the May 22, 2001 pre-construction conference, the NPS agreed that formalizing proposed modifications with a minimum of delay is essential. | |
| 2196 | Given that the work was divided into two principal phases, there was a practical restraint imposed by the contract as follows: the contractor had to keep a specified number of parking spots for cars, RV's and buses open year round. In order to perform the project the contractor had to construct the new spaces in the Upper Sherman parking lots (which meant all lots, along with the new access road the new comfort station and the new trail to the Sherman Tree) before he could relocate his efforts to the Lower Sherman portion and demo and rebuild the parking lot, highway and other improvements there. | |
| 2197 | These requirements are found in various locations of the contract documents but include Specification section 01110 1.4 A-F. | |
| 2198 | Specification section 1110, entitled "Summary of Work," describes the project and provides, in Part 1.4(c), the minimum number of parking spaces for passenger vehicles, buses, and RV's that must be maintained available at all times (thus yielding the conclusion that the Upper Sherman must be completed before the transition to the Lower Sherman). | |
| 2199 | In order to comply with the contract requirements the Upper Sherman work needed to be completed before transitioning to the Lower Sherman work. | |
| 2200 | Because the Lower Sherman work would take a full construction season (given the elevation of the project (over 7000 feet in the Sierra mountains) and the limited site access), the work season could only commence when the snow had melted and prior to it re-commencing. | |
| 2201 | In general, this means the construction season runs from June 1 to October 31 or so every year. | |
| 2202 | The contractor has the right to schedule the work so if he can finish early he's entitled to. The contractor is entitled to do that because the quicker he can finish, the more profit he can potentially make. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2203 | The contract issued to Remcon in the spring of 2001 gave Remcon 792 calendar days to construct from the issuance of the notice to proceed. | |
| 2204 | The notice to proceed was issued effective June 11, 2001 and the original contract completion date was therefore August 11, 2003. | |
| 2205 | Remcon's initial as-planned schedule was submitted to the NPS on June 11, 2001, the date the Notice to Proceed was issued. | |
| 2206 | Rod Keiscome believes that Remcon submitted only one schedule. | |
| 2207 | Remcon's first as-planned Project Schedule called for all work on the Upper Sherman Area to be completed in the 2001 season and the Lower Sherman Area to be completed in the 2002 season. | |
| 2208 | According to Remcon's first as-planned schedule, Remcon's plan was to complete the construction within two construction seasons. | |
| 2209 | Rod Keiscome believes that a prudent contractor could have completed this project within two construction seasons. | |
| 2210 | The critical path on Remcon's as-planned Project schedule commenced with the clearing of trees and pioneering of the Upper Sherman Access Road and Parking Areas. It then transitioned to the construction of the comfort station and related improvements for the balance of 2001. | |
| 2211 | This critical path was closely followed by the excavation and earthwork effort, and given what happened on the project, due to delays admitted to have occurred by the government, the critical path of the as-built project promptly shifted from the comfort station to the earthwork and excavation activities. | |
| 2212 | On June 25, 2001, Remcon submitted a revised as-planned schedule with resource loading. This schedule was accepted by the NPS subject to certain revisions being made. | |
| 2213 | Rod Keiscome believes that the June 25, 2001 schedule was merely a resubmittal of the prior schedule. | |
| 2214 | Remcon's first Project Schedule was returned to Remcon by Willie DeOcampo on July 2, 2001 because he claimed it was unacceptable. | |
| 2215 | By letter dated July 3, 2001, to Bob Russell, Remcon explained the resource loading coding included on its latest schedule submission. | |
| 2216 | At the July 10, 2001 weekly Project meeting, Bob Russell indicated that he had sent Remcon's 2-year schedule to Denver and that he should get word back soon. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2217 | While the June 25, 2001 revised schedule was under submission, Jacobs Facilities reviewed it and published a letter, dated July 11, 2001, finding the schedule to be "...well thought out and organized. The logic seemed complete and consistent throughout the schedule. The schedule is acceptable as is..." | |
| 2218 | Willie DeOcampo received the July 11, 2001 letter from Jacobs Facilities, Inc. | |
| 2219 | Willie DeOcampo's construction manager inspector believed the schedule contained logic that was complete and consistent and it was acceptable. | |
| 2220 | Willie DeOcampo, on July 12, 2001, forwarded the Jacobs' schedulers' comments to Ray Todd and Bob Russell. | |
| 2221 | Rod Keiscome respects Jacobs and their performance of work on the project. He believes that Jacobs' personnel that were tasked to work on this project, both in the field and the office, had competence with respect to reviewing and evaluating schedules. | |
| 2222 | Rod Keiscome can't recall if he was aware that Jacobs' personnel reviewing the schedule determined that it was "acceptable as is." | |
| 2223 | Rod Keiscome doesn't know why it is that Jacobs' commentary was not followed by the NPS in reviewing and commenting on the schedule submissions by Remcon. | |
| 2224 | Specification Section 1320, entitled "Project Schedule and Monthly Inspections," Part 1.4, entitled "Joint Review, Revision," provides: "Within seven calendar days of receipt of the contractor's proposed schedule, the contracting officer and contractor shall meet for joint review, correction, or adjustment of the proposed project schedule. Any areas, which, in the opinion of the contracting officer, conflict with timely completion of the project, shall be subject to revision by the contractor." | |
| 2225 | The NPS never complied with this contractual requirement, despite numerous requests from the contractor to do so. | |
| 2226 | Neither Rod Keiscome, the contracting officer, nor Willie DeOcampo, the contracting officer's representative, ever complied with Specification Section 1320, Part 1.4. | |
| 2227 | Rod Keiscome had a designated COR to meet with Remcon on the subject of the schedule. However, he can't recall if Willie DeOcampo did so in a timely manner. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2228 | On July 24, 2001, in the weekly meeting minutes, Bob Russell stated that Remcon's two-year proposed schedule should be accepted with notation. Willie DeOcampo, Joanne Cody, and Ray Todd participated in the meeting via phone. | |
| 2229 | The July 25, 2001 Remcon schedule was accepted with notation by Willie DeOcampo on July 25, 2001. | |
| 2230 | The July 25, 2001 weekly minutes record that the June 25, 2001 revised as-planned schedule had been accepted. | |
| 2231 | The NPS did not object to the logic or durations shown by Remcon in its as-planned schedule. | |
| 2232 | Remcon's as-planned schedule was impacted at the outset of the Project by mistakes, errors and maladministration by NPS personnel as well as differing site conditions encountered, all of which manifested themselves as breaches of contract as Remcon's ability to perform was severely hindered due to lack of timely modifications and direction. | |
| 2233 | On or before October, 2001, Jeff Northrop sent Willie DeOcampo a letter that coordination and planning along with discussions with the NPS was needed before an updated schedule could be made. | |
| 2234 | On October 11, 2001, the NPS received a letter from Jeffrey Northrop indicating that an updated Project Schedule would be forthcoming after further planning. | |
| 2235 | Remcon sought to develop a schedule during the winter shutdown that would work. | |
| 2236 | Absent the NPS resolving outstanding issues, at anytime, including during the six month winter shutdown between November, 2001 and May, 2002, the ability of Remcon to accurately plan and schedule the project was frustrated. | |
| 2237 | With respect to whether Remcon was given the opportunity to finish the Upper Sherman parking area in the first construction season, Rod Keiscome believes that Remcon was given the opportunity to be a prudent contractor to complete the job but, unfortunately, there were some delays and arguments about the trail, the Upper Sherman parking area, and the access road that created "spinning" and not completing that portion of the work | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2238 | For example, Rod Keiscome did not issue a modification recognizing a differing site condition for the access road until February of 2003 (Modification No. 6) while that work was done in July, August, and September of 2001. | |
| 2239 | On December 3, 2001, Jeff Northrop sent Willie DeOcampo an updated schedule. | |
| 2240 | On December 24, 2001, Bob Russell sent a transmittal to Willie DeOcampo which provided Bob Russell's comments for Remcon's revised CPM schedule (dated 12/07/01 and received 12/11/01). | |
| 2241 | On January 2, 2002, Bob Russell sent a transmittal to Willie DeOcampo indicating that project schedule acceptance was an issue that needed to be addressed/resolved the following year. | |
| 2242 | On February 25, 2002, Bob Russell sent a transmittal to Willie DeOcampo regarding his comments for Remcon's revised CPM schedule (dated 2/06/02 and received 2/14/02). | |
| 2243 | On March 4, 2002, Willie DeOcampo sent Remcon a letter with project schedule review comments regarding Remcon's schedule dated 2/06/02. | |
| 2244 | The March 4, 2002 letter from Willie DeOcampo to Remcon regarding Remcon's schedule dated 2/06/02 stated that the schedule was not in compliance with the Contract requirements because it was not prepared using the latest version of Primavera Project Planner (P3) software by Primavera Systems. | |
| 2245 | The March 4, 2002 letter from Willie DeOcampo to Remcon regarding Remcon's schedule indicated that a 10% retainage would be withheld from each monthly progress payment until an acceptable progress schedule and project schedule was received and accepted by the NPS. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2246 | On April 2, 2002, Steve Christensen sent an email to Willie DeOcampo regarding the Project Schedule. This letter indicates Steve Christensen's concern that Willie DeOcampo's March 2, 2002 letter references the use of Primavera Project Planner software when the NPS had previously agreed to the use of Microsoft Project. The letter also explains that Remcon's project schedule cannot be printed on 22-inch by 34-inch paper because the font size would be so small that the schedule could not be read. The letter ends by requesting necessary information as to whether Remcon can begin the retaining wall for the Generals Highway during 2002 or must wait until the following season. | |
| 2247 | Despite the NPS personnel agreeing to review impact issues and representing they would timely respond and provide the necessary design changes and/or issue the appropriate revised drawings and modifications, little or no information was forthcoming before the second construction season began. | |
| 2248 | As a result, Remcon was unable to publish an accurate, updated schedule as it was missing critical information to enable it to plan its work. | |
| 2249 | On May 16, 2002, Rod Keiscome, at the partnering meeting, directed Bob Russell to provide a detailed analysis of Remcon's then current proposed schedule for logic and content. | |
| 2250 | Rod Keiscome's May 16, 2002 directive was reiterated in a meeting with Steve Christensen in mid-June, 2002. | |
| 2251 | Remcon gave notice by letter dated May 20, 2002 that until issues restraining critical path work are resolved it would be delayed and seek project standby and delay costs. | |
| 2252 | In a May 20, 2002 email, Steve Christensen wrote Willie DeOcampo that due to unresolved issues, Remcon could not productively work on the project. | |
| 2253 | By email on May 22, 2002, Remcon told Willie DeOcampo that Remcon would mobilize as soon as possible to start the limited amount of productive work available, but once it runs out Remcon will need to be compensated for stand-by costs for labor and equipment. | |
| 2254 | Steve Christensen communicated in the May 22, 2002 email that he had no confidence that contract modifications will be issued soon. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2255 | Steve Christensen's lack of confidence was justified give that Modification No. 3 was not issued until August, 2002, Modification No. 4 was not issued until September, 2002, and Modification No. 5 was not issued until November, 2002. | |
| 2256 | On May 21, 2002, the NPS' project manager advised Rod Keiscome, Willie DeOcampo and Joanne Cody that if the NPS was holding up Remcon, "we better be reducing our liability in a BIG hurry." | |
| 2257 | On May 21, 2002, Joanne Cody forwarded the project manager's email to Bob Smith of DHM. | |
| 2258 | On May 22, 2002, Willie DeOcampo emailed Bob Smith seeking drawings with quantity take-offs for the Upper Sherman parking area to evaluate Remcon's claims for costs associated with the impact from excess material. | |
| 2259 | On May 29, 2002, Willie DeOcampo sent a letter to Remcon detailing work which the NPS felt could be done as it was unaffected by other issues. | |
| 2260 | None of the work listed in the May 29, 2002 letter were items on the project's critical path. | |
| 2261 | On June 3, 2002, Rod Keiscome directed Bob Russell to perform an estimate of costs to raise the Upper Sherman parking area from revised plans. | |
| 2262 | Bob Russell records in his daily report for June 3, 2002 that Rod Keiscome was considering issuing a directive for Remcon to raise the Upper Sherman parking area. | |
| 2263 | The directive was not issued for three and a half additional weeks (on June 27, 2002). | |
| 2264 | With respect to why, if this work was done shortly after the directive was issued, the modification did not come out sooner than September if the NPS and Remcon had already on a price, Rod Keiscome believes that this is "a good question." | |
| 2265 | On June 3, 2002, Steve Christensen requested consent from the NPS to permit Remcon to work on the Lower Sherman area. | |
| 2266 | On June 3, 2002, Willie DeOcampo sent an email to Jack Vance asking for something from the NPS concurring with Remcon's proposed change to the contract. In this email, Willie asks Jack to write something for Willie so that Willie could verify that this change is in the best interest of the NPS. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2267 | On June 4, 2002, Jack Vance responded to Willie DeOcampo's June 3, 2002 email. In his response, Jack Vance said that he did not want to change the contract until Remcon submitted an acceptable baseline schedule. | |
| 2268 | Bob Russell, on June 4, 2002, reported that Jack Vance had denied the request to start on the Lower Sherman area due to slow progress on the Upper Sherman work. | |
| 2269 | The NPS denied Steve Christensen's request to allow Remcon to start work on the Generals Highway. | |
| 2270 | No work was ever started by Remcon on the Lower Sherman because Remcon was not allowed by the contract to do so until the Upper Sherman had been completed. | |
| 2271 | On June 4, 2002, Steve Christensen emailed Willie DeOcampo asking where Bob Russell's promised comments to the most recent schedule submission were. | |
| 2272 | On June 8, 2002, Steve Christensen sent a letter to Willie DeOcampo which stated "...the revised completion date is now October 7, 2003." This letter detailed how NPS caused delays had pushed the anticipated completion date well past August 2003. | |
| 2273 | On June 19, 2002, Steve Christensen emailed Willie DeOcampo and Rod Keiscome that as of that date he still lacked Bob Russell's promised comments to Remcon's schedule and that four weeks since the promise was made had passed. | |
| 2274 | As of mid-June, 2002, Bob Russell was failing to timely perform his work insofar as RFIs, submittals and schedule analysis were outstanding. | |
| 2275 | On June 27, 2002, Steve Christensen sent Willie DeOcampo a letter regarding the Project baseline schedule and as-built/as-planned schedules. This letter included an updated Project schedule showing work on the Project not being completed until late fall 2003. | |
| 2276 | Rod Keiscome believes that these schedules were merely a baseline schedule resubmission of the first two schedules. | |
| 2277 | Remcon's June 27, 2002 updated schedule attempted to address the volume of problems and hindrances affecting the ability to progress the work. It showed a completion date of late fall 2003. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2278 | Modification No. 3 to the Project Contract provided that Remcon was entitled to a time extension of 13 calendar days and that the contract completion date was accordingly changed from August 11, 2003 to August 24, 2003. | |
| 2279 | No response was received to Remcon's June 27, 2002 updated schedule even though: (a) the specifications required the CO to meet with Steve Christensen within seven days of the submittal; and (b) the proposed completion date was three months beyond the contractual completion date. | |
| 2280 | The revisions to the Upper Sherman parking area were restraining the finishing of that area. | |
| 2281 | On July 1, 2002, Steve Christensen emailed Willie DeOcampo that daily standby sheets were being prepared due to grade conflicts on the Upper Sherman Access Road that had delayed the work. | |
| 2282 | On July 9, 2002, during a weekly project meeting, Willie DeOcampo indicated that he needed more time to review Remcon's updated baseline schedule and that he would provide an answer before the next meeting. | |
| 2283 | On August 6, 2002, Remcon submitted another revised schedule to the NPS. | |
| 2284 | Rod Keiscome believes that the August 6, 2002 schedule was merely a resubmission of the earlier schedule. | |
| 2285 | On August 12, 2002, Remcon issued to the NPS another project schedule. | |
| 2286 | On the August 12, 2002 project schedule, Willie DeOcampo wrote: "Resubmit in accordance with August 22, 2002 negotiations." He made this notation on September 3, 2002 as a result of what happened in project negotiations on August 22, 2002. | |
| 2287 | Willie DeOcampo doesn't think he ever requested that Remcon, every time it got a change to the drawings, to issue to him a new baseline schedule | |
| 2288 | It was difficult for Remcon to build the job when things were in flux. | |
| 2289 | Steve Christensen's September 16, 2002 letter notified Mike Giller that Remcon's ability to complete the project by early November had been severely compromised as a result of the issues outlined and that, although Remcon was making every effort to continue with work its ability to efficiently prosecute the work had been jeopardized. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2290 | Willie DeOcampo rejected the August 6, 2002 schedule submittal on September 3, 2002. | |
| 2291 | Following negotiations to settle claims in August of 2002, the NPS, by transmittal dated September 23, 2002, rejected the August 6, 2002 submitted schedule and asked Remcon to resubmit it in light of the August negotiations. | |
| 2292 | The NPS took four weeks to review the schedule and three additional weeks to transmit its rejection. | |
| 2293 | On September 24, 2002, Luke Triplett, Remcon's assistant project manager, provided notice to the NPS that the Upper Sherman Access Road work has been impacted and delayed by defective plans and specifications and changes and that all costs would be sought. | |
| 2294 | Steve Christensen wrote Mike Giller a detailed letter dated October 20, 2002. | |
| 2295 | The letter states the following as facts: (a) redesign of the Sherman Tree Access Road was severely impacting Remcon's work on the project; and (b) as a result of the five designs which have taken place in the deep cut area of the Upper Sherman Access Road, Remcon had been forced to incur tremendous loss of revenue as well as delays to the overall project. | |
| 2296 | Willie DeOcampo concurs with what Steve Christensen said in the October 20, 2002 letter. | |
| 2297 | There are undoubtedly some time extensions due Remcon that have not yet been issued. | |
| 2298 | But for the myriad of design deficiencies and differing site conditions encountered, and directed performance of extra work and constructive changes, the Upper Sherman work would have been completed by the end of the 2001 construction season. | |
| 2299 | Remcon's as-planned Project schedule was not able to be followed. | |
| 2300 | Instead of taking 21 calendar days to excavate the road and parking lots, as scheduled in the as-planned schedule, the activity took more than 13 months and the costs for excavation exceeded $700,000. | |
| 2301 | Willie DeOcampo is familiar with the term critical path. One of his job responsibilities was to review and accept project schedules. | |
| 2302 | The specifications required the contractor to identify the critical path on project schedules. | |
| 2303 | Willie DeOcampo can't recall if the access road was on the critical path as of July of 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2304 | Willie DeOcampo doesn't know if there was any float built into the project schedule. | |
| 2305 | If there was no float to any critical path activity as of that moment in time, July 1, 2001, then Willie DeOcampo would agree that that would cause a delay to the Project and there would be some time impacts. | |
| 2306 | Independent of the differing site condition issues, there were a whole series of revisions to the drawings during the months of July and August of 2001. | |
| 2307 | Willie DeOcampo isn't sure if the still pending design issues and revisions were finalized by the design team in conjunction with the NPS before Remcon got out to the site to start working in 2002. | |
| 2308 | The job was being impacted by all these multiple revisions being given to the contractor without clear direction from the contracting officer. | |
| 2309 | On June 22, 2002, Steve Christensen sent Willie DeOcampo an email asking when he would receive the contract modifications for the Upper Sherman Parking Area since he would like to get the work started as soon as he gets it. | |
| 2310 | Steve also stressed that this is critical to Remcon's work plan and continues to impact the overall schedule. | |
| 2311 | It was Willie DeOcampo's observation, after receiving Mr. Christensen's June 22, 2002 email, that it was affecting Mr. Christensen's ability to perform the work that he needed clear direction as to what to do with the upper parking area. | |
| 2312 | Willie DeOcampo does not know why Mr. Keiscome issued a contracting officer's directive on June 27, 2002, regarding the Upper Sherman parking lot when the modification was in process to authorize it. | |
| 2313 | It was probably issued because Remcon had identified that it was being delayed and disrupted and was putting the government on notice of that. | |
| 2314 | In the partnering meeting in May of 2002, the subject matter of delays and disruptions came up. | |
| 2315 | The revisions to the Upper Sherman Access Road and raising of the parking area had to be performed by Remcon, in order to address the excess material, before Remcon could pave the Upper Sherman Parking area. | |
| 2316 | By contract, Remcon was not authorized to do the extra work (raise the Upper Sherman parking area) until a modification was issued. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2317 | This extra work was restraining the finishing of the Upper Sherman Parking area. | |
| 2318 | Willie DeOcampo did not feel that Mr. Christensen was wrong in identifying that it was critical to get the modification for raising the parking area so the extra work could be done. | |
| 2319 | As a consequence of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation. | |
| 2320 | As of June 24, 2002, the NPS had not timely addressed dozens of outstanding RFIs and submittals and Remcon needed the responses in order to construct the project. | |
| 2321 | The NPS did not issue the modification (No. 5) for adjusting the Sherman Tree Trail, in accordance with the August, 2002 negotiations until October, 2002. | |
| 2322 | Remcon promptly upon receipt of Modification No. 5 in October, 2002 signed it and returned it to the CO. A reservation of rights letter accompanied it. The NPS took almost a month to sign Modification No. 5 thereafter. | |
| 2323 | Following the hauling of the burn pit materials, Remcon planned to perform its mass excavation work which principally consisted of excavation and grading of the access road and the parking lots in the Upper Sherman portion of the project. | |
| 2324 | This effort was planned to be a duration of 21 calendar days. Instead, it took over a year to perform due to the road relocation and the failure of the government, until September, 2002, to issue its final design changes to Remcon so that Remcon could complete the earthwork portions of the project and commence paving. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2325 | As a result of the multiple problems with the design, which are documented in dozens of written communications between the contractor, the inspector, the NPS and Denver Service Center personnel, and the outside design team members hired by the NPS, and which are admitted by the government to have been its responsibility in the modifications it issued as well as the testimony of multiple government witnesses including Willie DeOcampo, Rod Keiscome, Joanne Cody, as well as the independent designers (Bob Smith and Ray Tuttle), the project was unable to be constructed as-planned. | |
| 2326 | The combination of the road relocation, the burn pit material and the differing site condition on the access road collectively caused the critical path of the project to shift from going through the comfort station and put it entirely on the excavation activities. This continued into 2002. | |
| 2327 | On November 20, 2002, the CO signed and issued Modification No. 5 | |
| 2328 | At the time the CO signed and issued Modification No. 5, the winter shutdown had commenced. | |
| 2329 | The last schedule submitted by Remcon is dated June 9, 2003 and it was rejected as unacceptable. | |
| 2330 | As of July, 2003, due to delays directly attributable to the NPS, worked remained to be completed on the Upper Sherman Access Road and Parking Area and Sherman Tree Trail, and no work had been performed on the Lower Sherman Parking Area. | |
| 2331 | There were some problems with the steps on the Sherman Tree Trail which delayed or otherwise prevented Remcon from finishing that work in 2001. | |
| 2332 | Rod Keiscome remembers that Remcon argued vigorously that it was having problems with the Sherman Tree Trail and that it couldn't be built according to the original plans. | |
| 2333 | Rod Keiscome can't recall if revised drawings were ever issued by the design team and given to Remcon to build from. | |
| 2334 | In Modification No. 5, issued November 20, 2002, revised trail drawings T7A and T8A were added to the contract modifying the design. | |
| 2335 | Modification No. 1 was issued on July 24, 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2336 | Modification No. 1 amended the contract to add additional compensation of $317,850 for asphalt concrete pavement on the Upper Sherman roads and parking area, General's Highway stone headwall, and telephone service to Correl Stub. | |
| 2337 | Modification No. 1 did not provide for any time extension for contract completion. | |
| 2338 | Modification No. 2 was issued on January 28, 2002. | |
| 2339 | Modification No. 2 amended the contract to add additional compensation of $10,908.00 for a sewer force main from the dosing tank and for electrical/telephone changes on the Access Road. | |
| 2340 | Modification No. 2 did not provide for any time extension for contract completion. | |
| 2341 | Modification No. 3 was issued on August 20, 2002. | |
| 2342 | Modification No. 3 amended the contract to add additional compensation of $345,209.92 for general conditions costs associated with the deletion of Pay Item 26, hauling of excess material from the park, and extended field overhead. All of the work was performed in 2001. | |
| 2343 | Modification No. 3 provided for a time extension of 13 calendar (8 working) days. | |
| 2344 | This belated granting of a time extension in Modification No. 3 is not consistent with the government's duty to timely issue time extensions. | |
| 2345 | Instead of being granted in July, 2001, when it was experienced, it was issued 13 months later. | |
| 2346 | Modification No. 4 was issued on September 12, 2002. | |
| 2347 | There was a 14 or 15 month period between performance of the extra work and issuance of the modification. | |
| 2348 | Modification No. 4 amended the contract to add additional compensation of $95,120.36 for hauling of excess excavation, restaking the access road centerline, sorting and removing buried debris in the upper parking lot, and raising the finish grade of the upper parking lot. | |
| 2349 | Modification No. 4 did not provide for a time extension for contract completion. | |
| 2350 | Modification No. 5 was issued on November 20, 2002. | |
| 2351 | Modification No. 5 amended the contract to add additional compensation of $26,880.00 for adjustments to the Sherman Tree Trail. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2352 | Modification No. 5 provided for a time extension of 4 calendar days. | |
| 2353 | Modification No. 6 was issued unilaterally on February 18, 2003. | |
| 2354 | Modification No. 6 amended the contract to add additional compensation of 84,170.00 for the encountering of a differing site condition necessitating rock blasting and excavation. | |
| 2355 | Modification No. 6 did not provide for a time extension for contract completion or for the impacts the differing site condition caused. | |
| 2356 | Modification No. 6 only compensated for some of the blasting costs incurred, and for nothing else. | |
| 2357 | Rod Keiscome does not consider the modification that he issued for the differing site condition to have been timely issued. | |
| 2358 | Concurrent with all of the excavation issues are multiple issues of design problems with the parking lots and access road not being able to be constructed as designed due to many different impacts. These include rock outcroppings, trees which were not marked to be removed but which had to be removed, the government's identification that a stockpile of aggregate base was on site to access and use which turned out to be inaccurate and a myriad of other problems. | |
| 2359 | The government failed to promptly address the problems in a timely or efficient or fair manner and this maladministration plagued the project and contributed to the delays and extra costs incurred by Remcon. | |
| 2360 | As a result of encountering the differing site condition, it was communicated to Rod Keiscome by the technical personnel that he relied upon that the project was somewhat delayed. | |
| 2361 | Rod Keiscome recalls receiving a letter from Mr. Christensen which said something about ruination of Remcon's business if it wasn't compensated for the differing site condition issue at a minimum. | |
| 2362 | Steve Christensen communicated to Rod Keiscome that because he had not been paid for contract and/or extra work, he lacked the working capital to get back on the project. | |
| 2363 | Delays to the critical path are, by definition, a delay to the completion of the project. | |
| 2364 | If there is a critical path impact to the project, the parties typically sit down, negotiate, and work those things through. If the parties cannot reach an agreement, the government nevertheless has a duty to unilaterally issue, as promptly as possible, a modification for that portion of time and money that it believes it inexcusably owes the contractor. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2365 | If the government fails to do so, it would constitute a constructive acceleration. | |
| 2366 | Time extensions result from delays to the critical path. | |
| 2367 | If there was a delay to the critical path, such as the blasting on this project of the access road, it was incumbent upon Rod Keiscome, as the Contracting Officer, to promptly evaluate it, seek a resolution with the contractor, if he could; but if he couldn't reach a prompt resolution, to timely issue a time extension modification so as to avoid a claim that he failed to timely issue a time extension. | |
| 2368 | Rod Keiscome can't recall if there has ever been any time granted by him for the contractor having encountered a differing site condition on the access road. | |
| 2369 | Blasting for the roadway was seven consecutive weeks before transition to blasting for the utilities. | |
| 2370 | Rod Keiscome believes that it is hard to say if there is a critical path on this project. | |
| 2371 | Rod Keiscome cannot say if he, as Contracting Officer, timely issued modifications for time and/or money due Remcon. | |
| 2372 | Rod Keiscome has been restrained since November, 2002 from issuing modifications for time and/or money that are yet to be issued and are due Remcon because the NPS needs to address some issues with the surety. | |
| 2373 | Rod Keiscome does not know if the access road was ever a critical path work item. | |
| 2374 | Unless there was a directive by the Contracting Officer, any changes to the drawings for the Sherman Tree Trail not required by the contractor to be constructed until November 20, 2002. | |
| 2375 | If there was no directive, it wasn't until the third construction season that the Sherman Tree Trail could be completed because the sheet included in the modification issued November 20, 2002 are for work in the Sherman Tree Trail. | |
| 2376 | Rod Keiscome does consider this to be a delay to the project. | |
| 2377 | However, Rod Keiscome has not issued a time extension associated with the Sherman Tree Trail delay. He doesn't know why he hasn't done so. | |
| 2378 | There is nothing that the contractor did or didn't do that caused delay with respect to the issues addressed in Modification No. 4. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2379 | Joanne Cody did not play any role in reviewing any schedules from the contractor on this project of construction activities. This was Willie DeOcampo's responsibility. | |
| 2380 | On March 21, 2001, while preparing its bid estimate, Steve Christensen emailed the NPS asking a series of questions. | |
| 2381 | In his March 21, 2001 email, Steve Christensen noted that based on his knowledge, little or no aggregate base was available in a stockpile on site even though the bid documents advised otherwise. | |
| 2382 | Robert Smith recalls seeing, furnished to DHM by Jack Vance, photos of stockpiles that the government said should be used for aggregate base on this project by the contractor. | |
| 2383 | The materials that DHM was furnished by the NPS indicated that the NPS had stockpiled certain materials that were going to be made available for the contractor to use in constructing the project. | |
| 2384 | There was no independent verification effort undertaken by the design team to verify that the stockpiles actually existed. They merely relied on what they had been told by their client (the NPS). | |
| 2385 | The NPS was required by the contract plans and specifications to furnish all aggregate base to Remcon | |
| 2386 | Addendum No. 1 to the Contract identified a stockpile of aggregate base that was supposed to be available for the contractor's use. | |
| 2387 | The photograph included in Addendum No. 1 appears to show not an insubstantial quantity of material. | |
| 2388 | In Sheet G3 of the contract drawings, the NPS in a note: "The aggregate base course for this project is stockpiled in this general area." | |
| 2389 | Rod Keiscome would expect the contractor to look at the conditions and take it from there and what the documents say. However, if the conditions were buried under snow, the contractor could not do a takeoff on the volume that was there. | |
| 2390 | The contractor was entitled to rely upon the accuracy of the representation in the note on Sheet G3 that all aggregate base material anticipated to be used on this job was, in fact, in a stockpile at the location indicated. | |
| 2391 | The government identified that there was a stockpile of aggregate base material in the contract documents available for the contractor to use to build this project. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2392 | On October 27, 2000, Jack Vance identified attached pictures of stockpiles of aggregate base that could be used on this project. | |
| 2393 | One of the these pictures was used in Addendum No. 1, as "Photo 7," to identify aggregate base stockpiled for use by the contractor. | |
| 2394 | Exhibit 124 is a close-up photograph of the actual stockpile. | |
| 2395 | Rod Keiscome cannot recall if the aggregate base that is shown in the photo was physically present at the site when the snow melted in the spring of 2001, after the NPS had awarded the contract to Remcon. | |
| 2396 | Rod Keiscome believes that he was notified by a representative or representatives of the NPS that the volume that was available for the contractor in the location indicated on the plans was less than represented. | |
| 2397 | Rod Keiscome believes that the government did furnish some of the material that was used as aggregate base on this project as called for on the drawing. However, he can't recall how much was furnished. | |
| 2398 | Joanne Cody does not know that there was aggregate base there to be used. | |
| 2399 | If the aggregate base wasn't there, then that was an error, omission, conflict or inconsistency in the plans. | |
| 2400 | Joanne Cody doesn't know if the aggregate base that was designated in the contract documents to be stockpiled was accessible and available to Remcon to use either at the time the job was bid or at the time that construction began. | |
| 2401 | Willie DeOcampo brought it to Joanne Cody's attention that Remcon contended that no aggregate base had actually been made available. | |
| 2402 | The NPS did take photographs and the photographs are in the drawings of what existed. | |
| 2403 | During the bid phase, the material would not have been observable because of the time of year and the location where the project was located. | |
| 2404 | Rod Keiscome cannot recall if, in issuing his final decision with respect to the aggregate base issue, he used Exhibits 123 and 124. | |
| 2405 | Rod Keiscome believes that Willie DeOcampo is the person at the NPS most knowledgeable about the aggregate base issue. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2406 | It would be reasonable, in Robert Smith's experience in the construction industry, that a contractor receiving this photograph as part of an addendum for this bid document would reasonably anticipate that at least the volume represented in the photograph was in existence that could be used as aggregate base for the project. | |
| 2407 | DHM prepared the note on the left hand side of Sheet G3. | |
| 2408 | From this note, Remcon was informed that there was a quantity of material available for aggregate base creation in quantities sufficient to build the job. | |
| 2409 | Rod Keiscome recalls that the contract documents identified that there was stockpile and available for use by the contractor certain material to be used as base rock. | |
| 2410 | Robert Smith does not know if the material was actually present when Remcon commenced operations. | |
| 2411 | Remcon was entitled to rely upon the accuracy in the representation in the note on Sheet G3 that all aggregate base material anticipated to be used on the job was, in fact, in a stockpile at the location indicated. | |
| 2412 | There was no pre-bid site inspection for this Project because the Denver Service Center perceived that the site was inaccessible and the material would not have been observable. | |
| 2413 | The NPS did not furnish any aggregate base. | |
| 2414 | The aggregate base identified in the note on G-3 did not exist as of the date the contract was entered into. | |
| 2415 | Remcon was unable to confirm the accuracy of the note during the bid process because no pre-bid site inspection occurred due to the fact that bids were solicited in the winter when the site was under snow. | |
| 2416 | Remcon included an amount to furnish aggregate base in its bid. | |
| 2417 | The inclusion of an amount to furnish aggregate base was an error, to Remcon's advantage. | |
| 2418 | If the stockpiles of material were not where the contract documents said they were, the contractor would be entitled to be reimbursed for the extra cost associated with sourcing that material. | |
| 2419 | On August 22, 2001, after the differing site condition on the access road was encountered and notice given to the NPS, Remcon received a quote from Oasis Crushing to crush the rock encountered and required to be blasted on site into aggregate base. This was undertaken by Remcon to reduce the costs to furnish the aggregate base. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2420 | On August 31, 2001, Remcon transmitted the proposal to crush rock to the NPS. | |
| 2421 | On September 4, 2001, Bob Russell forwarded Remcon's crushing proposal to Willie DeOcampo. | |
| 2422 | On October 25, 2001, Oasis Crushing was crushing rock and screening material at the upper parking lot stockpile. | |
| 2423 | In the November, 2002 progress payment, the NPS reduced the amount to be paid Remcon for aggregate base and asphalt concrete work by $114,051.91. | |
| 2424 | The reduction in the progress payment was undertaken without notice, and followed agreement on quantity reached in the field by Remcon and NPS onsite personnel. | |
| 2425 | Section 2725 of the project specifications provides in Part 4 that the contractor will be paid for actual tons of aggregate base placed, verified by weight tickets. | |
| 2426 | Specification section 2725 "Aggregate Base Course" provides, in Part 2.1(A): "Material for aggregate base course shall come from crushing of material…removed from this project and/or stored from previous projects. | |
| 2427 | Through October, 2002, Remcon had placed 9,292.4 tons of aggregate base and this was verified by weight tickets. | |
| 2428 | The NPS reduced the payment to 6,640 tons. | |
| 2429 | No backup documentation was provided to substantiate this reduction in tonnage. | |
| 2430 | The reduction in tonnage was based on a theoretical calculation of the issued for construction contract drawings, and did not take into account any changes to the Upper Sherman Access Road or Upper Sherman parking area from those drawings which required extra aggregate base to be used, including as backfill for changing the road from a crown to a super. | |
| 2431 | Section 2743 of the project specifications provides in Part 4.2 that the contractor will be paid for actual tons of asphalt concrete placed, verified by weight tickets. | |
| 2432 | By letter dated March 17, 2003, Remcon gave notice of a potential claim to Rod Keiscome for failure to provide aggregate base. | |
| 2433 | By letter dated March 25, 2003, Remcon gave notice of a potential claim to Rod Keiscome for aggregate base. | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 2434 | Rod Keiscome can't recall if Willie DeOcampo testified that the aggregate base was not there and that Remcon was entitled to a modification compensating it for having to create or procure the materials. | |
| 2435 | On October 23, 2002, Steve Christensen wrote Mike Giller concerning Garcia paling's claim that Russell Belknap requested a kickback for permitting paving to occur. | |
| 2436 | Through October, 2002, Remcon had placed 5,441.7 tons of asphalt concrete, verified by weight tickets. | |
| 2437 | The NPS reduced the quantity to 4,977 tons, which reduced the payment by $50,744.50. | |
| 2438 | The NPS reduction was based on a theoretical quantity based on the issued for construction contract documents, without regards to any changes to the Upper Sherman Access Road or Upper Sherman parking area. | |
| 2439 | On December 9, 2002, Steve Christensen wrote Rod Keiscome providing a certified notice of claim for the NPS' failure to follow payment terms for aggregate base and asphalt concrete. | |
| 2440 | Willie DeOcampo had no responsibility, as he understood his duties as the COR, when he became aware from his lead inspector of the potential for extra work, to cause anything to be undertaken to investigate whether his lead inspector's communication was accurate. | |
| 2441 | Willie DeOcampo did advise Mr. Keiscome on July 2, 2001 that the centerline had to be relocated. | |
| 2442 | On July 2, 2001, Rod Keiscome got advice that there was a change necessary to the design in order to build the access road. | |
| 2443 | As the Contracting Officer, Rod Keiscome wanted the contractor to build the project in accordance with the design. | |
| 2444 | If the government decides the design has to be changed in order to accomplish the purpose for which the project is authorized to be built, that is an important event that Rod Keiscome, as Contracting Officer, needs to be involved with. | |
| 2445 | Rod Keiscome can't recall what he did with respect to issuing a modification or Contracting Officer's Directive to validate that necessary relocation. He's not sure if Remcon got reimbursed in another line item for this work. | |
| 2446 | Rod Keiscome can't recall what he did to make sure that work was being done in accordance with the necessary change in design. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2447 | Rod Keiscome can't say how far Remcon was pushed into the hill as a result of the centerline being relocated. | |
| 2448 | A July 2, 2001 memo from Willie DeOcampo to Bob Russell says: "The following information was received from Remcon. These offsets reflect the alignment adjustment that you reviewed with Remcon on June 26th." The memo shows offsets ranging from 1 foot up to 11 1/2 feet between Station 8+36 to Station 12+13, which are the same stations reflected in the June 26, 2001 daily log. | |
| 2449 | Joanne Cody never saw Willie DeOcampo's July 2, 2001 memo. | |
| 2450 | Even though Joanne Cody was later given the task to identify what the changes were, it wasn't important for her to discern whether any such changes were communicated to the government. It was up to Willie DeOcampo to discern what the documentation meant. | |
| 2451 | Exhibit 174 is cross-sections of the access road from Station 10+50 to 13+00. Joanne Cody does not know if this was part of the original set of contract drawings. | |
| 2452 | On August 15, 2001, Ray Todd sent an email to Andrea Gregor and Joanne Cody saying, "Rod would like to issue these changes as a contracting officer's directive letter. Attached is a blank CODL [Contracting Officer's Directive Letter] for 200Q." | |
| 2453 | Mr. Todd's August 15, 2001 email also notes, "The contracting officer's directive letter should describe the changes, in this case, the minor field adjustments described below and/or in the field notes, the control point changes, the drawings that were issued, etc. Maybe you should use an addendum format (delete some sheets, add other sheets, etc.). In this case, since the sheets have already been sent to Bob and Remcon, note that they were sent under separate cover. It should also note that we understand Remcon agrees to complete these changes at contract prices and list contract item and quantity adjustments. | |
| 2454 | This was not consistent with how the NPS issued Contracting Officer's directives for revised changes as he understood it in August of 2001. A CO directive would have been written from Rod informing the contractor to perform certain work, and it would be described. | |
| 2455 | Willie DeOcampo was made aware, on or before August 15, 2001, that Mr. Keiscome, as the Contracting Officer, wished to incorporate the changes to the trail, the access road, and the upper parking lot as a modification. | |