| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 2456 | To the extent there needed to be revisions to the design that were thought that had to be accomplished after the 2001 construction season ended, Willie DeOcampo has no idea what prevented the NPS or its designer from doing the redesign during the winter months. | |
| 2457 | Rod Keiscome met with Mr. Christensen twice in Denver during the winter shutdown of '01 to '02. | |
| 2458 | On August 20, 2001, Steve Christensen forwarded to Willie DeOcampo a letter regarding rock excavation and the differing site condition. | |
| 2459 | Mr. DeOcampo did not give the August 20, 2001 letter to Rod Keiscome on or about August 21, 2001, when it was received. Rod Keiscome doesn't recall seeing the letter until the meeting with Steve Christensen in Denver in June of 2002. | |
| 2460 | RFI No. 31, dated October 18, 2001, asked several questions. The responses given by Willie DeOcampo and Joanne Cody were not accurate, and the issue (excess excavation) ultimately led to direction from the CO to raise the parking lot in the upper area by 5 feet. | |
| 2461 | Bob Russell's January 2, 2002 transmittal to Willie DeOcampo indicated that a final decision needed to be made regarding raising the grade for the north side of the upper parking lot to accept 2,000 CY +/- of "Excess Material." | |
| 2462 | On January 29, 2002, Rod Keiscome sent Remcon a letter regarding an upcoming Project meeting in February 2002. | |
| 2463 | The January 29, 2002 letter from Rod Keiscome to Remcon requested that, two weeks prior to the February 2002 meeting, Remcon provide the NPS with all change order requests or requests for equitable adjustments for outstanding issues related to work accomplished to date, a revised schedule for the Project, a list of submittals and a schedule for their submissions, and a list of individuals who would be attending the meeting. | |
| 2464 | The NPS' Park Superintendent communicated, as of May 1, 2002, that it was critical that Rod Keiscome and Willie DeOcampo resolve 5 identified issues prior to the 2002 construction season commencing, and by May 30, 2002 | |
| 2465 | None of the five issues were resolved as communicated until August and September 2002 and February 2003 at the earliest. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2466 | In his email dated May 1, 2002, the NPS' Park Superintendent advised Rod Keiscome and Willie DeOcampo that based on Remcon's then pending claim, that "We are out on quite a limb financially, operationally and public-opinion wise. In other words, we're worried!" | |
| 2467 | On May 18, 2002, Bob Smith of DHM prepared a memo and sent it to Joanne Cody reflecting his thoughts and observations. They included the fact that Remcon did encounter hard rock and that this was a differing site condition; that Rod Keiscome should be so advised and prepared to address this fact for his June, 2002 negotiations with Remcon; that the extra work reported by Remcon for encountering the differing site condition was justified; and that, due to the volume of issues, "Remcon is in the driver's seat on this project." | |
| 2468 | Robert Smith's May 18, 2002 memo to Joanne Cody said that "Remcon is in the drivers seat on this project." He said this because Remcon had experienced a series of extra work items and was in a position to be entitled to receive modifications from the government for performance of a lot of extra work. | |
| 2469 | At the partnering session in May, 2002, Remcon informed Mr. Keiscome that its failure to get timely paid had significantly affected its financial ability to perform the job. | |
| 2470 | Rod Keiscome recalls that, during the May, 2002 partnering session, Remcon had some concerns with cash flow. | |
| 2471 | Part of the response on behalf of the government was that it would issue modifications unilaterally if it was taking too long to get a modification through the process. | |
| 2472 | During the partnering meeting, the commitment by the government was to have the contract modification for excess haul outside of the park completed by Bob Russell as of May 31, 2002. | |
| 2473 | The modification as not issued on that date. It wasn't issued until August, 2002. However, Rod Keiscome would have to look at the modification to say why. | |
| 2474 | During the partnering meeting, one of the issues to be addressed was the redesign of the parking lot and that the drawings were going to be put out to Remcon for pricing within two days. | |
| 2475 | This did not happen but Rod Keiscome isn't sure why. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 2476 | Coming into the partnering meeting in May of 2002, Remcon communicated to Rod Keiscome that there were a number of issues that caused Remcon to be very frustrated with the government's conduct, that what it contended were causing it to incur both extra costs and the inability to get the job going and be built. | |
| 2477 | A very substantive subject of the partnering sessions was that there were many issues outstanding. | |
| 2478 | The partnering session was utilized by Rod Keiscome, on behalf of the government, to allow an opportunity for these comments and issues to be aired and a process to come together whereby the parties could work together to get them done timely and efficiently so as to make them go away. | |
| 2479 | What happened immediately after the partnering session, in Rod Keiscome's experience, is extremely important to show the commitment and dedication, whether it's just words or there was substance behind the words spoken at the partnering session. | |
| 2480 | There were commitments in Exhibit 71, regarding the partnering session, that were not met. | |
| 2481 | Rod Keiscome can't recall what he did immediately after the partnering session in order to get the earthwork, drilling and shooting issues resolved. | |
| 2482 | At the partnering session, the government agreed that the information for the Sherman Tree Trail was going to be done by May 24, 2002. | |
| 2483 | Based upon what was said at the partnering session, Remcon was not able to do any extra work until it received either a Contracting Officer's Directive or a modification. | |
| 2484 | The government may have been restrained from issuing the directive the day after the partnering meeting to raise the Upper Sherman parking area because of a funding issue. | |
| 2485 | Other than whether or not there was adequate money to pay for that work, raising the Upper Sherman area was a cost-savings measure because there was extra money going to be spent, it was a question of how much. | |
| 2486 | Rod Keiscome can't recall what he did during the wintertime in order to figure out what funding would be available to raise the Upper Sherman parking area, since the issue was in existence at the end of the 2001 construction season, or if anything was done. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2487 | There was a pattern and practice that many things that were existence at the end of 2001 were not addressed until after the partnering session six months later. Rod Keiscome doesn't know why this was the case. | |
| 2488 | It distresses Rod Keiscome, as the Contracting Officer, that this job, at the dawn of the second construction season, was being impacted by things that weren't handled over the six preceding months when they could have been. | |
| 2489 | Rod Keiscome would have to look at the facts completely to say if the contractor was at fault for that. | |
| 2490 | The contractor is not at fault that the government did not determine what funding was available to pay for handling the excess material, an issue that was in existence at the end of 2001 and had not been addressed at the dawn of the second construction season. | |
| 2491 | During the partnering session, it was made crystal-clear that the CORs were not going to be issuing redesigns to the project or making adjustments without Rod Keiscome's Contracting Officer's Directive or modifications. | |
| 2492 | Rod Keiscome intended to reinforce that very strongly to his CORs. However, he is not aware as to whether or not his strong communication on that subject was complied with by his CORs. | |
| 2493 | On May 21, 2002, the NPS' project manager advised Rod Keiscome, Willie DeOcampo and Joanne Cody that if the NPS was holding up Remcon, "we better be reducing our liability in a BIG hurry." | |
| 2494 | On May 21, 2002, Joanne Cody forwarded the project manager's email to Bob Smith of DHM. | |
| 2495 | On May 22, 2002, Willie DeOcampo emailed Bob Smith seeking drawings with quantity take-offs for the Upper Sherman parking area to evaluate Remcon's claims for costs associated with the impact from excess material. | |
| 2496 | Rod Keiscome can't recall if the plans for raising the Upper Sherman parking area were prepared, but weren't produced until June 5th and 6th of 2002. | |
| 2497 | As of June of 2002, Rod Keiscome had reached a conclusion in his mind that some compensation was due Remcon for having encountered the rock in the access road during 2001. | |
| 2498 | Rod Keiscome cannot recall why he did not issue a unilateral modification for the work at that time. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2499 | At the June 2002 meeting, Mr. Lewis suggested that Rod Keisome issue a two-part modification, that which he Mr. Keiscome recognized was due, so as to allow the parties to continue negotiations to hopefully find a bilateral concurrence, but to at least issue some amount of compensation in time to Remcon so as to relieve the burdens they were then experiencing. | |
| 2500 | Rod Keiscome has the authority to do this, had he elected to, but didn't do so. | |
| 2501 | Throughout June, 2002, the NPS failed to respond to the RFIs or to provide any direction to Remcon on how to correct the slope problems resulting from earlier deficiencies. | |
| 2502 | On June 21, 2002, Remcon wrote Willie DeOcampo advising him that 18 submittals were pending up to 4 months and were overdue for response. | |
| 2503 | As of June 24, 2002, the NPS had not timely addressed dozens of outstanding RFIs and submittals and Remcon needed then responded to in order to construct the project. | |
| 2504 | On June 24, 2002, Steve Christensen sent Willie DeOcampo and Terry Lang an email, noting that Remcon's records indicate submittals going back to February 7, 2002 which have not yet been returned to Remcon. | |
| 2505 | It also notes that there are a total of 57 RFIs going back to June 7, 2001 and that, of these, 33 have not been answered. | |
| 2506 | Steve ends by indicating that the NPS and Remcon need to address how to get a quicker turn around on these issue so as not to further delay the project. | |
| 2507 | Remcon contended that the absence of RFI responses was impairing its ability to perform certain activities. | |
| 2508 | In response to Remcon's June 21, 2002 and June 24, 2002 communications to Willie DeOcampo, he may have communicated with Mr. Russell along the subject of, "Hey, we've got to get a handle on exactly what's out there, and we've got to devote sufficient time to get responses to the contractor fast." | |
| 2509 | Willie DeOcampo doesn't know if, in response, Bob Russell basically said, "No, I'm not going to devote any substantive attention to this process; I'll get to it when I get to it." | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2510 | In forwarding Mr. Christensen's June 22, 2002 email to Mr. Keiscome, Willie DeOcampo intended to express to him a sense of urgency with respect to the issue. Mr. DeOcampo was trying to get some concurrence from Mr. Keiscome to try and expedite. | |
| 2511 | Willie DeOcampo does not know why Mr. Keiscome issued a contracting officer's directive on June 27, 2002, regarding the Upper Sherman parking lot when the modification was in process to authorize it. | |
| 2512 | It was probably issued because Remcon had identified that it was being delayed and disrupted and was putting the government on notice of that. | |
| 2513 | Also, something may have occurred in the partnering meeting in May of 2002 in which the subject matter of delays and disruptions came up. | |
| 2514 | The revised Sherman Tree Trail drawings are dated August, 2001, yet as of June, 2002, ten months later, Remcon still had not received all of them. | |
| 2515 | In June, 2002, Remcon gave the CO and his representative comprehensive notice of the multiple problems on the Project and their impacts on Remcon's ability to continue with the Project. | |
| 2516 | When no substantive response was forthcoming, Remcon notified the Contracting Officer that work would cease unless circumstances changed quickly. | |
| 2517 | On June 26, 2002, Willie DeOcampo emailed Bob Russell and others that he would draft Modification No. 3 to avoid further delays. | |
| 2518 | Modification No. 3 did not get published for seven additional weeks. | |
| 2519 | Modification No. 3 was for work that was done in 2001. The quantities that were done was a unit price item so it is just a mathematical calculation. | |
| 2520 | On June 26, 2002, Willie DeOcampo directed Bob Russell to draft Modification No. 4 within two weeks. | |
| 2521 | Willie DeOcampo's direction that modifications be prepared and sent out quickly was consistent with Rod Keiscome's direction. | |
| 2522 | Rod Keiscome does not know why, nevertheless, Modification Nos. 3 and 4 were not issued until August and September of 2002. He thinks this is "a good question." He thinks it had more to do with the inability to negotiate these out with Remcon. | |
| 2523 | Modification No. 4 was not published for 11 weeks after June 26, 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 2524 | Rod Keiscome believes that the modifications stand on their own. They were negotiated. For whatever reason, they were delayed in negotiations, and they were bilaterally signed by both parties. | |
| 2525 | Rod Keiscome recalls that, as of June 26, 2002, Remcon had been communicating to him, as Contracting Officer, "we must get paid with respect to performing work on raising the grade of the upper parking lot." | |
| 2526 | On June 28, 2002, Remcon notified the CO in writing of grading conflicts and errors on plans causing delay, disruption and extra costs and requiring immediate attention. | |
| 2527 | On June 28, 2002, Remcon notified the CO that if immediate answers were not provided to clean up conflicts and errors, then it would be forced to cease work. | |
| 2528 | On June 28, 2002, Remcon advised the CO in writing that Bob Russell was not performing his duties and it was adversely affecting the project. | |
| 2529 | On July 8, 2002, Steve Christensen sent Willie DeOcampo a letter regarding unanswered RFIs that were then impacting the project, according to Mr. Christensen, and the completion schedule. | |
| 2530 | Willie DeOcampo received and understood that Mr. Christensen's July 8, 2002 letter communicated that the answers to certain RFIs that had not yet been received were delaying the project. | |
| 2531 | On July 16, 2002, Rod Keiscome promised to pay Remcon in the August 2002 pay cycle for the extra work in raising the Upper Sherman parking area. | |
| 2532 | In reliance upon the July 16, 2002 letter and representations by the Contracting Officer, Remcon performed the extra work. | |
| 2533 | A weekly project meeting was held on July 23, 2002. | |
| 2534 | From the weekly project meeting minutes for the meeting held on July 23, 2002, which Willie DeOcampo received and was part of the meeting, it appears that things were taking a week or weeks to get given to the contractor after Jacobs received the materials on-site. | |
| 2535 | On July 25, 2002, Loren Mangrum noted in his daily report that himself, Russell Belknap, Steve Christensen, Mark Penrose and Mike Kitchell concluded that the Upper Sherman Access Road cross section between Stations 24 and 30 should be super elevated rather than crowned to allow the roadway to fit rock shoulders and operate more successfully. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2536 | On July 25, 2002, Russell Belknap noted in his daily report: "S. Christianson (sic) & Mike Kitchell talked to me re: cuts @ 24 --> 30 access road…then discussed road issue 24 --> 30+00 w/ Kitchell. Discovered that Remcon had made adjustments w/ access road from Sta 1+50 --> 24+00 w/ respect to vertical & horizontal alignments including adding super's. Prior to decision @ 24 --> 30+00, had Kitchell show me the changes. Reviewed changes. Adjustments seem to be reasonable to facilitation (sic) completion of the project. Will need survey to redesign a geometric layout. Allowed Remcon to install super between 24 --> 30+00 to reduce cut along access road." | |
| 2537 | Rod Keiscome did not honor the representation and the payment for this extra work was no made until after Modification No. 4 was issued in September, 2002. | |
| 2538 | By letter dated August 14, 2002, Remcon quoted to Mike Giller its extra costs to perform the extra work set forth on the revised Sherman Tree Trail drawings. | |
| 2539 | This quote was accepted but the modification was not issued for more than three months thereafter. | |
| 2540 | Rod Keiscome isn't sure if, as of August 14, 2002, the trail design was still incomplete. | |
| 2541 | On August 22, 2002, a settlement meeting occurred to address issues on the project up to that time. A conceptual settlement was reached but fell apart when it was attempted to be documented. | |
| 2542 | On August 29, 2002, the NPS issued to Steve Christensen a letter rejecting the entire construction of the Upper Sherman Access Road as it was alleged to be out of alignment due to unilateral changes made by Remcon. | |
| 2543 | The August 29, 2002 letter from Terry Lange demanded that the work be corrected within ten business days upon receipt of the letter. This was not physically possible. | |
| 2544 | Remcon did not make unilateral changes on the Upper Sherman Access Road. | |
| 2545 | It was impossible to comply with the time limits set forth in the August 29, 2002 letter. | |
| 2546 | The factual basis for the August 29, 2002 letter is inconsistent with the facts documented by Russell Belknap, Bob Russell, Loren Mangrum, Mike Giller, Willie DeOcampo, Joanne Cody, and other NPS and design team personnel during 2001 and 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2547 | Willie DeOcampo is surprised by the existence of the August 29, 2002 letter. He believes that the changes were being told to Remcon by various people and the contractor was probably trying to work diligently to complete this project. | |
| 2548 | Willie DeOcampo does not believe that publication of the August 29, 2002 letter was fair. | |
| 2549 | If someone that hadn't touched the project or seen the documents were to go out and evaluate whether Remcon built the job in accordance with the issued-for construction documents, they would conclude that Remcon didn't because the road is in a different location than the design required. | |
| 2550 | Willie DeOcampo recalls that there was a contention asserted by the NPS after Remcon stopped work on the project that Remcon did not build the road as required by the contract documents. | |
| 2551 | When the subject matter came up, Willie believes he may have raised the location where the road was realigned as referenced in Bob Russell's June 26, 2001 daily log and Willie's July 2, 2001 email. | |
| 2552 | Willie DeOcampo, Bob Russell, Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Jack Vance, as well as other members of the design team, knew in 2001 that Remcon was building the road in accordance with the revised alignment drawings issued by the NPS and its designers. | |
| 2553 | This fact was discussed at length multiple times, including at the partnering meeting in May, 2002. | |
| 2554 | Willie DeOcampo does not know why it took more than one year for the government to publish a letter indicating to the contractor that its conduct in complying with all those various changes "has been rejected." | |
| 2555 | Joanne Cody does not recall that the contractor was ever informed by the government that the road was built in the wrong location. | |
| 2556 | Joanne Cody was shown a drawing that was the design that the contractor had shown for that location and there was a poorly engineered curve on it. | |
| 2557 | Mike Giller informed Joanne Cody that there were places where the road was built in the wrong location. | |
| 2558 | Joanne Cody investigated the accuracy of the communication from Mike Giller by doing a walk-through with Bob Smith. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2559 | On that walk-through, Joanne Cody did a comparison of the as-built to as planned or issued-for-construction set of drawings and detemined where there were locations where the road deviated in location or depth or width from where it was originally designed. | |
| 2560 | Joanne Cody did not then go through the entire record that was created during the time the project was being built. Her job was just to identify the differences and give those to Willie DeOcampo. | |
| 2561 | Joanne Cody does not know if anybody evaluated the different construction documents created during the construction phase to discern why there were locations where the road deviated in location or depth of width from where it was originally designed | |
| 2562 | Bob Russell's June 26, 2001 daily log is one example that would explain why in the particular stationing the road may not be in the place it was originally designed. | |
| 2563 | If someone comparing the as-planned to the as-built location did not have Bob Russell's June 25, 2001 daily log, they would not know of at least the communication that is referenced in the document to explain why the road was in a different location. | |
| 2564 | On August 30, 2002, Rod Keiscome sent a letter to Jacobs Engineering Group, Inc. indicating that Loren Mangrum had been designated as Project Supervisor with the responsibility for on-site construction administration of the Project. The letter also outlined the duties and limitations of the Project Supervisor. | |
| 2565 | This letter was sent two months after the departure of Bob Russell and the assumption of his duties by Loren Mangrum. | |
| 2566 | On September 12, 2002, Willie DeOcampo emailed Russell Belknap, Jack Vance, Loren Mangrum, Mike Giller, Terry Lang and Rod Keiscome concerning Terry Lang's August 29, 2002 letter rejecting the roadway. | |
| 2567 | In his email, Willie DeOcampo questioned why the August 29, 2002 letter was issued. | |
| 2568 | Remcon was paid in Modification No. 3, dated August, 2002, $345,209.92 for the excess hauling and time related costs | |
| 2569 | In Modification No. 4, dated September, 2002, Remcon was paid $38,400.00 for hauling excess excavation. | |
| 2570 | The modification to performing raising the Upper Sherman parking area did not get issued until September of 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 2571 | On October 20, 2002, Steve Christensen wrote Mike Giller and Rod Keiscome a detailed letter describing the problems and impacts that the redesign of the Upper Sherman Access Road between Stations 23 and 30 had caused to the project and Remcon. | |
| 2572 | Rod Keiscome received Steve Christensen's October 20, 2002 letter. | |
| 2573 | Rod Keiscome does not believe that he ever issued a modification as a result of impacts of the redesign of the access road as contrasted with just the cost to create the access road. | |
| 2574 | This is the subject matter, in part, of the Remcon certified claim that is the subject matter of this lawsuit, the impacts of the redesign of the access road. | |
| 2575 | On October 20, 2002, Remcon sent to Rod Keiscome and Mike Giller an express reservation of rights for all events since August 22, 2002. | |
| 2576 | It wasn't until November 20, 2002 that the contractor had the obligation to perform modifications to the trail, which design revisions started back in 2001. | |
| 2577 | Rod Keiscome can't recall why it took so long for him to issue the modification for these design revisions. | |
| 2578 | The date of November 20, 2002 was approximately at the very end of the construction season of 2002, if not afterwards. | |
| 2579 | Rod Keiscome does not recall receiving a communication from Mr. Christensen that, as a result of the redesign and resolution of issues committed by the government during the partnering session not occurring when they were promised, that Remcon was on standby mode for the project. | |
| 2580 | Rod Keiscome does recall the government responding that it thought that there was some work that Remcon could do. | |
| 2581 | Other than Modification No. 3 and a portion of Modification No. 4, no modification has ever been issued addressing the excess excavation effort, the balance of the Upper Sherman Access Road rock excavation, the Storm Water Protection Plan claim, or any of the pending Remcon claims. | |
| 2582 | Modification Nos. 3 and 4 were not drafted by Willie DeOcampo during the construction season of 2001 or during the winter of 2001-2002 because he never took it upon himself at that point in time. | |
| 2583 | There was nothing that prevented the NPS from issuing Modification No. 4 in May of 2002. | |
| 2584 | The language of Modification No. 4 was being drafted in July of 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2585 | Modification No. 4 was not finalized by the NPS until September, 2002. | |
| 2586 | Through Modification No. 5, dated November 20, 2002, the contract price increased $795,968.29. | |
| 2587 | Modification Nos. 6 and 7 were issued unilaterally. | |
| 2588 | Modification No. 6 added $84,170 to the contract price. | |
| 2589 | In Modification No. 6, dated February, 2003, Remcon was unilaterally authorized to be paid $84,170 for the Upper Sherman Access Road rock excavation. | |
| 2590 | Modification No. 7 decreased the contract price $2,743,771.14. | |
| 2591 | As of February 2003, Mr. Christensen had communicated to Rod Keiscome that Remcon's working capital had been depleted and it lacked the funds to go back to work until it was compensated for the differing site condition issue at a minimum. | |
| 2592 | Remcon prepared notes for Sequoia Project meetings to address project administration problems. | |
| 2593 | The NPS did not issue payment for Modification No. 6 prior to the time Remcon was terminated because of an administrative oversight. | |
| 2594 | Remcon wasn't paid for Modification No. 6. | |
| 2595 | Rod Keiscome's representatives communicated to Remcon that the center line of the access road had to be relocated. | |
| 2596 | Rod Keiscome can't recall if his representatives failed to advise him that they had made such a communication to the contractor. | |
| 2597 | The only unilateral modification issued was Modification No. 6. Anything else issued would have been by directive. | |
| 2598 | A directive only says to go ahead and do the work. It doesn't get the contractor paid, unless if the contractor got paid through another line item. | |
| 2599 | Rod Keiscome is not aware of any payment to Remcon for the differing site condition scope of work earlier than the issuance of Modification No. 6. | |
| 2600 | Lots of excess material had to be handled concerning the additional excavation that was encountered on this project and there was a determination by the government that it wanted to spread some of it in the Upper Sherman parking area. | |
| 2601 | Rod Keiscome can't recall why it took the government over two months from Remcon's request to issue the formal modification to raise the upper parking area when he knew that this project was weather sensitive. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2602 | Joanne Cody expected that the design team would handle the issue of what material would be used to fill the hole that the burn pit unsuitable material was in. She was the COR. They were the technical. | |
| 2603 | Joanne Cody didn't do anything as far as her QA role to make sure that they had adequately covered that subject. | |
| 2604 | Rod Keiscome believes that he did issue at least one progress application on this project that deducted money from Remcon that had already been paid after Remcon last performed work on the project but to remember why, he would have to look at the pay estimates | |
| 2605 | Prior to issuing any such pay estimates, Mr. Keiscome was informed by someone from the NPS that Remcon had not constructed the road in accordance with the plans. | |
| 2606 | Rod Keiscome can't recall if he had the content of Exhibit 180 before him when such a decision was made by him to deduct money from Remcon in any pay estimate. | |
| 2607 | If it was demonstrated to Rod Keiscome that the access road was built in accordance with the dimensions set forth on Exhibit 180 and he withheld money without knowing that Exhibit 180 was in existence, this would not necessarily mean that the withholding that he issued needs to be evaluated. | |
| 2608 | However, this would be something that Rod Keiscome would want to look into in order to confirm that what he previously did was what he should have done. | |
| 2609 | Mr. DeOcampo did not tell Joanne Cody and she never asked, in response to either the Martin and Martin realignment drawings for the access road or her creation of revised drawings to miss an existing tree, that it had not time or monetary impact. | |
| 2610 | Despite the authority limitations set forth in deposition Exhibit 265, Joanne Cody did not inquire as to the time or money impacts of the changes to the access road because she did not do any of these things. It was Willie that made the changes and decided what to do. If Willie issued them to the contractor and told the contractor to make the changes, then that as between Willie, the contractor, and the Contracting Officer. | |
| 2611 | The Remcon project was one of several ongoing or planned NPS construction projects in the park. | |
| 2612 | The total amount appropriated for all of the SEKI projects was $24,464,000 gross, with $19,232,000 net for actual construction. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2613 | The standard budgeted construction contingency to pay for all modifications at any particular time for the Denver Service Center is 10 percent and that would come from management. | |
| 2614 | There were several projects in the 1990s and early 2000s for Sequoia Kings Canyon. Each one had an identified budget for base contract and contingency. | |
| 2615 | As a Contracting Officer, Rod Keiscome was not concerned with where the money comes from, only that he can get the money. Where the money comes from is something from the project management side. | |
| 2616 | As a Contracting Officer, Rod Keiscome had to make sure that if he issued a modification that he had money available for it. | |
| 2617 | Rod Keiscome can't recall if, on this project, he was concerned at any time that there was inadequate funding for changes that either were then existing or were projected may occur. | |
| 2618 | The initial funding for this project was $7,087,000 for construction and $709,000 for contingency. | |
| 2619 | When the contract was initially awarded to Remcon, it was awarded in the amount of $7,121,636. | |
| 2620 | Rod Keiscome does not know why, when the contract was awarded, the contingency had been reduced by approximately $353,000. | |
| 2621 | In order to say what portion of the 10 percent contingency was left undisbursed and uncommitted as of August, 2001, Rod Keiscome would have to look at the modifications. | |
| 2622 | Modification No. 1 added $317,850 to the base contract for Options 1, 2 and 4 as set forth in the original solicitation. Rod Keiscome can't tell from looking at Modification No. 1 if these funds came from contingency. | |
| 2623 | Modification No. 2 was issued in January, 2002, and added a net amount of $11,000 to the contract. | |
| 2624 | Modification No. 3 was not signed by Mr. Christensen until August 20, 2002. | |
| 2625 | Rod Keiscome, as the Contracting Officer, had the authority to issue a modification to Remcon for any amount he believed Remcon was entitled to. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2626 | Augmentation of project funding would come if there is a meeting of the minds of the parties for modifications that they have negotiated. It doesn't even have to be on a request for additional funding because there is communications with the Pacific West Region by the project manager. | |
| 2627 | Funding, whether it is in the contingency or not, has to go through a purchase request which is an electronic format initiated by the project manager, goes to budget, comes to the Contracting Officer, Contracting Officer pushes the buttons, goes on the contract specialist, and negotiations take place. | |
| 2628 | Once Rod Keiscome determined, as the Contracting Officer, money should be funded to the contractor, it was his responsibility to timely issue that modification. | |
| 2629 | If Rod Keiscome couldn't reach an accord swiftly with the contractor, it was his responsibility to issue a modification unilaterally and cause the contractor to be paid swiftly thereafter. | |
| 2630 | On August 29, 2002, Mike Giller sent Rod Keiscome an email indicating that all fund requests are in and then listing four different fund requests. | |
| 2631 | Rod Keiscome does not know if, as of August 29, 2002, there was money available from 200N, O, or P available to be used to fund a change order in 200Q. | |
| 2632 | Projects 200N, O, P, Q, and R are within Rod Keiscome's region and all occurred during the fiscal years in which he was Contracting Officer for the Pacific West Region. | |
| 2633 | At that point in time, only Modification Nos. 1 and 2 had been issued to Remcon up to that point in time. | |
| 2634 | Had Rod Keiscome determined, as the Contracting Officer, that Remcon was entitled to $600,000 as a result of encountering a differing site condition, he had the authority to issue such a modification without regard to what the contingency or budget was. There could be absolutely no money shown but he would proceed with the modification and try to obtain the money from some source. | |
| 2635 | Included among the four items set forth in Modification No. 4 is Bid Item No. 139, which is raising the finished grade of the Upper Sherman parking lot for a total increase of $43,816 for the actual physical work. This is what Mr. Giller is referring to in his August 29, 2002 email. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2636 | The second item in Mr. Giller's August 29, 2002 email refers to Modification No. 5 of 200Q, regarding the trail, for $27,000. | |
| 2637 | Bid Item No. 140, for adjusting the Sherman Tree Trail, on Modification No. 5 is a different value in that the Modification is for $35,972 while the fund request was for $27,000. | |
| 2638 | The third item in Mr. Giller's August 29, 2002 email regards Modification No. 6, entitled differing site condition for rock, for $485,000. | |
| 2639 | The $485,000 number came from prior attempts at settling with Mr. Christensen with respect to the "quagmire of--of different issues that [the NPS] had addressed." | |
| 2640 | The $485,000, from the NPS' point of view, wasn't just for differing site-rock, as indicated in the request. It was intended on the NPS' behalf to compensate Remcon for a myriad of issues including the differing site condition regarding rock. | |
| 2641 | Rod Keiscome can't recall what other item or items were included in the $485,000, other than the differing site condition. | |
| 2642 | The $485,000 was for direct and indirect costs. | |
| 2643 | Remcon's position had come down to about $487,000 during the prior negotiations for the differing site conditions and other issues. | |
| 2644 | Rod Keiscome can't recall if the $485,000 included time extensions. | |
| 2645 | As of August 29, 2002, Rod Keiscome still questioned whether Remcon had encountered a differing site condition. | |
| 2646 | This amount was ultimately reduced by the NPS to $84,000 in Modification No. 6. | |
| 2647 | The compensation for the differing site condition was reduced because the NPS believed that Remcon had been reimbursed for everything but what was shown in Modification No. 6. | |
| 2648 | $24 1/2 million was appropriated for projects 200N through 200R. The total contingency for all of these projects was $2 million. | |
| 2649 | Other than Modification No. 6, which exclusively concerns the differing site condition, there were no modifications issued for the subjects contained in the $485,000 because the settlement between the NPS and Remcon did not come to fruition. | |
| 2650 | Rod Keiscome can't recall what documentation exists to substantiate the calculation that leads to $485,000. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2651 | As of August 29, 2002, the total net contingencies for all SEKI projects was $2,043,000, but $1,540,017 had already been allocated to date for other contingencies on this and other SEKI projects, leaving $502,000 unspent. | |
| 2652 | Rod Keiscome doesn't know how much contingency was left for all SEKI projects as of August 29, 2002. | |
| 2653 | As of August 29, 2002, only $502,985 of unallocated contingency funds existed for all SEKI projects. | |
| 2654 | As of August 29, 2002, Modification Nos. 4, 5 and 6 had not been issued. | |
| 2655 | As of August 29, 2002, the NPS elected to use $95,121 of the remaining unallocated balance of $502,985 to fund Modification No. 4. | |
| 2656 | This reduced the remaining unallocated balance to be $407,864 for all SEKI projects. | |
| 2657 | Modification No. 5 added $26,880 and Modification No. 6 added $84,170, for a total of $111,050. | |
| 2658 | This reduced the remaining unallocated balance to be $296,814 as of February, 2003. | |
| 2659 | As of February, 2003, Remcon's pending claims exceeded $1 million. | |
| 2660 | The NPS, as of May, 2002, lacked sufficient funding to pay for Remcon's pending claims arising out of year one's construction work. | |
| 2661 | The remaining allocated funds available to be used to pay for modifications for this project never got augmented after May 1, 2002. | |
| 2662 | The NPS, on August 22, 2002, agreed through negotiations to pay Remcon over $484,000 to pay for pending claims to the project. | |
| 2663 | A meeting of the minds as to which claims were to be compensated by the $484,000 negotiated amount never materialized. | |
| 2664 | Remcon believed the $484,000 related only to the Upper Sherman Access Road differing site conditions claim. | |
| 2665 | The NPS believed the $484,000 related to all pending claims then unresolved following the issuance of Modification No. 3. | |
| 2666 | As of August 22, 2002, the NPS had left as remaining allocated funds only $502,985 and this was to be used, as necessary, for all SEKI project and not this one exclusively. | |
| 2667 | The project lacked sufficient contingency funding to pay for excess costs. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2668 | When Robert Smith received the subpoena for this matter, the first thing he did was call Mike Giller, the NPS' project manager. He called Mike Giller instead of Joanne Cody because Mike Giller had contacted him earlier regarding the original files and he knew that Mike Giller had all of the original files. | |
| 2669 | Mike Giller told Robert Smith that the NPS would review DHM's files and determine which documents would be discoverable at that point. | |
| 2670 | Mike Giller told Robert Smith not to produce anything in response to the subpoena until he got back to Mr. Smith regarding what the NPS determined to be discoverable. Mr. Smith did not consult anyone, including private counsel, as to the propriety of that direction but nevertheless agreed to honor Mr. Giller's direction. | |
| 2671 | On September 20, 2004, Mike Giller sent a letter to Robert Smith at DHM. Mr. Smith relied upon this letter in not furnishing in response to the subpoena 100 percent of the documents he possessed. | |
| 2672 | As a result of the September 20, 2004 letter from Mike Giller, Robert Smith delivered to the NPS original documents for which he also kept a copy. The NPS then gave Mr. Smith back certain portions of the original documents which Mr. Smith was then authorized by the NPS to cause to have copied in response to the subpoena. | |
| 2673 | At the time that Robert Smith produced the documents in response to the subpoena, he did not disclose, orally or in writing, to Mr. Schoenfeld's office, or any representative of his office, that the data that was given to the copy service to copy was less than the entire amount of documents that he possessed relative to the Project. | |
| 2674 | Robert Smith's original response to the subpoena took place in September and October of 2004. | |
| 2675 | When Robert Smith received the subpoena for this matter, he did not cause a copy of the documents he possessed to be made and delivered to Mr. Schoenfeld's office immediately. Robert Smith asserts that this was because the NPS reviewed his files and determined what he should be giving as part of that subpoena. | |
| 2676 | Mike Giller directed DHM not to produce certain records. | |
| 2677 | The government interfered with, and attempted to improperly suppress, the production of project records. | |
| 2678 | The direction by Mike Giller was undisclosed to Remcon. | |
| 2679 | The direction by Mike Giller was improper. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2680 | Robert Smith believes, as a result of the communications with Mr. Schoenfeld's office, that, perhaps, the instructions he received from Mr. Giller were not the right instructions, insofar as Mr. Smith felt that he had a responsibility to give Remcon's counsel everything. | |
| 2681 | Specification Section 2831, in Part 4.1, provides that the stone materials to be used to construct boulder revetment shall be produced from park stockpiles. | |
| 2682 | Specification Section 2831 permitted Remcon to not include in its contract price the cost to create stone, but rather to expect to have it in a stockpile available to be accessed. | |
| 2683 | Based on Specification Section 2831, it was reasonable for a contractor to assume at the time it bid the job that the NPS had stockpiled all of the stone necessary for the required boulder revetment on this project. | |
| 2684 | Specification Section 2831 indicated that there were stockpiles available to be accessed. | |
| 2685 | The NPS was required by contract to furnish all stones to be used for rock revetment. | |
| 2686 | Remcon planned to use park stockpiles for boulder revetment. | |
| 2687 | Willie DeOcampo does not know whether those stockpiles ever existed once Remcon got to the site as the contractor. | |
| 2688 | Willie DeOcampo does not know how much cubic yardage was furnished by the NPS to Remcon to use for boulder rock revetment. | |
| 2689 | There were no stone stockpiles for boulder revetment as represented in Specification Section 2841, Part 4.1. | |
| 2690 | The NPS did not furnish virtually any stones for rock revetment. | |
| 2691 | Rod Keiscome can't recall if the government furnished from stockpiles in the park the material to be used for boulder revetment as required by Part 4.1 of Specification Section 2831. | |
| 2692 | Rod Keiscome doesn't have any first hand knowledge as to whether the represented stockpiles did not exist, could not be confirmed during bid time, and this false representation was unable to be discovered prior to bid submission and he can't recall what he did, as Contracting Officer, to investigate whether this was a true statement or not. | |
| 2693 | An investigation into this issue will undoubtedly be forthcoming as the NPS deals with the surety. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2694 | If the stockpiles were not supplied, Rod Keiscome would have to see what the facts are and go from there to determine if Remcon was entitled to reimbursement for having to procure the boulder revetment stones. | |
| 2695 | Rod Keiscome can't recall if he ever issued a Contracting Officer's Final Decision on Remcon's claim for boulder revetment. | |
| 2696 | The stone used for boulder revetment by Remcon had to be found or manufactured. | |
| 2697 | The costs incurred by Remcon to procure the stone for boulder revetment were not included in Remcon's bid. | |
| 2698 | If those stockpiles were not in actual existence at the time the contractor was authorized to proceed with the work, that would be extra work for the contractor to be reimbursed. | |
| 2699 | If the government was identified in the contract documents as having stockpiled the materials that the contractor could use for rock revetment, the contractor would have had to have included within its contract price prudently the cost to access and then transport and place that material. | |
| 2700 | Willie DeOcampo believes there were some boulders up at Wolverton, to his recollection. | |
| 2701 | Willie DeOcampo does not know whether, in approximately May of 2001, there were stockpiles from which Remcon could access material to be used for boulder revetment. | |
| 2702 | On August 1, 2002, Loren Mangrum wrote Remcon that detailed record of lineal footage of rock revetment placed needed to be maintained. | |
| 2703 | On September 24, 2002, Russell Belknap wrote Remcon that the rock revetment placed on the Upper Sherman Access Road between Stations 1 and 24 was acceptable. | |
| 2704 | In the November, 2002 progress payment draw, the NPS reduced Remcon's payment by $15,114.50 by deducting quantities to be paid for boulder revetment. | |
| 2705 | The NPS' advised quantity was less than the quantity agreed to by Luke Triplett of Remcon and Loren Mangrum in the field. | |
| 2706 | The reduction in quantity occurred without prior notice or substantiation to Remcon. | |
| 2707 | On December 7, 2002, Steve Christensen wrote to Rod Keiscome providing a certified notice of claim for boulder revetment work. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2708 | On December 7, 2002, Steve Christensen wrote Rod Keiscome providing notice of Remcon's claim for the NPS' failure to provide the rock to be used for boulder revetment. | |
| 2709 | Willie DeOcampo does not know if he ever saw Mr. Christensen's December 7, 2002 letter. | |
| 2710 | In terms of investigating a differing site condition on this project, Joanne Cody recalls making a summary of rock that was on site, which may have related to a differing site condition because the contractor said the amount of rock that they were supposed to have was not there. This included dry-laid stone wall and rock revetment. | |
| 2711 | On November 19, 2002, Steve Christensen wrote Rod Keiscome providing notice that the NPS was untimely paying Remcon and improperly modifying the project protocol established at the beginning and affirmed at the partnering meeting for agreeing on quantity of work performed monthly. | |
| 2712 | On November 25, 2002, Steve Christensen wrote Rod Keiscome about the continuing late payment being a breach of statute. | |
| 2713 | On December 4, 2002, Steve Christensen wrote Rod Keiscome about the continuing failure to timely and promptly be paid, along with objection to the reduction in quantities and payment, and that this caused economic damages. | |
| 2714 | The prompt payment requirements applicable to the contract were set forth at Paragraph I 87 of the contract documents, at pages 88 and 89. | |
| 2715 | On December 6, 2002, Rod Keiscome responded to Remcon's November 19, November 25, and December 4, 2002 letters. | |
| 2716 | On December 18, 2002, Steve Christensen responded to Rod Keiscome's December 6, 2002 letter. | |
| 2717 | On June 30, 2003, Steve Christensen wrote Rod Keiscome objecting to multiple items raised in Rod Keiscome's April 14, 2003 letter concerning quantity corrections. | |
| 2718 | WSC, a subcontractor to Remcon, never pulled off the project due to alleged nonpayment. | |
| 2719 | Remcon signed payment certifications and furnished them to the NPS representing that its subcontractors and suppliers were issued payments received under the contract. | |
| 2720 | These certifications were not universally true. | |
| 2721 | Some subcontractors and suppliers' payments were not made due to lack of insurance certificates and/or signed subcontracts. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2722 | Other subcontractors and suppliers were not paid due to lack of resources to pay them by Remcon. | |
| 2723 | When Remcon was short cash, it was after the performance of the differing site condition and other extra work which has never been paid to Remcon. | |
| 2724 | When faced with the dilemma of who to pay, Remcon elected to pay all of the workers and payroll taxes. | |
| 2725 | The NPS repeatedly paid Remcon untimely on this project. | |
| 2726 | The NPS recognizes four late progress payments. | |
| 2727 | The actual amount of the late progress payments is $2,802,337.24. | |
| 2728 | Without accounting for profit and overhead (17.4%) on costs incurred versus payments received basis, Remcon spent $1,339,887.75 more than it received from the NPS on this project from May, 2001 through December, 2002. | |
| 2729 | At the end of 2001, the difference in costs incurred versus payments received was $624,425.69. | |
| 2730 | This amount increased over $700,000 as a result of year 2002 activity. | |
| 2731 | The specification for dry laid stone wall is 4403. | |
| 2732 | Loren Mangrum reports on July 19, 2002 that the dry laid stone wall was not installed in the location called for in the plans. | |
| 2733 | On July 23, 2002, Russell Belknap noted in his daily report that the dry laid stone wall conflicted with two trees and that trees would have to be removed. | |
| 2734 | On July 23, 2002, Russell Belknap noted that he was adjusting the dry laid stone wall to fit the higher slopes. | |
| 2735 | On September 5, 2002, Loren Mangrum wrote Joanne Cody and Mike Giller that there was physical interference between Stations 36 and 48 in the Upper Sherman Access Road with trees affecting parking lot layout. | |
| 2736 | Jack Vance and Loren Mangrum confirmed in a site walk that there was a physical interference with trees. | |
| 2737 | This is the same area where the dry laid stone wall was affected by trees. | |
| 2738 | On September 5, 2002, Jack Vance wrote Loren Mangrum, Joanne Cody, and Mike Giller advising of the same problem and stated that a surveyor was needed to check out if control points in the drawings were inaccurate. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2739 | No surveyor was bought on site by the NPS despite problem identification. | |
| 2740 | On December 4, 2002, Steve Christensen provided Rod Keiscome with a certified notice of claim regarding dry-laid stone wall. | |
| 2741 | The dry laid stone wall was relocated from where the construction of the wall commenced. | |
| 2742 | The reason was that a tree, not shown on the plans, interfered with the planned wall. | |
| 2743 | The NPS did not want to remove the tree that interfered with the dry-laid stone wall. | |
| 2744 | Jack Vance and Russell Belknap inspected the conflict and directed that the wall be relocated to not conflict with the tree. | |
| 2745 | Remcon complied with this directive. | |
| 2746 | Additional wall footage, beyond the design dimensions, resulted. | |
| 2747 | NPS paid Remcon in progress payments for all work performed for the base contract and additional wall footage. | |
| 2748 | The NPS, in late 2002, later rescinded some of the payments and without discussion or notice reduced the pay item by $39,560. | |
| 2749 | The dry laid stone wall was off by 4 feet due to trees in the way. | |
| 2750 | The dry laid stone wall was shifted as a result of natural features found to be in the way. | |
| 2751 | In terms of investigating a differing site condition on this project, Joanne Cody recalls making a summary of rock that was on site, which may have related to a differing site condition because the contractor said the amount of rock that they were supposed to have was not there. This included dry-laid stone wall and rock revetment. | |
| 2752 | There were a series of realignments, adjustments, changes, revisions, etc. to various portions of the access road, the parking lot, and the trail, all occurring in the month of July of 2001. | |
| 2753 | These changes had a ripple effect in August 2001. The road realignment pushed the road into the hill, requiring extra excavation to be handled, and ultimately a differing site condition to be encountered. Instead of one hole, 2,000 cubic yards large to be filled, the parking area had two holes, one approximately 500 cubic yards (unknown) and the other exceeding 7,000 cubic yards. The trail was the subject of multiple changes on trail point elevations and revised drawings. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2754 | All of these changes, which occur in a relatively confined site, meant that the contractor's ability to productively work was impacted. | |
| 2755 | As of August 2001, there were changes made by the NPS to the trail design. | |
| 2756 | As of August 2001, the burn pit excavation had gone from 2,000 to 7,000 yards, and it required backfilling the hole left behind. | |
| 2757 | There were a series of trees and rock and boulders that couldn't be touched and had to be reevaluated each step of the way by the NPS. | |
| 2758 | As of August 2001, the NPS was making changes to the road alignment that were not even being disclosed timely, or at all. | |
| 2759 | As of August 2001, Remcon was encountering what DHM, based on its knowledge and experience, and Martin and Martin, based on its civil engineering knowledge and experience, believe are differing site conditions in the same area where all of these other things were happening. | |
| 2760 | Remcon couldn't work on the Lower Sherman until the Upper was done. | |
| 2761 | All three bullet items contained under the heading Potential Change Orders in Bob Russell's August 8, 2001 weekly field report deal with subsurface conditions either not indicated on the contract documents or being encountered in a manner that was different than indicated. However, Willie DeOcampo doesn't know if any of these three items caused delay or disruption to Remcon's work because neither he, nor anyone to his knowledge, ever analyzed this issue. | |
| 2762 | Robert Smith understands how Remcon would have had an issue with the limited work area to productively perform work while these series of design changes and differing site conditions and excess quantities were being encountered. | |
| 2763 | On April 3, 2002, Steven Christensen wrote a letter to Willie DeOcampo explaining how each of the NPS' requests for additional information on Remcon's claims had already been fulfilled through Remcon's prior claims and transmittals. | |
| 2764 | On April 22, 2002, Mark Penrose submitted to Willie DeOcampo Remcon's updated Request for Equitable Adjustment ("REA") for earthwork impacts and issues during the 2001 construction season. | |
| 2765 | The amount claimed was $333,308.09, plus overhead and profit. | |
| 2766 | The NPS never responded in writing to all of these claims, except to reject the form used to submit the REA on July 8, 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2767 | In June, 2002, Rod Keiscome orally offered Remcon $59,000 to settle the REA. | |
| 2768 | On April 15, 2002, the NPS published a status report of contract issues for this project. | |
| 2769 | Five items were listed as pending issues claimed by Remcon from its pending Request for Equitable Adjustment ("REA") | |
| 2770 | The five items listed were: (1) Excavation and loading, $222,377.44; (2) Haul excess excavation, $35,736.00; (3) Rock excavation (differing site condition), $355,483.05; (4) Haul miscellaneous material from park, $381,000.00; (and 5) Storm water pollution protection (differing site condition), $70,051.54. | |
| 2771 | These REA claims issues totaled more than $1,064,000. | |
| 2772 | At that time, the NPS recognized approximately $400,000 (for hauling miscellaneous material) was valid. | |
| 2773 | At that time, the NPS contended that no excess excavation occurred "because the excavation quantity (cut) has not changed from the contract documents." Item #1, for $222,000 was recommended as being denied. | |
| 2774 | At that time, the NPS recommended that an additional 6,000 cubic yards be paid for Item 2, thus finding the claim meritorious. | |
| 2775 | At that time, the NPS contended that because the contractor did not demonstrate lack of rippability with a D8 Dozer, the differing site condition claim for $355,000 should be denied, with the possible exception that 50% of the blasting costs, not exceeding $60,000 may be recognized. | |
| 2776 | At that time, the differing site condition claims for storm water plan was recommended to be denied. | |
| 2777 | On May 1, 2002, the NPS' Sequoia Park Superintendent emailed to Rod Keiscome, and others, his concerns following the first year of construction after he received and read the April 25, 2002 contract status report. | |
| 2778 | As of May 1, 2002, the NPS' Sequoia Park Superintendent communicated that he had been advised that Remcon created most of the problems that he was concerned about. | |
| 2779 | The concerns he expressed were valued at more than $1 million by him. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2780 | The Superintendent of the Park, as of May 1, 2002, believed that Remcon was responsible for Items 1, 2, 3 and 5 of the NPS' April 25, 2002 contract status memo. | |
| 2781 | Remcon was not responsible for the excess excavation identified in claim issue No. 1. | |
| 2782 | The NPS has subsequently acknowledged in testimony and Modification Nos. 3, 4 and 6, that excess excavation did occur and was not the responsibility of Remcon. | |
| 2783 | By contract, the defense to the differing site condition claim, that Remcon had to demonstrate the lack of rock rippability, does not exist. | |
| 2784 | The explanation provided as the defense of the differing site conditions claim for blasting was subsequently determined by the NPS to lack merit. | |
| 2785 | The facts represented by the NPS in response to claim issue Nos. 1 and 3 in the April 25, 2002 contract status report were inaccurate. | |
| 2786 | The NPS' Park Superintendent communicated, as of May 1, 2002, that it was critical that Rod Keiscome and Willie DeOcampo resolve all of these 5 issues prior to the 2002 construction season commencing, and by May 30, 2002. They were not timely resolved. | |
| 2787 | A partnering meeting occurred on May 16, 2002 in an attempt to ferret out issues affecting the project. | |
| 2788 | Robert Smith's May 18, 2002 memo to Joanne Cody said that "Remcon is in the drivers seat on this project." He said this because Remcon had experienced a series of extra work items and was in a position to be entitled to receive modifications from the government for performance of a lot of extra work. | |
| 2789 | Robert Smith doesn't know if any of these modifications were ever issued. | |
| 2790 | On May 20, 2002, Steve Christensen sent an email to Willie DeOcampo indicating that, "As a result of the pending plan changes, issues regarding the Generals Highway, and unresolved contract issues, Remcon is being prevented from productively starting any work...I'm deeply concerned, after hearing the process involved in obtaining additional funds, issuance of contract modifications and change orders that the project's completion date will be severely impacted and costs to the government will surely rise. Remcon will continue to work with you on these matters as long as it doesn't require an additional cost impact to Remcon." | |

| **Number** | **Fact** | **Stipulated to by the Government Y/N?** |
|---|---|---|
| 2791 | On May 20, 2002, Steve Christensen sent Willie DeOcampo a letter expressing his concern that the issues regarding the Upper Sherman Parking Area, the Sherman Tree Trail and the Generals Highway were not being resolved in a timely manner and could take up to a month. Steve then notified Willie that these delays would impact Remcon's ability to meet its proposed construction schedule and would surely delay the project completion date. Steve also noted that, as of the date of the letter, the only work which Remcon could effectively start was its subcontract work on the Upper Sherman Comfort Station. Steve ended by formally notifying the NPS of Remcon's request for additional compensation as it related to extended overhad and contract extension days until such time as the outlined issues had been rectified and Remcon could proceed with their work. The letter also enclosed an outline of Remcon's extended daily overhead rates. | |
| 2792 | Later on May 21, 2002, Willie DeOcampo forwarded Steve Christensen's May 20 email to Rod Keiscome, Terry Lang, Joanne Cody, Larry Walling, Ray Todd, and Jack Vance. In the email, Willie indicated that "I am forwarding this message I received this morning to all since this will impact cost on this project. We have set up a meeting with the A/E Designers to try to resolve some over-run quantities...We should discuss this problem also since I need to respond to Remcon concerning this message. | |
| 2793 | On May 21, 2002, Larry Walling sent an email to Willie DeOcampo saying, "If we are holding them up, we better be reducing our liability in a BIG hurry." | |
| 2794 | On May 21, 2002, Jack Vance forwarded Willie DeOcampo's May 21, 2002 email to Bob Russell saying "The impact game continues…How can he be delayed when he isn't approved to start yet?...." | |
| 2795 | Willie DeOcampo doesn't know what, if anything, the NPS did to reduce its liability. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2796 | On May 22, 2002, Steve Christensen sent Willie DeOcampo an email regarding the project noted that the NPS' desire to see work proceeding in the Sherman Tree Project is no greater than Remcon's and that if the NPS wants Remcon to fully mobilize to the project and start the limited amount of productive work available, it can do so. However, Steve asked for an agreement that once Remcon ran out of productive work, it would be fully compensated for the stand-by costs for men and equipment. Steve also stressed that without a proper avenue for payment, Remcon cannot proceed. | |
| 2797 | On May 24, 2002, Rod Keiscome sent an email to Steve Christensen indicating that he concurs that Remcon needs direction with some issues. | |
| 2798 | On May 24, 2002, Rod Keiscome sent Steve Christensen an email regarding an upcoming negotiation meeting between the NPS and Remcon. The email indicates that the meeting would take place on June 12, 2002. Mr. Keiscome opines that it is vital that Remcon and the NPS plan on mitigating the major issues together as a group and then, if necessary, shift to a small group. Mr. Keiscome also suggests that Steve provide Remcon's position paper to the NPS in advance of the meeting. | |
| 2799 | On May 29, 2002, Willie DeOcampo sent Steve Christensen a letter indicating that he disagrees with Steve's assessment for stand-by delays because, in his opinion, Remcon still has contractual work which is not being impacted. Willie then outlined the work he felt could be performed. Willie also noted that Remcon should have received the revised drawings for the Upper Parking Lot and Sherman Tree Trail the day before and that most of the excess cut could be used to raise the parking lot. Willie ended by saying that the NPS believes that once it receives and negotiates the changes for the upper lot and trail, the Upper Sherman area should be ready for completion without any further impacts. | |
| 2800 | Willie DeOcampo doesn't think that the issues that were pending as of May 20th and 21st, 2002 were ever resolved, based upon what he has seen, other than the unilateral modification. | |
| 2801 | On May 31, 2002, Remcon performed work on the Upper Comfort Station. | |
| 2802 | On June 3, 2002, Remcon continued work on the Upper Comfort Station. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2803 | On June 4, 2002, Remcon continued work on the Upper Comfort Station. | |
| 2804 | On June 5, 2002, Remcon continued work on the Upper Comfort Station. | |
| 2805 | On June 6, 2002, Remcon continued excavation for CM pipe and drop inlets in the access road, continued to place drop inlets, continued to excavate for lines from the septic tank and dosing tank, began installation of stone headwall on the east end of the culvert at the access road/Wolverton Road intersection, and continued rock excavation of drain pipe from drop inlet at Station 5+31, and other work. | |
| 2806 | On June 8, 2002, Steve Christensen sent a letter to Willie DeOcampo which stated "...the revised completion date is now October 7, 2003." This letter detailed how NPS caused delays had pushed the anticipated completion date well past August 2003. | |
| 2807 | On June 17, 2002, Remcon continued working on the storm drain system and continued digging, laying and backfilling sewer pipe between the dosing tank and leach field. | |
| 2808 | On June 18, 2002, Rod Keiscome sent Steve Christensen an email in response to Remcon's briefing paper on Remcon's claim. It stated that the NPS had the following difficulties in developing a legitimate price for work: no original project schedule, resource loaded, showing critical path; spot checks of contractor's records indicates duplications in labor and equipment; spot checks of contractor's records indicates excess charges; no deduction for equipment used over 8 hours per day in contractor's offer; cannot make Remcon well for bad assumptions and poor bidding; no evidence that quantities of excess material are different than what was bid; no evidence that government actions increased the amount of SWPPP work required; impacts from blasting on other items of work are not well supported. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2809 | On June 19, 2002, Steve Christensen sent Rod Keiscome an email stating that, rather than Bob Russell entering into a reasonable and fair negotiation with Remcon's on-site personnel for raising the parking area, he prepared a cost estimate and stated the amount of money he was willing to pay for the work. Mr. Christensen stressed that this is not a method of fair negotiation and that it is unfair to Remcon to be bound by the decisions of Bob Russell without following established protocol. Mr. Christensen ended the email me asking for a conference call with Rod Keiscome to try to resolve the issue. | |
| 2810 | On June 28, 2002, Remcon continued working on the drop inlets, restaked the access road slope, and continued backfill and compaction of sewer pipes to the leach field. | |
| 2811 | On June 28, 2002, Steve Christensen sent Rod Keiscome a letter listing of issues which Steve felt were not being addressed in a timely manner by Bob Russell. These issues included timely issuance of contract modifications, untimely response to RFIs, and failure to meet with Remcon to process monthly progress payments, failure to discuss project issues with Luke Triplett. | |
| 2812 | On July 11, 2002, Steve Christensen sent a letter to Willie DeOcampo confirming Mike Giller's July 10, 2002 direction, during a job walk, concerning the alignment of the access road and parking areas. The letter confirmed that Mr. Giller verbally directed Remcon to field fit the alignment of the access road and parking areas around existing natural features. | |
| 2813 | On August 1, 2002, Steve Christensen wrote Mike Giller, with copies to Willie DeOcampo and Rod Keiscome, asking for their position on the differing site condition claim and that all outstanding issues pending since the 2001 construction season be addressed in the August, 2002 progress payment. | |
| 2814 | On August 21, 2002, Steve Christensen wrote Mike Giller, with a copy to Rod Keiscome, stating that due to the delayed progress payment for July, 2002, subcontractors were ceasing their work. | |
| 2815 | On August 21, 2002, Steve Christensen advised Mike Giller and Rod Keiscome that due to non-payment of the 2001 extra work claims, Remcon lacked the ability to independently finance the progress payment draws which the NPS failed to timely make. | |
| 2816 | On November 19, 2002, Mike Giller wrote Steve Christensen advising of unilateral payment estimate quantity calculation adjustments. | |