| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2817 | The net result of Mike Giller's November 19, 2002 letter was to reduce Remcon's pay estimate by more than $406,839.09. | |
| 2818 | Remcon never agreed with the quantity calculation adjustments made by Mike Giller. | |
| 2819 | On November 19, 2002, Steve Christensen wrote a letter to the Contracting Officer concerning NPS' failure to issue prompt payment to Remcon for work performed. | |
| 2820 | On November 25, 2002, Steve Christensen wrote another letter to the Contracting Officer concerning NPS' failure to issue prompt payment to Remcon for work performed. | |
| 2821 | On November 25, 2002, Steve Christensen sent a formal request for Alternative Dispute Resolution to the Contracting Officer. | |
| 2822 | Remcon sought ADR and the NPS refused to participate in the ADR process. Mr. Keiscome told Mr. Christensen that "we don't need any third party assistance." | |
| 2823 | Remcon sought ADR due to its precarious financial condition caused by NPS' actions over the course of the 2001 and 2002 construction seasons. Remcon simply did not have the financial ability to mobilize for the 2003 season unless the NPS issued payments for existing work performed and time extensions due, and Remcon was trying desperately to obtain payments from the NPS through the ADR process. | |
| 2824 | On December 3, 2002, Steve Christensen submitted a notice of claim against the NPS for nonpayment for work performed (aggregate base and asphalt concrete pavement). | |
| 2825 | On December 4, 2002, Steve Christensen submitted a notice of claim for the NPS' failure to pay for work performed related to dry-laid stonewall. | |
| 2826 | On December 4, 2002, Steve Christensen wrote the Contracting Officer concerning NPS' failure to make progress payments to Remcon. | |
| 2827 | On December 7, 2002, Steve Christensen wrote the Contracting Officer concerning NPS' failure to pay in full for concrete drop inlets. | |
| 2828 | On December 7, 2002, Steve Christensen sent notice of claim for the NPS' failure to pay in full for boulder revetment work. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2829 | On February 13, 2003, Steve Christensen wrote the Contracting Officer reiterating the NPS' failure to process Remcon's progress payments. In that letter, Mr. Christensen noted that the failure "has severely impacted Remcon." | |
| 2830 | On February 26, 2003, Steve Christensen sent a letter to Willie DeOcampo requesting updated design drawings for the Project. | |
| 2831 | On March 4, 2003, Steve Christensen wrote the Contracting Officer protesting the NPS' reduction of Remcon's differing site condition claim from an agreed (per negotiations) $485,214 to $84,170. In this letter, Mr. Christensen noted that Remcon's submitted costs for the differing site condition exceeded $700,000. | |
| 2832 | On March 10, 2003, Steve Christensen again wrote the Contracting Officer concerning the NPS' failure to pay in full for aggregate base and concrete asphalt placement. | |
| 2833 | On March 21, 2003, Steve Christensen sent a notice of claim for the NPS' failure to timely issue Modification No. 7. | |
| 2834 | On March 25, 2003, Steve Christensen sent a notice of claim for the NPS' failure to provide aggregate base. | |
| 2835 | On March 27, 2003, Luke Triplett from Remcon forwarded to Willie DeOcampo a list of unresolved RFIs. | |
| 2836 | On April 9, 2003, Steve Christensen wrote the Contracting Officer concerning the NPS' failure to make proper progress payments. | |
| 2837 | On April 15, 2003, Steve Christensen sent a letter to the Contracting Officer which fully detailed the NPS' failures and breached of contract. | |
| 2838 | On April 16, 2003, Rod Keiscome emailed NPS personnel the definition of Termination for Convenience which included the following: "Termination for convenience is a permissible government breach of contract for which the government promises to return the contractor to the status quo or as good a position as the contractor would have been in but for the government's breach." | |
| 2839 | Before mobilizing for the 2003 construction season, Steve Christensen wrote a series of letters to the Contracting Officer and/or his representatives outlining the cost and schedule impacts that resulted from deficiencies in the contract documents and the numerous redesigns and other changes directly attributable to NPS. | |
| 2840 | On June 28, 2003, Remcon delivered to the CO a certified claim for the project for delays and damages exceeding $3,000,000. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2841 | On June 28, 2003, Remcon submitted a multi-volume, comprehensive certified claim to the Contracting Officer. The claim outlined in substantial detail the cost and time impacts incurred by Remcon on the Project. It also detailed the facts which support Remcon's breach of contract claims. The total of that claim was $3,091,799.60. | |
| 2842 | One of Rod Keiscome's responsibilities, as Contracting Officer, was to review and address certified claims that were submitted to him. | |
| 2843 | Rod Keiscome can't recall how he discharged this responsibility with respect to Remcon's June 28, 2003 certified claim. | |
| 2844 | Rod Keiscome was not aware that the Office of the Inspector General requested that Remcon download and give them a disk of its accounting file, but Remcon was unable to do so because Remcon no longer had a computer that could operate the system on which the accounting software existed. | |
| 2845 | Independent of the Inspector General's Office, Rod Keiscome convened a group of people to review the content of Remcon's June 28, 2003 claim, including individual claims for entitlement. | |
| 2846 | Rod Keiscome does not recall that Mr. DeOcampo testified in his deposition that he never saw Remcon's certified claim and played no role ever looking at any of it. | |
| 2847 | Rod Keiscome cannot recall if he asked anyone from Jacobs to review the claim and comment or feedback on entitlement to any of the subjects. | |
| 2848 | Rod Keiscome believes that he asked Russell Belknap to assist the NPS in reviewing the content of Remcon's June 28, 2003 claim. | |
| 2849 | One of the claims that Remcon asserted in the June 28, 2003 certified claim was the failure of the government to furnish aggregate base. | |
| 2850 | Rod Keiscome can't recall what he did in response to Remcon's claim for the failure of the government to furnish aggregate base. | |
| 2851 | In response to the aggregate base claim, Rod Keiscome believed that the supporting documentation was untimely. | |
| 2852 | Rod Keiscome does not believe that Remcon has waived its rights to these claims by failing to timely submit any categories of the claims. | |
| 2853 | Rod Keiscome's denial of entitlement on any of these claims would never be based on the failure to timely submit it. | |
| 2854 | Rod Keiscome does not recall if everything set forth in Remcon's June 28, 2003 certified claim had previously been submitted. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2855 | Rod Keiscome received Remcon's June 28, 2003 certified claim with multiple three-ring binders of supporting data, with a lot of case law throughout, but still felt that was inadequate support for entitlement and damages because he still needed the supporting documentation the Inspector General's Office on the audit. | |
| 2856 | Rod Keiscome has been trained that, in evaluating any claims submitted by a contractor, that there are two distinct components, one is entitlement and the other is quantum, or value flowing from entitlement. | |
| 2857 | The Inspector General Office was looking at the quantum side of the equation. | |
| 2858 | Some items in Remcon's June 28, 2003 certified claim had not been the subject of a final decision. | |
| 2859 | Rod Keiscome can't recall which claims set forth in Remcon's June 28, 2003 he has personally evaluated for entitlement as contrasted with relying on someone else to give him advice and information. | |
| 2860 | It is absolutely not Rod Keiscome's understanding that, by his issuance unilaterally of Modification No. 6, Remcon waived its right to seek additional compensation for encountering the differing site condition referenced therein. | |
| 2861 | Remcon has not waived either entitlement to additional dollars, to the extent that it proves such entitlement, or the time associated with having to encounter and address the differing site condition. | |
| 2862 | Rod Keiscome understood, when he received Remcon's June 28, 2003 claim, that Remcon was seeking additional compensation over and above Modification No. 6 for having encountered the differing site condition and the time associated with having to deal with it. | |
| 2863 | Rod Keiscome can't recall if he also understood that Remcon was seeking a cost for having to procure aggregate base that was not provided by the government as represented in Exhibits 123 and 124. | |
| 2864 | Rod Keiscome can't recall if Remcon was seeking reimbursement for costs and the time associated with filling back up the hole that it excavated when it removed the additional debris and the extra burn pit material that was encountered in the parking lot. | |
| 2865 | In Remcon's June 28, 2003 certified claim, Remcon was seeking reimbursement for having to construct boulder revetment, that was the by-product of the differing site condition that it encountered along the access road. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2866 | Rod Keiscome understands that, in the June 28, 2003 certified claim, Remcon was seeking reimbursement for credit that it believed the government had improperly taken from progress payments that had been previously issued. However, he can't recall what the position of the government was with respect to the improper credits that were claimed. | |
| 2867 | Rod Keiscome's letter back to Remcon stated that he needed the supporting documentation for the auditors. He believes that he still doesn't have that even after all this time. | |
| 2868 | Rod Keiscome can't recall if the Inspector General's Office specifically told him that they lack anything with respect to analysis of overhead quantification. | |
| 2869 | Rod Keiscome doesn't believe that there is a disk that the Inspector General's Office needs to look at. | |
| 2870 | As part of his training, Rod Keiscome has received information about the existence of a statute known as the Equal Access to Justice Act. | |
| 2871 | Rod Keiscome can't recall if he has received any training on the subject of what the Equal Access to Justice Act provides. | |
| 2872 | On June 30, 2003, Steve Christensen sent the Contracting Officer another detailed letter which again protested and communicated the impact on Remcon resulting from the NPS' lack of payment. | |
| 2873 | As of July, 2003, due to delays directly attributable to the NPS, work remained to be completed on the Upper Sherman Access Road and Parking Area and Sherman Tree Trail and no work had been performed by Remcon on the Lower Sherman Parking Area. | |
| 2874 | On July 17, 2003, Steve Christensen sent the Contracting Officer a letter stating that Remcon is prepared to proceed once the NPS met its contractual requirements. | |
| 2875 | When the Contracting Officer denied Steve Christensen's request for ADR, coupled with the CO's failure to issue any financial remuneration or time extensions, either bilaterally or unilaterally, in response to the June 28, 2003 certified claim, Remcon was disabled from mobilizing to the Project, as it could not longer pay employees if it did mobilize. | |
| 2876 | No response to Remcon's June 28, 2003 certified claim was received prior to July 24, 2003. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2877 | On July 24, 2003, Rod Keiscome sent Steve Christensen a Cure Notice asserting that, as of July 22, 2003, Remcon had completed only approximately 53% of the base contract work while approximately 95% of the contract time had expired and that Remcon had not provided a contract compliant schedule, had not provided schedule updates and revisions had not provided required submittals, had not provided contract required surveys and quantity surveys, failed to construct significant portions of the project in conformance with the contract, failed to pay subs and suppliers. The NPS then gave Remcon 10 days from receipt of the notice to submit a written plan on how it intends to complete the contract by August 24, 2003.. | |
| 2878 | When the Contracting Officer issued the Cure Notice, Remcon had already supplied him with reams of information concerning government-caused and responsible problems on the project, including NPS caused delays and impacts to Remcon. | |
| 2879 | The NPS, by letter dated August 13, 2003, signed by Rod Keiscome, provided notice to Remcon that its right to further proceed was terminated for default. | |
| 2880 | On one hand, Rod Keiscome cannot recall if, at the time he issued the Termination for Default, there were any issues that were then outstanding that were the subject of Remcon's right to receive either time extension or additional compensation that had not yet materialized into one or more modifications but he further testified (as to the differing site conditions) that some time and costs, not yet issued, were due. | |
| 2881 | The August 13, 2003 Notice of Termination for Default letter was a final decision of the CO permitting the contractor to bring an action in the U.S. Court of Federal Claims within 12 months. | |
| 2882 | On August 13, 2003, Rod Keiscome sent Steve Christensen a Notice of Termination for Default for the Project. This notice asserted that Remcon was terminated for default for failure to complete the project in a timely manner. | |
| 2883 | Although the NPS failed to grant Remcon virtually any time extensions, the contract time should have been extended, as of the end of 2002, through the 2004 construction season. | |
| 2884 | Remcon, but for this Project, was very successful and its financial inability to continue was exclusively caused by this Project. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2885 | While not every project concurrently performed by Remcon, other than this one, made a profit, Remcon's income and costs from all other Projects, during its performance of work on this Project (from June, 2001, when the NTP was issued, through November, 2002) shows a net increase in cash to Remcon of $1,809,147. | |
| 2886 | The combination of NPS caused delays, and its concurrent refusal to pay for all the extra work its representatives had directed Remcon to perform placed Remcon in dire financial duress at the end of the 2002 construction season. The job was incomplete, Remcon was prevented from bidding and obtaining further work, and its financial condition had been severely jeopardized by NPS' refusal to timely and properly pay Remcon for extra work performed. | |
| 2887 | There have been no modifications affecting time or money since the takeover agreement was entered into. | |
| 2888 | Remcon advised Rod Keiscome, on March 12, 2003, via letter from Mike Schoenfeld, that Modification No. 7, deleting the Lower Sherman work, was a termination for convenience by operation of law. | |
| 2889 | Rod Keiscome can't recall if, as a result of Remcon's March 12, 2003 letter, he communicated with individuals, among them Dan Wenk. | |
| 2890 | The content of Modification No. 7, issued February 24, 2003, deleted the Lower Sherman work. | |
| 2891 | The letter enclosing Modification No. 7 provided, on behalf of the CO, that it would be issued unilaterally within ten (10) days of February 24, 2003 if Remcon did not respond to it. | |
| 2892 | Modification No. 7 was issued for Steve Christensen to sign. | |
| 2893 | Rod Keiscome cannot recall if Modification No. 7 was returned within the 10 days requested. | |
| 2894 | Steve Christensen never signed Modification No. 7. | |
| 2895 | By letter dated April 1, 2003, the NPS attempted to withdraw Modification No. 7 | |
| 2896 | Rod Keiscome's April 1, 2003 letter confirms that, on February 24, 2003, Modification No. 7 was mailed to Steve Christensen for signature and stated that, if the signed modification was not received within 10 days, the modification would be issued as unilateral modification. | |
| 2897 | There is no document that Rod Keiscome is aware of that rescinds Modification No. 7. | |
| 2898 | Rod Keiscome did not rescind a signed version of Modification No. 7 signed by Mr. Christensen on behalf of Remcon. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2899 | Rod Keiscome recalls that Remcon's counsel did not want Modification No. 7 to happen. | |
| 2900 | The takeover contractor hired by GAIC is Agee Construction. | |
| 2901 | Rod Keiscome cannot recall if Agee Construction has requested any modifications. | |
| 2902 | Jacobs is not the continuing construction manager because NPS hired someone else because Jacobs' inspector left. | |
| 2903 | Jacobs' contract still had an authorized budget for calendar year 2003. Rod Keiscome doesn't know if the NPS terminated Jacobs' contract as well. | |
| 2904 | Rod Keiscome believes that Jacobs' contract is still in existence. | |
| 2905 | Jacobs' contract was issued in the form of a task order by Rod Keiscome. | |
| 2906 | PBS&J was the subsequent construction manager. They were hired under separate task order. | |
| 2907 | Rod Keiscome cannot recall why Jacobs was replaced by PBS&J or whether Mike Giller recommended that Jacobs no longer be used on the project. | |
| 2908 | The NPS has not yet determined whether it will assert a claim against Jacobs Facilities as a result of claims and conduct that Remcon performed while it was still performing. | |
| 2909 | Rod Keiscome does not know if the NPS has grounds to make a claim against Jacobs due to their failure to perform in accordance with their contract. | |
| 2910 | Rod Keiscome cannot recall if the NPS has made a claim, is contemplating a claim, or has put DHM on notice regarding the potentiality of a claim against DHM arising from their conduct on this project. | |
| 2911 | Rod Keiscome cannot recall if the NPS has made a claim, is contemplating a claim, or has put Martin and Martin on notice regarding the potentiality of a claim against Martin and Martin arising from their conduct on this project. | |
| 2912 | There is a possibility that the NPS will bring a claim against either Jacobs, DHM, and/or Martin and Martin for their conduct up through calendar year 2002 on this project. | |
| 2913 | Rod Keiscome and Mike Giller may have discussed the possibility of making a claim against Jacobs, DHM and/or Martin and Martin. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2914 | Mike Giller has never articulated to Rod Keiscome the perception that the design that was issued to Remcon to construct was less than it should have been. | |
| 2915 | Mike Giller may have articulated to Rod Keiscome that he believed that the construction management services provided by Jacobs were less than they should have been. | |
| 2916 | Remcon's daily production reports from June 21, 2002 to August 9, 2002 indicate some re-work and mistakes by Remcon. These costs are not part of Remcon's claim. | |
| 2917 | Agee Construction ("Agee") is about 50% complete with the Lower Sherman work, and expects to be completed by the first week in November, 2005. | |
| 2918 | The NPS provided Agee with a list of allegedly non-conforming work performed by Remcon. | |
| 2919 | Agee has billed approximately $906,852.79 for completing or repairing the allegedly non-conforming work. | |
| 2920 | The majority of the allegedly non-conforming work was either work Remcon was not allowed to complete, or work that was caused by storm damage after Remcon ceased performance on the project. | |
| 2921 | Remcon is not responsible for non-conforming work that it was not allowed to complete or that was caused by storm damage incurred after Remcon ceased performance on the project. | |
| 2922 | The NPS has not properly administered the project for Agee. For the 2004 and 2005 construction seasons, the NPS has used at least five different on-site construction managers. | |
| 2923 | Russell Belknap was on the project for a few months in 2004. | |
| 2924 | For the shuttle bus parking area, Agee incurred additional costs to separate out contaminated material, including trash, from dirt. These costs were not caused by Remcon, but instead by the NPS' decision to commingle excess soils with an existing dump area. | |
| 2925 | In its interaction with Agee, the NPS denied any knowledge as to why the intersection at Wolverton Road and the Upper Sherman Access Road area was aligned differently than originally designed. The NPS was involved with the realignment of the intersection during Remcon's performance on the project. | |
| 2926 | Agee is entitled to a contract modification for pressure grouting. The NPS has delayed in issuing this modification for over one year, and the modification is still pending. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2927 | Agee has had great difficulty obtaining direction from the NPS regarding how to complete work. | |
| 2928 | Agee has been required to regrade the trail as a result of storm damage which occurred during the winter of 2002-2003 and 2003-2004. Mike Giller told Agee to make it fit the existing trail. | |
| 2929 | The NPS delayed resolution of an anchor bolt issue on the bridge. | |
| 2930 | The NPS delayed in providing direction to Agee for paving in the upper parking lot and access road. The NPS demanded numerous cores and unnecessary tests during the 2004 and early 2005 construction seasons. These cores and tests led the NPS to direct Agee to slurry seal the access road, which Agee had suggested be done back in 2004. | |
| 2931 | The NPS delayed in providing suitable direction to Agee regarding the water line. The water line depth issue was not resolved until the 2005 construction season. | |
| 2932 | Agee was never provided a comprehensive re-design for the project. It was only given some design points and criteria, and made it fit. | |
| 2933 | Agee has discussed with the NPS the issuance of a modification for changes relating to allegedly non-conforming work. | |
| 2934 | The completion of the trail was delayed by the NPS until August, 2004. | |
| 2935 | Agee continuously asked for clarification of the specifications. | |
| 2936 | The NPS added ADA requirements/standards to the original contract documents, which led to extra/changed work by Agee. | |
| 2937 | Agee reserved time impact issues in its modification request for the pressure grouting. | |
| 2938 | Agee would have paved all of the Generals Highway in 2004 but for NPS caused delays, and also could have finished the trail and upper parking lot in 2004. | |
| 2939 | Agee widened the deep cut at one end. | |
| 2940 | The NPS failed to disclose to Agee what design changes had been made prior to Agee taking over the project. | |
| 2941 | The NPS has been late in issuing progress payments to Great American Insurance Company which in turn has delayed payment to Agee. | |
| 2942 | Russell Belknap was not in the field everyday that Remcon performed work. He was there for five weeks and then gone for three weeks. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2943 | Rusell Belknap inspected the road work and Loren Mangrum inspected the comfort station. | |
| 2944 | Russell Belknap assisted with the realignment of the access road from the entrance of the road to the upper parking lot. | |
| 2945 | This project was extraordinary and in normal circumstances a contractor would not have moved the road into the hill. | |
| 2946 | Russell Belknap was unaware of the modification for restaking the centerline of the access road. | |
| 2947 | In 2002, Russell Belknap's evaluation of the road did not include determining whether crowns and supers should be implemented. | |
| 2948 | Russell Belknap does not know if the NPS gave Remcon written direction regarding realignment of the road prior to the time he came to the project. | |
| 2949 | Russell Belknap cannot remember if anyone informed him that the road was realigned 400 feet between Stations 8 and 12. | |
| 2950 | Russell Belknap was tasked with redesigning the road instead of the original designer to facilitate getting the information to Steve Christensen as soon as possible | |
| 2951 | Jack Vance, Joanne Cody, and Russell Belknap together determined that Remcon's road alignments were okay per the July 31, 2002 daily log. | |
| 2952 | As of September 10, 2002, Russell Belknap and Dan Savage performed re-engineering of the road. | |
| 2953 | Russell Belknap admits that is was his and the QA/QC for Remcon's responsibility that if they observed the road to be in a condition not suitable for paving that they would have noted it in some written manner. | |
| 2954 | When Russell Belknap came to the site, the road was in a mess. Mr. Kitchell had made adjustments. The two of them worked together to facilitate completion of the project because the road needed to be realigned. Any changes after Russell Belknap came to the site would be on as-constructed drawings. | |
| 2955 | With respect to the differing site condition, Russell Belknap does not recall if he was asked to formulate an opinion, but he thinks Steve Christensen is a criminal. Russell Belknap does not believe that a differing site condition was encountered. It was cloudy whether a differing site condition existed other than the fact that the road was moved over 10 feet. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2956 | Russell Belknap believes that the differing site condition contention was either criminal or really substandard construction practice. | |
| 2957 | Russell Belknap believes that raising the upper parking lot was extra work. | |
| 2958 | Other than three-week look ahead schedules, Russell Belknap does not know if he saw a project schedule. He also did not know what was on the critical path. | |
| 2959 | Russell Belknap made no recommendations to the NPS regarding the amount of rock revetment that Remcon should be paid for. | |
| 2960 | Jack Vance has no knowledge if Athena Demetry marked the trees for removal outside of the right-of-way identified in the contract documents. | |
| 2961 | The moving of the road into the hill probably required additional volume of material to have to be moved, excavated in order to construct the road at the elevation designed. | |
| 2962 | Jack Vance is unaware if in late June 2001 there was a perception that the access road between Stations 24 and 30 was in a different location than where the trees were marked to be cleared. | |
| 2963 | An adjustment that exceeds 10 feet is not minor. | |
| 2964 | Jack Vance does not know why Rod Keiscome issued a modification paying Remcon for additional costs to survey the centerline between Stations 25 and 30. | |
| 2965 | Jack Vance thinks the survey of the centerline was probably off and the survey would not be extra work. | |
| 2966 | Jack Vance believes that, in June and July, 2001, no one from the NPS asked Remcon to have the area between Stations 24 and 30 resurveyed. | |
| 2967 | The handling of the burn pit material would take some additional time, and Jack Vance can't recall the additional cubic yards handled or whether a modification was issued for filling up the hole created by the excavation of the burn pit material. | |
| 2968 | Jack Vance does not think the hole created by the excavation of the additional material in the burn pit did not have to be filled up in order to increase the elevation of the upper parking lot. | |
| 2969 | Jack Vance believes that the burn pit hole was addressed with fill material created when the whole parking lot area was cut down. | |
| 2970 | Jack Vance was on site an average of once a week in 2001. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2971 | Jack Vance did not personally perform an inquiry as to whether or not the differing site condition claim was valid. | |
| 2972 | Jack Vance would agree today with Rod Keiscome's decision on the differing site condition modification. | |
| 2973 | Jack Vance was concerned about the claimed quantity overruns in 2001 but did not evaluate the merits of the contentions. | |
| 2974 | Jack Vance will not agree with Bob Smith's quantification of excess excavation at 15,000-17,000 cubic yards. | |
| 2975 | Agee hauled some of the stockpiled material in 2004. | |
| 2976 | Jack Vance was not responsible for evaluating the critical path of the project. | |
| 2977 | Jack Vance was consulted on decisions by the NPS whether to commit funds for a particular work item. | |
| 2978 | Jack Vance is not comfortable assuming that Modification No. 1 was paid out of another source of funds other than line item construction funding. | |
| 2979 | Ray Todd believes that it was the responsibility of Remcon to accompany Athena Demetry as she marked all the trees to make sure that they understood which ones should be removed or not removed. | |
| 2980 | Athena Demetry told Ray Todd that Remcon accompanied her part of the time, but that they failed to show up to complete that. | |
| 2981 | The NPS field staked the centerline during the construction document development. This is how Athena Demetry could determine the right-of-way in which to mark the trees to either be removed or not. | |
| 2982 | Based on field staking, the NPS determined which trees in the construction document needed to be removed. Based on walking the site, it appeared that the field conditions shown on the survey were consistent with the survey information in the construction documents. | |
| 2983 | Ray Todd coordinated the design reviews. | |
| 2984 | Ray Todd delegated the design review process to Joanne Cody. | |
| 2985 | Ray Todd is not sure if the project had the requirement that the construction documents be stamped by a professional licensed in the state where project occurred. | |
| 2986 | The NPS provided topographic information to the designers. | |
| 2987 | Willie DeOcampo agreed to move the road. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 2988 | Ray Todd believes that the realignment of the road was based on Willie DeOcampo and Remcon's thought that it would produce a better flow of the road. Ray Todd also believes that the realignment was not related to the differing site condition. | |
| 2989 | Ray Todd did not consider the realignment to be significant because it was conveyed to him that it was minor. | |
| 2990 | The NPS agreed that if the road had to be realigned and they had to resurvey, then Remcon should be compensated for that additional work. | |
| 2991 | Ray Todd did discuss with Rod Keiscome in 2001 the change in quantities in the bid item that related to the burn pit. | |
| 2992 | Obviously, Remcon would need to fill the burn pit hole. | |
| 2993 | Ray Todd recalls that in a review meeting, that based on the geotechnical report stating that the area was rippable by a D8, that there was no rock excavation. | |
| 2994 | Ray Todd does not know for sure why the words "rock excavation" and "partial rock excavation" were removed from the second set of 50% construction drawings. | |
| 2995 | The primary responsibility for determining the merits of the differing site condition was Contracting Officer's Representative's responsibility. | |
| 2996 | Ray Todd does not believe that a differing site condition was encountered on the access road. | |
| 2997 | Willie DeOcampo had the primary responsibility to address the differing site condition claim. | |
| 2998 | Ray Todd does not recall the 40% compaction rate. | |
| 2999 | Ray Todd contends that the total of the bid items will be able to provide a balanced project. | |
| 3000 | The 6,800 cubic yards was one item that identifies the excess excavation that would have to be hauled someplace. | |
| 3001 | Ray Todd believes that Remcon is entitled to compensation for those items that were in a modification that were negotiated with Remcon | |
| 3002 | Ray Todd believes that there were assumptions in the justification written by Willie DeOcampo for Modification No. 4 that were not true and accurate. | |
| 3003 | Ray Todd contends that the picture of aggregate base was intended to show what it looked like. He does not know what the contractor relied upon for their proposal. | |
| 3004 | Ray Todd does not know whey the NPS issued Addendum 1. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3005 | Contingency on NPS projects, per Congress, is 10%. | |
| 3006 | Construction management costs are 8% of construction costs. | |
| 3007 | Ray Todd told Rod Keiscome that the base bid was within net construction costs. | |
| 3008 | Ray Todd was responsible for requesting funds for modifications. | |
| 3009 | For this project, net construction was $7,087,000, contingency was $709,000 and construction management was $567,000. | |
| 3010 | Ray Todd was not concerned that there were insufficient funds to fund a modification for the differing site condition when he left. | |
| 3011 | Steve Christensen is the owner of Remcon. | |
| 3012 | Steve Christensen has over 25 years of construction experience. | |
| 3013 | Steve Christensen's work experience includes contract management of multiple projects, individual project management, bid preparation, project scheduling, project costing, marketing, contract negotiations, and proposals. | |
| 3014 | In his 25 years of construction experience, Steve Christensen has been involved in over $500 million worth of construction projects and he has worked on all aspects of field work including those functions performed by laborers, equipment operators, carpenters, and masons. | |
| 3015 | The projects that Steve Christensen has been personally active with concern multiple types of engineering projects ranging from large earthen dams, power houses, asphalt concrete highways, concrete highways, flood control work, large waterway projects (lock and dams) and environmental remediation projects. | |
| 3016 | Mr. Christensen is the holder of a California Contractor's License. | |
| 3017 | Steve Christensen formed Remcon in 1996. | |
| 3018 | In the late 1990's, Remcon moved its banking from County Bank to Bank of America. | |
| 3019 | Bank of America solicited Remcon's business. | |
| 3020 | Remcon's line of credit with Bank of America in the spring of 2001 was $1.8 million. | |
| 3021 | In 2001, Bank of America was purchased by Nations Bank. | |
| 3022 | Historically, Nations Bank did not maintain a large portfolio of contractors and those it did have had a large amount of assets. | |
| 3023 | In 2001, Bank of America began eliminating all of its smaller contractors from its portfolio. | |
| 3024 | As a result, Bank of America did not renew its banking relationship with Remcon. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3025 | After Bank of America ceased its relationship with Remcon, Remcon moved its banking and line of credit relationship to Oak Valley Bank. | |
| 3026 | Remcon had two accounts with Oak Valley Bank, one for general checking purposes and one for payroll. | |
| 3027 | The government's claim that as of August 7, 2002, Remcon did not have a Project Manager or Superintendent on the jobsite is misleading. | |
| 3028 | Jeff Northrop was Remcon's Project Manager from July, 2001 to June, 2002. | |
| 3029 | Remcon's Project Superintendent for the Sherman Tree Project was Mark Penrose. Mr. Penrose began the project in May of 2001 and continued in that position until August 7, 2002 at which time he left the project for personal family reasons. Mr. Penrose was replaced by Mike Kitchell who was already on site and working as Project Foreman. Mr. Kitchell was extremely knowledgeable in the construction activities on the project as noted in the NPS' diaries. Mr. Kitchell remained in that role until completion of the 2002 season. Mr. Kitchell had been a Project Superintendent on other Remcon projects. | |
| 3030 | Luke Triplett was Remcon's Assistant Project Manager from May, 2002 to June, 2003. He took over the Project Manager role once Jeff Northrop left in June, 2002 but his title remained Assistant Project Manager in the hope that Jeff Northrop's wife would get well so he could return to the project. | |
| 3031 | In May of 2002, Remcon's Project Manager, Jeff Northrop, had a family medical emergency which ultimately ended with the death of his wife after a long illness. In support of Mr. Northrop, he remained employed by Remcon and continued as the Project Manager while Remcon promoted Luke Triplett to the position of Assistant Project Manager. The NPS was fully aware of Mr. Triplett's position and that he was performing the same responsibilities as Mr. Northrop had performed. Though his title never changed, Mr. Triplett performed those duties throughout the 2002 season. Never once did the NPS request a title change for Mr. Triplett. | |
| 3032 | Mark Penrose was Remcon's Project Superintendent from June, 2001 to August, 2002. | |
| 3033 | Mike Kitchell was Remcon's Project Foreman from July, 2002 to August, 2002 and its Project Superintendent from August, 2002 to November, 2002. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3034 | Remcon provided adequate resources and personnel on the project. | |
| 3035 | Remcon mobilized management personnel to the project in mid May 2002. | |
| 3036 | The site was too damp and/or had snow cover until late May, 2002 to commence productive field operations in the second season. | |
| 3037 | There were numerous design deficiencies which Remcon had brought to the NPS' attention in the fall of 2001 and throughout the winter of 2001/2002 which remained unanswered in May 2002 for the Upper Sherman Access Road/Parking Area, and the Sherman Tree Trail. | |
| 3038 | Multiple revisions to the project plans for the Upper Sherman work areas were being worked on by the NPS and it designers in May, 2002. | |
| 3039 | Remcon issued a series of RFI's in early June 2002 requesting clarification of design deficiencies which remained unanswered. | |
| 3040 | Remcon was waiting on new design information for the Sherman Tree Trail which was not definitely provided until early August 2002. | |
| 3041 | Remcon was waiting for direction to use some of the excess excavation on site to raise the upper parking area. Direction to do so did not come until June 27, 2002. | |
| 3042 | Once Remcon received the proper direction from the NPS, Remcon fully mobilized and began work on the project. | |
| 3043 | The NPS' failure to address design deficiencies/differing site conditions prior to June, 2002 prevented Remcon from working on critical path work items. | |
| 3044 | The government's contention that in June and July, 2002, Remcon had to perform considerable rework upon the utility line, which in turn held up placing aggregate base upon the access road, is inaccurate. | |
| 3045 | Much of the alleged rework was actually work which Remcon was prevented from completing in 2001 due to deficient plans and differing site conditions. | |
| 3046 | Remcon incurred additional costs in constructing the utility line because work was being performed out of sequence due to NPS caused impacts. | |
| 3047 | While some rework was required for defective work on Remcon's part, its total cost was $34,356.00 and it has been credited out of Remcon's claims. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3048 | The government's contention that Remcon was delayed because it had to rework slopes that it contaminated with asphalt material is misleading. | |
| 3049 | As a result of the deficient plans and differing site conditions encountered, the project generated far more excess material than planned. | |
| 3050 | The NPS directed Remcon to stockpile the excess material in the shuttle bus parking area which was already contaminated with asphalt debris. | |
| 3051 | By complying with the NPS' directive, the existing asphalt debris contaminated the excess material which was relocated under NPS direction to the shuttle bus parking area. | |
| 3052 | It took Remcon less than a week, with a two man crew, to clean up this very limited contamination and this work did not prevent placement of aggregate base as the NPS was still redesigning the Upper Sherman Access Road. | |
| 3053 | The government's contention that in 2002 Remcon was delayed in placing aggregate base because its aggregate base failed to meet specifications is inaccurate. | |
| 3054 | The first test on the aggregate base stockpile failed becaues the tester failed to properly sample the existing stockpile. | |
| 3055 | Once a proper test was taken the material passed all test requirements. | |
| 3056 | At not time did the initial inaccurate test prevent Remcon from placing aggregate base since there was only a small portion of required aggregate base material in a stockpile and the balance was being imported from out of the park. | |
| 3057 | The government's claim that Remcon's operations were impacted by its failure to include all of the earthwork contained in the contract drawings in its bid is not accurate. | |
| 3058 | Remcon performed a quantity takeoff from the original project plans and specifications. | |
| 3059 | Remcon's quantity takeoff indicated that the earthwork quantity exceeded the quantity noted in the NPS' quantity for excess material. | |
| 3060 | Remcon contacted the NPS (Jack Vance and Terry Lang) and was told the NPS' quantity was correct and the job was to balance. | |
| 3061 | Remcon was directed to use the NPS' quantity for calculating the earthwork quantity. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3062 | The NPS' designers and COR all testified in their depositions that the job was planned to be balanced earthwork and the original quantities used by them were wrong. | |
| 3063 | The NPS' designers and COR all testified that the NPS' direction to the designers that they use a 40% compaction factor was wrong and this created additional excess quantity. | |
| 3064 | Modification No. 4 has recognized that excess quantity existed. | |
| 3065 | Modification No. 4 only addressed some of the excess quantity. | |
| 3066 | While the precise amount of excess excavation is unknown, the amount is between 15,000-17,000 cubic yards. | |
| 3067 | On July 31, 2001, Bill Morris wrote Dan Savage saying, "Dan, please check the points you sent me for the lower parking lot. I believe they are off by 100 feet." | |
| 3068 | On July 31, 2001, Dan Savage responded to Bill Morris' communication saying, "Bill, I checked the points for the lower parking lot, and the northing, eastings checked okay. What did you see was off? Northing or eastings? I will send you a centerline point for the upper and lower Wednesday a.m." | |
| 3069 | There was a typo in the plans such that the every single point was off by 100 feet and Joanne Cody knew that this mistake occurred. This was not a contractor mistake. | |
| 3070 | Design documents for this project were not stamped by a professional licensed in the state of California. Joanne Cody made sure that the design team had licensure. | |
| 3071 | The NPS has never stamped drawings. This was a new process and it wasn't fulfilled, despite being a contractual requirement, because Joanne Cody didn't require it. | |
| 3072 | Joanne Cody is the one that accepted the unstamped drawings. However, she doesn't have the right to waive the requirement that they be stamped. She passed it on to Terry Lang who continued the process. | |
| 3073 | Joanne Cody did not get authorization from Rod Keiscome to waive the requirement that the contract documents be stamped. | |
| 3074 | Joanne Cody believes that DHM, Martin and Martin and BRS all had people who were licensed in the state of California participate in aspects of the design of the project. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3075 | Joanne Cody did not read Mr. Tuttle's deposition and Mr. Smith's deposition of the subject. She didn't know that they testified that the licensed individuals in the state of California within their organizations were not materially involved in the design of this project. | |
| 3076 | Joanne Cody contends that it is not customary to have pre-bid site inspections in snow country. However, it is optimum to do so. | |
| 3077 | Other than utility excavation, there was no blasting anticipated by the soils engineer for roadway excavation, except for maybe isolated floaters here and there. However, this is not the reason why blasting was deleted from the specifications. | |
| 3078 | Bob Smith's June 10, 2002 memorandum states, "If his assumptions are accurate, it seems as if the blasting and rock excavation is valid, and it is a change in condition." Joanne Cody does not know if she passed this on to anybody. | |
| 3079 | Joanne Cody believed that 5,000 cubic yards were to be hauled out of the park. | |
| 3080 | Joanne Cody contends that she had not, as of September 19, 2001, come to the conclusion that there was quantities greater than that which was anticipated in existence that had to be addressed. | |
| 3081 | Joanne Cody can't recall if she received anything between July of 2001 and May of 2002 which quantified for her the excess material to be anything that was shown in Bob Smith's May 18, 2002 memo and Willie DeOcampo's July 2, 2001 email. | |
| 3082 | Joanne Cody gave Bob Smith's May 18, 2002 email to Willie to look it but doesn't believe that she discussed it with him. | |
| 3083 | The contractor communicated to the government pretty early on that the survey of the Sherman Tree Trail that the government had relied on to prepare its design was wrong. | |
| 3084 | On Friday, July 27, 2001, Andrea of DHM sent directly to Giuliani & Kull, the contractor's surveyor, with a cc to Joanne Cody, revised trail layout sheets. | |
| 3085 | On August 10, 2001, DHM sent a communication to Bob Russell, with a cc to Joanne Cody, showing that a series of changes have been made to the trail points and that an updated sheet called T6 was being issued and that a whole series of new parking coordinates has changed as well. | |