| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3086 | The trail points were changed because of the wash on the stairs. The parking coordinates were changed to save the tree on the rock and deleting a couple of parking spaces. | |
| 3087 | Joanne Cody does not know if these changes were made with the consent of the Contracting Officer. Joanne Cody did not communicate with Rod Keiscome the existence of these changes in summer of 2001 because it was not her responsibility. Her role as the design COR is to give them to Willie, the construction COR. Willie is the person that works with the CO. | |
| 3088 | The drawings attached to the August 10, 2001 communication caused changes in quantities and could have affected time and/or money. They were nevertheless done under Joanne Cody's oversight even though she didn't have the authority to have anything issued that affects time and/or money because Willie requested it. | |
| 3089 | Joanne Cody doesn't know when her design team members prepared the necessary documents so that the contractor could quote the price set for in the Contracting Officer's Directive Letter to raise the Upper Sherman parking lot. She doesn't know what delayed it from being done. She believes they were missing the surveys from the contractor showing how much the contractor had taken out at that point. | |
| 3090 | The note in the plans is a positive statement of the existence of a stockpile of aggregate base. | |
| 3091 | Joanne Cody contends that there was an issue with boulder revetment not being placed in the location shown on the plans. | |
| 3092 | She investigated the subject a little bit. | |
| 3093 | Joanne Cody doesn't know why it was not placed in the deep cut where it was shown on the plans. | |
| 3094 | On September 24, 2002, Russell Belknap wrote, "Revetment is acceptable to the government from Station 1+16 to 24." | |
| 3095 | Joanne Cody doesn't know if this letter was inconsistent with her observation as of that date. | |
| 3096 | Joanne Cody contends that there is rock available at Clover Creek quarry and that it was there as of this past summer. | |
| 3097 | There was not crushed rock at the quarry to be used by Remcon. Remcon would have had to quarry the rock. | |
| 3098 | Joanne Cody contends that the control points were checked and determined to be correct. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3099 | Currently, the construction management of NPS projects is outsourced such that, on this project, it was done by Jacobs Facilities during the first two years of work on the project. | |
| 3100 | As a Project Manager, Mike Giller managed the scope, schedule and budget of projects during design and construction. | |
| 3101 | During the time that he was a Project Manager between 1995 and 1998, Mike Giller did not work on any Sequoia Kings Canyon projects. | |
| 3102 | Congress gives the Project Manager a construction budget and the Project Manager manages that budget. | |
| 3103 | Generally, the design costs do not come out of the construction budget. | |
| 3104 | Mike Giller believes that, during the time he was Project Manager, there was no protocol in the NPS that a certain percentage of the construction funding could be spent on design. | |
| 3105 | Mike Giller is not familiar with this project and the amount that was spent on design. | |
| 3106 | The construction funding generally includes funding for modifications that may need to be issued on the project. | |
| 3107 | When Mike Giller came back to the NPS in 2002, he was given the same title, Project Manager and his responsibilities were the same. | |
| 3108 | Mike Giller has never had to seek additional money for any project in which he was Project Manager because that which had been budgeted was perceived to be inadequate to pay for work. | |
| 3109 | During the time that he was assigned to this project, in July of 2002, Mike Giller was also assigned to Sequoia National Park, general management plan. | |
| 3110 | Mike Giller had continually maintained his status as the Project Manager on this project through the date of his deposition. | |
| 3111 | The person most knowledgeable about this project may have been Willie DeOcampo. However, he is retired and his replacement has not been assigned. | |
| 3112 | The NPS' project team consisted of the Contracting Officer, Contract Specialist, Project Manager, and Contracting Officer's Representatives. | |
| 3113 | Once Mike Giller became Project Manager on this project, he was concurrently given around six projects to manage and it has remained approximately that amount. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3114 | Mike Giller does not maintain any type of daily log, diary, or time sheet. There is not source documentation that Mr. Giller could utilize in order to determine how much time he has spent on this project and he has no best estimate. | |
| 3115 | Mike Giller does not know if he interacted with Mr. Russell on July 1st, 2nd or 3rd of 2002 and isn't sure what where the circumstances that caused Mr. Russell to longer work on the project after July 4, 2002. | |
| 3116 | Mike Giller received a COR designation for construction on this project. The letter was issued by Mr. Keiscome but Mike Giller can't remember when. | |
| 3117 | Mike Giller can't remember if he received his COR designation while Remcon was still actively working on the project. | |
| 3118 | When Mike Giller received his COR designation, it was as COR for construction, concurrent with Mr. DeOcampo. | |
| 3119 | There were two CORs for construction and Mr. Giller remains one of them. | |
| 3120 | Mike Giller's responsibilities have not changed since Remcon stopped performing and the surety, through Agee, began performing. | |
| 3121 | Mike Giller isn't sure if the trees that were removed under the clearing operation corresponded to the limits required for construction between Stations 24 and 30. | |
| 3122 | Mike Giller is aware that the road was shifted. | |
| 3123 | Mike Giller understands that Remcon came to the NPS and said the trees and rock are in the wrong place and that their surveyor restaked a new suggested centerline and Willie and/or Joanne review that and accepted Remcon's proposed shifting of the road. | |
| 3124 | Mike Giller does not recall anyone ever bringing to his attention that the trees that were removed by Remcon that were marked for removal between Stations 24 and 30 were marked for removal in a location other than along the right-of-way to the access road as set forth in the original contract documents. | |
| 3125 | In some places, where Remcon requested it, the government approved the building of the road in a location other than as set forth in the original contract documents. One such place was between Stations 24+46 to 30+18 where the government agreed that the road should be moved to where Remcon suggested. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 3126 | The government recognized, in Modification No. 6, that the location between Station 24 and 30 where the road was constructed was a differing site condition. | |
| 3127 | Mike Giller does not recall, during the time that he was on-site in July of 2002, dealing with any adjustments to the crown or super of the road. | |
| 3128 | Mike Giller recalls a conference call amongst NPS individuals sometime around the first of August, 2002, when they indicated to him that Mark Penrose and Mike Kitchell had told the NPS that they had not followed the road engineering requirements of the contract and that Remcon requested that the NPS redesign the road to fit their nonconforming earthwork. | |
| 3129 | Mike Giller contends that the NPS did not indicate to him that the road was constructed in the location where it was as a by-product of the trees being directed to be cleared in a location other than that identified in the original contract documents. | |
| 3130 | Mike Giller doesn't know who's analysis was included on behalf of the government in determining the appropriate time extension for the scope of work set forth in Modification No. 3 or who's responsibility that was. | |
| 3131 | The quantity of material excavated was not different as a result of the differing site condition being encountered than that which was represented in the contract documents. | |
| 3132 | The content of the material that was handled as a result of encountering the differing site condition was possibly different than that which was represented in the contract documents. | |
| 3133 | Mike Giller doesn't know if there were any costs that the contractor incurred beyond that which were reasonably indicated in the contract documents as a result of having to handle blasted materials. | |
| 3134 | Mike Giller doesn't know if there was any time lost in performance of work on this project as a result of the contractor having to blast material between Stations 26 and 30 as contrasted with using conventional construction equipment as originally anticipated. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3135 | To Mike Giller's knowledge, no one on behalf of the government ever analyzed whether there was any time lost in performance of work on this project as a result of the contractor having to blast material between Stations 26 and 30 as contrasted with using conventional construction equipment as originally anticipated. He doesn't know why this wasn't done. | |
| 3136 | Mike Giller doesn't know whether it is a salient point to examine as to whether or not there was a loss of time associated with having to encounter a differing site condition, which the government recognized was encountered, given that the government has a duty to timely issue time extensions. | |
| 3137 | Mike Giller believes that the geotechnical report required the contractor to demonstrate ripping refusal in order to establish that there was a differing site condition encountered. | |
| 3138 | Remcon was not paid for Modification No. 6 for two reasons: One, the surety said not to release any further funds to Remcon and, two, there were retainages greater than the amount of the modification. | |
| 3139 | Mike Giller is not sure what retainages were in existence as of February of 2003. | |
| 3140 | Modification No. 6 is the last change order that Mike Giller became aware of that has been issued. | |
| 3141 | Mike Giller is not ware of any errors in assumptions by the design team that led to quantity overruns being experienced by Remcon. | |
| 3142 | Mike Giller is not aware of the compaction factor used by the design team in calculating quantities for earthwork. | |
| 3143 | Mike Giller does not know if decomposed granite is able to be compacted to 40% less than its excavated volume. He has no experience in this regard, or any geotechnical training and expertise for that matter. | |
| 3144 | Mike Giller does not know of anything that restrained Remcon's work in October of 2002. | |
| 3145 | Mike Giller believes that there were no pending modifications that had not yet been issued by Mr. Keiscome that prevented Remcon from performing work in any aspect of the Upper Sherman in October of 2002. | |
| 3146 | Revised drawings T7A and T8A were issued because of a change in design by the government that was sought to be implemented. The government issued these drawings to accomplish a change. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3147 | The Justification page attached to Modification No. 4 was authored by some individual or group of individuals on behalf of the government. | |
| 3148 | It was Willie DeOcampo's responsibility to review the contractor's schedule. | |
| 3149 | Mike Giller's schedule responsibilities involve having the project delivered in a completed state by a designated period of time. This includes both the design phase and the construction phase. | |
| 3150 | Congress establishes the schedule for the design phase. | |
| 3151 | Willie DeOcampo told Mike Giller that Jacobs did a review of Remcon's project schedule but that they failed to reference any specification and contract requirements in their review. Mike Giller believes that Willie was more thorough in that he reviewed the contract and his review wasn't cursory. | |
| 3152 | Mike Giller believes that, "in general," the government complied with the requirements of the schedule specifications. | |
| 3153 | Mike Giller doesn't know if the contractor had a duty to comply "in general," or if they had to comply with the specific requirements of all portions of the specifications. | |
| 3154 | Mike Giller doesn't believe that either the government or the contractor had the right to choose which portions of the specifications either would elect to comply with and which portion either chose not to. | |
| 3155 | If the contract documents, such as Specification section 1320, dealing with project schedule, place responsibility on the government, it is the government's duty to comply. | |
| 3156 | Mike Giller does not consider the issuance of unilateral Modification No. 6 in February of 2003, approximately 18 months after the work was performed, to be a timely issuance of a modification for recognized extra work on the project. | |
| 3157 | As part of Mike Giller's evaluation, he did consider what time that was critical in the project was utilized in the encountering and addressing the differing site condition between Stations 26 and 30. | |
| 3158 | Mike Giller does not believe that there was any delay to the project which occurred as a result of the encountering of the differing site condition in that locale. | |
| 3159 | Mike Giller does not know what was the critical path of the project between July 30, 2001 and the end of September, 2001. | |
| 3160 | Mike Giller commented to Mr. Keiscome that additional time should be granted in Modification No. 5. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3161 | Mike Giller believes that the number of days that he requested that Mr. Keiscome include in Modification No. 5 is the same number that Mr. Keiscome agreed to issue. | |
| 3162 | Mike Giller doesn't know if there is anything in writing that substantiates the request that he made to Mr. Keiscome. | |
| 3163 | The contractor was entitled to rely upon the accuracy of the note that some aggregate base material was stockpiled in the location indicated in the contract documents. | |
| 3164 | Mike Giller does not know of any portion of the contract documents that bears on the question of whether the note refers to all or some of the aggregate base course being stockpiled. | |
| 3165 | Mike Giller doesn't know if there was any aggregate base present when the snow melted. | |
| 3166 | It is not true that, once appropriated to a specific project, funding does not get reappropriated to another project. | |
| 3167 | Money was appropriated to this project to the exclusion of other projects. | |
| 3168 | Mike Giller contacted Sherman Chang of the NPS as of August 29, 2002 to see if there was money available for Modification Nos. 4, 5 and 6 and was informed that there was money available for all three proposed modifications in their entirety. | |
| 3169 | Mike Giller believes that there was sufficient funds appropriated by Congress that had not yet been committed, as of August 29, 2002, to pay for approximately 600-plus thousand additional dollars. | |
| 3170 | Modification No. 4 could not have been issued by the Contracting Officer prior to Mr. Giller receiving a communication from Mr. Chang that there were funds available. | |
| 3171 | So, while the NPS may have handed Mr. Christensen proposed Modification No. 4 on August 22nd, at least as of August 29th, Mr. Keiscome had yet to receive information as to whether there was funds available for that modification. | |
| 3172 | As Project Manager, it was Mike Giller's responsibility to seek authorization for funding for modifications before the Contracting Officer could issue a modification. | |

| Number | Fact | Stipulated to by the Government Y/N? |
| --- | --- | --- |
| 3173 | Mike Giller, in Exhibit 239, by saying that the request for $95,000 can be funded from the available $502,000, was conveying to the recipient of the form that there was for projects 200N through 200R $502,000 worth of unspent contingency from which the $95,000 proposed in Modification No. 4 could be allocated. | |
| 3174 | The fact that Modification Nos. 2 and 3 add up to $356,118 suggests to Mike Giller that Modification No. 1 may have been funded from a source other than that which is reflected in Exhibit 239. However, he doesn't know what source these funds were from. | |
| 3175 | The NPS has never carefully reviewed Remcon's June 28, 2003 certified claim, or its supporting documentation because it was waiting on an audit before it spent a lot of time evaluating the claim. | |
| 3176 | Mike Giller believes that Remcon agreed to remove two boulders in September of 2002 which Remcon agreed to be paid for within Bid Item 38 at a unit cost. Mike Giller also believes that Remcon billed the NPS for this extra work and was paid for it. | |
| 3177 | It is Mike Giller's understanding that in the pending claim, Remcon is seeking reimbursement for removing these boulders even thought it has already been compensated by the government, which is why the NPS is waiting on an audit. | |
| 3178 | With respect to work performed by Remcon in 2001, Mike Giller believes that, as of mid-August of 2002, Remcon was only contending that it hadn't received payment for rock blasting that had occurred in 2001 as a result of the differing site condition. | |
| 3179 | Mike Giller doesn't know if he recalls receiving a letter from Mr. Christensen to Mr. Keiscome contended that the government had fraudulently made a representation on contract Pay Estimate Number 12. | |
| 3180 | Mike Giller doesn't know if government personnel signed Mr. Christensen's name to Progress Pay Number 12 after the government had made adjustments to the progress pay estimate. | |
| 3181 | On November 4, 2002, Mr. Christensen sent a letter regarding the government's failure to make proper progress payments to the contractor. In the letter, Mr. Christensen comments not only on the failure to respond within 7 days, but the failure to receive payment within 14 days as required by the prompt payment clause. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3182 | Mike Giller may have investigated the merits of Mr. Christensen's November 4, 2002 contentions but cannot recall what conclusions he reached. | |
| 3183 | Mike Giller does not believe that he ever concluded that the government had failed to comply with the requirements of the prompt payment clause of the contract. | |
| 3184 | Mike Giller contends that Modification No. 7 was never formally issued by Mr. Keiscome. He contends that a draft Modification No. 7 was sent to Remcon in 2003 but admits that it was sent to the contractor to sign. | |
| 3185 | There has been work performed on the Lower Sherman. | |
| 3186 | Agee Construction requested the ability to work on the Lower Sherman while the Upper Sherman was still incomplete. | |
| 3187 | Mike Giller doesn't know why work has been performed on the Lower Sherman when the specifications do not permit that until the Upper Sherman is complete. | |
| 3188 | No one authorized a modification to the specifications to permit work on the Lower Sherman while the Upper Sherman was still incomplete. | |
| 3189 | Mike Giller permitted Agee Construction to perform work on the Lower Sherman while the Upper Sherman was still incomplete. It was not Mike Giller's decision exclusively. The Contracting Officer participated in the decision but there is nothing in writing that confirms that the Contracting Officer was briefed on the subject because the communication was oral. | |
| 3190 | Mike Giller doesn't know how the contractor was permitted to work on the Lower Sherman if the specifications don't permit it. | |
| 3191 | Mike Giller doesn't know why he recommended to Mr. Keiscome that Agee Construction be permitted to work in both the Lower Sherman and the Upper Sherman areas concurrently or why this was something that was even raised. | |
| 3192 | Mike Giller did not review a schedule submission by Agee Construction requesting to work concurrently in both the Lower and Upper Sherman areas. | |
| 3193 | Mike Giller is not aware that Remcon requested in calendar year 2002, that while the Upper Sherman was still incomplete, it be permitted to perform work in the Lower Sherman area. | |
| 3194 | In general, the biggest piece of work was the Generals Highway retaining wall, then there is some trail work. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3195 | Mike Giller has evaluated some time and progress payment applications for the work performed by Agee during 2004. | |
| 3196 | Mike Giller did not know, as of the date of his deposition, what percentage of work on the Generals Highway retaining wall had been authorized for payment purposes. | |
| 3197 | As of the date of his deposition, Mike Giller believes that less than 50% of the Lower Sherman trail work was complete. | |
| 3198 | The Lower Sherman work involved a grouting effort where grout was injected into the ground under the footer of the retaining wall. | |
| 3199 | There were some overruns in quantity for the grouting work on the Lower Sherman. | |
| 3200 | The government has paid Agee Construction more than the bid designated quantity identified for grouting. As of the time of Mike Giller's deposition, there was a modification pending. | |
| 3201 | There was some nonconforming work that was identified by the NPS that the NPS also elected to retain in its current manner without modification or repair. However, Mike Giller can't remember what those items are. | |
| 3202 | No deductive modifications have been issued whereby the government took credit for received something less than it perceived it had bargained to receive. | |
| 3203 | Jacobs Facilities was on-site for three years, including calendar year 2003. However, they weren't there throughout the entire spring, summer and fall because Remcon didn't show up so the NPS demobilized Jacobs Facilities. | |
| 3204 | There was a transition from Jacobs Facilities to PBS&J because of availability of resources. However, Mike Giller doesn't know what resources were unavailable from Jacobs Facilities to perform continuation of construction management services. | |
| 3205 | Mike Giller and Scott Ruesch were involved in the decision to process to transfer the construction management services from Jacobs Facilities to PBS&J. | |
| 3206 | The decision to go to PBS&J was a business decision based upon availability of PBS&J inspectors, specifically Ed Melroy who was then working in the park for PBS&J on the Generals Highway project. | |
| 3207 | Budget considerations was probably one of the factors used the evaluative process that the NPS could get one inspector to cover two projects rather than two separate inspectors for two separate projects. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3208 | Remcon could not perform the raising of the grade, without risk that it wouldn't get reimbursed, until July 16 of 2002. The entire Upper Sherman parking area was in limbo until then because Remcon had to get the grade set in order to do the subsequent improvements to that area. | |
| 3209 | On August 21, 2002, Steve Christensen sent Mike Giller a letter, with a cc to Loren Mangrum, saying, "the history of this project has proven that numerous plan errors have been encountered during construction by Remcon." | |
| 3210 | Based upon his involvement with the project up through August 21, 2002, Loren Mangrum believed the August 21, 2002 statement by Steve Christensen to be true. There had been plan errors. | |
| 3211 | Loren Mangrum does not know why it took the government from mid-June, once the price was agreed to, all the way until the end of August, at a minimum, to issue the paperwork to get approval for funding for Modification No. 4. | |
| 3212 | The amount due Remcon based upon a calculation assuming that the termination for default is converted to a termination for convenience is $6,540,903.00. | |
| 3213 | The amount due Remcon arising from the NPS' breach of contract prior to the termination totals $2,835,651. | |
| 3214 | Remcon's income from operations, less its interest expense, for the period of time from June 1, 2001 through November 30, 2002, which is the period of time it worked actively on this project, excluding costs and income for this project, was $1,809,147. | |
| 3215 | The accounting procedures used by Remcon for costing payroll, owned equipment, subcontractor and vendor costs are standard for the industry. | |
| 3216 | Remcon's internal control procedures properly accounted for costs incurred on the project. | |
| 3217 | Remcon's damage claim for termination for convenience is based upon the Federal Acquisition Regulations. | |
| 3218 | Remcon included a rate of 17.4% for overhead and profit in its bid to the NPS. Profit is in the sum of 8.86% and overhead is 8.54%. | |
| 3219 | Remcon's equipment costs included in its claim are based upon the U. S. Corps of Engineers rates as required by the contract documents. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3220 | This project had a negative effect on Remcon's financial position from June 1, 2001 through November 30, 2002. The total loss to Remcon from this project exceeded $1,289,000. | |
| 3221 | The parties agreed at the preconstruction conference that the labor burden to be paid to Remcon for extra work would be determined by negotiation through the modification process. | |
| 3222 | The parties agreed that the labor burden to be used on extra work shall be 33%. | |
| 3223 | On modifications that were issued by the contracting officer which compensated Remcon for labor the labor burden used 33%. | |
| 3224 | Federal Acquisition Regulations and established industry standards provide that a contractor is entitled to be reimbursed for indirect overhead costs allocable to projects and to receive a fair and reasonable profit on costs incurred. | |
| 3225 | The home office overhead component of Remcon's 17.4% markup, computed to be 8.54% of direct costs, is an allowable cost consistent with Federal Acquisition Regulations. | |
| 3226 | Remcon is due an additional 371 days of delay for a total of 384 days of delay. | |
| 3227 | Remcon could not formally mobilize to the site in 2003 due to severe financial hardships suffered during the previous two working seasons, and lack of payment for the problems encountered, and could not proceed until the alternative dispute resolution process was implemented. | |
| 3228 | In a document dated September 7, 2000, the NPS concurred that "The Sherman Tree Project should be able to be sequenced during a two-construction season time frame. | |
| 3229 | On May 20, 2002, a schedule was submitted at the partnering meeting held on May 20, 2002 for Bob Russell of Jacob Facilities' review. | |
| 3230 | In 2003, when the Cure Notice was issued, Jacobs Facilities' primary representative which had been present at the project had been let go effective the end of 2002 due to NPS budget constraints. | |
| 3231 | No other scheduling consultants were hired to replace Jacobs Facilities. | |
| 3232 | Design changes permitting the Sherman Tree Trail to proceed were not issued until November 20, 2002, after the entire project was scheduled to be complete. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3233 | At the end of the 2003 construction season, Remcon was able to place two of three lifts of paving on the Upper Sherman Access Road the Upper Sherman parking area. However, activities such as restoration, signage, and other minor items could not be completed. | |
| 3234 | Remcon commenced work on the comfort station on September 7, 2001. | |
| 3235 | Decomposed granite will compact no greater than 15%, and likely less. | |
| 3236 | The removal of material from the burn pit occurred from July 3, 2001 to July 30, 2001, a period of 28 days. | |
| 3237 | On September 6, 2002, the NPS provided design revisions for the Upper Sherman Access Road, | |
| 3238 | As a result of these changes, Remcon had to redo some of the aggregate base that had been previously placed, and add aggregate base to other areas. | |
| 3239 | The final changes to the Upper Sherman Access Road allowed paving operations to commence October 7,2002. Starting paving this time of year presented problems, as Remcon was only allowed to pave the temperature was 50° F and rising, which severely restricted the working time available to pave. | |
| 3240 | Nevertheless, Remcon was able to place two of the three lifts of paving required before winter shutdown. | |
| 3241 | When Remcon's surveyor, Giuliani & Kull, attempted to lay out the work for the Sherman Tree Trail, it discovered that it needed additional survey information to layout the grades. | |
| 3242 | This needed information was provided by DHM on July 27, 2001 with the issuance of four new contract drawings. | |
| 3243 | Giuliani & Kull promptly laid out the trail and the excavation and embankment work depicted in these drawings was completed two weeks later on August 17, 2001. | |
| 3244 | One week later, Jacobs Facilities issued Remcon eight revised Sherman Tree Trial contract drawings in August 24, 1001. | |
| 3245 | Remcon proceeded on the revised work and competed it 4 1/2 weeks later in the last week of September, 2001. | |
| 3246 | The size and scope of roadway excavations, and the project limits of construction, must be taken into consideration when evaluating the impact of drilling and blasting. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3247 | The NPS limited Remcon's ability to drill and blast. The restrictions included the size of the shots to be blasted as well as the time (blasting could not commence daily until 4:00 pm). | |
| 3248 | Remcon's blasting was forced to be incremental and limited. | |
| 3249 | The extent of the drilling and blasting had to be determined on a trial and error basis because the fact that the excavation was not rippable was not evident in advance. | |
| 3250 | If the roadway excavation between stations 24 and 30 was in fact rippable, the excavation face from original ground to subgrade would have moved continuously and without interruption from start to finish in one pass through the cut area. | |
| 3251 | In the deep cut, Remcon first proceeded through the excavation removing the rippable material whenever it was found. | |
| 3252 | As the hardrock that was not rippable was uncovered and identified, the excavation of the rippable material had to haul over and around the massive rock formations. | |
| 3253 | When each incremental drill and blast section was being drilled, this operation frequently interfered with excavation and hauling operations. | |
| 3254 | After a section of the roadway was drilled and blasted, the excavation and hauling of this material had to occur when the drilling equipment was not in the way in order to provide adequate access. | |
| 3255 | When the drilling and blasting interfered with the excavation, the excavation was impeded and required to stand-by. | |
| 3256 | Blasting, instead of ripping, required additional equipment and made the planned work much more incremental and extended. | |
| 3257 | The volume of earthen material excavated per hour and day during blasting operations decreased (as contrasted to when no drilling and blasting was being performed), while the total volume of material to be excavated increased due to multiple causes. | |
| 3258 | The excavation of the drilled and blasted rock often had to operate sequentially, and not concurrently, with the drilling and blasting. | |
| 3259 | The unrippable rock required the excavation operations to jump around throughout the area as excavatable material became available. | |
| 3260 | The excavation equipment had to sort out and place fine material to cover each blast so as to assure that rock throw (spray from blasting) was prevented and adjacent trees were not damaged. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3261 | The blasting of the granitic rock resulted in a large amount of oversize boulders/rocks, which in turn required secondary blasting or breaking up by a hoe-ram or splitting. | |
| 3262 | Specification sections 02310 and 02316 provide very restrictive specifications for maximum rock size that could be incorporated into the embankment. | |
| 3263 | Oversize rocks required sorting and stockpiling, and had to rehandled for placement. | |
| 3264 | The actual physical dimensions of the smaller embankment areas further provided practical restrictions necessitating that only small rock be utilized. | |
| 3265 | Rippable rock material by its nature is fairly uniform in size and does not generate oversize rock that has to be dealt with in excavation or constructing the embankments. | |
| 3266 | Rock requiring drilling and blasting will provide greater swell in the embankments (often 20% to 30%) compared to the ripped rock which by its nature is more uniform and will not swell as much, if at all. | |
| 3267 | Drilling and blasting led to a great increase in the amount of excess material that could not be used in the embankments and had to be re-handled and moved off site. | |
| 3268 | California Drilling and Blasting was the blasting subcontractor used by Remcon on the project. | |
| 3269 | California Drilling and Blasting was experienced in drilling and blasting, in mountain regions, and in not overshooting rock unnecessarily. | |
| 3270 | Giuliani and Kull was the surveying subcontractor used by Remcon on the project. | |
| 3271 | Jess Stanley and Bill Morris held valid registration as licensed land surveyors at the time of the project. | |
| 3272 | Jess Stanley had 36 years of experience of land surveying experience. | |
| 3273 | Giuliani & Kull (G&K) used state of the art surveying equipment that was properly maintained and calibrated and was of the appropriate nature for the type of surveying performed, | |
| 3274 | The main field surveying instrument was a digital readout Trimble total station utilizing electronic distance measuring. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3275 | A hand held field computer referred to as a data collector or survey instrument controller by those in the survey profession was used to make field calculations and perform the construction layout in the field. | |
| 3276 | Point coordinates provided by the NPS on the project plans were hand inputted by G&K office staff into an electronic data file using office surveying software. | |
| 3277 | Periodic field checks of the survey instrument were performed by measuring known base lines as a reference check. The dates and records of the base line checks are recorded in a field book kept by Jess Stanley. | |
| 3278 | G&K employed the normal standard of practice, procedure and methodology for executing surveys of this nature. | |
| 3279 | G&K conducted a survey control check prior to the start of construction layout and found that the survey control coordinates provided by NPS on the drawings were accurate enough to provide subsequent construction layout. | |
| 3280 | The construction layout generally followed the normal construction sequence. | |
| 3281 | During the surveying of the access road, it was discovered that the design data supplied by the NPS did not fall in the area designated to be cleared by NPS, the surveyors properly and immediately reported the problem to the NPS staff. | |
| 3282 | The NPS did not perform any surveying to accurately establish the clearing limits before tree marking commenced. | |
| 3283 | Cut sheets of surveying were properly prepared and forwarded the NPS. | |
| 3284 | Additional surveying information was provided to the NPS when requested. | |
| 3285 | A "Construction Staking Work Plan" was submitted to the NPS prior to the commencement of construction layout. | |
| 3286 | Reference lath (guard stakes) were set with the station and a cut or fill to the design surface or feature being controlled. | |
| 3287 | The form of the construction staking was specified in the approved work plan. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3288 | The construction layout of the access road between approximately stations 24+00 and 30+00 disclosed that the area designated to be cleared was in a different location than the location provided for on the plans, and the difference was not faulty surveying. | |
| 3289 | As the areas of the cut and fill were established per the plans on the ground, the location of the access road per the plan did not fit within the swath of trees previously cleared between stations 24+00 and 30+00. The survey control had been previously checked and found to be accurate. | |
| 3290 | A possible error by G&K was eliminated by re-checking the construction layout leaving the only possible source of the error to be by the NPS due to incorrectly marking the trees or a mistake in the plans. | |
| 3291 | The NPS did not ascribe the appropriate value to the resources being removed and proceeded with marking trees for removal without the benefits of preliminary construction layout. | |
| 3292 | When it was discovered that the NPS had marked the trees in error, an attempt was made to alter the location of the road design. | |
| 3293 | G&K surveyed the cleared area and proposed an alternate alignment, even though the alternate design was outside the scope of the contract, and forwarded it to the NPS for review. | |
| 3294 | After some modifications, the NPS returned the final design data for realignment to G&K for staking in the field. | |
| 3295 | The layout of the access road and parking areas was performed pursuant to schedule. | |
| 3296 | Construction layout for the access road commenced during the week of June 25, 2001. | |
| 3297 | NPS provided G&K updated alignment data on July 11, 2001. | |
| 3298 | On July 16, 2001, G&K performed the realignment of the access road surveying and staking that was recognized and compensated as extra work by the NPS in modification no. 4. | |
| 3299 | There were many locations of design mistakes or dimension busts. | |
| 3300 | Once construction layout commenced on the trail, it became apparent that there was a problem with the design. | |
| 3301 | By inspection, when the trail was cut to subgrade it was apparent that the trail would be depressed. | |
| 3302 | G&K checked their field data and found it to be accurate and forwarded it to the NPS. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3303 | The trail layout began during the week of July 30, 2001, and thirteen and a half months elapsed from the time construction layout commenced until the time the NPS provided revised plans. | |
| 3304 | In October, 2001, the NPS contended in response to RFI #31 that the trail had been staked, and constructed, one foot lower than required. | |
| 3305 | It was not until May 9, 2002, that DHM provided a summary chart showing the revised trail elevations. | |
| 3306 | During a site walk on May 16, 2002, Bob Smith and Bill Morris agreed that the staking for the trail previously performed by G&K was substantially correct. | |
| 3307 | As-built surveys performed by NPS contractors confirmed that the construction was in substantial conformance to the approved plans and modifications thereof. | |
| 3308 | The Psomas as-built survey indicates that the actual locations and grades for the constructed civil engineering works fit reasonably well within the design locations and grades. | |
| 3309 | For bidding this project, the classification of material to be encountered during excavation had to be done from the Kleinfelder report, which represented the character of the subsurface materials to be encountered. | |
| 3310 | The Kleinfelder report specifically mentions that the earthen materials to be excavated were weathered granitic rock, slightly to highly weathered and having seismic velocities of from 4947 to 5747 and rippable with a D8 dozer. The Kleinfelder report also mentions that "floater" rocks, which may not be rippable, may be encountered. | |
| 3311 | Remcon prudently included a small contingency of $30,000 in its proposal to blast unrippable rock since it was impossible to determine the quantity for "float" rock. | |
| 3312 | Remcon's earthwork quantity take-off was greater than the NPS quantity. During the bid phase, Remcon informed the NPS of this, and was told to use the bid quantities. | |
| 3313 | Remcon bid this project based on its prior experience with the NPS. | |
| 3314 | Bid items 370 (Excavation and Grading) and 390 (Haul Excess Excavation) in Remcon's bid account for 33% of the direct costs of the work to be performed by Remcon. The work consisted of about 14,136 cy of onsite cut and fill, and 7,100 cy to be excavated, stockpiled and rehandled and hauled to the excess excavation disposal site. | |

| Number | Fact | Stipulated to by the Government Y/N? |
|---|---|---|
| 3315 | Remcon estimated to cast the onsite excavated material into place using a Cat 345BL excavator and a Cat D8M ripping and dozing the excavated material. Material not going into the stockpile was to be compacted with a Cat 563 Compactor. | |
| 3316 | Remcon's estimated production, using two pieces of equipment (CAT D8 and Cat 345BL), to excavate and move the material on average approximately 300 feet to the locale for placement yields a rate of 231 cy/hr. The Cat handbook lists the production rate of a D8 pushing 300 feet at 580 cy/hr and the Cat 345 BL at 250 cy/hr. | |
| 3317 | Remcon's estimated production to excavate and stockpile was 98 cy/hr. | |
| 3318 | Remcon's overall estimate for bid item 370 was 260 hours of production earth moving production to move 21,226 cy. This rate is less than 100 cy/hr, a conservative production rate. | |
| 3319 | Remcon planned on the excess excavated material to be loaded from the stockpiles using the Cat 345BL, and hauled to the disposal area using Cat D350 trucks. | |
| 3320 | The estimated loading production with the Cat 345BL is 148 cy/hr or 7-Cat D350 truck loads per hour. | |
| 3321 | The Cat 345BL, with a 2.9 cy bucket, with 12 passes at 30 seconds per pass will load seven loads per hour at 70% efficiency. The estimated haul production is 49 cy/hr or 2.4 loads per hour, a 23 minute cycle time. | |
| 3322 | Remcon included a field engineer for 21 weeks (one season's work) and a Project Superintendent for 40 weeks (two season's work). | |
| 3323 | Remcon's cost summary shows that 60.7% of the work was subcontracted, while the labor and equipment for the work done by Remcon accounted for 27.5%. | |
| 3324 | Remcon performed the early critical items of work, and subcontracted out the later specialized work. | |
| 3325 | Remcon's bid was consistent with the other bids received by the NPS, was consistent with the NPS estimate, and was within 10% of the other bidders. | |