**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, v. THE UNITED STATES, Defendant. | ) | No. 03-2478C (Judge Braden) |

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to Appendix A, ¶ 14, of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following Memorandum of Contentions of Fact and Law.[1]

## INTRODUCTION

This matter involves work performed by plaintiff, Remediation Constructors, Inc. ("Remcon") upon a National Park Service ("NPS") project in Sequoia National Park. The Sherman Tree Parking project is located at about 6,400 feet of elevation in the Sierra Nevada Mountains in Eastern California in the Giant Forest of Sequoia/Kings Canyon National Park ("Giant Forest"). The Sequoia trees of the Giant Forest are the largest trees in the world, and the General Sherman Tree is the granddaddy of them all, making it the most visited area of the Giant Forest.

In the 1920s and 1930s the area around the General Sherman Tree looked very different. It held seasonal cabins, a restaurant, a grocery store and numerous roads. Over time, many of these structures had become dilapidated and many succumbed to

---

[1] Remcon's Memorandum of Contentions of Fact and Law is cited "Pl. Mem. __." References are to page numbers.

ruin. In the 1980s, NPS initiated a series of projects at Sequoia related to the demolition of these buildings and rehabilitation of the Giant Forest. Over fifteen projects have been successfully designed and built in furthering the NPS' goal of revitalizing Sequoia National Park's Giant Forest and making it one of the crown jewels of the National Park Service. The 200Q project, at issue in this litigation, is one of these projects.

On May 9, 2001, the NPS awarded a contract to Remcon for the 200Q project. The contract called for three distinct areas of work: the Upper Sherman Parking Area and access road (the "Upper Sherman"); the Sherman Tree Trail; and the Lower Sherman Parking Area. Work at the Upper Sherman included the construction of a paved access road, a parking lot split into two levels (upper and lower), the construction of a comfort station and wayside kiosk, the installation of utilities, and other site improvement work. The second construction area, the Sherman Tree Trail, consisted of about 2,000 linear feet of asphalt paved pedestrian path with associated wood bridges, a visitor overlook and wooden rail fences. The third area of construction was the Lower Sherman Parking Area, which required the realignment and reconstruction of a portion of the General's Highway, the construction of a reinforced concrete retaining wall, demolition of an existing comfort station and construction of a new comfort station, the construction of asphalt paved pedestrian paths, installation of utilities and other site improvements.

The amount of the contract on the date of award was $7,121,636. The period of performance was 792 calendar days. After the Notice to Proceed was issued, the contract completion date was established as August 11, 2003. At that time, Remcon

had been in business only five years. However, Remcon had worked as a subcontractor upon another project – the 200O project – for the Giant Forest Museum.

## STATEMENT OF THE ISSUES

Plaintiff identified forty-eight issues for ths Court to decide, it is the NPS' position that there are two primary issues that need to be resolved with sub-issues for each. For convenience, the NPS will reference Remcon's related issues:

1. Whether the NPS properly terminated Remcon for default.
    a. Whether the contracting officer was justified in terminating Remcon for default. (Pl. Issue Nos. 4, 18, 47, 48).
    b. Whether Remcon's anticipatory repudiation of the contract, by its failure to respond to the cure notice and provide adequate assurances, provided independent grounds for a default termination.
    c. Whether Remcon lacked adequate justification for failing to mobilize to the project site in the third construction season. (Pls. Issue Nos. 16, 17, 34, 35, 37).
    d. Whether the project was commercially practicable.
    e. Whether, prior to the default termination, the Government terminated the contract for convenience. (Pls. Issue Nos. 44, 45).
2. Whether Remcon is entitled to compensation for claims detailed in its omnibus claim dated June 28, 2003.

f. Whether Remcon encountered "changed conditions" and, if so, whether those conditions were constructive changes or otherwise directed, and whether Remcon was compensated for these changes. (Pl. Issue Nos. 3, 9, 13, 22, 23, 25, 26, 27, 29, 30, 31, 40).

g. Whether there was a differing site condition related to the excavation of rock. (Pl. Issue Nos. 12, 28, 39).

h. Whether the Government issued defective design documents. (Pl. Issue Nos. 1, 2, 10, 11).

i. What were the Government's and Remcon's responsibilities under the contract related to providing materials such as aggregate base and revetment? (Pls. Issue Nos. 14, 15).

j. Whether the Government had superior knowledge that it failed to disclose to Remcon.

k. Whether the Government improperly administered the contract or violated a duty of cooperation. (Pls. Issue Nos. 5, 6, 38, 42, 43).

l. Whether Remcon encountered compensable delay and disruption. (Pls. Issue Nos. 7, 8, 24, 31, 33, 41, 46

m. Whether Remcon properly assessed its alleged damages. (Pls. Issue Nos.19, 36).

## CONTENTIONS OF FACT

The Government's Contentions of Fact are contained in a separate document filed as an attachment hereto. Our discussion of the Government's position with respect to the alleged facts upon which Remcon is expected to rely is incorporated into our contentions of law, discussed below.

## CONTENTIONS OF LAW

As an initial matter, Remcon's assertions are often not supported or directly conflict with contemporaneous records. This is significant because it is well-established that contemporaneous documents have far greater probative value than post-hoc, self-serving testimony. This includes situations where the testimony is directly contradicted by the contemporaneous documents, e.g., Applied Companies v. United States, 144 F.3d 1470, 1474-75 (Fed. Cir. 1998) (affirming summary judgment); Montgomery Coca-Cola Bottling Co. v. United States, 222 Ct. Cl. 356, 369-75, 615 F.2d 1318 (1980) (citing United States v. Gypsum Co., 333 U.S. 364, 396 (1947)); Sterling Millwrights, Inc. v. United States, 26 Cl. Ct. 49, 90 (1992), and situations where an allegedly significant event is not reflected in the contemporaneous documents. E.g., Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 42-43 (2nd Cir. 1986) ("The failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim."); Fru-Con Construction Corp. v. United States, 43 Fed. Cl. 306, 335-37 (citing cases), aff'd on recon. in relevant part, 44 Fed. Cl. 298, 307, 314-15 (1999).

The lack of contemporaneous evidence supporting Remcon's assertions is a strong indication that Remcon's claims, as a general matter, lack genuine factual support.

## I. The Default Termination Of Remcon's Contract Was Justified

The United States has detailed its reasons for terminating Remcon for default in its Motion for Partial Summary Judgment, filed June 24, 2005, and in its Reply to Remcon's Opposition to the Motion for Partial Summary Judgment, filed September 2, 2005. We respectfully refer the Court those filings for a more detailed discussion of the default termination issue. An abbreviated discussion is set forth below.

### A. Remcon Failed To Mobilize To The Project Site For The Third Construction Season, Failed To Provide Assurances That It Could Timely Complete The Project, And Failed To Respond To The Cure Notice

#### 1. Remcon Failed To Mobilize For The 2003 Construction Season

This contract incorporated FAR 52.249-10, which allows the contracting officer to terminate a contract for default if the contractor "refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in [the] contract including any extension, or fails to complete the work within this time." The decision to terminate a contract is discretionary, based upon the contracting officer's business judgment.

This Court is bound by the standards set forth in Lisbon Contractors, Inc. v. United States, 828 F.2d 759 (Fed. Cir. 1987) for evaluating terminations for default. See also, McDonnell Douglas Corp. v. United States, 323 F.3d 1006 (Fed. Cir. 2003)

(reaffirming that the test formulated in Lisbon controls); Danzig v. AEC Corp., 224 F.3d 1333, 1336-37 (Fed. Cir. 2000) (indicating that the ASBCA properly applied the Lisbon standard in reviewing a default for failure to make progress).

In Lisbon, 828 F.2d at 765, the Federal Circuit construed the default provision to "require reasonable belief upon the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for the contract performance." The precedent of Lisbon does not require the contracting officer to be correct in his or her assessment, only that the contracting officer be "justifiably insecure about the contract's timely completion." McDonnell Douglas, 323 F.3d at 1017 (citing Discount Co. v. United States, 213 Ct. Cl. 567, 554 F.2d 435, 441 (Ct. Cl. 1977)). Factors generally relied upon by courts include a comparison of work completed compared to that remaining under the contract, problems with subcontractors and suppliers, a contractor's financial situation and other pertinent circumstances surrounding the contracting officer's decision. McDonnell Douglas, 323 F.3d at 1016-17.

In this case, there were more than sufficient grounds for the contracting officer to be concerned about Remcon's performance (or lack thereof). Remcon cannot dispute that it failed to commence work during the third construction season. Further, and more importantly, Remcon improperly refused to mobilize to the project site for the third construction season and stated that it would not mobilize unless the NPS engaged in alternative dispute resolution related to its claims. When the NPS repeatedly asked

Remcon when it would mobilize to the site, Remcon responded that "Remcon is in control over its own mobilization process not the NPS." If the NPS paid Remcon for its claims, Remcon would mobilize. Remcon's behavior was not acceptable and violated the applicable contract provisions and its duty to act in good faith regarding the performance of the contract.

Remcon also cannot dispute that, as of July 22, 2003, only approximately 53% of the work had been completed, while approximately 95% of the contract time had expired. Remcon also cannot dispute that, as of July 24, 2003, the date of the issuance of the cure notice, there was no possibility that Remcon would complete the work by August 28, 2003, the extended completion date.

### B. Remcon's Failure To Respond To The Cure Notice And Provide Adequate Assurances That It Would Timely Complete Performance Provided Grounds For Termination For Default

Remcon's failure to respond to the cure notice is an independent ground for the termination for default. When a valid cure notice is issued, the contractor is obligated to provide "assurances that progress is being made toward a timely completion of the contract, or to explain that the reasons for any prospective delay in completion of the contract are not the responsibility of the contractor." Danzig, 224 F.3d at 1337.

Remcon contends that our position, that failure to respond to a cure is grounds for termination, is an "overly literal application of the law." Pl. Mem. at 45. Remcon takes this position because, if the law is applied, the termination must be upheld. Although a contracting officer must establish that he or she had reasonable grounds for

terminating a contract for default, where there are justifiable means for a cure notice, the contractor's failure to provide an adequate response will, in and of itself, satisfy the standard. See C.H. Hyperbarics, Inc., ASBCA 49375 et. al., 04-1 BCA P. 32,568 (2004) (the ASBCA invoked Danzig in finding the contractor anticipatorily repudiated the contract by stopping work despite the disputes clause and that the contractor's failure to respond to the cure notice with any justification for stopping work justified the termination).

A contractor must respond to a cure notice by either providing adequate assurance, or offering an appropriate explanation excusing performance. Remcon's failure to provide any such assurance or explanation in response to the cure notice was, in itself, ground for termination for default. See Composite Laminates, Inc. v. United States, 27 Fed. Cl. 310, 323 (1992) ("[P]arties are entitled to ask for reassurances . . . and they are entitled to treat the failure to provide such assurances as a repudiation of the contract.") (quoting Tubular Aircraft Prods., Inc. v. United States, 213 Ct. Cl. 749, 566 F.2d 1190 (1977) (text of opinion of trial judge appears in 23 CCF ¶ 81,327 at 86,619 (1977)). Similarly, this Court, in A.R. Sales Co., Inc. v. United States, 51 Fed. Cl. 370, 373 (2002), granted the Government's motion for summary judgment, holding that the plaintiff's "utter failure to provide reasonable assurances in response to a well-justified cure notice sufficed as a justification for the termination of the contract for default."

The requirement to respond to a cure notice serves an essential role in the administration of Government contracts. As the courts have reasoned implicitly, this requirement is necessary to ensure that cure notices serve their purpose to "provide the contractor with an opportunity to assert any excusable delay, and allow the Government to assess whether the contractor can complete performance." Roxco, Ltd. v. United States, 60 Fed. Cl. 39, 43 (2004) (quoting 5 John Cosgrove McBride & Thomas J. Touhey, Government Contracts, Cyclopedic Guide to Law, Administration, Procedure § 35A.80[3] (2001)).

Once the cure notice was issued, Remcon was under an absolute duty to provide adequate assurances or to explain that the contract difficulties were not its fault. Unlike the contractors in Danzig and A.R. Sales, Remcon provided the contracting officer with no explanation whatsoever. Although the courts in those cases found the responses to the cure notices insufficient, this case presents the much stronger case for the Government because, here, there was no response at all. Remcon's silence left the contracting officer with no indication that Remcon would ever return to the work site and no choice but to terminate the contract for default. Moreover, Remcon's previous failure to mobilize and refusal to proceed without an ADR agreement only offered further support for this conclusion. Remcon's failure to provide any response to the cure notice justifies the termination and requires the entry of summary judgment in favor of the Government in connection with the termination claims raised by Remcon.

## B. Remcon Does Not Have An Adequate Defense For Failing To Mobilize For The Third Construction Season

### 1. The NPS Did Not Render Remcon Financially Incapable Of Performing

The NPS did not render Remcon financially incapable of continuing its performance of the contract. The NPS made progress payments to Remcon as the payments were due and paid Remcon for bilateral modifications to the contract. With respect to disputed items, the NPS diligently worked with Remcon to negotiate disputed items. However, there were many times when the NPS did not agree that Remcon was entitled to payment or other relief (e.g., additional time) and Remcon was so advised.

#### a. The NPS Provided Remcon With Progress Payments

Remcon claims that it was excused from performance because the NPS rendered it financially unable to continue performance of the contract. It claims in this regard are unfounded.

It is well established that a Government contractor is obligated to possess adequate financing to enable it to perform its contract. E.g., Southeastern Airways Corp. v. United States, 230 Ct. Cl. 47, 63 & nn.15-18, 673 F.2d 368 (1982). When the contractor argues that its financial difficulties were caused by the Government's failure to make progress payments that were required by the contract, "the burden is on the contractor to establish that the progress payments were erroneously withheld and that the withholding of such progress payments was the primary or controlling cause of the

contractor's default." TGC Contracting Corp. v. United States, 736 F.2d 1512, 1515 (Fed. Cir. 1984); accord, e.g., KPM Corp., ASBCA No. 26540, 84-3 BCA ¶ 17,668 at 88,115 (1984).

Remcon was paid progress payments for the 200Q project as prescribed by Clause I.87 DS52.232-27 – Prompt Payment for Construction Contracts. Remcon submitted certified pay estimates certifying that it had done the work and paid its subcontractors and the NPS paid Remcon progress payments as a result. On the few occasions when the NPS made late payments, it paid the appropriate Prompt Payment Act interest.

It is important to note that although the NPS was paying Remcon on this project, Remcon was not always paying its subcontractors. The NPS issued numerous Miller Act responses to subcontractors because they alleged that they had not been paid by Remcon even though Remcon certified that it was paying its subcontractors.

**b. The NPS Was Entitled To Reduce Progress Payments For Improper Credits**

In November, 2002, the NPS readjusted Progress Payment No. 12 to reflect actual quantities placed under the contract. Remcon claims that the NPS could not unilaterally and retroactively readjust progress payments that it made to Remcon. Remcon is incorrect.

The 200Q contract contained Clause I.87 DS52.232-27 – Prompt Payment for Construction Contracts. Progress payments are made upon the basis of costs incurred by the contractor as work progresses under the contract. The Government must ensure

that payments made are commensurate with work accomplished under the contract. Greenhut Constr. Co., ASBCA No. 41777, 93-1 BCA ¶ 25,374. Pursuant to FAR 32.503-6, the Government has the right to reduce or suspend progress payments.

In the current case, the NPS reviewed and audited Remcon's Pay Estimate for Progress Payment No. 12. The NPS sent Remcon a letter on November 19, 2002 entitled, "Pay Estimate Quantity Corrections," noting that Remcon was over billing for some quantities, and charging for work that was incomplete or non-conforming. Notably, there were six instances in which Remcon claimed payment for work not done; there were six instances where Remcon had requested money for work that did not conform to the specifications; there was one instance where the NPS increased the quantity; and there was one instance where Remcon's request was more than agreed to in the field.

Remcon disputes the amounts withheld from Progress Payment No. 12 and subsequent progress payments.[2] Remcon submitted claims regarding the work related to the reduction of payments. The NPS denied Remcon's claims. While Remcon's claims are appropriately disputed items, they are not an excuse for Remcon to not mobilize to the project for the third construction season. The amounts withheld from Progress Payment No. 12 were not so significant that it should have rendered Remcon financially unable to continue with the contract.

---

[2] Although the NPS disagreed with costs claimed in Remcon's pay estimate for Progress Payment No. 12, Remcon continued to make the same requests for the same disputed items in its pay estimate for Progress Payment Nos. 13 and 14.

**c. The NPS Paid Remcon For Modifications**

By the third construction season, Remcon had been paid for Bilateral Modification Nos. 1-5. The NPS also issued unilateral Modification No. 6, related to Remcon's alleged Differing Site Condition claim (the proceeds of which were paid to Remcon's surety).

Remcon claims that the NPS belatedly issued modifications. We disagree. However, even if Remcon's contentions were true, by late fall 2002 Remcon had been paid upon all outstanding bilateral modifications. Further, in August 2002, the NPS had expressed a willingness to pay Remcon $485,000 to resolve all of its outstanding claims. By the 2003 construction season, when it refused to mobilize, Remcon could not claim that any alleged failure by NPS to issue modifications was rendering it incapable of returning to the project.

**d. The NPS Was Not Obligated To Pay Remcon For Disputed Items**

Remcon asserts that it was not obligated to mobilize to the project site for the third construction season until the NPS engaged in Alternative Dispute Resolution ("ADR") with Remcon. This is incorrect. A contractor cannot condition its continued performance of its contract upon Government agreement that it will compensate the contractor or provide schedule relief. E.g., Alliant Techsystems, Inc. v. United States, 178 F.3d at 1276-77, reh'ing denied, 186 F.3d at 1380-81; Stoeckert v. United States, 183 Ct. Cl. 152, 160-64, 391 F.2d 639 (1968); Valley View Enterprises, Inc. v. United States, 35 Fed. Cl. 378, 382-86 (1996); Ralph C. Nash, Jr., Government Contract

Changes 3-2, 6-2 through 6-4, 6-12 through 6-13 (1989 & Supp. 1991). In effect, Remcon was attempting to hold the contract hostage to an ADR procedure to which Remcon had no contractual or statutory entitlement.

The NPS reminded Remcon, upon more than one occasion, that Remcon was required, under the disputes clause of the contract, to "proceed diligently with performance of [the] contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer." I.59 52.233-01 – Disputes. Even when the contracting officer advised Remcon to mobilize, it refused.

**e. Remcon Caused Its Own Financial Problems**

Remcon argues that its failure to mobilize to the site for the third construction season was excused due to its financial incapacity, allegedly caused by the NPS. However, any problems that Remcon had regarding its financial capability to complete the contract were not the fault of the NPS.

The poor financial condition or insolvency of a contractor ordinarily is not a sufficient excuse for a contractor's default in performance of a contract. Southeastern Airways Corp. v. United States, 230 Ct. Cl. 47, 673 F.2d 368, 377-78 (1982); In re Boston Shipyard Corp., 886 F.2d 451, 457 (1st Cir. 1989); Pruess v. United States, 188 Ct. Cl. 469, 412 F.2d 1293, 1302 (1969). A contractor who makes a bid should have the financial capacity to perform. In re Boston Shipyard Corp., 886 F.2d at 457.

In the current case, Remcon's financial incapacity was caused by Remcon's thin capitalization, in concert with other significant debts, that made it impossible for it to absorb even routine and foreseeable problems. This cannot excuse Remcon's failure to mobilize the third season.

The 200Q project was not the source of Remcon's financial woes. Documents Remcon produced to the NPS in discovery indicate that Remcon lost money upon several other projects. Further, as of Summer 2002, it was not losing money upon the 200Q project. In addition, in June, 2002, the Bank of America obtained a judgment against Remcon for $1.4 million. It is disingenuous for Remcon to blame its financial condition on the NPS. It is simply impossible to believe that the $1.4 million judgment against Remcon did not have a significant effect on its financial condition.

## C. The Contract Was Not "Commercially Impracticable"

Remcon claims it was "commercially impracticable" for it to continue performance on the contract. The NPS disagrees.

For a court to find entitlement upon the basis of commercial impracticability, the following factors must be considered: 1) whether any other contractor was able to comply with the specifications; 2) whether the specifications require performance beyond the state of the art; 3) the extent of the contractor's efforts in meeting the specifications; and 4) whether the contractor assumed the risk that the specifications might be defective. Oak Adec, Inc. v. United States, 24 Cl. Ct. 502 (1991). In Jennie-O Foods, the Court of Claims held that the doctrine of commercial impracticability could

only be used "when the promissor has exhausted all of its alternatives, when in fact it is determined that all means of performance are commercially senseless." Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. 314, 327, 580 F.2d 400, 409 (1978).

The 200Q project was a standard construction contract. To prove commercial impossibility, Remcon would have to show that "industry as a whole found the specifications impossible." Jennie-O Foods, Inc. v. United States, 217 Ct. Cl. 314, 580 F.2d 400 (1978). That is not the case here. The plans and specifications were standard construction documents. This was not a very difficult project. Its main components involved the construction of roads, parking lots, a walking trail and comfort stations – standard contractor fare. It certainly did not require performance that was "beyond the state of the art."

Remcon's inability to complete the project was its own doing. It did not exhaust all of its alternatives to complete the project, especially when it refused to mobilize to the construction site for the third construction season. Instead of putting more workers on the project, Remcon was having problems keeping its key personnel on the project.

Put simply, the project could have been built by a competent construction contractor. It was neither impracticable nor impossible for Remcon to return to the site and continue the project.

### D. There Was No Partial Termination For Convenience Related To Modification No. 7

Remcon claims that there was a partial termination for convenience when the NPS issued Modification No. 7. Remcon's argument fails because the NPS did not issue Modification No. 7.

On March 3, 2003, the contracting officer, Mr. Keiscome, submitted Modification No. 7 to Remcon for its signature. This modification would have deleted work in the Lower Sherman Area from the contract. Remcon had been amenable to deletion of this work in discussions with the NPS in August of the prior year, but when it received proposed Modification from the contracting officer it responded with several letters threatening that if the NPS issued Modification No. 7 it would seek damages and would consider the NPS in breach of its contract. On April 1, 2003, the NPS contracting officer sent a letter stating that "pursuant to Remcon's request," it would not issue Modification No. 7. The letter rescinded proposed Modification No. 7.

## II. The NPS Did Not Breach Its Contract With Remcon

Remcon claims that its failures to return to the project site for the third construction season and to respond to the cure notice were excusable because the NPS allegedly had breached the parties' contract.[3] However, by the third construction

[3] Remcon's memorandum of law states that the NPS' breaches "are legion" including, but not limited to, the NPS' alleged failure to timely issue and pay for modifications, the NPS' unilateral change order No. 6 did not adequately compensate Remcon for the differing site conditions, allegedly inadequate plans and specifications, the NPS' alleged failure to provide aggregate base, and alleged failure to fully compensate for excess excavation. See Pl. Mem. at 50.

season, the NPS was current in its payments to Remcon (and/or its surety) and the performance issues that Remcon claims are the basis for NPS' breach are "disputed" items, which are properly the subject of the contract disputes clause. They did not give Remcon the excuse to cease performance and condition continued performance upon the Government's payment of its claims. Further, even assuming, for the sake of argument only, that there was a material breach, Remcon waived any such alleged breach by not affirmatively telling the Government that it believed the Government was in breach.

Only a material breach constitutes a defense to a termination for default of a Government contract. See, e.g., Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1276-77, reh'ing denied, 186 F.3d 1379,1380-81 (Fed. Cir. 1999); Malone v. United States, 849 F.2d 1441, 1445-46 (Fed. Cir. 1988); Allan Construction Co. v. United States, 227 Ct. Cl. 193, 203, 646 F.2d 487 (1981). This is so, because the standard Government contract disputes clause requires the contractor to continue performance even when there is a dispute between the parties with regard to, for example, the interpretation of the contract. A contractor cannot condition its continued performance of its contract upon Government agreement that it will compensate the contractor or provide schedule relief. Stoeckert v. United States, 183 Ct. Cl. 152, 160-64, 391 F.2d 639 (1968); Valley View Enterprises, Inc. v. United States, 35 Fed. Cl. 378, 382-86 (1996). In order for Remcon to prevail under a theory of breach, Remcon must show that the Government materially breached the contract, that, as a result of

the breach, the NPS lost the right to terminate, and that Remcon did not waive the breach.

Although a contractor cannot condition its continued performance of its contract upon the Government's agreement that it will compensate the contractor, this is exactly what Remcon did. In essence, the Government was being "held hostage" by Remcon. Remcon stated repeatedly that it would not mobilize to the site and begin performance until the Government entered into Remcon's proposed ADR agreement with respect to disputed items. The upshot is that if the Government paid more money, then Remcon would complete the work. Aside from the unseemliness of Remcon's tactics, and the fact that Remcon was attempting to condition the performance of its contractual duties upon the Government agreeing to provide Remcon with something that was not bargained for (ADR), the problem, as this Court will see below, is that the Government simply did not agree that Remcon's claims were valid. This is why the CO wrote decisions denying Remcon's claims and which is why they were disputed items. Remcon's conduct in refusing to perform the contract is precisely what the courts were trying to avoid when they required contractors to continue performance, even if there were disputes.

Further, assuming for the sake of argument only, that this Court were to find that the Government breached the contract, Remcon waived any such breach. A party that alleges that a contract has been materially breached must, within a reasonable time of learning of the breach, cease performance and notify the breaching party that it

considers the contract to be at an end. If the non-breaching party fails to take these steps, it waives the material breach and is limited to pursuing damages for a non-material breach. E.g., Pinewood Realty Ltd. v. United States, 223 Ct. Cl. 98, 104, 617 F.2d 211 (1980); Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 234-45 & nn.19-20, 22-24, 28, 34, 543 F.2d 1306 (1976). The right to cancel a contract for material breach must be exercised with reasonable promptness after discovering the breach. Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306, 1315 (1976).

If Remcon truly believed that the Government was in material breach, it should have canceled the contract. For example, in Roxco, Ltd. v. United States, 60 Fed. Cl. 39 (Fed. Cl. 2004), a case upon which Remcon relies, the contractor wrote the contracting officer informing the Government that it "irrevocably and voluntarily abandons and terminated the above construction Contract immediately." At that point in time, the Government was aware that the contractor could not continue performance.

Remcon never notified the Government that it considered the contract at an end. Indeed, quite the opposite. Remcon would have happily continued under the contract, as long as the Government paid Remcon what it wanted to be paid. Although Remcon states that its June 28, 2003 claim was notice of a breach, the claim does not use the word breach or claim that the Government was in breach of the contract. Instead, Remcon stated that it would mobilize to the site and begin performance, but not until

the Government entered into ADR with respect to disputed items. Again, Remcon was holding the Government hostage.

For the contract to be at an end, Remcon must unequivocally make it so. Remcon filed a Complaint for Breach of Contract and Damages, in October, 2003, two months after the Government terminated the contract.

## III. Remcon's Claim Items

### A. Earthwork Claims Have Been Paid For By Modification

Remcon claims that it encountered increases in earthwork quantities. See Pl. Mem. 23. Most of the earthwork that occurred on the 200Q project occurred during the first year of the project. During that year, Remcon claimed it was entitled to compensation for additional excavation that it had to haul away from the project and for differing site conditions when it allegedly encountered rock. With respect to the additional excavation, Remcon was paid for this work pursuant to Bilateral Modifications No. 3 and 4. Therefore, Remcon is barred from additional compensation for this work pursuant to the doctrine of accord and satisfaction.

Further, even if this Court were to find that Remcon was entitled to compensation for earthwork, it should still deny Remcon's claim because Remcon has submitted a total cost claim and it cannot meet the requirements for such claim because Remcon's bid estimate for earthwork was substantially incorrect.

### 1. Excess Excavation Was Paid for by Modification No. 4

Remcon is not due any additional amounts for excess excavation related to the 200Q project because it has been paid for this work under Modification No. 4 and is now barred by accord and satisfaction from seeking additional compensation.

Accord and satisfaction require the following prerequisites: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. Brock & Blevins Co. V. United States, 170 Ct. Cl. 52, 58-59, 343 F.2d 951, 955 (1965) (quoting Navada Half Moon Mining Co. V. Combined Metals Reduction Co., 176 F.2d 73, 76 (10th Cir. 1949)); Spalding and Son, Inc. V. United States, 24 Ct. Cl. 112, 154 (1991).

In June 2001, Remcon alleged that it encountered additional excavation. Although excavation and grading was to be paid for as a lump sum, the contract contemplated that Remcon would be paid for additional excavation that needed to be hauled elsewhere on the project.

The contract bid schedule indicated that Remcon would have to haul 6,800 CY of excess material to a storage area at Wuksachi. Remcon claimed that it encountered an additional 15,000 CY of excess material. Remcon was contractually required to provide quantity surveys, which would have verified the amount of excess material that Remcon was encountering upon the project. See Contract, Section C – Descriptions and Specifications, Division 1, Section 01720 Field Engineering, 1.2.A. However, Remcon failed to do so.

At the end of 2001 and beginning of 2002, Remcon pointed to the numerous piles of material stockpiled in the upper parking lot as "proof" that it had encountered massive quantities of excess excavation that needed to be hauled off site. Most of the material stockpiled at the Upper Sherman Parking Area in 2001 represented material that was needed for use at other areas of the project. By the end of 2001, 90 percent of the excavation upon the project had already been performed. Some of the material that was stockpiled at the Upper Sherman Parking Area in 2001 included excess excavation from the Upper Sherman that was needed for fill at the Lower Sherman Parking Area. There were 4,750 tons of aggregate base that Remcon had crushed on site; there were 3,940 tons of sand Remcon had crushed on site; and there were 800 tons of by-product from the crushing. Only some of the material that was stockpiled at the Upper Sherman Parking Area was material that needed to be hauled away.

Also, the NPS did not know that Remcon had incorrectly assessed the amount of excavation it would encounter. Remcon estimated that it would encounter about 21,000 CY of excavation on the project, while the NPS' design team estimated that Remcon would encounter about 33,000 CY of material. As a result, it was likely that Remcon actually encountered about 5,000 CY of excess material, but perceived that it encountered much more because of its mistake. The parties discussed the excess excavation issue during meetings in October 2001, December 2001, and May 2002.

Regardless of the amount of excess material upon the project, the NPS proposed to resolve the issue by using the excess material to raise the upper parking

lot in the Upper Sherman Parking Area. In May 2002, Remcon agreed. The parties negotiated a price for the work in June, 2002. During the negotiations, the parties agreed that there was no need to extend the contract completion date because the work was not upon the critical path.

The NPS issued drawings for raising the upper parking lot in the Upper Sherman Parking Area and the contracting officer issued a directive for Remcon to proceed with the work on June 28, 2002. Remcon proceeded with the work and raised the parking lot. On September 12, 2002, the NPS issued bilateral Modification No. 4. Modification No. 4 compensated Remcon for the excess excavation it encountered in two ways: It paid Remcon for hauling 3,200 CY of material off site and it paid Remcon to raise the upper parking lot. This modification contained a release of claims that was signed by Remcon.

Remcon is barred by accord and satisfaction for claims related to excess excavation that occurred in 2001. Modification No. 4 was issued as accord and Remcon's performance of hauling the excess material off site and raising the parking lot constitutes satisfaction.

With respect to the first requirement of accord and satisfaction, proper subject matter, all of Remcon's excess excavation encountered up to the date of its issuance is the proper subject matter of Modification No. 4. By 2001, Remcon had been paid for 90% of the excavation upon the 200Q project. That means that Remcon had completed virtually all of its excavation. If Remcon encountered excess excavation,

regardless of the cause, it had already been encountered by the end of the construction season in 2001. Therefore, when the NPS issued Modification No. 4, it compensated Remcon for handling all of the excess excavation that it had encountered, not for just some of the excess.

Indeed, there were no conversations during the negotiations of Modification No. 4 indicating that raising the parking lot in conjunction with a pay item for hauling away additional material would not compensate Remcon fully for the excess it had encountered in 2001.

Remcon claimed that it encountered 15,000 CY of excess material. Of this, 6,800 CY was material that was designated under the contract to go to Wuksachi. With respect to the additional material Remcon claimed it encountered, the NPS paid Remcon to haul away 3,800 CY of material and to raise the parking lot with 5,000 CY of material. Together, the 6,800 CY to Wuksachi, the 3,800 CY to Wolverton, and the 5,000 CY to raise the parking lot comes to 15,000 CY.

The language in the justification for Modification No. 4 reflects this understanding. Modification No. 4 states:

> Item 39: Haul Excess Excavation: Compensate the Contractor for hauling an additional estimated quantity of 3,200 CY of excess excavation to Wolverton Point. Payment will be made at the Contract Unit Price of $12.00 CY.
>
> New Item No. 139: Compensate the Contractor for costs associated for placing and compacting the excess excavation required to raise the upper parking lot to the

> revised grading elevations. Payment will be made at a negotiated Lump Sum price.

The Justification for hauling excess excavation was described as follows:

> During the excavation for the access road and parking lots, the contractor stated that the cut and fill volumes did not balance. The contractor notified the NPS of this discrepancy and was informed that any excess material was his responsibility for its removal. It took the NPS approximately nine months to determine that they were responsible for the hauling costs associated with this excess material. This material had to be removed from the project site in order for the contractor to complete design subgrades. If this work is not performed this contractor, the contractual work can not be completed and delay claims will follow. Therefore this work is necessary to the completion of this project and I recommend it be approved.

The Justification for raising the parking lot was described as follows:

> During the excavating and Grading of the Access Road and the Upper Sherman Parking lots, it became apparent that excess excavated material was being generated. The contract provides for hauling 6,800 CY of Excess Excavation to Wolverton point for disposal. It was estimated by the Government that a total quantity of approximately 15,000 CY of Excess excavation will be generated. The Denver Service Center and the Designer have determined that the Upper Parking Lot can be raised approximately 5-feet at the easterly end and will allow 5,000 CY of Excavated material to be incorporated into fill at this location. This change will reduce some of the costs associated with hauling excess material within the Park boundaries and will result in the approximate savings of $17,000 as opposed to hauling this material within the Park. This change is necessary in order to eliminate possible construction impact that will result in claims. Therefore, this change is in the best interest of the Government and I recommend it be approved.

With respect to the second requirement of accord and satisfaction, competency of the parties, Steve Christensen, Remcon's president, signed Bilateral Modification No. 4 and its subsequent release. The NPS's contracting officer, Rod Keiscome, signed the modification upon behalf of the NPS. Both parties were competent to enter into contracts upon behalf of their respective entities.

With respect to the third requirement of accord and satisfaction, a meeting of the minds, "the intent of the parties controls." Black v. Denver United States Nat'l Bank, 362 F.2d 38, 41 (8th Cir.), cert. denied, 385 U.S. 990 (1966), Cyr Constr. Co. v. United States, 27 Fed. Cl. 153, 160 (1992). A contract modification is the best source of evidence regarding intent. McClaim Plumbing & Electrical Service, Inc. v. the United States, 30 Fed. Cl. 70, 81 (1993). In the current case, this requirement is certainly met. Modification No. 4 was issued and was the result of numerous discussions and extensive negotiations between the parties.

With respect to the final requirement for accord and satisfaction, consideration, the modification is the best evidence. Modification No. 4 contains a release that states:

> The contractor agrees that, in consideration of receiving the benefits of Modification No. 4, all claims or obligations which now exist or which may hereafter arise, whether known or unknown, or which have or could have been asserted against the National Park Service or the Government as well as its officers and employees in any form or forum, whether in law or equiry, arising out of or resulting from this modification are hereby released, waived and forever discharged.

Since all four requirements of accord and satisfaction are met, Remcon is barred from arguing that it is entitled to additional funds.

As an aside, when Remcon was raising the upper parking lot, it ran out of excavated material to use to raise the lot. Remcon actually had to go out and find material to complete the job. Further, the completion contractor did not have enough material upon the job for fill. Thus, it is very likely that the excesses Remcon claimed were not excesses at all.

### 2. The NPS Has Paid For All Earthwork Related To The Excavation Of The Burn Pit

In 2001, Remcon encountered more material in the burn pit area than it anticipated. The NPS issued Modification No. 3 to compensate Remcon for excavating and hauling the burn pit material out of the park. Remcon now alleges that it is due additional compensation for "filling" the burn pit area. The first time Remcon ever claimed that it was entitled to compensation for filling the burn pit is in context of this litigation.

Remcon is barred by accord and satisfaction from receiving compensation for "filling" the burn pit. Remcon was paid for excavating the burn pit under Modification No. 3. Backfill was included in the cost of hauling away the burn pit material. Specification Section 02316, related to Roadway Excavation and Embankment, refers to Specification Section 02310 for Measurement and Payment, which states: "This work consists of all excavation, placement of fill, <u>backfill</u> and surface grading." It is clear that, at the time, the parties understood that backfill was included in the cost of

excavating the burn pit. There are no contemporaneous letters requesting compensation for filling the burn pit.

The burn pit was the subject matter of Modification No. 3. The work was described as follows:

> Reimburse the Contractor for costs associated for hauling and disposing 4,624 Tons of deleterious material outside the park. Payment will be made at the newly negotiated unit price of $93.86/ton for 4,624 tons.

The justification for this item was as follows:

> No. 26 Haul Miscellaneous materials from the Park. The original contract price schedule required the contractor to haul 2,000 CY of material from the park. However, the contract drawings showed three areas to haul from that totaled 3,000 CY. This overage plus the fact that an unknown buried dump pit was discovered during the excavation operation for the Upper Parking Lot, created a huge over-run for this item. The buried dump pit contained debris (such as rubber tires, metal, and burn ask) that the upper parking lot could not be constructed upon. These two items resulted in an overrun of material to be removed from the Park. Since this material could not be accurately measured per the unit price (cubic yards), the NPS decided to renegotiate this cost based on a tonnage cost with certified weight receipts.

As stated previously, accord and satisfaction require the following prerequisites: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. Spalding, 24 Ct. Cl. at 154. The requirements of accord and satisfaction are met under this modification because this modification related to excavating the burn pit, there was a meeting of the minds, the modification was made by competent parties, and there was consideration with the standard release language.

Even if this Court were to find that Remcon is not barred by accord and satisfaction through Modification No. 3 for seeking compensation to "fill" the burn pit, Remcon still would be barred by accord and satisfaction for seeking compensation to "fill" the burn pit by Modification No. 4, discussed previously. Modification No. 4 paid Remcon to raise the upper parking lot.

The burn pit was located at the eastern portion of the Upper Sherman Parking Area upper parking lot. This is the same area that was raised pursuant to Modification No. 4. It is incomprehensible that the parties would negotiate raising the grade of the parking area, but exclude from consideration the burn pit which was right in the middle of the area that was going to be raised. When Remcon got paid to raise the grade of the parking lot, it was paid to raise the grade regardless of whether raising the grade meant filling the hole. The fact that there is no record that the parties discussed filling the burn pit is because this issue was not contemporaneously viewed as a separate item by the parties.

The requirements of accord and satisfaction regarding the burn pit are met under Modification No. 4 because this modification related to raising the parking lot where the burn pit was located, there was a meeting of the minds, the modification was made by competent parties, and there was consideration with the standard release language.

**3. Earthwork Related To Realignment In 2001**

Remcon claims that when the access road was realigned between stations 24+46 to 30+00 – an area that Remcon called "the deep cut" and the NPS will call the

"through cut" – that the access road was pushed into the hillside, which resulted in additional excavation and resulted in Remcon encountering rock excavation, which it claims is a differing site condition. See, e.g., Pl. Mem. 24-26.

**a. Realignment In The "Through Cut"**

The issues surrounding the realignment of the access road are numerous, but the realignment actually was simply a minor field change. In 2001, the NPS agreed to two field adjustments to the alignment of the access road. One change was at an area that was designated as a motor vehicle turn-out upon the access road between stations 8+00 and 12+00 and another change was between stations 24+46 to 30+00, in "the through cut" area.

Remcon would have this Court believe that the road was realigned because Athena Demetry, the Park Ecologist, marked the wrong trees for removal. The result allegedly was that the cleared alignment did not match the staked alignment and the parties agreed to realign the road. This theory was not advanced by Remcon contemporaneously. In fact, contemporaneous documents indicate that the change to the alignment of the access road was a standard field change prescribed by the specifications. Only in the second construction season did Remcon assign any blame for the alignment change to the NPS and then it blamed the change on the NPS' allegedly "defective design."

Remcon's theory was later revised to pin blame on Ms. Demetry, who, coincidentally, marked trees with Remcon employees. The most likely reason that

Remcon changed its theory was because in October 2003, after Remcon submitted its omnibus claim, Remcon received the as-built survey for the project. This survey revealed that the design documents were not defective.

The evidence will show a different reason that the road was realigned. The road was moved because Remcon's President, Steve Christensen, "took a walk" with the contracting officer's representative, Willie DeOcampo, and NPS' on-site inspector, Jacobs' Bob Russell, and very convincingly told them that Remcon needed to make the field adjustment because the center line of the road was approaching the edge of the cleared area. Mr. Christensen stated that, if the road were built per plan, additional trees would have to be cut. The NPS representatives, who were on site without the benefit their own survey (the survey was Remcon's responsibility), and who had no reason to believe at the time that Remcon was dealing with them in bad faith, agreed to a no-cost field adjustment.[4]

Mr. Christensen's "walks" were part of a pattern of behavior whereby Mr. Christensen finagled changes to the contract. In retrospect, the most reasonable explanation for Mr. Christensen's behavior is that he was trying to set things up for claims that he intended to file at a later date. For instance, Mr. Christensen took another "walk" with Mr. DeOcampo and convinced him that the turn-out needed to be moved at station 8+ to 12+ because of a tree. He even made a video where he very

---

[4] It is important to note that after the trees were felled and before the surveyors laid the center line stakes, Remcon "pioneered" the road, that is, it sent a bulldozer to clear the area. Remcon did this without the benefit of a surveyed layout.

convincingly demonstrates (with Mark Penrose) that the tree is in the wrong place and that the turn-out needed to be moved due to an alleged design error. The turn-out was moved after Mr. Christensen's convincing display, but the as-built survey shows that Mr. Christensen was just plain wrong. The road could have been built as planned.

Another example of where Remcon's Mr. Christensen "took a walk" with an NPS employee is when Mr. Christensen told the NPS' contracting officer's representative for design, Joanne Cody, that the leach field needed moved 30 feet north because a big pine tree was in the way. Again, Ms. Cody did not have the benefit of a survey – all she had to rely upon was Remcon's word that a tree was in the way. Ultimately, the NPS did not move the leach field. The leach field was built according to plan and the tree was not in the wrong place. However, the fact that Mr. Christensen attempted to have it moved evidences a pattern of behavior in which he attempted to cause changes in the configuration of the project. In any event, regardless of why the access road was realigned, Remcon is not entitled to additional compensation as a result.

**b. Excavation Impacts Due To Realigning The Access Road**

Remcon claims that it is entitled to compensation for additional excavation that it encountered when the NPS agreed to realign the access road in the "through cut" area.

There are two facets to excavation upon this project. The first is actually excavating or cutting the material, which was priced as a lump sum item under the contract. The second is handling or hauling the "excess" excavation. When the access