road was realigned, Remcon had to cut and haul away more material than would have been the case had the road not been realigned.

### i. Only A Small Portion Of The Access Road Protruded Into The "Through Cut"

When the access road was realigned, a portion of the road went into the hillside. Remcon would have the Court believe that an entire 600-foot section of the access road shifted into the hillside a full ten feet. In reality, when the access road was realigned, the result was that a thin sliver of the access road protruded into the through cut. The area where sliver protruded into the hill looked like a new moon or a finger nail. The thickest portion of the sliver was at about station 26+50 where the sliver protruded about eight feet into the hillside. As the sliver thinned on its sides, less was cut from the hillside. At 300 feet in either direction from the thickest part of the sliver, it had thinned to nothing. The impact of the protrusion was that Remcon had to cut some amount of additional material than it would have if the alignment change had not occurred.

To date, Remcon has not quantified the amount of additional material that Remcon had to cut out of the hillside because of the alignment change. Remcon was contractually required to perform quantity surveys and should have been able to provide this information to the NPS. The NPS has estimated that the excess cut is very small, less than 1000 CY of material. In any event, the Government is not responsible for Remcon's refusal or inability to provide quantity information.

Excavation and grading was a lump sum item under the contract. Remcon claims that it is entitled to additional funds related to excavating the area that was realigned, not just hauling it. Remcon has proposed $350,000 for all of the excavation upon the project, including cut and fill. The amount of cut on the project was about 33,000 CY. Certainly the excess 1,000 CY represents only a small amount of extra cut.

**ii. Remcon Is Not Entitled To Additional Compensation For Hauling Away The Excess Excavated Material From The "Through Cut"**

Through Modification No. 4, Remcon already has been paid for hauling away the excess excavation that may have been encountered in the through cut. Remcon is barred from seeking additional compensation for this work by accord and satisfaction.

The argument related to excess excavation was discussed at length previously. The excess excavation that resulted from the alignment change was included in the excavation that was hauled to the Upper Sherman Parking Area in 2001 that was the subject of Modification No. 4. When Modification No. 4 was issued, it was intended to compensate Remcon for all the excess excavation that Remcon had encountered up to that point.

**c. Impacts Related To Differing Site Condition**

Remcon claims that because the realignment pushed Remcon into the hillside in the through cut area, it encountered a differing site condition, rock. The alleged differing site condition will be discussed below in detail, but, with respect to Remcon's

contention that it encountered rock because it was pushed into the hillside, Remcon is mistaken.

Remember that the realignment resulted in a thin sliver that protruded into the through cut area. The thickest portion of the sliver was at approximately station 26+50. Yet, the location where the blasters started drilling was between station 29+00 and 31+00. By station 29+00 the access road was back on its original alignment. While Remcon blasted throughout the access road, including the realignment area, it was not the realignment that caused Remcon to blast the road.

The reason why this is important is because Remcon claims that the it could not use the geotechnical investigation report as a way to determine the subsurface conditions because the road shifted into the hillside. Remcon is incorrect. Most of the blasting that was done upon the project was performed in areas where the NPS' geotechnical consultant, Kleinfelder, tested the subsurface conditions and found that there was rippable rock.

### 4. The NPS Did Not Have "Superior Knowledge" Of Earthwork Totals

Remcon claims that the NPS had "superior knowledge" of excess earthwork and did not provide this information to Remcon. Remcon is incorrect.

Part of the NPS's duty to cooperate with a contractor and not to interfere with its performance is a duty to disclose vital information. See Helene Curtis Indus. v. United States, 160 Ct. Cl. 467, 312 F.2d 774 (1963). Elements of the implied duty to disclose vital information include the following: (1) the contractor undertakes to perform without

vital knowledge of a fact that affects performance, costs or duration, Bradley Constr. Inc. v. United States, 30 Fed. Cl. 507 (1994); (2) the Government was aware that the contractor had no knowledge of and had no reason to obtain such information, Hardeman-Monier-Hutcherson v. United States, 198 Ct. Cl. 472, 458 F.2d 1364 (1972); (3) The contract specification misled the contractor or did not put it on notice to inquire, D.F.K. Enter., Inc. V. United States, 45 Fed. Cl. 280 (1999); and (4) the Government failed to provide the relevant information, P.J. Maffei Bldg. Wrecking Corp. V. United States, 732 F.2d 913 (Fed. Cir. 1984).

Remcon cannot show that the NPS had superior knowledge that it did not share with Remcon. Remcon contends that Joanne Cody, the NPS contracting officer's representative for design, acknowledged in an e-mail to the contracting officer's representative for construction, Willie DeOcampo, that Remcon would encounter 15,000 CY of excess material. The information that Ms. Cody was reporting to her colleagues regarding the supposed 15,000 CY "excess" was from received from Remcon itself. Ms. Cody was merely reporting Remcon's allegations to others. Further, there was no contract specification that misled the contractor. Remcon was responsible for determining the amount of earthwork it would encounter upon the project. Earthwork was awarded as a lump sum.

### B. Remcon's Differing Site Condition Claim Is Without Merit

#### 1. NPS Is Not Barred By Accord And Satisfaction

NPS acknowledged that there was a differing site condition when it issued Unilateral Modification No. 6. While the Government understands that this Court will give some weight to the fact that the NPS was willing to pay Remcon for its alleged differing site condition, the Government is not barred by accord and satisfaction from defending itself against Remcon. The modification was unilateral. As a result, the parties had no meeting of the minds and there was not a mutual agreement regarding the price for the work under the modification. Therefore, if Remcon can claim that the NPS did not pay Remcon enough for the alleged differing site condition, then the Government should not be precluded from arguing that it should not have paid at all. Cf. Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (contract must prove liability and damages de novo where suit is filed following contracting officer's final decision). Moreover, even if this Court finds that the NPS is precluded from challenging that it should not have compensated Remcon at all for the alleged differing site condition, the Court should find that Modification No. 6 more than amply paid Remcon for the work, especially in light of what happened on the project.

#### 2. The Conditions Remcon Encountered Were Not Different from Those Identified In The Contract

The 200Q contract included the standard Differing Site Conditions clause which stated:

> (a) The Contracting shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of
>
> (1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract: or
>
> (2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

**a. Conditions Were As Stated In The Geotechnical Report**

There is no evidence that Remcon encountered a differing site condition. To prove a differing site condition, Remcon must show that it encountered subsurface or latent physical conditions at the site which differed materially from those indicated in the contract. FAR 52.236-2. Specifically, Remcon must show that: 1) conditions indicted in the contract differ materially from those actually encountered during performance; 2) the conditions actually encountered were reasonably unforseeable based upon all information available to the interpretation of the contract and the contract-related documents; and 3) the contractor was damaged as a result of the material variation between expected and encountered conditions. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (citing H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998)).

The contract did not affirmatively indicate a subsurface condition that differed from the subsurface conditions that Remcon encountered. The solicitation included a

Geotechnical Investigation Report by Kelinfelder, Inc., which described the conditions that the contractor would encounter upon the project. The report stated that the contractor would encounter "weathered granitic rock" that ranged from "slightly to highly weathered." Further, the report concluded that the "weathered granitic rock material at the site appear[s] to be conducive to ripping." However, the report also continued "we anticipate that some areas of weathered granite may be ripped with larger equipment."

There is no evidence that Remcon encountered anything other than slightly to highly weathered granitic rock intermixed with boulders. The daily logs and Mr. Russell's calendar recording blasting at the site and indicates that Remcon encountered boulders. Boulders were expected at the project site. Remcon knew it would encounter boulders that it intended to blast.

Remcon claims that the conditions upon the project were different than it expected because the road was not rippable. Remcon's August 20, 2001 notice states that it tried to rip the road, but to no avail. However, up to July 30, 2001, there is no evidence that Remcon had attempted to rip the road. None of the NPS' personnel were called to witness ripping and there is no evidence that Remcon used anything larger than a D8 bulldozer to rip. The very day that Remcon apparently encountered the "unrippable conditions" was the first day it blasted. It is unlikely that, in one half day, Remcon could have made a determination that 600 lineal feet of access road was not rippable and then called in the blasters, who miraculously mobilized to the site. The reality is that Remcon always intended to blast the access road.

**b. Remcon Anticpated The Conditions**

To prevail upon a differing site condition claim, Remcon must also show that it reasonably relied upon the conditions it expected to encounter and was damaged as a result of the variation between the expected conditions and the encountered conditions. See, e.g., Power Contracting and Engineering Corp., GSBCA 12741, 96-1 BCA ¶ 28,125 (1995). The conditions that Remcon encountered were not unforseeable because they were, in fact, foreseen by Remcon.

Remcon knew it would encounter boulders upon the site that needed to be blasted. As a result, Remcon included $30,000 in its bid estimate for blasting boulders in the access road. Further, Remcon had at least contemplated blasting the access road. In discovery, the Government discovered that Remcon received a quote in March 2001 from California Drilling & Blasting for blasting 10,000 CY of mass excavation. This is a little less than half of of the total excavation that Remcon expected to encounter upon the project.

**c. Remcon Failed To Provide Proper Notice**

Remcon did not provide the NPS with adequate notice of a differing site condition. This Court has held that if a contractor gives insufficient notice to the Government of its differing site condition claim, the Court need not consider the merits of the claim. Engineered Maintenance Services, Inc. v. United States, 55 Fed. Cl. 637, 643 (2003). The purpose of the prompt notice requirement is to give the contracting officer the opportunity to observe actual conditions before they are disturbed.

Remcon claims that it encountered a differing site condition on July 30, 2001. Instead of stopping work and notifying the contracting officer pursuant to FAR 52.236-2, Remcon started drilling (for blasting) the road that very day. Remcon did not advise the NPS that it considered this work differing site condition work until more than three weeks later. Not until August 21, 2001, did Remcon finally sent the NPS a notice of an alleged differing site condition. However, even then, Remcon did not send the notice to the contracting officer, as required. Instead, Remcon sent the notice to the contracting officer's representative. At this point, Remcon had already blasted more than half the road, thus destroying the best evidence of whether blasting actually was required.

Remcon cannot claim that the NPS had constructive notice of the differing site condition. No one from the NPS was surprised when Remcon's subcontractor, California Drilling & Blasting, showed up to the site. The NPS was aware that Remcon was going to blast on site. It was going to blast the utility line, which ran down the center of the access road, and it was going to blast the leach field. The contract contemplated this work, including specifications that required a blasting plan. Further, Remcon was able to choose its means and methods for excavating the access road. Even though Remcon claims it was more expensive to blast the access road, it was at liberty to blast if it chose to do so.

Remcon also cannot argue that the NPS knew about the alleged differing site condition. For the first few weeks that Remcon blasted the access road, Remcon did not contend that it had encountered a differing site condition. Instead, Remcon

contended that the blasting should be paid for under the rock excavation pay item in the contact. The NPS disagreed. Only after the NPS refused to pay for the work as rock excavation did Remcon advise the NPS that it believed the condition was a differing site condition.

### C. The Specifications Were Not Defective

Remcon claims that the plans and specifications were defective. Specifically, Remcon cites the following as allegedly defective: the plans related to the trail; the plans related to the access road; and information in the plans related to the provision of aggregate base and boulders for boulder revetment. However, the plans were not defective. The as-built survey indicates that the project could have been built as it was planned by the NPS.

The Government is obligated to provide drawings and specifications to a contractor that are free from defects. United States v. Spearin, 248 U.S. 132 (1918), Luria Bros. & Co. v. United States, 177 Ct. Cl. 676, 369 F.2d 701 (1966).

To be excused for nonperformance or delay because of alleged defective specifications, Remcon must prove that it reasonably relied upon the defective plans specifications and complied fully with them. Al Johnson Constr. Co. v. United States, 854 F.2d 467 (fed. Cir. 1988). Further, the contractor cannot recover if it unilaterally decides to perform work knowing that the specifications were defective. Ordnance Reasearch, Inc. v. United States, 221 Ct. Cl. 641, 609 F.2d 462 (1979).

In the current case, the plans were not defective[5]. The NPS design team and the consultant design team, worked together closely to develop a set of plans and specifications for the Sequoia 200Q project. This design process took over a year and a half and required many iterations of the plans and specifications. After numerous iterations, the end product was a set of plans and specifications that were issued by the NPS in its solicitation. During the first two construction seasons, Remcon claimed that it was encountering difficulties because the NPS' plans and specifications were defective. It wrote many letters to that effect, including letters related to the realignment of the access road, which occurred early in 2001. In October 2003, the as-built survey showed that Remcon's assertions were incorrect.

### 1. The Trail Was Built Per Plan And Remcon Signed A Bilateral Modification Related To Trail Modifications

Remcon argues that the trail was poorly designed and that it took over two years to obtain clarification regarding the trail. Remcon is wrong. The only clarifications that the NPS gave Remcon regarding the trail were additional trail points that Remcon's surveyor requested (and these were truly only clarifications), and it repeatedly clarified for Remcon that the plans called for four stairs because Remcon continued to ask for direction. The only significant change that was made to the trail was made after a walk-through of the project in the Spring of 2002, when the NPS decided to add two 24-inch

[5] There were minor errors in the plans that would not have affected Remcon's work.

culverts with stone headwalls and the delete of two stone trench drains. This was a small change.

As a result of the culvert change, the NPS issued two drawings, T7A and T8A. These drawings were issued in May 2002, and there were no other changes to the trail. After May, Remcon kept writing to the NPS and asking for clarification when none was truly needed. In the end, the NPS issued Modification No. 5, to clarify what it had been telling Remcon all along – build the trail as planned, but substitute T7A and T8A for T7 and T8.

Any "defective design" argument related to the trail fails for two main reasons. First, Remcon signed a bilateral modification regarding the trail. Second, the trail was built per the plans and specifications.

**a. Remcon's Claims Regarding The Trail Are Barred By Accord And Satisfaction**

As previously noted, accord satisfaction require the following prerequisites: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. Brock, 170 Ct. Cl. at 58-59, 343 F.2d at 955; Spalding, 24 Ct. Cl. at 154. All of these criteria were met regarding construction of the trail. The purpose of Modification No. 5 was to clarify that Remcon was to build the trail using T7A and T8A. The parties met and negotiated Modification No. 5, including time. The modification was executed on November 20, 2002. No exception was taken to the release of claims.

Notwithstanding these indisputable facts, Remcon alleges that it took exception to the release language by separate letter of October 20, 2002. However, that letter

refered to an agreement that was reached between the parties on August 22, 2002, related to blasting. The October 20, 2002 letter does not even mention Modification No. 5.

**b. The Trail Was Built As Planned**

The trail was ultimately built by the completion contractor according to the plans and specifications. Remcon had all that it needed to build the trail in its possession by May 24, 2003.

**2. Road Realignments In 2001 And 2002 Were Not Due To "Defective" Documents**

**a. Access Road Realignment In 2001**

Realignment of the access road in 2001 was not due to defective plans and specifications. Remcon argued in its omnibus claim that the road was realigned due to "devastating design errors," but changed its theory to "Athena Demetry marked the wrong trees" after Remcon received the as-built survey in October 2003.

Very simply, the road could have been built where it was planned to be built.

**b. Access Road Realignment In 2002**

In 2002, Remcon realigned the access road by its own volition. NPS is still puzzled as to why Remcon did this. Notwitstanding Remcon's decision, the as-planned set of plans indicate that 1) the road could have been built as-planned; and 2) that Remcon made unnecessary changes to the alignment of the access road during the second construction season.

The alignment changes started the same way the other ones did. Remcon's President, Steve Christensen, "took a walk" with an NPS employee. The very day Mike Giller started as the NPS' project manager, Mr. Christensen suggested that they "take a walk" to discuss problems on the project. Mr. Giller, Mr. Christensen, and several others walked the access road and Mr. Christensen showed Mr. Giller where there were minor issues with tree roots and slopes. Mike Giller agreed with Mr. Christensen regarding these small field adjustments, and the parties agreed that these field adjustments would be at no cost. Mr. Giller took notes of what the parties agreed to during the walk-though. Remcon takes the position that Mr. Giller's specific agreements relating to specific field conditions somehow meant that Remcon could realign the access road. Remcon's Mike Kitchell started realigning the access road the next week without the NPS's permission.

If Remcon believed it was realigning the road due to "defective plans or specifications," it never advised the NPS. It never wrote the contracting officer to tell him that it was realigning the road and expected compensation for its work.

The NPS wanted an engineered road. That is precisely why it spent a lot of money took a lot of time producing plans and specifications. It is simply incomprehensible that the NPS wanted Remcon's Project Foreman/Superintendent to redesign the road. When the NPS found that Remcon had unilaterally realigned the road, it worked with Remcon to the best of its abilities to "fix" the problem that Remcon

had created. Any alignment changes that were issued after July 25, 2002 were done merely to fix what Remcon "broke."

Remcon cannot prove that it reasonably relied upon "defective plans specifications" and complied fully with them. In this case, Remcon did not rely upon the NPS' plans and comply with them; it effectively designed its own road.

### 3. The Issuance Of Revised Drawings Does Not Mean The NPS's Plans Were Defective

Remcon alleges that the issuance of revised drawings indicates that the NPS' plans and specifications were defective. This is not so. In one case, the NPS issued revised plans to raise the parking lot. This was done pursuant to a bilateral modification. In another case, the NPS issued revised drawings related to the trail. Again, this was done pursuant to a bilateral modification. The reasons for these modifications previously have been discussed at length. Finally, the NPS issued a revised road alignment to bring the design into conformity with Remcon's unilateral "redesign."

### 4. The Alleged "Failure" To Supply Rock Revetment Or Aggregate Base Does Not Mean The Plans And Specifications Were Defective

Remcon claims that the NPS's plans and specifications were defective because the NPS failed to supply Aggregate Base or boulders for Boulder Revetment. If the NPS actually failed to provide revetment or aggregate base (there is no way to forensically know whether the NPS provided aggregate base for revetment because Remcon did not contemporaneously raise it as an issue), it does not mean that the

plans or specifications were defective. It means that the NPS did not provide what was specified. In any event, the Government disagrees with Remcon's interpretation of the contract. The NPS showed, infra, that the contract documents did not state that this material would be provided to the contractor and Remcon did not rely upon its supposed belief that it would be provided when bidding the project.

### 5. The Consultant Designers Were Not Deficient In Failing To "Wet Seal" Documents Or Follow State And Local Rules

Remcon contends that the documents were deficient because its designers did not "wet-seal" its documents or comply with California State law. Sequoia National Park is on Federal land. Therefore, Federal law takes precedence. The NPS is not bound by local rules and regulations. State of Arizona v. State of California, 283 U.S. 423 (1931); Public Utiltities Commission of California v. United States, 355 U.S. 534 (1958).

## D. Realignment Was Not A Constructive Change

### 1. The Government did not Direct Changes

Remcon cannot prevail in its claim that work performed upon the 200Q contract constitutes a constructive change because the NPS did not require Remcon to perform work beyond what was required in the specifications and the contract itself.

There were no changes to the contract other than those referenced in modifications and "field adjustments" made pursuant to the contract specifications. The contract, Section C – Descriptions and Specifications, Division 1, Section 01720 Field Engineering, states in part as follows:

> 1.1.C Locations and elevations shown on the drawings are subject to final field adjustment by the Contracting Officer before construction. Contractor shall immediately notify the Contracting Officer of apparent errors discovered on the drawings or in the initial stakeout. If changes in stakeout are required, the Contractor shall cooperate with Contracting Officer in prompt establishment of the field control for altered or adjusted work. All construction layout shall be completed a minimum of seven (7) working days ahead of actual construct start for that particular work to allow time for the Contracting Officer to inspect the layout and perform any necessary field adjustments to the design.

(Emphasis added).

For a change to be compensable under the changes clause, the change must be one that the NPS ordered the contractor to make; the contracting officer, by his words or deeds, must require the contractor to perform work that is not a necessary part of the contract. See T. Milford Constr. Corp., ASBCA No. 27,594, 83-1 BCA ¶ 16,422. This did not happen.

**2. Remcon Unilaterally Decided To Deviate From The Requirements Of The Contract**

As stated before, Remcon decided to deviate from the contract. Again, the NPS does not know why Remcon did this. What is clear is that Remcon did not advise the NPS' contracting officer of its changes and then expected the contracting officer to pay Remcon for the changes after the fact. This happened again and again. The access road realignment changes in 2002 being the clearest and most flagrant change.

## E. Remcon Has Incorrectly Interpreted The Contract

Remcon has at least two claims directly related to contract interpretation and one claim that is tangentially related to contract interpretation. First, Remcon claims that the contract mandated that the NPS would provide the contractor aggregate base in stockpiles before starting the project. Second, Remcon claims that the contract mandated that the NPS provide the boulders in stockpiles for revetment. The third item of contract interpretation is Remcon's claim that the NPS was responsible for marking trees for removal which ultimately was the reason Remcon alleges that the road was realigned in the "through cut" area.

Contract interpretation is a question of law. Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985). Contract interpretation begins with the plain language of the agreement. Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991); Fort Vancouver Plywood Co. v. United States, 860 F.2d 409, 413 (Fed. Cir. 1988).
Basic rules of contract interpretation are as follows: First, the contract should be interpreted as a whole and in a manner that gives meaning to all its provisions and makes sense. Hughes Communications Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993); B.D. Click Co. v. United States, 614 F.2d 748, 753 (Ct. Cl. 1980); Jamsar, Inc. v. United States, 442 F.2d 930 (Ct. Cl. 1971); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972 (1965). Second, the provisions must be given their "plain and

ordinary meaning." Alaska Lumber & Pulp Co., Inc. v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993); Elden v. United States, 223 Ct. Cl. 239, 617 F.2d 254, 260 (1980).

An Order of Precedence clause may also aid in interpreting a contract. DS52.215-08 was incorporated into the 200Q, mandates that if the contract has any inconsistencies, the inconsistencies shall be resolved by giving precedence in the following order: (a) the schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits and attachments; (e) the specifications; (f) the drawings, and (g) supplemental reports.

Another rule of contract interpretation is that the Court may not resort to extrinsic evidence to interpret contract provisions that are otherwise clear. Interwest Constr. v. Brown, 29 F.3d 611, 615 (Fed. Cir. 1994); Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988); C. Sanchez & Son, Inc. v. United States, 24 Cl. Ct. 14, 22 (1991), rev'd on other grounds, 6 F.3d 1539 (Fed. Cir. 1993) (evidence of trade usage may not vary or contradict unambiguous contract language).

### 1. The Specifications Do Not State That All Aggregate Base Course Would Be Stockpiled On Site For Remcon's Use

Remcon alleges that the contract mandates that all aggregate base would be provided by the NPS for use on the 200Q project. Remcon is incorrect.

#### a. Remcon Has Misinterpreted The Contract

Remcon alleges that the contract mandates that it was the NPS' responsibility to provide aggregate base for this project. It bases its allegation upon three areas of the contract: (1) Specification Section 02725; (2) Drawing, G3 - Contractor Staging and

Storage Areas; and (3) an addendum issued on March 12, 2001, containing with a picture of a pile of aggregate base that the NPS had taken on the project. Remcon claims that the specification section, taken in conjunction with the drawing and the addendum, lead it to believe that all of the aggregate base would be supplied to by the NPS.

Specification Section 02725 – Aggregate Base Course – states that "[m]aterial for aggregate base course shall come from crushing of material (asphalt or concrete) moved from this project and/or stored from previous projects." This specification does not state that all of the aggregate base would be provided by the NPS.

If all the aggregate base was to be provided from stockpiles stored upon the project, than it would be unnecessary to tell the contractor that aggregate base may come "from crushing of material (asphalt or concrete) removed from this project." Remcon does not give plain meaning to all of the words in the specification. The very fact that Remcon might have to crush aggregate base indicates that the NPS. contemplated that there would not be enough aggregate base stockpiled on site.

Remcon points to the drawing to show that stockpiles of aggregate base would be stored at Wolverton. Drawing G3, entitled, Contractor Staging and Storage Areas, that contained a note with an arrow pointing to Lower Wolverton, stated: "the aggregate base course for this project is stockpiled in this general area." This drawing does not indicate that all aggregate base on the project would be stored at Wolverton, just that the aggregate base that was stored on the project would be stored there. Even

the title of this drawing indicates that the purpose of the drawing was to advise the contractor of the storage areas at the project site.

Remcon also points to the picture allegedly showing that the NPS would provide all of the aggregate base on the project. There is no way to tell how much aggregate base is depicted in the photograph. It is doubtful that the aggregate base in the picture represents anywhere close to 10,000 CY of aggregate (the amount for the entire project), and Remcon should have known this.

Taken together, neither the specification section, the drawing, or the addendum stated that all of the aggregate base would be provided under the contract.

**b. Remcon Did Not Rely Upon Its Supposed Interpretation When It Submitted its Bid**

Even if Remcon's interpretation were correct, for Remcon to prevail, it must show that it bid in reliance upon the ambiguous contract terms before it can establish ambiguity against the NPS. Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1429 (Fed. Cir. 1990) (reliance at time of bid must be shown). Remcon can provide no evidence that it actually bid the 200Q contract in reliance on the belief that all of the Aggregate Base for the project would be stockpiled on site.

Remcon submitted its proposal (or bid) for this contract on March 29, 2001. On March 26, 2001, three days earlier, Remcon wrote to the contract specialist and noted that it did not think that enough aggregate base "exists on the project site to meet demand for the Aggregate Base on this project." Remcon continued by stating that

Remcon was currently working upon the Giant Forest Project (200O) and was using stockpiled crushed aggregate on those projects.

In concert with that understanding, Remcon did not bid the project as if the NPS would be providing stockpiled aggregate base. Mr. Christensen, Remcon's president, bid the project as if he were going to purchase and haul aggregate base to the project. In his deposition, he conveniently said this was a "mistake." This flies in the face of the contemporaneous evidence. Remcon bid the project as it was specified. Further, even if Mr. Christensen had made a mistake, it was one that was in his favor. The NPS paid for aggregate base under the contract as if it was being purchased off site. If the NPS now was to pay Remcon as if it had to provide stockpiled aggregate base, Remcon would receive a windfall. As it was, when the NPS approved Remcon's request to crush aggregate base on site, Remcon saved substantial money in comparison to how it bid the project.

#### c. Remcon Did Not Rely Upon Its Supposed Interpretation During Its Performance Of The Contract

Remcon did not allege that the NPS failed to provide stockpiled aggregate base for its use until the winter between the second and third construction season. Before that time, Remcon never mentioned any belief that the NPS was obligated to provide it with aggregate base. Remcon never sent letters to the NPS stating that it had relied upon a stockpile that wasn't there. Instead, Remcon expressed its desire to submit a value engineering proposal to crush aggregate base on site. This would have been unnecessary if the NPS had stockpiled all of the material.

### 2. The Specifications Do Not State That All Boulders Would Be Stockpiled On Site For Remcon's Use

Remcon alleges that the contract mandates that boulders would be provided by the NPS for use for revetment upon the 200Q project. This is incorrect.

Pursuant to Specification Section 02381 – Boulder Revetment – the contract states that the "source" for boulders for revetment is referenced in "Section 04403, 2.1 paragraph A." In turn, Section 04403 – Dry Laid Stone Wall – states the following:

> Boulders: Natural boulders stockpiled during previous projects. This rock is available at Wolverton, approximately 4 miles north of the project site, or the Clover Creek Quarry. The Contractor is to transport all rock to the project work area. The Contractor shall also use rocks salvaged from this current contract. The Contractor will be responsible for sorting through the stone pile and selecting the best stones as approved by the Contracting Officer. Any remaining rocks not used in construction shall be transported and stored at Wolverton.

Remcon claims that the specification section lead it to believe that all of the boulders would be supplied to Remcon by the NPS in stock piles. However, specification 04403 does not state that <u>all</u> the boulders would be provided by the NPS in stock piles. Indeed, it states that the contractor "shall also use rocks salvaged from this current contract." If <u>all</u> the boulders were to be provided from stockpiles stored on the project, than it would be unnecessary to tell the contractor that it shall also use rocks "salvaged from this current contract." Remcon does not give plain meaning to all of the words in the specification.

Moreover, Remcon provides no evidence that it actually bid the 200Q contract in reliance upon the belief that all of the boulders for the project would be stockpiled on site. For Remcon to prevail, it must show that it bid in reliance upon the ambiguous contract terms before it can establish ambiguity against the NPS. Fruin-Colnon Corp. v. United States, 912 F.2d at 1429.

Remcon did not allege that the NPS failed to provide stockpiled boulders for its use until the winter between the second and third construction season. Before that time, Remcon never mentioned that it believed that the NPS was obligated to provide it with boulders for revetment. Remcon never sent letters to the NPS stating that it believed there would be stockpiles. As a result, the NPS never had the opportunity to confirm whether or not there were boulders in its stockpiles. It was simply not an issue.

### 3. It Was Not The NPS's Responsibility To Mark Trees Upon The Project

As stated earlier, Remcon blames the "through cut" realignment upon the fact that trees allegedly were mismarked by the NPS. For reasons previously demonstrated, Remcon is incorrect. Moreover, even if the trees were mismarked (and the NPS does not believe they were), tree marking was not the NPS's responsibility under the contract.

Remcon does not convincingly cite to a section of the contract where it mandates that the NPS would mark the trees. This is because Remcon, as the contractor, is responsible for building the project according to the plans and specifications.

**E. NPS Did Not Breach A Duty Of Cooperation**

Remcon claims that the NPS violated the duty of constructive cooperation. Nothing could be further from the truth. With respect to each and every issue that Remcon raised, the NPS worked with Remcon to resolve its issues. The NPS met with Remcon when requested and worked to negotiate with Remcon even when Remcon would not provide information to support its claims.

Government agents are presumed to discharge their duties in good faith. Abcon Associates Inc., 49 Fed. Cl. 678, 688 (2001). As stated in L.P. Consulting Group, Inc. v. United States, 66 Fed. Cl. 238; 2005 Claims Lexis 182 (Fed. Cl. 2005); Spezzaferro v. Fed. Aviation Admin., 807 F.2d 169, 173 (Fed. Cir. 1986); Asco-Falcon II Shipping Co., 32 Fed. Cl. at 604; Kalvar Corp. v. United States, 211 Ct. Cl. 192, 543 F.2d 1298, 1301-02 (1976), cert. denied, 434 U.S. 830 (1977). In order to overcome this presumption, Remcon "must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government." Asco-Falcon, 32 Fed. Cl. at 604; Galen Medical Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004); see also Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1241 (Fed. Cir. 2002 (clear and convincing evidence required to show that contracting officer acted in bad faith).

In the present case, Remcon cannot show that the Government violated its duty of good faith and fair dealing. Here we do not have a situation where the Government is unresponsive to issues that arise on the project site. If anything, it is the

Government's position that it was *too responsive* and Remcon took advantage of the Government's willingness to cooperate. Contrary to Remcon's allegations, the Government did whatever it could to alleviate the financial hardship on Remcon.

Remcon's earthwork claim is a good illustration. Remcon alleged that it encountered excess excavation in early July 2001. Almost immediately, the NPS rallied to determine how much excavation Remcon encountered. It contacted its designers to see what might have happened. In the meantime, Remcon, which had the responsibility to provide quantity surveys on the project, did nothing. In October 2001, the parties met and discussed earthwork and Remcon promised to get the NPS quantity surveys to support its allegations. None were forthcoming. The parties met again in December 2001 and discussed earthwork quantities. Remcon went to that meeting and listened to the NPS designers and its own surveyor discuss earthwork quantities under the contract, which were at about 30,000 CY, and never mentioned that its own assumptions under the contract had been flawed.

In mid-March 2002, over eight months after Remcon claims it encountered excess earthwork, it finally provided a Request for Equitable Adjustment to the NPS. The NPS responded quickly. On March 28, 2002, the NPS asked for specific supporting documentation. Remcon responded tersely a few days later that it had provided supporting documentation in its REA and would not provide additional information. In response, the NPS responded explaining why it needed supporting information. The NPS was able to get a drawing to Remcon for raising the upper

parking lot of the Upper Sherman Parking Area in May 2002 and the parties negotiated the cost for this work in June 2002. On June 28, 2002 the contracting officer issued a directive to raise the upper parking lot and, on September 12, 2002, the contracting officer issued a modification, on September 12, 2002, the contracting officer issued a modification.

For Remcon to claim that it took the NPS over a year to recognize this work is to ignore Remcon's role. The largest gap was the time it took Remcon to submit an REA.

**F. Remcon Is Not Entitled To Delay Damages**

Remcon asserts that it was delayed by 371 days. Remcon's delay claims are discussed in great detail in the expert report prepared by the Government's construction expert, Capital Project Management, Inc. As that report shows, Remcon's request for 371 days of delay damages is without merit.

In order to prevail upon its delay claim, Remcon bears the burden of establishing the extent of the delay, the causal link between the Government's actions and the delay claimed, and harm resulting from the delay. See Essex Electro Engineers, Inc. v. Danzig, 224 F.3d 1283, 1295 (Fed. Cir. 2000). The delay must be to the overall completion of the contract; meaning that the delay must be to work upon the "critical path" because only work upon the "critical path" has an impact upon when the project is completed. See Wilner v. United States, 24 F.3d 1397, 1399 n. 5. 1400-01 (Fed. Cir. 1994) (en banc); Kelso v. Kirk Brothers Mechanical Contractors, Inc., 16 F.3d 1173, 1177 (Fed. Cir. 1994).

Remcon's delay analysis has serious flaws: 1) it fails to take into account the importance of the comfort station, which was on its as-planned critical path; 2) it assesses delay days for the winter shut-down period; 3) it recognizes delays for items that were the subject of bilateral modifications; and 4) it fails to take into account its own concurrent delays.

Remcon's delay claims are based upon an as-built CPM analysis prepared by Remcon's expert, who compares it to Remcon's alleged as-planned schedule (which the expert claims is Remcon's July 11, 2001 schedule).[6] Although the schedule Remcon's expert, Mr. Lloyd, used was "approved-as-noted," it was accepted subject to a number of comments. This schedule showed the critical path running through the earthwork and then moving to the comfort station. Remcon intended to complete the comfort station the first construction season.

Mr. Lloyd's as-built schedule does not identify a realistic critical path because he fails to recognize that the as-planned critical path moved through the construction of the comfort station. Mr. Lloyd also counts the winter of 2001-2002 in determining the duration of delay. The winter of 2001-2002 was in Remcon's original schedule, and the winter shut-down was prescribed by the contract. The contract also required a second winter shut-down.

---

[6] We note that the schedule Remcon's expert uses as the as-planned schedule was not produced to the NPS on July 11, 2001. It was produced to the NPS on June 28, 2002.

Remcon also fails to recognize that many of the delays it claims are for items that were paid for by bilateral modification. When the parties negotiated these items (often over many months), the parties negotiated both money and time. For example, Modification No. 3 compensated Remcon for the excavation of the burn pit. In connection with this modification, the NPS gave Remcon 15 working days for the work. With respect to work associated with raising the upper parking lot to account for excess excavation, the parties agreed that no time was necessary because the work was not on the critical path. Having freely negotiated the terms of these modifications, Remcon cannot now claim that it is entitled to days of delay for this work, especially when it agreed at the time that the work was not critical.

Finally, Remcon fails to account for concurrent delay. Remcon was unable to complete the utilities upon the project. This, in turn, held up placing aggregate base and asphalt concrete pavement.

**G. Remcon Did Not Accelerate**

Remcon contends that the NPS delayed its performance under the contract and, that it is entitled to recover under its "accelerated" schedule. However, NPS expressly told Remcon that it's schedule needed to show all three construction seasons and reflect an August 11, 2003 contract completion date.

To show early completion, the contractor must show that, from the outset of the contract, it intended to complete early, had the capability to do so, and actually would have done so, but for the delay caused by the government. Jackson Constr. Co., Inc. v.

United States 62 Fed. Cl. 84 (2004); Interstate General Government Contractors, Inc. v. West, 12 F.3d 1053, 1059 (Fed. Cir. 1993). To determine whether a contractor could have finished early, the Court must look at the actions and activities during contract performance in determining the reasonableness of the intent to perform on a feasible and attainable schedule. Frazier-Fleming Co., ASBCA No. 34537, 91-1 BCA P 23,378 at 117,287 (Sept. 18, 1990).

With contract modifications, the actual contractual completion date was extended to August 28, 2003. Remcon did not finish early (indeed, it did not finish at all) and could not have finished early. Remcon cannot support its conclusion, with any competent evidence, that its early completion schedule was reasonably feasible and attainable and that Remcon had the capability of completing the project by the end of the second construction season.

## H. Remcon Is Not Entitled To Other Alleged Damages

### 1. Modified Cost Approach Fails Because Remcon's Bid Was Unreasonable

Remcon uses a "modified" total cost method to assess its alleged costs. This is method is not favored and should not be used where another, more reliable method is available by which to compute a contractor's damages. HoShear Tech. Corp. v. United States, 356 F.3d 1372, 1383 (Fed. Cir. 2004). A total cost method is based upon the idea that the contractor is owed the difference between the actual cost of the contract and the contractors bid, Raytheon Co. v. White, 305 F.3d 1354, 1365 (Fed. Cir. 2002), whereas the modified total cost method adjusts the total cost method for a contractor's

lack of proof. Propellex Corp. V. Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003). The requirements of a total cost method are: (1) impracticability of proving actual losses directly; (2) the reasonableness of bid; (3) the reasonableness of actual costs; and (4) lack of responsibility for the added costs. Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1383 (Fed. Cir. 2004). The contractor bears the burden of proving these requirements. Propellex Corp., 342 F.3d at 1339.

In this case Remcon has two significant problems with respect to a total costs claim. First, its bid was not reasonable. Remcon made a significant mistake in its bid. Instead of calculating that there would be over 30,000 CY of cut on the project, it estimated that it would encounter just over 21,000 CY of cut. Much of what Remcon claims it is owed under its omnibus claim is related to earthwork. Remcon's bid estimate was just plain wrong and its bid reflects what was in its estimate.

Similarly, Remcon admits it made a mistake in its bid related to aggregate base. Remcon says that it should not have bid the project as if it were going to purchase aggregate base and haul it to the project site. Remcon should not get a windfall for bidding incorrectly. Remcon was paid under the contract line item for aggregate base as if it purchased aggregate base off site and had it hauled to the project.

The second problem Remcon has with respect to the total cost claim is that it fails to take into account its own inefficiencies and responsibility for its own added costs. Remcon spent much of the second season upon the project fixing utilities that it had laid incorrectly the first year of the project. The NPS was not responsible for this

rework. In turn, the rework effected other areas of the project. Remcon could not lay aggregate base and asphalt until after it had completed utility rework.

### 2. Eichleay Damages For Unabsorbed Overhead Not Appropriate

Remcon is not entitled to Eichleay damages for unabsorbed overhead. To prevail upon an Eichleay claim, the following elements must be met: (1) the contracting officer has issued a suspension of all of the work order for an uncertain duration with no time for remobilization; or absent a direct suspension order; (2) the contractor must show that the delay was both substantial and of uncertain duration; (3) during the delay, the contractor must have been ready to resume the work at full speed without time to "remobilize;" and (4) the contractor must show that much, if not all, of the work was suspended. P.J. Dick, Inc. v. U.S., 324 F.3d 1364 (Fed. Cir. 2003). The trend is to construe the term "stand-by" very narrowly. See, e.g., Nicon, Inc. v. United States, 331 F.3d 878 (Fed. Cir. 2003) (stating that Eichleay damages are an "extraordinary remedy").

### 3. If The Government's Termination For Default Is Upheld, The Surety Will Not Be Able To Seek Damages Against the NPS

Because the NPS properly terminated Remcon for default, it is entitled to recover the excess costs of reprocurement "in addition to any other rights and remedies provided by law or under this contract." The contractor and/or its surety are liable for any damages to the Government related the contractor's failure to complete the work on time, including any increased costs incurred by the Government in completing the work. See FAR 52.249-10.

In the current case, the NPS did not actually "reprocure." The surety provided a completion contractor to complete the project. As a result, Remcon's reliance upon Appeal of Etex Company, VABA 3415, 93-3 BCA 26,116 (1993), is misguided. The surety found a completion contractor to complete the exact same project for which the Government terminated Remcon.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

*s/Franklin E. White, Jr.*
FRANKLIN E. WHITE, JR.
Assistant Director

*s/Richard P. Schroeder*
RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Attorneys for Defendant

OF COUNSEL

COLLEEN DULIN
U.S. Department of Interior
Office of the General Counsel
755 Parfet Street
Lakewood, CO 80215

October 7, 2005

Certificate of Filing

I hereby certify that on October 7, 2005, a copy of the foregoing DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Richard P. Schroeder