**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2478C<br>(Judge Braden) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF FACTS**

## I. INTRODUCTION

1. The Sherman Tree Parking project is located at about 6,400 feet of elevation in the Sierra Nevada Mountains in Eastern California in the Giant Forest of Sequoia/Kings Canyon National Park ("Giant Forest").

2. The Sequoia trees of Sequoia are the largest trees in the world, and the General Sherman Tree is the granddaddy of them all, making it the most visited area of the Giant Forest.

3. In the 1920s and 1930s the area around the General Sherman Tree looked very different. It held seasonal cabins, a restaurant, a grocery store and numerous roads.

4. Over time many of these structures had become dilapidated and many succumbed to ruin.

5. In the 1980s the National Park Service ("NPS") initiated a series of projects at Sequoia related to the demolition of these buildings and rehabilitation of the giant forest.

6. The first of these projects, 200A was in 1984. Prior to the 200Q project, there had been about fourteen other Sequoia projects, collectively worth about $100 million that had been constructed successfully.

7. Most of the work in the earlier 200-series projects was for demolition of old buildings and roads, road construction and construction of visitor comfort areas.

8. The Sherman Tree Parking project, SEKI-200Q, was made up of three distinct construction areas: the Upper Sherman area, the Sherman Tree Trail and the Lower Sherman area.

9. Work at the Upper Sherman Area included the construction of a paved access road, the construction of a parking lot split into two levels, the construction of a comfort station and wayside kiosk, the installation of utilities, and other site improvement work.

10. The paved access road begins at the intersection on Wolverton Road and runs southward for approximately 3,337 feet. [1]

11. At the end of the access road are two lots, collectively known as the Upper Sherman Parking Area.

12. The two parking lots of the Upper Sherman Parking Area are both located at the southern end of the access road.

13. The upper parking lot in the Upper Sherman Parking Area opens to the east off the access road (at approximately station 30+25).

14. The lower parking lot in the Upper Sherman Parking Area begins at station 34+48, as an extension of the access road.

15. The lower parking lot is approximately 1,200 linear feet long and runs in a loop configuration that returns back to the access road.

---

[1]The feet are referenced by "stations," the beginning of the access road being station 1+11 and the end being 34+48, which is approximately 3000 feet +337 feet or 3,337 feet.

16. The Upper Sherman comfort station and wayside kiosk are both located just off the southern side of the lower parking lot.

17. The Shuttle Drive is a 205 foot long paved road, located perpendicular to and on the east side of the Upper Sherman access road at approximately station 24+08.

18. The second construction area, the Sherman Tree Trail, consists of about 2,000 linear feet of asphalt paved pedestrian path with associated wood bridges, a visitor overlook and wooden rail fences.

19. The third area of construction was the Lower Sherman Parking Area, which required the realignment and reconstruction of a portion of the General's Highway, the construction of a reinforced concrete retaining wall, demolition of an existing comfort station and construction of a new comfort station, the construction of asphalt paved pedestrian paths, installation of utilities, and other site improvements.

## II. PROJECT DESIGN

20. The preliminary designs for the 200Q project were performed by NPS in 1999.

21. The NPS design team for the preliminary design of the 200Q project consisted of several individuals: Ms. Joanne Cody, who was the design team lead, Dan Savage and Jon Mitchell worked on design and Ray Todd was the Program Manager.

22. Since the 200Q project was part of a long term, coordinated effort to revitalize the Giant Forest, this particular team had extensive experience working on projects in Sequoia National Park.

23. All of the members had a good understanding of the park's natural features and unusual building conditions, including the short construction season.

24. There were several considerations that the NPS designers took into account when designing the 200Q project. First and foremost, the NPS designers understood that as one of the "crown jewels" of the NPS, the natural resources at Sequoia had to be preserved and carefully protected.

25. Natural resource protection was a very important consideration in the design of the 200Q project; to that end the NPS wanted to preserve natural rock outcroppings, trees, and the general look of the Giant Forest.

26. The NPS designers planned to "phase" the 200Q project to assure that visitors had access to the General Sherman Tree during construction.

27. Therefore, while the construction of the upper parking area was in progress, visitors could access the Sherman Tree via the Generals Highway and park at the Lower Sherman Parking Area, which would remain open to park visitors until the Upper Sherman Parking Area was completed.

28. Similarly, after 85 passenger parking spaces, 12 oversize vehicle spaces and the Comfort Station at the Upper Sherman Parking Area was completed, park visitors would be directed down the access road and the Upper Sherman area would become the main entrance for park visitors to see the Sherman Tree.

29. The contract required the contractor to maintain public pedestrian access to the Sherman Tree at all times.

30. The NPS designers also had to take into consideration the short construction season.

31. The construction season in Sequoia National Park is generally limited to the period from May to November. After November, the snowfall could be too great for construction activities.

32. In connection with the development of the preliminary design documents, NPS had a topographic survey performed and the design team walked the project site.

33. The NPS completed its preliminary design in mid-summer, 1999.

34. In October, 1999, the NPS issued Task Order No. 15 to Barker Rinker Seacat Architects ("BRS Architects") under an Architect & Engineer ("A&E") indefinite quantity contract ("IDIQ") to provide 30% construction documents (i.e., the construction drawings are 30% complete) for the road and trail, with parking profiles and cross sections.

35. After the task order was issued under the A&E IDIQ, BRS Architects retained subconsultants from the firms of Martin/Martin, Inc. ("Martin/Martin") and DHM Design Consultants ("DHM Design"), collectively the "consultant design team," to work upon different design elements related to the task order.

36. This task order required survey staking and preliminary layout for the Upper Sherman Parking Area.

37. In October, 1999, members from the consultant design team undertook to walk the site with the NPS design team.

38. The natural features that the park wanted to protect were discussed during the walkthrough of the project site.

39. In June, 2000, the NPS issued Task Order 21 to BRS Architects under A&E IDIQ to provide construction documents for the Sherman Tree parking project.

The scope of work identified in the task order included, but was not limited to, preparing construction documents for the parking area, roads and trails; preparing specifications for the project; preparing a geotechnical and soils investigations report; preparing quantities for the bid schedule; and preparing a "Class A" cost estimate (an estimate developed at the completion of construction drawings and specifications).

40. The scope of work also required survey staking of 50% construction drawings (i.e., the construction drawings are 50% complete) for the Upper Sherman Parking Area, the access road, and the General's Highway realignment.

41. After the task order was issued under the A&E IDIQ, BRS Architects retained subconsultants to work upon different design elements of the project.

42. Each subconsultant was responsible for its own specialized area of work.

43. DHM Design was retained as a subconsultant for landscape architecture. Among the areas that DHM Design was responsible for include design related to the Sherman Tree Trail and the Upper Sherman Parking Area.

44. DHM Design's Robert Smith was the president of DHM Design and was the project manager on the 200Q project.

45. Martin/Martin was retained as a subconsultant for work related to civil engineering, including design of the Upper Sherman access road, the General's Highway retaining wall, and design of the utilities, including the leach field.

46. Martin/Martin also developed quantity-takeoffs (an estimate of material quantities) for the project.

47. Raymond Tuttle was the project manager for Martin/Martin on the 200Q project.

48. For the construction document phase of the design, for NPS, Joanne Cody was the A&E Manager/Job Captain, Ray Todd was the Contracting Officer's Representative and that Project Manager, and Rod Keiscome was the Contracting Officer.

49. The NPS design team and the consultant design team had experience working with one another. Prior to 200Q many of the team members had participated in other 200 series projects before with good success.

50. The NPS team and the consultant team worked closely together and collaborated on developing the construction documents and the specifications for the project.

51. On March 3, 2000, DHM Design entered into an agreement with Psomas to stake a preliminary layout of the parking lot and roadway design.

52. BRS Architects entered into an agreement with Kleinfelder, Inc. for a geotechnical investigation report.

53. With respect to the 50% design review, the consultant design team walked the project site with the NPS design team.

54. Prior to the walk-through, Psomas laid out survey stakes and specifically laid out the center line of the Upper Sherman access road, the Upper Sherman Parking Area, and the Sherman Tree Trail.

55. The NPS design team and consultant design team reviewed the site with the survey staking in place.

56. On or about August 17, 2001, the 75% design review – i.e., a review of the construction drawings when they were 75% complete – occurred.

57. For the 75% design review, and all other design reviews, the NPS design team met and worked closely with the consultant design team.

58. The NPS design team and the consultant design team met numerous times and collaborated with one another on drawings and specifications.

59. The consultant design team was unable to complete their documents until after they received the geotechnical investigation report.

60. The geotechincal report advised the design team of the probable subsurface conditions at the project site.

61. On September 11, 2000, Kleinfelder issued its geotechnical investigation report.

62. Kleinfelder's geotechnical investigation report stated that the "earthen material" on the access road was granitic rock that ranged from slightly weathered to highly weathered.

63. The report generally stated that the contractor should expect to be able to rip – i.e., tear up rock and earth – most of the area with a "D8" bulldozer. The report further stated:

> The upper silty sand and weather granitic rock material at the site <u>appear to be</u> conducive to ripping. We anticipate that some areas of weathered granitic rock may be ripped with larger equipment. Some oversize materials may be generated during ripping/excavation.

64. Kleinfelder also specifically performed a geotechnical review of the construction documents and project specifications that had been prepared by

the design team for the 75% review for compliance with the geotechnical investigation report.

65. After receiving the Kleinfelder report, the designers made sure that the drawings and the specifications accurately reflected the subsurface conditions as they were told existed in the geotechnical report.

66. To this end, the draft of Specification Section 02310, Site Excavation and Grading, was revised to show that rock excavation would be limited to utility trenching.

67. Further, the draft of Specification Section 02310, Site Excavation and Grading, was revised to state that the contractor was required to get specific permission from the Contracting Officer before undertaking mass rock excavation.

68. With respect to the performance period, the design team determined that they could not maintain public access to the Sherman Tree and complete the project in two construction seasons.

69. Therefore, the designers also decided that it would take two and a half construction seasons to build the project, and ultimately the design team allowed 792 calendar days for completion of the project.

70. With respect to the price schedule, the NPS design team and the consultant design team ultimately decided that excavation would be a lump-sum item.

71. This meant that the bid documents did not identify the amount of cut and fill upon the project.

72. With respect to excavation, the consultant design team prepared their own internal calculations for excavation and fill.

73. This was necessary to determine whether there would be excess excavation on the project. Excess excavation is the difference between cut (material excavated) and fill (material placed on the job).

74. Any excess excavation on the project would have to be hauled elsewhere.

75. For the purposes of determining these quantities, Ray Tuttle from Martin/Martin performed quantity take-offs and determined that there would be 33,400 cubic yards ("CY") of cut and 16,100 CY of fill (assuming 40% compaction factor).

76. While no specific quantity of excavation was used in the price schedule because it was a lump-sum item, the NPS identified that there would be 6800 CY of "excess" excavation that would have to be hauled to Wolverton point.

77. A "compaction factor" is used when calculating the amount of fill on a project because the material that is excavated and placed as fill will compress to some degree when it is placed as embankment.

78. A compaction factor has no effect of the amount of cut on a project.

79. Mr. Tuttle used a 40% compaction factor because the NPS had experienced 40% compaction at Sequoia in the past.

80. This was because the ground contained a lot of boulders that could not be used for fill, but would be used elsewhere upon the project.

81. DHM Design took the lead in bringing the documents together and coordinating them for the solicitation.

82. Since the work of the consultant design team was divisible into separate elements (i.e. civil engineering, landscape design), each member of the

design team had the responsibility to undertake appropriate quality control and quality assurance related to their own areas.

83. After the design elements were assembled, the design team undertook to review the assembled documents.

84. This was done in sit-down review sessions, which included members from the consultant design team and the NPS design team.

## III. THE SOLICITATION

85. The 200-series of projects were an ongoing attempt to revitalize the Giant Forest and restore the Sequoia Grove.

86. To that end, contractors that had worked on the 200-series projects generally knew that there would be upcoming projects.

87. Thus, it was no secret that the work associated with the 200Q project would come up for bid.

88. The NPS issued a Request for Proposal ("RFP") for the Sherman Tree Parking Project in February, 2001.

89. In the Solicitation, Standard Form 1442, provides that the Contractor was to begin performance within 15 calendar days of the notice to proceed and complete performance within 792 calendar days after receiving notice to proceed.

90. Solicitation Section B was the price schedule.

91. Under the price schedule, the NPS gave prospective bidders quantities and units for bidding, and for other work, the NPS asked the bidder to provide a lump sum price.

92. Notably, work under bid item 37, excavation and grading, was a lump sum item.

93. Solicitation, Section C – Descriptions and Specifications, Division 1, Section 01320 Project Schedule and Monthly Inspections, states in part as follows:

> 1.4.A.1 The project schedule shall cover the entire contract period. The late finish date of the project schedule shall be the same date as the established completion date of the contract.
>
> 1.4.A.2 The Contractor shall use the Precedence Diagram Method (PDM) with limited use of lead or lag durations between schedule activities. The Contractor's project schedule shall consist of procurement activities (including mobilization, submittal, and the fabrication and delivery of key and long-lead procurement items) and construction activities.
>
> 1.4.A.4 In developing the project schedule, the Contractor shall be responsible for ensuring that subcontractor work at all tiers, as well as its own work, is included in the project schedule.
>
> 1.4.A.5 The project schedule as developed shall show the sequence and interdependence of activities required for complete performance of the work. The Contractor shall be responsible for ensuring all work sequences are logical and the project schedule shows a coordinated plan of the work.
>
> 1.5.A. General: The project schedule shall be updated on a monthly basis throughout the entire contract time and until project substantial completion. The status date of each schedule update shall be the 10th day preceding the progress payment request date.
>
> 1.7.A. Requirements: When contract modifications or changes are initiated, delays are experienced, or the Contractor desires to revise the project schedule, the Contractor shall submit to the Contracting Officer a written time impact analysis illustrating the influence of each modifications, change, delay, or Contractor request on the contract time.

94. Solicitation Section E – Inspection and Acceptance, subparagraph E.1 – Inspection of Construction, states in part as follows:

> (b) The Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the work performed under the contract conforms to contract requirements. The Contractor shall maintain complete inspection records and make them available to the Government. All work shall be conducted under the general direction of the Contracting Officer and is subject to Government inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the contract.
>
> (d) The presence or absence of a Government inspector does not relieve the Contractor from any contract requirement, nor is the inspector authorized to change any term or condition of the specification without the Contracting Officer's written authorization.

95. Solicitation Section F – Deliveries or Performance, subparagraph F.1 – Liquidated Damages Construction, states as follows:

> (a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $550.00 for each calendar day of delay until the work is completed or accepted.
>
> (b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

96. Solicitation Section I – Contract Clauses, subparagraph I.7 – Definitions Alternate I, states in part as follows:

> (f) "Contracting Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer.

97. Solicitation, Section I, subparagraph I.17 – Variation in Estimated Quantity, states as follows:

> If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity. If the quantity variation is such as to cause an increase in the time necessary for completion, the Contractor may request, in writing, an extension of time, to be received by the Contracting Officer within 10 days from the beginning of the delay, or within such further period as may be granted by the Contracting Officer before the date of final settlement of the contract. Upon the receipt of a written request for an extension, the Contracting Officer shall ascertain the facts and make an adjustment for extending the completion date as, in the judgement of the Contracting Officer, is justified.

98. Solicitation Section I, subparagraph I.62 – Differing Site Conditions, states in part as follows:

> (a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of
>
> (1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or
>
> (2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

99. Solicitation Section I, subparagraph I.77 - Changes, states in part as follows:

(a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes–

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work.

100. Solicitation Section I, subparagraph I.81 - Default, states in part as follows:

(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Government in completing the work.

101. Solicitation Section I, subparagraph I.91 – Seasonal Shutdown, states as follows:

(a) It is recognized that seasonal climatic conditions regularly occur in some of the National Park Service areas that restrict and in some cases prohibit normal construction activities. The actual timing of a seasonal shutdown will be determined by mutual agreement between the Contractor and the Contracting Officer. The Contractor shall give the Contracting Officer at least two weeks notice prior to the anticipated resumption of work. The actual date that work is resumed is subject to the approval of the Contracting Officer. The amount of time during a seasonal shutdown is taken into consideration when the completion time as stated in the Contract is

determined. Therefore, the contract time will not be extended due to seasonal shutdowns.

102. The Specifications for this project are contained in Section C - Descriptions and Specifications.

103. Solicitation Section C – Descriptions and Specifications, Division 1, Section 01110 SUMMARY OF WORK, states in part as follows:

> Preservation of Natural Features: See Section 01351. The Giant Forest, in which this demolition and construction project is located, is part of the prime resource for which Sequoia National Park was created. This prime resource must be protected. Any damage to natural features which occurs will result in an immediate stoppage of operations, so that any appropriate penalties can be assessed, (Section 01351-3.8), restoration or repair can be prescribed, and procedures for presenting any similar occurrences can be implemented. Delays to additional work that occur as a result of any damage to any natural features will be at no additional expense to the Government.

104. Solicitation Section C – Descriptions and Specifications, Division 1, Section 01430 Contractor Quality Control, states in part as follows: "

> The quality of all work shall be the responsibility of the Contractor. Testing shall be the responsibility of an independent testing laboratory.

105. Solicitation Section C – Descriptions and Specifications, Division 1, Section 01720 Field Engineering, states in part as follows:

> 1.1.A Contractor shall use monuments shown on the plans. Contractor shall layout the work by accurately measuring from these controls. All work improperly located due to Contractor's errors or omissions shall be corrected at no additional expense to the Government.
>
> 1.1.B Contractor shall preserve controls thus established. Controls originally set by Contracting Officer that are

destroyed by Contractor will be replaced by Contracting Officer, with the cost of replacement deducted from Contractor's final payment.

1.1.C Locations and elevations shown on the drawings are subject to final field adjustment by the Contracting Officer before construction. Contractor shall immediately notify the Contracting Officer of apparent errors discovered on the drawings or in the initial stakeout. If changes in stakeout are required, the Contractor shall cooperate with Contracting Officer in prompt establishment of the field control for altered or adjusted work. All construction layout shall be completed a minimum of seven (7) working days ahead of actual construct start for that particular work to allow time for the Contracting Officer to inspect the layout and perform any necessary field adjustments to the design.

1.1.E General Earthwork: Original cross sections for earthwork shall be performed on all contractor work. Cross sections shall be performed at station intervals not to exceed 25 feet, at all PC, PT and angle points, at all design template transition stations, terrain breaks, and at all design center line profiles grade breaks, points of vertical curvature and tangency.

1.2.A Quantity surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed in place.

1.2.B The Contractor shall conduct the original and final surveys and surveys for the periods for which progress payments are requested. All these surveys shall be conducted in the presence of the Contracting Officer, unless the Contracting Officer waives this requirement in a specific instance. The Government shall make such computations as are necessary to determine the quantities of work performed or finally in place. The Contractor shall make computations based on the surveys for any period for which progress payments are requested. All surveys and computations shall be subject to review and approval by the Contracting Officer.

106. Solicitation Section C – Descriptions and Specifications, Division 2, Section 02310 Site Excavation and Grading, states in part as follows:

1.3.A Use of rippers will be considered as unclassified excavation.

1.3.B All excavation under this section will be considered unclassified regardless of the nature of material encountered. No rock excavation will be permitted unless approved by Contracting Officer.

3.7.A Deep Fill Areas: The drawings and specifications indicate several sources of material to be placed in the deep fill areas of the Upper Sherman Tree Parking Area. The geotechnical report outlines the placement procedures and compaction requirements. The deep fill material can be crushed asphalt or concrete, soil, boulders and other material not suitable for fill within the upper embankment layer requiring compaction levels of 95% or maximum density as outlined in Paragraph 3.9 Compaction. The Contractor must use the soil from Wukasachi as deep fill material.

3.12.A Dispose of all surplus and unsuitable material outside the park and as specified in Section 01570.

4.1 EXCAVATION AND GRADING

4.1.A Payment will be included in the contract lump sum price for all excavation, embankment (including deep fill material), transporting of cut and fill material within the project area, stripping, staging, stockpiling, handling, and placement of topsoil and finish grading.

4.2 ROCK EXCAVATION

4.2.A Measurement will be by original cross sections and final cross sections of the finished subgrade. Volumes will be computed from cross sections by the average end area method. This work is for utility excavation only. Payment will be made at the contract unit price per cubic yard.

4.3 HAUL EXCESS EXCAVATION

4.3.A This work involves the hauling and disposal of excess excavation to Wolverton Point. Measurement will be by final cross sections of the finished stockpile. Volumes will be computed from cross sections by the

average end area method. Payment will be made at the contract unit price per cubic yard.

107. Solicitation Section C – Descriptions and Specifications, Division 2, Section 02316 Roadway Excavation and Embankment, states in part as follows:

> 1.1.A The work of this section consists of roadway and embankment construction, including excavation and grading for roadways and parking areas, ditch construction, and slope finishing.
>
> 3.15.A Dispose of all surplus material and unsuitable materials outside the park and as specified in Section 01570.
>
> 4.2.A This work involves the hauling and disposal of excess excavation outside the park. Payment will be made under the bid items for site excavation and grading (Section 02310) at the contract unit price per cubic yard.

108. Solicitation Section C – Descriptions and Specifications, Division 2, Section 02725 Aggregate Base Course, states in part as follows:

> 1.1.A The work of this section consists of furnishing and placing aggregate, including recycled crushed asphalt and concrete, on a prepared subgrade.
>
> 1.2.C If materials are obtained from a commercial source, submit certification from the supplier certifying that aggregate base course meets the requirements of this section.
>
> 1.2.D If recycled crushed concrete or asphalt is used, testing as specified in Section 02726.
>
> 3.4.B Width: Plan dimension, plus or minus 2 inches.
>
> 3.4.C Thickness: Plan dimension, plus or minus ½ inch.
>
> 4.1.A Measurement for aggregate base course under bituminous concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Deduction will be made for moisture content exceeding 5

percent by weight. Payment will be made at the contract unit price.

109. Solicitation Section C – Descriptions and Specifications, Division 2, Section 02743 Asphalt Concrete Pavement, states in part as follows:

> 1.1.A The work of this section consists of constructing one or more surface courses composed of a mixture of aggregate and bituminous material to lines, grades, cross-sections and details, as shown on the plans and covered within these specifications.
>
> 4.2.A Measurement for asphalt concrete pavement will be the number of tons, to the nearest tenth of a ton, verified by weight tickets. Payment will be at the contract unit price.

## IV. HOW PLAINTIFF BID THE PROJECT AND CONTRACT AWARD

110. Plaintiff, Remediation Construction, Inc., ("Remcon") was established in 1996.

111. Its president is Mr. Stephen B. Christensen.

112. Mr. Christensen worked at Granite Construction Company ("Granite") from 1980 to 1995 and held several positions including the positions of division manager and products manager.

113. Mr. Christensen was involved in claims and litigation related to projects at Granite.

114. Mr. Christensen has extensive training in claims preparation and litigation.

115. From 1999 to 2001, Remcon worked as a subcontractor to Atherton Construction on a 200-series project, 200O for the rehabilitation of the Giant Forest museum.

116. Remcon responsibilities on the 200O project were for general site work.

117. The project was only a few miles away from the site of the 200Q project.

118. Since Remcon had been working at Sequoia on the 200O project, it was familiar with the general locality and the conditions where the work would be performed.

119. NPS issued its RFP for the Sherman Tree Parking Project on February 27, 2001.

120. On March 12, 2001, the NPS issued an Amendment No. 1 to the solicitation, which included pictures of the project site, including a picture of a pile of aggregate base (i.e., material of a type that may be suitable for use under asphalt to form a base for a walkway or roadway).

121. By e-mail dated March 21, 2001, Remcon's Steve Christensen advised Terry Lang, NPS' contract specialist, that a pile of aggregate base that was identified in the solicitation as being available for contractor's use, would likely not be available.

122. Specifically, the e-mail stated:

> Bid Item 71 - Aggregate Base. Page 02725 of the specifications states in Section 2.1.A "Material for aggregate base course shall come from crushing of materials (asphalt and concrete) removed from this project and/or stored from previous projects." I believe this statement may lead some bidders to assume that enough material exists on the project site to meet the demand for aggregate base [of] this project. REMCON is currently working on the Giant Forest Project and I believe that the use of any stockpiled base crushed during previous contracts will be used in the completion of the those contracts. Other than a limited amount salvaged from this project I do not believe any additional base material is available.

123. The NPS responded to Remcon's concern by informing Remcon that there was a pay item for furnish and install, and that the contractor would be paid for purchasing material from a common source, if it chose to do so.

124. On March 27, 2001, Remcon received a quote from California Drilling & Blasting and asked for a price quote for blasting.

125. California Drilling & Blasting gave Remcon a price quote for drilling 700 linear feet ("LF") of sewer trench, 1230 LF of sewer line, a sceptic tank, a leach field, boulders (on a time and material basis), and 10,000 CY for mass excavation.

126. Considering that Remcon claimed that there was 5,000 CY of rock excavation on site, 10,000 CY is a large amount of excavation and accounts for a very large proportion of the total amount of excavation Remcon planned to encounter on the project.

127. Mr. Christensen did not advise the contract specialist that he saw any other inconsistencies – other than the alleged issue raised by Mr. Christensen in his March 21, 2001 e-mail – in the bid documents.

128. Remcon did not notify the NPS that the bid quantities as expressed in Schedule B were inconsistent with Remcon's own quantity determinations.

129. If there were any mistakes in the amounts identified in the NPS's solicitation, they were not identified by Remcon and Remcon did not notify the Contracting Officer.

130. On March 29, 2001, Remcon submitted a proposal to the NPS in the amount of $7,988,267.08, of this $7,595,417.08 was for the base contract, Schedule items 1 - 128, and the remaining amount was for option items 129 - 132.

131. On April 12, 2001, the NPS advised Remcon that it was in the "competitive range" of proposals received.

132. The source selection evaluation panel requested that Remcon provide, among other items, additional information for some of its proposed key personnel.

133. On April 16, 2001, Remcon provided a response to the NPS together with a revised proposal.

134. With respect to key personnel, Remcon identified W. Spencer Boyer as the construction/project manager for the project.

135. Remcon stated that Mr. Boyer would work with the project superintendent to make sure that the project had the required manpower, equipment and materials to meet Remcon's construction schedule.

136. Remcon also identified Greg Kasparek as the project superintendent.

137. Remcon informed the NPS that Mr. Kasparek had intimate knowledge of the sensitive nature of the project because he was the project superintendent on the 200O Giant Forest project, and had a "strong working relationship" with Sequoia National Park.

138. Finally, Remcon stated that Mark Penrose and Kurt Korrigan would be project foremen.

139. Also in its revised proposal, Remcon stated that it had experience with "signature" boulders.

140. Specifically, Remcon stated it understood the Park Service's requirements related to "procuring these boulders, transporting and placement."

141. With respect to the revised proposal, Remcon made a few notable changes.

142. Among others, Remcon reduced its price for hauling miscellaneous material out of the park from $230,000 to $124,000, but it increased its price for hauling within the park from $24,000 to $45,000.

143. With respect to site excavation and grading, Remcon bid $350,000 for the lump sum item.

144. Since excavation and grading was a lump sum item, the NPS did not know the manner in which Remcon calculated the cut and fill for the project or whether Remcon considered compaction of the material in determining the amount of fill.

145. Remcon's bid estimate sheet shows that Remcon believed there would be 21,788 CY of cut, significantly less than the NPS' designer's calculations of 33,400 CY of cut.

146. Remcon's bid estimate also shows that Remcon understood that it would have to blast. Remcon included $30,000 for a "blasting allowance" for sub-drilling and shooting.

147. Remcon's bid estimate does not reflect that it considered the quote it had received from California Drilling & Blasting for 10,000 CY of mass excavation.

148. 10,000 CY would account for close to one-half of the 21,788 CY of cut that Remcon anticipated it would encounter on the project.

149. With respect to the Sherman Tree Trail, excavation and grading of the trail was part of the lump-sum excavation and grading bid item.

150. With respect to aggregate base, Remcon's estimate showed that it planned to purchase aggregate base off site and haul it to the project site.

151. Remcon included $233,719.40 in its bid estimate for "furnishing and hauling" aggregate base.

152. This was consistent with Mr. Christensen's understanding that a pile of aggregate base would not be available for his use on site.

153. Remcon's actual bid reflects its bid estimate.

154. Remcon bid the project as if it planned to purchase aggregate base off site and haul it to the project.

155. On May 9, 2001, NPS awarded a contract (base items 1 - 128) to Remcon, in the amount of $7,121,636.

156. On June 6, 2001, NPS issued a notice to proceed.

157. The NPS notified Remcon that the contract would begin on June 11, 2001, and thus, with a period of performance of 792 calendar days, the project completion date was August 11, 2003.

## V. THE FIRST CONSTRUCTION SEASON

158. The individuals from the NPS responsible for the 200Q project included the following:

159. Rod Keiscome was the contracting officer on the 200Q project.

160. Joanne Cody was the contracting officer's Representative with respect to the design.

161. William ("Willie") DeOcampo was the contracting officer's representative with respect to construction.

162. Willie DeOcampo had worked for the NPS as a COR since approximately 1982, and has worked on several 200-series projects.

163. Mr. DeOcampo has both a bachelors and masters degree in landscape architecture.

164. Ray Todd was the project manager .

165. Jack Vance was the on-site facilities project manager at Sequoia.

166. Mr. Vance has been with the NPS for 22 years.

167. Athena Demetry was the park ecologist and restoration specialist.

168. Ms. Demetry graduated from the Worcester Polytechnic Institute in 1991 with a bachelor of science in biology.

169. Ms. Demetry also attended graduate school at Northern Arizona University where she received a masters degree in forestry.

170. For the 200Q project, the A/E Construction Management Firm was Jacobs Engineering Group, Inc. ("Jacobs").

171. The on-site project supervisor from Jacobs was Robert ("Bob") Russell.

172. The construction management services were to include full-time on-site construction inspection services during the construction season and office services related to the construction contract to support the on-site inspection staff.

173. By the time the 200Q project started, Remcon had been in business five years.

174. For the first construction season, Remcon identified its Project Superintendent as Greg Kasparek.

175. Mr. Kasparek had a good working relationship with the NPS on the 200O project.

176. Almost immediately after the 200Q project started, Remcon requested that it replace Greg Kasparek, its Project Superintendent, with Jeff Northrop.

177. For the first construction season, Remcon identified its construction/project manager as Spencer Boyer.

178. Mr. Boyer was not on the project long after the 200Q project started.

179. Mark Penrose was the project foreman.

180. Teddy Michael was Remcon's Quality Control representative in 2001.

181. Remcon's grade setter was fired by Mr. Northrop shortly after Mr. Northrop started the project.

182. Afterward, Bill Houk acted as the grade setter for Remcon.

**A. PRECONSTRUCTION CONFERENCE**

183. On May 22, 2001, the NPS held a pre-construction conference with Remcon.

184. The pre-construction conference subjects included outlining the working relationship between the contracting officer, the contracting officer's representative and the A/E consultants.

185. At the meeting, the NPS restoration specialist, Athena Demetry, emphasized the importance of protecting natural resources, including trees and rocks.

186. Ms. Demetry also said that she needed to work with the contractor to assess the existing condition of vegetation to establish a baseline.

187. To that end, the parties stated that trees would be marked for removal prior to logging operations.

188. Mr. Christensen asked at the meeting if the park would mark only merchantable timber.

189. Ms. Demetry told Mr. Christensen that all trees that would be removed would be marked.

190. Ms. Demetry also stated that tree protection would need to be installed and Mr. Christensen offered to install some of the devices.

191. At the preconstruction conference, Remcon's Steve Christensen informed the NPS that it planned to have its survey crew set cut/slope stakes after the logging was complete.

192. Finally, at the meeting Mr. Christensen asked if the NPS would consider value engineering proposals. Specifically, Remcon wanted to crush aggregate base on site.

193. This would relieve Remcon from having to import material from outside the park.

**B. SCHEDULE**

194. On June 11, 2001, the first official day of the project, Remcon submitted a project schedule to NPS.

195. The project schedule did not include work on the Lower Sherman and was not resource loaded (i.e., Remcon did not include the required personnel and material resources necessary to perform the work).

196. The NPS reviewed the schedule and, within a week, advised Remcon that its project schedule was unacceptable.

197. On June 18, 2001, the schedule was returned to Remcon with the comment that it did not conform to Division 1 Section 1.4.A1 and 1.4A7.

198. The transmittal stated "Correct and resubmit."

199. Two weeks later, on June 25, 2001, Remcon submitted a revised project schedule to the NPS.

200. On July 25, 2001, Willie DeOcampo, the contracting officer's representative, attached comments to the transmittal accepting the schedule and advised Remcon that the schedule was accepted subject to Remcon resubmitting the schedule with the requested revisions.

201. Mr. DeOcampo's comments indicated that Remcon's schedule was very optimistic and that current progress was behind schedule.

202. Furthermore, he stated that the completion date should be as addressed in Specification Section 01320, part 1.4A1 and 2, Schedule Development.

203. Remcon's June 25, 2001 schedule projected an early completion; however, the specifications required that the project schedule shall cover the entire contract period and that the late finish of the project schedule was to be the same date as the established completion date of the contract.

204. The critical path on Remcon's second schedule, dated June 25, 2001, commenced with road work activities, including clearing trees from the roadway, clearing and grubbing, installing erosion control, hauling material, placing fill from the Wuksachi stock pile, excavation and embankment for the access road, and excavation and embankment for the Upper Sherman Parking Area.

205. Following the earthwork activities in the Upper Sherman Parking Area, the critical path of the second schedule (dated June 25, 2001) then proceeded through the comfort station activities to substantial completion of the Upper Sherman Parking Area.

## C. TREE REMOVAL

206. Since protection of the natural resources at 200Q were of the utmost importance, the NPS was involved in making sure that the natural resources, including but not limited to sugar pines, attractive rock outcroppings and other natural features, were to be protected during construction.

207. While Remcon had the responsibility to build the project according to the plans and specifications, the NPS took an active role in making sure Remcon did not remove or damage any more resources than identified in the plans and specifications.

208. Remcon also understood the importance of protecting resources since damage to the resources would result in work stoppage and penalties that would be assessed against the contractor.

209. Keeping in line with the parties' respective responsibilities, Athena Demetry, the NPS's resource ecologist, and Remcon's project personnel, Mark Penrose and Greg Kasparek, walked with Ms. Demetry and marked trees with "plans in [their] hands."

210. This work started on June 1, 2001, before the NPS issued the notice to proceed.

211. Although the contractor employees were to accompany Ms. Demetry, on June 1, 2001, they failed to show up after lunch.

212. There were two hundred and seventy trees noted in the plans for removal. Two hundred and fifty-two of these trees were in the parking lot and access road, sixteen were located in the area of the leach field.