213. The parties marked trees for removal that were noted upon the plans. Those trees marked were trees generally over 12 inches in diameter.

214. Ms. Demetry used the drawings, US1 - US8 to determine which trees to mark.

215. As an ecologist, Ms. Demetry was able to use the relative placement, species and size of trees as a guide to help mark trees.

216. Greg Kasparek was not on the 200Q project much after his walk-though with Ms. Demetry.

217. Prior to logging, Remcon employees again walked the site with the loggers to make sure that the proper trees were marked for removal.

218. This was essential since Remcon knew that it would be charged for resource damage to the trees if it made a mistake.

219. Again, Mr. Penrose carried plans and specifications during this walk-through.

220. Another activity related to protection of the park's natural resources was inventorying trees for protection.

221. The purpose of inventorying trees was twofold: inventorying prior damage to trees and marking trees for tree protection.

222. On June 7, 2001, Steve Christensen, in concert with Ms. Demetry and Bob Russell, walked the site to inventory trees for natural protection in compliance with the specification section.

223. The parties also reviewed trees to be removed at this time and additional trees were marked for removal.

224. On June 11, 2001, immediately after the Notice to Proceed was issued, Remcon commenced tree removal and clearing operations over the entire Upper Sherman Parking Area.

225. Tree removal occurred up to July 2, 2001.

226. At the same time, Remcon hauled both wood chips and contaminated wood chips off the project as well as timber to the mill.

227. Remcon failed to have its loggers log the trees in the leach field when it logged the access road and had to have its loggers go back up to the project site and remove logs.

228. Remcon claimed that the NPS was responsible for its failure to log the leach field.

229. Tree removal was discussed at the meeting on October 23, 2001, and the parties agreed that marking was a joint effort between Remcon and the NPS and the issue regarding logging the leach field was dropped by Remcon.

230. Remcon contends that the access road was realigned because Ms. Demetry mis-marked the trees for removal.

231. At no point in time during the first, second or third years of the project was any mention made that the road was realigned was because the trees were marked incorrectly.

232. Even Remcon's June 28, 2003 omnibus claim does not advance the theory that the reason the road was realigned was because trees were mis-marked.

233. The Omnibus claim states that the road was realigned due to design errors.

234. The as-built survey does not support Remcon's contention that the road was realigned due to design errors.

235. The first time this theory was put forth was in context of this litigation.

**D. BURN PIT**

236. In the Upper Sherman Parking Area, the contract drawings contained a reference to "burn material", which the contractor was required to haul from the park.

237. Excavation and removal of the material located in the "burn pit" of the Upper Sherman Parking Area commenced on July 2, 2001. The contract documents indicated that there was 2,000 CY of material that needed to be removed from this area.

238. Shortly after Remcon started excavating the burn pit, Remcon informed the NPS that the volume of material that it had encountered in the burn pit was more extensive than anticipated.

239. Remcon alleged that the quantities of off-haul would exceed the amount identified in the contract.

240. In response to Request for Information ("RFI") No. 003, the NPS agreed to pay Remcon per truck load for the material hauled out of the park.

241. The parties agreed that the trucks should be loaded with 24 CY of material.

242. Remcon continued to haul material out of the burn pit until July 18, 2001.

243. In a meeting on July 25, 2001, Remcon claimed that it had hauled out approximately 7,584 CY of material to date.

244. At the July 25 meeting, the NPS' on-site representative, Bob Russell, disagreed with Remcon's calculation because he had noticed that Remcon was loading the trucks "light".

245. Instead of loading the trucks with 24 CY of material, trucks were being loaded with 22 CY of material or less.

246. Mr. Russell even noted that sometimes the trucks were loaded only with 18 CY of material.

247. On July 31, 2001, Remcon submitted Change Order 2 with respect to the burn pit.

248. The change order stated that Remcon was directed to excavate the burn pit.

249. The contracting officer stated that "material not requiring off-site disposal was then placed back into the excavated pit and compacted."

250. By letter dated July 31, 2001, the NPS stated that it would pay Remcon for hauling 7,925 CY of material from the park at the unit price of $62.00 a cubic yard.

251. The letter stated that once the NPS received Remcon's trucking receipts it would open the pay items for renegotiations.

252. On August 1, 2001, the NPS sent Remcon a letter stating that its work would be compensated under Progress Payment No. 3.

253. The NPS paid Remcon based on Remcon's estimates regarding the amount removed.

254. However, since the NPS did not know how much material was actually taken out of the park, the NPS asked Remcon to provide additional information regarding what was hauled from the area.

255. Remcon was paid for its estimated quantities of burn pit in progress payment No. 3, dated August 6, 2001.

256. On September 22, 2001, Bob Russell sent Willie DeOcampo a breakdown of how much material was hauled from the park related to bid item No. 26 (burn pit and other debris).

257. In Mr. Russell's memo he stated, "weight receipts were requested in July but have not been received to date."

258. On September 24, 2001, Steve Christensen forwarded Mr. DeOcampo "detailed back-up" for off haul of burn pit material from the park.

259. In his back-up, Mr. Christensen identifies that the trucks were all loaded with 24 CY of material.

260. After reviewing Mr. Christensen's back-up, Mr. Russell adjusted his breakdown.

261. Mr. Russell found that the total quantity hauled outside the park was 6,126 CY and that Remcon had already been paid for 7,925 CY of material.

262. The increase in the quantity of material removed from the burn pit was formally recognized in Modification No. 3.

263. Remcon was given a total of $434,618.75 for the work associated with the burn pit.

264. Backfill was included in the cost of hauling away the burn pit material. Specification Section 02316, related to Roadway Excavation and Embankment, refers to Specification Section 02310 for Measurement and Payment, which states: "This work consists of all excavation, placement of fill, backfill and surface grading."

265. Remcon was also given 13 working days for the work.

266. At no time between when the work occurred and when Modification No. 3 was issued, did Remcon state that it anticipated that it should be paid for "filling the hole" caused by additional burn pit excavation.

267. The first time that Remcon requested compensation for "filling the hole" left by excavation of the burn pit was in the context of this litigation.

268. Remcon never contemporaneously asked for compensation for filling the burn pit.

269. Further, between the time that Remcon excavated the burn pit and when Remcon requested compensation for filling the pit, the parties negotiated and the NPS issued Modification No. 4 which paid Remcon to raise the parking lot to account for excess excavation that Remcon alleged it encountered during the 2001 construction season.

270. No mention was made by Remcon, during negotiations related to raising the parking lot, that it intended to seek additional compensation for filling the burn pit, which was in the middle of the parking lot that was being raised.

271. In addition, Remcon never provided NPS with cross-sections showing the actual depth to which the burn pit was excavated.

**E. ALIGNMENT**

272. Even before the trees were felled, Remcon requested that the NPS' survey data be sent directly by e-mail to Remcon's surveyors, Giuliani & Kull.

273. This was unusual in the NPS' experience, because most contractors obtain all survey information from the contract documents.

274. However, the NPS, in an effort to be cooperative, agreed to help Remcon and provide this information to its surveyors.

275. On June 8, 2001, NPS' Dan Savage advised Guiliani & Kull that the drawings and files for the project were on the "file transfer protocol (ftp)" site, an internet based file sharing site where the NPS posts information for others to access.

276. Dan Savage advised Guiliani & Kull where it could find all of its drawings, including drawings for the Upper Sherman Parking Area, Upper Sherman access road, Sherman Tree Trail, and the existing topographical map.

277. The NPS was not in any way obligated to forward this information to Remcon, or even to Remcon's surveyor, but did so as a favor to Remcon.

278. On June 13, 2001, Remcon's Steve Christensen sent RFI No. 0004 to the NPS, specifically requesting that the NPS send its Computer Aided Design ("CAD") files directly to Guiliani & Kull.

279. The RFI stated that this information needed to be "immediately forwarded to Giuliani & Kull so as not to impede the progress schedule."

280. In response to the RFI, the NPS advised Remcon at the June 15, 2001 construction meeting that the requested information was on the plans.

281. After the tree clearing/logging operations had been completed, Remcon "pioneered" the road, that is a bulldozer made a rough cut through the area that had been cleared.

282. Remcon did not follow a survey when it pioneered the road.

283. Remcon commenced survey layout work on June 25, 2001.

284. The survey work commenced on the access road at the intersection of the access road and Wolverton road and proceeded south towards the Upper Sherman Parking Area.

285. Specification Section 01720 required the contractor to immediately notify the contracting officer of apparent errors discovered on the drawings or in the initial stakeout.

286. Specification Section 01720 also required that the construction layout be completed a minimum of seven working days ahead of actual construction start so that the NPS could inspect the layout and the parties could perform <u>any necessary field adjustments</u> to the design.

287. To that end, as Guiliani & Kull performed its survey, it discovered two potential alignment issues.

288. The first issue that came up was between stations 9+00 and 12+00, at a turn-out location, where Steve Christensen advised Willie DeOcampo that it appeared that a large tree was not in the location shown on the plans.

289. On June 26, 2001, Steve Christensen reviewed an alignment issue with the contracting officer's representative, Willie DeOcampo.

290. The NPS had not done its own survey in this area, so the NPS relied upon what it was told by Remcon and by a visual inspection of the survey stakes that had been placed by Guiliani & Kull.

291. Mr. Christensen convinced Mr. DeOcampo that, if the access road turn-out was built as laid out, then additional tree removal on the East side of the access road would be required.

292. Mr. DeOcampo agreed with Mr. Christensen and decided it would be best to make a field adjustment to the turn-out since Mr. Christensen stated that the shift would be at "no additional cost" and because Mr. DeOcampo believed Mr. Christensen that additional tree removal would be necessary if the road was built as planned.

293. Mr. Christensen assured Mr. DeOcampo that this would be a "no-cost" field adjustment pursuant to Specification Section 01720.

294. The as-built survey performed in 2003 shows that the tree was correctly located in the plans and the turn-out area did not need to be realigned.

295. The as-built survey performed in 2003 shows that Remcon did not construct the turn-out according to the contract: it was too shallow.

296. On June 27, 2001, the Remcon's surveyors, Giuliani and Kull, expressed a second concern regarding the access road alignment.

297. This time they expressed concern that the center line location between 24+46 and 30+18 was approaching the right edge of the cleared area.

298. For clarity, the area between stations 24+46 and 30+18 is referred to by Remcon as "the deep cut."

299. On their own initiative and without direction from the NPS, the surveyors recalculated a center line for this area and restaked it for Mr. DeOcampo's review the next day.

300. The next day, June 28, 2001, the Contracting Officer's Representative, Mr. DeOcampo, and the NPS's on-site project inspector, Bob Russell, walked Guiliani & Kull's restaked alignment.

301. Again, Mr. Christensen recommended the relocation of the road.

302. Mr. DeOcampo advised Mr. Christensen that he would have to check with the designers regarding the suggested realignment.

303. On July 3, 2001, Bob Russell sent Mr. DeOcampo at the Denver Service Center ("DSC") Guiliani & Kull's revised alignment, the same alignment that they had walked along with pictures (from July 2).

304. Guiliani & Kull's revised alignment was also sent to Joanne Cody, the contracting officer's representative for the design of the 200Q project.

305. When Ms. Cody reviewed Guiliani & Kull's staked alignment on July 9, 2001, she did not find it satisfactory.

306. She spent the day on site with an individual from Martin/Martin, a consultant designer, to determine how to best adjust the alignment between 25+ and 30+.

307. To that end, on July 11, 2001, NPS forwarded an "adjusted" access road alignment to Remcon.

308. The alignment change was minor. From above, the area that shifted looked like a new moon, a thin finger-nail sliver.

309. The thickest part of the "moon" was eight feet off of the original alignment at about station 26+50. The "moon" thinned as it moved away from station 26+50: 200 feet in either direction and it had thinned to almost nothing.

310. On July 15, 2001, the NPS's on-site representative, Bob Russell, spoke with Steve Christensen regarding the road realignment at 24+38 and 30+20.

311. Mr. Christensen said that he expected the NPS to compensate its subcontractors for the extra cost of restaking the center line of the access road the second time, which was to occur the next day.

312. Mr. Christensen stated that he would not charge for field work performed prior to July 16.

313. On July 16, 2001, Remcon's surveyors began re-staking the adjusted access road alignment.

314. Steve Christensen did not advise the NPS at this time that he expected that the alignment change might result in additional excavation for which he expected compensation.

315. On July 26, 2001, Remcon asked whether it could make adjustments to its slopes in the deep cut area from 27+00 to 32+00. Jacobs responded with the slope ratio identified in the contract.

316. On July 31, 2001, Remcon submitted Change Order Request No. 1, stating that Guiliani & Kull was entitled for compensation for its additional survey work.

317. The NPS agreed that it was reasonable to pay Remcon for restaking the alignment change as extra work.

318. When negotiating the modification to pay Guiliani & Kull for the additional survey, Remcon did not advise the NPS that it believed it was otherwise due any compensation related to the minor field adjustments to the access road.

319. The work associated with the resurvey was paid for by Modification No. 4, which was bilateral.

320. Modification No. 4 was issued on September 12, 2002.

321. On October 20, 2002, Remcon sent a letter to the NPS regarding the various alignment changes on the access road. With respect to the changes related to the initial survey in June/July 2001, Remcon claimed that the reason for these changes was "a defective design."

322. Similarly, Remcon's omnibus claim states that the access road was realigned due to "devastating design errors."

323. Remcon has never substantiated its design error allegations.

324. Remcon's assertion regarding design error conflicts with the as-built survey.

325. The as-built survey revealed that the NPS' original plans and specifications were sufficient and the road could have been built per plan.

326. At no point in the discussions between the parties that occurred in late June and July of 2001 did the parties assess blame regarding who was at fault for the road being realigned.

327. Specifically, there are no contemporaneous documents that indicate that Ms. Demetry, along with the Remcon employees that accompanied her, mis-marked trees.

328. The theory that Ms. Demetry mis-marked the trees only came about after the as-built survey was received by Remcon.

329. In its earthwork claim, Remcon states that the alignment change caused it to go into the hillside and resulted in additional excavation.

330. Although Remcon was contractually required to perform quantity surveys, which would have identified exactly how much additional excavation Remcon encountered, if any, in the area of the "deep cut", it failed to do so.

331. Regardless of the cause of the additional excavation, which will be discussed below, the NPS paid Remcon for disposal of the additional excavation in Modification No. 4, when it paid Remcon to raise the parking lot and to haul excess excavation to Wolverton point.

**F. LEACH FIELD**

332. On August 7, 2001, during a walk-through with Joanne Cody, the contracting officer's representative for the design team, Ms. Cody was told by Mr. Christensen that building the leach field in the designed location would be a problem because of a large sugar pine that was not shown in the plans.

333. Since Remcon was responsible for staking the project, Ms. Cody relied upon what she was told by Mr. Christensen regarding the need to relocate the leach field.

334. Ms. Cody tentatively agreed that Remcon could move the leach field, but stated that she would have to check with the Denver Service Center and the designers.

335. When she consulted the designers and the Denver Service Center, the NPS decided that it should not move the leach field.

336. The NPS had already made two field revisions upon the access road and, in an e-mail of August 9, 2001, Mr. DeOcampo stated that the NPS needed to stop making construction field revisions because it would make "it look like our plans are worthless."

337. At this point in time, Mr. DeOcampo was beginning to suspect that Remcon intended to file a claim based on the *Spearin* Doctrine.

338. The leach field was to be built in accordance with the original design location and the tree that Remcon's Steve Christensen claimed was in the way was, in fact, not in the way.

**G. EXCESS EXCAVATION**

339. In late June, 2001, at the same time that Guiliani & Kull was laying out a survey on the access road, Remcon advised NPS that it believed the "cut and fills will not balance."

340. Remcon also advised the NPS that it believed there may be 13,000 CY of material that would have to be moved "somewhere in the park."

341. On July 2, 2001, the NPS' Willie DeOcampo informed other NPS employees of Remcon's contentions related to excess excavation.

342. At the July 10, 2001, project meeting, the parties discussed the alleged overrun of quantities.

343. Joanne Cody discussed her understanding of the material on the project and explained where material needed to go on the project.

344. Ms. Cody also discussed where the cut material should go on the project at the project meeting of July 18, 2001.

345. In an e-mail dated September 14, 2001, Steve Christensen informed Mr. DeOcampo, that he should expect additional overruns on the following quantities: 1,500 CY of off-haul within the park and 15,000 CY of haul excess material from the park.

346. Mr. Christensen also claimed that as a result of the excess material being generated that his schedule was being impacted.

347. In the same e-mail, Mr. Christensen requested a meeting with the NPS.

348. In response, Mr. DeOcampo forwarded the e-mail to other NPS employees so that Remcon's contentions could be discussed.

349. Jack Vance, the on-site Sequoia/Kings Canyon facilities manager, responded to Mr. DeOcampo by stating that he believed that Remcon had not provided adequate documentation to support its overruns.

350. Mr. Vance said "it has been discussed at every weekly meeting without positive response from them. How can [Mr. Christensen] estimate (and discuss) a quantity without backup documentation?"

351. Mr. Vance's e-mail also noted that Remcon was causing its own delays by failing to send in submittals, and it had not yet resolved utility trench issues.

352. Up to this point, Remcon had not produced cross sections of the project showing where the claimed excess material was coming from.

353. Remcon was required to produce quantity surveys for the project which would have revealed excess excavation if, in fact, there was any.

354. On October 18, 2001, Remcon submitted RFI No. 31, entitled "Excess Excavation" to NPS.

355. Through RFI No. 31, Remcon informed NPS that it still believed there were approximately 15,000 CY of excess material in various piles on the project.

356. Remcon asked NPS what NPS wanted done with the excess material and how Remcon was going to be compensated for moving it.

357. NPS responded that, based upon field observations, it appeared that earthwork was being constructed approximately one foot below design grades.

358. The NPS advised Remcon that it would have the surveyors check the field work.

359. The NPS's consultant design team rechecked their earthwork calculations in October, 2001.

360. They came up with 31,200 CY of cut.

361. Remcon's surveyors, Guiliani & Kull, also performed their own quantity take-off and found 29,400 CY of cut.

362. Remcon's earthwork estimate shows that its estimate of the cut on the project was 21,788 CY.

363. This is hugely significant because it is almost 10,000 less than the amount estimated by the NPS and its consultant design team.

364. Remcon did not advise the NPS that it made a mistake in its estimate.

365. Since earthwork was bid as a lump sum item, it would not affect the work that was required under the contract (the cut and fill remained the same on the contract), but the effect of Remcon's bid mistake was that Remcon would be handling over 7,500 CY more material than it anticipated.

366. Thus, this fact alone would lead to Remcon's perception of "excess" earthwork.

367. The NPS does not deny that there was some excess excavation that needed to be hauled off of the project that was not directly referenced in bid quantities.

368. With respect to the cut on the project, the cut only changed in one place in 2001, in the "deep cut" area.

369. The alignment change would have resulted in less than 1,000 CY of additional cut.

370. However, Remcon never produced a quantity survey of this area to show the NPS how much excavation it encountered.

371. Other than the small change in the alignment, the amount of material that the designers calculated, 33,000 CY, only varied by the small amount in the cut.

372. The NPS used a 40% compaction factor on this project with respect to fill.

373. This compaction was used was because NPS employees on site knew that much of the material that would be excavated on this project consisted of boulders and material that probably would not be used for fill.

374. In fact, there were rocks and boulders encountered during excavation that was used on the project as aggregate base, veneer, dry laid stone walls, landscape boulders, signature boulders, and revetment.

375. The result would be that excess excavation "left over" from cut would not be used for fill.

376. The result of using a 40% compaction factor instead of a 15% or 20% compaction factor is that Remcon encountered about 2,500 CY of excess material.

377. In total, in the summer of 2001, Remcon would have encountered about 5,000 CY of excess excavation that needed to be hauled away.

378. This is consistent with the NPS' perceptions at the time (June 10, 2001).

379. Remcon's perception of 15,000 CY of excess material is consistent with the 5,000 CY of material that was actually greater than anticipated and the 10,000 CY of material that Remcon failed to include in its quantity take-off of the contract quantity.

380. Remcon's 10,000 CY mistake in its bid estimate accounts for two-thirds of the 15,000 CY of "excess material" Remcon claimed to have encountered.

381. The NPS recognized that it was going to have to compensate Remcon for dealing with the 5,000 CY of extra material.

382. In 2001, the NPS looked at the possibility of raising the Upper Sherman Parking Area to maximize areas to place excess fill.

383. Excavation in the Upper Sherman Parking Area continued until September 24, 2001.

384. The excavated material from the "deep cut" area of the access road was hauled to the staging area and to the upper parking lot.

385. By October 29, 2001, Remcon's crushing subcontractor, Oasis, had crushed 4,750 tons of aggregate base and 3,940 tons of sand and 800 tons of byproduct.

386. These stockpiled materials were still in the upper parking lot when the project was shut down for the winter of 2001-2002.

387. As stated above, Remcon did not perform quantity surveys, despite being asked on numerous occasions to do so by the NPS.

388. Quantity surveys would have quantified the amount of excess excavation on site.

**H. PARKING LOT**

389. Shortly after Remcon started claiming that it was encountering excess excavation, the NPS indicated a willingness to raise the parking lot to account for the excess excavation.

390. In July, 2001, the NPS suggested the possibility of raising the Upper Sherman Parking Area.

391. On July 25, 2001, the NPS sent electronic survey data to Remcon for the revised grades and alignment for the Upper Sherman Parking Area.

392. The following day, July 26, 2001, Bob Russell sent Remcon's Project Superintendent, Jeff Northrop, two copies of the coordinates for the revised grades/elevations for the Upper Sherman Parking Area.

393. The transmittal noted that the "revised grades represent the maximum changes and are to be used only if the park service determines that it is

necessary or desirable to adjust the parking lot grades to minimize excess cut material."

394. On July 30, 2001, Guiliani & Kull sent an e-mail to the NPS designer stating that it had reviewed the electronic data the NPS had sent and asked whether the parking lot elevations were all off by 100 feet.

395. The next day, the NPS designer replied that the surveyor was correct and he would resend the information.

396. The NPS designer sent the revised information to Remcon's surveyor the following day, August 1, 2001.

**I. <u>BLASTING</u>**

397. The specifications for the 200Q project anticipated that a contractor would have to do some blasting on site.

398. Notably, the contractor would likely blast the utility trench, which ran longitudinally down the access road; the storm drains, which ran across the access road and parking lots; and the leach field.

399. Further, the geotechnical investigation report noted that the access road consisted of "weathered granitic rock" that ranged from "slightly to highly weathered."

400. The report advised the NPS that the "weathered granitic rock material at the site appear[s] to be conducive to ripping."

401. However, the report also continued "we anticipate that some areas of weathered granite may be ripped with larger equipment."

402. Pursuant to the requirements of the contract, Remcon transmitted the qualifications of California Drilling & Blasting as well as a blasting plan to NPS on June 25, 2001.

403. The NPS returned the blasting plan that same day approving California Drilling & Blasting's qualifications, but disapproving its blasting plan.

404. On July 18, 2001 California Drilling & Blasting was on site to review the blasting plan with NPS.

405. Remcon submitted California Drilling & Blasting's revised blasting plan on July 26, 2001.

406. The plan was entitled, "Explosives Use and Blasting Plan for Sequoia National Park, Big Tree Parking."

407. The general location of blasting as identified in this transmittal was as follows: "Blasting will be performed on a new sewer line in Sequoia National Park Big Tree Parking Project."

408. The blasting plan also states that, "blasting is required to allow a new parking area and sewer line to be constructed."

409. As of the date that California Drilling & Blasting submitted its blasting plan, there were no indications that Remcon encountered rock in its earthwork activities.

410. None of the daily reports, quality control reports or meeting minutes suggests that Remcon was on site trying to "rip" the road.

411. During meetings, Remcon provided two-week "look ahead" schedules.

412. On July 24, 2001, Remcon submitted a two-week look ahead schedule that showed Remcon's blasting subcontractor, California Drilling & Blasting, would be on site starting on July 30, 2001.

413. Remcon did not advise the NPS why the blasting subcontractor would be on site, but the NPS was not surprised because all the parties knew that there would be some blasting on site.

414. Further, even if Remcon had decided to blast the access road, it would have been Remcon's prerogative since the specifications allowed Remcon to execute the excavation in the manner it saw best.

415. Earthwork operations begin in the deep cut of the access road on July 27, 2001.

416. The area of the deep cut runs from approximately station 24+50 to 30+50, or about 600 lineal feet.

417. There is no evidence in the meeting minutes, the NPS's daily logs or Remcon's quality control reports, that Remcon was attempting to "rip" the road and was facing difficulties in doing so.

418. The following work day, July 30, 2001, Remcon claimed that it was "encountering large boulders" and would need to blast.

419. At noon on the same day, Remcon's blasting subcontractor, California Drilling & Blasting, arrived on site and began to drill in the access road at station 28+00.

420. Remcon, as of this date, July 30, 2001, did not give written notice to the contracting officer, Rod Keiscome, that it considered this a "differing site condition."

421. Remcon did not cease excavation and give the NPS contracting officer the opportunity to investigate the site before the conditions were disturbed.

422. On July 31, 2001, the day after Remcon began to drill, Steve Christensen acknowledged that the access road was being blasted in his diaries.

423. He noted that Remcon needed to "write up blasting for payment. Tracking all blasting costs and pricing up the extra work."

424. In the same entry, Mr. Christensen noted in his diary that he wanted to get a proposal for crushing aggregate base.

425. Remcon planned to process the rock obtained from blasting in order to make aggregate base.

426. Starting on July 31, 2001, and over the next several days, Remcon was excavating the access road between station 25+00 and 31+00 and encountering boulders which, it contended, required blasting.

427. Although the daily reports mention that Remcon encountered "boulders," it does not otherwise say that the road was "not rippable," or that Remcon attempted to rip elsewhere.

428. Again, Mr. Christensen did not advise the NPS that it considered the blasting "extra work."

429. Nor did Remcon advise the Government on July 31, 2001 that it considered the conditions encountered a differing site condition.

430. Interestingly, in Remcon's estimate, Steve Christensen anticipated that Remcon would be encountering boulders and included $30,000 for blasting boulders in its bid estimate.

431. Once the earthwork operation began on the access road in the "deep cut" area, access to the Upper Sherman Parking Area would be limited.

432. On August 1, 2001, Remcon sought permission to construct a temporary construction road to bypass the "deep cut" area due to utility work and blasting operations.

433. The temporary construction road linked the staging area at the end of the Shuttle Drive to the Upper Sherman Parking Area.

434. By letter dated August 7, 2001, the NPS approved Remcon's request to construct a temporary access road.

435. The same day, August 7, 2001, Remcon transmitted a subcontract to California Drilling & Blasting for blasting work.

436. The scope of work in the subcontract between Remcon and California Drilling & Blasting included, among other items, 10,000 CY of mass excavation.

437. The purpose of the 10,000 CY of mass excavation was so that California Drilling & Blasting could blast the access road.

438. The 10,000 CY of mass excavation was also included in California Drilling & Blasting's proposal, which it transmitted to Remcon in March 2001.

439. On August 8, 2001, Remcon's Project Superintendent, Jeff Northrop, sent a fax to NPS suggesting that the quantity of rock excavation would greatly exceed the contract quantity for Pay Item No. 38.

440. In Mr. Northrop's August 8, 2001 fax stated that there was already an overrun of over 500% for the rock excavation pay item due to blasting on the access road.

441. In the specifications, it is clear that no "rock excavation" was to be performed unless approved by the contracting officer.

442. As of, August 8, 2001, Remcon had not sought approval for rock excavation from the contracting officer, Rod Keiscome.

443. At this point in time, Remcon did not tell the NPS that it considered rock excavation (blasting) a "differing site condition," rather, it only stated that it thought the work was to be paid for under Pay Item No. 38, Rock Excavation, not under the lump sum pay item for excavation.

444. Pay Item No. 38 Rock Excavation was included in the Contract to pay for rock excavation that was required during utility trench work. [Project Specification, Section 02310-5, Article 4.2, and CPS].

445. On August 8, 2001, the NPS conferred with its employees and the consultant design team regarding rock excavation and whether blasting was to be paid under that pay item.

446. On August 13, 2001, the NPS met with its design team and discussed Remcon's allegations that rock excavation on the utility road should be paid for under Pay Item No. 38.

447. It was the consensus that pay item No. 38 Rock Excavation was limited to utilities.

448. Rock excavation was defined as "material that cannot be excavated without blasting or using rippers, including boulders having a volume of 2 CY or more."

449. During a meeting on August 14, 2001, the NPS advised Remcon that it disagreed that this work should be paid for under pay item No. 38.

450. At the meeting, Joanne Cody advised Remcon that the definition of rock excavation in the contract was for utility trenches only.

451. Joanne Cody handed out portions of the specifications that showed that rock excavation is for utilities only.

452. On Sunday, August 20, 2001, three full weeks after Remcon alleges that it encountered rock, Remcon sent both a change order request and notice to the NPS's COR (not the contracting officer) of the alleged Differing Site Condition, claiming it had encountered "rock that can not be ripped".

453. Mr. Christensen drafted the notice, which was a detailed 6-page write-up with legal analysis.

454. The notice was received by the contracting officer's representative the following day, August 21, 2001.

455. At no point in time before the notice was received by the NPS on August 21, 2001, had Remcon contacted the contracting officer, Rod Keiscome, to put him on notice that Remcon considered the condition a differing site condition, notwithstanding the fact that Remcon believed 21 days earlier it would be accumulating costs as alleged "extra work."

456. At this point, over half of the blasting that occurred on the access road had already been completed.

457. By the time Remcon advised the NPS of the apparent condition, Remcon had blasted most of the access road and the NPS <u>could not determine</u> whether Remcon had encountered "unrippable rock."

458. At this point in time, Remcon did not cease blasting so that the NPS could investigate the alleged changed condition.

459. Unfortunately, the best evidence of whether the road could have been ripped was destroyed by Remcon's blasting.

460. On August 22, 2001, Oasis Crushing & Screening provided a rock crushing price quote to Remcon for crushing 11,000 tons of stockpiled material.

461. Between the time that the NPS was advised that Remcon considered there to be a differing site condition, on August 21, 2001, and when Remcon completed blasting on the access road and Upper Sherman Parking Area (about September 11, 2001), the NPS's contracting officer, Rod Keiscome, did not go to the site and investigate the conditions.[2]

462. On October 20, 2001, Remcon's Superintendent, Jeff Northrop, sent Steve Christensen a memorandum by facsimile regarding rock excavation.

463. His comment upon the facsimile cover sheet stated: "I am somewhat concerned they are going to say - we did not let them know - soon enough."

464. On October 30, 2001, California Drilling & Blasting submitted an invoice for drilling and blasting mass excavation in the amount of $120,216.80.

465. Remcon did not pay this invoice or any other California Drilling & Blasting invoices, and subsequently California Drilling & Blasting filed a lawsuit against Remcon in the amount of $251,389.91.

**J. <u>AGGREGATE BASE</u>**

466. At the pre-construction conference there is no mention that Mr. Christensen expected that aggregate base would have been available in a stock pile upon site, and Remcon knew the aggregate base would not be there because Mr.

---

[2] There was an intervening labor day holiday during this time and Mr. Keiscome was located in Denver, Colorado.

Christensen advised the NPS in March, 2001, prior to bid opening, that the aggregate base would not be on site.

467. At the pre-construction conference, Mr. Christensen asked the NPS whether he could submit a value engineering proposal related to aggregate base.

468. Remcon wanted to crush aggregate base on site, from rock found on site.

469. This was intended to save Remcon significant money because Remcon had bid the project as if it would purchase the material and haul it to the site.

470. On July 31, 2001, just after Remcon started blasting in the access road, Steve Christensen opined in his diary that he should call the crushers.

471. Steve Christensen intended to use the blasted material for crushing.

472. On August 22, 2001, Mr. Christensen received a quote from Oasis Crushing & Screening Co., Inc. to crush 11,000 tons of material on site.

473. On August 31, 2001, Mr. Christensen submitted a rock crushing plan to the NPS stating that it planned to produce 12,000 tons of Class 2 aggregate base on site.

474. Remcon stated that this would be a "no cost adjustment proposal."

475. As of August 31, 2001, Remcon had never complained to the NPS that the "stockpiled aggregate base" was not there for its use or that it intended to receive compensation for providing aggregate base.

476. Willie DeOcampo responded to Remcon's request by a letter "misdated" July 3, 2001 (the actual letter was likely written around September 18, 2001 because it references a meeting of that date).

477. In this letter, the NPS informed Remcon that it approved of Remcon's proposal. It also noted that this proposal would save Remcon the costs of transporting about 560 loads of aggregate base to the site.

478. Remcon was also reminded that, prior to crushing operations, it needed to secure all usable rock for stone veneer, dry laid stone walls, revetment and other requirements.

479. On September 25, 2001, Remcon's subcontractor, Oasis, arrived at the site and began to crush material into aggregate base, sand, and by-product.

480. By October 29, 2001, Oasis had made 4,750 tons of aggregate base, 3,940 tons of sand to be used in the leech field, and 800 tons of by-product for use as utility trench backfill, and left the project.

481. The stockpiled materials were still in the upper parking area of the Upper Sherman Parking Area when the project was shut down for the winter.

**K. COMFORT STATION**

482. On July 24, 2001, at the weekly field meeting, the NPS advised Remcon that it needed to submit submittals regarding the Comfort Station.

483. Remcon needed to produce these submittals to the NPS before Remcon could proceed with the work.

484. Construction of the Comfort Station began on August 6, 2001.

485. As of that point in time, very few shop drawings for the Comfort Station had been submitted by Remcon.

486. The submittals, including those for doors and windows, were very important.

487. Until those and other submittals were provided to the NPS for review and approval, fabrication and delivery could not commence.

488. Without windows and doors, the exterior construction of the comfort station was being delayed.

489. The slab on grade related to the comfort station was scheduled to be complete on September 4, 2001, but was not completed until October 10, 2001.

490. Until the slab on grade was complete, Recmon could not begin construction of the concrete masonry unit walls.

491. On October 2, 2001, Remcon advised the NPS that it was going to be shutting the project down on November 1, 2001 for the winter and, therefore, it planned to stop work on the Comfort Station when it completed the slab on grade pour.

492. At the same meeting, Remcon advised NPS that it would finally produce submittals for the Comfort Station windows and doors later that day.

493. In a memo to Mr. Christensen discussing the October 2, 2001, meeting, Remcon's project superintendent, Jeff Northrop, noted that the lead time for some of the Comfort Station materials was "between 6 and 8 weeks" after the review and approval cycle was complete.

494. As of November 9, 2001, when the project was shut down for the winter by Remcon, the concrete masonry unit walls had not started.

495. Also, shop drawings for the doors and windows, the subject of the recent submittals, still had not been received by NPS.

**L. <u>SHERMAN TREE TRAIL</u>**

496. Remcon requested that the NPS provide Guiliani & Kull with electronic data for the Sherman Tree Trail ("Trail").

497. This data was for Guiliani & Kull's convenience.

498. Typically, most surveyors obtain survey data from the contract documents.

499. It was expected that Guiliani & Kull could perform its work by using plans and without electronic data.

500. On July 27, 2001, the a member of the consultant design team, Andrea Gregor, sent the Trail layout sheets to Remcon's surveyor Guiliani & Kull.

501. By e-mail of July 30, 2001, Remcon requested "finish grades at all TP points."

502. TP stands for "trail point."

503. Pursuant to Guiliani & Kull's request, all finished grades for TP points was transmitted to Guiliani & Kull on July 30, 2001.

504. The Sherman Tree Trail was staked on July 30, 2001.

505. On July 31, 2001, Ms. Gregor informed Guiliani & Kull that she would be sending revised grading plans for the Trail as Guiliani & Kull had requested.

506. Ms. Gregor also asked if she could make a minor change, approximately 31/2 inches, related to TP 3.

507. All grading sheets for the Trail were transmitted to Guiliani & Kull on July 31, 2001 in a file entitled Trail-grading.zip.

508. Guiliani & Kull responded the same day requesting a specific drawing.

509. On August 5 through August 7, 2001, the NPS designers along with Andrea Gregor from DHM Design attended the site. At this time minor clarifications were made related to the parking lot and Sherman Tree Trail.

510. On August 12, 2001, clarifications related to the Trail were submitted to Guiliani & Kull.

511. Remcon repeatedly asked for clarifications on the Trail. In August, in response to Remcon's request, the NPS provided clarifications to Remcon.