512. On October 23, 2001, the NPS designers, along with Andrea Gregor from DHM Design and Mr. Tuttle from Martin/Martin, reviewed the site.

513. At a walk-through NPS designers expressed concern that the Trail might be one foot below grade.

**M. UTILITY INSTALLATION**

514. Utility work on the 200Q project included water, storm drainage, sewer, electric service, and telephone.

515. All of the utility work, except for the sewer, was beneath the access road and Upper Sherman Parking Area pavement.

516. That meant that installation of the utility work was a predecessor to placing aggregate base and paving the road.

517. The plans indicate that the water and electric service were designed to be located in the center of the access road and run from Wolverton Road, at one end, to the Comfort Station (approximately 3,900 linear feet).

518. The water line as designed was to be installed with a minimum cover of four feet.

519. The storm drains on the project consisted of 24" corrugated metal pipe, which ran beneath the access road at specific locations, seven in all. The storm drains also passed under the parking lot at six specific locations.

520. Further, the storm drains were designed to cross under the water line at two locations at approximately station 12+00 and station 19+00.

521. At the up stream end or head of each of the storm drain runs were concrete drainage structures (inlets).

522. At the lower end of each of the storm drain runs were stone head walls, which are retaining walls at the end of culverts or drains.

523. In places where the storm drain lines were beneath the waterline they needed to be installed before the waterline.

524. The sewer line was to be constructed from the Comfort Station out to the leach field.

525. The sewer disposal system included 750 LF of sewer pipe, dosing and septic tanks, and a leach field.

526. On July 7, 2001, Remcon requested and received permission to install the water line and electric conduit in a single trench.

527. The NPS approved Remcon's request for a joint utility trench.

528. With respect to the combined utility trench, the water line was to be at the bottom of the trench and the electric conduit would be at least one foot above the water line and offset one foot to the side of the water line.

529. On September 4, 2001, Remcon submitted a value engineering proposal for a joint water, electrical and telephone trench.

530. After receiving permission to construct a joint utility trench, Remcon began construction of the utility trench on September 11, 2001.

531. On September 19, 2001, Remcon began to install the water line.

532. The water line began at Wolverton Road and worked south towards the comfort station.

533. Between September 17, 2001, and October 9, 2001, Remcon drilled and blasted rock within the utility trench at various locations, between stations 6+00 and 36+00, on the access road.

534. Blasting for rock excavation during utility trench excavation was covered under Pay Item No. 38 in the contract documents.

535. On October 2, 2001, Remcon began installation of the water line, and reached station 39+00 by October 25, 2001.

536. Backfill material for the utility trench was hauled from Wuksachi.

537. Approximately two weeks after the start of water line installation, the electrical conduit work commenced and continued until November 9, 2001.

538. During this time period, Remcon excavated and constructed the septic and dosing tanks, and excavated for the leach field.

539. As Remcon excavated the leach field, it encountered rock.

540. The contract documents provided for a lump sum price for the sewage disposal system, which included constructing the disposal (leach) field, included the cost of all earthwork, weathered granite removal and blasting as required.

541. When Remcon left the project for the first construction season, Remcon had not completed the utility work (water, electric and sewer).

542. When Remcon left the project for the first construction season, Remcon had not completed the leach field.

543. Since this work was not done, Remcon could not have placed aggregate base.

544. As a result, more than 10,000 tons of crushed material, together with other stored materials, were stockpiled in the upper parking lot, prohibiting Remcon from completing its contract work in the upper parking lot.

545. In essence the upper parking lot was a “staging area”.

## N. CLAIMS RESOLUTION DURING 2001

546. On September 12, 2001, Remcon's Steve Christensen requested an "immediate meeting" citing "disillusion over the whole management level at the jobsite level."

547. The NPS agreed to meet with Mr. Christensen to discuss and resolve issues.

548. On October 23, 2001, shortly before the winter shut-down, individuals from the Denver Service Center, Sequoia NP, and the contractor met in the park to discuss issues that had arisen throughout the first construction season.

549. At this meeting the issues that were open on the project were discussed.

550. At the October meeting, the parties discussed the realignment of the access road (at the "deep-cut" and turn-out).

551. The only discussion on this matter related to paying Guiliani & Kull for the second survey it performed.

552. At the October meeting, the parties discussed "additional excavating and grading" and the NPS agreed to review quantities and Remcon's surveying information.

553. On this same subject, Remcon agreed to submit surveying data to the NPS by October 26, 2001.

554. The parties also discussed material excavating and sorting, and Remcon agreed to prepare and submit its costs to the NPS based on a time and material basis.

555. The parties also discussed the amount Remcon should be compensated for hauling and disposal of material outside the park (excavating the burn pit).

556. Although the NPS compensated Remcon for this work in progress payment No. 3, it was based upon the amount of material Remcon estimated that it hauled out of the park. This amount needed to be definitive so the NPS could issue a modification.

557. The NPS claimed that the parties could not base measurement on the truck loads of material that were hauled out of the park because the trucks were loaded light.

558. The parties also discussed Remcon's contention that it was due excess compensation for rock excavation related to the access road.

559. At the October meeting, NPS personnel told Remcon that it did not witness Remcon "ripping" the road before Remcon blasted.

560. The NPS also expressed its belief that blasting the access road was not a differing site condition.

561. With respect to this subject, Remcon agreed to submit all of its costs for excavation and grading on the entire project to the NPS.

562. With respect to the Trail, the NPS stated that it believed that the Trail was excavated by Remcon too low.

563. Remcon agreed that it would submit its survey data to the NPS for its review.

**O. <u>PAYMENTS IN 2001</u>**

564. On June 14, 2001, the NPS received an invoice from Remcon on Pay Estimate No. 1 in the amount of $56,320 for bond premium reimbursement.

565. On June 29, 2001, the NPS' contracting officer approved and signed off upon the pay request.

566. On or about July 26, 2001, NPS's contracting officer received an invoice from Remcon on Pay Estimate No. 2 for work performed during the period of June 11, 2001 through June 30, 2001 in the amount of $338,403.00.

567. On July 27, 2001, the NPS's contracting officer approved and signed off upon the pay request.

568. On August 2, 2001, the NPS's contracting officer issued bilateral Modification No. 1 to compensate Remcon for option items.

569. Mr. Christensen, President of Remcon, signed Bilateral Modification No. 1 on July 24, 2001.

570. The contract was increased by $317,850.00 and no additional contract days were allowed for the additional work.

571. The contract completion date remained August 11, 2003.

572. Modification No. 1 was a bilateral modification with a signed statement of release stating: "The contractor agrees that, in consideration of receiving the benefits of Modification 1, all claims or obligations which now exist or which may hereafter arise, whether known or unknown, or which have or could have been asserted against the National Park Service or the Government as well as its officers and employees, in any form or forum, whether in law or equity, arising out of or resulting from this modification are hereby released, waived, and forever discharged."

573. On August 2, 2001, the NPS's contracting officer received an invoice from Remcon on Pay Estimate No. 3 for work performed during the period of July 1, 2001 through July 27, 2001 in the amount of $674,630.60.

574. On August 6, 2001, the NPS's contracting officer approved and signed off upon the pay request.

575. On September 11, 2001, the NPS's contracting officer received an invoice from Remcon on Pay Estimate No. 4 for work performed during the period of July 28, 2001 through August 31, 2001 in the amount of $316,978.75.

576. On September 12, 2001, the NPS's contracting officer approved and signed off upon the pay request.

577. On October 9, 2001, the NPS's contracting officer received an invoice from Remcon on Pay Estimate No. 5 for work performed during the period September 1, 2002 through September 30, 2001 in the amount of $179,943.32.

578. On October 11, 2001, the NPS's contracting officer approved and signed off upon the pay request.

579. On November 21, 2001, the NPS's contracting officer received an invoice from Remcon on Pay Estimate No. 6 for work performed during the period of October 1, 2001 through November 9, 2001 in the amount of $544,054.41.

580. On November 27, 2001, the NPS's contracting officer approved and signed off upon the pay request.

**VI. WINTER, 2001-2002**

581. Between November 9, 2001 and May 8, 2002 no contract work upon site was performed.

582. The contract provisions clearly indicate the impact weather can have upon the project.

583. The contract included an allowance for each winter shutdown and that time was included in the overall contract duration.

584. This gave Remcon the opportunity to work on its schedule and on any outstanding submittals.

A. **SCHEDULE**

585. Just before winter, 2001, the NPS reminded Remcon that it would start withholding funds if its schedule was not updated.

586. On October 11, 2002, Remcon's Project Superintendent, Jeff Northrop, sent the NPS a letter regarding the subject, "project schedule."

587. In the letter, Mr. Northrop recognized that a schedule was "critical to the success of the job."

588. He also stated that he would spend the early part of winter working upon a schedule and apologized profusely regarding Remcon's delinquency.

589. On December 3, 2001, Remcon submitted two schedules, one for the completion of the Upper Sherman phase and one for the completion of the first phase of Lower Sherman.

590. On December 24, 2001, the NPS's on-site representative from Jacobs provided NPS its comments regarding Remcon's revised CPM schedule.

591. Jacobs recommended that NPS require Remcon comply with the requirements of the specification and provide an acceptable baseline for the entire project and that Remcon be required to submit monthly updates as required by the project specifications.

592. In late January 2002, NPS requested that Remcon provide it with a revised schedule for the project in accordance with Specification Section 01320 in advance of a meeting to be scheduled in February.

593. On February 14, 2002, Remcon submitted several schedules to the NPS bearing the date February 6, 2002.

594. One schedule was for the completion of Upper Sherman.

595. A second schedule showed all of the Lower Sherman tasks being completed in 2003.

596. A third schedule combined the Upper Sherman work with the retaining wall on the General's Highway and some other preliminary Lower Sherman work.

597. The last schedule showed completion in 2003 using the combined schedule for 2002.

598. On February 25, 2002, Jacobs provided NPS its comments on Remcon's February schedules.

599. Jacobs' comments on the February schedules were virtually the same as its comments regarding Remcon's December 2001 schedules.

600. Jacobs reiterated its previous recommendation that NPS require an acceptable baseline schedule for the entire project and that Remcon be required to submit monthly updates per the project specifications.

601. On March 4, 2002, the NPS notified Remcon that it had reviewed Remcon's progress schedules dated February 6, 2002 and had found that it was still not in compliance with the contract requirements.

602. Despite the fact that the NPS had already rejected Remcon's schedules, on April 2, 2002, Remcon advised the NPS that it had produced two preliminary schedules to NPS.

603. Specifically, Remcon reminded the NPS that one of the schedules was based upon Remcon being able to start the retaining wall on the General's Highway (at the Lower Sherman) in 2002, and the other schedule had the wall starting the following year.

604. Remcon asserted that if it did not start the Lower Sherman retaining wall in 2002 it would be pushed back to the next year and would result in delays to the project.

605. As stated earlier, it was very important to the NPS that visitors to Sequoia have uninterrupted access to the General Sherman Tree throughout construction.

606. If Remcon were working on both the Upper Sherman and Lower Sherman simultaneously, it would likely result in making it very difficult for visitors to go to the Sherman Tree.

**B. <u>CLAIMS AND CLAIM RESOLUTION</u>**

607. Contrary to Remcon's numerous assertions that the NPS was unwilling to help Remcon, the NPS was always responsive to Remcon's numerous requests for meetings to resolve issues.

608. The parties met several times throughout the winter shut down of 2001-2002, to discuss outstanding issues.

609. In a December 11, 2001, meeting in Denver, Colorado, the NPS invited the consultant design team, the NPS design team, and Remcon to discuss earthwork quantities.

610. At the work session, a summary of earthwork figures indicated that there were approximately 32,000 CY of cut and 17,500 CY of fill.

611. Again, Remcon's Steve Christensen did not admit that his estimate for cut was 21,788 CY, not 30,000 CY.

612. Among other activities during the winter shut-down of 2001-2002, Remcon was preparing claims against the NPS.

613. On March 19, 2002, the NPS asked its geotechincal consultant, Kleinfelder, to submit a proposal for a post-construction rippability assessment.

614. On March 21, 2002, Kleinfelder responded with a proposal.

615. Kleinfelder cautioned the NPS that it could not make some determinations regarding rippability because work had already been done by Remcon.

616. On March 28, 2002, Remcon submitted a Request for Equitable Adjustment ("REA") to the NPS related to increased quantities of earthwork, changes in the scope of work, hauling materials out of the burn pit, design changes, and the differing site condition.

617. In this REA, Remcon claimed $222,377.49 for rock excavation and grading and $35,736.00 for hauling excess excavation.

618. In Remcon's Revised REA of June 4, 2004, Remcon claimed $396,938.47 for rock excavation.

619. While the NPS did not deny that it owed Remcon compensation for some additional earthwork, the information provided in Remcon's March 28, 2002 REA was insufficient to support its costs and the amount of earthwork encountered.

620. This was likely due to the fact that Remcon's original bid estimate was incorrect.

621. The NPS responded to Remcon's REA the same day it received it, on March 28, 2002, and requested additional information.

622. Specifically, the NPS asked for Remcon's backup.

623. Remcon issued a response to the NPS on April 3, 2002, but failed to provide the requested information.

624. Instead, Remcon told the NPS it had already provided the NPS with information in its REA.

625. The parties also met on April 10 and 11, 2002 to discuss outstanding issues.

626. After the meeting, the NPS drafted a memorandum upon its position.

627. At or about this time, the NPS conducted a technical evaluation of Remcon's claims.

628. The NPS' technical evaluation of Remcon's REA expresses frustration that Remcon had not provided adequate cost accounting and quantification of its claims.

629. With respect to the hauling claim, the NPS expressed concerns because Remcon wanted to be paid by truck load and the NPS had noticed that Remcon was loading the trucks light.

630. On April 24, 2002, the NPS sent another letter to Remcon related to its REA and again explained to Remcon the information that it was seeking.

631. On April 25, 2002, it was the NPS's position that: it should deny Remcon's claim for excavation and grading because the cut had not changed from the contract documents; that the NPS pay Remcon for hauling excess excavation;

that the NPS pay Remcon for hauling the burn pit material; that the NPS deny Remcon's claim related to storm water pollution prevention.

632. The NPS was still uncertain about whether or how much to compensate Remcon for blasting.

633. It noted that Remcon had never demonstrated to the NPS that it could not rip rock, that Remcon blasted boulders to make Aggregate Base, that Remcon appeared to be charging the NPS for all blasting costs (not just those associated with mass excavation), and that excavation was a lump sum item.

634. Throughout the winter, the parties discussed the fair and reasonable cost for restaking the alignment of the access road.

635. At no time during these discussions was it brought up that Remcon intended to seek additional costs for realigning the access road.

**C. <u>OUTSTANDING WORK</u>**

636. In November, 2001, the NPS noted that Remcon had not met its schedule and that the NPS would meet with Remcon in the winter months to see if Remcon could revise its schedule before the following season.

637. During the winter of 2001-2002, Jacobs advised NPS that there were a number of items of work that Remcon needed to address the following spring.

638. The items of work that Jacobs identified had not been completed in the first year of the contract were as follows: 1) Remcon still had not provided all of its submittals for the Comfort Station; 2) fill slopes that were not placed in accordance with the plans; 3) the Shuttle Drive roadway was constructed four feet south of the plan location; 4) the leach field percolation soil needed to be

tested to ensure it conformed to the contract requirements; and 5) the water line should be pressure tested and the air relief valve assemblies installed.

639. On January 29, 2002, the NPS sent Remcon a letter asking Remcon to produce Change Order requests and REAs for outstanding issues with materials supporting Remcon's costs; a revised schedule; and list of submittals and schedule for their submission.

640. The NPS was asking for this material so it could have productive discussions with Remcon at a meeting the parties had scheduled for February, 2002.

641. On March 6, 2002, the NPS wrote Remcon a letter requesting critical submittals that needed completion.

642. Mr. DeOcampo warned Remcon that if it did not complete the submittals and get them approved, it could delay Remcon's progress upon the project.

**D. <u>PAYMENTS IN WINTER</u>**

643. On December 20, 2001, the NPS's contracting officer received an invoice from Remcon upon Pay Estimate No. 7 for work performed during the period of November 10 through November 30, 2001 in the amount of $101,301.34.

644. On December 21, 2001, the NPS' contracting officer approved and signed off upon the pay request.

645. Remcon was paid $115.17 in prompt payment interest because it received payment on this request after the contractually required 14 days.

646. On January 28, 2002, the NPS contracting officer issued bilateral Modification No. 2 to compensate Remcon for work related to a sewer force main from the dosing tank and electrical/telephone changes upon the access road.

647. Mr. Christensen signed bilateral Modification No. 2 on January 16, 2002.

648. The contract was increased by $10,908.00 and no additional days were granted for the work because these items were not upon the critical path.

649. The contract completion date remained August 11, 2003.

650. This was a bilateral modification with a signed statement of release.

## VII. SECOND CONSTRUCTION SEASON

651. During the second construction season, the NPS team remained largely the same.

652. Rod Kesicome remained the contracting officer, Joanne Cody remained as the contracting officer's representative for design, Willie DeOcampo remained the contracting officer's representative for construction, and Jack Vance was still the park facility manager.

653. Ray Todd, who was the project manager during the first season, was promoted so he no longer was the project manager for the 200Q project.

654. Larry Walling was the interim project manager on 200Q until July 1, 2002, when Mike Giller took his place as project manager.

655. For the second season of the 200Q project, Jacobs remained as the A/E construction management firm.

656. On May 6, 2002, Loren Mangrum started working for Jacobs on the 200Q project as an assistant to Mr. Russell.

657. The on-site project supervisor from Jacobs was Robert Russell until July 3, 2002.

658. Loren Mangrum then took over as the project supervisor.

659. Russell Belknap started working upon the project on July 22, 2002. He worked for Jacobs as a subcontractor and provided on-site inspection services.

660. During the second construction season, Remcon's construction team changed significantly.

661. Jeff Northrop, the Project Superintendent, stopped working for Remcon shortly after the start of the second construction season due to a family emergency.

662. Mark Penrose became the Superintendent, but only continued working upon the Project until August 7, 2002, after which Remcon no longer had a job superintendent on site.

663. Luke Triplett was designated as the Assistant Program Manager in May, 2002.

664. Bill Houck, Remcon's grade checker, quit working for Remcon on or about July 3, 2002.

665. Mike Kitchell started working on the 200Q project in mid-July and was placed in the role of project foreman and superintendent.

666. Steve Christensen acted in the role of project manager after Mr. Northrop left the project.

667. In 2002, Bob Reinhardt was Remcon's Quality Control Representative until October, 2002, when Jerry Straw took his place.

### A. PROJECT START-UP AND THE PARTNERING MEETING

668. By the end of the first construction season the NPS had paid Remcon for 90% of the excavation pay item.

669. The excavation pay item included earthwork on the Lower Sherman Parking Area, which had not occurred yet.

670. That means the Upper Sherman excavation work was essentially complete.

671. Excavated material that was not placed as fill, but needed to be used at other areas of the project, was stored at the Upper Sherman Parking Area.

672. By October 2001, Remcon had crushed 4,750 tons of aggregate base, 3,940 tons of sand and 800 tons of by-product.

673. This material, which was sitting in piles in the Upper Sherman Parking Area, was produced from rock that Remcon had excavated.

674. Remcon returned to the project on May 8, 2002, and began to re-establish the construction yard and clean up of the construction site.

675. Pursuant to Remcon's request, a partnering meeting was held May 14 and 15, 2002.

676. At this meeting the parties agreed to work together to get the project built.

677. A walk-through of the project was held on May 16, 2002.

678. On May 16, 2002, the consultant design team member from Martin/Martin, Bob Smith, Jacobs' Bob Russell, Remcon's surveyor, Bill Morris, and Remcon's Luke Triplett, Bob Reinhardt, and Bill Houk, walked the Sherman Tree Trail to determine whether it had been built to plan and whether changes were necessary.

679. By May 20, 2002, due to poor weather conditions, Remcon advised NPS it was sending the staff home.

**B. <u>DELAY</u>**

680. On May 20, Steve Christensen sent an e-mail to NPS claiming that the NPS was delaying him from "productively starting any work at the Sherman Tree Project."

681. He threatened that the completion date of the project would be "severely impacted and that costs to the NPS would surely rise" if change orders and modifications were not issued by the NPS.

682. He stated that he was sending a letter to the NPS that Remcon would be requesting stand-by costs "until these issues have been resolved."

683. Up to this point in time, the NPS had been working to resolve issues with Remcon.

684. This had been made difficult by Remcon's refusal to provide the support documentation that the NPS repeatedly requested.

685. In response to Remcon's e-mail, the NPS set up a meeting with its design team to try to determine how much Remcon had overrun its quantities.

686. This would have been unnecessary if Remcon had provided contractually required quantity surveys.

687. Jack Vance received a copy of Mr. Christensen's e-mail of May 20 and stated that Remcon had failed to mobilize for the second construction season except for a few personnel, that Remcon had not turned in an acceptable schedule, and that the Government had yet to receive many important submittals from Remcon.

688. As promised, on May 20, 2002, Mr. Christensen sent a letter to the contracting officer's representative, Willie DeOcampo, claiming that Remcon had mobilized to the site with the intent of "fully starting work on May 20, 2002," but that it would not mobilize until the execution of change orders and contract modifications.

689. In the letter, Mr. Christensen stated that Remcon would request compensation for extended overhead and contract "extension days" until Remcon could fully proceed with work.

690. In response to Remcon's claim that it was being delayed, Jacobs' Bob Russell told NPS' Willie DeOcampo and Joanne Cody that the NPS needed to get an acceptable project schedule from Remon.

691. On May 22, 2002, Mr. Christensen sent another e-mail to Mr. DeOcampo.

692. Again, Mr. Christensen stated that Remcon would not begin working without an agreement; that once Remcon ran out of work it would be compensated for standby costs.

693. The NPS disagreed that Remcon was unable to work on site, but assured Remcon that it would get a Request for Proposal to Remcon soon for raising the grade in the upper parking lot (which would compensate Remcon for its claimed excess excavation).

694. During the week that Steve Christensen was sending the NPS e-mails and a letter claiming the NPS was "delaying" him from starting work, Remcon was unable to work upon site because the weather prevented it from doing so.

695. On May 29, 2002, the NPS sent Remcon a letter advising it of all the places where it could be working on site.

696. The letter included a list of contractual work that needed to be accomplished and that was not hindered by the stock piles in the upper parking lot.

697. This work included constructing road embankment, constructing the leach field, constructing the comfort station, installing culverts, testing water lines and boulder revetment.

698. A majority of the material in the Upper Sherman Parking Area was processed material that Remcon had stored in the lot prior to winter and that needed to be used elsewhere on the project (i.e. the aggregate base).

699. On May 29, 2002, Bob Russell indicated in his notes that Remcon's Mark Penrose, who was now acting at the Project Superintendent, had learned that Remcon had submitted a stop work letter to the NPS and Mr. Penrose told Jacobs' Mr. Russell that he was furious.

700. Mr. Penrose stated that the stop work letter was unnecessary and uncalled for and that his crews could begin upon the Sherman Tree Trail work, access road work, comfort station, leach field and revetment on the access road.

701. On May 31, 2002, some of Remcon's forces returned to the project.

702. At a meeting held on site on May 31, 2002, Remcon advised Jacobs' Bob Russell that, although it had quite a bit of work, it was not going to receive any additional equipment or personnel until June 10, 2002.

703. In Mr. Russell's daily log of this date, Mr. Russell stated that Mr. Penrose and Mr. Triplett told him that Steve Christensen had directed them to "bury" the NPS with RFIs.

704. In response to Mr. Penrose's and Mr. Triplett's comments, Jacobs' Bob Russell told them that it would be to their advantage to complete the water system, which was work that could be done upon the project.

705. Consistent with what Mr. Russell had been told, Remcon did not provide additional personnel or equipment to the project.

706. Nor did Remcon work upon the items identified by the NPS in its letter of May 29, 2002.

707. On June 3, 2002, Steve Christensen again requested that the NPS issue a modification allowing him to start upon the General's Highway.

708. If Remcon were allowed to work on the General's Highway it would result in Remcon impacting two areas related to the Sherman Tree at the same time.

709. For example, on June 3, 2002, Remcon's laborers repaired a silt fence and construction fence. Remcon performed no other construction activity that day.

710. Jack Vance, the on site Park Facility Manager, advised the NPS that it would be a mistake to allow Remcon to proceed with the General's Highway because the park could not afford to have both areas torn up at the same time.

711. On June 4, 2002, Remcon's Superintendent, Mr. Penrose, again admitted to Jacobs' Mr. Russell that Remcon was not providing adequate resources for the project and that as a result Remcon had lost 32 working days.

712. The same day, Jacobs' Mr. Russell sent a transmittal to NPS' Willie DeOcampo advising Mr. DeOcampo of all the areas that had been available for construction activities.

713. By letter of June 28, 2002, Remcon claimed grading operations were being delayed as a result of unresolved grading conflicts and errors, including cut slopes which require grading within drip lines of existing trees.

714. Remcon threatened that if the NPS did not immediately respond to the problem, that, on July 1, 2002, it would cease all grading operations on the Upper Sherman.

715. On July 1, 2002, Mr. Christensen advised NPS' Willie DeOcampo that Remcon's grading operations were on stand-by and he told Mr. DeOcampo to provide standby sheets for equipment and manpower on stand-by.

716. On July 8, 2002, Remcon sent Mr. DeOcampo a letter claiming that there were unanswered RFIs and the letter requested "immediate response" because the issues impacted the schedule.

717. In August 2002, Remcon continued to claim it was being delayed and sent several letters to the NPS.

718. Remcon requested the NPS to come to negotiations in August 2002, prepared to address issues and react to impacts.

719. The Government agreed to meet with Remcon in late August 2002, to discuss all of the open issues on the project.

720. Although Remcon was claiming that there were "delays" on the project, the meeting minutes between the parties do not reflect this.

721. For example, the meeting minutes of August 13, 2002 state that there were "no outstanding RFIs that were causing problems at this time."

### C. <u>RESOLUTIONS OF 2001 ISSUES</u>

#### 1. <u>2001 Realignment Issues</u>

722. On May 17, 2002, Jacobs' Bob Russell, Remcon's Mark Penrose and Luke Triplett, and Guiliani & Kull's Bill Morris, met to discuss pricing of the realignment of the access road that was done in 2001. SX5/17/02

723. The parties determined that $1,149.17 was a fair price for the work.

724. On September 12, 2002, the contracting officer issued Modification No. 4, which compensated Remcon for the alignment changes that occurred in 2001.

725. This modification paid Remcon for the work Guiliani & Kull had done when it restaked the center line of the access road.

726. During negotiations, Remcon did not ask for any additional money for the realignment that it performed upon the access road in 2001.

727. On September 16, 2002, Remcon wrote the NPS a letter entitled "breach of the covenant of good faith and fair dealing," claiming that the NPS had not issued modification No. 4.

**2. <u>Hauling Miscellaneous Materials from the Park</u>**

728. On May 24, 2002, Bob Russell, Steve Christensen, Mark Penrose, and Willie DeOcampo came to a resolution regarding payment for hauling material out of the burn pit.

729. The work associated with removing material from the burn pit was done in 2001, and Remcon was paid for the quantity of material it estimated it hauled.

730. Remcon proposed a price of $488,867 for the work and the NPS's estimate was $350,018.00.

731. Remcon had already been paid for this work based on the estimated amount that it had hauled out of the park under Progress Payment No. 3.

732. The parties agreed to $434,008.64 for this work.

733. By letter dated July 30, 2002, Mr. Christensen stated that he wanted changes to proposed Contract Modification No. 3 to reflect thirteen calendar days of overall project extension.

734. The increase in the quantity of material removed from the burn pit was formally recognized by Modification No. 3, which was issued on August 20, 2002.

735. Remcon was given a total of $434,618.73 for the work associated with removing material from the burn pit.

736. Remcon was also given 13 working days for the work associated with removing material from the burn pit.

737. At no time between when the work occurred and when the modification was issued did Remcon state that it anticipated that it should be paid for "filling the hole" caused by the burn pit.

### D. THE DEPARTURE OF BOB RUSSELL

738. On July 3, 2002, Remcon claimed that an incident took place between Jacobs' Bob Russell and Remcon's Luke Triplet and Mark Penrose at the project site.

739. Luke Triplett wrote a memorandum claiming that Mr. Russell used profanity and vulgarities and Mr. Triplett alleged that Mr. Russell "threatened his safety."

740. Remcon's Mark Penrose also wrote a memorandum and stated that, although he had left the room, he witnessed Bob Russell yelling profanities at Luke Triplett.

741. Mr. Penrose is a large man, over six feet tall and well over 200 pounds.

742. Mr. Triplett is a large man over six feet tall and well over 200 pounds.

743. Mr. Russell was an older man, who was about 5'6" and not over 140 pounds.

744. On July 3, 2002 Remcon wrote to the Contracting Officer, Mr. Keiscome, demanding Mr. Russell's removal.

745. The letter Remcon sent included the two memoranda that the Remcon employees wrote regarding the incident with Mr. Russell.

746. Mr. Russell left the project on or about June 3, 2002.

747. On July 16, 2002, NPS' Rod Keiscome sent a letter to Remcon stating that Mr. Russell would be replaced.

748. Mr. Russell is currently fighting cancer and is profoundly ill.

## E. EXCAVATION AND RAISING THE PARKING LOT

749. At the start of the second construction season, the NPS had a difficult time correlating the excess excavation quantities that it saw on the project with what Remcon was claiming to have encountered.

750. While Remcon was still claiming to have encountered 14,000 to 16,000 CY of excess material, the NPS saw something less than 5,000 CY of material.

751. Prior to the partnering meeting, the NPS had spent time evaluating earthwork quantities so that the parties could discuss them.

752. At the partnering meeting on May 10 - 11, 2002, the parties discussed using some of the "excess" earthwork material to raise the elevation of the upper parking lot.

753. It was estimated that this would use about 4,200 CY of excess material.

754. Also at the partnering session, the parties agreed that Bob Russell would work with Remcon employees to negotiate the price for changes.

755. At the walk-through of the site on May 16, 2002, Bob Smith, of the consultant design team, reviewed the Upper Sherman Parking Area and stated that he would prepare revised plans to raise the elevation of the upper parking lot.

756. The parties agreed that the plans would be distributed so that Remcon could prepare a bid for the cost to raise the parking lot.

757. On May 21, 2002, Remcon's Steve Christensen called Jacobs' Bob Russell and asked Mr. Russell what he believed the earthwork quantities were.

758. Mr. Russell stated that, from his recollection, he had calculated about 30,500 CY of material.

759. In Bob Russell's daily report he stated "all of us appeared to agree on the earthwork quantities and that the discrepancy was either in Martin & Martin's take off or in the quantity of excess material."

760. Mr. Christensen did not tell Mr. Russell the truth that, in fact, Mr. Christensen had incorrectly estimated the earthwork quantities.

761. Remcon's bid estimate shows that the earthwork on the project was just over 21,788 CY, about 10,000 CY less than the NPS's estimate.

762. Not only did Mr. Christensen fail to tell Mr. Russell that he had made a mistake, but the next day Mr. Christensen wrote an e-mail to the NPS requesting change orders and modifications associated with excess excavation.

763. On May 24, 2002, only eight days after the design team walked the site, the NPS sent revised drawings to Remcon to raise the upper parking lot.

764. On June 3, 2002, NPS personnel met to discuss raising the parking lot.

765. They agreed that Jacobs' Mr. Russell would complete an NPS estimate and that the NPS would issue a directive for Remcon to proceed with the work.

766. On June 5, 2002, Steve Christensen sent Jacobs' Bob Russell Remcon's price proposal for raising the parking lot.

767. After receiving Remcon's estimate, Mr. Russell told Remcon that he was reluctant to review Remcon's estimate before completing his own estimate.

768. On June 6, 2002, Jacob' performed its estimate for the work.

769. When Steve Christensen found out that Jacobs had not immediately reviewed Remcon's proposal, he faxed a copy of Remcon's proposal to the contract specialist, Terry Lang.

770. NPS's Willie DeOcampo asked Jacobs' Bob Russell to negotiate the cost proposal with Remcon.

771. On June 14, 2002, Jacobs' Bob Russell had discussions with Mark Penrose, Remcon's superintendent, and both agreed that $41,600 was a reasonable cost for the work.

772. Remcon's Mark Penrose also stated that he did not believe that the NPS should have to pay for relocating the various stockpiles that Remcon had stored on the Upper Sherman Parking Area over the winter while Remcon raised the upper lot.

773. On June 19, 2002, Steve Christensen contacted the NPS' contracting officer, Rod Keiscome, and stated that he disagreed with how Jacobs' Bob Russell and Remcon's Mark Penrose had negotiated the price for raising the upper parking lot.

774. Mr. Christensen asked if he could renegotiate the price with Mr. Keiscome.

775. The same day, June 19, 2002, Mr. Christensen called the contracting officer's representative, Mr. DeOcampo, and they agreed to a price of $43,816 for raising the Upper Sherman Parking Area.

776. A few days later, Mr. Christensen sent an e-mail to Mr. DeOcampo asking when a modification would be issued because the work is "critical to our work plan" and "continues to impact the overall schedule."

777. On June 24, 2002, the NPS' design team informed the NPS of its view of Remcon's earthwork claim.

778. Specifically, the designers noted that earthwork was a lump sum item and that cut and fill quantities had not changed.

779. On June 28, 2002, the NPS' contracting officer, Rod Keiscome, directed Remcon to raise the upper parking lot of the Upper Sherman Parking Area.

780. Immediately after the contracting officer directed the work, Remcon wrote a letter to Mr. Keiscome demanding that the NPS issue a modification for the work.

781. The NPS' contracting officer responded to Remcon on July 16, 2002 stating that the NPS intended to issue Remcon a modification related to the work.

782. Up to this point in time, Remcon never advised the NPS that it believed it was due any additional monies related to the construction of the parking lot; notably, Remcon never mentioned to the NPS that it wanted additional compensation for "filling" the burn pit.

783. The burn pit was located at the eastern end of the upper parking lot that NPS was planning to raise in elevation.

784. If Remcon believed it was due additional compensation related to filling in the burn pit in the upper parking lot, it never mentioned it to the NPS.

785. Remcon started raising the parking lot on July 25, 2002.

786. Interestingly, in a daily report, Jacobs' Loren Mangrum reported that Remcon's Mike Kitchell stated that Remcon had "run out of fill" in raising the upper parking lot.

787. The whole purpose for raising the parking lot was to use material that Remcon claimed was excess material.

788. The next day, Mr. Kitchell, who was raising the parking lot, asked Mr. Mangrum where he could get fill material for the upper parking lot.

789. The NPS issued Modification No. 4 on September 12, 2002, two and a half months after directing the work.

790. With respect to "excess" excavation, the NPS paid Remcon $38,400 to haul some of the "excess" excavation to Wolverton Point and it paid Remcon $43,816 for raising the upper parking lot.

791. Under bilateral Modification No. 4, which contained a release of claims and was executed by the NPS and Remcon, the parties agreed that the work associated with Modification No. 4 was not on the critical path and no time extension was granted.

792. Remcon did not take exception to the release of claims in Modification No. 4, which provided that the contractor agreed that, in consideration of receiving the benefits of Modification 4, "all claims or obligations which now exist or which may hereafter arise, whether known or unknown, or which have or could have been asserted against the National Park Service or the Government as well as its officers and employees, in any form or forum, whether in law or equity, arising out of or resulting from this modification are hereby released, waived, and forever discharged."

793. Remcon never advised the NPS that it believed that the modification did not cover all of the "excess excavation" encountered by Remcon.

**F. SCHEDULE**

794. In early June 2002, in an internal e-mail, the NPS agreed that it needed to receive an acceptable baseline schedule for the entire project from Remcon.

795. On June 4, 2002, Steve Christensen sent an e-mail to the NPS claiming that he had submitted a schedule to Jacobs' Bob Russell and that he had not received comments back.

796. In internal e-mails, the NPS expressed that it would not entertain Remcon's proposal to start work upon the Lower Sherman Area until it got the Upper Sherman Area back on track and under construction.

797. The NPS noted that it had met with Remcon twice regarding Remcon's request for this change.

798. If Remcon was working on both the Upper Sherman and Lower Sherman at the same time, then the visitors' access to the Sherman Tree would be limited, which is why the project was phased to begin with.

799. The NPS was worried that Remcon, which already was claiming there were delays where none existed, could effectively shut down access to the General Sherman Tree if it were allowed to work in both places simultaneously.

800. On June 19, 2002, Remcon's Steve Christensen again complained that Jacobs' Mr. Russell had not reviewed the schedule Remcon produced at the partnering meeting.

801. The NPS does not have the referenced schedule, nor any transmittal showing that Remcon produced a schedule at the partnering meeting.

802. On June 27, 2002, Remcon produced three schedules to the NPS. All three schedules included the June 27, 2002 date in the lower left hand corner of the document.