803. One schedule was Remcon's baseline schedule, which was an unstated update of the schedule submitted on June 25, 2001 (accepted with comments, resubmittal required).

804. Remcon's June 27, 2002, version of the "accepted with comments, resubmittal required" schedule contained some of the revisions that the contracting officer's representative, Mr. DeOcampo, requested in his June 2001 comments.

805. This schedule will be referred to as Remcon's "As-Planned" schedule.

806. The second schedule contained some as-built durations for 2001 and as-planned durations for 2002 and 2003.

807. The third schedule contained some as-built durations for 2001 and as-planned activities if NPS allowed Remcon to begin work upon the General's Highway in 2002.

808. On August 13, 2002, the NPS received a transmittal submitting a schedule dated August 6, 2002, to the NPS.

809. On August 22, 2002, the parties came to a tentative agreement wherein Remcon agreed to complete work on the Upper Sherman Area by November 5, 2002, and all work at the Lower Sherman would be deleted from the project.

810. As a result, on September 3, 2002, Mr. DeOcampo returned Remcon's August 13, 2002, schedule and asked for a schedule that complied with the August 22, 2002 Agreement and showed completion of the Upper Sherman Area work by November 5, 2002.

## G. COMFORT STATION

811. The Comfort Station was the first contract work that resumed after the winter shutdown.

812. On May 28, 2002, Remcon's subcontractor, Ken Smith Masonry, was on site to begin constructing the concrete masonry unit walls.

813. However, on that same date, Remcon submitted RFI No. 40 requesting permission to retrofit the door jams after the walls were completed.

814. On May 30, 2002, NPS approved an alternate method of anchoring the metal door frames to the concrete masonry unit walls.

815. With this change, Remcon could begin work on the exterior concrete masonry unit walls.

816. The roof framing started next and was completed by June 13, 2002.

817. The stone veneer upon the exterior walls was the next item of work for the Comfort Station.

818. The Comfort Station was not completed by Remcon before it was terminated for default, but the building was enclosed by September 11, 2002.

819. The Comfort Station was completed by Agee, the completion contractor, in July, 2005.

## H. REALIGNMENT OF THE ACCESS ROAD

820. Up to July 2002, the NPS had only approved the alignment changes related to the car turnout at 8+00 to 12+00 and the changes between 24+46 to 30+00.

821. On June 28, 2002, Remcon wrote a letter to the NPS claiming that there were "unresolved grading conflicts and errors within the contract plan" largely related to slopes.

822. A new NPS Project Manager for the 200Q project, Mike Giller, arrived on site on July 10, 2002.

823. That day, Mr. Christensen requested that he and Mr. Giller take a walk together.

824. Mr. Giller walked the site with NPS' Jack Vance, Jacobs' Loren Mangrum, and Remcon's Steve Christensen, Luke Triplett, Bob Reinhardt, and Mark Penrose.

825. At the site, the parties discussed areas of concern related to Remcon's June 28, 2002, letter.

826. Mr. Giller took detailed notes during the walk-through related the specific field adjustments requested by Remcon and those adjustment to which the parties agreed.

827. These adjustments largely dealt with slope and grading of the road embankment, not road grading.

828. On July 11, 2002 Remcon's Steve Christensen sent a letter to the Contracting Officer's Representative, Willie DeOcampo, stating that Remcon had been given oral instructions related to the access road to "[j]ust make it fit."

829. Mr. Christensen did not carbon copy Mr. Giller on his July 11 letter.

830. Apparently, Steve Christensen had taken Mr. Giller's comments regarding the embankment and other related field changes as a wholesale license for Remcon to realign the access road any way that Remcon saw fit.

831. On July 15, 2002, Remcon's Mike Kitchell started working on the 200Q project.

832. The first day that Mr. Kitchell was on the project, Remcon's Steve Christensen asked him to realign the access road not in accordance with the plans.

833. There is no indication that Mr. Kitchell was "realigning" the road to make the field adjustments the parties agreed to on July 10, 2002.

834. In fact, Mr. Kitchell was changing the road alignment, not the road embankment (which had been the subject of the field adjustments agreed to at the July 10 meeting).

835. Mr. Kitchell started at station 1+00 and moved up-station along the access road making adjustments as he saw fit.

836. On July 25, 2002, Mr. Kitchell had already realigned the road up through station 24+00.

837. Between station 24+00 and station 29+75, Mr. Kitchell discussed a slope issue with Mr. Christensen, who advised him to get direction from the NPS. DX43.

838. That same day, Jacobs' Mr. Belknap, who had been working as an on-site representative on the project for four days, walked the site with Remcon's Mr. Kitchell to review the field conditions and discovered that Remcon had realigned the road from stations 1+50 to 24+00 (with respect to both horizontal and vertical alignment), including adding "super elevations."

839. The terms "super" and "crown" are terms used to describe how a road is banked. A "crown" means the road is banked with the highest point in the middle, and a "super" is banked with the highest point up to one side.

840. Mr. Belknap stated that they needed to check the grades and look the problem over.

841. Mr. Belknap stated that, with respect to the alignment changes, the NPS would need a survey to redesign a geometric layout of the road.

842. He also agreed to a "super" between station 24+00 to 30+00 to reduce cut.

843. At the July 30, 2002 project meeting, the parties agreed that any field changes that were agreed to would be of no charge to the contract.

844. The same day, July 30, 2002, Remcon's Steve Christensen sent a letter to the NPS entitled "notice of potential claim for defective plans and related differing site conditions" related to the access road.

845. In the letter, Mr. Christensen stated that "Remcon's grading work along the Upper Sherman access road has required a tremendous amount of time and money as it relates to correction of defective plans and specifications."

846. The original plans and specifications related to the access road were not, in fact, defective, and the project could, and should have been built to the original plans and specifications.

847. As of the end of July 2002, if the road was defective it was solely because Remcon had changed it pursuant to its whim.

848. On July 31, 2002, Mr. Belknap reviewed Remcon's road realignment changes with Remcon and the NPS, including members of the NPS design team.

849. Again Remcon was told that the NPS needed a survey of the road's center line to provide design/build geometry that would meet civil engineering standards.

850. This same day, July 31, 2002, the NPS worked with Remcon to adjust the intersection of the access road and Wolverton road to fit within Remcon's adjustments.

851. Remcon agreed that there would be "no added charge" for the change.

852. On August 14, 2002, the NPS received survey data on the access road as it had been realigned by Remcon.

853. After the NPS received the results from the survey, it found that Remcon had made horizontal adjustments that ranged over five feet in various directions east and west and vertical adjustments that raised the grades of the road up to 1.5 feet.

854. On August 22, 2002, the parties met and negotiated a tentative agreement for all of the outstanding issues.

855. On August 29, 2002, the NPS drafted a letter to Remcon rejecting the horizontal and vertical alignment of the access road from stations 1+11.87 through Station 30+25.70.

856. The contracting officer's representative, Mr. DeOcampo, reviewed the draft letter and advised against sending it because he believed that the parties had negotiated an agreement on August 22, 2002.

857. As a result, the NPS worked with Remcon to make the road work as best it could.

858. About the second week of September, 2002, the NPS sent centerline data to Remcon.

859. This was done in order for Remcon to fix what it had done in realigning the road.

860. On September 24, 2002, Remcon issued a letter stating that "as a result of NPS defective plans and specifications, Remcon has encountered delays on the access road work due to the many alignment and grade changes during the execution of the work."

861. The letter also warned that delays in receiving the center line data would result in additional costs.

862. Remcon began paving the access road and parking area on October 7, 2002.

## I. CONTAMINATION OF TOPSOIL WITH ASPHALT DEBRIS

863. Around the same time that Remcon was unilaterally readjusting the access road, the NPS discovered that Remcon had contaminated the slopes on the sides of the access road with asphalt debris.

864. In the meeting minutes dated August 13, 2002, NPS' Project Manager, Mike Giller, advised Remcon that the use of fill contaminated with asphalt debris was not acceptable.

865. This was a major concern to the NPS because it wanted to protect the Park's resources.

866. On August 21, 2002, Remcon offered the NPS a proposal for cleaning the slopes.

867. The NPS responded to Remcon on August 30, 2002, asking for clarification regarding Remcon's proposal to clean up the contaminated fill.

868. Specifically, the NPS stated that it would not tolerate asphalt chunks and debris in the fill and along the embankment.

869. On September 11, 2002, Remcon advised the NPS that the asphalt debris was removed and that the NPS's "Jack Vance has inspected the site and given final approval."

870. The NPS disagreed with Remcon's assertion that it had removed the contaminated asphalt and, on September 18, 2002, it sent a letter to Remcon rejecting the status of the slope clean-up work.

871. On September 23, 2002, Remcon suggested another fix regarding the contaminated material.

872. On September 28, 2002, Remcon bladed (to grade with construction equipment) the contaminated area and removed the contaminated material to the shuttle bus parking area.

873. Remcon left the asphalt debris at the shuttle bus parking area.

874. This material was cleaned by the completion contractor, Agee, as non-conforming work.

**J. <u>REWORK</u>**

875. In June and July, 2002, Remcon had to perform considerable rework on the water line and electrical conduit, which runs beneath the access road, because it did not perform the work properly the first time.

876. This rework held up installing aggregate base upon the access road.

877. On July 19, 2002, Remcon had to move revetment that had been laid out wrong.

878. Further, Remcon had to redo work in the leach field to correct a grading mistake.

879. The NPS was required to issue letters to Remcon regarding non-conforming work.

880. Work that did not meet contract requirements included work upon the electrical conduit and water line appurtenances.

881. On August 2, 2002, the NPS issued a letter to Remcon rejecting work related to the water pipe.

882. On August 7, 2002, the NPS issued a letter of rejection to Remcon regarding the use of deep embankment fill from station 6+00 through station 21+00.

883. The specification indicated that the fill was supposed to be used only in the deep fill areas of the Upper Sherman.

884. On August 20, 2002, the NPS discussed Remcon's failure to pass the waterline inspection.

885. The same day, the NPS issued a letter to Remcon entitled, "suspect work - waterline and appurtenances," requesting to examine work done by Remcon related to the waterline.

886. On August 20, 2002, the NPS also issued a letter entitled, "suspect work - Electrical conduit." This letter notified Remcon that electrical conduit installed the year before might not meet contract requirements.

887. Remcon was also delayed in placing aggregate base because Remcon's aggregate base failed to meet specifications. See letter of August 19, 2002,

**K. <u>STONE WALL</u>**

888. On June 27, Remcon's subcontractor, Ken Smith Masonry ("Ken Smith"), completed excavating for the dry laid stone wall.

889. On July 15, 2002, Ken Smith had excavated the stone wall and was applying aggregate base material for the base of the wall.

890. On July 17, 2002, Ken Smith pointed out that the top elevation of the dry stack stone wall was 3½ feet below the matching grade line and was coming close to actual trees.

891. Mr. Mangrum, the NPS on site inspector from Jacobs, noted in his daily log that "field observations of the wall shows that it does not concur with plans."

892. On July 18, 2002, Ken Smith was still expressing concern that the stone wall did not meet the topography of the area in either elevation or tree location.

893. The same day, Jack Vance and Loren Mangrum inspected the stone wall and found that the elevation of the top of the wall on the south portion was three to four feet off of finish grade.

894. The same day, July 18, Remcon's surveyors, Guiliani & Kull, checked the grade again and confirmed that the elevations were in compliance with the plans.

895. Guiliani & Kull also confirmed the location of the staking for the wall.

896. The next day, July 19, 2002, the parties, including Remcon's Bob Reinhardt, Jacobs' Loren Mangrum, and NPS' Jack Vance took plans and scaled distances from the dry stack wall.

897. The parties realized, as before, that the "wall is not as shown on the plan."

898. On July 23, 2002, Jacobs' Russ Belknap and Remcon's Bob Reinhardt checked the dimensions of the wall from field monuments and trees shown on plans.

899. At the time, the parties believed that the dimensions revealed that the wall was no more than 2 feet off.

900. The same day, NPS's Mike Giller, Jacobs' Russ Belknap and Remcon's Steve Christensen and Bob Reinhardt, had a discussion regarding the stone wall.

901. During this discussion, the NPS decided to let Remcon continue constructing the stone wall.

902. The result was that the wall became taller because the wall height had to extend upward to meet the existing grade.

903. It also resulted in the removal of a tree.

904. On September 17, 2002, when Remcon's surveyors were checking the layout of the parking lot, they found that the dry laid stone wall "was staked for the bottom back face of the wall" instead of the front face of the wall.

905. This means that Ken Smith Masonry should have built the wall away from the hillside as opposed to into the hillside.

906. This explains why the wall was pushed into the hill four feet.

**L. AGGREGATE BASE**

907. On June 5, 2002, Central Valley Testing tested some of the aggregate base that Remcon had crushed on site.

908. The results showed that some of the rock crushed was too soft and did not comply with the contract specifications.

909. On August 19, 2002, the NPS rejected some of Remcon's aggregate base material because it did not comply with specifications.

910. On September 19, 2002, the NPS sent Remcon a letter noting problems with the aggregate base installed by Remcon.

911. Notably, the letter stated that Remcon was responsible for quality assurance upon the project and that tests on the aggregate base showed that the aggregate base installed by Remcon did not conform to the contract specifications.

**M. THE SHERMAN TREE TRAIL**

912. Regarding the Trail, Remcon delayed its construction by repeatedly asking for clarification when none was needed.

913. Prior to the second construction season, Remcon alleged that there were design errors with respect to the Sherman Tree Trail.

914. Remcon alleged that the Trail was in a hole, the Trail did not have a cross slope, the topographic survey was not accurate, and the drainage pattern could affect the Sherman Trail.

915. On May 16, 2002, the consultant design team member from DHM Design, Bob Smith, Jacobs' Bob Russell, Remcon's surveyor, Bill Morris, and Remcon's Luke Triplett, Bob Reinhardt, and Bill Houk walked the Trail to determine whether it had been built to plan and whether changes were necessary.

916. During the walk-though, NPS's consultant design team member, Bob Smith, noted that Remcon's assertions regarding the Trail had been incorrect.

917. Notably, he saw that the Trail was not in a hole, but may have appeared to be in a hole because Remcon had not completed shoulder grading.

918. Mr. Smith also noted that the Trail had a cross slope, that grading plans had been provided, and that the topographic survey was very accurate, especially in light of the cuts and fills.

919. At the same May 16 walk-through, another discussion was held concerning the "number of stairs" at each grade change on the Trail.

920. Remcon stated its belief that the plans indicated that there were three steps because of the number of lines shown on the plans and because the stringer detail on the plans showed three stairs.

921. The detail states, "number of intermediate steps varies. See plan at each location."

922. Mr. Smith, from NPS' consultant design team, disagreed because the details showed 6-inch risers and the plans outline 2 feet of grade change, which would result in four stairs.

923. After the May 16, 2002 walk-through of the project, the parties agreed that the design plans and the topographic survey matched the field staking done by the contractor for the rough grading of the Trail.

924. The only change that the consultant designer, Mr. Smith, recommended after the walk-through was the addition of two 24-inch culverts with stone headwalls and the deletion of two stone trench drains.

925. On May 24, 2002, the NPS issued two revised drawings, T7A and T8A.

926. T7A and T8A added the two 24-inch culverts as recommended by Mr. Smith.

927. T7A and T8A also clarified the plans and showed that the Trail should have four steps. This was not a change to the drawings.

928. On June 3, 2002, Remcon's Mr. Christensen advised the NPS that he had received T7A and T8A revisions for the Trail, but nothing else.

929. He also stated that there were "numerous design corrections required."

930. Mr. Christensen advised the NPS that he would be submitting RFIs to the NPS requesting clarifications related to the issuance of new plans.

931. The same day, June 3, 2002, the NPS reviewed the Trail revisions with Steve Christensen and assured Mr. Christensen that the revisions were limited to the addition of culverts with appropriate stone rip-rap and headwalls.

932. The NPS also showed Mr. Christensen that the number of stone steps had not changed.

933. On June 19, 2002, Remcon sent an e-mail to the Contracting Officer's Representative, Willie DeOcampo, stating that he had received T7A and T8A, but not T3A through T10A.

934. The e-mail also asked for a drawing detail for a "four stair concrete stringer".

935. On August 14, 2002, Remcon provided an estimate for the changes associated with T7A and T8A.

936. Remcon asked for $26,880 and a four-day contract extension.

937. By letter of August 21, 2002, Remcon advised the NPS that it had submitted a Change Order Request for a modification to the Trail.

938. Remcon told the NPS that it needed an "immediate response" to the letter.

939. On August 21, 2002, Remcon sent another letter to NPS claiming that there was no "survey control" upon the Trail.

940. Remcon claimed that the detail did not match the number of stairs, that there was no "survey control" at the overlook, and that design changes were not incorporated into control data provided to Guiliani & Kull.

941. The NPS had clarified over and over that there were four stairs; the NPS had given Remcon drawings T7A and T8A, which reflected all of the clarifications Remcon had requested; and the NPS had given Guiliani & Kull electronic data when it had no obligation to do so.

942. On August 29, 2002, the NPS responded to Remcon's letter of August 21.

943. Again, Remcon was reminded that the NPS issued drawings T7A and T8A to clarify stair locations and associated grading.

944. The letter also stated that the NPS had come to the understanding that Remcon had staked and final graded the Trail according to its interpretation of the original T7 and T8 drawings, not to the T7A and T8A drawings.

945. To prevent Remcon from incurring additional costs to fix its mistake, the NPS told Remcon in its letter that it could either modify its grading to the revised sheets T7A and T8A or utilize the work that it had already done.

946. On September 17, 2002, Remcon sent another letter to the NPS related to whether Remcon should build the Trail in accordance with T7 and T8 or T7A and T8A.

947. In response, the NPS drafted Modification No. 5, recognizing the changes found in T7A and T8A.

948. Modification No. 5, in the amount of $26,880, was sent to Remcon for signature on September 19, 2002.

949. Upon receipt of the modification, Remcon's Mr. Christensen requested some changes to the modification by letter dated September 23, 2002.

950. Notably, Mr. Christensen requested an additional $872.00 for the work.

951. The NPS changed the modification to reflect the amount Mr. Christensen requested and was sent to Remcon for signature on October 16, 2002.

952. Modification No. 5 was issued bilaterally, in the amount of $26,880, on November 20, 2002, and officially recognized the culvert changes and the clarifications in T7A and T8A.

953. The changes in T7A and T8A represent the only changes that the parties agreed to regarding the Sherman Tree Trail.

954. These drawings had been in Remcon's possession since May 24, 2002.

955. Remcon was granted four additional calendar days for this work, thus extending the contract completion date from August 24, 2003 to August 28, 2003.

956. Remcon did not take exception to the release of claims.

957. The Trail was ultimately built by Agee, the completion contractor, according to the plans and specifications.

958. In building the trail, the completion contractor, Agee, had to add sixteen inches of Aggregate Base fill because Remcon had over excavated.

## N. ROCK EXCAVATION AND THE AUGUST 22 NEGOTIATIONS

959. Discussions between the parties regarding whether Remcon was entitled to compensation for blasting the access road were ongoing throughout the 2002 construction season.

960. On June 3, 2002, Remcon's Steve Christensen complained that the NPS would not witness its representatives take rock from the 200Q project site to test for "rippability."

961. The NPS' contracting officer's representative, Willie DeOcampo, advised Jacobs' representatives against just watching Remcon employees take a rock from the site because Mr. DeOcampo had concerns that the rock would not be representative.

962. Further, Mr. DeOcampo believed that the NPS' geotechnical consulting firm needed to be included in the matter.

963. On June 4, 2002, Remcon sent a "Mediation Brief" to the NPS, a portion of which was devoted to Remcon's claims that it was owed money for rock excavation.

964. In its mediation brief, Remcon lumped claims for site excavation and grading with its claims for blasting, so that the NPS could not track how much Remcon was claiming for each individually.

965. On June 18, 2002, the NPS responded to Remcon by e-mail regarding Remcon's Mediation Brief.

966. The NPS expressed that it was encountering difficulties determining Remcon's alleged costs because Remcon had failed to submit a project schedule, its records had duplications in labor and equipment, excess charges, and impacts from blasting were not well supported.

967. The June 18, 2002, e-mail also stated that the Government could not make Remcon well for bad assumptions and poor bidding.

968. On July 23, 2002, Remcon's Steve Christensen, NPS' Mike Giller and Jack Vance, Jacobs' Loren Mangrum, and Richard Lewis, who was on Remcon's Board of Directors, met to discuss blasting costs.

969. Mr. Giller also had a conversation with Mr. Christensen on July 30, 2002, and expressed that the NPS' position regarding a potential resolution was that there had to be a clean slate release of claims.

970. On August 10, 2002, Remcon sent a letter to NPS claiming that the NPS had placed Remcon in a dire financial position.

971. Remcon again alleged that the NPS had failed to recognize differing site conditions and that the NPS had supplied defective plans and specifications.

972. Mr. Christensen told the NPS that it should come to the August 22 meeting "prepared to fully compensate Remcon for the impacts caused by NPS."

973. Remcon's letter did not mention that Remcon had a judgement against it from Bank of America in the amount of $1,416,902.

974. Remcon's letter also did not mention that Remcon had lost money upon other projects in 2002.

975. Remcon's letter also did not mention that at least five Miller Act claims had been filed against Remcon by August 2002.

976. By the time the meeting was held on August 22, 2002, the NPS had been working with Remcon and Mr. Christensen for almost two construction seasons.

977. The NPS' overriding goal was to ensure that Remcon cease its endless allegations and to obtain a full release of claims upon the project from Remcon.

978. The NPS also believed it would be beneficial to delete the Lower Sherman portion of the project because Remcon had damaged Park resources and the NPS sincerely doubted that Remcon would stop creating alleged claims against the NPS.

979. The NPS was also deeply concerned about Remcon's failure to build in accordance with the contract.

980. On August 22, 2002, the parties met to negotiate outstanding issues.

981. The parties agreed in principal to $485,214 for the "differing site condition with respect to unrippable rock" and <u>all existing issues/claims</u>.

982. The parties also agreed in principal to 42 calendar days for delays encountered.

983. More importantly, the parties agreed in principal to delete the Lower Sherman work.

984. In turn, Remcon agreed, in principal, to complete the Upper Sherman work and the Sherman Tree Trail by November 5, 2002, after which liquidated damages would be assessed against Remcon.

985. This agreement was never finalized or ultimately signed by the parties.

986. On August 29, 2002, Remcon received a draft agreement from the NPS.

987. On August 30, 2002, Remcon revised the draft agreement and sent it back to the NPS.

988. By letter of September 16, 2002, entitled "Breach of the covenant of good faith and fair dealing," Remcon claimed that the NPS was not acting in good faith because it had not issued a revised draft of the August 22, 2002 Agreement.

989. The same day, Remcon wrote another letter regarding "impacts to project completion."

990. It was the NPS' view that, despite its hopes, Remcon intended to continue submitting claims to the NPS.

991. Further, it was becoming apparent to Remcon that it could not complete the Upper Sherman Parking Area by November 5, 2002.

992. On September 24, 2002, Remcon sent two letters to the NPS. One claiming that Remcon was encountering defective plans and specifications related to the access road, and the other claimed that Remcon was encountering defective plans and specifications related to the Upper Parking Lot.

993. On October 20, 2002, Remcon sent a letter advising the NPS that it reserved its rights to seek "additional monetary compensation" related to work that occurred after the agreement of August 22.

994. On November 5, 2002, Remcon sent a letter to the NPS detailing its opinion of the reasons why the August 22, 2002, agreement had not come to fruition.

995. One of the reasons Mr. Christensen offered for the failure of the Agreement was that Remcon would not give up its rights to claims "which may arise on future work taking place on the project."

996. The date of the November 5 letter was the same date the parties had established during the August 22 negotiations that Remcon would be completed with the Upper Sherman work.

997. On November 16, 2002, Remcon sent another letter to NPS entitled, "Notice of potential claim-related owner caused delays."

998. The costs alleged detailed in its letter were all costs that Remcon claimed to have incurred since August 22, 2002.

999. On November 20, 2002, Remcon sent another letter to the NPS, claiming to be offended that the NPS considered its recent letters as an attempt to get double compensation.

1000. Remcon stated that its offer to resolve all claims up to August 22, 2002 for $485,000 would remain in effect until November 22, 2002.

1001. The NPS responded on November 27, 2002 with a revised stipulation extending the contract completion date.

1002. The NPS' revision of November 27, 2002, required a full release of claims from Remcon for all work that had occurred up to that point in time.

1003. By the end of November 2002, it was clear to both parties that they would not come to a resolution upon the wording of the August 22 Agreement.

### O. PAYMENTS

1004. In early July, 2002, following a $1.4 million judgement against Remcon from the Bank of America, Remcon submitted an invoice on Pay Estimate No. 8 for work performed during the period of December 1, 2001 through June 30, 2002.

1005. On July 9, 2002, the NPS issued a letter to Remcon because the invoice Remcon submitted was not proper.

1006. July 12, 2002, the contracting officer, Mr. Keiscome, received an invoice from Remcon on Pay Estimate No. 8 for work performed during the period of December 1, 2001 through June 30, 2002 in the amount of $156,930.62.

1007. The contracting officer approved and signed off on Progress Payment No. 8 on July 15, 2002.

1008. On August 12, 2002, NPS' contracting officer received an invoice from Remcon on Pay Estimate No. 9 for work performed during the period of July 1, 2002 through July 31, 2002 in the amount of $301,164.64.

1009. On August 20, 2002, NPS' contracting officer approved and signed off upon the pay request.

1010. Remcon was paid $307.44 in prompt payment interest because payment on this request was made after the contractually required 14 days. SA151.

1011. On August 21, 2002, NPS' Contracting officer issued Bilateral Modification No. 3 to compensate Remcon for work related to hauling miscellaneous material from the park.

1012. Mr. Christensen signed Bilateral Modification No. 3 on August 20, 2002.

1013. Bilateral Contract Modification No. 3 increased the contract amount by $345,209.92 and granted Remcon thirteen additional calendar days (eight working days) for the work related to this modification.

1014. The contract completion date was changed from August 11, 2003 to August 24, 2003.

1015. This was a bilateral modification with a signed statement of release, stating that the contractor agreed that, in consideration of receiving the benefits of the modification, "all claims or obligations which now exist or which may hereafter arise, whether known or unknown, or which have or could have been asserted against the National Park Service or the Government as well as its officers and employees, in any form or forum, whether in law or equity, arising out of or resulting from this modification are hereby released, waived, and forever discharged."

1016. On September 12, 2002, the contracting officer, Mr. Kesicome, received an invoice from Remcon upon Pay Estimate No. 10 for work performed during the period of August 1, 2002 through August 30, 2002 in the amount of $381,371.83.

1017. On September 12, 2002, the contracting officer, Mr. Kesicome, approved and signed off upon the pay request.

1018. Remcon was paid $55.62 in prompt payment interest because it received payment upon Pay Estimate No. 10 after the contractually required 14 days.

1019. On September 12, 2002, the contracting officer, Mr. Kesicome, issued bilateral modification No. 4 to compensate Remcon for hauling excess excavation, restaking the access road centerline, sorting and removal of buried debris in the upper parking lot and raising the finish grade in the upper parking lot.

1020. Mr. Christensen signed bilateral Modification No. 4 on September 11, 2002.

1021. Bilaterial Modification No. 4 increased the contract amount by $95,120.36 and no additional time extension was granted for the work because the parties agreed that the work was not on the critical path.

1022. The contract completion date remained August 24, 2003.

1023. Modification No. 4 was a bilateral modification with a signed statement of release.

1024. Modification No. 4 compensated Remcon for "restaking the access road centerline," which was related to the survey Guilianai & Kull performed on June 16, 2001, when it staked the access road to the NPS' revised alignment.

1025. The amount given to Remcon under Modification No. 4 for "haul excess excavation," and for "raising finish grade of upper parking lot" was to compensate Remcon for the excess excavation that it alleged it had encountered on site.

1026. On September 19, 2002, the NPS sent Modification No. 5 to Remcon for its signature.

1027. Modification No. 5 was drafted by the Government to compensate Remcon for adjusting the Sherman Tree Trail largely to deduct two stone trenches and add two culverts in their place.

1028. On September 23, 2002, Remcon's Mr. Christensen requested additional funds for Modification No. 5.

1029. On October 9, 2002, the NPS' contracting officer, Rod Kesicome, received an invoice from Remcon on Pay Estimate No. 11 for work performed during the period of August 31, 2002 through September 30, 2002 in the amount of $609,481.73.

1030. On October 10, 2002, the NPS' contracting officer, Rod Kesicome, approved and signed off upon the pay request.

1031. October 16, 2002, the NPS resent Remcon Modification No. 5 for its signature with the amount changed to reflect Mr. Christensen's request for additional payment for the trail.

1032. On November 4, 2002, NPS' project manager, Mike Giller, received Remcon's invoice on Pay Estimate No. 12 for work performed during the period of September 31, 2002 through October 31, 2002 in the amount of $985,668.32.

1033. With respect to Progress Payment No. 12, the NPS performed an internal audit on past payments and the present request for payment and informed Remcon that it had found significant overpayments.

1034. Mr. Giller sent a letter to Remcon on November 19, 2002 entitled, "Pay Estimate Quantity Corrections," noting that Remcon was over billing on some quantities, and charging for work that was incomplete or non-conforming.

1035. Notably, there were six instances where Remcon claimed payment for work not done, there were six instances where Remcon had requested money for work that did not conform to the specifications, there was one instance where the NPS increased the quantity, and one instance where Remcon's request was more than agreed to in the field.

1036. On November 20, 2002, the contracting officer, Mr. Kesicome, received Remcon's invoice with the Mr. Giller's recommended corrections.

1037. After the appropriate corrections were made, the Contracting Officer, Mr. Kesicome, approved and signed off upon the pay request for the corrected amount of $578,829.23 on November 20, 2002.

1038. On November 20, 2002, the contracting officer, Mr. Kesicome, issued Bilateral Modification No. 5.

1039. Modification No. 5 increased the contract amount by $26,880.00.

1040. The NPS granted four additional working days due to the impact of the work on asphalt placement.

1041. Modification No. 5 changed the contract completion date from August 24, 2003 to August 28, 2003.

1042. Modification No. 5 was a bilateral modification with a signed statement of release.

1043. On November 25, 2002, Remcon sent a letter to the NPS alleging that it had failed to follow the prompt payment act (had the amounts in Remcon's invoice not been overstated, Remcon would have been paid on or about November 15).

1044. In the letter, Remcon stated that the NPS was obligated to pay the amount in its pay request because the NPS' on site representative and Remcon's project manager agreed to the sums in the payment request.

1045. The NPS responded by letter and informed Remcon that the contracting officer is the only person with contractual authority to approve progress payment amounts and explained why the amounts had been adjusted.

1046. On or about November 27, 2002, Remcon was paid the adjusted amount for Progress Payment No. 12.

1047. Remcon replied to the NPS' letter on December 4, 2002, stating that it was "shocked" that the NPS modified the estimate and accusing the NPS of not complying with the Federal Acquisition Regulations.

1048. Remcon also sent a similar letter to Congressman Radonovich stating that the NPS was causing it financial hardship.

## VIII. WINTER 2002-2003

1049. On March 7, 2003, due to Remcon's prompting, Congressman Radanovich sent a letter asking the Director of the National Park Service to look into allegations that the Denver Service Center had driven Remcon to bankruptcy.

1050. The director of the Denver Service Center replied to the Congressman Radonovich on May 9, 2003, and explained that it was the contractor, not the NPS, that was being unreasonable.

1051. The Office of Inspector General ("OIG") for the Department of the Interior conducted an independent review of allegations made by Remcon.

1052. The investigation revealed that with respect to the NPS' administration of the Project, "the Contractor's claims were pursued by the NPS with due diligence and progress payments made to the contractor were appropriate under the circumstances and within the time frames set in the Federal Acquisition Regulations."

1053. The OIG also found that during the performance of the project, Remcon submitted several claims and requests for progress payments to the NPS without adequate documentation required by the contract. Although the NPS requested additional information from the Contractor to support the amounts claimed and an updated performance schedule, the Contractor failed to provide sufficient information.

## A. SCHEDULE AND CONTRACT REQUIRED DOCUMENTS

1054. On January 13, 2003, the NPS requested a project schedule from Remcon.

1055. On January 23, 2003, Jacobs' Loren Mangrum forwarded the NPS a long list of items that needed to be addressed by Remcon at the beginning of the 2003 construction season.

1056. On February 24, 2003, Remcon was advised what it needed to do to comply with the contract.

1057. Specifically, the NPS requested Remcon to provide contractually required quantity surveys, project submittals, a complete schedule and drawings.

1058. Remcon responded to the NPS' letter of February 24, 2003, by letter of April 2, 2003.

1059. In its letter, Remcon's Steve Christensen identified himself as project manager and Mike Kitchell as the project foreman and superintendent.

1060. The letter admitted that Remcon had not paid outstanding utility bills, but Remcon stated that it would not pay these bills until it was paid by the NPS.

1061. The letter also included an attached schedule that showed Remcon mobilizing to the project site on May 5, 2003.

1062. The schedule that Remcon provided did not comply with the contract specifications.

1063. The schedule was not resource loaded and did not include work at the Lower Sherman Parking Area.

1064. The letter did not include the quantity survey that the NPS requested in its letter of February 24.

1065. On May 22, 2003, the NPS submitted progress schedule review comments to Remcon regarding its April 3, 2003 Schedule.

**B. ALTERNATIVE DISPUTE RESOLUTION**

1066. On November 25, 2002 Remcon requested that the parties engage in Alternative Dispute Resolution ("ADR") to resolve the claims between the parties.

1067. The NPS responded in letters dated December 2 and December 13, 2002 that it would be responsive to resolution through the ADR process.

1068. On March 26, 2003, Remcon sent a letter to the NPS requesting that the NPS engage in ADR.

1069. On March 28, 2003, the NPS offered the same response that it had before.

1070. The NPS's contracting officer, Rod Keiscome, stated that the NPS was willing to engage in ADR, but it did not want a third-party mediator.

1071. Remcon's attorney responded a few days later, claiming that the NPS was being "unreasonable."

1072. On April 24, 2003 the NPS' Solicitor's Office offered to meet with Remcon to discuss resolution of all issues relating to the Sequoia contract.

1073. On April 29, 2003, the NPS' Solicitor's Office repeated its request.

1074. On May 1, 2003, the NPS' Solicitor's Office provided a list of dates that it was willing to meet with Remcon.

**C. BLASTING**

1075. Because the proposed agreement of August 22, 2002 had eroded, the NPS decided to issue Modification No. 6 to pay Remcon for its differing site condition claim.

1076. NPS' Project Manager, Mike Giller, made the determination of the amount that was reasonably due to Remcon for this work.

1077. On February 18, 2003, the contracting officer, Mr. Kesicome, issued Unilateral Modification No. 6 to compensate Remcon for work related to rock blasting and excavation.

1078. This amount was paid to Remcon's surety pursuant to its request.

1079. Modification No. 6 increased the contract amount by $84,170.00 and granted no additional time for the work.

1080. The contract completion date remained August 28, 2003.

1081. On March 4, 2003, Remcon responded to the NPS' issuance of unilateral Modification No. 6.

1082. Remcon disagreed that $84,170.00 fairly compensated it for its work.

1083. In its letter, Remcon stated that it had blasted "over 5,000 CY of rock excavation."

1084. 5,000 CY of excavation is 5,000 CY less than it had contracted with California Drilling & Blasting to blast.

1085. Remcon's letter also stated that its "submitted costs for [blasting] exceed $700,000."

1086. Under bid item 28 - Rock Excavation, the NPS has paid $135,189.60.

1087. This is striking, because in March of 2002, the amount Remcon was claiming for the very same rock excavation was only $396,938.47.

1088. The rock excavation paid under Modification No. 6 and at issue in Remcon's multiple Requests for Equitable Adjustments all occurred in August 2001.

**D. AGGREGATE BASE**

1089. On November 19, 2002, the NPS issued a letter to Remcon regarding correction of quantities.

1090. Included in the NPS' November 19 letter was a correction related to the quantities of aggregate base for which Remcon claimed it was due payment for.

1091. Remcon had claimed that it had hauled and placed 9,292 tons of aggregate base.

1092. The specifications for the bid item clearly state that the contractor would only be compensated for aggregate base under bituminous concrete.

1093. Aggregate Base necessary for other areas, such as under the dry laid stone wall, was compensable in accordance with the related bid items.

1094. The consultant design team estimated that the area beneath the bituminous concrete for the entire project, for both Upper and Lower Sherman, required just over 10,376 tons of aggregate base.

1095. The NPS' Project Manager, Mr. Giller, knew it was impossible for Remcon to have installed as much aggregate base as it said it did, unless Remcon was claiming costs for aggregate base that was used on other bid items and/or the aggregate base that Remcon installed under the bituminous concrete was installed too thick.

1096. Mr. Giller determined the amount of aggregate base installed by looking at the surface area of the project, the specifications stating that the Aggregate Base was to be installed to a depth of 61/2 inches, and he calculated that