only 6,640 tons of Aggregate Base could have been installed under the bituminous concrete.

1097. The excess aggregate base claimed by Remcon is enough to cover an acre of land twelve inches deep.

1098. On December 9, 2002, Remcon sent a Notice of Claim to the NPS regarding Aggregate Base.

1099. In the letter, Remcon claimed it placed 9,292 tons of Aggregate Base and that the NPS reduced the amount to 6,640 tons.

1100. The claim acknowledged that the NPS had already paid Remcon $285,520 for aggregate base and asked for the $114,051 that it determined was an underpayment.

1101. In Remcon's December 9, 2002 claim, Remcon never mentions that it understood a stockpile of aggregate base would be available for its use at the beginning of the project.

1102. In response to receiving Remcon's claim, NPS' Project Manager, Mr. Giller, asked the Jacobs on site inspector to check whether the aggregate base or Asphalt Concrete was installed too thick.

1103. Jacobs' Mr. Mangrum responded to Mr. Giller that it had only tested to make sure that Remcon complied with the minimum depth required in the specifications.

1104. Jacobs had not checked to determine whether Remcon had installed the aggregate base at a thickness greater than the 61/2 inch depth indicated in the contract documents.

1105. On March 3, 2003, the NPS asked for contract required documentation supporting Remcon's Aggregate Base claim and asked whether the claim was a certified claim.

1106. On March 10, 2003, Remcon replied to the NPS' request for additional information, lambasting the NPS for its "further attempts to misrepresent the terms of the conditions of the contract by requesting supporting documentation."

1107. On March 17, 2003, Remcon sent a notice of potential claim to the Agency regarding the failure to provide aggregate base.

1108. This time, Remcon claimed that it installed 10,183.50 tons of Aggregate Base, about 900 more tons than it claimed in its December letter.

1109. Further, Remcon claimed that it should be compensated for purchasing the Aggregate Base because it believed that Aggregate Base was to be stockpiled for its use at the project.

1110. Remarkably, even though the project was now going into its third construction season, this was the first time Remcon had complained that there was not a stockpile for its use.

1111. This is completely contrary to how Remcon both bid the project and its stated desire, at the beginning of the project, to crush Aggregate Base on site, which would have been unnecessary if Aggregate Base had been provided.

1112. On March 25, 2003, just over a week after Remcon sent its notice of "potential claim," Remcon submitted a claim to the NPS related to its failure to provide Aggregate Base.

1113. In its claim, Remcon asked for $63,646.88 for purchasing of Aggregate Base and $185,848 for hauling the Aggregate Base, with a total, including mark-ups, of $292,908.02.

1114. Remcon did not give the NPS any credit for amounts already paid to Remcon for Aggregate Base.

1115. Remcon's claim also did not mention that it bid the project with the intent to purchase and haul Aggregate Base.

**E. <u>SHERMAN TREE TRAIL</u>**

1116. On February 26, 2003, Remcon's Luke Triplett asked for "design clarifications" regarding the Sherman Tree Trail.

1117. Although Modification No. 5 was issued specifically to clarify that Remcon was to build the project in accordance with drawings T7A and T8A, Remcon wanted to know if it needed drawings T3A - T10A.

1118. The NPS had already clarified this point several times the year before and had issued Modification No. 5 solely to clarify that the trail should be built in accordance with drawings T7A and T8A and that all other drawings remained the same.

**F. <u>STONE WALL</u>**

1119. In the November 19, 2002 Pay Estimate quantity corrections letter, NPS' Project Manager, Mr. Giller, adjusted the amount paid to Remcon for the stone wall.

1120. Under the project specification, the stone wall was to be paid for by the number of square feet on the face of the wall.

1121. It was the NPS' position that it was not responsible for paying Remcon for the increased height in the wall because the height of the wall was increased due solely to Remcon's mistake.

1122. On December 4, 2002, Remcon submitted a claim to the NPS for the dry laid stone wall.

1123. In its claim, Remcon stated that the wall was "relocated" at the direction of NPS' Jack Vance and Russell Belknap.

1124. Remcon's assertions that Jack Vance and Russell Belknap directed it to move the wall are not true.

1125. By letter dated March 3, 2003, the NPS requested backup for Remcon's stone wall claim.

1126. In response to the NPS' request for additional information, Mr. Christensen sent a letter lambasting the NPS for requesting additional information. Notably, Mr. Christensen said, "clarity is an ongoing problem within the NPS."

**G. <u>BOULDER REVETMENT</u>**

1127. On December 7, 2002, Remcon sent the NPS a notice of potential claim regarding the failure of the NPS to provide boulders for boulder revetment.

1128. In the potential claim, Remcon stated stat the contract specifications state that boulders would be provided from park stockpiles and that Remcon had to "scrounge" for boulders.

1129. The specifications identified the Clover Crede Quarry for Remcon to use for these stones.

1130. When Remcon submitted its proposal to crush rock on site for Aggregate Base, the NPS asked Remcon for verification that it had adequate rock for revetment, landscape boulders, the dry laid stone wall, etc.

1131. Although Remcon was entering its third construction season on the project, this was the first time that Remcon complained that boulders were not available for its use.

### H. <u>MODIFICATION NO. 7</u>

1132. On March 3, 2003, the contracting officer, Mr. Keiscome, submitted Modification No. 7 to Remcon for its signature.

1133. The purpose of Modification No. 7 was to delete work in the Lower Sherman area from the contract.

1134. The parties had agreed to delete the Lower Sherman work in the parties' proposed August 22, 2002 agreement.

1135. In August 2002, both the NPS and Remcon were in agreement regarding deletion of the work.

1136. Remcon sent a letter on March 12, 2003 claiming that if the NPS issued Modification No. 7, that it would consider the NPS in breach of its contract.

1137. Remcon also sent a letter on March 21, that if the NPS issued Modification No. 7, it would seek damages, which would be over $500,000.

1138. On April 1, 2003, the NPS contracting officer rescinded proposed Modification No. 7.

1139. The letter advised Remcon that, "pursuant to Remcon's request," it would not issue Modification No. 7. SA365.

1140. The NPS contracting officer also sent Remcon a letter on April 4, 2003 that discussed both Modification No. 7, which it had withdrawn, and Modification No. 6.

1141. On April 15, 2003, Remcon responded to the NPS' contracting officer and stated that the NPS' withdrawal of Contract Modification No. 7 was "unconscionable and without merit."

1142. Remcon's letter is difficult to believe because its letters clearly requested that the NPS withdraw Modification No. 7, which it did.

**I. REMCON'S FINANCIAL CONDITION**

1143. On January 2, 2003, Remcon submitted a request for Progress Payment No. 13 for work progress performed during the period of November 1, 2002 through December 31, 2002, in the amount of $119,203.44.

1144. Again, Remcon overstated amounts due under the progress payment.

1145. For example, Remcon was still claiming that it had placed 10,183 tons of Aggregate Base, and the NPS still disagreed that Remcon could have placed that much Aggregate Base in accordance with the contract.

1146. On January 16, 2003, the NPS sent Remcon a letter stating that Remcon was seeking quantities above those in the contract requirements for work that is "incomplete or nonconforming".

1147. On January 17, 2003, the NPS' contracting officer, Mr. Kesicome, received the invoice from Remcon on Pay Estimate No. 13 with the quantities corrected by the NPS.

1148. On January 17, 2003, the contracting officer, Mr. Kesicome, approved and signed off upon the pay request.

1149. On February 13, 2003, Remcon responded to the NPS' correction and claimed that the NPS was trying to force Remcon into "financial ruin" and was "violating its civil rights."

1150. On March 6, 2003, Remcon submitted Progress Payment No. 14 specifically requesting payment for items the NPS denied under earlier pay requests.

1151. On March 12, 2003, Remcon's surety, Great American Insurance Company, advised the NPS that no funds under the contract should be released to Remcon without its approval.

1152. On April 1, 2003, Rod Keiscome acknowledged Great American Insurance Company's request.

1153. On April 9, 2003, Remcon wrote a letter to the NPS stating that NPS had failed to pay Remcon under Progress Payment No. 14.

1154. On April 15, 2003, the NPS reminded Remcon that the NPS could not release funds to Remcon.

1155. The NPS also again told Remcon why it disagreed with the quantities Remcon claimed under Progress Payment No. 14.

1156. The NPS also reminded Remcon that it had failed to produce a contract-compliant schedule and quantity survey to the NPS.

1157. As the third construction season was approaching, the NPS had issued Remcon all financial remuneration due, save claims that were still pending.

1158. The NPS had also issued all outstanding modifications; five of six of the modifications were bilateral.

## IX. THIRD CONSTRUCTION SEASON AND DEFAULT

### A. REMCON'S FAILURE TO MOBILIZE

1159. On May 3, 2003 a project meeting was held.

1160. At the meeting, the NPS stated that it had reviewed Remcon's April 3, 2003, schedule and stated that Remcon's schedule needed to contain all activities on the project, it needed to be resource loaded and needed to contain activities for the Lower Sherman area.

1161. At the meeting, the NPS also reminded Remcon that it had not received a contract compliant quantity survey or survey notes.

1162. Remcon's Steve Christensen said he would direct quantity surveys when he mobilized to the project site.

1163. At the May 3 meeting, the NPS advised Remcon that it required two weeks notice before Remcon could mobilize to the project site.

1164. At the May 3 project meeting, the parties tentatively scheduled mobilization for June 3, 2003.

1165. On June 6, 2003, the NPS sent Remcon a letter stating that Remcon had not yet mobilized to the job site, even though Remcon's Mr. Christensen had indicated that Remcon would mobilize to the site.

1166. The NPS ended its letter by stating its understanding that Remcon would mobilize to the site by June 9, 2003.

1167. The same day the NPS' Solicitor's Office wrote to Remcon's attorney, Michael Schoenfeld, expressing concern that Remcon would not return to the site "without an infusion of money from the NPS."

1168. Mr. Christensen responded to the NPS' June 6 letter on June 7, 2001, stating that he never said he would mobilize to the site on June 9.

1169. The letter stated that "Remcon is in control over its own mobilization process not the NPS."

1170. On June 8, 2002, Remcon sent the NPS another letter.

1171. With respect to Remcon's schedule, Remcon replied to the NPS' letter of May 22, 2003 by stating that its April schedule was not, in fact, a schedule.

1172. Instead, Remcon claimed that the "schedule" it produced to the NPS in April was merely an "approximate time line for project start up for the 2003 work season."

1173. Attached to the June 8 letter, Remcon produced a new schedule, which it called, "Revision 2."

1174. "Revision 2" shows the revised contract completion date as October 7, 2004.

1175. "Revision 2" included Activity No. 20 as a critical path activity.

1176. Critical Path Activity No. 20 was "contractor/owner ADR" (Alternative Dispute Resolution).

1177. In the same letter, Remcon stated that its "as-built construction schedule for the 2001 and 2002 work season "is protected by attorney client privilege and is not available to the NPS."

1178. Remcon's attorney, Mr. Schoenfeld, was copied on the June 8, 2003 letter.

1179. On June 18, 2003, the NPS replied to Remcon's letter of June 7, 2001.

1180. The NPS' contracting officer did not agree that the Remcon was "in control over its own mobilization process.

1181. In the letter, Mr. Keiscome pointed out that Section I.91 of the contract, entitled "Seasonal Shutdown," states that the contractor shall give the Contracting Officer at least two weeks notice prior to the anticipated resumption of work."

1182. Although Mr. Keiscome advised Remcon that it was the NPS' prerogative to have two weeks notice, the NPS stated that it would waive the notice if Remcon would mobilize to the project site.

1183. Remcon still didn't mobilize.

1184. On June 28, 2003, Remcon sent a letter to the NPS entitled, "site deficiencies" stating that work on the project was being delayed because of NPS' failure to complete "Critical Path Activity 20."

1185. Remcon's letter advised the NPS that as soon as this critical activity occurred, Remcon would be able to proceed with work.

1186. Critical Path Activity 20 was ADR.

1187. ADR is not a construction activity that is appropriate for a critical path activity scheduling.

1188. The same day, June 28, 2003, Remcon sent another letter to the NPS entitled, "mobilization notification."

1189. In this letter Remcon again stated that NPS' failure to complete "critical path Activity 20," was delaying the project and increasing the cost to NPS.

1190. On July 2, 2003, the NPS issued Remcon comments related to the schedule Remcon had submitted on June 8, 2003.

1191. On July 3, 2003, the NPS sent a letter to Remcon reminding Remcon that it needed to mobilize and "proceed diligently with performance of the contract,

pending final resolution of any request for relief, claim, appeal, or action arising under the contract."

1192. On July 3, 2003, Remcon sent a letter to the NPS "rejecting" the comments that the NPS had issued related to Remcon's schedule.

1193. Remcon argued that the NPS did not issue its comments on time, therefore the schedule was accepted.

1194. Remcon's letter again blamed the NPS for work upon the project being delayed because of NPS' failure to complete "Critical Path Activity 20."

1195. On July 8, 2003, the NPS wrote Remcon a letter disagreeing with Remcon's assertions that Remcon's noncompliant schedule was accepted and disagreeing that the NPS was delaying Remcon from mobilizing to the project because of the NPS' supposed failure to engage in ADR.

1196. Notably, the NPS told Remcon that ADR was not appropriately a critical path activity.

1197. On July 9, it responded to the contracting officer, Rod Keiscome, stating that because the contracting officer had not responded to Remcon's schedule within seven days that the NPS was forever barred from doing so.

1198. Also, Remcon insisted that the project was being delayed because of NPS' failure to complete "Critical Path Activity 20."

1199. Similarly on July 17, 2003, Remcon again stated that it had an acceptable schedule and was being delayed by the NPS (by not entertaining ADR).

1200. Remcon's Mr. Christensen sent another letter to the NPS on July 17 about meeting with the NPS' on site representative regarding the schedule.

1201. Mr. Christensen advised the NPS that he would meet with the NPS' representative, but would not change its (June 8) schedule.

1202. Also, in Remcon's letter, it again insisted that the project was being delayed because of NPS' failure to complete "Critical Path Activity 20" (i.e., ADR).

### B. CONTRACTING OFFICER'S FINAL DECISIONS

1203. On July 3, 2003, the contracting officer, Rod Keiscome, issued a final decision denying Remcon's claim related to Aggregate Base.

1204. On July 3, 2003, the contracting officer, Rod Keiscome, issued a final decision denying Remcon's claim related to the Dry Laid Stone Wall.

1205. On July 15, 2003, the contracting officer, Rod Keiscome, issued a final decision denying the Differing site, Excavation, Grading and Storm Water Pollution Prevention portions of Remcon's claim.

### C. REMCON'S OMNIBUS CLAIM

1206. In a document dated June 28, 2003, Remcon submitted a certified claim for an equitable adjustment to the contract price in the amount of $3,091,799.60 and requested the contracting officer's final decision regarding its claim.

1207. This claim is referred to as the "omnibus claim."

1208. The NPS received Remcon's certified claim on July 15, 2003, over two weeks after the date identified on the omnibus claim.

1209. Remcon's omnibus claim, in the amount of $3.1 million is almost 10 times the amount of Remcon's original Request for Equitable Adjustment of March 28, 2002, in the amount of $396,000.

1210. The earthwork that is the subject of Remcon's March 28, 2002, claim is the same 2001 earthwork that is the bulk of Remcon's omnibus claim.

1211. Remcon's omnibus claim, in the amount of $3.1 million is about three times the amount of Remcon's revised Request for Equitable Adjustment of April 22, 2002, in the amount of $700,000.

1212. The earthwork that is the subject of Remcon's April, 22, 2002, claim is the same 2001 earthwork that is the bulk of Remcon's omnibus claim.

1213. Remcon's "submitted costs" for the rock excavation claim were in the form of a total cost claim, meaning that itemized what it spent to do the work less what it bid to do the work.

1214. Remcon's bid estimate related to "unclassified" excavation contains a significant error – Remcon underestimated the amount of earthwork contained in the contract.

## D. TERMINATION FOR DEFAULT

1215. As of July, 2003, Remcon had failed to mobilize to the work site, although work still remained to be completed on the Upper Sherman Access Road, Upper Sherman Parking Area, the Sherman Tree Trail, and no work had been performed on the Lower Sherman Parking Area.

1216. On July 24, 2003, the NPS sent a cure notice to Remcon.

1217. The NPS reminded Remcon in the cure notice that it had an obligation to mobilize and continue to perform work.

1218. The cure notice reminded Remcon that it had failed to provide a contract compliant schedule.

1219. The cure notice reminded Remcon that it had not provided required submittals.

1220. The cure notice also reminded Remcon that it had not provided quantity surveys on the contract.

1221. On July 29, 2003, the NPS sent another letter to Remcon stating that "Activity 20" is not appropriately a critical path activity.

1222. In the same letter, the NPS reminded Remcon of its schedule obligations.

1223. On July 31, 2002, Remcon requested additional time, until August 11, 2003, to respond to the cure notice.

1224. By certified mail, the NPS responded to Remcon's cure letter extension request and gave Remcon up to August 11, 2003 to respond.

1225. On August 11, 2003, Remcon stated that it expected a response from its surety "sometime that day."

1226. A response was not forthcoming.

1227. On August 13, 2003, NPS notified Remcon that it was terminating the contract for default.

**E. <u>THE AS-BUILT SURVEY</u>**

1228. An as-built survey, prepared in approximately August 2003, confirmed the accuracy of contract drawings, including natural features such as trees, rocks and topography.

1229. There were some minor errors in the as-built drawings, but they would not have affected Remcon's ability to build the project.

1230. The as-built survey indicated that much of Remcon's work did not conform to the contract.

1231. The as-built survey showed that the road did not need to be realigned at station 9+00 and 12+00 in 2001.

1232. The as-built survey showed that there were not design errors that required the road to be realigned between station 24+ and 30+ in 2001.

1233. The as-built survey showed that the Dry Laid Stone Wall was built in the wrong place.

### F. <u>REMCON'S CLAIM OF BREACH</u>

1234. In October 2003, Remcon filed its "Complaint for Breach of Contract and Damages," seeking damages of at least $3,115,096.89, and conversion of the termination for default to termination for convenience.

### G. <u>CORRECTION OF REMCON'S DEFECTIVE WORK</u>

1235. Following the termination of Remcon's contract, the surety entered into the takeover agreement because it had executed performance and payments bonds in connection with the Sherman Tree Parking Contract between Remcon and the Government at issue in this litigation.

1236. Pursuant to the takeover agreement, the surety entered into an agreement with Agee Construction, Inc. for completion of the Sherman Tree Parking Contract.

1237. Pursuant to the agreement between Agee and the surety, Agee is and continues to act as the "completion contractor" for the project.

1238. Agee commenced its work at the beginning of the 2004 construction season.

1239. To date, Agee still has not completed work upon the project.

1240. In performing its work as the completion contractor, Agee was required to correct non-conforming work performed by Remcon.

1241. Examples of Remocn's non-conforming work include, but are not limited to: (a) the access road was as much as five feet to narrow in some places; (b)

water lines were buried too shallow and had many leaks; (c) storm water drains were incorrectly located and did not properly drain; (d) the leach-field was incomplete and in violation of the State of California waste water permit; (e) sections of asphalt were poorly compacted and had to be replaced; numerous sections of the parking lot were constructed either two high or two low, or in the wrong location; (e) many storm drain culverts (pipes) were installed in the wrong location; (f) stone curb alignments were incorrect; (g) many portions of the access road presented traffic safety problems; (h) a comfort station floor sloped too steeply in several locations in violation of Americans With Disabilities Act standards; and (i) road embankments were incomplete and lacked earthen fill, presenting safety issues and resulting in unused earthen excavation material.

1242. The total cost for correcting Remcon's non-conforming work currently is not known to the Government, although the work took several months and the costs are very significant.

1243. Not all of Remcon's non-conforming work has been corrected.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

*s/Franklin E. White, Jr.*
FRANKLIN E. WHITE, JR.
Assistant Director

*s/Richard P. Schroeder*
RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Attorneys for Defendant

OF COUNSEL

COLLEEN DULIN
U.S. Department of Interior
Office of the General Counsel
755 Parfet Street
Lakewood, CO 80215

October 7, 2005