IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., | ) | DOCKET NO. 03-2478C |
| Plaintiff, | ) | **DECLARATION OF WILLIAM MORRIS IN LIEU OF LIVE DIRECT TESTIMONY** |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | (Judge Susan G. Braden) |
| Defendant. | ) | Trial Date: October 24, 2005 |

I, WILLIAM MORRIS, declare:

1. I was Giuliani & Kull's Project Engineer for the Sherman Tree Parking Project ("Project") from June, 2001 until Remcon was no longer performing work on the Project. I have extensive experience in the design and surveying of road projects, and have been involved in the design and surveying of road projects since 1990. I have personal knowledge of the following and if called to testify could and would completely testify thereto.

2. I am currently employed by Giuliani and Kull, Inc. ("G&K") and have been since 1997. Prior to that time I worked with Jesse Stanley Surveying from 1992 through 1997.

3. I graduated from the University of the Pacific in 1990 with a Bachelor of Science in Civil Engineering. I currently hold valid registrations as a licensed Engineer and Surveyor in the State of California and did so at the time of the Project. My engineering license was first issued in 1996 and at all times since then has been active

and in good standing. My surveying license was first issued in 2001 and at all times since then has been active and in good standing.

4. As G&K's Project Engineer for the Project my duties, in general, were: review/study the Project plans and specifications, set up all survey data which was derived from the plans, point of contact for survey information with the National Park Service ("NPS"), coordinated survey information with G&K's field survey crew, schedule our work, manage our work, negotiated extra work and performed quality control for survey work.

5. During G&K's performance on the Project, G&K used state of the art surveying equipment that was properly maintained and calibrated and was of the appropriate nature for the type of surveying performed. The main field-surveying instrument was a digital readout utilizing electronic distance measuring. A hand held field computer, referred to as a data collector or survey instrument controller by those in the survey profession, was used to make field calculations and perform the construction layout in the field.

6. Point coordinates provided by the NPS on the project plans were hand inputted into an electronic data file using office-surveying software, and verified with the electronic drawing files.

7. Periodic field checks of the survey instrument were performed by measuring known base lines as a reference check.

8. Based on my personal knowledge and experience, and licensure, G&K employed the normal standard of practice, procedure and methodology for executing surveys of the nature performed on this Project.

9. G&K conducted a survey control check prior to the start of construction layout and found that the survey control coordinates provided by the NPS on the drawings were accurate enough to provide subsequent construction layout.

10. The construction layout generally followed the normal construction sequence, which was as follows: design information received from the NPS was inputted into G&K's survey instruments, G&K's survey crew on site then confirmed survey control information, survey stakes were then set along the centerline of the roadway, parking lot or trail, and slope staking was then performed. Data was crosschecked and confirmed as being accurate.

11. A "Construction Staking Work Plan" was submitted to the NPS prior to the commencement of our construction layout.

12. Reference lath (survey stakes) were set with the station and a cut/fill to the design surface or feature being constructed.

13. The form of the construction staking was specified in the approved work plan.

14. Cut sheets of our surveying were properly prepared and forwarded to the NPS.

15. Additional surveying information was provided to the NPS when requested.

16. In late May 2001, we requested that the NPS provide the CAD files for the Project and that those CAD files be emailed to our office so we could begin deriving the data. On June 13, 2001, having received no CAD files, even though promised by the NPS, a second request was issued once again requesting this information. Attached hereto as Exhibit A to this declaration is a true and correct copy of the June 13, 2001 Request for Information No. 4 to Dan Savage of the NPS and by this reference made a part hereof.

17. G&K was directed by the NPS to communicate all surveying questions to either Dan Savage of the NPS or Andrea Gregor of DHM, the NPS' designer.

18. The original NPS topographic survey did not accurately reflect all the actual field conditions such as the location of trees, shrubs, and rocks that the NPS

wanted to preserve. When we encountered this in the field, we were required to notify Remcon. We did so.

19. Many of these resources, which the NPS wanted to save, impacted the construction of the original roadway and parking lot design and required design modifications that were furnished to us.

20. In late June 2001, during the surveying of the access road, our surveying and staking of the centerline of the access road, in the area known as the "deep cut," which was approximately between Stations 24+00 and 30+00, discovered a conflict between the design data supplied by the NPS and the area which the NPS had designated to be cleared and was cleared by Remcon's loggers prior to our survey. We properly and immediately reported the problem to the NPS inspectors and Remcon.

21. The construction layout of the access road between approximately Stations 24+00 and 30+00 disclosed that the area designated to be cleared was in a different location than the location provided for on the plans, and both Jesse Stanley and I personally confirmed that the difference was not faulty surveying. Bob Russell and Willie DeOcampo confirmed this fact, in a meeting held in the field at the Project.

22. As the areas of the cut/fill were established per the plans on the ground, the location of the access road per the plan did not fit within the swath of trees previously cleared between Stations 24+00 and 30+00. The survey control had been previously checked and found to be accurate.

23. A possible error by G&K was eliminated by re-checking the construction layout leaving the only possible source of the error to be by the NPS due to incorrectly marking the trees or a mistake in the plans.

24. When it was discovered that the NPS had marked the trees in error, an attempt was made to alter the location of the road design.

25. We were requested to survey the cleared area by the NPS, and we did so, and proposed an alternate alignment, even though the alternate design was outside the scope of our contract, and forwarded it to the NPS for review.

26. On July 2, 2001, G&K complied with the NPS' request and faxed the requested survey information to the NPS. Attached hereto as Exhibit B to this declaration is a true and correct copy of my July 2, 2001 fax to the NPS and by this reference made a part hereof.

27. On June 25, 2001, I issued a follow up email to the NPS notifying them that additional information was needed for the parking lot grades and the trail grades. Attached hereto as Exhibit C to this declaration is a true and correct copy of my June 25, 2001 email to Dan Savage of the NPS and by this reference made a part hereof.

28. On July 2, 2001, I sent a follow up email (to my June 25, 2001 email) to the NPS, again requesting survey information for the parking lots. My email stated that we needed all curve points and grade breaks so it could be properly staked. Attached hereto as Exhibit D to this declaration is a true and correct copy of my July 2, 2001 email to Joanne Cody of the NPS and by this reference made a part hereof.

29. After some modifications to our July 2, 2001 submittal, relating to the realignment of the access road, the NPS returned new design data for realignment of the access road to us for staking as extra work, in the field. The NPS provided G&K this updated alignment data on July 11, 2001.

30. On July 16, 2001, G&K performed the surveying and staking for the realignment of the access road that was recognized and compensated as extra work by the NPS. It is my understanding that Modification No. 4 is the formal document issued by the NPS recognizing the extra work. The layout for the access road and parking areas was performed pursuant to the new design coordinates provided by the NPS.

31. It was not until July 25, 2001 that the NPS responded by email to my two previous requests for parking lot grades. Rather than providing the requested as planned

grades, the email contained attached files for revised upper lot grades. Attached hereto as Exhibit E to this declaration is a true and correct copy of Dan Savage's July 25, 2001 email to me and by this reference made a part hereof.

32. On July 30, 2001, I issued a follow up email to Dan Savage concerning the lower parking lot grades. In review of the information he previously provided it became apparent that some survey points were off by 100-feet in the lower lot and additional information was still needed for the upper lot. Attached hereto as Exhibit F to this declaration is a true and correct copy of my July 30, 2001 email to Dan Savage of the NPS and by this reference made a part hereof.

33. On July 31, 2001 at 11:44 AM, Mr. Savage of the NPS responded to my July 30, 2001 email stating that he would be sending me the centerline coordinate points for both the upper and lower parking lots. This was now over a month since my original request. Attached hereto as Exhibit G to this declaration is a true and correct copy of Dan Savage's July 31, 2001 email to me and by this reference made a part hereof.

34. Mr. Savage of the NPS then responded five minutes later with a follow up email of July 31, 2001 at 11:49 AM, verifying that the lower parking lot was off by 100-feet. Attached hereto as Exhibit H to this declaration is a true and correct copy of Dan Savage's July 31, 2001 email to me and by this reference made a part hereof.

35. On August 1, 2001, I received another email from Mr. Savage of the NPS, notifying me of an updated drawing and text files for the upper and lower parking areas as well as correcting the 100-foot error. Attached hereto as Exhibit I to this declaration is a true and correct copy of Dan Savage's August 1, 2001 email to me and by this reference made a part hereof.

36. Then, on August 12, 2001, I received an email from Andrea Gregor of DHM, the NPS' designer, notifying me of yet another change. Her email states that as a result of a site visit they were adjusting the Upper Sherman Parking design. Full size drawings were sent out on August 10, 2001. Attached hereto as Exhibit J to this

declaration is a true and correct copy of Andrea Gregor's August 12, 2001 email to me and by this reference made a part hereof.

37. On August 27, 2001, I received another email from Andrea Gregor, the NPS' designer. Her email reads; "I am attaching the latest Sequoia 200Q drawings. All the changes have been clouded including the coordinates on the table. I just got back from Sequoia. Lots of staking ... You guys are doing a great job!" Attached hereto as Exhibit K to this declaration is a true and correct copy of Andrea Gregor's August 27, 2001 email to me and by this reference made a part hereof.

38. During June, July and August 2001, we received multiple design changes issued by the NPS and its design team. These changes and directions affected multiple areas of the Project and caused us to survey, and re-survey, multiple times. Many aspects of the access road, the trail and the parking lot were affected by the changes, and the time devoted to the Project substantially increased.

39. As a result of the numerous problems that Remcon had encountered during the 2001 construction season a partnering meeting was set up for May 14 & 15, 2002, in hopes of addressing many of the problems stalling and/or impacting the project. As the lead engineer for Giuliani and Kull, I attended this meeting at Sequoia National Park. Also present were representatives of Remcon, the key personnel for the NPS assigned to the Project, and the NPS' outside designers.

40. It was during this partnering meeting that I was informed that additional design changes were being planned for the Upper Sherman Parking Area and the Sherman Tree Trail. Further, I personally listened to the description of multiple events which Remcon contended impacted and affected its work. I also observed the NPS acknowledging the fact that there was excess excavation that had to be handled and that there were many design issues then unresolved.

41. It was on July 1, 2002 that I received an email from Andrea Lind (Ms. Lind was previously Ms. Gregor) of DHM, with the revised grading plans for the upper

parking area. Attached hereto as Exhibit L to this declaration is a true and correct copy of Andrea Lind's (DHM) July 1, 2002 email to me and by this reference made a part hereof.

42. In August 2002, at the request of Remcon and the NPS, Giuliani and Kull's surveyors provided the NPS with as-built survey information for the Upper Sherman Access Road. The NPS had communicated concerns that additional changes may be needed on the access road.

43. Then, in the latter part of August 2002, Remcon informed me that the NPS had indicated that it was going to make more changes to the access road design.

44. On September 5, 2002, I issued an email to Russell Belknap of the NPS, wanting to know the status of the revised plans. G&K was planning on returning to the Project the following Monday, but only if we received the revised grading information. Attached hereto as Exhibit M to this declaration is a true and correct copy of my email of September 5, 2002 to Russell Belknap and by this reference made a part hereof.

45. Later that day I received an email with attached files from Dan Savage of the NPS, which provided the revised horizontal alignment and vertical profile for the access road. In addition the attached files also contained new vertical curve data and elevations at every 25-foot. If there were any problems I was directed to contact Dan Savage or Russell Belknap. Attached hereto as Exhibit N to this declaration is a true and correct copy of Dan Savage's September 6, 2002 email to me and by this reference made a part hereof.

46. On September 10, 2002, Russell Belknap responded with an email notifying me that he was giving Remcon's Project Superintendent, Mike Kitchell, the new super elevations and he can go off the staking of the centerline profile that we were staking from the new design. Attached hereto as Exhibit O to this declaration is a true and correct copy of Russell Belknap's (NPS) September 10, 2002 email to me and by this reference made a part hereof.

47. Not only were we experiencing design and layout problems with the access road and parking areas in 2001 and 2002, but we also had problems with the trail which required design corrections.

48. It was not until July 27, 2001, that the NPS responded by email to my requests for Sherman Tree Trail grades. It had taken the NPS over a month to provide the information, which was needed to begin staking the trail. Attached hereto as Exhibit P to this declaration is a true and correct copy of Andrea Gregor's (DHM) July 27, 2001 email to me and by this reference made a part hereof.

49. On July 30, 2001, I received a follow up email from Andrea Gregor of DHM, the NPS' designer, providing finished grades for all TP points along the Sherman Tree Trail. Attached hereto as Exhibit Q to this declaration is a true and correct copy of Andrea Gregor's (DHM) July 30, 2001 email to me and by this reference made a part hereof.

50. Then, on July 31, 2001 at 9:02 AM, I received an email from Andrea Gregor of DHM, the NPS' designer, notifying me that she would be sending a new set of revised grading plans for the trail in a couple of hours. Attached hereto as Exhibit R to this declaration is a true and correct copy of Andrea Gregor's (DHM) July 31, 2001 email to me and by this reference made a part hereof.

51. Then on August 12, 2001, I received an email from Andrea Gregor of DHM, the NPS' designer, notifying me of yet another change. Her email stated that, as a result of a site visit, they were adjusting the Sherman Tree Trail design. Full size drawings were sent out on August 10, 2001. Attached hereto as Exhibit S to this declaration is a true and correct copy of Andrea Gregor's (DHM) August 12, 2001 email to me and by this reference made a part hereof.

52. Once construction layout commenced on the trail, it became apparent that there was a problem with design. By inspection, when the trail was cut to subgrade it was apparent that the trail would be depressed.

53. We checked our field data and found it to be accurate and forwarded it to the NPS.

54. The trail layout began during the week of July 30, 2001.

55. In October 2001, the NPS contended in response to RFI No. 31 that the trail had been staked, and constructed, one foot lower than required. Attached hereto as Exhibit T is a true and correct copy of the NPS' response to RFI No. 31 and by this reference made a part hereof.

56. We went out and checked the trail and found that it was staked, and constructed, pursuant to the designed elevations, and that the reason for the excess material being in existence was not a surveying error. Following the demonstration of this fact, the NPS provided a summary chart showing revised trail elevations in 2002.

57. During a site walk on May 16, 2002, Bob Smith of DHM and I agreed that the staking for the trail previously performed by G&K was substantially correct. Attached hereto as Exhibit U to this declaration is a true and correct copy of the Daily Log of Construction for May 16, 2002, which was prepared by Bob Russell, the NPS' onsite representative which reflects the findings of the job walk and by this reference made a part hereof.

58. As-built surveys performed by NPS contractors confirmed that the trail construction was in substantial conformance to the approved plans and that modifications were needed.

59. Throughout the 2002 work season, G&K was never provided revised grading plans for the Sherman Tree Trail. I understand that these revised plans were not issued to Remcon for construction until mid-November, 2002, when it was too late to work at the site due to weather.

60. On numerous occasions, the NPS made field modifications to the project layout without ever incorporating these changes into the project plans. One such example of this type of change is a fax from Bob Russell, the NPS' on-site representative, to

Willie DeOcampo, the Contracting Officers Representative (COR), which details changes made by the NPS' Joanne Cody so that a tree could be saved. Attached hereto as Exhibit V to this declaration is a true and correct copy of Mr. Russell's fax to Willie DeOcampo of the NPS and by this reference made a part hereof.

61. The extra work we performed was compiled by us and the amount, which remains unpaid without interest, is $ 41,782.50. It is detailed in our letter-dated May 2, 2003, a true and correct copy is attached hereto as Exhibit W and by this reference made a part hereof.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the forgoing is true and accurate.

Executed on this 6TH day of October 2005 in Oakdale, California.

WILLIAM MORRIS



1918.001-295659.1