IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., | ) | DOCKET NO. 03-2478C |
| Plaintiff, | ) | **DECLARATION OF JESSE STANLEY IN LIEU OF LIVE DIRECT TESTIMONY** |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | (Judge Susan G. Braden) |
| Defendant. | ) | Trial Date: October 24, 2005 |

I, JESSE STANLEY, declare:

1. I was Giuliani & Kull's Party Chief or Surveyor in Charge for the Sherman Tree Parking Project (Project) from June 2001 till Remcon was no longer performing work on the Project. I have extensive experience in the design and surveying of road projects, and have been involved in the design and surveying of road projects for over 35 years.

2. I am currently employed by Giuliani and Kull, Inc. (G&K), under a subcontract agreement with Jesse Stanley Land Surveying, and have been since 1993. I am the owner of Jesse Stanley Land Surveying.

3. I currently hold valid registrations as a licensed surveyor in the State of California and did so at the time of the Project. In addition, I also hold surveying licenses in four other states.

4. During 1954 and 1955, I was employed by the United States Forest Service as an engineering technician tasked with surveying and designing forest service roads.

5. During G&K's performance on the Project, G&K used state of the art surveying equipment that was properly maintained and calibrated and was of the appropriate nature for the type of surveying performed. The main field surveying instrument was a digital readout utilizing electronic distance measuring. A hand held field computer, referred to as a data collector or survey instrument controller by those in the survey profession, was used to make field calculations and perform the construction layout in the field.

6. Point coordinates provided by the NPS on the project plans were hand inputted by G&K's office staff into an electronic data file using office surveying software.

7. Periodic field checks of the surveying instruments were performed by measuring known base lines as a reference check. The dates and records of the base line checks are recorded in a field book, which I maintained.

8. Based on my personal knowledge and experience, and licensure, G&K employed the normal standard of practice, procedure and methodology for executing surveys of the nature performed on this Project.

9. G&K conducted a survey control check prior to the start of construction layout and found that the survey control coordinates provided by the NPS on the drawings were accurate enough to provide subsequent construction layout.

10. The construction layout generally followed the normal construction sequence, which was as follows: design information received from the NPS was imputted into G&K's survey instruments, G&K's survey crew on site then confirmed survey control information, survey stakes were then set along the centerline of the roadway,

parking lot or trail, and slope staking was then performed. Data was crosschecked and confirmed as being accurate.

11. A "Construction Staking Work Plan" was submitted to the NPS prior to the commencement of our construction layout.

12. Reference lath (survey stakes) were set with the station and a cut/fill to the design surface or feature being constructed.

13. The form of the construction staking was specified in the approved work plan.

14. Cut sheets of our surveying were properly prepared and forwarded to the NPS.

15. Additional surveying information was provided to the NPS when requested.

16. The original NPS topographic survey did not accurately reflect all the actual field conditions such as the location of trees, shrubs, and rocks that the NPS wanted to preserve. When we encountered this in the field, we were required to notify Remcon.

17. Many of these resources, which the NPS wanted to save, impacted the construction of the original roadway and parking lot design and required design modifications that were furnished to us.

18. I began construction layout for the access road during the week of June 25, 2001.

19. In late June 2001, during the surveying of the access road, our surveying and staking of the centerline of the access road, in the area known as the "deep cut," which was approximately between Stations 24+00 and 30+00, discovered a conflict between the design data supplied by the NPS and the area which the NPS had designated to be cleared and was cleared by Remcon's loggers prior to our survey. We properly and immediately reported the problem to the NPS inspectors and Remcon.

20. The construction layout of the access road between approximately Stations 24+00 and 30+00 disclosed that the area designated to be cleared was in a different location than the location provided for on the plans, and both Bill Morris and I personally confirmed that the difference was not faulty surveying. Bob Russell and Willie DeOcampo confirmed this fact, in a meeting held in the field at the Project.

21. As the areas of the cut/fill were established per the plans on the ground, the location of the access road per the plan did not fit within the swath of trees previously cleared between Stations 24+00 and 30+00. The survey control had been previously checked and found to be accurate.

22. A possible error by G&K was eliminated by re-checking the construction layout leaving the only possible source of the error to be by the NPS due to incorrectly marking the trees or a mistake in the plans.

23. I did not observe any signs that indicated that the NPS performed any surveying in 2001 to accurately establish the clearing limits before tree marking commenced.

24. When it was discovered that the NPS had marked the trees in error, an attempt was made to alter the location of the road design.

25. We were requested to survey the cleared area by the NPS, and we did so, and proposed an alternate alignment, even though the alternate design was outside the scope of our contract, and forwarded it to the NPS for review.

26. On July 2, 2001, G&K complied with the NPS' request and faxed the requested survey information to the NPS. Attached hereto as Exhibit A to this declaration is a true and correct copy of our July 2, 2001 fax to the NPS and by this reference made a part hereof.

27. On July 16, 2001, G&K performed the surveying and staking for the realignment of the access road that was recognized and compensated as extra work by the NPS. It is my understanding that Modification No. 4 is the formal document issued by

the NPS recognizing the extra work. The layout for the access road and parking areas was performed pursuant to the new design coordinates provided by the NPS.

28. As of July 25, 2001, I was still waiting on information to be sent to G&K's office from the NPS so we could complete staking of the parking lot grades. I communicated this need to Bill Morris. I am aware that Mr. Morris had requested this information in late June 2001.

29. Not until early August 2001 did I receive the necessary information to complete the survey layout of the parking areas. Subsequently this information proved to be inaccurate and additional changes were made to the parking lots to correct design deficiencies.

30. During June, July and August 2001, we received multiple, and sometimes conflicting, design changes issued by the NPS and its design team. These changes and directions affected multiple areas of the Project and caused us to survey, and re-survey, multiple times. Many aspects of the access road, the trail and the parking lot were affected by the changes, and the time devoted to the Project substantially increased.

31. It was not until July 1, 2002 that G&K received the revised grading plans for the upper parking area. Attached hereto as Exhibit B to this declaration is a true and correct copy of Andrea Lind's (DHM) July 1, 2002 email to Bill Morris and by this reference made a part hereof.

32. In August 2002, at the request of Remcon and the NPS, I returned to the project with a survey crew to perform an as-built survey for the Upper Sherman Access Road. The NPS had communicated concerns that additional changes may be needed on the access road.

33. Then, in the latter part of August 2002, Remcon informed me that the NPS had indicated that it was going to make more changes to the access road design.

34. It was not until mid September 2002, that I returned to the Project to once again provide construction staking on yet another modification to the Upper Sherman Access Road and Parking Areas.

35. Not only were we experiencing numerous design and layout problems with the access road and parking areas in 2001 and 2002, but we also had problems with the Sherman Tree Trail which required design corrections.

36. It was not until July 27, 2001, that the NPS responded by email to G&K's requests for Sherman Tree Trail grades. It had taken the NPS over a month to provide the information, which was needed to begin staking the trail. Attached hereto as Exhibit C to this declaration is a true and correct copy of Andrea Gregor's (DHM) July 27, 2001 email to Bill Morris and by this reference made a part hereof.

37. Once construction layout commenced on the trail, it became apparent that there was a problem with design. By inspection, when the trail was cut to subgrade it was apparent that the trail would be depressed.

38. We checked our field data and found it to be accurate and forwarded it to the NPS.

39. The trail layout began during the week of July 30, 2001.

40. In October 2001, the NPS contended in response to RFI No. 31 that the trail had been staked, and constructed, one foot lower than required. Attached hereto as Exhibit D is a true and correct copy of the NPS' response to RFI No. 31 and by this reference mad a part hereof.

41. We went out and checked the trail and found that it was staked, and constructed, pursuant to the designed elevations, and that the reason for the excess material being in existence was not a surveying error. Following the demonstration of this fact, the NPS provided a summary chart showing revised trail elevations in 2002.

42. During a site walk on May 16, 2002, Bob Smith of DHM and Bill Morris of G&K agreed that the staking for the trail previously performed by G&K was

substantially correct. Attached hereto as Exhibit E to this declaration is a true and correct copy of the Daily Log of Construction for May 16, 2002, which was prepared by Bob Russell, the NPS' onsite representative which reflects the findings of the job walk and by this reference made a part hereof.

43. As-built surveys performed by NPS contractors confirmed that the trail construction was in substantial conformance to the approved plans and that modifications were needed.

44. Throughout the 2002 work season, G&K was never provided revised grading plans for the Sherman Tree Trail. I understand that these revised plans were not issued to Remcon for construction until mid-November, 2002, when it was too late to work at the site due to weather.

45. On numerous occasions the NPS made field modifications to the project layout without ever incorporating these changes into the project plans. One such example of this type of change is a fax from Bob Russell, the NPS' on-site representative, to Willie DeOcampo, the Contracting Officers Representative (COR), which details changes made by the NPS' Joanne Cody so that a tree could be saved. Attached hereto as Exhibit F to this declaration is a true and correct copy of Mr. Russell's fax to Willie DeOcampo of the NPS and by this reference made a part hereof.

46. The extra work we performed was compiled by G&K and the amount, which remains unpaid without interest, is $ 41,782.50. It is detailed in our letter-dated May 2, 2003, a true and correct copy of which is attached hereto as Exhibit G and by this reference made a part hereof.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the forgoing is true and accurate.

Executed on this 6th day of October 2005 in Oakdale, California.

JESSE STANLEY