IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) | DOCKET NO. 03-2478C<br>**DECLARATION OF JEFF NORTHRUP IN LIEU OF LIVE DIRECT TESTIMONY**<br>(Judge Susan G. Braden)<br>Trial Date: October 24, 2005 |

I, JEFF NORTHRUP, declare:

1. I make this declaration as my direct testimony pursuant to the Order of the Court. I have personal knowledge of all matters stated herein and, if called upon to do so, I could and would competently testify thereto.

2. I was Remcon's Project Manager from July, 2001 to June, 2002 for the subject project. As project manager, I was in charge of the day to day operations for the project, in charge of all paperwork, in charge of communicating with the NPS and its inspector, and in charge of managing the project schedule. I generally was on site daily.

3. I have extensive experience in grading and road projects, and have been involved in grading projects since 1973. I am currently employed by Teichert Construction as a project manager. In my construction career, which has spanned over 30 years, I have been a piping and grading foreman, and have done just about everything relating to the civil end of the business except for concrete. I have operated heavy equipment, have helped lay many miles of pipe, have worked on all different types of

grading and road projects, and have excavated hundreds of thousands of cubic yards of material.

4. I have performed quite a bit of subdivision work, which included mass excavation. I built subdivisions for Lee Catt in the 1990s as a foreman. I also worked on the Burlington Northern Santa Fe Railroad. I worked on public works projects in Tennessee in the mid 1990s.

5. I worked for Remcon from the late 1990's to 2002. I was the foreman for Remcon project called Mosher Creek Levee project. I then worked on the Caltrans and Turlock Irrigation District project in Delhi. This project involved irrigation piping and construction of a highway overpass. After the Delhi project, I worked on the Wolf Creek Road realignment project for forest service in Markleeville. I was the grading foreman on that project, and the project involved a huge deep cut using similar equipment as the Sequoia project.

6. For Remcon, immediately prior to the Sequoia project, I was the Project Superintendent and Project Manager on the Lime Saddle Campground project in Oroville. We moved several hundreds of thousands of cubic yards of material with excavators and haul trucks, and used a D11 dozer to rip hard rock in lieu of blasting. We were able to use the D11 dozer on that project because access was not limited and the site was huge.

7. I understood for this project that Bob Russell, the construction manager hired by the NPS, was to be the on-site field "eyes and ears" of the NPS, inspecting the work of the contractor. During the first year, Bob Russell was the lead inspector, the person in charge on behalf of Jacobs Facilities, the construction manager in the field. I also understood, from direct interaction with Mr. Russell and Mr. DeOcampo, that Mr. Russell was authorized to direct or approve Remcon's work in the field, that he was our main contact on the project, that all communications to the NPS were to go through Mr. Russell, and that we were to comply with his directions.

8. While in the field during construction operations, I interacted with Bob Russell on virtually a daily basis. While there were some days that we did not see each other or speak when I was in the field, those were the exceptions, not the rule.

9. The routine that was followed on this project was that Mr. Russell would visit the work site and monitor/inspect our daily efforts. We regularly spoke about any concerns he may have had, and I orally told him, on a daily basis, of our actions, concerns, issues, planned activities, problems, and proposed solutions, which we had. Once a week, Bob conducted a scheduled weekly meeting. At this time, we discussed, along with many project participants, including Steve Christensen and Willie DeOcampo, many topics. In general, they included the work activities we were currently performing, the three week look ahead schedules and overall project schedules we prepared and furnished to him (to confirm what we had done, what we were doing, and what we projected we would be performing during a three-week cycle), the problems or issues we had confronted, whether we were waiting for solutions or not, the need for submittals, correspondence, or RFIs to be written or responded to, the extra work being performed, delays, impacts to the job, and other general information. Minutes of those meetings were prepared, distributed, and discussed at subsequent meetings.

10. Following the hauling of the burn pit materials, we planned to perform our mass excavation work which principally consisted of excavation and grading of the access road and the parking lots in the Upper Sherman portion of the project. This effort was scheduled to be a duration of 21 calendar days. Instead, this work was substantially delayed due to the road realignment into the hill and the failure of the government to issue its final design changes to Remcon so that Remcon could complete the work. When I left the project in 2002 (due to health issues concerning my wife), the design problems and other impediments concerning the access road and upper parking lots, as well as the handling of the many stockpiles of excess material excavated from the project, but for which we had no direction to deposit, haul or address, as well as the Sherman Tree Trail

regarding design, were still outstanding. This prevented us from finishing the earthwork portion of the project on the Upper Sherman area.

11. In June, 2001, we learned that there was a significant discrepancy (up to 15 feet) between Stations 24 and 30 (approximately 600 lineal feet) between the area Remcon had cleared per the clearing of the trees marked to be removed by the NPS, and where the centerline of the road was staked by our surveyor (which I understand was staked where the NPS plans and specifications called for the access road to be constructed). For the road realignment, the survey stakes were set, and it did not appear that the roadway layout or the new proposed layout for the road really matched the topography of the land.

12. Willie DeOcampo directed us to realign the centerline of the Upper Sherman Access Road in two locations: between Stations 8 and 12, up to a maximum of 11.5 feet; and between Stations 24 and 30, up to 15 feet. We had our surveyors perform this work in July, 2001, and then commenced the excavation and earthwork effort in those locales. The relocation of the Upper Sherman Access Road centerline between Stations 24 and 30 caused additional earthwork to be performed by Remcon in constructing the Upper Sherman Access Road because it was a cut section, and by pushing the road into the hill (a higher elevation) and not adjusting the vertical elevation of the road, more material had to be excavated and handled. I discussed this with Steve Christensen, Bob Russell, and Willie DeOcampo in early July, 2001.

13. In June and July, 2001, Remcon had on site a new D8 Dozer/Ripper with a single shank which was the piece of equipment along with other support equipment we planned to use to excavate and fill the entire planned roadway locale to subgrade based upon the Kleinfelder soils report. I am informed and believe that we started grading the access road on June 26, 2001.

14. Notice of the conflict between the location of the staking of the Upper Sherman Access Road and the cleared area, between Stations 24 and 30, was provided to

me, Bob Russell, Willie DeOcampo, and Steve Christensen, by our surveyors, on June 27, 2001.

15. As a result of the conflict between the location of the staking of the Upper Sherman Access Road and the cleared area, between Stations 24 and 30, the NPS directed us to realign the road. To accomplish this realignment, the access road needed to be re-surveyed by Remcon's surveyor, and this extra work was performed on July 16, 2001. A true and correct copy of Bob Russell's daily report for July 16, 2001 recording this extra work is attached hereto as Exhibit A , and by this reference made a part hereof.

16. At the July 10, 2001 weekly Project meeting, Bob Russell indicated to me and those present that he had sent Remcon's overall 2-year project schedule to Denver and that he should get word back soon. A true and correct copy of the Weekly Meeting Minutes for July 10, 2001 is attached hereto as Exhibit B, and by this reference made a part hereof.

17. On July 10, 2001, Joanne Cody published Upper Sherman Access Road and Upper Sherman Parking Area realignment drawings. A true and correct copy of Ms. Cody's revised realignment for the access road and upper parking lot is attached hereto as Exhibit C, and by this reference made a part hereof. Between Stations 24 and 30, when the center line moved to the left, the access road moved into the hillside as contrasted with away from the hillside. This is the exact area between Stations 24 and 30 that we later encountered a differing site condition of non-rippable rock.

18. Once the NPS issued the direction to realign the road (Design No. 2), Remcon's surveyor, Guiliani and Kull, returned to the Project and re-surveyed the area with the revised design information. This new design information affected some 600 feet, or 20% of the access road.

19. While the road realignment issue was ongoing, we ceased operations in the deep cut area pending new design data from the NPS, and relocated our equipment and began work in the Upper Sherman Parking Area to address the burn pit. The burn pit

was located in the upper parking lot area, and contained tree, stump, wood, metal, and ash waste. Per the contract documents, it was supposed to contain 2000 cubic yards.

20. The amount of unsuitable material (debris) encountered in the burn pit ended up being several thousand more yards than the bid quantity. Not only did Remcon have to perform the extra work to excavate out of the burn pit approximately 5,000 additional cubic yards, we had to perform the extra work to backfill the hole created by the additional 5,000 or so yards removed. We had originally scheduled 5 work days for the burn pit excavation work based on the NPS quantity estimate. It took us 27 workdays to perform the work.

21. We removed all of the burn pit material from the park and the extra costs exceeded $300,000. We promptly submitted the trucking receipts and weigh tags from the disposal site relating to the burn pit excavation and hauling that Willie DeOcampo asked for in an August 1, 2001 letter.

22. The excavation and hauling of the burn pit/dump area material, beyond 2000 cubic yards, was extra work, which was performed in June and July, 2001 and increased Bid Item 26 from the specified 2000 cubic yards to be more than 7000 cubic yards. The burn pit hole was three times larger than anticipated.

23. In mid July, 2001, we also uncovered buried material not shown on the plans or addressed in the specifications along the south side of the Upper Parking Lot. The material included metal, old tires, kitchen appliances, car parts, etc., and required us to use additional labor, an excavator, a haul truck, and a D8 dozer to remove the material. In the area of the Upper Sherman project, the excess material had to be removed from an area that had to be built up to be ultimately paved. I immediately informed Bob Russell, who in turn advised the NPS. This area was investigated within a week by the NPS, and we were given direction to perform the extra work of removing the previously undisclosed debris.

24. On July 26, 2001, Bob Russell issued to me, with a "cc" to Willie DeOcampo and Joanne Cody, revised grades/elevations for the parking lot. A true and correct copy of Mr. Russell's transmittal, and the enclosures, are attached hereto as Exhibit D, and by this reference made a part hereof. The transmittal indicated that these revised grades were to supplement the coordinates and elevations sent the day before, and represented the maximum changes and were to be used only if the NPS determined that it was necessary or desireable to raise the grades to minimize excess cut material.

25. At this point in time, I understood that the NPS acknowledged that excess excavation and material was going to be encountered and handled, and that the process of addressing what to do with it was being evaluated by the NPS. Unfortunately, it took about a year for us to get direction what to do with the excess material, and this delay, and the stockpiles created and remaining in place while waiting for direction, seriously affected our ability to have our work productively performed. This cost us time and money.

26. Each major phase of the Upper Sherman project, except for the comfort station, had some design revisions that had been given to us during the month of July, 2001.

27. As of July 30, 2001, we had on site a D8 Dozer with a single shank ripper which was being operated and was in good condition. The excavation effort started on the Upper Sherman Access Road at Station 1 and proceeded towards Station 35+50. Because we knew we were going to have to blast the utility trenches and/or the leach field, we had submitted our blasting plan to the NPS and received approval for it prior to the end of July, 2001. On July 30, 2001, we encountered solid rock (not isolated "floaters") that we determined would need to be blasted. Bob Russell was on site and he did not object to our request to blast.

28. Notice was given to the NPS, commencing on July 30, 2001, that blasting would occur because we encountered rock that was not rippable in the deep cut section,

between Stations 25 and 31. Mr. Russell identified our notice in his July 30, 2001 daily log. The subsurface material encountered between these stations was no longer "earth and rippable rock" which could be "ripped" by conventional construction equipment as disclosed in the project soils report made available to bidders, but rather, had to be blasted. It was predominately non-rippable rock.

29. From July 30, 2001, Remcon personnel tried to rip the road multiple times daily. We observed the rock was not rippable on July 30th. I saw that Remcon could not rip the rock several times a day when I was on site in July, August, and September, 2001. I visited the site daily. On days when blasting was occurring, the primary focus of our work on the Upper Sherman Access Road was to create areas to blast at 4:00 p.m. and handle material from the prior day's blasting. Further, to limit the amount of blasting needed to be performed, and promote the efficient blasting, we used our equipment to expose as much rock as possible. This work was inefficient, but in the long run saved blasting costs and time.

30. When the non-rippable rock was encountered, we discussed using larger equipment (such as a D11 dozer), but because getting such equipment to the site was problematic (weight), and due to the size of the equipment and the limits of the project, we determined that the only reasonable means to excavate the granitic rock and boulders in the deep cut area was blasting.

31. There were quite a few discussions about blasting on-site with Mr. Russell, and blasting was discussed during every weekly meeting from July 30, 2001 through September, 2001. Blasting was discussed during the August 7, 2001 weekly meeting, and NPS and Jacobs employees present agreed that blasting was necessary at the deep cut. At no time during the blasting operations did Mr. Russell or anyone from the NPS tell me that the blasting was not allowed or required, or questioned that the blasting was extra work.

32. On August 8, 2001, I wrote Bob Russell enclosing drilling and blasting logs. A true and correct copy of my August 8, 2001 letter to Bob Russell, with the enclosed blasting logs is attached hereto as Exhibit E and by this reference made a part hereof. My letter included a quantification of 990.93 cubic yards of rock blasted through August 7, 2001, and included documentation showing my calculation. I sent Bob Russell the complete diagrams of the drilling and blasting areas that we were first encountering. This is how I came up with the quantity that was greater than the 640 cubic yards that was in the Remcon estimate as a bid unit. My letter also advised Bob Russell that I believed the overrun may be as high as 500%, and requested negotiation of quantity overruns.

33. I recall that about 5,000-10,000 cubic yards of blasting for the access road and parking lot occurred. Some of the blasted material was hauled to stockpiles to be crushed later (for use as aggregate base and boulder revetment because the NPS did not furnish us with the aggregate base as promised nor were we furnished with the stones to be used as boulder revetment as promised). In some instances the material was used actually or set aside by the stone mason for work he was going to do. The excess material was taken to the parking lot and the bus turnaround locations, and stockpiled waiting direction. The crushing operation, performed in October, 2001, was undertaken to convert the rock into class two base rock (aggregate base) for the access road and parking lot.

34. On August 20, 2001, Remcon gave the NPS formal notice of the differing site condition being encountered. On August 20, 2001, I submitted a change order request for rock excavation, drilling, and shooting, arising from the differing site condition. A true and correct copy of my August 20, 2001 change order request is attached hereto as Exhibit F and by this reference made a part hereof .

35. California Drilling and Blasting, our subcontractor, blasted and drilled rock in the deep cut area from July 30, 2001 to September 13, 2001 to create the access

road. On every work day from July 30, 2001 through the end of blasting the access road in mid-September 2001, Remcon used the D8 Dozer on site to rip rock or attempt to rip rock on the Upper Sherman Access Road between Stations 24 and 30. It was our goal, every day, to rip rock encountered between Stations 24 and 30 if possible as the cost to do so was far less than blasting, and it was much more productive and efficient. Further, we discussed in detail with the blaster, prior to every blast, the depth of the design elevation and the amount required to be blasted. Blasting is not a perfect science, and some minimal over-blasting was and is required (Leaving non-rippable rock, not blasted, in an elevation too high is not an option. Therefore, you must overblast at least a foot or more to make sure you blast what you have to at a minimum). We used the plans and the cut stakes with the elevations noted to determine the depth the blasting needed to achieve. In some instances, where the utility trenches were located, we had them blasted concurrently with the access road. While you can be precise excavating with a dozer, you cannot be precise blasting. It was not our fault that the access road had to be blasted.

36. All things being equal, it is faster and a contractor can move more material and be more productive with a D8 dozer than having to drill, put cover, shoot, clean up the isolated areas, go and rip, redrill, shoot, put in cover, shoot it, and remove it. With regular dirt, it is easier to use a piece of equipment and remove it. Blasting, in substance, involves drilling holes to place charges, covering the holes, clearing the site, and blasting. The material then needs to be removed. It cannot be used as backfill or fill as planned without special processing.

37. The fact that blasting time was limited caused lost productivity in the ability of Remcon to productively perform work because blasting is a very labor-intensive and time-consuming process because you have to drill a hole, fill the hole, cover the hole to prevent materials from flying out and damaging nearby features. Then you have to remove the blasted material and remove and sort it while performing the same process on site again.

38. As a consequence of the excess material to be removed and the lack of timely direction from the NPS, Remcon's operations were severely impacted, resulting in an inefficient use of Remcon's planned labor and equipment and Project supervision and an immediate negative impact to Remcon's schedule. At the end of 2001, I believe there was between 15,000 and 17,000 extra cubic yards sitting in multiple stockpiles in the bus turnaround area and parking areas. Until we received direction what to do with this material, and moved it, we could not effectively or completely build and pave the bus turnaround and parking areas, or the utility trenches.

39. The government was aware of our oral and written contentions as to the quantity of excess excavation in both September and October, 2001.

40. The NPS directed us to bring some of the excess material to Wolverton Point (about 3000 yards), but also directed us to stockpile the bulk of it at the shuttle bus location and parking areas. This was done in the summer of 2001.

41. In August, 2001, Remcon, in an effort to minimize the effects of the differing site condition, requested that we be permitted to construct a temporary access road between the Upper Sherman parking area and the shuttle bus/staging area. I sent to Jack Vance and Bob Russell a proposal for this work, and it was accepted. We did construct this temporary access road in order to assist performance on this project. The costs to do so were not charged to the NPS.

42. Independent of the differing site conditions on the access road and the parking areas, there were a whole series of revisions to the design drawings issued to us during the months of July and August of 2001.

43. The Sherman Tree Trail, per our survey, was very close to design grade as of October, 2001. By letter dated April 17, 2002, we informed Willie DeOcampo and Robert Smith of DHM that the survey on the Sherman Tree Trail confirmed that the Sherman Tree Trail, as then constructed, was per plans.

44. On October 18, 2001, I wrote and sent RFI No. 31 to Bob Russell reminding him that despite several discussions over the previous three weeks, Remcon had not received direction on what to do with the excess material excavated and stockpiled. A true and correct copy of RFI #31 is attached hereto as Exhibit G, and by this reference made a part hereof. In RFI No. 31, I informed Bob Russell that there were so many piles of dirt on the site that Remcon could not finish grade the parking lot. I also advised Bob Russell that Remcon estimated there were 15,000 cubic yards of excess material in various piles, and asked three questions: (1) Why is there so much more yardage? (2) How are we going to be compensated for dealing with it? and (3) Where will we put the balance of the yardage once we have done everything discussed above?

45. We received a response to RFI #31 on October 29, 2001. It was signed jointly by Willie DeOcampo and Joanne Cody. The response to RFI No. 31, stated that the access road, parking areas and trail were built one foot below design grades. This response was not accurate since the Upper Sherman Access Road, Upper Sherman Parking Area, and Sherman Tree Trail were not built one foot below design grades, and this was later confirmed to be true by the NPS. A true and correct copy of Willie DeOcampo's May 29, 2002 email, admitting that the Sherman Tree Trail was properly graded, is attached hereto as Exhibit H, and by this reference made a part hereof.

46. On August 22, 2001 Bob Russell sent a fax to me, with a cc to Willie DeOcampo and others, showing a transmittal of the referenced drawings that are in the August 20, 2001 transmittal from Andrea Gregor. A true and correct copy of Mr. Russell's August 22, 2001 transmittal is attached hereto as Exhibit I, and by this reference made a part hereof. These revised drawings addressed changes in the upper parking lot.

47. On August 24, 2001, I received from Bob Russell copies of additional revised drawings. A true and correct copy of the August 24, 2001 transmittal from Bob

Russell, is attached hereto as Exhibit J and by this reference made a part hereof. These revised drawings addressed layout and grading for the upper parking lot and trail.

48. On January 7, 2002, Bob Russell sent to me a fax requesting Remcon's cost proposal for restaking the access road centerline and Remcon's cost proposal for sorting and removing upper park lot debris so that Bob could wrap up Modification No. 3. A true and correct copy of Mr. Russell's January 7, 2002 transmittal is attached as Exhibit K and by this reference made a part hereof.

49. On a monthly basis, based on my personal observations, I determined quantities performed for pay estimates and submitted them to Bob Russell. Some quantities came from cubic yards moved or from truck tags for stuff that was hauled off the job. In some instances, I was able to actually measure footage, and in some instances Bob Russell and I were able to actually calculate the quantities that we agreed to. Ultimately, Bob and I agreed on the quantities to be billed and we then billed the NPS on a monthly basis. This process (working with the project inspector as the most knowledgeable person) prior to submitting a formal pay application, is how most projects proceed.

50. Remcon did publish, on a weekly basis, a three-week look ahead schedule which detailed the activities performed the prior week, that week's planned activities, and the forecasted activities for the subsequent week. In 2001, the events experienced on the project, coupled with the absence of direction and/or issuance of modifications, prevented us from producing a schedule that was reliably accurate. The three-week look ahead schedule, presented and discussed at each weekly meeting with the NPS, was used to construct the project as the full project schedule was rendered inaccurate by the absence of NPS action and direction relating to the delay events and extra work requiring direction.

51. On or before October, 2001, I sent Willie DeOcampo a letter that coordination and planning along with discussions with the NPS was needed before an

updated full project schedule could be made. A true and correct copy of my undated letter to Willie DeOcampo is attached hereto as Exhibit L and by this reference made a part hereof.

52. On October 11, 2001, the NPS received a letter from me indicating that an updated Project Schedule would be forthcoming after further planning. A true and correct copy of my October 11, 2001 letter to Willie DeOcampo is attached hereto as Exhibit M and by this reference made a part hereof. It was my intent to work with the NPS to permit us to resolve all of the issues so we could schedule, and then perform, the remaining work. The assistance requested from the NPS did not come while I was on the project.

53. We sought to develop a schedule during the winter shutdown that would work despite the problems experienced during the 2001 construction season and the fact that many were not resolved. Absent the NPS resolving outstanding issues, at anytime, including during the six month winter shutdown between November, 2001 and May, 2002, our ability to accurately plan and schedule the project was frustrated at best. On December 3, 2001, I sent Willie DeOcampo an updated schedule for completion of the Upper Sherman phase and one for the Lower Sherman phase. A true and correct copy of my December 3, 2001 letter to Willie DeOcampo is attached hereto as Exhibit N and by this reference made a part hereof. My intent was to provide a realistic schedule which took into account the delays, and remaining unresolved issues, from the 2001 season.

54. On February 6, 2002, I sent to Willie DeOcampo further revised schedules.

55. While I assisted Steve Christensen with preparing full project schedules, only Steve had the authority to ultimately approve the schedules that were submitted to the NPS. Steve also worked on the logic ties for the CPM schedules.

56. The revisions to the Upper Sherman Access Road and raising of the parking area had to be performed by Remcon, in order to address some of the excess

material, before Remcon could pave the Upper Sherman Parking Area. As a consequence of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation.

57. The NPS did not furnish any aggregate base. Starting in September, 2001, Oasis Crushing crushed rock and screening material at the upper parking lot stockpile to convert the material into class 2 base. All of this work was extra and not originally planned.

58. On September 11, 2001, I requested from Bob Russell simple changes to be made to the openings for the septic tank based on details provided by the NPS. After not receiving an adequate response, I submitted RFI #27 and change order request no. 7 for clarification on this issue. This issue impacted the schedule and caused delay. We finally received a response to this RFI, and attached as Exhibit O to my declaration, and by this reference made a part hereof, is a true and correct copy of RFI #27 and the response from the NPS. Attached as Exhibit P to this declaration, and by this reference made a part hereof, is my September 27, 2001 change order request.

59. We had to complete the Upper Sherman first, which consisted of the access road, parking lot, restroom facilities, and trail. We then had the road alignment of Lower Sherman project and demolition of the old parking lot. Our work had to accommodate buses in the lower area.

60. At the time the NPS received the October 2001 pay estimate, Remcon was carrying lots of additional costs that hadn't been paid for yet and we were struggling. We had incurred in excess of $500,000-$600,000 in work that had been done, but had not been paid for at that particular time. Due to the excessive cost overruns, there just was not enough money to go around at that particular time to pay all subcontractors. Further,

the work of some subcontractors, including California Drilling and Blasting, had not been approved as an extra and incorporated into a modification by October, 2001.

61. In late September, 2001, Bob Russell, Mark Penrose, and I discussed the need for additional Storm Water Pollution Prevention Plan (SWPPP) measures for the upcoming winter shutdown. We agreed that additional measures were needed.

62. I attended the May 14 and 15, 2002 partnering session with the NPS. I understood from the meeting that outstanding design issues and RFIs would be addressed, and that I was to continue to communicate directly with Bob Russell regarding project issues. We discussed with NPS the need to receive full and complete responses to all outstanding RFIs and design questions, and were promised to receive responses. We also discussed the need to receive clear and timely direction from the NPS.

63. I read Steve Christensen's declaration concerning the events that occurred in 2001 and early 2002 before my departure from the project. While I do not have knowledge of the intimate detail that Steve describes, I am aware of all of the events that occurred during my tenure on the project, and affirm that they all happened and caused us both time and money.

I declare under penalty of perjury under the laws of the State of California and the United States of American that the foregoing it true and accurate.

Executed on October 5, 2005 in Oakdale, California.

JEFF NORTHRUP