IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., | ) | DOCKET NO. 03-2478C |
| Plaintiff, | ) | **DECLARATION OF RICHARD MARK PENROSE IN LIEU OF LIVE DIRECT TESTIMONY** |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | (Judge Susan G. Braden) |
| Defendant. | ) | Trial Date: October 24, 2005 |

I, RICHARD MARK PENROSE, declare:

1. I make this declaration as my direct testimony pursuant to the Order of the Court. I have personal knowledge of all matters stated herein and, if called upon to do so, I could and would competently testify thereto.

2. I was Remcon's Superintendent from May, 2001 to August, 2002 for the Sequoia project. As Superintendent, I was responsible for the day to day operations of the crews, equipment, and the field work. I was in charge of the foremen.

3. I have over thirty years of supervisory experience on heavy civil engineering projects and mining operations.

4. I am currently employed by Teichert Construction, working on grading projects.

5. I worked for Sonora Mining in the mid 1990s, and worked on numerous projects involving blasting and excavation.

6. I had two tours of duty with Remcon from 1996 through 2001. In between my two tours, I worked for Peter Kiewit for six to eight months on a fiberoptics project. I have operated numerous pieces of equipment, including dozers, excavators, and loaders.

7. For Remcon, prior to the Sequoia project, I was the foreman on two Turlock Irrigation District projects and the Highway 99 project. These projects involved mass excavation and grading operations. I was also an operator on Remcon's prior project in the Sequoia National Park.

8. I attended the May 22, 2001 pre-construction meeting at the Ash Mountain Recreation Hall at Sequoia National Park. During the May 22, 2001 pre-construction conference, the NPS indicated that the Contracting Officer's Representative, Willie DeOcampo, would furnish Remcon with the details of any proposed modifications including revised plans and specifications if necessary. The NPS also agreed that labor burden percentages would be established at the time the first modification was negotiated, and that the Corps of Engineers equipment rates would be used for all modifications.

9. I understood for this project that Bob Russell, the construction manager hired by the NPS, was to be the on-site field "eyes and ears" of the NPS, inspecting the work of the contractor. During the first year, Bob Russell was the lead inspector, the person in charge on behalf of Jacobs Facilities, the construction manager in the field. I also understood, from direct interaction with Mr. Russell and Mr. DeOcampo, that Mr. Russell was authorized to direct or approve Remcon's work in the field, that he was our main contact on the project, that all communications to the NPS were to go through Mr. Russell, and that we were to comply with his directions.

10. At the preconstruction conference, it was identified that the first order of work in the field on this project would be the marking of trees that Remcon could remove because NPS representatives agreed that trees would be marked prior to surveying by Remcon. The NPS identified what natural resources should be preserved, specifically,

the number and location of the trees and boulders to remain. The key person on the ground once the job started who was tasked with this responsibility was Athena Demetry.

11. After the preconstruction conference, the fieldwork started on June 1, 2001 by Athena Demetry who started to mark trees. Athena Demetry marked virtually all of the trees for removal along the access road on Friday, June 1, 2001 and Monday, June 4, 2001. This work was performed prior to Remcon receiving the Notice to Proceed ("NTP").

12. I recall walking the right of way with Athena Demetry on June 1, 2001 for about two hours while she marked the trees. I did so, along with Greg Kasparek, to familiarize myself with the project site. We had mobilized to the site to start work, but had not yet received a notice to proceed.

13. Ribbons were already on trees when I walked the project with Athena. I did not identify the trees to be marked. Ms. Demetry identified the trees that were to be marked, and I assisted her in physically marking the trees by placing the blue paint on trees which she determined were to be removed.

14. I did not accompany Ms. Demetry when she marked trees on June 4, 2001.

15. I was not going to question Ms. Demetry's decisions on which trees to mark since it was the government's responsibility to mark the trees. During our walk, we had the plans in our hands, and walked areas which ultimately became the access road, lower parking lot, and upper parking lot. The plans designated trees to be saved, and the trees to be removed, and Ms. Demetry appeared to be using the plans to determine which trees to mark.

16. At the time that Athena Demetry was marking the trees for removal, we had not yet received a notice to proceed on this project.

17. While in the field during construction operations, I interacted with Bob Russell on virtually a daily basis.

18. The routine that was followed on this project was that Mr. Russell would visit the work site and monitor/inspect our daily efforts. We regularly spoke about any concerns he may have had, and I orally told him, on a daily basis, of our activities, concerns, issues, planned efforts, problems, and proposed solutions, which we had. Once a week, Bob conducted a scheduled weekly meeting. At this time, we discussed, along with many project participants, including Steve Christensen and Willie DeOcampo, many topics. In general, they included the work activities we were currently performing, the three week look ahead schedules and overall project schedules we prepared and furnished to him (to confirm what we had done, what we were doing, and what we projected we would be performing during a three-week cycle), the problems or issues we had confronted, whether we were waiting for solutions or not, the need for submittals, correspondence, or RFI's to be written or responded to, the extra work being performed, delays, impacts to the job, and other general information. Minutes of those meetings were prepared, distributed, and discussed at subsequent meetings.

19. Following the hauling of the burn pit materials, we planned to perform our mass excavation work which principally consisted of excavation and grading of the access road and the parking lots in the Upper Sherman portion of the project. This effort was scheduled to be a duration of 21 calendar days. Instead, this work was substantially delayed due to the road realignment into the hill and the failure of the government to issue its final design changes to Remcon so that Remcon could complete the work.

20. In June, 2001, we learned that there was a significant discrepancy (up to 15 feet) between Stations 24 and 30 (approximately 600 lineal feet) between the area Remcon had cleared per the clearing of the trees marked to be removed by the NPS, and where the centerline of the road was staked by our surveyor (which I understand was staked where the NPS plans and specifications called for the access road to be constructed). For the road realignment, the survey stakes were set, and it did not appear

that the roadway layout or the new proposed layout for the road really matched the topography of the land.

21. Willie DeOcampo directed us to realign the centerline of the Upper Sherman Access Road in two locations: between Stations 8 and 12, up to a maximum of 11.5 feet; and between Stations 24 and 30, up to 15 feet. We had our surveyors perform this work in July, 2001, and then commenced the excavation and earthwork effort in those locales. The relocation of the access road between station 8 and 12 forced Remcon to perform additional fill and compaction work as the roadway alignment was moving away from the hill. The relocation of the Upper Sherman Access Road centerline between Stations 24 and 30 caused additional earthwork to be performed by Remcon in constructing the Upper Sherman Access Road because it was a cut section, and by pushing the road into the hill (a higher elevation) and not adjusting the vertical elevation of the road, more material had to be excavated and handled.

22. In June and July, 2001, Remcon had on site a new D8 Dozer/Ripper with a single shank which was the piece of equipment we planned to use in conjunction with other equipment, to excavate and fill the entire planned roadway locale to subgrade based upon the Kleinfelder soils report. We started grading the access road on June 26, 2001.

23. At the July 10, 2001 weekly Project meeting, Bob Russell indicated to me and those present that he had sent Remcon's overall 2-year project schedule to Denver and that he should get word back soon. A true and correct copy of the Weekly Meeting Minutes for July 10, 2001 is attached hereto as Exhibit A, and by this reference made a part hereof.

24. On July 10, 2001, Joanne Cody published Upper Sherman Access Road and Upper Sherman Parking Area realignment drawings. A true and correct copy of Ms. Cody's revised realignment for the access road and upper parking lot is attached hereto as Exhibit B, and by this reference made a part hereof. Between Stations 24 and 30, when the center line moved to the left, the access road moved into the hillside as contrasted

with away from the hillside. This is the exact area between Stations 24 and 30 that we later encountered a differing site condition of non-rippable rock.

25. Once the NPS issued the direction to realign the road (Design No. 2), Remcon's surveyor, Guiliani and Kull, returned to the Project and re-surveyed the area with the revised design information. This new design information affected some 600 feet, or 20% of the access road. Along with the change made between stations 8 and 12, the NPS had redesigned 1000 feet of the total 3000 feet of the access road (33% of it).

26. While the road realignment issue was ongoing, we ceased operations in the deep cut area pending new design data from the NPS, and relocated our equipment and began work in the Upper Sherman Parking Area to address the burn pit. The burn pit was located in the upper parking lot area, and contained tree, stump, wood, metal, and ash waste. Per the contract documents, it was supposed to contain 2000 cubic yards.

27. The amount of unsuitable material (debris) encountered in the burn pit ended up being several thousand more yards than the bid quantity. Not only did Remcon have to perform the extra work to excavate out the burn pit of approximately 5,000 additional cubic yards, we had to perform the extra work to backfill the hole created by the additional 5,000 or so yards removed. We had originally scheduled 5 work days for the burn pit excavation work based on the NPS quantity estimate. It took us 27 workdays to perform the work.

28. We removed all of the burn pit material from the park and the extra costs exceeded $300,000. We promptly submitted the trucking receipts and weigh tags from the disposal site relating to the burn pit excavation and hauling that Willie DeOcampo asked for in an August 1, 2001 letter.

29. The excavation and hauling of the burn pit/dump area material, beyond 2000 cubic yards, was extra work, which was performed in June and July, 2001, and increased Bid Item 26 from the specified 2000 cubic yards to be more than 7000 cubic yards. The burn pit hole was three times larger than anticipated.

30. In mid July, 2001, we also uncovered buried material not shown on the plans or addressed in the specifications along the south side of the Upper Parking Lot. The material included metal, old tires, kitchen appliances, car parts, etc., and required us to use additional labor, an excavator, a haul truck, and a D8 dozer to remove the material. In the area of the Upper Sherman project, the excess material had to be removed from an area that had to be built up to be ultimately paved. This area was investigated within a week by the NPS, and we were given direction to perform the extra work of removing the previously undisclosed debris.

31. At this point in time I understood that the NPS acknowledged that excess excavation and material was going to be encountered and handled, and that the process of addressing what to do with it was being evaluated by the NPS. Unfortunately, it took about a year for us to get direction what to do with the excess material, and this delay, and the stockpiles created and remaining in place while waiting for direction, seriously affected our ability to have our work productively performed. This delayed us.

32. Each major phase of the Upper Sherman project, except for the comfort station, had some design revisions that had been given to us during the month of July, 2001.

33. As of July 30, 2001, we had on site a D8 Dozer with a single shank ripper which was being operated and was in good condition. The excavation effort started on the Upper Sherman Access Road at Station 1 and proceeded towards Station 35+50. Because we knew we were going to have to blast the utility trenches and/or the leach field, we had submitted our blasting plan to the NPS and received approval for it prior to the end of July, 2001. On July 30, 2001, we encountered solid rock (not isolated "floaters") that we determined would need to be blasted. Bob Russell was on site and he did not object to our request to blast.

34. Notice was given to the NPS, commencing on July 30, 2001, that blasting would occur because we encountered rock that was not rippable in the deep cut section,

between Stations 25 and 31. Mr. Russell identified our notice in his July 30, 2001 daily log. The subsurface material encountered between these stations was no longer "earth and rippable rock" which could be "ripped" by conventional construction equipment, but rather, had to be blasted. It turned out to be predominately non-rippable rock.

35. From July 30, 2001, my personnel tried to rip the road multiple times daily. We observed the rock was not rippable on July 30th. I saw that we could not rip the rock several times a day when I was on site in July, August, and September, 2001. I was on site daily. On days when blasting was occurring, the primary focus of our work on the Upper Sherman Access Road was to create areas to blast at 4:00 p.m. and handle material from the prior day's blasting. Further, to limit the amount of blasting needed to be performed, and promote the efficient blasting, we used our equipment to expose as much rock as possible. This work was inefficient, but in the long run I believe it saved blasting costs and time.

36. There were quite a few discussions about blasting on-site with Mr. Russell, and blasting was discussed during every weekly meeting from July 30, 2001 through September, 2001. Blasting was discussed during the August 7, 2001 weekly meeting, and NPS and Jacobs employees present agreed that blasting was necessary at the deep cut. At no time during the blasting operations did Mr. Russell or anyone from the NPS tell me that the blasting was not allowed or required, or questioned that the blasting was extra work.

37. I recall that about 5,000-10,000 cubic yards of blasting for the access road and parking lot occurred. Some of the blasted material was hauled to stockpiles to be crushed later (for use as aggregate base and boulder revetment because the NPS did not furnish us with the aggregate base as promised nor were we furnished with the stones to be used as boulder revetment as promised). In some instances, the material was used actually or set aside by the stone mason for work he was going to do. The excess material was taken to the parking lot and the bus turnaround locations, and stockpiled

 1922.001-294618.1

waiting direction. The crushing operation, performed in October, 2001, was undertaken to convert the rock into class two base rock (aggregate base) for the access road and parking lot.

38. California Drilling and Blasting, our subcontractor, blasted and drilled rock in the deep cut area from July 30, 2001 to September 13, 2001 to create the access road. On every work day from July 30, 2001 through the end of blasting the access road in mid-September 2001, we used the D8 Dozer on site to rip rock or attempt to rip rock on the Upper Sherman Access Road between Stations 24 and 30. It was our goal, every day, to rip rock encountered between Stations 24 and 30 if possible as the cost to do so was far less than blasting, and it was much more productive and efficient. Further, we discussed in detail with the blaster, prior to every blast, the depth of the design elevation and the amount required to be blasted. Blasting is not a perfect science, and some minimal over-blasting was and is required (Leaving non-rippable rock, not blasted, in an elevation too high is not an option. Therefore, you must overblast at least a foot or so to make sure you blast what you have to at a minimum). We used the plans and the cut stakes with the elevations noted to determine the depth the blasting needed to achieve. In some instances, where the utility trenches were located, we had them blasted concurrently with the access road. While you can be precise excavating with a dozer, you cannot be precise blasting. It was not our fault that the access road had to be blasted.

39. In my experience, all things being equal, it is faster and a contractor can move more material and be more productive with a D8 dozer than having to drill, put cover, shoot, clean up the isolated areas, go and rip, redrill, shoot, put in cover, shoot it, and remove it. With regular dirt, it is easier to use a piece of equipment and remove it. Blasting, in substance, involves drilling holes to place charges, covering the holes, clearing the site, and blasting. The material then needs to be removed. It cannot be used as backfill or fill as planned without special processing. Remcon was only allowed to blast after 4 p.m. daily.

40. The fact that blasting time was limited caused lost productivity in the ability of Remcon to perform our work because blasting is a very labor-intensive and time-consuming process because you have to drill a hole, fill the hole, cover the hole to prevent materials from flying out and damaging nearby features. Then you have to remove the blasted material and remove and sort it while performing the same process on site again.

41. As a consequence of the excess material to be removed and the lack of direction from the NPS, my operations were severely impacted, resulting in an inefficient use of our labor and equipment and my time, and had an immediate negative impact to Remcon's schedule. At the end of 2001, I believe there was between 15,000 and 17,000 extra cubic yards sitting in multiple stockpiles in the bus turnaround area and parking areas. Until we received direction what to do with this material, and moved it, we could not effectively or completely build and pave the access road and parking areas.

42. The government was aware of our oral and written contentions as to the quantity of excess excavation in both July, August, September and October, 2001.

43. The NPS directed us to bring some of the excess material to Wolverton Point (about 3000 yards), and also directed us to stockpile the bulk of it at the shuttle bus location and parking areas. This was done in the summer of 2001.

44. In August, 2001, in an effort to minimize the effects of the differing site condition, we requested that we be permitted to construct a temporary access road between the Upper Sherman parking area and the shuttle bus/staging area. We got permission and constructed it.

45. Independent of the differing site conditions on the access road and the parking areas, there were a whole series of revisions to the design drawings issued to us during the months of July and August of 2001.

46. Remcon did publish, on a weekly basis, a three-week look ahead schedule which detailed the activities performed the prior week, that week's planned activities, and

the forecasted activities for the subsequent week. The three-week look ahead schedule, presented and discussed at each weekly meeting with the NPS, was used to construct the project as the full project schedule was rendered inaccurate by the absence of NPS action and direction relating to the delay events and extra work requiring direction.

47. The revisions to the Upper Sherman Access Road and raising of the parking area had to be performed by Remcon, in order to address some of the excess material, before Remcon could pave the Upper Sherman Parking Area. As a result of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and the Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation.

48. The NPS did not furnish us with any aggregate base. Starting in September, 2001, Oasis Crushing crushed rock and screening material at the upper parking lot stockpile to convert the material into class 2 base. All of this work was extra and not originally planned.

49. We had to complete the Upper Sherman first, which consisted of the access road, parking lot, restroom facilities, and trail. We then had the road alignment of Lower Sherman project and demolition of the old parking lot. Our work had to accommodate buses in the lower area.

50. In late September, 2001, Bob Russell, Jeff Northrup, and I discussed the need for additional Storm Water Pollution Prevention Plan (SWPPP) measures for the upcoming winter shutdown. We agreed that additional measures were needed. We installed these additional measures.

51. I worked on submittals during off-season from 2001 to 2002. There were delays in starting the 2002 season since there were numerous RFIs unanswered regarding drawings and design.

52. Through the 2002 season, our grading work was delayed in the access road and parking lots as the result of rock removal requirements. We encountered rock formations that required us to use a large excavator with a rock hammer to excavate the rock. This process was unplanned, reduced our productivity, and cost us time and money.

53. In 2002, the dry laid stone wall was relocated from where the construction of the wall was designed. The reason was that trees, not shown correctly on the plans, interfered with the planned wall. Jack Vance and Russell Belknap inspected the conflict and directed that the wall be relocated to not conflict with the tree. The dry laid stone wall was off by 4 feet due to trees in the way. Further, the footing that was to be established for the dry stack wall had to be blasted and excavated, and horizontal alignment was off. These field issues, and the lack of a proper design, led to additional costs incurred by us.

54. On April 22, 2002, I submitted to Willie DeOcampo Remcon's updated Request for Equitable Adjustment ("REA") for earthwork impacts and issues during the 2001 construction season. The amount claimed was $333,308.09, plus overhead and profit. A true and correct copy of our April 22, 2002 claim is attached hereto as Exhibit C, and by reference made a part hereof. I am advised that the NPS never responded in writing to all of these claims, except to reject the form used to submit the REA on July 8, 2002.

55. During the last week of May, 2002, I requested that either Bob Russell or his representatives make time to witness a sample of material being taken out of the undisturbed area in the deep cut in the access road. We offered to have NPS personnel, or its inspectors, witness a sampling of rock from the Upper Sherman Access Road between Stations 24 and 30, but the NPS and its inspectors refused to do so. I was told by Bob Russell that he was not interested in sampling of rock from the cut area and that he was not available.

56. On May 13, 2002, I met with Bob Russell, Terry Lang, Willie DeOcampo and Steve Christensen at the project site to review areas that were blasted.

57. I attended the May 14 and 15, 2002 partnering session with the NPS. I understood from the meeting that outstanding design issues and RFIs would be addressed, and that I was to continue to communicate directly with Bob Russell regarding project issues. We discussed with NPS the need to receive full and complete responses to all outstanding RFIs and design questions, and were promised to receive responses. We also discussed the need to receive clear and timely direction from the NPS.

58. We remobilized to the Project in mid May 2002, following the 2001-2002 winter shutdown. We commenced field work in late May or early June, 2002 when site conditions permitted.

59. On May 16, 2002, I walked the Sherman Tree Trail with Bob Russell, Bob Smith, Luke Triplett, Bob Reinhardt, Bill Houck and Bill Morris to review grades and drainage. Bob Smith of DHM and Bill Morris, of Guiliani and Kull, agreed that staking for the trail was substantially correct. Bob Smith of DHM agreed to review/redesign the drainage and review it with Joanne Cody the following Monday (May 21, 2002) in Denver.

60. On May 31, 2002, I met with Bob Russell, Loren Mangrum, and Luke Triplett, at Jacobs' office to discuss plan revisions of the Sherman Trail, including revised plan sheets T7A and T8A (revised on May 20, 2002), and the Upper Parking Lot. Areas of interest were discussed and mutual understanding of the discussion was reached.

61. In May and June, 2002, we understood that we were to proceed based on the plan revisions received to date. We understood that additional revised plans may be provided regarding the trail. On June 13, 2002, we sent an RFI which inquired into whether we would receive additional revised drawings. We did not receive further revised plans until July, 2002, and as of August 9, 2002, we had caused staking and final

grading on the Sherman Tree Trail to occur in compliance with contract drawings T7 and T8.

62. Despite the lack of response from the NPS on design issues regarding the access road and trail, we did our best to perform other contract work while we waited for responses. On May 31, 2002, we performed work on the Upper Comfort Station. On June 3, 2002, we continued work on the Upper Comfort Station. On June 4, 2002, we continued work on the Upper Comfort Station. On June 5, 2002, we continued work on the Upper Comfort Station. On June 6, 2002, we excavated for CMP pipe and drop inlets in the access road, continued to place drop inlets, continued to excavate for lines from the septic tank and dosing tank, began installation of stone headwall on the east end of the culvert at the access road/Wolverton Road intersection, and continued rock excavation for a drain pipe from drop inlet at Station 5+31, and other work. On June 17, 2002, we worked on the storm drain system and continued digging, laying and backfilling sewer pipe between the dosing tank and leach field.

63. There were numerous design deficiencies which we had brought to the NPS' attention in the fall of 2001 and throughout the winter of 2001/2002 which remained unanswered in May 2002 for the Upper Sherman Access Road/Parking Area, and the Sherman Tree Trail. In 2001, we had previously notified the NPS that the final slope grades had not been completed, and additional earthwork would be needed to meet the designed slope minimums. When we mobilized to the site in May, 2002, we had still not received this information.

64. We issued a series of RFIs in late June 2002 requesting clarification of design deficiencies which remained unanswered. Many of these RFIs focused on how to proceed through the deep cut area, primarily addressing problems with the slopes. True and correct copies of the pending RFIs 59, 61A, 62A, 65A, 66A, in June, 2002 are attached hereto as Exhibit D, and by reference made a part hereof. The lack of response to our design questions was preventing us from performing any productive work on the

project. The access road could not be constructed as we waited for responses to our RFIs, and waited for a new design, and we were waiting for a new design for the Sherman Tree Trail.

65. By June, 2002, we were waiting on new design information for the Sherman Tree Trail which was not definitely provided until early August 2002.

66. We waited many months for a new design for the upper parking lot. We finally received the re-design in late May, 2002. While I was able to negotiate a final price for raising the Upper Sherman parking area with Bob Russell on June 14, 2002, I am advised that we were not authorized to start this work until weeks later.

67. Due to the lack of response to our RFIs, and our continued frustration with the lack of design clarifications, we requested a meeting to discuss these issues, and the NPS sent Mike Giller, the new project manger, to the site on July 10, 2002 to meet with us. Mike Giller walked the site with Steve Christensen and Remcon's lead Project personnel, including myself, to review and discuss the status of the project. After we explained to Mr. Giller the problems we were experiencing in building the access road per the current design, we walked every inch together and pointed out each problem. During the site walk, he directed us to "field fit" the Upper Sherman Access Road to the existing natural features. This was a clear directive for us to undertake our best efforts to make the road fit despite a poor and incomplete project design. We also discussed numerous issues that had arisen on the access road, and Mr. Giller provided and confirmed some field adjustments to the road.

68. As the result of Mr. Giller's directive, Mike Kitchell of Remcon, our foreman, laid out the access roadway alignment using the design staking information provided by the NPS under Design 2, and adjusted the road to fit field conditions per Mr. Giller's directions.

69. By July 25, 2002, we had yet again encountered further problems in fitting the design to field conditions between stations 24+00 and 29+75. On July 25, 2002,

Russell Belknap walked the site with myself and Mr. Kitchell to review the field conditions and determine what could be done in order that Remcon could proceed. I understand that Mr. Belknap told Mr. Kitchell that his field adjustments from stations 1 through 24 were fine, and that he personally directed Mr. Kitchell to make additional changes to the roadway alignment between stations 24+00 and 29+75, including multiple grade and alignment changes.

70. The plans called for a crown on the Upper Sherman Access Road. We built a crown on the Upper Sherman Access Road. As of July 25, 2002, a crown was in place on the Upper Sherman Access Road. The use of the crown created a large vertical cut along the westerly portion of the roadway through the deep cut, and it became quite pronounced along an area of two large boulders.

71. On July 25, 2002, Loren Mangrum and Russell Belknap, along with myself and Mike Kitchell, concluded that the Upper Sherman Access Road, between Stations 24+00 and 30+00, should be super elevated, rather than a crown, to fit the roadway into the rock shoulders and operate more successfully. We had begun raising the upper parking lot, and Russell Belknap, the newly arrived inspector, allowed us to install a super between Station 24 and 30+00 to reduce the cut along the access road. The location of this change is precisely where the differing site condition (rock blasting) was encountered. By utilizing a super, the large vertical slope was reduced, but we were required to place additional fill over the already completed subgrade. Mr. Belknap directed us to proceed with the change from a crown to a super, and the roadway work through the deep cut was performed under his direction and inspection. Eventually, the subgrade was completed, and we were able to begin placing aggregate base.

72. At no time during the extended discussions with the NPS throughout July 2002 (when Remcon was struggling to make progress) did any NPS personnel insist that we follow the original (and unbuildable) design. We were told to make the road fit, and did our best to do so. It was not until much later in the 2002 season that the NPS pulled

the rug out from underneath us by accusing us of not building the road pursuant to the original design.

73. Mr. Russell left the job somewhere between the end of June and early July of 2002.

74. I left the project on August 7, 2002 due to personal family reasons.

75. The government's contention that Remcon was delayed because it had to rework slopes that it contaminated with asphalt material is misleading. The NPS directed us to stockpile the excess material in the shuttle bus parking area which was already contaminated with asphalt debris. By complying with the NPS' directive, the existing asphalt debris contaminated the excess material which was relocated under NPS direction to the shuttle bus parking area. It took us less than a week, with a two man crew, to clean up this very limited contamination and this work did not prevent placement of aggregate base as the NPS was still redesigning the Upper Sherman Access Road.

76. The government's contention that in 2002 we were delayed in placing aggregate base because its aggregate base failed to meet specifications is inaccurate. The first test on the aggregate base stockpile failed because the tester failed to properly sample the existing stockpile. Once a proper test was taken the material passed all test requirements. At not time did the initial inaccurate test prevent us from placing aggregate base since there was only a small portion of required aggregate base material in a stockpile and the balance was being imported from out of the park.

77. At no time during this project did I feel that we lacked adequate resources to properly and timely perform our work.

78. I have read Steve Christensen's declaration concerning the events that occurred in 2001 and early 2002 before my departure from the project. While I do not have knowledge of the intimate detail that Steve describes, I am aware of all of the events that occurred during my tenure on the project, and affirm that they all happened and caused us both time and money.

I declare under penalty of perjury under the laws of the State of California and the United States of American that the foregoing it true and accurate.

Executed on October 3, 2005 in Oakdale, California.

RICHARD MARK PENROSE