IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | DOCKET NO. 03-2478C **DECLARATION OF RICHARD LEWIS IN LIEU OF LIVE DIRECT TESTIMONY** (Judge Susan G. Braden) Trial Date: October 24, 2005 |

I, RICHARD LEWIS, declare:

1. I make this declaration as my direct testimony pursuant to the Order of the Court. I have personal knowledge of all matters stated herein and, if called upon to do so, I could and would competently testify thereto.

2. I have been retained by Remcon to serve as an expert consultant in the instant lawsuit. I have extensive experience in the construction trades, including numerous projects involving rock excavation and blasting procedures.

3. I was active in supervision and management of heavy engineering construction projects from 1958 until my retirement in December of 1997. My education includes a BS in Civil Engineering and a MS in Construction Management from Stanford University. In addition, I am a registered Civil Engineer in California and hold an engineering construction license (Class "A") in California. Attached hereto as Exhibit A and by this reference made a part hereof is a true and correct copy of my CV. A brief summary of my professional experience is outlined below.

4. From 1958-1965, I worked for Granite Construction Company (Watsonville, CA). I was the on-site project supervisor for five highway projects, four of which involved extensive rock excavation, requiring significant quantities of drilling and blasting as well as ripping. Three of the projects were in the vicinity of the Sierra Nevada mountain range, and included similar terrain and conditions to the subject project.

5. I left Granite in 1965, and from 1965 – 1972 started and managed Lewis-Nicolson Inc., a heavy engineering construction company. During this time period, we did various types of construction work, specializing in projects involving rock excavation and rock riprap construction. Those projects included four new alignment roadway contracts for the United States Forest Service, and one new alignment roadway project for the Bureau of Public Roads (now FHWA), all of which were in the Sierra Nevada region. We also constructed four additional highway repair projects for the State of California Department of Transportation. All of these projects involved the excavation of rock.

6. I returned to Granite Construction Company in 1972 as an Area Manager. In 1990, I was appointed Vice President and Assistant Manager of the Heavy Construction Division, retiring in December, 1997. During my second stint at Granite, I was responsible for estimating and managing numerous large dam, roadway, and site excavation grading projects involving rock excavation for various Federal and State agencies and utility companies throughout the United States as noted in my CV. In 1958, when I began my employment with Granite Construction, the company was doing $18 million in gross annual revenue. When I retired, the company had gross annual revenues of over $1.3 billion. This allowed me to gain extensive experience in a large variety of construction projects.

7. While working at Granite I had the opportunity to meet, and work with, Steve Christensen, the President of Remcon. I swiftly observed him, while he was still quite young, to be a bright, energetic and very hard working individual who worked very

well with people and a person who could be relied upon. Over several years I watched (an assisted in) his professional growth and observed his growing maturity and ability and acumen in bidding, scheduling, managing field operations, analyzing plans and specifications, figuring out how to solve problems, negotiations, working with difficult people, and overall project management. Of the many people I worked with over the years, Steve was among those I came to rely upon, and I enthusiastically recommended him to work on the hardest projects and for him to be promoted.

8. When Steve decided to leave Granite to start his own company he did so only after consulting with me. At that time I believed he had matured to possess all the necessary skills to run a heaving engineering construction company, and I supported his decision.

9. Following the formation of Remcon, I was asked to serve on its Board of Directors and I agreed. I was also asked to periodically consult with him when he felt such assistance was required. I always agreed.

10. Between 1996 and 2001, it is my recollection that the overall performance of Remcon, as a growing construction company, was excellent. Not only were projects profitable, but the bonding capacity, was able to be increased to over $7 million for this project. This capacity, in a company only five years old, was an impressive feat which was a product of the success Remcon achieved.

11. I was asked to consult with Steve concerning this project at various times in 2001 and 2002. These included reviewing project records, and site visits. I participated in two negotiations with Steve and Rod Keiscome, the Contracting Officer, and I believe that my personal investment of time, my knowledge of the project, and my experience, validates the factual accuracy of this declaration.

12. In particular, during Steve Christensen's preparation of the estimate for this project, a question arose regarding what to do about the "float" rock as it was impossible to determine a quantity for this. Steve called me concerning this issue and

asked me whether a $30,000 contingency that Steve estimated was, in my opinion, sufficient to cover the floaters based on the content of the soils report. I responded that this amount should be sufficient and a reasonable allowance.

13. I was asked to review and provide a rebuttal opinion regarding certain issues and opinions offered by the government's expert, Capital Project Management, Inc. ("CPMI") and its expert report entitled; Expert Report - Evaluation of Project Delays & Remcon's Certified Claim, Sequoia and Kings Canyon National Parks – Giant Forest, Sherman Tree Parking dated July 27, 2005. I specifically examined the following issues:

- Rippable rock (blasting and excavation issues)
- Supply of Aggregate Base
- Productivity Impact

Documents and information that I relied upon to form the opinions I offer include:

- project plans and specifications (including all addenda)
- geotechnical report
- job site visits
- discussions with Stephen Christensen
- Ray Tuttle deposition

Attached hereto as Exhibit B and by this reference made a part hereof is my Rebuttal Report.

My opinions on these issues are as follows:

14. **Unrippable Rock (Section IV-A-2 of CPMI Report)**

CPMI states the following on Page 50 of its report:

"Remcon alleges that since it now had to handle shot rock instead of rippable rock its costs for earthwork greatly exceeded its estimated costs. In CPMI's opinion, once Remcon drilled and blasted the rock, the effort to excavate this material was no different that if the rock had been rippable. Therefore, in CPMI's opinion, this differing site condition, other than the cost for drilling and blasting, did not materially change Remcon's excavation costs. The

> comparison should be shot rock versus ripped rock, not shot rock versus soil. Therefore, in CPMI's opinion, <u>Remcon is not entitled to additional compensation for excavation, except for drilling and blasting rock, due to the differing site condition</u>."

15. This opinion and conclusion is grossly erroneous and incorrect for various reasons. To begin with, the limited size and scope of the roadway excavations on this project, as well as the configurations of these excavations, must be taken into consideration when evaluating the impact of drilling and blasting on the cost and productivity of the roadway excavation and embankment construction. As a result of restrictions placed on Remcon by the project specifications, Remcon's ability to productively proceed with the drilling and blasting was severely limited. These restrictions limited, as a matter of practicality, the size of the shots to be blasted as well as limited the contractor to a certain period of time (blasting could not commence daily until 4:00 pm.). Physically, this was not a large site and there were adjacent natural resources to protect.

16. If the roadway excavation between stations 24+00 and 30+00 was in fact rippable material, as represented by the contract documents, the excavation face from original ground to subgrade would have moved continuously and without interruption from start to finish in one pass through the cut area. What this means is that the equipment used to excavate, load and haul the material excavated could be operated in an efficient and coordinated manner, which is the optimum method to promote efficiency and minimize costs. This would have allowed the hauling equipment to access the loading equipment and travel to the embankments efficiently utilizing the final roadway subgrade. The fact that a significant portion of this excavation required drilling and blasting significantly changed the character of the excavation and hauling operations from that which otherwise would have occurred if the Kleinfelder geotechnical report with regard to rippability had been correct.

17. Thus, Remcon's blasting was forced to be incremental and limited. Further, because the soils report made a part of the contract documents identified that all material to be encountered in excavating the road, other than isolated boulders ("floaters"), was rippable with conventional construction equipment (a D8 Dozer, which Remcon had on site) the exact location, and extent of, drilling and blasting that ultimately became required, because the excavation was not rippable, was not evident in advance. It had to be determined on a trial and error basis as the excavation work proceeded, and required the contractor to be careful of not affecting adjacent natural resources, and fundamentally changed the planned methodology.

18. As confirmed with Steve Christensen and consistent with good and prudent construction practices, the contractor, on a daily basis, first proceeded through the excavation around the hard rock removing the rippable material wherever it was found (exposing the hard rock requiring blasting). This was done as the cost of ripping, rather than blasting, per cubic yard, was and is significantly less. The unrippable material requiring drilling and blasting remained as an obstacle to the hauling equipment and accessing the loading operation. As the hardrock that was not rippable was uncovered and identified, the excavation of the rippable material had to haul over and around these massive rock formations, thus severely impacting the excavation and hauling operation as it provided for poor access conditions. When each incremental drill and blast section was being drilled, this operation frequently interfered with excavation and hauling operations as these operations occurred along the lineal configuration of the roadway.

19. After a section of the roadway was drilled and blasted, the excavation and hauling of this material had to occur when the drilling equipment was not in the way in order to provide adequate access. On other occasions, when the drilling and blasting interfered with the excavation, the excavation was impeded and required to stand-by and/or jump around to another location. Thus, instead of using a dozer and ripper, loader, and trucks to excavate, load and haul the rippable decomposed granitic material

represented to be encountered, the encountering of granitic rock requiring blasting substantially altered this planned methodology, requiring additional equipment and making the planned work much more incremental and extended. The hourly costs of labor and equipment incurred by Remcon, during this period, did not change. What did change was the volume of earthen material excavated per hour/day. The less material excavated per hour/day, the higher costs per cubic yard incurred, and the greater time it took to perform the work. This translates into lost productivity and higher costs and delays since the contractor was not able to effectively utilize the equipment for all of the hours of each shift.

20. The excavation of the drilled and blasted rock, as well as the rippable rock, often had to operate sequentially, and not concurrently, with the drilling and blasting. As a result, many days of inefficient and restricted roadway excavation resulted in order to allow the necessary drilling and blasting to take place. The unrippable rock required the excavation operations to jump around throughout the area as excavatable material became available. Further, the excavation equipment had to sort out and place fine material to cover over each blast so as to assure that rock throw (spray from blasting) was prevented and adjacent trees were not damaged. All of these factors seriously and adversely affected Remcon's roadway excavation costs and productivity.

21. The blasting of granitic rock of this type in the various irregular rock formations of random depth encountered, which remained after the rippable excavation was removed, resulted in a large amount of oversize boulders/rocks, which in turn required secondary blasting or breaking up by hoe-ram or splitting to reduce the oversize. This required additional labor and equipment to handle and haul the material, which in turn further increased the costs of the roadway excavation incurred.

22. The project, as represented and bid, was essentially a balanced job (with a specified amount to be stockpiled in one locale and another amount to be hauled off-site), meaning that the volume of the roadway embankments utilized the available excavation.

Specification sections 02310 and 02316 provide very restrictive specifications for the maximum rock size that could be incorporated in the embankment. Oversize rocks which were encountered by Remcon required sorting and stockpiling for subsequent size reduction, and subsequently had to be rehandled for placement in the embankment. The labor and equipment costs resulting from the handling and sorting of the oversize rocks encountered far exceeded what would be expected in a rippable rock formation. The actual physical dimensions of the smaller embankment areas further provided practical restrictions necessitating that only small rock be utilized rather than large boulders.

23. In turn, rippable rock material by its nature is fairly uniform in size and does not generate oversize rock that has to be dealt with in excavation or constructing of embankments. This avoids the stop and start of excavation operations which on this project occurred as a consequence of the significant drilling and blasting, and sorting of oversize rock, that was necessitated by the granitic rock encountered. The extended overall duration of the roadway excavation between approximately stations 24+00 to 30+00 (approximately 6 weeks) as compared to a productive ripping and excavation operation (mere days) confirmed that the impact of the hardrock, requiring drilling and blasting, to the roadway excavation (i.e. the differing site condition), was enormous and caused both delay and significantly increased costs.

24. Therefore, the conclusion of the CPMI report, that Remcon's costs and productivity were not materially affected by the encountering of the rock, is absolutely inaccurate. It is either a contrived conclusion or a product of lack of knowledge.

25. Another point which was not addressed in the CPMI report is that rock requiring drilling and blasting will provide greater swell in the embankments (often 20% to 30%) compared to the ripped rock which by its nature more uniform and will not swell as much, if at all (that is 1 cubic yard of excavation will come close to making 1 cubic yard of embankment). Because drilling and blasting was required, there was a great

increase in the amount of excess material that could not be used in the embankments and had to be re-handled and moved off site.

26. The impact of the blasting operations and excavation was confirmed in Mr. Tuttle's deposition, in which he confirmed that the blasting increased the time and cost for the rock excavation. This testimony is from the project's civil engineer, and validates this rebuttal report and undermines the CPMI report.

27. **Aggregate Base (Section IV–B1 of CPMI Report)**: Contract plan sheet 4, reference G3 clearly states; "The aggregate base course for this project is stockpiled in this general area. (Note arrow pointing to upper park area). The contractor will be responsible for moving this material to accommodate construction sequencing. This work shall be included in the general site excavation and grading task." This is reaffirmed by Addendum No. 1.

28. The significance of this language is that it supports the contractor's reasonable assumption that all aggregate base ("AB") material needed to be placed on the job was stockpiled on the project site, available for use and the costs to import (buy) or make (crush) the base rock on site was not necessary. Rather, the costs to haul the material from the stockpile and place it in the roadway as planned was all that was required.

29. Remcon had every right to assume this aggregate base will be available for use on the project, particularly under these circumstances under which this project was bid – during the winter conditions. Whether the contractor's estimate did or did not provide a contingency sum in its estimate for securing aggregate base from an alternate source is irrelevant to its entitlement to receive the benefit of this warranty by NPS. As represented in the contract documents, the NPS should compensate the contractor for the full actual costs of supplying the AB for this project, as the representation and warranty in the plans and specifications proved to be false: virtually no AB was provided by the government and all of it had to be purchased and imported from off-site.

30. **Impact to Productivity** Projects like this, with limited scope and quantities of work, will be seriously impacted and disrupted when changes and revisions are allowed to interfere with the momentum and continuity of the work that was originally shown to be performed in the contract documents. This will disrupt construction sequencing and require continual adjustment of operations. Plan revisions and changes caused by differing site conditions or delays in response to RFI's, or changes in quantities from those originally planned, are all examples that result in disruptions which seriously adversely impact the productivity and work schedule. As stated above, serious, adverse impacts and affects to labor and equipment productivity occurred and were experienced by Remcon due to the many changes and differing site conditions experienced, and for CPMI to discount or disregard these facts and their impacts demonstrates the flawed reasoning in its report. In my opinion, this project had sufficient amount of these types of impacts to account for the severe cost overrun and serious loss of productivity and delays that occurred. The result was that there has been a total change in character of the work from that originally contemplated in the contract documents, and the resulting costs are compensable.

31. **Maladministration** During my 40 year career, virtually all of my professional experience was on public works projects. I dealt with "the good, the bad, and the ugly." As a contractor, "time is money", and every day I was productive meant I had a chance to meet our budget. The ability to do so was extraordinarily influenced by the accuracy and completeness of the contract plans and specifications, and the competency, ability, cooperation, and timely conduct by the Owner and Owner's Representatives (inspectors, construction managers, contract administrators, etc.). Construction projects, to be successful, require cooperation and timely response in addressing issues which arise, and when such issues arise which only the Owner can resolve, it is incumbent upon the Owner (through its project team) to efficiently and competently do so.

32. In my personal experience, based on what I observed, read and witnessed, including during the negotiation meetings with the NPS, I must honestly qualify this project as one of the "ugly" ones. While the NPS personnel I encountered were personable, their failure to act, and the content of their actions when they got around to acting was and is shocking. As a contractor, I expect the Owner to handle its responsibilities timely and in an even handed manner. When extra work was necessary, and delays or problems experienced, I expected that upon notice the Owner would promptly investigate, analyze and evaluate, and then respond. If there were impacts, direction to address them would be swiftly communicated and modifications for extra time and money promptly negotiated and issued. This never happened on this project.

33. When I met with Mr. Keiscome in June, 2002, and again in August, 2002, it was clear to me that not only did he lack the technical expertise to discuss the engineering and construction issues involved in the claims that were outstanding, but he was not prepared, via staff present, to do so. It was clear to me that his staff had not timely or completely advised him of project events and/or their impacts, and as a result he was, in substance, receiving some information during our meetings for the first time. There appeared to be a significant lack of communication, as well as candor, among the NPS staff and Mr. Keiscome. The NPS had not seriously reviewed the materials presented or the site conditions. Indeed it was and is my observation that the NPS personnel were overwhelmed by the issues presented and seemed unable to resolve them. The differing site condition on the access road is the most extreme example. I never previously encountered an Owner who, like an ostrich, simply buried its head in the sand, in response to a differing site condition claim.

34. In the meetings it was so clear that the NPS knew something had happened but had failed to recognize the changes and the resulting impacts. As a result, they were ill-prepared or equipped to timely address the issues, let alone address them at all. After I realized this fact I suggested to the Contacting Officer a way out – to issue

part one of a two part modification. Part one would be issued unilaterally for at least the amount of money and time recognized, to both provide relief to Remcon from carrying the financial burden due to the changes and acceleration it was experiencing, while giving the NPS more time to evaluate the full impact of the issues. This was presented by me as a "win-win" proposal. Mr. Keiscome agreed that he had the authority to do so, that it made sense, and that he would consider doing so. Nevertheless, he failed to take such action to mitigate the financial impact on Remcon.

35. I am of the belief that most of Remcon's damage claims could and should have been addressed and resolved in a timely manner during the project. The NPS' failure to do so is inexcusable, and is a direct cause of the litigation. The NPS' multiple failures to timely address the claims presented by Remcon was absolutely unacceptable and unconscionable, and can only be characterized as maladministration.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing it true and accurate.

Executed on October 4, 2005 in Escondido, California.

RICHARD LEWIS