IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, | DOCKET NO. 03-2478C |
| v. | **DECLARATION OF MIKE KITCHELL IN LIEU OF LIVE DIRECT TESTIMONY** |
| UNITED STATES OF AMERICA, Defendant. | (Judge Susan G. Braden) |
| | Trial Date: October 24, 2005 |

I, MIKE KITCHELL, declare

1. I make this declaration as my direct testimony pursuant to the Order of the Court. I have personal knowledge of all matters stated herein and, if called upon to do so, I could and would competently testify thereto.

2. I have worked in the construction field for 35 years. My experience includes earthwork, grading for roadways, excavation and backfill for underground utilities and concrete. I was a licensed ICBO inspector in California, and worked for Kleinfelder as an inspector in the 1990s.

3. I began my employment with Remcon in 1997. Initially, I started as a gradesetter on the Turlock Irrigation District's Tuolumne River project, which was located in La Grange, California. I was then promoted to the position of haz-mat (environmental remediation) foreman. My duties included the scheduling of manpower and equipment, scheduling and working with subcontractors, the ordering of materials,

scheduling the transport of contaminated materials, and meeting with owners and public officials regarding permits.

4. Remcon performed numerous environmental projects throughout California. A few of the larger projects were: the Fort Hunter Liggett Landfill which involved the excavation, relocation and grading of an existing landfill; the Presidio of Monterey Project which included the removal and disposal of existing underground fuel tanks, the removal and disposal of an oil-water separator, the demolition of an existing building including all concrete slabs and foundations, and final site grading; and the Fort Ord Building 68 Project which included the removal and disposal of contaminated soils, the demolition and removal of the building, and final site grading.

5. In 2000 and 2001, I worked as a project superintendent on the Limesaddle Project in Oroville, California. The project was a large campground project for the California Department of Water Resources (DWR), and my duties included overseeing the clearing and grubbing, all earthwork (cuts and fills), sub-grade preparation, and the placement and finishing of aggregate base. There were numerous design problems on this project which were a result of defective plans and specifications. As a result of these design problems, I worked closely with DWR personnel and Remcon's surveyors, Giuliani and Kull, to make field revisions that would match the existing natural features and terrain.

6. In fall 2001 and winter 2002, after the Limesaddle project I was a Project Foreman on the Porter Creek Slide Repair Project. Then in the spring of 2002 I was assigned the Project Superintendent position for the Interstate 80/Trout Creek Project in Truckee, California. Both of these project involved extensive earthwork as it relates to road construction.

7. I was assigned to the Sherman Tree Parking Project ("Project") on July 15, 2002, and worked on the project through October 2002. It was my understanding that the Project was having many of the same design issues that the Limesaddle Project had

experienced and that Remcon had been directed, by NPS personnel, to field fit the access road and parking lots to the natural features. This was the same type of conditions that I had worked under on the Limesaddle Project and Steve Christensen, Remcon's President, felt my experience was needed to help move the work along. I started as the earthwork foreman, but became the project superintendent after Mark Penrose left the project in early August 2002.

8. When I came to the job, the rough grading was not complete on the access road and parking areas, but the utilities had generally been installed. Normally, utilities are not installed until sub-grade is complete. I came to understand that as a result of the NPS' defective plans and specifications, numerous design changes, and delayed responses to Remcon's Requests for Information, Remcon went ahead and began the installation of the waterline and electrical conduit. This ultimately contributed to additional work having to be performed by Remcon to lower lines, which had been previously installed.

9. When I first walked the job on July 15, 2002, I was told by Luke Triplett and Mark Penrose, Remcon's Asst. Project Manager and Project Superintendent, that the access road and parking lots as designed in the original plans did not fit the existing topography and natural features. There were numerous impediments to constructing the road as originally designed. These impediments included: trees which were improperly located on the plans and conflicted with the access road and parking lot design, rock boulders which the NPS designated to be saved, and slopes which if constructed as planned would impact trees and natural features. I also understood that due to the lack of response to our RFIs, and our continued frustration with the lack of design clarifications, the NPS had sent Mike Giller, the new project manger for the NPS, to the site on July 10, 2002, and that Mr. Giller had directed us to "field fit" the Upper Sherman Access Road to the existing natural features. I confirmed this direction by reviewing a letter which had been sent to the NPS from Remcon on July 11, 2002, which confirmed Mr. Giller's

direction to "just make it fit". A true and correct copy is attached hereto as Exhibit A and by this reference made apart hereof. I undertook the task of trying to make the road fit per Mr. Giller's directions.

10. Between July 15 and July 25, 2002, I worked on making field adjustments to the access road between Stations 1 and 24. I tried to make the road fit by laying it out using the design staking information provided by the NPS and adjusting the roadway to fit field conditions. I personally worked with Remcon's gradesetter to make the field adjustments for the access road realignment. Attached as Exhibit B to this declaration, and by this reference made a part hereof, are true and correct copies of my daily notes from July 15-25, 2002, which detail my efforts.

11. On July 25, 2002, Russell Belknap (the NPS' new field inspector who had just arrived on the project July 22, 2002) and I walked the access road to review the field conditions and alignment changes I had made between approximately Stations 1+50 and 24+00. Mr. Belknap said the adjustments made up to Station 24+00 were functional and reasonable, and thought we did a good job. Attached as Exhibit C to this declaration, and by this reference made a part hereof, is a true and correct copy of Mr. Belknap's Daily Log of Construction for July 25, 2002, which details this discussion and his findings. Additionally, attached as part of Exhibit B to this declaration is my personal diary for July 25, 2002 which confirms Mr. Belknap's discussions and findings.

12. By July 25, 2002, we had encountered problems in fitting the field conditions between Stations 24+00 and 30+00, the area known as the "deep cut". This is the location where I understand the roadway was realigned into the hill and the differing site condition (rock blasting) was encountered. Between Stations 24+00 and 29+75, there was a two and a half vertical cut by design from staking that was leaving an exposed slope. The plans called for a crown on the Upper Sherman Access Road. The use of the crown in the deep cut created a large vertical cut along the westerly portion of the roadway and it became quite pronounced along an area of two large boulders.

13. On July 25, 2002, Loren Mangrum and Russell Belknap (the NPS' on-site inspectors), along with myself and Mark Penrose, evaluated this problem and concluded that the Upper Sherman Access Road, between Stations 24+00 and 30+00, should be super elevated, rather than crowned, to allow the road to fit the rock shoulders and operate more successfully as well as to save two signature type boulders along the slope. Mr. Belknap directed us to proceed with the change from a crown to a super, and the roadway work through the deep cut was performed under his direction and inspection. Attached as Exhibits C and D to this declaration, and by this reference respectively made a part hereof, are true and correct copies of Mr. Belknap's and Mr. Mangrum's Daily Log of Construction reports for July 25, 2002, which detail and confirm this direction. Additionally, attached as Exhibit B is my personal diary for July 25, 2002, which also confirms this direction.

14. The effort to save these two signature type boulders, which were in the deep cut at approximately Station 28+00, had been a safety concern of Remcon's and was so address in our RFI No. 42. Remcon was concerned that these two boulders would eventually fall from the slope and end up on the access road.

15. After repeated warnings to the NPS' on-site representatives, the NPS determined that Remcon was correct, the two boulders were a safety concern. On September 16, 2002 the NPS directed Remcon to remove the boulders and to change the roadway back to a crown. Exhibit E is a true and correct copy of Russell Belknap's Daily Log of Construction which documents the direction given to Remcon to remove the boulders at Station 28+50 and is attached hereto and made a part hereof.

16. Remcon removed the boulders on September 20, 2002. Mr. Belknap recorded this work in his Daily Log of Construction for September 20, 2002 and made special note that "it was some of the best excavation equipment work I have ever seen". Exhibit F is a true and correct copy of Mr. Belknap's Daily Log of Construction and is attached hereto and made a part hereof.

17. Once the boulders had been removed Remcon was then required to remove the roadway super, which had previously been constructed, and return it back to a roadway crown. Remcon notified the NPS that this was extra work, Remcon performed it.

18. On July 31, 2002 we were required to make additional changes to the intersection of the Sherman Tree Access Road and Wolverton Road as a result of a defective design. The entrance of the access road off of Wolverton Road would not fit based on the radius that was identified on the project plans. On July 31, 2002, I met with Russell Belknap and Joanne Cody to discuss this design problem. Mr. Belknap asked that I lay the road out for Joanne Cody to look at it. Based on my layout, Mr. Belknap and Ms. Cody recalculated the radius for the entrance, and it was a one foot difference in the center line. We were then directed by Ms. Cody and Mr. Belknap to fit the field conditions. Mr. Belknap affirmed this direction to adjust the entrance as well as the acceptance of the realignment changes in his Daily Log of Construction report dated July 31, 2002 a true and correct copy of which attached hereto as Exhibit G to this declaration, and by this reference made a part hereof.

19. In early August 2002, the NPS requested that we provide survey data for the access road as built. We had our surveyor return to the Project and survey the entire access road. The new survey data was sent to the NPS in Denver on August 14, 2002.

20. During a meeting on August 22, 2002, we notified the NPS that immediate survey design direction was needed for the Upper Sherman Access Road. The NPS responded that final control layout would be provided to Remcon's surveyor, Giuliani and Kull, no later than the first few days of the week of August 26. Late in the afternoon on Friday, September 6, 2002, Giuliani and Kull finally received the new survey control points for the access road. We had Giuliani & Kull again lay out the road. In most instances, only minor extra work was required to meet the latest design requirements other than in the deep cut.

21. I continued to work extensively on readjusting the alignment of the access road with Russell Belknap throughout August, September and October 2002. The changes being made to the roadway alignment were based on the directives and changes provided by the NPS. Attached hereto as Exhibit H and by this reference made a part hereof, are true and correct copies of Russell Belknap's and Loren Mangrum's Daily Log of Construction reports which document the direction and changes.

22. Due to the continuing grade adjustments on the access road and parking areas in July through September, 2002, which were caused by poor design documents and multiple directives from the NPS for us to make field adjustments, we had to perform additional fine grading activities to already placed and finished aggregate base. This extra work caused us time and additional money.

23. At no time during the multiple discussions with the NPS' inspectors in July, August, and September 2002 (when we were struggling to make progress) did any NPS personnel insist that we follow the original (and unbuildable) design. We were told to make the road fit, and did our best to do so. It was not until later in the 2002 season that the NPS accused us of not building the road pursuant to the original design.

24. In September, 2002, I received super elevations data from the NPS so that the road could be surveyed and staked. Until the super elevation data was provided by the NPS, we could not complete the Upper Sherman Access Road grading, and this restrained completion of placement of aggregate base and paving.

25. As weather became an impediment to completing paving operations (paving can only occur within certain temperature ranges), we were forced to wait for the following 2003 construction season to complete paving operations.

26. By the end of the 2002 construction season, we were able to place two of three lifts of paving on the Upper Sherman Access Road and the Upper Sherman parking area. However, activities such as restoration, signage, and other minor items could not be completed. The final changes to the Upper Sherman Access Road allowed paving

operations to commence October 7, 2002. Starting paving this time of year presented problems, as we were only allowed to pave the temperature was 50° F and rising, which severely restricted the working time available to pave. Nevertheless, we were able to place two of the three lifts of paving required before the winter shutdown.

27. The government's contention that Remcon was delayed because it had to rework slopes that it contaminated with asphalt material is misleading. The stockpile of excess material in the shuttle bus parking area was already contaminated with asphalt debris. I understand that by complying with the NPS' directive as to where to place the stockpiles, that asphalt debris contaminated the excess material which was relocated under NPS direction to the shuttle bus parking area. It took us less than a week, with a two man crew, to clean up this very limited contamination and this work did not prevent placement of aggregate base as the NPS was still redesigning the Upper Sherman Access Road.

28. Further impacted our ability to effectively work on the project was the lack of information being received on the Sherman Tree Trail. When I arrived on the Project in mid July I was told that design changes were being made to the trail and in general the trail work was on hold.

29. As of August 9, 2002, we had caused staking and final grading on the Sherman Tree Trail to occur in compliance with contract drawings T7 and T8. Changes to the trail design were part of the Upper Sherman area that had to be finished before the transition to the Lower Sherman could occur.

30. I was aware at this time that the NPS had issued revised trail drawings, which were entitled T7A – T8A. These sheets were to replace the previous T7 – T8 project plans. In mid August I was involved in discussions concerning pricing for a modification, based on these revised plans, for the trail which had been issued by the NPS.

31. In mid August 2002, Steve Christensen met with representatives of the NPS at the project site and negotiated a pricing change for the additional work as required by the revised project plans. A price was agreed upon and work was prepared to start pending issuance of a contract modification for this work. Apparently the NPS did not issue this modification until November 2002, after the 2002 work season was over. The failure on the part of the NPS to issue this modification sooner prevented the trail work from being completed and pushed the Upper Sherman work into another construction season.

32. In addition to the need for the modification our surveyors had found that a major excavation problem existed which was forcing a sharp drop off and that the trail needed to be re-routed. This is confirmed in Loren Mangrum's daily report for September 20, 2002, a true and correct copy of which is attached hereto as Exhibit I and by this reference made a part hereof.

33. In 2002, the dry laid stone wall was relocated from where the construction of the wall was designed. The reason was that trees, not shown on the plans, interfered with the planned wall. The NPS did not want to remove the trees that interfered with the dry-laid stone wall. Jack Vance and Russell Belknap inspected the conflict and directed that the wall be relocated to not conflict with the trees. The dry laid stone wall was off by 4 feet due to trees in the way. Further, the footing that was to be established for the dry stack wall had to be blasted and excavated, and horizontal alignment was off. These field issues, and the lack of a proper design, led to additional costs incurred by us.

34. At no time during this project did I feel that we lacked adequate resources to properly and timely perform our work.

35. I have read Steve Christensen's declaration concerning the events that occurred in 2002 while I was on the project. While I do not have knowledge of the intimate detail that Steve describes, I am aware of all of the events that occurred during

my tenure on the project, and affirm that they all happened and caused us both time and money.

I declare under penalty of perjury under the laws of the State of California and the United States of American that the foregoing it true and accurate.

Executed on October 3, 2005 in Sacramento, California.

Mike Kitchell
MIKE KITCHELL