IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | DOCKET NO. 03-2478C<br>**DECLARATION OF ROBERT LONERGAN JR. IN LIEU OF LIVE DIRECT TESTIMONY**<br>(Judge Susan G. Braden)<br>Trial Date: October 24, 2005 |

I, ROBERT LONERGAN JR., declare:

1. I was and remain a superintendent for California Drilling and Blasting ("CD&B"), which was a subcontractor to Remediation Constructors, Inc. ("Remcon"), Plaintiff in this action, on the Giant Forest Sherman Tree Parking Area, Project No. SEKI-200Q ("Project"). I make this declaration as my direct testimony pursuant to the Order issued by the Court. I have personal knowledge of all matters stated herein and, if called upon to do so, I could and would competently testify thereto.

2. After graduating from high school in 1975, I attended Modesto Junior College for one year and then Cal Poly San Luis Obispo for 1 ½ years. I did not obtain a degree.

3. While attending Modesto Junior College and Cal Poly, I worked during the summers for two very large earthmoving and civil engineering construction companies (Guy F. Atkinson and S.J. Grove) as a powder helper and chuck tender. All of this work concerned blasting. As a powder helper, I worked on the powder crew and

carried powder. As a chuck tender, I helped the driller with the holes and set up steel for blasts.

4. After leaving school, I worked for various construction companies and at all times my primary duties concerned performing drilling and blasting work as a powder helper and chuck tender.

5. In 1981, I became a driller. As a driller, I read cut stakes, laid out cuts and patterns, and drilled holes for dynamite. I was also fully responsible for my piece of drilling equipment.

6. In 1986, I became licensed as a powderman by the state of California and my license has remained active and in good standing at all times since. I am also licensed as a powderman in the state of Nevada. I was promoted to powderman foreman as a result of obtaining my license. As a powderman foreman, I was responsible for all aspects of blasting and was the lead man on the crew on the projects I worked on. I worked as powderman foreman from approximately 1986 to 1998.

7. In June of 1987, I started working for CD&B. In 1998, I was promoted to the position of Superintendent. As Superintendent, I oversaw anywhere from four to five jobs at a time.

8. Since 1977, I have been performing drilling and blasting work in a variety of settings, including dams, tunnels, road excavation, housing pads, mountain excavation, structures, underground excavation, and ditch lines.

9. While most of my drilling and blasting knowledge has been gained through hands-on experience, I have attended some seminars over the years to learn about new drilling and blasting systems and techniques.

10. In 2001, it is my understanding that CD&B put a bid into Remcon, as well as other prospective bidders, and was awarded the job by Remcon when it was awarded the contract by the National Park Service. When our bid was accepted, my supervisor asked me to go oversee the job.

11. Prior to July 30, 2001, Remcon requested that CD&B bring the drilling and blasting equipment to the job site. As a general rule, CD&B likes to have its equipment on site at least a couple of days ahead of time.

12. CD&B's drill was dropped off at the project site on July 30, 2001. CD&B drilled in the deep cut area of the access road for approximately 1 ½ hours that day but then had to stop to make some repairs.

13. On July 30, 2001, I met CD&B's manager for northern California at the job site in the Sequoia National Park.

14. During the days that drilling and blasting were occurring on the access road, CD&B usually had three men on-site performing the work. This consisted of a driller, a powder helper, and myself, the project superintendent. This crew of three men was sufficient to keep up with the pace of drilling and blasting that was necessary on the project.

15. From July 30, 2001 to September 13, 2001, the daily routine was that Remcon would try to rip an area in the deep cut area of the access road and, if it could not be ripped, then it would show CD&B where it needed to blast. I personally observed Remcon trying to rip the material on the access road many times with its construction equipment.

16. Remcon was constantly working ahead of CD&B so that it would be able to tell CD&B what areas couldn't be ripped and needed to be blasted. CD&B didn't know what areas it would need to blast until Remcon got to each area and tried to rip it first or dig it with an excavator.

17. The same general procedure was used for blasting on the access road, the utility trenches, and the leach field. On a typical day on-site, CD&B would begin by laying out the pattern of the holes in a grid formation, using a pole to mark where they would go. The depth and diameter of each hole was determined by how hard the rock was, what natural resources surrounded the area to be blasted, and the design elevation

we needed to reach. Most holes had a diameter of 2 ½ to 3 ½ inches. Prior to CD&B laying out the grid, Remcon had set out cut stakes which had numbers on them to tell CD&B the depth that it needed to blast that particular area. Remcon's foreman, Mark Penrose, told us how big of an area needed to be blasted and Remcon would sometimes even paint the cuts on the ground. The areas to be blasted varied greatly in size and depended on whether Remcon had been able to rip or excavate a particular area or not.

18. CD&B used the same equipment for all areas of blasting. It also sometimes used jackhammers/hand drills. CD&B's main drill was a Gardner Denver 300. This drill is generally used for drilling 2 ½ inch to 4 ½ inch holes and is standard for this type of job. Remcon's cut stakes, or areas painted by Remcon, told CD&B how deep to drill the holes.

19. While layout and drilling was taking place, Remcon was typically working all around CD&B.

20. CD&B loaded the charges according to the density of the rock present and the presence of nearby trees or other natural resources. For example, for a 3 inch hole, CD&B would place roughly 2.48 pounds of charge per foot of hole. The charge used was ammonium nitrate with a Class A as a primer. It was important for CD&B to be efficient and not undershoot, thereby necessitating another shoot of the same area, but, at the same time, keep the blasting sufficiently contained so as to not damage nearby trees or other natural resources. When drilling, it is necessary to drill beyond where the ultimate target grade is. This is referred to as "subdrill." The exact depth of subdrill depends upon the pattern and depth of the holes to be drilled. However, generally the subdrill is about 2-3 feet below the target grade.

21. Once the holes were drilled and loaded, Remcon was responsible for using an excavator and a loader to cover the areas that had been loaded with clean dirt material to protect the surrounding areas from the blast. This was a very time consuming process but was necessary to protect the park's surrounding natural resources.



1918.001-294103.1

22. Remcon was always ready to start covering once the charges were loaded. CD&B never had any problems with coordination with Remcon.

23. The cover material was clean material that had been stockpiled on the job. There was never an issue with Remcon not being able to get clean cover material.

24. Once the area to be blasted had been totally covered, I would then talk to Remcon's foreman, Mark Penrose to see if Remcon was ready for CD&B to shoot. If Remcon was ready to shoot, we used two-way radios to put men (both CD&B and Remcon's) in position to make sure that the area remained clear during the blast and that no bystanders entered the blast area. Remcon could not be in the area during loading of the blast holes and had to clear all equipment from within 200 feet or more of the blast area before loadingcould begin.

25. CD&B would then blast the holes. This could only be done approximately 1-4 times per week because some areas were so big that CD&B needed a couple of days of drilling before we could blast. At least 75% of the time, blasting was in the afternoon. CD&B was often ready two to three hours prior to this time. When this happened, CD&B often went on to the next area and started prepping and layout in that area for the next day. However, once the loads were put in the holes, at least one person from CD&B had to stay at the blast site at all times until the blast occurred.

26. A blast typically breaks up the area of rock down to about one foot below the target grade. This extra foot of blast is necessary in order to allow the contractor to excavate out the rock down to target grade.

27. Typically, CD&B would blast a 1,500 to 3,000 square foot area at one time, plus 150 to 250 feet (linear) of ditch line or boulders.

28. The amount of area blasted varied because some cuts were deeper than others, some areas were larger than others, and because of limited access to the areas to be blasted.

29. The material blasted on the access road was all solid rock. There was no variation in the quality of the rock, only the depth. There were seams throughout the blasted areas, ranging from six inches to two feet. However, the rock was hard top to bottom

30. After the blast occurred, I checked the area to make sure that all of the loads went off.

31. After I gave the "all clear," it was then up to Remcon to remove the material. I didn't generally evaluate how much of the rock was actually blasted, or how deep the blasts actually reached unless called back to a particular area by Remcon.

32. From July 30, 2001 to September 13, 2001, CD&B drilled and blasted mostly the access road. CD&B moved on-site on July 30, 2001 and the first blast occurred on August 2, 2001. From July 30, 2001 to September 13, 2001, CD&B blasted on the access road on 14 separate days. CD&B charged Remcon $213,746.90 for blasting the access road. CD&B was paid for this work by Remcon's surety on June 11, 2003.

33. From September 19, 2001 to October 9, 2001, CD&B blasted in the utility trenches. Between September 19, 2001 and October 9, 2001 CD&B blasted on 11 separate days. On October 22, 2001, CD&B blasted for the sewer line. On October 23, 2001, CD&B blasted for an electrical vault. CD&B charged Remcon $65,319.82 for blasting the utility trenches, sewer line, and electrical vault. CD&B was paid for this work by Remcon's surety on June 11, 2003.

34. The drilling and blasting of the leach field occurred from October 10, 2001 to October 18, 2001 and took place on four separate days. CD&B charged Remcon $27,273.75 for blasting the leach field. CD&B was paid for this work by Remcon's surety on June 11, 2003.

I declare, under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed on October 4, 2005 at San Jacinto, California.

ROBERT LONERGAN, JR.