IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., | ) | DOCKET NO. 03-2478C |
| Plaintiff, | ) | **DECLARATION OF CARL DAMOUDE IN LIEU OF LIVE DIRECT TESTIMONY** |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | (Judge Susan G. Braden) |
| Defendant. | ) | Trial Date: October 24, 2005 |

I, CARL DAMOUDE, declare:

1. I have been retained by Remcon as an expert to provide testimony regarding surveying regarding the subject matter of this lawsuit. I have personal knowledge of the following and if called to testify could and would completely testify thereto.

2. I have been engaged in the land surveying and civil engineering profession since 1977, and am currently licensed as a land surveyor in the States of California (LS 7612) and Montana (12210 LS) and as a professional civil engineer in the State of California (C 60632). My past surveying experience includes performance and oversight of construction staking in both the private and government sectors.

3. Seasonally, from 1977 to 1980, I was employed by the United States Forest Service under various work programs. During that engagement, I worked on a survey crew performing design and construction surveys. I am familiar with the appropriate survey methods needed to execute a survey of the type undertaken on the

project Remcon was performing and have an insight into the federal government procedures related to design and construction.

4. Since my change to the private sector, I have continued to practice both as a land surveyor and a civil engineer and am competent to render an opinion on land surveying and civil engineering as it relates to current standard practice and standard of care.

5. I have personally met with Steve Christiansen, the plaintiff, and Jesse Stanley, William Morris and William Kull, all of whom are affiliated with Giuliani & Kull, the surveying subcontractor that performed the construction layout on the project. I have conducted interviews of these parties in an effort to learn the facts surrounding this matter, and have read the declarations (and attached exhibits) of Mr. Morris and Mr. Stanley.

6. Correspondence between these parties and the government representatives has been produced for my review. I have reviewed the project plans and specifications and revisions thereto, e-mails between the parties, Daily Logs of Construction, technical data files, both hardcopy and electronic drawings, portions of the depositions and the certified claim served by Remcon to the NPS in 2003. Specific documents that form the basis of my opinion are cited in, and/or attached as exhibits to, this declaration.

7. I was asked to evaluate and render an expert opinion on the questions and issues listed below. I prepared an expert opinion report, dated July 25, 2005, which identified my expert opinions for this matter. The opinions issued in that report mirror the opinions offered in this declaration. My testimony is based on the following items:

A. Was the experience and qualifications of Mr. Jesse L. Stanley and Mr. William D. Morris sufficient to execute the contracted work consistent with the requirements of the project plans and specifications?

B. Did Messrs. Stanley and Morris utilize state of the art surveying equipment that was properly maintained and calibrated and was of the appropriate nature for the type of surveying performed?

C. What is the normal standard of practice, procedure and methodology for executing surveys of this nature?

D. Was the normal standard of practice, procedure and methodology for executing surveys of this nature employed by Messrs. Stanley and Morris on this project?

E. Did Messrs. Stanley and Morris execute the field surveying in conformance with the project plans, specifications and local practice and standard of care?

F. What did the construction layout of the access road between Stations 24+00 and 30+00 disclose?

G. What is the normal method and reasonable standard of care used to establish clearing limits for tree and brush removal?

H. Did the NPS personnel exercise the normal method and reasonable standard of care when marking the trees to be removed?

I. Was the layout of the access road and parking areas timely and accurate?

J. Who was responsible for the accurate production of design information for use by the field surveyors?

K. Who was responsible to transfer the design information to a reference point on the ground for use by the contractor?

L. Was the design information furnished by the NPS for the access road and parking areas substantially accurate other that the issue regarding the cleared trees?

M. Was the trail design accurate?

N. Was field engineering of the Sherman Tree Trail performed in a timely and accurate manner and not a contributing cause to the delay of the project?

O. Did the contractor perform field engineering to a reasonable standard of care thereby enabling the construction of the facilities within substantial conformance to the approved plans or modifications thereof?

My testimony addressing these questions is as follows:

8. Question No. 1

Was the experience and qualifications of Mr. Jesse L. Stanley and Mr. William D. Morris sufficient to execute the contracted work consistent with the requirements of the project plans and specifications?

Opinion

Yes, the experience and qualifications of Mr. Jesse L. Stanley and Mr. William D. Morris was sufficient to execute the contracted work consistent with the requirements of the project plans and specifications.

Basis and Reasons

Construction surveying is defined as 'Field Engineering' under Section 01720 of the Project Specifications. Licensure or registration by a state board is not a requirement of the specifications.

Mr. Jesse L. Stanley and Mr. William D. Morris, the responsible personnel who headed this project for Giuliani and Kull, the subcontractor hired by Remcon to perform all surveying work, were both holders of valid registration as Licensed Land Surveyors in the State of California at the time of project construction. A licensed Land Surveyor in the State of California may perform construction surveying that by definition, "Locates.... establishes,... the alignment or elevation for any of the fixed works embraced within the practice of civil engineering..." Messrs. Stanley and Morris were deemed qualified by the State of California to perform such construction surveying through examination and

qualifying experience. My personal interview of them confirmed that they are competent and qualified.

Article 1, Section 415 of The Rules of the State Board for Professional Engineer's and Land Surveyors require that "A... land surveyor... shall practice and perform engineering or land surveying work only in the field or fields which he/she is by education and/or experience fully competent and proficient". Mr. Stanley had approximately 36 years of land surveying experience during the project construction and is a certified technical expert appointed by the Board for Professional Engineers and Land Surveyors. A true and correct copy of the resume of Mr. Jesse Stanley is attached hereto as Exhibit A, and by this reference made a part hereof.

9. Question No. 2

Did Messrs. Stanley and Morris utilize state of the art surveying equipment that was properly maintained and calibrated and was of the appropriate nature for the type of surveying performed?

Opinion

Yes, Messrs. Stanley and Morris utilized state of the art surveying equipment that was properly maintained and calibrated and was of the appropriate nature for the type of surveying performed.

Basis and Reasons

The surveyor utilized state of the art survey equipment of similar nature to equipment that is routinely utilized for similar surveying activity and considered the standard of practice. The main field surveying instrument was a digital readout utilizing electronic distance measuring. A hand-held field computer, referred to as a data collector or survey instrument controller by those in the survey profession, was used to make field calculations and perform the construction layout in the field. Point coordinates provided by the NPS on the project plans were hand inputted by G&K office staff into an

electronic data file using office surveying software. All of the survey equipment employed for the project was adequate for the purpose it was intended.

Periodic field checks of the survey instrument were performed by measuring known base lines as a reference check. The dates and records of the base line checks are recorded in a field book kept by Mr. Jesse Stanley. Based on Mr. Stanley's records, the survey instruments were in proper repair and calibration.

10. Question No. 3

What is the normal standard of practice, procedure and methodology for executing surveys of this nature?

Opinion

Construction surveying for civil engineering works of this nature consist of generally three major components. They are (1) survey control and design data, (2) rough grading and (3) finish grading and utilities. On some projects two additional components are (4) quantity surveys and (5) As-built surveys.

The first step in the construction survey is to set or recover survey control points for use in making the field measurements. Coordinates of previously set control points, monuments or other physical markers are related to the coordinates of the civil engineering works. A critical step in the survey control phase is to verify that the coordinates of the survey control points fit within reason between themselves and the design coordinates of the civil engineering works.

The normal procedure is to perform field measurements between the control points and then compare the data with the data provided by the engineer. Any discrepancies are then reported to the engineer for clarification. It is not uncommon for the surveyor performing the construction layout to be different from the surveyor performing the initial survey used for design. This check is necessary to ensure continuity between the surveyor and the engineer.

Design data is provided by the engineer in hardcopy format in the form of plans and in electronic format in the form of data files, electronic drawings, spreadsheets, etc. The data thus provided is converted or input directly into an electronic format and then downloaded into the field computer.

The second step is to provide layout for rough grading operations. Typically the order of construction dictates that clearing limits, borrow sources, stockpile locations, temporary staging areas, etc. be set as an aid to the contractor to begin work.

Minimal stakes are set during the clearing and grubbing stage because such stakes are subject to destruction as a result of the clearing process. Clearing limits may not even be staked but may instead be marked with flagging for economic reasons. The purpose of locating the clearing limits is to preserve valuable resources by identifying only what areas need to be disturbed. Once the clearing limits are identified on the ground it is customary to protect resources just outside the clearing limits with fencing and protective barriers.

After the clearing and grubbing is performed, the project is typically slope staked. Slope staking identifies the major cuts and fills on the project. The purpose of the slope staking and rough grade staking is to provide sufficient information for the contractor to bring the construction site to rough grade. Rough grade is the point where utility work can proceed and where final grading for paving, curb and gutter, sidewalks, etc. can begin. The change to finish grading is usually marked by a change in the type of equipment being utilized on the site. For instance, large bulldozers with rippers, scrapers, compactors and blasting drill rigs are replaced with graders and dump trucks for spreading road gravel and excavators for underground utilities.

The third step is to provide layout for finish grading and utilities. Construction staking at this stage is generally executed within a closer tolerance. The finish grading of the final paving requires more accuracy to prevent undesirable drainage or cosmetic

problems. Typically finish grade staking includes finish pavement, curb, gutters, sidewalks, underground utilities, retaining walls, stairs, building, etc.

Throughout the construction staking process various markers are used at various times to provide the construction information. The markers vary from a flag tied to a tree, to indicate that the tree stays, to nails set in the pavement for providing reference points for pavement striping. The points are typically temporary. In some instances, permanent monuments are set for later work.

Construction information is conveyed to the contractor primarily on the companion stake to the marker. The stake is readable from an equipment operator's position on a heavy construction machine. In addition to the stake, it is customary and usually required to keep a record of all points set and the cut or fill to the design feature in the form of a tabulated document called a cut sheet. The cut sheet records such information as the date, point number, elevation, cut or fill, station, and any other comments. The cut sheet becomes part of the construction record and in the case that there are lost stakes or errors in construction it can be consulted to help determine the locations or potential cause.

One of the additional steps sometimes required is quantity surveys. Bid items can be based upon surveyed quantities because estimates during design can be unreliable when field conditions are not completely known. Examples of quantity surveys are for estimating import from a borrow source or for construction of temporary fencing to protect natural resources.

As-built surveys may be required after construction to document the final conditions for future reference. The as-built surveys are almost always incorporated into a set of record drawings for filing.

Basis and Reasons

The normal standard of practice, procedure and methodology for executing surveys of this nature is based upon the local standard of care. The methods and

procedures are based upon those employed by other equally qualified practitioners performing similar surveys on similar projects within the geographic region.

The contract in this case required performance of (1) survey control and design data, (2) rough grading and (3) finish grading and utilities. Also, on this project quantity surveys were required. Notably, providing staking or flagging for clearing limits for tree removal was not required under this contract.

11. Question No. 4

Was the normal standard of practice, procedure and methodology for executing surveys of this nature employed by Messrs. Stanley and Morris on this project?

Opinion

Yes, the normal standard of practice, procedure and methodology for executing surveys of this nature employed by Messrs. Stanley and Morris on this project and I could find no fault or mistakes in their work.

Basis and Reasons

Messrs. Stanley and Morris generally followed the local practice, procedures and methodology when executing their work.

A survey control check was performed prior to the start of construction layout and found that the survey control coordinates provided by NPS on the drawings were accurate enough to provide subsequent construction layout. Design coordinates were taken from the plans and hand-input onto the electronic data files for use in the field computers.

The construction layout generally followed the normal construction sequence. During rough grading, when it was discovered that the design data supplied by NPS did not fall in the area cleared by NPS, the surveyors properly and immediately reported the problem to NPS staff. It must be noted that the NPS staff did not perform any surveying to accurately establish the clearing limits before tree marking commenced.

In my personal opinion, especially given the precious nature of the resources and that protection of them is an essential element of the National Park Services' ("NPS")

mission, the failure of the NPS to survey the forest prior to marking trees was and is inexcusable, and a serious error.

Cut sheets were properly prepared and forwarded to the appropriate NPS representative. Additional surveying information was provided to NPS when requested.

The surveyor followed the standard of practice required by the contract but, because Remcon was terminated, all aspects of the project (and thus the surveying) were not completed, including final quantity surveys.

12. Question No. 5

Did Messrs. Stanley and Morris execute the field surveying in conformance with the project plans, specifications and local practice and standard of care?

Opinion

Yes, Messrs. Stanley and Morris executed the field surveying in conformance with the project plans, specifications and local practice and standard of care.

Basis and Reasons

The project specifications under field engineering (Section 01720) have several specific requirements for the execution of work. Relevant requirements will be discussed separately as follows:

1.1(A)-"Contractor shall use monuments shown on the plans." NPS survey control points are tabulated on Sheet US29 of the project plans and were used as the basis of survey control by the contractor. A true and correct copy of the printout of survey control point coordinates used as the basis of the survey control is attached hereto as Exhibit B, and by this reference made a part hereof. A field-check of the control point coordinates was conducted by the surveyor prior to the commencement of construction layout. A true and correct copy of the raw survey data file of the field check between control point coordinates is attached hereto as Exhibit C, and by this reference made a part hereof. The field check is not required by the project specifications but was employed as a routine quality assurance practice as part of local practice and standard of

care. Adjustments to the coordinates of the control points were not necessary as a result of the field check.

1.1 (A) (1) "The Contractor shall submit his staking plan..." A "Construction Staking Work Plan" was prepared by the contractor and submitted to the contracting officer or his representative prior to the commencement of construction layout. No exceptions were taken by NPS to the work plan as submitted. A true and correct copy of the Construction Staking Work Plan prepared by Giuliani & Kull is attached hereto as Exhibit D, and by this reference made a part hereof.

1.1 (A) (2) "Points set shall be ... durable enough to withstand instabilities..." Reference stakes consisted of wooden ginnies with a reference lath. The form of the construction staking was specified in the approved work plan and is consistent with local practice and standard of care.

1.1 (A) (3) "Points set shall be identified with guard stake marked with the station number, cut or fill... and any other identifying labels to distinguish its purpose." Reference lath (guard stakes) were set with the station and a cut or fill to the design surface or feature being controlled. The form of the construction staking was specified in the approved work plan and is consistent with local practice and standard of care.

1.1 (A) (4) "All guard or marker stakes shall have their point identification written on the backside." Reference lath (guard or marker stakes) were set with the point number written on the backside. The form of the construction staking was specified in the approved work plan and is consistent with local practice and standard of care.

1.2 (C) "...the Contractor shall furnish... all other records relating to the survey or to the layout of the work to the Contracting Officer." Cut sheets were prepared and forwarded to the Contracting officer for his review after the completion of layout. The cut sheets were typically sent via fax under a cover sheet and listed the station, elevations, cut/fill and remarks for each of the points set. The form of the cut sheets was specified in the approved work plan and is consistent with local practice and standard of care.

13. Question No. 6

What did the construction layout of the access road between Stations 24+00 and 30+00 disclose?

Opinion

The construction layout of the access road between Stations 24+00 and 30+00 disclosed that the area cleared was in a different location than the location provided for on the plans and that the difference was not the result of faulty surveying.

Basis and Reasons

An error became apparent when the rough grade staking was in progress. As the areas of the cut and fill were established per the plans on the ground, the location of the access road per the plan did not fit within the swath of trees previously cleared between approximately Stations 24+00 and 30+00. The survey control had been previously checked and found to be accurate. There then became two possible causes for the difference, namely, the clearing as directed by the NPS was in error or the staking by G&K was in error.

A possible error by G&K was eliminated by rechecking the construction layout leaving the only possible source of the error to be by the NPS when they incorrectly marked the trees for clearing. This conclusion is supported by the NPS issuance of Modification No. 4 which compensated Remcon for having Giuliani & Kull re-survey the road, in this locale, in the area where the tress were removed, as extra work.

14. Question No. 7

What is the normal method and reasonable standard of care used to establish clearing limits for tree and brush removal?

Opinion

The normal method and reasonable standard of care used to establish clearing limits for tree and brush removal varies depending on the sensitivity and value of the local natural resources encountered on a construction site. In this instance, the normal

method and reasonable standard of care used to establish clearing limits for tree and brush removal was to perform preliminary field surveying to establish the approximate extents of the road construction.

Basis and Reasons

NPS management policies direct NPS managers to "avoid the construction of... roads... that will cause unacceptable impacts on park resources and values". The NPS is required to protect valuable natural public resources such as the trees and boulder features in the project area. These features are collectively referred to as "Natural Features" in Section 01351 the project specifications.

Per the contract documents, high value has been placed on these natural features and the contractor can be assessed monetary penalties for causing damage to natural features. Given the value so placed on the natural features, it was imperative that only the minimum number of trees and boulders should be removed. Failure of the NPS to provide some kind of preliminary construction layout defeats the purpose of this objective, and the NPS is solely responsible for the mistake it made.

Even in non-NPS projects it is usual and customary to provide preliminary construction layout to identify clearing limits in areas of high value timber and other scenic resources.

15. Question No. 8

Did the NPS personnel exercise the normal method and reasonable standard of care when marking the trees to be removed?

Opinion

No, the NPS personnel did not exercise the normal method and reasonable standard of care when marking the trees to be removed.

Basis and Reasons

NPS did not ascribe the appropriate value to the resources being removed and proceeded with marking trees for removal without the benefit of preliminary construction layout. The trees to be removed are shown on the construction drawings. When it was discovered that the NPS had marked the trees in error, an attempt was made to alter the location of the road design instead of clearing additional trees in the originally planned area. This implicit admission of the value of the natural features leads one to the conclusion that the NPS should have exercised greater care in their attempts to locate the trees for removal.

Further, the NPS directed the contractor to initiate a re-design of the affected portion of the road alignment. G&K surveyed the cleared area and proposed an alternate route even though the alternate design was outside of the scope of the contract, and forwarded it to the NPS for review. After some modifications, the NPS returned the final design data for the realignment to G&K for staking in the field. This extra work was recognized as outside the scope of the contract and paid for by the NPS in Modification No. 4 and is another admission of fault by the NPS for improperly locating the clearing limits.

16. Question No. 9

Was the layout of the access road and parking areas timely and accurate?

Opinion

Yes, the layout of the access road and parking areas timely and accurate.

Basis and Reasons

The layout of the access road and parking areas was performed pursuant to the schedule. Construction layout for the access road commenced during the week of June 25, 2001. The NPS clearing error was discovered immediately and the surveyors, following a request by the NPS, provided the NPS with updated alignment data within one week on July 2, 2005 via fax to Bob Russell, the lead inspector. NPS provided G&K updated information on July 11, 2001. Within one week, on July 16, 2001, the surveyors

returned to the field to stake the revised design. The intervals between getting or receiving data and performing field surveying are not excessive.

The fact that a redesign for the portion of the access road between stations 24+00 and 30+00 was requested by NPS substantiates the fact that the clearing was directed to be performed in an improper (or at least unplanned) location. Had the clearing been directed in the correct location, but the staking been in error, the only solution needed would have been to correct the staking.

17. Question No. 10

Who was responsible for the accurate production of design information for use by the field surveyors?

Opinion

The NPS was responsible for the accurate production of design information for use by the field surveyors.

Basis and Reasons

The preparation of civil engineering improvement plans falls under the responsibility of an adequately qualified licensed civil engineer. The project was a design-bid-build project. This delivery method does not include the contractor in the design and engineering phase of the project and he bears no responsibility for the accuracy of the construction documents.

18. Question No. 11

Who was responsible to transfer the design information to a reference point on the ground for use by the contractor?

Opinion

The surveyor, a subcontractor of the contractor, was responsible to transfer the design information to a reference point on the ground for use by the contractor and I found no error or fault in the execution of his work.

Basis and Reasons

Section 01720 of the project specifications states that the contractor is to provide construction layout. If apparent errors are found in the drawings or initial stakeout the contractor is to notify the contracting officer immediately. This section does require that the surveyor perform quality control on the engineer's data.

19. <u>Question No. 12</u>

Was the design information furnished by the NPS for the access road and parking areas substantially accurate other that the issue regarding the cleared trees?

<u>Opinion</u>

In most instances, the design information furnished by the NPS for the access road and parking areas was substantially accurate other that the issue regarding the cleared trees and some changes to the grading in the parking lots as a result of tree locations improperly shown on the plans. However, there were many locations of design mistakes or dimension busts, and these are documented in the project records.

<u>Basis and Reasons</u>

Construction layout was generally able to proceed and the project was, in many areas, able to be constructed generally according to plan. Other than the six hundred foot clearing mistake caused by the NPS, the majority of the field problems encountered centered on the desire to preserve the trees and rock outcrops where possible, but this did hinder the contractor's work because of dimension busts. Preservation of natural features was a goal of the project and resulted in numerous changes to fit the access road and parking lots within the areas available between the natural features. These alterations to the design necessarily required additional time and costs to perform construction layout.

20. <u>Question No. 13</u>

Was the trail design accurate?

<u>Opinion</u>

No, the trail design was grossly inaccurate which led to a redesign that caused additional survey work and delays.

Basis and Reasons

Once construction layout commenced on the trail, it became apparent that there was a problem with the design. The grading concept was to have minimal impact and few drainage features by allowing the trail to drain using sheet-flow surface drainage as much as possible. Some flow into trailside ditches was necessary. By inspection, when the trail was cut to subgrade it was apparent that the trail would be depressed. G&K checked their field data and found it to be accurate and forwarded it to NPS.

The trail layout began during the week of July 30, 2001 and fully 13 and one-half months elapsed from the time that the construction layout commenced until the time that the NPS provided revised plans and an executed contract modification to correct their design errors. Thus, it was not until August, 2002 that the design "finalized" and then it took three months, until November, 2002, for Modification No. 5, incorporating the trail re-design, to be issued. The data referenced and attached to the declarations of Messrs. Morris and Stanley, substantiate this fact.

21. Question No. 14

Was field engineering of the Upper Sherman Tree Trail, access road and parking areas performed in a timely and accurate manner and not a contributing cause to the delay of the project?

Opinion

Yes, field engineering of the Upper Sherman Tree Trail, access road and parking areas was performed in a timely and accurate manner and was not a contributing cause to the delay of the project nor was it a cause of the extra work alleged to have been performed by Remcon.

Basis and Reasons

Field engineering of the trail was scheduled to commence on the week of July 30, 2001. Failure of the NPS to provide the finished grades on the approved plans resulted in an e-mail correspondence on July 30, 2001 at 8:08 a.m. from Bill Morris to Andrea Lind

of DHM, one of the third- party designers, requesting finished grade elevation data to complete the construction layout of the trail. The contractor showed initiative and diligence when he proposed that the construction layout could proceed without the elevation data and that the stakes could be set without affecting the survey schedule and marked later. Subsequent to the construction layout of the trail, the existing ground elevations were sent to NPS for review. It was not until May 09, 2002 that Robert Smith of DHM provided a summary chart showing the revised trail elevations via an email dated May 9, 2002 at 11:18 a.m.

As evidenced by the Daily Log of Construction dated May 16, 2002, a site walk of the trail was conducted on May 16, 2002. During the site walk, the trail grades were reviewed and "Bob Smith and Bill Morris agreed that staking for [the] trail was substantially correct." This admission as to the NPS' opinion of the correctness of the contractor's field engineering was further documented in an email from Willie DeOcampo dated May 29, 2002 at 2:24 p.m. (Additional design changes were later issued).

22. Question No. 15

Did the contractor perform field engineering to a reasonable standard of care thereby enabling the construction of the facilities within substantial conformance to the approved plans or modifications thereof?

Opinion

The contractor performed field engineering consistent with the requirements of the contract documents and in accordance with the applicable reasonable standard of care requirements thereby enabling the construction of the facilities within substantial conformance to the approved plans or modifications thereof. As-built surveys performed by NPS contractors confirmed that the construction was in substantial conformance to the approved plans or modifications thereof.

Basis and Reasons

Field engineering, or construction staking, is the basis for the location of the civil engineering works on the ground. Accurate field engineering enables the contractor to construct the civil engineering works "according to plan." Therefore, accurate field engineering followed by close adherence to the layout during construction will result in civil engineering works being constructed closely to the design locations and grades, otherwise referred to as "according to plan". The ultimate test of the accuracy of the field engineering and construction comes in the form of an as-built survey. The as-built survey is performed subsequent to the construction of a civil engineering work to verify the constructed location of the civil engineering work relative to the design locations and grades.

An as-built survey of the project was conducted by Psomas at the direction of NPS during 2003. The as-built survey information was overlayed on the original design drawings for comparison. The as-built survey indicates that the actual locations and grades of the constructed civil engineering works fits reasonably well within the design locations and grades. There are minor differences between the two data sets but none that are grossly inconsistent with the original design intent or approved modifications thereof.

I declare under penalty of perjury under the laws of the State of Oregon and the United States of America that the foregoing is true and correct.

Executed this _7_th day of October, 2005 at Sheridan, Oregon.

Carl Damoude

CARL DAMOUDE