IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | DOCKET NO. 03-2478C<br>**DECLARATION OF TINA ERICKSON IN LIEU OF LIVE DIRECT TESTIMONY**<br>(Judge Susan G. Braden)<br>Trial Date: October 24, 2005 |

I, TINA ERICKSON, declare:

1. I make this declaration as my direct testimony pursuant to the Order of the Court. I have personal knowledge of all matters stated herein and, if called upon to do so, I could and would competently testify thereto.

2. Starting in 1982, my first job out of high school was for Advanced Logic Systems, a computer software company in San Jose, California, in their accounts receivable department. I worked there until 1986.

3. From there, I went to Race Street Fish & Poultry where I worked as a credit manager until 1991.

4. From 1991 to 1996, I was a collection manager for Central Valley Credit Union in Modesto, California.

5. I was affiliated with Remcon since December of 1996. I left Remcon in December of 2002.

6. In 1996, my title at Remcon was Controller. I had that same title through December 2002 when I left.

7. I always worked in Remcon's main central office, which was located in Oakdale, California. Remcon's accounting and financial documents were located at the main central office.

8. I was the Controller. This was not a corporate officer. As Controller, I oversaw all the financial and accounting transactions in the office. My job responsibilities were to oversee all the office functions, cashflow, the accounting, payroll, accounts payable, profit and loss statements, and accounts receivable. I worked closely with Steve Christensen on these duties, as well as Remcon's outside auditor. I was also responsible for maintaining Remcon's computer accounting and financial files, and routinely reviewed, updated, and printed accounting and financial reports from our accounting software system. From 1996-2002, we used Construction Partner as our accounting software system. Typical reports that I maintained, revised, developed, and printed included general ledgers, job cost reports, payroll reports, vendor reports, and check registers.

9. Remcon's financial institution from the late 1990s until 2001 was Bank of America. Remcon then transferred its accounts to Morgan Stanley Dean Witter later in 2001. In the second quarter of 2002, Remcon transferred its accounts to Oak Valley Bank. Remcon had general and payroll checking accounts at these respective financial institutions.

10. I am familiar with the Sequoia Kings Canyon National Parks Giant Forest project. I do not recall the scope of work but recall that it was a construction project with the federal government and National Park Service.

11. I received and reviewed daily time cards for Remcon employees related to that project. The purpose of the time cards were to record who was on the project, which item of work they were performing, how many hours they worked to be paid, and what equipment and materials were on site.

12. Remcon's accounting system was designed so that all the job cost information for the jobs was generated through the payroll system. Remcon's standard job costing system was utilized during the entirety of its work on the project in 2001 and 2002.

13. I also received invoices from subcontractors and suppliers for the project. Under my oversight, our accounts payable persons matched the invoices to the delivery receipts or subcontract, if it was a subcontractor's invoice, and routed it for approval to Project Management or Steve Christensen. After that, they were inputted into the accounts payable computer program for payment. Once the invoice was inputted for payment and when it was ready to be paid, I reviewed them again to make sure that they were correct, matched the delivery receipt to the invoice (for materials), and then would approve them for a check to be issued. Our accounting program allowed us to prepare and print out reports which clearly identified the invoice dates and numbers, and when and how payments were made to these vendors.

14. For subcontracts, Remcon's subcontract reads that the contractor is paid when Remcon is paid as the general contractor. Therefore, if Remcon had not been paid

on the project, the subcontractor would not get paid. I was responsible to verify that Remcon had been paid for an item of work prior to authorizing payment to the subcontractor.

15. It was Remcon's policy that no payment would be issued to a subcontractor if they had not complied fully with Remcon's subcontract agreement. This included the following: signed subcontract agreement, valid insurance in the amount specified, valid workers compensation, compliance with Remcon's safety and drug program, up-to-date certified payrolls, and other requirements from the subcontract.

16. I matched invoices using our code system. Remcon cost coded all activities and invoices, and when the invoice came in from the subcontractor it was coded to the line item code for that job, and for that specific item of work, so that told me what work they performed. Then, when Remcon would receive payment from the NPS, I would match the two items' line item codes, and I would know that that work was performed and had been paid by the NPS.

17. On this project, there were issues regarding nonpayment or late payments by Remcon to subcontractors, suppliers, or vendors. I was generally aware of these. My job duties entailed me becoming involved in attempting to resolve those issues, including receiving several calls relating to issues of alleged nonpayment.

18. When I received such calls, I would research why an invoice had not been paid. I would first verify that the work had been performed and, if there was an invoice in Remcon's accounts payable accounting system, then the work had been acknowledged by us as having been performed. Then I would go to Remcon's accounts receivable to find out if that item of work had been paid for by the Park Service.

19. If the NPS had paid Remcon, I would speak directly with Steve about the circumstances. I was concerned about this because I always wanted Remcon's bills to be paid on time by the NPS. While I cannot recall any specific conversations, I do recall I expressed my concern to Steve Christensen several times by saying, "Steve, we have some vendors that need to get paid. I can't pay them. I haven't been paid." Mr. Christensen would agree with me when I brought up the issue but I can't remember exactly what he said. I knew that my instructions were to try to collect the accounts receivable so that I could pay the accounts payable.

20. I do not know why payments on our bills and extra costs were not being made on time. I just knew that there wasn't the money there to pay.

21. I did not, at any time, intentionally receive funds from one job to pay another. If the cash was there in the account and somebody really needed to get paid, then I would do my best to get them paid.

22. The funds from the various projects were all placed in one bank account because Remcon maintained only one checking account. The payments to all suppliers, vendors and subcontractors on all projects were paid out of the same bank account. From 2001 through 2003, these accounts were held at different times at Bank of America, Oak Valley Bank and Morgan Stanley Dean Witter.

23. The nonpayment of a subcontractor after payment by the government is not typical of the way Remcon did business.

24. I knew that Steve Christensen was handling the nonpayment issue with California Drilling & Blasting so I did not get concerned.

25. My leaving at the end of 2002 had nothing to do with these nonpayment issues.

26. I signed pay estimate No. 6, dated November 21, 2001.

27. I understand that, by signing the certification, I was certifying that any funds received from the Park Service that were received as receipts were applied to vendors for the same project. I believe that the certification for pay estimate No. 6 was correct.

28. I also was certifying that payments would be timely made from the proceeds of the payment covered by this certification. I believe that when payments were received from the NPS, any related payables were paid, and any payments related to the request of payment in pay estimate No. 6 would be paid.

29. I have never had any substantive discussion regarding these certifications with either Mr. Christensen or anyone else.

30. I signed the certification for Pay Estimate No. 8 on June 30, 2002.

31. I signed the certification for Pay Estimate No. 9, dated July 31, 2002.

32. I signed the certification for Pay Estimate No. 12, dated October 31, 2002.

33. After looking at those certifications and having a chance to review the correspondence, I still stand by those certifications. I felt that the related payables that needed to be paid were paid.

34. The project manager, or possibly the foreman in the field, if they ordered materials, were ultimately responsible for determining whether the work was performed and paid from the NPS was related to the invoice.

35. As part of my responsibilities, I had to familiarize myself with the payment application and timing process in order to make sure that I did whatever I needed to in order to get myself in a slot timely for getting an application in for payment.

36. Once a payment application went into the NPS, the government had to timely pay Remcon within 14 days of the payment application being submitted.

37. On January 9, 2002, I spoke with Terry Lang of the NPS and she stated that the payments were running three to four weeks behind and that late payment interest would be paid.

38. I believe that Remcon did receive late payment interest.

39. Up through October of 2001, I was aware that Remcon claimed that in addition to performing contract work it also performed extra work.

40. There were job costs accounting system entries set up to note when billings were being made for extra work as contrasted with original base scope. This would be in each payment application.

41. The process that Remcon followed with respect to receipt of invoices from subcontractors and vendors on other projects was the same process that was used on this project.

42. There were no special procedures for this project in Remcon's accounting methodology.

43. Aside from this project, it is my recollection that Remcon's cash flow was sufficient to pay current all of Remcon's obligations on its other projects. To the best of my knowledge, no funds received from the NPS were used, at any time, to pay any individual or entity for invoices or claims unrelated to this project.

44. On this project, the cash flow received from the government payments to Remcon between April 2001 and December 2002 was not sufficient to cover all of the invoices that Remcon received, and obligations Remcon incurred, concerning this project.

45. I did hear from Mr. Christensen, more than once, that he believed that the government was not promptly issuing modifications on this project. I recall that this was impacting Remcon as our income from the project was far less than our expenses.

46. I recall Steve Christensen being frustrated by the lack of what he perceived was the timely processing of change orders on this project.

47. I did communicate to some of the vendors who claimed that they hadn't been paid on this project the reason that they hadn't been paid was because Remcon hadn't been paid. I got this information not only from the accounting system but from information through my interactions with Steve Christensen.

48. There were certain requirements that I needed to follow before I could issue payment to a vendor or subcontractor. I needed to check that there was a fully signed subcontract in the file, that there were insurance certificates up to date and timely.

49. There was at least one instance where a subcontractor did not deliver back to Remcon a fully signed subcontractor or insurance certificate. This did restrain payment.

50. As the Controller for Remcon, I was intimately familiar with all accounting and financial records and reports, and how these records were filed and stored in hard copies and on the computer system. I understand that a listing of Remcon's accounting records, which support Remcon's costs and damages in this case, is attached

as Exhibit A to the Declaration of Steve Christensen as testimony at the time of trial. I have reviewed this list (Exhibit A), am familiar with the reports and documents identified in the list, and recognize that the reports and documents identified in Exhibit A are from the files maintained by Remcon during the course of the project and were kept in the course of our regularly conducted business activity. I have reviewed Remcon's job cost, payroll, vendor, and general ledger reports, as identified in Exhibit A to Mr. Christensen's declaration, and can verify that the reports are outputted from Remcon's computer system used on this project, and accurately detail costs and transactions relating to the project.

51. I assisted Steve Christensen in preparing the June 28, 2003 Certified Claim, including assembling and verifying the costs to support the claims, and preparing summary spreadsheets and daily extra work sheets. This process included reviewing time cards, payroll records, accounting reports, invoices, weigh tickets, and other source documents. The accounting and financial documents that were submitted in support of the claims were maintained in Remcon's business office, and the spreadsheets presented in the claim, which summarized these documents, are accurate summaries of the business records maintained by Remcon relating to this project.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing it true and accurate.

Executed on October 10, 2005 in Oakdale, California.

TINA ERICKSON