IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | ) | DOCKET NO. 03-2478C **DECLARATION OF BRENT BOOTH IN LIEU OF LIVE TESTIMONY** (Judge Susan G. Braden) Trial Date: October 24, 2005 |

I, Brent Booth, declare:

1. I am an individual retained as an expert witness on behalf of Remediation Constructions, Inc. ("Remcon") in the litigation referenced above. I have personal knowledge of the following and if called to testify could and would competently testify thereto.

2. I have been retained to offer expert opinions concerning Remcon's bid/proposal for the subject project.

3. I retired from Granite Construction in 1996 as its Assistant Branch Manager and have served as a Consulting Engineer on construction projects from 1996 to date. My construction experience started in 1958 and constitutes almost 40 years of successfully bidding and managing all types of construction projects. A summary of my professional experience is set forth in my resume, a true and correct copy of which is attached hereto as Exhibit A and by this reference made a part hereof. I have not

published any articles in the past ten years and the names of the cases in which I have testified in the past four years are set forth in my resume which is attached.

4. Included in my experience has been the bidding and management of several mountain projects including the Emigrant Gap and the very difficult Soda Springs Highway Interstate 80 projects for Caltrans and, while working for Granite, I bid and managed several FHWA mountain projects. Early in my career I worked on several mountain projects during the summer and have been involved on mountain work from an early age, as this was my father's work.

5. I reviewed the following documents to arrive at my opinions and comments:

- Remcon Bid estimate dated April 18, 2001
- Geotechnical Investigation Report dated September 11, 2000 by Kleinfelder
- NPS project plans and specifications
- NPS Sherman Tree Summary of Bids based on best and final offers (spreadsheet)
- Project Photographs

6. This approach to estimating used by Steve and myself is as follows:

- Study the plans and specifications including performing quantity take-offs. Clarify any questions/ambiguities in the documents with the owner.
- Study the materials/soils report if available, walk the project, and dig test holes if at all possible.
- Classify the excavation work as to common excavation, rippable rock excavation, or blasting. If possible, quantify each type of excavation.
- Analyze each item of work to put together "spreads" of labor and equipment and the duration needed to accomplish each task.
- After the estimate is put together it is reviewed by the Contractor's staff

including the Construction Manager and any field personnel that have experience in the type of work being bid. Changes are made until all concur that project could be built for the price estimated.

- If there are concerns and/or contingent items the estimator will often go to outside knowledgeable persons to seek their guidance.

- The final step is to add the profit and contingency. One of the factors when adding the contingency is the Contractor's past experience with the Owner. Some considerations are: were requests for information replied to promptly, were change orders processed promptly, were disputes settled promptly at the job level, and was the past experience one of working together as partners.

7. I am confident and of the opinion that this is the procedure that Remcon followed in putting together its estimate for this project with the following comments:

- The big problem in classifying the excavation material was that there were several feet of snow on the ground in February, 2001 when the plans were made available and the owner provided for no other opportunity for a job walk or to dig test holes. Consequently the material classification had to be done from the Kleinfelder report which represented the character of the subsurface materials to be encountered.

- The Kleinfelder report specifically mentions that the earthen materials to be excavated were weathered granitic rock — slightly to highly weathered and having seismic velocities of from 4947 to 5747 rippable with a D8 dozer. <u>Some</u> oversized materials "floaters" may be generated during ripping/excavation is also mentioned. Remcon prudently, and in my opinion, accurately anticipated and included costs in its estimate to rip the rock as indicated in the report. The question then was what to do about the "float" rock as it was impossible to determine a quantity for this. Remcon consulted with Dick Lewis. Dick is a former group vice-president of Granite, a former member of Remcon's Board of Directors, and a man that has extensive experience estimating and building rock jobs. Steve asked him whether a $30,000 contingency was sufficient to cover the floaters based on the content of the soils report. Mr. Lewis advised Steve that this amount should be sufficient and I believe this was a very reasonable amount to include.

- Remcon's earthwork quantity take-off was greater than the NPS quantity. Remcon advised the NPS of this and was told to use the bid quantities. (I have come to understand that excessive quantities were in fact encountered by Remcon.)

- Remcon had performed at least two projects with the NPS. Its experience

on these projects with the NPS was good. It experienced prompt replies to request for information and was treated fairly working together as a team. Remcon priced this project based upon this prior experience. Had its experience been otherwise it would have either not bid the job or it would have added money to its bid.

8. I have studied the Remcon estimate for bid items 370 Excavation and Grading and 390 Haul Excess Excavation. These two items account for 33% of the direct cost of work performed by Remcon. The work consisted of about 14,136 cy of onsite cut and fill and 7100 cy to be excavated, stockpiled and rehandled and hauled to the excess excavation disposal site. Remcon estimated to cast the onsite excavated material into place using a CAT 345BL excavator and a CAT D8M ripping and dozing the excavated materials. Materials not going into the stockpile were to be compacted with a CAT 563 Compactor. This action plan was very reasonable not only because of the locale and represented site conditions, but also because of the physical abilities of these pieces of equipment.

9. The estimated production, using two pieces of equipment (CAT D8R and CAT 345BL) to excavate and move the material on average approximately 300 feet to the locale for fill placement, yields a rate of 231 cy/hour. The CAT handbook lists the production rate of a D8 pushing 300 fee at 580 cy/hour and the CAT 345BL at 250 cy/hour. In my opinion the production rates used by Remcon in its estimate were reasonable. The estimated production to excavate and stockpile is 98 cy/hour, which also was reasonable.

10. Overall, the estimate for item 370 has 260 hours of production earth moving equipment to move 21, 226 cy. This is less than 100 cy/hour, which is in my opinion a conservative production rate. This validates Remcon's estimate for this scope of work.

11. The excess excavated material was planned to be loaded from the stockpiles using the CAT 345BL and hauled to the disposal area (about a 4-mile roundtrip haul) using CAT D350 trucks. The estimated loading production with the CAT 345BL is 148 cy/hour or 7-CAT D350 truck loads per hour. The B345BL with a 2.9 cy bucket with 12 passes at 30 seconds per pass will load 7 loads pr hour at 70% efficiency. The estimated haul production is 49 cy/hour or 2.4 loads per hour, a 23 minute cycle time.

In my opinion the estimate for these items are conservative by industry practice, and this validates this portion of Remcon's estimate.

12. Remcon included a field engineer for 21 weeks (one season's work) and a Project Superintendent for 40 weeks (two season's work). In my opinion the project should have been completed in two seasons. I would have included a field engineer in the bid for the second season ($35,000 added to the cost), but defer to Remcon's plan as being reasonable.

13. An analysis of the cost summary shows that 60.7% of the work was subcontracted, while the labor and equipment for the work done by Remcon amounted to 27.5%. Remcon performed the early critical items of work and subbed out the later specialized work.

14. The following comparison of the bids show that the Remcon bid was consistent with the other bids received and consistent with the NPS estimate. A spread of less than 10% indicates that the bidder's estimate of the work was very close.

| | | |
|---|---|---|
| REMCON | 7,595,417 | |
| | | |
| BUDDY'S CONTRACTING | 7,792,839 | 2.6% |
| | | |

| | | | |
|---|---|---|---|
| AVERAGE CONTRACTOR | 8,087,805 | 6.5% | |
| | | | |
| NPS ESTIMATE W/15% PROFIT | 8,216,000 | 8.2% | |

15. Overall, I am of the opinion that the Remcon estimate/proposal for the overall project, and specifically for the earthwork operations, was reasonable. Having been denied the opportunity to perform a site inspection, Remcon reasonably relied upon the contract documents, including the soils report.

16. As an aside, I understand that Remcon encountered substantial granitic rock that was unable to be ripped with a D8 dozer. As a result, blasting was required. In my experience, blasting is much more expensive to perform, as concurrent excavation and placement activities cannot occur while drilling and blasting is performed, drilling and blasting disrupts all other performance, and the production which blasting yields is far less, in cubic yardage, than the as-planned ripping methodology.

17. Attached hereto as Exhibit B and by this reference made a part hereof are some of my work papers which support and substantiate my opinions, calculations and conclusions.

I declare, under penalty of perjury under the laws of the State of California and the United States of America, that the foregoing is true and correct.

Executed this 7 day of October, 2005 at Fair Oaks, California.

Brent Booth



1918.001-295679.1