IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, | ) | DOCKET NO. 03-2478C |
| v. | ) | **DECLARATION OF STEPHEN B. CHRISTENSEN IN LIEU OF LIVE DIRECT TESTIMONY** |
| UNITED STATES OF AMERICA, Defendant. | ) | (Judge Susan G. Braden) |
| | ) | Trial Date: October 24, 2005 |

I, STEPHEN B. CHRISTENSEN, declare

1. I am, and at all times have been, the President of Remediation Constructors, Inc. ("Remcon" or "Plaintiff"), Plaintiff in this action. I make this declaration as my direct testimony pursuant to the Order issued by the Court. I have personal knowledge of all matters stated herein and, if called upon to do so, I could and would competently testify thereto.

**DOCUMENTS AND EXHBIITS**

2. Due to the volume of project records which were created and which are relied upon to support this declaration, this declaration has been prepared as follows:

- The specific records which are relied upon to establish a specific fact or series of facts are individually referenced and expressly incorporated by an exhibit identification herein.

- All other documents relied upon in forming this declaration are set forth in Exhibits A and B attached hereto, and these documents are expressly incorporated herein and made a part hereof in the following manner:

3. Attached hereto as Exhibit A, and by this reference made a part hereof, is a list of project records and documents, including all accounting and financial records, which support Remcon's claimed damages in this action. As the President for Remcon, I am intimately familiar with all company records and reports, and how these records were filed and stored in hard copies and on the computer system. I have reviewed this list (Exhibit A), am familiar with the reports and documents identified in the list, and recognize that the reports and documents identified in Exhibit A are from the files maintained by Remcon during the course of the project and were kept in the course of our regularly conducted business activity. I have reviewed Remcon's job cost, payroll, vendor, and general ledger reports, and the underlying source documents, as identified in Exhibit A, and can verify that the reports and documents are from Remcon's filing system/records, and that the accounting and financial reports are outputted from Remcon's computer system used on this project and accurately detail costs and transactions relating to the project.

4. In addition, the documents identified in Exhibit A which support payments made by Great American Insurance Company ("GAIC"), my surety, were produced to Remcon and the government by the surety, and I am informed and believe that these business records are true and accurate copies of the documents maintained by GAIC.

5. The records identified as Exhibit A are voluminous, and total over 15 bankers boxes. The amount of documents is so voluminous that an in-court examination will be burdensome and time-consuming. All of the records identified in Exhibit A have been made available to the government since 2003, and the government's accounting expert, John Snowden, has been provided full access to the records on at least two occasions (in March and June, 2005). Mr. Snowden was provided access to all invoices,

time cards, accounting records, and all financial records, and was provided copies of over 30,000 pages. In addition, Mr. Snowden came to my home where my business computer is located and together we reviewed the list of accounting reports available from Remcon's accounting computer system. Mr. Snowden was allowed to request any report(s) he desired. He reviewed the menu of reports and requested that I print out numerous reports. I personally printed out each and every report he requested, which amounted to thousands of pages of accounting reports. If the government claims that Remcon has not produced any accounting or financial records or reports, such a contention would not be accurate. Any financial record or report not in the government's possession can only arise because Mr. Snowden did not request a copy or print out of the document(s). Further, I am informed and believe that the GAIC accounting and financial documents have been produced to the government.

6. The accounting and financial documents that were submitted in support of the claims by Remcon were maintained in Remcon's business office, and the spreadsheets presented in the claim, which summarized these documents, are accurate summaries of the business records maintained by Remcon relating to this project. Each of the documents identified in Exhibit A is a business record, has been made a deposition exhibit, and/or has been exchanged by the parties during discovery. This list is a sub-set of the list of exhibits produced by Plaintiff on September 15, 2005 in accordance with this Court's pre-trial order and Appendix A of this Court's rules. Each of the documents listed in Exhibit A are relied upon by me in making this declaration, and at the time of trial will be produced in the courtroom for reference and/or examination. Because of the

voluminous nature of all of these records, they are not physically attached hereto.[1]

7. Attached hereto as Exhibit B, and by this reference made a part hereof, is a list of project records and documents and sketches which concern this project. This list is a sub-set of the list of exhibits produced by Plaintiff on September 15, 2005 in accordance with this Court's pre-trial order and Appendix A of this Court's rules. Each of the documents listed in Exhibit B are relied upon by me in making this declaration, and at the time of trial will be produced in the courtroom for reference and/or examination. Because of the voluminous nature of all of these records, they are not physically attached hereto.[2] These records have either been produced by Remcon, received from the government during discovery in this matter, or received from third parties pursuant to subpoenas.

In preparing this declaration, an effort has been made to divide it into sections, identified by a heading, to promote issue identification and understanding.

## DAMAGES CLAIMED

8. Through this litigation Remcon seeks to recover from the government damages which Remcon has incurred, plus the damages resulting from the NPS improperly terminating my right to proceed due to my alleged default. Remcon seeks an Order converting the termination for default into a termination for convenience and based

[1] To the extent any of the records/documents/sketches are questioned by the Defendant, or sought by Defendant, Defendant is invited to contact Plaintiff's counsel to seek clarification and/or an additional copy in advance of trial. All of the exhibits on this list are identified by their deposition exhibit number, or bates stamp number, date of the document, description of the document and number of pages. This includes all of Remcon's time cards and project records supporting our costs and damage claims, as well as the Project plans and specifications.

[2] To the extent any of the records/documents/sketches are questioned by the Defendant, or sought by Defendant, Defendant is invited to contact Plaintiff's counsel to seek clarification and/or an additional copy in advance of trial. All of the exhibits on this list are identified by their deposition exhibit number, or bates stamp number, date of the document, description of the document and number of pages. This includes all of Remcon's time cards and project records supporting our costs and damage claims, as well as the Project plans and specifications.

on the facts of this declaration, I believe that the NPS materially breached the contract in multiple instances prior to issuing the cure notice in July, 2003, which excused Remcon from further performing. Once the court converts the termination for default into a termination for convenience, Remcon seeks the resulting costs and damages incurred. The identification of the specific termination for convenience damages is set forth in the Declarations of Randy Wikinsky of Great American Insurance Company, our surety, and our expert, Jordan Rosenfeld.

9. The amount due Remcon based upon a calculation assuming that the termination for default is converted to a termination for convenience, and/or all damages resulting from the NPS' breach of contract, is $6,963,733.00, plus interest.[3]

10. The amount due Remcon arising from the NPS' breach of contract prior to the termination totals $2,726,956.00, plus interest.

11. These damage calculations are based upon my detailed analysis and examination of all of the facts regarding entitlement and quantum, including my personal knowledge of all of the job cost information, project accounting records, both in hard copy and electronic format, which I have studied. They are also based upon my personal interaction with Remcon's damage expert Jordan Rosenfeld, who has published an expert report, a rebuttal, supplemental report, and declaration. Further, I have reviewed in detail the government damage expert's report.

12. Excluding this Project, Remcon's income from operations, less its interest expense, for the period of time from June 1, 2001 through November 30, 2002, which is the period of time we worked actively on this project, was $1,809,147.

13. The accounting procedures used by Remcon for costing payroll, owned equipment, subcontractor and vendor costs are standard for the industry.

[3] Given that the Project, as of the date of this declaration, is still ongoing, a slight adjustment of this amount will be presented at trial.

14. Remcon's internal control procedures properly accounted for costs incurred on the project.

15. Remcon's damage claim for termination for convenience is based upon the Federal Acquisition Regulations, and is calculated in detail in our damage expert's report.

16. I included a rate of 17.4% for overhead and profit in our bid to the NPS. Profit is in the sum of 9.11% and overhead is 8.29%.

17. Remcon's equipment costs included in our claim are based upon the U. S. Army Corps of Engineers rates as required by the contract documents.

18. This project had a negative effect on Remcon's financial position from June 1, 2001 through November 30, 2002. The total loss to Remcon from this project exceeded $1,289,000.

19. The parties agreed at the preconstruction conference that the labor burden to be paid to Remcon for extra work would be determined by negotiation through the modification process.

20. The agreed rate was 33%. In each modification issued, we received 33% for labor burden and a markup of 17.4%. The home office overhead component of Remcon's 17.4% markup, computed to be 8.29% of direct costs, is an allowable cost consistent with Federal Acquisition Regulations.

21. It is my belief that costs which are not recoverable (e.g. costs due to Remcon errors) have been properly excluded from the Remcon damage claim. Attached hereto as Exhibit 1 and by this reference made a part hereof are true and correct copies of the spreadsheets which summarize and support the damage claims which Remcon is claiming and seeking in this action.

**PROJECT IDENTIFICATION**

22. The name of the Project that is the subject matter of this action is the Giant Forest Sherman Tree Parking Area, Project No. SEKI-200Q ("Project"). The Project had two parts to it, the Upper Sherman area and trail and the Lower Sherman (General's

Highway). The Lower Sherman area, in general, was the existing improvements. The premise of the Project was to construct a new road, parking lots, comfort station and trail to the General Sherman tree, to augment the existing facilities, and once completed, modernize and improve the existing facilities. The Upper Sherman area consisted of an access road, parking area and trail, plus ancillary improvements. The Owner of the Project was and is the United States of America, Department of the Interior, by and through its National Park Service ("NPS").

23. As bid, the USAR and USPA involved, in substance, the construction of approximately 3,000 linear feet of a new two lane asphalt paved roadway, a new two level parking area, installation of 3,700 linear feet of domestic waterlines and 3,800 linear feet of electrical service line, installation of a new sewer system (including approximately 750 linear feet of sewer line, a concrete septic tank, dosing siphon tank, and sewage leach field), construction of a comfort station, a wayside kiosk, rock revetments, landscaping/erosion control measures and related improvements.

24. As bid, the STT component required the construction of approximately 2,000 linear feet of asphalt surfaced trail, including concrete/stone stairs, drainage improvements, timber edgings, a visitor outlook, and related landscaping/erosion control measures.

25. As bid, the LS component included demolition and removal of existing structures and landscape, construction of approximately 300 linear feet of concrete retaining wall with rock facing, realignment of the General's Highway, construction of a visitor comfort station, and related landscape/erosion control measures.

26. Due to the elevation of the Project (above 7000 feet) and its location in the Sierra Nevada Mountains, the construction season for the Project at bid time, realistically annually ranged from late May/early June through October, a duration of five or six months.

27. Because the contract specifications for the Project required that the Upper portion of the Project (USAR/USPA/STT) be complete before any work would proceed on the LS, combined with the limited area permitted to be accessed and used to perform the work (the existing forest was to be preserved as much as possible), Remcon was furnished with a narrow and limited site to work within. Attached hereto as Exhibit 2 and by this reference made a part hereof is a sketch/diagram depicting the Upper Sherman park site. It is reprinted on the next page so as to assist the reader in understanding the physical layout and relationship between the USAR, USPA and STT. (However, due to its size, it will be submitted by mail to the court as it cannot be filed electronically.)

28. While the narrow and limited work site was not unexpected or unanticipated, its existence required, to avoid extra costs and/or delays from being realized, that mistakes in the drawings, or problems encountered, when they materialized or became observed, be promptly addressed. The size of construction equipment necessary to be used, the need for sequential earthwork operations (e.g. excavation, loading, hauling, placement, compaction, etc.), and the "linear" nature of the worksite, combined with the limited and narrow worksite, the need to preserve and not trample natural features (trees, rocks, etc.) and the limited construction season, collectively required heightened competence, attention to detail, and focused construction administration efforts to address every issue that arose that could delay or impact the Project. Absent such heightened and competent construction administration vigilance, our ability to construct the Project, without experiencing extra costs and losses of productivity, as well as delays, was jeopardized.

29. This Project was a design-bid-build Project. All design was performed by the NPS (and in part outsourced to third-party designers). All construction administration was provided by the NPS and its on site construction manager, Jacobs Facilities, that inspected the Project and was the contact liaison between the NPS and the contractor.

This was established in the preconstruction conference and minutes which occurred on May 22, 2001.

## SUMMARY OF TESTIMONY

In order to permit the Court to place in context the substance of my testimony, the following paragraphs (Nos. 25 to 60) are set forth as a summary of my entire testimony. Following this summary I have provided detailed references, by subject matter, to the underlying facts and documents that support and substantiate this summary.

30. I prepared and submitted the Remcon proposal for this Project and signed the contract on behalf of Remcon in May, 2001.

31. Remcon submitted an as-planned schedule to the NPS in June, 2001 which called for all work on the Upper Sherman area to be completed in the 2001 season and the Lower Sherman area to be completed in the 2002 season. The NPS never questioned the logic of Remcon's as-planned schedule, and its construction manager, by letter dated July 11, 2001, praised its reasonableness, completeness and content.

32. The critical path on our schedule commenced with the clearing of trees and pioneering of the USAR and USPA. It then transitioned to the construction of the comfort station and related improvements for the balance of 2001. But for the myriad of design deficiencies encountered, and directed performance of extra work and constructive changes, the Upper Sherman work would have been completed by the end of the 2001 construction season. Unfortunately, the as-planned schedule was not able to be followed.

33. Prior to the issuance of the Notice to Proceed ("NTP"), Athena Demetry of the NPS, a field biologist and forester, marked all trees in the virgin forest which were to be removed by Remcon during its clearing and grubbing operation (including logging) for construction of the USAR and USPA. While Remcon personnel, for two hours one day, walked the right-of-way with Ms. Demetry, and "assisted" her by placing the paint on trees which she determined were to be removed, the selection of which trees were to be removed was, by contract, and action in the field, exclusively the government's.

34. Thereafter, on June 11, 2001, the date the NTP was issued, we began falling and logging the trees marked by Ms. Demetry. Once the logging operations were complete, our surveyor, Guiliani & Kull ("G&K"), began to lay out the USAR and USPA. G&K immediately discovered that about 600 feet of the road, as shown in the NPS plans and specifications, did not match the clearing limits that had been laid out by Ms. Demetry in the field. Either the road had to be relocated into the hill, or more trees had to be removed and a big scar of cleared area would be seen by park visitors.

35. The significant discrepancy, between Stations 24 and 30 (approximately 600 lineal feet or 20% of the road length) between the area Remcon had cleared per Ms. Demetry's direction and where the NPS plans and specifications called for the access road to be constructed, caused a series of NPS re-designs and other problems that impacted Remcon's ability to schedule and complete its work as we had originally planned. Remcon has not been compensated in time extensions or additional money for virtually any of the costs or delay impacts that flowed from those changes. The limited compensation that has been received for the resulting extra work and delays was also belatedly received, in most cases over a year after the extra work was performed.

36. The trees, designated by Ms. Demetry to be removed along the access road right-of-way, between Stations 24 and 30, were in a location up to fifteen feet off of the right-of-way set forth in the plans. As a result, the access road needed to be re-surveyed by Remcon's surveyor (recognized belatedly 14 months after the events by the Contracting Officer in Mod. No. 4 as extra work) and the road was relocated by the government to a location into the hill from the planned locale. The content of Mod. No. 4, in its Justification section, admits that the cause of the road relocation was not due to Remcon. It states:

> On July 31, 2001, the Contractor's submitted a change order request for "Additional Survey Work" for their Surveying Subcontractor (Giuliani & Kull). This request was based upon the initial Access Road centerline staking

> per the contract drawings. After the initial staking it was discovered that the centerline with all required cut boundaries did not fall within the earlier cleared limits as delineated by Park staff. Thus the Government agreed that the centerline had to be revised in order to fit all earthwork into the already cleared limits. Therefore the surveyor had to re-staked this revised centerline and are entitle to be compensated for their additional work. In addition, this work had to be completed at this time to prevent additional construction costs associated with equipment stoppage and delays. The revised road layout and re-staking reduced construction costs since additional clearing and tree removal was not required. Therefore, this work is necessary in order to construct the roadway alignment in the location shown on the construction drawings. This change is in the best interest of the Government and I recommend it be approved.

A true and correct copy of Mod. No. 4 is attached hereto as Exhibit 3 and by this reference made a part hereof.

37. Remcon orally notified the NPS's on-site representative, in late June, 2001, of the conflict between the clearing limits and the surveyed location of the road per the plans. Multiple visits by the Contracting Officer's Representative for Construction ("COR") (Willie DeOcampo) and COR for Design (Joanne Cody) in late June and early July, 2001 occurred and ultimately resulted in an NPS direction to relocate the road further into the hill where the trees had been logged. To do so, Remcon was directed to survey the new road alignment. This extra work was performed in July, 2001 but not recognized until Mod. No. 4 in September, 2002. See Exhibit 3.

38. While the road realignment issue was ongoing, Remcon ceased operations in the deep cut area pending new design data from NPS, and relocated its equipment and began work in the USPA to address the burn pit.

39. Our relocated grading operations were then immediately impacted by two differing site conditions ("DSC") in the parking lot area. The plans and specifications estimated 2,000 cubic yards of material would be hauled from the known burn pit. We were required to remove and dispose of over 7,000 cubic yards of material. We had

originally scheduled 5 days for this work based on the NPS quantity estimate. It took 27 workdays and the extra costs exceeded $300,000. Further, previously unknown debris was found buried in another locale of the planned parking area. We were directed to remove it and haul it out of the park. Both of these DSC's caused extra costs and delays, which were incurred and experienced in the summer of 2001, and were not recognized by the government until August/September 2002 when Mods. No. 3 and 4 were issued. The NPS' internally published justification for Mod. No. 4, as to the previously unknown debris, stated:

> On July 12, 2001 while grading the Upper Parking Lot the Contractor encountered unknown miscellaneous buried debris in the easterly end of the upper parking lot. The buried debris consisted of logs, stumps, tires and miscellaneous material that had been buried in this area over the years. The Denver Service Center Project Manager and Lead Designer inspected this area on July 16, 2001 and determined that the buried material would be detrimental to the construction of the parking lot. All agreed that a parking lot constructed upon structurally unsound material would eventually fail causing future maintenance problems for the Park. Therefore, the upper 5-feet of the existing grade, which contained unsuitable debris had to be removed. This removal included the sorting and screening of the material cited above. This work is necessary at this time so that the parking lot construction can be continued without delay to the project. This change is in the best interest of the Government and I recommend it be approved.

See Exhibit 3.

As of the burn pit extra work the NPS' justification provided:

> <u>New Item No. 135: Haul Excess Miscellaneous Material from the Park</u>
>
> Reimburse the Contractor for costs associated for hauling and disposing 4,624 Tons of deleterious material outside the park. Payment will be made at the newly negotiated unit price of $93.86/ton for 4,624 Tons.

A true and correct copy of Mod. No. 3 is attached hereto as Exhibit 4 and by this reference made a part hereof.

40. Once the access road was re-surveyed, and the burn pit and debris extra work performed, we sought to excavate the realigned access road to subgrade. As of July 30, 2001, we encountered granitic rock which could not be "ripped" with a D-8 Dozer. The soils report made a part of the contract documents expressly stated that all earthen material to be encountered to construct the road could be ripped and that blasting would not be necessary except in isolated instances ("floater rocks"). We had on site a new D8 Dozer/ripper which meant Remcon had the equipment on site which should have been able to excavate the entire planned roadway locale to subgrade. We encountered, between about Stations 24 and 30, where the road was relocated into the hill by the NPS, solid granitic rock which required blasting. We swiftly asserted, orally and in writing, to the NPS that we had encountered a DSC requiring blasting.

41. The drilling, blasting and material handling operations occurred, continuously, until September 13, 2001, a duration of over six weeks, which was twice our planned earthwork duration for the entire Project. The NPS, for eighteen months thereafter, disputed that we had encountered a differing site condition. Ultimately, by unilateral Mod. No. 6, dated February, 2003, the Contracting Officer recognized that a Type I differing site condition was encountered. However, the change order only granted us $84,170 in extra compensation and no time extension. Instead of taking 21 calendar days to excavate the road and parking lots, as scheduled in the as-planned schedule, the activity and its impacts consumed more than thirteen months and the costs for excavation exceeded $700,000. A true and correct copy of Mod. No. 6 is attached hereto as Exhibit 5 and by this reference is made a part hereof.

42. The unsuccessful efforts to rip the granitic rock is documented in both Remcon's daily reports as well as the daily reports prepared by NPS representatives.

Remcon gave timely notice of the DSC to the NPS so that the NPS could investigate Remcon's claim before conditions were disturbed. The NPS failed to do so.

43. While the Access Road and Parking Areas were greatly impacted by differing site conditions, extra work and design problems, the Upper Sherman Tree Trail, the last piece of the Upper Sherman work, was also the subject of multiple and continuing design changes, and the last design change was not issued to me until November, 2002. While some work was able to be performed in 2001 and 2002, there were multiple and continuing changes issued by the NPS to the trail points and the trail's physical components and dimensions throughout 2001 and 2002. It was not until November 20, 2002 (after our as-planned schedule demonstrated that we would be complete with the entire Project) that the Contracting Officer signed and issued Mod. No. 5, which officially modified the trail's design and finalized the design changes which had been going on for almost two years. A true and correct copy of Mod. No. 5 is attached hereto as Exhibit 6 and by this reference made a part hereof. The timing of the issuance of Mod. No. 5 was too late for us to proceed in 2002 as winter weather had commenced, and it further restrained us from completing the trail until 2003's construction season, as the design changes had to be implemented before the balance of the trail could be built. Recognizing that the government's conduct regarding delays to the Project was a material breach, and to protect my company, I signed Mod. No. 5 on October 18, 2002 on behalf of Remcon and forwarded it to the Contracting Officer on October 21, 2002 along with a cover letter expressly reserving Remcon's rights to receive time extensions and delay damages resulting from government breaches of contract, constructive acceleration, directed changes, constructive changes and the additional work performed and materials handled due to defective and deficient contract documents, including the Sherman Tree Trail. A true and correct copy of my October 20, 2002 letter to Rodney Keiscome, the Contracting Officer, is attached hereto as Exhibit 7 and by this reference made a part hereof.

44. In early July, 2001, we notified Bob Russell, the NPS designated representative, and Willie DeOcampo, the COR, of a substantial overrun in quantity of excavated material. This resulted from the realignment of the road, the differing site conditions as well as errors in design assumptions. The NPS did not provide Remcon with direction to mitigate this problem until mid-season 2002. As a consequence of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and the Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation. As a consequence of the excess material to be removed and the lack of timely direction from the NPS, Remcon's operations were severely impacted, resulting in an inefficient use of Remcon's planned labor and equipment and Project supervision and an immediate negative impact to Remcon's schedule. I have subsequently come to learn that, as early as July 2, 2001, the NPS was aware that earthwork quantities would overrun, up to 13,000 cubic yards, and that the NPS considered, in writing, notifying the design team that its conduct was professionally negligent. Despite this awareness, no NPS direction was given for up to one year regarding what I was to do to address the excavation quantity overruns.

45. The constant NPS design revisions, occasioned by defective plans and specifications, and the belated timing of them, combined with the differing site conditions encountered, coupled with lack of direction and/or time extensions, severely impacted our ability to schedule or perform the Project with any semblance of efficiency or economy. From the very outset of the Project, our ability to control the construction of the Project was put in jeopardy by the acts and omissions of the NPS, and events for which the NPS is responsible. In fact, within the first three weeks of work on the Project, NPS changes and deficiencies in the contract documents, along with lack of direction, meant that completion of the 2001 work schedule, as-planned by Remcon and accepted by the NPS, was impracticable.

46. Added to the discrepancies in the road alignment and quantity estimates, the USAR DSC and the necessity for blasting effectively prevented us from completing our planned scope of work for the 2001 construction season. Moreover, the necessity for blasting adversely impacted our ability to stay on schedule, and shifted the critical path to all earthwork activities. Not only did the road require blasting, but the NPS would, on most days, not let us blast until 4 p.m. daily, thus limiting our ability to efficiently perform critical path work.

47. Although we submitted our formal request for a change order for the USAR DSC on August 20, 2001 to recover the added cost and time of the DSC (a true and correct copy is attached hereto as Exhibit 8 and by this reference made a part hereof) no relief was granted until February 18, 2003.

48. Between the first and second construction seasons (December 2001 and April 2002), I traveled to Denver to meet with NPS personnel on three different occasions to discuss extra work performed but not compensated or turned into a modification; differing site conditions; design problems; quantity overruns; delays; and payment of Remcon's claims that were significantly impacting the Project. During that time, I notified the NPS that final slope grades had not been completed and additional earthwork would be needed to meet the designed slope minimums. Despite NPS personnel agreeing to review the impact issues and representing they would timely respond and provide necessary design changes and/or issuing the appropriate revised drawings and modifications, little or no information was forthcoming before the second construction season began. As a result, we were unable to publish an accurate, updated schedule as we were missing critical information to enable us to plan our work.

49. We re-mobilized to the Project in mid May 2002. A partnering meeting in the Park was held with all Project participants in the Park. It involved a comprehensive job walk so that the problems experienced in 2001 could be actually seen by the Contracting Officer and the Contracting Officer's Representatives, who traveled to the

Park from Denver. Also present were the outside designers, the inspectors and Park personnel. During the partnering meeting, I identified all of the problems experienced to date and requested from all attendees prompt direction on how to address the issues then continuing to be unresolved, how to proceed through the deep cut area, and how to address slope problems. When the NPS continued to fail to respond, we began issuing a series of requests for information ("RFIs"). Throughout June, 2002 the NPS failed to respond to the RFIs or to provide any direction to us on how to correct the problems resulting from earlier design deficiencies, directions and differing site conditions. Concurrently, we sought direction on what to do with the thousands of yards of excess material on site. While in July, 2001 a design revision was secretly prepared by the NPS to use some of the excess material to raise the designated finish elevation of the parking lots, the NPs did not direct this extra work until June 27, 2002, again delaying the work, and Mod. No. 4 was not issued until September, 2002 even though agreement on all terms was reached in early June, 2002. The justification written by the government, set forth in Exhibit 3 hereto states:

> During the Excavating and Grading of the Access Road and the upper Sherman Parking lots, it became apparent that excess excavated material was being generated. The Contract provides for hauling 6,800 CY of Excess Excavation to Wolverton Point for disposal. It was estimated by the Government that the total quantity of approximately 15,000 CY of Excess Excavation will be generated. The Denver Service Center and the Designer have determined that the Upper Parking Lot can be raised approximately 5-feet at the easterly end and will allow 5,000 CY of Excavated Material to be incorporated into the fill at this location. This change will reduce some of the costs associated with hauling excess material within the Park boundaries and will result in an approximate savings of $17,000.00 as opposed to hauling this material within the Park. This change is necessary in order to eliminate possible construction impacts that will result in claims. Therefore, this change is in the best interest of the Government and I recommend it be approved.

50. The issue of excess material was noted in writing by government personnel in an internal email memorandum as of July 2, 2001. It was not until June 27, 2002, a delay of 361 days, that the Contracting Officer ("CO") partially dealt with the excess material issue when he issued a directive letter to us to use some of it to raise the finish grade of the upper parking areas. Concurrently, I had informed the CO that the events of 2001 had materially depleted my capital to perform work, and I sought written assurance from the CO that the modification for the directed extra work to raise the parking lots would be immediately processed so Remcon could bill for the work and get paid no later than August, 2002. The CO gave me his written assurance by letter dated July 16, 2002, but he did not honor his representation as the modification (No. 4) was not issued until September 14, 2002, and Remcon could not receive payment for the work until October, 2002.

51. By the end of June 2002, the NPS-caused impacts and delays and maladministration effectively prevented Remcon from accomplishing any productive work on the Project. I published on June 27, 2002 an updated schedule which attempted to address the volume of problems and hindrances affecting the ability to progress the work. It showed a completion date of November, 2003. No response was received even though: (a) the specifications required the CO to meet with me within seven days of the submittal; and (b) this completion date was more than three months beyond the contractual completion date. In an attempt to mitigate delays, I asked that we be allowed to begin work on the Lower Sherman Trail component. A true and correct copy of my June 3, 2002 email to Willie DeOcampo of the NPS is attached hereto as Exhibit 9 and by this reference made a part hereof. The NPS denied this request.

52. In late June, 2002, I gave the CO and his representative comprehensive notice of the multiple problems on the Project and their impacts on Remcon's ability to continue with the Project. When no substantive response was forthcoming, I notified the CO that work would cease unless circumstances swiftly changed. On July 3, 2002, I

wrote the CO requesting an emergency on-site meeting. A new NPS Project Manager, Mike Giller, then arrived on site on July 10, 2002. As of this date, Mr. Russell, the lead inspector who had become abusive and non-responsive, had departed from the Project. Mr. Giller walked the site with myself and my lead Project personnel and, having the problems explained to him orally, directed Remcon to "field fit" the Upper Sherman Access Road to the existing natural features. This direction was confirmed in our letter to the NPS on July 11, 2002, more than eight months after those problems had been brought to the attention of the NPS. A true and correct copy of my July 11, 2002 letter is attached hereto as Exhibit 10 and by this reference made a part hereof.

53. We then began what we hoped would be the final construction of the deep cut area. My grading superintendent and foreman, Mark Penrose and Mike Kitchell, laid the roadway alignment out using the design staking information provided by the NPS as adjusted for field conditions. By July 25, 2002, we encountered still further problems in fitting the design to field conditions. A new assistant inspector, Russell Belknap, arrived and reviewed the field conditions to determine what could be done in order that we could proceed. Mr. Belknap personally directed us to make additional changes to the roadway alignment and this is recorded in the project records.

54. The NPS advised Remcon in August, 2002 that it was going to issue still more new design changes (its fifth revision) to correct what it perceived were our failures to properly build the road. The NPS took that position despite the fact we had received and followed dozens of oral and written directives of NPS on-site representatives to field fit the road as needed. At no time during the extended discussions with NPS throughout July 2002 (when Remcon was struggling to make progress) did any NPS personnel insist that Remcon follow the original (and unbuildable) design. Indeed, the project records disclose the opposite. The NPS provided the fifth design changes on September 6, 2002. We had our surveyor again lay out the road. In most instances only minor extra work was required to meet the latest requirements other than in the deep cut. Meanwhile, due

to the originally deficient design and consequent re-designs, we were forced to delay our paving operations. As weather became an impediment to completing paving operations (paving can only occur within certain temperature ranges), we were forced to wait for the following 2003 construction season to complete paving operations.

55. Concurrently, throughout 2001 and 2002, the Sherman Tree Trail design was undergoing multiple revisions, and was not definitively revised and issued to Remcon to construct until November, 2002, after the 2002 construction season was over. This re-design delayed the completion of the Upper Sherman work, and thus the Project, two years. None of the design changes to the Trail were completed by Remcon.

56. The combination of the events described above, and resulting delays, and the NPS' concurrent refusal to timely or otherwise pay for all of the extra work its representatives had directed Remcon to perform, placed our company in dire financial duress.

57. Before mobilizing for the 2003 construction season, I wrote a series of letters to the Contracting Officer and/or his representatives outlining the cost and schedule impacts that resulted from deficiencies in the contract documents and the numerous redesigns and other changes directly attributable to NPS. These letters placed the NPS on notice of the financial duress we were under due to the lack of payments, and detailed the delays to project completion caused by the NPS. I have attended all depositions taken in this matter and was personally present when Rodney Keiscome, the CO, testified that he received my communications that I lacked the financial wherewithal to continue due to the claimed government caused issues.

58. On October 20, 2002, I wrote a lengthy letter to the NPS outlining the impacts of the redesign of the Upper Sherman Tree Access Road and Parking Area. A true and correct copy of my October 20, 2002 letter is attached hereto as Exhibit 11 and by this reference made a part hereof.

59. On November 16, 2002, I wrote a letter to the NPS outlining a potential claim due to NPS caused delays. On November 19, 2002, I wrote to the CO concerning NPS' failure to issue prompt payment to Remcon for work performed. I wrote again on November 25, 2002. On November 25, 2002, I sent a formal request for Alternative Dispute Resolution to the CO. On December 3, 2002, I submitted a notice of claim against the NPS for nonpayment for work performed (aggregate base and asphalt concrete pavement). On December 4, 2002, I submitted a notice of claim for failure to pay concerning the dry-laid stonewall. On the same day, I wrote to the CO concerning NPS' failure to make progress payments to Remcon. On December 7, 2002, I wrote to the CO concerning NPS' failure to pay in full for concrete drop inlets. The same day, I gave notice of a claim for NPS' failure to pay in full for boulder revetment work. On February 13, 2003, I wrote to the CO reiterating NPS' failure to process Remcon's progress payments. In that letter, I noted that the failure "has severely impacted Remcon." On March 10, 2003, I again wrote to the CO concerning NPS' failure to pay in full for concrete base and concrete asphalt placement. On March 21, 2003, I gave notice that the NPS' failure to timely issue Mod. No. 7 did not eliminate its existence. On March 25, 2003, I gave notice of a claim for the NPS' failure to provide aggregate base. On April 9, 2003, I wrote to the CO concerning NPS' failure to make proper progress payments. On April 15, 2003, I sent a letter to the CO which fully detailed the NPS' failures and breaches of contract. On June 8, 2003, I sent a letter to Willie DeOcampo which stated "...the revised completion date is now October 7, 2004." My letter detailed how NPS caused delays had pushed the anticipated completion date well past August, 2003. True and correct copies of these letters are attached hereto as Exhibits 12 through 27, respectfully, and by this reference made a part hereof.

60. After repeated attempts to resolve our disputes with the NPS, I finally submitted a multi-volume, comprehensive certified claim to the Contracting Officer on June 28, 2003. That claim outlined in substantial detail the cost and time impacts

incurred by Remcon on the Project. This voluminous document details the facts which support Remcon's breach of contract claims, and had been received by the Contracting Officer mere weeks prior to the issuance of the cure notice. The total of that claim was $3,091,799.60. Prior to issuing the cure notice, no response to the Remcon certified claim was made by the government. A true and correct copy of the narrative section of my June 28, 2003 certified claim is attached hereto as Exhibit 28 and by this reference made a part hereof.[4]

61. On June 30, 2003, I sent to the CO another detailed letter which again protested and communicated the impact on Remcon resulting from lack of payment.

62. On July 17, 2003, I sent to the CO a letter which stated that we were prepared to proceed once the NPS met its contractual requirements. I sought ADR but the NPS refused to participate in the ADR process. Mr. Keiscome told me that "we don't need any third party assistance." When the CO denied the request for ADR, coupled with his failure to issue any financial renumeration or time extensions, either bilaterally or unilaterally, in response to the June 28, 2003 certified claim, we were disabled from mobilizing to the Project, as we could no longer pay employees. I sought ADR due to our precarious financial condition caused by NPS's actions over the course of the 2001 and 2002 construction seasons. I simply did not have the financial ability to mobilize for the 2003 season unless NPS issued payments for existing work performed and time extensions due, and I was trying desperately to obtain payments from the NPS through the ADR process. This left only the litigation route and the certified claim dated June 28, 2003 was and is the condition precedent to litigation. When the CO issued the cure notice, I had already supplied him with reams of information concerning deficient plans and specifications, breaches of contract, NPS-caused delays and impacts to Remcon.

---

[4] The narrative of our certified claim is only attached as Exhibit 28. It incorporates binders of data provided to the NPS. These binders will be produced in the courtroom during trial.

63. Although the NPS failed to grant Remcon virtually any time extensions, the contract time should have been extended, as of the end of 2002, through the 2004 construction season.

64. Remcon's income and costs from all <u>other</u> Projects, during its performance of work on this Project (from June, 2001, when the NTP was issued, through November, 2002) shows a net increase in cash to Plaintiff of $1,809,147. It is my belief that our company, but for this Project, was very successful, and our financial inability to continue was exclusively caused by this Project.

**<u>BIDDING PHASE</u>**

65. The NPS' design was not completed until February, 2001, during the heart of the winter. The NPS issued a Request for Proposal ("RFP") for the Project in February, 2001. In late February, 2001, we received a set of the contract documents (e.g. plans and specifications and soils report) for the Project. Remcon previously worked for the NPS in the park as a subcontractor, and I based our responsive proposal to the NPS on the information contained within these documents, including the NPS published quantity estimates for removal and hauling of excavated material, as well as our general familiarity with the isolated and distant locale of the park from construction resources.

66. In the construction industry, it is a standard practice for prebid site inspections to be made available so prospective bidders can familiarize themselves with the locality and the conditions under which the work will be performed.

67. At the time this job was bid, it was during winter and there was no prebid site inspection while the documents were out for bidding. I had never walked or inspected the actual Project site, and during late February and early March, 2001, the site was inaccessible due to snow. Based upon the timing and availability of the contract documents, and the required submission of proposals, Remcon, and all other prospective bidders, were prevented from conducting a site investigation to confirm the accuracy, or

to uncover any observable discrepancy, between the plans and specifications and the Project site. The date for submittal of proposals was March 29, 2001.

68. On or about March 21, 2001, the NPS published Amendment No. 1. Included was a picture of stockpiled aggregate base at the project site. Aggregate base ("AB") is a rock material of a certain uniform size used to bridge between natural earth (subgrade) and either paving or concrete. On this Project, tons of AB was required to be used under all roadway and parking lot pavement.

69. On March 21, 2001, while preparing our bid estimate, I emailed the NPS asking a series of questions. I noted that based on my knowledge, little or no aggregate base was located where stated in Amendment No. 1. In the same email, I also questioned the accuracy of the quantities used in the bid documents as the Project, as represented was, in essence, a balanced job, meaning no import or export would be required except for 2000 cubic yards of a burn pit to be hauled away and 6800 cubic yards hauled to a stockpile locale. A true and correct copy of my email is attached hereto as Exhibit 29 and by this reference made a part hereof. Further, as detailed in paragraph 1526 (m) and (o), Jack Vance, prior to bid, confirmed to me that the NPS intended this project to be a balanced job other than the 6800 cubic yards to be hauled to Wolverton Point.

70. In its response dated March 26, 2001, see Exhibit 29, the NPS informed me that my perceptions were not accurate and to bid the Project as represented in the contract documents. I complied.

71. The Project site is in an area adjacent to a heavily visited national treasure (the General Sherman Tree), and had limited construction access and a limited construction season. Further compounding the Project difficulty was its location and weather. Instead of being able to work all or most months of the year, we had to anticipate a limited construction season depending on the extent and duration of winter precipitation and temperature. Realistically, the construction season ranged from late

May/early June through October, a duration of five or six months. The NPS' RFP allowed 792 days (less than three construction seasons) to perform the work.

72. Remcon's bid proposal is dated March 26, 2001 and was in the amount of $7,595,417.08.

73. The NPS' published estimated price range for the Project was $5,000,000 to $10,000,000.

74. A competitive range determination and request for final proposal revisions was sent to me on April 12, 2001. My response was sent to the NPS on April 16, 2001. The amount of our revised proposal was $7,121,636.

75. By memo dated April 16, 2001, the CO determined that Remcon was a responsible prospective contractor to receive the award of the contract. A true and correct copy is attached hereto as Exhibit 30 and by this reference made a part hereof.

76. Remcon, prior to bidding this project, had performed more than $25 million worth of road and engineering projects, including work in the Sierra Nevada mountains.

77. My bid was based upon the contract documents and my experience and training, which is summarized as follows: I am the sole shareholder of Remcon which was formed in 1996. I have over 25 years of construction experience, including contract management of multiple projects, individual project management, bid preparation, project scheduling, project costing, marketing, contract negotiations, and proposals. In my 25 years of construction experience, I have been involved in well over $500 million worth of construction projects and have worked on all aspects of field work including those functions performed by laborers, equipment operators, carpenters, and masons, as well as project management, which includes bidding, contract administration, scheduling, authoring and responding to correspondence and notices, setting up project accounts and job cost systems, and running a construction company. The projects that I have been personally active with concern multiple types of engineering projects ranging from large

earthen dams, power houses, asphalt concrete highways, concrete highways, flood control work, large waterway projects (lock and dams) and environmental remediation projects. I am the holder of a California Contractor's License. The companies I have worked for are as follows:

- I have over twenty five years of construction management experience on projects ranging in value from less than $1 million to over $100 million, covering environmental remediation and all aspects of heavy civil engineering construction. Work experience includes: contract management of multiple projects, individual project management, bid preparation, project scheduling, project costing, marketing, contract negotiations and proposals.
- Prior to my starting Remcon, I had 20 years of construction experience going back to 1976.
- Starting in 1976, while I was going to college, I worked part-time as a Project Superintendent for Bee & Bee Contractors. I worked with Bee & Bee through 1979. At that time a portion of Bee & Bee was purchased by Granite Construction Company.
- While working with Bee & Bee I was directly involved in the construction of roadway projects (primarily mountain roads), medium sized earthmoving projects, and the operation of large portable rock crushing plants. My duties included the supervision and scheduling of manpower and equipment, supervision and scheduling of subcontractors, ordering of project materials, project scheduling and coordination, project estimating, and negotiation of change orders.
- As a result of the sale to Granite Construction Company I became employed by Granite in January 1980.

- I was initially assigned temporary duty as a Project Engineer on the Helms Pump Storage Project, which was located in the Sierra Nevada mountains near Sequoia National Park.
- In May 1980, I was assigned as a Project Superintendent/Manager for the Spinney Mountain Dam Project, a large earth fill dam located in Lake George, Colorado. I remained on the Spinney Mountain Dam Project until completion in November 1981.
- From 1982 - 1986 I was Granite's Project Manager for Aggregate and Concrete operations for the Heavy Construction Division. Projects included Ridgway Dam in Colorado, the Alamo Powerhouse in California, and two projects on Highway I-27 in Texas.
- From 1986 - 1989 I was manager of Granite's Southeastern Operations for the Heavy Construction Division. Projects included: Granite's largest aggregate producing facility located in Iuka, Mississippi, construction of the Sardis Lake Retention Dam, Lock E on the Tennessee Tombigbee Waterway, as well as numerous smaller projects.
- In 1990, I was tasked with starting Granite's Environmental Remediation Division. I continued as the manager of this division until I left Granite in 1996 to start Remcon.
- In 1996 I left Granite.
- Prior to working on the Project, some of the projects Remcon had completed and/or were working on, and their approximate values, were:

| | | |
|---|---|---|
| 1. | Sequoia Giant Forest Project | $ 1,515,003.00 |
| 2. | Wolf Creek Project | $ 985,283.00 |
| 3. | T.I.D. Tuolumne River Clean-up | $ 375,000.00 |
| 4. | Arroyo Ditch Project | $ 447,495.00 |
| 5. | Southeast Regional Landfill | $ 2,100,000.00 |

| | | |
|---|---|---|
| 6. | Bonzi Sanitation Landfill | $ 900,000.00 |
| 7. | Saratoga Housing Project | $ 4,800,000.00 |
| 8. | Winters Wastewater Reservoir | $ 1,194,794.00 |
| 9. | Lime Saddle Campground | $ 5,900,000.00 |
| 10. | Airport Reservoir D | $ 5,500,000.00 |
| 11. | Jack Tone Road Interchange | $ 5,563,098.00 |

Using this experience and knowledge, as well as our historic production rates of the proposed equipment to be used, and general knowledge of the terrain the work would be performed in, I compiled a comprehensive estimate.

78. After preparing my estimate for the Project, I had my personnel independently review and evaluate the bid, and I consulted Dick Lewis.

79. Ultimately, it was my decision to determine the amount of the proposal and the revised amount to submit.

80. Based upon the discovery undertaken in this lawsuit, I have come to discover I made the following bid mistake: I included in my bid an amount for supplying AB when this was unnecessary based upon the specifications. I address this item in greater detail when commenting upon the AB claim towards the end of this declaration.

**CONTRACT FORMATION**

81. Rod Keiscome, as the Contracting Officer, is the independent authority for the contract side of the Project. The written Notice of Award by Rod Keiscome to Remcon is dated May 9, 2001 for the sum of $7,121,636. I signed the Contract on May 15, 2001. A true and correct copy is attached hereto as Exhibit 31 and by this reference made a part hereof.

82. By contract, the contract documents included, at a minimum, the plans, the specifications, and the geotechnical report dated September 11, 2000. A Notice to Proceed for the Project was issued effective June 11, 2001. At that time, the contract completion date was August 11, 2003.

***SUMMARY OF CONTRACT PERFORMANCE***

83. A preconstruction conference for the Project was held on May 22, 2001 at the Ash Mountain Recreation Hall at Sequoia National Park. The minutes are dated June 18, 2001. A true and correct copy is attached hereto as Exhibit 32 and by this reference made a part hereof.

84. During the May 22, 2001 preconstruction conference, among other things, the NPS indicated/agreed/directed as follows:

(a) that Willie DeOcampo, the COR, would furnish Remcon with the details of any proposed modifications including revised plans and specifications if necessary;

(b) that labor burden percentages would be established at the time the first modification was negotiated;

(c) that the Corps of Engineers equipment rates would be used for all modifications;

(d) directed that all communications from Remcon to the NPS be directed to Bob Russell of Jacobs Facilities, the lead inspector, who would forward it to Willie DeOcampo; and

(e) that Athena Demetry would mark the trees to be removed before construction surveying and staking would occur.

85. Loren Mangrum, as an assistant inspector for Jacobs Facilities, was added to the Project inspection team in 2002 for the second construction season.

86. In June and July of 2002, I informed Willie DeOcampo that Mr. Russell was acting belligerent with Remcon's personnel and not performing his duties, and that this was delaying our work and causing extra costs. These contentions were raised within a couple weeks of Mr. Russell being removed from the Project.

87. Rod Keiscome, the CO, has advised us that he investigated the contention that Mr. Russell's conduct was inappropriate and concluded that the two Remcon

employees felt threatened. Bob Russell was no longer on the project effective July 4, 2002.

88. Loren Mangrum became the lead project inspector upon Bob Russell's departure.

89. We were unable to perform the volume of work we planned to perform during the initial construction season. The reasons for our inability are well documented and are all admitted by the government to be true. In summary, we encountered three differing site conditions ("DSC") (all of which have been recognized by the government , albeit untimely, in Contract Modifications 3, 4 and 6) (See Exhibits 3, 4 and 5), the USAR was realigned and relocated by the NPS "into the mountain", thus causing extra material to be excavated (when the NPS realigned the road into the hill, it was pushed into a higher slope, but the finished elevation of the road was not changed, thus causing a thicker wedge of natural terrain to be addressed), and the combination of these changes, coupled with the time it took to receive direction of what to do as a result (ranging from weeks to 18 months), bolluxed up the Project site, impeding and impairing our ability to productively perform. Despite multiple instances of oral and written notice, including multiple trips by me and my personnel to Denver to attempt to meet with the NPS' Project personnel (the CO and COR) to negotiate resolutions to these impacts so we could proceed, the Denver based NPS personnel failed and refused to timely perform their jobs and address and resolve the problems even when its own designers advised them that Remcon was due extra money. No unilateral or bilateral modification was issued by the NPS for at least 17 months after the differing site conditions and excess material encountered on the access road were disclosed to the NPS and acknowledged by it to be true. This conduct is a significant cause of our damages and/or inability to timely perform and complete our work, and ultimately depleted all of my funds.

90. Our efforts to get the problems encountered in 2001 addressed by the NPS during the six month winter shut down proved fruitless. Despite our efforts, and those

promoted by the Superintendent of the Park (see Exhibit 33 hereto, which is a true and correct copy of the Park Superintendent's May 1, 2002 memo to the CO pleading for the CO to resolve the problems existing at the end of 2001, valued at more than $1 million), the efforts of Remcon and others were not headed or responded to.

91. We remobilized to the Project in mid May 2002, following the 2001-2002 winter shutdown. We actually commenced field work in early June, based on the weather and site conditions, and we continued until later October/early November, 2002.

92. After we remobilized in mid May 2002, a partnering meeting was held on May 15-16, 2002 in the Park with all Project participants. This meeting involved a comprehensive job walk so that the problems experienced in 2001 could actually be seen by the CO and COR, who traveled to the Park from Denver. At the Partnering Meeting the CO was informed of all of the issues encountered by Remcon in 2001. He was advised that virtually none of them had yet been addressed, and thus the critical path of the Project was seriously affected and commencing productive work in 2002 was compromised. The CO was advised that multiple changes to the design had been issued by NPS personnel and the outside designers, including the realignment of the access road and the fact that the STT had had multiple design changes and revised drawings were still being worked upon.

93. During discovery, I have reviewed the government's production of records. I understand from reading the records that the government internally communicated about the existence of the DSC's and the fact that excess quantities of material were in fact going to be encountered by Remcon. Despite internally acknowledging these facts, the NPS, throughout 2001 and 2002 denied, in writing, the existence of the DSC on the access road, and also denied, in writing, its responsibility for the existence of excess material. These internal records are identified and commented upon in greater detail in subsequent paragraphs.

I also discovered that the government considered terminating our contract for its convenience two months after we started in 2001. The reason was the overrun in quantities coupled with the fact that the NPS lacked the resources ("funding") to pay for the problems encountered within 60 days of the 792 calendar day contract. The inability of the NPS to timely issue modifications to pay for the extra work we were required to perform, both constructively and through formal direction, as well as to grant us time extensions we were due (whether timely granted or not), caused our work to be constructively accelerated and impacted our ability to perform.

It is my belief that the totality of the Project records and events, and the impacts we experienced, were caused by constructive changes, directed changes, maladministration, errors in design, DSC's, and an abject failure of the NPS personnel to competently or fairly respond. It is my further belief that a lack of financial resources allocated to the Project, as documented by records we received in discovery, validate my beliefs. These facts are detailed below.

**CONTRACT MODIFICATIONS**

94. The NPS assigned a ten percent (10%) contingency amount to our contract to address modifications. This was part of its standard funding. This meant that approximately $712,000 was allocated to pay for change orders.

95. After contract award, the NPS opted to award certain alternates which were originally bid but not awarded.

96. Mod. No. 1 was issued bilaterally on July 24, 2001. It amended the contract to add additional compensation of $317,850 for asphalt concrete pavement on the Upper Sherman roads and parking area, General's Highway stone headwall, and telephone service to Correl Stub. These were alternates which we originally bid but where not originally awarded. A true and correct copy is attached hereto as Exhibit 34 and by this reference made a part hereof. Mod. No. 1 brought the cumulative total of the

base contract, plus modifications, to $7,439,486. Mod. No. 1 did not provide for any time extension for contract completion.

97. Mod. No. 2 was issued bilaterally on January 28, 2002. It amended the contract to add additional compensation of $10,908.00 for a sewer force main from the dosing tank and for electrical/telephone changes on the Access Road. A true and correct copy is attached hereto as Exhibit 35 and by this reference made a part hereof. Mod. No. 2 brought the cumulative total of the base contract, plus modifications, to $7,450,394. Mod. No. 2 did not provide for any time extension for contract completion. Despite all of the extra work performed in 2001, no modifications addressing such conduct were issued.

98. Mod. No. 3 was issued bilaterally on August 20, 2002. It amended the contract to add additional compensation of $345,209.92 for general conditions costs associated with the deletion of Pay Item 26, hauling of excess material from the park, and extended field overhead. See Exhibit 4. Mod. No. 3 brought the cumulative total of the base contract, plus modifications, to $7,795,603.92. Mod. No. 3 provided for a time extension of 13 calendar (8 working) days.

99. All of the extra work performed by Remcon made the subject of Mod. No. 3 was completed in July and August, 2001. Mod. No. 3 was not timely issued and the time extension was granted one year late.

100. Mod. No. 4 was issued bilaterally on September 12, 2002. It amended the contract to add additional compensation of $95,120.36 for hauling of excess excavation, restaking the access road centerline, sorting and removing buried debris in the upper parking lot, and raising the finish grade of the upper parking lot. See Exhibit 3. Mod. No. 4 brought the cumulative total of the base contract, plus modifications, to $7,890,724.28. Mod. No. 4 did not provide for a time extension for contract completion.

101. Except for the extra work of raising the USPA, which work was performed in July, 2002, all of the extra work recognized in Mod. No. 4 was performed in June and July, 2001. Mod. No. 4 was untimely issued.

102. At the time Mod. No. 4 was issued, the total funding authorized $7,121,636 (original contract) plus the 10% contingency ($712,164), for a total of $7,833,800, had been expended. The NPS, in order to fund Mod. No. 4, had to use funds from other projects at the park, and had to go through an undisclosed detailed path of getting funding approval from multiple sources in order to pay for extra work. Discovery in this case has allowed me to learn that the NPS did not anticipate or react to these funding limitations, on a timely basis, and this further constricted the timing of the issuance of modifications by over one year. At the time Mod. No. 4 was issued, I was less than 50% complete with our work and the NPS still had not recognized or addressed the two biggest impacts then pending: the USAR DSC and excess excavation costs, including delays and loss of productivity resulting from encountering them or the multiple re-design efforts, and resulting delays, caused by re-design of the STT.

103. As detailed later in this declaration, the failure of the NPS to possess adequate funding, to seek extra funding, timely or otherwise, or to address the issues encountered on a timely basis, collectively compounded the problems, increased our damages and delays, and ultimately exhausted my financial ability to perform.

104. Mod. No. 5 was issued bilaterally on November 20, 2002. It amended the contract to add additional compensation of $26,880.00 for adjustments to the Sherman Tree Trail. See Exhibit 6. Mod. No. 5 brought the cumulative total of the base contract, plus modifications, to $7,917,604.28. Mod. No. 5 provided for a time extension of 4 calendar days but we reserved our rights for further delays and impacts and damages.

105. At the time Mod. No. 5 was issued, November 20, 2002, it was too late to perform the extra work on the STT and thus it, by itself, caused at least a one year delay to the Project. This is explained in further detail in the declaration below.

106. Mod. No. 6 was issued <u>unilaterally</u> on February 18, 2003. It amended the contract to add additional compensation of $84,170.00 for the encountering of a differing site condition necessitating rock blasting and excavation. See Exhibit 5. Mod. No. 6

brought the cumulative total of the base contract, plus modifications, to $8,001,774.28. Mod. No. 6 did not provide for a time extension for contract completion or for the impacts the differing site condition caused. The only compensation recognized by the NPS in Mod. No. 6 was for a portion of the blasting costs incurred.

107. In late February, 2003, the CO advised he would issue Mod. No. 7, unilaterally, if I elected not to sign within ten (10) days. Mod. No. 7 deleted the Lower Sherman work from our contract. I never signed Mod. No. 7.[5]

108. On June 28, 2003, I submitted a multi-volume, comprehensive certified claim to the Contracting Officer. It outlined in substantial detail the cost and time impacts incurred by Remcon on the Project, and Remcon's breach of contract claims. The total of that claim was $3,091,799.60. See Exhibit 28.

***MARKING AND CLEARING OF TREES***

109. The plans for the Project indicated the trees identified by the designers to be removed to create the USAR and USPA in the virgin forest.

110. Specification Section 2230, entitled "Logging, Clearing and Grubbing" concerns logging, clearing and grubbing. Parts 3.3 and 3.7 expressly provide that the Contracting Officer shall mark the trees to be cleared, which include both merchantable and non-merchantable logs. Part 3.3A provides: "After installing silt and tree protection, remove all trees, brush and vegetation from areas designated approved by C.O. to be cleared." A true and correct copy of Specification Section 2230 is attached hereto as Exhibit 36 and by this reference made a part hereof.

111. It is my understanding that Athena Demetry and her supervisor, Tom Warner, the park forester, and Rich Thiel and Gary Muerle of the NPS went through the area to be built in 2000 or early 2001, prior to the preconstruction meeting, and marked

[5] There is a legal question pending whether Mod. No. 7 was issued or not. If it was issued, Remcon contends its content, as a result of federal case law, operated as a termination for convenience.

trees to indicate whether they were to be saved or to be removed, so that they could quantify the trees to be removed to provide input on this Project. Blue ribbon indicated a tree to be removed and yellow ribbon indicated a tree to be saved. This was done so that participants could visually see the trees that would be lost.

112. It is my understanding that most of the trees identified on the drawings to be removed were marked with blue ribbon by the NPS before the preconstruction conference which occurred in May, 2001.

113. The preconstruction conference minutes affirm that the marking of trees would be undertaken by the NPS. During the meeting, Athena Demetry indicated that she would mark all trees to be removed prior to logging operations. See Exhibit 32.

114. At the preconstruction conference, it was identified that the first order of work in the field on this project would be the marking of trees that we could log because the NPS agreed that trees would be marked prior to surveying by Remcon.

115. I personally communicated at the conference that until the trees were marked for removal and logged we would not be able to have our surveyors efficiently use surveying techniques to lay out the access road. This was agreed to by the NPS at the conference as the order in which things would proceed, and this is the sequence in which events actually occurred: no survey by Remcon was done prior to logging.

116. The NPS identified what natural resources should be preserved, specifically, the number and location of the trees and boulders to remain. The key person who was tasked with this responsibility was Athena Demetry.

117. After the preconstruction conference, the fieldwork started on June 1, 2001 by Athena Demetry who started to mark trees. As documented in her daily field notes, Athena Demetry marked virtually all of the trees for removal along the access road on Friday, June 1, 2001 and Monday, June 4, 2001. Per her deposition testimony, many of these trees had already been marked by her in April or May, 2001. True and correct

copies of Athena Demetry's field notes are attached hereto as Exhibit 37 and by this reference made a part hereof.

118. While Remcon personnel walked the right-of-way with Ms. Demetry for about 2 hours on June 1, 2001, and "assisted" her by placing the blue paint on trees which she determined were to be removed, the determination of which trees were to be removed was, by contract, and action in the field, exclusively the NPS' pursuant to section 2230 of the specifications. See Exhibit 36. On June 1, 2001, Mark Penrose and Greg Kasparek of Remcon helped Athena Demetry mark trees from 10:30 a.m. to 12:30 p.m. Athena Demetry continued on her own thereafter.

119. In the second paragraph of Athena Demetry's narrative on the first page of Exhibit 37 (her Friday, June 1, 2001 daily diary), she wrote: "Only about 252 of the total of 270 trees for removal were found on the drawings, and several of the trees shown in the drawings can't be found in the field, so fewer than the total of 270 will probably be removed." See Exhibit 37.

120. At the time that Athena Demetry was marking the trees for removal, Remcon had <u>not</u> yet received a notice to proceed on this project.

121. It is my understanding that when Athena Demetry did her marking of the trees, there was no survey that had been undertaken by the NPS during calendar year 2001 indicated by stakes in the ground.

122. It is my understanding that when marking the trees, Athena Demetry did not take into consideration the width of the road and didn't try to make sure that the trees that she was marking cleared the right-of-way for Remcon to construct the road. That process had already been done in the office on AutoCAD on the drawings. The drawings identified the trees to be removed.

123. On Monday, June 4, 2001, Athena Demetry noted in her daily log that she completed marking trees for removal in the Upper Sherman site. On Monday, July 4,

2001, no one from Remcon accompanied Athena Demetry on her marking of trees. See Exhibit 37.

124. On Monday, June 4, 2001, Athena noted in her daily log that the existing tree damage survey would be performed on Thursday, June 7, 2001. See Exhibit 37.

125. On Thursday, June 7, 2002, Athena Demetry recorded in her daily report that she walked the site with Bob Russell and myself to conduct the tree inventory required by Specification section 1351. See Exhibit 37. Specification section 1351, Part 1.2A (entitled "Natural Features Protection") provides that prior to field activities involving placing fencing, etc., the contractor and CO/Park Ecologist shall perform an onsite inventory of trees and other natural features. The purpose of the site walk/inventory was to note in writing previous damage to trees and vegetation.

126. The inventory required under Specification section 1351 is different from the responsibility to mark trees to be removed for construction.

127. Although I did not have to, I participated in the inventory process with the Athena Demetry on June 7, 2001, prior to the Notice to Proceed being issued to Remcon, in order for us to get a jump on the Project.

128. On June 7, 2001, the NPS (Athena Demetry) issued a memo to Remcon publishing the plant condition inventory conducted on June 7, 2001.

129. Logging commenced after the Notice to Proceed was issued on June 11, 2001 and was completed on or shortly after June 19, 2001.

130. On Monday, June 11, 2001, Athena Demetry noted in her daily log that she completed marking trees for removal based on input from Willie DeOcampo and the designers.

131. It is my understanding that the trees identified on the drawings to be removed were identified in the following manner: The original effort on this project was a survey done of the natural features in the forest of trees, rocks, and associated things that were mapped by surveyors. This information was put into an AutoCAD format and

transmitted to the designers for the design of this project. During the design phase, the surveying had been done with mapping. It got to the designers and they designed their improvements which were overlaid onto the survey map. The designers then overlaid the new road design onto the map of the trees and the landscape and the rocks.

132. It is my understanding that Athena Demetry did not do any formal quality control to look at the map prepared by the surveyors and compare it to the landmarks in the forest and features to see if it was accurate.

133. The plans did not indicate trees, recognized to be in the right-of-way where the access road was going to be constructed, that were less than 12 inches in diameter because the surveyors who did the mapping could not mark all of the trees.

134. It is my understanding that Athena Demetry was aware that a geotechnical effort was undertaken as part of the design phase of the Project and that Kleinfelder performed that effort. She was also aware that, in doing so, they were going to have to access and perform some testing within the natural resources. Athena Demetry does not know how it is that Kleinfelder was made aware of where the project was supposed to occur so that they could perform whatever testing they needed to do. She did not accompany them in any way, shape or form in the Upper Sherman area.

135. It is my understanding that Athena Demetry contends she was never informed by Willie DeOcampo, or someone else, in late June 2001 that we claimed that the center line of the USAR, as staked by our surveyors, was in a location different than where the trees had been cleared, and that she asserts that her first knowledge of this was in mid-July of 2001. However, Bob Russell's daily report for June 29, 2001 recites that he walked the site with Athena for 1 ½ hours and they looked at the logged areas, which include where the centerline was realigned.

136. It is my understanding that Athena Demetry learned from Bob Russell that both Willie DeOcampo (the NPS' COR in charge of construction) and Joanne Cody (the NPS' COR in charge of design) visited the project site late June 2001 and early July 2001

to examine the site between Stations 24 and 30 (approximately), along the access road. She was made aware, in mid-July 2001, that the deep cut area was staked in a locale other than where the trees had been marked for removal and cleared.

137. On July 2, 2001, Bob Russell sent a fax to Willie DeOcampo. The first page has the word "Willie" and then the words "Suggested realignment of access road Station 24 plus 46 to Station 30 plus 18." A true and correct copy is attached hereto as Exhibit 38 and by this reference made a part hereof.

138. On July 2, 2001, in a communication from Bob Russell to Willie DeOcampo, Mr. Russell writes, with reference to a second area of realignment on the access road: "My understanding is that these alignment adjustments were made to minimize the impact on the large tree located on the left at Station 12 plus 00, plus or minus." A true and correct copy is attached hereto as Exhibit 39 and by this reference made a part hereof.

139. On July 2, 2001, Willie DeOcampo, the COR in charge of construction, sent an email to the key NPS personnel involved in the Project: Joanne Cody (COR for Design), Ray Todd (Project Manager), Terry Lang (Contract Specialist working for the CO), Rod Keiscome (CO), Scott Reusch (Park employee), Jack Vance (Park employee), and Bob Russell (lead Project inspector) concerning existing field conditions and conflicts in the deep cut section. A true and correct copy is attached hereto as Exhibit 40 and by this reference made a part hereof. The email stated that the alignment of the road, as it had been surveyed by Remcon, appeared to be different than the extent of the road that was logged and he didn't know the reason for it.

140. As a result of the difference between the cleared area and the staked area, Bob Russell recommended that Remcon place the road in the logged alignment. Athena Demetry did not make a site visit on this issue ad was not consulted. If the road was going to remain in the location outside of the cleared area as staked by Remcon's surveyors in the deep cut, it would have required additional logging efforts (extra work)

to be undertaken. The area that was cleared or logged was uphill or into the hill from where the surveyors of Remcon had identified the center line to be. The NPS, in evaluating the issue, did not want to have additional trees and signature boulders removed, and also did not want a 600 or so foot scar adjacent to the road if direction was given to build it as staked.

141. As a result of direction given by the NPS in July, 2001, the road was actually built by Remcon into the cleared area between Stations 24 and 30 and the NPS moved the road in relation to what Remcon had surveyed. This is documented in multiple project records, including the July 10, 2001 realignment. True and correct copies of these records are attached hereto as Exhibit 41 and by this reference made a part hereof.

***DESIGN***

142. The NPS was responsible for the entire design of this Project and the plans and specifications were a combined product of internal design efforts by NPS personnel as well as by private designers retained by the NPS. It is my understanding that it was the responsibility of the NPS when soliciting proposals, whether by bid or proposals, to put out contract documents that were full, complete, accurate, and constructable.

143. The contract documents that were issued to Remcon to construct were not free from errors, omissions, conflicts, inconsistencies, and ambiguities, and the CO agrees with this statement of fact. He also agrees that:

(a) Not all of the errors, omissions, conflicts, inconsistencies and ambiguities existing in the contract documents that were issued to Remcon to construct have been the subject of one or more modifications issued by Mr. Keiscome, as CO;

(b) Rod Keiscome has come to believe that the plans and specifications and contract documents issued for this Project were not free from errors, omissions, conflicts, and ambiguities; and

(c) That there are some errors, omissions, conflicts, inconsistencies, and/or ambiguities that Rod Keiscome admits have not been covered in a modification (and that Rod Keiscome does not believe that the fact that Remcon was terminated for default relieves him of the obligations as the Contracting Officer to issue modifications for those additional costs that were incurred by Remcon while it was performing work prior to termination).

144. The design of the construction documents was procured, via task order, issued by the C.O. to an outside, Denver-based design team consisting of BRS, DHM and Martin and Martin. A true and correct copy is attached hereto as Exhibit 42 and by this reference made a part hereof. The task order required that all architectural, engineering and landscape architecture work produced pursuant to the task order be performed under the direct supervision of a professional architect/ professional engineer/professional landscape architect, and further required that all work be stamped by an architect/ professional engineer/landscape architect licensed in California.

145. The plans were not stamped by anyone, whether licensed in California or not, and Rod Keiscome did not waive, in writing, the requirement that the contract documents be stamped. Both Martin and Martin and DHM had engineers licensed in California but no one with a California license supervised the design effort.

146. The design team had the responsibility to confirm on this Project that there was accurate survey data shown on the drawings. From my personal review of the Project records produced by the NPS, it is my understanding that no one on behalf of the NPS, confirmed as part of a constructability review of this Project that there was accurate survey data on the plans.

147. It is my understanding that Robert Smith, since 1998, has been the President of DHM Design Corporation ("DHM"). Robert Smith is not licensed in the state of California. Robert Smith is at the top of the DHM hierarchy and has a staff of

five other professionals that he directs and manages. He oversees their work and prepares the scope of the work and fees.

148. It is my understanding that a licensed landscape architect in the State of California did not supervise the work of DHM on this Project.

149. Despite the requirement in the task order for the design phase of the Project, DHM did not stamp the plans for the Project.

150. During the design effort for the Project, DHM considered its primary contact at the NPS, and specifically the Denver Service Center, to be Joanne Cody.

151. The Project was designed by the NPS. DHM picked up the Project just to prepare construction documents, after the roads and the parking and trails had been laid out on paper. DHM did not create the layouts that were built.

152. At the time that DHM first became involved in this Project, the Denver Service Center of the NPS had laid out the road in a conceptual manner on paper but had not done anything to the physical topography to indicate the road. The source of the topographic background in the plans was from the NPS, was performed late in the design process and the outside design team did not independently review or validate the NPS furnished information. The only way to actually verify the NPS' topographic survey would be to have individuals on the ground with surveying equipment. Robert Smith isn't aware of any such effort being undertaken during the construction document phase.

153. Robert Smith is aware of certain guidelines issued by the NPS that standardize or govern the work or what the NPS expects to see, otherwise known as NPS-10. DHM's intent on performing its work on this project was to comply with the standard of care that others in his discipline perform, as well as NPS-10.

154. DHM coordinated the drawings and plans from the three design team members because DHM assembled all sets as one package.

155. In the task order for the design phase of the Project, the largest paragraph under the heading Project Identification, says, "All architectural, engineering, and

landscape architecture work produced under this task order shall be performed under the direct supervision of a professional architect/professional engineer/professional landscape architect and all work shall be stamped by an architect/engineer/landscape architect licensed in the state of California." This paragraph from the task order for the design phase of the Project applied to DHM's scope of work.

156. DHM did not comply with this requirement.

157. Martin/Martin, Inc had certain scopes of work it was responsible for in the design of the construction document phase that included preparing technical specifications and plans for the civil engineering portions and structural engineering portions of the work.

158. Raymond Tuttle is a licensed professional engineer in Colorado. Prior to working on this Project, Raymond Tuttle had never personally worked on any National Park Service project. Raymond Tuttle acted on behalf of Martin/Martin, Inc. as a principal with respect to the access road design phase effort for Martin/Martin, Inc.

159. Raymond Tuttle was the chief liaison on behalf of Martin/Martin, Inc. regarding the scope of work that it was tasked with the other designers.

160. As the person most knowledgeable on behalf of Martin/Martin, Inc. with respect to the design phase of the access road portion of the Project, Ray Tuttle did not make sure that their drawings were consistent with BRS' and DHM's drawings to ensure that they were free from error, omission, conflict and inconsistency, nor did he consult and/or use the California Building Code.

161. Despite the requirement in the task order for the design phase of the Project, Martin/Martin, Inc. did not stamp the plans for the Project, and Raymond Tuttle is not aware of anything in writing that modified the portion of the task order for the design phase of the Project that required that plans be stamped.

162. Raymond Todd was the NPS' Project Manager and the NPS' Contracting Officer Representative for the design phase of the Project.

163. In all design drawings produced prior to July, 2000, "rock excavation" and "partial rock excavation" were identified in multiple locations thereon by the designers.

164. The 30% construction documents, dated February 18, 2000, contain seven indications of rock excavation or partial rock excavation for the Upper Sherman Tree Existing Conditions. These indications were placed there by DHM. A true and correct copy is attached hereto as Exhibit 43 and by this reference made a part hereof. DHM included rock excavation and partial rock excavation in the 30% construction drawings after reading and interpreting the existing conditions mapping that came from the NPS.

165. The 50% construction documents, dated June 2, 2000, contain the same seven indications of rock excavation and partial rock excavation. These were placed and remained there at the direction of DHM. A true and correct copy is attached hereto as Exhibit 44 and by this reference made a part hereof.

166. The 50% construction documents, dated July 13, 2000, contain no notations for rock excavation or partial rock excavation in the areas where it had previously been noted. This fact cannot be explained by earlier testing by Kleinfelder for its report as the seismic refraction work to discern the hardness/rippability of rock was not undertaken until July 19, 2001 per Exhibit 65 referred to hereinbelow. A true and correct copy of excerpts of the 50% construction documents are attached hereto as Exhibit 45 and by this reference made a part hereof.

167. Commencing in July, 2000, the references to "rock excavation" and "partial rock excavation", all the way up through the 100 percent complete set (which were issued for construction), did not include the words "rock excavation" or "partial rock excavation" for the same locale where they were noted in the 30% and first set of 50% construction documents.

168. The deletion of the references to rock excavation and partial rock excavation occurred prior to the September 11, 2000 publication of the soils report.

169. When the soils report was received, the design team and NPS reached the conclusion that the contractor would not have to blast the access road to construct it or, if it did have to blast, it was going to be very little, if any.

170. The issued-for-construction set of documents had no line item of work known as rock excavation for the earthwork because of the content of the soils report.

171. On September 7, 2000, during the design phase, the NPS concluded that the project should be able to be sequenced and completed during a two construction season time frame. The NPS further noted that only delay to the Project will affect a contractor's ability to complete the project in two construction seasons.

172. Without having knowledge of the NPS independent conclusion, bid and scheduled the project to be completed in two construction seasons.

173. During the design phase, DHM's estimate of probable construction costs ranged from $7,803,335 to $9,289,241. All of the cost estimates prepared by the designers used a markup for overhead and profit of 18%. True and correct copies of DHM's estimates of probable construction costs are attached hereto as Exhibit 46 and by this reference made a part hereof.

174. During the bidding phase, the designers' Class A revised construction Cost Estimate, dated April 16, 2001, was $7,669,217.95.

175. Remcon's final proposal amount was $7,121,636.

176. Our bid used a 17.4% markup for overhead and profit.

177. The project specifications were not completed until February 27, 2001. At that time, the site was under winter weather conditions.

## ***DESIGN ERRORS TO UPPER SHERMAN WORK***

178. On July 10, 2001, the NPS, without participation of the design team, published a revised alignment for the access road and upper parking lot. See Exhibit 41. The design team, including Ray Tuttle, was frozen out of the road realignment change and the NPS just assumed responsibility to do it themselves.

179. On July 27, 2001 our surveyor was given some revised sheets concerning layout for the Sherman Tree Trail.

180. The day before, we were directly given revised sheets for elevations and coordinates for the upper parking lot.

181. Earlier in July 2001, the access road was realigned by Remcon in accordance with the NPS direction. The re-staking effort ultimately compensated for in Mod. No. 4 (in September, 2002) was performed on July 16, 2001. See Exhibit 3.

182. Each major phase of the Upper Sherman portion of the Project had some design revisions that had been given to us during the month of July, 2001. For example, on July 30, 2001, our surveyor, Bill Morris sent an email to Dan Savage of the NPS saying, "Dan, please check the points you sent me for the lower parking lot. I believe they are off by 100 feet." On July 31, 2001, Dan Savage responded via email to Bill Morris, stating, "Bill, I just saw the lower parking elevations are off 100 feet as you had noticed. I will correct and send you a new text file along with centerline points Wednesday." True and correct copies of these emails are attached hereto as Exhibit 47 and by this reference made a part hereof.

183. During the Project the NPS designers initiated changes to the design multiple times and we were furnished with the design changes and required to build to them. As an example, on July 31, 2001, Andrea Lind of DHM sent an email to our surveyor, Bill Morris, with copies to Bob Smith and Joanne Cody regarding spot grade adjustment. The email says, "Hi Bill. Is it too late to change trail .3 from elevation 7057.56 to elevation 7057.22?" A true and correct copy is attached hereto as Exhibit 48 and by this reference made a part hereof.

184. During the Project I specifically asked whether we were required to build the Project according to the original design or revised designs we were repeatedly given. Bob Russell and Willie DeOcampo told me to build from the revised designs as the CO was expected to issue a modification incorporating the changes. I complied rather than

stopping the Project, standing on principle, and increasing the costs associated with and caused by the many design changes as stopping the Project would have meant no productivity as contrasted with compromised productivity of my labor and equipment.

185. On August 8, 2001, Willie DeOcampo sent an email to Andrea Lind, Joanne Cody, Ray Todd, and Bob Russell regarding quantity overruns on this Project. He sent this email because he was questioning the designers in terms of how they came up with quantities--he wanted to know what the designers were thinking when they designed the project. The overruns were questionable because the NPS was seeing a 350 percent overrun on an estimated quantity (hauling out burn pit materials). A true and correct copy is attached hereto as Exhibit 49 and by this reference made a part hereof.

186. In response to Exhibit 49, Robert Smith responded that they didn't expect rock to be encountered that needed to be blasted.

187. By August 8, 2001, Rod Keiscome was already questioning his COR for construction, Willie DeOcampo, and his Project Manager, Ray Todd, why Pay Item 26 (hauling materials out of the park) was almost 350 percent over the estimated quantities, as the Project lacked adequate funding to pay for such overruns. See Exhibit 49.

188. On August 9, 2001, Rod Keiscome communicated to Willie DeOcampo that he was considering terminating the contract for convenience of the government as a result of the overruns on the Project. At this time, the Project was less than 60 days old. A true and correct copy of Willie DeOcampo's August 9, 2001 email is attached hereto as Exhibit 50 and by this reference made a part hereof.

189. At the same time the CO was concerned about overruns from the burn pit, by August 8, 2001, we had encountered three DSC's (two in the parking area and one on the access road). Willie DeOcampo, at that time, had at his disposal and reviewed the information from his inspector, which said that there was a differing site condition on the access road (rock that was not rippable), and the geotechnical report, which indicated that blasting wouldn't be required because all rock was going to be rippable. Willie was

looking for answers as to why the NPS shouldn't have to pay Remcon for blasting because the CO was already concerned about cost overruns.

190. On August 8, 2001, Bob Russell sent a fax to Willie DeOcampo regarding blasting and attaching Jeff Northrop's fax with attached blasting costs. A true and correct copy is attached hereto as Exhibit 51 and by this reference made a part hereof. Willie DeOcampo had received and reviewed Bob Russell's August 8th fax, with the attachment from Jeff Northrop, by the morning of August 9, 2001. When he received it, he came to the conclusion that Remcon was claiming a differing site condition.

191. When Willie DeOcampo received Exhibit 51, he knew that Remcon was seeking additional compensation, was proposing tracking the cost on a day-to-day basis, and perceived that the overrun could be as high as 500 percent.

192. Independent of the differing site condition issue on the USAR, there were a whole series of revisions to the drawings issued to us in July and August of 2001. On August 20, 2001, Bob Russell received revised drawings for the Upper Sherman Parking Area from DHM with a request to forward them to Jeff Northrop of Remcon. A true and correct copy is attached hereto as Exhibit 52 and by this reference made a part hereof. On August 22, 2001, Bob Russell forwarded the revised drawings to Jeff Northrop of Remcon. A true and correct copy is attached hereto as Exhibit 53 and by this reference made a part hereof. The pending design issues and revisions, as of August, 2001, relating to the USAR, USPA and the STT, were not finalized by the design team, in conjunction with the NPS, before Remcon got out to the site to start working in 2002.

193. On May 9, 2002, Bob Smith sent Joanne Cody, Ray Tuttle, Andrea Lind, and Willie DeOcampo revised and proposed grades for the STT. A true and correct copy is attached hereto as Exhibit 54 and by this reference made a part hereof.

194. On May 21, 2002, Bob Smith emailed Willie DeOcampo advising that the stone stair quantity for the Sherman Tree Trail had to be adjusted. A true and correct copy is attached hereto as Exhibit 55 and by this reference made a part hereof.

195. On May 22, 2002, Willie DeOcampo emailed Bob Smith seeking the Sherman Tree Trail revisions indicating where changes are required. See Exhibit 55.

196. On May 22, 2002, Bob Smith advised Willie DeOcampo that revised Upper Sherman Parking Area and Sherman Tree Trail plans were being worked on. See Exhibit 55.

197. On May 24, 2002, DHM sent Martin and Martin revised grading and parking lot plans, and Martin and Martin needed them to prepare design materials for the NPS. A true and correct copy is attached hereto as Exhibit 56 and by this reference made a part hereof.

198. As of early June, 2002, the weather and site conditions were sufficient to permit construction to commence in earnest. By email on June 3, 2002, I sought clarification as to what plans should be used to build the trail and also where were the revisions repeatedly promised so I could work on critical path activities. A true and correct copy is attached hereto as Exhibit 57 and by this reference made a part hereof.

199. On June 5, 2002, Bob Russell prepared an estimate to raise the Upper Sherman Parking Area. His estimate showed he used a 20% compaction factor.

200. On June 19, 2002, I inquired from Willie DeOcampo and Rod Keiscome what plans were to be used to construct the STT as some of the plans referenced on the revised STT drawings we had received referenced plans not yet received by Remcon. A true and correct copy is attached hereto as Exhibit 58 and by this reference made a part hereof. The direction did not ultimately come until November, 2002.

201. The plans issued for construction called for a crown on the USAR. We built a crown on the USAR. As of July 25, 2002, a crown was in place on the USAR.

202. On July 25, 2002, NPS inspectors, along with Remcon, concluded that the USAR, between Stations 24+00 and 30+00, should be super elevated, rather than a crown, to fit the roadway into the rock shoulders and operate more successfully. True and correct copies of Russell Belknap's and Loren Mangrum's July 25, 2002 daily logs