are attached hereto as Exhibit 59 and by this reference made a part hereof. The change from a crown to super resulted in extra work being performed by Remcon.

203. No modification has been issued for the extra work performed by Remcon to change the Upper Sherman Access Road from a crown to a super and the location of this change is precisely where the road was realigned and the differing site condition (rock blasting) was encountered.

204. On June 28, 2002, I notified the CO in writing of grading conflicts and errors on plans causing delay, disruption and extra costs and requiring immediate attention. A true and correct copy is attached hereto as Exhibit 60 and by this reference made a part hereof. I further notified the CO that if immediate answers were not provided to clean up conflicts and errors, then we would be forced to cease work.

205. On August 21, 2002, I wrote Mike Giller, the NPS' COR and Project Manager, advising that the lack of survey control on the STT continued. A true and correct copy is attached hereto as Exhibit 61 and by this reference made a part hereof.

206. On September 5, 2002, Loren Mangrum wrote Joanne Cody and Mike Giller that there was physical interference between Stations 36 and 48 in the Upper Sherman Access Road with trees affecting parking lot layout. A true and correct copy is attached hereto as Exhibit 62 and by this reference made a part hereof.

207. Jack Vance and Loren Mangrum confirmed in a site walk that there was a physical interference with trees. See Exhibit 62.

208. This is the same area where the dry laid stone wall was affected by trees.

209. On September 5, 2002, Jack Vance wrote Loren Mangrum, Joanne Cody, and Mike Giller advising of the same problem and stated that a surveyor was needed to check out if control points in the drawings were inaccurate. A true and correct copy is attached hereto as Exhibit 63 and by this reference made a part hereof.

210. No surveyor was bought on site by the NPS despite problem identification.

211. On September 10, 2002, Loren Mangrum wrote that trees and rocks are affecting the project as they are in the way. A true and correct copy is attached hereto as Exhibit 64 and by this reference made a part hereof.

212. Between the issuance of the NTP on June 11, 2001 and November 20, 2002, when Mod. No. 5 was issued, changes in trench grades, trail points, stone steps, culverts and other STT features occurred numerous times.

213. Between the issuance of the NTP on June 11, 2001, and November of 2002, multiple changes to the USAR and USPA were issued to us.

214. The access road, parking lot, and/or trail were relocated by the NPS and its designers, in part, because of natural features that were found to be in the way.

215. The access road was not built in the location originally designed based upon multiple directions issued to us by the NPS, and its designers, as well as the DSC.

***PROJECT SOILS REPORT***

216. The Geotechnical Investigation Report for the Project, prepared by Kleinfelder, Inc., was issued on September 11, 2000. A true and correct copy is attached hereto as Exhibit 65 and by this reference made a part hereof.

217. Martin and Martin solicited Kleinfelder's proposal to perform the geotechnical investigation and report on February 4, 2000. A true and correct copy is attached hereto as Exhibit 66 and by this reference made a part hereof.

218. The soils report was issued particularly late on this Project, after the construction document phase was substantially in progress. Specifically, the design team had already gone through 30, 50, and 75 percent drawings by the time it was issued. This was the latest Robert Smith had ever seen a soils report be prepared for a Project. Because the report was procured late, Martin/Martin, Inc. needed to have additional time to finalize the construction documents once it got the soils report.

219. Kleinfelder performed its field exploration on July 5, 6, and 19 of 2000. See Exhibit 65. At that time, the construction drawings were already 50% complete. See Exhibit 45.

220. It is my understanding that the late arrival of the soils report had a negative impact on the ability of the design team to perform their work swiftly because they were missing data and had to make assumptions. Until the soils report was received, the design team had assumed that there was going to be a lot of rock that would have to be blasted by the contractor in constructing the Upper Sherman Access Road.

221. The Geotechnical Investigation Report provides:

(a) Section 1.1: "Recommendations presented herein should not be extrapolated to other areas or used for other projects without our prior review"; and

(b) Section 5.2.2: "The upper silty sand and weathered granitic rock material at the site appear to be conducive to ripping…The apparent velocities indicate the weathered granitic rock should be rippable in large excavations with the appropriate equipment in good working condition." See Exhibit 65.

222. The apparent seismic compressional velocities specified in the Geotechnical Investigation Report indicate that the material to be excavated at the Project would be rippable with a D8 dozer.

223. In Section 7.1 of the Geotechnical Investigation Report, Kleinfelder recommended that it conduct a general review of the final plans and specifications for the Project to evaluate that its earthwork and foundation recommendations had been properly interpreted and implemented during design.

224. In Section 7.2 of the Geotechnical Investigation Report, Kleinfelder recommended that all earthwork during construction of the Project be monitored by a representative from Kleinfelder.

225. No one from Kleinfelder was hired by the NPS or its inspector to monitor the earthwork.

226. Section 8 of the Geotechnical Investigation Report provided that, if the scope of the proposed construction changed from that described in the report, Kleinfelder's recommendations should be reviewed.

227. When the DSC on the USAR was encountered, no one called Kleinfelder.

228. No one called Kleinfelder when the location of the access road, between Stations 24 and 30, was realigned by the NPS in late June and early July 2001.

229. Kleinfelder was not ever consulted by the NPS or design team about the realignment of the Upper Sherman Access Road.

230. The responsibility to contact Kleinfelder was Mr. DeOcampo's as the COR during the construction phase.

231. Page 11 of the soils report contains a table entitled "Summary Seismic Line Data". This table contains the apparent velocities of sound transmitted in feet per second. The higher the number means the denser or less weathered the granitic rock encountered is, and the more difficult it is to rip. See Exhibit 65.

232. If the access road is realigned off the profile of the design, the geotechnical data may not have the same or accurate application.

233. Raymond Tuttle developed the design for the access road with the interpretation and understanding that the soils report stated clearly that, with the exception of utility trenching, all material expected to be encountered by the contractor in constructing the access road was expected to be rippable by a Cat D8 dozer.

234. Robert Smith understood that the soils engineer determined and published in the soils report that the rock to be encountered, while dense, was nevertheless rippable based upon the standards published by Caterpillar for a D8 dozer, such that blasting wouldn't be required to build the USAR where it was planned to go.

235. After reviewing the report, Willie DeOcampo came to the conclusion that Kleinfelder communicated that the rock to be encountered by the contractor on this

project was all able to be ripped by conventional construction equipment using the standard Caterpillar D8 dozer.

236. The soils report concluded that all rock material encountered along the Upper Sherman Access Road excavation, except isolated floaters, were rippable.

237. The Caterpillar Performance Handbook provides that granitic rock with a seismic velocity between zero and 5800 is rippable with a D8R dozer. A true and correct copy is attached hereto as Exhibit 67 and by this reference made a part hereof.

238. The apparent seismic velocities reported by Kleinfelder in its soils report to be encountered were between 1115 and 5,747.

239. The last sentence of the second paragraph on page 31 of the soils report reads, "The recommendations provided in this report are based on the assumption that an adequate program of tests and observations will be conducted by Kleinfelder during the construction phase in order to evaluate compliance with our recommendations." See Exhibit 65. No one with geotechnical expertise and knowledge was assigned to this Project to perform tests and observation during the construction phase while Remcon was on-site performing work.

***<u>SURVEYING</u>***

240. Remcon subcontracted the surveying work on the Project to G&K. The key members of G&K that were involved in the Project were Bill Morris and Jesse Stanley.

241. G&K's personnel are very experienced, competent surveyors, used modern equipment, with dozens of years of experience of surveying in mountain terrain.

242. Following the clearing of trees in the USAR and parking areas, I had G&K commerce its surveying and staking conduct. This effort started in mid-June, 2001. Swiftly after it commenced, G&K discovered, and disclosed, that the centerline of the USAR, as designed, between approximately Stations 24-30, which is the area otherwise

known as the "deep cut" because it was a locale that required excavation, was in the trees and downslope from the area that had been logged and cleared.

243. We immediately notified the lead inspector, Bob Russell, and COR, Willie DeOcampo, about this conflict. Both Bob and Willie, and G&K, swiftly visited the site on June 25, 26 and 27, 2001 to investigate G&K's disclosure. The conclusion reached was that the area marked by the NPS to clear the trees was upslope, and in a different location for about 600 feet, than shown on the contract drawings.

244. Following more than two weeks of evaluation and analysis, which included involving the NPS' Joanne Cody, the NPS' most knowledgeable person about the design, the NPS determined and directed that the centerline of the road, and the road itself, be realigned upslope, into the hill, by up to fifteen feet between approximately Stations 24 and 30. The extra work of restaking the centerline in compliance with this direction was performed on July 16, 2001. The NPS paid for the extra surveying work through Mod. No. 4 issued fourteen months later in September, 2002.

245. On June 25, 2001, Bill Morris of G&K sent an email to Dan Savage stating: "We are requesting further information to construction-stake the parking lots and trail. We have the horizontal information. We need the vertical data." A true and correct copy is attached hereto as Exhibit 68 and by this reference made a part hereof.

246. Throughout 2001 and 2002, when surveying the Project, G&K found multiple errors in the plans and conflicts between the plans and the physical conditions encountered in the field. As a result, multiple e-mails and oral communications were sent regarding the errors and conflicts. Many are attached as exhibits to the Declarations of Bill Morris and Jesse Stanley.

247. As a result of these multiple communications, many changes to the design were issued to Remcon and G&K. Each design change or clarification, including those as small as inches, required G&K to re-survey and/or re-stake the affected area.

248. Each such effort was extra work.

249. During 2001, following Remcon's notices that there was excess excavation/material encountered, the NPS disputed our contention by asserting that the reason for extra material was because Remcon had mis-staked and/or mis-graded the site too low. A true and correct copy is attached hereto as Exhibit 69 and by this reference made a part hereof.

250. By letter dated April 17, 2002, Remcon informed Willie DeOcampo and Bob Russell that the survey on the Sherman Tree Trail confirmed that the Sherman Tree Trail, as then constructed, was per plans. A true and correct copy is attached hereto as Exhibit 70 and by this reference made a part hereof. This was based on an extra survey performed by G&K.

251. On May 9, 2002 and May 10, 2002, Remcon's survey crew continued checking existing stakes in the parking area and access road. All existing stakes were confirmed to be correct. New stakes were installed as required. True and correct copies of Loren Mangrum's May 9, 2002 and May 10, 2002 daily logs are attached hereto as Exhibit 71 and by this reference made a part hereof.

252. The NPS eventually recognized that the surveying and grading was correctly performed by issuing Mod. No. 4 which paid for re-surveying and handling excess excavation and hauling as extra work.

253. The only modification to pay Remcon for extra surveying work was Mod. No. 4, and only in the amount of $1,154.00. See Exhibit 3.

254. On May 2, 2003, G&K sent Remcon its statement of extra work claim for $41,782.50. A true and correct copy is attached hereto as Exhibit 72 and by this reference made a part hereof.

255. This amount is sought as part of Remcon's claim.

**USPA DSC's**

256. Concurrent with the problem which led to the realignment of the access road location, and continuing into the month of July 2001, Remcon encountered a

differing site condition in the Upper Sherman Parking Area. This involved the fact that the estimated quantity of material to be excavated and hauled out of the park from an area known as the burn pit, specified to be 2,000 cubic yards in Bid Item 26, actually increased to more than 7,000 cubic yards.

257. In his weekly report dated July 3, 2001 Bob Russell reported that up to 7,000 cubic yards of material will need to be excavated from the burn pit/dump area of the Upper Sherman parking lot. A true and correct copy is attached hereto as Exhibit 73 and by this reference made a part hereof.

258. In his weekly field report dated July 12, 2001, Bob Russell reported that the burn pit/dump area in the Upper Sherman Parking Area was more extensive than shown on the plans and that the final quantity of the burn pit/dump area "may be as much as 7,000 cy.". A true and correct copy is attached hereto as Exhibit 74 and by this reference made a part hereof.

259. On July 16, 2001, Ray Todd visited the site and inspected the debris found on the south side of the upper parking lot. This was an area separate from the burn pit and constituted another differing site condition. Mr. Todd agreed that it had to be excavated and hauled out of the park, and agreed that methods being used by Remcon were cost effective and that a contract modification was in order to cover the contractor's extra costs. A true and correct copy of Bob Russell's July 16, 2001 daily log is attached hereto as Exhibit 75 and by this reference made a part hereof.

260. On July 16, 2001, Andrea Gregor of DHM visited the project site. In a subsequent email to a series of people at the NPS, she noted that the bid quantity for hauling off the burn pit materials is not accurate, that the bid item shows 2,000, and that the total haul-off is closer to 6,000 cubic yards.

261. The extra work excavating and hauling out this debris was performed. The NPS did not timely process the modification for debris hauling (as contrasted with the burn pit) until 14 months later when Mod. No. 4 was issued. See Exhibit 3.

262. In his weekly report dated July 25, 2001, Bob Russell stated that Remcon completed hauling burn/dump material out of the park for a total of 7,584 cubic yards (but due to some short loads that amount may need to be adjusted to about 7,000 cubic yards), and that Remcon continued removing debris from the Upper Sherman parking lot and that Ray Todd and Joanne Cody had reviewed site conditions and methods used by Remcon and agreed it was probably the most cost efficient. A true and correct copy is attached hereto as Exhibit 76 and by this reference made a part hereof.

263. In his weekly report dated August 1, 2001, Bob Russell reported that "It still appears that the existing burn/dump area located in the upper parking lot may contain as much as 7000 CY." A true and correct copy is attached hereto as Exhibit 77 and by this reference made a part hereof. He also reported that additional buried material, not known on plans or addressed in specifications was encountered in the upper parking lot. This is the same material identified on July 16, 2001 by Ray Todd.

264. On August 1, 2001, Willie DeOcampo wrote Remcon advising that the NPS would pay Remcon for the extra work associated with hauling miscellaneous material (the burn pit excavation and hauling) upon submission of truck weight receipts and the re-negotiation of the unit price based on overruns in quantity. A true and correct copy is attached hereto as Exhibit 78 and by this reference made a part hereof.

265. On August 9, 2001, Willie DeOcampo sent an email to Ray Todd. Willie wrote in this email that Mr. Keiscome had a communication with him about the overrun in quantity for Bid Item 26. See Exhibit 50. At the time that Willie DeOcampo wrote the August 9, 2001 email, another issue had arisen--the existence of hard rock that had to be blasted between Stations 24 to 30. It was his intent when he wrote the email to combine the existence of the additional excavation for Bid Item 26, which was already known, and pair it with the additional extra work that was perceived being done by us with respect to rock excavation.

266. As of August 2001, Willie DeOcampo understood that Bob Russell perceived that Remcon was encountering a DSC with respect to the burn pit material.

267. On June 26, 2002, Willie DeOcampo sent Bob Russell, Terry Lang, and others an email indicating that, due to time constraints, Willie would write draft Mod. No. 3 for hauling of material from the burn pit outside the park, work which was actually done in June and July of 2001 (approximately one year earlier). Mod. No. 3 was ultimately issued in August, 2002 and, to some extent, reimbursed Remcon for the extra work performed.

268. Under the arrangement with the NPS, it was part of Bob Russell's job requirement to draft modifications.

269. The NPS provided no explanation why the preparation and issuance of Mod. Nos. 3 and 4 was not done in calendar year 2001.

270. It is my understanding that Mod. Nos. 3 and 4 were not prepared during the construction season of 2001, nor during the winter of 2002 (when there was no construction operations to inspect) because neither Bob Russell nor Willie DeOcampo took it upon themselves to prepare them at those points in time.

271. In the last paragraph of Willie DeOcampo's June 26, 2002 email, he writes, "We need this Mod Number 4 within the next two weeks, but not later than three." In the same email Willie also noted, "Keep in mind that Remcon's accusations and negotiating position becomes stronger the longer these negotiated items remain unprocessed through the modification process." A true and correct copy is attached hereto as Exhibit 79 and by this reference made a part hereof.

272. It is my understanding that he wrote this because he wanted to wrap things up and the extra work that was encompassed by Mod. No. 4 had already been done, with the exception of raising the upper parking lot. Further, he felt that our claims for delay, disruption and loss of productivity, and our inability to get the job done could become stronger the longer these negotiated items remained unprocessed.

273. Following my review of the Project records in 2001, I believed we were required to remove and dispose of approximately 7000 or more cubic yards of material.

274. Not only did Remcon have to perform the extra work to excavate approximately 5,000 additional cubic yards from the burn pit, we had to perform the extra work to haul and place material back in it to pave it at the design elevation.

275. Remcon was paid for hauling out the burn pit materials as extra costs in Mod. No. 3 pursuant to Bid Item 26. See Exhibit 4.

276. As part of the bid documents, the hole that the NPS anticipated would be created and Remcon had to plan to fill back in was about 2,000 cubic yards. We had planned on 2,000 yards in our bid to haul the material out, and we had to fill in that 2,000 yards as part of our bid.

277. We have always contended that we were entitled to be paid extra compensation to both haul off excess material as well as fill up the larger hole created as a result, but no modification has ever been issued to compensate Remcon for filling back the hole to the design elevation for the excess quantity that had been excavated.

278. It is my understanding that Willie DeOcampo determined that we were entitled to get paid to replace the excess burn pit material because it would have been extra work to fill back in the larger hole created by the burn pit excavation.

279. It is my understanding that Ray Tuttle believes it was both extra work to remove the extra burn pit material and because it brought the site below the elevation of design, that it would also be extra work, requiring additional compensation, to put material in the hole to bring it back to the elevation it should be.

280. Remcon had originally scheduled 5 work days for the burn pit excavation work based on the NPS quantity estimate. It took 27 workdays and the extra costs exceeded $300,000. We excavated and hauled this material out of the park at the direction of the government in June and July of 2001. In December of 2001, I traveled to Denver to present the extra costs for both the excavation effort and backfilling the hole

back to grade to the NPS. I brought with me volumes of project records to substantiate the extra costs incurred. A true and correct copy is attached hereto as Exhibit 80 and by this reference made a part hereof. These documents consisted of an entire banker's box, are identified in Exhibit B to this declaration, and will be produced at the time of trial.

281. The existence of the unknown, undisclosed debris, as well as the excess burn pit materials, were Type I DSC's.

282. The parking lot had a certain configuration of certain dimensions that had to be paved and it had to have certain underlay in the form of base rock and subgrade that was compacted to certain requirements. In order to do that work, we had to excavate out the material that was found not to be acceptable to support the parking lot.

283. The justification for Mod. No. 4 states, in detail, that Remcon encountered unknown miscellaneous buried debris that it had to remove in order to do that which he was originally required to do. See Exhibit 3.

***USAR ROAD REALIGNMENT***

284. Following the hauling of the burn pit materials, Remcon planned to perform its mass excavation work which principally consisted of excavation and grading of the access road and the parking lots in the Upper Sherman portion of the project.

285. This effort was planned to be a duration of 21 calendar days. Instead, it took over a year to perform due to the road relocation and the failure of the government, until September, 2002, to issue its final design changes to Remcon so that Remcon could complete the earthwork portions of the project and commence paving.

286. Once the logging operations were complete in June, 2001, Remcon's surveyor, G&K, began to lay out the Upper Sherman Access Road and Parking Areas. G&K immediately discovered that about 600 feet of the road, as shown in the NPS plans and specifications, did not match the clearing limits that had been laid out by Ms. Demetry in the field. The trees were marked to be removed, between Stations 24 and 30 on the access road, in a location into the hill from where the designers intended.

287. The significant discrepancy between Stations 24 and 30 (approximately 600 lineal feet) between the area Remcon had cleared per Ms. Demetry's direction and where the NPS plans and specifications called for the access road to be constructed, for which we had no responsibility, initiated a series of re-designs and other problems that impacted our ability to schedule and complete our work as we had originally planned.

288. Because G&K's stakes were among the many trees which had not been marked to be removed, either the road had to be relocated into the hill, or more trees had to be removed and a big scar of cleared area would be seen by park visitors.

289. Based upon the published mission of the NPS, having to remove additional trees and signature-type boulders was to be avoided as far as the NPS was concerned because its goal is to conserve the natural resources.

290. On June 26, 2001, Remcon's surveyors were on site surveying and staking the USAR. On June 26, 2001, Remcon started grading the access road. On June 26, 2001, Bob Russell also noted in his daily report that Remcon advised him of concerns regarding the centerline of the USAR between Stations 8 and 12. Bob Russell further noted in his daily report that Willie DeOcampo, while on site, reviewed the Remcon concerns in the field between Stations 8 and 12 and Willie DeOcampo directed a realignment of up to a maximum of 11 1/2 feet right of the staked location to miss an existing tree. A true and correct copy is attached hereto as Exhibit 81 and by this reference made a part hereof. We complied with Willie DeOcampo's direction. The relocation of the access road between stations 8 and 12, a distance of 400 feet, caused Remcon to incur additional time and money as a result of increase earthwork. These costs are included in Remcon's earthwork claim.

291. It is my understanding that it was Willie DeOcampo's intent, when he walked the site with me on June 26, 2001, that Remcon relocate the road in accordance with the discussions that Willie had with me. He made this direction crystal clear.

292. On June 27, 2001, the surveyors staked the centerline between Stations 24 and 30. A true and correct copy of Bob Russell's June 27, 2001 daily log is attached hereto as Exhibit 82 and by this reference made a part hereof. At the time, the surveyors noted that the centerline of the Upper Sherman Access Road was not in the location where the trees were cleared.

293. Notice of the conflict between the location of the staking of the Upper Sherman Access Road and the cleared area, between Stations 24 and 30, was immediately provided to Bob Russell on June 27, 2001. See Exhibit 82. In Bob Russell's June 27, 2001 daily log of construction, under the heading Unforeseen Developments on Job Continued, Mr. Russell wrote: "Work with surveyors to realign center line of access road within. So that road would be located within the cleared area, surveyors recalculated suggested center line location to fit the site and will restake tomorrow so that Willie can review." See Exhibit 82.

294. Bob Russell's June 27, 2001 daily log says that the contractor cleared the trees within the area that was marked, and thereafter it was determined that the road, because of one or more natural features, did not fit or was misdesigned. Mr. DeOcampo then showed up and said that he needed to talk to Joanne because additional trees and boulders would otherwise have to be removed.

295. Willie DeOcampo was on site on June 27, 2001 when the conflict was identified, and a restaking effort was undertaken so that Willie DeOcampo could personally review it on June 28, 2001 in the field. See Exhibit 82.

296. The road, as designed between Stations 24 and 30, is approximately 22 feet wide. If stakes were approaching the edge of the cleared area, the road was eleven feet off of the cleared area.

297. Multiple visits by Willie DeOcampo and Joanne Cody in late June and early July 2001 occurred and resulted in the NPS' direction to Remcon to relocate the road between Stations 24 and 30 further into the hill where the trees had been logged. As

a result, the access road needed to be re-surveyed by Remcon's surveyor. To do so, Remcon was directed to survey the new road alignment. This extra work was performed on July 16, 2001.

298. On June 28, 2001, Bob Russell recorded in his daily report that Remcon's surveyors continued restaking the suggested centerline of the USAR between Stations 24 and 30, for review by Willie DeOcampo, that Willie reviewed the surveyed realignment of the USAR between Stations 24 and 30, and said he would review it with Joanne Cody next week. In response, Bob Russell told Willie DeOcampo that a quick decision was needed so as not to delay Remcon. Willie DeOcampo agreed that if the alignment was not adjusted, additional trees and boulders will have to be moved. A true and correct copy is attached hereto as Exhibit 83 and by this reference made a part hereof.

299. The June 26, 2001 daily log dealt with realignment between Station 8 to Station 12, a distance of 400 lineal feet. The June 28, 2001 daily log dealt with Station 24 to Station 30, which is another 620 lineal feet. A total of 1,020 lineal feet or 33% of the access road, was realigned by the NPS.

300. Bob Russell was responsible to make sure Remcon stayed within the project limits that were marked.

301. The stationing that is referenced in Bob Russell's June 28, 2001 daily log is that portion of the access road that became the subject of the differing site condition where unrippable rock was encountered.

302. On June 26th, June 27th and June 28th, the center line was being directed by the NPS to be relocated but they are not the subject of either a then-issued Contracting Officer's Directive or a modification. It is my understanding that Rod Keiscome believes these NPS directions to Remcon were constructive changes.

303. Further, it is my understanding that Rod Keiscome can't recall if Mike Giller, Ray Todd, Jack Vance, Bob Russell, Loren Mangrum, Joanne Cody, or Willie DeOcampo ever advised him of all the changes that occurred on the project, prior to him

being aware of them during the litigation. However, I personally advised him of these changes in writing and orally many times, including during my trips to Denver during the winter shut down of 2001-2002 and during the Partnering meeting in May, 2002.

304. The NPS did not retain one or more surveyors to go out to the project site and prepare a revised layout as a result of the alignment issue arising.

305. On July 2, 2001, Bob Russell emailed to Willie DeOcampo photographs of the Upper Sherman Access Road realignment which Willie DeOcampo had reviewed with me the prior week, between Stations 8 and 12. A true and correct copy of the email is attached hereto as Exhibit 84 and by this reference made a part hereof.

306. On July 2, 2001, Bob Russell also sent Willie DeOcampo and Joanne Cody an email entitled Access Road Suggested Realignment from Station 24+46 to Station 30+18, which included photos of the Upper Sherman Access Road realignment between Stations 24 and 30. A true and correct copy of the email is attached hereto as Exhibit 85 and by this reference made a part hereof.

307. The July 2, 2001 emails are clear documentation of communication regarding design changes between the COR and the NPS' onsite Construction Manager.

308. On July 2, 2001, Bob Russell also faxed to Willie DeOcampo the offset details and dimensions for the realignment between Stations 24 and 30. For almost 300 feet, the offset exceeded 8.5 feet, and was between 12.41 and 15.22 feet offset for almost 200 of those feet. See Exhibit 38.

309. On July 2, 2001, Bob Russell documented to Willie DeOcampo the actual dimensions of the offset of the centerline, between Stations 8 and 12, of the Upper Sherman Access Road, that were directed to be realigned on June 26, 2001. See Exhibit 39. The maximum offset and adjustment was 11 feet between Stations 8 and 12.

310. The relocation of the USAR centerline between Stations 8-12 and 24-30 caused additional earthwork to be performed by Remcon in constructing the USAR.

311. When Willie DeOcampo received Exhibit 39, he agreed that the offsets that were set forth therein were the appropriate offsets that Remcon should undertake to achieve that which Willie communicated on June 26, 2001. At Station 10+60, the road was realigned 11 1/2 feet.

312. On July 2, 2001, Remcon's surveyor, G&K sent Joanne Cody a drawing of the access road realignment. A true and correct copy is attached hereto as Exhibit 86 and by this reference made a part hereof.

313. On July 2, 2001, Willie DeOcampo sent an email to the NPS Project personnel (Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Scott Ruesch, and Jack Vance), with a cc also to Bob Russell. This email says, "Upper Sherman Road, surveyors laid out centerline and found two places that conflict with existing field conditions. One area is located near Station 28 and 29. The centerline appears to swing further out than our drawings indicate. The clearing has been performed per the drawings; however the center line as staked will make it necessary to clear additional trees and remove signature-type boulders." The email also noted that Remcon had indicated that it believed that its cuts and fills would not balance, that there could be 13,000 CY of excess materials that would have to be transported elsewhere at $15.00/CY. See Exhibit 40.

314. The reference in Exhibit 40 to "last week" refers to Willie's presence at the site on June 26th, 27th and 28th, 2001.

315. Rod Keiscome, the CO, was advised in this email that the access road centerline had been properly staked but its locale was different than the area cleared.

316. Willie DeOcampo's July 2, 2001 email indicates that the surveyor laid out the centerline, found two conflicts, and that the road will need to be constructed in a location other than shown in the drawings. Rod Keiscome received this data.

317. Willie DeOcampo's July 2, 2001 email also noted that the NPS wanted to pursue the "error and omission" clause of the contract concerning the design team and that Martin and Martin needed to recheck their calculations.

318. Exhibit 40 reads "Bob and I figure the road center line can be shifted in order to make this work and prevent delays." By writing this, Willie was stating that Bob Russell had told him that it would work to move the road.

319. Exhibit 40 also reads: "The surveyors will send you a revised layout. The contractor believes our cut and fills will not balance."

320. After Remcon left the project, the government hired Psomas to perform a survey. Psomas' survey indicated that the access road was not built in the location indicated on the original drawings issued to Remcon to build the job. Rod Keiscome does not know if Psomas was furnished Exhibits 39, 40 and 81 through 86 in order for them to be informed that Remcon had received information telling them that the access road needed to be built in a different alignment than that shown on the contract documents.

321. The government has admitted it directed a realignment by agreeing to pay Remcon for re-surveying the road into the cleared area in Mod. No.4. See Exhibit 3.

322. On July 4, 2001, Bob Russell faxed to Willie DeOcampo a sketch and memo detailing the need to remove one or two additional trees on the Upper Sherman Access Road due to the realignment. A true and correct copy is attached hereto as Exhibit 87 and by this reference made a part hereof.

323. On July 6, 2001 Joanne Cody sent Exhibit 86 to DHM and Martin and Martin.

324. On July 9, 2001, Joanne Cody performed a field inspection of the Upper Sherman Access Road horizontal alignment. The same day she worked with the civil engineer, Martin and Martin, to adjust the USAR alignment between Stations 25 and 30. Bob Russell recorded this in his daily report. A true and correct copy is attached hereto as Exhibit 88 and by this reference made a part hereof. Joanne Cody also reviewed with Bob Russell the possibility of adjusting the vertical alignment to maximize areas for placing excess cut material.

325. While Rod Keiscome does not recall if the changes that were being directed by the NPS on or before July 9, 2001 were done with his authorization, he agrees that he did ratify them in Mod. No. 4.

326. Joanne Cody's July 9, 2001 site visit followed her receipt of Exhibit 40.

327. The July 10, 2001 daily log of construction says, "Joanne said that the adjustment alignment (horizontal Station 25 to 30) would be faxed to Remcon, surveyors, and to me today." A true and correct copy is attached hereto as Exhibit 89 and by this reference made a part hereof.

328. On July 10, 2001, Joanne Cody published USAR and USPA realignment drawings. In his July 11, 2001, daily report, Bob Russell recorded that the adjustments to the USAR between Stations 24 and 30 had been emailed by the NPS to Remcon's surveyors. This new design information affected some 600 feet, or 20% of the access road. See Exhibit 41.

329. Raymond Tuttle was not consulted about the access road realignments that were directed in writing by the design team to Remcon. The design team was frozen out of the road realignment change and the NPS just assumed responsibility to do it themselves. In my personal experience it is not customary in the construction industry that the owner usurps the role of the designer.

330. The restaking of the centerline of the USAR between Stations 25 and 30 occurred on July 16, 2001. Bob Russell's July 16, 2001 daily log, under the heading Status of Work, reads, "Surveyors working on access road spent four hours staking center line revisions between Stations 25 and 30. Bob Russell's daily report of July 16, 2001 notes the costs/effort for re-surveying the centerline that will be charged. See Exhibit 75.

331. On July 25, 2001, Andrea Lind of DHM sent an email to Willie DeOcampo, Joanne Cody, Jack Vance, Athena Demetry, Ray Todd, Robert Smith, and Scott Ruesch. This email indicates that the road had been realigned. A true and correct copy is attached hereto as Exhibit 90 and by this reference made a part hereof.

332. While Rod Keiscome testified in his deposition that he did not become aware of the USAR realignment changes until the partnering session, which occurred in May, 2002, I know this is not true. First, he was advised in writing of it no later than July 2, 2001 and was orally advised of it by me no later than December, 2001.

333. While Rod Keiscome testified in his deposition that he does not have any idea what the impact of the totality of each of these individual things had on Remcon's ability to efficiently construct the project, this is not entirely true. I personally discussed this in detail with him, and also put in writing the impacts to him, several times.

334. On July 31, 2002, Russell Belknap noted in his daily report that he "reviewed Remcon's road realignment changes with NPS and Remcon staff. Determined adjustment is o.k." A true and correct copy is attached hereto as Exhibit 91 and by this reference made a part hereof.

335. On September 5, 2002, Bill Morris of G&K emailed Russell Belknap requesting Upper Sherman Access Road information so G&K could survey and stake. A true and correct copy is attached hereto as Exhibit 92 and by this reference made a part hereof.

336. On September 10, 2002 Russell Belknap emailed Bill Morris, Steve Christensen, and Mike Giller that he was giving Mike Kitchell the super elevations data so it can be surveyed and staked. A true and correct copy is attached hereto as Exhibit 93 and by this reference made a part hereof.

337. Until the super elevation data was provided by the NPS, Remcon could not complete the Upper Sherman Access Road grading, and this restrained completion of placement of aggregate base and paving.

338. As of September 10, 2002, the NPS was still re-engineering the Upper Sherman Access Road. On September 10, 2002, Mike Giller reported to Joanne Cody via email that the re-engineering of the USAR by the NPS was nearing completion and requested that the civil engineer review the re-engineering because "…the area at Station

29 had some real complexities, as do the transition from crown to super throughout." A true and correct copy is attached hereto as Exhibit 94 and by this reference made a part hereof.

339. Russell Belknap's daily report for September 18, 2002 states that he made adjustments to the Upper Sherman Access Road that day. A true and correct copy is attached hereto as Exhibit 95 and by this reference made a part hereof.

340. Remcon has not been compensated in time or money for virtually any of the costs or delay impacts that flowed from the redesign changes on the USAR. The limited compensation that has been received for the resulting extra work (re-surveying) and delays was also belatedly received over a year after the work occurred.

341. Mod. No. 4 was signed by me on September 11, 2002 and Rod Keiscome on September 12, 2002. With respect to the road realignment surveying, it only compensated Remcon for restaking the access road on July 16, 2001.

342. When Mod. No. 4 was signed by Remcon, including when it was returned signed by the CO, there was no "JUSTIFICATION" page attached. The JUSTIFICATION page was received only during discovery in this matter. The JUSTIFICATION page, authored by the NPS, was never seen or agreed to by Remcon prior to signing the modification or at any time prior to litigation commencing. The JUSTIFICATION page, and its content, reflects the unilateral perception of the government. In the Justification section of Mod. No. 4, regarding staking of the Upper Sherman Access Road centerline, the government wrote:

(a) that the initial Access Road centerline staking was per the contract drawings. It also wrote that after the initial staking it was discovered that the centerline did not fall within the earlier cleared limits;

(b) that the NPS park staff had delineated the trees to be cleared. (This confirms what actually happened; the NPS decided and directed which tress would be removed.);

(c) that the government determined the centerline had to be revised in order to fit all earthwork into the already cleared limits;

(d) that to do so the centerline had to be re-surveyed and re-staked; and

(e) this was extra work and Remcon was entitled to be compensated for this effort. See Exhibit 3.

**USAR DIFFERING SITE CONDITION**

343. Specification Section 02316, Item 1.4, Part A, Classification, says: "Rock excavation consists of material that cannot be excavated without blasting or using rippers, including boulders having a volume of 2 cubic yards or more." Remcon encountered such material in constructing the roadway excavation and embankment.

344. Remcon had on site a new D8 Dozer/Ripper with a single shank which meant it had the equipment on site which should have been able to excavate the entire planned roadway locale to subgrade based upon the soils report.

345. Remcon started grading the access road on June 26, 2001. See Exhibit 81.

346. On July 30, 2001, when Remcon encountered the unrippable rock, the D8 Dozer was being operated and was in good condition. A true and correct copy of Bob Russell's July 30, 2001 daily log is attached hereto as Exhibit 96 and by this reference made a part hereof.

347. The project general conditions contained the FAR differing site conditions clause. The relevant portions state:

I.62 52.236.02 DIFFERING SITE CONDITIONS

(a) The contractor shall promptly, and before conditions are disturbed, give a written notice to the Contracting Officer of—

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in the contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

. . .

A true and correct copy is attached hereto as Exhibit 97 and by this reference made a part hereof.

348. Pursuant to the differing site conditions clause, if the contractor encounters a subsurface condition which it contends is different from that which is indicated in the contract documents, the contractor has a duty to disclose that promptly to the on-site government representative, in this case, the inspector. Remcon complied with the requirement to give prompt oral and written notice to the government that it had encountered a differing site condition.

349. Once that notice is given, the government then has a duty to make a determination as to whether it agrees or disagrees a differing site condition exists.

350. On this project, that prompt investigation would logically include, among other things, requesting the contractor to demonstrate refusal through the D8 Dozer of not being able to rip the rock.

351. The NPS' responsibility to investigate an alleged DSC promptly after receipt of notice of such condition from the contractor was delegated to Willie DeOcampo by Mr. Keiscome in his letter of authorization. Thus, it was Willie's

responsibility to cause an investigation of the site conditions promptly after receiving the DSC notice.

352. Notice was given to the NPS, commencing on July 30, 2001, that blasting would occur due to non-rippable rock encountered. Bob Russell's July 30, 2001 daily log indicates that Remcon encountered large boulders and that blasting would be necessary in that area. Bob Russell's July 30, 2001 daily log has Willie DeOcampo's initials on it, which means Willie received and reviewed it. See Exhibit 96.

353. The subsurface material encountered between these stations was no longer "earth and rippable rock" which could be "ripped" by conventional construction equipment as disclosed in the contractor's soils report made available to bidders and upon which our bid was based, but rather, had to be blasted.

354. The unsuccessful efforts to rip the granitic rock was documented in both Remcon's daily reports as well as the daily reports prepared by the NPS representatives.

355. Remcon encountered, between Stations 24 and 30, where the road was relocated into the hill, solid granitic rock which required drilling and blasting.

356. Remcon encountered rock that it had to blast in the same areas where rock excavation and partial rock excavation were indicated in the 30% and 50% (first version) construction documents. See Exhibits 43 and 44.

357. Bob Russell's July 31, 2001 daily log indicates that he was on site and that, on that date, the Cat D8 dozer was active and on-site. The daily log indicates that Remcon encountered boulders that required blasting from Station 25+00 to 31+00 on the access road. Willie DeOcampo received Bob Russell's July 31, 2001 daily log. It has his initials on it, which indicates that he received and read the copy and that he gave it to Terry Lang for filing. A true and correct copy is attached hereto as Exhibit 98 and by this reference made a part hereof.

358. Bob Russell's July 31, 2001 daily report was altered. A true and correct copy is attached hereto as Exhibit 99 and by this reference made a part hereof.

359. The significance of the underline and asterisks on the altered version of Bob Russell's July 31, 2001 daily report is that the subject matter concerns what ultimately became the subject of Mod. No. 6, the differing site condition.

360. Exhibit 99 (the altered July 31, 2001 daily log) does not have Willie DeOcampo's initials on it.

361. Willie DeOcampo testified that he was aware that Remcon contended that during the last week of July 2001 it encountered rock between Stations 24 and 30 and that it was unable to rip with a D8 Dozer. This affirms we gave prompt notice.

362. Bob Russell's August 2, 2001 daily log noted that, between Station 25 to 31, Remcon was encountering large boulders which would require blasting. The log also noted that the blasting crew completed drilling rock between Station 29 and 31 and that blasting occurred at 4:00 p.m. A true and correct copy is attached hereto as Exhibit 100 and by this reference made a part hereof. Willie DeOcampo received a copy of Bob Russell's August 2, 2001 daily log and it has Willie's initials on it.

363. Bob Russell reported on August 6, 2001 that material blasted on August 2, 2001 was very rocky. The August 6, 2001 has Willie DeOcampo's initials on it. A true and correct copy is attached hereto as Exhibit 101 and by this reference made a part hereof. Bob Russell's August 6, 2001 daily log shows the D8 dozer on-site working.

364. Bob Russell reported on August 7, 2001 that material blasted on August 7, 2001 was very rocky. The August 7, 2001 daily log has Willie DeOcampo's initials on it. Bob Russell's August 7, 2001 daily log indicates that Remcon's Cat D8 dozer was on site in good working order. This means that he observed it operating. A true and correct copy is attached hereto as Exhibit 102 and by this reference made a part hereof.

365. In August, 2001, we requested, in an effort to reduce the financial effects of the differing site condition, that we be permitted to construct a temporary access road between the USPA and the shuttle bus/staging area. The NPS approved the request on August 7, 2001. True and correct copies of our request and an NPS letter confirming its

approval are attached hereto as Exhibit 103 and by this reference made a part hereof. The costs to complete the bypass road are excluded from Remcon's cost claims.

366. The weekly meeting minutes for August 7, 2001, meeting #11, discuss blasting. A true and correct copy is attached hereto as Exhibit 104 and by this reference made a part hereof.

367. We tried to rip the road multiple times daily. My standing direction, and consistent with common sense economics, was to rip anything and everything we could so as to minimize the amount of blasting needed and maximize production and reduce/avoid the extra costs and delay which blasting is used.

368. On days when blasting was occurring, the primary focus of Remcon's work on the USAR was to create areas to blast at 4:00 p.m. and handle material from the prior day's blasting. This included clearing around the rock formations encountered to minimize blasting costs and time. Basically, as a result of having confined limits and concurrently encountering difficulty in constructing the access road that we had to blast, this impeded our ability to work in multiple areas in the same locale because it impeded our ability to go back and forth. Therefore, the bypass area was allowed to occur.

369. The August 8, 2001 weekly field report by Bob Russell indicates that blasting operations began on the USAR by Remcon's subcontractor, California Drilling & Blasting, and that this may be an extra cost. A true and correct copy is attached hereto as Exhibit 105 and by this reference made a part hereof.

370. At the preconstruction meeting, Remcon was directed to send all written notices to Bob Russell who passed stuff through to Willie DeOcampo. This is how Willie got information. Remcon complied with this direction.

371. During the first week of August, 2001, Remcon gave oral notice and written notice to Bob Russell that the rock encountered was a differing site condition.

372. Mr. Russell was tasked to identify for Willie DeOcampo, as part of his "red flag" process, information regarding things he felt may extra work so he could alert

Willie as the COR. Bob Russell recognized and acknowledged this notice when he published in his August 8, 2001 weekly field report to Willie DeOcampo, under potential change orders, says "blasting for roadway excavation may be a potential extra cost." This portion of the weekly field report was one of those "red flag" communication devices that was in place to keep Willie DeOcampo informed. See Exhibit 105. The preparation of weekly minutes was part of the responsibilities of the construction manager to prepare weekly meeting minutes and summaries of what was going on.

373. It is my understanding that Willie DeOcampo understood the content of the August 8, 2001 weekly field report to mean that Mr. Russell perceived the drilling and blasting on the access road to be a differing site condition.

374. By August 8, 2001, Willie DeOcampo had at his disposal and reviewed the information from his inspector, which said that there was a differing site condition on the access road, and the geotechnical report, which indicated that blasting wouldn't be required on the Upper Sherman Access Road because all rock was going to be rippable.

375. On August 8, 2001, Willie DeOcampo sent an email to Andrea Lind, Joanne Cody, Ray Todd, and Bob Russell regarding overruns on this Project. He sent this email because he was questioning the designers in terms of how they came up with quantities--he wanted to know what the designers were thinking when they designed the project. The overruns were questionable because the NPS was seeing a 350 percent overrun on an estimated quantity (Bid Item 26). See Exhibit 49.

376. By August 8, 2001, Rod Keiscome was already questioning why Pay Item 26 was almost 350 percent over the estimated quantities. See Exhibit 49.

377. Exhibit 49 states: "Now we have possible overruns in Item 38-rock excavation." The underlying subject of Exhibit 49 is the item ultimately for which Mod. No. 6 was issued as a differing site condition.

378. It is my understanding that Willie DeOcampo discussed the DSC on the USAR with Rod Keiscome as of August 8, 2001, which is within 10 days of Remcon encountering non-rippable rock.

379. On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell enclosing drilling and blasting logs, along with his quantification of 990.93 cubic yards of rock blasted through August 7, 2001, and included documentation showing his calculation. He also advised that he believed the overrun may be as high as 500% and requested negotiation of quantity overruns. A true and correct copy is attached hereto as Exhibit 106 and by this reference made a part hereof.

380. On August 8, 2001, Bob Russell sent a fax to Willie DeOcampo regarding blasting and attaching Jeff Northrop's fax with attached blasting costs. See Exhibit 51.

381. When Willie DeOcampo received the August 8, 2001 fax from Bob Russell, with the attachment from Jeff Northrup, he knew that Remcon was claiming we encountered a DSC, was seeking additional compensation, was proposing tracking the costs on a day-to-day basis, and perceived that the overrun could be as high as 500 percent. In response, Willie DeOcampo believed he instructed Bob Russell to go ahead and keep dailies on how many men from California Drilling and Blasting were on site and what they were performing.

382. As of August 9, 2001, Rod Keiscome received notice from Remcon that it had encountered non-rippable rock to such an extent that Remcon contended a differing site condition was being encountered at the Project.

383. On August 9, 2001, Willie DeOcampo recorded that Rod Keiscome communicated to Willie DeOcampo that he was considering terminating the contract for convenience of the government as a result of the overruns on the project.

384. No one at DHM performed any investigatory and analytical effort as to the merits of the contention as to whether or not a differing site condition was encountered in the deep cut section of the Project. Robert Smith told Raymond Tuttle that he had

concluded that a differing site condition was, in fact, encountered by Remcon and that they were and/or are entitled to reimbursement for some amount. The design team members concluded that a differing site condition had been encountered. As the civil engineer member of the design team, of the three members of the design team, Ray Tuttle was the most knowledgeable person involved on the subject of the differing site condition. Raymond Tuttle communicated his perception that it was very likely that Remcon had encountered a differing site condition to the NPS.

385. On August 20, 2001, Remcon gave the NPS formal notice of the differing site condition being encountered. See Exhibit 8. It enclosed a detailed factual and legal discussion. The facts presented in the August 20, 2001 notice of differing site condition and accompanying documents were true, and the CO recognized them as true when he unilaterally issued Mod. No. 6, eighteen months later in February 2003. See Exhibit 5.

386. Exhibit 8 followed oral communications to the inspector, starting on July 30, July 31st and August 2nd that Remcon was blasting non-rippable rock and the August 8, 2001 notice that the rock was a DSC.

387. In Bob Russell's weekly field report dated August 22, 2001, for the week ending August 18, 2001, he wrote: "Blasting for roadway excavation continues to be a potential extra cost." A true and correct copy is attached hereto as Exhibit 107 and by this reference made a part hereof.

388. On September 19, 2001, Jack Vance wrote to the NPS' Ray Todd, Willie DeOcampo and Joanne Cody, along with Bob Russell, that Remcon had quantified the rock blasted from the road to be 6000 cubic yards so far. A true and correct copy is attached hereto as Exhibit 108 and by this reference made a part hereof. The 6,000 cubic yard reference of rock for roadway excavation was the subject of the differing site condition modification that Rod Keiscome issued seventeen months later.

389. NPS-10, the requirements for design for NPS Projects, requires the designers to prepare, in conjunction with drawings, cost estimates periodically along the

way so that Rod Keiscome, as the Contracting Officer, and his staff, are advised as to the projected, anticipated costs. From looking at the cost estimate prepared by the design team, it is Rod Keiscome's understanding that, as of July 12, 2000, the government cost estimate to blast the USAR and USPA would cost $45 per cubic yard of material. A true and correct copy is attached hereto as Exhibit 109 and by this reference made a part hereof.

390. During the 2001 work season Remcon encountered over 6000 CY of rock which was not rippable.

391. Under Bid Item 38 (rock excavation) Remcon's bid price was $112.00 per CY.

392. During the 2002 work season the NPS paid Remcon $112.00 per CY for all rock encountered during excavation which required removal.

393. Had the NPS paid Remcon the same price ($112/cy) in 2001, or ever, for the DSC on the access road, the compensation would have $672,000.00 (6000 CY x $112.00 per CY).

394. The $112/cubic yard cost for rock encountered is solely for excavation. It does not compensate for impacts, hauling, delays or re-handling or processing the material.

395. The CO believed that reasonable way to quantify additional material, because the bid item was a lump sum, was to look at the quantity that was additional, 6,000 cubic yards, as reflected in Jack Vance's September 19, 2001 communication (Exhibit 108), and multiply it by a price per cubic yard.

396. Mod. No. 6 does not show the quantity of rock that was encountered and had to be blasted.

397. Nothing prevented the government from measuring the quantities that had to be excavated by Remcon through blasting.

398. The calendar of blasting prepared by Bob Russell shows that blasting for the road occurred all the way into September of 2001. A true and correct copy is attached hereto as Exhibit 110 and by this reference made a part hereof.

399. Rod Keiscome does not know what prevented the NPS from having Kleinfelder visit the site on or after August 20, 2001 while rock was still being encountered and blasted and when formal notice of the DSC was given.

400. Remcon had on site, at all times relevant, in good working order, a D8 Dozer with a single shank ripper. Every work day from July 30, 2001 through the end of blasting in mid-September 2001, we used the D8 Dozer on site to rip rock or attempt to rip rock on the USAR between Stations 24 and 30. The D8 Dozer could not rip the bulk of the rock encountered. The area where the D8 Dozer could not rip the rock is the same location where the USAR was realigned into the hill.

401. Bob Russell never requested from Remcon, on or after July 30, 2001, that he wanted to specifically observe the inability of the D8 Dozer to rip rock on the USAR between Stations 24 and 30. Bob Russell was on-site daily when ripping was unable to be accomplished and he noted the activities in his daily report.

402. No NPS employee or inspector ever told me that he or she wanted to observe the inability of the D8 Dozer to rip rock on the USAR between Stations 24 and 30. After we provided notice of a DSC to the NPS, no one advised us that they wished to review the lack of rippability of the rock encountered.

403. It was our goal, every day, to rip rock encountered if possible as the cost to do so was far less than blasting, and it was much more productive and efficient. We used the dozer to expose all non-rippable rock.

404. Once we gave notice that we had encountered what we contended to be a DSC, we had done what we were supposed to do under the DSC clause and then the response, if any, was on the NPS to evaluate and investigate our contention. See Exhibit 97.

405. It is my understanding that Willie DeOcampo did not read the differing site condition notice letter as thoroughly as he believes, in hindsight, that he should have.

406. Once the issues regarding rock and lack of rippability arose on this project, Willie DeOcampo consulted the Kleinfelder report to find out what information had been provided to the contractor to rely upon in forming its bid.

407. Section 8 of the Geotechnical Investigation Report provides that, if soil conditions are encountered during construction that differed from those described in the report, Kleinfelder should be notified immediately in order that review could be made and any supplemental recommendations provided. Willie DeOcampo was aware of this provision. However, he never notified Kleinfelder during the 2001 construction season. Willie DeOcampo does not know why Kleinfelder was not requested to come back to the site in accordance with the limitation set forth in the soils report. He claims that he probably just missed it.

408. It was Willie DeOcampo's responsibility to have contacted Kleinfelder.

409. At the end of 2001, we were behind schedule because, among other things, we had encountered the DSC in the big cut. I advised Willie DeOcampo and Bob Russell of this fact repeatedly, and they provided no argument or dispute in response.

410. The Project soils report, made a part of the contract document identified that a D8 Cat should be able to rip the material on the access road.

411. The lead civil engineer, Ray Tuttle, is of the belief that if Kleinfelder was the most knowledgeable individual or entity on behalf of the design team as to whether or not what the contractor was encountering was different than Kleinfelder anticipated, then they were the most important entity or individual to be called out to evaluate the issue.

412. It is my understanding that even though Willie DeOcampo may not have furnished Rod Keiscome with the actual notice of a DSC, which was dated August 20, 2001, until June of 2002, Willie DeOcampo had nevertheless discussed the subject with Mr. Keiscome as of August 8, 2001, within ten days of Remcon encountering rock.

413. Rod Keiscome knew earlier than June of 2002 that not only a claim was in existence, but also the that NPS needed to analyze the claim. I traveled to Denver during the winter shut down and provided detailed documentation and a comprehensive write up explaining the DSC and the extra costs incurred. Rod Keiscome has provided no explanation why he did not issue a formal modification until February 2003.

414. Given the multiple instances of notice, both orally and in writing to the NPS and its inspector, Rod Keiscome agrees that there certainly was opportunity for the NPS to inspect and evaluate whether any of the material encountered along the road, that was contended by us to be a DSC was or was not rippable prior to it being fully disturbed. Rod Keiscome admits that the plain and complete truth is that the NPS failed to inspect and evaluate our DSC contention on the USAR.

415. It was not until March, 2002 that Willie DeOcampo contacted Kleinfelder because, at that point in time, the NPS was trying to make a determination if Remcon's DSC claim was actually true. Although the NPS agreed that the time to evaluate whether a differing site condition was encountered is at the time it is being encountered and before it gets disturbed, the NPS failed to do so.

416. Once we gave the NPS notice of the DSC, there were major portions of the DSC locale that were undisturbed so the NPS had the opportunity to investigate.

417. Rod Keiscome understands that both myself and my personnel communicated the encountering of rock that we perceived to be a differing site condition to NPS representatives much earlier than he personally became aware of the issue. I firmly believe that Remcon complied with the requirement under the DSC clause to give timely notice of the DSC to the government representatives.

418. Mod. No. 6 recognized that the DSC that Remcon encountered was rock that could not be ripped with a D8 Dozer. As a result, Remcon had to blast the rock, and this effort was extra work. See Exhibit 5.

419. Although it was communicated to Rod Keiscome, by the technical personnel that he relied on, that the project was delayed as a result of the DSC, Rod Keiscome did not include any time extension in Mod. No. 6. The reason Rod Keiscome provides for a lack of a time extension in unilateral Mod. No. 6 is because he believes that Remcon could have used a larger Caterpillar Dozer than a D8.

420. This excuse lacks any merit for the following reasons: a larger piece of equipment was not only too heavy to truck over the mountain bridges into the park, but they were also too wide to perform the work. This Project had confined limits and the road width was, nominally, 22 feet. Therefore, in order to be able to reasonably maneuver the equipment used, and avoid going beyond the Project limits, a D8 dozer was selected. This was supported by the content of the soils report which identified the material to be encountered to be fully rippable, except for an isolated "floater," by a D8 Dozer. The excuse provided by Rod Keiscome is just not factually accurate.

421. On October 20, 2001, Jeff Northrop prepared and faxed to me a chronology of the differing site conditions issues.

422. In December 2001, I brought to Denver and delivered to the NPS our earthwork claim and backup, labeled as Request for Equitable Adjustment ("REA"), in an amount exceeding $222,000. See Exhibit 80.

423. During discovery I have found a government document which indicates that in the winter shutdown of 2001-2002, the NPS internally recognized responsibility and exposure for our claims, but developed a negotiating strategy to offset our claims for costs and time associated with the access road differing site condition. The strategy was to consider granting some access to the Lower Sherman portion of the work. A true and correct copy is attached hereto as Exhibit 111 and by this reference made a part hereof. No such offset was ever offered to me. Indeed, nothing was offered during the winter shutdown.

424. On March 18, 2002, Willie DeOcampo faxed Remcon's REA for rock blasting, excavation and handling to Kleinfelder.

425. On March 19, 2002, during the winter shutdown of 2001-2002, Willie DeOcampo phoned the project soils engineer, Kleinfelder, requesting a proposal to perform additional geotechnical assessment at the project. A true and correct copy of Kleinfelder's March 21, 2002 proposal, confirming such phone conversation, is attached hereto as Exhibit 112 and by this reference made a part hereof.

426. On March 21, 2002, during the winter shutdown of 2001-2002, Kleinfelder sent its written proposal to Willie DeOcampo. See Exhibit 112.

(a) "The purpose of the additional work was '…to observe cut areas along the new roadway that reportedly required blasting during recent construction and provide our opinion as to the quality of the rock which has been exposed in-cut.'" The cost proposed to perform the additional work was $4,400; and

(b) That it had concluded in its September 11, 2000 project soils report that the "…data indicated that the bedrock should be rippable with well maintained D-8 or larger dozer equipped with single tooth ripper."

427. Given the dimensions of the site, and the gross heights and width of larger dozers (they were too heavy to transport on the mountain bridges and too wide for the site), the D8 was the largest piece of equipment which could reasonably be used at the site. The width of the road was 22 feet. The width of a D8 is 14 feet. The weight of a D8 is 82,850 pounds. The width of a D9 is 15 feet, 3 inches. The weight of a D9 is 106,790 pounds. The width of a D10 is 17 feet, 3 inches. The weight of a D10 is 144,190 pounds a D11 is 225,500 pounds. See Exhibit 67.

428. Per Exhibit 112, Kleinfelder was not notified or advised of the apparent change in conditions nor was Kleinfelder requested to visit the site to observe the reported rock conditions, as indicated in the geotechnical report.

429. Willie DeOcampo is quoted by Kleinfelder in Exhibit 112 as informing Kleinfelder that NPS' site representative did not observe the dozer trying to cut the rock after the overburden soils had been removed.

430. Kleinfelder wrote in its March 21, 2002 proposal that based on Willie DeOcampo's statement, "There appears to be a discrepancy between the durability, seismic data and the need for blasting." See Exhibit 112.

431. No where in Exhibit 112 did the Kleinfelder report that Willie DeOcampo advised them that the Upper Sherman Access Road had been realigned for approximately 600 feet off of the right-of-way and/or that where it was realigned is where the DSC was contended to be encountered requiring blasting.

432. Kleinfelder's proposal acknowledged that its site visit after March 21, 2002 would not be able to note the quality, fracturing or hardness of the rock and the depth encountered, when Remcon reported it could not rip in 2001. See Exhibit 112. It also acknowledged that any visit after March 21, 2002 could not discern or comment upon what effort Remcon actually used to rip prior to blasting, including the type, size and condition of equipment used.

433. Kleinfelder's proposal further acknowledged that after the fact it could not determine the depth where the contractor initially determined he needed to start blasting.

434. The proposal was never accepted by the NPS, and Kleinfelder was never requested or authorized to go out to the site to investigate or evaluate the DSC or claim.

435. Prior to March 28, 2002, I gave written notice to the NPS of the following claims arising out of the 2001 contracting season's differing site condition: changes in the character of work (including delays), increase in quantities, increase in scope of work and design changes, and that the impacts severely impacted Remcon's work. See Exhibit 80. On March 28, 2002, Willie DeOcampo wrote me requesting additional information on these claims. Willie DeOcampo also requested in writing certain information from

Remcon to substantiate the costs incurred and quantities encountered in addressing the Upper Sherman Access Road differing site condition.

436. Prior to March 28, 2002, I had delivered to Willie DeOcampo all of the information requested in Willie DeOcampo's March 28, 2002 letter.

437. By sending the March 28, 2002 letter, the NPS tried to place the burden on Remcon, that was the government's, but which the government had failed to do in or after August 2001.

438. On April 3, 2002, I responded to Willie DeOcampo's March 28, 2002 letter communicating both facts and that the information requested was already in the NPS' possession from Remcon. My April 3, 2002 letter explained in detail the facts ultimately found to be true by the Contracting Officer in Mod. No. 6 issued in February, 2003. A true and correct copy is attached hereto as Exhibit 113 and by this reference made a part hereof.

439. On May 13, 2002, I received laboratory test results confirming three tests on rock excavated from the deep cut. Even though I had no duty to do so, I had rocks tested to provide further evidence to the NPS that the rock encountered was not rippable. A true and correct copy is attached hereto as Exhibit 114 and by this reference made a part hereof. The test results obtained indicate that the seismic velocities of the rock encountered in the deep cut where the DSC was encountered greatly exceeded the maximum velocity identified in the project soils report.

440. I submitted to Willie DeOcampo data from the certified testing laboratory regarding the seismic velocities of the rock encountered. This data was submitted as substantiation of the fact that Remcon had encountered a DSC. The seismic velocities encountered, as detailed in Exhibit 114, exceeded the maximum ripping capacity of a D8 Dozer found in Exhibit 67.

441. On May 13, 2002, Bob Russell recorded in his daily report that he, Terry Lang, Willie DeOcampo, and I met and reviewed the previous years' blasting and

earthwork operations in the field. A true and correct copy is attached hereto as Exhibit 115 and by this reference made a part hereof.

442. On May 14, 2002, after reviewing Exhibit 80, our Request for Equitable Adjustment, Willie DeOcampo made us an offer of $59,500.47 to settle the DSC claim. This amount was based upon Bob Russell's estimate. Willie DeOcampo told me that he believed that we had expended that amount of money as a result of encountering rock, that Bob Russell made the determination that only 50 percent of the recognized costs would be reimbursed by the government, and Willie DeOcampo agreed with this recommendation because Bob Russell was on-site.

443. The $59,500.47 amount was based on a 50% share of the blasting costs which the NPS believed may have been incurred. A true and correct copy of Bob Russell's May 14, 2002 daily log, which refers to such blasting costs, is attached hereto as Exhibit 116 and by this reference made a part hereof.

444. The offer to settle of $59,500.47, and analysis of the issue, did not take into account anything other than extra blasting costs, and assumed that the boulder blasting was for the benefit of Remcon.

445. I rejected the offer.

446. On May 18, 2002, Bob Smith of DHM prepared a memo and sent it to Joanne Cody reflecting his thoughts and observations. They included the fact that Remcon did encounter hard rock and that this was a differing site condition; that Rod Keiscome should be so advised and prepared to address this fact for his scheduled June, 2002 negotiations with Remcon; that the extra work reported by Remcon for encountering the differing site condition was justified; and that, due to the volume of issues, "Remcon is in the driver's seat on this project." A true and correct copy is attached hereto as Exhibit 117 and by this reference made a part hereof.

447. The NPS never made any determination as to whether or not the actual rock encountered between Station 24 and Station 30 on this project was denser than the rock identified by Kleinfelder in its report.

448. There was a partnering meeting in mid-May of 2002 at the park. Rod Keiscome was present at the partnering meeting. There were discussions during the partnering meeting regarding various issues that I contended we had encountered and were then unaddressed and unresolved. Included among those issues was the DSC claim.

449. During the last week of May, 2002, Mark Penrose requested that either Bob Russell or his representative make time to witness a sample of material being taken out of the undisturbed area. We offered to have NPS personnel, or its inspectors, witness a sampling of rock from the USAR between Stations 24 and 30 but the NPS and its inspectors refused to do so. A true and correct copy of my June 3, 2002 email, referencing such request, is attached hereto as Exhibit 118 and by this reference made a part hereof.

450. Bob Russell, on June 4, 2002, recorded in his daily report that Willie DeOcampo directed that NPS personnel observe Remcon's sampling of rock in areas blasted in 2001. The soils engineer is noted as being necessary for this effort. A true and correct copy is attached hereto as Exhibit 119 and by this reference made a part hereof.

451. On June 5, 2002, Bob Russell noted that because Kleinfelder was not on site, no observation of rock sampling would occur. A true and correct copy is attached hereto as Exhibit 120 and by this reference made a part hereof. Willie DeOcampo's initials were on Bob Russell's June 5, 2002 daily log, indicating that Mr. DeOcampo received it and read it.

452. During meetings held by the NPS during which the DSC claim was discussed, Raymond Tuttle does not recall anybody in attendance on behalf of the NPS disagreeing with his or Mr. Smith's conclusions.

453. On June 10, 2002, Bob Smith of DHM commented and opined on Remcon's pending DSC claim on the USAR (non-rippable granitic rock): (a) The plans and specs were prepared based on the soils report; (b) The soils report indicated that the rock material to be encountered was rippable; (c) The soils report was issued late in the design process; (d) Prior to receiving the soils report the cost estimate contained a significant line item for rock excavation; (e) The significant line item for rock excavation was deleted after review of the soils report by the NPS' Denver Service Center personnel, the NPS' park personnel, and the A/E at a joint review session; (f) Unless the geotechnical engineer advises otherwise, it seems that Remcon is entitled to a change order and his contention that it is a change of condition is valid. A true and correct copy is attached hereto as Exhibit 121 and by this reference made a part hereof.

454. On June 18, 2002, Rod Keiscome emailed to me an offer to pay $138,699 for excess excavation on the USAR and USPA, and hauling excess quantities. Rod Keiscome represented that there was "no evidence that quantities of excavated material are different than what was bid." A true and correct copy is attached hereto as Exhibit 122 and by this reference made a part hereof.

455. This representation by Mr. Keiscome was not true and multiple letters, project records, written opinions from the designers and a testing report substantiate that the CO's representation was untrue. See Exhibits 3, 4, 8, 49, 67, 80, 81 and 96-121.

456. The subjects of the June 18, 2002 email offer were later the subject of Mod. Nos. 3, 4 (partially) and 6. The total compensated in these modifications, for the same scope of work for which $138,699 was offered, was in excess of $520,000.

457. I rejected the CO's June 18, 2002 offer.

458. On August 1, 2002, I wrote Mike Giller, with copies to Willie DeOcampo and Rod Keiscome, asking for their position on the differing site condition claim and that all outstanding issues pending since the 2001 construction season be addressed in the August, 2002 progress payment. A true and correct copy is attached hereto as Exhibit

123 and by this reference made a part hereof. At that time, essentially no modifications for all of the extra work performed, which exceeded $1 million, had been issued (only Mod. No. 2 for $10,000, had been issued), and I was almost out of money. The government's failure to act responsibly or timely was strangling me and my company.

459. From July 30, 2001 until December, 2002, the government never investigated in the field whether a DSC on the USAR was encountered.

460. On December 16, 2002, almost 16 months after the formal differing site condition claim notice was given to the NPS, Willie DeOcampo, Mike Giller and Jack Vance were evaluating whether the contract required Remcon to prove a differing site condition was encountered via showing inability to rip rock. A true and correct copy is attached hereto as Exhibit 124 and by this reference made a part hereof.

461. On December 16, 2002, Willie DeOcampo wrote Mike Giller and Jack Vance that, pursuant to the DSC clause, Remcon had to show why blasting was necessary, but that he could not find the contract requirement that Remcon demonstrate lack of rippability. See Exhibit 124.

462. On December 17, 2002, Jack Vance wrote Willie DeOcampo, Mike Giller, and Robert Belknap that ripping refusal was not a requirement imposed on Remcon by the contract. See Exhibit 124.

463. December 2002 was the first time that Willie DeOcampo came to the understanding that the contract did not require the contractor to demonstrate lack of rippability as Mr. Vance had written him, but he did not pass this information on to the CO.

464. Mike Giller authored a two page memo, dated January 14, 2003, which summarized his conclusions justifying the unilateral issuance of Mod. No. 6 in the sum of $84,170. A true and correct copy is attached hereto as Exhibit 125 and by this reference made a part hereof. Attached to Mr. Giller's memo are the documents he relied upon and the calculations he made in reaching the conclusion that $84,170 was due.

465. Rod Keiscome relied upon Mr. Giller's memo, and other supporting documentation, in concluding that the total adjusted cost for the differing site condition for roadway blasting was $84,170.

466. There was nothing, as of 2002 or 2003 that restrained Rod Keiscome, as CO, from issuing a task order soliciting the expertise to evaluate roadway blasting issues. He believes that he considered doing so but can't recall if he implemented that option.

467. No such expertise was retained or used.

468. As detailed in its contract and backup documentation, Mod. No. 6 did not grant Remcon any additional contract time or impact costs, and only compensated for blasting costs evaluated by the NPS to be the responsibility of the NPS. See Exhibit 5.

469. Mod No. 6 was unilateral and increased the contract amount by $84,170.00 for rock blasting and excavation resulting from the differing site condition encountered by Remcon. Both Rod Keiscome and Mike Giller admit that the issuance of the unilateral Mod. No. 6 in February 2003, approximately 18 months after the work was performed, was not a timely issuance of a modification for recognized extra work on the Project. Mod. No. 6 indicates that the work was performed in August and September of 2001. Rod Keiscome issued Mod. No. 6 based on his determination that Remcon had encountered a differing site condition concerning rock on this project.

470. As part of the documentation submitted, not only did Remcon identify that it had encountered a DSC, but it also contended that the work necessitating addressing the DSC caused delay and disruption to the work.

471. Mod. No. 6 granted Remcon only $84,000 worth of compensation based upon an analysis which is flawed in many respects and which ignores multiple items and issues, and Mod. No. 6 also failed to address the issue of time extensions and delay.

472. Despite the untimely issuance of Mod. No. 6, the surety was not paid the $84,000 before the notice of termination was given in August, 2003. Michael Giller doesn't know why payment wasn't issued.

473. Instead of taking us 21 calendar days to excavate the road and parking lots, as scheduled in our as-planned schedule, the activity took more than 13 months and the costs for excavation exceeded $700,000.

474. No time extensions or impacts to our production, due to encountering the differing site condition, have ever been offered by the NPS to Remcon.

475. At no time from July 30, 2001, when blasting preparations commenced, until the issuance of Mod. No. 6 in February, 2003, did the NPS acknowledge, in writing, that a DSC had been encountered in the deep cut area on the USAR. Indeed, between July 30, 2001 and February, 2003, the NPS published multiple written communications (both internally, and to its designers and to Remcon) denying the existence of the DSC and/or seeking a way to avoid paying for the circumstances. The NPS took the position throughout 2001 and 2002 that the blasting of rock on the USAR was a convenience for Remcon so we could split the boulders to make crushed rock, producing revetment and stone veneer material.

476. The position taken by the NPS regarding the DSC and blasting lacked substantial justification. Actually, I believe it lacked any justification at all.

477. In Mod. No. 4, which was signed by me on September 11, 2002 and Rod Keiscome on September 12, 2002, compensation for hauling an additional 3200 cubic yards of excess excavation to Wolverton Point was given. See Exhibit 3.

478. In the Justification to Mod. No. 4, the government wrote that Remcon advised it during excavation operations that the cut and fill volumes did not balance, and that it took the government nine months to determine it was responsible for the hauling costs associated with this excess material. Further, it was written: This material had to be removed from the Project site in order for the contractor to complete design subgrades. If this work is not performed this contractor (sic), the contractual work can not be completed and delay claims will follow. See Exhibit 3. (The Justification page, attached

to Mod. No. 4, produced by the government in discovery, was not part of the modification furnished by the NPS to Remcon when I signed it.)

479. The Justification page attached to Mod. No. 4 admits that the NPS did not timely act in response to Remcon's claims regarding excess excavation. The reference to "nine months" for government action in response to Remcon's notice is not accurate as Remcon gave notice to the NPS of excess material in the summer of 2001 and it wasn't until September of 2002 that the modification was issued.

480. The government's belated recognition of the extra work, as well as its concurrent failure to issue any time extensions and/or recognize the actual damages incurred, constituted constructive acceleration and a constructive change, both of which are a material breach of contract in my experience and opinion.

481. In the text of the backup for Mod. No. 6, there are the words "differing site conditions" and "rock blasting excavation." When he issued Mod. No. 6, unilaterally, Rod Keiscome knew that that language was there in the description of the activity for which the compensation of $84,170 was being authorized. The justification memo for Mod. No. 6 was included and intended by Rod Keiscome to be included as part of Mod. No. 6. At the time Rod Keiscome placed his initials on the Modification, he intended to adopt the content of it as justification substantiating the issuance of Mod. No. 6.

482. Rod Keiscome is familiar with the concept of efficiency of performance of construction work. The concept of efficiency means that certain labor yields certain productive results which produce certain efficiency curves or evaluations, and certain equipment can move certain quantities of earthen material at a greater rate than other equipment.

483. Like all contractors I know, contractors strive to be as efficient as they can in order to reduce time that they are on a project because the less time they are on the project, that hopefully translates to less costs incurred to construct the project.

484. Mr. Giller came to this project no sooner than July of 2002. Mr. Giller did not observe the blasting effort in encountering the differing site condition on the USAR.

485. Rod Keiscome doesn't know if he investigated the factual representations set forth in the analysis, authored by Mr. Giller (Exhibit 125), but he relied upon it to issue the $84,170 amount in Mod. No. 6.

486. The relocation of the road, as reflected in Mod. No. 4, Item No. 137, impacted Remcon's ability to construct the project as originally designed because it moved the centerline of the road which resulted in blasting.

***BLASTING***

487. The fact that we had to blast the USAR to construct it, as well as the volume and duration of the blasting, caused substantial losses in terms of time and money. The size and scope of roadway excavations, and the project limits, must be taken into consideration when evaluating the impact of drilling and blasting. The NPS limited Remcon's ability to drill and blast. The restrictions included the size of the shots to be blasted as well as the time (blasting was generally allowed until 4:00 pm).

488. Remcon's blasting effort, through its subcontractor, was forced to be incremental and limited, and the extent of the drilling and blasting had to be determined on a trial and error basis because the fact that the excavation was not rippable was not evident in advance. In the deep cut area, Remcon first proceeded through the excavation removing the rippable material whenever it was found. This was done daily, multiple times.

489. If the roadway excavation between stations 24 and 30 was in fact rippable, the excavation face from original ground to subgrade would have been excavated continuously and without interruption from start to finish through the cut area.

490. As the hardrock that was not rippable was uncovered and identified, the excavation of the rippable material had to haul over and around the massive rock formations.

491. When each incremental drill and blast section was being drilled, this operation frequently interfered with our excavation and hauling operations. It caused our work to be intermittent and unproductive, and idled our crew and equipment during prime excavation weather and conditions.

492. After a section of the roadway was drilled and blasted, the excavation and hauling of this material had to occur when the drilling equipment was not in the way in order to provide adequate access.

493. Blasting, instead of ripping, required additional equipment and made the planned work much more incremental and extended.

494. The volume of earthen material excavated per hour and day during blasting operations decreased (as contrasted to when no drilling and blasting was being performed), while the total volume of material to be excavated increased due to multiple causes.

495. The excavation of the drilled and blasted rock often had to operate sequentially, and not concurrently, with the drilling and blasting.

496. The unrippable rock required the excavation operations to jump around throughout the area as excavatable material became available.

497. The excavation equipment had to sort out and place fine material to cover each blast so as to assure that rock throw (spray from blasting) was prevented and adjacent trees were not damaged.

498. The blasting of the granitic rock resulted in a large amount of oversize boulders/rocks, which in turn required secondary blasting or breaking up by a hoe-ram or splitting. Oversize rocks required sorting and stockpiling, and had to rehandled for placement. The actual physical dimensions of the smaller embankment areas further provided practical restrictions necessitating that only small rock be utilized. Rippable rock material by its nature is fairly uniform in size and does not generate oversize rock that has to be dealt with in excavation or constructing the embankments.

499. Specification sections 02310 and 02316 provide very restrictive specifications for maximum rock size that could be incorporated into the embankment.

500. It is my experience, based on multiple prior projects, that rock requiring drilling and blasting will provide greater swell in the embankments compared to the ripped rock which by its nature is more uniform and will not swell as much, if at all.

501. Drilling and blasting led to a great increase in the amount of excess material that could not be used in the embankments and had to be re-handled and moved off site.

502. California Drilling and Blasting was the blasting subcontractor used by Remcon on the project. California Drilling and Blasting was experienced in drilling and blasting, in mountain regions, and in not overshooting rock unnecessarily.

503. Page 31 of the geotechnical report, under the heading "Limitations" reads, "...If soil conditions are encountered during construction that differ from those described herein, Kleinfelder should be notified immediately in order that a review may be made and any supplemental recommendations provided." See Exhibit 65.

504. The NPS did not follow this admonition and contact Kleinfelder at any time earlier than calendar year 2002 regarding the differing site condition contention.

505. Rod Keiscome has never performed any blasting work, has never studied the process and methodology of blasting in rocky terrain, and has never consulted any experts in the subject of blasting in order to learn about it in relationship to this project.

506. Rod Keiscome is aware of the contention that the government made in response to Remcon's claim regarding blasting, that Remcon overblasted or overshot the volume of rock that it otherwise needed to in order to create the access road. Indeed, he included this contention in correspondence to Remcon. This contention is wrong.

507. Rod Keiscome can't recall how he would know if the rock need to be blasted if no one from the NPS or its construction manager went out and inspected and evaluated it during the time frame Remcon was encountering the particular rock.

508. Remcon intended to build the access road using a D8 dozer instead of blasting. If a contractor can rip rock as opposed to blast, he will rip because it is cheaper, more efficient and faster. All things being equal, its faster and a contractor can move more material and be more productive with a D8 dozer than having to drill, put cover, shoot, clean up the isolated areas, go and rip, redrill, shoot, put in cover, shoot it, and remove it.

509. Blasting, in substance, involves isolating and exposing the material to be blasted, drilling holes to place charges, covering the holes, clearing the site, idling other activities and blasting. The material then needs to be removed. It cannot be used as backfill or fill as planned without special processing.

510. There were restrictions on when blasting could occur on this project. Remcon was only generally allowed to blast after 4 p.m. daily. Because the national park where the Project was being constructed was open to the public, blasting could occur within a limited time frame on a working day so as to minimize the potential disruption to use of the park. The NPS' limitations as to when blasting could occur (after 4 p.m.) on a normal construction day, severely limited the amount of work that we could do during a construction workday if blasting was required. While blasting was occurring, all planned work in that area had to be shut down. The fact that blasting time was limited caused lost productivity in our ability of Remcon to productively perform work because blasting is a very labor-intensive and time-consuming process because you have to clean the item to be blasted with equipment and hard work, drill a hole, fill the hole, with charge(s), and cover the hole to prevent materials from flying out and damaging nearby features. Then you have to remove the blasted material and remove and sort it while performing the same process on site again.

511. Robert Smith would expect there to be extended periods of time where limited work would be done to the activity for which blasting was necessary.

512. As a result of not being able to use the D8 dozer on a significant portion and having to blast instead, it took six to eight weeks to do something that was planned to be done in one or two weeks.

513. Based upon the density and rippability of the material identified in the soils report that was represented and indicated to be encountered, I understood that virtually all of the rock, except an isolated "floater," would be rippable. Therefore, in my estimate, I included only $30,000 for the costs of blasting and the by-product of blasting. The prospect of an isolated floater was not high, and therefore little down time was anticipated. The financial and time consequences of blasting, rather than ripping, are enormous. They include the fact that it is much slower to blast then rip and thus a huge overrun in labor, material and equipment costs are incurred when blasting is required in lieu of ripping. The time it took to blast this 600 foot area was six or so weeks long, twice the planned duration of the entire excavation and earthwork in the Upper Sherman Access Road and Parking Areas included in my as-planned schedule and which was found by the government's consultant to be reasonable.

**EXCESS EXCAVATION**

514. On October 30, 2000, during the design phase, Andrea Gregor sent a memo to Joanne Cody, attaching a copy of US30-Parking Lot Grading Plan. The memo states: "Joanne, attached are two copies of US30, one for you and one for Ray Todd. You can use them for discussions with the park for determining what to do about our excess fill. This solution will use approximately 3200 cubic yards of fill. The cross slopes of the parking area improved. The downside is that we fill at this drainage area at the lower part of the lot. If the park is interested in this, we have three options. First, we can do the adjustments to the sheets now. This would require a new profile. Second, we can do a modification during bidding. Third, we could do the adjustment during construction when we have knowledge of how much cut and fill we are doing. Any of

these solutions is fine with us." A true and correct copy is attached hereto as Exhibit 126 and by this reference made a part hereof.

515. The change that was made after October 30, 2000 was that the road elevation was raised slightly.

516. The NPS was at 100% construction documents by October 30, 2000.

517. Rod Keiscome was not made aware of this excess fill issue on or after October 30, 2000 during the design phase.

518. That project was, in essence, planned to be as close to a balanced job as possible for import and export.

519. Joanne Cody is aware that during construction of the project there was excess material created that had to be addressed by the NPS and that there was a modification, in fact, issued by Mr. Keiscome addressing that portion of it that was used to spread in the upper parking lot and raising it by 5 feet.

520. That was a lot more excess material to address by Remcon than the amount of excess fill addressed in the October 30, 2000 memo.

521. Rod Keiscome understood, at the time that he issued the contract documents for proposals, that this project was, more closely than not, a balanced job in that there was no import required to build it and very little export to other areas.

522. This is not what actually happened.

523. Rod Keiscome can't recall if the job was not balanced because there were errors in the drawings, but he now believes that there were some deficiencies in the contract documents, meaning that the quantities were not sufficiently correct so as to avoid him having to issue one or more modifications.

524. Rod Keiscome is familiar with the term compaction. Rod Keiscome understands compaction to be a construction term that concerns the compression of earthen material or some type of material. In its natural state, various different types of material have different relative compactions. By applying some force, mechanical or