otherwise, there is a compression factor that occurs to material; some compress greater than others. With respect the earthen material on this project, Rod Keiscome understood that, at some time during the project, the design team used a compaction factor of 40% for the excavated material to be compressed.

525. Rod Keiscome also recalls reading about this in the civil engineer, Raymond Tuttle's, deposition and recalls that Mr. Tuttle testified that, in hindsight, the use of a 40% compaction factor was an error, that material excavated could not compress 40%. Rod Keiscome recalls that the quantification of quantities used in the contract documents by the designer, as testified to by Mr. Tuttle, included the assumption of a 40% compaction factor.

526. Rod Keiscome has come to learn that the ability of the on-site material to compress was actually a lower percentage, and the consequence of that is more material that has to be handled by the contractor.

527. Rod Keiscome does not recall if any analysis was undertaken by anyone on behalf of the government that evaluated whether the handling of additional material caused any delay to the project. He also does not know whether there have been any time extensions granted by him as a result of Remcon having to handle material in excess of that originally contemplated as a result of the material not compressing to the 40% anticipated.

528. With respect to what happened to the excess material that Remcon had to handle, five feet was added to spread on the parking lot to minimize hauling.

529. Rod Keiscome can't recall what happened to the rest of the material. He believes that Remcon hauled it to Wolverton Point.

530. No portion of Mod. No. 2 references hauling excess excavation or excavation of excess material.

531. Mod. No. 3 did not compensate Remcon for the excess excavation of the material which was paid, once excavated, to be hauled out of the park under Bid Item 26, nor the costs incurred to fill up the oversized burn pit hole.

532. Item No. 39 in Mod. No. 4 is for hauling excess excavation for an additional 3200 cubic yards to Wolverton. See Exhibit 3.

533. New Bid Item No. 138, in Mod. No. 4, was for sorting and removal of buried debris in the upper parking. There is nothing in Mod. No. 4 that pays Remcon for excavation of the excess material not for filling up and compacting the hole created by encountering the debris. See Exhibit 3.

534. New Item No. 139, in Mod. No. 4, for raising the finish grade of the upper parking lot relates to the excess excavation issue because instead of hauling it to Wolverton Point or out of the park, the government elected to minimize its cost and had Remcon raise the finish grade. See Exhibit 3.

535. There is nothing in Mod. No. 5 that pays Remcon for excavation of the excess material.

536. Mod. No. 6 is solely related to the differing site condition claim so it does not pay Remcon for excavation of any excess material.

537. Contract Specification Section 02310-5, Subsection 4.1.A (entitled Earthwork) provides: "Payment will be included in the contract lump sum price for all excavation, embankment (including deep fill material), transporting of cut and fill material within the project area, stripping, staging, stockpiling, handling, and placement of topsoil and finish grading." Subsection 4.2.A provides: "Measurement will be by original cross sections and final cross sections of the finished sub grade. Volumes will be computed from cross sections by the average area end method. This work item is for utility excavation only. Payment will be made at the contract unit price per cubic yard." Subsection 4.3.A provides: "This work involves hauling and disposal of excess excavation to Wolverton Point. Measurement will be by final cross sections by the

average area end method. Payment will be made at the contract unit price per cubic yard."

538. The first design of grading for the roadway had the road in a filled condition, meaning the contractor would have had to import fill into the park.

539. During the June 14 and 15 meeting of 2000 during the design phase, the NPS directed the design team to lower the road elevation and place it in cut so that the contractor wouldn't have to import fill but that it would yield an estimated 6800 yards excess to be deposited at Wolverton Point. The intent was to create a project that was, in essence, balanced.

540. A balanced job means that the cut-and-fill quantities are approximately even, such that no material is perceived needed to be imported to the job and none would be exported.

541. The direction from the NPS was to create a balanced job for the contractor with a certain volume that the NPS wanted to be deposited and stockpiled in the park. Based upon the contract documents, the Project was, in essence, planned by the designers to be a balanced job (requiring neither the import of earthen materials nor their export, except for the 2,000 cubic yards of identified burn pit materials planned to be hauled off as well as 6,800 cubic yards to be hauled within the park to a designated locale).

542. The quantities, and assumptions as to those quantities, of earthwork, as represented in the contract documents, were inaccurate.

543. The design team was directed by the NPS to use a 40% compaction factor for the material that was to be excavated. The 40% compaction factor means that for every 100 cubic yards of cut material, it would be compressed into 60 cubic yards of fill.

544. The designers used a compaction factor of 40% to have the earthwork calculations (cut and fill), plus 6800 cubic yards of hauling, yield a balanced job.

545. The actual realized compaction percentage on the project was significantly lower than used in the design. Rod Keiscome has come to recognize that this resulted in

excess material to be handled by Remcon and meant that Remcon would be eligible to receive a modification.

546. Willie DeOcampo does not know who, if anybody, performed an evaluation of the material to be encountered by the contractor and what its compaction or compaction factor was.

547. Raymond Tuttle is not aware of Kleinfelder performing or being asked to perform any evaluation or determination as to whether the granitic material could be compacted 40%.

548. It is important for a design professional working with a road job that has cut and fills to know what the swell potential and compaction capacity of the material would be.

549. The design team did not request that the compaction factor of the material be tested because the NPS directed them to use a 40% compaction factor.

550. On June 24, 2000, during the design phase, records reflect that the quantity calculation by the NPS' designers used a 40% compaction factor for excavation material. A true and correct copy is attached hereto as Exhibit 127 and by this reference made a part hereof. The designers assumed in the quantity calculations included in the bid documents and upon which bids were solicited that the excavated (cut) material would be compacted by 40%.

551. The same 40% calculation was used in the October 24, 2000 quantities summary for the project by DHM. As of October 24, 2000, the design was represented to be 100% complete.

552. The issued for construction plans and specifications, including the quantities listed in the bid schedule, were calculated by the designers using a 40% compaction factor for cut material.

553. The outside designers used the 40% compaction factor even though they didn't agree with it.

554. Willie DeOcampo would have used a factor somewhere around 20 to 25 percent based on what he's dug out before on other projects in the same park.

555. Robert Smith has never seen a 40% compaction of granitic material before. Robert Smith doesn't know if he has ever seen a 20 percent compaction of granitic material.

556. Raymond Tuttle would normally use a compaction factor of approximately 15% for granitic material. He communicated this to the NPS.

557. Despite raising the subject that the compaction factor seemed unusually high, the NPS directed the design team to use the 40% compaction factor to calculate the quantities for the Project and that is what was actually done.

558. As a general principle, if the material could not be compacted to the extent of 40 percent and it was in the range of 15 percent, then that would generate excess material that would have to be handled.

559. The compaction factor (40%) used by the designers to calculate the earthwork quantities used on the Project's contract documents, as part of their assumptions in designing the Project, was mistaken, and contributed to thousands of yards worth of excess material being encountered by Remcon and extra work performed.

560. In my experience, decomposed granitic material does not compact greater than 15%-20%. The contract documents did not disclose that the design was based on an assumption that excavated material could be compacted by 40%. This was concealed by the NPS during the Project and was only found out during discovery.

561. The result produced by this error was excess material that could not be used as fill as planned.

562. The causes of the excess material encountered on the project were the mistaken 40% compaction factor, the rock material that was blasted, the existing base mapping likely being off by a little bit, and the road realignment into the hill which created a 600 foot wedge of additional material which had to be excavated and was not

accounted for in the design. Additional causes are the debris and burn pits in the USPA, and design revisions.

563. None of these causes were contractor-caused such that Remcon would have borne the risk of loss to incur the cost of handling the extra material without reimbursement.

564. I believe that 15,000 to 17,000 cubic yards of excess material we actually encountered was a result of the compaction factor not being achieved, along with the shifting of the road, into the hill, and the other factors listed above.

565. There is no doubt in my mind that the use of a 40 percent compaction factor, as directed by the National Park Service, was a contributing element to the fact that there was excess material to have to be handled by Remcon. The use of an incorrect compaction percentage by the NPS designers was not Remcon's responsibility. Based upon this fact, it is my understanding that Willie DeOcampo believes that Remcon should be reimbursed for the excess resulting.

566. In June, 2001, Remcon's Project superintendent, Jeff Northrop notified myself and Bob Russell, the lead inspector of a substantial overrun in quantity of excavated material.

567. During Willie DeOcampo's site visit from June 26th to 28th, 2001 he became aware of our perception that the job, other than the 6800 extra yards that had to be hauled to Wolverton and the 2,000 yards that come out of the burn pit, was not going to be balanced.

568. On July 2, 2001, only three weeks into the Project, Willie documented that he was advised by me that earthwork quantities would overrun, up to 13,000 cubic yards, and the NPS that day considered in writing notifying the design team that its conduct in causing this excess material was professionally negligent. See Exhibit 40, which was sent to Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Scott Ruesch, and Jack Vance, with a cc also to Bob Russell. This email noted that Remcon had indicated that it

believed that its cuts and fills would not balance that they were could be 13,000 CY of excess materials that would have to be transported elsewhere at $15.00/CY.

569. Willie DeOcampo's July 2, 2001 email was his attempt to notify Rod Keiscome of the possibility that the job would not be balanced.

570. As of October 20, 2000, Joanne Cody projected excess material of 3500 cubic yards. As of July of 2001, the actual number was at least 13,000 excess yards.

571. Exhibit 40 also states: "We also reviewed the possibility of adjusting vertical alignment to maximize areas for placing excess cut material." This was a result of Mr. DeOcampo's email to Joanne Cody on July 2nd about the existence of my perception of up to 13,000 cubic yards of excess material.

572. Rod Keiscome can't recall that he did anything about this information on or after July 2, 2001. This inaction is inexcusable, but consistent with the failure of administration I experienced throughout the job.

573. Exhibit 40 also reads, "The surveyors will send you a revised layout. The contractor believes our cut and fills will not balance."

574. One of Willie DeOcampo's purposes in his July 2, 2001 email was to go ahead and notify people of the possibility that additional quantities would need to be compensated to the contractor if the road realignment occurred because there would be excess material to be handled. This included Mr. Todd, the project manager; Ms. Cody, the person most responsible for design; and Mr. Keiscome, the CO.

575. As a result of the excess material issue arising as reflected in this email, Remcon had to perform what Willie DeOcampo understood to be extra work. Willie DeOcampo verified the extra work performed by Remcon through Bob Russell.

576. Per the specifications, some additional excavation, as indicated in the bid documents, had to be handled by us and stockpiled at Wolverton.

577. As a result of the road being realigned into the hill, the road profile, which was already in a "cut" location between Stations 24 and 30, now had more excess material to be handled.

578. We were directed by Bob Russell and Willie DeOcampo not only to bring the excess material that we were hauling in from this access road locale to Wolverton Point, but also to stockpile some of the material at the shuttle bus location. This was done in the summer of 2001 and 2002.

579. As of July 9, 2001, Bob Russell recorded that Joanne Cody recognized that excess cut material would be generated on the project. See Exhibit 88.

580. On July 9, 2001, Joanne Cody reviewed with Bob Russell the possibility of adjusting the vertical alignment of the Upper Sherman Access Road (e.g. raising the height of the road) to maximize areas for placing excess cut material.) As of July 9, 2001, Bob Russell recorded that Joanne Cody recognized that excess cut material would be generated on the project, that Joanne Cody stated that the excess material could be used to raise the upper parking lot, and that Joanne Cody left with him a revised grading plan to raise the upper parking lot area if necessary. No plans to raise the height of the access road were issued until 2002. See Exhibit 41 and 88.

581. Joanne Cody figured out, as of July 9, 2001, that if there was excess material then the upper parking lot could absorb some of it. She communicated that to the Contracting Officer's Representative for construction sometime shortly thereafter. Nevertheless, Joanne Cody doesn't know why it took almost on year for written direction to be given to Remcon to address that. See Exhibits 41 and 88.

582. Joanne Cody does not know how much excess material was, in fact, generated on this project.

583. Revised drawings to raise the elevation of the upper parking lot were not issued until late May of 2002. While Joanne Cody believes that revised drawings were not issued until late May of 2002 to be priced by us because the NPS wasn't sure that the

excess material existed and they wanted to see our surveys, Joanne Cody doesn't know why it took over six months after the winter shutdown to issue the revised drawings for the upper parking lot. She also doesn't know what prevented her from having it done sooner, as the stockpiles of thousands of yards were sitting on the site and she knew they were there.

584. Willie DeOcampo recalls that Joanne Cody commented on July 9, 2001 that she thought the way to address the excess material that was being generated was to raise the upper parking lot.

585. In his July 10, 2001 daily report, Bob Russell recorded that Remcon expressed concern regarding excess material on the project. See Exhibit 89. In response to Remcon's expressed concerns on July 10, 2001, Bob Russell recorded in his daily report that Joanne Cody, who was on site, responded that the material should balance.

586. Joanne Cody contends that, except for the 6,800 cubic yards which was already pre-identified in the contract, she was still of the mind-set as of middle of July that this was, in essence, a balanced job.

587. When Joanne Cody made this representation to Remcon, it was inconsistent with Joanne Cody's own observations regarding excess material the prior day. See Exhibits 41, 88, and 89.

588. Excess material was encountered by Remcon on the project.

589. At the time that Raymond Tuttle read that Remcon contended that it had encountered and had to handle excess material, he connected the 40% compaction factor as a possible cause. He communicated this connection to Bob Smith, who agreed with him, and told someone at the NPS. Robert Smith was aware that, during the job, there were contentions raised by the contractor that it had to handle substantial volumes (in the thousands) of additional cubic yards. After Raymond Tuttle told members of the NPS that he believed that the 40% compaction factor was not being achieved and was causing

the existence of the excess excavation material, he remembers that the members of the NPS acknowledged this as a possibility.

590. Willie DeOcampo concluded that the excess volume of material was a product of the compaction percentage that the designers utilized being wrong.

591. On July 26, 2001, Bob Russell sent Jeff Northrup a transmittal with copies to both Willie DeOcampo and Joanne Cody. The transmittal reads, "Transmitted herewith are two copies of the coordinates and elevations for the revised grades/elevations for the upper parking lot. These revised grades/elevations are to supplement the coordinates and elevations that you received yesterday. Note, these revised grades represent the maximum changes and are to be used only if Park Service determines that it is necessary or desirable to adjust the parking lot grades to minimize excess cut material. A true and correct copy is attached hereto as Exhibit 128 and by this reference made a part hereof. Joanne Cody requested that these revised drawings be developed and she caused them to be given to Willie DeOcampo where they then went to Bob Russell and then to Remcon. Joanne Cody does not know what Remcon was supposed to do with the July 26, 2001 revised drawings. She didn't ask, even though she was a cc on the transmittal.

592. On August 1, 2001, Willie DeOcampo wrote Remcon advising that the NPS would pay Remcon for the extra work associated with hauling miscellaneous material (the burn pit excavation and hauling) upon submission of truck weight receipts and the re-negotiation of the unit price based on overruns in quantity. See Exhibit 78. We promptly submitted the trucking receipts and weigh tags from the disposal site.

593. On August 8, 2001, Willie DeOcampo sent an email to Andrea Lind, Joanne Cody, Ray Todd, and Bob Russell regarding earthwork quantity overruns. By August 8, 2001, Rod Keiscome was already questioning why Pay Item 26 (Hauling Miscellaneous Material from the Park) was almost 350 percent over the estimated quantities. See Exhibits 49 and 50.

594. As of August 8, 2001, Remcon had encountered and/or performed the following directed extra work: (1) realignment of the Upper Sherman Access Road between Stations 8 and 12; (2) realignment of the Upper Sherman Access Road between Stations 24 and 30; (3) excavated and hauled burn pit increase from 2000 to 7000 cubic yards; (4) excavated and hauled the buried debris in the Upper Sherman Parking Area; and (5) the differing site condition on the Upper Sherman Access Road between Stations 24 and 30. Each of these items caused extra earthwork to be excavated, stockpiles to be created and/or quantities to be hauled, to increase.

595. On August 8, 2001, Jeff Northrop of Remcon wrote Bob Russell with his quantification of 990.93 cubic yards of rock blasted through August 7, 2001, and included documentation showing his calculation, advising that he believed the overrun may be as high as 500%, and requested negotiation of quantity overruns. See Exhibit 106. On August 9, 2001, Rod Keiscome communicated to Willie DeOcampo that he was considering terminating the contract for convenience of the government as a result of the overruns on the quantity project. See Exhibit 50.

596. On August 9, 2001, Willie DeOcampo wrote DHM advising that the overrun in quantity due to rock was too excessive and unacceptable, and requested a justification to deny Remcon's claim. A true and correct copy is attached hereto as Exhibit 129 and by this reference made a part hereof.

597. On September 14, 2001, I emailed Willie DeOcampo concerning quantity overruns advising that there would be about 16,500 cubic yards in excess material to haul. I advised that as a result of the large overrun, and the fact that we had stockpiles all over the place, direction needed to occur as to how to address the excess material and the lump sum item adjustment. Finally, I advised that all of these items were seriously impacting our contract schedule. A true and correct copy is attached hereto as Exhibit 130 and by this reference made a part hereof.

598. On September 17, 2001, Willie DeOcampo, without disclosure to me, in response to my September 14, 2001 email, emailed Bob Russell that it was time to start a modification for the overrun in quantities being experienced. See Exhibit 130. (The modification for overruns was not processed for one year, until Mod 4 was issue in September, 2002, but only addressed some of the excess excavation, not all of it.)

599. On September 19, 2001, Jack Vance wrote to the NPS' Ray Todd, Willie DeOcampo and Joanne Cody, along with Bob Russell, that Remcon had quantified the rock blasted from the road to be 6000 cubic yards so far. See Exhibit 108.

600. Jeff Northrop, on October 18, 2001, wrote and sent RFI No. 31 to Bob Russell reminding him that despite several discussions over the previous three weeks, Remcon had not received direction on what to do with the excess material excavated and stockpiled. In RFI No. 31, Jeff Northrop informed Bob Russell on October 18, 2001 that there were so many piles of dirt on the site that Remcon could not finish grade the parking lot, and that there were 15,000 cubic yards of excess material in various piles. See Exhibit 69.

601. The quantity of 15,000 excess yards set forth in RFI No. 31 was about the same quantity identified by Willie DeOcampo (13,000 cubic yards) to Rod Keiscome and other NPS personnel, including Bob Russell, on July 2, 2001. See Exhibit 40. The NPS did not share with Remcon Willie DeOcampo's July 2, 2001 email (Exhibit 40), which communicated to the CO the projected excavation quantity overrun of 13,000 cubic yards. We only discovered its existence after we received the government's production of documents.

602. In RFI No. 31, we asked Bob Russell three questions: (1) Why is there so much more yardage? (2) How are we going to be compensated for dealing with it? and (3) Where will we put the balance of the yardage once we have done everything discussed above? See Exhibit 69.

603. In response to RFI No. 31, Joanne Cody and Willie DeOcampo co-signed a reply, dated October 29, 2001. The NPS contended that the cause of the overrun was that we allegedly graded the USAR, USPA and STT approximately one foot below designed grades. See Exhibit 69.

604. The response to RFI No. 31 was not accurate. The USAR, USPA and STT were not built one foot below design grades, and both Willie DeOcampo and Joanne Cody knowingly misrepresented the facts in the response was read.

605. The NPS did not disclose to Remcon, until discovery, that Willie DeOcampo reported to Rod Keiscome and other NPS individuals that Remcon projected an overrun of 13,000 cubic yards within three weeks of the issuance of the Notice to Proceed, that the NPS perceived this to be the result of a design error, and/or that on July 9 and 10, 2001, Joanne Cody communicated that excess material could be used to revise the parking area and leaving sketches behind with the inspector to achieve this need and/or that Willie, on September 17, 2001 emailed Bob Russell that the excess excavation justified a modification. See Exhibits 40, 41, 88, 89, and 130.

606. On November 15, 2001, Ray Todd emailed Willie DeOcampo and Joanne Cody that I had advised that the NPS should hire an independent firm to review the project quantities and that Remcon estimated 12,000 to 15,000 of excess cubic yards and that he was seeking funds to perform a survey but needed fund clearance to do so. A true and correct copy is attached hereto as Exhibit 131 and by this reference made a part hereof. The survey sought to be performed by Ray Todd as of November of 2001 was not performed until November of 2002.

607. During the 2001-2002 winter shutdown, I sent and brought materials to Denver to address Remcon's claims and outstanding issues. These materials included binders of backup and supporting project records. Copies were given to the NPS.

608. On May 18, 2002, Bob Smith of DHM prepared a memo (Exhibit 117) reflecting his thoughts and observations relating to the project. They included the fact

that excess quantities may be between 15,000 and 17,000 cubic yards, that some of the excess material could be used to raise the USPA by up to 6 feet, and that he had communicated his thoughts to the NPS that there was excess material and how it should be addressed by the NPS in December, 2001 but that this "fell on deaf ears."

609. On May 21, 2002, I called Bob Russell and asked him what quantities Bob came up with when he did his earthwork take-off the prior winter. I stated that all appeared to agree on the earthwork quantities and that the discrepancy was either Martin & Martin's take-off or in the quantity of excess material (earthwork not balanced). I also stated that I had contacted NPS personnel during the bid period to inform them that I was getting an excess of material and that the NPS said that they had checked their quantities and felt they were correct. A true and correct copy of Bob Russell's May 21, 2002 daily log is attached hereto as Exhibit 132 and by this reference made a part hereof.

610. On May 22, 2002, Bob Smith sent Willie DeOcampo an email regarding the revised parking lot and trail plans. As of May 22, 2002, the upper parking lot was a candidate to be raised to accommodate some of the excess material that was on site. This concept was to minimize the additional cost from the excess material encountered by raising the upper parking lot by up to 5 feet at a reduced cost per yard than the $15 per yard it would have cost to haul the material off site per Bid Item 26. There was nothing that prevented the parking lot redesign effort from being done sooner given that between 15,000 to 17,000 cubic yards was known to exist in August of 2001. As of May 22, 2002, we did not have direction what to do with the extra 15,000 to 17,000 cubic yards.

611. On May 23, 2002, Willie DeOcampo sent me an email indicating that he had not received the drawings to raise the upper parking lot as of that day but that he did expect to get an RFP with these drawings to me the following week. A true and correct copy is attached hereto as Exhibit 133 and by this reference made a part hereof. He also indicated that, once the NPS received Remcon's estimate to perform this work, they would make a quick determination as to what to do with the excess dirt in question.

612. As of May 29, 2002, the NPS, through Willie DeOcampo, had determined that during the first construction season we had hauled over 9,800 cubic yards to Wolverton Point under Item 39. This bid item was 6,800 cubic yards. This was a 40% overrun. A true and correct copy is attached hereto as Exhibit 134 and by this reference made a part hereof.

613. Willie DeOcampo doesn't know why it was not until June 3, 2002 that action started being taken by the NPS to implement a plan to address the excess material involving raising the Upper Sherman parking lot area. This was almost 11 months after Joanne Cody identified this conduct as a partial solution to the overrun.

614. On June 5, 2002, I sent Terry Lang a price proposal for the proposed modification to raise the Upper Sherman Parking Lot. A true and correct copy is attached hereto as Exhibit 135 and by this reference made a part hereof.

615. On June 5, 2002, Bob Russell began working on the government's estimate for using excess material for raising the Upper Parking lot grades some 4 1/2 feet. Mr. Russell noted that this would require filling a void of 4,000 cy and would require approximately 5,000 CY of loose material (using an estimated 20% loss/compaction). A true and correct copy of Bob Russell's June 5, 2002 daily log is attached hereto as Exhibit 120 and by this reference made a part hereof.

616. On June 6, 2002, Bob Russell sent Willie DeOcampo the government estimate he prepared for raising the grade of the Upper Parking Lot. A true and correct copy is attached hereto as Exhibit 136 and by this reference made a part hereof.

617. On June 18, 2002, Rod Keiscome emailed to me an offer to pay $138,699 for all of the excess excavation on the USAR and USPA. See Exhibit 122. In Exhibit 122, Rod Keiscome represented that there was "no evidence that quantities of excavated material are different than what was bid."

618. The facts presented in the Project records demonstrate that Mr. Keiscome's representation was false, and without justification. The subjects of the

Exhibit 122 offer were later the subject of Mod. Nos. 3 and part of 4. The total compensated in these modifications for the excess excavation was $439,176.28.

619. One design solution for the excess volume of cubic yards encountered that was actually encountered was to raise the parking lot by 5 feet at one corner, but it did not use more than about 25% - 30% of the excess material.

620. On June 19, 2002, I sent Willie Deocampo an email indicating that the NPS and Remcon had agreed to a contract modification price of $43,816.00 for raising of the Upper Sherman Parking Area and requesting that Willie provide the necessary modification so that Remcon could proceed with the work. A true and correct copy is attached hereto as Exhibit 137 and by this reference made a part hereof.

621. Throughout June 2002, I sought direction from the NPS on what to do with the thousands of yards of excess material on site.

622. On June 27, 2002, Rod Keiscome sent me a Contracting Officer's Directive, directing Remcon to raise the Upper Sherman Parking Lot. This directive indicated that a bilateral modification to the contract would be issued in the mutually agreed negotiated contract amount of $43,816.00 as soon as possible. A true and correct copy is attached hereto as Exhibit 138 and by this reference made a part hereof.

623. Although raising the USPA to spread excess cut material was identified by Joanne Cody on July 9, 2001, and a revised grading plan prepared on July 10, 2002, direction to implement this plan did not get issued until 353 days later on June 27, 2002.

624. On June 28, 2002, in response to the June 27, 2002 Contracting Officer's Directive to raise the Upper Sherman Parking Lot, I sent a letter to Rod Keiscome requesting written assurance that Remcon would be paid for this work in a timely manner and pursuant to the contract conditions for payment. A true and correct copy is attached hereto as Exhibit 139 and by this reference made a part hereof.

625. On July 16, 2002, Rod Keiscome sent me a letter acknowledging receipt of my June 28, 2002 request for assurances that the NPS would pay for the work in a

timely manner. A true and correct copy is attached hereto as Exhibit 140 and by this reference made a part hereof. In Keiscome's letter, he stated that his intent was to do just that by incorporating the Upper Sherman parking lot work into a bilateral modification and include payment, as appropriate, for work accomplished to date into the next payment cycle in August 2002.

626. Mod. No. 4 was not issued until September, 2002, and Mr. Keiscome did not honor his promise to me.

627. Based upon receipt of Mr. Keiscome's July 16, 2002 letter, I actually billed the government for the performance of this extra work, but the government struck it out of the pay estimate and wouldn't pay it in the August draw.

628. On July 25, 2002, we began raising the upper parking lot. In addition, Russell Belknap, the newly arrived inspector, allowed Remcon to install a super between Station 24 and 30+00 to reduce the cut along the access road.

629. On July 30, 2002, Willie DeOcampo emailed Mike Giller that a design bust along the Upper Sherman Access Road deep cut area required extra work to perform additional cut operations generating more excess fill. A true and correct copy is attached hereto as Exhibit 141 and by this reference made a part hereof.

630. Mod. No. 3, on August 21, 2002, increased the contract amount by $345,209.92 for general conditions costs associated with deletion of item 26, hauling of excess miscellaneous material from the park, and extended field office overhead resulting from an 8 working day (13 calendar day) time extension. See Exhibit 4.

631. Mod. No. 4, issued on September 12, 2002, increased the contract amount by $95,120.36 for hauling of excess excavation material, restaking of the access road centerline, sorting and removal of buried debris in the upper parking lot, and raising the finish grade of the USPA. In Mod. No. 4, the NPS compensated Remcon for raising the USPA approximately 5 feet from the design grade. See Exhibit 3.

632. In the Justification page of Mod. No. 4, the government states that during the excavating and grading of the USAR and USPA, it became apparent that excess excavated material was being generated. The government also states that it was estimated by the government that a total quantity of approximately 15,000 cubic yards of excess excavation will be generated. The government further states that the Denver Service Center and designer determined that the Upper Sherman Parking Area could be raised by 5 feet to spread 5,000 cubic yards of the 15,000 cubic yard overrun. The government additionally states that the direction to perform this work will save $17,000 in extra costs which would otherwise be incurred. See Exhibit 3.

633. The NPS, in Mod. No. 4, admitted in the Justification the facts asserted by Remcon during the summer and fall of 2001 regarding the existence of excess excavation. Although it was aware of Remcon's contentions as to the quantity of excess excavation on July 2, 2001, the NPS denied it and delayed addressing it.

634. Mod. No. 4 did not pay all costs associated with excess excavation on the entire project up to that time. It exclusively compensated for handling the existing excess excavation to raise the parking lot for 5 feet and for hauling some excess debris.

635. The NPS' negotiator for Mod. No. 4, Willie DeOcampo, has admitted that Mod. 4 was intended (with reference to excess excavation) only to compensate Remcon for that portion of the excess excavation that was used to raise the finish grade of the parking lot but was not for all of the excess excavation on the project.

636. On the last page of Mod. No. 4, produced by the NPS during discovery, in the description justifying the work, Willie DeOcampo wrote that this change is necessary in order to eliminate possible construction impacts that will result in claims and that the change is in the best interest of the government and that Willie DeOcampo recommends that it be approved.

637. Willie DeOcampo believes that he ran calculations and came up with about 17,000 cubic yard of excess material. Mod. No. 4 paid to spread only some of this excess material (about 5000 yards).

638. Mod. No. 4 did not compensate Remcon to backfill the hole created as a result of burn pit excess excavation from 2,000 to 7,000 cubic yards.

639. The work to backfill that hole was performed in 2001 and was the subject of my requests for extra compensation in 2001.

640. There has been no modification issued that compensated Remcon for filling the hole back to the design elevation for the excess quantity that had to be excavated.

641. Willie DeOcampo doesn't know why it took so long for Mod. No. 4 to be issued.

642. All excess excavation costs as of November of 2001 were combined by Remcon into a comprehensive request, with binders of backup supporting records, and delivered in December of 2001 to the NPS in Denver. See Exhibit 80.

643. As a consequence of the excess material to be removed and the lack of timely direction from the NPS, Remcon's operations were severely impacted, resulting in an inefficient use of Remcon's planned labor and equipment and Project supervision and an immediate negative impact to Remcon's schedule. Stockpiles of excess excavation were all over the site, as we were unable to get direction what to do with it, which in turn hindered our ability to build the job as the stockpiles rested on the site we needed to build up on. Until the upper parking lot was finished, which would then provide additional parking capacity for the Park that wasn't in existence, the NPS didn't want to have Remcon affecting and minimizing or reducing the available parking spaces that preexisted when it did work in the Lower Sherman Area. So, in order to finish the Upper Sherman area, before we could go to the Lower Sherman, we had to ultimately raise the parking lot. The government controlled the timing of when that directive would be

issued that would allow us to do so. Even though we did ultimately get direction to use some of the stockpiles to raise the parking lot, the NPS did not timely issue the direction or timely pay Remcon for the performance of raising the grade of the Upper Sherman parking lot.

644. During 2001, Remcon excavated and hauled excess excavation in the park to Wolverton Point. The NPS quantified this additional material to be 3000 CY.

645. That portion of the work was compensated, at $12 per cubic yard, per bid item 39.

646. Mod. No. 4 compensated Remcon for the hauling costs of an additional 3200 cubic yards above the estimated 6800 cubic yards for bid item 39.

647. Through Progress Payment No. 14, for work performed through November, 2002, Remcon was recognized by the NPS as having hauled 13,936 cubic yards within the park to the Wolverton site at $12 per cubic yard.

648. While Remcon was paid for hauling all of this 13,936 cubic yards, in progress payments, no modification addressing the additional quantities beyond the total of 10,000 cubic yards was ever issued by the NPS, and no modifications addressing whether any time extension was due for this extra work has ever been issued, unilaterally or bilaterally.

649. The NPS payments for bid item 39 are as follows:

| Progress Payment | Bid Item Quantities | Payment Quantity | |
|---|---|---|---|
| 1 + 2 | 6800 cubic yards | 0 cubic yards | |
| 3 | 6800 cubic yards | 5,418 cubic yards | |
| 4 | 6800 cubic yards | 6,800 cubic yards | |
| 5 - 7 | 6800 cubic yards | 6,800 cubic yards | |
| 8 | 6800 cubic yards | 9,600 cubic yards | (June 30, 2002) |

| Progress Payment | Bid Item Quantities | Payment Quantity | |
|---|---|---|---|
| 9 | 6800 cubic yards | 6,800 cubic yards | (July 31, 2002) |
| 10 | 10,000 cubic yards | 9,680 cubic yards | (August 30, 2002) |
| 11 | 10,000 cubic yards | 11,472 cubic yards | |
| 12 | 10,000 cubic yards | 13,446 cubic yards | |
| 13 | 10,000 cubic yards | 13,936 cubic yards | |

In Progress Payment #8, for work through June, 2002, the NPS increased the quantity paid for in Item 39 ("Haul Material Within Park") from 6800 cubic yards to 9,600 cubic yards. In Progress Payment #9, for work performed through July, 2002, the NPS reduced the quantity paid for in Item 39 from 9,600 cubic yards to 6,800 cubic yards, thereby reducing the amount otherwise to be paid to Remcon, even though this work was confirmed in writing by the NPS to have been done as of the end of the 2001 construction season. In Progress Payment #10, for worked performed through August, 2002, the NPS increased the quantity paid for in Item 39 to 9,680 cubic yards. In Progress Payment #11, for work performed through September, 2002, the NPS increased the quantity paid for Item 39 to 11,472 cubic yards. In Progress Payment #12, for work performed through October, 2002, the NPS increased the quantity paid for Item 39 to 13,446 cubic yards. In Progress Payment #13, for work performed through November, 2002, the NPS increased the quantity paid for Item 39 to 13,936 cubic yards.

650. Mod. No. 4 was issued in September, 2002 and adjusted the bid quantity for Item 39 from 6,800 cubic yards to 10,000 cubic yards.

651. Following Mod. No. 4's issuance, no further modification was issued for Bid Item No. 39 work.

652. None of the items in Mod. No. 4, prepared by the NPS and presented to Remcon to sign, indicate that Items 39, 138 and/or 139 were compensating Remcon for all excess excavation encountered to date. Item 39 in Mod. No. 4 expressly addressed

only 3,200 cubic yards. Item 138 addressed only several hundred cubic yards. Item 139 addressed approximately 4,500 cubic yards. This left approximately 7,000 to 9,000 cubic yards of excess excavation unaddressed in any modification.

***UPPER SHERMAN PARKING AREA***

653. As of July, 2001, Remcon had encountered two differing site conditions in the Upper Sherman Parking Area. The first was the significant increase in the burn pit quantity from 2,000 cubic yards to over 7,000 cubic yards. The second was the debris which was encountered in the upper parking area. The loading and hauling of the excess materials encountered in the differing site conditions were addressed in Mod. Nos. 3 and 4 in late summer, 2002, over a year after they were encountered.

654. No modification has ever been issued for backfilling the holes created by the encountering of the differing site conditions in the Upper Sherman Parking Area.

655. On July 26, 2001, Bob Russell issued to Jeff Northrop, with a "cc" to Willie DeOcampo and Joanne Cody, revised grades/elevations for the parking lot. See Exhibit 128. These revised grades were to supplement the coordinates and elevations sent the day before. The revised grades represented the maximum changes and were to be used only if the NPS determined that it was necessary or desirable to raise the grades to minimize excess cut material.

656. On August 1, 2001, the NPS sent an email to Remcon's surveyors with a new plan for the Upper Sherman Parking Area. A true and correct copy is attached hereto as Exhibit 142 and by this reference made a part hereof.

657. Willie DeOcampo's August 9, 2001 email to Ray Todd said "we don't want to continue making construction field revisions since it would look like our plans are worthless." See Exhibit 50. This was a pretty significant statement. Willie DeOcampo admits that he does not use words carelessly and would not have used those words if he didn't believe them to be true and correct.

658. On August 10, 2001, Andrea Gregor sent a letter to Bob Russell regarding addendum sheets for the USPA and STT and dealing with changes to the design. A true and correct copy is attached hereto as Exhibit 143 and by this reference made a part hereof.

659. On August 12, 2001, Andre Gregor sent an email to Joanne Cody, Bill Morris, Willie DeOcampo, Bob Russell, Ray Todd, Robert Smith, and Ray Tuttle. The text reads: "On our site visit, we adjusted the Upper Sherman Tree Parking design and made changes to the Sherman Tree Trail due to site conditions." A true and correct copy is attached hereto as Exhibit 144 and by this reference made a part hereof.

660. According to Willie DeOcampo, Remcon was expected to build the project in accordance with the adjustments and the changes referenced in the August 12, 2001 email (Exhibit 144).

661. On August 13, 2001, Andre Gregor of DHM sent an email to Joanne Cody, Willie DeOcampo, Ray Todd, Bob Russell, and others. The first paragraph of the August 13, 2001 email reads: "On our site visit, we adjusted the Upper Sherman parking design and made changes to the Sherman Tree Trail due to site conditions. They are outlined in the field report August 5 to August 7. They have been adjusted in AutoCAD and sent out as an addendum." A true and correct copy is attached hereto as Exhibit 145 and by this reference made a part hereof.

662. Rod Keiscome can't recall why he didn't issue a Contracting Officer's Directive letter for the adjustments reflected in the August 13, 2001 email (Exhibit 145). No modification of Contracting Officer’s Directive was ever received by Remcon for these design changes.

663. The subject matter of these design changes reflected in the August 13, 2001 email and the attached addendum (Exhibit 145) are what Rod Keiscome's understands to be constructive changes.

664. On August 15, 2001, Ray Todd wrote to Joanne Cody and DHM that Rod Keiscome wanted all design changes to the Sherman Tree Trail and Upper Sherman Parking Area set forth in DHM's August 12, 2001 site visit email (Exhibits 144 and 145) to be issued as a contracting officer's directive. See Exhibit 145.

665. They never were.

666. On June 6, 2002, Bob Russell wrote Willie DeOcampo advising him that his estimate to raise the USPA was $39,475, and that this was $20,000 less than hauling the material out of the park. See Exhibit 136. Our quotation was $48,217.94. See Exhibit 135. With my consent, Mark Penrose negotiated a final price for raising the USPA with Bob Russell on June 14, 2002. A true and correct copy of Bob Russell's June 14, 2002 daily log is attached hereto as Exhibit 146 and by this reference made a part hereof. On June 19, 2002, due to the continued existence of the stockpiles impeding our work, combined with no direction to proceed, I wrote Willie DeOcampo and Rod Keiscome pleading for the modification to raise the USPA. See Exhibit 137.

667. On June 22, 2002, I emailed Willie DeOcampo asking where the modification was authorizing the raising of the USPA. A true and correct copy is attached hereto as Exhibit 147 and by this reference made a part hereof.

668. On June 24, 2002, Willie DeOcampo emailed Rod Keiscome asking if a modification would be issued authorizing the raising of the USPA. A true and correct copy is attached hereto as Exhibit 148 and by this reference made a part hereof.

669. On June 27, 2002, Rod Keiscome issued a CO's directive letter authorizing the extra work. See Exhibit 138. On June 28, 2002, I sought assurance from the CO that payment for extra work would be prompt. See Exhibit 139.

670. On June 28, 2002, I again requested from Willie DeOcampo and Rod Keiscome that electronic survey data for the revised grades and alignment for the USPA be emailed to Remcon's surveyors. A true and correct copy is attached hereto as Exhibit 149 and by this reference made a part hereof. On July 1, 2002, Willie DeOcampo

emailed Joanne Cody asking her to take care of my request. A true and correct copy is attached hereto as Exhibit 149 and by this reference made a part hereof.

671. Although on July 16, 2002, Rod Keiscome answered Exhibit 139 by promising me, in writing (Exhibit 140), that he would cause payment for the extra work of raising the USPA to be made in the next payment cycle in August, 2002, he did not honor his promise.

**SHERMAN TREE TRAIL**

672. In June of 2001, Willie DeOcampo was made aware that Remcon's surveyor was seeking additional information regarding the USPA and STT.

673. In his weekly report dated July 25, 2001, Bob Russell stated that Remcon began surveying the Sherman Tree Trail. See Exhibit 76.

674. On July 27, 2001, Andrea Gregor at DHM sent an email to Bill Morris, the surveyor, with a copy to Joanne Cody, regarding the STT. Attached to this email were trail layout sheets (T3-T6), the design base, the base, and a trail text file. A true and correct copy is attached hereto as Exhibit 150 and by this reference made a part hereof.

675. On July 30, 2001, Andrea Gregor sent an email to Bill Morris, with a cc to Joanne Cody and Bob Smith regarding the STT. Attached to this email were the finished grades for all TP points along the STT. According to Willie DeOcampo, these changes made to the STT at the end of July 2001 were communicated to our surveyor with the intent that we build the trail based on these changes.

676. On July 30, 2001, Mark Penrose told Bob Russell that additional survey control was needed on the STT for layout. See Exhibit 96.

677. On August 12, 2001, Andrea Gregor sent an email to Bill Morris regarding AutoCAD files 200Q addendum. It describes a series of drawings that he is receiving and with respect to sheets T3-T10 (trail sheets have changed). A true and correct copy is attached hereto as Exhibit 151 and by this reference made a part hereof.

678. On August 15, 2001, Ray Todd wrote to Joanne Cody and DHM that Rod Keiscome wanted all design changes to the Sherman Tree Trail and Upper Sherman Parking Area set forth in DHM's August 12, 2001 site visit email to be issued as a Contracting Officer's directive. See Exhibit 145.

679. G&K thereafter staked the trail pursuant to the revised grades set forth in the revised drawings, and Remcon excavated the trail in accordance with the revised drawings in 2001.

680. On October 29, 2001, in response to RFI #31 (concerning the existence of the excess excavation), Joanne Cody and Willie DeOcampo advised Remcon that it had constructed the trail at least one foot lower than designed. See Exhibit 69.

681. On April 17, 2002, I sent Willie DeOcampo, Terry Lang, and Bob Russell a letter (Exhibit 70) indicating that I had confirmed that the design elevations and layout provided by DHM prior to G &K staking the trail was correct and that the trail as currently constructed had been built to the design grades. I ended by reminding the NPS that any delay in starting the trail work at the beginning of the 2002 season would impact that year's construction schedule and overall completion of the project.

682. On May 9, 2002, Bob Smith sent Joanne Cody, Ray Tuttle, Andrea Lind, and Willie DeOcampo revised and proposed grades for the STT. See Exhibit 54.

683. On May 16, 2002 Bob Russell walked the Sherman Tree Trail with Bob Smith, Luke Triplett, Mark Penrose, Bob Reinhardt, Bill Houck and Bill Morris to review grades and drainage. Bob Smith and Bill Morris agreed that staking for the trail was substantially correct. Bob Smith agreed to review/redesign the drainage and review it with Joanne Cody the following Monday (May 21, 2002) in Denver. A true and correct copy of Bob Russell's May 16, 2002 daily log is attached hereto as Exhibit 152 and by this reference made a part hereof.

684. As of May 24, 2002, the NPS' CO was informed that revised drawings for the Sherman Tree Trail needed to be issued, and that extra costs would be incurred to

construct revised drawings for the STT. A true and correct copy is attached hereto as Exhibit 153 and by this reference made a part hereof.

685. Willie DeOcampo expected Remcon, upon receipt of the revised STT drawings in late May, 2002, to build according to them. The title block on each revised trail drawings T7A and T8A show that they were originally prepared and given to the NPS in August of 2001. Both T7A and T8A have a triangle with the Number 1 in them. Adjacent to the triangle it says Revision 1 and there is a date of May 20, 2002. This was the second revision to the trail drawings. A true and correct copy is attached hereto as Exhibit 154 and by this reference made a part hereof.

686. The original contract documents issued had sheets T7 and T8 and they were initially revised in the form of being called T7A and T8A. Willie DeOcampo doesn't know why it took between August of 2001 and May 20, 2002 to issue revisions to T7A and T8A.

687. On May 22, 2002, Bob Smith emailed Willie DeOcampo advising that the stone stair quantity for the Sherman Tree Trail had to be adjusted. See Exhibit 55.

688. On May 22, 2002, Willie DeOcampo emailed Bob Smith seeking the STT revisions indicating where changes are required. See Exhibit 55.

689. On May 22, 2002, Bob Smith advised Willie DeOcampo that revised Upper Sherman Parking Area and Sherman Tree Trail plans were being worked on. See Exhibit 55.

690. On May 29, 2002, Willie DeOcampo emailed me that DHM had confirmed that the STT had been graded in 2001 to the proper elevation. A true and correct copy is attached hereto as Exhibit 155 and by this reference made a part hereof.

691. This meant that the response to RFI #31 by Willie DeOcampo and Joanne Cody, in October, 2001, stating that the trail had been constructed one foot too low, was in error. See Exhibit 69 and by this reference made a part hereof.

692. On June 3, 2002, I sent Willie DeOcampo an email indicating that Remcon had received revised drawings T7A and T8A, which referenced revised drawings T9A and T10A, but that we did not receive T9A and T10A, and that numerous design corrections were required. I also noted that Luke Triplett and Mark Penrose were preparing RFIs requesting clarification of issues with regards to the two drawings we did receive. I ended by requesting clarification regarding the issuance of new plans and stressed that Remcon needed quick responses to its RFIs so that it could complete its cost estimate. A true and correct copy is attached hereto as Exhibit 156 and by this reference made a part hereof.

693. On June 3, 2002, Willie DeOcampo sent an email to me, with a copy to Bob Russell, Terry Lang, and Ray Todd. It reads, "Steve, I had given Ray Todd some drawings to take to the site last week. They were drawings sent to you by Marty S. the week before. The drawings sent with Ray were T7A, T8A, and US30. The two additional drawings were US32 (which was the centerline profile of the revised upper parking lot and a sketch profile of the new culverts for the Sherman Tree Trail). T9A and T10A were not included in this package. A true and correct copy is attached hereto as Exhibit 157 and by this reference made a part hereof.

694. By email on June 3, 2002, I sought clarification as to what plans should be used to build the trail. See Exhibit 57.

695. On June 9, 2002, I sent Willie DeOcampo, Terry Lang and Rod Keiscome an email indicating that Remcon was still waiting for a response to various RFIs regarding the revised trail design. I also indicated that it was made very clear at the partnering meeting that any plans not issued formally by the CO did not exist.

696. On June 19, 2002, I wrote to Willie DeOcampo and Rod Keiscome asking when I would receive the further revised STT drawings as the STT revised drawings I was given referenced others I was not given. See Exhibit 58.

697. On August 21, 2002, I wrote Mike Giller advising that the lack of survey control on the Sherman Tree Trail continued. See Exhibit 61.

698. T7A and T8A were not formally issued until Mod. No. 5 was issued to me on November 20, 2002. See Exhibit 6.

699. Willie DeOcampo doesn't know why it took until November of 2002 for a modification to actually be issued by the government to the contractor for revisions issued by the design team six months earlier.

700. By letter dated August 14, 2002, we quoted to Mike Giller our extra costs to perform the extra work set forth on the revised STT plans. A true and correct copy is attached hereto as Exhibit 158 and by this reference made a part hereof. This quote was accepted but the modification was not issued for more than three months thereafter. See Exhibit 6.

701. On August 14th, Luke Triplett sent a letter to Mike Giller requesting a contract modification for changes to the trail design as a result of the contents of Sheets T7A and T8A. See Exhibit 158.

702. On August 21, 2002, I wrote Mike Giller and Rod Keiscome providing notice that an immediate modification for the STT needed to be issued so as not to delay the STT work as the STT was "...considered critical path." Mod. No. 5 was not issued until 3 months later. A true and correct copy is attached hereto as Exhibit 159 and by this reference made a part hereof.

703. On August 21, 2002, I wrote Mike Giller and Rod Keiscome that the STT was continuing to be affected by lack of survey control in the design. A true and correct copy is attached hereto as Exhibit 160 and by this reference made a part hereof.

704. As of August 9, 2002, Remcon had caused staking and final grading on the STT to occur in compliance with contract drawings T7 and T8.

705. On August 29, 2002, Mike Giller wrote me advising that we could build the STT from either the original plans (T7 and T8) or revised plans (T7A and T8A). A

true and correct copy is attached hereto as Exhibit 161 and by this reference made a part hereof.

706. As of August 29, 2002, the revised T7A and T8A drawings, while given to Remcon, had not been made a part of any modification. The modification was pending.

707. In response to Mike Giller's August 29, 2002 letter regarding sheets T7, T8, T7A, and T8A, which letter was faxed to Remcon on September 6, 2002, and the fact that Remcon could select which sheets to build from, I sent a letter on September 17, 2002, stating: "It should not be the responsibility of the contractor to arbitrarily choose which design he wants to build." In my response, I further stated that "The T7A and T8A plans have additional changes…I believe additional clarification is needed…" Although we quoted additional costs to construct the STT per the content of revised drawings T7A and T8A in August, 2002, promptly following the NPS' advice that these revised drawings would be the basis of the redesign of the STT, we had to wait, per Rod Keiscome's direction, to receive the modification. A true and correct copy of my September 17, 2002 letter is attached hereto as Exhibit 162 and by this reference made a part hereof.

708. On September 17, 2002, in response to my letter regarding the STT, and the fact that non-issuance of the modification was causing delay, Mike Giller emailed Rod Keiscome, the C.O., requesting that Mod. No. 5 be issued as soon as possible. A true and correct copy is attached hereto as Exhibit 163 and by this reference made a part hereof.

709. On September 17, 2002, Rod Keiscome's assistant had the necessary paperwork signed off by the park superintendent to issue Mod. No. 5.

710. On September 20, 2002, Loren Mangrum's daily report states that the Sherman Tree Trail had a major excavation problem due to a sharp drop off in rock excavation and requested a re-routing of the trail. A true and correct copy is attached hereto as Exhibit 164 and by this reference made a part hereof.

711. Mod. No. 5 was initially issued with incorrect data in September, 2002 and was rejected by Remcon and sent back unsigned. It took the NPS approximately one month to re-issue Mod. No. 5 with the correct information. See Exhibit 6.

712. I signed Mod. No. 5 on October 18, 2002 on behalf of Remcon and forwarded it to the Contracting Officer on October 21, 2002, along with a cover letter expressly reserving our rights to receive time extensions and delay damages resulting from the government breaches of contract, constructive acceleration, directed changes, construction changes and additional work performed and materials handled due to defective and deficient contract documents, including the STT. See Exhibits 6, 7 and 11.

713. The C.O. took approximately one month, until November 20, 2002, to sign and issue Mod. No. 5, which incorporated revised drawings T7A and T8A, and the direct extra costs thereof only. Mod. No. 5 officially modified the trail's design and finalized the design changes which had been going on for almost two years.

714. The timing of the issuance of Mod. No. 5 was too late for Remcon to proceed in 2002 as winter weather had commenced, and it further restrained Remcon from completing the trail until 2003's construction season as the design changes had to be implemented before the balance of the trail could be built. Changes to the trail design were part of the Upper Sherman area that had to be finished before the transition to the Lower Sherman could occur.

715. Between the issuance of the Notice to Proceed on June 11, 2001 and November 20, 2002, when Mod. No. 5 was issued, changes in trail grades, trail points, stone steps, culverts and other STT features occurred numerous times.

**ROD KEISCOME'S AUTHORITY AND DIRECTION**

716. Rod Keiscome has taken all four federal government construction law courses necessary to become eligible to be a Level IV contracting officer. Rod Keiscome has taken specific courses on advanced contract law. Rod Keiscome has heard of the

Spearin Doctrine and understands that it means that the government warrants the contents of plans and specifications.

717. Rod Keiscome also learned about multiple different types of entitlement that a contractor can have on federal government construction contracts for issues that it may encounter. These include acceleration, constructive acceleration, differing site conditions (both Type 1 and Type 2), and directed and constructive changes.

718. As part of his advanced contract law training, Rod Keiscome learned the government had a responsibility to have a quick turnaround in issuing modifications for either time or money. This was supposed to occur within a reasonable period of time.

719. In the training courses or seminars that he attended, Rod Keiscome was taught that when a contractor encounters a circumstance in the field that they can't build according to the plans they are supposed to communicate that fact to the COR and/or the construction manager who is on site. When Remcon encountered something in the field, they were directed to communicate it in the first instance to the construction manager, Jacobs Facilities.

720. In 1996, Rod Keiscome acquired his Contracting Officer warrant. Since that time, he had had the title of Contracting Specialist and his duties are as a CO.

721. With respect to this project, Rod Keiscome was at all times for both design and construction the CO.

722. The NPS underwent a reorganization which included the fact that the NPS, for any particular construction work that may go on in a National Park, was not permitted to actually administer the field operations. Congress directed that third-party construction managers be the means and method implemented by the NPS for administering field operations of contractors. On this project, Jacobs Facilities was the NPS' construction manager during the first two years of active construction. The construction manager was hired by the NPS to be the on-site field eyes and ears of the NPS, inspecting the work of the contractor. During the first year, Bob Russell was the

lead inspector, the person in charge on behalf of Jacobs Facilities, the construction manager in the field.

723. It is exclusively the province of the Contracting Officer to issue a change for anything that affects time or money.

724. Rod Keiscome has not ever had any training on the means and methods required for earthwork and the excavation of a roadway.

725. Rod Keiscome can't recall if he has any training with respect to how a contractor creates from excavated rock material that is properly sized to be used as either backfill or base rock for a road.

## ***CONSTRUCTIVE AND DIRECTED CHANGES***

726. According to Rod Keiscome, the primary two ways that a contractor is authorized by a CO to perform extra work is by issuance of a modification or the issuance of a Contracting Officer's Directive. A contractor can also be authorized to perform extra work by constructive change.

727. The CO believes a constructive change is when the contractor is directed or believes that he has been directed to perform something that the CO has not yet formally directed him to do.

728. From his training, Rod Keiscome understands that the doctrine of constructive change is a doctrine whereby a contractor who receives information and perceives it is responsible to perform pursuant to it may be entitled to receive a modification compensating it for the time and/or money associated with performance of that constructive change.

729. Rod Keiscome believes and admits that constructive changes occurred on this project with respect to some overruns and earthwork.

730. Rod Keiscome believes and admits that there are probably some items that he became aware of that occurred during the project while Remcon was still the

contractor that he perceived were a constructive change but have not yet materialized into one or more modifications.

731. On July 11, 2001, Bob Russell sent Mark Penrose what was purported to be a copy of the adjusted access road alignment between Stations 24+38 +/- and 30+20 +/-.

732. There were a series of issues at various parts of the project that required some redesign and realignment in the summer of 2001, but they were not formally issued by the Contracting Officer as a modification.

733. The revised design information regarding what was sought to be done as far as realignment of the road and redesign of the road, parking area and trail was given to Remcon multiple times in 2001 and 2002.

734. As the COR, when Willie DeOcampo got notice that someone on behalf of the NPS had issued a drawing that was identified as a field revision and had given it to Remcon, he expected Remcon to comply with the revised drawing. When the design team issued changes to the drawings and they are given to the contractor by Bob Russell, and the design team sends changes to our surveyor, the design team and Willie DeOcampo expected us to make those changes and stake according to the most recent updated design.

735. If the Contracting Officer does not ratify those changes in a modification, the contractor would be in limbo. Every day the contractor is in limbo, that he could otherwise perform work in the field because the site would be available, would be effectively a delay if it affected a critical path activity.

736. According to Willie DeOcampo, in the summer of 2001, it was not the NPS' standard practice to furnish design changes to the contractors just for information for them to look at and put into their files.

737. In July of 2001, I asked Willie DeOcampo what Remcon was supposed to do with all the drawing revisions that it was receiving. Willie DeOcampo responded, "Proceed as if we're going to issue a modification."

738. Willie DeOcampo agrees it is true that I specifically communicated to him on that subject, and further believes he may have responded, "Proceed as we're going to issue a modification."

739. On August 20, 2001, Andrea Gregor sent Bob Russell a communication which stated, "Attached are full-sized revision drawings, the follow-up to my fax. Please pass along one copy to Jeff Northrop. The dark clouded areas are the latest changes. The light clouded area is the same as the first addendum I sent you on August 10." On August 22, 2001 Bob Russell sent a fax to Jeff Northrop, with a cc to Willie DeOcampo and others, showing a transmittal of the referenced drawings that are in the August 20, 2001 transmittal from Andrea Gregor. See Exhibits 52 and 53.

740. Willie DeOcampo expected Remcon, upon receipt of these latest revised drawings through the transmittal of August 22, 2001, to build according to them.

741. On August 24, 2001, Bob Russell sent a fax to Jeff Northrop, Willie DeOcampo, Ray Todd, and Joanne Cody, transmitting copies of revised drawings. A true and correct copy is attached hereto as Exhibit 165 and by this reference made a part hereof.

742. Rod Keiscome contends that he was not made aware of the issuance of revised drawings on August 24, 2001 until the partnering session in May of 2002. I personally raised this issue at the partnering session.

743. Willie DeOcampo, who received Bob Russell's August 24, 2001 transmittal of revised drawings, admits that he expected Remcon, upon receipt of these revised drawings, to build according to them.

744. Independent of the three differing site conditions encountered in June, July and August, 2001, there were a whole series of revisions to the drawings during the

months of July and August of 2001 issued to Remcon which further hindered our work and our ability to work productively or stay on schedule.

745. Willie DeOcampo can't remember if, in early August 2001, he went and spoke with Mr. Keiscome about the various different things that were going on the project (e.g. the excess material from the burn pit, the contention that there were DSC's, the excess material, and all these various drawing revisions) and that Mr. Keiscome got upset because he didn't have the funding to pay for all this extra work. However, Willie has seen something in writing that would lead a person to believe that this occurred.

746. Based on what Mr. Todd had recommended in mid August, 2001, Willie DeOcampo concluded that a modification would be issued by Mr. Keiscome for all of the extra work Remcon had performed. See Exhibit 145.

747. Willie DeOcampo does not know why all design issues that had not been negotiated to completion were not issued as a directive in some manner, shape, or form so as to permit Remcon, as of commencement of the 2002 construction season, to allow us to proceed without impact.

748. On January 2, 2002, Bob Russell sent Jeff Northrop a fax requesting our cost proposal for restaking the USAR centerline and our cost proposal for sorting and removing upper parking lot debris so that Bob could wrap up Mod. Nos. 3 and 4.

749. During the May 2002 partnering meeting, I requested from all attendees direction on how to address all of the issues then continuing to be unresolved, including how to proceed through the deep cut area, and how to address slope problems.

750. I was first informed during the May 2002 partnering meeting of the lengthy process the NPS represented it took to get funds for modifications. In response to the identification of the funding mechanism process for modifications, I responded that it would inevitably cause delays to the Project.

751. After we had experienced all of the changes and clarifications and directions in 2001, and documented them, we expected that the NPS, at the very least

during the winter shutdown, would have worked on solutions so we could proceed when weather permitted. We were advised at the partnering meeting that the problems were still unresolved (after 6 months!) and that it would take time to sort them out, that further design changes were forthcoming, and that the funding was not in place to issue modifications. To say I was frustrated at the lack of action, and maladministration, would be an understatement.

752. After mobilizing to start work in 2002, we had little productive work to perform and we lacked direction to enable us to proceed on critical path work.

753. It is distressing to Willie DeOcampo, as the COR, that the design was still uncertain as of May 22, 2002, almost a year after Remcon had received the notice to proceed for this project. This is why Willie sent an email to DHM asking them to get him something. However, the design revisions weren't done yet. See Exhibit 55.

754. On May 24, 2002, following the partnering meeting, Rod Keiscome sent me an email noting: "We also agree that there are issues that we've mutually identified as action plans to work out. That process continues..." A true and correct copy is attached hereto as Exhibit 166 and by this reference made a part hereof.

755. The designers, working with Joanne Cody, had issued multiple generations of design revisions for the USAR, USPA and STT to Remcon in July and August of 2001 and Willie knew at the time that this was going on that he had a short construction season that limited the ability of Remcon to implement design revisions. He also knew at the same time that the process by which the funding for extra work took a long time because he had to get lots of people to agree to it and then it had to go back to Washington, D.C. to get approved.

756. On June 28, 2002, I sent Rod Keiscome a letter notifying Mr. Keiscome of delays due to unresolved grading conflicts and errors within the contract plans. This letter noted that RFIs were sent from June 20, 2002 to June 27, 2002, requesting an immediate response, and none had been received. I notified Mr. Keiscome that, effective

July 1, 2002, we would be forced to cease all grading operations on the USAR and go on stand-by pending resolution of these conflicts. See Exhibit 60.

757. On July 3, 2002, I wrote the Contracting Officer, requesting an emergency on site meeting as many issues impairing our work were still unresolved.

758. A new Project Manager, Mike Giller of the NPS Denver Service Center, arrived on site on July 10, 2002, and he walked the entire site with me and my lead Project personnel. After having the problems on the USAR explained to him orally, he directed us to "field fit" the USAR to the existing natural features.

759. On July 11, 2002, I confirmed in writing the receipt of direction, in the field, from Mike Giller, on July 10, 2002, to align the access road to fit within natural features sought to be saved. A true and correct copy is attached hereto as Exhibit 10 and by this reference made a part hereof. This direction was confirmed in Remcon's letter to the NPS on July 11, 2002, more than eight months after those problems had been brought to the attention of the NPS.

760. We then began what it hoped would be the final construction of the deep cut area. My grading superintendent/foreman, both Mark Penrose and Mike Kitchell, laid the roadway alignment out using the design staking information provided by the NPS as adjusted for field conditions.

761. By July 25, 2002, we had encountered further problems in fitting the design to field conditions.

762. A new assistant inspector, Russell Belknap, arrived onsite to replace Bob Russell's subordinate, Loren Mangrum, who had assumed Bob Russell's role. Mr. Russell left the site as of early July, 2002. Mr. Belknap walked the site with Mr. Kitchell and myself to review the field conditions and determine what could be done in order that Remcon could proceed, and he personally directed us to make additional changes to the roadway alignment. These changes were recorded in Remcon's Project records and in Russell Belknap's daily report. See Exhibit 59.

763. On July 25, 2002, Loren Mangrum noted in his daily report that himself, Russell Belknap, myself, Mark Penrose and Mike Kitchell concluded that the USAR cross section between Stations 24 and 30 should be super elevated rather than a crown to allow the roadway to fit rock boulders and operate more successfully. See Exhibit 59.

764. Mike Kitchell prepared a summary of USAR crown and super locations. A true and correct copy is attached hereto as Exhibit 167 and by this reference made a part hereof.

765. On July 25, 2002, Russell Belknap noted in his daily report: "S. Christianson (sic) & Mike Kitchell talked to me re: cuts @ 24 --> 30 access road…then discussed road issue 24 --> 30+00 w/ Kitchell. Discovered that Remcon had made adjustments w/ access road from Sta 1+50 --> 24+00 w/ respect to vertical & horizontal alignments including adding super's. Prior to decision @ 24 --> 30+00, had Kitchell show me the changes. Reviewed changes. Adjustments seem to be reasonable to facilitation (sic) completion of the project. Will need survey to redesign a geometric layout. Allowed Remcon to install super between 24 --> 30+00 to reduce cut along access road." See Exhibit 59.

766. The change from a crown to a super is a change of design requiring additional work as of July 25, 2002.

767. A super is explained as follows: the entire road is sloped to drain water to one side. A crown is explained as follows: the center of road is the highest point for water to drain to both pavement edges.

768. Both NPS inspectors (Mr. Belknap and Mr. Mangrum) communicated in writing on July 25, 2002 (Exhibit 59) that adjustments to the alignment by Remcon from Stations 1+50 to 24+00, with respect to the USAR vertical and horizontal alignments, including super, were reasonable to facilitate completion of the project, and allowed Remcon to build from Stations 24+00 to 30+00 with a super to reduce cut work along the USAR.

769. On July 26, 2002, we commenced building a super between Stations 24+00 and 30+00. A true and correct copy of Russell Belknap's July 26, 2002 daily log is attached hereto as Exhibit 168 and by this reference made a part hereof.

770. On July 30, 2002, Willie DeOcampo wrote to Mike Giller indicating that our work building a super was extra and in the best interest of the NPS. See Exhibit 141.

771. On July 31, 2002, Russell Belknap wrote that our road alignment changes were OK. A true and correct copy is attached hereto as Exhibit 169 and by this reference made a part hereof.

772. At no time during the extended discussions with the NPS throughout July 2002 (when we were struggling to make progress) did any NPS personnel insist that Remcon follow the original (and unbuildable) design.

773. In late July 2002, the NPS requested that we provide survey data for the access road as built. See Exhibit 169.

774. I had our surveyor return to the Project and survey the entire access road. The new survey data was sent to the NPS in Denver on August 14, 2002.

775. The NPS then orally advised me that it was going to issue still more new design changes for the USAR (the fifth set of changes) to correct what it perceived to be failures to properly build the road.

776. The NPS took this position despite the fact that we followed the oral and written directives of NPS on-site representatives to field fit the road as needed.

777. During a meeting on August 22, 2002, we notified the NPS that immediate survey design direction was needed for the Upper Sherman Access Road. The NPS responded that final control layout would be provided to our surveyor, G&K, no later than the first few days of the week of August 26.

778. Late in the afternoon on Friday, September 6, 2002, G&K finally received the new survey control points for the access road.

779. Remcon had G&K again lay out the road. In most instances, only minor extra work was required to meet the latest (5th) design changes other than in the deep cut.

780. Meanwhile, due to the originally deficient design and consequent re-designs, we were forced to delay its paving operations.

781. As weather became an impediment to complete paving operations (paving can only occur within certain temperature ranges), we were forced to wait for the following 2003 construction season to complete paving operations.

782. Final horizontal and vertical control data from the NPS, for the Upper Sherman Access Road, did not arrive at G&K's office until September 11, 2002, approximately 2 weeks later than represented. The data provided failed to contain critical information relative to super-elevations locations.

783. On September 16, 2002, I sent a letter to Michael Giller outlining events that impacted Remcon because of a lack of direction or information from the NPS. These issues included our need for immediate survey design direction for the USAR. By then, we had been told that Russell Belknap would provide this information during the week of September 16, 2002. In addition, I informed Mike Giller that work on the STT had been placed on hold pending a written notification of the acceptance of the modification. Lastly, I reminded Mike Giller of the impact that NPS design deficiencies and design changes were having on the Project, namely, that such events would require additional time and would impact completion of the Project. A true and correct copy is attached as Exhibit 170 and by this reference made a part hereof.

784. Willie DeOcampo, who retired on January 31, 2005 from the NPS, after spending his whole professional career on NPS projects, admitted that he has never been associated, while a Contracting Officer's Representative, with a project that had as many design changes issued as this one along the same station.

785. Rod Keiscome also admitted that the staking of the access road by Remcon's surveyor was not a Remcon mistake.

786. It is my belief that the belated issuance of modifications, coupled with the delivery of multiple design changes issued by both the NPS and its outside designers, are constructive changes, a constructive acceleration and a breach of contract.

**DELAY**

787. By contract, Remcon was granted 792 days to build the project.

788. The original contract completion date was August 11, 2003.

789. I initially bid and scheduled to complete the project within 2 construction seasons (by November, 2002).

790. The project schedule specifications are at section 1320. A true and correct copy is attached hereto as Exhibit 171 and by this reference made a part hereof.

791. My initial as-planned schedule was submitted to the NPS on June 11, 2001, the date the Notice to Proceed was issued. It was not accepted due to the perceived absence of required resource loading.

792. I resubmitted it on June 25, 2001 with the required resource loading clearly indicated. The June 25, 2001 revised as-planned schedule was accepted with notations for additional edits by Willie DeOcampo.

793. While the June 25, 2001 revised schedule was under submission, Jacobs Facilities reviewed it and published a letter, dated July 11, 2001, finding the schedule to be "...well thought out and organized. The logic seemed complete and consistent throughout the schedule. The schedule is acceptable as is..." A true and correct copy is attached hereto as Exhibit 172 and by this reference made a part hereof.

794. Willie DeOcampo received the July 11, 2001 letter from Jacobs Facilities, and on July 12, 2001, forwarded the Jacobs' schedulers' comments to Ray Todd and Bob Russell. A true and correct copy is attached hereto as Exhibit 173 and by this reference made a part hereof.

795. Rod Keiscome respects Jacobs, their performance of work on the project, and believes that Jacobs' personnel who worked on this project, both in the field and the office, had competence with respect to reviewing and evaluating schedules.

796. Rod Keiscome doesn't know why Jacobs' commentary was not followed by the NPS in reviewing and commenting on the schedule submissions by Remcon.

797. Specification Section 1320, entitled "Project Schedule and Monthly Inspections," Part 1.4, entitled "Joint Review, Revision," provides: "Within seven calendar days of receipt of the contractor's proposed schedule, the contracting officer and contractor shall meet for joint review, correction, or adjustment of the proposed project schedule. Any areas, which, in the opinion of the contracting officer, conflict with timely completion of the project, shall be subject to revision by the contractor."

798. The NPS never complied with this contractual requirement, despite my numerous requests to do so. Neither Rod Keiscome, the CO, nor Willie DeOcampo, the COR, ever complied with Specification Section 1320, Part 1.4.

799. On July 25, 2001, in the weekly meeting minutes, Bob Russell stated that Remcon's two-year proposed schedule should be accepted with notation. Willie DeOcampo, Joanne Cody, and Ray Todd participated in the meeting via phone. The June 25, 2001 Remcon schedule was accepted with notation by Willie DeOcampo on July 25, 2001. The July 25, 2001 weekly minutes record that the June 25, 2001 revised as-planned schedule had been accepted.

800. We did not strictly comply with the contract requirements to provide monthly updates of our overall project schedule.

801. I was denied the ability to meaningfully comply with this contract requirement due to the events encountered on this Project, including the volume of changes, differing site conditions and lack of direction provided by the NPS, coupled with the absence of modifications. This prevented me from producing an accurate or realistic schedule. We did publish, on a weekly basis, a two-week look ahead schedule

which detailed the activities performed the prior week, that week's planned activities, and the forecasted activities for the subsequent week. The two-week look ahead schedule was presented and discussed at each weekly meeting with the NPS. The three-week look ahead schedule was used to construct the project as the full project schedule was rendered inaccurate by the absence of NPS action relating to the delay events. Although we submitted approximately six full project schedules, they were unable to be effectively used to manage the project.

802. At the end of 2001, we were behind schedule because we had encountered what we contended were differing site conditions on the USAR and USPA, as well as numerous changes to the plans, as we were suffering from a lack of response and direction from the NPS, resulting in delay, stockpiles of excess excavation, and lack of direction on how to address them.

803. It was communicated to Rod Keiscome, by the technical personnel that he relied on, that the project was delayed as a result of encountering the DSC on the USAR.

804. The critical path is those series of activities in an uninterrupted pattern that is the longest, continuous series of activities that control the time frame within which a project could be constructed.

805. Willie DeOcampo doesn't know why, given that the government did recognize that a differing site condition was encountered in the deep cut area requiring blasting, Mr. Keiscome did not grant additional time when granting Mod. No. 6.

806. According to Willie DeOcampo, additional time was due Remcon as a result of encountering the differing site condition on the access road.

807. The drilling, blasting and material handling operations occurred, continuously, until September 13, 2001, a duration of over six weeks, which was twice the planned earthwork duration for the entire project. Between July 30th of 2001 and completion of the blasting of the access road in September of 2001, the access road construction was on the critical path.

808. If there is a delay to the critical path, such as blasting on this project of the access road, it is incumbent upon Rod Keiscome, as CO, to promptly evaluate it, seek a resolution with the contractor, if he can, and if not then to timely issue a time extension modification so as to avoid a claim that he failed to timely issue a time extension.

809. The NPS has still not granted any time extensions for the blasting work done by Remcon or anything related to the access road's differing site condition.

810. Rod Keiscome admits that he has not addressed the time extension issue for blasting work on the USAR because of an admitted administrative oversight on his part.

811. Willie DeOcampo doesn't know if he ever looked at the project schedule and evaluated the critical path of the project to determine if the contractor was entitled to a time extension. If he didn't, he never gave this responsibility to anyone else.

812. It was Willie DeOcampo's responsibility within the governmental structure set up for this project to evaluate schedule issues. If he didn't do it, it wasn't anybody else's responsibility to do it.

813. On September 12, 2001, I sent Willie DeOcampo an email. Willie DeOcampo understood that I was very concerned regarding delays and impacts to the project that were being experienced up through that date. A true and correct copy is attached hereto as Exhibit 174 and by this reference made a part hereof. Due to the problems encountered and the NPS' failures to act, this Project consumed a disproportionate amount of my time and the main office's time, to administer.

814. Willie DeOcampo believes that the Project schedules were never accepted because he didn't know the logic behind the scheduling. This is untrue. Our June 25, 2001 schedule was accepted.

815. Willie DeOcampo has never scheduled a project himself and he admits he is not proficient in performing scheduling.

816. Rod Keiscome admits he is not an expert in critical path scheduling methodology and is not technically qualified to do it.

817. During the May 22, 2001 pre-construction conference, the NPS agreed that formalizing proposed modifications with a minimum of delay is essential.

818. Given that the work was divided into two principal phases, there was a practical restraint imposed by the contract as follows: we had to keep a specified number of parking spots for cars, RV's and buses open year round. In order to perform the project we had to construct the new spaces in the Upper Sherman parking lots (which meant all lots, along with the new access road the new comfort station and the new trail to the Sherman Tree) before we could relocate our efforts to the Lower Sherman portion and demo and rebuild the parking lot, highway and other improvements there. These requirements are found in various locations of the contract documents but include Specification section 01110 1.4 A-F. Specification section 1110, entitled "Summary of Work," describes the project and provides, in Part 1.4(c), the minimum number of parking spaces for passenger vehicles, buses, and RV's that must be maintained available at all times (thus yielding the conclusion that the Upper Sherman must be completed before the transition to the Lower Sherman). A true and correct copy is attached hereto as Exhibit 175 and by this reference made a part hereof.

819. Because the Lower Sherman work would take a full construction season (given the elevation of the project (over 7000 feet in the Sierra mountains) and the limited site access), the work season could only commence when the snow had melted.

820. In general, this means the construction season runs from June 1 to October 31 or so every year.

821. Our as-planned Project schedule called for all work on the Upper Sherman Area to be completed in the 2001 season and the Lower Sherman Area to be completed in the 2002 season.

822. Rod Keiscome believes that a prudent contractor could have completed this project within two construction seasons. This means that government caused delays which prevented us from achieving our goals should be compensable to us.

823. The critical path on Remcon's as-planned Project schedule commenced with the clearing of trees and pioneering of the USAR and USPA. It then went to the comfort station and related improvements for the balance of 2001.

824. This critical path was closely followed by the excavation and earthwork effort, and given what happened on the project, due to delays admitted to have occurred by the government, the critical path of the as-built project promptly shifted from the comfort station to the earthwork and excavation activities.

825. Our as-planned schedule was impacted by re-designs and maladministration by NPS personnel as well as differing site conditions encountered, all of which manifested themselves as breaches of contract as our ability to perform was severely hindered due to lack of timely modifications and direction.

826. On or before October 11, 2001, Jeff Northrop sent Willie DeOcampo a letter that coordination and planning along with discussions with the NPS was needed before an updated schedule could be made. A true and correct copy is attached hereto as Exhibit 176 and by this reference made a part hereof.

827. On October 11, 2001, the NPS received a letter from Jeffrey Northrop indicating that an updated Project Schedule would be forthcoming after further planning. See Exhibit 176.

828. We sought to develop a full project schedule during the winter shutdown that would work when we started in 2002.

829. Absent the NPS resolving outstanding issues, at anytime, including during the six month winter shutdown between November, 2001 and May, 2002, our ability to accurately plan and schedule the project was frustrated.

830. On December 3, 2001, Jeff Northrop sent Willie DeOcampo an updated schedule. On December 24, 2001, Bob Russell sent a transmittal to Willie DeOcampo which provided Bob Russell's comments for Remcon's revised CPM schedule (dated 12/07/01 and received 12/11/01). On January 2, 2002, Bob Russell sent a transmittal to Willie DeOcampo indicating that project schedule acceptance was an issue that needed to be addressed/resolved the following year. On February 25, 2002, Bob Russell sent a transmittal to Willie DeOcampo regarding his comments for Remcon's revised CPM schedule (dated 2/06/02 and received 2/14/02). On March 4, 2002, Willie DeOcampo sent Remcon a letter with project schedule review comments regarding Remcon's schedule dated 2/06/02. The March 4, 2002 letter from Willie DeOcampo to Remcon regarding Remcon's schedule dated 2/06/02 stated that the schedule was not in compliance with the Contract requirements because it was not prepared using the latest version of Primavera Project Planner (P3) software by Primavera Systems, and indicated that a 10% retainage would be withheld from each monthly progress payment until an acceptable progress schedule and project schedule was received and accepted by the NPS. True and correct copies of these documents are collectively attached hereto as Exhibit 177 and by this reference made a part hereof.

1128. On April 2, 2002, I sent an email to Willie DeOcampo regarding the Project Schedule. This letter indicates my concern that Willie DeOcampo's March 4, 2002 letter references the use of Primavera Project Planner software when the NPS had previously agreed to the use of Microsoft Project in 2001. A true and correct copy is attached hereto as Exhibit 178 and by this reference made a part hereof.

1129. Despite the NPS personnel agreeing to review impact issues and representing they would timely respond and provide the necessary design changes and/or issue the appropriate revised drawings and modifications, little or no information was forthcoming before the second construction season began. As a result, we were unable to

publish an accurate, updated schedule as it was missing critical information to enable us to plan our work.

1130. On May 16, 2002, Rod Keiscome, at the partnering meeting, directed Bob Russell to provide a detailed analysis of our then current proposed schedule for logic and content. Rod Keiscome's May 16, 2002 directive was reiterated in a meeting with me in mid-June, 2002. Rob Russell never complied.

1131. I gave notice by letter dated May 20, 2002 that until issues restraining critical path work are resolved we would be delayed and seek project standby and delay costs. A true and correct copy is attached hereto as Exhibit 179 and by this reference made a part hereof.

1132. In a May 20, 2002 email, I wrote Willie DeOcampo that due to unresolved issues, Remcon could not productively work on the project. A true and correct copy is attached hereto as Exhibit 180 and by this reference made a part hereof.

1133. By email on May 22, 2002, I told Willie DeOcampo that Remcon would mobilize as soon as possible to start the limited amount of productive work available, but once it runs out Remcon will need to be compensated for stand-by costs for labor and equipment. A true and correct copy is attached hereto as Exhibit 181 and by this reference made a part hereof. I communicated in the May 22, 2002 email that we had no confidence that contract modifications will be issued soon. My lack of confidence was justified. Mod. No. 3 was not issued until August, 2002; Mod. No. 4 was not issued until September, 2002; and Mod. No. 5 was not issued until November, 2002.

1134. On May 21, 2002, the NPS' project manager advised Rod Keiscome, Willie DeOcampo and Joanne Cody that if the NPS was holding up Remcon, "we better be reducing our liability in a BIG hurry." A true and correct copy is attached hereto as Exhibit 182 and by this reference made a part hereof.

1135. On May 21, 2002, Joanne Cody forwarded the project manager's email to Bob Smith of DHM. See Exhibit 182.

1136. On May 22, 2002, Willie DeOcampo emailed Bob Smith seeking drawings with quantity take-offs for the USPA to evaluate Remcon's claims for costs associated with the impact from excess material. See Exhibit 55.

1137. On May 29, 2002, Willie DeOcampo sent a letter to Remcon detailing work which the NPS felt could be done as it was unaffected by other issues. A true and correct copy is attached hereto as Exhibit 183 and by this reference made a part hereof.

1138. None of the work listed in the May 29, 2002 letter were items on the project's critical path.

1139. On June 3, 2002, Rod Keiscome directed Bob Russell to perform an estimate of costs to raise the Upper Sherman Parking Area from revised plans. A true and correct copy of Bob Russell's June 3, 2002 daily log is attached hereto as Exhibit 184 and by this reference made a part hereof. Bob Russell records in his daily report for June 3, 2002 that Rod Keiscome was considering issuing a directive for Remcon to raise the Upper Sherman Parking Area.

1140. Through government inaction, the directive was not issued for three and a half additional weeks (on June 27, 2002). See Exhibit 138.

1141. On June 3, 2002, I requested consent from the NPS to permit Remcon to work on the Lower Sherman area. See Exhibit 9.

1142. On June 3, 2002, Willie DeOcampo sent an email to Jack Vance asking for something from the Park concurring with Remcon's proposed change to the contract. In this email, Willie asks Jack to write something for Willie so that Willie could verify that this change is in the best interest of the NPS. On June 4, 2002, Jack Vance responded to Willie DeOcampo's June 3, 2002 email stating that he did not want to change the contract until Remcon submitted an acceptable baseline schedule.

1143. Bob Russell, on June 4, 2002, reported that Jack Vance had denied our request to start on the Lower Sherman area due to slow progress on the Upper Sherman work. See Exhibit 119.