1144. The NPS denied my request to allow Remcon to start work on the Generals Highway.

1145. No work was ever started by Remcon on the Lower Sherman because Remcon was not allowed by the contract to do so until the Upper Sherman had been completed.

1146. On June 4, 2002, I emailed Willie DeOcampo asking where Bob Russell's promised comments to the most recent schedule submission were. A true and correct copy is attached hereto as Exhibit 185 and by this reference made a part hereof.

1147. On June 8, 2002, I sent a letter to Willie DeOcampo which stated "...the revised completion date is now October 7, 2003." This letter detailed how NPS caused delays had pushed the anticipated completion date well past August 2003.

1148. On June 19, 2002, I emailed Willie DeOcampo and Rod Keiscome that as of that date we still lacked Bob Russell's promised comments to Remcon's schedule and that four weeks since the promise was made had passed. A true and correct copy is attached hereto as Exhibit 186 and by this reference made a part hereof.

1149. As of mid-June, 2002, Bob Russell was failing to timely perform his work insofar as RFIs, submittals and schedule analysis were outstanding.

1150. On July 1, 2002, I emailed Willie DeOcampo that daily standby sheets were being prepared due to grade conflicts on the USAR that had delayed the work. A true and correct copy is attached hereto as Exhibit 187 and by this reference made a part hereof.

1151. On July 9, 2002, during a weekly project meeting, Willie DeOcampo indicated that he needed more time to review Remcon's updated baseline schedule and that he would provide an answer before the next meeting. A true and correct copy of the July 9, 2002 meeting minutes is attached hereto as Exhibit 188 and by this reference made a part hereof.

1152. On August 6 and 12, 2002, Remcon submitted revised schedules to the NPS.

1153. Willie DeOcampo admitted that it was difficult for Remcon to build the job when things were in flux.

1154. My September 16, 2002 letter notified Mike Giller that Remcon's ability to complete the upper portion of the project by early November 2002 had been severely compromised as a result of the issues outlined in my letter and that, although Remcon was making every effort to continue with work its ability to efficiently prosecute the work had been jeopardized.

1155. Following negotiations to settle claims in August of 2002, the NPS, by transmittal dated September 25, 2002, rejected the August 6, 2002 submitted schedule and asked us to resubmit it in light of the August negotiations. A true and correct copy is attached hereto as Exhibit 189 and by this reference made a part hereof. The NPS took four weeks to review the August, 2002 schedule and three additional weeks to transmit its rejection.

1156. On September 24, 2002, Luke Triplett, Remcon's assistant project manager, provided notice to the NPS that the USAR work was being impacted and delayed by defective plans and specifications and changes and that all costs would be sought. A true and correct copy is attached hereto as Exhibit 190 and by this reference made a part hereof.

1157. I wrote Mike Giller a detailed letter dated October 20, 2002. The letter states the following as facts: (a) redesign of the USAR was severely impacting Remcon's work on the project; and (b) as a result of the five designs which have taken place in the deep cut area of the USAR, Remcon had been forced to incur tremendous loss of revenue as well as delays to the overall project. See Exhibit 11.

1158. Willie DeOcampo concurs with what I said in the October 20, 2002 letter.

1159. Rod Keiscome admits that there are undoubtedly some time extensions due Remcon that have not yet been issued.

1160. But for the myriad of design deficiencies and DSC's encountered, and directed performance of extra work and constructive changes, the Upper Sherman work would have been completed by the end of the 2001 construction season. Our as-planned Project schedule was not able to be followed.

1161. Instead of taking 21 calendar days to excavate the road and parking lots, as scheduled in the as-planned schedule, the activity took more than 13 months and the costs for extra excavation exceeded $700,000.

1162. On June 22, 2002, I sent Willie DeOcampo an email asking when I would receive the contract modifications for the USPA since I would like to get the work started as soon as I could. I stressed that this is critical to Remcon's work plan and continued to impact the overall schedule. See Exhibit 147.

1163. It was Willie DeOcampo's observation, after receiving my June 22, 2002 email, that it was affecting my ability to perform the work that we needed clear direction as to what to do with the upper parking area.

1164. In the partnering meeting in May of 2002, the subject matter of delays and disruptions came up and was discussed extensively. Despite this fact, the government's inaction, promoting and causing further delay, continued.

1165. The revisions to the USAR and raising of the USPA had to be performed by Remcon, in order to address the excess material, before we could pave the USPA and USAR.

1166. By contract, Remcon was not authorized to do the extra work (raise the Upper Sherman Parking Area) until a modification was issued.

1167. As a consequence of the failure of the NPS to provide direction with regard to the disposition of excess material, further delays to the earthmoving work and

Project resulted as stockpiles of excavated material remained in place, thereby preventing completion of excavation work and utility installation.

1168. As of June 24, 2002, the NPS had not timely addressed dozens of outstanding RFIs and submittals and Remcon needed the responses in order to construct the project.

1169. Promptly upon receipt of the accurate version of Mod. No. 5 in October, 2002, I signed it and returned it to the CO. A reservation of rights letter accompanied it. The NPS took almost a full month to sign Mod. No. 5 thereafter.

1170. As a result of the differing site conditions encountered and multiple problems with the design, which are documented in dozens of written communications between us, the inspectors, the NPS and Denver Service Center personnel, and the outside design team members hired by the NPS, and which are admitted by the government to have been its responsibility in the modifications it issued, along with government inaction, the project was unable to be constructed as-planned.

1171. The combination of the road relocation, the burn pit material and the differing site condition on the access road collectively caused the critical path of the project to shift from going through the comfort station and put it entirely on the excavation activities. This continued into 2002.

1172. As of July, 2003, due to delays directly attributable to the NPS, work remained to be completed on the USAR, USPA and STT, and no work had been performed on the Lower Sherman Parking Area.

1173. Rod Keiscome does not consider the modfication that he issued for the DSC on the access road (unilateral Mod. No. 6) to have been timely issued.

1174. Concurrent with all of the excavation issues are multiple issues of design problems with the parking lots and access road not being able to be constructed as designed due to many different impacts. These include rock outcroppings, trees which were not marked to be removed but which had to be removed, the government's

identification that a stockpile of aggregate base was on site to access and use which turned out to be inaccurate and a myriad of other problems. The government failed to promptly address the problems in a timely or efficient or fair manner and this maladministration plagued the project and contributed to the delays and extra costs incurred by Remcon.

1175. I communicated to Rod Keiscome that because we had not been paid for contract and/or extra work, I lacked the working capital to get back on the project. Rod Keiscome recalls receiving a letter from myself which said something about ruination of Remcon's business if it wasn't compensated for the differing site condition issue at a minimum.

1176. Rod Keiscome has admitted that if there is a critical path impact to the project, the parties typically sit down, negotiate, and work those things through. If the parties cannot reach an agreement, the government nevertheless has a duty to unilaterally issue, as promptly as possible, a modification for that portion of time and money that it believes it inexcusably owes the contractor. If the government fails to do so, it would constitute a constructive acceleration.

1177. Rod Keiscome has admitted that time extensions result from delays to the critical path.

1178. Rod Keiscome has admitted that if there was a delay to the critical path, such as the blasting on this project of the access road, it was incumbent upon Rod Keiscome, as the Contracting Officer, to promptly evaluate it, seek a resolution with the contractor, if he could; but if he couldn't reach a prompt resolution, to timely issue a time extension modification so as to avoid a claim that he failed to timely issue a time extension.

1179. Rod Keiscome can't recall if there has ever been any time granted by him for the contractor having encountered a differing site condition on the access road.

1180. Blasting for the roadway was seven consecutive weeks before transition to blasting for the utilities.

1181. Rod Keiscome cannot say if he, as Contracting Officer, timely issued modifications for time and/or money due Remcon.

1182. Rod Keiscome has admitted that unless there was a directive by the CO, any changes to the drawings for the Sherman Tree Trail were not required to be constructed until November 20, 2002 when Mod. No. 5 was issued.

1183. Because Mod. No. 5 was not issued until November, 2002, too late to be performed in 2002, Rod Keiscome considers this to be a delay to the project. However, he has not issued a time extension associated with the STT delay. He doesn't know why he hasn't done so. This, by itself, entitles me to at least a one year compensable time extension, and makes the cure notice without merit.

## ***MODIFICATION NO. 4***

1184. Mod. No. 4, issued in September, 2002, concerned 4 items: restaking the access road due to its directed realignment (Bid Item 137); increase in hauling excess material to Wolverton Point (Bid Item 39); compensation for hauling debris encountered in the upper parking area (Bid item 138); and compensation for raising the upper parking area by up to five feet. See Exhibit 3.

1185. Three of these items of work were performed in 2001. Only the raising of the upper parking lot occurred in 2002.

1186. Three of these items concerned the handling of excess material. Only the restaking of the centerline of the access road did not.

1187. In July, 2001, Joanne Cody identified that raising the finished grade of the Upper Sherman Parking Area was a way to use excess material and reduce extra costs. Despite knowing about the issue for 11 months, it was not until June 3, 2002 that Rod Keiscome directed Bob Russell to perform an estimate of costs to use excess material to raise the Upper Sherman Parking Area from revised plans. Bob Russell recorded in his

daily report for June 3, 2002 that Rod Keiscome was considering issuing a directive for Remcon to raise the Upper Sherman Parking Area. The directive was not issued for three and a half additional weeks on June 27, 2002.

1188. On June 28, 2002, I sought assurance from the CO that payment for extra work would be prompt. On July 16, 2002, Rod Keiscome promised to pay Remcon in the August 2002 pay cycle for the extra work in raising the Upper Sherman Parking Area. In reliance upon the July 16, 2002 letter and representations by the Contracting Officer, I had our forces perform the extra work. Rod Keiscome did not honor the representation and the payment for this extra work was not made until after Mod. No. 4 was issued in September, 2002.

1189. The content of Mod. No. 4, in its Justification sections, admits that the cause of the road relocation was not due to Remcon. See Exhibit 3. The government wrote that the initial Access Road centerline staking was per the contract drawings, and that after the initial staking it was discovered that the centerline did not fall within the earlier cleared limits. The government further wrote that the NPS park staff had delineated the trees to be cleared, and that the government determined the centerline had to be revised in order to fit all earthwork into the already cleared limits. As a result, the government wrote that to do so the centerline had to be re-surveyed and re-staked. The government wrote that this was extra work and Remcon was entitled to be compensated for this effort.

1190. Mod. No. 4 recognized the fact that the additional survey work by G&K was extra work and was solely caused by the NPS, and the item compensated Remcon for restaking the access road between Stations 25 and 30. It was surveying work that was being compensated. The restaking effort occurred on July 16, 2001 but was not compensated until sometime after September of 2002.

1191. Willie DeOcampo believes that he authored the detailed write-up, contained on the last page of Mod. No. 4, on each of the items for which extra compensation was being given to the contractor.

1192. It was Willie DeOcampo's intent, when writing the justification for Mod. No. 4, to pay only for the hauling of the excess material encountered, not for the effort to excavate it or handle it multiple times, or the impacts which it caused.

1193. Mod. No. 4 compensated Remcon for hauling an additional 3200 cubic yards of excess excavation to Wolverton Point in Bid Item 39. In the Justification for Bid Item 39, the government wrote that Remcon advised it during excavation operations that the cut and fill volumes did not balance, and that it took the government nine months to determine it was responsible for the hauling costs associated with this excess material. Further, it was written: This material had to be removed from the Project site in order for the contractor to complete design subgrades. If this work is not performed this contractor (sic), the contractual work can not be completed and delay claims will follow.

1194. The Justification page attached to Mod. No. 4 admits that the NPS did not timely act in response to Remcon's claims regarding excess excavation.

1195. In Mod. No. 4, the NPS compensated Remcon for removal of the excess quantity of buried debris in the Upper Sherman Parking Area. While the effort to perform this extra work was performed in July, 2001, the government took 14 months to issue the modification to pay for it. The issuance of Mod. No. 4, with respect to the removal and sorting of the buried debris extra work, was untimely

1196. In the Justification page of Mod. No. 4, relating to the extra work associated with excavating and sorting the buried debris, the government states that the differing site condition was encountered on July 12, 2001 in the Upper Sherman Parking Area, that the notice was promptly given as the NPS staff and inspector inspected the area on July 16, 2001 and determined that the buried material had to be removed before the

parking lot was built, and that direction was given to remove the upper 5 feet of the existing grade which contained unsuitable debris.

1197. In Mod. No. 4, the NPS compensated Remcon for raising the Upper Sherman Parking Area approximately 5 feet from the design grade. Direction to perform this work was not received until June 27, 2002.

1198. In the Justification page of Mod. No. 4, the NPS states that during the excavating and grading of the USAR and USPA, it became apparent that excess excavated material was being generated. The excavation effort that primarily produced this excess material occurred from July through September, 2001.

1199. In the Justification page of Mod. No. 4, the NPS states that it was estimated by the NPS that a total quantity of approximately 15,000 cubic yards of excess excavation will be generated. This admission was written after the NPS, for more than a year, repeatedly denied my contention and the physical evidence on site of excess material.

1200. In the Justification page of Mod. No. 4, the government states that the NPS' Denver Service Center and designers determined that the Upper Sherman Parking Area could be raised by 5 feet to spread 5,000 cubic yards of the 15,000 cubic yard overrun, and that the direction to perform this work will save $17,000 in extra costs which would otherwise be incurred. Therefore, it took one year of denials and resulting delays and impacts, costing hundreds of thousands of dollars yet to be addressed or compensated, for the government to save $17,000.

1201. The NPS, in Mod. No. 4, admitted in the Justification the facts asserted by Remcon during the summer and fall of 2001 regarding the existence of excess excavation.

***AGGREGATE BASE***

1202. The NPS was required by the contract plans and specifications to furnish all aggregate base to Remcon. Specifications section 2725 "Aggregate Base Course"

provides, in Part 2.1(A): "Material for aggregate base course shall come from crushing of material…removed from this project and/or stored from previous projects. A true and correct copy is attached hereto as Exhibit 191 and by this reference made a part hereof.

1203. On October 27, 2000, Jack Vance identified attached pictures of stockpiles of aggregate base that could be used on this Project. One of the pictures provided by Mr. Vance was used in Addendum No. 1, as "Photo 7," to identify aggregate base stockpiled for use by the contractor. Addendum No. 1 to the Contract identified a very large stockpile of aggregate base that was supposed to be available for the contractor's use. A true and correct copy is attached hereto as Exhibit 192 and by this reference made a part hereof.

1204. In Sheet G3 of the contract drawings, a note states: "The aggregate base course for this project is stockpiled in this general area." A true and correct copy is attached hereto as Exhibit 193 and by this reference made a part hereof. From this note, Remcon was informed that there was a quantity of material available for the aggregate base stockpiled in quantities sufficient to build the job.

1205. Robert Smith recalls seeing, furnished to DHM by Jack Vance, photos of stockpiles that the government said should be used for aggregate base on this project by the contractor. The materials that DHM was furnished by the NPS indicated that the NPS had stockpiled certain materials that were going to be made available for the contractor to use in constructing the project.

1206. There was no independent verification effort undertaken by the design team to verify that the stockpiles actually existed. They merely relied on what they had been told by their client (the NPS). That is the basis for the note on Sheet G-3.

1207. On March 21, 2001, while preparing my bid estimate, I e-mailed the NPS asking a series of questions. Included was my inquiry, based on my knowledge, that little or no aggregate base was available in a stockpile on site even though the bid documents advised otherwise. See Exhibit 29. I was told to bid the contract documents as indicated.

1208. I was entitled to rely upon the accuracy of the representation in the note on Sheet G3 that all aggregate base material anticipated to be used on this job was, in fact, in a stockpile at the location indicated, and Rod Keiscome agrees with me. This is because no pre-bid site inspection was possible due to the site buried under snow.

1209. Rod Keiscome cannot recall if the aggregate base that is shown in the photo was physically present at the site when the snow melted in the spring of 2001, after the NPS had awarded the contract to Remcon.

1210. Rod Keiscome believes that he was notified by a representative or representatives of the NPS that the volume that was available for the contractor in the location indicated on the plans was less than represented.

1211. If the aggregate base shown in the picture in Addendum No. 1 wasn't there, then Joanne Cody believes that was an error, omission, conflict or inconsistency in the plans.

1212. Rod Keiscome issued a final decision denying Remcon's claim for the failure to furnish aggregate base, but cannot recall if, in issuing his final decision with respect to the aggregate base issue, he was aware of, or referred to, Exhibits 192 or 193. A true and correct copy is attached hereto as Exhibit 194 and by this reference made a part hereof.

1213. The NPS did not furnish virtually any aggregate base. The aggregate base identified in the note on G-3 did not exist at the time it was required by Remcon.

1214. I included an amount to furnish aggregate base in my bid. The inclusion of an amount to furnish aggregate base was an error, to my advantage.

1215. If the stockpiles of material were not where the contract documents said they were, I am entitled to be reimbursed for the extra cost associated with sourcing that material.

1216. On August 22, 2001, after the differing site condition on the access road was encountered and notice given to the NPS, I solicited and received a quote from Oasis

Crushing to crush the rock encountered and required to be blasted on site into aggregate base. This was undertaken by me to reduce the costs to furnish the aggregate base and to concurrently find a way to reduce the costs of handling and addressing the rock encountered. It was intended to be a "win-win". A true and correct copy is attached hereto as Exhibit 195 and by this reference made a part hereof.

1217. On August 31, 2001, I transmitted the proposal to crush rock to the NPS. A true and correct copy is attached hereto as Exhibit 196 and by this reference made a part hereof.

1218. On September 4, 2001, Bob Russell forwarded my crushing proposal to Willie DeOcampo. A true and correct copy is attached hereto as Exhibit 197 and by this reference made a part hereof.

1219. By October 25, 2001, my proposal was accepted and Oasis Crushing was crushing rock and screening material at the upper parking lot stockpile.

1220. Aggregate base is rock material of uniform size and strength, used to bridge between subgrade and under the pavement of the access road and parking lots. The volume required for the project was pretty substantial and once placed, cannot be disturbed or additional costs to handle the material will be incurred.

1221. In the November, 2002 progress payment, the NPS reduced the amount to be paid Remcon for aggregate base by $114,051.91. A true and correct copy of my December 9, 2002 letter concerning such reduction is attached hereto as Exhibit 198 and by this reference made a part hereof. The reduction in the progress payment was undertaken without notice, and followed agreement on quantity reached in the field by Remcon and NPS onsite personnel.

1222. Section 2725 of the project specifications provides in Part 4 that the contractor will be paid for actual tons of aggregate base placed, verified by weight tickets. See Exhibit 191.

1223. Through October, 2002, Remcon had placed 9,292.4 tons of aggregate base and this was verified by weight tickets and quantity surveys. See Exhibit 198.

1224. The NPS reduced the payment to 6,640 tons, but no backup documentation was provided to substantiate this reduction in tonnage. Through the end of 2002, Remcon placed a total of 10,183 tons of aggregate base, for a total amount due of $437,870.50. The NPS has only paid $297,482.60 for this bid item, leaving an unpaid amount of $140,407.90.

1225. Through the end of 2002, Remcon placed a total of 10,183 tons of aggregate base, for a total amount due of $437,870.50. The NPS has only paid $297,482.60 for this bid item, leaving an unpaid amount of $140,407.90. Through discovery, I have come to learn that the reduction in tonnage was based on a theoretical calculation of the issued for construction contract drawings, and did not take into account any changes in design to the USAR or USPA from those drawings which required extra aggregate base to be used, including as backfill for changing the road from a crown to a super. See Exhibit 198. I promptly made a claim to the CO on December 3, 2002. See Exhibit 16.

1226. Section 2743 of the project specifications, entitled Asphalt Concrete Pavement provides in Part 4.2 that the contractor will be paid for actual tons of asphalt concrete placed, verified by weight tickets. A true and correct copy is attached hereto as Exhibit 199 and by this reference made a part hereof.

1227. Through October, 2002, Remcon had placed 5,441.7 tons of asphalt concrete, verified by weight tickets.

1228. The NPS reduced the quantity to 4,977 tons, which reduced the payment by $50,744.50, progress payment No. 12.

1229. The NPS reduction was based on a theoretical quantity based on the issued for construction contract documents, without regards to any changes to the Upper Sherman Access Road or Upper Sherman Parking Area.

1230. On December 9, 2002, I wrote Rod Keiscome providing a certified notice of claim for the NPS' failure to follow payment terms for aggregate base and asphalt concrete. A true and correct copy is attached hereto as Exhibit 198 and by this reference made a part hereof.

1231. By letter dated March 17, 2003, Remcon gave notice of a potential claim to Rod Keiscome for failure to provide aggregate base. A true and correct copy is attached hereto as Exhibit 200 and by this reference made a part hereof.

1232. By letter dated March 25, 2003, Remcon gave notice of a potential claim to Rod Keiscome for handling aggregate base. A true and correct copy is attached hereto as Exhibit 201 and by this reference made a part hereof.

1233. These claims were denied by Rod Keiscome.

## MALADMINISTRATION

1234. As detailed in the facts set forth herein, the NPS' administration of this Project was abysmal, and it severely hindered, delayed and impacted our company in terms of cash flow and time. Virtually every issue requiring analysis, attention and response by the NPS was done untimely, and in many instances, on an incomplete basis. No one assumed control, there was a failure to internally communicate, and collectively the project records disclose that the NPS failed to act timely, in an even-handed manner, and/or in a consistent manner. The conduct was a breach of the duty to act in good faith and fairly. The by-product of this conduct damaged our company and it caused extra time and extra costs to be incurred. It ultimately led to me running out of money and being unable to further perform.

1235. On July 2, 2001, Rod Keiscome got advice that there was a change necessary to the design in order to build the access road.

1236. Rod Keiscome can't recall what he did with respect to issuing a modification or Contracting Officer's Directive to validate that necessary relocation. He's not sure if Remcon got reimbursed in another line item for this work.

1237. On August 15, 2001, Ray Todd sent an email to Andrea Gregor and Joanne Cody saying, "Rod would like to issue these changes as a contracting officer's directive letter. Attached is a blank CODL [Contracting Officer's Directive Letter] for 200Q." Mr. Todd's August 15, 2001 email also notes, "The contracting officer's directive letter should describe the changes, in this case, the minor field adjustments described below and/or in the field notes, the control point changes, the drawings that were issued, etc. Maybe you should use an addendum format (delete some sheets, add other sheets, etc.). In this case, since the sheets have already been sent to Bob and Remcon, note that they were sent under separate cover. It should also note that we understand Remcon agrees to complete these changes at contract prices and list contract item and quantity adjustments. See Exhibit 145. This was not done for over a year.

1238. Willie DeOcampo was made aware, on or before August 15, 2001, that Mr. Keiscome, as the Contracting Officer, wished to incorporate the changes to the trail, the access road, and the upper parking lot as a modification.

1239. To the extent there needed to be revisions to the design that had to be accomplished after the 2001 construction season ended, Willie DeOcampo has no idea what prevented the NPS or its designer from doing the redesign during the winter.

1240. Rod Keiscome met with me twice in Denver during the winter shutdown of '01 to '02 to discuss the problems encountered during the 2001 season, the unresolved issues, and Remcon's claims. Even though I made 3 trips to Denver during the 2001-2002 winter season to address project impacts with Mr. Keiscome, Mr. Keiscome was not interested in discussing these issues directly and had me meet with his staff personnel including Willie DeOcampo, Joanne Cody, Jack Vance and Bob Russell. I traveled over 1000 miles to meet with the only person who could authorize payment to me, and, in essence, he refused to meet with me.

1241. On August 20, 2001, I forwarded to Willie DeOcampo a letter regarding rock excavation and the differing site condition. See Exhibits 8 and 80.

1242. Mr. DeOcampo did not give the August 20, 2001 letter to Rod Keiscome on or about August 21, 2001, when it was received. Rod Keiscome doesn't recall seeing the letter until the meeting with me in Denver in June of 2002.

1243. RFI No. 31, dated October 18, 2001, asked several questions. The responses given by Willie DeOcampo and Joanne Cody were not accurate, and the issue (excess excavation) ultimately led to direction from the CO to raise the parking lot in the upper area by 5 feet. See Exhibit 69.

1244. Bob Russell's January 2, 2002 transmittal to Willie DeOcampo indicated that a final decision needed to be made regarding raising the grade for the north side of the upper parking lot to accept 2,000 CY +/- of "Excess Material." This was not done until June 27, 2002.

1245. The NPS' Park Superintendent communicated, as of May 1, 2002, that it was critical that Rod Keiscome and Willie DeOcampo resolve five identified issues prior to the 2002 construction season commencing, and by May 30, 2002. See Exhibit 33.

1246. None of the five issues were resolved as communicated until August and September of 2002 and February 2003 at the earliest.

1247. In his email dated May 1, 2002, the NPS' Park Superintendent advised Rod Keiscome and Willie DeOcampo that based on Remcon's then pending claim, that "We are out on quite a limb financially, operationally and public-opinion wise. In other words, we're worried!" See Exhibit 33.

1248. On May 18, 2002, Bob Smith of DHM prepared a memo and sent it to Joanne Cody reflecting his thoughts and observations. They included the fact that Remcon did encounter hard rock and that this was a differing site condition; that Rod Keiscome should be so advised and prepared to address this fact for his June, 2002 negotiations with Remcon; that the extra work reported by Remcon for encountering the differing site condition was justified; and that, due to the volume of issues, "Remcon is in the driver's seat on this project." He said this because Remcon had experienced a series

of extra work items and was in a position to be entitled to receive modifications from the government for performance of a lot of extra work. See Exhibit 117.

1249. At the partnering session in May, 2002, I informed Mr. Keiscome that our failure to get timely paid had significantly affected our financial ability to perform. Rod Keiscome admits that, during the May, 2002 partnering session, Remcon advised it had concerns with cash flow.

1250. Part of the response on behalf of the government was that it would issue modifications unilaterally if it was taking too long to get a modification through the process. This did not happen.

1251. During the partnering meeting, the commitment by the government was to have the contract modification for excess haul outside of the park completed as of May 31, 2002. The modification (Mod. No. 3) was not issued until August, 2002.

1252. During the partnering meeting, one of the issues addressed was the redesign of the parking lot and that the drawings were going to be put out to Remcon for pricing within two days. This matter took another five weeks before direction to proceed was given.

1253. Coming into the partnering meeting in May of 2002, I had communicated to Rod Keiscome that there were a number of issues that caused us to be very frustrated with the government's lack of competent or timely administration of the Project, and that this was causing us to incur both extra costs and delays, and the inability to get the job going and be built.

1254. A very substantive subject of the partnering sessions was that there were many issues outstanding, and that the government's failure to promptly address them was causing damages, disruption and delay.

1255. The partnering session was utilized by Rod Keiscome, on behalf of the government, to allow an opportunity for these comments and issues to be aired and a

process to come together whereby the parties could work together to get them done timely and efficiently so as to make them go away.

1256. What happened immediately after the partnering session, in Rod Keiscome's experience, is extremely important to show the commitment and dedication, whether it's just words or there was substance behind the words spoken at the partnering session.

1257. Virtually all of the commitments made in the partnering session by the NPS were not met. Rod Keiscome can't recall what he did immediately after the partnering session in order to get the earthwork, drilling and shooting issues resolved.

1258. At the partnering session, the government agreed that the information for the STT was going to be issued by May 24, 2002.

1259. Based upon what was said at the partnering session, Remcon was specifically directed not to do any further extra work until it received either a Contracting Officer's Directive or a modification. At the same time we were so directed, the CO has now admitted that he was restrained from issuing a directive the day after the partnering meeting to raise the USPA because of a funding issue.

1260. Other than whether or not there was adequate money to pay for that work, raising the USPA was a cost-savings measure because there was extra money going to be spent, it was a question of how much.

1261. Rod Keiscome can't recall what he did during the wintertime in order to figure out what funding would be available to raise the USPA, since the issue was in existence at the end of the 2001 construction season, or if anything was done.

1262. There was a pattern and practice that many things that were in existence at the end of 2001 were not addressed until after the partnering session six months later. Rod Keiscome doesn't know why this was the case.

1263. While Rod Keiscome admitted that it distressed him, that this job, at the dawn of the second construction season, was being impacted by things that weren't

handled over the six preceding months when they could have been, I was more than distressed. I had sent letters. I had flown to Denver. I had spoken on the phone. I had published claims with binders of back-up documents. None of these caused the NPS to do what it was supposed to do. It simply failed to act at all.

1264. Rod Keiscome has admitted that Remcon is not at fault that the government did not determine what funding was available to pay for handling the excess material, an issue that was in existence in 2001 and had not been addressed at the dawn of the second construction season.

1265. While as of June of 2002, Rod Keiscome had reached a conclusion in his mind that some compensation was due Remcon for having encountered the rock in the access road during 2001, Rod Keiscome cannot recall why he did not issue a unilateral modification for the work at that time. The unilateral modification was not issued until February 18, 2003.

1266. At the June 2002 meeting, Dick Lewis, a Remcon representative, suggested to Rod Keisome that he issue a two-part modification, to compensate Remcon for that which he, Mr. Keiscome, recognized was due, so as to allow the parties to continue negotiations to hopefully find a bilateral concurrence, but to at least issue some amount of compensation in time to Remcon so as to relieve the financial burdens we were then experiencing. Rod Keiscome had the authority to do this, had he elected to, but didn't do so.

1267. Throughout June, 2002, the NPS failed to respond to the RFIs or to provide any direction to Remcon on how to correct the slope problems resulting from earlier deficiencies.

1268. On June 21, 2002, Remcon wrote Willie DeOcampo advising him that 18 submittals were pending up to 4 months and were overdue for response. A true and correct copy is attached hereto as Exhibit 203 and by this reference made a part hereof.

1269. As of June 24, 2002, the NPS had not timely addressed dozens of outstanding RFIs and submittals and Remcon needed then responded to in order to construct the project. I sent Willie DeOcampo and Terry Lang an email noting that Remcon's records indicate submittals going back to February 7, 2002 which have not yet been returned to Remcon. The email also noted that there are a total of 57 RFIs going back to June 7, 2001 and that, of these, 33 have not been answered. I ended my email by indicating that the NPS and Remcon need to address how to get a quicker turn around on these issues so as not to further delay the project and contended that the absence of RFI responses was impairing our ability to perform certain activities. A true and correct copy is attached hereto as Exhibit 204 and by this reference made a part hereof.

1270. In June, 2002, I gave the CO and the COR comprehensive notice of the multiple problems on the USAR, USPA and STT portions of the Project and their impacts on our ability to continue with the Project. When no substantive response was forthcoming, I notified the Contracting Officer that work would cease unless circumstances changed quickly.

1271. On June 26, 2002, Willie DeOcampo emailed Bob Russell and others that he would draft Mod. No. 3 to avoid further delays. Mod. No. 3 did not get published for seven additional weeks. Mod. No. 3 was for work that was done in 2001. The quantities that were done was a unit price item so it is just a mathematical calculation.

1272. On June 26, 2002, Willie DeOcampo directed Bob Russell to draft Mod. No. 4 within two weeks. Mod. No. 4 was not published for 11 weeks after June 26, 2002.

1273. Rod Keiscome does not know why Mod. Nos. 3 and 4 were not issued until August and September of 2002. He thinks this is "a good question." I believe it is due to maladministration.

1274. On June 28, 2002, I notified the CO in writing of grading conflicts and errors on plans causing delay, disruption and extra costs and requiring immediate

attention, and that if immediate answers were not provided to clean up conflicts and errors, then we would be forced to cease work.

1275. On June 28, 2002, I also advised the CO in writing that Bob Russell was not performing his duties and it was adversely affecting the project.

1276. On July 8, 2002, I sent Willie DeOcampo a letter regarding unanswered RFIs that were then impacting the project, and the completion schedule. A true and correct copy is attached hereto as Exhibit 205 and by this reference made a part hereof. Willie DeOcampo received and understood that my July 8, 2002 letter communicated that the answers to certain RFIs that had not yet been received were delaying the project.

1277. On July 16, 2002, Rod Keiscome promised to pay me in the August 2002 pay cycle for the extra work in raising the Upper Sherman Parking Area.

1278. In reliance upon the July 16, 2002 letter and representations by the Contracting Officer, I had our crews perform the extra work. Rod Keiscome did not honor his representation.

1279. From the weekly project meeting minutes for the meeting held on July 23, 2002, which Willie DeOcampo received and was part of the meeting, it appears that things were taking a week or weeks to get given to the contractor after Jacobs received the materials on-site. A true and correct copy is attached hereto as Exhibit 206 and by this reference made a part hereof. By letter dated August 14, 2002, Remcon quoted to Mike Giller its extra costs to perform the extra work set forth on the revised Sherman Tree Trail drawings. This quote was accepted but the modification (No. 5) was not issued for more than three months thereafter.

1280. On August 29, 2002, the NPS issued to me a letter rejecting the entire construction of the Upper Sherman Access Road as it was alleged to be out of alignment due to unilateral changes made by Remcon. A true and correct copy is attached hereto as Exhibit 207 and by this reference made a part hereof. The August 29, 2002 letter from

Terry Lang demanded that the work be corrected within ten business days upon receipt of the letter. This was not physically possible.

1281. Remcon did not make unilateral changes on the Upper Sherman Access Road.

1282. The factual basis for the August 29, 2002 letter is inconsistent with the facts documented by Russell Belknap, Bob Russell, Loren Mangrum, Mike Giller, Willie DeOcampo, Joanne Cody, and other NPS and design team personnel during 2001 and 2002.

1283. Willie DeOcampo admits that publication of the August 29, 2002 letter was unfair.

1284. If someone who hadn't touched the project or seen directions or design revision the documents issued during construction were to go out and evaluate whether Remcon built the job in accordance with the issued-for construction documents, they would conclude that Remcon didn't because the road is in a different location than the design required.

1285. Willie DeOcampo recalls that there was a contention asserted by the NPS after Remcon stopped work on the project that Remcon did not build the road as required by the contract documents. When the subject matter came up, Willie believes he stated the road was realigned as referenced in Bob Russell's June 26, 2001 daily log and Willie's July 2, 2001 email. See Exhibits 38, 39 and 40.

1286. Willie DeOcampo, Bob Russell, Joanne Cody, Ray Todd, Terry Lang, Rod Keiscome, Jack Vance, as well as other members of the design team, knew in 2001 that Remcon was building the road in accordance with the revised alignment drawings issued by the NPS and its designers.

1287. This fact was discussed at length multiple times, including at the partnering meeting in May, 2002.

1288. Willie DeOcampo does not know why it took more than one year for the government to publish a letter indicating to the contractor that its conduct in complying with all those various changes "has been rejected."

1289. On September 12, 2002, Willie DeOcampo emailed Russell Belknap, Jack Vance, Loren Mangrum, Mike Giller, Terry Lang and Rod Keiscome concerning Terry Lang's August 29, 2002 letter rejecting the roadway. In his email, Willie DeOcampo questioned why the August 29, 2002 letter was issued. A true and correct copy is attached hereto as Exhibit 208 and by this reference made a part hereof.

1290. No modifications ever issued as a result of impacts of the redesign of the access road as contrasted with just the cost to create the access road. This is the subject matter, in part, of the Remcon certified claim that is the subject matter of this lawsuit.

1291. Other than Mod. No. 3 and a portion of Mod. No. 4, no modification has ever been issued addressing the excess excavation effort, the balance of the Upper Sherman Access Road rock excavation, the Storm Water Protection Plan claim, or any of the pending Remcon claims.

1292. Mod. Nos. 6 and 7 were issued unilaterally.

1293. Mod. No. 6 added $84,170 to the contract price. See Exhibit 5.

1294. Remcon wasn't paid for Mod. No. 6.

1295. Mod. No. 7 decreased the contract price $2,743,771.14. A true and correct copy is attached hereto as Exhibit 209 and by this reference made a part hereof.

1296. As of February 2003, I had communicated to Rod Keiscome multiple times that Remcon's working capital had been depleted and I lacked the funds to go back to work until I was compensated for the differing site condition issue at a minimum.

1297. Rod Keiscome can't recall why it took the government over two months from Remcon's request to issue the formal modification to raise the upper parking area when he knew that this project was weather sensitive.

1298. Rod Keiscome believes that he did issue at least one progress application on this project that deducted money from Remcon that had already been paid after Remcon last performed work on the project but to remember why, he would have to look at the pay estimates. Prior to issuing any such pay estimates, Mr. Keiscome was informed by someone from the NPS that Remcon had not constructed the road in accordance with the plans. Rod Keiscome can't recall if he had the content of re-design of the access road before him when such a decision was made by him to deduct money from Remcon in any pay estimate.

1299. When confronted with the fact that Remcon had been directed to build the USAR different than originally shown, and that he ratified part of it in Mod. No. 4, but that he thereafter ratified the issuance of a letter saying the road was rejected for being constructed other than in the location originally designed, as well as withheld money previously paid, he stated that he would want to look into this in order to confirm that what he previously did was what he should have done.

1300. The Remcon project was one of several ongoing or planned NPS construction projects in the park. The total amount appropriated for all of the SEKI projects was $24,464,000 gross, with $19,232,000 net for actual construction. A true and correct copy of the NPS' fund request spreadsheet is attached hereto as Exhibit 210 and by this reference made a part hereof.

1301. The standard budgeted construction contingency to pay for all modifications at any particular time for the Denver Service Center is 10 percent and that would come from NPS management. As a Contracting Officer, Rod Keiscome was not concerned with where the money comes from, only that he can get the money. Where the money comes from is something from the project management side.

1302. As a Contracting Officer, Rod Keiscome had to make sure that if he issued a modification that he had money available for it. Rod Keiscome can't recall if, on this

project, he was concerned at any time that there was inadequate funding for changes that either were then existing or were projected may occur.

1303. The initial funding for this project was $7,087,000 for construction and $709,000 for construction contingency.

1304. When the contract was initially awarded to Remcon, it was awarded in the amount of $7,121,636.

1305. Rod Keiscome does not know why, when the contract was awarded, the contingency had been reduced by approximately $353,000.

1306. In order to say what portion of the 10 percent contingency was left undisbursed and uncommitted as of August, 2001, Rod Keiscome would have to look at the modifications.

1307. Mod. No. 1 added $317,850 to the base contract adding Options 1, 2 and 4 as set forth in the original solicitation. Rod Keiscome can't tell from looking at Mod. No. 1 if these funds came from contingency.

1308. Mod. No. 2 was issued in January, 2002, and added a net amount of $11,000 to the contract.

1309. Mod. No. 3 was not signed until August, 2002.

1310. It is my understanding that funding for a modification, whether it is in the contingency or not, has to go through a purchase request which is an electronic format initiated by the project manager, goes to budget, comes to the Contracting Officer, Contracting Officer "pushes the buttons", goes on to the contract specialist, and negotiations then take place with the contractor. Once completed, the Park itself must approve the request. This burdensome process was not disclosed in the contract documents.

1311. Once Rod Keiscome determined, as the CO, money should be funded to the contractor, it was his responsibility to timely issue that modification.

1312. If Rod Keiscome couldn't reach an accord swiftly with us, it was his duty to issue a modification unilaterally and cause us to be paid swiftly thereafter.

1313. On August 29, 2002, Mike Giller sent Rod Keiscome an email indicating that all pending fund requests were in and listed four different fund requests. A true and correct copy is attached hereto as Exhibit 211 and by this reference made a part hereof. Rod Keiscome does not know if, as of August 29, 2002, there was money available from other projects to be used to fund a change order on this Project.

1314. $24 1/2 million was appropriated for Sequoia projects ("SEKI") 200N through 200R. The total contingency for all of these projects was $2 million.

1315. As of August 29, 2002, the total net contingencies for all SEKI projects was $2,043,000, but $1,540,017 had already been allocated to date for other contingencies on this and other SEKI projects, leaving only $502,985 of unallocated contingency funds existing for all SEKI projects. See Exhibit 210.

1316. As of August 29, 2002, Mod. Nos. 4, 5 and 6 had not been issued.

1317. As of August 29, 2002, the NPS elected to use $95,121 of the remaining unallocated balance of $502,985 to fund Mod. No. 4. This reduced the remaining unallocated balance to be $407,864 for all SEKI projects. Mod. No. 5 added $26,880 and Mod. No. 6 added $84,170, for a total of $111,050. This reduced the remaining unallocated balance to be $296,814 as of February, 2003.

1318. As of February, 2003, Remcon's pending claims exceeded $1 million.

1319. Following 2001's construction season, my claims were valued at more than $1 million. The NPS, as of May, 2002, lacked sufficient funding to pay for Remcon's pending claims arising out of year one's construction work, and it did nothing about it. It simply ignored the pending issues.

1320. The remaining allocated funds available to be used to pay for modifications for this project never got augmented after May 1, 2002.

1321. The NPS, on August 22, 2002, agreed through negotiations to pay Remcon over $484,000 to pay for pending claims to the project. A meeting of the minds as to which claims were to be compensated by the $484,000 negotiated amount never materialized.

1322. Remcon believed the $484,000 related only to the Upper Sherman Access Road differing site conditions claim. The NPS believed the $484,000 related to all pending claims then unresolved following the issuance of Mod. No. 3.

1323. As of August 22, 2002, the NPS had left as remaining allocated funds only $502,985 and this was to be used, as necessary, for all SEKI projects and not this one exclusively.

1324. This project lacked sufficient contingency funding to pay for known and documented excess costs, and no effort was made by the NPS to augment the funds. Instead, inaction prevailed.

1325. When Robert Smith received the subpoena for his project records in this matter, the first thing he did was call Mike Giller, the NPS' project manager. He called Mike Giller instead of Joanne Cody because Mike Giller had contacted him earlier regarding the original files and he knew that Mike Giller had all of the original files.

1326. Mike Giller told Robert Smith that the NPS would review DHM's files and determine which documents would be discoverable at that point.

1327. Mike Giller told Robert Smith not to produce anything in response to the subpoena until he got back to Mr. Smith regarding what the NPS determined to be discoverable. Mr. Smith did not consult anyone, including private counsel, as to the propriety of that direction but nevertheless agreed to honor Mr. Giller's direction.

1328. On September 20, 2004, Mike Giller sent a letter to Robert Smith at DHM. Mr. Smith relied upon this letter in not furnishing in response to the subpoena 100 percent of the documents he possessed.

1329. As a result of the September 20, 2004 letter from Mike Giller, Robert Smith delivered to the NPS his original project records. Without advising the NPS, he also kept a copy of what he sent to Mr. Giller. The NPS then gave Mr. Smith back certain portions of the original documents which Mr. Smith was then authorized by the NPS to cause to have copied in response to the subpoena.

1330. At the time that Robert Smith produced the documents in response to the subpoena, he did not disclose, orally or in writing, to our counsel that the data that was given to the copy service to copy was less than the entire amount of documents that he possessed relative to the Project.

1331. Robert Smith's original response to the subpoena took place in September and October of 2004.

1332. Mike Giller directed DHM not to produce certain records.

1333. The government interfered with, and attempted to improperly suppress, the production of project records.

1334. The direction by Mike Giller was undisclosed to Remcon.

1335. The direction by Mike Giller was improper.

1336. It is my understanding that NPS' maladministration is not unique to our project. Evidence of the NPS' Denver Service Center's previous and on-going maladministration of construction projects is well documented in letters, which have been authored by other contractors who contend their businesses have been impacted by the NPS failures. Attached hereto as Exhibit 237 are true and correct copies of letters respectively dated April 16, 2003, April 17, 2003 and June 2, 2003, and by this reference made a part hereof. These letters clearly show the contempt in which the NPS operates with regard to its own specifications. Never in my 25 years in the business have I ever encountered an owner with such contempt and inability to address its own projects and required processes.

**DELAY/CURE NOTICE/TERMINATION**

1337. There were a series of realignments, adjustments, changes, revisions, and differing site conditions which impacted various portions of the access road, the parking lot, and the trail, all occurring in the month of July of 2001. These changes had a ripple effect in August 2001 and throughout the balance of the Project. The road realignment pushed the road into the hill, requiring extra excavation to be handled, and ultimately a differing site condition to be encountered. Instead of one hole, 2,000 cubic yards large to be filled, the parking area had two holes, one approximately 500 cubic yards and the other exceeding 7,000 cubic yards. The trail was the subject of multiple changes. All of these changes, which occurred in a relatively confined site, meant that our ability to productively work was impacted.

1338. As of August 2001, the burn pit excavation had gone from 2,000 to 7,000 yards, and it required backfilling the hole left behind, and stockpiles of rock and excess material started to dominate the Project site impairing our ability to maneuver our equipment and perform our work. Concurrently, the NPS was making changes to the road alignment that were not being disclosed timely, or at all.

1339. All three bullet items contained under the heading Potential Change Orders in Bob Russell's August 8, 2001 weekly field report deal with subsurface conditions either not indicated on the contract documents or being encountered in a manner that was different than indicated. Robert Smith understands how Remcon would have had an issue with the limited work area to productively perform work while these series of design changes and differing site conditions and excess quantities were being encountered. (See Exhibit 105).

1340. I documented the claims and damages to the NPS in the fall of 2001, but no response from the NPS addressing my claims was received. On April 3, 2002, I wrote a letter to Willie DeOcampo explaining how each of the NPS' requests for additional

information on Remcon's claims had already been fulfilled through Remcon's prior claims and transmittals. See Exhibit 113.

1341. On April 22, 2002, Mark Penrose submitted to Willie DeOcampo Remcon's updated Request for Equitable Adjustment ("REA") for earthwork impacts and issues during the 2001 construction season. The NPS never responded in writing to all of these claims, except to reject the form used to submit the REA on July 8, 2002.

1342. On April 25, 2002, the NPS published a status report of contract issues for this project. Five items were listed as pending issues claimed by Remcon from its pending Request for Equitable Adjustment ("REA"). The five items listed were: (1) Excavation and loading, $222,377.44; (2) Haul excess excavation, $35,736.00; (3) Rock excavation (differing site condition), $355,483.05; (4) Haul miscellaneous material from park, $381,000.00; (and 5) Storm water pollution protection (differing site condition), $70,051.54. These REA claims issues totaled more than $1,064,000. A true and correct copy is attached hereto as Exhibit 212 and by this reference made a part hereof.

1343. As of April 25, 2002, the NPS:

(a) recognized approximately $400,000 (for hauling miscellaneous material) was valid;

(b) contended that no excess excavation occurred "because the excavation quantity (cut) has not changed from the contract documents." Item #1, for $222,000 was recommended as being denied;

(c) recommended that an additional 6,000 cubic yards be paid for Item 2, thus finding the claim meritorious;

(d) contended that because we did not demonstrate lack of rippability with a D8 Dozer, the differing site condition claim for $355,000 should be denied, with the possible exception that 50% of the blasting costs, not exceeding $60,000 may be recognized; and

(e) recommended that the differing site condition claims for storm water plan be denied.

1344. On May 1, 2002, the NPS' Sequoia Park Superintendent emailed to Rod Keiscome, and others, his concerns following the first year of construction after he received and read the April 25, 2002 contract status report. As of May 1, 2002, the NPS' Sequoia Park Superintendent communicated that he had been advised that Remcon created most of the problems that he was concerned about. The concerns he expressed were valued at more than $1 million by him. The Superintendent of the Park, as of May 1, 2002, believed that Remcon was responsible for Items 1, 2, 3 and 5 of Exhibit 212. See Exhibit 33.

1345. In June, 2002, Rod Keiscome orally offered me $59,000 to settle the REA. I rejected the offer.

1346. Remcon was not responsible for the excess excavation identified in claim issue No. 1 in Exhibit 212. The NPS has subsequently acknowledged in testimony and Mod. Nos. 3 and 4, that excess excavation did occur and was not the responsibility of Remcon.

1347. By contract, the defense to the differing site condition claim, that Remcon had to demonstrate the lack of rock rippability, does not exist.

1348. The explanation proffered by the NPS as the defense of the differing site conditions claim for blasting was subsequently determined by the NPS to lack merit.

1349. The facts represented by the NPS in response to claim issue Nos. 1 and 3 in the April 25, 2002 contract status report were inaccurate.

1350. The NPS' Park Superintendent communicated, in Exhibit 33, that it was critical that Rod Keiscome and Willie DeOcampo resolve all of these 5 issues prior to the 2002 construction season commencing, and by May 30, 2002. They were not.

1351. A partnering meeting occurred on May 16, 2002 in an attempt to ferret out issues affecting the project. Robert Smith's May 18, 2002 memo to Joanne Cody, Exhibit

117, states: "Remcon is in the driver's seat on this project." He said this because Remcon had experienced a series of extra work items and was in a position to be entitled to receive modifications from the NPS for performance of a lot of extra work.

1352. On May 20, 2002, my email to Willie DeOcampo indicated that, "As a result of the pending plan changes, issues regarding the Generals Highway, and unresolved contract issues, Remcon is being prevented from productively starting any work...I'm deeply concerned, after hearing the process involved in obtaining additional funds, issuance of contract modifications and change orders that the project's completion date will be severely impacted and costs to the government will surely rise. Remcon will continue to work with you on these matters as long as it doesn't require an additional cost impact to Remcon." See Exhibit 180.

1353. On May 20, 2002, I sent Willie DeOcampo a letter expressing my concern that the issues regarding the Upper Sherman Parking Area, the Sherman Tree Trail and the Generals Highway were not being resolved in a timely manner and could take up to a month. I notified Willie that these delays would impact Remcon's ability to meet its proposed construction schedule and would surely delay the project completion date. I also noted that, as of the date of the letter, the only work which Remcon could effectively start was its subcontract work on the Upper Sherman Comfort Station. I ended by formally notifying the NPS of Remcon's request for additional compensation as it related to extended overhead and contract extension days until such time as the outlined issues had been rectified and Remcon could proceed with their work. The letter also enclosed an outline of our extended daily overhead rates. See Exhibit 178.

1354. On May 21, 2002, Willie DeOcampo forwarded my May 20 email to Rod Keiscome, Terry Lang, Joanne Cody, Larry Walling, Ray Todd, and Jack Vance. In the email, Willie indicated that "I am forwarding this message I received this morning to all since this will impact cost on this project. We have set up a meeting with the A/E Designers to try to resolve some over-run quantities...We should discuss this problem

also since I need to respond to Remcon concerning this message. A true and correct copy is attached hereto as Exhibit 213 and by this reference made a part hereof.

1355. On May 21, 2002, in response, Larry Walling sent an email to Willie DeOcampo saying, "If we are holding them up, we better be reducing our liability in a BIG hurry." See Exhibit 182.

1356. On May 21, 2002, Jack Vance forwarded Willie DeOcampo's May 21, 2002 email to Bob Russell saying "The impact game continues…How can he be delayed when he isn't approved to start yet?...." See Exhibit 213.

1357. On May 22, 2002, I sent Willie DeOcampo an email regarding the project noting that the NPS' desire to see work proceeding in the Sherman Tree Project is no greater than Remcon's and that if the NPS wanted Remcon to fully mobilize to the project and start the limited amount of productive work available, it would do so. However, I asked for an agreement that once Remcon ran out of productive work, we would be fully compensated for the stand-by costs for men and equipment. I also stressed that without a proper avenue for payment, we could not proceed based upon RK's direction in the partnering meeting. See Exhibit 181.

1358. On May 24, 2002, Rod Keiscome sent an email to me indicating that he concurred that we needed direction with some issues. See Exhibit 166.

1359. On August 1, 2002, I wrote Mike Giller, with copies to Willie DeOcampo and Rod Keiscome, asking for their position on the differing site condition claim and that all outstanding issues pending since the 2001 construction season be addressed in the August, 2002 progress payment. See Exhibit 123.

1360. On August 21, 2002, I wrote Mike Giller, with a copy to Rod Keiscome, stating that due to the delayed progress payment for July, 2002, subcontractors were ceasing their work. A true and correct copy is attached hereto as Exhibit 214 and by this reference made a part hereof. I further advised Mike Giller and Rod Keiscome that due

to non-payment of the 2001 extra work claims, Remcon lacked the ability to independently finance the progress payment draws which the NPS failed to timely make.

1361. On November 19, 2002, Mike Giller wrote me advising of unilateral payment estimate quantity calculation adjustments. The net result of Mike Giller's November 19, 2002 letter was to reduce Remcon's pay estimate by more than $406,839.09. A true and correct copy is attached hereto as Exhibit 215 and by this reference made a part hereof.

1362. I never agreed with the quantity calculation adjustments made by Mike Giller, and on November 19, 2002, I wrote a letter to the Contracting Officer concerning NPS' failure to issue prompt payment to Remcon for work performed. See Exhibit 13.

1363. On November 25, 2002, I wrote another letter to the CO concerning NPS' failure to issue prompt payment to Remcon for work performed. See Exhibit 14.

1364. On November 25, 2002, I sent a formal request for Alternative Dispute Resolution to the Contracting Officer. See Exhibit 15.

1365. I sought ADR due to my precarious financial condition caused by NPS' actions over the course of the 2001 and 2002 construction seasons. I simply did not have the financial ability to mobilize for the 2003 season unless the NPS issued payments for existing work performed and time extensions due, and I was trying desperately to obtain payments from the NPS through the ADR process.

1366. By letters dated December 3, 4, and 7, 2002, I submitted notices of claims to the NPS for a series of direct cost issues. See Exhibits 16, 17, 18 and 19.

1367. On February 13, 2003, I wrote the Contracting Officer reiterating the NPS' failure to process Remcon's progress payments. In that letter, I noted that the failure "has severely impacted Remcon." See Exhibit 20.

1368. On March 4, 2003, I wrote the Contracting Officer protesting the NPS' reduction of Remcon's differing site condition claim from an agreed (per negotiations) $485,214 to $84,170. In this letter, I noted that Remcon's submitted costs for the

differing site condition exceeded $700,000. A true and correct copy is attached hereto as Exhibit 216 and by this reference made a part hereof.

1369. On March 10, 21, 25 and 27, 2003, I again wrote the Contracting Officer regarding a series of claims. See Exhibits 21, 22, 23 and 24.

1370. On April 9, 2003, I wrote the Contracting Officer concerning the NPS' failure to make proper progress payments. See Exhibit 25.

1371. On April 15, 2003, I sent a letter to the Contracting Officer which fully detailed the NPS' failures and breaches of contract. See Exhibit 26.

1372. On June 28, 2003, I delivered to the CO a multi-volume comprehensive certified claim for the project for delays and damages exceeding $3,000,000. The claim outlined in substantial detail the facts supporting the branches of content by the NPS and the cost and time impacts incurred by Remcon on the Project. The total of that claim was $3,091,799.60. See Exhibit 28.

1373. One of Rod Keiscome's responsibilities, as CO, was to review and address certified claims that were submitted to him. Rod Keiscome can't recall how he discharged this responsibility with respect to Remcon's June 28, 2003 certified claim.

1374. Rod Keiscome does not believe that Remcon waived its rights to any of the claims set forth in the June 28, 2003 certified claim by failing to timely submit any categories of the claims. Rod Keiscome's denial of entitlement on any of these claims would never be based on the failure to timely submit it.

1375. Rod Keiscome received Remcon's June 28, 2003 certified claim with multiple three-ring binders of supporting data, with a lot of case law throughout, but still felt that was inadequate support for entitlement and damages because he still needed the supporting documentation the Inspector General's Office on the audit.

1376. Some items in Remcon's June 28, 2003 certified claim have not been the subject of a final decision, but sixty days elapsed prior to filing suit.

1377. Rod Keiscome can't recall which claims set forth in Remcon's June 28, 2003 he has personally evaluated for entitlement as contrasted with relying on someone else to give him advice and information.

1378. Rod Keiscome agrees that his unilateral issuance of Mod. No. 6 did not waive Remcon's right to seek additional compensation for encountering the DSC referenced therein for time or additional money.

1379. Rod Keiscome understood, when he received Remcon's June 28, 2003 claim, that Remcon was seeking additional compensation over and above Mod. No. 6 for having encountered the DSC and the time associated with having to deal with it.

1380. Rod Keiscome can't recall if he also understood that Remcon was seeking damages for having to procure aggregate base that was not provided by the government as represented in Exhibits 191, 192 and 193.

1381. Rod Keiscome can't recall if we were seeking reimbursement for costs and the time associated with filling back up the hole that it excavated when it removed the additional debris and the extra burn pit material that was encountered in the parking lot.

1382. Rod Keiscome understands that, in the June 28, 2003 certified claim, Remcon was seeking reimbursement for credit that it believed the NPS had improperly taken from progress payments that had been previously issued. However, he can't recall what the position of the NPS was with respect to the improper credits that were claimed.

1383. On June 30, 2003, I again sent the CO another detailed letter which again protested and communicated the impact on Remcon resulting from the NPS' lack of payment. A true and correct copy is attached hereto as Exhibit 217 and by this reference made a part hereof.

1384. As of July, 2003, due to delays directly attributable to the NPS, and our failure to be paid, work remained to be completed on the USAR, USPA and STT and no work had been performed on the Lower Sherman Parking Area.

1385. On July 17, 2003, I sent the Contracting Officer a letter stating that Remcon was prepared to proceed once the NPS met its contractual requirements. A true and correct copy is attached hereto as Exhibit 218 and by this reference made a part hereof.

1386. When the Contracting Officer denied my request for ADR, coupled with the CO's failure to issue any financial remuneration or time extensions, either bilaterally or unilaterally, in response to the June 28, 2003 certified claim, Remcon was disabled from mobilizing to the Project, as it could no longer pay employees if it did mobilize.

1387. No response to Remcon's June 28, 2003 certified claim was received prior to July 24, 2003.

1388. On July 24, 2003, Rod Keiscome sent me a Cure Notice asserting that, as of July 22, 2003, Remcon had completed only approximately 53% of the base contract work while approximately 95% of the contract time had expired and that Remcon had not provided a contract compliant schedule, had not provided schedule updates and revisions had not provided required submittals, had not provided contract required surveys and quantity surveys, failed to construct significant portions of the project in conformance with the contract, and failed to pay subs and suppliers. The NPS then gave Remcon 10 days from receipt of the notice to submit a written plan on how it intends to complete the contract by August 24, 2003. A true and correct copy is attached hereto as Exhibit 219 and by this reference made a part hereof.

1389. When the CO issued the Cure Notice, we had already supplied him with reams of information concerning NPS-caused and responsible problems on the project, including delays and impacts to Remcon, all of which were, individually and collectively, breaches of contract justifying no further performance.

1390. The NPS, by letter dated August 13, 2003, signed by Rod Keiscome, provided notice to Remcon that its right to further proceed was terminated for default. A

true and correct copy is attached hereto as Exhibit 220 and by this reference made a part hereof.

1391. On one hand, Rod Keiscome cannot recall if, at the time he issued the Termination for Default, there were any issues that were then outstanding that were the subject of Remcon's right to receive either time extension or additional compensation that had not yet materialized into one or more modifications but he further testified (as to the differing site conditions) that some time and costs, not yet issued, were due.

1392. The August 13, 2003 Notice of Termination for Default letter was a final decision of the CO permitting Remcon to bring an action in the U.S. Court of Federal Claims within 12 months.

1393. Although the NPS failed to grant Remcon virtually any time extensions, the contract time should have been extended, as of the end of 2002, through the 2004 construction season. This, by itself, was a breach of contract, in my opinion.

1394. Remcon, but for this Project, was very successful and its financial inability to continue was exclusively caused by this Project.

**BOULDER REVETMENT**

1395. Specification Section 2831, in Part 4.1, entitled "Boulder Revetment," provides that the stone materials to be used to construct boulder revetment shall be procured from park stockpiles. A true and correct copy is attached hereto as Exhibit 221 and by this reference made a part hereof.

1396. Willie DeOcampo agrees that Specification Section 2831 permitted Remcon to not include in its contract price the cost to create stone, but rather to expect to have it in a stockpile available to be accessed.

1397. According to Ray Tuttle and Bob Smith, based on Specification section 2831, it was reasonable for Remcon to assume at the time it bid the job that the NPS had stockpiled all of the stone necessary for the required boulder revetment on this project.

1398. When I bid the job, I read Specification Section 2831 and understood that the NPS was required by contract to furnish all stones to be used for rock revetment, and I planned to use park stockpiles for boulder revetment..

1399. There were no stone stockpiles for boulder revetment as represented in Specification Section 2841, Part 4.1., and the NPS did not furnish virtually any stones for rock revetment.

1400. Neither Willie DeOcampo nor Rod Keiscome can recall if the government furnished from stockpiles in the park the material to be used for boulder revetment as required by Part 4.1 of Specification Section 2831.

1401. If the stockpiles were not supplied, Rod Keiscome would have to see what the facts are and go from there to determine if Remcon was entitled to reimbursement for having to procure the boulder revetment stones.

1402. The stone used for boulder revetment by Remcon had to be found or manufactured by us.

1403. The costs incurred by Remcon to procure the stone for boulder revetment were not included in Remcon's bid, and they are in the amount of $94,079.21.

1404. On August 1, 2002, Loren Mangrum wrote Remcon that detailed record of lineal footage of rock revetment placed needed to be maintained. A true and correct copy is attached hereto as Exhibit 222 and by this reference made a part hereof.

1405. On September 24, 2002, Russell Belknap wrote Remcon that the rock revetment placed on the Upper Sherman Access Road between Stations 1 and 24 was acceptable. A true and correct copy is attached hereto as Exhibit 223 and by this reference made a part hereof.

1406. In the November, 2002 progress payment draw, the NPS reduced Remcon's payment by $15,114.50 by deducting quantities to be paid for placing boulder revetment. See Exhibit 198.

1407. The NPS' revised quantity was less than the quantity agreed to by Luke Triplett of Remcon and Loren Mangrum in the field. The reduction in quantity occurred without prior notice or substantiation to Remcon.

1408. While Remcon was paid some money to place boulder revetment, no money was paid for having to locate or create the boulders to be used.

1409. On December 7, 2002, I wrote to Rod Keiscome providing a certified notice of claim for boulder revetment work, and also wrote Rod Keiscome providing notice of Remcon's claim for the NPS' failure to provide the rock to be used for boulder revetment. See Exhibit 19.

1410. Although I submitted this claim in 2002, the NPS has not investigated it. According to Rod Keiscome, an investigation into this issue will undoubtedly be forthcoming as the NPS deals with the surety. See Exhibit 19.

## ***DRY LAID STONE WALL***

1411. The specification for dry laid stone wall is 4403. A true and correct copy is attached hereto as Exhibit 202 and by this reference made a part hereof.

1412. Loren Mangrum reports on July 19, 2002 that the dry laid stone wall was not installed in the location called for in the plans. A true and correct copy is attached hereto as Exhibit 224 and by this reference made a part hereof.

1413. On July 23, 2002, Russell Belknap noted in his daily report that the dry laid stone wall conflicted with two trees and that trees would have to be removed. He also noted that he was adjusting the dry laid stone wall to fit the higher slopes. A true and correct copy is attached hereto as Exhibit 225 and by this reference made a part hereof.

1414. On September 5, 2002, Loren Mangrum wrote Joanne Cody and Mike Giller that there was physical interference between Stations 36 and 48 in the Upper Sherman Access Road with trees affecting parking lot layout. Jack Vance and Loren

Mangrum confirmed in a site walk that there was a physical interference with trees. This is the same area where the dry laid stone wall was affected by trees. See Exhibit 62.

1415. On September 5, 2002, Jack Vance wrote Loren Mangrum, Joanne Cody, and Mike Giller advising of the same problem and stated that a surveyor was needed to check out if control points in the drawings were inaccurate. See Exhibit 63.

1416. No surveyor was bought on site by the NPS despite problem identification.

1417. The dry laid stone wall was relocated from where the construction of the wall commenced because the trees, not shown on the plans, interfered with the planned wall. The NPS did not want to remove the trees that interfered with the wall.

1418. Jack Vance and Russell Belknap inspected the conflict and directed that the wall be relocated to not conflict with the trees. Remcon complied with this directive. Additional wall footage, beyond the design dimensions, resulted. NPS paid Remcon in progress payments for all work performed for the base contract and additional wall footage.

1419. The NPS, in late 2002, later rescinded some of the payments and without discussion or notice reduced the pay item by $39,560. See Exhibit 198.

1420. On December 4, 2002, I provided Rod Keiscome with a certified notice of claim regarding dry-laid stone wall. See Exhibit 17.

1421. No payment for my claim has been provided. The amount claimed is $39,560.00.

**UNTIMELY PAYMENTS**

1422. On November 19, 2002, I wrote Rod Keiscome providing notice that the NPS had been, and was, untimely paying Remcon and improperly modifying the project protocol established at the beginning and affirmed at the preconstruction meeting for agreeing on quantity of work performed monthly. See Exhibit 13.

1423. On November 25, 2002, I again wrote Rod Keiscome about the continuing late payment being a breach of statute. See Exhibit 14.

1424. On December 4, 2002, I wrote Rod Keiscome about the continuing failure to timely and promptly be paid, along with objection to the reduction in quantities and payment, and that this caused economic damages. A true and correct copy is attached hereto as Exhibit 226 and by this reference made a part hereof.

1425. The prompt payment requirements applicable to the contract were set forth at Paragraph I 87 of the contract documents, at pages 88 and 89. A true and correct copy is attached hereto as Exhibit 227 and by this reference made a part hereof.

1426. On December 6, 2002, Rod Keiscome responded to my November 19, November 25, and December 4, 2002 letters. A true and correct copy is attached hereto as Exhibit 228 and by this reference made a part hereof.

1427. On December 18, 2002, I responded to Rod Keiscome's December 6, 2002 letter. A true and correct copy is attached hereto as Exhibit 229 and by this reference made a part hereof.

1428. On June 30, 2003, I wrote Rod Keiscome objecting to multiple items raised in his April 14, 2003 letter concerning quantity corrections. See Exhibit 217.

1429. Remcon signed payment certifications and furnished them to the NPS representing that its subcontractors and suppliers were issued payments received under the contract.

1430. These certifications were not universally true.

1431. Some subcontractors and suppliers' payments were not made due to lack of insurance certificates and/or signed subcontracts. Other subcontractors and suppliers were not paid due to lack of resources to pay them by Remcon.

1432. When Remcon was short cash, it was after the performance of the differing site conditions and other extra work which has never been paid to Remcon.

1433. When faced with the dilemma of who to pay, I elected to pay all of the workers and payroll taxes.

1434. Although some subcontractors were not timely paid by us, at no time did they fail to mobilize, supply the volume of labor, materials or equipment required, or to otherwise fully perform on a timely basis.

1435. The NPS repeatedly paid Remcon untimely on this project.

1436. The NPS recognizes four late progress payments.

1437. The actual amount of the late progress payments is $2,802,337.24.

1438. Without accounting for profit and overhead (17.4%) on costs incurred versus payments received basis, Remcon spent $1,339,887.75 more than it received from the NPS on this project from May, 2001 through December, 2002.

1439. Prior to the start of the 2002 work season, the difference in costs incurred versus payments received was $624,425.69.

1440. This amount increased over $700,000 as a result of year 2002 activity.

1441. This conduct by the NPS all pre-existed the issuance of its cure notice in July of 2003.

**TAKEOVER AGREEMENT/AGEE CONSTRUCTION**

1442. Following the termination for default, the NPS made a demand upon my performance bond surety, Great American Insurance Company ("GAIC") to complete the contract. This matured into a takeover agreement dated November, 2003. A true and correct copy is attached hereto as Exhibit 230 and by this reference made a part hereof.

1443. The takeover contractor hired by GAIC is Agee Construction.

1444. Agee commenced performance in 2004 and is scheduled to complete the project during trial.

1445. I am advised that there have been no modifications concerning time or money issued by the CO since the takeover agreement was entered into.

***MOD #7***

1446. The content of Mod. No. 7, issued February 24, 2003, deleted the Lower Sherman work. See Exhibit 209. The letter enclosing Mod. No. 7 provided, on behalf of

the CO, that it would be issued unilaterally within ten (10) days of February 24, 2003 if Remcon did not respond to it.

1447. Mod. No. 7 was issued for me to sign, but I never signed Mod. No. 7.

1448. Remcon advised Rod Keiscome, on March 12, 2003, via letter from its counsel, that Mod. No. 7, deleting the Lower Sherman work, was a termination for convenience by operation of law. A true and correct copy is attached hereto as Exhibit 231 and by this reference made a part hereof.

1449. By letter dated April 1, 2003, the NPS attempted to withdraw Mod. No. 7. A true and correct copy is attached hereto as Exhibit 232 and by this reference made a part hereof.

1450. Exhibit 232 confirms that, on February 24, 2003, Mod. No. 7 was mailed to me for signature and stated that, if the signed modification was not received within 10 days, the modification would be issued as unilateral modification.

1451. There is no document that Rod Keiscome is aware of that rescinds Mod. No. 7.

## ***DEFENSES TO GOVERNMENT ASSERTIONS***

1452. The NPS contends that Remcon lacked the capital to perform the project because Bank of America acquired a judgment against Remcon effective June, 2002.

1453. In the late 1990's, Remcon moved its banking from County Bank to Bank of America because Bank of America solicited Remcon's business.

1454. Remcon's line of credit with Bank of America in the spring of 2001 was $1.8 million. Latter in 2001, Bank of America was purchased by Nations Bank.

1455. Historically, Nations Bank did not maintain a large portfolio of contractors and those it did have had a large amount of assets. In 2001, following the purchase, Bank of America began eliminating all of its smaller contractors from its portfolio. As a result, Bank of America did not renew its banking relationship with Remcon. At the time our

line of credit was called, Remcon had its funds allocated to many projects. The most significant allocation was to this project.

1456. After Bank of America ceased its relationship with us, we moved our banking to Morgan Stanley Dean Witter in the second half of 2001.

1457. In 2002, we then moved our banking relationship to Oak Valley Bank. We had two accounts with Oak Valley Bank, one for general checking purposes and one for payroll.

1458. The government's claim that as of August 7, 2002, Remcon did not have a Project Manager or Superintendent on the jobsite is not accurate.

1459. Remcon's Project Superintendent for the Sherman Tree Project was Mark Penrose. Mr. Penrose began the project in May of 2001 and continued in that position until August 7, 2002 at which time he left the project for personal family reasons. Mr. Penrose was replaced by Mike Kitchell who was already on site and working as Project Foreman, commencing in July, 2002. Mr. Kitchell was extremely knowledgeable in the construction activities on the project as noted in the NPS' diaries. Mr. Kitchell remained in that role until completion of the 2002 season. Mr. Kitchell had been a Project Superintendent on other Remcon projects for a government agency in mountain terrain.

1460. Luke Triplett was Remcon's Assistant Project Manager from May, 2002 to June, 2003. He took over the Project Manager role once Jeff Northrop left in June, 2002 but his title remained Assistant Project Manager in the hope that Jeff Northrop's wife would get well so he could return to the project.

1461. In May of 2002, Remcon's Project Manager, Jeff Northrop, had a family medical emergency which ultimately ended with the death of his wife after a long illness. In support of Mr. Northrop, he remained employed by Remcon and continued as the Project Manager while Remcon promoted Luke Triplett to the position of Assistant Project Manager.

1462. The NPS was fully aware of Mr. Triplett's position and that he was performing the same responsibilities as Mr. Northrop had performed. Though his title never changed, Mr. Triplett performed those duties throughout the 2002 season. Never once did the NPS request a title change for Mr. Triplett.

1463. At all times, Remcon provided adequate resources and personnel on the project. Remcon mobilized management personnel to the project in mid May 2002. At the time, the site was too damp and/or had snow cover until late May, 2002 to commence productive field operations in the second season.

1464. There were numerous design deficiencies which Remcon had brought to the NPS' attention in the fall of 2001 and throughout the winter of 2001/2002 which remained unanswered in May 2002 for the Upper Sherman Access Road/Parking Area, and the Sherman Tree Trail.

1465. Multiple revisions to the project plans for the Upper Sherman work areas were being worked on by the NPS and it designers in May, 2002.

1466. Remcon issued a series of RFI's in early June 2002 requesting clarification of design deficiencies which remained unanswered.

1467. Remcon was waiting on new design information for the STT which was not definitely provided until early August 2002, but Mod. No. 5 was not issued, authorizing the extra work, until November 20, 2002.

1468. Remcon was waiting for direction to use some of the excess excavation on site to raise the upper parking area. Direction to do so did not come until June 27, 2002.

1469. Once Remcon received the proper direction from the NPS, Remcon fully mobilized and began work on the project.

1470. The NPS' failure to address design deficiencies/differing site conditions impacts and costs thereof, prior to June, 2002, prevented Remcon from working on critical path work items as the 2002 season commenced.

1471. The government's contention that in June and July, 2002, Remcon had to perform considerable rework upon the utility line, which in turn held up placing aggregate base upon the access road, is inaccurate.

1472. Much of the alleged rework was actually work which Remcon was prevented from completing in 2001 due to deficient plans and differing site conditions.

1473. Remcon incurred additional costs in constructing the utility line because work was being performed out of sequence due to NPS caused impacts.

1474. While some rework was required for defective work on our part, its total cost was $34,356.00 and it has been credited out of our claims. See Exhibit 1.

1475. The government's contention that Remcon was delayed because it had to rework slopes that it contaminated with asphalt material is misleading.

1476. As a result of the deficient plans and differing site conditions encountered, Remcon contended, and the NPS belatedly admitted, that the project generated far more excess material than planned. The NPS directed Remcon to stockpile the excess material in the shuttle bus parking area which was already contaminated with asphalt debris. By complying with the NPS' directive, the existing asphalt debris contaminated the excess material which was relocated under NPS direction to the shuttle bus parking area. It took us less than a week, with a two man crew, to clean up this very limited contamination and this work did not prevent placement of aggregate base as the NPS was still redesigning the Upper Sherman Access Road.

1477. The government's contention that in 2002 Remcon was delayed in placing aggregate base because its aggregate base failed to meet specifications is inaccurate. The first test on the aggregate base stockpile failed because the tester failed to properly sample the existing stockpile. Once a proper test was taken the material passed all test requirements.

1478. At no time did the initial inaccurate test prevent Remcon from placing aggregate base since there was only a small portion of required aggregate base material in a stockpile and the balance was being imported from out of the park.

**CONTRACTING OFFICER REPRESENTATIVES/PROJECT MANAGERS**

1479. The Contracting Officer delegated authority to administer the design and construction phases to Contracting Officer's Representatives.

1480. The initial Contracting Officer's Representative for design was Ray Todd.

1481. Joanne Cody was the A/E Manager for design and she had the direct contact with the outsourced design team.

1482. Effective February, 2001, Joanne Cody became the Contracting Officer's Representative for the design.

1483. Concurrently, Willie DeOcampo was the Contracting Officer's Representative for construction. Mike Giller was made a Project Manager in July, 2002 and a Contracting Officer's Representative (concurrently with Willie DeOcampo) thereafter. When Willie DeOcampo retired on January 31, 2005, Mike Giller became the sole Contracting Officer's Representative for construction.

1484. Ray Todd was also the project's Project Manager. In this position, he was responsible for scope of work, schedule, and budget.

1485. Prior to Mr. Giller becoming project manager on this project, on July 1, 2002, there were two prior Project Managers, initially Ray Todd (until spring of 2002), and then Larry Walling, in an interim role for a few months.

1486. Primarily, the project managers are involved in the means and methods of the project, including funding, whereas the Contracting Officer is more responsible for the administrative side of projects.

1487. Rod Keiscome relied upon Joanne Cody to perform the responsibility to manage the third-party designers during the construction document phase (from fall, 1999

until February, 2001) so that the plans and specifications and contract documents were competently prepared and were full, complete, and accurate.

1488. Prior to February, 2001, when she acted as the A/E manager, Joanne Cody managed and acted as the design team lead for the in-house design team as well as the A/E team.

1489. One of Joanne Cody's responsibilities in quality assurance mode as COR was to make sure the design was complete.

1490. Part of Joanne Cody's quality assurance role is to make sure the drawings are constructable.

1491. The constructability review was part of the design phase. The project was not put on the street for bids until the constructabilty review was done.

1492. It was the Contracting Officer who had the responsibility to make sure the bids were received from a complete set of drawings.

1493. Rod Keiscome is not technically inclined, so he asked others to assume the responsibility to make sure that that duty got fulfilled.

1494. Joanne Cody was the person tasked with the responsibility to make sure bids were received from a complete set of drawings.

1495. Joanne Cody was, in essence, a liaison between the park, her own design subordinates, and the third-party outside design team.

1496. As the COR for design issues, Joanne Cody's responsibilities changed given that the project had transitioned into the construction phase. At that point, she was responsible to Willie DeOcampo, the COR for construction, not the Contracting Officer.

1497. To the extent design-related issues arose during construction, Mr. DeOcampo was the hub to receive such information and he would then channel them to Joanne Cody. She was away from the day-to-day interaction of the project unless and until Mr. DeOcampo brought something to her attention.

1498. If the change involved a third party, such as the A/E firms on this project, Joanne Cody's responsibility was to get them the information, receive it back, QA it, and if found to be adequate give it to Willie.

1499. In 1980, Willie DeOcampo began continuously working for the NPS.

1500. When Willie DeOcampo was transferred to Denver from field work in 1999, he was a landscape architect and was then reassigned as a COR once the NPS started construction on this project. He served as COR for construction activities only.

1501. As the COR, Willie DeOcampo was directed to communicate with the CO, Rod Keiscome, through the CO's contract specialist, Terry Lang, instead of communicating directly with Rod Keiscome. Terry Lang acted as an intermediary between Willie DeOcampo and Rod Keiscome on issues that arose on this Project.

1502. As the COR for construction, Willie DeOcampo was responsible for performing government estimates on extra work, performing evaluations as to whether something was extra work, reviewing daily reports from the construction manager, approving submittals, accepting project schedules, reviewing submittals which were recommended to him by designers or CMs, reviewing pay estimates, inspecting the job site, receiving correspondence from the contractor, authoring correspondence, monitoring the project, and was responsible for change order requests, negotiating costs, and performing government estimates. He also negotiated extra work change orders and performed government estimates on extra work.

1503. When a contention was raised, whether by correspondence or otherwise, that there was a design error that affects the job, either in time or money, this was brought to his attention as COR and it was his responsibility to evaluate and respond.

1504. Willie DeOcampo is familiar with RFIs as a construction document and is aware that they were used on this Project and that contractor RFIs flowed through him.

1505. When Willie DeOcampo saw an RFI that had a design-related inquiry, he would have his design team respond to it but it would funnel back through him. The