process was generically as follows: Remcon would identify something they contended to be a design-impediment, they would prepare an RFI in which they would communicate certain information in writing and give it to the inspector who would review it, channel it to Willie, Willie would review it, channel it to DHM, who in turn may send it to Martin and Martin. Once a response was prepared, it would go back the opposite direction through the same hands just described. That was the protocol and, while occasionally they may have broken protocol, that was the way the main things happened.

1506. Willie DeOcampo received and reviewed on some periodic basis daily reports from his construction managers.

1507. It was Bob Russell's responsibility based on the organization setup to communicate that information that he felt necessary to be transmitted to Willie DeOcampo as his next immediate line of communication.

1508. If Willie DeOcampo perceived it was something for which a modification might need to be published, Mr. DeOcampo had the responsibility to communicate it to Rod Keiscome, either directly or through Terry Lang.

1509. Terry Lang doesn't have the technical background of Mr. DeOcampo or Mr. Russell. Rod Keiscome and Terry Lang were physically located in the Denver Service Center, no more than probably 25 steps from each other so a fair amount of communication was happening with the project.

1510. When Willie DeOcampo received information on any subject matter from his lead inspector that the contractor had encountered something that maybe resulted in a modification to be issued, one of his duties was to evaluate extra work issues when the issue arose and negotiate extra work orders and modifications.

1511. With respect to any issues that arose concerning delays, Willie DeOcampo had the responsibility to evaluate them.

1512. Willie DeOcampo did not travel to the project site to evaluate extra work issues. He relied on what his inspector told him.

1513. There was never an instance on this Project where Willie DeOcampo negotiated a change order with Mr. Christensen on behalf of Remcon, made a recommendation to Mr. Keiscome, and Mr. Keiscome did not agree with Mr. DeOcampo.

1514. In terms of Mr. Keiscome authorizing work, when it did occur, there were substantial gaps in time between when Mr. DeOcampo would make a recommendation for something for Mr. Keiscome to issue and the paperwork for Mr. Keiscome to sign to be issued authorizing the extra work because there was a lot of paperwork that the NPS had to send off to Washington to get fund clearance. The NPS cannot issue a modification until funds are cleared.

1515. Every modification that the government recognized on this Project through Willie DeOcampo's office went through the same process: Willie needed to have the superintendent of the park approve it or concur.

1516. As a result of the training he got associated with the Spearin decision and the Spearin doctrine, Willie DeOcampo perceived that it was his role as the Contracting Officer's Representative that if the contractor encountered something that was not in the contract documents as being completely shown that they were entitled to be reimbursed.

1517. Rod Keiscome believes that Mr. DeOcampo discharged his responsibilities to the best of his abilities with respect to the timing of giving Mr. Keiscome notice of potential modifications that the contractor claimed it was entitled to.

1518. However, with respect to giving Mr. Keiscome notice of the differing site condition issue, Mr. Keiscome is not sure if Mr. DeOcampo performed in accordance with the responsibilities that were delegated to him.

1519. The preamble of the Contracting Officer's authorization, section 1.602.2 states that the Contracting Officer shall ensure that the requirements of 1.602(b) have been met, and that sufficient funds are available for obligation. A true and correct copy is attached hereto as Exhibit 233 and by this reference made a part hereof.

1520. Rod Keiscome understood the word "shall" to mean that it is something that a person is supposed to be doing, something that is not discretionary.

***LETTERS OF RECOMMENDATION***

1521. Prior to working on this Project I had worked on three prior NPS projects. On two of them, I had received written letters of appreciation and recommendation from the NPS. Jack Vance authored one letter, dated October 20, 1999. Another was offered by Frederick Angell, dated February 3, 1997. True and correct copies of these letters are attached as Exhibits 234 and 235 and by this reference made a part hereof.

1522. The 1997 letter characterizes our work as "of excellent quality and was done in a highly professional manner." It continues that Remcon's "management style relies on efficiency, good operators with high morale, and well maintained equipment…most important is that this contractor is extremely knowledgeable of earthmoving operations." The letter concludes: "It has been a pleasure to work with Steve Christensen who knows the work, knows his labor and equipment costs, and can put it all together to get done on time to the quality standards required."

1523. Further, attached hereto as Exhibit 236 and by this reference made a part hereof is a true and correct copy of a March 21, 2001 letter from the Turlock Irrigation District, for whom Remcon performed six separate earthwork projects from 1997 through 2001. Mr. Barton, the author, states: "We have always found [Remcon's] work to be of high quality and consistently completed on time. I believe that Remcon's consistently exceptional performance is directly attributable to the quality and integrity of its personnel. From the Owner down to the field personnel, Remcon regularly demonstrates a willingness to act as a team member…They have proven themselves to be capable of adapting quickly to changed conditions and fairly negotiate related costs considerations resulting from these changes."

***EARTHWORK AND ROCK CALCULATIONS***

1524. Earthwork for this Project was detailed in Specification Sections 02310 – Site Excavation and Grading and Section 02316 – Roadway Excavation and Embankment, with references to other sections within the specifications. A true and correct copy of Contract Specification Sections 02310 and 02316 are attached hereto and made a part hereof as Exhibits 238 and 239.

1525. The excavation and embankment construction for this project was Bid Item 37 – Excavation and Grading, and was paid under a lump sum bid price, meaning no quantities were provided nor were they needed from the contractor. Remcon's bid price for Item 37 was $350,000.00.

1526. In the Defendant's Memorandum of Contentions of Fact and Law, the Government states in H.1. on pages 64 and 65 that Remcon's bid was unreasonable for earthwork. This is not accurate based upon the following undisputed and documented facts:

(a) The Government fails to disclose that its own estimate for performing the same exact work was $280,000.00, or $70,000.00 less than Remcon's bid. A true and correct copy of NPS' Class A Cost Estimate, 100% Submittal, prepared on February 9, 2001, is attached hereto and made a part hereof as Exhibit 240.

(b) The hauling and disposal of all excess excavation was covered under Bid Item 39 – Haul Excess Excavation and had a defined bid quantity of 6,800 cubic yards and was specified by the NPS.

(c) Bid Item 39-Haul Excess Excavation was for the hauling and disposal of all the quantities generated during excavation and which were not used in construction of the on-site embankments or fills. Section 02310-Site Excavation and Grading, Part 4.3 Haul Excess Excavation paragraph A states: "This work involves the hauling and disposal of excess excavation to Wolverton Point. Measurement will be by final cross sections of the finished stockpile. Volumes will be computed from cross

sections by the average end area method. Payment will be made at the contract unit price per cubic yard." See Exhibit 238.

(d) Remcon's price for Bid Item 39 was $12.00 per cubic yard.

(e) During actual construction activity on the Project a conflict arose with regard to providing survey quantities for the hauling of the excess excavation to Wolverton Point. As Remcon was hauling the material to Wolverton Point, other contractors, working within the park on other projects, were removing the stockpiled soils at Wolverton Point for use on their projects. This fact is confirmed in Weekly Meeting Minutes #12 from August 14, 2001, note 12.24, which makes reference that the NPS was not providing Remcon with the quantities of material being hauled from Wolverton Point by others. No such quantity was ever provided. A true and correct copy of the Weekly Meeting Minutes #12 are attached hereto and by this reference made a part hereof as Exhibit 241.

(f) As a result of material being removed from Wolverton Point by other contractors, and in an effort to avoid conflict and delay to both this Project and other projects, I agreed with the NPS project personnel that the quantity hauled to Wolverton Point by Remcon would be calculated by truck count rather than survey. This was necessary as the NPS had failed to track the amount of material already removed for other projects.

(g) The NPS' on-site representative kept a daily log of the loads hauled and this was how he determined the quantity to be paid monthly to Remcon.

(h) In my preparation of Remcon's bid I performed an earthwork quantity takeoff utilizing a computerized takeoff program known as Agtek.

(i) Our takeoff indicated that the following cut to fill quantities (the amount of soil which would be excavated and then utilized on the project to complete construction) were required to complete the project: the Upper Sherman Access Road and Parking Area needed 11,116 cubic yards, the Sherman Tree Trail needed 2,320 cubic

yards, and the Lower Sherman Area required 700 cubic yards. This provided a total cut to fill quantity of 14,136 cubic yards. This volume of work was included by me in the price I calculated for Bid Item 37-Excavation and Grading and was included in the lump sum price. The bid form used by the NPS did not call for quantities of fill or cuts to be listed. My bid documents do include my calculations. A true and correct copy of Remcon's estimate for Bid Item 37 is attached hereto and by this reference made a part hereof as Exhibit 242.

(j) To arrive at Remcon's fill quantity of 14,136 cubic yards I included a compaction factor of 15 percent.

(k) In addition to calculating the fill quantity our takeoff also calculated an excavation quantity of approximately 26,000 cubic yards.

(l) Based on an excavation quantity of 26,000 cubic yards and a fill quantity of 14,136 cubic yards, there would be 11,864 cubic yards of excess excavated material to be handled through Bid Item 39 – Haul Excess Excavation. As previously noted, Bid Item 39 only accounted for 6,800 cubic yards of excess material.

(m) Because our takeoff yielded a calculation different than the bid documents, on or about March 6, 2001, I attempted to communicate with the NPS' designee for bid inquires, Terry Lang. She was unavailable. I therefore call Jack Vance of the NPS, who was located in the park, regarding this discrepancy in quantities. At that time Mr. Vance informed me that this was a balanced job and that the NPS didn't expect any excess material over the 6,800 cubic yards.

(n) In the depositions of Bob Smith, Ray Tuttle, Joanne Cody, and Willie DeOcampo, they all testified that, other than the 6,800 cubic yards bid item, this was intended to be a balanced earthwork project. While this confirmed Mr. Vance's advise to me, this ultimately proved to be inaccurate.

(o) Based on the information received from Mr. Vance, I revised our earthwork calculation to reflect a balanced earthwork project. This meant adding the

excess excavation quantity to Remcon's calculated fill quantity. Remcon's estimated excavation quantity was reduced to 21,236 cubic yards, a reduction of 4,764 cubic yards. See Exhibit 242.

(p) As a result of this litigation and through discovery I have learned that the NPS' designers had, on October 24, 2000, prior to bid, performed a quantity takeoff and calculated a fill quantity of 16,100 cubic yards, but their calculation utilized a compaction factor of 40 percent. A true and correct copy of the NPS' October 24, 2000 earthwork quantity calculations is attached hereto and by this reference made a part hereof as Exhibit 243.

(q) I was present at the depositions of Bob Smith of DHM, and Ray Tuttle of Martin & Martin, the designers for this project. Both men testified that while they used a 40% compaction factor the use of a 40 percent compaction factor was an error. They further testified that they only used it because they were directed to do so by the NPS.

(r) The NPS has provided no documentation to support the use of a 40 percent compaction factor. The NPS' Contracting Officer Representative, Willie DeOcampo, also testified in his deposition, at which I was present, that the use of a 40 percent compaction factor was a mistake.

(s) The NPS did not disclose to the contractors bidding on the project that it had used a 40 percent compaction factor to calculate quantities nor did it disclose this fact to Remcon when it became apparent in early July, 2001 that excess material was being generated on the project. Rather, the NPS accused Remcon in October, 2001 of generating the excess by improperly constructing the project a foot too low. This accusation ultimately proved to be false.

(t) Had the NPS utilized a compaction factor of 15 percent in the design phase the fill quantity would have been 13,219 cubic yards, 917 cubic yards less than Remcon's bid used.

(u) The use of an incorrect compaction factor resulted in an approximate increase of 2,881 cubic yards of excess excavated material which was not needed as fill.

(v) Based on the deposition testimony of the NPS that this was a balanced earthwork project, the NPS' excavation quantity, utilizing an appropriate compaction factor of 15 percent, would have been 20,019 cubic yards.

(w) The NPS failed to include in the bid documents the calculated earthwork quantities, which were prepared by the designers on October 24, 2000.

1527. From information obtained through discovery it is possible to accurately estimate the amount earthwork encountered and handled on this project by Remcon.

1528. The earthwork quantity which Remcon was required to excavate was approximately 50,903 cubic yards, and the additional excess excavation quantity handled by Remcon was 20,298 cubic yards.

1529. In the NPS' letter of August 1, 2001, the NPS acknowledges that the total quantity of material excavated from the burn pit was 7,925 cubic yards. The contract called for the removal and replacement of 2,000 cubic yards, which was covered under Bid Item 26. Based on this known information, Remcon had to utilize an additional 5,925 cubic yards of excavated material to fill the hole created by the burn pit excavation. A true and correct copy of the NPS's August 1, 2001 letter is attached hereto and made a part hereof as Exhibit 244.

1530. In the Government's expert report, prepared by CPMI, at pages 30 and 31, the report states that Remcon crushed 9,490 tons of material on the project site. A true and correct copy of CPMI's report pages 30 and 31 is attached hereto and made a part hereof as Exhibit 245. Based on the NPS' own factor for the weight of this material being 124.5 lbs. per cubic foot, this converts to 5,649 cubic yards. A true and correct copy of the NPS' letter of January 16, 2003, which shows the factor, is attached hereto and made a part hereof as Exhibit 246.

1531. The NPS paid Remcon for the hauling of 13,936 cubic yards of material to Wolverton Point. A true and correct copy of the NPS' Pay Estimate 13 is attached hereto and made a part hereof as Exhibit 247.

1532. Remcon's calculated a fill quantity of 14,136 cubic yards. The NPS' calculated fill quantity would have been 13,219 cubic yards had it used a correct (15%) compaction factor. For purposes of this declaration I have used Remcon's fill quantity as it is higher than the NPS quantity, thus giving the NPS the benefit of the doubt.

1533. Contract Modification No. 4 was issued to Remcon for the raising of the upper parking lot. The plans call for the use of 4,257 cubic yards. Exhibit 248 is a true and correct copy of a portion of the plan sheet which shows the quantity required to raise the parking lot and is attached hereto and made part hereof. In addition, CPMI's report on page 51 confirms the 4,257 cubic yardage figure and is attached hereto and made a part hereof as Exhibit 249.

1534. The NPS had the replacement contractor Agee perform a survey of the material which was stockpiled in the Shuttle Bus Parking Area. The survey calculated a total of 7,000 cubic yards of stockpiled material. A true and correct copy of Chris Hickey's, Agee's Project Manager, letter of May 31, 2004 to the NPS is attached hereto and made a part hereof as Exhibit 250.

1535. These six items (5,925 + 5,649 + 13,936 + 14,136 + 4257 + 7000) total 50,903 cubic yards of excavation. This is 29,667 cubic yards more than Remcon estimated in its bid. Exhibit 251 is a true and correct copy of a spreadsheet that details these quantities and calculations and is attached hereto and made a part hereof.

1536. In CMPI's report, on page 49, the government states that there was approximately 30,000 cubic yards of excavation. Based on the actual excavated quantity of 50,903 cubic yards, Remcon would of excavated 20,903 cubic yards extra for which they have not been paid. See Exhibit 252 where the amount of 30,000 cubic yards of excavation is expressed.

1537. CPMI's report, on page 51, calculates that Remcon is due $16.48 per cubic yard for every yard of excess excavated material Remcon had to handle. Based on Remcon's excess quantity of 29,667 cubic yards this translates into an additional compensation to Remcon of $488,912.16. If the amount of yardage to be excavated was 30,000 cubic yards as the government's documents show, this still yields an overrun of 20,903 cubic yards of excess excavation. Remcon would therefore be minimally due an additional $344,481.44. This does not include any allowance for time extensions or extended overhead costs or the impacts resulting from this volume of material being stockpiled.

1538. In addition to the quantity excavated from the project, Remcon was required by the contract specifications to import additional material from Wuksachi Village. This quantity is confirmed in CPMI's report on Page 51 which correctly identifies the quantity imported to be 1,724 cubic yards. See Exhibit 249.

1539. It is important to note that the NPS' design team, in their October 24, 2000 Earthwork Calculation spreadsheet, told the NPS that there was 17,300 cubic yards of excess material and not to import the material from Wuksachi Village as it would only create additional excess material on the project. See Exhibit 243. The NPS disregarded its designer's advice.

1540. Remcon thus had 52,627 cubic yards of excavated and imported material which it had to deal with on the Project site.

1541. The project only needed 14,136 cubic yards to construct the fills as noted on the Project plans.

1542. The Project specifications required that an additional 6,800 cubic yards was to be hauled to Wolverton Point.

1543. Based on the original Project plans and specifications the project was going to utilize a total of 20,936 cubic yards of material.

1544. Based on these known quantities Remcon was now left with 31,691 cubic yards of excess material on the project site.

1545. The NPS directed and paid Remcon to haul an additional 7,136 cubic yards of material to Wolverton Point, increasing the total quantity now stockpiled at Wolverton Point to 13,936 cubic yards.

1546. The NPS, under Modification No. 4, directed and paid Remcon to utilize an additional 4,257 cubic yards to raise the Upper Parking lot. See Exhibit 3.

1547. This left Remcon with a total of 20,298 cubic yards of excess material for which Remcon needed direction from the NPS. The NPS stalled giving any direction and has not paid Remcon for this volume of excess excavation even though it directed Remcon to move some of this material to the Shuttle Bus Parking Area, where it was stockpiled.

1548. Remcon is due payment for the hauling and disposal of 20,298 cubic yards at the contract unit price of $12.00 per cubic yard or $243,576.00.

1549. In late July 2001, when Remcon encountered rock along the access road which was unrippable, Remcon's Project Manager, Jeff Northrup, notified the NPS on this condition. See Exhibit 96.

1550. On August 8, 2001, Mr. Northrup submitted to the NPS' on-site representative a letter quantifying the amount of rock, which had been blasted and a request for payment under Bid Item 38 – Rock Excavation. Even though Bid Item 38 was specified for rock excavation for utilities only this was, by the terms of the contract, most analogous to the extra work being performed.

1551. The NPS denied Remcon's request.

1552. Discussions continued to take place between Remcon and the NPS is early August 2001, regarding what Remcon clearly saw as a Differing Site Condition. The NPS also recognized this to be a possible differing site condition as it is noted in the NPS' weekly report of August 7, 2001. The NPS was on notice of a possible claim. A

true and correct copy of Bob Russell's Weekly Report is attached hereto and made a part hereof as Exhibit 10.

1553. Remcon's Project Management staff continued dialog with NPS personnel in hopes of resolving the rock excavation issue.

1554. Finally, after no resolution, Remcon filed its formal Notice of the Differing Site Condition on August 20, 2001.

1555. At no time during the 2001 work season did the NPS pay Remcon, under Bid Item 38 – Rock Excavation, for rock excavation other than that which was encountered during the installation of utilities.

1556. During the 2002 work season, as Remcon continued to encounter rock during grading operations, the NPS began calculating the quantity of rock being excavated and paid Remcon for this work at the contract unit price of $112.00 per cubic yard. This was exactly the same method of payment, for rock excavation encountered during excavation, in which Remcon's Project Manager had proposed in 2001 to avoid Remcon's assertion of a claim.

1557. In addition to paying Remcon for rock excavation encountered in earthwork in 2002, the NPS also has paid the replacement contractor, Agee, $112.00 per cubic yard for all the rock it encountered during grading operations in 2004 and 2005.

1558. The NPS reported our estimate, as of September 19, 2001, that we excavated over 6,000 cubic yards of rock. A true and correct copy is attached hereto and by reference made a part hereof as Exhibit 108.

1559. Had the NPS followed the same payment guidelines for rock excavation in 2001, as it did in 2002, 2004 and 2005, Remcon should have been paid for 6,000 yards of rock excavation at a unit price of $112.00 per cubic or $672,000.00. See Exhibit 253. Instead, to date, we have only been paid (by a check issued to our surety after we were terminated) $84,170.00.

***DAMAGES/COSTS***

1560. During the course of this litigation, I worked closely with Jordan Rosenfeld, Remcon's retained accounting expert, to verify costs and claims asserted by Remcon against the government. Mr. Rosenfeld and I have spent a lot of time reviewing and discussing the claims asserted by Remcon in its June 28, 2003 certified claim, Remcon's job cost reports and data, payroll records, equipment rates and records, Remcon's financial and profit and loss statements, Remcon's cashflow and performance on projects, including this project and others performed by Remcon in 2001 and 2002, and the costs incurred by my surety. Mr. Rosenfeld and I reviewed accounting reports and time cards to verify labor, equipment, and material costs, and worked together to verify Remcon's and the surety's total costs on this project. I have reviewed the conclusions, opinions, damages, and costs asserted in the two reports authored by Mr. Rosenfeld, and, other than slight adjustments that have been made since the time of those reports (including additional costs incurred by our surety), I believe the damages and costs stated in Mr. Rosenfeld's reports to be true and accurate to a reasonable certainty.

1561. I have personally printed out and reviewed all of the accounting reports relied upon by Remcon to support its claims and costs for this project, and have reviewed all time cards and certified payroll records, all invoices, all weigh tickets/tags, all pay estimates, all correspondence, all bank account statements, and all documents produced by my surety, its construction manager (Sage), and the completion contractor (Agee) regarding their costs.

1562. Remcon claims that due to the government's breach of contract, Remcon incurred an additional $925,819 in excess excavation, rock excavation/blasting, and grading costs for 2001 and 2002, including costs incurred for work on the access road, Sherman Tree Trail, and parking lots. These costs, which are inclusive of a 17.4% mark-up for profit and overhead, are broken down as follows: $266,844 for labor, materials, and equipment for extra earthwork in 2001; $323,252 for labor, materials, and equipment

for extra earthwork in 2002; $445,529 for labor, materials, and equipment for extra rock excavation; and $120,267 for labor, materials, and equipment for extra work related to the Sherman Tree Trail. These extra costs total $1,155,892.

1563. My original bid included $350,000 under Bid Item 37 for the excavation and grading work. After evaluating how much of that bid item related to the Upper Sherman portions of work, and correlating that bid item amount to the areas we performed extra work, I calculated $120,463 of our original bid item related to the work actually performed by Remcon in 2001 and 2002. Due to NPS delays, Remcon was not able to start excavation and grading on the Lower Sherman work, or complete the Upper Sherman work. This is why I calculated that we were only able to complete approximately one-third of the excavation and grading scope of work per bid item 37. With the 17.4% mark-up, the amount to deduct from my claimed extra work is $141,424. After deducting $141,424 from the extra costs of $1,155,892, plus a payment of $84,170 that was made by the NPS to my surety pursuant to Modification No. 6, Mr. Rosenfeld and I calculated Remcon's damages for extra excavation and grading to be $930,298. This amount is further reduced by a $4,479 credit for the temporary access road, which reduces my earthwork/grading claim to total $925,819. A true and correct copy of my temporary access road calculation is attached hereto as Exhibit 264, and by reference made a part hereof.

1564. The direct costs which form the basis of the extra excavation and grading claim are based on Remcon's daily time cards and invoices from subcontractors/suppliers, and the summaries of these costs prepared by Tina Erickson and myself in 2002 and 2003. The summaries of these extra costs were produced to the government as exhibits to my June 28, 2003 certified claim, and have been made available to the government for review and audit, as have the underlying source documents. All documents supporting the extra work calculation for the excavation/grading claim are identified in Exhibit A to this declaration, or are identified

in the declaration of Jordan Rosenfeld. All of these documents, which are voluminous, will again be made available at the time of trial.

1565. Remcon also claims that the government owes it $47,004 for boulder revetment. I calculated this claim as follows. Based on time cards and invoices, I calculated that Remcon incurred $94,009 in labor, material, and equipment costs to construct boulder revetment slope protection and landscape boulders, and their placement, in 2001 and 2002. A summary of costs incurred by Remcon for the boulder revetment, including daily extra work sheets, was attached as an exhibit to Remcon's June 28, 2003 certified claim (these documents are specifically incorporated herein and will be produced at the time of trial for review if necessary). Since the specifications required that the government was responsible for providing stone from park stockpiles, but it failed to do so, we contend entitlement for the costs of furnishing the stones. I have reasonably estimated that Remcon employees spent 50% of their time locating, sorting, and working with boulders to develop suitable material, which should have been made available by the government. This estimate is based on my experience, time in the field, and discussions with my employees. After reducing the $94,009 in costs by 50%, I reasonably estimate Remcon's extra costs for the boulder revetment work to be $47,004.

1566. Remcon claims that it incurred $90,182 in extra costs for Storm Water Pollution Prevention Program ("SWPPP") operations. As a result of government caused delays, Remcon was forced to install additional SWPPP measures in 2001 and 2002. After reviewing daily time cards and invoices, I calculated Remcon's extra SWPPP operations in 2001 to cost $55,921.99, and $34,260.13 for extra SWPPP operations in 2002. A summary of costs incurred by Remcon for the extra SWPPP measures, including daily extra work sheets, was attached as exhibit to Remcon's June 28, 2003 certified claim (these documents are specifically incorporated herein and will be produced at the time of trial for review if necessary). The NPS has failed to pay Remcon for these costs.

1567. As discussed earlier in this declaration, the government failed to supply aggregate base. As a result, Remcon was forced to crush its own base, and purchase the remainder of the aggregate base. Based on weigh tickets, and as confirmed by Bob Russell (NPS' on-site inspector), I calculated that Remcon's subcontractor, Oasis Crushing, crushed 4,757 tons of aggregate base, and that we were forced to purchase and haul an additional 5,426 tons of aggregate base. The total amount of aggregate base that Remcon procured through its own crushing efforts on site, or by purchase, was 10,183 tons. For the 4,757 tons of aggregate base we crushed, Remcon is entitled to receive $94,710 (which was the actual cost paid to Oasis Crushing) to crush the rock. For the aggregate base Remcon had to purchase, it is entitled to $6.25 per ton for the purchase and $18.25 for the hauling, for a total of $24.50 per ton. After multiplying the 5,426 tons purchase by the $24.50 rate, and then multiplying the amount purchased by a 7.875% tax, Remcon is entitled to $132,950 in direct costs for the purchase of aggregate base. After adding the 17.4% mark-up, Remcon calculates its recoverable costs to be $270,409 for its creation and purchase of aggregate base that the government should have provided. However, Remcon believes that it should credit $7,803 to the NPS for the costs it would have incurred to haul government supplied material had it been provided. A true and correct copy of my AB hauling credit calculation and summary is attached hereto as Exhibit 265, and by reference made a part hereof. Therefore, Remcon claims a total amount of $262,606 from the government for this issue.

1568. As discussed earlier, due to numerous design changes, Remcon was forced to perform additional fine grading activities in August and September 2002 to aggregate base already placed and finished. I reviewed our costs, and calculated that the total costs for fine grading of the aggregate base were $199,170. After deducting our bid budget cost of $82,277, and then adding the 17.4% mark-up on the difference, I have calculated Remcon's damages for the re-grading to be $102,577.

1569. I worked with Jordan Rosenfeld to confirm Remcon's daily field overhead costs during 2001 and 2002. We reviewed the job cost reports, and the underlying data, and I believe that Mr. Rosenfeld has been provided with true and accurate information for his calculation of our daily field overhead rates.

1570. I worked with Mr. Rosenfeld on evaluating and calculating our equipment stand-by rates. After adjusting the rates to match the Corps of Engineer rates, and verifying the equipment used on the project, I believe the calculation provided by Mr. Rosenfeld is based on true and accurate information.

1571. During the course of the project, the NPS improperly deducted amounts from Remcon's pay estimates for work completed. In 2002, Remcon placed aggregate base on the access road, parking lots, and the trail. As discussed earlier, and as verified by the NPS, Remcon crushed/procured 10,183 tons of aggregate base.

1572. Based on bid item 71, Remcon should have been paid $437,890.50 for the placement of the aggregate base. However, in response to pay estimates, the NPS unilaterally decided to only pay Remcon $297,482.60 for this work, based on a theoretical quantity of 6,918 tons, leaving an unpaid balance of $140,407.90. Remcon is still owed this amount. The NPS has failed to provide any back-up or explanation for this unilateral reduction.

1573. In 2002, as verified by weigh tags, Remcon placed 6,179.80 tons of asphalt concrete, which is the final pavement surface placed on top of the aggregate base. The summaries of these weigh tags, and the weigh tags themselves, were attached as exhibit to Remcon's June 28, 2003 certified claim (these documents are specifically incorporated herein and will be produced at the time of trial for review if necessary). Based on the verified tonnage, Remcon is entitled to be paid $579,974.23 for the asphalt concrete work based on bid items 72 and 129. The NPS unilaterally paid Remcon only $529,651.75 for this work, leaving an outstanding claim of $50,322.48. Remcon is entitled to be paid this amount.

1574. Due to design errors, and/or interference with natural features requiring wall relocation, Remcon was forced to install additional footage for the Dry-Laid Stone Wall. Despite direction by the NPS to adjust alignment of the wall, the NPS has refused to fully compensate Remcon for its work. Remcon is owed an outstanding amount of $39,560 for its installation of the Dry-Laid Stone Wall.

1575. In pay estimate number 12, which covered work through October, 2002, Remcon billed the NPS $113,358.75 for boulder revetment work. This amount was based on verified quantities agreed to in the field between Remcon personnel and the NPS' on-site inspectors. The NPS, without cause, unilaterally paid Remcon $98,244.25 for this work, leaving an unpaid amount of $15,114. This amount is still owed to Remcon.

1576. In pay estimate number 12, which covered work through October, 2002, Remcon billed the NPS $14,562 for drop inlet – type A. This amount was based on verified quantities agreed to in the field between Remcon personnel and the NPS' on-site inspectors. The NPS, without cause, unilaterally paid Remcon $12,555.68 for this work, leaving an unpaid amount of $2,006.32. This amount is still owed to Remcon.

1577. The NPS has underpaid Remcon $34,520 for work performed on Bid Item No. 45, Silt Protection. The NPS approved and paid this amount in Payment Estimate No. 4 but subsequently rescinded its approval in Pay Estimate No. 13. The NPS mistakenly has contended that this pay item should be paid at the end of the project. The NPS' contention is erroneous since Specification section 02370 does not explicitly state that payment shall be made at the end of the project. Instead, the specification section implies that payment will be made during the project, and the final quantity will be adjusted at the end of the project.

1578. As President of Remcon, I earned a salary of $12,000 per month from 2001-2003. Over the past two years, I have worked exclusively in my capacity as President of Remcon on this litigation. However, due to the NPS not paying Remcon, I

have not been paid my salary. Therefore, I am entitled, as a result of Remcon's claim and litigation against the NPS, to recover my parts of my salary for the past two years during this litigation. This amount total $240,000.00.

1579. Remcon's surety claims against Remcon and me, as a personal indemnitor, reimbursement for all of its out of pocket costs which exceed amounts that it has been paid for by the NPS relating to the project, including costs incurred by the completion contractor, payment bond claims made by my surety, costs incurred by Sage, and attorneys' fees incurred by my surety. I have received spreadsheets which identify these amounts, and back-up documentation from the surety for many of these costs.

1580. As the result of the NPS' material breaches of contract, Remcon, and in some instance myself, have been forced to retain legal counsel to address litigation initiated by Bank of America and my surety. I also retained counsel to prosecute this action against the NPS. To date, I have incurred approximately $600,000.00 in legal fees, and these fees are part of the total costs incurred by Remcon in this matter. While I can produce the redacted legal billings/invoices from my attorneys, these documents are voluminous, and can be produced at trial.

## ADDITIONAL NOTICES TO THE NPS

1581. I provided notice to the NPS by letter on August 10, 2002 that its failure to properly administer the project placed Remcon in dire financial position. A true and correct copy of my August 10, 2002 letter is attached as Exhibit 254, and by this reference made a part hereof.

1582. On August 11, 2002, I sent a letter to the NPS which provided notice of the extensive project delays caused by the NPS in 2001 and 2002, and the time extensions which had not yet been granted. A true and correct copy of my August 11, 2002 letter is attached hereto as Exhibit 255, and by this reference made a part hereof.

1583. The government alleges in its contentions of fact and law that Remcon never notified the NPS that Remcon considered the NPS in breach of contract. This

statement is factually untrue. Not only was the NPS notified of material breaches to the contract in the winter and spring of 2003 (previously addressed in my declaration), but I also notified the Contracting Officer in the summer of 2002 that the NPS was in material breach of contract. A true and correct copy of my September 16, 2002 letter is attached hereto as Exhibit 256 and by this reference made a part hereof .

## STORM WATER POLLUTION PREVENTION AND PROTECTION

1584. As the result of NPS project impacts, including delays, Remcon's construction schedule was severely impacted. These impacts forced Remcon to provide additional Storm Water Pollution Prevention and Protection ("SWPPP") measures for the winter of 2001/2002 and 2002/2003 that would not have been necessary had Remcon been allowed to progress on the project as originally planned. These additional SWPPP measures exceeded those required in the contract documents to protect the site during the two winter shutdowns between 2001/2002 and 2002/2003.

1585. Had Remcon been able to complete the Upper Sherman Access Road/Parking Area and the Sherman Tree Trail in 2001, as originally planned and submitted in Remcon's schedule, the contract SWPPP measures would have been installed and paid for under the contract terms. As previously discussed, Remcon encountered numerous NPS related impacts which prevented Remcon from completing the work as planned. As a result of these impacts and delays Remcon was forced to install extensive SWPPP measures to protect the project site for the anticipated winter weather. It should be noted that the measures installed by Remcon were extremely successful in protecting the site during the 2001/2002 winter. Those measures included the installation of erosion control check dams, erosion control logs, silt fence, covering of stockpiled soils with plastic, temporary erosion control measures. Not only did Remcon incur the cost of installing these SWPPP measures, but we also incurred the cost of removing them prior to the start of construction in the spring.

1586. During the week of October 28, 2002, Remcon requested that the NPS make themselves available to perform a SWPPP inspection of the site. NPS personnel were unavailable during that week to make an inspection. It was not until November 5, 2002 that NPS personnel, which included Jack Vance, Russell Belknap, Mike Giller, and Loren Mangrum, made a site inspection of Remcon's SWPPP measures. During that meeting Remcon pointed out numerous areas, which we felt required additional SWPPP measures beyond those required in the NPS Project plans. In response, Mr. Giller asked that Mr. Triplett, my Project Manager, prepare a plan showing the additional SWPPP measures that Remcon felt was needed.

1587. On Thursday morning, November 7, 2002, NPS personnel met with Mr. Triplett to review the proposed additional SWPPP measures. At that point in time the weather forecasted impending storm weather. NPS personnel reviewed Remcon's proposal and stated that these additional measures were not needed, nor was the NPS willing to pay additional funds to implement the plan. On that afternoon, NPS and Remcon personnel made an additional site investigation of Remcon's installed SWPPP measures. During the site investigation NPS personnel pointed out locations where they felt additional SWPPP measures were needed. Remcon crews immediately installed or upgraded previously installed protection measures. At the conclusion of the site investigation, NPS personnel approved all of the SWPPP measures and requested no further measures be installed.

1588. On the evening and throughout the night of November 7 and 8, 2002, the Project was severely impacted by a 100-year storm that hit the Sequoia National Park including this Project. As a result of this storm, parts of the Project were heavily damaged, primarily the Sherman Tree Trail.

1589. On the morning of November 8, 2002, the Contracting Officer, Rodney Keiscome, who was located in Denver, Colorado, over 1,000 miles from the project site, issued a very threatening letter to Remcon claiming Remcon was at fault for not properly

implementing SWPPP measures. A true and correct copy of Mr. Keiscome's letter is attached hereto and by reference made a part hereof as Exhibit 257. Mr. Keiscome had no personal knowledge of the efforts that were taking place by both NPS and Remcon personnel on site and at Remcon's home office. He also did not have any first hand knowledge of what damage had occurred to the project. As it turned out, the park, in general experienced far more damage than did this Project, as the Parks main roads were closed for days after the storm.

1590. Throughout November 8 and 9, 2002, Remcon personnel worked at the project site to minimize damage to the Project and the Park even though much of the storm damage was a result of water which was flowing from off the project site and onto the Project. Much of the damage which occurred to the trail was as a result of a tree which had fallen during the storm, and which fell across a creek effectively creating a dam. It is important to note that this area was outside the defined work limits of Remcon's project.

1591. On November 10, 2002, I issued a very detailed letter to Mr. Keiscome addressing all of the events which had transpired concerning the storm's impact and the lack of response by the NPS and the action taken by Remcon. A true and correct copy of my November 10, 2002 letter, is attached hereto as Exhibit 258 and by this reference made a part hereto.

1592. Though the NPS had full and complete knowledge that the damage which had occurred to the Project was an "act of god", the NPS continued to threaten Remcon with the assessment of damages. On November 13, 2002 and November 26, 2002, I issued follow up letters to Mr. Keiscome notifying him of these facts. True and correct copies of my November 13, 2002 and my November 26, 2002 letters are attached hereto as Exhibits 259 and 260, respectively, and by this reference made a part hereto.

1593. As a result of NPS caused design changes, differing site conditions, and delays, Remcon incurred additional costs having to implement additional SWPPP

measures which otherwise would not have been required. After a careful and thorough review of the contract documents, invoices, and Remcon's daily time cards and contemporaneous documentation, I calculated that Remcon's extra SWPPP operations in 2001 to cost $55,921.99, and the extra SWPPP operations in 2002 cost $34,260.13. These amounts have not been paid by the NPS.

**RE-GRADING OF AGGREGATE BASE**

1594. As discussed earlier, Remcon began placement of the aggregate base in July 2002. The initial material placed was the aggregate base material Remcon had produced on-site in the fall of 2001, and which was stockpiled in the USPA (upper lot).

1595. This stockpile of aggregate base material, 4,750 tons, had to be removed to allow the upper parking area to be adjusted per the subsequent design changes by the NPS, which ultimately were issued in Contract Modification No. 4. The stockpiled material was loaded into trucks and hauled to the access road for placement. This material was primarily utilized along the entire access road and was all placed my mid July 2002. Throughout the latter part of July, and all of August and September, 2002, Remcon was directed by the NPS to make adjustments to the grades along the access road. These directives are documented in the NPS inspectors' and personnel's daily reports, emails and letters. These constant adjustments and re-adjustments caused Remcon to perform additional fine-grading activities with the already placed and finished aggregate base. We would not have incurred these costs if the NPS had not been constantly redesigning the access road and parking areas.

1596. After a careful and thorough review of the contract documents, invoices, and Remcon's daily time cards and contemporaneous documentation, Remcon is owed $102,577.00 for this claim.

1597. Giuliani and Kull, Remcon's subcontractor for surveying, had provided Remcon with a quote prior to bid for performance of construction surveying and staking on this Project. Giuliani and Kull's quote as well as subcontract for performance of

construction surveying and staking was $75,000.00. As a result of the numerous design errors, design changes issued by the NPS, and the defective plans and specifications, Giuliani and Kull incurred additional cost in both office engineering time as well as field survey time. Attached hereto as Exhibit 261 and by this reference made a part hereof is a true and correct copy of Giuliani and Kull's May 2, 2003 invoice for extra work performed.

1598. The additional survey costs claimed by Remcon are $49,053. These amounts are calculated on the extra survey costs of $41,782, which were incurred by Guiliani and Kull plus markup for overhead and profit at 17.4%. Though this cost has not been paid as yet, it is a payable obligation of Remcon.

**EQUIPMENT STAND-BY COSTS**

1599. As a result of the numerous impacts we experienced, such as defective plans and specifications (e.g., the 40% compaction error), changes in the character of the work, failure to provide timely responses to Requests for Information, failure to properly comply with the terms and conditions of the contract specifications, overruns in contract quantities, and a failure to timely and properly issue contract change orders, Remcon was unable to obtain or maintain efficient operations on the Project. Remcon bases equipment utilization on 176 hours per month. As a result of these NPS impacts Remcon was unable to attain these utilization hours. Remcon is due $138,422.95 in compensation for the loss of revenue on these units. A true and correct copy of our spreadsheet detailing these calculations is attached hereto and by this reference made a part hereof as Exhibit 262.

1600. Claimed equipment standby costs of $138,423 are based upon the Corps of Engineers standby rates as required by our contract.

**NON-CONFORMING WORK**

1601. Agee has billed approximately $965,376.06 for completing or repairing work by Remcon that the NPS alleges was non-conforming work. From my review of

documents, and based on detailed, item-by-item discussions with Chris Hickey of Agee, I believe the majority of the allegedly non-conforming work was either work Remcon was not allowed to complete, additional work being requested by the NPS, or work that was caused by storm/weather damage after Remcon ceased performance on the project. Attached hereto as Exhibit 263 and by this reference made a part hereof is a true and correct copy of a spreadsheet I created that details the total amount billed for completing the alleged non-conforming work.

1602. Of the $965,376.06 billed by Agee, for non-conforming work identified by the NPS, I believe $140,409.02 is actual non-conforming work by Remcon, $131,881.10 is work which had not been completed by Remcon prior to the termination, and $671,581.61 is extra work for which payment is due from the NPS.

**TOTAL COST METHODOLOGY**

1603. For Remcon's excavation/grading and re-grading of aggregate base claims, we used a modified total cost approach in calculating these claims. We did so because it is highly impractical and we were unable to be able to track, on a daily basis, which excavation and grading work was extra as compared to base contract work. The volume of the problems in these areas, their concurrent nature, and the inability to discretely track each of them by time and material studies, given that the work was all done in the same locale, makes this methodology appropriate. Further, and as substantiated by Remcon's expert Brent Booth, Remcon's bid for these items of work was realistic, the actual costs were reasonable, and, as detailed above, Remcon was not responsible for the added expenses associated with the extra excavation and grading.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed at Sacramento, California on October 14, 2005.

STEPHEN B. CHRISTENSEN