IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | DOCKET NO. 03-2478C<br><br>**DECLARATION OF THOMAS W. LLOYD IN LIEU OF LIVE TESTIMONY**<br><br>(Judge Susan G. Braden)<br><br>Trial Date: October 24, 2005 |

I, THOMAS W. LLOYD, declare:

1. I am a construction claims consultant and disclosed expert for Plaintiff in this action.

2. Attached hereto as Exhibit 1 and by this reference made a part hereof is a true and correct copy of my resume.

3. I have prepared and published a very detailed Report, with supporting exhibits, graphs and charts, and this document was produced to the government at the end of July, 2005. My Report, a true and correct copy of which is attached hereto as Exhibit 2 and by this reference made a part hereof, contains, in substantial detail, my analysis of the project facts and records, and my opinions and conclusions. Key documents which I relied upon to support my opinions and conclusions are physically attached to my Report. At the time I authored the Report it was true and accurate, and I affirm that its content is

true and correct through this declaration as amended in this declaration. The narrative of the Report discusses, and addresses and analyzes, in detail, the key subjects and events which occurred on this project. Instead of reprinting them as this declaration, they have been incorporated by reference to reduce the volume of paper otherwise being generated.

4. In August, 2005, following my receipt and review of the government expert's, CPMI, report, I authorized and published a Rebuttal Report which identified the inaccuracies, mistakes and other errors and omissions in CPMI's report. It is my understanding that this Rebuttal Report was timely served upon the government in August, 2005. At the time I authored the Rebuttal I believed it was true and accurate, and I affirm its content through this declaration. Attached hereto as Exhibit 3 and by this reference made a part hereof is a true and correct copy of my Rebuttal Report dated August 26, 2005.

5. In preparing to issue both the Report and the Rebuttal, as well as this declaration, I reviewed hundreds of deposition exhibits and other project records, including the project schedules, modifications, daily reports and many emails and written correspondence, as well as Remcon's certified claim, and read several of the deposition transcripts taken in this case. I have also spent many hours meeting with and discussing the events of the project with Mr. Stephen B. Christensen, the owner of Remcon, to enable me to evaluate and comprehend the various issues and impacts which occurred on the project and their effect on the planned contract work. Based upon my professional experience, which is detailed below, as well as the review and understanding I have gained from the effort I have undertaken as part of my engagement over the last several

months, I have personal knowledge of the following and if called to testify could and would competently testify thereto.

**SUMMARY OF TESTIMONY**

Set forth in the balance of this declaration are my opinions and key points which can be understood as a summary of my testimony. Because of the volume of facts and opinions already set forth in detail in my Report and Rebuttal, I have not restated them in this declaration. Instead, I incorporate and adopt the content of my Report and Rebuttal and attach them as Exhibits 2 and 3.

6. I am of the opinion that the government, in multiple instances, breached its obligations to Remcon and that these breaches caused delay and disruption to Remcon denying it the ability to perform the work as planned. My opinions, and the facts they are based upon, are as follows:

a. The contract specifications, set forth in section 1320 Part 1.4.B.1, which deals with scheduling, provides that the Contracting Officer will, within seven (7) days of submission, meet with the contractor to discuss any issues or comments relating to the schedule. I find that at no time did the government ever perform this duty despite multiple requests from the contractor to do so. Further, I have read the deposition transcript of Willie DeOcampo, the Contracting Officer's Representative, in which he states, under oath, that while he was delegated the responsibility from Mr. Keiscome, the Contracting Officer, to review Remcon's schedule submissions, that he did not do so within the seven day period required and that he did not believe himself to be competent to review schedules. True and correct copies of the scheduling specification and excerpts of Mr. DeOcampo's deposition are attached hereto, respectively, as Exhibits 4 and 5 and by this reference made a part hereof.

b. Remcon made multiple schedule submissions, including those dated 6/11/01, 6/25/01, 6/27/02, 8/6/02 and 6/9/03. The baseline or as-planned schedule relevant to my analysis is the one dated 6/11/01 as revised on 6/25/01. This schedule provides that Remcon proposed to perform all of the contract required work within two construction seasons (by November, 2002). In my expert report and in deposition testimony I incorrectly referred to the 6/11/01 schedule as the accepted as-planned schedule. The two schedules differ slightly and do not change the substance of my testimony. Given that the work was divided into two principal phases, known as Upper Sherman and Lower Sherman, there was a practical restraint imposed by the contract as follows: the contractor had to keep a specified number of parking spots for cars, RV's and buses open year round. In order to perform the project the contractor had to construct the new spaces in the Upper Sherman parking lots (which meant all of the lots, along with the new access road and the new comfort station and the new trail to the Sherman Tree) before he could relocate his efforts to the Lower Sherman portion and demo and rebuild the parking lot, highway and other improvements there. These requirements are found in various locations of the contract documents but include Specification section 01110, Part 1.4 A-F. A true and correct copy of this section is attached hereto as Exhibit 6 and by this reference made a part hereof.

c. In order to comply with the contract requirements the Upper Sherman work needed to be completed before transitioning to the Lower Sherman work. Because the Lower Sherman work would take a full construction season (given the elevation of the project (over 7000 feet in the Sierra Nevada mountains) and the limited site access),

the work season could only commence when the snow had melted. In general, this means the construction season runs from approximately June 1 to October 31 or so every year.

d. Remcon's as-planned schedule planned to perform all of the Upper Sherman work in one construction season (during 2001) and then perform all of the Lower Sherman work in the next season (during 2002). The contract issued to Remcon in the spring of 2001 gave Remcon 792 calendar days to construct from the issuance of a notice to proceed. The notice to proceed was issued effective June 11, 2001, and the original contract completion date was therefore August 11, 2003. A true and correct copy of the Notice to Proceed is attached hereto as Exhibit 7 and by this reference made a part hereof.

e. I have reviewed Remcon's as-planned schedule both as to durations of planned activities and logic and find them to be reasonable. My opinion in this regard is assisted by the fact that not only did the government not object to the logic or durations shown by Remcon (whether timely or otherwise), but in fact the government's retained construction manager, Jacobs Facilities, had its scheduler, Adam Schwartzman, review the schedule. His opinion and commentary on Remcon's as-planned schedule is as follows:

> "The cursory review of the NPS - Sherman Tree Resource schedule looked well thought out and organized. The logic seemed complete and consistent throughout the schedule. The schedule is acceptable as is, however, there are a few areas where changes could be implemented to enhance the schedule's sorting and organizing features."

A true and correct copy of Mr. Schwartzman's letter dated July 11, 2001 is attached hereto as Exhibit 8 and by this reference made a part hereof.

f. In Remcon's as-planned schedule, the critical path of the work in the Upper Sherman commenced with the clearing of trees and pioneering of the access road and parking lots and then transitioned into the construction of the comfort station and related improvements. This critical path was closely followed by the excavation and earthwork effort, and given what happened on the project, due to delays admitted to have occurred and caused by the government, the critical path of the as-built project promptly shifted from the comfort station to the earthwork and excavation activities. The following is a list of events that impacted the critical path and caused Remcon to not be able to complete the Upper Sherman portion of the project as-planned:

i. The NPS had the duty to mark the trees being designated for removal. The trees which were marked to be removed by the government, between stations 24 and 30 on the access road, in a location into the hill from where the designers intended. This was discovered after Remcon had removed the trees. Between June 26 and July 9, 2001 the government evaluated this issue and ultimately directed Remcon to relocate the road into the hill where the trees had been removed. The government admitted it was responsible for this mistake by agreeing to pay Remcon for re-surveying the road into the cleared area. (Prior to June 26th, the trees had been cleared and Remcon's surveyors had come out to stake the road. Between stations 24 and 30, the stakes were in a location up to 10 to 15 feet from the area where the trees had been marked to be cleared, and the clearing had been undertaken. The NPS, faced with this issue, brought personnel out from its Denver Service Center to evaluate the issue and made the decision to relocate the road into the hill. As described below, this was a decision that had serious financial and time extension ramifications.) The government's

admission that it was responsible for relocation of the road and that it was not the result of Remcon's error is set forth in writing as part of Modification No. 4, issued by the government on September 14, 2002 (over 1 year after the fact, which is one of many examples of the government's maladministration and failure to timely perform its responsibilities). In the modification the government included new bid item number 137, which was its express justification for the work, which reads as follows:

> **New Item No. 137: Restaking Access Road Centerline.**
>
> On July 31, 2001, the Contractor's submitted a change order request for "Additional Survey Work" for their Surveying Subcontractor (Giuliani & Kull). This request was based upon the initial Access Road centerline staking per the contract drawings. After this initial staking it was discovered that the centerline with all required cut boundaries did not fall within the earlier cleared limits as delineated by Park staff. Thus the Government agreed that the centerline had to be revised in order to fit all earthwork into the already cleared limits. Therefore the surveyor had to re-staked this revised centerline and are entitle to be compensated for their additional work. In addition, this work had to be completed at this time to prevent additional construction costs associated with equipment stoppage and delays. The revised road layout and re-staking reduced construction costs since additional clearing and tree removal was not required. Therefore, this work is necessary in order to construct the roadway alignment in the location shown on the construction drawings. This change is in the best interest of the Government and I recommend it be approved.

A true and correct copy of Modification No. 4 is attached hereto as Exhibit 9 and by this reference made a part hereof.

ii. Concurrent with the problem with the access road location, and continuing into the month of July, 2001, Remcon encountered two differing site conditions in the Upper Sherman parking area.

Specifically, the contract documents identified that a portion of the area to be constructed into a parking lot was previously used as a burn pit and was estimated to contain approximately 2000 cubic yards of material to be excavated and hauled out of the park. Remcon bid the work as indicated. Unfortunately, the volume of material, which was encountered and deemed unacceptable appears to have exceeded 6000 cubic yards. Remcon was directed to excavate and haul this material out of the park at the direction of the government in June and July of 2001 but the government, again untimely, did not issue Modification No. 3 until August, 2002. As part of Mod. No.3, a true and correct copy of which is attached hereto as Exhibit 10 and by this reference made a part hereto, Remcon was given a time extension of 13 days. This belated granting of a time extension is not consistent with the government's duty to timely issue time extensions. Instead of being granted in July, 2001 when it was experienced, it was issued 13 months later. This is a classic example of a constructive acceleration.

The second differing site condition involved debris encountered elsewhere in the parking lot on July 12, 2001. It was investigated by the NPS on July 16, 2001 and directions were given to Remcon to excavate and haul it out of the Park. Remcon swiftly performed the directed extra work but, consistent with its maladministration, the NPS took fourteen months, until September, 2002, to issue a modification. This extra work was belatedly recognized in Modification No. 4. See Exhibit 9.

iii. Following the hauling out of the burn pit materials and the unknown debris from the parking areas, Remcon planned to perform its mass excavation work, which principally consisted of excavation and grading of the access road and the parking lots in the Upper Sherman portion of the project. This effort was planned to be a

duration of 21 calendar days. Instead, it took over a year to perform due to the road relocation identified above, the differing site condition (rock requiring blasting), and the failure of the government, until September, 2002, to issue its final design changes to Remcon so that Remcon could complete the earthwork portions of the project and commence paving. As a result of the multiple problems with the design, which are documented in dozens of written communications between the contractor, the inspector, the NPS park and Denver Service Center personnel, and the outside design team members hired by the NPS, and which are admitted by the government to have been its responsibility in the modifications it issued as well as in the testimony of multiple government witnesses, including Willie DeOcampo (COR for construction), Rod Keiscome (CO), Joanne Cody ( COR for design), as well as the independent designers (Bob Smith and Ray Tuttle), the project was unable to be constructed as-planned (both physically and temporally).

iv. One of the worst and most far-reaching design problems stemmed from the road relocation issue. As a result of being placed into the hill, the road profile, which was already in a "cut" location between approximately stations 24 and 30, now had more excess material to be handled. Further, the subsurface material to be encountered between these stations was no longer "earth and rippable rock" which could be "ripped" by conventional construction equipment as disclosed in the contract's soils report made available to bidders and upon which the bid of Remcon was based. Instead, it had to be blasted.

The consequences of blasting, rather than ripping, are enormous. They include the fact that it is much slower to blast than rip and thus a huge overrun in time, plus

overruns in labor, material and equipment costs were and are incurred, as production rates are much lower. Blasting, in substance, involves uncovering the unrippable rock, drilling holes to place charges, covering the holes, clearing the site, and blasting. The material then needs to be removed. It cannot be used as backfill or fill as planned without special processing. The time it took to blast this 600 foot area was six or so weeks alone, twice the planned duration of the entire excavation and earthwork in the Upper Sherman Access Road and Parking Areas included in the as-planned schedule and which was found by the government's consultant to be reasonable.

v. Remcon gave prompt notice orally and in writing concerning encountering the rock, which it characterized as a differing site condition. The contract required the government, upon receipt of such notice, to investigate the validity of Remcon's contention. This requirement is found in the Differing Site Condition clause of the contract found at FAR 52.236-02. A true and correct copy of this clause is attached hereto as Exhibit 11 and by this reference made a part hereof.

vi. The government has now belatedly admitted that it failed to investigate the claimed type one differing site condition claim. This admission is found in the deposition testimony of Willie DeOcampo and Rod Keiscome and true and correct copies of excerpts from their depositions are attached hereto as Exhibit 12 and by this reference made a part hereof.

vii. Further still, the government steadfastly denied Remcon's multiple written and oral requests for compensation in time and money for encountering the differing site condition. Remcon sought many weeks of delay damages and over $700,000 in additional costs as a result of the issue. More than 18 months after Remcon

encountered the issue, after the entire 2002 construction season was over, the Contracting Officer issued, on a unilateral basis, Modification No. 6 which expressly recognized the fact that Remcon did in fact encounter a differing site condition between stations 24 and 30 in constructing the access road. This admission granted Remcon only $84,000 worth of compensation based upon an analysis of the blasting costs only. This analysis is flawed in many respects and ignores multiple items and issues. However, not only was the modification improperly issued with respect to its timing, it also failed to address the issue of time extensions and delay or the effects and impacts of blasting. Indeed, it is wholly silent on that point.

Because Remcon was apparently in such a dire financial situation due to the impacts on this project as of February, 2003 when Modification No. 6 was unilaterally issued, it appears to me that the issuance was akin to "too little too late" and the failure to include any time extension cannot be justified as my analysis shows that the encountering of the differing site condition was a material delay to the project and the government has never addressed it (timely or otherwise).

viii. The combination of the road relocation, the burn pit material, the debris in the parking area and the differing site condition on the access road collectively caused the critical path of the project to shift from going through the comfort station and put it entirely on the excavation activities. This continued into 2002.

g. Concurrent with all of the excavation issues identified above are multiple instances of design problems with the parking lots and access road not being able to be constructed as designed due to many different impacts. These include rock outcroppings, trees which were not marked to be removed but which had to be removed, the

government's identification that a stockpile of aggregate base was on site to access and use which turned out to be inaccurate and a myriad of other documented problems. The fact that there were design problems is not of concern to me. Design problems are to be expected. However, the government failed to promptly address them in a timely or efficient or fair manner (whether they were huge issues such as the differing site conditions or relatively minor issues which one could expect to be encountered and addressed), and this maladministration plagued the project and contributed to the delays and extra costs incurred by Remcon.

One such example is the burn pit issue. Once Remcon was directed to excavate the hole from 2000 cubic yards to over 6000 cubic yards it did so in July, 2001. The design planned for the 2000 yards to be excavated and then the hole created to be filled in with clean backfill material from other locations along the access road and parking lots that were "cut" because their existing elevation was higher than required. However, the material to fill in the 2000 yards was planned to come, in part, from the deep cut area, but it was rock which needed to be blasted, and then had to be processed so it could be used, at a much higher cost, per yard, than planned. While Modification No. 3 (Exhibit 10) paid Remcon to create the larger hole and haul out the material, to this day no modification reimbursing Remcon to fill in the hole has been issued, whether for time or money. This extra work was performed in 2001, and was needed to be performed as the design elevation of the finished parking lot required the hole (originally thought to be 2000 cubic yards) to be properly filled to support pavement and vehicles.

h. Additionally, commencing in late summer of 2001 or so, Remcon repeatedly asked for direction from the government regarding what to do with the

thousands of extra cubic yards it had excavated and for which there was no provision in the contract to handle. This issue arose as early as July 2, 2001 when the NPS documented in internal communications to the Contracting Officer and all key NPS project participants that up to 13,000 cubic yards of excess material was identified by Remcon that may be excavated and encountered, and that if the contractor was directed to haul it out of the park at the contract rate of $15/cy the cost would be almost $200,000. The internal written materials from the NPS perceive this to be a result of a design error and discussed putting the designer on notice of a professional negligence claim. Based on the records reviewed and deposition testimony, the NPS did not do so and the Contracting Officer testified that he was not informed of these issues or events. Further, the NPS communications subsequent to July 2, 2001 indicate that the NPS personnel recognized that Remcon's assertion regarding thousands of yards of excess excavation being encountered was accurate, that this recognition was documented in July, 2002, but that written denials were thereafter repeatedly sent to Remcon. It was not until one year later, on June 27, 2002, that the NPS gave Remcon any written direction of what to do with some of the thousands of yards and multiple stockpiles of excess material. Once again, maladministration was the constant seen which permeated the NPS' actions.

The existence of excess material stems from multiple causes, which include relocation of the access road into the hill (but not adjusting the vertical elevation, thus creating a wedge of additional material to be handled), plus the fact that the designers used a compaction rate of 40% for the decomposed granite to be excavated. This percentage appears in the records found in discovery (not disclosed in the contract documents) and was acknowledged in their deposition testimony. It is my experience

that this compaction percentage was extremely flawed and overstated and the designers have testified that they were dubious of it as well but were directed by the NPS to use it. In my experience decomposed granite will compact no greater than 15% and likely much less, and this explains, in part, the reason for such a large volume of overrun in material. Additionally, as a result of encountering unrippable rock and being required to blast some 6,000 cubic yards, which typically will swell (up to 30% to 40%), even more excess excavation was generated. To date, Remcon has received limited compensation for this extra work. Only about 7000-8000 cubic yards are addressed in Modification No. 4. See Exhibit 9.

i. The bottom line is that there were a myriad of design and other issues which arose during the first year of the project and which continued unresolved into the second year (2002). When Remcon remobilized in the second year it had no direction what to do with the excess material and ultimately was given direction in late June, 2002 to raise portions of the upper parking lot by up to 5 feet. This, unfortunately, did not address bringing the lot back to its intended grade. The modification for this effort was also delayed by the government until September 2002. See Exhibit 9.

j. Adding to all of these issues is the fact that the design of the third prong of the Upper Sherman work, concerning the construction of the new trail to the Sherman Tree, was found to be substantially deficient throughout 2001 and again into 2002. The record is filled with multiple instances where the designers acknowledged that trail points and other items, including the planned drainage, needed to be modified and multiple design revisions were issued by the NPS to Remcon and/or Remcon's surveyors. The design changes issued by the NPS concerning the trail (while Remcon was still on the

project) did not stop until the issuance of Modification Number 5, signed by Remcon on October 18, 2002 but not signed and issued by the Contracting Officer until November 20, 2002. This one modification, alone, prevented Remcon from completing the Upper Sherman Tree Trail work for over two construction seasons. Stated otherwise, even if all of the other problems on the Upper Sherman (e.g. access road, parking area) had not occurred, the delay by the government arising from its late issuance of the redesign to the Upper Sherman Tree Trail, and the issuance of this modification to Remcon to construct the changes, until November 20, 2002, prevented Remcon from finishing the Upper Sherman Tree Trail work in 2001 or 2002, as it was already snowing as of November 20, 2002, and there was much work to perform on the trail that was restrained by the redesign effort maturing into Modification No. 5. This meant, as a practical consequence, that had Remcon remobilized during the 2003 construction season it would have still had to work on the trail even if it had finished all other Upper Sherman work (which it hadn't for a multitude of reasons). This meant that the Lower Sherman work could not have started until 2004 at the earliest without relief from the contract standards (allowing work concurrently on the Upper and Lower Sherman areas) and the NPS indicated to Remcon in 2002 that it would not provide such relief. Thus, by the government's own conduct, the Project was delayed at least two years but a time extension recognizing this delay has not been issued.

k. Collectively, all of these issues compelled Remcon to be unable to construct the project as-planned. Because of this fact Remcon issued a revised, updated schedule to the NPS early in the 2002 construction season. It showed that the earthwork, not the comfort station, was on the critical path and that the government was responsible

for the delays to date. It also showed that completion would occur, at the earliest, in November, 2003.

No response to the schedule, as to its material content, has been found by me in the project records. In fact, had the government objected to Remcon's contention that the project was then delayed until November, 2003, it was the government's responsibility, by the rules promulgated by the government in the project specifications, to sit down with Remcon within seven days of receipt of the schedule. I am not aware that any such meeting or response which occurred within this time frame or at all. No evidence exists to support that it did. As a result, I conclude that the government failed to perform as required which I understand to be a breach.

l. The failure to issue time extensions, on a timely basis, in most instances has dire financial and performance effects on a contractor. My opinion is that the government failed to timely issue modifications for time or money, and its belated issuance of modifications, combined with the volume of the design problems and failure to timely address most of them, whether big or small, but especially the big ones, had a devastating effect on the contractor and was unfair and was a breach of the duties I read the government had under the contract.

m. Given the fact that there were multiple events on the project which caused and contributed to the delays encountered in July and August 2001 (e.g. three differing site conditions (two in the parking area and one on the road), plus the road realignment causing excess excavation, plus the improper compaction factor causing excess excavation, plus the multiple re-designs of the Sherman Tree Trail), all coupled with the failure of the Contracting Officer to address them (timely or otherwise) when they arose,

effectively rendered the overall original and revised project schedule useless. Without knowing what time extensions were going to be granted, or the government's reaction to an issue (e.g. the access road differing site conditions), but nevertheless receiving directions to address the parking area differing site conditions, relocate the access road, and a series of design revisions concerning the access road, the parking areas and the trail, all of which were extra work, but none of which were contemporaneously recognized in modifications granting time and/or money, effectively undermined the ability of Remcon, or any contractor, to plan and schedule its work. The by-product of these circumstances was and is the inability to produce accurate, updated monthly schedules.

n. The criticism leveled at Remcon by CPMI, the government's expert, concerning failure to produce updated schedules, is both ill-advised and unfair. It is true that Remcon did not provide, every month, monthly updates of the overall project schedule. The questions are "why", and was such conduct "justified" and/or "excused"?

As to "why", the answers are quite clear. The June 25, 2001 revised schedule was found to be well executed by Jacobs Facilities and the weekly meeting minutes of July 24, 2001 indicate that the NPS has approved the schedule as well. As of July 25, 2001, when this information was communicated to Remcon, it was dealing with two parking area differing site conditions, the access road relocation into the hill, the presence of excess excavation, and Remcon had already received a few re-designs of the trail and parking area, and was about to encounter the access road differing site condition.

As the same time, it had received no modifications for the impacts or changes to date, and had no recognition from the government as to the amount of time the NPS recognized, to date, the project was impacted.

Thus, as August, 2001 dawned, what was Remcon to do? Without government concurrence or direction, inserting delays and new activities into the schedule was an exercise in futility.

o. The deposition testimony of Robert Smith of DHM on this subject is illuminating. After being shown documents detailing just some (not even all) of these delay events and impacts swirling throughout all aspects of this project by August, 2001, Robert Smith testified that, in essence, the construction was "in limbo." This accurately describes the situation in my opinion.

p. Further, when the access road had to be blasted in August and September, 2001, the volume of excess material encountered and having to be handled substantially increased. As a result, "mountains" of excess materials were stacked within the project limits (Remcon had no direction to off-haul or place the material anywhere else). This both constricted the areas which could be worked as well as restrained overall production as any location covered by a stockpile could not itself be worked until direction to handle the stockpile was given.

q. By September, 2001, the problems arising in July and August, 2001 had grown in size, volume and dimension. More design changes to the trail, access road and parking area were issued (without concurrent directions to implement or modifications issued by the Contracting Officer) and the stockpiles of thousands of yards of excess excavation were now existing on the site.

r. Remcon had, in less than the first three months of construction, encountered three differing site conditions, directed changes (e.g. relocate the access road and re-survey it), constructive changes (e.g. the multiple design changes given) and constructive acceleration. Concurrently, not one modification for time or money, for any of these items or issues had been issued, and the site was now covered with thousands of yards of stockpiled rock and excess excavation for which direction to handle had not been given.

s. At the same time the project records disclose that the Contracting Officer, due to quantity overruns (and lack of funds to pay for all of these issues), was considering terminating the contract for convenience. This fact was not disclosed until discovery (and in hindsight termination for convenience then would have been a wise decision).

t. Instead, paralysis occurred. The government did not issue modifications, which substantially addressed the problems existing as of August, 2001 until August 2002, September 2002, November 2002 and February 2003 (Modifications 3-6, respectively). As detailed in this declaration, and my Report, the modifications were issued far too late and only partially addressed the time and money due. Further, during the period between August, 2001 and May, 2002, the government did essentially nothing to attempt to rectify the problems which were its responsibility. This conduct cannot be justified or defended. Given the timing of the project and the data provided by the contractor, the failure to take action and give direction is inexcusable. This maladministration is a huge cause of the extra costs and delays experienced, and definitely prevented, hindered and delayed Remcon.

u. Commencing in August, 2001, Remcon inquired, both orally and in writing, what to do with the excess material encountered, as it was inhibiting its ability to perform. A definitive response as to all of the excess material, was never received.

While about 3000 cy was allowed to be hauled to a stockpile area, off of the project site, but still within the park (Wolverton Point), it was not until June, 2002 that direction to use some of the excess material to raise the upper parking area was given This means that from July, 2001, when the identification of the issue arose, until June 27, 2002, about one year later, no direction to address what was an acute problem (except for 3000 cy) was given.

Additionally, other than the raising of the parking area (about 4000-5000 cy) and the 3000 cy hauled to Wolverton Point, no further direction was given for about one year to deal with about 10,000 additional cubic yards in stockpiles.

Instead of addressing this matter in a forthright manner, the NPS improperly denied in writing any responsibility for the existence of the excess material. This conduct is a microcosm of the NPS' maladministration, which hindered and delayed Remcon.

v. On October18, 2001, Remcon wrote and sent RFI #31. It states as follows:

> Over the past three weeks there have been several discussions, and I have provided several spread sheets, Regarding Excess Excavation. At this point in time there is approximately 1,978 cubic yards of dirt at Wolverton Point in excess of the contract yardage. There is so many piles of dirt on the site we can not finish grade the parking lots. The general consensus of our People onsite, is that there is approximately 15,000 cubic yards of Excess In various piles on the site. The crushing operation will help considerably, but there will still be more material on this site than we can use. The area in the upper most parking lot that was previously designated for excess according to

> My calculations will take approximately 2,500 yards, this will also help. My main question at this time are #1 why is there so much more yardage? #2 How are we going to be compensated for dealing with it? #3 Where will we put the balance of the yardage once We have done everything discussed above?

In response, on October29, 2001, the NPS stated, in writing:

> 1. With instruments available, hand level & tape measure, it appears that bldgs., trail & pkg. Are being constructed approx. 1' below designated grades. Monuments and topo Appear to correlate with design documents. Note – many monuments are missing.
>
> 2. Need to determine where error took pace.
>
> 3. Need to determine fix to 1' grade discrepancy.

This response is co-signed by Willie DeOcampo, the COR for construction and Joanne Code, the COR for design. The response was misleading, and at least Joanne Cody, as of the date of the response, knew it to be misleading.

In July, 2001, after Remcon gave notice to Willie DeOcampo of Remcon's perception that up to 13,000 cy of excess material would exist (this was before the access road differing site condition was encountered), Willie prepared and set an email to all key NPS project participants, including Rod Keiscome, the Contracting Officer, and Joanne Cody.

One week later, on July 9, 2001, Joanne Cody visited the site, and her writings, and those of the lead inspector, Bob Russell, record that Ms. Cody recognized that excess excavation may result, and she authored sketches and revised design drawings to address the excess material should the circumstance arise. (Neither the existence of her writings

on this subject in July 2001, nor Bob Russell's, nor the revised plans, were disclosed to Remcon until discovery in this litigation.)

Thus, when she denied the existence of the excess material two months later in response to RFI #29 she was, at best, less than candid. The response to the RFI, that whatever excess material that was then in existence was a result of Remcon cutting the site too low (e.g. an alleged contractor error) was false, and demonstrated to be false by subsequent surveys and site walks. As the second season commenced in May, 2002, Giuliani & Kull, Remcon's surveyor, confirmed the site was properly staked and excavated, and Bob Smith of DHM reviewed the NPS' assertion and found it to lack merit. This fact was expressly and implicitly admitted by virtue of the fact that direction to raise the parking area and haul more material to Wolverton Point was given and paid for by the NPS in Modification No. 4.

Therefore, looking again at the big picture, how could Remcon, or any contractor, plan or schedule the overall project?

w. Despite the NPS' roadblocks affecting Remcon's ability to schedule, Remcon tried. Several letters and draft schedules were sent by Remcon from October, 2001 through the winter and into June, 2002. On the same day direction was finally given to raise the parking area (June 27, 2002), Remcon also published a revised schedule. It was its best guess. CPMI's use of this schedule to analyze delays, as detailed in my Rebuttal Report (Exhibit 3 hereto) is improper because it virtually ignores how the project got to the circumstances, which existed as of June 27, 2002, of the continuing impacts. Rather than restate my criticisms I adopt those expressed in my Rebuttal Report.

x. Fundamental to any project is the Owner's duty to not hinder, delay or obstruct a contractor, and to timely and completely respond to issues when raised. The hallmark of a well administered project is the comprehensive and evenhanded conduct by the Owner. This project was not well administered by the NPS and the record reflects that the NPS, if graded for its conduct, would receive an "F". Often construction activities have been compared to those conditions encountered in a battlefield. This was so written in the *Blake Construction Co. v C.J. Coakley*, 431 A.2d 569, 575 (D.C. App. 1981), the Court said:

> We note parenthetically and at the outset that, except in the middle of a battlefield, nowhere must men coordinate the movement of other men and all materials in the midst of such chaos and with such limited certainly of present facts and future occurrences as in a huge construction project such as the building of this 100 million dollar hospital. Even the most painstaking planning frequently turns out to be mere conjecture and accommodation to changes must necessarily be of the rough, quick and ad hoc sort, analogous to ever-changing commands on the battlefield.

y. As a result of not being able to comprehensively schedule the project, Remcon used three-week look ahead schedules, which were updated weekly. This is a common and reasonable scheduling tool to get work done. While not optimum, it was the best one could expect given the problems encountered and the lack of timely owner response.

The three-week look ahead schedule captures the prior week's activities, the forecasted activities planned to be performed in the current week and those anticipated to be accomplished the following week. It was discussed at each weekly meeting so all project participants knew the "who, what, where and when" that was going on contemporaneously.

Based upon the facts of this project, the criticism leveled at Remcon regarding scheduling is substantially unfounded. It did a good job given what it had to deal with.

z. Further, in order to analyze delays on a project, there must be a firm foundation of the facts to start with. Any omissions of relevant facts, or errors, diminish or eliminate the validating of later analysis.

My examination of the CPMI report, especially the Time Impact Analyses, discloses that CMPI omits several relevant facts, or ignores them, and that they are based, in part, on erroneous information not supported by the facts. This undermines the accuracy.

CPMI's analysis omits comment upon, or analysis of, virtually all delay events that occurred on the project. Combined with these serious omissions, is the fact that CPMI essentially ignores the NPS' "response time" (or more appropriately characterized as "lack of response time") to the delay events and impacts which occurred on this project and which are well documented. Also, CPMI fails to address the untimely issuance of modifications and the belated granting of time extensions. Further still, by not commenting upon repeated issuance of updated design changes, CPMI camouflages the actual facts. The incomplete content and lack of content renders the CPMI analysis incomplete and flawed.

aa. The CPMI analysis absolutely ignores the collective impacts on the project. For instance, given the fact that Modification No. 5 was not issued until November 20, 2002, it was too late to perform this extra work during the second season. This means that NPS caused delays, at a minimum, pushed the project into a second winter season. CPMI ignores this fact and provides no analysis of it. By contrast, my

analysis identifies this crucial fact, discusses its relevance, and lead to the inescapable conclusion that compensable government-caused delay protracted this project to a huge extent.

bb. As a result of the impacts experienced in 2001, there is absolutely no doubt that the earthwork was the controlling activity on this project. CPMI's contention that the comfort station was controlling is contrived and based upon a flawed foundation. Until the road was ready to be rocked with aggregate base and paved, in 2002, the critical path of the project could not advance. Instead of being able to accomplish this work in late summer, 2001, it was not accomplished until fall, 2002. The NPS is responsible for this fact.

The comfort station was, in reality, a minor element. While the importance of the improvement is not challenged, it was not controlling. It did not need to take two seasons to construct, and its construction was paced by the dominating activity: the access road. CPMI's claim to the contrary simply lacks factual or analytical support.

The amount of labor and equipment hours devoted to the access road, and the timing of design decisions affecting the road, dominate this project.

cc. I have had an opportunity to review in detail the content of Steve Christensen's declaration with respect to Earthwork and Rock Calculations (paragraphs 1524 through 1559), as well as the exhibits referred to and incorporated therein. It has always been my opinion that Remcon encountered substantial excess quantities of material which could not be used as fill. I believe the calculations and quantification detailed in Mr. Christensen's declaration on this issue is accurate.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed at Sacramento, California on October 12, 2005.

Thomas W. Lloyd
THOMAS W. LLOYD