IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant. | DOCKET NO. 03-2478C<br>**DECLARATION OF JORDAN ROSENFELD IN LIEU OF LIVE TESTIMONY**<br>(Judge Susan G. Braden)<br>Trial Date: October 24, 2005 |

I, JORDAN ROSENFELD, declare:

1. I am the Managing Member of Sutor Krystad & Rosenfeld, PLLC. Sutor Krystad & Rosenfeld, PLLC is one of the companies comprising The Sutor Group which specializes in providing accounting, financial, tax, litigation support, project management, management consulting and other services to the construction industry. I have personal knowledge of the following and if called to testify could and would competently testify thereto.

2. The amount due Remediation Constructor, Inc. based upon a calculation assuming the termination for default is converted to a termination for convenience and for the government's breach of contract is $6,963,733. The determination of the amount due Remediation Constructor, Inc. utilizes standards outlined in the Federal Acquisition Regulations, in particular Part 31 and Part 49 of those regulations. A true a correct copy of the schedule summarizing the amount due Remediation Constructors, Inc under a

termination for convenience scenario is attached hereto as Exhibit 1 and by this reference made a part hereof.

3. The damages suffered by Remediation Constructors, Inc. up to the time of its termination from the project, due to the National Park Service's breach of contract, totals $2,726,956. A true and correct copy of the summary of the Breach of contract damages is attached as Exhibit 2 hereto and by this reference made a part hereof.

4. The Sherman Tree Parking project had a severe financial impact on Remediation Constructors, Inc.'s financial position and cash flow. Through November 30, 2002 Remediation Constructors, Inc. recognized a loss of $(1,289,962) (excluding home office overhead) on the Sherman Tree Parking project. The company had a profit of $519,185 for the period June 1, 2001 to November 30, 2002, despite the loss incurred on the Sherman Tree Parking project. Excluding the Sherman Tree Parking project, Remcon would have earned a net profit of $1,809,147 for the period June 1, 2001 to November 30, 2002. A true and correct of the Remediation Constructors, Inc. profit and loss analysis is attached as Exhibit 3 and by this reference made a part hereof.

5. I received a Bachelor degree in accounting from the University of Massachusetts, Amherst, in February of 1976.

6. I have worked in accounting since finishing college. For the last twenty-two years my work experience has been concentrated almost exclusively in construction accounting.

7. In August 1983, upon moving to Seattle, I started working for Sutor & Company, the predecessor of what is now The Sutor Group. I was a Supervisor providing financial statement and tax services to a clientele consisting entirely of construction companies.

8. From February 1985 to July 1986 I was Controller of Anderson Magruder, Inc., a Seattle mechanical contractor. My duties included preparation of company

financial statements, project status schedules and budget reports, supervision of the accounting and administrative staff, and banking and surety company relations.

9. From August 1986 to December 1990 I worked for Reliance Surety Company as Accounting Manager in the bond claim department. As such my primary duty was to provide accounting support to bond claim attorneys in the investigation of contractor defaults. These duties included the investigation of the accounting status of ongoing construction projects and the evaluation of contractor claims for additional compensation.

10. In January 1991 I returned to work at Sutor & Company as the partner in charge of financial statement and surety services. In 1997 I began providing expert witness services pertaining to construction litigation. Currently approximately 40% of my time is dedicated to surety claim services, 10% to 15% to traditional CPA financial statement and tax work, and 45% to 50% to litigation support. To date, I have been engaged as a construction accounting expert on approximately forty-five occasions, provided deposition testimony thirty-one times, testified in trial seven times and in arbitration twelve times.

11. My litigation support service experience includes the preparation of termination for convenience settlement proposals and/or claims for over fifty contractors pertaining to terminations on thirteen different projects or prime contracts.

12. I am a Certified Public Accountant in the states of California, Washington, Alaska and Hawaii.

13. I am a member of the American Institute of Certified Public Accountants, Washington Society of Certified Public Accountants, and National Bond Claims Association. I am also a member of the Construction Financial Managers Association of which I am a Board Member and Treasurer of the Puget Sound Chapter.

14. A true and correct copy of my curriculum vitae is attached hereto as Exhibit 4 and by this reference made a part hereof.

15. The attorneys for Remediation Constructors, Inc., Murphy Austin Adam Schoenfeld LLP, first contacted me concerning being engaged for this matter in September 2004. The initial general scope of my engagement is described on page 1 of my expert report dated July 28, 2005, a true and correct copy of which is attached as Exhibit 5 and by this reference made a part hereof.

16. At the time I prepared Exhibit 5 it was true and correct based on the work performed through that date. It remains true and correct today with the exception of changes noted in my Supplemental Report dated August 30, 2005 or in this declaration. A true and correct copy of my Rebuttal and Supplemental Expert Report dated August 30, 2005 is attached hereto as Exhibit 6 and by this reference made a part hereof.

17. Subsequent to issuing the July 28, 2005 expert report I was also asked to provide opinions of the accounting analysis expressed in the expert report of Henry Rinder and John O. Snowden of Smolin, Lupin & Co., LLC, the accounting experts engaged by the National Park Service. My opinions are expressed in my Rebuttal and Supplemental Report dated August 30, 2005 (Exhibit 6.) When Exhibit 6 was initially prepared it was true and correct and remains true and correct today except as otherwise noted in this declaration.

18. In the performance of my engagement I interviewed Stephen Christensen and Tina Erickson, President and former Controller of Remediation Constructors, Inc., respectively, D. Michael Schoenfeld and Kenneth Schumaker of Murphy Austin Adams Schoenfeld LLP, Randy Wilkinsky of Great American Insurance Company, and Brent Booth, the estimating expert engaged by Remediation Constructors, Inc.

19. A true and correct listing of the documents I relied upon in reaching the opinions expressed in this declaration is attached hereto as Exhibit 7 and by this reference made a part of hereof. It is my understanding that these documents will be present in the courtroom during my testimony.

20. In the performance of my work on this engagement I compiled various binders containing my work papers or supporting documents. A true and correct listing of the contents my binders is attached hereto as Exhibit 8 and by this reference made a part hereof. The binders will be present in the courtroom during my testimony.

21. Remediation Constructors, Inc.'s procedures for processing and job costing payroll and vendor/subcontractor invoices is standard for the industry and properly account for costs incurred on the Sherman Tree Parking project.

22. I reviewed Remediation Constructors, Inc.'s general accounting procedures and the accounting procedures for the Sherman Tree Parking project with Steve Christensen and Tina Erickson. I reviewed the procedures for processing invoices and payroll and found that Remediation Constructors, Inc. followed industry standards for coding costs to a project.

23. I performed an audit of the labor costs included in the Remediation Constructors, Inc. claim submitted on June 28, 2003.

a. I randomly selected fifty individual payroll items included in the various claim items.

b. For the randomly selected items I verified that the wage rate utilized in the claim was equal to or less than the actual rate according to Remediation Constructors, Inc.'s Certified Payroll reports. (Remediation Constructors, Inc utilized the prevailing wage rate for pricing the labor in their claim. In some instances they actually paid the employee in excess of the prevailing wage rate.)

c. I verified the claimed hours worked and cost coding to Remediation Constructors, Inc. Daily Time Sheets.

d. I also randomly selected Daily Extra Work Report Summaries included in the supporting documentation of Remediation Constructors, Inc.'s claim and verified that the hours reflected for all employees and equipment on those summaries matched the Daily Time Sheets.

24. As stated in Paragraph 2, the amount due Remediation Constructors, Inc. based upon a calculation assuming the termination for default is converted to a termination for convenience is $6,963,733. The schedule summarizing the amount due Remediation Constructors, Inc under a termination for convenience determination is attached hereto as Exhibit 1.

25. The determination of the Remediation Constructors, Inc. termination for convenience claim is principally based upon the company's job cost accounting system. As previously stated in Paragraph 22 of this declaration, I reviewed Remediation Constructor's, Inc. general accounting procedures and believe the accounting system meets industry standards. For the substantiation of a termination for convenience claim, it should be noted that the Federal Acquisition Regulations provide that the contractor is not expected to be able to verify each and every cost. In Subpart 49.201 it states:

> *(a) A settlement should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit.* ***Fair compensation is a matter of judgment and cannot be measured exactly. In a given case, various methods may be equally appropriate for arriving at fair compensation. The use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement.***
>
> *(b) The primary objective is to negotiate a settlement by agreement. The parties may agree upon a total amount to be paid the contractor without agreeing on or segregating the particular elements of costs or profit comprising this amount.*
>
> *(c)* ***Cost and accounting data may provide guides, but are not rigid measures, for ascertaining fair compensation.*** *In appropriate cases, costs may be estimated, differences compromised, and doubtful questions settled by agreement. Other types of data, criteria, or standards may furnish equally reliable guides to fair compensation.* ***The amount of recordkeeping, reporting, and accounting related to the settlement of terminated***

> ***contracts should be kept to a minimum compatible with the reasonable protection of the public interest.***
> [Emphasis added]

The Federal Acquisition Regulations recognize that the contractor did not enter into the contract anticipating that it would need to prove each cost as if it were a cost reimbursable contract and thus has not maintained the accounting system to do so. A true and correct copy of Federal Acquisition Regulation 49.201 is attached hereto as Exhibit 9 and by this reference made a part hereof.

26. Explanations of the various calculations in the determination of the amount due Remediation Constructors, Inc. under a termination for convenience are as follows:

a. The Remediation Constructors, Inc. direct costs of $6,679,478 are the costs according to their job cost accounting system of $6,236,850 adjusted for the following:

i. Remediation Constructors, Inc. payable obligations paid by their surety, Great American Insurance Company, that were not posted to the job cost have been added to direct costs. The amount is based upon a listing of payment bond expenditures prepared by Randy Wilkinsky of Great American Insurance Company. I spoke with Mr. Wilkinsky by telephone to confirm that the amount presented in the schedule utilized for my August 30, 2005 Supplemental Report (Exhibit 6) was the amount paid by Great American Insurance Company as of August 22, 2005. Great American Insurance Company has since provided updated schedules as of September 30, 2005. A true and correct copy of the Great American Insurance Company schedules summarizing payment bond and performance bond obligation payments and expenses is attached hereto as Exhibit 10 and by this reference made a part hereof.

ii. The amount added to the Remediation Constructor, Inc. direct costs for the Great American Insurance Company payment bond obligations has

been reduced by $20,000 from that reflected in my Rebuttal and Supplemental Expert Report dated August 30, 2005 (Exhibit 6.) The $20,000 pertained to a union benefit payment that would be included in the accrued employee benefit costs.

iii. Standby equipment costs have been adjusted to reflect the revised calculation discussed subsequently in Paragraph 29 m. of this declaration.

iv. Claim preparation costs included in job costs have been eliminated.

v. Extended home office overhead costs included in job costs have been eliminated.

vi. The cost for the surety bond premium has been adjusted to reflect an amount calculated based on the anticipated final contract amount. The bond premium amount has been adjusted from that reflected in my Rebuttal and Supplemental Expert Report dated August 30, 2005 (Exhibit 6) due to the changes in other items.

vii. Costs relating to Remediation Constructors, Inc. "redo work" and miscellaneous items have been eliminated.

A true and correct copy of the schedule summarizing the determination of Remediation Constructors, Inc. direct costs is attached hereto as Exhibit 11 and by this reference made a part hereof.

b. Surety Direct costs totaling $3,990,578 are the project completion costs paid by Great American Insurance Company through October 12, 2005 to Agee Construction ($4,127,485.58) and Ken Smith Masonry ($3,501.70) less a credit of $140,409 for Agee Construction rework of Remediation Constructors, Inc. non-conforming work. The amounts are according to the schedule of performance payments (Exhibit 10) provided by of Great American Insurance Company and a schedule of the rework credit prepared by Stephen Christensen. A true and correct copy of the rework credit schedule is attached hereto as Exhibit 12 and by this reference made a part hereof.

c. The general and administrative expenses of $554,056 is the allowable indirect costs according to Federal Acquisition Regulations allocable to the Sherman Tree Parking project based upon the percentage of project direct costs to total company direct costs from June 2001 to November 2002, the period that Remediation Constructors, Inc. worked on the project. The allocable overhead amount has been determined by:

i. Dividing the project direct costs as determined above by;

ii. The total company direct costs for the period June 2001 through November 2002, the same period that the project direct costs were incurred. Total company direct costs for that period are derived from the Remediation Constructors, Inc. CPA reviewed August 31, 2001 year end financial statements and internally prepared June 30, 2001, August 31, 2002 and November 30, 2002 financial statements. A true and correct copy of the CPA prepared and internal financial statements are attached hereto as Exhibit 13 and Exhibit 14, respectively, and by this reference made a part hereof.

iii. The percentage determined by dividing the project direct costs by total company direct costs of 32.36% is multiplied by the company's allowable general and administrative expenses for the same June 2001 to November 2002 period to arrive at the $554,056 in general and administrative costs allocable to the project. Allowable general and administrative expenses are the amounts according to the Remediation Constructors, Inc. financial statements adjusted to eliminate costs not allowed according to Federal Acquisition Regulation Part 31. A true and correct copy of the determination of allowable general and administrative expenses is attached hereto as Exhibit 15 and by this reference made a part hereof.

iv. The allocable general and administrative expenses are 8.29% of direct costs.

A true and correct copy of the allocable general and administrative expense calculation is attached as Exhibit 16 and by this reference made a part hereof.

d. Profit markup of 9.11% has been applied to the direct costs incurred on the project. The profit markup percentage is the Remediation Constructors, Inc. bid gross profit of 17.4% less the 8.29% determined for general and administrative expenses. Federal Acquisition Regulation Part 49.202 (See Exhibit 9) provides for the contractor to be paid profit in a termination for convenience. Several factors are stated to be considered for the determination of profit, including the rate of profit contemplated when the contractor entered into the contract.

e. Termination/Breach Expenses totaling $1,646,331 is the amount due Remediation Constructors, Inc. for legal consulting and other costs related to the determination of the impacts on the project, contesting the improper termination for default, and amounts due Remediation Constructors, Inc. under a termination for convenience. This amount includes actual invoices from attorneys and consultants recorded by Remediation Constructors, Inc., an estimate of the Murphy Austin Adams Schoenfeld LLP legal and various consulting fees, Stephen Christensen's costs through October 31, 2005 and Great American Insurance Company expenses through September 30, 2005. Under a termination for convenience a contractor is entitled to all "settlement" expenses incurred through final settlement. This amount is appropriately increased for all costs and fees incurred or accrued after August 30, 2005.

A true and correct copy of the schedule summarizing Termination/Breach Expenses is attached hereto as Exhibit 17 and by this reference made a part hereof.

f. Payments received to date of $6,878,752 are the amounts paid to Remediation Constructors, Inc. and Great American Insurance Company by the National Park Service through September 30, 2005.

27. The damages suffered by Remediation Constructors, Inc. due to the National Park Service breach of contract totals $2,726,956 (Exhibit 2.) The amount

determined as of the date of my expert report of July 28, 2005 (Exhibit 5) was $2,691,407. Ongoing work on this matter resulted in a change in the amount to $2,835,651 as of August 30, 2005 (Exhibit 6.) The change as of August 30, 2005 was for the correction of addition errors in the Remediation Constructors, Inc. cost summary schedules. The amount included in my July 28, 2005 expert report was derived from schedules summarizing extra costs incurred prepared by Remediation Constructors, Inc. for the claim submitted on June 28, 2003. For certain claim items those schedules understated the total cost due to errors in totaling the columns. Changes made since August 30, 2005 affecting the excavation, supply of aggregate base material and extended home office overhead claim items are discussed subsequently in this declaration.

28. My review of the quantification of the Remediation Constructors, Inc. breach of contract claim included the following general procedures:

a. I reviewed the June 28, 2003 claim narrative and supporting schedules and documentation.

b. I reviewed each claim item with Stephen Christensen relative to the impacts suffered by Remediation Constructors, Inc. and the methodology for quantifying the amount of those impacts.

c. I reviewed the documentation supporting the claimed amounts.

d. Audited the labor costs as previously described.

e. Reviewed other supporting documentation, such as Remediation Constructors, Inc.'s estimate detail, job cost reports, and certain invoices.

f. Re-quantified those claim items deemed necessary based upon the above review.

29. Detail concerning the quantification of each of the Remediation Constructors, Inc. breach of contract claim items is as follows:

a. A modified total cost approach has been used for the determination of the $925,819 excavation/grading claim. The costs claimed do not include any cost that

would be deemed extra costs incurred due to deficiencies in Remediation Constructors, Inc.'s performance. The additional costs incurred are a direct result of the failures of the National Park Service. Brent Booth, the estimating expert engaged by Remediation Constructors, Inc., determined that the Remediation Constructors, Inc. bid for this scope of work was accurate. Due to the nature of the changes and work scope, there is no other method to quantify the extra costs incurred by Remediation Constructors, Inc. A true and correct copy of the summary and supporting schedules of the Excavation claim and is attached hereto as Exhibit 18 and by this reference made a part hereof.

b. The determination of the amount due Remediation Constructors, Inc. for additional cost incurred relating to excavation/grading has been reduced by credit of $4,479 for the temporary access road. This credit was not included in previous determination of the amount due Remediation Constructors, Inc. A true and correct copy of Stephen Christensen's determination of the access road credit is attached hereto as Exhibit 19 and by this reference made a part hereof.

c. The excavation/grading claim has been reduced by $84,170 from the amount claimed as of August 30, 2005 to account for the payment by the Government to Great American Insurance Company for Modification #6, a modification approved unilaterally by the government. This credit was not included in previous claim determinations absent confirmation that Great American Insurance Company had received payment. A true and correct copy of Modification #6 is attached as Exhibit 20 and by this reference made a part hereof.

d. Remediation Constructors, Inc. reviewed the project documents, such as daily timesheets and project daily reports to determine the actual costs incurred pertaining to excavation/grading. For each day, it completed an Extra Work sheet detailing the manpower, equipment usage and material purchases relative to the excavation/grading scope of work. The information on the Extra Work sheet was carried forward to a Daily Extra Work Report Summary, where the cost was quantified. The

totals of each Daily Extra Work Report Summary were then input into a summary by day. The quantification of the costs was as follows:

i. Labor rates are the standard prevailing wage rates plus burden at 33%. The 33% burden rate is the rate agreed to between the government and Remediation Constructors, Inc. for changed work. The National Park Service prepared Pre Construction Meeting Notes dated June 18, 2001, a true and correct copy of which is attached hereto as Exhibit 21 and by this reference made part hereof, which state under item F on the eighth page: "Labor burden percentages will be established at the time the first modification is negotiated." Remediation Constructors, Inc. utilized a 33% burden for the first and all modifications approved by the government.

ii. Equipment costs are computed utilizing Corps of Engineer rates as of August 2001 times the actual usage according to timecards.

iii. Material and subcontractor costs are the actual invoiced cost. The material and subcontractor costs for this claim item includes $213,746.90 (including Remediation Constructors, Inc. gross profit markup) for work performed by California Drilling & Blasting paid by Great American Insurance Company. Though Remediation Constructors, Inc.'s surety made the payment to California Drilling & Blasting it was a Remediation Constructors, Inc obligation and continues to be under the indemnity agreement with the surety. The California Drilling & Blasting amount included in the claim of $213,746.90 pertains only to the extra work performed. The total amount paid to California Drilling & Blasting by Great American Insurance Company was $274,660.78. That amount includes $27,273.75 for leach field excavation and $65,319.82 for utility trench excavation that has been deducted to determine the extra work amount. A true and correct copy of the California Drilling & Blasting progress estimates for the leach field and utility trench work is attached hereto as Exhibit 22 and by this reference made a part hereof.

iv. Markup for overhead and profit at 17.4% is applied to all costs. Remediation Constructors, Inc. utilized a 17.4% markup for gross profit in their estimate for bidding the project.

e. Boulder Revetment is a discretely priced claim item totaling $47,004. The costs relative to Boulder Revetment were determined in the same manner as the excavation/grading claim. Stephen Christensen has estimated that half of the Boulder Revetment costs incurred are impact costs. A true a correct copy of the Boulder Revetment Direct Cost Summary is attached hereto as Exhibit 23 and by this reference made a part hereof.

f. Storm water pollution prevention protection ("SWPPP") operation is a discretely priced claim item totaling $90,192. The costs relative to SWPPP were determined in the same manner as the excavation/grading claim. A true a correct copy of the SWPPP Operations claim is attached hereto as Exhibit 24 and by this reference made a part hereof.

g. Remediation Constructors, Inc.'s claim of $262,606 for the government's failure to supply aggregate base is a discretely priced claim item. The amount claimed includes:

i. The actual cost of $94,710 for onsite rock crushing of 4,757 tons by Oasis Crushing.

ii. The cost for 5,426.50 tons of purchased material at the unit cost of $6.25 per ton.

iii. Sales tax on the purchased material at 7.875%.

iv. The cost to haul the purchased material at $18.25 per ton.

v. Markup for overhead and profit at 17.4%.

vi. A credit has been applied against the costs incurred as calculated above to account for the cost that Remediation Constructors, Inc. would have incurred to haul government supplied material to its intended location on the site.

A true and correct copy of the calculation of the damages for the aggregate base hauling credit is attached as Exhibit 25 and by this reference mart a part hereof.

A true and correct copy of the Failure to Supply Aggregate Base summary is attached hereto as Exhibit 26 and by this reference made a part hereof.

h. The amount Remediation Constructors, Inc. may have included in their estimate for aggregate base material is irrelevant to their claim for the government's failure to supply aggregate base. The claim is based on the contract providing for the government to supply the aggregate base material. The government's failure to do so entitles the contractor to the extra cost incurred.

i. The quantification of the re-grading aggregate base claim of $102,577 is based on a total cost methodology. Costs were determined in the same manner as the excavation/grading claim item. Budgeted costs are derived from Remediation Constructors, Inc.'s estimate. A true and correct copy of the Re-Grading Aggregate Base Summary is attached hereto as Exhibit 27 and by this reference made a part hereof.

j. The additional survey cost claim of $49,053 is the extra survey cost of $41,783 according to a May 2, 2003 letter from Giuliani & Kull, Inc. plus markup for overhead and profit at 17.4%. Though this cost has not been paid as yet, it is a payable obligation of Remediation Constuctors, Inc. A true and correct copy of the Giuliani & Kull, Inc. May 2, 2003 letter is attached hereto as Exhibit 28 and by this reference made a part hereof.

k. The extended field overhead claim amount of $454,287 is based upon a determination of the Remediation Constructors, Inc. daily field overhead cost, including markup for overhead and profit at 17.4%, multiplied by the number of delay days for each year determined by Pacific Construction Consulting, Inc., the scheduling experts retained by Remediation Constructors, Inc. The daily field overhead costs for 2001 and 2002 include the actual field overhead costs incurred according to the

Remediation Constructors, Inc. job cost data for each year from June 1 to November 30 divided by 183 days, the number of days from June 1 to November 30, a daily rate for the job trailer determined by dividing the purchase price of $7,500 by the anticipated 792-day project period, and a daily rate for pick up trucks based upon the Corps of Engineer hourly rate times eight hours. The extended field overhead claim only pertains to additional costs incurred between June 1 and November 30 of 2001 and 2002. A true and correct copy of the Extended Field Office Overhead determination is attached hereto as Exhibit 29 and by this reference made a part hereof.

l. Remediation Constructors, Inc.'s claim for extended home office overhead of $375,081 is based on a daily overhead rate of $1,011 per day times 371 days of delay determined by Pacific Construction Consulting, Inc. The daily rate has been determined by dividing the general and administrative expenses allocable to the project of $554,056 by 548 days, the number of days between June 1, 2001 and November 30, 2002. These amounts reflect changes to the general and administrative expenses allocation previously discussed. A true and correct copy of the Extended Home Office Overhead calculation is attached hereto as Exhibit 30 and by this reference made a part hereof.

m. Claimed equipment standby costs of $138,423 are based upon Corps of Engineers standby rates. The equipment standby represents the time Remediation Constructors, Inc. was idle due to the delays caused by the deficient plans and specifications and other project impacts. A true and correct copy of the Equipment Standby calculation is attached hereto as Exhibit 31 and by this reference made a part hereof.

n. The Remediation Constructors, Inc. claim includes $281,924 for improper credits applied by the government. These pertain to the underpayment of completed quantities or improper withholding of monies due Remediation Constructors,

Inc. A true and correct copy of the Improper Credit Summary is attached as Exhibit 32 and by this reference made a part hereof.

i. The Government has underpaid Remediation Constructors, Inc. $140,408 for work performed placing aggregate base. The claimed amount is the difference between the quantity (10,183.5 tons) determined by Remediation Constructors, Inc. and that approved by the Government (6,918.2 tons) times the contract unit price of $43.00 per ton. Remediation Constructors, Inc determination of the placed aggregate base quantity is based upon certified weight tickets. It should be noted that this claim item is not duplicative of the purchase aggregate base as this item pertains solely to the placement of the aggregate base, not its purchase. A true and correct copy of Payment Application No. 13 showing the quantity and amount approved by the Government is attached hereto as Exhibit 33 and by this reference made a part hereof.

ii. The Government has underpaid Remediation Constructors, Inc. $50,322 for work performed pertaining to Bid Item No. 71, Asphalt Concrete Pavement. The claimed amount is the difference between the quantity (4,016.87 tons) determined by Remediation Constructors, Inc. from certified weight tickets and that approved by the Government (3,533.00 tons) times the contract unit price of $104.00 per ton. See the copy of Payment Application No. 13 (Exhibit 33.)

iii. The Government has incorrectly credited the amount due Remediation Constructors, Inc. $39,560 for work performed on Bid Item No. 11, Dry-Laid Stone Wall. The Government approved a total of $150,535 for the Dry-Laid Stone Wall item in Payment Application No. 11 dated October 10, 2002. The Government subsequently reduced the approved amount by $39,560 to $110,975. See the copy of Payment Application No. 13 (Exhibit 33). A true correct copy of Payment Application No. 11 is attached hereto as Exhibit No. 34 and by this reference made a part hereof.

iv. The amount approved and paid by the Government to Remediation Constructors, Inc. for Boulder Revetment understates by $15,114 the actual

amount earned as determined by Remediation Constructors, Inc. The amount paid by the government does not reflect the actual work performed by Remediation Constructors, Inc. as agreed by the government's on-site representative.

v. The Government inappropriately reduced its payment to Remediation Constructor, Inc. for Bid Item No. 68, Concrete Drop Inlet – Type A. The Government's reduction of the previously approved amount (see Payment Applications No. 11 and No. 13 in Exhibits 34 and 33, respectively) by $2,000 is based on an estimate for raising two structural collars at $1,000 each.

vi. The Government has underpaid Remediation Constructors, Inc. $34,520 for work performed on Bid Item No. 45, Silt Protection. The Government approved and paid this amount in Payment Application No. 4 but subsequently rescinded its approval. See Payment Application No. 11 and No. 13 in Exhibits 34 and 33, respectively.

30. The Sherman Tree Parking project had a severe financial impact on Remediation Constructors, Inc.'s financial position. Through November 30, 2002 Remediation Constructors, Inc. had recognized a loss of $(1,289,962) on the Sherman Tree Parking project. This loss does not include all the costs incurred on the project. According to the Remediation Constructors, Inc. internally prepared financial statements, the company had a profit of $519,185 for the period June 1, 2001 to November 30, 2002, despite the loss incurred on the Sherman Tree Parking project. Excluding the Sherman Tree Parking project, Remcon would have earned a net profit of $1,809,147 for the period June 1, 2001 to November 30, 2002. See Exhibit 3.

31. My analysis of the profit earned by Remediation Constructors, Inc. from June 1, 2001 to November 30, 2002 shows the aggregate profit or loss with and without the Sherman Tree Parking project. I did not look at the specific profit or loss of other jobs nor is such a review relevant to my analysis. My analysis shows the global profit

Remediation Constructors, Inc. would have earned but for the Sherman Tree Parking project.

32. The loss incurred by Remediation Constructors, Inc on the Sherman Tree Parking project severely impacted its cash flow. The Government's failure to pay Remediation Constructors, Inc. for the extra costs incurred due to the deficient plans and specifications and other failures of the Government left the company in a position that it could not meet its obligations, despite the substantial profits earned on other jobs. This was heightened by the Government's reduction in progress payments in the Fall of 2002.

33. The issue concerning Remediation Constructors, Inc.'s bank, Bank of America, canceling the line of credit note payable and receiving a judgment against Remediation Constructors, Inc. is irrelevant to my analysis. Repayment of the line of credit does not impact the income statement. It is a balance sheet item.

34. The analysis prepared by Henry Rinder and John O. Snowden, as expressed in their report dated July 28, 2005, contains various flaws. My critique of the Rinder/Snowden analysis is stated from page 1 to page 8 of my Rebuttal and Supplemental Expert Report dated August 30, 2005 (Exhibit 6.)

I declare, under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct. Executed this 13th day of October 2005 at Bellevue, Washington.

JORDAN ROSENFELD