IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| REMEDIATION CONSTRUCTORS, INC., | ) | DOCKET NO. 03-2478C |
| Plaintiff, | ) | **DECLARATION OF DOUG HEACOCK IN LIEU OF LIVE TESTIMONY** |
| v. | ) | (Judge Susan G. Braden) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | Trial Date: October 24, 2005 |

I, DOUG HEACOCK, declare:

1. I am a Project Manager for Sage Associates, Inc. ("Sage"). I have personal knowledge of the following and if called to testify could and would competently testify thereto.

2. I have worked with Sage for the past five years. I initially worked with Sage, on a contract basis, and have been employed full-time with Sage since 2003. With Sage, I provide consulting and expert services to the construction, insurance, legal, and surety industries.

3. With respect to our primary role on the matter in this litigation, our services have been, primarily, to act as an effective and efficient administrator and manager of the General Sherman Tree project on behalf of Great American Insurance Company ("GAIC"), as a liaison between GAIC and the completion contractor, to enable the responsibilities of the surety to be fulfilled, and to coordinate efforts to minimize

costs, promote completion of the project, and to ensure that all costs properly incurred are paid.

4. Prior to working with Sage, I was involved in the construction industry for fifteen years, including managing and estimating for new construction and high-end renovation projects. I managed and/or supervised all aspects of construction from preliminary design through project completion. Attached hereto as Exhibit A and by this reference made a part hereof is a true and correct copy of my CV.

5. With respect to Remediation Constructors, Inc. ("Remcon") and the project involving the Sequoia-Kings Canyon General Sherman Road and Trail, Sage was retained in 2003 to assist GAIC, Remcon's surety, in investigating the merits of and addressing issues relating to, Miller Act payment bond claims by subcontractors and suppliers of Remcon concerning the National Park Service ("NPS") project in the Sequoia Kings Canyon Park. While I was not personally involved to a significant extent, I am aware that Sage worked with GAIC to evaluate the payment bond claims, and recommended that these claimants be paid, and we monitored and coordinated payment and resolution of each of the bond claims.

6. After Remcon was terminated from the project, I handled the solicitation of completion contractors for the completion of the Upper and Lower Sherman portions of the project.

7. Beginning in late September 2003 I solicited referrals for contractors competent to handle the completion of the Upper Sherman completion work. The Upper Sherman portion of the project had been started by Remcon, but was incomplete. On or about September 30, 2003 I met with representatives of the NPS and Agee Construction Company ("Agee") to walk the project and assess the scope of work to be performed on Upper Sherman, including the NPS' claims regarding non-conforming work by Remcon. I worked with GAIC and its legal counsel to negotiate a completion contract with Agee the Upper Sherman portion of the project. Agee's contract for the Upper Sherman

portion was a cost plus a fee with a not to exceed sum of $2,000,000 (which excluded costs to correct and/or repair allegedly non-conforming work).

8. In addition to the Upper Sherman portion of the project, we solicited bids on December 31, 2003 for completion of the Lower Sherman work through the use of a Solicitation of Offers packet. A true and correct copy of our Solicitation of Offers packet is attached as Exhibit B to this declaration, and by reference made a part hereof. To assist the bidders, we arranged for a December 17, 2003 pre-bid site visit with representatives of GAIC and the NPS to allow the prospective bidders to inspect the work areas and ask questions. The solicitation was based on the original contract documents and any known change orders, addenda, plans, and/or specifications. This information was obtained from the NPS. Bids were received on January 30, 2004.

9. Agee submitted the only qualified bid for the Lower Sherman work, and was selected as the completion contractor. Agee agreed to complete the Lower Sherman work for the sum of $3,163,051.15. We evaluated Agee's bid, discussed the scope of work with Agee, and determined that Agee was qualified to perform the work, and that Agee's bid price was the best possible price we could achieve on behalf of GAIC. We recommended that GAIC contract with Agee for the Lower Sherman contract.

10. Prior to Agee beginning work on the project, I familiarized myself with the project by reviewing plans and specifications, and visiting the site. I also reviewed the takeover agreement between GAIC and the NPS, and fully understood Agee's scope of work for the project.

11. I have been involved in monitoring Agee's work on the Upper and Lower Sherman portions of the project. At the time Agee mobilized to the project, the incomplete portions of the upper area had experienced damage from the weather and the fact that it had gone through two winters (2002-2003 and 2003-2004) before Agee would access the site. Because no physical work was performed by Remcon in 2003, additional costs were anticipated to be incurred to address the consequences of the passage of time.

12. Agee, and its project manager, Chris Hickey, have, in my opinion, excelled in performing the completion work and in communicating to both advance the project and allow me to understand the costs and issues incurred and encountered. I worked closely with Agee and the NPS to get the project started, and for Agee to mobilize to the site in May 2004.

13. In managing the project for GAIC, I have provided periodic reports to GAIC, have been GAIC's "eyes and ears" on the ground, acted as the conduit and liaison for both the NPS and Agee, kept GAIC informed, promoted the swift completion of the project, and facilitated action, or at least tried to do so, by the NPS. I have either personally attended or participated via telephone at the weekly construction meetings, and have worked with Agee and the NPS to get the project completed as fast as possible and at the lowest price possible.

14. I have also reviewed and evaluated all monthly project pay applications from Agee to GAIC and to the NPS. This review includes evaluating and verifying quantities. I have provided recommendations to GAIC regarding payments to be made to Agee.

15. With respect to issues arising on the project since 2004, I have reviewed correspondence, and been updated on the status of the project by Agee and the NPS. I have periodically visited the project to meet with Agee and to review progress of the construction, and have worked with Agee to mitigate issues with GAIC regarding GAIC's bond exposure. My goal has consistently been to promote the best construction practices by Agee at the most reasonable cost to GAIC and the NPS. I have been involved with Agee's construction work on the project from the time it first mobilized through the date this declaration is signed.

16. Prior to starting work on the project, Agee submitted to Sage and GAIC a schedule which demonstrated that Agee could finish the project by the first week in November 2004. During my involvement on this project, I have observed poor project

management from NPS field representatives, inconsistent NPS project management due to high personnel turnover, tardy responses by the NPS to issues raised by Agee (i.e. change orders, RFIs, design clarifications), and directions given by NPS field representatives to Agee have later been overturned or disregarded by NPS personnel from the Denver Service Center. Agee has not been provided clear and timely direction on how to proceed by the NPS, and the NPS was a factor in preventing Agee from completing the project in 2004. Agee is now scheduled to complete the project by the first week of November, 2005.

17. In addition, the NPS has repeatedly deferred addressing time extensions on the project. This failure to address time issues has just recently become a more contentious matter. This is because the NPS, without prior notice, and without explanation (either orally or in writing), has unilaterally withheld approximately $400,000 from the most recent progress payment. Although I have requested an explanation of the basis for the withheld funds, to date, the NPS has refused to provide a response.

18. We have been advised that the withholding is due to an assertion of liquidated damages by the NPS. If this is true, the failure of the NPS to issue or address time extensions claimed by Agee renders this conduct unreasonable.

19. Sage bills GAIC on a monthly basis for its work. Attached hereto as Exhibit C and by this reference made a part hereof is a true and correct copy of a spreadsheet containing the billings and payments received from GAIC, for Sage's work on the project. Sage has billed GAIC a total of $117,656.30 for its work relating to the project, and has received total payments of $107,018.46 from GAIC. All of the costs incurred by Sage are supported by invoices and claim documents, and payments have been made by check from GAIC. I am personally aware of the business practices of Sage and specifically its accounting department in billing for work performed, and for amounts

received, and I affirm that all of the costs represented as having been incurred actually have been incurred.

I declare, under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed this 12TH day of October, 2005 at RICHMOND, California

DOUG HEACOCK