IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REMEDIATION CONSTRUCTORS, INC., Plaintiff, | DOCKET NO. 03-2478C |
| v. | **DECLARATION OF RANDY WILKINSKY IN LIEU OF LIVE TESTIMONY** |
| UNITED STATES OF AMERICA, Defendant. | (Judge Susan G. Braden) |
| | Trial Date: October 24, 2005 |

I, RANDY WILKINSKY, declare:

1. I am a Divisional Assistant Vice President with Great American Insurance Company ("GAIC"). I have personal knowledge of the following and if called to testify could and would competently testify thereto. I have a Bachelor of Science degree in Business Administration from Towson University in Baltimore which was conferred in 1978.

2. I have been employed continuously in the surety industry since July, 1988. My initial position was with United States Fidelity and Guaranty Company ("USF+G") and in October, 1994 I left USF+G and commenced my employment with GAIC. My duties and responsibilities concern handling contract surety claims relating to bonds issued by GAIC. My territory is national in scope and I address bond claims on both public and private projects, whether local, state of federal in nature. I generally do not have responsibilities concerning underwriting or evaluating clients with respect to whether a surety relationship shall be formed with GAIC or the extent of the amount of

bonding capacity that may be extended to our clients. My primary duties concern addressing and handling issues that arise when claims against bonds issued by GAIC are asserted.

3. With respect to Remediation Constructors, Inc. ("Remcon"), Mick Flak, who was based in Denver, Colorado, was initially assigned the responsibility by GAIC to investigate the merits of claims relating to the Miller Act payment bond concerning the National Park Service ("NPS") project in the Sequoia Kings Canyon Park. Mr. Flak was a Bond Claims Specialist who was assigned to monitor projects and principals and bonds that we had received claims against.

4. Beginning in the latter half of 2002, I was assigned to supervise Mr. Flak. At that time, consistent with my standard practice, I received and reviewed several documents to both educate myself and permit me to evaluate the claims on the Remcon bonds. These documents included our underwriting file that contained the general indemnity agreement with Remcon and its indemnitors (which is the core document upon which the bond was issued), the bond itself (to review the terms), and the claims asserted for amount and content. I did not have any responsibility concerning underwriting or evaluating Remcon with respect to whether a surety relationship should be formed with GAIC or the amount of bonding capacity that should be extended to Remcon.

5. At the time the payment bond claims were brought to my attention, our standard practice was, and remains, to promptly collect the relevant information available from the claimants and our principal so that we can evaluate the merits of the claims, the asserted defenses and make an informed decision as to what our responsibilities are. Mr. Flak conducted the investigation under my supervision and reported to me during this process. Our investigation disclosed that there were several payment bond claimants from this project who were not paid by Remcon and Remcon affirmed that they had not been paid.

6. Following GAIC's investigation of the claims, which occurred over several months, I was fully advised and then made decisions to negotiate and pay several of the payment bond claimants and work with our principal to address issues relating to the NPS and the overall project. I was personally involved in all of the major decisions undertaken by GAIC with respect to the bond claims, the takeover agreement with the NPS, and the completion contract with the contractor, and have been involved in an oversight role concerning all disbursements made by GAIC for which reimbursement is claimed against Remcon, its indemnitors, and against the NPS.

7. On this project and with this principal, Remcon (specifically Steve Christensen, the President of Remcon), was candid about the problems he said he was experiencing with the NPS and its failure to properly, and promptly, pay Remcon for contract and extra work.

8. During our investigation, Mr. Christensen advised us of multiple claims asserted by Remcon for both time extensions and money that had not been addressed by the NPS, the NPS' unilateral reduction in progress payments and the late issuance of progress payments. At the end of 2002, or early in 2003, Mr. Christensen informed GAIC that absent resolution of its claims with the NPS, he lacked the financial ability to continue to perform on the project.

9. Based upon the payment bond claims received by GAIC, Mick Flak wrote a letter to the NPS directing it not to make further payments to Remcon without the consent of GAIC. A true and correct copy of our March 4, 2003 letter to the NPS is attached hereto as Exhibit A and by this reference made a part hereof.

10. During our investigatory period I also elected to retain counsel in California to advise GAIC, and a consultant to investigate the claims Remcon was making against the NPS, and to assist GAIC in evaluating the termination of Remcon from the project. These entities, Wickwire Gavin LLP, and Sage Consulting, respectively, have been actively involved in monitoring the project and working with GAIC and NPS

to draft and enter into a takeover agreement pursuant to our performance bond, finding a completion contractor, monitoring the completion effort, administering the completion effort, and monitoring the Remcon litigation. Both Wickwire Gavin and Sage remain intimately involved in this matter.

11. As 2003 progressed, we became aware of the deteriorating situation between the NPS and Remcon. Our investigation preliminarily disclosed that Remcon had asserted claims against the NPS, but it was not our role to intercede.

12. In late June 2003 Remcon submitted a certified claim to the NPS which sought damages in excess of $3 million. Remcon provided a copy of the claim to GAIC. In August 2003 GAIC was notified that the NPS terminated Remcon's right to further proceed with the project. Subsequently, the NPS made a demand on GAIC to honor its obligations under the performance bond.

13. Through the assistance of the Sage and Wickwire firms, GAIC entered into a Takeover Agreement with the NPS. A true and correct copy of the takeover agreement entered into between GAIC and the NPS is attached hereto as Exhibit B and by this reference made a part hereof. One of the terms of the agreement is set forth in paragraph 14, on page seven, wherein GAIC expressly reserves its rights to challenge the propriety of the NPS' default termination of Remcon.

14. In furtherance of the Takeover Agreement, I directed Sage to solicit proposals and bids from qualified completion contractors. At the end of the 2002 construction season, Remcon was incomplete with the upper portion of the project and had not transitioned to the lower portion. The incomplete portions of the upper area had experienced damage from the weather and the fact that it had and would go through two winters (2002-2003 and 2003-2004) before our completion contractor would access the site. Because no physical work was performed by Remcon in 2003, additional costs would be incurred to address the remedial work required at the project. While Remcon has always maintained that it was relieved of the burden to incur these costs due to prior

breaches of contract by the NPS, the NPS compelled GAIC to complete the project and thus part of the costs incurred by GAIC, in addition to finishing the portions of the project not yet performed, was for additional costs associated with repair work caused by erosion, the effects of winters and simply being exposed to the elements for 18 or more months. These additional costs have, as detailed below, been actually incurred by GAIC, have not been reimbursed by the NPS, are part of GAIC's claim against Remcon, pursuant to the indemnity agreement between Remcon and GAIC, and are part of Remcon's claim against the NPS as part of Remcon's termination for convenience and breach of contract damages. A true and correct copy of the indemnity agreement between GAIC and Remcon is attached hereto as Exhibit C and by this reference made a part hereof.

15. GAIC has partially perfected its claim for indemnity against Remcon and its indemnitors pursuant to a settlement agreement. GAIC has agreed to await the resolution of this legal action before taking further action against Remcon and its indemnitors.

16. As I understand Remcon's claims against the NPS, Remcon contends that the NPS' termination for default was improper, and that if a determination is made by the court that the NPS' termination was improper, this will convert the termination for default into a termination for convenience, which will permit Remcon to recover from the NPS (and thus reimburse GAIC) for the reasonable and proper costs incurred by GAIC, through paying Sage, Wickwire and the completion contractor for completing the project, and allowable expenses under applicable law.

17. In furtherance of the Takeover Agreement, GAIC sought, through Sage, completion contractors for the project. Only one proposal from a qualified entity, Agee Construction from Fresno ("Agee"), was received.

18. Following the receipt of Agee's proposal, discussions with Sage and Agee, and analysis of the proposal, GAIC entered into a completion contract with Agee. A true

and correct copy of the written completion contract between Agee and GAIC is attached hereto as Exhibit D and by this reference made a part hereof. The amount of the contract was as follows: given the inability to precisely determine the value of the work remaining to be performed in the Upper Sherman locale, coupled with the unknown value of the work requiring to be addressed and corrected that was already performed, the agreement provided that the Upper Sherman would be performed on a cost of the work plus a stipulated fee basis with a guaranteed maximum price of $2,000,000, excluding repair of non-conforming work. This time and materials contract was the only reasonable way to get a completion contractor to perform. Based on the investigation performed and advice received I authorized the Upper Sherman contract with Agee.

19. Further, as to the Lower Sherman work, after a bid/solicitation process administered by Sage, GAIC and Agee entered into a lump sum fixed price contract. The price to be paid for the Lower Sherman work is $3,163,051.15. Based on my involvement with the project, the negotiations with Agee, and the advice I received, it is my opinion that this was the most cost effective way to proceed. I therefore authorized the Lower Sherman contract with Agee.

20. Commencing when the weather permitted in the late spring of 2004, the completion contract proceeded. I am informed and believe that the work is almost completed and that it is scheduled, subject to the conduct of the NPS, to be completed on or before November 1, 2005.

21. Sage's role in managing the project on behalf of GAIC included providing periodic reports to me and GAIC, being GAIC's "eyes and ears" on the ground, acting as GAIC's conduit and liaison with both the NPS and Agee, to keep GAIC informed and promote the swift completion of the project, and to facilitate action rather than inaction on the project. Sage has performed very well on behalf of GAIC, has been mindful to keep costs down as much as possible, and their attendance and participation at the weekly

construction meetings has been an asset fulfilling GAIC's duty to get the project done as fast as possible and at the lowest price possible.

22. Sage has administered the project for GAIC, since retained, through the same people from the beginning: Rick Tasker, a principal, and Doug Heacock, who has been involved day to day. This continuity of administration has enabled us to keep the costs down.

23. On the legal side, GAIC hired Wickwire to assist Sage on the project and to monitor the litigation with the NPS. Concurrently, GAIC hired the law firm of Nielson, Haley & Abbott to pursue Remcon and the indemnitors under the indemnity agreement. I have given strict instructions to our counsel to do what is necessary and to be mindful of the costs and fees in doing so. I have personally received all of the invoices for legal fees and costs generated on the Remcon matter, and have also reviewed the invoices from Sage, and personally approved them for payment.

24. Concurrent with all of the completion contractor matters I also had Sage assist with some of the payment bond claims and negotiate with Remcon's subcontractors to obtain ratification agreements.

25. Attached hereto as Exhibit E and by this reference made a part hereof is a true and correct copy of the financial spreadsheet containing all income received from the NPS as of September 2005 for the completion of the project. The total as of September 2005 is $2,267,138.87. Also included on this spreadsheet, by categories, are all of the costs incurred by GAIC, by date, to each of the entities and individuals we have paid money to. This includes all of the payment bond claimants (the total paid is $1,193,548.75), the amount to Agee under the completion contract ($4,130,987.28) and the amount to Sage, our law firms and other miscellaneous payees listed on the spreadsheet ($503,271.00).

The total amount GAIC expended on the performance and payment bonds for this project, as of September 2005, is $5,827,807.03. The total received from the NPS during

the same time period is $2,267,138.87. As of September 2005, GAIC is out of pocket the total amount of $3,560,668.16. This amount will increase until the project is complete. All of the costs incurred have been approved for payment by me personally, are supported by invoices and claim documents, and were actually incurred through the issuance of a check or a wire transfer of funds. I am personally aware of the business practices of GAIC and specifically its accounting department in paying amounts due and I affirm that all of the costs represented as having been incurred actually have been incurred.

Attached hereto as Exhibit F, and by this reference made a part hereof, is a list of project records and documents which support and evidence the costs incurred by GAIC as identified in Exhibit E to this declaration. Generally, the documents referenced in Ex. F include invoices, pay applications, checks, correspondence, drafts, time cards, extra work sheets, and other documents. These documents have been produced to, and made available to, the NPS and Remcon during discovery in this litigation, and documents referencing billings and payments in the past few months will be produced. Because of the voluminous nature of these records, they are not physically attached hereto, but will be produced at the time of trial.

26. In 2004, after the effort to negotiate a takeover agreement and find a completion contractor was completed, we turned our attention to evaluating the merits of the Remcon claims. We retained Tom Lloyd of PCCI, and Sage Consulting, to undertake a preliminary review of entitlement. I am informed and believe that the conclusion reached was that the claims were perceived to have merit.

27. All of the excess costs incurred by GAIC, which are not offset by payments from the NPS, are sought by GAIC against Remcon and its indemnitors. GAIC has an outstanding claim against Remcon and its indemnitors and has not waived its right to recover these overruns in costs exists.

28. In September 2005 the NPS withheld approximately $400,000 from the most recent progress payment made to GAIC. GAIC did not receive prior notice that any amounts would be withheld from the progress payment. I have written to the NPS to ascertain the basis for the amounts withheld but have not received a response.

I declare, under penalty of perjury under the laws of the State of Ohio and the United States of America that the foregoing is true and correct. Executed this 12 day of October, 2005 at Cincinnati, Ohio

RANDY WILKINSKY